```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                            Docket #22cv2435
FREEMAN,                              :

                  Plaintiff,          :

   - against -                        :

DEEBS-ELKENANEY, et al.,              :  New York, New York
                                         September 15, 2022
                  Defendants.         :

------------------------------------ :

                      PROCEEDINGS BEFORE
                 THE HONORABLE SARAH NETBURN,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:           CSREEDER, PC
                          BY:  MARK PASSIN, ESQ.
                          11766 Wilshire Boulevard, Suite 1470
                          Los Angeles, California 90025

                          REITLER KAILAS & ROSENBLATT LLP
                          BY:  BRETT VAN BENTHYSEN, ESQ.
                          885 Third Avenue, 20th Floor
                          New York, New York 10022

For Prospect Agency       KLARIS LAW, PLLC
and Kim :                 BY:  LANCE KOONCE, ESQ.
                               ZACHARY PRESS, ESQ.
                          29 Little West 12th Street
                          New York, New York 10010




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES CONTINUED:

For Deebs-Elkenaney,          COWEN, DEBAETS, ABRAHAMS & SHEPPARD
Entangled Publishing,         BY:  BENJAMIN HALPERIN, ESQ.
Other Publishers and               CECE COLE, ESQ.
Universal:                    41 Madison Avenue, 38th floor
                              New York, New York 10010

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    4

 2          THE COURT:  -- everybody, this is Judge Netburn.

 3  This case is Freeman v. Deebs-Elkenaney, et al.  The

 4  docket number is 22cv2435.  Can I ask counsel for the

 5  plaintiff to state their appearance.

 6          MR. MARK PASSIN:  Good afternoon, Your Honor,

 7  Mark Passin.  I thank the Court for accommodating my

 8  request to attend by telephone.

 9          THE COURT:  Welcome.

10          MR. BRETT VAN BENTHYSEN:  Brett Van Bentyhsen

11  from Reitler Kailas & Rosenblatt as local counsel for

12  plaintiff is also on.  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon.  And on behalf of

14  Prospect Agency and defendant Kim.

15          MR. LANCE KOONCE:  Good afternoon, Your Honor,

16  Lance Koonce with Klaris Law, and I believe on the phone

17  with me is Zach Press from Klaris Law as well.

18          THE COURT:  Thank you.  And on behalf of Deebs-

19  Elkenaney and Entangled Publishing and other publishers

20  and Universal.

21          MR. BENJAMIN HALPERIN:  Good afternoon, Your

22  Honor, this is Benjamin Halperin of the law firm Cowan

23  Benjamin Samuel Halperin  Cowen, DeBaets.  Als with me is

24  CeCe Cole from the same firm.

25          THE COURT:  Thank you.  I hope everybody on the
```

1                           PROCEEDINGS                    5

2  call is healthy and safe.  I did want to conduct this

3  proceeding in person for two reasons.  One, I think it's

4  going to be a longish call, and I tend to prefer that

5  longer calls go in person.  And, secondly, because I am

6  concerned that the parties are not engaging in effective

7  meet and confers and that maybe the emailing back and

8  forth with a few phone calls is preventing the parties

9  from working through problems on their own.  I feel that

10 doubly having read the submissions from the defendants

11 that sound like some of the disputes that were raised by

12 the plaintiff have, in fact, been addressed.  So I've

13 identified what I think are the issues for today.  It

14 seems like they overlap a fair amount between defendants.

15 So why don't we see if we can clip through them and

16 address those that remain outstanding.

17         And if I can, I'm recording today's conference.

18 Can I ask two things:  one, that everybody mute their

19 line unless they're speaking and, two, that you state

20 your name each and every time you speak.  If we do have a

21 court reporter transcribe the recording, that they know

22 who to attribute statements.

23         All right, first base, I understand that all

24 defendants have produced or agreed to produce documents

25 up until what people are calling the notice dates which I

```
 1                         PROCEEDINGS              6

 2  believe is February 2 of 2002 and that they've agreed to

 3  produce further documents later in time that relate to

 4  financial records.  That seems like a reasonable approach

 5  to take.  I'm happy to hear from plaintiff as to why that

 6  approach is not appropriate.

 7              MR. PASSIN:  Mark Passin on behalf of

 8  plaintiffs, Your Honor.  You know, there could be other

 9  documents.  For example, the defendants themselves may

10  have communicated and it may not be protected by a joint

11  defense privilege depending on what they say.  For

12  example, they said, you know, we should destroy all

13  documents, I obviously would be entitled to that.  Okay.

14  So I just think not all the communications necessary

15  would be privileged.

16              THE COURT:  Okay, I think that that's probably

17  true.  A theme of today's conference is that all parties

18  are going to try this case without having seen every

19  possible document that they would want to see.  That's

20  just the nature of litigation.  And so the possibility

21  that you might find a communication that says something

22  as nefarious as we should destroy all of our documents

23  presumably is earlier documents would include the

24  exchange of those documents that are then directed to be

25  destroyed.  So I'm not sure the hypothetical that there's
```

```
 1                       PROCEEDINGS                    7
 2   some guilty statement made would justify expanding the
 3   scope of discovery beyond the date of both the notice of
 4   the claims but also the publication of the last published
 5   book.
 6            MR. PASSIN:   Okay, Your Honor.  That's fine,
 7   Your Honor.
 8            THE COURT:   All right, so the dates for the
 9   searches, unless otherwise directed either by the Court
10   or by an appropriate discovery demand, will be up until
11   the date of notice which, again, I believe it's some time
12   in February of 2022, except for financial records which
13   can be produced later in time.
14            All right, with respect to the search terms, my
15   read on the letter from Mr. Koonce is that they agreed to
16   run searches for all of the terms that were proposed.
17   They examined that hit report, they de-duplicated, they
18   got rid of privilege, etc., and they produced I think
19   23,000 pages' worth of documents.  I know that with
20   respect to the Deebs-Elkenaney plaintiffs, defendants, it
21   appears that the production was only made yesterday.
22            So I assume Mr. Passin hasn't had an opportunity
23   to review those records yet, but at least with respect to
24   the searches that, again, I understand were done based on
25   the terms that plaintiff's counsel provided, what, Mr.
```

1                          PROCEEDINGS                    8

2    Passin, are the objections now with respect to search

3    terms?

4            MR. PASSIN:   Well, I just – look, first of all,

5    I'm an older lawyer, I just have to say so.  Search

6    terms, you know, is a new thing.  But the fact of the

7    matter is that I just, my client and I both felt search

8    terms wouldn't pick up everything we need.  For example,

9    again, we're concerned that Ms. Kim and Ms. Wolf

10   exchanged graphs of my client's manuscript or large

11   excerpts and we just can't include every word in all

12   those drafts to make sure we catch them all.

13           Moreover, the search terms do not, you know, I

14   had that exhibit C which listed a whole bunch of

15   requests, and I don't think the search terms cover any of

16   those document requests, and I think those need to be

17   pulled, certainly if they're not all going to be pulled

18   by hand, those certainly need to be pulled by hand.

19           THE COURT:   Well, let's talk about electronic

20   documents because, you know, I understand that these

21   custodians have hundreds of thousands of documents,

22   email, etc., and so it's not practicable that the parties

23   could open each one and search them.  So that is not a

24   practice that is conducted.  And for what it's worth, I

25   think many people view the use of assistive technology

1                          PROCEEDINGS                    9

2   like using search terms or even more advanced

3   technologies as better than the sleepy eyed young

4   associate who has to plow through volumes and volumes of

5   documents and may miss something.

