MCCKFREC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LYNNE FREEMAN,

4                    Plaintiff,

5              v.                          22 CV 2435 (LLS)(SN)
                                           Telephone Conference
6    TRACY DEEBS-ELKENANCY, et al.,

7                    Defendants.

8    ------------------------------x
                                           New York, N.Y.
9                                          December 12, 2022
                                           3:00 p.m.
10
     Before:
11
                         HON. SARAH NETBURN,
12
                                           Magistrate Judge
13
                            APPEARANCES
14
     CSREEDER PC
15        Attorneys for Plaintiff
     BY:  MARK D. PASSIN
16        -and-

17   REITLER KAILAS & ROSENBLATT LLC
     BY:  PAUL LiCALSI
18
     COWEN DEBAETS ABRAHAMS & SHEPPARD LLP
19        Attorneys for Defendants Tracy Deebs-Elkenaney, Entangled
     Publishing LLC, Holtzbrinck Publishers LLC, and Universal City
20   Studios LLC
     BY:  BENJAMIN HALPERIN
21        CeCe COLE

22   KLARIS LAW PLLC
          Attorneys for Defendants Prospect Agency LLC and Emily
23   Sylvan Kim
     BY:  LANCE KOONCE
24        ZACH PRESS

25

MCCKFREC

```
 1              (The Court and all parties appearing telephonically)

 2              THE COURT:  This case is Freeman v. Deebs-Elkenaney,

 3    et al.  The docket number is 22 CV 2435.

 4              Can I ask counsel for plaintiff to state his

 5    appearance?

 6              MR. PASSIN:  Good afternoon, your Honor.  Mark Passin,

 7    for Plaintiff Lynne Freeman, and I have with me Mr. Paul

 8    LiCalsi.

 9              Are you there, Paul?

10              MR. LiCALSI:  Yes, I am.

11              THE COURT:  Thank you.

12              On behalf of Tracy Deebs-Elkenaney and the remaining

13    defendants?

14              MR. HALPERIN:  Good afternoon, your Honor.  This is

15    Ben Halperin.  With me, I have CeCe Cole.

16              THE COURT:  Thank you.

17              And on behalf of Prospect Agency and Emily Sylvan Kim?

18              MR. KOONCE:  Good afternoon, your Honor.  Lance

19    Koonce, with Klaris Law, and I have with me Zach Press.

20              THE COURT:  Great.  Thank you, all.

21              Let me begin by reminding everybody that we have a

22    court reporter on the line.  What that means, for our purposes,

23    is that everyone needs to state their name every time they

24    speak so that the court reporter knows whom to attribute the

25    statements.
```

MCCKFREC

1        I will give everybody an opportunity to be heard

2   today, but the parties also need to make sure not to step over

3   one another because it makes it impossible to make a clean

4   record.  So, please be respectful to one another, and please

5   speak slowly and clearly when you do speak.

6        We are here on a stack of letters regarding discovery

7   disputes and related requests to extend the deadline for

8   discovery.  I issued an order earlier last week indicating I

9   was going to extend the discovery for a reasonable period of

10  time — and we'll discuss that today, probably at the conclusion

11  of the proceedings — and I also made some rulings related to

12  deposition locations.  So I'm going to assume that those are

13  off the table for now.

14        In preparing for today's conference, I've created a

15  list of issues that I believe are subject to discussions today.

16        I think the primary ones include the issue of texts

17  and redactions of the texts.  There seems to still be some

18  issue with respect to manuscripts, and I understand that the

19  plaintiff has a proposal.  I wasn't sure I followed the

20  proposal, but there was a proposal offered.

21        There's a question about the plaintiff's searches and

22  whether or not those searches were conducted through counsel or

23  whether the plaintiff, on her own, has conducted searches,

24  which would be improper.  And there are disputes related to

25  privilege logs, both with respect to what needs to be on it and

MCCKFREC

1    where the privilege log cataloging should begin.

2            I think those are the primary issues.  I flagged

3    issues related to the volume of document discovery.

4    Potentially issues related to 30(b)(6) depositions, it wasn't

5    clear to me that those issues are ripe for the Court.  And then

6    there's also this open question about plaintiff's interest in

7    seeking leave to amend the complaint.

8            Let me just begin by asking you, Mr. Passin:  Anything

9    that you think is subject for today's discussion that I haven't

10   listed?

11           MR. PASSIN:  Let me go through, right now, my letters.

12   Bear with me one second, please.

13           There's the plaintiffs text messages --

14           THE COURT:  Sorry, sorry, Mr. Passin, one second.

15           One thing that I didn't say when we were beginning was

16   that anyone who's not speaking needs to mute their line.

17   Someone, I think, maybe just joined us, and we have some

18   background noise.  So, unless you're Mr. Passin, your line

19   should be muted at this point.

20           MR. PASSIN:  So, there's the plaintiff's text messages

21   is an issue.  And along with the privilege log, there's also

22   the date of productions, and then let me look at my other

23   letter, your Honor.

24           I believe that's it.  You know, your Honor, I would

25   like to make an introductory statement, if I can.  If your

MCCKFREC

1    Honor doesn't want me to, I understand that as well.

2              THE COURT:  Sure.  Go ahead.

3              MR. PASSIN:  Your Honor, at the last hearing, in

4    September, I purposely held back and intentionally tried to

5    avoid criticizing the other side, for a lot of reasons — I

6    didn't know you at all — not that I know you now, but it's the

7    second or third hearing — and I'm from California.  But,

8    anyway, I really cannot hold back anymore because it is

9    certainly prejudicing my client.

10             The other side is very good at writing letters, trying

11   to obfuscate the issues.  They're really very good at that.

12   But the reality of the situation is that they are not complying

13   with discovery and doing everything they can so that my client

14   does not have the documents and information she needs to oppose

15   the summary judgment or present her case at trial.

16             We've already addressed -- they produced $40,000, of

17   which we haven't finished going through them, but, so far,

18   about half of them are not responsive and I think should have

19   been pulled prior to production.

20             But let me give you a little example, and these are

21   just examples, and there's plenty of these.  For example, the

22   other side, Mr. Koonce didn't produce the agency agreement

23   between my client and his client.  He said that was a mistake.

24   Okay, maybe it was a mistake, if that was just one thing.  And

25   then when I asked for it, he produced it.

MCCKFREC

1          Then the other day I find -- and this is how it is.

2     We have to go through thousands of documents and then determine

3     what hasn't been produced.

4          Then I noticed they didn't produce Wolff's agency

5     agreement with Mr. Koonce's clients, and I said to him -- well,

6     first of all, I thought he told me that didn't exist.  He

7     disagrees with that.  Let's not get into a fight over that,

8     maybe there was a misunderstanding, we'll never resolve that.

9          But then I said:  Why didn't you produce it?

10          And he said:  Well, I didn't produce it because it

11     wasn't asked for.

12          I said:  What are you talking about?  I had a request

13     for all agreements between Wolff, on the one hand, and any

14     person on the other hand that are concerning Wolff paying to

15     the person any money generated from the exploitation of any of

16     the books in the *Crave* series.

17          His answer was:  Well, the agency agreement doesn't

18     specifically mention the *Crave* books.

19          Well, your Honor, this is an agency agreement that

20     says we'll pay you 15 percent on all your books.  It never

21     mentions specific books.

22          Then he said:  Moreover, it predated 2010.  Well, your

23     Honor made clear the financial documents — and this would be a

24     financial document — has to be included even if they weren't in

25     the dates.

MCCKFREC

1          Then there's the issue of the redactions.  They

2     admitted they redacted over half — at least one of them, one of

3     the defendants — over half the texts they produced, and they

4     produced a lot of texts.  And we have shown examples -- and

5     that's only the tip of the iceberg.  We have many more examples

6     where Wolff redacted things that Mr. Koonce's clients didn't

7     redact or -- didn't redact, and you can see they're not about

8     personal items, and they're not about other unpublished books.

9     They're about the books at issue.  And those are only the ones

10    that we're able to see because the two parties treated them

11    differently.

12          Now, let's talk about the damages --

13          THE COURT:  Sorry, sorry, Mr. Passin.  You asked

14    permission to make some brief introductory remarks.  Is what

15    you're saying now part of that, or are you getting into the

16    merits of these discovery issues?

17          MR. PASSIN:  No, it's -- some of this -- we're going

18    to be back here a lot of times, your Honor, unless something is

19    done.  Can I give you the last example, which is the damages?

20          THE COURT:  Okay.

21          MR. PASSIN:  Okay.  Last time we were here, in

22    September, I had sent interrogatories asking for information

23    about damages.  The other side said we don't want to do that,

24    we want to produce documents.  I didn't want to do that, but

25    your Honor said they could do that.

MCCKFREC

1    So, as to Entangled, they -- oh, and you also said

2    they can't bury them in their document responses.  I have

3    40,000 documents.  So for Entangled, I said, where are your

4    documents amongst the 40,000, and they said that -- their

5    response was you just need to conduct your own discovery and

6    find them in your own production because we're not required to

7    do that for you.

8    Then on MacMillan, they produced a few sales

9    summaries — not one financial number is on any of those

10   summaries — and then they said, you know, we've changed our

11   mind, I know we fought with you, with the judge, but we decided

12   now on MacMillan, we're not going to produce documents, we're

13   asking to answer the interrogatories.  But they didn't answer

14   the interrogatories; they answered part of the interrogatories.

