## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN,<br><br>     Plaintiff,<br><br>vs.<br><br>TRACY DEEBS-ELKENANEY P/K/A<br>TRACY WOLFF, et al.,<br><br>     Defendants. | Case No.:  1:22-cv-02435-LLS-SN |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE NETBURN'S JANUARY 11, 2023 ORDER

Nancy E. Wolff, Esq.
Benjamin S. Halperin, Esq.
CeCe M. Cole, Esq.
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474

*Attorneys for Defendants Tracy
Deebs-Elkenaney p/k/a Tracy Wolff,
Entangled Publishing, LLC,
Holtzbrinck Publishers, LLC d/b/a
MacMillan, and Universal City
Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
29 Little West 12th Street New York,
NY 10014 Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim and
Prospect Agency, LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 2

      A.      The Works At Issue In This Case ................................................................. 3

      B.      Plaintiff's Refusal To Specify The Allegedly Infringed Work ................... 6

      C.      Judge Netburn's Order And Plaintiff's Objection ....................................... 7

ARGUMENT ..................................................................................................................... 9

I.      THE ORDER WAS NOT DISPOSITIVE OF ANY OF PLAINTIFF'S CLAIMS. ................................................................................................................. 10

II.      JUDGE NETBURN DID NOT CLEARLY ERR IN REQUIRING PLAINTIFF TO SELECT TWO MANUSCRIPTS AS PRIMARY WORKS FOR PROVING COPYRIGHT INFRINGEMENT. ......................................................................... 12

      A.      The Order Is Not Contrary To The Copyright Act. ................................... 12

      B.      The Order Did Not Misapply Relevant Caselaw. ...................................... 16

CONCLUSION ................................................................................................................ 19

i

## **TABLE OF AUTHORITIES**

Cases

*Allen v. Scholastic Inc.*,
739 F. Supp. 2d 642 (S.D.N.Y. Jan. 6, 2011) ...................................................... 17-18

*Amanze v. Adeyemi*,
2019 WL 2866071 (S.D.N.Y. July 3, 2019),
*aff'd*, 824 F. App'x 86 (2d Cir. 2020) ...................................................................... 17

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*,
90 F. Supp. 2d 431 (S.D.N.Y. Mar. 31, 2000) ........................................................ 19

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) ..................................................................... 15, 16, 19

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992) ..................................................................................... 16

*Dean v. Cameron*,
53 F. Supp. 3d 641 (S.D.N.Y. Sept. 17, 2014) ......................................................... 15

*DiTocco v. Riordan*,
815 F. Supp. 2d 655 (S.D.N.Y. Sept. 20, 2011),
*aff'd*, 496 F. App'x 126 (2d Cir. 2012) ........................................................... 6, 17, 18

*Ferriso v. Conway Org.*,
1995 WL 580197 (S.D.N.Y. Oct. 3, 1995) ......................................................... 10, 11

*Green v. Harbach*,
750 F. App'x 57 (2d Cir. 2019) ................................................................................ 16

*Guity v. Santos*,
2020 WL 4340417 (S.D.N.Y. July 28, 2020) ........................................................... 18

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. Jan. 26, 1999) .......................................................... 17

*Hudson v. Universal Pictures Corp.*,
2004 WL 1205762 (E.D.N.Y. Apr. 29, 2004),
*aff'd sub nom. Hudson v. Imagine Ent. Corp.*, 128 F. App'x 178 (2d Cir. 2005) ................... 14

*In re Hulley Enters. Ltd.*,
400 F. Supp. 3d 62 (S.D.N.Y. Sept. 5, 2019) ........................................................... 9

*Jean-Laurent v. Wilkerson*,
   461 F. App'x 18 (2d Cir. 2012) ............................................. 11

*Khatabi v. Bonura*,
   2017 WL 10621191 (S.D.N.Y. Apr. 21, 2017) ....................................... 11

*Kroencke v. Gen. Motors Corp.*,
   270 F. Supp. 2d 441 (S.D.N.Y. July 10, 2003),
   *aff'd*, 99 F. App'x 339 (2d Cir. 2004) .............................. 15

*Marshall v. Yates*,
   1983 WL 1148 n.2 (C.D. Cal. Oct. 26, 1983) ....................................... 15

*May v. Sony Music Ent.*,
   399 F. Supp. 3d 169 (S.D.N.Y. June 28, 2019) .................................. 18

*McAllan v. Von Essen*,
   2004 WL 2998510 (S.D.N.Y. Dec. 27, 2004) ................................. 9-10

*Montgomery v. Holland*,
   408 F. Supp. 3d 353 (S.D.N.Y. Sept. 30, 2019),
   *aff'd sub nom. Montgomery v. NBC Television*,
   833 F. App'x 361 (2d Cir. 2020) .................................... 16, 18

*Montgomery v. NBC Television*,
   833 F. App'x 361 (2d Cir. 2020) .................................... 16, 18

*Nelson v. Grisham*,
   942 F. Supp. 649 (D.D.C. Sept. 26, 1996),
   *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) ................................. 14

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) ........................................ 6, 17

*PowerShare, Inc. v. Syntel, Inc.*,
   597 F.3d 10 (1st Cir. 2010) ....................................... 11

*Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*,
   2 F. Supp. 3d 499 (S.D.N.Y. Feb. 21, 2014) .......................... 10

*Ramgoolie v. Ramgoolie*,
   2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018) ...................... 9, 10, 12

*Rodriguez v. Hanesbrands Inc.*,
   2018 WL 1686105 (E.D.N.Y. Mar. 30, 2018) ........................... 12, 13

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ........................................ 16

*Sheldon Abend Revocable Tr. v. Spielberg*,
 748 F. Supp. 2d 200 (S.D.N.Y. Sept. 21, 2010) .......................................... 14, 17, 18

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*,
 900 F.2d 522 (2d Cir. 1990) .......................................................................... 9

*TufAmerica, Inc. v. Diamond*,
 968 F. Supp. 2d 588 (S.D.N.Y. Sept. 10, 2013) ............................................ 18-19

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
 996 F.2d 1366 (2d Cir. 1993) ........................................................................ 15-16

*United States v. Gladden*,
 394 F. Supp. 3d 465 (S.D.N.Y. Aug. 20, 2019) ............................................ 12

