

February 22, 2023

The Honorable Sarah Netburn
United States Magistrate Judge

Re: *Lynne Freeman v. Tracy Deebs-Elkenaney et. al*., Case No. 22 Civ 2435 (LLS) (SN)

Dear Judge Netburn:

      Plaintiff moves for an order directing Defendants to make available for inspection their computer hard drives with all metadata, and, to the extent natives were not previously produced, to produce all electronically stored information, including but not limited to all emails and attached Word documents Defendants produced to date in "native" format from all computers, or alternatively, permission to file a formal motion with supporting declarations and exhibits. The parties had a lengthy telephonic meet and confer on this and other issues on February 13, 2023.

      This motion centers on two emails with Word documents attached relevant to the present action: (1) an e-mail from ███████████ (defendant Tracy Wolff "Wolff") to ███████████ ( Shellee Roberts ("Roberts"), an author and close friend of Wolff's also published by defendant Entangled) dated August 25, 2010 (Wolff 0102203) with several draft manuscripts attached, including a draft of *Tempest Rising* (Wolff 0102250), Wolff's first Young Adult novel; and (2) an email from ███████████ (Wolff) to ███████████ (Wolff); tracywolff.com (Wolff 0102700) dated September 17, 2010, with several draft manuscripts attached, including a draft of *Deserving of Luke* (Wolff 0102701), written by Tracy Wolff.

      *Tempest Rising* is relevant because it is Wolff's first YA novel, Defendants claim through documents in discovery that it set the stage for the "Crave" series, and it contains a number of language examples and other elements in common with Plaintiff's "Blue Moon Rising," given in October 2010 to Wolf and Freeman's literary agent, defendant Emily Kim ("Kim"). Similarly, *Deserving of Luke* also contains a number of specific details found in Plaintiff's work.

      Plaintiff believes that Wolff intends to claim that some of the material Plaintiff alleges was copied and included in the alleged infringing books *Crave, Crush, Covet* and *Court* (the "*Crave* Book Series") was actually contained in Wolff's earlier books.[1] Plaintiff believes that Wolff intends to use the August 25, 2010 email from Wolff to Roberts with the draft of *Tempest Rising* for that purpose. Based on the evidence described below, Plaintiff believes that the August 25, 2010 email with the attachments was backdated, and that the version of *Tempest Rising* attached to that e-mail did not exist until after Plaintiff provided

---

[1] The foregoing is interesting because Defendants objected to Plaintiff obtaining any discovery regarding Wolff's earlier books.

| | | |
|---|---|---|
| 11766 Wilshire Boulevard | PHONE | (310) 861-2470 |
| Suite 1470 | FAX | (310) 861-2476 |
| Los Angeles, California 90025 | EMAIL | mark@csrlawyers.com |
| | WEBSITE | www.markpassin.com |

Page 2
February 22, 2023

some or all of her copyright material to Kim, who in turn provided  it to Wolff., Plaintiff also believes this to be true for *Deserving of Luke*, which is attached to an e-mail Wolff sent to herself. Additional discovery is requested to prove that this is the case.

Plaintiff suspects the above emails were backdated for the following reasons:

A) In December 2010, Kim asked Plaintiff, what is the "coolest kind of Ducati" motorcycle. Plaintiff's romantic lead rides a Ducati and Plaintiff told Kim a "Ducati Streetfighter S." Kim then asked Plaintiff for permission to use "Ducati Streetfighter S" in another writer's book, as she felt it was too much detail for Plainitff's. "Ducati Streetfighter S" is the motorcycle the romantic lead rides in Wolff's first YA novel *Tempest Rising*, published in May 2011. ███████████████████████████████████████████████████████████████. The other author that Kim was referring to was obviously her good friend and client, Wolff.  If Wolff really had this motorcycle in her June 2010 draft why did Kim ask Plaintiff about it and ask Plaintiff's permission to use it months later in December?

