UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN,<br><br>     Plaintiff,<br><br>     v.<br><br>TRACY DEEBS-ELKENANEY P/K/A<br>TRACY WOLFF, et al.,<br><br>     Defendants. | Case No.: 1:22-cv-02435-LLS-SN |

<u>**DECLARATION OF**</u>
<u>**TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF**</u>

Tracy Deebs-Elkenaney declares as follows:

1. I am a defendant in the above case. This declaration is in opposition to plaintiff Lynne Freeman's motion to compel the inspection of my computer hard drives.

2. My pen name is "Tracy Wolff." I have written most of my novels under this name, including the New York Times-bestselling books titled *Crave*, *Crush*, *Covet*, and *Court*, which I refer to in this declaration as the "*Crave* Series." I started writing *Crave*, which is the first book in the *Crave* Series, in April 2019.

3. In 2009, my literary agent, Emily Sylvan Kim, who is also a defendant in this case, pitched to Bloomsbury Publishing a manuscript that originally went by the name of *Riptide*. *Riptide* was about a sixteen-year-old girl by the name of "Tempest" who always knew she was half mermaid. As she approaches her seventeenth birthday, Tempest knows she will have to decide if she will remain human or give in to the water's temptation. She always assumes she will remain human, but Tempest realizes she may not have a choice. When she does become mermaid, she

discovers a fantastical undersea world, and that she has a larger destiny that just might save the entire ocean.

4. In January 2010, Bloomsbury acquired the rights to publish *Riptide*.

5. After Bloomsbury acquired my partial manuscript, I spoke with my editor, Stacy Abrams (previously Stacy Cantor) about her ideas for the story, at which time I finished writing the novel in March 2010. I continued to revise the novel based on feedback and edits given to me by Ms. Abrams in May 2010 and turned in a final manuscript on June 30, 2010.

6. At that time, Ms. Abrams worked at Bloomsbury. She now works for Entangled Publishing, LLC, another defendant in this action.

7. Very soon after Ms. Abrams and Bloomsbury acquired Riptide, Ms. Abrams informed me that they wanted a different name for the story. We discussed naming the story *Tempest*, but after brainstorming numerous ideas, I emailed Ms. Abrams on March 16, 2010, telling her that I thought "*Tempest Rising*" was a better title than *Riptide* or *Tempest*. Ms. Abrams agreed with me, and the manuscript was renamed to *Tempest Rising*.

8. Bloomsbury wanted *Tempest Rising* to go into production in July 2010, at which point I would have no further contact with the manuscript. I submitted my final draft, based on an editorial letter from Ms. Abrams in May 2010, to Bloomsbury on June 30, 2010. The manuscript actually went into production in August 2010. My understanding is that the plaintiff, Lynne Freeman, began working with Ms. Kim around December 2010.

9. After submitting the final manuscript of *Tempest Rising* to Bloomsbury, I only saw it again in copyedits and page proofs, which I mailed back to Ms. Abrams in August 2010.

10. Bloomsbury published *Tempest Rising* in May 2011.

11. From August 2010 to May 2011, I did not make any changes to that manuscript, though Bloomsbury made one additional change with my permission. In the first week of November 2010, Bloomsbury changed the name Kai to Kona throughout the novel.

12. On August 25, 2010, I sent to Shellee Roberts, a fellow author and friend, my June 30, 2010 draft of *Tempest Rising*, along with two other works of mine. Because Shellee was my friend and we were working on a book titled International Kissing Club together, I often sent her my finished books or works in progress to read.

13. The Advanced Reader Copies (which are called ARCs) of *Tempest Rising* were printed by Bloomsbury and arrived in their office on October 19, 2010. Ms. Abrams emailed me on that same day and said that she would send several to me in the mail that day. I am still in possession of this *Tempest Rising* ARC and will provide it to Plaintiff for inspection at my deposition on Tuesday, March 7 in Austin, Texas.

