UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN,

        Plaintiff,

  -against-

TRACY DEEBS-ELKENANEY, et al.

        Defendants.

Case No. 22-cv-02435 (LLS)(SN)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE COURT'S JUNE 14, 2023 ORDER**

i

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT……………………………………………………………..1

ARGUMENT……………………………………………………………………………...4

1. AN INITIAL TRIAL LIMITED TO SUBSTANTIAL SIMILARITY WILL MULTIPLY AND COMPLICATE THE CASE RATHER THAN STREAM-LINE IT BECAUSE DEFENDANTS ARE UNLIKELY TO PREVAIL ON SUBSTANTIAL SIMILARITY AND MUCH EVIDENCE FROM THAT PHASE WILL NEED TO BE DUPLICATED FOR THE OTHERS………………………4

    A. The cast of characters is remarkably similar……………………………………….6

        i. The heroine is a girl, approximately 17, from San Diego…………………..6

        ii. Both heroines hear voices speaking to them in their heads which come from parallel characters……………………………………………...6

        iii. The romantic leads have very similar physical descriptions……………….7

        iv. The heroine's best guy friend in both books is of mixed race………………7

        v. There are also other parallel family members……………………………...8

    B. The storyline and scenes are remarkably similar…………………………………..8

        i. The heroine meets the romantic lead………………………………………8

        ii. Both heroines go to parties and imbibe a spiked drink……………………..8

        iii. The heroine is kidnapped by a vampire who wants to bring back their dead mate and needs the heroine in order to do so……………………9

        iv. The heroine learns she is a supernatural being……………………………9

        v. The heroine is attacked by two supernaturals wearing jeans and t-shirts……………………………………………………………………..9

vi.  Freeman's story ends when the Bloodletter character turns into a raven and lies off into the night sky…………………………………………9

2. BECAUSE THE NON-COPYRIGHT CLAIMS IN THIS CASE ARE NOT DEPENDENT ON THE OUTCOME OF THE COPYRIGHT CLAIMS, YET WILL RELY ON MUCH THE SAME EVIDENCE, SEPARATE TRIAL PROCEEDINGS WILL ONLY CAUSE UNNECESSARY DELAY, EXPENSE, AND DUPLICATION IN THE PRESENTATION OF EVIDENCE……….11

CONCLUSION…………………………………………………………………………..12

## TABLE OF AUTHORITIES

Page(s)

Cases

*Castle Rock Entertainment, Inc. v. Carol Publishing Group*,
　150 F.3d 132 (2d. Cir. 1998) ............................................................................................... 10
*Computer Associates International, Inc. v. Altai, Inc.*,
　982 F.2d 693 (2nd Cir. 1992) ................................................................................................ 5
*Currin v. Arista Records*,
　724 F.Supp.2d 286 (D. Conn. 2010) ..................................................................................... 5
*Lipton v. Nature Co.*,
　71 F.3d 464 (2d Cir. 1995) .................................................................................................... 5
*Repp v. Webber*,
　132 F.3d 882 (2d Cir. 1997) ............................................................................................ 5, 10

Other Authorities

L.R. 6.3 ........................................................................................................................................... 1

Pursuant to L.R. 6.3, Plaintiff Lynne Freeman respectfully moves for reconsideration of the Court's June 14, 2023, Order (the "Court's Order") for "a separate jury trial on whether the Crave series and Plaintiff's manuscripts are substantially similar," and asks this Court to permit a single jury trial on her claims as that will be far more streamlined and efficient as well as fair and cost effective for all parties.

## PRELIMINARY STATEMENT

On June 14, 2023, this Court issued an Order for "a separate jury trial on whether the *Crave* series and Plaintiff's manuscripts are substantially similar." It did so "[i]n light of defendants' request to streamline this litigation." But a first trial on substantial similarity followed by a second trial on both the remaining copyright issues (access, actual copying, independent creation, and all other affirmative defenses) and Freeman's non-copyright claims cannot possibly "streamline" the case. Rather, it will make the resolution of the case longer and more expensive, as it will require the duplication of evidence and testimony across different phases, adding unfair roadblocks to Ms. Freeman's prosecution of her case and consuming far more of this Court's time than necessary.

