# EXHIBIT 1

Videotaped Deposition of

# Emily Kim

March 16, 2023

Freeman

vs.

Deebs



www.aptusCR.com | 866.999.8310

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------------------x
     LYNNE FREEMAN, an individual,
 3
                            Plaintiff,
 4
 5              -against-        Case No:
                                1:22-cv-02435-LLS
 6

 7

 8   TRACY DEEBS-ELKENANEY, P/K/A
     TRACY WOLFF, an individual,
 9   EMILY SYLVAN KIM, an individual
     PROSPECT AGENCY, LLC, a New Jersey
10   Limited liability company,
     ENTANGLED PUBLISHERS, LLC, a
11   Delaware limited liability company
     HOLTZBRINCK PUBLISHERS, LLC
12   D/B/A MACMILLAN, a New York
     Limited liability company, and
13   UNIVERSAL CITY STUDIOS, LCC,
     A Delaware limited liability company,
14                            Defendants.
     ----------------------------------------x
15

16           EXAMINATION BEFORE TRIAL of EMILY KIM, taken

17   by the Plaintiff, pursuant to Notice, held at 885 Third

18   Avenue, 20th Floor, New York, New York 10022, on March

19   16, 2023, at 9:00 a.m., before a Notary Public of the

20   State of New York.

21
     *********************************************
22

23

24   Job No. 10116380

25
```

```
 1    A P P E A R A N C E S:

 2      CSREEDER, PC
                Attorneys for Plaintiff
 3              11766 Wilshire Boulevard, Suite 1470
                Los Angeles, California 90025
 4
        BY:     MARK PASSIN, ESQ.
 5              mark@csrlawyers.com

 6
        DONIGER/BURROUGHS
 7              Attorneys for Plaintiff
                603 Rose Avenue
 8              Venice, California 90291

 9      BY:     STEPHEN M. DONIGER, ESQ.

10
        KLARIS LAW
11              Attorneys for Defendants
                29 Little West 12th Street
12              New York, New York 10014

13      BY:     LANCE KOONCE, ESQ.
                ZACH PRESS, ESQ.
14

15      COWAN, DeBEATS, ABRAHAMS & SHEPPARD LLP
                Attorneys for Defendants
16              41 Madison Avenue, 38th Floor
                New York, New York 10010
17
        BY:     CECE COLE, ESQ. Via Zoom
18              ccole@cdas.com

19
        ALSO PRESENT:
20
        JASON DUBINSKI-Videographer
21                      Aptus
        TRENT BAER
22      LYNNE FREEMAN via Zoom

23

24

25
```

1                          EMILY KIM

2           Sheppard, appearing on behalf of defendants

3           Entangled Publishing, LLC, Universal, MacMillan

4           and Tracy Deebs-Elkenaney.

5                     THE VIDEOGRAPHER:  The Court Reporter

6           today is Brooke Perry.  Will you please swear

7           in the witness.

8    E M I L Y   K I M,  the witness herein, having been

9    first duly sworn by a Notary Public of the State of New

10   York, was examined and testified as follows:

11   EXAMINATION BY

12   MR. PASSIN:

13   **Q.      State your name for the record, please.**

14   A.      Emily Kim.

15   **Q.      State your address for the record, please.**

16   A.      551 Valley Road PMB 377 Upper Montclair, New

17   Jersey 07043.

18                     MR. PASSIN:  Before we start, I just

19           want to make one comment for the record,

20           Mr. Koonce's firm produced some documents last

21           night at 7:24 p.m., New York time.  I have not

22           had a chance to look at those documents.  It

23           may be and it may not be that I need to ask

24           some follow up questions based on those

25           documents, so I reserve my right to call the

**Emily Kim**

```
 1                      EMILY KIM
 2   those chapters, she would have to give you permission to
 3   enter Google Docs to read it; isn't that correct?
 4   A.      I think what you do is you share a link and
 5   then the person can join the Google Docs.
 6   Q.      Do you have any online subscription to any
 7   editing software?
 8   A.      No.
 9   Q.      So you mentioned that you only used Google Docs
10   to, sort of, babysit Tracy Wolff while she wrote.
11   A.      I would say keep her company.
12   Q.      Did you get involved in giving her suggestions?
13   A.      Not really.  Usually I would say, Are you
14   awake, kind of thing.
15                   MR. PASSIN:  Let's take a look at some
16           documents.  I'd like to mark as Exhibit 84 a
17           document that's Bate stamp numbers Wolff
18           0097494 through 0097498.
19                   (Whereupon, WOLFF_0097494-99 was marked
20           as Exhibit 84, for identification, as of this
21           date.)
22   Q.      Can you review the document, please?
23   A.      (Witness complies.)
24                   MR. PASSIN:  Lance, just so you know,
25           this one is consecutive Bates numbers, but
```

**Page 19**

**Emily Kim**

**Freeman vs.
Deebs**

1               EMILY KIM

2          sometimes some of the text messages are 1100

3          pages or so forth.

4                    MR. KOONCE:  Right.

5                    MR. PASSIN:  So I would only take the

6          first page and then the relevant pages and what

7          I ask about.

8                    MR. KOONCE:  Okay.  I mean, we'll --

9          that sounds fine.  We'll take a look at them

10         when we present them.

11                    And, Ms. Kim, you should -- you're

12         doing it, but just to remind you, you should

13         make sure you're comfortable with the -- if

14         there are pages cut off with the text, that you

15         have the full context.

16                    MR. PASSIN:  Let me know when you're

17         ready to discuss the document.

18    BY MR. PASSIN:

19    Q.        All right.  So turn, please, to Bates number

20    Wolff 0097498.

21    A.        I'm sorry.  Just turn to this document?

22    Q.        Yes, the page number at the bottom, the Bates

23    numbers, go to 0097498.

24              Is this a text message between you and Tracy

25    Wolff?

**Page 20**

```
 1                          EMILY KIM
 2   A.       Yes.
 3   Q.       And where it says "no sender information
 4   available," that's Tracy Wolff?
 5   A.       I -- yes, I think so.
 6   Q.       And did you have this text exchange with Tracy
 7   Wolff on October 21 -- October 21, 2021?
 8   A.       I'm not sure.
 9   Q.       Well, if you look at the first page, it has the
10   date.
11   A.       Okay.  Yes.
12   Q.       It says the date at the bottom.
13                    MR. KOONCE:  Are you asking whether she
14              recalls it here or whether she's reading that
15              that's when it was?
16   Q.       Well, I guess I'm asking you, did you recall
17   having this text exchange with Tracy Wolff on or about
18   October 21, 2021?
19   A.       I don't recall having it, but reading it is
20   bringing back my memories.
21   Q.       And you don't dispute that you had it?
22   A.       No.
23   Q.       ████████████████████████████████████████████
24   ███████████████████████████████████████████████████████
25   ███████████████████████████
```



```
 1                    EMILY KIM
 2    ████████████████████████████████████████████████
 3  ██████████████████████████████████████████████████
 4  ████████
 5      ████████████████████████████████████████████
 6  ██████████████████████████████████████████████████
 7                    MR. KOONCE:  ████████████████████
 8    ██████████████████████████████████████
 9  A.  ██████████████████████████████████████████████
10  ████████████████████████████████████████████
11  ██████████
12  Q.  ██████████████████████████████████████████████████
13  ██████████████████████████████████████████████████
14  ████████████████
15  A.  ████████████████████████████████.
16  Q.  ██████████████████████████████████████████████████
17  ██████████████████████████████████████████████
18  ██████████████████████████████████████████
19                  MR. KOONCE:  Object to the form.
20          Mischaracterizes the document.
21  A.      She's talking about earlier chapters of Court.
22  Q.      Of Court?
23  A.      Correct.
24  Q.      And you helped her write those?
25  A.      No.  I helped her stay awake.  I kept her
```

```
1                    EMILY KIM
2   company.  And occasionally, I might throw out a
3   suggestion.  But it was just more of a keeping the
4   company type of suggestion.
5   Q.      So you did get on -- so Tracy Wolff did write
6   part of Court on Google Docs and you sat with her while
7   she did that?
8   A.      Correct.
9              MR. PASSIN:  You can put this document
10         away.
11             Next I'd like to mark as Exhibit 85 a
12         document Bate stamped Number Wolff 0095695
13         through Wolff 0095698.
14             (Whereupon, WOLFF_0095695-98 was marked
15         as Exhibit 85, for identification, as of this
16         date.)
17  Q.      Will the witness please take a look at the
18  Exhibit?
19  A.      Okay.
20  Q.      All right.  So is this an e-mail text between
21  you and Tracy Wolff?
22  A.      Yes.
23  Q.      And did you exchange this e-mail text with
24  Tracy Wolff on June 16, 2020?
25             MR. KOONCE:  Object to the form.
```

```
  1                    EMILY KIM
  2  A.        I can see on this document that it says June
  3  16, 2020.
  4  Q.        And you have no reason to doubt that you
  5  exchanged this e-mail text with Tracy Wolff on that
  6  date?
  7  A.        No.
  8                   MR. KOONCE:  Object to the form.  I'm
  9            just trying to understand the term "e-mail
 10            text."
 11                   MR. PASSIN:  Excuse me.  Text.
 12  Q.        What book is Tracy Wolff saying she's going to
 13  send you?
 14  A.        I don't know.
 15  Q.        So it could be a book other than Court?
 16  A.        I think based on the date, it probably wouldn't
 17  be Court.
 18  Q.        And then, let's take a look at page Wolff
 19  0095697.  I'm going to read out loud the penultimate
 20  paragraph from you.  It says:
 21            ██████████████████████████████████
 22  ████████████████████████████████████████████
 23  ██████████████████████████████████████████████
 24  ████████████
 25            So what are you offering to do on Google Docs?
```