6           So search terms I think have a real advantage

7   both because you can rapidly go through a very large

8   volume of records and because no matter how tired you

9   are, your computer will find the word that you're

10  searching for.  So I'm not going to direct that the

11  defendants abandon the benefits of using technology here.

12          My understanding is that you proposed a

13  significant number of terms and Boolean searches and that

14  the defendants at least with respect to the Kim and

15  Prospect defendants did run those terms as you requested,

16  obtained a very large volume of records, I think it was

17  something like 440,000 documents were collected based on

18  those terms.  That was then reduced for privilege reasons

19  and relevancy, which ultimately resulted in the

20  production of 23,000 documents.  So you have a

21  significant volume of documents.  Is there a reason that

22  you think the search terms that you proposed are not

23  turning up the types of documents that you think it

24  should be?

25          MR. PASSIN:  Well, first of all, Your Honor,

```
 1                        PROCEEDINGS                  10
```

 2  they didn't run all the search terms that I suggested,

 3  and the only reason I gave them any search terms is

 4  because otherwise we weren't going to get anywhere.  I

 5  reserved by rights, I said just get me some, get me

 6  documents, search terms I'd like to add.  They limited

 7  the number that I could give them.  And, secondly, I

 8  don't think it was 400,000 after they ran my search

 9  terms.  I think it was 400,000 when they just called the

10  raw documents.  All right.  And, again, I don't think any

11  of the search terms will gather the requests that are set

12  forth in exhibit C.

13          THE COURT:   All right, why don't I ask Mr.

14  Koonce to tell me the process as it played out on his end

15  with respect to searches.

16          MR. KOONCE:   Thank you, Your Honor.  When we

17  were first, you know, when we first spoke to plaintiff

18  about producing documents and then received their written

19  requests, we, you know, we tried to figure out what the

20  volume would be and how to essentially on our end prove a

21  negative, which is that there were no communications like

22  the ones that plaintiff is speculating about.  We know

23  that to be a fact.  We talked to our client at length

24  about this.  So this, you know, and in normal copyright

25  cases this issue of access really comes very secondary to

```
1                        PROCEEDINGS                    11
```

2   the issue of substantial similarity.

3          But knowing that this is the scenario that

4   plaintiff has alleged here that there were these

5   surreptitious emails, what we tried to do is come up with

6   a strategy that would hopefully be acceptable to

7   plaintiff to sort of alleviate the concern that things

8   were, you know, were hidden or missing.  So rather than

9   do searches initially to sort of narrow the scope of what

10  we pulled, we pulled every single email from Ms. Kim and

11  her primary email account.  She's the owner and the

12  primary agent.  And we've now pulled as well the other

13  two custodians at Prospect who worked either with

14  plaintiff, Ms. Freeman, during the few years she was

15  working with the agency back in the early 2010/2014

16  timeframe and the agency worked, and assistants who

17  worked with Ms. Wolf, the defendant here who authored the

18  Crave series.  So we pulled everything.

19          And then we went to plaintiff's counsel and

20  proposed search terms that would find any communications

21  from Prospect or to Prospect that mentioned the name of

22  the manuscripts that Ms. Freeman wrote, her name, her

23  email addresses, anything we could think of that would

24  identify an email that might attach or discuss those

25  works or her that might have been sent to Ms. Wolf or to

```
 1                        PROCEEDINGS                    12
```

 2  Entangled although we know that from speaking to our

 3  clients we know that didn't happen.  But we wanted to be

 4  able to prove that negative.

 5          And then the hard part was, well, because

 6  plaintiffs speculate that they might have sent excerpts

 7  or pieces or something like that, how do you get at that

 8  those?  So we proposed a series of search terms tied to

 9  the parties and to Tracey Wolf (indiscernible) to Liz

10  Pelletier to Entangled, and then some tied to the names

11  of the books.  And we proposed a pretty large set of

12  terms of to Mr. Passin.  He came back and then proposed,

13  you know, hundreds of terms.  We ended up with something

14  well north of a hundred terms that we actually ran, and

15  the original documents we pulled were over 300,000

16  documents, close to 400, and then when we went through

17  and we did the search terms, we ended up with, out of Ms.

18  Kim's email accounts, over 23,000 and now we've produced

19  another, I can't remember if it's 3,000 or 4,000 from the

20  other agents.  And we still have a few more repositories,

21  much smaller, to go through.  But that's the process we

22  had followed.

23          And all along I have said to Mr. Passin that

24  many of the terms that we were using that he insisted on,

25  like single words, two word phrases, that really wouldn't

```
 1                          PROCEEDINGS                    13
 2   get at what he was looking for.  It was going to be
 3   overbroad, things like win-win, my eyes snap open, trust
 4   no one, that, you know, you're dealing with a literary
 5   agency that works in this particular genre, and as a
 6   result we did, a lot of those 23,000 documents are
 7   completely irrelevant documents that relate to other
 8   books and other authors.  But to be thorough, that what
 9   we did, that's what he insisted on.
10         I think if we had gone to searching for, you
11   know, a sentence of ten words, you would've seen that
12   knocked way, way down just by the way search terms work
13   and I think to basically nothing.  But we did it this way
14   because that's what they insisted on, and we were trying
15   to be transparent.
16         THE COURT:  So in light of that, Mr. Passin,
17   what do you think, short of requiring that they go
18   through every single document by hand which I will not
19   require them to do, what more do you think needs to be
20   done?  Where are the inadequacies?  Alternatively,
21   (indiscernible) you should say to me would be that based
22   on the production to date you've received documents that
23   lead you to believe that there would be other documents.
24   So not just your rank speculation that these documents
25   should exist but that some of the produced documents
```

1                              PROCEEDINGS                    14

2   illustrate that there's a basis to believe there are

3   other documents that haven't been produced.

4          MR. PASSIN:   Well, first of all, I just want to

5   point out that I did ask Mr. Koonce to run a search of

6   how many documents there were between Ms. Kim and Ms.

7   Wolf so we could see, you know, if that was unmanageable,

8   and he wouldn't do that.  So I don't know – I would like

9   that done so I know how many documents those are.  Okay.

10         And, secondly, again, I go back to the ones in

11  exhibit C which will not come up in the search, and I

12  don't know if, he said some stuff he would do manually,

13  some stuff he wouldn't.  He never told me exactly what he

14  would.  If he's not going to pull all those, then I guess

15  we have to do more search terms.  And then I suppose he

16  took out some of my search terms.  I'd have to go back

17  and look at those and see if we wouldn't think they

18  should be added.

19         THE COURT:   Well, I think you need to do better

20  than just we want more.  Is there, you know, is there a

21  basis, for instance, can you explain to me with some

22  specificity why a particular term that was not run you

23  believe would uniquely capture what you're looking for

24  that might not otherwise have been captured?

25         MR. PASSIN:   Well, because we think it was

1

2    copies and, therefore, if it comes up in one of their

3    documents, the evidence (indiscernible) that it was

4    copied.

5             THE COURT:   I'm not sure I follow you.

6             MR. PASSIN:   Well, it's one of the infringed

7    words.

8             THE COURT:   Sorry --

9             (interposing)

10            THE COURT:   Can you repeat your response to me?

11            MR. PASSIN:   It was - you know, we gave them -

12   I have to go back and look and see what he didn't give us

13   and what we took out at the last minute, and I believe

14   some of them were words that were infringed.  And so

15   obviously if those words came, were hit, that would be

16   evidence to us to look further to see if there are more

17   infringing words.