15   They didn't answer completely.  They didn't tell us, with

16   respect to the expenses, the source of the revenue, the dates

17   they received the revenue.  Actually, that's the revenue except

18   by year.  Moreover, we also asked for specific documents for

19   revenues, and they didn't produce them.

20   And I can go on with the other damages.  There's

21   problems with all the damage responses.  I won't bore you with

22   that.  All I'm saying is the other side is playing games,

23   they're trying to prevent us from having what we need to go to

24   trial, and we're going to be back here again because we haven't

25   even -- I tried to meet and confer on that, and I was basically

MCCKFREC

1     told, we can't really meet and confer until we have this

2     conference with you, Judge.

3              That's my introduction.

4              THE COURT:  Okay.

5              Unless Mr. Halperin or Mr. Koonce feels compelled to

6     respond, I would prefer to move into the merits of these

7     discovery disputes, but I think fairness would allow me to give

8     you an opportunity if you wish to make similar opening remark.

9              MR. HALPERIN:  Thanks, your Honor.  This is Ben

10    Halperin, on behalf of the Tracy Wolff defendants.

11             And, no, your Honor, we did not prepare introductory

12    remarks and don't think it would be productive to do what

13    Mr. Passin just did.  So, we'll move on.

14             THE COURT:  Thank you.

15             MR. KOONCE:  And, your Honor, this is Lance Koonce,

16    and we'd like to move to the merits as well.

17             THE COURT:  Okay.

18             So, let's move to this issue of the text redactions.

19    I understand that the defendants have redacted a significant

20    portion of texts that were produced.  It sounds like some of

21    them are communications between Wolff and Kim, and Kim did not

22    redact certain portions, so the plaintiff can actually see what

23    was redacted and what was not redacted.

24             I understand that the defendants have offered either

25    what they call high-level summaries of the redacted portions or

MCCKFREC

```
1    an inspection by the plaintiff in your office.  The plaintiff's

2    counsel has asked to do an attorney's eyes only inspection, but

3    doesn't want to have to physically be in counsel's office to do

4    that.

5         So, I think this is your client, Mr. Halperin.  Can I

6    talk to you about these redactions.  The alternative is that I

7    do an in camera review of some of them, which I'm prepared to

8    do, but it sounds like your position, as I understand it, is

9    that Mr. Passin can look at these documents unredacted, you

10   just prefer he does it physically in your office.  Is that

11   correct?

12        MR. HALPERIN:  This is Ben Halperin, your Honor.  And,

13   yes, that is correct.  My clients are very sensitive that these

14   are their personal text messages.  There are long chains going

15   back years.  As we stated in our letter, it's different than

16   with emails where you can kind of produce them one by one.

17   These are just wide-ranging conversations that, frankly, have

18   candid information about, for example, their minor children's

19   health concerns.

20        So, we would consent to Mr. Passin reviewing these

21   unredacted, but we are not comfortable with turning over copies

22   of them to plaintiff's side's possession.

23        THE COURT:  I'm no technology maven, but isn't it

24   possible for you to allow Mr. Passin to do a review of these

25   documents, which I understand, based on what you've just said,
```

MCCKFREC

1    he can look at notwithstanding their sensitive nature?  Can't

2    you just make them available on a shared drive for some

3    designated period of time and then unavailable, with no ability

4    to download the document?  It would seem to me that the

5    requirement that he be physically present in order to look at

6    these documents in this day and age seems like something we

7    should be able to avoid.

8              MR. HALPERIN:  Your Honor, we're happy to look into

9    that.  We would just want to make sure there are protections

10   against, for example, downloading and taking screenshots, but

11   if there is, in fact, a way to put them on some sort of online

12   platform that's secure, that he could look at, but not copy in

13   any way, I think we would be open to that.

14             THE COURT:  Okay.  Look, I'm happy to look at a sample

15   of text redactions.  If I were to do that, I would probably ask

16   the plaintiff to identify ten sections of the text string that

17   he would like me to look at, and do that in camera.  I'm

18   certainly not going to read thousands of pages of text

19   messaging, but I will read a sample.  But it would seem to me,

20   given that the defendants' position is not that Mr. Passin

21   can't look at this, just that you have some concerns, I think

22   you should be able to come up with a system that allows him to

23   review, during designated period of time, you can make it

24   available and then unavailable, with no downloading

25   possibility, and understanding that it's attorney's eyes only

MCCKFREC

1    at this point.

2          MR. HALPERIN:  Your Honor, this is Ben Halperin again.

3          That sounds correct with the caveat we would want to

4    make sure that technology is workable and doable, but that

5    would be fine.

6          THE COURT:  Okay.

7          Again, I'm no tech maven here, but I can't imagine

8    that Dropbox, for instance, isn't a reliable platform, and you

9    could just say we're putting it up at 9:00 o'clock today, and

10   we're taking it down at noon, and if he needs more time, you

11   can come up with another window when he can access it and not

12   access it.  I would assume that that is workable.

13         MR. HALPERIN:  Your Honor, Ben Halperin again.

14         We're happy to work in good faith to make this happen.

15         THE COURT:  Okay.

16         I'm --

17         MR. PASSIN:  Your Honor, this is Mark Passin.

18         I'll work with them also in good faith.  It's going to

19   be time-consuming because there's a lot.

20         And one other thing, which, when you asked whether

21   there were other topics, just to put a pin in it, other books

22   was another topic.

23         THE COURT:  Okay.

24         MR. HALPERIN:  Your Honor, this is Ben Halperin.  If I

25   can just interject one more time.

MCCKFREC

1          This should be reciprocal because Mr. Passin

2    communicated he's similarly redacted some of his client's

3    emails for similar reasons.  So it should go both ways with

4    whatever the solution is.

5          THE COURT:  Mr. Passin?

6          MR. PASSIN:  They should include any emails they

7    redacted as well.

8          THE COURT:  Well, we're starting right now with texts,

9    which is what was presented to me, not emails.

10         MR. PASSIN:  That's all they're talking about, are my

11   emails.

12         THE COURT:  Mr. Halperin, are you referring to -- I

13   thought there was an issue with respect to plaintiff's texts.

14   Are you referring to something different?

15         MR. HALPERIN:  Let me clarify that, please, your

16   Honor.

17         So, he redacted emails purportedly to shield highly

18   sensitive and some irrelevant information.  As for the texts,

19   we don't really know because he hasn't produced any text

20   messages.  So I guess I would propose if he has concerns about

21   producing the text messages, they be subject to this system

22   that we're all going to try, and that the redacted emails of

23   those that were redacted due to the conclusion of sensitive

24   information, that those be uploaded to it as well.

25         THE COURT:  All right.

MCCKFREC

1              Any objection, Mr. Passin?

2              MR. PASSIN:  All I said is if -- I'm happy to give

3     them the redacted emails in the same procedure, but I want him

4     to give me his redacted emails as well.

5              THE COURT:  Mr. Halperin, have you and your colleagues

6     redacted emails for sensitive information or relevance as well?

7              MR. HALPERIN:  Your Honor, we have only redacted, in a

8     couple of instances, credit card information and, like, log-in

9     info.

10             THE COURT:  All right.  If that's all it is,

11    Mr. Passin, then I think that's reasonable, and you don't need

12    to see --

13             MR. PASSIN:  That is fine.  I don't want to see their

14    credit card information.

15             THE COURT:  All right.

16             Let's move on now to the issue of manuscripts.  I'm a

17    little confused precisely what the plaintiff is alleging.  I

18    assume that the plaintiff provided some of the defendants with

19    copies of the manuscript.  And I don't know how often that was

20    updated or if new copies were provided, but certainly you need

21    to be able to show what your document is, what your original

22    work is, that you believe is being infringed by the defendants'

23    works.

24             So, can you identify specifically which work of your

25    client you believe was infringed?

MCCKFREC

1          MR. PASSIN:  Yes.  Let me explain what happened, your

2     Honor, because there's a lot of them — that's the problem — and

3     that's why I think we're going to need expert testimony at

4     trial.

5          But what happened was, my client presented a draft

6     manuscript to Kim at Prospect, the agent, and then over a

7     few -- a number of years, she gave them different versions

8     based on comments made by the agent.  So, before we filed this

9     complaint -- she also gave her notes and chapter outlines and

10    various things.  And she copyrighted all of those, and I think

11    there may be as many as maybe even 18 registered manuscripts

12    and notes and chapter outlines.  And what we claim is what the

13    defendants did is they were edited, each of the versions, so

14    they took portions of these different manuscripts, and that

15    that's how they committed their infringement.  They didn't take

16    all the material from just one of them; they took various

17    materials from various of the manuscripts and various of the

18    notes.  And we produced all the deposit copies, and we gave

19    them the metadata for the deposit copies.

20         Now, what I was suggesting in my email was even though

21    we have to rely on all of them for copyright purposes, some of

22    the manuscripts — obviously a lot of them — contain duplicate

23    material.  So if we can work out a stipulation where they won't

24    hold it against us, we can probably limit it to probably six or

25    seven manuscripts and not all the notes for purposes of them

MCCKFREC

1    doing the comparison.  But they have to realize we're relying

2    on all the copyright certificates, but if we give them the list

3    that we give them, that will be all the material, it's just

4    duplicate material and some of the other copyright

5    certificates, so they don't have to go through the process of

6    doing the comparison on the ones that are just duplicates.