*Walker v. Time Life Films, Inc.*,
 615 F. Supp. 430 (S.D.N.Y. Aug. 14, 1985),
 *aff'd*, 784 F.2d 44 (2d Cir. 1986) .................................................................. 14-15

*Walker v. Time Life Films, Inc.*,
 784 F.2d 44 (2d Cir. 1986) ............................................................................ 8

*Warner Bros. v. Am. Broad. Cos.*, Inc.,
 530 F. Supp. 1187 (S.D.N.Y. Jan. 20, 1982) ................................................ 8, 16

*Williams v. Beemiller*,
 527 F.3d 259 (2d Cir. 2008) .......................................................................... 11

*Williams v. Crichton*,
 84 F.3d 581 (2d Cir. 1996) ............................................................................ 17, 18

*Zappin v. Comfort*,
 2022 WL 4592551 (S.D.N.Y. Sept. 30, 2022) .............................................. 12, 13

Statutes

17 U.S.C. § 101 .................................................................................................... 13

Other Authorities

U.S. Copyright Office, Compendium of U.S. Copyright Practices § 507.1 ................................13

U.S. Copyright Office, Compendium of U.S. Copyright Practices § 709.4 ...............................13

Defendants[1] respectfully respond to Plaintiff's objection ("Objection" or "Obj.," ECF No. 112) to Magistrate Judge Sarah Netburn's January 11, 2023 Order ("Order," ECF No. 105) requiring Plaintiff to select two of the many drafts of her unpublished novel to serve as the primary works for establishing copyright infringement.[2] The Order was correct as set forth herein.

In this case, Plaintiff Lynne Freeman alleges that the New York Times bestselling *Crave* book series plagiarizes her unpublished young-adult paranormal romance fantasy novel, known as either *Masqued* or *Blue Moon Rising* (collectively, *"Masqued"*). Plaintiff argues that 17 different drafts of *Masqued* plus 13 sets of informal notes—for a total of *30* iterations of the same underlying work—need to be considered when comparing the parties' works to adjudicate whether they are substantially similar and thus whether there was copyright infringement. Judge Netburn ordered Plaintiff to select two specific drafts of *Masqued* to serve as the primary versions for proving infringement.

Plaintiff objects to this ruling as allegedly beyond magistrate authority and a clearly erroneous application of copyright law, but none of this is correct. As explained below, Judge Netburn did not exceed her authority or render a "summary adjudication" because the Order did not dispose of any of Plaintiff's claims and instead merely streamlined the evidence Plaintiff can use to try to prove infringement. Judge Netburn also correctly applied applicable law, since the Copyright Act and Second Circuit law do not allow a plaintiff to attempt to prove copyright infringement by amalgamating unprotectible short phrases from numerous drafts of the same underlying work, which is what Plaintiff is trying to do here.

---

[1] Defendants collectively are Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal").

[2] Plaintiff argues that the Order was dispositive, which entitles Defendants to a response under Rule 72(b)(2).

Most importantly, Judge Netburn's Order is not only legally correct but sensible, since it recognizes that nobody (not the parties, Court, or jury), can reasonably compare the four *Crave* books (each around 600-700 pages) to dozens of different versions of Plaintiff's unpublished novel (each manuscript draft around 400-600 pages). Ultimately, if Plaintiff cannot prove copyright infringement based on two full versions of her novel of her own choosing, there is no reason to believe that she could do so by adding in short tidbits of unprotected content from 28 others. Plaintiff's Objection should be overruled.

## BACKGROUND

Plaintiff is a non-practicing family law attorney based in Alaska and California and the alleged author of *Masqued*. Wolff has written more than 60 novels over the last 30 years and is the New York Times bestselling author of the allegedly infringing *Crave* series. Defendants Entangled and Macmillan are the publisher and distributor, respectively, of the *Crave* series. Defendant Universal has an agreement with Wolff and Entangled to make a *Crave* movie. Defendant Kim is a literary agent, through her company Prospect, and has at different times represented both Wolff and, for a short period, Plaintiff. Plaintiff filed this lawsuit on March 25, 2022 and filed a First Amended Complaint ("FAC," ECF No. 24) on May 23, 2022.

Plaintiff's central allegation is that she shared numerous versions of her manuscript and related notes with Prospect, who then secretly shared them with Wolff and others at Entangled, "who then copied the material from the various versions of the manuscript and the notes to write the Crave series." (Obj. at 1.) Defendants will demonstrate at summary judgment that none of this is true as a factual matter.[3] Plaintiff claims that Defendants copied from 17 different drafts of her

---

[3] Notably, at least 16 of the manuscript drafts/notes pre-date Plaintiff's engagement of Prospect as her agent, and three others post-date her work with Prospect. Discovery has shown that none of these 19 documents was ever shared with Prospect, nor even all the drafts that Plaintiff created during her engagement of Prospect.

manuscript and 13 sets of notes variously containing "chapter outlines, plot points, character descriptions, and excerpts." (*Id.* (collectively referring to these materials as the "Freeman Copyrighted Materials").)[4] She alleges that "each of the thirty" collective drafts/notes "were infringed individually and in the aggregate by the four books in the Crave series." (*Id.* at 4.) As set forth herein, the issue before the Court now is whether Judge Netburn clearly erred in requiring Plaintiff to select two of these 30 iterations of the same work to serve as the primary versions for the purpose of proving copyright infringement.

A. **The Works At Issue In This Case**

Although the merits of Plaintiff's claims are not currently before the Court, a brief description of the works at issue is necessary to supply context to Judge Netburn's ruling.

Plaintiff's unpublished novel, *Masqued*, is "a young adult paranormal romance fantasy manuscript." (Obj. at 3-4.) The title of this work has changed over time, but all the different drafts are merely revisions of the same underlying novel.[5] Wolff's *Crave* series consists of five published books entitled *Crave*, *Crush*, *Covet*, *Court*, and *Charm*.[6] Plaintiff claims in her Objection that both *Masqued* and *Crave* are set in high schools in Alaska and feature teenaged female protagonists who initially believe they are human but learn that they possess magical powers as they navigate dark romance and supernatural conflicts (this description by Plaintiff is not fully accurate as set forth below). (*See id.* at 4.) But as Defendants will demonstrate at summary judgment, the works'

---

[4] The term "Freeman Copyright Materials" is misleading insofar as it implies that each of the 30 drafts/notes is subject to its own valid copyright. As explained below, different drafts of the same underlying work are derivative works of the original. But here, when registering her 30 various drafts/notes, Plaintiff did not register them as derivative works or reference the original work in her applications, which renders her copyright registrations defective.