B)  Wolff produced a March 2011 version of *Tempest Rising* (Wolff 0012495).  The March draft has exactly the same number of pages **and only one revision** from the June 30, 2010 draft sent to Roberts in August of 2010. Over a nine (9) month period, with the book published in May of 2011, the word count decreased by 20,000 words, yet the page count remains the same. The foregoing makes no sense, suggesting a manipulated document.

C)  Wolff's *Tempest Rising* was originally entitled *Rip Tide*, then *Tempest* and ultimately *Tempest Rising.* Wolff first announced the title *Tempest Rising* on her blog on November 17, 2010, yet she has a suspicious e-mail in August of 2010 with the *Tempest Rising* title. Why didn't she announce it three months earlier if the name was already "Tempest Rising" in the manuscript Wolff sent Roberts in August of 2010, as the attachment purports to show?  Plaintiff contends that Wolff changed the name of the manuscript from *Tempest* to *Tempest Rising* after Kim received the first three chapters of Plaintiff's book entitled *Blue Moon Rising* on October 27, 2010.

A computer forensics expert examined the above-described emails and attachments, and concluded they are suspicious, and may be backdated, for the following reasons:

A)      At our request, Wolff's counsel provided the native e-mails in question. We requested that both e-mails be harvested from the received side (meaning from the e-mail recipient's account). Although they produced the e-mail dated September 17, 2010, from Wolff to herself supposedly from the received side, they said they could not produce the received side of the e-mail dated August 25, 2010 from Wolff to Roberts. However, online research reveals Roberts is a writer with Defendant publisher Entangled, and that Roberts and Wollff are writing friends. See https://entangledpublishing.com/authors/shellee-roberts; See https://m.facebook.com/LoveBTCFilm/videos/lbtc-bonus-clip-sherry-thomas-tracy-woldd-shellee-roberts/1284675504948459/?locale=zh_CN.   Defendants thus could have provided Plaintiff with a copy of the "received" side of the e-mail had they wished to do so.

11766 Wilshire Boulevard
Suite 1470
Los Angeles, California 90025

PHONE    (310) 861-2470
FAX    (310) 861-2476
EMAIL    mark@csrlawyers.com
WEBSITE    www.markpassin.com

Page 3
February 22, 2023

B)      The expert examined the two native e-mails provided by Defendants. Neither of the e-mails had a "Message-ID" in the header metadata, which is significant because the email addresses in question are from Yahoo and sbcglobal, commercial email servers that use Message-IDs. The "Message-ID" is a unique identifier created by the sending server that is customarily contained in the header of the sent email message of the receiving party or parties.  It contains information that can help identify manipulated e-mails.  Neither of the native e-mails produced by Wolff contained a "Message-ID."  The e-mail to Roberts did not have it because we were not given the e-mail from the receiving side. Thus, there is no way for our expert to verify if that e-mail was actually ever sent to Roberts or, if it was, the date on which it was sent, and whether it was manipulated. The e-mail from Wolff to herself, which we were told was from the receiving side, also does not contain a "Message-ID," which it should as sbcglobal is a commercial server, and casts significant doubt on the authenticity of the e-mail. The lack of the "Message-ID" on the later e-mail implies that the e-mail was not sent through an e-mail server, or that the Message-ID metadata was removed by a program that removes metadata from an e-mail to prevent the true date it was sent from being determined. Either alternative suggests the email was manipulated, and at a minimum, should arouse suspicion.

C)      The Microsoft Word files attached to those emails and examined by the expert also contained unusual metadata that suggests manipulation. The email from Wolff to Roberts dated August 25, 2010, contains three Microsoft Word documents, including a questionable "tempest rising.doc." The email from Wolff to herself sent on September 17, 2010, contains four Microsoft Word documents including the questionable "Deserving of Luke 2.doc." ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████. Those are the questioned versions of *Tempest Rising* attached to Wolff's 2010 email to herself, and a March 2011 version of the manuscript (Wolff 0012495) also produced by Wolff. Why do only those two documents have the username "Author" out of 1062 Word documents produced?