14. The phrase "Ducati Streetfighter S" appears multiple times in this *Tempest Rising* ARC.

15. In November 2010, I announced in a blog that I was hosting a giveaway for one of these print ARCs of *Tempest Rising*. These posts can be accessed at http://tracy-deebs.blogspot.com/2010/11/win-arc-of-tempest-rising.html?m=1 and http://tracywolff.blogspot.com/2010/11/tracy-deebs-giveaway.html?m=0. At the time of these giveaways, I had already sent in the final manuscript of *Tempest Rising*, and hadn't made any changes to the version sent to Bloomsbury on June 30, 2010, except for the minor copyedits and grammatical proofing sent in in August 2010, which I previously mentioned.

16. In March 2011, Ms. Kim asked me to send her the "most recent e-copy" of *Tempest Rising*. I believe the most recent version of *Tempest Rising* was from June 2010 and contained

in-line comments, so I think I copied and pasted the text of the manuscript into a clean Word document and removed any inline comments, as this is something I have done innumerable times before and since. I then sent this version of *Tempest Rising* to Ms. Kim.

17. I am also the author of *Deserving of Luke*, which is about a woman who moves back to her hometown in Oregon with her young son. Determined to give her son the family he deserves, she rekindles a relationship with the boy's father, even though she isn't sure if he is really parent material.

18. I started writing *Deserving of Luke* in July or August 2010.

19. I sent my editor, Wanda Ottewell, ideas for the book that would become *Deserving of Luke* in July 2009. Harlequin acquired the rights to the untitled book that would become *Deserving of Luke* as the third book in a three-book contract in October 2009.

20. After *Deserving of Luke* was acquired by Harlequin as the third book in the contract, I continued writing the novel in August and September of 2010, after finishing the first two books in the contract.

21. On September 17, 2010, I emailed to myself a working draft of *Deserving of Luke*, along with two other documents relating to other books I was working on.

22. I am not very computer proficient, so my practice is to email myself draft documents as backups in case I experience technical difficulties.

23. In October 2010, I made my final substantive edits to *Deserving of Luke*. After this date, I never had access to make changes to the manuscript myself.

24. On November 18, 2010 Megan Long, an editorial assistant for Harlequin, emailed me to let me know that *Deserving of Luke* was in production. It had been formatted and copyedited and she was asking me to do a final proofread of an attached PDF of the manuscript.

4

I was not allowed to change the PDF so, per Megan's request, on November 29, 2010, I sent back a one-page list of minor grammatical edits (such as changing the location of a comma, asking them to omit a repeated word in a sentence, or correcting a typo).

25. Once I sent my list of minor grammatical edits to Harlequin in November 2010, I did not make any further changes or edits to *Deserving of Luke*. My understanding is that Ms. Kim and Plaintiff did not enter their agency agreement until after November 2010.

26. Harlequin published *Deserving of Luke* in April 2011.

27. I have never read any of Plaintiff's manuscripts. No one has ever shown me any of Plaintiff's manuscripts. I have never heard any passages from Plaintiff's manuscripts. The only knowledge I have of Plaintiff's manuscripts is what I read in the complaint that she filed in this case. I did not copy Plaintiff's manuscripts, or incorporate any of Plaintiff's material into my books, regardless of whether we're talking about the *Crave* Series, *Tempest Rising*, *Deserving of Luke*, or any of my other novels.

28. When this case began, I provided my email passwords and phone to an e-discovery vendor, and gave the vendor complete access to my computer.

29. I had no input or involvement in the document collection process for this case, other than providing my email passwords and phone, and giving full access to my computer and OneDrive to the e-discovery vendor.

30. I did not "backdate" any document or email, or manipulate the metadata of anything collected or produced in this litigation. I do not even know how to manipulate metadata or "backdate" documents or emails. Not only that, I didn't instruct anyone or hire anyone to "backdate" or manipulate any documents, emails, or metadata for me.

31. Plaintiff's allegations or suggestions that I may have changed documents or emails or metadata are completely false, as are her suggestions that I included material from her manuscripts in my own work. As shown by the chronology above and Plaintiff's own timeline, I completed *Deserving of Luke* and *Tempest Rising*, and handed over the finals of each book to the publisher before Plaintiff submitted a draft to or signed an agreement with Ms. Kim. In addition, even as of today's date, I have not read any of Plaintiff's manuscripts whatsoever, nor have I received any of her manuscripts or heard any passages from her manuscripts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 2, 2023

_____
Tracy Deebs-Elkenaney