There are at least two distinct but overlapping reasons for this. First, as set forth more fully below, this is not a case that is likely to be resolved on summary judgment based on substantial similarity, and much of the evidence that would be presented to address substantial similarity also goes to the other copyright related issues in this case and will also need to be presented in addressing them. Indeed, Freeman intends to make an affirmative summary judgement motion to establish the copyright infringement by defendants in this case arguing, *inter alia*, that access and actual copying are beyond reasonable disputes based on (1) the striking similarity of non-trope elements of the two works and (2) the findings of her computational linguistic experts that the mathematical probability of joint authorship of the two works is over 99.99%. Because much of the evidence that Freeman intends to present goes to access, actual copying, *and* substantial

1

similarity, holding an initial trial on substantial similarity alone is far more likely to significantly multiply the costs and burdens of addressing Freeman's infringement claims than to streamline that effort.

Second, because the non-copyright claims in this case are not dependent on the outcome of the copyright claims, they will need to go forward regardless of the outcome of the copyright claims. And those claims similarly will rely on much of the same evidence, including expert testimony, as to the copyright claims. For example, Ms. Freeman's breach of fiduciary duty claims against Defendants Prospect Agency and Emily Kim allege that they improperly used Freeman's work for/with Defendant Deebs-Elkenaney, "Wolff" to create the *Crave* series. Even assuming *arguendo* that the *Crave* series only harvested unprotectable ideas from Freeman's work (such that there is no copyright infringement), Defendants Kim and Prospect can be held liable for breaching their fiduciary duties by taking Freeman's work and using it for the benefit of another client. The very same evidence used to establish access and substantial similarity will be used as circumstantial evidence that Freeman's agents improperly shared that work with Wolff. Thus, again, separate trial proceedings will both add significant additional expense and delay and require substantial duplication in the presentation of evidence, including though expert witnesses, by both parties.

Under the recently abandoned trial schedule in this case (Dkt. 200), initial expert reports were disclosed on May 10, 2023, rebuttal expert reports were to have been produced on May 31, 2023, expert discovery was to have been completed by June 16, 2023, and the parties were to have filed pre-motion conference letters for summary judgment and *Daubert* motions with this Court by June 30, 2023. Under that schedule, Ms. Freeman anticipated requesting permission to move for summary judgment on her copyright claims, as there can be no real question of fact that the

*Crave* series infringes her *Blue Moon Rising* ("*BMR*") work. Indeed, after helping Ms. Freeman revise her work over a period of years and submitting that work to Entangled Publishing, Freeman's agent (Defendant Emily Kim) worked with Tracy Wolff and Entangled Publishing to create the *Crave* series, even insofar as assisting in the writing. Not only do *BMR* and *Crave* share overwhelming similarities of characters, storyline, plot, and scenes, which are *not* attributable to genre conventions or tropes, but two renowned experts have concluded with 99.99% certainty that there is common authorship between the two works.[1]

Unfortunately, this Court's June 14, 2023 Order, unless reconsidered, virtually ensures that Freeman's claims will be addressed piecemeal with substantial duplication of evidence over a far longer period at far greater expense and with far more work for the parties and the Court, as discussed below. This is a significant concern for Freeman, an individual plaintiff, who has already had to sell her home in Alaska to pay for this litigation against well-funded and insured defendants. *See* attached Declaration of Lynne Freeman. If the case is bifurcated, Freeman does not have the finances to cover the cost of two trials. Moreover, placing the burden of traveling for two trials also presents a substantial hardship as Ms. Freeman suffers from panic disorder, a disability for which she has a service animal and is not reliably able to travel by plane.