```
 1                      EMILY KIM
 2   A.
 3
 4
 5
 6
 7           So I was probably reading it and offering my
 8   opinion.
 9   Q.      So then you did more than just sort of babysit
10   with her.  You actually got involved with editing the
11   document?
12                   MR. KOONCE:  Object to the form.
13           Mischaracterizes her testimony.
14   A.      When I mentioned babysitting, I was mentioning
15   sitting up with her late nights on Google Doc.  I also
16   read her work and commented on it as well on other
17   occasions.
18   Q.      And she also wrote other books other than Court
19   on Google Docs, correct?
20   A.      I don't recall her doing that.
21   Q.      Well, what book did you say this was, you
22   didn't know?
23   A.      No.
24   Q.      But you know it wasn't Court, correct?
25   A.      No.  What I think was happening was I was
```

```
 1                      EMILY KIM
 2   offering to read it and make suggestions or comments.
 3   But she wasn't sitting with me late at night working on
 4   Google Docs.
 5   Q.       All right.  But Tracy Wolff was writing this
 6   book which was not Court on Google Docs, correct?
 7                      MR. KOONCE:  Objection to the form.
 8            Mischaracterizes her testimony.
 9   A.       No, that's not correct.
10   Q.       And what's incorrect about it?
11   A.       She wrote it on Microsoft Word, and I was
12   offering to make comments by putting into Google Docs
13   myself.
14   Q.       ████████████████████
15   A.       ██████████████████
16   Q.       So your daughter helped review the books as
17   well?
18   A.       Correct.
19   Q.       And did she give comments to Tracy Wolff?
20   A.       On occasion.
21   Q.       ███████████████████████████
22   ████████████████████████████████████████
23   ████████████████████████████████████
24   ████████████████████████████████████
25            So did you often review and comment on the
```

```
                            EMILY KIM
 1
 2    Wolff?
 3    A.      I don't believe that ever happened.
 4    Q.      Why would it not happen then when it happens
 5    other times?
 6                    MR. KOONCE:  Object to the form.
 7    A.      I don't think Tracy -- I ever made a lot of
 8    suggestions on Google Docs.  And if I did, I don't think
 9    she very often took my suggestions.
10    Q.      If you had gotten any of those e-mails, did you
11    turn them over to your counsel?
12    A.      I turned everything in my inbox to my counsel.
13    Q.      Would these have been in your inbox?
14                    MR. KOONCE:  Object to the form.
15    A.      Again, I'm not sure.  I turned everything in my
16    inbox over to my counsel.
17    Q.      Did you turn everything from all your Gmail
18    accounts to your counsel?
19    A.      Correct.
20                    MR. PASSIN:  Next, I'd like to mark as
21    Exhibit 86 another text string -- strike that.
22                    Let's not mark it as 86.  I'm going to
23    show you an Exhibit that was previously marked
24    as Pelletier Exhibit 62.
25    Q.      Can you please take a look at this document?
```

| | |
|---|---|
| 1 | **EMILY KIM** |
| 2 | A.        Okay. |
| 3 | **Q.        Is this a text string from October 27, 2021** |
| 4 | **between you and Liz Pelletier?** |
| 5 | A.        Again, I can see on the e-mail that that's the |
| 6 | date on this e-mail. |
| 7 | MR. KOONCE:  I'm just going to -- |
| 8 | sorry.  For the record, there's highlighting at |
| 9 | the bottom of page 74295.  Is that highlighting |
| 10 | the original or did that happen -- |
| 11 | MR. PASSIN:  No.  That happened |
| 12 | somewhere on our end. |
| 13 | MR. KOONCE:  But the Exhibit that was |
| 14 | marked at Ms. Pelletier's has that in it or is |
| 15 | that something -- |
| 16 | MR. PASSIN:  I would guess it does, but |
| 17 | I'm not 100 percent sure. |
| 18 | MR. KOONCE:  Okay. |
| 19 | BY MR. PASSIN: |
| 20 | **Q.        But you have no reason to believe that you** |
| 21 | **didn't send this exchange this text message with Ms.** |
| 22 | **Pelletier on October 27, 2021?** |
| 23 | A.        No. |
| 24 | **Q.        And by the way, is that your mobile number,** |
| 25 | ████████████? |

1                         EMILY KIM

2    A.      That's correct.

3    Q.      ████████████████████████████████████

4    ████████████████████     ██████████████████████

5    ███████████████████████████     ███████████

6    █████████████████████

7            Do you know what Ms. Pelletier is referring to

8    there?

9    A.      Yes, at the end of Court, I sat with Tracy in

10   Google Doc to give her motivation and to help her get

11   through the hardest part of Court.

12   Q.      And did you sit with her for 19 hours a day?

13   A.      Probably.

14   Q.      For how many days?

15   A.      Maybe one or two.

16   Q.      Did you make any comments during that period of

17   time?

18   A.      Can you please explain what you mean by

19   comments?

20   Q.      Did you make any comments to Court, suggested

21   changes?

22   A.      Again, I told you it just would be in the

23   course of keeping someone company and saying, great job,

24   I really like what you did here; that kind of comment.

25   Q.      Well, she asked you at various times to help

```
 1                        EMILY KIM
 2   Like I like what you're doing here, kind of comment.
 3   Q.        Excuse me.
 4   A.        Like an encouraging comment, that kind of
 5   comment.
 6                        MR. PASSIN:  Next I'd like to mark
 7        another text message.  Let's mark this as 86.
 8                        (Whereupon, KIM00352321 and 00352413
 9        was marked as Exhibit 86, for identification,
10        as of this date.)
11   Q.        Please take a look at this Exhibit.
12   A.        Okay.
13   Q.        Is this a text exchange between you and Stacy
14   Abrams?
15   A.        Correct.
16   Q.        And did you have this exchange with Stacy
17   Abrams on October 24, 2021?
18   A.        Again, I can see in the -- actually I don't
19   really see that.
20   Q.        Do you see above each of the text messages?
21   A.        Okay, yes.
22   Q.        And do you have any reason to dispute that?
23   A.        No.
24   Q.        ████████████████████████████████████████
25   █████████████████████████████████████████████████
```

1              EMILY KIM

2    ██████████████████████████████████

3         **What are you telling her in that text message?**

4    A.      I don't recall.

5    **Q.      Do you know what you meant by "you can pop it**

6    **in"?**

7    A.      No, I don't recall.

8    Q.      Do you have any idea?

9              MR. KOONCE:  Object to form.  Asked and

10             answered.

11   Q.      Do you have any idea?

12   A.      My best guess is that this was right at the end

13   of the Court and that act three needed to be written

14   very quickly, and they were considering cutting major

15   chunks of it.

16   Q.      So she would put it on Google Docs for you to

17   look at?

18   A.      I believe that Tracy put it on Google Docs, but

19   again, I don't recall the exact circumstances of this

20   text message exchange.

21   Q.      But did you look at it and give your comments?

22             MR. KOONCE:  Object to form.

23   A.      I don't think that this was a matter of giving

24   comments.  This was a matter of trying to figure out

25   what content was going in the book.

```
 1                        EMILY KIM

 2   Q.        And this was Court?

 3   A.        Court.

 4   Q.        Who had access to the Google Docs in connection

 5   with the books in the Crave book series?

 6                  MR. KOONCE:  Objection.

 7   A.        Can you be more specific?

 8   Q.        Well, with respect to your Google Docs account,

 9   who had access to that account?

10   A.        My particular Google Docs?

11   Q.        Yes.

12   A.        Me and Ellen.

13   Q.        You and who?

14   A.        My assistant Ellen.

15   Q.        And then you could either send a link to

16   someone or you could invite them onto Google Docs?

17   A.        Correct.

18   Q.        And on occasion you would invite Tracy Wolff

19   onto Google Docs, correct?

20   A.        Correct.

21   Q.        And on other occasions, would you invite other

22   people?

23   A.        Correct.

24   Q.        And who would you invite in connection with the

25   Crave book series?
```

**EMILY KIM**

1

2  A.      It looks like I invited Stacy Abrams and I know

3  in connection with the Crave bible other people were

4  invited.  I can't tell who they are off the top of my

5  head.

6  Q.      Well what about the books?  Did you sometimes

7  invite Ms. Pelletier on your Google Docs in connection

8  with the books in the Crave book series?

9  A.      To the best of my recollection, Liz Pelletier

10 never worked in Google Docs.

11 Q.      Did you use the track change feature in Google

12 Docs?

13 A.      No.

14 Q.      Was there any sort of access log in connection

15 with Google Docs?

16 A.      I'm not sure.

17 Q.      There may have been?

18 A.      I'm not proficient in computers enough to know

19 exactly what an access log is.

20 Q.      If you had such a log, would you turn it over

21 to your e-discovery people?

22 A.      I turned everything, I gave access to my

23 accounts to my e-discovery people.

24 Q.      Can you still access your Google Docs in your

25 computer?

**Emily Kim**

1                       EMILY KIM

2   A.      Yes.

3   Q.      And if there's an access log, can you still

4   access that?

5   A.      Again, I'm not exactly sure what an access log

6   is.

7   Q.      Did you use any text spinning software in

8   connection with any of the books in the Crave book

9   series?

10  A.      No.

11  Q.      Did you use any artificial intelligence bots

12  that are able to reword sentences in connection with any

13  of the books in the Crave book series?

14  A.      No.

15  Q.      Were you involved in editing any of the books

16  in the Crave book series?

17  A.      No.  Beyond encouragement and the duties of an

18  agent.

19  Q.      Well, what are the duties of an agent?

20  A.      Encouragement, support, light brainstorming.

21  Q.      With Lynne Freeman, you gave substantial

22  comments on rewrites.  Is that considered part of the

23  duty of the agent?

24                  MR. KOONCE:  Object to form.

25  A.      I tailor my agent duties to each of my specific

EMILY KIM

1

2    clients and try to offer each person what they need.

3    Q.      And sometimes it includes giving suggestions

4    for substantial rewrites?

5    A.      Yes.

6    Q.      I showed you a phone number earlier with which

7    you used to text.  Were there any other phone numbers

8    you used to text in connection with the Crave book

9    series?

10   A.      No.

11   Q.      Do you remember that when you had lunch with

12   Lynne Freeman at the Romance Writers of America

13   conference in 2012, that you and her walked up to a

14   table where her husband Trent Baer and his son was

15   eating?

16                   MR. KOONCE:  Object to the form.

17           Haven't established the facts for that

18           question.

19   A.      I do not recall that.

20   Q.      Did you attend the 2012 American conference --

21   Romance Writers of America conference?

22   A.      Yes.

23   Q.      Did you recall meeting Mr. Baer at a

24   restaurant?

25   A.      I do not, no.