18            THE COURT:   Right.  I mean, you know, if, for

19   example, you believe that the word red was a word that

20   was in your manuscript and then appeared in the published

21   books and they did not run the word red, but they ran

22   other words and other terms that would have found this

23   transaction, then requiring them to run a word that may

24   appear in multiple types of communications having nothing

25   to do with this case would be unduly burdensome without a

1

2  lot of benefit.

3          So what I'd like you to do is look at the

4  production, look at the terms that were run and the

5  search terms that were excluded, and if you have a basis

6  to argue that a particular term that was excluded may, in

7  fact, you know, uniquely hit on a relevant document that

8  would otherwise have been missed by the search terms that

9  were run, then you should bring that to Mr. Koonce's

10 attention and have a discussion with him.

11         It sounds like he proposed – please speak up,

12 Mr. Koonce, if I misheard you – but that you would run

13 full sentences which I think would, you know, be very

14 comprehensive and may return zero hits, of course.  And

15 so what I heard Mr. Koonce say is he didn't think that

16 was the best way to run the search on, you know, for his

17 point to clear his client for your point to find the

18 relevant documents.  But you think that there's a passage

19 that is directly lifted you believe from your client's

20 manuscript, maybe running a full sentence is the best way

21 to proceed.

22         MR. PASSIN:  Let me talk to my client, and I'll

23 back to Mr. Koonce.  Also, could Mr. Koonce please run

24 for me and let me know how many emails during the

25 relevant time period were exchanged between Ms. Kim and

```
 1                    PROCEEDINGS                17
```

 2  Ms. Wolf.

 3          THE COURT:   Mr. Koonce, is that easy enough for

 4  you to day?

 5          MR. KOONCE:   I think we can do that.  I mean,

 6  you know, Ms. Kim and Ms. Wolf, I mean they have a

 7  relationship that spans more than a decade now.  So that

 8  number is going to be a pretty large number, but I can

 9  provide that I believe.  I don't think I have an

10  objection to doing that.  I think the reason we didn't do

11  that before is just because we had not it that way at

12  that point in time.  What we've done already though is

13  produced all emails between or all documents that hit on

14  search terms that included Deebs-Elkenaney's name,

15  whether it's Tracey Wolf or her name using her email

16  addresses and a number of terms that Mr. Freeman, excuse

17  me, that Mr. Passin had proposed.  So we've done a lot of

18  that, but if it's just a matter of getting the number of

19  times they've emailed each other, I believe we can do

20  that.

21          Just mentioning the sentences, I just want to

22  just for clarity, my sense is if we run a full sentence

23  from Ms. Freeman's manuscripts, we will then pull up

24  every version and every copy of her manuscripts that are

25  at, were with Prospect or attached to emails back and

1                           PROCEEDINGS              18

2    forth between Prospect and Ms. Freeman but that they

3    would not turn up other documents because those, you

4    know, those words were not transmitted to Ms. Wolf.

5              THE COURT:   All right, so I'd like --

6              MR. PASSIN:   And, Your Honor, what're we going

7    to do about the exhibits, the requests which I do not

8    believe are responsive to word searches?  I mean are

9    those being pulled by hand such as the royalty

10   statements, the contracts, the various versions of her

11   books, drafts of her books?

12             THE COURT:   I mean I would say if some of these

13   are specific documents, then I think those should be

14   produced I mean to the extent that there is an agreement,

15   for instance, but I think a lot of these also would be

16   picked up through the search terms, you know, all

17   documents evidencing are likely, you know, what's being

18   used to find responsive documents.  So I wouldn't direct

19   the defendants to do a manual search for something like

20   that request.

21             MR. PASSIN:   But what about the royalty

22   statements and the contracts?

23             MR. KOONCE:   Can I just interrupt for a moment

24   which is we've said, I told Mr. Passin before we're

25   producing those multiple times and we said it in our

```
 1                         PROCEEDINGS                 19

 2   responses letter, I mean that is absolutely something

 3   we'll be produced.  And I do think that the bulk of the

 4   rest of these will be picked up by the search terms by

 5   definition, but if not, I've told Mr. Passin separately

 6   that to the extent that there are documents that are

 7   individual or subject of a request that would not be

 8   picked up by search terms, we'll produce them unless

 9   we've made an objection to producing them.

10         THE COURT:  So let's talk about production.  I

11   think we need to have a deadline for the substantial

12   completion of paper discovery.  Mr. Koonce, when do you

13   think that will be for you?

14         MR. KOONCE:  Your Honor, I believe we should be

15   able to be done with that production within the next two

16   to three weeks, maybe sooner, maybe more like two weeks.

17   I think we've identified almost, I mean we're down to

18   the, like I said, smaller batches of, you know, smaller

19   repositories of documents.  So we're very near the end.

20   I think the bulk of the documents have been produced at

21   this point.

22         THE COURT:  All right, and the same question to

23   you, Mr. Halperin, just, generally speaking, when do you

24   think you'll be done with substantial production of

25   documents?
```

1              PROCEEDINGS              20

2         MR. HALPERIN:   Thank you, Your Honor, this is

3  Ben Halperin.  We think about three weeks.  As we noted

4  in our letter, the dispute over the search terms

5  significantly slowed everything down.  We're also doing

6  what we understand to be a more extensive responsiveness

7  review to weed out communications related to totally

8  different books that aren't involved in this case at all

9  by completely different individuals.  And that's why our

10 initial volume was lower.  But if I had to estimate, I

11 would say about three weeks.

12        THE COURT:   All right, thank you. So what I'd

13 like you to do I think, Mr. Passin, I know you only just

14 got some documents from the Elkenaney defendants

15 yesterday, so you probably haven't had a chance to go

16 through them.  I'd like you to go through this documents

17 to go through the production from Mr. Koonce to talk

18 about, you know, to the extent you believe there are

19 search terms that were excluded that would uniquely

20 identify responsive documents, meaning other search terms

21 that were run were not adequate to find these types of

22 documents.

23        And, again, I think I heard Mr. Koonce

24 suggesting that they could run a full sentence, for

25 example, if you believe the full sentence was listed, it

2  sounds like at a minimum that will come up with every

3  time your manuscripts traveled through the, you know,

4  internet so to speak and might show a transmission to a

5  defendant or it might just show that it was a back and

6  forth between the plaintiff and Ms. Kim.  So if you think

7  that that would be helpful, I think I hear Mr. Koonce

8  saying he's willing to look at that.

9          Mr. Koonce, I do want you to provide plaintiff

10  with just a hit report on the number of emails between

11  Kim and Wolf during the relevant period.  Given what I've

12  heard and what I understand, I suspect that will be a

13  large number, and, again, I'm not inclined to direct a

14  party to do a manual review of large volumes of

15  electronically stored information.  And given that the

16  search terms would have picked up those emails with the

17  relevant term, I think you're probably getting what

18  you're going to see, but I want you to continue to meet

19  and confer with the defense counsel on those issues.

20          I'm going to set the deadline for the

21  substantial completion of fact, sorry, of document

22  discovery as October 7.  So that gives the defendants a

23  little over three weeks to complete their production.