7              So, we could limit that to six or seven, if we can

8    work out an appropriate stipulation, and certain notes and

9    synopses and so forth.  But we've given them everything we were

10   required to give them.

11             THE COURT:  What type of stipulation are you

12   contemplating?

13             MR. PASSIN:  Well, here's all I'm saying:  Because

14   let's say we copyrighted a manuscript on day one, and then

15   day -- copyrighted one manuscript and then copyrighted a second

16   manuscript, it may be only the new material that is

17   copyrighted, I'm not sure, and there's an argument that it's

18   only the new material.  So I would want a stipulation that even

19   though, for comparison purposes, we're only using the following

20   materials, we're relying on all the copyrights, so they can't

21   say, oh, you didn't rely on one of the copyrights you needed

22   because the material was originally copyrighted in that

23   certificate, and that certificate, you should have used.

24             But there won't be any question about the material

25   we're relying on; we just have to make it clear that they can't

MCCKFREC

1    claim, by not using any certain material, we didn't have the

2    right to copyrights that we're relying on.

3        THE COURT:  So, could you provide to the defendants a

4    list of the six or so manuscripts that you would rely on, and a

5    proposed stipulation?

6        MR. PASSIN:  Yes, I can do that.  And when I say six

7    or seven, I've got to talk to my client, but I think that's a

8    good estimate, but it will also be, don't forget, notes,

9    various notes, and chapter outlines and things like that.

10       THE COURT:  So, it's six or seven manuscripts, plus

11   notes, plus chapter outlines?

12       MR. PASSIN:  And things like that.  I'm not giving

13   synopses.  I have to look at the -- I have to talk to my client

14   to state, in fact, what it is, but we can definitely reduce the

15   number that they currently have if we can work out the proper

16   stipulation.

17       THE COURT:  Mr. Halperin, what do you think about that

18   proposal?

19       MR. HALPERIN:  Thanks, your Honor.  This is Ben

20   Halperin.

21       I'm not entirely sure I understand what Mr. Passin's

22   point is about the copyright registrations.  I think what he's

23   saying is that he doesn't want us to run a comparison and then

24   say, oh, but this wasn't in a registration or something like

25   that.  I don't think we're anywhere near that issue right now,

MCCKFREC

```
 1    so I'm going to put that aside.

 2            As to the six or seven stipulation that he proposes,

 3    I, frankly, think that's too many on both summary judgment and

 4    at trial, if we get there.  The Crave series, which is right

 5    now five books — well, four of them are in the case — are going

 6    to have to be compared against whatever the plaintiff's work

 7    is.  And these are long books.  I think the Crave books are

 8    around 600, 700 pages, the manuscripts are hundreds of pages.

 9    To compare it to six or seven different versions of the same

10    manuscript, together with notes and character outlines — it's

11    unclear to me whether or not Mr. Passin is going to include

12    those in the stipulation — just seems unwieldy and unfair in a

13    case where plaintiff is alleging copyright infringement and

14    should be able to tell us what the work she thinks was

15    infringed is.

16            THE COURT:  Well, I guess what they're saying is they

17    think it all is.  And I'm not sure that there is a legal basis

18    to preclude them from saying, well, we had an evolving

19    manuscript, and, arguably, the defendants picked up this piece

20    of information from draft one, but then picked up this piece of

21    information from draft two.  I don't think that that is

22    prohibited under the law.  I agree with you, it's unwieldy, but

23    I'm not sure that it's impermissible.

24            MR. KOONCE:  Your Honor, this is Lance Koonce.

25            With due respect, I think there is an issue, under
```

MCCKFREC

copyright law, with that description that Mr. Passin gave, of

how they would argue this.  Typically, you do have to look at

an underlying work and compare the alleged infringing work with

that underlying work.

Now, if there are two versions, you can do that

comparison, of one version against the new work and the second

version against the new work, technically.  But I have

litigated cases and looked at the case law on -- you do not get

to pull from your entire oeuvre of works and create something

that never existed and claim infringement because, of course,

the substantial similarity is going to require that there are

either passages that are the same or substantially similar or

elements that, even if unprotectable separately, add up to

something.

So, for instance, you can't pull a character from one

book that's described in not very much detail and then a

character from another manuscript and then a plot outline piece

from another one.  I don't think you can do that under

copyright — I mean, that may just be something we have to argue

at summary judgment — but to Mr. Halperin's point, the

copyright law does anticipate you comparing works to works.

And this becomes so unwieldy, that it's hard to even know how

that gets presented to the Court and resolved, especially here,

where all that the plaintiff -- we urged the plaintiffs to

identify longish passages, meaning a whole sentence, that had

MCCKFREC

1    identical or very similar words, and, instead, the kind of

2    copyright infringement that's being alleged here is scattered

3    similarity of a phrase like "black jeans" or fused words

4    together that are common in the genre.

5          So, it makes it so unwieldy, that it's going to be

6    very difficult.  I don't know that I have an answer, although I

7    guess what I would encourage is that the plaintiff be required,

8    if it's going to make these kind of arguments, to identify one

9    or two versions, key versions, so we can do a comparison that

10   makes sense.

11         THE COURT:  Thank you.

12         MR. HALPERIN:  Your Honor, this is Ben Halperin.

13         Can I jump in with one additional point, please?

14         THE COURT:  Yes.

15         MR. HALPERIN:  Thanks.

16         So, Mr. Passin's position, if I understand it, is that

17   the work kept changing over time, and there would be one

18   version that was rejected and then new content would be added

19   to a new version, and all of these were seen, and all of these

20   were infringed, but I think kind of implicit in the theory is

21   that there was a lot of content that stayed the same between

22   these different versions and, I think, evolved.

23         So, if we are going to let him rely on more than one

24   of them, I would say that plaintiff should have to pick one

25   main manuscript, here is another version where I added a

MCCKFREC

1   chapter about whatever, you know, here is another version where

2   I added 20 pages about something else, he should have to

3   identify that as part of the stipulation because the plaintiff

4   is in the best position to say what all the new stuff is as to

5   each version.

6           MR. PASSIN:  May I be heard, your Honor?  It's Mark

7   Passin.

8           THE COURT:  Yes.

9           MR. PASSIN:  First of all, you have to understand,

10  your Honor, it's one book, basically, just different versions

11  and some scenes were changed a little, some language was

12  changed a little.

13          This is what the plaintiff did.  That's our

14  contention, okay?  They can't complain this is what they did,

15  all right?

16          Now --

17          THE COURT:  I'm sorry, this is what they did?

18          MR. PASSIN:  We're claiming that they stole -- they

19  took bits and pieces from each one of the versions, and now

20  they can't say that we can't take a deposition if that's what

21  they did.

22          Now, Mr. Koonce said he had a case that says I can't

23  do that.  I said please send it to me, and he never sent me

24  anything, all right?

25          And, by the way, that's why I believe we need experts.

MCCKFREC

1    This can be easily resolved by experts.  I've already -- I had

2    an expert do it, and they can do it.  The expert read the

3    versions and read the books, and can prepare a report.  And I

4    think because of the complication of them having four books and

5    us having multiple manuscripts, the only way to do this is

6    vis-a-vis experts.

7        Asking us to identify a version, they're just trying

8    to get an advantage.  There is no one or two versions that will

9    capture the majority of the infringements.  The 2010 and 2011

10   are probably the best, those are the keys, but there's a lot of

11   language in other versions.  And they, very disingenuously,

12   always say they have to designate the 2013 version because they

13   know the 2013 version is very different from the 2010 and 2011,

14   and we don't have much material on the 2013 version, but we

15   really need to rely on all the versions.

16        THE COURT:  I guess I don't --

17        MR. PASSIN:  I believe that's the only way to go.

18        THE COURT:  Mr. Passin, I'm not sure I understand how

19   you're going to prove your case.  You need to be able to say to

20   the Court or to the jury, here is the work of my client, and

21   here is the work of the defendants, and look for yourself.

22        So, you need to be able to do that apples-to-apples

23   comparison, and it sounds like, from what you're saying, is

24   that it's a little bit more etherial and not quite tethered to

25   actual works.  I don't think that that's fair for this

MCCKFREC

```
 1   litigation.
 2              MR. PASSIN:  But I don't think it's fair that they do
 3   it, and then they say because of the way they committed the
 4   infringement, I'm not allowed to have a case.  And that's why I
 5   contend we should have experts, because an expert can do it
 6   easily.  I've already had an expert do it.
 7              THE COURT:  What do you mean "do it"?  I don't
 8   understand what you're saying.
 9              MR. PASSIN:  I've had an expert say, here are our
10   versions, read them, read the four books, and then write a
11   report of the similarities.
12              THE COURT:  And your expert has prepared that report?
13              MR. PASSIN:  Yes.
14              THE COURT:  I wonder whether or not it might make
15   sense for that report to be produced, and the defendants maybe
16   will have a better sense of what your claims are by looking at
17   that report now.
18              MR. PASSIN:  Well, I'd have to talk to my client about
19   that.
20              The other thing is we're working on some other
21   reports, too, that would also be helpful.  Because there's a
22   great deal of similarity of language, we put some in the
23   complaint, but we're probably going to put a report together
24   about the similarity of language as well.  But I'll talk to my
25   clients about that, your Honor.  I'm happy to do that.
```

MCCKFREC

1          MR. KOONCE:  Your Honor, this is Lance Koonce.

2          If I could just make one other point, which is that my

3    understanding — and I will admit it's not a hundred percent

4    clear because I don't think it's been made clear to us — of the

5    many versions of manuscripts and notes that plaintiff has

6    identified — I think there's 30-some that have been produced —

7    some of those were created after the time that Ms. Freeman was

8    an author with the Prospect Agency and some of them were

9    created before the time that she was an author with the

10   Prospect Agency.

11         I think the only allegation here in this case that

12   there was any kind of access is based upon the fact that

13   Ms. Freeman was an author at the Prospect Agency for

14   three years or so, and the rest of it is -- because we've now

15   gone through at least document discovery — I know we've got

16   depositions to come — but as Mr. Passin, I think, will concede,

17   there's no documentary evidence whatsoever that other than

18   Prospect sending a copy, one version of the manuscript, in 2012

19   or '13 to Entangled at Ms. Freeman's request to ask to be

20   published by them, to pitch it to them.  There's no evidence in

21   the record of sharing of manuscripts or pieces of manuscripts

22   or whatever else Mr. Passin is speculating about.