[5] Based on documents produced in discovery, it appears that Plaintiff initially called her manuscript *Blue Moon Rising* but changed the title to *Masqued* in roughly August 2012.

[6] *Charm*, which had not been published when this lawsuit was filed, is not presently at issue in this case.

share no similarities other than high-level themes and tropes that are both unprotectible and common in young-adult paranormal romance literature.

Just to start, and while the short summary below is no substitute for a direct comparison and only scratches the surface of the many ways these works significantly differ:

- The protagonist in *Masqued* is a teenaged girl named Anna who lives in Anchorage, Alaska with her mother and aunt. The mother discourages Anna from engaging with Tarot cards (a significant theme throughout the novel) and practicing a form of magic referred to as the "Craft," while Anna's aunt secretly supports it. Anna knows from the outset that she, her mother, and aunt are "Kindred" (meaning natural-born witches). As Anna's 17th birthday and her "Initiation" into the Craft approaches, she is haunted by disturbing dreams and Tarot visions that foreshadow a difficult choice she will be forced to make about whether to use her powers for Light (good) or Shadow (evil). Anna is also being stalked by a raven who at first seems to be one of her "Initiation guides" but turns out to be an evil demon. Anna is otherwise a typical frustrated teenager who attends a typical high school (not a remote boarding school), where magic is neither overt nor widespread. Anna confronts typical day-to-day high school tropes, like mean girls, issues with social status, and teen romance. Anna reluctantly falls for a handsome and mysterious new student named Ash, whose parents ostensibly moved to Alaska to research the ancient Celts and teach history, but who are really shapeshifters fighting a supernatural war. As a mostly unrelated storyline, girls randomly go missing throughout the story and the kidnappers are in search of "the Nyx," who turns out to be Anna. Significantly, each chapter is marked by a different Tarot card, and the story explores the different meanings of each Tarot card as related to Anna's storyline.[7]

- The protagonist in the *Crave* series, Grace, moves to a remote boarding school in Alaska called Katmere Academy after both her parents suddenly die in a car crash. Her uncle is the headmaster of Katmere and her cousin is a student and Grace's roommate. Although Grace does not know this at first, Katmere is a bona fide magical school (much like Hogwarts in *Harry Potter*), where the student body is divided into vampires, witches, werewolves, and dragons, who variously align with and/or fight each other. Magic is woven into the fabric of the school; the students take classes on it and discuss and display it openly (except in front of Grace at first). Grace begins the story mild-mannered and lacking confidence, believing that she is a normal girl, but toward the end of the first novel learns that she too is paranormal and is in fact a member of a magical faction known as the gargoyles that was

---

[7] This summary is based mostly on the manuscript version produced by Plaintiff as LF06904-LF07371 (titled *Masqued*), which is one of the two drafts Plaintiff designated pursuant to the Order. (*See* ECF No. 111.) The other manuscript Plaintiff designated pursuant to the Order (produced as LF03750-LF04352 and titled *Blue Moon Rising*), is an earlier draft that features the same basic characters and plot, but has some differences reflecting that Plaintiff continually revised her work.

previously thought to be extinct. Grace's initial love interest is a dark, mysterious, "bad boy" type named Jaxon (a vampire), who first appears aloof but proceeds to protect Grace from various dangers and the two eventually become "mated." Things become more complicated, however, when Jaxon's brother Hudson (previously thought to be both deceased and evil) returns and Grace gets trapped in a love triangle with the two brothers. As the books progress, Grace evolves into a strong, confident, leader and overcomes many paranormal obstacles. This includes leading the resistance against the brothers' father, Cyrus, the "Vampire King," who seeks a factional war and world domination. Tarot cards have nothing to do with the story, only appearing once in a single short scene in the third book.

If the Court wishes to see this for itself, Defendants have provided the first six chapters of both *Crave* and one of the manuscript versions Plaintiff selected pursuant to the Order, and stand ready to provide complete copies (as Defendants will do at summary judgment) at the Court's request. (Exs. A, B to 2/8/23 Halperin Decl.) Plaintiff, by contrast, has not provided copies of the parties' works themselves (either here or with her FAC), and instead provides a list of cherry-picked purported "similarities" between the two ("Pl.'s List").[8] Plaintiff's List attempts to show that both works use common (and unprotectible) phrases like "get-out-of-jail-free card" (Pl.'s List at 58; FAC at 65); "more to you than meets the eye" (Pl.'s List at 4; FAC at 66); "careful what you wish for" (Pl.'s List at 23; FAC at 66); "there's no time like the present" (Pl.'s List at 21; FAC at 69-70); and "million-dollar question" (Pl.'s List at 57; FAC at 70). Plaintiff's List even alleges similarity through both parties' use of ***single words***, like "Yes," "counterbalance," "gentleman," and "Touche." (Pl.'s List at 31, 40, 43, 98.)[9]

---

[8] Plaintiff's List was provided as Exhibit 1 to Plaintiff's infringement letter, which Plaintiff refiled with her Objection as Ex. 7 to the 1/25/23 Passin Decl. (ECF No. 113-7). The List begins on page 8 of ECF No. 113-7. Page cites herein to the List are to the List's own page numbering.

[9] Other examples of infringement Plaintiff claims to have identified are highly misleading. For example, Plaintiff alleges that both parties' works use the phrase "tiger's eye." (FAC at 73.) This is misleading because the phrase "tiger's eye" can have more than one meaning—Plaintiff used it to refer to the literal eyes of an animal, whereas Wolff used it to refer to a type of gemstone. This only shows that the fact that certain language appears in both parties' works is no proof of copyright infringement (and illustrates the pitfalls of relying on computer software to generate lists of similarities, as Plaintiff appears to have done). Indeed, "tiger's eye" (and the other common phrases Plaintiff identifies) likely appear in thousands of other books.