D)      The metadata from the Word documents included "Authors," "Last saved by," "Company," "Revision number," "Content created" and "Date last saved." From the metadata, between the 41 days of August 3 through September 13, 2010, at least three different computers were used to create most of these files. At least two computers can be identified within all of the seven files. Although the Word documents "tempest Rising.doc" and 'deserving of luke 2.doc' contain metadata of Date Last Saved on 6/30/2010 and 9/13/2010 respectively, the date saved is generated by the computer's date and time when the Word document was last saved.  If, however, a computer's date and time were backdated and the document was saved, then that Date Last Saved would reflect the backdated time.  By itself,

11766 Wilshire Boulevard

Suite 1470

Los Angeles, California 90025

PHONE    (310) 861-2470

FAX       (310) 861-2476

EMAIL     mark@csrlawyers.com

WEBSITE   www.markpassin.com

Page 4
February 22, 2023

metadata of Last Saved Date on these documents could be untrustworthy and highly suspect due to the ease of deception.

      E)      Defendants did not provide any other emails in their "native" format. If we had those, we could compare the metadata in them against the metadata in the two suspect e-mails that were produced with metadata.

      F)      As of now, the expert cannot conclusively establish if the documents in question were manipulated.  However, based on the evidence we have gathered to date, they are highly suspect.

      G)      When a file's metadata is suspect, more metadata is needed to verify the authenticity of the files.  The best available evidence to authenticate the files would be the computer hard drives creating those emails and attachments and Wolff's email files. The hard drives contain many artifacts that would evidence backdating of documents and emails if it occurred.  If we had access to Wolff's email account, we could compare the metadata to the metadata in the two emails in question.

      Plaintiff moves for an order permitting a forensic examination of the hard drive of the computer or computers on which those files were created, and the natives of all emails previously produced by Wolff, in addition to access to her email accounts to conclusively establish whether backdating took place for these reasons.[2]

      Good cause exists to grant Plaintiff's motion. "Federal courts have recognized that <u>Rule 34(a)[of the Federal Rules of Civil Procedure]</u> concerning inspection, copying, and testing of tangible objects authorizes a court to order reproduction of an entire hard drive using the 'mirror image' method," and have ordered production of a computer's hard drive where the producing party may have used the  computer to commit the wrong that is the subject of a lawsuit. *List Indus. v. Umina*, 2019 WL 1933970 (S.D. Ohio 2019); *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443 (D. Conn. 2010); *Ameriwood Industries, Inc. v. Liberman*, 2006 WL 3825291, at *4 (E.D. Mo. 2006). Thus, Plaintiff is entitled to the computer hard drives even without raising the issue of the backdated

---

[2] Plaintiff also seeks permission to serve a second subpoena on "Tempest Rising" publisher Bloomsbury Publishing, Inc. to obtain all versions of "Tempest Rising" Defendant Wolff sent Bloomsbury in 2010 and 2011. Plaintiff is mindful of this Court's ruling of December 12, 2022, that Plaintiff is not entitled to any written discovery on any other books written by defendant Wolff.  However, the Court also stated that if Plaintiff's counsel wants to ask Ms. Kim or somebody else questions that relate to possible breaches of fiduciary duty beyond the *Crave* series at her deposition, you can ask those questions, and based on those answers, you may be able to come back to me and ask for additional discovery, but on the record before me now, I'm going to deny that request. Production of the manuscripts from Bloomsbury could prove definitely if the *Tempest Rising* version of the manuscript at issue was backdated.  Moreover, the previous subpoena served on Bloomsbury was very short and Bloomsbury only produced one version of *Blue Moon Rising* and two e-mails in response to the subpoena.  Clearly, good cause exists for subpoenaing Bloomsbury for the manuscripts within their possession.

| | | |
|---|---|---|
| 11766 Wilshire Boulevard | PHONE | (310) 861-2470 |
| Suite 1470 | FAX | (310) 861-2476 |
| Los Angeles, California 90025 | EMAIL | mark@csrlawyers.com |
| | WEBSITE | www.markpassin.com |

Page 5
February 22, 2023

documents. Nonetheless, an expert has already opined that the limited information provided is inadequate and the dates claimed in certain documents are suspicious.