Freeman fully agrees that the case should not be made any more expensive or complicated than necessary to fairly address her claims but submits that ordering an initial trial on substantial similarity cannot possibly streamline the proceedings in this case and will unnecessarily multiply

---

[1] One of those experts, Dr. Juola, is one of the foremost experts in his field, and roughly a decade ago became quite famous for uncovering that the book "The Cuckoo's Calling" was in fact authored by Harry Potter creator J.K. Rowling. The book was published under a fictitious name, but after Dr. Juola's computer analysis was presented to Rowling, she admitted to writing the novel. See https://www.smithsonianmag.com/science-nature/how-did-computers-uncover-jk-rowlingspseudonym-180949824

and complicate them. She therefore respectfully requests that this Court reconsider its June 14, 2023 Order, and upon reconsideration Order this case back on its original track (with an accommodation for the prior month) so that the overlapping claims can be addressed in an orderly, fair, and efficient manner.

## ARGUMENT

1. **AN INITIAL TRIAL LIMITED TO SUBSTANTIAL SIMILARITY WILL MULTIPLY AND COMPLICATE THE CASE RATHER THAN STREAMLINE IT BECAUSE DEFENDANTS ARE UNLIKELY TO PREVAIL ON SUBSTANTIAL SIMILARITY AND MUCH EVIDENCE FROM THAT PHASE WILL NEED TO BE DUPLICATED FOR THE OTHERS.**

Freeman's copyright infringement claims in this case are extraordinarily strong. Not only are access and substantial similarity beyond reasonable dispute, but there is evidence of actual copying to a *99.99% mathematical certainty*. It is thus far more likely that summary judgment proceedings would result in a finding for Freeman than for Defendants. And in any event, the evidence in this case does not readily lend itself to clear delineation between access, probative copying, and substantial similarity since access can also be shown through the striking similarity of the works that exists here. As such, a trial limited to substantial similarity will not streamline this case, but rather will lead to a duplication of evidence in the two trial phases.

With respect to access, the undisputed evidence is that Ms. Freeman hired Defendant Emily Sylvan Kim of Prospect Agency, LLC as her literary agent in December of 2010 to find a publisher for her BMR manuscript. Over the next 3-4 years, Kim actively worked with Freeman to edit the story, causing Freeman to generate dozens of revised manuscripts. At least one of those iterations was submitted to Stacy Abrams at Defendant Entangled. Several years later, Kim, acting as Tracy Wolff's literary agent, negotiated the contracts with Entangled for Wolff to write the Crave book series. Kim was actively involved in that writing, including staying up with Wolff for a 19-hour

writing spree on one of the books, and Stacy Abrams is listed in both *Crave* and *Crush* as the editor.

But these chains of intermediaries are not the only route, or even necessarily the strongest route, to establish access. As the Second Circuit explained in *Repp v. Webber*, "where there are striking similarities probative of copying, proof of access may be inferred. 132 F.3d 882, 889 (2d Cir. 1997) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995) ("If the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.")). In this case, there are overwhelming similarities that can and do establish access. Defendants insist these similarities are nothing more than tropes or genre convention, but the expert report of Professor Kathryn Reiss, a professor of English who has been teaching Young Adult literature for thirty years, and who is a successful published author of more than twenty books, discusses many of those similarities, and explains that none of them follow in any meaningful way from the genre of the book. A copy of her report is submitted with this letter as Exhibit "1" for the Court's consideration (Declaration of Stephen M. Doniger ("Doniger Decl.") ¶ 3, Ex. 1).

It is challenging to summarize those similarities succinctly as they are spread across at least six iterations of *BMR* manuscripts (totaling approximately 2,650 pages) and are used in the first four *Crave* books (totaling approximately 2,750 pages).[2] But a sampling of those similarities include:

---

[2] Although this is not the time to argue *Daubert* motions, Freeman notes that expert testimony has been held proper and admissible in literary infringement cases at the summary judgment phase on the issue of whether any reasonable jury could find the works substantially similar. *See Currin v. Arista Records*, 724 F.Supp.2d 286, 291 (D. Conn. 2010). Indeed, courts regularly permit expert testimony where comparing the works would be unduly complicated for lay witnesses. *See Computer Associates International, Inc. v. Altai, Inc.* 982 F.2d 693, 713 (2nd Cir. 1992). Given that