```
 1                        EMILY KIM

 2   A.       Correct.

 3   Q.       And what were your duties as her assistant?

 4   A.       I reviewed contracts.  I communicated with

 5   clients.  I read manuscripts.  I answered the phone.  I

 6   talked to Robin about issues that came up in her daily

 7   work.  I helped order lunch for the agency.

 8   Q.       While you were there, did you discover Twilight

 9   and the Slash Fics?

10   A.       No, I did not.

11   Q.       Did you ever tell Lynne Freeman that?

12   A.       No.

13   Q.       And then in 2005, you started Prospect Agency?

14   A.       Correct.

15   Q.       What type of entity is Prospect Agency?

16   A.       It's an LLC.

17   Q.       ████████████████████████████

18   A.       ████████████████████

19   Q.       ███████████████████████████████████████████

20   ██████████████████████████████

21   A.       ███████████████████████████████

22   Q.       ███████████████████████████████████████████

23   A.       ███████████████████████████████████████████

24   ███████████████████

25   Q.       ███████████████████████████████████████
```

```
 1                    EMILY KIM
 2   A.         ████████████████████████████████
 3   ████████████████████████████
 4   Q.    What does Prospect Agency do?
 5   A.    We are a literary agency.
 6   Q.    What do you personally do at Prospect Agency?
 7   A.    I represent clients and I manage the agency.
 8   Q.    What do you typically in connection with a
 9   client's manuscript from submission to Prospect Agency
10   to publication of the final book?
11                    MR. KOONCE:  Object to the form.
12   A.     There's no typical process for any given
13   client.
14   Q.    Well, explain to me the various different
15   scenarios that may occur.
16                    MR. KOONCE:  Object to the form.
17   A.     Sometimes a client comes to me with the
18   contract and I help them review the contract and manage
19   the relationship with their editor.  Sometimes a client
20   will come to me with a project and I will help edit it
21   and then try to sell it.  Sometimes a client will come
22   to me with a project, but will put that project aside
23   and work on another project.  Those are three common
24   scenarios.
25   Q.    And what scenario would you put Tracy Wolff in?
```

```
 1                          EMILY KIM

 2   Q.       What were the circumstances in which you met

 3   Lynne Freeman?

 4   A.       I do not recall.

 5   Q.       You have no recollection?

 6   A.       No.

 7   Q.       Have you ever met Lynne Freeman face to face?

 8   A.       Yes, at the Romance Writers Convention.

 9   Q.       We'll discuss that a little later.

10            Is that the only time you met her face to face?

11   A.       I believe so.

12                    MR. PASSIN:  Next I'd like to mark as

13            next in order as Exhibit 87 an agreement for

14            artists.

15                    (Whereupon, KIM00352651-54 was marked

16            as Exhibit 87, for identification, as of this

17            date.)

18   Q.       Are you familiar with this document?

19   A.       Yes.

20   Q.       Can you please turn to page 4 of the document,

21   which is Bate stamped Number Kim 00352654.

22            Is that your signature that appears above your

23   name?

24   A.       Yes.  Below my name, I should say.

25   Q.       Below your name.  I apologize.  And is it your
```

**Emily Kim**

1                        EMILY KIM

2    understanding this is an agreement between Lynne Freeman

3    on the one hand and Prospect Agency and yourself on the

4    other hand?

5    A.        Correct.

6                        MR. PASSIN:  You can put this Exhibit

7              down.

8                        Next I'm going to mark as Exhibit 88 a

9              document which is Bate stamped Number Kim

10             00075469 through 00075471.

11                       (Whereupon, KIM00075469-71 was marked

12             as Exhibit 88, for identification, as of this

13             date.)

14   Q.        This is an e-mail between Lynne Freeman and you

15   between 2015 and 2021.  Please take a look at the

16   Exhibit.  Tell me when you're done, please.

17   A.        Okay.

18   Q.        Please take a look at the second page, the

19   e-mail dated April 1, 2021, at 8:00 p.m. from Lynne

20   Freeman to you.

21             Do you see that e-mail?

22   A.        I do.

23   Q.        Let me read it out loud.

24             "It's been so long since we've been in touch.

25   I hope you're well during these crazy times and

**Emily Kim**

1                      EMILY KIM

2   surviving the challenges of COVID.  I moved back home to

3   Alaska where it is so much easier to write, and I'm now

4   in Santa Barbara.  Would you mind sending me a copy of

5   our contract?  I'm writing again, and I believe my copy

6   is in my law office in Alaska.  Thank you, and take

7   care."

8            Do you see that?

9   A.    Yes.

10  Q.     Now I want to look at the e-mail above, which

11  is an e-mail the same date, 7:57 p.m., obviously it's

12  from a different time zone, from you to Lynne Freeman.

13           Do you see that e-mail?

14  A.    I do.

15  Q.     Let me read that out loud.

16           "Hey, Lynne.  So good to hear from you.  I'm

17  working from Vermont these days and your paper contract

18  is back at the office.  Do you have a specific question?

19  We've long since parted ways and you are perfectly free

20  to seek alternative representation including the book we

21  worked on together."

22           Do you see that?

23  A.    Yes.

24  Q.     Now, let's take a look on the first page at the

25  e-mail dated April 1, 2021, at 11:22 p.m. from Lynne

1                    EMILY KIM

2    Freeman to you.  It's in the middle of the first page,

3    and I'm going to read that out loud.  And, again, this

4    is from you.

5              "I'll be back in short while and can get you a

6    copy.  I'm happy to do it.  Our contract is now void

7    though, and no past client has made this request.  So

8    I'm curious, is there any issue that concerns you?"

9                    MR. KOONCE:  Object to the form.

10                   I just want to note for the record that

11        you skipped an e-mail in there.  I don't know

12        if you're trying to be thorough or not.

13                   MR. PASSIN:  We'll get to the next

14        e-mail too.  In fact --

15                   MR. KOONCE:  I'm sorry.  Maybe I read

16        it wrong.

17   BY MR. PASSIN:

18   Q.      Then let's get to the e-mail underneath that,

19   and it's from Lynne Freeman dated April 1 at 11:22 p.m.

20            "Is there an assistant in your office who could

21   shoot me a copy of the contract?  I don't have specific

22   questions, but would really like to have a copy and mine

23   is in Alaska.  Thanks so much.  I appreciate it."

24            And then you answer:  "I'll be back in a short

25   while and can get you a copy.  I'm happy to do it.  Our

1                        EMILY KIM

2    A.      B-E-R-S-C-I-A.

3    Q.      And where did your assistant live at the time?

4    A.      She lived in New Jersey.

5    Q.      Was your assistant with you in Vermont at the

6    time?

7    A.      No.

8    Q.      Why didn't you ask your assistant to send you a

9    copy of the contract while you were in Vermont?

10                   MR. KOONCE:   Object to the form.

11   A.      I asked Lynne Freeman why she wanted a contract

12   and she didn't answer me, and I felt like she was

13   treating me like her secretary and I was frustrated.

14   Q.      So that's why you didn't send her a copy of the

15   contract?

16   A.      Correct.

17   Q.      When you returned from Vermont did you ever

18   send Ms. Freeman a copy of the contract she requested?

19   A.      No.

20   Q.      Why not?

21   A.      Again, I was frustrated she didn't ask her own

22   assistant her own assistant to get a copy of the

23   contract and we had long since parted ways.  I felt it

24   was an administrative duty that I no longer owed her.

25                   MR. PASSIN:   Next I'd like to mark as

**Emily Kim**

1          EMILY KIM

2    Exhibit 89 a text exchange.  It's a March 31,

3    2021 text string between you and Ellen, Bate

4    stamp number Kim 00351468 (sic).

5            (Whereupon, KIM00351461-4 was marked as

6    Exhibit 89, for identification, as of this

7    date.)

8            MR. PASSIN:  Please take a look at this

9    text string.

10           MR. KOONCE:  And, again, let me just,

11   for the record -- Mark, earlier you had said,

12   when you were going to show text strings, that

13   you took a first page of the whole string and

14   then added.  Is this the first -- is 351461 the

15   first page of this text string or not?

16           MR. PASSIN:  I'm not 100 percent sure,

17   but I would guess so -- We don't know for sure.

18   We don't know.

19           MR. KOONCE:  So this may just be in the

20   middle of the chain.

21           MR. PASSIN:  It may be in the middle,

22   it's possible.  I don't know.

23           MR. KOONCE:  So just for identification

24   purposes it would be helpful to know the

25   beginning.

**Page 49**

**Emily Kim**

<b>Freeman vs.<br>Deebs</b>