24          Let me jump to interrogatory 3 and 4 because I

25  think it's a good way to segway from this issue about

```
 1                      PROCEEDINGS                22
 2  individual documents.  So certainly to the extent there
 3  is an agreement, that needs to be searched for and
 4  produced.  You know, documents concerning are the types
 5  of documents that get pulled from search terms, but a
 6  communication, a letter, an agreement, that should be
 7  searched for manually and produced.
 8           With respect to interrogatories, I think they're
 9  generally three and four, sometimes there are two, having
10  to do with revenue and expenses, I believe that Mr.
11  Koonce indicated in his letter that he would be producing
12  the sort of answer to the interrogatories with respect to
13  revenues and expenses.  Is that correct?
14           MR. KOONCE:  Sorry, Your Honor, I was trying to
15  get off of mute.  When you say responses, yeah, we will
16  be providing documents responsive to the requests, yes.
17           THE COURT:  And when you say you're providing
18  documents responsive to the requests, you know, to the
19  extent those documents are things like a revenue, I'm
20  sorry, a royalty chart or something where you can pretty
21  easily determine the total revenue because you've got the
22  royalties coming in, that's one thing.  To the extent any
23  of these documents require interpretation or even
24  discretion in determining whether or not something is an
25  appropriate expense or not, I don't think that that would
```

```
 1
 2    be a responsive and helpful document.  So can you tell me
 3    what sorts of documents you intend to provide?
 4              MR. KOONCE:   Well, I think generally speaking
 5    there will be primarily what we'll be providing are
 6    commission statements that, you know, that show the
 7    agency commissions.  I think not, I'm sorry, I'm not
 8    following Your Honor as to documents that would relate to
 9    expenses not being helpful.  We certainly will provide, I
10    mean I think the commission statements will basically
11    show what the agency, typically agencies just make a
12    certain percentage on sales of a book, and that's what
13    we'll be providing.
14              THE COURT:   I think what I was referring to is,
15    you know, to the extent you would be deducting from gross
16    revenues any expenses (indiscernible) tax purposes or
17    otherwise, I think it would not be helpful or fair to
18    produce your credit card statement or your rent statement
19    and say this is an expense that would partially be
20    attributed to this particular revenue stream.  Does that
21    make sense?  I mean an expense for, you know, marketing
22    of a book, that's pretty clearly all going to one book,
23    but an expense that is a little bit more vague I think
24    would be more problematic if it was provided without
25    direct clarity.
```

```
 1                        PROCEEDINGS              24
 2            MR. KOONCE:   Understood, Your Honor.  I don't
 3  think we have, I've litigated copyright cases for some
 4  time, and I think I have a pretty good understanding of
 5  what types of expenses can be deducted from gross
 6  revenues in order to determine what the profits should
 7  be, and our intent would certainly not be to produce
 8  anything, I mean unless it's shown in a statement we're
 9  producing for other purposes, I think we'd be producing
10  documents showing expenses that aren't related to the
11  books themselves.
12            THE COURT:   All right, Mr. Halperin, I know you
13  had the same response for this category of
14  interrogatories.  Is your response the same as Mr.
15  Koonce's now?
16            MR. HALPERIN:   Yes, it is, Your Honor.
17            THE COURT:   Okay.  All right, so what I'm going
18  to do --
19            MR. PASSIN:   Your Honor, can I address that,
20  it's Mr. Passin, for one second?
21            THE COURT:   Sure.
22            MR. PASSIN:   Look, I mean the standard is if
23  (indiscernible) the answer will be substantially the same
24  for either party, I mean these parties must have ledgers
25  or something that they keep running totals of these
```

```
 1                        PROCEEDINGS            25
 2   things, and it would be, it is not substantially the same
 3   for either party to ascertain the answer.  They could
 4   much more easily than myself just answer the
 5   interrogatories by giving me the numbers.
 6            THE COURT:   So I understand.  That's sort of
 7   why I was asking about the types of documents.  Why don't
 8   we see what the documents are that are produced.  If
 9   there are five pages of documents with a bottom line
10   number and all you need to do is add that number up, then
11   I think you probably prefer to have the actual documents
12   themselves rather than have them just give you a number
13   because you can look at those documents then.
14            So why don't you see what's produced.  If the
15   production is not sufficiently clear or is going to
16   complicate matters, then I think we can either come back
17   to this issue and ask for a response in the form of an
18   interrogatory or even ask for a request for admission
19   towards the end of discovery.
20            MR. PASSIN:   Okay, thank you, Your Honor.
21            THE COURT:   Okay, so those documents will be
22   subsumed in the October 7 deadline for the substantial
23   completion of discovery.
24            There was an issue related to email addresses,
25   personal and professional.  My interpretation of the
```

```
 1                        PROCEEDINGS              26
 2  parties' responses is that personal email addresses are
 3  being searched, that an email address that the
 4  defendants, the Kim and Prospect defendants, allege is
 5  the husband's email address, I think unless I have a
 6  better reason than what was presented thus far, that
 7  should not be produced.  And I understand that there are
 8  also two email addresses that the plaintiff believes are
 9  controlled by the Kim and Prospect defendants that they
10  deny.  I'm happy to hear from Mr. Passin what the basis
11  is for his belief, and we can go from there.
12          MR. PASSIN:  Well, Your Honor, you know, we
13  think who has evidence is pretty clear, but if you're not
14  going to accept that, then there's nothing more to say.
15  But I mean it's like, if a house is in someone's name and
16  then they say it's not their house, well, it's in their
17  name, so it's their house.
18          THE COURT:  Can you draw out that analogy for
19  me?  How does that apply here?
20          MR. PASSIN:  Well, we gave you two who as
21  reports that shows that that email address that they
22  claim is the husband's is registered in the name of Ms.
23  Kim.  So if it's registered in Ms. Kim's name, it's Ms.
24  Kim's email address.
25          THE COURT:  Have you received any documents so
```

1                              PROCEEDINGS                    27

2   far in discovery or has your client ever received

3   documents just in her own business transaction with that

4   email address?

5            MR. PASSIN:   Not that I'm aware of, Your Honor.

6   I would have to ask her, but not that I'm aware of.

7            THE COURT:   Okay.  I mean my son's phone number

8   is probably in my name, but I don't use my son's phone.

9   So if that's the analogy, I'm not sure it's good enough

10  for me to justify searching this husband's email address.

11           MR. PASSIN:   Your Honor, just so you know, I'm

12  just trying to do the best I can.  My client feels very

13  strongly that there has to be emails exchanged and stuff.

14  I'm trying to do my due diligence, you know, and that's

15  what I'm trying to do.

16           THE COURT:   I appreciate that, and, look, if

17  you find a substantive document that suggests that that

18  email was being used for these transactions, you can come

19  back to me, but the evidence you have thus far is not

20  sufficient for me to interfere with this person's privacy

21  rights.

22           MR. PASSIN:   Thank you, Your Honor.

23           THE COURT:   All right, the next question's with

24  respect to the definition of the Crave series, and all

25  defendants object to including unpublished books which

```
 1                        PROCEEDINGS              28
 2   are not even alleged to have been infringing since
 3   presumably the plaintiff hasn't even seen them.  So
 4   they're not part of the complaint.  And so the
 5   defendants' argument, as I understand it, is that there's
 6   not a good enough basis to produce these documents, at
 7   least not now, when you haven't established infringement
 8   with respect to the first four published novels.  And
 9   given the heightened business sensitivity of releasing
10   unpublished manuscripts, there is an objection to the
11   production.  I think that that is the defendants'
12   positions.  What's your response, Mr. Passin?
13            MR. PASSIN:  Well, there have been four books
14   that have been published.  We claim all four of them
15   infringe, all right.  We think it's (indiscernible) to
16   admissible evidence because they're likely to be
17   infringing as well.  For example, they most likely
18   involve the same characters.  The characters are
19   sufficiently delineated that we feel that in and of
20   itself would constitute copyright infringement.  But for
21   us to have to go through this lawsuit and if they come
22   out during the lawsuit and then maybe have to go through
23   a second or third lawsuit when we could get the
24   information now seems like a waste of judicial resources.
25            THE COURT:  Who from the defense wants to
```

1                           PROCEEDINGS                      29

2    respond?