23         So at the very least, I think any of these documents

24   they claim reliance on in terms of manuscripts that they think

25   were infringed, surely the ones that Prospect never even

MCCKFREC

1    received at any point should not be part of this analysis he

2    wants to do, and at least we can put it down to just the

3    manuscripts during a particular period.

4           MR. PASSIN:  May I address that, your Honor?

5           THE COURT:  One second, please.

6           Mr. Koonce, your client or your codefendants

7    presumably have the documents that were received from

8    Ms. Freeman, you have that body of work, correct?

9           MR. KOONCE:  We do.  I think because of the time that

10    had passed before this lawsuit was brought, I think on both

11    sides — Ms. Freeman's side and -- probably, actually, on all

12    sides, is not maybe as complete a record as it would have been

13    if this was four years ago, but we have the manuscript -- we

14    have a number of versions of manuscripts that Ms. Freeman

15    provided to Prospect over the course of the time she was an

16    author there, they seem to align with most of the key drafts,

17    and we certainly have a copy of the manuscripts that was

18    current at the time that Prospect sent it as a pitch to

19    Entangled.

20           THE COURT:  Mr. Passin, why isn't that transcript the

21    key one here, the one that Prospect sent to Entangled?

22           MR. PASSIN:  Because that was, according to them, the

23    2013 version, and by that time, the agent had already had her

24    make so many changes, that it didn't really resemble the

25    earlier version.

MCCKFREC

1        But we really do believe — and we have do evidence,

2   okay — the text, there's evidence in the text that they must

3   have had the books.  Moreover, what he seems to ignore is that

4   Emily Kim, the agent, was instrumental in drafting the book,

5   which we didn't even know until we started looking at the

6   documents.  She, the one that got all the versions, was

7   instrumental in drafting the book.

8        And as far as Mr. Koonce saying that we're relying on

9   versions after, I just tried to comply with discovery.  If you

10  look at the list I gave them of what we're relying on, none of

11  those manuscripts are after the time she stopped working with

12  the agents.  What we did is —- my client was very upset with

13  me, to be honest with you, because my client didn't think she

14  had to produce any versions that she continued to work on or

15  different books she worked on after March 31, 2021, but I said,

16  no, we have to produce those.  So we produced them, but we did

17  not include them in the list of books that we're relying on.

18       So, I don't know what Mr. Koonce is talking about when

19  he said we're relying on books after she stopped working with

20  the agents.  We produced them because I thought we had to, but

21  we're not relying on them.  And that's an issue that I want to

22  discuss today, as well.

23       THE COURT:  Okay.

24       I'm going to have to think about this a little bit

25  more, but I think I'm going to direct Mr. Passin to provide a

MCCKFREC

1    proposed list of the body of work of your client that you

2    believe were infringed upon, and to be as specific as possible

3    about how that was, so that the defendants have a sense of the

4    universe that we're talking about here.

5              MR. PASSIN:  When you say "be specific as possible,"

6    I'm not sure what you mean.

7              THE COURT:  Well, if you're saying that a particular

8    storyline or character development or a particular passage was

9    listed, I am expecting you to identify that.

10             MR. PASSIN:  We'll need a lot of time to do that, your

11   Honor, and I need experts to help me.

12             MR. HALPERIN:  Your Honor, this is Ben Halperin.

13             May I jump in for a moment, please?

14             THE COURT:  Please.

15             MR. HALPERIN:  So, as I understand it, in the Second

16   Circuit, the way infringement works is one work is compared to

17   another, experts don't have a role in that, unlike, for

18   example, in the Ninth Circuit, where there's a separate expert

19   granted extrinsic analysis.  So while I understand that your

20   Honor wasn't willing at the last hearing to preclude Mr. Passin

21   from honoring expert testimony, there's going to be *Daubert*

22   briefing on this issue if he tries to do it.

23             I think his theory seems to be that it's so

24   complicated to figure out what was infringed because there's

25   lots of different words and phrases scattered all over the

MCCKFREC

1   place, that he needs an expert to do it, but that's not how you

2   prove infringement.  You read the books, and you compare them.

3          So, I think what your Honor was going for was he could

4   list six to seven versions, but he should explain, all right,

5   here's another version, here's the additional stuff I'm

6   claiming was infringed on top of the last version, here's a

7   third version, here's the additional section I'm claiming was

8   infringed, and then we can piece together sort of one master

9   work to compare everything, but I don't think it would be

10  productive for him to take, I don't know, weeks, months, at

11  this point, and put together an expert-oriented approach of

12  bits and pieces from many different things that isn't even

13  going to ultimately be useful in addressing infringement at the

14  end of the day given that at trial, he's just got to put one

15  work next to another.

16         THE COURT:  I'm wondering if it makes sense for the

17  parties to submit just short letter briefs to me on this issue

18  and see if I can help illuminate how we're going to proceed.

19         MR. HALPERIN:  Ben Halperin.

20         I'm happy to do that, your Honor.

21         MR. PASSIN:  Mark Passin.

22         I'm happy to do that.

23         MR. KOONCE:  Lance Koonce.

24         I'm happy to as well.

25         THE COURT:  All right.  I think maybe that is what we

MCCKFREC

1    need to do because it sounds like both sides have differing

2    views on how this case is going to be litigated, but, more

3    importantly, proved at trial.  So, maybe the briefing will help

4    narrow the issues.

5           We were talking about the manuscripts, and then

6    Mr. Passin indicated that, in connection with that, there are

7    other books that you'd like to discuss?

8           MR. PASSIN:  Yes, your Honor.

9           THE COURT:  Why don't you raise that, Mr. Passin?

10          MR. PASSIN:  Look, we also believe that the Defendant

11   Wolff started copying my client's manuscript and using material

12   in earlier books, so we believe we'd like to have some

13   discovery on the earlier books.

14          But besides that, and more importantly, we have claims

15   against the agent and the agency for fraud, deceit, breach of

16   fiduciary duty, fraudulent concealment, and breach of contract

17   for basically taking my client's manuscripts and showing it to

18   Wolff and possibly others so they could copy it.  So, that's

19   not limited to the claimed series.

20          So, by them saying that we can't have discovery on any

21   other books by Wolff or by Entangled to show that they took

22   material from our client's manuscript is depriving us of

23   discovery certainly we'd be entitled to on those other claims I

24   just mentioned, and I think the copyright claim, because at

25   trial, I do intend to show that she started copying gradually,

MCCKFREC

```
1    got away with it, started copying a little more, got away with
2    it, and then went for the whole thing in her YA book.
3              THE COURT:  Do you have specific books that you
4    believe are the product of that infringement?
5              MR. PASSIN:  Yes, we do have some, yes.
6              THE COURT:  Which books are those?
7              MR. PASSIN:  Well, I'd have to get my client -- the
8    one I know for sure is Tempest Rising, is one.  I think our
9    expert needs to get the rest.
10             THE COURT:  Why didn't you bring Tempest Rising as
11   part of this copyright case?
12             MR. PASSIN:  Well, because we're not claiming it's
13   copyright infringement; we're just claiming that they took some
14   material from there.  So it was a gradual process, she started
15   taking some, and then in her later books, she took enough to be
16   copyright infringement.  Plus we are suing because it's a
17   violation of those other causes of action.  I didn't limit it
18   to the Crave series.  I said that the agent disclosed her
19   manuscript to Wolff and possibly others for the purposes of
20   copying them and committing copyright infringement.  But I
21   didn't limit it to the Crave series.
22             MR. KOONCE:  Your Honor, this is Lance Koonce.
23             I've had trouble following this argument, I will
24   confess.  I think I understand it better today than I have in
25   the letter-writing.
```

MCCKFREC

1          But as I understand what Mr. Passin is saying, it's

2     that somehow Prospect Agency thought that -- believed that the

3     manuscripts that Ms. Freeman had provided were so valuable,

4     that they started broadcasting to multiple of their clients,

5     including Ms. Wolff, that, oh, you should borrow some language

6     from these manuscripts, and they weren't enough to add up to

7     any kind of copyright infringement, but that that's a violation

8     of Prospect's fiduciary duty or a breach of contract.