As set forth below, copyright infringement is proven in the Second Circuit by simply comparing the parties' works side by side, not with lists of random isolated similarities like what Plaintiff provided. The need for Judge Netburn's Order arose precisely because it is not feasible or appropriate under the law to compare the four *Crave* books at issue (each between 600-700 pages) with as many as 30 different drafts/notes of *Masqued* (with manuscript drafts generally ranging from 400-600 pages)**.**

## B.    <u>Plaintiff's Refusal To Specify The Allegedly Infringed Work</u>

The question of which Plaintiff manuscript is at issue has been unanswered since the beginning of this litigation. Plaintiff did not attach ***any*** versions of her unpublished manuscript to her Complaint or FAC, effectively preventing Defendants from moving to dismiss due to a lack of substantial similarity—as is typically done in literary copyright infringement cases.[10] As far back as pre-suit negotiations, Defendants explained that they required a copy of Plaintiff's allegedly infringed unpublished manuscript so that they could compare it to *Crave* and defend this lawsuit. Yet despite Defendants' repeated requests, Plaintiff continued to withhold all copies of her manuscript until Judge Netburn ordered her to produce them in a June 10, 2022 Order. (*See* ECF No. 37 (requiring Plaintiff to "supply the Defendants with copies of the alleged infringed material, including, but not limited to, the various versions of the unpublished manuscript").) More than a month later, Plaintiff finally produced six versions of her manuscript on August 2, 2022. Several weeks later, on August 22, 2022, Plaintiff stated in interrogatory responses that there are

---

[10] Many copyright infringement cases can be resolved due to a lack of substantial similarity on motions to dismiss because when the parties provide their works at that stage (which Plaintiff did not do here), "the court has before it all that is necessary in order to make such an evaluation." *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 666 (S.D.N.Y. Sept. 20, 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *see also, e.g.*, *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) ("Indeed, there is ample authority for the proposition that a district court may make a determination as to substantial similarity on a motion to dismiss for failure to state a claim under Rule 12(b)(6)."). Plaintiff's withholding of all copies of her manuscripts until five months into the lawsuit and continued refusal to specify a primary manuscript has created substantial litigation costs that could have been avoided.

collectively more than 80 different versions of her unpublished manuscript (over 40 each titled *Masqued* and *Blue Moon Rising*).

After Plaintiff's August 2022 production and interrogatory responses indicated that over 80 unpublished drafts could be at issue in this case, Defendants became concerned that the volume of material would make it impossible to resolve the issue of substantial similarity, unless the volume of draft manuscripts was reduced to a more manageable number. Consequently, Defendants raised the issue with Judge Netburn, who in a September 16, 2022 Order, required Plaintiff to "identify with specificity which manuscripts were infringed" by October 14. (ECF No. 67.) Plaintiff responded to this by identifying the 30 various drafts/notes that she now argues must be considered, which did little to resolve the issue.

Defendants raised the issue again with Judge Netburn and asked her to order Plaintiff to specify at most one version each of *Masqued* and *Blue Moon Rising* (even though they are the same novel). After hearing argument at a December 12, 2022 discovery conference, Judge Netburn ordered the parties to write five-page letters (the "infringement letters") on the issue of how Plaintiff might prove copyright infringement, to inform her ruling on whether to require Plaintiff to specify a particular manuscript. (12/12/22 Hr'g Tr. (ECF No. 113-6) 49:16-24, 54:23-55:6; ECF No. 93.) Plaintiff did not object to this assignment at the time, or to Judge Netburn's statement that she would rule on the issue of specifying manuscripts after reviewing the parties' letters. (12/12/22 Hr'g Tr. 49:16-50:9, 54:23-55:6.) The parties filed their infringement letters on January 4, 2023. (ECF Nos. 102, 103.)

### C.   Judge Netburn's Order And Plaintiff's Objection

The Order requires Plaintiff "to identify two manuscripts to serve as the primary works that establish her copyright claim." (Order at 4.) Judge Netburn recognized that proving copyright infringement will "require a 'detailed examination of the *work themselves*.'" (*Id.* at 2 (citing

*Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986))). Accordingly, she held that "Plaintiff must identify the work she alleges was copied and cannot rely on an amalgam of bits and pieces of her work in progress." (*Id.* at 3.) Judge Netburn observed that "Plaintiff does not allege that her copyright works are a series but rather a collection of works-in-progress leading to a final single manuscript." (*Id.*) She distinguished this case from others where plaintiffs alleged infringement of multiple related but distinct works, such as different movies, TV series, and comic books all containing Superman. (*See id.* (comparing with *Warner Bros. v. Am. Broad. Cos.*, Inc., 530 F. Supp. 1187, 1193 (S.D.N.Y. Jan. 20, 1982)).

On January 20, 2023, Plaintiff complied with the Order by identifying two draft manuscripts, one titled *Masqued* and the other *Blue Moon Rising*. (ECF No. 111 (identifying Bates LF03750-LF04352 and LF 06904-LF 07371).)[11]

Plaintiff filed her Objection on January 25. Plaintiff argues, *inter alia*, that Judge Netburn exceeded her authority because "[t]he Order effectively does not function as a discovery ruling, but rather substantially limits Plaintiff's copyright and related state law claims by prohibiting Plaintiff from relying on all but two" versions of her draft manuscripts. (Obj. at 2.) Plaintiff argues that each of the 30 collective manuscript drafts and sets of notes is a separate "work" that she has a right to claim infringement over, and that the Order "is functionally equivalent to a dispositive motion and bars the majority of Plaintiff's claims." (*Id.*). Plaintiff asks that the Order be overturned "in its entirety as it is clearly erroneous and contrary to law." (*Id.*)

---

[11] This draft titled *Masqued* was not in any Defendant's possession before Plaintiff produced it. The draft titled *Blue Moon Rising* appears to have been in the possession of Kim and Prospect, but not Wolff or anyone at Entangled. Defendants expect discovery to confirm that neither Wolff nor Entangled president Elizabeth Pelletier (who collaborated with Wolff to help write the *Crave* series) ever received or reviewed either of these drafts, and accordingly expect to additionally seek summary judgment on the issue of access. Defendants expect to further show if necessary that Wolff or Pelletier never received or reviewed **any** of Plaintiff's various drafts/notes.