Ordering Defendants to provide Plaintiff with a "mirror image" of the relevant hard drive(s) of the computer that allegedly sent those emails is the best way to conclusively determine that issue in these circumstances. Many courts have recognized the propriety of such an order. *Balboa Threadworks, Inc. v. Stucky,* 2006 WL 763668, at \*3 (D. Kan. 2006) (ordering mirror imaging of computers and defining a mirror image as a forensic duplicate, which replicates bit for bit, sector for sector, all allocated and unallocated space, including slack space, on a computer hard drive); *Armament Sys. & Procedures, Inc. v. IQ Hong Kong Ltd*., 2007 WL 895836 (E.D. Wis. 2007) (plaintiff ordered to produce mirror image copies of hard drives at location of defendant's computer forensics expert, since no reason to treat such discovery differently than traditional paper discovery; any privacy concerns were addressed in the protocol proposed by defendants); *Oce' North America, Inc. v. MCS Services, Inc*., 2011 WL 197976 (D. Md. 2011); *United Factory Furniture Corp. v. Alterwitz*, 2012 WL 1155741 (D. Nev. 2012). Given Defendants' claimed inability to provide complete "native format" files for relevant emails, among other reasons, makes such an order is appropriate here.

The Court should also order Defendants to produce all other electronically stored information they have produced in "native" format. Courts routinely order production of electronically stored information in "native" format in the first instance. See, e.g*., In re Acetaminophen – ASD-ADHD Products Liability Litigation*, 2023 WL 196157 (S.D.N.Y. January 17, 2023) (ordering that a "Producing Party shall produce discoverable portions of Excel spreadsheets, audio files, electronic presentations… and video files in the Native Format…"). Given the uncertainties in the specified emails and attachments discussed above, Plaintiff's need to review the other emails or attachments Defendants produced in their "native" format to verify their authenticity.

In summary, Freeman moves for an order 1) directing Defendants to produce relevant computer hard drives of the computers that created the above-described documents for a forensic exam and imaging. If the actual computers and hard drives are not available, then the computers and hard drives that store these files should be produced; 2) directing the production of all other electronically stored information Defendants previously produced in this action to Plaintiff in "native" format, including, but not limited to, any and all emails and the received side of the August 25, 2010 e-mail in the possession of Entangled writer Roberts; 3) access to Defendant's email accounts, and 3) permitting Plaintiff to serve a second subpoena on Bloomsbury to obtain all versions of the work variously entitled *Rip Tide, Tempest* and *Tempest Rising* Wolff provided to Bloomsbury in 2010 and 2011.

11766 Wilshire Boulevard
Suite 1470
Los Angeles, California 90025

PHONE   (310) 861-2470
FAX   (310) 861-2476
EMAIL   mark@csrlawyers.com
WEBSITE   www.markpassin.com

Page 6
February 22, 2023

Respectfully submitted,

CSREEDER, PC

Mark D. Passin
11766 Wilshire Boulevard,
Suite 1470
Los Angeles, CA 90025
310-861-2475


**REITLER KAILAS &
ROSENBLATT LLP**
Paul V. LiCalsi
885 Third Avenue, Ste 20th Floor
New York, NY 10022
212-209-3090
plicalsi@reitlerlaw.com

*Attorneys for Plaintiff* Lynne Freeman

| 11766 Wilshire Boulevard | PHONE | (310) 861-2470 |
|---|---|---|
| Suite 1470 | FAX | (310) 861-2476 |
| Los Angeles, California 90025 | EMAIL | mark@csrlawyers.com |
| | WEBSITE | www.markpassin.com |