A. ***The cast of characters is remarkably similar.*** Both books include:

i. The heroine is a girl, approximately 17-years old, originally from San Diego who moved to Alaska after an "accident" killed her family, and she now suffers panic attacks and has anxiety from the trauma. She feels guilty about her family members' deaths because they had a fight before the accident. She now lives with the only two remaining relatives she believes she has left, who are both supernatural witches, although she doesn't discover this until later. She will later learn she has a grandmother, and a father (BMR) / grandfather (Crave) who are parallel characters. She believes she is human, as does most everyone else, but later learns she is not only supernatural, but the most powerful being born in 10 generations (BMR) / 1,000 years (Crave). She is also a queen and the descendant of a twin goddess. Her family used tea to bind her power to keep her ignorant of being supernatural and of the supernatural world in order to protect her. She is an avid reader, takes advanced classes in school, quotes literature, quotes Shakespeare, and talks about French philosophers. She drinks tea often, has a favorite food from a Mexican restaurant, loves chocolate chip cookies, and locks her feelings of anxiety in a box. She thinks that Alaska feels like the moon.

ii. Both heroines hear voices speaking to them in their heads which come from parallel characters. One voice is the heroine's long-lost father/grandfather (<u>Athair</u> in BMR, <u>Alastair</u> in Crave). Both speak Gaelic, their kind communicate telepathically, and the heroine first meets them physically on an island which she visits by portal. This character is stuck in his supernatural form, is in chains, and was put there by the ultimate villain in

---

this case will require a jury to compare the four *Crave* books at issue to multiple versions of Freeman's work—approximately 5,000 pages of material, this is precisely such a case.

the story, the vampire prince (BMR) / the vampire king (Crave series). The heroine cannot free him when they meet. She promises him she'll be back.

   iii. The romantic leads have very similar physical descriptions, even being described as smelling the same (of citrus and waterfalls (BMR) or oranges and fresh water (Crave)). His scent is particularly appealing to the heroine and she thinks about it often. The romantic lead feels responsible for the death of his older brother (who was 19 in BMR and looks 19 in the *Crave* series). The heroine can see the pain in his eyes and recognizes it as being like her own, that he, too, has suffered a loss.  His parents are leaders among their kind. The romantic lead feels he has a duty to stop the supernatural war between the races of beings and is actively trying to do so. He wears designer clothing and wears black jeans and a t-shirt when meeting the heroine for the first time. He also wears a black V-neck sweater. The heroine and romantic lead first encounter one another in the first school scene in the books at the end of chapter two. He tries to resist his attraction to her because he believes that being with him will put the heroine, whom he believes to be a human girl, in danger. At the end of their first meet day scene, the romantic lead warns her about it not being safe for her. It's the last thing he says to her that day.

   iv. The heroine's best guy friend in both books is of mixed race, part Black, with warm brown skin, and is gay—and the heroine is the only person he has told. He laughs and jokes with the heroine, has a smile he is known for, and calls her nicknames (BMR) a nickname (Crave). The romantic lead doesn't like this character being around the heroine and stares him down several times throughout the story. The heroine believes it's because the romantic lead is jealous. This character is a supernatural being with wings. The

heroine thinks he is beautiful in his supernatural form. He "waggles his brows at" the heroine.

   v.  There are also other parallel family members, the childhood best friend (Amanda / Macy who is a cheerleader in BMR and a dance team member with pom poms in Crave), the nemesis female character (Taylor / Lia who spikes the heroine's drink and is out to get her), the ultimate villain of the story (vampire prince Julian / vampire king Cyrus who wants war), the outspoken, fashion-forward character whom the heroine admires (Rachel / Eden), and the nasty daughter of the vampire prince / vampire king <u>who turns out to be related to the heroine by blood</u> (Taylor / Isabella). The stories have remarkably similar inner mind and motivations of characters, dialogue, and even shared character names including: The Bloodletter, Marise, Lily, Collin (Colin), Aedan (Aidan), Emma, Gwendolyn (Gwen), and Macy (Mason).