```
 1                    EMILY KIM
 2                 MR. PASSIN:  Well, we usually know.
 3          This is a rare one.  It usually has all the
 4          metadata in front or at the top who the sender
 5          is.  This one doesn't, admittedly.
 6   BY MR. PASSIN:
 7   Q.       Now, by the way, this text string, I think,
 8   like all your text strings read from the bottom to top,
 9   correct?
10   A.       Meaning?
11   Q.       Meaning, you have to go to the last page to
12   read the first text message.
13   A.       Oh, okay.
14   Q.       Let me know when you've reviewed it.
15   A.       Okay.
16   Q.       Now I'm going to read out loud from 11:56 to
17   12:05 for you?
18                 MR. KOONCE:  What's the Bates number?
19                 MR. PASSIN:  It starts at the bottom of
20          351464.  It reads from the bottom, okay?
21   Q.       You:  I had two creepy things happen.
22          Ellen: Sounds good.
23          Ellen:  Uh oh.
24          Ellen:  What creepy things happened?
25          You:  One a really long ago client from like
```

<b>Page 50</b>

| 1 | EMILY KIM |
|---|---|

2  nine years ago, asked me to send her her old agency

3  agreement.

4          You:  I told her I was in Vermont and she said

5  she really wanted it and asked if I had someone in the

6  office who could send it over.

7          You:  I never sold a book for her.

8          Ellen:  That's weird.  Why?  Did you end on

9  good terms with them?

10          You:  I did.

11          You:  I told her the contract was now void, but

12  she still wants it.

13          Ellen:  Do you want me to find it when I go

14  over?

15          You:  After contemplating I decided I never

16  want to send it to her.

17          Ellen:  That's probably the wisest course of

18  action.

19          You:  She should have her own company copy.  I

20  can think of no good reason to give it to her,

21  especially since she won't say why she wants it, even

22  though I pointblank asked her.

23          Ellen:  Yeah, definitely.  Maybe she wants to

24  become a literary agent and rip-off your agreement.

25          You:  The only really nefarious reason I can

**Emily Kim**

1                        EMILY KIM

2    think of is her book was a paranormal romance set in

3    Alaska.  Maybe now that Tracy is famous, she's poking

4    around, but that's probably, hyper, hyper paranoid.

5            You:  The books are a 100 percent different.

6            Ellen:  Oh definitely, that sounds absolutely

7    what's happening.

8            You:  Except they're both set in Alaska.  He's

9    in Anchorage and about a girl that fell in love with a

10   werwolf.  It was good; she should have kept working on

11   it.  So you think I'm not being too paranoid?  But even

12   if I'm right, what did the agency agreement have to do

13   with it.

14           Ellen:  I don't think you're being too paranoid

15   at all.  If she can't provide a reason that she needs

16   it, why should you give it to her?

17           You:  You can look at the e-mails and see if

18   they're creepy too.

19           You:  Lynne Freeman, I was nothing but nice to

20   her.  Bye.

21           So let me ask a few questions.  Why did you

22   think it was creepy that Lynne Freeman asked for a copy

23   of her contract?

24   A.      No past client has ever asked for a copy of her

25   contract before.

**Page 52**

**Emily Kim**

1                          EMILY KIM

2    Q.        You knew Lynne Freeman was a lawyer, correct?

3    A.        I didn't remember that until she reached out to

4    me again.

5    Q.        But that's the only reason you thought it was

6    creepy?

7                     MR. KOONCE:  Object to the form.

8    A.        Yes.

9    Q.        Why, after contemplating, did you decide never

10   to send her the contract?

11   A.        I think there were two reasons:  One, as I

12   said, I was annoyed that she was treating me like a

13   secretary -- or maybe three reasons.  Two, I thought

14   maybe she wanted to crib my agreement for a new literary

15   agent she was working with.  And three, I thought that

16   my author Tracy was getting to be very famous and I know

17   when authors get famous, bad actors come out of the

18   woodwork sometimes, like Harry Potter, Twilight, Michael

19   Crichton, Stephen King.  So I thought perhaps that there

20   was like a gold-digging expedition going on with Tracy.

21                     MR. PASSIN:  Can you read her answer

22              back, please.

23                     (Whereupon, the record was read by the

24              reporter.)

25   Q.        Well, why did you think she was poking around

Emily Kim

```
 1                      EMILY KIM

 2    about the Tracy Wolff?

 3    A.      Like I said, I think when authors get famous

 4    and they get attention, sometimes there can be people

 5    that come out the woodwork that want something from them

 6    in a nefarious way.

 7    Q.      Wasn't it because you knew that Tracy had

 8    copied from Lynne Freeman's book to create Crave?

 9                    MR. KOONCE:  Object to form.

10    A.      Absolutely not.

11    Q.      Wasn't your concern that Lynne had figured out

12    that Tracy Wolff had copied her book?

13    A.      Absolutely not.

14                    MR. PASSIN:  Next I'd like to mark as

15            Exhibit 90, a text string between you and Ellen

16            Bate stamped number Kim 00351468.

17                    (Whereupon, KIM00351468 was marked as

18            Exhibit 90, for identification, as of this

19            date.)

20                    MR. PASSIN:  Please take a look at that

21            string.

22                    MR. KOONCE:  Just again, for the

23            record -- and Mark, this is only because when

24            you started you had said that for all the text

25            chains you would have a first page that
```

```
 1                          EMILY KIM
 2   do recall receiving those e-mails from Lynne Freeman
 3   when I was in Vermont.
 4   Q.      Well, was this during COVID?  You had said you
 5   were in Vermont working during COVID?
 6   A.      Correct.
 7   Q.      Well then, weren't you in Vermont during COVID?
 8   A.      I traveled back and forth.
 9                   MR. KOONCE:  Just let me object.
10   Q.      So it's your position as we're sitting here
11   that on March 31, 2021, at approximately 10 in the
12   morning, you were in New Jersey, and then on April 1,
13   you were in Vermont?
14   A.      Correct.
15                   MR. PASSIN:  Next I'm going to mark as
16           Exhibit 91 a document Bate stamped number LF
17           126632 through 126633.
18                   (Whereupon, LF 126632-33 was marked as
19           Exhibit 91, for identification, as of this
20           date.)
21   Q.      Did Lynne Freeman submit -- well, why don't you
22   take a look at the --
23   A.      Okay.
24   Q.      So you read it?  Did Lynne Freeman submit a
25   manuscript to you and request that you be her agent in
```

1                     **EMILY KIM**

2     **late 2010?**

3     A.        Could you repeat the question?

4                         MR. PASSIN:   Could you read it back,

5              please.

6                     (Whereupon, the record was read by the

7     reporter.)

8                         THE WITNESS:   Yes.

9     **Q.        And what was the name of the manuscript?**

10    A.        Blue Moon Rising.

11    **Q.        Please be advised that I will refer throughout**

12    **this deposition to the manuscript as either Blue Moon**

13    **Rising or Masqued; is that understood?**

14    A.        Understood.

15    **Q.        Isn't it correct that Ms. Freeman actually sent**

16    **you or gave to you various versions of Blue Moon Rising**

17    **between late 2010 and March 2015?**

18    A.        Correct.

19    **Q.        Approximately how many different versions did**

20    **she send or give you during that time period?**

21    A.        I couldn't say.

22    **Q.        Well, was it more than 10?**

23    A.        I would hesitate to guess on the record.

24    **Q.        You can't make any sort of estimate at all?**

25    A.        I would say about 10 to 15 perhaps.

```
 1                        EMILY KIM
 2           (Whereupon, a short break was taken.)
 3                   THE VIDEOGRAPHER:  The time is 11:49
 4           a.m.  We're back on the record.
 5                   MR. PASSIN:  I'd like to mark as
 6           Exhibit 104, a document Bate stamped number Kim
 7           185194 through Kim 00185765, a copy of Blue
 8           Moon Rising.
 9                   (Whereupon, KIM00185194-765 was marked
10           as Exhibit 104, for identification, as of this
11           date.)
12    BY MR. PASSIN:
13    Q.     I want you to take a quick look at that, I
14    don't expect you to read the whole thing.  And I don't
15    think your counsel would, but I don't want to speak for
16    him.
17           Is this one of the versions of Blue Moon Rising
18    that Lynne Freeman e-mailed to you?  Notice it was
19    produced by you.
20    A.     Then I would say yes.
21    Q.     Do you know when you received this version of
22    the manuscript?
23    A.     No.
24    Q.     Did Prospect Agency, any time from 2010 to
25    2014, have a practice of keeping a log of when
```

```
 1                    EMILY KIM
 2    manuscripts were received?
 3    A.        No.
 4    Q.        Excuse me?
 5    A.        No.
 6    Q.        Did Prospect Agency, from any time from 2010 to
 7    2014, have a practice regarding how to handle former
 8    clients' manuscripts or rejected manuscripts?
 9    A.        No.
10    Q.        Who is Tracy Wolff?
11    A.        Tracy Wolff is the pen name for Tracy
12    Deebs-Elkenaney, who is my client.
13    Q.        So just so the record is clear, I'm going to
14    refer to her from now on as Tracy Wolff; is that
15    understood?
16    A.        Understood.
17    Q.        When did you first meet Tracy Wolff?
18    A.        ████████████████████████████████████████
19    ██████████████████████████████████████████████
20    ███████████
21    Q.        ████████████████████████████████████
22    A.        █████████
23    Q.        ████████████████████████
24    A.        █████████████████████████████████████
25    Q.        Under what circumstances did you meet Tracy
```

1                          EMILY KIM

2   Wolff?

3   A.      I do not recall, but it's likely that she

4   submitted a manuscript to me.

5   Q.      And at which agency, your current agency or

6   your former agency?

7   A.      At that time, I was at my current agency.

8   Q.      And is she an agent -- client of yours

9   currently?

10  A.      Yes.

11  Q.      And how long has she been a client of yours?

12  A.      She's been a continuous client of mine since we

13  started working together about when my son was one or

14  two years old.

15  Q.      Do you know what year that was?

16  A.      That would be 2006 or 2007.

17  Q.      Let me show you what's been previously marked

18  as Exhibit 24.  What is your understanding of what this

19  document is?

20  A.      This is an agency agreement.

21  Q.      With whom?

22  A.      With Tracy Wolff.

23  Q.      And what's the date of this agreement?

24  A.      10/07/07.

25  Q.      Are there any amendments to this agreement?

```
1                        EMILY KIM

2    A.       No.

3    Q.       How much is Prospect Agency entitled to be paid

4    for the books subject to Exhibit 24?

5    A.       Subject to this agreement?

6    Q.       Yes.

7                    MR. KOONCE:  Object to the form.

8    Q.       Well, what's your understanding of how much

9    Prospect Agency is entitled to be paid for the books

10   subject to this Exhibit 24?