3            MR. HALPERIN:   This is Ben Halperin, I can

4    respond, Your Honor.  So plaintiff already has, you know,

5    tens of thousands of documents to review based on the

6    four existing books.  If there is any evidence of ripping

7    off the plaintiff, then we maintain that our books are

8    not even remotely substantially similar to the

9    plaintiff's manuscripts and that there was never any

10   access.  It should be visible from all of the years

11   leading up to when those first four books were published.

12           As Your Honor noted, it would be just

13   devastating to defendants' business for plot points of

14   unpublished books to leak at this point.  They're widely

15   popular books, and if there isn't evidence that allows

16   plaintiff to prove her claims in the existing books,

17   there's no reason to require that documents about

18   unpublished books be produced, especially given that

19   these books are not named in the complaint, they're not

20   alleged to infringe, they can't infringe because they

21   haven't been published yet, and the plaintiff doesn't

22   seek to enjoin their production.

23           THE COURT:   Mr. Passin.

24           MR. PASSIN:   Well, as far as we haven't alleged

25   they infringe, you know, like I said, if they use the

1                          PROCEEDINGS                    30

2  same characters, they do infringe in my opinion.  And if

3  we move to enjoin, we'll move to enjoin those as well.

4  We'd enjoin any books that contain any of the material.

5          THE COURT:  Okay, well, certainly if you are

6  able to establish that characters in books one through

7  four are infringing, then presumptively the same

8  characters appearing in books five and six will also be

9  found as such.  So for purposes of discovery in this

10 copyright case, I don't think that there is a need to

11 access these documents at this time, and I do think on

12 the other side there is significant prejudice and burden

13 to the defendants to produce them, again, without much

14 upside to you given that these books haven't even been

15 published.

16          I do think, if the plaintiff is able to prevail

17 in her case, that, you know, these other, you know, books

18 five and six may either be folded into this litigation or

19 revenue that is obtained from those later published books

20 may be, you know, fair game for the plaintiff now.  So

21 I'm going to deny the request for discovery into these

22 books, but that doesn't mean that if plaintiff is able to

23 establish infringement, that those books are off limits

24 in this litigation.  Understood?

25          MR. PASSIN:  Thank you, Your Honor.

```
 1                      PROCEEDINGS                    31
 2           THE COURT:   Okay.  I think the last issue here
 3  I can dispense with easily which is the request to search
 4  the parties' computers.  Unless there is a very clear
 5  evidence of misconduct or that the lawyers are
 6  misrepresenting to the Court, I don't typically allow
 7  discovery on discovery which searching somebody's
 8  computer would constitute.  So I'm going to deny that
 9  request as improper.
10           MR. PASSIN:   Thank you, Your Honor.
11           THE COURT:   Any other issues, Mr. Passin, that
12  you want me to raise?  (indiscernible)
13           MR. PASSIN:   Well, first off, let me just point
14  out we still have some problems because, you know, I just
15  got a letter last Friday from Ms. Wolf telling me for the
16  first time that her client's going to be on a book tour
17  most of October in Europe; therefore, she can either sit
18  for a deposition in September which doesn't make sense
19  and I don't have these documents or early November which
20  is after the cutoff --
21           THE COURT:   Right --
22           MR. PASSIN:   And then I'm also --
23           THE COURT:   -- sorry, I meant to talk about
24  this.  Before we move to the schedule, thank you for
25  bringing that up, and I would've been remiss not to
```

1                              PROCEEDINGS                    32

2    address that.  Besides the schedule, anything else you

3    want to address?

4              MR. PASSIN:   Well, and then I also got a letter

5    I'm concerned about, yeah, we got documents from Mr.

6    Koonce, but I sent him an email, him and Nancy Wolf an

7    email yesterday pointing out that our vendor discovered

8    an issue where commas as being used as multiple vowel

9    separators for the correspondence fields.  Please provide

10   an updated data file for the volumes with a different

11   unique special character that properly separates the data

12   in (indiscernible).  In addition, please provide two

13   additional headers, a creation date, and modified date

14   field (indiscernible) update data files.  And they also

15   pointed out something wrong with the metadata of Ms.

16   Wolf's production.

17             And Mr. Koonce told me, you know, he's trying to

18   sound very cooperative now, but he told me, and this is

19   typical, that he won't answer my questions.  Mr. Koonce

20   said I won't answer the question because he claims that I

21   haven't answered his pending question which is what

22   process plaintiff is following to identify and produce

23   documents.  Well, if plaintiff is not using search terms

24   to do so, okay, quite frankly, ever since I sent Your

25   Honor my two letters, Mr. Koonce has been trying to pick

```
 1                        PROCEEDINGS                    33
 2  a fight with me.  I told him twice that we're going to
 3  gather and produce the responsive documents we said we
 4  would produce.  We're gathering and producing.  We're not
 5  going to use search terms.  We're going to go through all
 6  the files and we're going to produce what's responsive.
 7          There's nothing more I can say.  I don't know
 8  what else to say, yet he keeps on asking me the same
 9  question, and now he's refusing (inaudible) to produce,
10  but they haven't produced because they don't have the
11  right metadata, and he's refusing to correct it or even
12  answer my questions.
13          MR. KOONCE:   May I speak to this, Your Honor?
14          THE COURT:   Sure.
15          MR. KOONCE:   So starting with the first, the
16  second issue or the issue about the metadata, in my
17  response to Mr. Passin who raised this literally
18  yesterday, I did first address the fact that he refuses
19  to answer very direct questions from us about their
20  production which has not yet happened, but at the end of
21  that email, if you'll look at it, I then said we don't
22  follow what you're asking for with respect to the
23  supposedly missing metadata.  And when we can turn to
24  that issue, he's going to need to provide a better
25  explanation because the explanation he just gave on the
```

1                           PROCEEDINGS                    34

2    call today as well, I just don't, we just don't follow

3    what they need.  So we're just going to need more

4    detailed information.

5              I did say to him that we don't want to start

6    engaging – he has asked, you know, many, many, many

7    questions about our production over time.  I sent him a

8    list in that email last night of eight to ten questions

9    with specifics he's asked.  I have tried every time to

10   respond thoroughly, and if I have an answer for him, I

11   give it to him and straightforwardly.  It's exactly the

12   way we approached the search term issue.  And the only

13   question we have asked him, since this production hasn't

14   been made yet, is simply if you're not using search

15   terms, Mr. Passin, how are you going about producing

16   documents because presumably Ms. Freeman, that we know

17   from our side of documents at least with Prospect Agency

18   is there's a lot of emails and a lot of documents.

19             So maybe they are going through one by one and

20   maybe Mr. Passin and his law firm and his lawyers are

21   doing that, but he's refused to even answer that simple

22   question, and we just feel like if this is going to be a

23   one-way street in discovery where we raise things he

24   doesn't answer and then he continues to shoot questions

25   at us about our production, that's not a productive way

1                         PROCEEDINGS                    35

2    to go.