9          There is zero evidence whatsoever in the record for

10    any of this, including with respect to the books that Ms. Wolff

11    eventually wrote many, many years after Ms. Freeman had been an

12    author with Prospect.  Zero evidence.  So the idea that now, as

13    we're hopefully hitting the end of fact discovery, Mr. Passin

14    is identifying new books by not just -- presumably it sounds

15    like not just by Wolff, but books by other authors who were

16    working with Prospect Agency to allege that Prospect was

17    providing that kind of information to them.  He had no

18    evidence, no documentary evidence, whatsoever that anything

19    like that happened with the Wolff books.  So the idea that

20    somehow he now needs discovery of books that aren't part of

21    this case at this point in time and/or were with other authors

22    altogether, and he's saying that, ultimately, if they used

23    them -- I don't even want to sort of give any credence to this

24    hypothetical argument, but just completely hypothetically, if

25    you provided -- if they provided something to some other

MCCKFREC

1    author, which they didn't, he's not even alleging a legal claim

2    that that resulted in.

3              I guess he's saying that that would be somehow breach

4    of fiduciary duty, I don't know.  I'm baffled by this, but all

5    I know is it seems like an attempt to expand discovery further

6    in this case to other things that were not part of his

7    complaint to begin with.

8              MR. PASSIN:  Your Honor, it's Mark Passin.

9              We'll limit it to the Wolff books.

10             THE COURT:  Well, Mr. Passin, the thrust of your

11   letters to me have been that discovery is burdensome, that

12   you're a solo practitioner, that you can't take on all the work

13   here and are feeling snowballed by the defendants.  I don't

14   understand how you intend to take on this additional burden of

15   looking at all other books, where you haven't alleged any

16   specific facts about misconduct or breaches of any duties with

17   respect to any other books.  And discovery is not an

18   opportunity to go searching for a claim.  If you don't have a

19   basis when you file your complaint, I'm not going to allow you

20   to go rummaging through other books and all of the process that

21   goes into publishing a book in order to try to locate a claim

22   that you haven't pled yet.

23             MR. PASSIN:  Your Honor, but I did make the claim on

24   the breach of fiduciary duty and all those claims.  How about

25   if I show you some evidence?  I have evidence.

MCCKFREC

1          THE COURT:  All right.  On the record before me, I'm

2     going to deny any written discovery into the other books than

3     the *Crave* series at issue in this case.

4          Mr. Passin, if you want to ask Ms. Kim or somebody

5     else questions that relate to possible breaches of fiduciary

6     duty beyond the *Crave* series at her deposition, you can ask

7     those questions, and based on those answers, you may be able to

8     come back to me and ask for additional discovery, but on the

9     record before me now, I'm going to deny that request.

10          MR. PASSIN:  Okay, your Honor.  Thank you.

11          THE COURT:  Let's turn to the issue of the plaintiff's

12     document production.

13          I understand from the defendants that there is a

14     concern that the plaintiff herself has searched for responsive

15     documents and produced what she believes is responsive, rather

16     than either having some sort of search term protocol and/or

17     having counsel go through the documents.

18          So, Mr. Passin, why don't I begin with you, and you

19     can tell me how you've collected the documents that are

20     responsive to the defendants' demands.

21          MR. PASSIN:  With respect to the emails, we hired an

22     i-discovery company, and they uploaded her entire computer and

23     did the search.  The only thing they're complaining about is,

24     on her computer, she had manuscripts and notes, and those, she

25     gathered from me, we didn't do a search of her computer, but

MCCKFREC

1    that's just like hard copies.  I mean, there are hard copy

2    documents that the other side has to gather, and their client

3    gets those for them.  I thought I only had to do the search of

4    the emails, okay?  She had no incentive not to give -- it's to

5    her benefit to produce all these documents.

6           But the only thing that we didn't do a search of is

7    her computer, and we know it's everything, also, because, to be

8    honest with you, in 2021, we had her computer imaged, and we

9    have compared it to, and we've produced -- and I know from the

10   person that's a forensic computer expert, my understanding is

11   we produced everything.

12          But the fact of the matter is, we did it on the emails

13   like we thought we had to do, but getting documents off her

14   computer is the same like them getting hard copies from their

15   clients.

16          THE COURT:  I'm not sure that's exactly true, because

17   you can do searches on a computer that you can't do of a file.

18          Let me turn to the defendants.  I don't know,

19   Mr. Halperin or Mr. Koonce, who raised the issue of the

20   non-email document production.

21          MR. KOONCE:  Right.  This is Lance Koonce.

22          I think we raised this first.  So, Ben, you can jump

23   in if you'd like.

24          But I think the way you framed it, your Honor, is

25   exactly right.  At the last hearing, I think Mr. Passin

MCCKFREC

1   disclosed that in doing an email search of his client's

2   documents, that he had allowed his client to self-select the

3   emails that she believed were responsive, and your Honor

4   ordered him to, instead, run search terms on those emails.  And

5   when we were in the course of meeting and conferring on their

6   production, we learned that in collecting digital material

7   documents — I mean, it could be manuscripts, but I think the

8   point is we don't know what else could have been on her

9   computer besides the emails, that every other type of document

10  that would have been digitally on her computer — that the

11  proper way to have identified those materials would also have

12  been to provide access to folders or files.  I think the client

13  has identified generally where things are located, but it's

14  really outside counsel's obligations to then do a search,

15  whether it's -- if it's small enough to go through and search

16  manually and identify responsive documents or if it's a large

17  set, do some sort of keyword search to find anything that would

18  be relevant.  And it sounds like, instead, here, Ms. Freeman,

19  like she did with the emails initially on her computer,

20  self-identified anything she believed was responsive.

21          THE COURT:  Mr. Passin, I think you need to -- if

22  you've got the imaged computer, you need to run searches on

23  that image.  You can work with your client to identify folders

24  that are likely to have responsive materials, but I think you

25  need to, yourself, conduct those searches and then review the

MCCKFREC

1    responses to see whether there are documents that are

2    responsive to the discovery demands.

3                MR. PASSIN:  I will do that, your Honor.

4                But what's frustrating about this all is, again, it

5    looks like I'm not complying, and the fact of the matter is,

6    Wolff produced texts, that we see a zillion texts are deleted

7    that were produced by Kim.  So, all these things are going on

8    on the other side, and they're getting away with all this, and

9    that's what's becoming so frustrating.

10               THE COURT:  I don't know what you mean by getting away

11   with all that.  I think earlier in the conference, we discussed

12   that you were going to be reviewing all those texts.

13               MR. PASSIN:  Well, no, but they've also deleted -- I

14   don't know how I'm going to review those -- Wolff deleted

15   appears in many texts.  How am I going to deal with that?

16               THE COURT:  Well, this is the first that I'm hearing

17   about that.

18               MR. PASSIN:  No, it's in my letter, I apologize, your

19   Honor, but we showed, also, you on one of the exhibits that Kim

20   produced certain texts, and then if you looked at the texts

21   produced by Wolff, they're mysteriously not included.

22               THE COURT:  Okay.  I'm not sure what the application

23   is.

24               MR. PASSIN:  Well, I guess you could order them to

25   produce all their texts that are responsive.  And, to be honest

MCCKFREC

1    with you, they'd say we don't have evidence that they shared

2    the manuscripts.  We believe, very strongly, they did share the

3    manuscripts.  If your Honor would order them to produce those

4    to the extent they had them, if they don't have them, they

5    don't have them, but if you order it, at least they have a

6    court order.

7            MR. HALPERIN:  Your Honor, Ben Halperin.

8            If I may?

9            THE COURT:  Yes.

10           MR. HALPERIN:  Thank you.

11           I want to just state for the record that we did not

12   destroy documents, we are not hiding documents.  We produced

13   everything responsive that exists with the text messages.  The

14   only issue with the redactions, and now there's a potential

15   solution to that.  I think Mr. Passin has repeatedly accused

16   both sets of defendants of unethical conduct here --

17           MR. PASSIN:  I did not accuse you -- I'm not accusing

18   you of deleting the texts, okay?  If that was --

19           THE COURT:  Mr. Passin — Mr. Passin — I'll remind you

20   of my admonition when we started this — I can't have you

21   interrupt lawyers.  It's not fair to the court reporter.

22           MR. PASSIN:  Thank you.  Sorry.

23           MR. HALPERIN:  Your Honor, this is Ben Halperin.

24           I'm basically done.  I think the accusations,

25   respectfully, should stop at this point, and let's move forward

MCCKFREC

1    to try to get the issues resolved.

2            THE COURT:  Okay.

3            So, Mr. Passin, I need you to conduct a search

4    yourself, an electronic search, of your client's electronically

5    stored documents, and you can work with her as to which folders

6    are likely to have responsive documents, but you need to

7    conduct that search in the same sort of way that you did the

8    email search.  These electronically stored documents should be

9    treated similarly.

10           MR. PASSIN:  Okay, your Honor.  Could you please ask

11   the -- may I talk?

12           THE COURT:  Yes, sir.

13           MR. PASSIN:  Can you ask the other side if they did

14   that?

15           THE COURT:  Can I ask the other side if they conducted

16   an electronic review to produce documents?

17           MR. PASSIN:  Of their clients' computers.

18           THE COURT:  Of course.

19           Mr. Halperin, did you conduct an electronic review of

20   your client's information?

21           MR. HALPERIN:  Your Honor, our vendor collected

22   everything pursuant to the way vendors collect documents in

23   e-discovery, so, yes, using the search terms.