## ARGUMENT

"A magistrate judge's ruling on a non-dispositive matter, such as a discovery dispute, 'may be set aside only if the district court determines the ruling to be clearly erroneous or contrary to law.'" *E.g.*, *Ramgoolie v. Ramgoolie*, 2018 WL 4266015, at *4 (S.D.N.Y. Sept. 6, 2018); *see also, e.g.*, *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) ("Matters concerning discovery generally are considered 'nondispositive' of the litigation" and "are committed to the discretion of the magistrate, reviewable by the district court under the 'clearly erroneous or contrary to law' standard").[12] "This standard is highly deferential, and 'a magistrate's ruling is contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure, and is clearly erroneous if the district court is left with the definite and firm conviction that a mistake has been committed.'" *Ramgoolie*, 2018 WL 4266015, at *4.

Magistrate discovery orders "are considered non-dispositive so long as they do not dispose of a claim." *Id.* This includes, for example, "an order precluding the introduction of certain evidence or barring certain contentions," which "may be properly characterized as non-dispositive as long as the order does not wholly dispose of a party's claim or defense." *Id.* "Similarly, orders directing that designated facts be taken as established are within the Magistrate Judge's discretion, so long as the facts so designated do not have the effect of finally resolving a party's claim or defense." *Id.* In short, "[a] ruling is 'dispositive' if it resolves substantive claims for relief rather than mere issues in the litigation," *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 71 (S.D.N.Y. Sept. 5, 2019), whereas a ruling "is nondispositive if it 'does not dispose of the litigation,'" *McAllan v. Von Essen*, 2004 WL 2998510, at *1 (S.D.N.Y. Dec. 27, 2004); *see also, e.g.*, *Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*, 2 F. Supp. 3d 499, 502

---

[12] All emphasis is added to and citations are omitted from legal citations herein unless otherwise indicated.

(S.D.N.Y. Feb. 21, 2014) (magistrate ruling limiting scope of discovery to record from prior administrative proceeding was non-dispositive); *Ferriso v. Conway Org.*, 1995 WL 580197, at *1 (S.D.N.Y. Oct. 3, 1995) (magistrate ruling on admissibility of evidence at trial which "may affect plaintiff's ability to prove her claims" was non-dispositive).

Plaintiff's Objection should be overruled because there was nothing clearly erroneous (nor wrong at all) about Judge Netburn's Order, for the following reasons.

## I.    THE ORDER WAS NOT DISPOSITIVE OF ANY OF PLAINTIFF'S CLAIMS.

Plaintiff first argues that the Order should receive *de novo* review because it "is functionally equivalent to a dispositive motion and exceeds the scope of authority assigned to the Magistrate." (Obj. at 9 (capitalization removed).) This is far off base.

As an initial matter, none of Plaintiff's actual claims have been disposed of. Plaintiff has asserted causes of action for copyright infringement, contributory copyright infringement, fraud, breach of contract, and breach of fiduciary duty. The Order merely required Plaintiff to narrow the scope of evidence used to establish copyright infringement and did "not dispose of" that claim (or any of Plaintiff's claims). *See, e.g.*, *Ramgoolie*, 2018 WL 4266015, at *4. The cases Plaintiff relies on to attempt to show otherwise—which held that magistrate rulings were dispositive when they remanded an entire action from federal to state court or precluded an amended complaint from including state law causes of action that had previously survived a motion to dismiss—only underscore the non-dispositive nature of the Order here. (*See* Obj. at 9-10.)[13]

---

[13] *See Williams v. Beemiller*, 527 F.3d 259, 265-66 (2d Cir. 2008) (magistrate ruling remanding a federal action to state court was dispositive because it was "'functionally equivalent' to an order of dismissal" and was "indistinguishable from a motion to dismiss the action from federal court based on a lack of subject matter jurisdiction"); *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 25 (2d Cir. 2012) (ruling was dispositive where "the Magistrate Judge not only denied plaintiff leave to plead new claims, but effectively dismissed Jean-Laurent's existing state-law claims, which had survived the defendant's motion to dismiss"). The remaining cases Plaintiff cites actually held that the orders at issue therein were **non-dispositive**. *See PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 14 (1st Cir. 2010) (order staying litigation pending arbitration); *Khatabi v. Bonura*, 2017 WL 10621191, at *3 (S.D.N.Y. Apr. 21, 2017) (sanctions order).

Moreover, Judge Netburn did not "effectively award[] Defendants, *sua sponte*, summary adjudication as to all but two of" the 30 various drafts and note sets Plaintiffs claims are at issue, as Plaintiff now argues. (Obj. at 10.) The Order correctly recognized that all the different drafts Plaintiff points to are of the ***same underlying novel*** (which Plaintiff admits). Nothing in the Order denies Plaintiff an opportunity to prove infringement of the actual novel that she filed suit over. *See, e.g.*, *Ferriso*, 1995 WL 580197, at *1 (magistrate ruling non-dispositive where it merely might have "affect[ed] plaintiff's ability to prove her claims").[14] Rather, the Order simply requires Plaintiff to pick the version of her unpublished novel that she believes is most representative of its contents, and is in fact generous in this respect because it allows Plaintiff to pick two versions rather than just one. All the Order precludes is Plaintiff's legally unsupported and untenable theory that she may take bits and pieces of unprotectible content from many different iterations of the same work to attempt to demonstrate infringement.