B.  ***The storyline and scenes are remarkably similar***:

   i.  The heroine meets the romantic lead, learns about the supernatural world when he loses control of his powers during their first kiss, and discovers that he is a dangerous supernatural being who is trying to stop a supernatural war among the factions of beings, and she is irresistibly drawn to him, even though she doesn't want to be. She realizes she is even drawn to the dangerousness of him, which isn't usual for her.

   ii.  Both heroines go to parties and imbibe a spiked drink. In Freeman's manuscripts, there is first a Halloween party, where the mean girls are out in full force and the heroine feels uncomfortable and leaves early. Then a bit later in the novel there is a house party, where Freeman's heroine is given a spiked drink by the female nemesis character, wants to leave early, and later feels nauseous, then vomits, falling into "a fitful

sleep." (BMR). In Wolff's Crave, the time of year is said to be near Halloween ("Halloween wasn't that long ago,"). Wolff creates a slightly different party scene with Grace feeling uncomfortable, and deciding to leave the party, then being given a spiked drink by the female nemesis character, feeling nauseous, and vomiting. Finally, she drifts off into a "fitful sleep."

   iii. The heroine is kidnapped by a vampire who wants to bring back their dead mate and needs the heroine in order to do so. This vampire believes the heroine will become the reincarnation of his dead mate (BMR) / will be used in a spell to resurrect her dead mate (Crave). This vampire wants to use the heroine as an act of vengeance against the person believed to be responsible for their mate's death. This vampire is also responsible for the accident that killed the heroine's family members.

   iv. The heroine learns she is a supernatural being, one who can shift forms, and she turns out to be a unique supernatural being made of magic who is a protector of supernaturals, humans, and other creatures. She has magic in her veins / blood. She is in danger because of what she is, and others are seeking to destroy her so that she can't be used in the supernaturals' war.

   v. In another scene, the heroine is attacked by two supernaturals wearing jeans and t-shirts described as having an eighties rocker look. It is winter, there is snow outside and the two supernaturals are not wearing coats or winter gear and appear unaffected by the cold. They say and do similar things, the shorter attacker in each book restrains the heroine the same way, and she fights back in the same way in both books. She stomps on his feet (BMR) / thinks about stomping on his feet (Crave). She is pinned to him "my back to his front" and the scene plays out with remarkable similarity.

9

    vi.  Freeman's story ends when the Bloodletter character turns into a raven and flies off into the night sky. Crave ends with the Bloodletter character turning into a winged creature and flying off.

  There are far more similarities and they are of the quantity and type that preclude any colorable claim of independent creation. Of course both books share tropes like "the evil leader trying to kill the hero/heroine," but the specific details in their expression are not scènes á faire, and are so striking as to preclude the possibility of independent creation.

  And as if that were not enough, Plaintiff has also secured expert testimony from two renowned forensic linguists, Dr. Patrick Joula and Dr. Carole Chaski. After running a scientifically validated quantitative and computational linguistic analysis on *BMR* and *Crave*, as compared to 10 baseline novels in the same genre, Dr. Juola concluded that the odds of common authorship are 1000:1, which is 99.99%. Using a different and equally reliable methodology comparing lexical clusters, Dr. Chaski concluded with mathematical certainty of over 99.9981% (odds of 10,000,000:19) that the works share common authorship. Copies of those reports are attached for this Court's convenience as Exhibits "2" and "3." Doniger Decl. ¶ 4-5; Exs. 2-3.

  The point, of course, is that after Freeman prevails at trial on substantial similarity, she will need to present all this evidence again to establish striking similarity, both as a means to establish access, establish copying in fact, and to counter any claims of independent creation. To establish infringement, "actual copying" must first be shown, and it "is only after actual copying is established that one claiming infringement is required to show substantial similarity." *Repp v. Webber*, 132 F.3d 882 at 889 (2d Cir. 1997); *Castle Rock Entertainment, Inc. v. Carol Publishing Group*, 150 F.3d 132 (2d. Cir. 1998). Where, as here, the evidence in support of each overlaps there is no economy or "streamlining" to be gained from bifurcation.

Wolff, having previously worked with plagiarism software, and who appears to have employed "text spinning" in writing the *Crave* series, was clever enough to rewrite Freeman's story to avoid many obvious signs of her misappropriation. However, the evidence compels the conclusion that Wolff copied protectable expression from Freeman's work, and much of the evidence that goes to substantial similarity also goes to both access and actual copying/probative similarity such that there is no efficiency or "streamlining" to be gained from an initial trial on substantial similarity alone.