11                   MR. KOONCE:  Object to form.

12   A.       I don't quite understand what you're asking.

13   Q.       Well, what percentage commission does -- is

14   Prospect Agency entitled to pursuant to this agreement?

15                   MR. KOONCE:  Object to form.

16   A.       ████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████

19   Q.       ████████████████████████████████████████████

20   A.       ████████████████████████████████████████████

21   Q.       ████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   A.       ███████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   █████
```

```
 1                        EMILY KIM

 2   that understood?

 3   A.      Understood.

 4                MR. KOONCE:  I'm going to object to the

 5           definition including the last two books.

 6                MR. PASSIN:  It depends on what the

 7           question is.

 8                MR. KOONCE:  It does.  I mean, I'm just

 9           asking -- it depends on the question, but if

10           you're saying that every time you say the Crave

11           series, you mean all six books and not just the

12           first four, I may have to object specifically,

13           depending on the question.

14   BY MR. PASSIN:

15   Q.      Would you characterize Tracy Wolff as a good

16   friend?

17   A.      I would characterize her as a client, someone I

18   admire and respect.

19   Q.      But you wouldn't refer to her as a good friend?

20   A.      We have grown closer over the years.

21   Q.      Haven't you referred to her as a good friend in

22   the past?

23   A.      I think of Tracy as a friend, but again, when

24   we first met, we were not friends.  But as the years

25   have gone by, I am friends with many of my clients, and
```

**Emily Kim**                                    Freeman vs.
                                                       Deebs

| | |
|---|---|
| 1 | EMILY KIM |
| 2 | Tracy is one of them. |
| 3 | Q.      And would you characterize her today as a good |
| 4 | friend? |
| 5 | A.      As with many/most of my clients, I would |
| 6 | consider her a friend and a client. |
| 7 | Q.      Do you socialize with Tracy Wolff? |
| 8 |           MR. KOONCE:  Object to the form. |
| 9 | A.      Do I socialize with Tracy Wolff? |
| 10 | Q.      Yes. |
| 11 | A.      Not usually, no.  We live in different states, |
| 12 | and our relationship is primarily a work relationship . |
| 13 | Q.      Over the last three years, how often would you |
| 14 | estimate that you speak with her? |
| 15 | A.      It depends on what's going on with her books. |
| 16 | If a book is under deadline, multiple times a day.  If |
| 17 | we don't have something happening, not as often. |
| 18 | Q.      And over the last three years, how often would |
| 19 | you estimate you text with her? |
| 20 |           MR. KOONCE:  Object to the form. |
| 21 | A.      I would find that very difficult to estimate. |
| 22 | Q.      But again, if you're working on a book, it |
| 23 | would be more often, I take it? |
| 24 | A.      Correct. |
| 25 |           MR. PASSIN:  Let me show you some text |

```
 1                    EMILY KIM
 2           messages.  I'm going to mark as Exhibit 105, a
 3           text message between you and Tracy Wolff.
 4                      (Whereupon, KIM00347988 and KIM00348541
 5           was marked as Exhibit 105, for identification,
 6           as of this date.)
 7                      THE WITNESS:  Okay.
 8    Q.      Is this a text message between you and Tracy
 9    Wolff?
10    A.      Yes.
11    Q.      And was this text message exchanged with Tracy
12    Wolff on December 25, 2021?
13    A.      Correct.
14    Q.      ████████████████████████████████████████
15    ████████████████████████████████████████████████
16    ████████████████████████████████████████████████
17    ████████████████████████████████████████████████
18    ███████████████████████████
19           Do you see that?
20                      MR. KOONCE:  I'm going to interject
21           here, Mark.  We've got a Bates number -- at
22           least the version I have -- I may -- you may
23           have given me one that's not the same.  But
24           it's Kim 347998, and then the next Bates number
25           is Kim 348541, and the dates on the first page
```

**Emily Kim**

|    | EMILY KIM |
|----|-----------|
| 1  | EMILY KIM |
| 2  | are in December, and on the second page are in |
| 3  | July. |
| 4  | MR. PASSIN:  Right. |
| 5  | MR. KOONCE:  So is that because -- I |
| 6  | just want to be clear, these are not a |
| 7  | continuous chain.  This is page one of a text |
| 8  | chain, and then one page in the middle of that |
| 9  | chain; is that right? |
| 10 | MR. PASSIN:  Right.  And we thought it |
| 11 | was appropriate to give you the cover sheet. |
| 12 | So that's the first page and it has some |
| 13 | information on it, and then we attached the |
| 14 | relevant page. |
| 15 | MR. KOONCE:  Okay.  Perfect.  Just |
| 16 | making sure I understood.  Sorry. |
| 17 | MR. PASSIN:  So can you read the |
| 18 | pending question back, please. |
| 19 | (Whereupon, the record was read by the |
| 20 | reporter.) |
| 21 | THE WITNESS:  Yes, I see that. |
| 22 | BY MR. PASSIN: |
| 23 | Q.      Was that a true statement when you made it? |
| 24 | A.      Yes.  I often feel my that clients are my |
| 25 | friends and it's my honor to help them. |

```
 1                       EMILY KIM
 2   Q.        ███████████████████████████████
 3   ██████████████████████████████████████████████
 4   ████████
 5             Do you see that?
 6   A.        Yes, I do.
 7                  MR. PASSIN:  You can put this Exhibit
 8             down.  Next I'd like to mark as Exhibit 106 --
 9             let's skip that for a moment.  Let's move on to
10             another topic.
11   Q.        Which is, I'm going to show you a document that
12   was previously marked as Exhibit 38.  So I'm showing you
13   what's been previously marked as Exhibit 38.  Can you
14   take a quick look at it, please.  These appear to be ACH
15   payment receipts from January 8, 2020 to December 4,
16   2022.
17             What is your understanding of what these are?
18   A.        These are payments that I sent -- payment
19   receipts that I sent to Tracy Wolff via e-mail.
20   Q.        And what do the payment receipts reflect?
21   A.        They reflect money that has come into my
22   account that I am now deducting my commission from and
23   sending on to her.
24   Q.        Okay.  So in other words, they are electronic
25   payments you received from Entangled; is that correct?
```

**Emily Kim**

```
 1                    EMILY KIM
 2    Q.       Does Tracy Wolff directly or indirectly pay any
 3    month to you, the Prospect Agency, in connection with
 4    the books in the Crave book series, or any of the books
 5    other than what Prospect is paid pursuant to Exhibit 24?
 6    A.       No.
 7    Q.       Does Tracy Wolff directly or indirectly pay you
 8    or Prospect Agency any money other than pursuant to the
 9    agency agreement that we marked as Exhibit 24?
10    A.       No.
11    Q.       Who is Entangled?
12    A.       Entangled is a book publishing company.
13    Q.       And are they the publisher of the Crave book
14    series?
15    A.       Yes.
16    Q.       Who is the primary owner of Entangled?
17                    MR. KOONCE:  Object to form.
18    A.    I don't know, because I'm not aware of their
19    business structure.
20    Q.       You're not aware that Liz Pelletier is the
21    primary owner of Entangled?
22                    MR. KOONCE:  Object to form.
23    A.    Again, I cannot answer that question, because
24    I'm not privy to their back end business dealings.
25    Q.       But does Liz Pelletier represent to you that
```

```
 1                          EMILY KIM

 2   A.       I think what I was trying to tell my assistant

 3   was that I thought the books were completely different.

 4   Q.       Well, but you pointed to the fact that it

 5   wasn't set in Anchorage.

 6   A.       Tracy's book is set in the deep wilderness of

 7   Alaska, which, for me, is a unique setting environment.

 8   Q.       But it was originally set in Anchorage, wasn't

 9   it?

10   A.       No.

11   Q.       It wasn't originally set in Anchorage?

12   A.       No.

13   Q.       Originally, Anchorage was mentioned in the

14   book, wasn't it?

15                     MR. KOONCE:  Object to the form.

16   A.       Not that I'm aware of.

17   Q.       Is if fair to say that Stacy Abrams made

18   contributions to the story line of the Crave book

19   series?

20                     MR. KOONCE:  Object to the form.

21   A.       I believe that most of the decisions about the

22   Crave series were made by Liz Pelletier and Tracy Wolff.

23   Q.       What about Stacy Abrams, though? Did she make

24   some considerations to the story line in the Crave book

25   series?
```

**Emily Kim**

| | |
|---|---|
| 1 | **EMILY KIM** |
| 2 | A.      Tracy Wolff. |
| 3 | Q.      And then can you please describe for me the |
| 4 | creation and writing of Covet? |
| 5 | A.      I believe Covet was very similar to the |
| 6 | creation of Crush. |
| 7 | Q.      Were there any differences you're aware of? |
| 8 | A.      I think that the outline was created even as |
| 9 | the book itself was being created, whereas in Crush, I |
| 10 | think the outline was created from the outset.  But |
| 11 | again, I wasn't that involved in the actual creation. |
| 12 | Q.      When you say outline, are you referring to the |
| 13 | synopsis? |
| 14 | A.      A synopsis. |
| 15 | Q.      Please describe for me the creation writing of |
| 16 | Court? |
| 17 | A.      Court was written in -- the outline or synopsis |
| 18 | was written in more of an ongoing process as the book |
| 19 | was being written, maybe even than the other two, and |
| 20 | near the end, Tracy was -- this was the book where Tracy |
| 21 | was very tired and I kept her company on a Google Doc. |
| 22 | Q.      So on Court was the synopsis not finished until |
| 23 | after the book was done? |
| 24 | A.      I think it was created alongside the creation |
| 25 | of the book. |

**Emily Kim**