3              THE COURT:   All right, let me ask a question

4    with respect to the electronic production.  Is it

5    possible to have a vendor to vendor conversation so that

6    the people who speak the language can have a discussion

7    about where the problem lies?

8              MR. PASSIN:   That's fine with me, Your Honor.

9    It's Mark Passin.

10             MR. KOONCE:   That's fine on our end too.  And

11   I'm sure that's where we would've gotten, Your Honor, if

12   we had continued this discussion in a meet and confer as

13   opposed to it being raised today prematurely.

14             THE COURT:   Okay, so let's make sure that that

15   happens as soon as possible so that whatever technical

16   problem can be addressed so that the production can be

17   utilized.

18             MR. PASSIN:   Your Honor, let me finish my

19   answer to your question.  Let me just look at my list of

20   open items for today, if you can bear with me a minute.

21             THE COURT:   Sure, I do want to raise the issue

22   that Mr. Koonce raised though.  I do want to discuss that

23   --

24             MR. PASSIN:   Go ahead.

25             THE COURT:   -- before I turn back to you, Mr.

```
 1                       PROCEEDINGS                36
 2  Passin, for other things on your list.  You know, my
 3  understanding is that you've produced I think 17
 4  documents which seems like a surprisingly small number of
 5  documents for a case like this.  I assume that your
 6  client used email herself, and those emails need to be
 7  properly searched.  Can you report to the Court how you
 8  are searching for responsive documents?
 9            MR. PASSIN:   Sure.  First of all, Your Honor, I
10  want to point out that we just served our documents on
11  August I think it's 22, and we're in the process of
12  gathering documents now.  My client is a lawyer, and
13  she's going through every email and given me every – and,
14  by the way, they served 150 document request on us, okay.
15  So she's going through every email and sending us every
16  document response.  She's a lawyer, a family lawyer,
17  she's a litigator, and she's pulling all the documents.
18            MR. KOONCE:   Your Honor, it's – sorry, Your
19  Honor, I'm interrupting.
20            THE COURT:   All right, I'm not sure it's
21  appropriate for the client to be reviewing the documents.
22  I appreciate that she may be a lawyer, but a family law
23  lawyer is not a copyright lawyer, and she may be not in
24  bad faith but because of her lack of expertise may not
25  appreciate what kind of document would be responsive.  I
```

1                           PROCEEDINGS              37

2  mean she is the immediate witness in this case.  I think

3  the better course needs to be that you get her email,

4  that it's copied over to you, or at a minimum that you

5  provide the search terms that she needs to do.  But I

6  think we can't rely on her to individually open her email

7  and select documents that she thinks are responsive.

8          MR. PASSIN:   She has to turn her whole email

9  box over to me?

10          THE COURT:   Or to a vendor and you and the

11  defendants need to identify appropriate search terms.

12          MR. PASSIN:   Well, first, I think even they

13  called out, I mean I don't think she should just give me

14  every email that she's ever sent during the ten years.

15          THE COURT:   Excuse me?

16          MR. PASSIN:   You're saying she has to send me,

17  give me every email she's sent over ten years?

18          THE COURT:   Well, you brought this case, so you

19  have an opinion about when this copying may have

20  happened, when the opportunity for it to have happened

21  exists.  So if that's 2010, then, yes, that would be when

22  we start searching.