24           THE COURT:  Okay.  Thank you.

25           Mr. Koonce, I assume the same for you?

MCCKFREC

1        MR. KOONCE:  Yes, we ran search terms on all the

2    document repositories that we identified as potentially

3    relevant document repositories.  So, sets of files, those kinds

4    of things.  We did not have our client individually identify

5    any documents, other than with respect to some of the financial

6    statements, which is, I think, what Mr. Passin referred to

7    previously, where we could physically -- he was asking for

8    documents sufficient to show the revenues earned by Prospect

9    Agency.  So, in those cases, we would specifically go and pull

10   those financial documents.

11        THE COURT:  All right.

12        Let's turn to, I think, what might be the last issue

13   for document discovery.  I'm sensitive to the time — we've been

14   going an hour already — which is with respect to the privilege

15   log.

16        I understand that the plaintiff stopped logging after

17   the date on which she bought the book on a theory that any

18   communications after that date are, I believe, privileged, is

19   the theory.  In subsequent letter communications, Mr. Passin,

20   you suggested that she might have communicated with advisors or

21   other people or even forwarded information from lawyers to

22   advisors or friends.  I don't know why those communications

23   would be privileged.  Certainly, communications with lawyers

24   where she is seeking the advice of counsel would be privileged,

25   but communications with friends and advisors, unless they were

MCCKFREC

1    with lawyers to get legal advice, would not be privileged.

2              MR. PASSIN:  May I answer, your Honor?

3              THE COURT:  Please.

4              MR. PASSIN:  Well, first off, it wasn't on the grounds

5    of privilege.  What I was saying is, your Honor said that the

6    defendants didn't have to produce anything after February 7th,

7    after February 6th, because I sent my cease-and-desist letter

8    on February 7th — and I assume the theory is on relevance — and

9    I said to you, there may be documents that are very relevant,

10   they may have said to each other destroy all the documents, and

11   you said, look, the theme of this case is we're not going to

12   get every document that's out there, and after you sent the

13   cease-and-desist letter, they don't have to produce any

14   documents.

15             So, my client got very angry with me and said, well,

16   that's not fair.  Why do I have to produce any documents after

17   I discovered the claim on March 31, and then -- first of all,

18   as far as a privilege log, I don't think they have the right to

19   know how many lawyers she contacted and their names and how

20   many experts they contacted and their names.

21             I also think, on the same theory, that they don't have

22   to produce anything after February 6th, she shouldn't have to

23   produce anything after March 31.  It's the same theory.  I

24   don't understand why they get treated one way and we get

25   treated another way.

MCCKFREC

1          THE COURT:  Well, I don't know that they are equal.  I
2     think, oftentimes, the question is when the complaint is filed,
3     that's often a cutoff date.  I don't have a specific
4     recollection of deciding that the cutoff date should be the
5     cease-and-desist letter, though it's six weeks' difference
6     between one and the other.  And so, typically, once a complaint
7     is filed, or when a cease-and-desist letter is submitted,
8     lawyers are getting involved, and much of the communications
9     about the issues raised in the cease-and-desist or in the
10    complaint are issues with or communications with counsel.  I
11    think it's very different to have a communication from your
12    client to her sister or a friend, after she read the book,
13    talking about her views about whether this book is like the
14    book or the manuscript that she wrote.

15          So, I don't think it's an apples-to-apples comparison;
16    I think it's a question of developing the facts.

17          With respect to your concern about how many lawyers
18    she contacted, I suppose -- I'm not sure why it really matters,
19    but I suppose if you're really concerned about that, that you
20    could just log as a group emails with counsel, so long as it
21    was just your client and counsel, meaning the privilege wasn't
22    pierced because a third party was on those communications.

23          With respect to communications your client might have
24    with experts, I don't know why that would be privileged or why
25    she would not have to produce those communications.

MCCKFREC

1          MR. PASSIN:  Because they're consulting experts.

2          THE COURT:  Consulting experts?

3          MR. PASSIN:  Communications with -- it's all work

4     product.

5          THE COURT:  Well, I guess I'd like to know who these

6     experts are.  I mean, if she's sending it to her best friend

7     and calling that person an expert, you know -- if it was truly

8     an expert, someone who could be qualified as an expert at

9     trial, I suppose you might have an argument there, but to the

10    extent she's communicating with friends and family or other

11    people sort of generally in the industry, I don't think that

12    that's work product in the way that the law recognizes.

13         MR. PASSIN:  I really think all of this is irrelevant,

14    your Honor.  What she discusses with third parties about the

15    claim, it's really not relevant.

16         THE COURT:  I'm not sure I agree.  If she's talking

17    about her view of the infringement with her sister, I don't

18    know why that would not be something that would be

19    discoverable.

20         MR. PASSIN:  Well, then I would like their discovery

21    up to after February 6th, for the same reason.  Your Honor, you

22    said that it's not a perfect world, and I'm not going to get

23    it.

24         THE COURT:  Okay.

25         The "what about it" just doesn't really work like this

MCCKFREC

1   in discovery.  So they're really different analyses that we

2   need to consider.  And so once the prospect of litigation is

3   fully ripened because a lawyer sent a cease-and-desist letter,

4   those types of communications typically are with counsel, but

5   before that happens, when a person is musing about whether to

6   bring a lawsuit with friends or family or whomever, there's

7   really no basis to withhold that information.  I'm not aware of

8   any ground on which you can withhold communications that your

9   client made about the case.  I'm not saying she did this, but

10  what if she sent an email to her best friend that said, oh, my

11  gosh, I just read this book, it's kind of like mine, I think

12  I'm going to sue them for a billion dollars even though I know

13  there's no basis, I don't know, that seems like something that

14  they're entitled to.

15         MR. PASSIN:  But that's the exact situation I gave you

16  after February 6th, and you said I'm not entitled to it.  I

17  said suppose they sent an email that said let's destroy the

18  documents so they don't know that we ripped them off.

19         THE COURT:  Okay, understood.

20         I'm going to direct that you revise your privilege log

21  to include communications.  On the privilege log, you don't

22  need to include the communications, you just need to make it

23  clear what the privilege is that you're asserting, that they

24  can stop on February 7th, 2022 --

25         MR. PASSIN:  I believe they stopped February 6th.

MCCKFREC

1          THE COURT:  Sure.  They can stop on February 6, 2022.

2          But you need to log the communications that you're

3     seeking to withhold, and you need to comply with the local

4     rules so the log is clear enough, that the Court, if necessary,

5     and certainly counsel, can evaluate your assertion of

6     privilege.

7          MR. PASSIN:  But I can group together -- how do I

8     group together the lawyers, your Honor?

9          THE COURT:  I would advise you to look at some of the

10    case law that talks about categorical groupings.  If you have

11    communications, your client to a lawyer, I suppose, depending

12    on the nature of those communications, you could date them and

13    indicate lawyer one, lawyer two, but you need to make sure that

14    if there are other people on those communications, that needs

15    to be revealed.  So, I don't know what your client's

16    communications looked like.

17         MR. PASSIN:  I'll be completely honest.  For example,

18    I know she had a communication with a lawyer, and she sent it

19    to her father.  Do I have to produce that, or can I list her

20    father, and then we deal with it?

21         THE COURT:  You need to log it.  If you're going to

22    claim privilege, I'm not sure what the basis is, because if she

23    had a privileged communication with a lawyer, and then she

24    shared it with a third party, that privilege extinguishes.

25         MR. PASSIN:  Okay.

MCCKFREC

1          Let me ask you one other question because I don't want

2    it to come back on this issue.  After she stopped -- and

3    Mr. Koonce was even complaining about this — after she stopped

4    being represented by the agent, she talked to other people

5    about maybe modifying that manuscript.  I don't think those are

6    relevant at all.  Do I have to produce those?

7          THE COURT:  I can't really make a ruling in the

8    abstract.  I'm not quite sure what you're referring to.

9          MR. PASSIN:  All right, all right.

10          MR. HALPERIN:  Your Honor, this is Ben Halperin.

11          Really quick, I think the solution you just fashioned

12    sounds fine, that we can start with a privilege log, and then

13    we can discuss about whether there should be briefing or some

14    other resolution of these, but I think the swath of documents

15    that Mr. Passin revealed relating to the manuscripts might be

16    relevant, and so I think we'd like -- we don't want to prolong

17    discovery, we don't want to have to go through a big fight

18    about this, but I think we would like some explanation from him

19    in an email or her about what these additional documents he

20    just mentioned are so that we can figure out whether we want to

21    pursue discovery of them.

22          MR. PASSIN:  But then -- all right.

23          Your Honor, may I be heard?  They withheld documents

24    on irrelevancy, and no one has told me what they've withheld.

25          THE COURT:  Mr. Halperin, I'm sorry, what exactly are

MCCKFREC

1    you seeking?

2            MR. HALPERIN:  I think he just stated that after

3    completing the relationship with Ms. Kim, that she communicated

4    regarding her manuscripts with other people, and that those

5    documents haven't been produced.  So, those clearly would have

6    hit on the search terms.  They involve her manuscripts.  All

7    the terms that involve the contents of those manuscripts would

8    have been hit on, and we didn't know about these documents

9    until right now.  So I just want to understand what they are

10   and why they weren't produced.  And to just kind of preview

11   Mr. Passin's concern, our attorneys did a responsiveness

12   review, as is common in e-discovery, and we removed

13   nonresponsive documents that had hit on search terms for any

14   reason.  For instance, because the word "crave" is in the

15   search terms, and someone might crave a sandwich, for example,

16   like something like that would have been removed.  It is a

17   good-faith due diligence review of the production, like happens

18   in any case.