Finally, Plaintiff waived her right to argue that Judge Netburn exceeded her authority as a magistrate in requiring Plaintiff to select two of her 30 drafts/notes to use as primary works for proving copyright infringement. Judge Netburn made clear at the December 12 discovery conference that she would rule on this issue after reviewing the parties' infringement letters, and Plaintiff did not object to this. (12/12/22 Hr'g Tr. 49:16-50:9, 54:23-55:6.) Nor did Plaintiff argue in her infringement letter that a ruling limiting the universe of manuscripts would amount to a dispositive ruling that exceeds magistrate authority. (*See* ECF No. 103.) Instead, Plaintiff waited until after Judge Netburn ruled against her to challenge the ruling as a purported summary adjudication that exceeded magistrate authority (presumably Plaintiff would not have objected on

---

[14] Plaintiff's FAC did not assert 30 different claims of copyright infringement for each of the 30 drafts/notes—nor could she—but rather a single claim of copyright infringement for the purported "Freeman Copyrighted Materials" collectively (FAC ¶¶ 71-80.) That claim has not been dismissed.

this basis if Judge Netburn had found in her favor). Plaintiff therefore waived these arguments by raising them for the first time in her Objection after not first presenting them to Judge Netburn. *See, e.g.*, *Zappin v. Comfort*, 2022 WL 4592551, at *1 (S.D.N.Y. Sept. 30, 2022) ("[A] district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not."); *Rodriguez v. Hanesbrands Inc.*, 2018 WL 1686105, at *1 (E.D.N.Y. Mar. 30, 2018) ("[A] court will not 'ordinarily consider arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance.'"); *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. Aug. 20, 2019) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.").

II.     **JUDGE NETBURN DID NOT CLEARLY ERR IN REQUIRING PLAINTIFF TO SELECT TWO MANUSCRIPTS AS PRIMARY WORKS FOR PROVING COPYRIGHT INFRINGEMENT.**

Because the Order is not dispositive, Plaintiff must show that Judge Netburn "failed to apply or misapplie[d] relevant" law or provide the Court with "the definite and firm conviction that a mistake has been committed." *Ramgoolie*, 2018 WL 4266015, at *4 (describing the clearly erroneous standard). None of the grounds Plaintiff raises establishes clear error, nor any error.

A.     **The Order Is Not Contrary To The Copyright Act.**

Plaintiff first argues that the Order "is [c]ontrary to the Copyright Act" because, according to Plaintiff, each of the 30 draft manuscripts/notes is a distinct "work" for which she has a right to pursue a distinct copyright infringement claim. (Obj. at 11-13.) Judge Netburn's ruling on this issue was not clearly erroneous (or wrong at all).

As a threshold issue, Plaintiff waived this argument by not presenting it before Judge Netburn. Plaintiff's infringement letter did not argue that it would be contrary to the Copyright

Act to require her to designate two specific drafts as primary works for proving infringement because each of her 30 drafts/notes is a distinct "work," or cite the cases and statutory provision she now provides in support of this argument. (*See* ECF No. 103.) This argument therefore has been waived. *See, e.g.*, *Zappin*, 2022 WL 4592551, at *1; *Rodriguez*, 2018 WL 1686105, at *1.

In fact, prior to raising this new argument in her Objection, Plaintiff repeatedly acknowledged that her 30 various drafts/notes are all merely revisions of the same underlying novel. For example, Plaintiff refers to "her manuscript," "the manuscript," and her "book" in the singular in her FAC (*e.g.*, FAC ¶¶ 1-5), and continues to do so elsewhere in her Objection (*see, e.g.*, Obj. at 3-4 (describing the various drafts collectively as "a" single "manuscript" or "fantasy")). And far from trying to market her various drafts as discrete individual works, Plaintiff wrote a single blurb about the work for her agent for use in pitching to publishers. (*See* KIM00195441 (Ex. C to Halperin Decl.).)[15]

In any event, the law generally does not permit a party to rely on multiple unpublished drafts of the same underlying work to prove substantial similarity and copyright infringement. Few cases address such a situation, since plaintiffs almost always sue over final published versions of their work rather than multiple unpublished drafts. In the only cases Defendants are aware of that involved such allegations, the courts focused the substantial similarity analysis on the final version

---

[15] Although Plaintiff registered her 30 drafts/notes each as a separate "work" with the U.S. Copyright Office, this was incorrect because a later work containing editorial revisions to an earlier work is technically a derivative of the earlier work and must be registered as such. *See* 17 U.S.C. § 101 ("A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."); U.S. Copyright Office, *Compendium of U.S. Copyright Practices* § 507.1, https://copyright.gov/comp3/docs/compendium.pdf (defining a derivative work as a work based upon one or more preexisting works ... in which a work may be recast, transformed, or adapted" including works that consist of "editorial revisions, annotations, elaborations, or other modifications...."); *id.* § 709.4 ("Editorial revisions … or other modifications to a preexisting work … for a published work may be registered as a derivative literary work if the author contributed a sufficient amount of new material to the work, and if the derivative work as a whole sufficiently modifies or transforms the preexisting work such that it constitutes an original work of authorship."). Here, Plaintiff failed to label her various drafts as derivatives or reference the underlying work when registering them, which renders her registrations defective. (*See, e.g.*, LF050493-LF050495 (Ex. D to Halperin Decl.).)

of the plaintiff's work rather than prior drafts. *See Hudson v. Universal Pictures Corp.*, 2004 WL 1205762, at *3 (E.D.N.Y. Apr. 29, 2004), *aff'd sub nom. Hudson v. Imagine Ent. Corp.*, 128 F. App'x 178 (2d Cir. 2005) (explaining, after plaintiff "submitted several drafts of [his] movie script," that "[t]he Court is under no obligation to consider the [plaintiff's] draft scripts, as it 'need only consider the final version of the film as presented to the viewing public'")[16]; *Nelson v. Grisham*, 942 F. Supp. 649, 651 (D.D.C. Sept. 26, 1996), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (applying Second Circuit law and using final published version of plaintiff's book for comparison even though "Plaintiff alleges that Grisham copied from earlier drafts, as opposed to the final published version"). Plaintiff does not cite any cases showing a different approach.

In an analogous and more common situation, when a plaintiff alleges that multiple different drafts of the ***defendant's*** work are infringing, courts follow the same principle and compare the plaintiff's work to the final version of the defendant's work, not earlier drafts. *See, e.g.*, *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 204 & n.4 (S.D.N.Y. Sept. 21, 2010) (explaining that "[a] determination of copyright infringement requires a side-by-side comparison of the disputed works themselves" and that "earlier drafts of a book, manuscript, or screenplay are irrelevant"); *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434-35 (S.D.N.Y. Aug. 14, 1985), *aff'd*, 784 F.2d 44 (2d Cir. 1986) (not considering "earlier scripts of the screenplay, explaining that "[t]he Court considers the works as they were presented to the public" and that "Courts have routinely rejected requests to consider earlier drafts of the screenplay" because "[c]onsideration of earlier versions of the screenplay is too unreliable in determining substantial similarity"); *Marshall v. Yates*, 1983 WL 1148, at *2 n.2 (C.D. Cal. Oct. 26, 1983) ("The Court has not considered any

---

[16] The *Hudson* court focused its analysis the final version but nevertheless reviewed earlier drafts because the plaintiff was pro se, and proceeded to "conclude[] that no reasonable jury could find a substantial similarity between the protected elements of" the parties' works. 2004 WL 1205762, at *4.

of the draft screenplays or the shooting script of Frances in evaluating the similarity between plaintiffs' book and defendants' film. Such preliminary drafts are not relevant in this regard.").