There is no cause to require the parties to go through thousands of pages of materials with a jury twice. There is no cause to require the parties to pay their experts multiple times to offer essentially the same testimony so that the jury can apply it to the different elements of the different claims (discussed below as to the non-copyright claims) in separate trials. This is especially so given that it will require Ms. Freeman to travel across the country at great expense and burden multiple times, and to multiply the costs she will otherwise have to pay to present her case. In that situation, as set forth in the attached Declaration of Ms. Freeman, justice delayed may truly be justice denied. Ms. Freeman prays this Court will reconsider its Order and permit this case, or at least her copyright claims, to be tried once, in a single proceeding.

**2. BECAUSE THE NON-COPYRIGHT CLAIMS IN THIS CASE ARE NOT DEPENDENT ON THE OUTCOME OF THE COPYRIGHT CLAIMS, YET WILL RELY ON MUCH THE SAME EVIDENCE, SEPARATE TRIAL PROCEEDINGS WILL ONLY CAUSE UNNECESSARY DELAY, EXPENSE, AND DUPLICATION IN THE PRESENTATION OF EVIDENCE.**

Regardless of the outcome of the copyright claims, the non-copyright claims will move forward. There is full diversity jurisdiction over the state law claims and the determination of the state law claims is not dependent on the determination of the copyright claims. For example, Ms. Freeman's breach of fiduciary duty claims against Defendants Prospect Agency and Emily Kim allege the improper use of Freeman's work for the benefit of another client. Even assuming

*arguendo* that the *Crave* series only harvested unprotectable ideas from Freeman's work (such that there is no copyright infringement), Defendants can be held liable for breaching their fiduciary duties by taking freeman's work and using it for their own profit. Thus, in determining whether to bifurcate trial in this case the Court should consider the extent to which the same evidence will also need to be presented for those claims. Because the evidence will overlap to a great extent, bifurcation will multiply and not streamline proceedings.

Freeman anticipates using the same evidence—including expert witnesses—that she will use to show substantial similarity, access, and actual copying to establish her non-copyright claims. Thus, far from streamlining the case or offering some judicial economy, requiring separate trials will again result in the unnecessary duplication of evidence, a significant multiplication of the costs of litigation, and significant delay in fully addressing the merits of this lawsuit—all with no real benefit. Consider, for example, that in the first trial, Professor Reiss will offer her testimony regarding the non-trope nature of the similarities to establish substantial similarity, and Drs. Joula and Chaski will be offered to establish probative copying and the striking similarity of certain portions of the works. In the second trial, that same testimony will be offered to establish that it is more likely than not that Kim improperly shared various versions of Freeman's manuscript and/or ideas from that work with Wolff in violation of her fiduciary duties to Freeman.

Because much of the evidence that Freeman intends to present on the issue of access (that Kim gave Wollf and others copies of Freeman's work) is the same evidence that Freeman intends to use to prove her state court claims, it will not streamline the case to have multiple trials. To the contrary, it will cause significant delay, multiplication of proceedings, and additional expense for no good reason.

///

## **CONCLUSION**

Plaintiff prays that this Court reconsider its June 14, 2023 Order that an initial trial proceed on the question of substantial similarity only, and upon reconsideration see that separate trials will not streamline this litigation but will instead have the opposite effect. Freeman prays that this Court reinstate the prior order permitting the parties to file pre-motion letters so that Freeman can promptly address her copyright claims and the remaining claims can proceed without further delay.

Dated: June 20, 2023  
Venice, CA

Respectfully submitted,

By: */s/ Stephen Doniger*  
Stephen Doniger, Esq.  
Scott Alan Burroughs, Esq.  
DONIGER / BURROUGHS  
247 Water Street, First Floor  
New York, New York 10038  
(310) 590-1820  
stephen@donigerlawfirm.com  
scott@donigerlawfirm.com  
Attorneys for Plaintiff