```
 1                      EMILY KIM
 2           break for lunch?
 3                   MR. KOONCE:  It's really up to you.
 4   A.      Anytime.  I'm fine.
 5   Q.      I'm going to show you what had previously been
 6   marked as Exhibit 4.  Please take a look at the e-mail
 7   dated 10/10/2013 from Liz Pelletier that was previously
 8   marked Exhibit 4.
 9   A.      Okay.
10   Q.      Did you receive this -- strike that.
11           Have you ever seen that e-mail from Liz
12   Pelletier before?
13   A.      An e-mail from Liz Pelletier?
14   Q.      Well, let's start over, okay.  I want you to
15   look at the e-mail at the bottom that's from Emily to --
16   from you to Stacy, and then your response at the top,
17   okay?
18                   MR. KOONCE:  Object to form.  I think
19           it mischaracterizes the document.
20                   MR. PASSIN:  Well the bottom e-mail is
21           from the witness to Liz Pelletier, even though
22           it says Lynne, and then the top e-mail is from
23           Stacy Abrams to the witness.
24                   MR. KOONCE:  Right.  That's not the way
25           you described it previously.
```

**Page 136**

**Emily Kim**

```
 1                        EMILY KIM
 2    Q.        Can you read that e-mail, please?
 3    A.        Okay, I've read it.
 4    Q.        Is it correct that you were writing to see if
 5    Entangled is interested in publishing Masqued?
 6    A.        Correct.
 7    Q.        And why did you write to Stacy Abrams instead
 8    of -- initially you had written to Liz Pelletier,
 9    correct?
10    A.        Yes.
11    Q.        And why did you write her instead of Stacy
12    Abrams?
13    A.        I think I must have thought she would be the
14    best match for the book.
15    Q.        At that time who did you have a better
16    relationship with, Stacy Abrams or Liz Pelletier?
17    A.        I do not recall.
18    Q.        You can't recall?
19    A.        No.
20    Q.        Look at the e-mail at the top of first page,
21    and let me read it out loud.  "Liz asked me to respond
22    to you about the submission because she's currently
23    closed to acquisitions.  It definitely sounds like it
24    would be up my alley, if you wouldn't mind sending it
25    along."  Do you see that?
```

```
 1                     EMILY KIM

 2   A.      Yes.

 3   Q.      So Stacy seemed to be very interested in

 4   reading and getting the book, correct?

 5                     MR. KOONCE:  Object to form.

 6   A.      That's a standard response from an editor when

 7   they receive a submission.

 8   Q.      So you can't wage your interest based on that

 9   e-mail?

10   A.      No.

11   Q.      Next, I'd like to show you what was previously

12   marked as Exhibit 5.  Please take a look at this e-mail.

13   A.      Okay.  I read it.

14   Q.      Is this -- are the top few e-mails an e-mail

15   exchange between you and Stacy Abrams that took place on

16   October 30, 2013?

17   A.      From the e-mails it appears to be the case.

18   Q.      Do you see that you forwarded a copy of Masqued

19   to Stacy Abrams?

20   A.      I don't see that on this e-mail, but it looks

21   like that happened.

22   Q.      Well, it is on this e-mail, but you see where

23   it says, I'm looking at the 10/30/2013 e-mail from Stacy

24   to you, "Hi Emily, I think you might have forgotten to

25   attach the manuscript.  I'm thrilled with how Tracy's
```

**Emily Kim**

1                   EMILY KIM

2   book has gone out the gate.  Whoot."  And then you wrote

3   back, "Sorry.  Here you go," and then Stacy Abrams says,

4   "Got it."  So does that refresh your recollection that

5   Stacy Abrams actually received a copy of Masqued?

6   A.      Again, it looks like Stacy received it, but I

7   can't confirm it without seeing an e-mail with the

8   attachment.

9   Q.      You have no reason to believe that she didn't

10   get it, correct?

11   A.      Correct.

12   Q.      And isn't it correct that it's your

13   understanding that she did eventually receive it?

14   A.      Based on this e-mail, it looks like she

15   received it.

16   Q.      What about based on your understanding?

17   A.      I don't recall this exchange, but again, I can

18   say based on this e-mail, it looks like she received the

19   manuscript.

20   Q.      Did Stacy Abrams or anyone else at Entangled

21   ever discuss Masqued with you?

22   A.      No.

23   Q.      Do you know if Stacy Abrams or anyone else at

24   Entangled read Masqued?

25   A.      No.

**Emily Kim**

```
 1                    EMILY KIM
 2   A.      I don't feel comfortable giving you a specific
 3   timeframe for something that's different for every
 4   project.
 5   Q.        Please stake a look at Exhibit 106.
 6   A.        Okay.
 7   Q.        Did you have this e-mail exchange with Lynne
 8   Freeman and Carrie Pestritto on the dates reflected in
 9   the e-mail?
10   A.        It wasn't an exchange between the two of them
11   it was --
12   Q.        Well, there was an exchange between you and
13   Lynne Freeman, and then there was an exchange between
14   you and Carrie Pestritto?
15   A.        Correct.
16   Q.        Did you have those e-mail exchanges in the
17   times reflected in the e-mail?
18   A.        According to this e-mail, this e-mail to be an
19   accurate reflection.
20   Q.        Please look at the e-mail at the bottom of the
21   second page, dated March 25, 2014 between you and Lynne
22   Freeman.  I'm going to read that to you:  "Hi Emily.  We
23   never did catch up after the other week.  I'm sure you
24   have your hands full.  I had the pleasure of attending a
25   three-day children's working workshop a few weeks ago,
```

**Page 143**

```
                         EMILY KIM
```

1

2   and am more than ever convinced that writing YA fantasy

3   is my thing.  I know the fantasy element is not yours.

4   I don't believe Entangled will want Masqued as it is.  I

5   actually brought this manuscript to the workshop and we

6   had so much fun with it.  I'd like to see Masqued make

7   it and I'd like to keep my adult manuscript in fantasy.

8   So I believe that brings us to a parting of the ways.  I

9   really enjoyed working with you and getting to know you.

10  I'd of course prefer that we talk, but I know how very

11  busy life is with a new baby, not to mention two other

12  wee ones, and owning your own business.  When you have a

13  chance, a goodbye is always nice voice-to-voice.  Best,

14  Lynne."  Do you see that?

15  A.      Yes.

16  Q.      Is it fair to say that on March 25, 2014, you

17  and Lynne Freeman parted ways?

18  A.      Yes.

19  Q.      Do you see that Ms. Freeman states that she

20  does not believe Entangled will want Masqued as it is?

21  A.      Yes.

22  Q.      Now, she also says that -- she says, "I know

23  the fantasy element is not yours."

24          Was that true at the time?

25                  MR. KOONCE:  Object to the form.

**Emily Kim**

Freeman vs.
Deebs

|    | EMILY KIM |
|----|-----------|
| 1  | EMILY KIM |
| 2  | A.      I don't think that that is quite an accurate |
| 3  | statement. |
| 4  | Q.      Please take a look at the e-mail at the bottom |
| 5  | of the page dated March 13, 2014, between you and |
| 6  | Ms. Freeman.  You say, "Dear Lynne, I am sorry to hear |
| 7  | this news but understand if you want to take your books |
| 8  | in this direction.  I think you're a very talented |
| 9  | writer and so enjoyed our many conversations.  Would you |
| 10 | like me to withdraw the manuscript from Entangled?" |
| 11 |         Do you see that? |
| 12 | A.      Yes. |
| 13 | Q.      So you see in your e-mail, you ask Ms. Freeman |
| 14 | if she would like to you withdraw the manuscript from |
| 15 | Entangled, and that in the e-mail above that one, Lynne |
| 16 | states, "Yes, please do withdraw the manuscript from |
| 17 | Entangled.  I think that it would be best." |
| 18 |         Do you see that? |
| 19 | A.      Yes. |
| 20 | Q.      And who is Carrie Pestritto? |
| 21 | A.      She was my assistant at the time. |
| 22 | Q.      And then do you see in the two e-mails at the |
| 23 | top of the first page of the document, you ask Carrie |
| 24 | Pestritto, "Can you do this?"  And she responds, "It's |
| 25 | in your drafts." |

**Emily Kim**

**Freeman vs.
Deebs**

```
1                        EMILY KIM
2              So what is your understanding of what
3    Ms. Pestritto's comment is, "It's in your drafts."
4              What does that mean?
5    A.        My assistants have access to my e-mails, so she
6    would have created a draft to Stacy Abrams. It's just a
7    conjecture, but I think this is what happened, and she
8    would have written withdrawing the manuscript from
9    Entangled, and I would go into my drafts and press send.
10   Q.        So it would was an e-mail?
11   A.        It was an e-mail.
12   Q.        And did you send it to Entangled?
13   A.        If she put it my drafts and it was something I
14   wanted to do, it seems most likely I did.
15   Q.        And you sent it to Stacy Abrams?
16   A.        That's what would have happened.
17   Q.        And did it go out shortly after of the date
18   Ms. Pestritto prepared it?
19   A.        It is my practice to send things that my
20   assistants create in my drafts as quickly as I can.
21   Q.        Did you ever discuss the letter or the
22   withdrawal with anyone at Entangled?
23   A.        Discuss the letter that I sent them?
24   Q.        Yes.
25   A.        I don't believe so.
```

**Emily Kim**

1              EMILY KIM

2   Q.      Do you still have a copy of that letter?

3   A.      No, I don't think so.

4   Q.      Why not?

5   A.      I only have the e-mails that I have.

6   Q.      Why is it that you have some e-mails and not

7   others?

8   A.      I don't know.  It's many years ago.

9   Q.      So is it fair to say that you don't have all of

10  the e-mails from the years 2010 through 2014?

11  A.      I don't know.

12  Q.      Well, you just said that you don't have this

13  e-mail?

14  A.      I don't think I have this e-mail.  I haven't

15  looked through each and every one of my e-mails.

16  Q.      Do you know if a copy of the e-mail was given

17  to your attorneys?

18  A.      All I know is I gave my attorneys my e-mail

19  user name and password, and they have everything that's

20  in my e-mail folders.

21  Q.      Is it your testimony that Entangled had the

22  manuscript Masqued for approximately five months and no

23  one from Entangled during that period of time ever told

24  you if they wanted to publish the book or that they were

25  going to pass on the book?