23          I mean, look, the defendants are entitled to

24  know maybe your client shared her manuscript with her

25  first cousin and maybe that first cousin then slipped to

```
 1                          PROCEEDINGS              38
 2    a friend and that may explain what's going on here, or
 3    not, I have no idea.  But I don't think it's appropriate
 4    for the plaintiff to decide what documents are
 5    responsive.  And then to your point about the large
 6    number of document requests, without making comments
 7    about whether that number's the right number or not, it
 8    is a lot of document requests, and I'm not sure I would
 9    feel confident independently going through all of my
10    emails and making sure I'm responding to each and every
11    document demand.  That's a lot to keep in your mind.
12              And that's why, like I said at the beginning of
13    this conference, that's why using technology as your
14    friend, using search terms is much more effective than
15    relying on the human to just determine independently
16    whether a document is responsive or not.
17              MR. PASSIN:  All right, well, then I'll talk to
18    her and may have to do search terms.
19              THE COURT:  Okay, I think that's where we're
20    headed, and I'll direct that you report back to the
21    defendants next week because --
22              MR. PASSIN:  Your Honor --
23              (interposing)
24              MR. PASSIN:  -- could I have a little more - I
25    hate to bring this up, but my client in the past had, I
```

```
 1                        PROCEEDINGS                39
 2   had to put this on the record, but had breast cancer, and
 3   at the end of last week they just found a mass, and she's
 4   been going to doctors this week.  So it may take a little
 5   longer, but it'll be quick.
 6             THE COURT:   Okay.  Well, I certainly hope that
 7   everything is quickly resolved on her, in her health.
 8   I'm sorry to hear that.  You may pass along my regards to
 9   her.  So if you can, you know, I think that deadline of
10   substantial production of all document discovery would
11   apply to you as well, so if you can get back to plaintiff
12   --
13             MR. PASSIN:   Your Honor, I got my request about
14   seven weeks after (indiscernible).
15             THE COURT:   Okay.
16             MR. PASSIN:   Or five weeks after this.  So
17   should I get more time?
18             THE COURT:   Do you need more time?  It seems to
19   me --
20             MR. PASSIN:   Yes.
21             THE COURT:   -- you know, you got three more
22   weeks here.
23             MR. PASSIN:   Yes, we need more time.
24             THE COURT:   When do you think you can have
25   substantial production of documents?
```

```
1                        PROCEEDINGS              40
2              MR. PASSIN:   How about October 21.
3              MR. HALPERIN:   Your Honor, this is Ben
4    Halperin, may I just be heard on that point briefly?
5              THE COURT:   Sure.
6              MR. HALPERIN:   Thank you, Your Honor.  We
7    served our document requests on July 15, and we have far
8    more custodians to search then plaintiff.  I don't think
9    plaintiff should unilaterally get an extension here.
10             THE COURT:   Other than the plaintiff what other
11   custodians are you searching, Mr. Passin?
12             MR. PASSIN:   Her husband as well.
13             THE COURT:   So it's two custodians.  Yes?
14             MR. PASSIN:   Yes.
15             THE COURT:   And are you disputing that you
16   received document requests on July 15?
17             MR. PASSIN:   No, I'm not, I'm sorry, July 15 it
18   was, that's correct.
19             THE COURT:   Okay, so that's --
20             (interposing)
21             MR. PASSIN:   So it was, I guess about five
22   weeks after.
23             THE COURT:   Okay, regardless of how later from
24   when you served discovery, that's eight weeks ago which
25   means your responses are four weeks late.
```

```
 1                        PROCEEDINGS                41

 2          MR. PASSIN:   All right.

 3          THE COURT:   I think we should set a substantial

 4  completion of document discovery of October 7.  If, Mr.

 5  Passin, because of your client's circumstances you cannot

 6  complete all of that, meaning you cannot have substantial

 7  production, you should have, you should be well on your

 8  way.  And certainly with respect to this issue about how

 9  you're going to be searching documents, there needs to be

10  clarity on that point as well.

11          So I'll direct that you get back to the

12  defendants no later than September 28 on how you're

13  conducting your search for documents.  If in advance of

14  that the defendants want to propose search terms that

15  they think would capture the types of material that

16  they're looking for based on their own document demands,

17  you should present that to the plaintiffs.  Okay?

18          MR. PASSIN:   And then I hate to point this out

19  too, but I never go on a vacation and I'm on vacation for

20  about four days, September I think it's 24th to 28th.  My

21  wife's 65th birthday, and I'd hate to cancel.

22          THE COURT:   Of course.  I am a judge but I'm

23  also a human being.  Okay, so can you get back to the,

24  get back to the defendants by the 30th, that Friday?

25          MR. PASSIN:   Yes, and can I have until the 14th
```

```
 1                      PROCEEDINGS                42
 2   to produce?
 3            THE COURT:   Fine.
 4            MR. PASSIN:    Thank you.
 5            MR. HALPERIN:    Your Honor, this is Ben
 6   Halperin.  If plaintiff is going to get till the 14th, can
 7   we, can all parties just have to the 14th to keep it nice
 8   and clean?
 9            THE COURT:   I'm not sure I would call this case
10   nice and clean.
11            MR. HALPERIN:    Fair enough.
12            THE COURT:   Okay, so by September 30 I want the
13   plaintiff to have advised the defendants how he is
14   conducting his search for responsive documents.  The
15   plaintiff herself is not competent to do that, and I mean
16   that not because she's not a competent person but because
17   she is a party to this litigation, she is not an expert
18   in copyright law.  So she is not the person who should be
19   going through documents.  If you, Mr. Passin, or your
20   colleagues in this case or co-counsel.  So certainly by
21   September 30 you need to advise the defendants how you
22   are searching for documents.
23            To the extent that search terms are the
24   preferred method, which I suspect they probably are,
25   there's nothing that stop the defendants between now and
```

```
 1                      PROCEEDINGS                43
 2   then from proposing terms so that the plaintiff can maybe
 3   even consider those terms in advance of their deadline of
 4   September 30 to get back to you.  And if the parties --
 5            MR. PASSIN:   I suggest they do that if they
 6   could.
 7            THE COURT:   Okay.  So if the defendants can do
 8   that, propose search terms, I recognize today is the 15th,
 9   and by the 23rd.  After that Mr. Passin is not going to be
10   available.  So the sooner you can get those search terms
11   or Mr. Passin, the better.
12            MR. HALPERIN:   Understood, Your Honor.
13            THE COURT:   All right, we'll put the deadline
14   for the substantial completion of document discovery at
15   October 14.
16            MR. KOONCE:   Thanks, Your Honor.
17            THE COURT:   I'm going to then ask for a status
18   letter from the parties.  Why don't I get a status letter
19   from the parties on October 21.  So we can just check in
20   and see how things are going then.  Hopefully we will
21   have everything squared away such that we can being
22   taking depositions in November.  It sounds like some
23   people may be away in October, so that works for
24   everybody.  And I will extend the discovery deadline
25   until the end of the year.  That'll give the parties two
```

```
 1                         PROCEEDINGS              44

 2   months to complete any depositions.

 3              MR. PASSIN:   Your Honor, then the other date

 4   that have to be moved is obviously deadline to complete

 5   depos yet.  Deadline for requests to admit. Can we work

 6   that out ourselves?

 7              THE COURT:   Yes.

 8              MR. PASSIN:   And then expert discovery

 9   deadline, that's currently December 9.

10              THE COURT:   So we'll move that into 2023.  What

11   sort of experts are parties anticipating?

12              MR. PASSIN:   This is Mark Passin.  We

13   anticipate having two experts on various copyright

14   issues, probably an expert on damages.

15              THE COURT:   Two copyright experts and one

16   damages expert?

17              MR. PASSIN:   Yes.

18              MR. HALPERIN:   Your Honor, this is Ben

19   Halperin.  May I answer one if you're done?

20              THE COURT:   Sure.

21              MR. HALPERIN:   Thank you.  We don't believe

22   that experts are needed at all on copyright issues in

23   this case.  These are young adult works that can easily

24   be compared.  So, well, easily is an open question due to

25   the issues we raised about it being unclear which
```

```
 1                          PROCEEDINGS                45
 2   manuscript plaintiff is really suing over, but they're
 3   not scientific material that need to be parsed by
 4   experts.  They can be compared by the Court, and if
 5   summary judgment is appropriate, they can be compared by
 6   the jury.  It's possible if we get damages, that
 7   financial experts might be needed, but we're a long way
 8   from there.  So that's our position on experts.
 9            THE COURT:   So I'm going to set a deadline for
10   expert discovery in the early part of 2023.  I asked what
11   sort of experts were contemplated because it wasn't
12   obvious to me that there would be a need for experts.
13   I'm not prepared to preclude the plaintiff right now from
14   engaging experts, and I don't know that I would
15   necessarily preclude the process.  Obviously the
16   defendants would be open to making a motion to preclude
17   the witness from testifying, but I think we can just
18   table that issue for now with the recognition that
19   experts are incredibly expensive, and whether or not
20   that's really a necessary and appropriate use of
21   resources I think maybe remains to be seen.  But I'll set
22   a deadline now for expert discovery.  I don't think I
23   could bar the plaintiff from seeking an expert if that
24   was his intention.
25            MR. HALPERIN:   Thanks, Your Honor.
```

1                         PROCEEDINGS                    46

2              THE COURT:   All right, maybe if my last comment

3   is a --

4              (interposing)

5              MR. PASSIN:   Wait, wait, wait, what is the

6   deadline for expert discovery?

7              THE COURT:   I'll work it out in the schedule,

8   but it'll be roughly 30 days from the close of fact

9   discovery will be the reports and then rebuttal reports,

10  you know, three weeks or so thereafter and then a period

11  of time for depositions.

12             MR. PASSIN:   Thank you, Your Honor.

13             THE COURT:   Okay, anything further?

14             MR. PASSIN:   No, Your Honor.

15             MR. HALPERIN:   Your Honor, this is Ben Halperin

16  again.  I would like just an opportunity to be heard on

17  the issue of the lack of clarity as to which manuscript

18  is at issue.  But if the Court has other topics first,

19  I'm happy to wait.

20             THE COURT:   No, that's fine, go ahead.

21             MR. HALPERIN:   Okay, so I mean this is a case

22  that should be decided substantial similarity.

23  Unfortunately, there's not a case where there's a

24  published book that we could easily compare the Crave

25  series against.  It's a vague collection of unpublished

1                        PROCEEDINGS                    47

2   manuscripts, and understanding that when an author writes

3   a manuscript, the editing process happens and things

4   change.  What's preventing potentially a dispositive

5   motion right now is that, one, the plaintiff hasn't sent

6   us all versions of the manuscripts, and it's completely

7   unclear which version the plaintiff believes was

8   infringed.  The plaintiff has said that the allegedly

9   infringed manuscripts were reflected in copyright

10  registrations, but there are 16 manuscripts in those

11  registrations.

12          Plaintiff has also stated in interrogatory

13  responses that it's clear from the complaint which

14  version of the manuscripts has been infringed, but it's

15  not at all.  No specific manuscripts were provided with

16  the first amended complaint, and none are directly cited

17  in it.

18          So one way or another we are chopping at the bit

19  to move for summary judgment on substantial similarity

20  because we're confident that once the Court reviews these

21  actual works at issue, it's going to find that there's

22  just basis at all to believe that they're substantially

23  similar.  But what's holding that up is the point of

24  comparison on the plaintiff's side.