19           MR. PASSIN:  May I be heard, your Honor?

20           Burt they've also told me they withheld relevant

21   documents as well.

22           THE COURT:  Okay.  Can I understand what it is you're

23   saying your client has done and that you don't think should be

24   produced?

25           MR. PASSIN:  Oh, me, your Honor, Mark Passin?

MCCKFREC

1              THE COURT:  Yes.

2              MR. PASSIN:  What I asked -- I'm trying to be honest.

3      What I asked is after she stopped working with the agent at

4      issue, she, I think, continued to work on the manuscript,

5      although with someone different, and she would communicate with

6      people about that manuscript, about maybe making changes to

7      that manuscript and so forth, which has nothing to do with this

8      case.

9              THE COURT:  Well, as I understand it, your client,

10     after sending manuscripts and working with the defendants, she

11     then retained another agent and sent --

12             MR. PASSIN:  No, no, I think they were writing

13     partners, or she may have hired someone to review to look at

14     her manuscript and give her some ideas.

15             THE COURT:  And how do we know that the person that

16     she sent it to didn't share this information inappropriately?

17             MR. PASSIN:  Well, I don't see how that would be

18     relevant unless they showed it to Ms. Wolff.

19             THE COURT:  Exactly.

20             MR. PASSIN:  But we're not claiming that, so...

21             THE COURT:  I know --

22             MR. KOONCE:  It certainly would be relevant to

23     Prospect if that were true.

24             THE COURT:  Right, the claims against Prospect and

25     Kim, as I understand them, are both breaches of certain duties

MCCKFREC

```
1    and contractual obligations, and that's based on a sort of

2    theory of opportunity.  But to the extent your client was

3    distributing her manuscript more widely, then the opportunity

4    shifts.

5             MR. PASSIN:  It's a different manuscript was changed,

6    it's not -- they don't have -- it's a different manuscript,

7    but, okay, I hear what you're saying.

8             All I'm saying, too, your Honor, is I'm telling you

9    they told me they withheld, on relevancy, some documents, and

10   I'm being honest and saying what we withheld.  I'd like them to

11   do the same.

12            THE COURT:  Okay.

13            MR. PASSIN:  We can meet and confer about it.  We can

14   meet and confer about it.

15            THE COURT:  Okay.  But, to be clear, I'm not going to

16   direct the defendants to identify all of the grounds on which

17   they withheld documents on relevancy.  That would be enormously

18   burdensome.  The hypothetical that was just given about craving

19   a sandwich is a perfect example of that.  And so I'm not going

20   to require either side to identify those documents that they

21   have withheld because they believe they are irrelevant.  I

22   assume, as officers of the Court, everybody is conducting

23   themselves appropriately.

24            However, I think documents or communications between

25   your client and nonparties sharing the very work that you claim
```

MCCKFREC

1    was infringed would be relevant, and so those types of

2    documents, I think, should be produced.

3            MR. PASSIN:  Okay.  Thank you, your Honor.

4            THE COURT:  All right.

5            I'd like the parties to submit a letter on Friday with

6    respect to any agreements on the reviewing of the redacted

7    materials.  If the parties can't reach agreement, then I'll do

8    an in-camera review of a sample of those texts, but I'm hopeful

9    that the parties can come up with some protocol to allow

10   plaintiff's counsel to do an attorney's eyes only review of the

11   redacted text messages sitting in his own office through some

12   sort of platform.  So I'd like a letter on Friday letting me

13   know either that the parties have reached an agreement or are

14   otherwise at an impasse, in which case, we'll switch gears, and

15   I will do an in-camera review of a sample.

16           In addition, I am going to direct that each side

17   submit a five-page letter for me with respect to the issue

18   about how plaintiff is going to prove this case, specifically

19   on what works he's identifying or his client is identifying as

20   the works that were infringed upon.  And it sounds like there

21   was some colloquy today about the difference between how such

22   claims are proved in the Second Circuit versus the Ninth

23   Circuit that may have bearing on how the Court proceeds.  So, I

24   invite the parties to develop those arguments.

25           I'd like that letter filed a week from today.

MCCKFREC

1          Any objection to it being filed on the 19th?

2          MR. HALPERIN:  Your Honor, Ben Halperin.

3          Can we just possibly have until the end of next week

4   on that letter in light of some deadlines on some other cases

5   and since this will require some kind of legal research and

6   briefing type exercises?

7          THE COURT:  Sure.  Does the 23rd work for everybody?

8          MR. PASSIN:  That's fine, your Honor.

9          MR. HALPERIN:  Yes, your Honor.

10          THE COURT:  Why don't we set that as also the date by

11   which the plaintiff is to provide a revised privilege log.

12          It should also be the date by which the plaintiff

13   produces any new responsive documents, if any, based on an

14   electronic searching of the plaintiff's computer files.

15          The only other thing on my agenda was the issue of

16   plaintiff's interest in amending the complaint.  As I

17   understand it, the suggestion is to add a claim of infringement

18   with respect to a book that was published in 2021, *The Katmere*

19   *Academy* and with respect to the fifth in the series in the

20   *Crave* series that I understand was published within the last

21   month or so.

22          Is that correct, Mr. Passin?

23          MR. PASSIN:  Yes.  It was published November 8th, your

24   Honor.

25          THE COURT:  So, I guess I have a question about why

MCCKFREC

1   you're only raising the 2021 book now.  And then my second

2   question is sort of related to my earlier ruling on discovery.

3   I still don't see why bringing in another book, particularly at

4   this late stage, makes sense.  If you are right, and you're

5   able to prove that the defendants infringed your client's works

6   and violated either contractual or common-law duties, then that

7   will almost certainly be true as to the fifth book.  But given

8   the sprawling nature of this litigation and the difficulty by

9   which I think both sides are facing in identifying the

10   infringements, I don't see the value in expanding the scope of

11   the works at this stage.

12        Mr. Passin, can you explain to me why this makes

13   sense?

14        MR. PASSIN:  First of all, to answer your first

15   question about *The Katmere Academy*, we just never knew it

16   existed.  We never saw that it existed.

17        Well, I mean, my client sort of -- my client feels

18   that they don't want to have to go through this all again, and

19   they'd like to dispose of it all in one lawsuit.

20        THE COURT:  Let me ask you, as her representative:  I

21   understand her sort of emotional desire to be done with it all,

22   but, legally speaking, why at this stage, what would otherwise

23   be weeks before the close of fact discovery, why does this make

24   sense?  I guess relatedly, have you been able to identify for

25   the defendants any specific infringement, or is it just a

MCCKFREC

1    continuation of character development?

2          MR. PASSIN:  I believe my client has specific

3    infringement, but I haven't discussed it with the other side.

4          THE COURT:  Well, in that case --

5          MR. PASSIN:  To answer your question, your Honor, we

6    haven't taken depositions yet, and we haven't had that much

7    time for discovery.  Remember, I didn't get the documents until

8    October 21, and it's only -- it's not even two months.

9          THE COURT:  All right.

10         Well, I think before you're going to file any motion

11   for leave to amend, you should provide the defendants with a

12   proposed amended complaint.  That will certainly be something

13   that you will need to submit if you're going to make a motion

14   for leave to amend your complaint.  And so, if you are set on

15   proceeding in that way, I would suggest that you first get a

16   draft proposed amended complaint to the defendants, and based

17   on that, you can meet and confer on whether or not the

18   defendants would consent to the amendments.

19         Again, I don't know exactly whether or not -- it

20   sounds like you don't necessarily either — whether or not

21   you're saying there's specific passages that you believe were

22   listed or whether or not it's just a continuation of character

23   development, but I think that's something that needs to be

24   shared with the defendants because, depending on what your

25   theory is, it could radically expand the scope of discovery at

MCCKFREC

1   a late stage in the lawsuit.

2          MR. PASSIN:  Okay, your Honor.

3          And, your Honor, there's another part to that, which

4   is:  The other side is producing versions of my client's

5   manuscript that she no longer has, and she needs to review

6   those to see if there are infringed passages in those that she

7   didn't have in the manuscripts in her possession.  And if

8   that's the case, she needs to add additional manuscripts that

9   she claims have been infringed.  But she needs a couple of more

10  weeks to go through all the manuscripts they produced to see

11  which ones she had and which ones she didn't have and if

12  there's any additional material in there that has been

13  infringed.

14         THE COURT:  Is there an application to the Court?

15         MR. PASSIN:  I mean, that was mentioned in the letters

16  as part of the amendment — she needs to add possibly new

17  material that's been infringed, but she has to review the

18  material that's been produced by the other side.

19         THE COURT:  Okay.

20         The filing of a complaint and amending, it can't be an

21  iterative process.  So, again, I'll just say, I'd like your

22  client to expeditiously review whatever material she needs to

23  review, and for you, if you're going to move forward on

24  amending the complaint, to send the defendants a proposed draft

25  amended complaint, and for the parties to have a

MCCKFREC

1   meet-and-confer, and if the parties can't reach an agreement on

2   that amendment, then the plaintiff should file a motion for

3   leave to amend.  I'm going to continue to move the case forward

4   regardless, and I will just leave it to the plaintiff to file

5   that motion at the appropriate time.  But because that motion

6   will necessarily have to have a draft amended complaint, the

7   first thing you need to do is submit that draft amended

8   complaint to the defendants and then have a meet-and-confer

9   with them about what you're seeking to amend.