Moreover, courts generally do not allow plaintiffs to attempt to "aggregate" multiple discrete works to attempt to prove copyright infringement. *See Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. Sept. 17, 2014) ("a court must not 'aggregate' a plaintiff's work but must consider each allegedly infringed work independently"); *Kroencke v. Gen. Motors Corp.*, 270 F. Supp. 2d 441, 443-44 (S.D.N.Y. July 10, 2003), *aff'd*, 99 F. App'x 339 (2d Cir. 2004) (rejecting aggregation theory and observing that the Copyright Act "refers to the infringed 'work' in the singular"). The limited cases that have allowed such an approach have done so when the plaintiff alleged infringement of multiple discrete works in the same series (such as contiguous television episodes). *See Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.,* 150 F.3d 132, 137-39 (2d Cir. 1998) (allowing aggregation of multiple *Seinfeld* episodes where defendant had created a quiz book about *Seinfeld* and "freely admitted that she created [it] by" reviewing and drawing from multiple episodes, explaining that "[w]here the secondary work focuses on an entire continuous television series such as *Seinfeld*, there is no basis for looking in isolation at the amount copied from each separately copyrighted episode"); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1370, 1372-73 (2d Cir. 1993) (same where defendant's work was a "Complete Guide" to the *Twin Peaks* television series).[17]

---

[17] These are the sort of cases Plaintiff relies on in her Objection. (*See* Obj. at 11-12.) For example, Plaintiff heavily relies on *Warner Brothers*, which as explained above concerned discrete Superman movies, television shows, and comic books, not multiple drafts of the same work. *See* 530 F. Supp. at 1189. As Judge Netburn observed here, "Plaintiff does not allege that her copyright works are a series but rather a collection of works-in-progress leading to a final single manuscript." (Order at 3.) Plaintiff also relies on a footnote in *Montgomery v. Holland*, where the court held that the defendants' mini-series was not substantially similar to plaintiff's two unique unpublished short stories, which were not ultimately the same work as is the case here. 408 F. Supp. 3d 353, 358 (S.D.N.Y. Sept. 30, 2019), *aff'd sub nom. Montgomery v. NBC Television*, 833 F. App'x 361 (2d Cir. 2020). Finally, *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) is inapposite. In *Salinger*, the court analyzed whether defendants' copying of plaintiff's unpublished letters in defendants' autobiography about plaintiff was fair use and therefore addressed the

None of these cases holds that a plaintiff can aggregate multiple unfinished drafts of the *same underlying work*. And certainly, these cases do not allow a plaintiff to allege infringement of bits and pieces of **unprotectible** words and phrases taken out of context from multiple of her drafts, which is what Plaintiff's List makes clear she is trying to do here. *Accord Castle Rock*, 150 F.3d at 138-39 (allowing aggregation when defendant's quiz book was "based directly upon original, **protectable expression** in *Seinfeld*"). Judge Netburn correctly applied these principles in holding that proving copyright infringement "require[s] a 'detailed examination of the *work themselves*'" and that Plaintiff "cannot rely on an amalgam of bits and pieces of her work in progress." (Order at 2-3.) This was not only not clear error, but it was the only sensible approach for this case, since the alternative would impossibly require the parties, Court, and jury to compare the *Crave* series to dozens of different versions of the same work.[18]

**B.   The Order Did Not Misapply Relevant Caselaw.**

Plaintiff next argues that Judge Netburn "misappl[ied] relevant case law regarding proof of copyright infringement and substantial similarity." (Obj. at 13-15 (caps removed).) This, too, is misplaced.

As explained above, and as Judge Netburn recognized, copyright infringement is proven by "a side-by-side comparison of the disputed works **themselves**." *E.g.*, *Spielberg*, 748 F. Supp. 2d at 204 & n.4. (*See also* Order at 2). Thus, court after court in the Second Circuit tasked with adjudicating whether two novels, screenplays, or other literary works were substantially similar

---

four fair use factors, which includes analyzing the amount and substantiality of the portion of plaintiff's letters used in defendants' book.

[18] Plaintiff has maintained that such a comparison could be performed by expert witnesses (*see, e.g.*, Obj. at 7 n.3), but as Judge Netburn recognized, "the well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar" (Order at 3 n.2 (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992)). *See also, e.g.*, *Green v. Harbach*, 750 F. App'x 57, 59 (2d Cir. 2019) ("Outside a limited class of cases involving highly technical works such as computer software, [expert] testimony is 'irrelevant and not permitted.'").

has done so by simply reviewing and comparing the works at issue. *See, e.g.*, *Williams v. Crichton*, 84 F.3d 581, 590-91 (2d Cir. 1996) (affirming summary judgment for defendant on similarity after "[h]aving reviewed both parties' works in detail, [and] find[ing] that nearly all the similarities between the works arise from noncopyrightable elements"); *DiTocco*, 815 F. Supp. 2d at 671 (Percy Jackson books); *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 655 (S.D.N.Y. Jan. 6, 2011) (Harry Potter books); *Amanze v. Adeyemi*, 2019 WL 2866071, at *10 (S.D.N.Y. July 3, 2019), *aff'd*, 824 F. App'x 86 (2d Cir. 2020) (young adult fantasy novel); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311-12 (S.D.N.Y. Jan. 26, 1999) (comics and graphic novels).[19] In conducting this analysis, courts "examine[] the similarities between the two literary works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting of the works." *Allen*, 739 F. Supp. 2d at 655; *Williams*, 84 F.3d at 588; *Amanze*, 2019 WL 2866071, at *6; *DiTocco*, 815 F. Supp. 2d at 667 (all stating similar). "[T]he inquiry is 'principally guided by comparing the contested work's total concept and overall feel with that of the allegedly infringed work, as instructed by a reader's good eyes and common sense." *Allen*, 739 F. Supp. 2d at 654; *DiTocco*, 815 F. Supp. 2d at 666 ("[C]ourts' principal task is to compare the works' 'total concept and overall feel as instructed by good eyes and common sense.'").[20]