```
 1                    EMILY KIM
 2                    MR. KOONCE:  Object to the form.
 3          Mischaracterizes her testimony.
 4   A.     The question is: Did I ever receive a response
 5   on Entangled on my submission.
 6   Q.     Correct.
 7   A.     No.
 8   Q.     And you're never you followed up with them in
 9   that five months?
10   A.     I'm not aware of if I did or not.
11                    MR. PASSIN:  You know, I'm probably at
12          a good point now.  It's 12:51.
13                    MR. KOONCE:  Okay.  How long do you
14          want to take for lunch?
15                    MR. PASSIN:  You want to say 1:30?
16                    MR. DONIGER:  Yeah, 1:30 sounds good.
17                    THE VIDEOGRAPHER:  The time is 12:51
18          p.m.  We are going off the record.
19                    (Whereupon, a luncheon recess was taken
20          from 12:51 to 1:43.)
21                    THE VIDEOGRAPHER:  The time is 1:43
22          p.m.  We are back on the record.
23   Q.     Ms. Kim, if Lynne Freeman were to testify that
24   on the morning that Tracy Wolff gave a lecture at the
25   2012 Romance Writers of America conference that you
```

1                    **EMILY KIM**

2                    MR. KOONCE:  Object to the form.

3    A.      I created a document with chapter titles to

4    make it easier when we got to the very, very end, crunch

5    time.  But my ideas were meant to be jumping-off places

6    not the titles themselves.

7    Q.      What do you mean by "jumping off places"?

8    A.      Like, I would suggest what we would call a bad

9    title, and then they would say, "Oh, well, I don't like

10   that.  And that helps me think of a title that I do

11   like."

12   Q.      So you purposely chose bad titles?

13   A.      No.  I always try do give a great title. I just

14   know that I'm not as talented of a writer as Tracy.

15   Q.      Did you also write the bible for the Crave

16   series?

17                   MR. KOONCE:  Object to the form.

18   A.      No, I didn't write the bible.  I got the idea

19   to create the bible, and I made a stab at getting it

20   started, but it a lot of other people jumped in to

21   create the bible.

22   Q.      Well, would it surprise you to know that a lot

23   of people testified that you wrote the bible?

24                   MR. KOONCE:  Object to the form.  Do

25          you want to put in testimony, Mark?

Emily Kim

1                         **EMILY KIM**

2  **was an infringement on a former client?**

3  A.      There's no exceptions to that.  I'm completely

4  against copyright infringement in every way.

5                         MR. PASSIN:  I would like to mark as

6          Exhibit 109 a document that's Bate stamped Kim

7          00134635, which is an e-mail dated June 23,

8          2011, from Lynne Freeman to you.

9                  (Whereupon, KIM00134635-41 was marked

10          as Exhibit 109, for identification, as of this

11          date.)

12                         MR. PASSIN:  Why don't we take a break

13          for five minutes, okay?

14                         MR. KOONCE:  Okay.

15                         THE VIDEOGRAPHER:  The time is 2:29

16          p.m.  We're going off the record.

17          (Whereupon, a short break was taken.)

18                         THE VIDEOGRAPHER:  The time is 2:36

19          p.m.  We are back on the record.

20                         MR. PASSIN:  All right.  I'm going to

21          mark as Exhibit 109 a document Bate stamped

22          number 134635 through Kim 0134631, which is an

23          e-mail dated June 23, 2011, from Lynne Freeman

24          to you.

25                         MR. KOONCE:  This one does have

**Emily Kim**

**Freeman vs.
Deebs**

1                    EMILY KIM

2              handwriting at the top, is that yours?  Just at

3              the top.

4                    MR. PASSIN:  Just at the top, yeah,

5              they were printed that way.

6    Q.       Have you had a chance to look at that?

7    A.       It's pretty long, so I'm still looking at it.

8              Okay.

9    Q.       All right.  You notice -- first of all, did

10   Lynne Freeman send you this e-mail on June 23, 2011?

11   A.       I see from this e-mail that it looks like that

12   is the case.

13   Q.       And let me read the top of the e-mail. It says,

14   "Hi, Emily."

15                   MR. KOONCE:  Sorry, Mark, I don't mean

16              to interrupt, but just for the record, can we

17              put on the record that there's some underlining

18              on this document that we understand was not

19              with the document originally?

20                   MR. PASSIN:  Correct. There's underling

21              next to attachments, correct, Doc X and there's

22              underlining five lines down where it says the

23              areas that I was to address.

24                   MR. DONIGER:  If I could just suggest

25              that we can probably even stipulate that if the

**Page 189**

Emily Kim

Freeman vs.
Deebs

1              EMILY KIM

2          document that's produced in discovery didn't

3          have these lines, I assume if this goes to

4          trial for whatever the purpose, Exhibit 109, we

5          can use a version of this that doesn't have

6          those lines.

7                  MR. KOONCE:  Yeah.  And I don't think

8          we need to have -- to the extent we're using

9          her to authenticate the document, I mean, you

10         know, I don't think we will have to redo that.

11                 MR. PASSIN:  Yeah. We can also agree, I

12         can replace it for the reporter in the next

13         couple of days.

14                 MR. KOONCE:  I mean, if the only change

15         is taking off the the underlining, that's fine.

16         I just wanted it noted for the record because

17         otherwise, we might have a copy later on that

18         has -- does and doesn't, and it may be

19         confusing.

20                 MR. DONIGER:  The intention is that for

21         any official purposes, the version we'll use is

22         that the version produced by your client.

23                 MR. KOONCE:  Fair enough.

24    Q.      Let me read the first few lines.  "Hi Emily.

25    Okay.  I hesitate to say this, but I think we're there!

**Emily Kim**

1                    EMILY KIM

2   Please let me know when we can discuss, Lynne."

3           And then you notice at the top it says,

4   "Attachments," correct? ".docx."

5           Is it your understanding that a revised draft

6   of Blue Moon Rising was attached to this document?

7   A.     Is it my understanding --

8   Q.     Yes.

9   A.     It seems, likely given the context of this

10  e-mail.

11  Q.     So then, see where it says that the areas I was

12  to address that I underlined?

13  A.     Yes.

14  Q.     Did you have a communication with Lynne Freeman

15  in which you discussed rewrites that you thought

16  Ms. Freeman should make prior to Ms. Freeman sending you

17  this version of the manuscript?

18  A.     I do not recall a specific conversation, but it

19  looks likely based on the context of this e-mail.

20                  MR. PASSIN:  Next I'd like to mark as

21          Exhibit 110 an e-mail that's Bate stamped Kim

22          00138447 through Kim 00138456, which is an

23          e-mail chain between Lynne Freeman and the

24          witness between June 23 and July 19.

25                  (Whereupon, KIM00138447-56 was marked

```
 1                     EMILY KIM

 2           as Exhibit 110, for identification, as of this

 3           date.)

 4                     MR. KOONCE:  What year, Mark?

 5                     MR. PASSIN:  2011.

 6                     MR. KOONCE:  Thank you.

 7    Q.      Let me know when you've read it.

 8    A.      Okay.  I haven't received it yet.  Okay.

 9    Q.      I'm going to ask you one question on this.  Did

10    you exchange this e-mail chain with Lynne Freeman

11    between June 23 and July 13, 2011?

12    A.      June 23?  It looks like the first e-mail was

13    June 23, and the last e-mail was July 13, 2011.

14    Q.      Yes.  So the answer is yes?

15    A.      Based on what I'm looking at here, it looks

16    like this e-mail chain occurred between the two of us.