25          So what I would propose on this is any way to

1                        PROCEEDINGS                    48

2    get to an agreement that the manuscripts identified in

3    our letter which is the one that Ms. Kim sent to an

4    editor at Entangled in October 2013 be used as the point

5    of comparison so that we can go ahead and assemble our

6    motion for partial summary judgment on substantial

7    similarity.  But what we don't want to happen is to

8    through that entire process and then to have plaintiff

9    come back and say, whoa whoa whoa, you're using the wrong

10   manuscript here and just have a bunch of wasted effort.

11   And we don't want the Court to have to sift through 16

12   different version of manuscripts too to decide the

13   motion.

14           THE COURT:   Mr. Passin.

15           MR. PASSIN:   First of all, that's very

16   disingenuous.  They know that version is not the version

17   that we claim.  It's the copyrighted versions.  And they

18   took bits and pieces of various versions.  That's why we

19   think it's appropriate for copyright experts because it

20   is akin to something scientific.  It would be very

21   complicated for a jury to read all the different versions

22   and piece it all together.

23           THE COURT:   Okay, I do think you need to

24   identify with clarity even if you're suggesting that they

25   copied multiple versions, you do need to provide with

1                          PROCEEDINGS                    49

2  clarity those manuscripts as well as the date in which it

3  was published.  I know not, I don't mean published in the

4  public sense but published to someone other than the

5  author.  The defendants have a right to know what it is

6  that you are alleging was copied.

7            MR. PASSIN:   I understand, and - I understand.

8            THE COURT:   Okay.

9            MR. PASSIN:   I understand.

10           THE COURT:   By that deadline of October 14 you

11  need to identify with specificity which manuscript or

12  manuscripts you believe were infringed and provide the

13  relevant metadata so that the defendants can see when

14  those documents were published.  Okay?

15           MR. PASSIN:   Okay.  Yes.

16           THE COURT:   All right.  Anything further from

17  any side?

18           MR. HALPERIN:   Your Honor, Ben Halperin one

19  more time.  I mean I would just empathize that, you know,

20  substantial similarity is going to be potentially

21  dispositive, and the parties could save a whole lot of

22  time and money if that issue could just be briefed as

23  soon as possible.  So we did ask for a stay of discovery

24  so that process could happen in our letter.  I take it

25  from Your Honor's comments that you want discovery to

1                            PROCEEDINGS                    50

2  proceed, but I do want to ask for that stay now.

3           THE COURT:  Understood.  I'm going to reject

4  that request.  I appreciate the interest.  It's also not

5  clear to me, you've been saying partial motion for

6  summary judgment.  I don't know exactly what --

7           MR. HALPERIN:  Yes.  Thank you, Your Honor, and

8  I'm sorry to interrupt.  Let me clarify that.  So

9  plaintiff needs to essentially to prove two things to

10 prevail.  One is substantial similarity and the other is

11 defendants' access to her manuscripts, and we understand

12 that access is something that has to be vetted at

13 depositions.  So we would not move on that issue yet, but

14 we do think that substantial similarity, as is the case

15 in, you know, most literary infringement cases where you

16 can decide on a motion to dismiss before discovery, that

17 can be decided now just as soon as we figure out what

18 plaintiff's work is.

19          THE COURT:  Okay, one thing I can say with

20 certainty is the parties are not having serial motions.

21 So you will have an opportunity to file a motion for

22 summary judgment.  Maybe that motion will be for partial

23 summary judgment, maybe it'll be for total summary

24 judgment, but I'm not going to allow the parties,

25 entirely inefficient from the Court's perspective, to

1                          PROCEEDINGS                    51

2    allow the parties to file a motion for summary judgment

3    on one element, and if that motion is not granted, then

4    for the parties to file a second motion on another

5    element.  So that is a non-starter from my perspective.

6         MR. HALPERIN:   Okay, we accept that, Your

7    Honor, thank you.

8         THE COURT:   Okay.  If you think that you would

9    file a motion and not file a second one, you're welcome

10   to make an application at the appropriate time, but I'm

11   absolutely not entertaining serial motions for summary

12   judgment.

13        MR. HALPERIN:   And just to clarify, so the

14   Court would like us, if we want to move for summary

15   judgment on access and substantial similarity, the Court

16   is directing us to do that in one motion at the end of

17   discovery?

18        THE COURT:   Correct.

19        MR. HALPERIN:   Thanks, Your Honor.

20        THE COURT:   All right, a segway from spending a

21   lot of money and time on a litigation is talking about

22   settlement.  I've heard the defendants take strong

23   positions about the merits of this case, but sometimes

24   there's also a business calculation in thinking about

25   settlement.  Have the parties had any settlement

1                          PROCEEDINGS                    52

2   discussions to date?

3          MR. PASSIN:   No.

4          THE COURT:   Does anyone think having a

5   settlement conference with me would be productive?

6          MR. PASSIN:   Well, the plaintiffs are always

7   open, but I don't know about the defendants.

8          MR. HALPERIN:   Ben Halperin here, Your Honor.

9   Respectfully, not at this juncture given the issues we

10  raised about substantial similarity and access.

11         THE COURT:   All right, let me just tell you a

12  bit about my calendar.  If you asked me today to come in

13  for the absolute soonest I could see you for a settlement

14  conference, I would give you a date in the middle of

15  November.  Which means if you ask me in mid-October, I'll

16  probably give you a date in January.  So if you think

17  there might be a time where a settlement conference would

18  be productive, maybe after you've reviewed the discovery

19  but before you've taken all of the depositions, it would

20  be in your interests to get on my calendar now.  I don't

21  mind you cancelling a settlement conference at the last

22  minute because you think it would not be productive, but

23  I won't be able to fit you in if you ask for it with some

24  urgency.  And I won't extend litigation deadlines to

25  accommodate late requests.

```
 1                        PROCEEDINGS                53
 2          So we don't need to do anything now.  If you
 3   want to schedule a settlement conference, just email my
 4   chambers or call my deputy, and she can help you do that.
 5   But I would rather you get on my calendar if there's any
 6   opportunity for settlement.  Given that I'm not going to
 7   permit the defendants to make serial motions for summary
 8   judgment, it does mean that the parties are going to have
 9   to pay for the rest of document discovery, deposition
10   costs, potentially rebuttal expert costs, and then the
11   motion for summary judgment before the case is
12   potentially resolved in the defendants' favor, and, of
13   course, if the motion's not granted, the case will move
14   forward to trial.
15          So I hope that the defendants will speak with
16   their clients.  Has the plaintiff made a demand yet?
17          MR. PASSIN:   No, because we don't know anything
18   about profits.
19          THE COURT:   Okay.  Well, I think when you're
20   able to make a demand, you should so that the defense
21   lawyers at least have something to take back to their
22   clients, and then the parties can have a serious
23   conversation about whether settlement makes sense at this
24   point.  And, again, just keep in mind my schedule because
25   it's usually about eight weeks from when you ask that I
```

```
 1                        PROCEEDINGS                54
 2  can see you.
 3            MR. PASSIN:   Thank you very much, Your Honor.
 4            THE COURT:   Okay.  All right, everybody, thank
 5  you very much.  We're adjourned.
 6            MR. HALPERIN:   Thank you.
 7            MR. KOONCE:   Thank you, Your Honor.
 8            (Whereupon, the matter is adjourned.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

55

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Freeman versus

Deebs-Elkenaney, et al., Docket #22cv2435, was prepared

using digital electronic transcription equipment and is a

true and accurate record of the proceedings.




Signature _____ *Carole Ludwig*

            CAROLE LUDWIG

Date:  November 17, 2022