10          Okay?

11          MR. PASSIN:  That's fine, your Honor.

12          And, your Honor, I apologize if I was a little too

13   aggressive on that.  It's very important to my client.  She

14   felt it was unfair, but I apologize if I was arguing too

15   strenuously on that.

16          THE COURT:  That's fine.

17          So just to recap:

18          On Friday, I'm going to get a letter from the parties

19   letting me know, hopefully, that they have reached an agreement

20   on the attorney's eyes only review of the unredacted text

21   messages.  If not, then we'll move forward with an in-camera

22   review of sampling.

23          By December 23rd, I'm going to receive simultaneous

24   five-page letter briefs regarding the type -- just to be clear,

25   the types of briefs I'm looking for are to help the Court

MCCKFREC

1    manage discovery, so to help me understand how this case is
2    going to be tried and what sort of evidence is going to be
3    relied upon, and that will help me further evaluate this issue
4    with respect to plaintiff's more sweeping claims of infringing
5    works and whether or not they need to be narrowed to a
6    particular body of work.

7         In addition, by February 23rd, the plaintiff is to
8    produce a revised privilege log and those documents that were
9    generated by an electronic searching of the plaintiff's
10   computer files and a production of those documents.

11        I'm not going to require anybody to state why they
12   didn't submit relevant documents, but, as I indicated, based on
13   the information presented to me today, I think that
14   communications that Ms. Freeman had with subsequent people
15   after her relationship with the Prospect Agency ended, but with
16   respect to the same infringing works that she's claiming the
17   defendants infringed, that those would be relevant
18   communications subject to production.

19        So, the very last thing — and then I'll let the court
20   reporter go, for whom I know it's been a long day — is the
21   discovery deadlines.

22        Given all of this information and the holidays, I
23   don't expect there to be -- I imagine there won't be
24   depositions this month and there's going to be additional
25   documents exchanged towards the end of the month.  Mr. Passin

MCCKFREC

1    has indicated that he thinks it's going to take until the end

2    of January to review the documents that have been produced to

3    date.  In light of that and the 12 or more depositions that I

4    think the parties anticipate taking, I'm inclined to extend the

5    discovery deadline until the end of February.  I think that

6    that's generous and allows the parties to get through what they

7    need to get through.

8                Any objections to that?

9                MR. HALPERIN:  Your Honor, Ben Halperin --

10               MR. PASSIN:  This is Mark Passin.

11               Could we have until the middle of March?  Because if

12   I'm not going to get through until the end of January, that

13   gives us one month to take all those depositions.

14               THE COURT:  Mr. Halperin?

15               MR. HALPERIN:  Your Honor, I'd like to be heard on

16   this, if you don't mind.  And I realize it's the end of the

17   day, and I apologize to your Honor and the court reporter for

18   the length of the call.

19               We do object to that.  A recurrent theme in

20   plaintiff's letter is that the defendants somehow acted

21   improperly in not producing documents until October 21st.

22   October 21st was the Court's deadline for production, so we did

23   nothing improper.

24               I think what we're seeing here is a plaintiff who got

25   40,000 documents, which is not an unreasonable amount in a case

MCCKFREC

1    of this scope, and didn't have the resources to review them.

2              Now, we understand your Honor is going to grant a

3    discovery extension, but the reason for that should be that at

4    this stage of December, with the holidays, it's just not

5    feasible to get all these depositions in, but I think all those

6    depositions can happen in January, and the end of January

7    should be sufficient for that.

8              The other point is that this extension should not be

9    used by Mr. Passin to propound additional written discovery or

10   issue new subpoenas.  This should be a matter of finishing up

11   the review of documents and finishing these depositions so that

12   the parties can move on with the case and we can move to

13   summary judgment.  We should not be using this as a way to

14   further expand the scope of discovery in any way.  He indicated

15   twice in his letter, that was dated December 6th, I think at

16   1:00 a.m. December 7th, that he intends to issue new written

17   discovery requests after he's reviewed all the documents.  I

18   think we should put a stop to that at this point.  Let's get

19   his review done — he needs more time because he's one guy doing

20   it, we get it — but let's get these depositions finished so we

21   can move on, and we'd request that ends January 31st.

22             MR. KOONCE:  I'd like to be heard.  This is Lance

23   Koonce.

24             I would just reiterate what Mr. Halperin said.  I

25   would say just two other things, which is:

MCCKFREC

1          My client, Prospect Agency, is my client, and Emily

2     Kim, it's a very, very small firm, and they've been counting on

3     this discovery concluding quickly and efficiently because this,

4     for them, they're going to have spent the money that they

5     earned on this book.  We will be seeking prevailing party

6     attorneys' fees in this case, but it's a huge burden on these

7     small entities.

8          The other thing I'd say is that even though Mr. Passin

9     complains about receiving 40,000 documents and that some of

10    them are nonresponsive, we, at the last hearing, and also in

11    meet-and-confers, pleaded with Mr. Passin to identify longer

12    search strings, not one or two or three words here or there,

13    because at the same time that he was seeking for us to produce

14    responsive documents, the complaint here is that, oh, you might

15    be hiding something, that you could be burying messages to

16    Ms. Wolff somewhere, so we needed to be as inclusive or even

17    overinclusive as possible, because we're trying to prove a

18    negative that no manuscript, no pieces of manuscripts, were

19    sent to anyone here.  We described that process at the last

20    hearing, and your Honor, I think, encouraged Mr. Passin to

21    provide narrower search terms.

22         So, to the extent he's got more documents than he

23    wanted, we weren't trying to bury him; it was exactly the

24    opposite, we were trying to find ways to provide narrower

25    terms, but he did bring that on himself by insisting on these

1    broad search terms.

2          And he's now complaining that we, instead, after he

3    insisted on broad search terms, should have reviewed tens of

4    thousands of documents individually.  We did run our own

5    filters, and we did pull out a significant amount of

6    nonresponsive documents, like communications with other clients

7    of Prospect and contracts with them, but I think we would love

8    to see this discovery period end as soon as reasonably possible

9    and not be expanded because this costs a small firm like my

10   client's firm an inordinate amount of money every month that

11   this discovery goes on.

12         MR. PASSIN:  Your Honor, may I be heard?

13         THE COURT:  Briefly.

14         MR. PASSIN:  All right.

15         First of all, again, they're trying to make me sound

16   like the bad guy.  I just got written interrogatory responses

17   from them yesterday that I served in June.  I still don't have

18   responsive documents about damages, all of them.  And I still

19   need to take some written discovery.  It won't be voluminous.

20   And I need to maybe serve some subpoenas.

21         THE COURT:  Okay.  Thank you.

22         I'll just begin by saying granting an extension of

23   discovery is not because I view the defendants as having been

24   dilatory.  My review of the production so far and the court

25   docket suggest that they have been producing documents

MCCKFREC

1    appropriately.

2              If I had a quarter for every time one party wanted

3    expansive discovery search terms and then complained about

4    those voluminous documents, I'd be a rich person, so it's not

5    surprising to me that we find ourselves with a high volume of

6    documents, maybe some of which are less responsive than we

7    would have wanted.

8              I recognize that Mr. Passin is handling this case, it

9    sounds like, on his own, or largely on his own, and I think, in

10   fairness to the defendants, there's a need to clarify exactly

11   the scope of what is being alleged, which is why we're going to

12   have those letter briefs submitted essentially the day before

13   Christmas.  And I don't intend on reading them on Christmas

14   Eve, so I wouldn't assume that I'm going to be getting my

15   resolution of that issue out right away, and I think that's

16   going to affect, potentially, the way the case is going to

17   proceed from there on out.

18             So I'm going to extend the discovery deadline until

19   March 15th.

20             With respect to additional discovery demands, I'm not

21   going to make an advisory ruling, Mr. Passin.  I expect you to

22   be conducting yourself in a way that is efficient and not

23   serving discovery demands that are broad and expansive without

24   any foundation.

25             So, you've already served a number of discovery

MCCKFREC

1    demands, as I understand it.  I'm not going to preclude you

2    from having follow-up discovery demands, but I expect that they

3    will be narrowly tailored to information that you have received

4    as a result of those first round of discovery demands.

5            The March 15th date is a real date, so that date will

6    not be extended, so the parties should conduct themselves as

7    such.  Certainly, if the defendants want to move forward with

8    their depositions in January, there is nothing that stops them

9    from doing that, but I think that fairness necessitates

10   extending it to the 15th of March.

11           MR. PASSIN:  Thank you, your Honor.

12           THE COURT:  Anything further?

13           MR. KOONCE:  Just one quick clarification on your

14   prior order.  You indicated that depositions would be held --

15   could be held either remotely or in the state where the witness

16   was located.

17           Two of the individuals that were in the list of

18   deponents here from plaintiff are non -- they're third-party

19   witnesses, they're former employees of Prospect Agency, and it

20   wasn't clear to me from the order, your Honor, whether the

21   ability of plaintiff to take those depositions in person

22   extended to those third parties.  They would prefer remote

23   depositions, but I just mainly wanted clarification that that

24   order extended to third parties as well as -- where the burden

25   is a slightly different analysis than the party witnesses.

MCCKFREC

1               THE COURT:  It does.

2               MR. HALPERIN:  Okay.  Thank you, your Honor.

3               THE COURT:  All right.

4               Thank you to our court reporter for staying on so

5     long.  I apologize.

6               Thank you to everyone else, and I will look out for

7     that first letter at the end of the week.  We're adjourned.

8                              *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25