---

[19] As Defendants explained in their infringement letter, the standard test for evaluating substantial similarity in the Second Circuit is "the so-called 'ordinary observer test,'" which "ask[s] whether 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Peter F. Gaito*, 602 F.3d at 66. However, "[w]here the allegedly infringing work contains both protectible and non-protectible elements, … the usual 'ordinary observer' test becomes 'more discerning,' and requires the Court to 'attempt to extract the unprotectible elements from … consideration and ask whether the protectible elements, standing alone, are substantially similar.'" *Allen*, 739 F. Supp. 2d at 654 (cleaned up). This "more discerning" approach is what is required when analyzing literature, which inevitably "contains both protectible and unprotectible elements. *Id.* at 655 n.122

[20] Lists of random isolated purported similarities such as the ones provided with Plaintiff's Objection and in the FAC are "inherently subjective and unreliable" and "cannot support a finding of substantial similarity because [they] fail[] to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590; *see also, e.g.*, *Montgomery*, 408 F. Supp. at 377 (rejecting plaintiff's "110 pages of purported 'resemblances'" because "random similarities scattered throughout the works cannot by themselves support a finding of substantial similarity"); *Allen*, 739 F. Supp. 2d at 663 (rejecting plaintiff's "attempts to portray

Plaintiff does not cite any cases involving a comparison of fictional literature. Instead, Plaintiff argues that she may prove copyright infringement by demonstrating either "comprehensive nonliteral similarity" or "fragmented literal similarity." (Obj. at 13.) These tests, which are mentioned only in a relative minority of cases, should not be applied here, as Defendants will demonstrate at summary judgment.

In particular, "fragmented literal similarity" has only been applied in rare cases to prove copyright infringement when a work exactly copies a portion of another work, without otherwise "appropriating the work's overall essence or structure." *May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 185 (S.D.N.Y. June 28, 2019). In applying the doctrine, courts caution that the copying must pertain to a "qualitatively important or crucial element." *Guity v. Santos*, 2020 WL 4340417, at *1 (S.D.N.Y. July 28, 2020); *see also May*, 399 F. Supp. 3d at 180. The paradigmatic application of fragmented similarity is in music, when one artist directly samples different audio clips from a prior artist's work. *See, e.g.*, *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 597 (S.D.N.Y. Sept. 10, 2013). The doctrine has also been applied when a retailer copied a competitor's brochure text for use on their own brochure and website. *See Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 460 (S.D.N.Y. Mar. 31, 2000) (cited in Obj. at 13-14). Plaintiff will not be able to prevail under a theory of fragmented literal similarity here, at least because the unprotected words and short phrases she alleges were copied are neither protected expression nor qualitatively important to *Masqued* or the *Crave* series. *See, e.g.*, *Castle Rock*, 150 F.3d at 140 (refusing to apply fragmented literal similarity "because the direct quotations or close paraphrases

---

similarities by selectively extracting various trivialities from each book"); *Spielberg*, 748 F. Supp. at 203-04 & n.4 (conducting "side-by-side comparison" and disregarding plaintiff's "many lists, charts and DVDs purporting to identify similarities," since "lists or charts, in any medium, of purported similarities [are not] relevant to a determination of substantial similarity"). This accords with the well-established rule that "isolated words, phrases, and concepts lack the originality required for copyright protection." *Montgomery v. NBC Television*, 833 F. App'x 361, 364 (2d Cir. 2020).

that The SAT copied from the *Seinfeld* series are few and almost irrelevant to The SAT," such that "undue focus upon these isolated quotations could improperly distract us from inquiring as to whether substantial similarity exists between *Seinfeld* and The SAT").[21]

But for the present purpose of ruling on Plaintiff's Objection to the Order, the tests Plaintiff refers to are unavailing merely because neither doctrine allows a plaintiff to aggregate bits and pieces of unprotectible content from ***multiple drafts of the same work*** to try to prove infringement. None of the cases Plaintiff cites allowed that, and Defendants are aware of no case that ever did. Although Plaintiff argues that the tests she refers to do not "limit the number of infringed works that can be examined by a court," it is ***Plaintiff*** who has failed to supply any authority applying these tests to multiple drafts of the same underlying work. It was hardly clear error for Judge Netburn to reject such a novel infringement theory absent any authority adopting it.

## CONCLUSION

For the foregoing reasons, the Court should overrule Plaintiff's Objection to Judge Netburn's January 11, 2023 Order.

Dated: New York, New York            Respectfully submitted,
        February 8, 2023

                                            **COWAN DeBAETS ABRAHAMS & SHEPPARD, LLP**

                                            By: /s/ Benjamin S. Halperin
                                            Nancy E. Wolff, Esq.
                                            Benjamin S. Halperin, Esq.
                                            CeCe M. Cole, Esq.
                                            41 Madison Avenue, 38th Floor
                                            New York, New York 10010
                                            Telephone: (212) 974-7474

---

[21] "Comprehensive nonliteral similarity" has been inconsistently defined in the relative few cases that have discussed it. To the extent it is merely a synonym for the side-by-side comparison approach that courts routinely apply when analyzing literature (as shown above), Defendants do not dispute its applicability. But the vast majority of Second Circuit courts that have adjudicated whether two works of fiction are substantially similar have simply compared the works to each other without using that term to describe their analysis.

Fax: (212) 974-8474

*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a MacMillan, and Universal City Studios LLC*


Lacy H. Koonce, III
KLARIS LAW PLLC
29 Little West 12th Street New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim and Prospect Agency, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin S. Halperin, hereby certify that a true and correct complete copy of the foregoing Defendants' Response to Plaintiff's Objections to Magistrate Judge Netburn's January 11, 2023 Order has been served on all counsel of record via the Court's CM/ECF service.

<u>/s/ Benjamin S. Halperin</u>
Benjamin S. Halperin