17    Q.      Okay.  Thank you.

18                     MR. PASSIN:  Next I'd like to mark as

19           Exhibit 111.

20                     MS. COLE:  Apologies to interject. I

21           want to be clear that we're identifying the

22           exhibit numbers in the correct order. I just

23           had that exhibit -- this past exhibit would

24           have been 111, and now we would have been on on

25           112. I just want to make sure the record is
```

**Emily Kim**

                           EMILY KIM

1

2          clear and we don't have an issue.

3                    MR. KOONCE:  So CC, we have as -- if

4          you think we've got off, can you tell me where

5          I'm --

6                    THE REPORTER:  Sure.

7                    MR. PASSIN:  Can we go off the record

8          if we're going to do this?

9                    MR. KOONCE:  It's fine for us to go off

10         the record.

11                   THE VIDEOGRAPHER:  The time is 2:46

12         p.m.  We are going off the record.

13          (Whereupon, a discussion was held off the

14     record.)

15                   THE VIDEOGRAPHER:  The time is 2:47

16         p.m.  We are back on the record.

17                   MR. PASSIN:  I'd like to mark as

18         Exhibit 111, a document Bate stamped number Kim

19         00139438 through Kim 00139439, which is an

20         e-mail chain between Lynne Freeman and the

21         witness between June 3, 2011 and August 10,

22         2011.

23                    (Whereupon, KIM00139438-39 was marked

24         as Exhibit 111, for identification, as of this

25         date.)

**Emily Kim**

1                         EMILY KIM

2                    THE WITNESS:   Okay.

3   Q.        All right. Did you exchange this e-mail with

4   Lynne Freeman between June 3, 2011, and August 10, 2011?

5   A.        It appears from this e-mail that that is the

6   case.

7   Q.        Okay.  Please look at the top of the e-mail.

8   Ms. Freeman writes, "And here it is in PDF," and then

9   under attachment, it says, "Blue Moon Rising-8.

10  PDF.PDF."  Was a revised version of Blue Moon Rising

11  attached to this e-mail?

12  A.        I can see that Blue Moon Rising-8 PDF was

13  attached to this e-mail.

14  Q.        Look at, if you will, please, the middle of the

15  page, the e-mail dated July 15, 2011, from Lynne Freeman

16  to you.  I'm going to read that out loud.  It says,

17  "Emily, thank you for your time and input today.  I'm

18  looking forward to tightening the manuscript up and

19  appreciate your enthusiasm and encouragement, Lynne."

20            Did you have a conversation with Lynne Freeman

21  on July 15, 2011, before receiving the revised version

22  of Blue Moon Rising, in which you talked to her about

23  tightening up the manuscript?

24  A.        Did I have a conversation with her before I

25  received the August 13, 2011, version of the manuscript?

**Page 194**

**Emily Kim**

<strong>Freeman vs.<br>Deebs</strong>

1                     EMILY KIM

2   Q.      Well, I think I asked a little different.   I

3   said, did you have a conversation with Lynne Freeman on

4   July 15, 2011 before receiving, yes, the revised version

5   on August 13, 2011 Blue Moon Rising in which you talked

6   to her about tightening up the manuscript?

7   A.      I don't recall that conversation, but the

8   e-mail seems to say that that conversation occurred.

9              MR. PASSIN:   Okay.   Let's mark next as

10             Exhibit 112 a document stamped Kim 004140044,

11             an e-mail string between Lynne Freeman and the

12             witness dated August 16, 2011.

13             (Whereupon, KIM00140044 was marked as

14             Exhibit 112, for identification, as of this

15             date.)

16             THE WITNESS:   Okay.

17   Q.      Did you exchange this e-mail string with Lynne

18   Freeman on August 16, 2011?

19   A.      Again, I don't recall but this e-mail exchange

20   makes it clear that this exchange occurred.

21             MR. PASSIN:   That's fine on that one.

22             Next, I'm going to mark as Exhibit 113

23             a document Bate stamped number Kim 00143915

24             through Kim 00143920, an e-mail dated October

25             9, 2011, from Lynne Freeman to the witness.

<strong>Page 195</strong>

**Emily Kim**

1                          EMILY KIM

2                    (Whereupon, KIM00143915-20 was marked

3              as Exhibit 113, for identification, as of this

4              date.)

5                    THE WITNESS:   Okay.

6    Q.        So did you receive this e-mail from Lynne

7    Freeman on October 9, 2011?

8    A.        The -- this document appears to confirm that

9    that occurred.

10   Q.        Okay.  And you have no reason to doubt it,

11   correct?

12   A.        No.

13   Q.        Let me read you the top of the e-mail where it

14   says corrected version.

15             "Hi Emily.  I'm excited by this version of the

16   manuscript.  I think you will be too and I believe we're

17   ready to go.  I've addressed everything we discussed in

18   our last meeting and made revisions accordingly.  Please

19   let me know when you're free to meet to discuss.  So

20   excited."

21             And then you'll see at the top where it says

22   attachment, it says Blue Moon Rising 23.docX.  Was a

23   revised version of Blue Moon Rising attached to this

24   e-mail?

25   A.        Based on this e-mail I can tell you that Blue

**Emily Kim**

1              EMILY KIM

2   Moon Rising_23.docX appears to be attached to this

3   e-mail.

4   Q.      And did you have a phone conversation with

5   Lynne Freeman in the previous week in which you

6   discussed possibly rewrites for the manuscript?

7   A.      I don't know.  It just says I have addressed

8   everything we have discussed in our last meeting.  So I

9   don't know when that meeting, if it occurred, what kind

10  of meeting it was.

11  Q.      Well, but it appears that you did have a

12  discussion with Lynne Freeman prior to her sending you

13  this e-mail in which you discussed possible rewrites for

14  manuscripts, is that true?

15  A.      According to this e-mail, it looks like we had

16  a meeting that discussed potential revisions for the

17  manuscript.

18              MR. PASSIN:  You can put this aside.

19              Next I'm going to mark as Exhibit 114

20          a document Bate stamped Kim 00154158 which is

21          an e-mail dated April 11, 2012 from Lynne

22          Freeman to the witness.

23              (Whereupon, KIM00154158 was marked as

24          Exhibit 114, for identification, as of this

25          date.)

**Emily Kim**

```
 1                    EMILY KIM

 2              THE WITNESS:  Okay.

 3   Q.       Did you receive this e-mail from Lynne Freeman

 4   on April 11, 2012?

 5   A.       According to this e-mail record it looks like I

 6   received this e-mail.

 7   Q.       And you have no reason to doubt it, correct?

 8   A.       Correct.

 9   Q.       All right, you're going to have to speak up a

10   little, please.  Let me read the top of it.  Let me read

11   the e-mail to you.  "Hi Emily.  Here it is in Word.  Let

12   me know if this works.  Lynne."

13            And then under attachment it says Masqued.docx.

14   Was the revised version of Masqued attached to this

15   e-mail?

16   A.       I can say that Masqued.docx was attached to

17   this e-mail.

18                    MR. PASSIN:  Thank you.  Next I'm going

19            to show you what we'll mark as Exhibit 115,

20            which is a document Bate stamped number Kim

21            00195362 through 0195363, which is an January

22            15, 2013 e-mail chain between Lynne Freeman and

23            the witness.

24                    (Whereupon, KIM00195362-64 was marked

25            as Exhibit 115, for identification, as of this
```

```
 1                      EMILY KIM

 2              date.)

 3                      THE WITNESS:  Okay.

 4    Q.      Did you have this e-mail exchange with Lynne

 5    Freeman on January 15, 2013?

 6    A.      It appears from this e-mail chain that this

 7    occurred.

 8    Q.      And is the document attached to it the Masqued

 9    pitch?

10    A.      Yes, it looks like that.

11                      MR. PASSIN:  That's fine.  Thank you.

12              Next I'm going to mark as Exhibit 116 a

13              document Bate stamped number Kim 198163 which

14              is an e-mail dated January 27, 2013 from Lynne

15              Freeman to you.

16                      (Whereupon, KIM00198163 was marked as

17              Exhibit 116, for identification, as of this

18              date.)

19    Q.      Did you receive this e-mail from Lynne Freeman

20    on January 27, 2013?

21    A.      According to this document, it looks like I

22    received this e-mail.

23    Q.      And was the chapter -- a document entitled

24    chapter outline attached?

25    A.      That is what I'm looking at in this e-mail.
```

**Emily Kim**

1                      EMILY KIM

2    Q.        Excuse me?

3    A.        I can see chapter under core dot X appears to

4    be attached in this e-mail.

5    Q.        And you have no reason to doubt it, correct?

6    A.        Correct.

7                      MR. PASSIN:  Let me mark as Exhibit 117

8              a document Bate stamp number Kim 198164 --

9              198187.

10                     (Whereupon, KIM00198164-87 was marked

11             as Exhibit 117, for identification, as of this

12             date.)

13                     THE WITNESS:  Do you want me to read

14             the whole thing.

15   Q.        I'm just going to ask you, is this the chapter

16   outline that was attached to Exhibit 116?  And if you'll

17   notice, it's consecutively stamped and produced by you,

18   as far as the Bate numbers.

19   A.        I'm not expert in law, but if you're saying it

20   goes with this e-mail, I have no reason to doubt you.

21   Q.        Well, is it your understanding this is the

22   chapter outline?

23   A.        Is it the chapter outline that correlates to

24   this particular e-mail?

25   Q.        Yes.

**Emily Kim**

1                         **EMILY KIM**

2     A.         I would have to -- if you can assure me that

3     they were attached, then I can agree with you.

4     **Q.        Well, I can't assure you, so you have to look**

5     **at it if you want to look at it.**

6     A.         I wouldn't be able to tell.  It just says, here

7     is the chapter outline and here is the chapter outline.

8     I don't know if it's the one that correlates with this

9     e-mail.

10    **Q.        Well, like I said it's consecutively marked, so**

11    **it was produced that way by you.**

12    A.         Again, I'm not really familiar with whatever

13    went with --

14                     MR. KOONCE:  I can represent on the

15              record that if it was consecutively marked,

16              chances are it's an attachment, and we are also

17              happy to check and make sure that that's the

18              case.

19                     MR. PASSIN:  Can she agree for now

20              subject to your reviewing it?

21                     MR. KOONCE:  I think that's okay.

22                     THE WITNESS:  My lawyer advises me this

23              is attachment that goes with this e-mail, then

24              --

25                     MR. KOONCE:  Subject to our

**Emily Kim**

1              EMILY KIM

2       double-checking it, yes.

3                    We've checked.  He looked at Everlaw,

4       we can look at it right here, so we can confirm

5       on that record that that is the attachment.

6                    MR. PASSIN:  Thank you.  Next I'm going

7       to mark as Exhibit 118 a document Bates

8       numbered Kim 001598110 which is an e-mail chain

9       between Lynne Freeman and the witness dated

10      between July 30th and July 31, 2013.

11                   (Whereupon, KIM00159810 was marked as

12      Exhibit 118, for identification, as of this

13      date.)

14                   THE WITNESS:  Okay.

15      Q.      Did you exchange this e-mail with Lynne Freeman

16      between July 30 and July 31, 2013?

17      A.      It appears from this e-mail that those are the

18      dates that these e-mails were exchanged.

19      Q.      And you have no reason to doubt it, correct?

20      A.      No.

21      Q.      I'm going to read this e-mail to you.  Starting

22      from the bottom.

23              "Hi Emily.  Hope you're having a great summer.

24      Masqued is done done.  I had a dozen readers review it,

25      and after their feedback, it's polished and ready to go.

**Emily Kim**

```
 1                    EMILY KIM

 2      C E R T I F I C A T E

 3    STATE OF NEW YORK     )

 4                              ) ss.:

 5    COUNTY OF QUEENS )

 6

 7             I, BROOKE E. PERRY, a Notary Public

 8          within and for the State of New York, do hereby

 9          certify:

10             That EMILY KIM, the witness whose

11          deposition is hereinbefore set forth, was duly

12          sworn by me and that such deposition is a true

13          record of the testimony given by such witness.

14             I further certify that I am not related

15          to any of the parties to this action by blood

16          or marriage; and that I am in no way interested

17          in the outcome of this matter.

18             IN WITNESS WHEREOF, I have hereunto set

19          my hand this 16th day of March, 2023.

20

21    _____

22    BROOKE E. PERRY

23

24

25
```

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Freeman vs. Deebs

3    Date of Deposition: 03/16/2023

4    Job No.: 10116380

5

6         I, EMILY KIM, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9         Executed this _____ day of

10   _____, 2023, at _____.

11

12

13                    _____

14                    EMILY KIM

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25