# EXHIBIT 4

Videotaped Deposition of

# Tracy Wolff

March 07, 2023

Freeman

vs.

Deebs

**Confidential**



www.aptusCR.com | 866.999.8310

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2

   LYNNE FREEMAN,              )
3  AN INDIVIDUAL               )
   PLAINTIFF,                  )
4                              )
   VS.                         )
5                              )
   TRACY DEEBS-ELKENANEY       )
6  P/K/A TRACY WOLFF, AN       )
   INDIVIDUAL, EMILY SYLVAN    )
7  KIM, AN INDIVIDUAL,         )
   PROSPECT AGENCY, LLC, A     )
8  NEW JERSEY LIMITED          )   CASE NO. 1:22-CV-02435-LLS
   LIABILITY COMPANY,          )
9  ENTANGLED PUBLISHING,       )
   LLC, A DELAWARE LIMITED     )
10 LIABILITY COMPANY,          )
   HOLTZBRINCK PUBLISHERS,     )
11 LLC D/B/A MACMILLAN,        )
   A NEW YORK LIMITED          )
12 LIABILITY COMPANY, AND      )
   UNIVERSAL CITY STUDIOS,     )   JOB NO. 10115799
13 LLC, A DELAWARE             )
   LIMITED LIABILITY COMPANY )
14        DEFENDANTS.          )

15 **********************************************************

16         ORAL AND VIDEOTAPED DEPOSITION OF
                     TRACY WOLFF
17               MARCH 07, 2023

18 **********************************************************

19

20         ORAL AND VIDEOTAPED DEPOSITION of TRACY WOLFF,
   produced as a witness at the instance of the Plaintiff,
21 and duly sworn, was taken in the above-styled and
   numbered cause on the 7th day of March, 2023, from 8:54
22 a.m. to 4:34 p.m., before Gabriela S. Silva, CSR, RPR in
   and for the State of Texas, reported by stenograph, at
23 the Law Offices of Kowert, Hood, Munyon, Rankin &
   Goetzel, 1120 S. Capital of Texas Hwy,  Building 2,
24 Austin, Texas, pursuant to the Federal Rules of Civil
   Procedure and the provisions stated on the record or
25 attached hereto.

Tracy Wolff

```
 1                    A P P E A R A N C E S

 2

 3     COUNSEL FOR THE PLAINTIFF:

 4          MARK D. PASSIN
            CSREEDER, PC
 5          11766 Wilshire Blvd., Ste. 1470
            Los Angeles, California 90025
 6          (310) 861-2470
            Mark@csrlawyers.com
 7

 8     COUNSEL FOR THE DEFENDANTS:

 9          DWAYNE GOETZEL
            KOWERT, HOOD, MUNYON, RANKIN & GOETZEL
10          1120 S. Capital of Texas Hwy, Building 2
            Austin,  Texas 78746
11          (512) 853-8800
            Dgoetzel@intprop.com
12
            NANCY E. WOLFF
13          CECE COLE
            COWAN, DEBAETS, ABRAHAMS & SHEPPARD, LLP
14          41 Madison Avenue, 38th Floor
            New York,  New York 10010
15          (212) 974-7474
            Nwolff@cdas.com
16

17     ALSO PRESENT:

18          Mr. Walter Bryan, Videographer
            Mr. Trent Baer, Plaintiff's Husband
19          Mr. Lance Koonce (via Zoom)
            Mr. Zachary Press (via Zoom)
20          Mr. Stephen Doniger (via Zoom)
            Mrs. Lynne Freeman (via Zoom)
21

22

23

24

25
```

1   **Do you still have them?**

2   A.   I still have the ███████.   I still have the ███████

3   ███████████████   and I still have the Tracy Wolff author

4   one, but it feeds into my Tracy Deebs e-mail, so I don't

5   check it because it feeds into my Tracy Deebs e-mail.

6   **Q.   All right.   And how long have you had each one of**

7   **those?**

8   A.   ████████████████████, a decade maybe.   ████████,

9   since we've had Internet so when I was living in San

10  Diego, which would've been in the late '90s, early

11  2000s.   So -- and Tracy Wolff author was set up with my

12  new website in 2020.

13  **Q.   Did we cover them all?   I think so.   All right.**

14  **Do you know the -- do you know the Internet service**

15  **provider for each one of those addresses?**

16  A.   The ███████ is Yahoo.   The Gmail is Google.   I

17  don't even know what my Tracy Wolff author one is run

18  on.   That's through my web master.

19  **Q.   And what about ██████████████████?**

20  A.   That was a long time ago.   Maybe, and I am not

21  certain about this, maybe 1&1.

22  **Q.   How many computers did you use to write and edit**

23  **the books in the Crave book series?**

24  A.   Four, maybe five.

25  **Q.   Now, can you describe them for me as best as you**

1    can each one of the computers by make, you probably

2    don't know the model number, but by as much information

3    as you have?

4        A.  I believe they were all Lenovos because I like

5    Lenovos.

6        **Q.  You and I have that in common.  What kind of note**

7    **-- were they Thinkpads?  Do you know or?**

8        A.  They were a laptop.

9        **Q.  Laptops?  But you don't know what kind they were,**

10   **such as a Thinkpad or?**

11       A.  No, I'm sorry, I don't.

12       **Q.  And you still have each one of those computers?**

13       A.  I may not have one of them.  I usually go through

14   a laptop a year and when they die, they tend to die

15   spectacularly.

16       **Q.  All right.  But you think you still have --**

17       A.  I think I still have --

18       **Q.  -- four of them?**

19       A.  (Witness nods head.)

20       **Q.  Yes?**

21       A.  Three definitely.

22       **Q.  But you had either four or five at one time.**

23   **Correct?**

24       A.  Yes.

25       **Q.  Okay.  How long ago did you lose or did the other**

1   one or two stop working?

2      A.   Every time I got a new one.

3      Q.   But did you recall approximately the year?

4      A.   Probably 2019, maybe early 2020.

5      Q.   But the two that -- the one or two that you no

6   longer have, you did use to write and edit the Crave

7   book series?

8      A.   Yes.

9      Q.   Did you use the computer at Austin Community

10  College for some of your early writing in the book,

11  Crave?

12     A.   It wouldn't have been at Austin Community College

13  because I was teaching early college start at local high

14  schools.  So it was a college class to high school

15  students and I was in a local high school.

16     Q.   And did that local high school provide you access

17  to their computer?

18     A.   They did.

19     Q.   And did you use that computer to write any

20  portions of the Crave book?

21     A.   I don't remember, but it is not beyond the realm

22  of possibility.  I --

23     Q.   And what was the name of the high school?

24     A.   Lake Travis High School was one of them.  Round

25  Rock Early College Start.

**Confidential**

1    Q.  I'm sorry.  Say that again, please.

2    A.  Round Rock Early College Start High School and

3  one in Leander.  I can't think of the name of the

4  Leander one, I'm sorry.

5    Q.  Leander is a city?

6    A.  Leander is a school district.

7    Q.  School district?  Okay.  So what city were these?

8    A.  The Round Rock was in Round Rock.  The Lake

9  Travis was in Lake Travis.  And whatever the Leander

10  high school was was either in Cedar Park or Leander.

11   Q.  I guess what I'm asking, what city were they in?

12   A.  Those are -- they're all --

13   Q.  What state was it in?  I wasn't sure if you moved

14  to Austin yet or not.

15   A.  Oh, it's all in -- they're all areas around

16  Austin.

17   Q.  Okay.  When did you move to Austin?

18   A.  My son was 8 -- 2005.

19   Q.  Okay.  Do you maintain any back-up systems for

20  your computers?

21   A.  My fiancée instituted, I think it's called

22  OneDrive.  Before that, no.

23   Q.  What's the name of your fiancée?

24   A.  Stephanie Marquez.

25   Q.  And when did she create OneDrive for you?

1    A.  Some time in the last -- some time since COVID

2  started.

3    **Q.  What e-mail programs do you have on each one of**

4  **the computers, meaning Outlook or Gmail?**

5    A.  I don't use -- G mail.

6    **Q.  They're all Gmail?**

7    A.  Uh-huh.

8         MR. GOETZEL:  Was that yes?

9         THE WITNESS:  Yes.

10   **Q.  (By Mr. Passin) So is it fair to say that you use**

11  **your Gmail address more than any of the other addresses?**

12   A.  Yes, that is true.

13   **Q.  And then the other addresses, where are those?**

14  **On your phone?**

15   A.  No.  They're not on my phone.  Only my Gmail is

16  on my phone.

17   **Q.  So then how do you access the other addresses?**

18  **By the web?**

19   A.  Yes.  I only access -- the only other one I

20  access very occasionally is ███████.

21   **Q.  And you access by going on the Internet and then**

22  **on the web?**

23   A.  Yes.  I go to Yahoo.com.

24   **Q.  What kind of software did you use to write and**

25  **edit the books in the Crave book series?**

1     A.  I used Microsoft Word; and occasionally, I used a

2   Google Doc.

3     **Q.  Do you have an online subscription for any**

4   **editing software?**

5     A.  I have an online subscription for Book Brush,

6   which helps me make ads for Instagram.  Not ads.  Like,

7   what goes on your Instagram.

8     **Q.  Do you have a subscription for Microsoft Word?**

9     A.  No.

10    **Q.  Do you have a subscription for Google Docs?**

11    A.  I pay $1.99 a month for -- to keep my storage on

12  Google Docs.  I don't know if that counts as an online

13  subscription.

14    **Q.  All right.  And you still have that storage?**

15    A.  Yes.

16    **Q.  Okay.  And when you produced documents in the**

17  **case, did you provide access to that storage to the**

18  **vendors who are gathering the documents?**

19    A.  I did, yes.

20    **Q.  As a professor at a community college, have you**

21  **used turn it on -- excuse me -- Turnitin or any other**

22  **plagiarism software to review student's papers?**

23    A.  Not at Austin Community College.

24    **Q.  Did you at some other teaching facility?**

25    A.  I did, yes.

1    Q.   And where was that?

2    A.   Marian Catholic High School in San Diego.

3    Q.   And during what years were you there?

4    A.   I believe 2002 to 2005.

5    Q.   And what type of software did you use?

6    A.   Turnitin.com.

7    Q.   Any other kind?

8    A.   Microsoft Word to create my tests.

9    Q.   Okay.  And what kind of information did Turnitin

10   provide to you if you ran the student's papers through

11   it?

12   A.   It would provide what percentage of the paper had

13   -- might've occurred somewhere else.  I believe it's

14   been 17 years since I've used it.

15   Q.   Okay.  Now, going back to Google Docs, did Google

16   Docs send you an e-mail every time someone made an edit

17   to any of the Crave books?

18   A.   The Crave books weren't on Google Docs.

19   Q.   So you didn't use Google Docs to edit the Crave

20   books?

21   A.   No, I did not.

22   Q.   None of the Crave books?

23   A.   The book?

24   Q.   The --

25   A.   No.

**Confidential**

1    Q.   Any of the books in the Crave book series.

2    A.   Not the book, no.

3    Q.   Well, what did you use the Google Docs for?

4    A.   I used them for chapter titles and a few random

5    scenes in Court and I don't -- I don't believe -- I

6    don't recall using them in Crave, Crush or Covet.

7    Q.   All right.  But you did use it in Court.

8    Correct?

9    A.   Yes.

10   Q.   So you did use it for some of the books in the --

11   A.   Not to edit the book, Court, no.

12   Q.   What did you use it for?

13   A.   To write a couple of random scenes and for

14   chapter titles.

15   Q.   Did you use Google Docs to write any of the other

16   books in the Crave book series?

17   A.   Can you clarify in terms of this?  I'm in the

18   understanding that in terms of this lawsuit we are

19   referring to Crave, Crush, Covet and Court --

20   Q.   Right.

21   A.   -- as the Crave book series.

22   Q.   Right now, I'm asking about all the books in

23   Crave book series.

24   A.   We used -- I used a couple for Cherish and I

25   don't recall if I used them for Charm, any for Charm.

Tracy Wolff                    **Confidential**                    Freeman vs.
                                                                        Deebs

1     Q.   When you say a couple for Cherish, what does that

2   mean?

3     A.   I believe there were three or four that I wrote a

4   scene in in Cherish.

5     Q.   Meaning you wrote three or four scenes?

6     A.   Yes.

7     Q.   And when you did that, did Google send you an

8   e-mail every time you made a change to Cherish?

9     A.   Every time I made a --

10    Q.   Right.

11    A.   I don't think so, no.

12    Q.   Who else had access to your Google Docs that --

13   on which you maintained any documents relating to the

14   Crave book series?

15    A.   Emily Sylvan Kim, Liz Pelletier had access to

16   several and Stacy Abrams had access to several or to I

17   don't know how many.

18    Q.   All right.  When you say several, and I

19   apologize.  I'm not that familiar with Google Docs.  You

20   mean several documents on Google Docs?  Would you

21   provide access by document or would someone just have

22   access to the whole program?

23    A.   You provide access by document.

24    Q.   Okay.  Do you know which documents Mrs. Pelletier

25   had access to?

Tracy Wolff                          **Confidential**                  Freeman vs.
                                                                              Deebs

1      A.   I don't recall.

2      Q.   Do you know which documents Stacy Abrams had

3   access to?

4      A.   I know she had access to the Crave chapter

5   titles.  I believe she has access to the Crave Bible

6   because I believe she does.  I'm not sure about other

7   ones.

8      Q.   Okay.  And when the vendor in this case gathered

9   documents, did you provide to him all the documents

10  relating to the Crave chapter titles that was on Google

11  books?

12             MR. GOETZEL:  Objection.  Google books?

13             MR. PASSIN:  Excuse me, Google Docs, thank

14  you.

15      A.   I tried.  I couldn't because they weren't started

16  by me.  I can't provide access if I don't start the doc.

17      Q.   (By Mr. Passin) And did -- so of all the

18  documents you had on Google Docs, did you provide any of

19  those documents to the vendor?

20      A.   If -- if -- he looked at all of the Google Docs.

21  My recollection is that none of them were started by me,

22  so he couldn't get them from me.  But if there had been

23  any that I had started, he would have gotten them.

24      Q.   And who started them?

25      A.   Emily Sylvan Kim and I don't know if Stacy Abrams

**Confidential**

 1   started any.  Liz Pelletier, I believe, started one or

 2   two.

 3       Q.  Are you aware, was there an access log to the

 4   Google Docs?

 5       A.  I don't know what an access log is.

 6       Q.  Well, access log would be a listing that shows

 7   who had accessed the Google Docs at any time.  Did you

 8   ever see anything like that?

 9       A.  No.

10       Q.  And maybe because you're not the owner?

11       A.  Yeah, I -- I don't know.

12       Q.  Did you use any text spinning software to write

13   any of the books in the Crave book series?

14       A.  I'm sorry.  I don't understand the question.

15       Q.  Are you familiar with text spinning software?

16       A.  I have no idea what that is.

17       Q.  Well, did you use any other kind of software --

18   did you use any kind of software to write or edit the

19   books in the Crave book series other than what we've

20   already discussed?

21       A.  I used Microsoft Word.

22       Q.  Did you use any artificial intelligent bots that

23   are able to reword sentences in writing any of the books

24   in the Crave book series?

25       A.  I did not.

**Confidential**

1    Q.   And which novel was that?

2    A.   Dancing in the dark by Sherrilyn Kenyon.

3    Q.   Okay.  I didn't mean to cut you off there.  Are

4    there other reasons?

5    A.   Other reasons is when I was brainstorming, I

6    really wanted a fish out of water story.  It's one of --

7    well, Liz really wanted a fish out of water story and I

8    thought that was a really great idea.  And being from

9    San Diego, the thing -- like, I tried to imagine where

10   in North America I would feel most uncomfortable.  And

11   Alaska came to mind.

12       When I was brainstorming, it was one of the

13   places I had listed and then when I was brainstorming

14   with Emily Sylvan Kim, we were talking over cold and

15   dark places in North America and she reminded me -- I

16   believe it was she reminded me of Alaska, that I had put

17   it -- you know, that I had mentioned it.  And I thought

18   about it and decided that was a really great place.

19       And then when I went and talked to Liz about it,

20   Liz had just come back on a cruise from Alaska and she

21   was very excited about Alaska as well because she had

22   just been on the cruise.  And it just seemed like

23   overall, all those things came together and seemed like

24   a great place to set the book.

25   Q.   All right.  Well, you had mentioned that Alaska

**Confidential**

1   was used by you in the original set of ideas that you

2   sent to Stacy Abrams.  Is that correct?

3       A.  Yes.

4       Q.  I take it that's the document that has five ideas

5   and then Stacy and Liz picked idea Number 2?

6       A.  I believe that is the document.

7       Q.  All right.  So it was Alaska -- the Crave book

8   series was Alaska ever since you gave them those five

9   ideas.  Correct?

10      A.  The Crave book series was Alaska as soon as I

11  decided on the setting.

12      Q.  Was that before or after you gave them the five

13  ideas?

14      A.  It was after I gave them the five ideas.

15      Q.  Okay.  Now, is it correct that in an interview

16  you gave with Hank Garner you told him that it was your

17  agent who suggested Alaska, your book agent?

18      A.  I don't remember that specific interview or

19  everything I said in that interview, but I believe I

20  might've said that.

21      Q.  And was the agent you're referring to Emily Kim?

22      A.  Yes.

23      Q.  Okay.  And when you made that statement to Hank

24  Garner, was it true?

25      A.  Insomuch as during our brainstorming session she

**Confidential**

1   to?

2       A.   I am not.

3       Q.   Who is Emily Kim?

4       A.   Emily Sylvan Kim is my agent.

5       Q.   And when did you first meet Emily Kim?

6       A.   I first met Emily Sylvan Kim at an RWA conference

7   before she represented me.  So prior to 2006, I believe.

8       Q.   And what does RWA stand for?

9       A.   It stands for Romance Writers of America.

10      Q.   And where did that one take place?

11      A.   I don't know.

12      Q.   And how did you meet her at the conference?

13      A.   She was on a panel.  I went to her panel.  After

14  her panel, I walked up and I introduced myself to her

15  and told her I had sent her some material to read and

16  that I hoped to work with her one day or something of

17  that gist.  Those may not have been my exact words.

18      Q.   And when did she become your literary agent?

19      A.   I believe it was 2006.

20      Q.   Did you have a different literary agent before

21  Emily Sylvan Kim?

22      A.   I did not.

23      Q.   And why did you choose Emily Sylvan Kim?

24      A.   There were various reasons.

25      Q.   And what were those reasons?

**Confidential**

1    A.   The first reason was she had interned or trained

2   at Writers House, which was at the time the most

3   prestigious or certainly one of the most prestigious

4   literary agencies in America and I liked that she had

5   had that training and those connections.

6        Two, I liked that she had started her own agency

7   and that she was young and wanting to build her business

8   the way that I wanted to build my career.  And three, I

9   remember really liking her website at the time.  It had

10   little poetry quotes on it and I liked it.  I thought

11   that was cool.

12    Q.   When you refer to starting her own business, that

13   was Prospect Agency?

14    A.   I believe so, yes.

15    Q.   Were you friends with Mrs. Kim before you became

16   -- before she became your agent?

17    A.   I was not.

18    Q.   Let me mark for identification as Exhibit 24 a

19   document that is Bates-stamped Number Kim 00352674

20   through Kim 00352676, and it's entitled Agreement for

21   Authors.

22        (Exhibit Number 24 was marked.)

23    Q.   (By Mr. Passin) Can you please take a look at the

24   exhibit?

25    A.   (Witness complies.)

**Page 45**

**Confidential**

1      Q.   Now, on --

2               MR. GOETZEL:   Excuse me, Mark, I think you

3      gave several different copies to her.

4               MR. PASSIN:   Yeah, I knew I had extra

5      copies.

6      Q.   (By Mr. Passin) So is that your signature on Page

7      3 --

8      A.   It is, yes.

9      Q.   -- on behalf of yourself?

10     A.   Yes.

11     Q.   And you entered into this agreement on or about

12     November 25, 2007?

13     A.   I suppose it was 2007 and not 2006.

14     Q.   Do you know when this agreement became effective?

15     A.   I would believe when she received it back from

16     me.

17     Q.   And can you describe for me briefly what this

18     agreement is, your understanding of what the agreement

19     is?

20     A.   My understanding is that she agrees to be my

21     literary agent and represent me, represent me in

22     discussions with literary publishers.

23     Q.   And what's your understanding of what Mrs. Kim

24     was supposed to do as your literary agent?

25     A.   Mrs. Kim was supposed to negotiate contracts for

**Confidential**

1   me and submit my work to publishers and explain

2   contracts to me.

3       Q.  **Does she sometimes edit manuscripts for you?**

4       A.  No, she does not edit manuscripts for me.

5       Q.  **Does she get involved in editing manuscripts?**

6       A.  Editing --

7              MR. GOETZEL:  Object to the form.  Are you

8   talking about specifically with her or for anyone?

9       Q.  **(By Mr. Passin) For you.**

10      A.  Editing manuscripts?

11      Q.  **Yes.**

12      A.  Can you clarify?

13      Q.  Well, isn't it true that Emily Kim made changes

14  to various books in the Crave book series?

15      A.  I don't believe that's true, no.

16      Q.  **It's true she wrote some chapter titles.  Isn't**

17  **it?**

18      A.  She did.

19      Q.  **Okay.  What else did she do in connection with**

20  **the Crave book series?**

21      A.  She always read the books, and I believe if she

22  saw any proofreading errors or typos, she would let

23  Stacy or Liz know about them.

24      Q.  **Did she make any story line suggestions?**

25      A.  Story line suggestions?  Not to the best of my

**Confidential**

1   recollection.

2       Q.  Did she make any content edits?

3       A.  Edits?

4       Q.  Yes.

5       A.  No, not that I'm aware of.

6       Q.  Does she sometimes help you write any books?

7       A.  She does not help me write books.

8       Q.  Were there any amendments to the agreement which

9   we've marked as Exhibit 24?

10      A.  Not that I am aware of.

11      Q.  And was this the first agency agreement you

12  entered into with Mrs. Kim and Prospect?

13      A.  It is, yes.

14      Q.  And is it the only agency agreement you entered

15  into with Mrs. Kim and Prospect?

16      A.  It is, yes.

17      Q.  Do you have any other agreements with either Mrs.

18  Kim or Prospect relating to Crave or any of the books in

19  the Crave book series?

20      A.  I do not, no.

21      Q.  Did you pay any money to Emily Kim or Prospect in

22  connection with the books in the Crave book series or

23  any other books other than what Prospect is paid

24  pursuant to Exhibit 24?

25              MR. GOETZEL:  Object to the form of the

1  question, compound.  If you understand it, you can

2  answer.

3     A.  I don't understand it.

4     Q.  **(By Mr. Passin) Did you pay any money to Emily**

5  **Kim or Prospect in connection with anything other than**

6  **the money that you paid pursuant to Exhibit 24?**

7          MR. GOETZEL:  Object to the form of the

8  question.  I believe you're assuming facts not in

9  evidence with respect to her paying pursuant to this

10  agreement.

11     Q.  **(By Mr. Passin) You can still --**

12          MR. PASSIN:  Can you read the question back?

13  And then you can answer.

14          (Previous question read back.)

15     A.  I don't pay Emily.  My publishers give my

16  royalties to Emily, Emily takes 15 percent of my

17  royalties and forwards on the rest to me.

18     Q.  **(By Mr. Passin) And what I'm asking you, do**

19  either you directly or someone on your behalf pay her

20  any money other than that 15 percent royalty?

21     A.  No.

22     Q.  Okay.  And do you have any other agreement

23  whatsoever with Mrs. Kim or Prospect other than Exhibit

24  24?

25     A.  No.  I -- it's not -- she has sold gaming rights

**Confidential**

1    Q.  Well, in your mind -- in your mind, it was

2    successful financially.

3    A.  What is the question?  How many?

4    Q.  Yes.

5    A.  For my purposes, I'm going to define financially

6    successful as earning back the advance and making more

7    money, in which case most but not all.

8    Q.  All right.  We'll get back to that.  Would you

9    characterize Mrs. Kim as a good friend?

10   A.  Now, yes.

11   Q.  And when did she become a good friend?

12   A.  It was a gradual thing.

13   Q.  How would you describe your relationship with

14   her?

15   A.  She's my agent and secondarily, she is my friend.

16   Q.  Over the last three years, how often would you

17   estimate that you speak with her?

18   A.  Regularly.

19   Q.  Meaning daily?

20   A.  Several times a week.

21   Q.  And over the last three years, how often do you

22   estimate that you text with her?

23   A.  Several times a week.

24   Q.  Is it fair --

25   A.  On the days that I am texting her more than once,

1   answered.

2         MR. GOETZEL:  Same objection.

3     A.  I was worried she was very sad after the death of

4   her father.

5         MR. PASSIN:  Can you mark that question,

6   please, and answer?  Thank you.

7     **Q.  (By Mr. Passin) Is it fair to say that Mrs. Emily**

8   **Kim was involved in editing the books in the Crave book**

9   **series?**

10    A.  No, it is not fair to say she was involved in

11   editing the books.

12    **Q.  Well, didn't Emily Kim also make contributions to**

13   **the story line in the Crave book series?**

14    A.  She did not make contributions to the story line

15   in the Crave book series.

16    **Q.  Isn't it accurate to say that Emily Kim**

17   **contributed to the writing of the Crave book series?**

18    A.  She did not contribute to the writing of the

19   Crave book series.  She did not write.

20    **Q.  Well, how would you describe Emily Kim's**

21   **contributions to the Crave book series?**

22    A.  Emily is an amazing cheerleader.

23    **Q.  Meaning that all she did is acted as a**

24   **cheerleader in connection with the Crave book series?**

25    A.  She kept a document and made suggestions for

1    chapter titles, some of which I took, most of which I

2    did not.  But she kept, like, the summary of what

3    happened in that chapter so that when I went to do the

4    chapter titles...

5        Q.  Did she write the series Bible?

6        A.  I believe she contributed to the -- yeah.  I

7    believe she started and did some of the series Bible,

8    yes.  I don't believe she did all of it, but the series

9    Bible is not story lines.  The series Bible is what is

10   already written.

11       Q.  But isn't it fair to say that she was more

12   involved in the creation of the Crave book series than

13   acting as a cheerleader?

14       A.  No.  I don't think that's fair to say.

15       Q.  You just said she wrote some of the chapter

16   titles, you just said she wrote the series Bible.  Is

17   that acting as a cheerleader or is that more involved?

18       A.  The series Bible is not about the creation of the

19   series.  The series Bible took place after the book was

20   written --

21       Q.  What about the chapter --

22       A.  -- so that is not about the creation.

23       Q.  What about the chapter titles?

24       A.  The chapter titles are titles of chapters, but

25   the chapters were not written by Emily Sylvan Kim.

1      Q.  Did -- were your chapter titles structured sort

2    of as innuendos or comments about certain things?

3      A.  I wouldn't call them innuendos.

4      Q.  What was the purpose -- what did you try in

5    achieve in a chapter title?

6      A.  To get a laugh and set the tone of what the

7    chapter was.  So if a chapter was very somber, it would

8    not have a funny title.

9      Q.  Did you write a synopsis for each book in the

10   Crave book series?

11     A.  I did not.

12     Q.  Did someone else?

13     A.  For each book?  No.

14     Q.  For some of the books?

15     A.  Some of the books, there are synopses for.

16     Q.  Which books?

17      A.  I believe I wrote something for Crave.  Crush, I

18   wrote the first half of the synopsis.  I believe Liz

19   Pelletier wrote the second half.  Covet, Liz Pelletier

20   wrote the synopsis.  Court, the synopsis was more

21   nebulous in Court.

22     Q.  First of all, describe for me what a synopsis is.

23     A.  A synopsis is the basic plot plan for the book.

24     Q.  And when you say that Liz Pelletier wrote the

25   second half of the synopsis for Crush, was it based on

**Confidential**

1    your plot plan for the book or hers?

2         A.   Brainstorming and also a dream she had.

3         Q.   What was the dream she had?

4         A.   She dreamt about one of the heroes walking over a

5    cliff and trees exploding around him.

6         Q.   And when did she tell you about that dream?

7         A.   On a phone call, an early morning phone call.

8         Q.   Excuse me?

9         A.   An early morning phone call.  I don't know what

10   day.  I couldn't tell you.

11        Q.   Well, how far along in the process of writing the

12   Crave book series?

13        A.   It was while we were writing Crush.

14        Q.   And then on Court, you said Liz Pelletier wrote

15   the synopsis?

16        A.   I said the synopsis was nebulous on Court.

17        Q.   I'm sorry, Covet.  I meant Covet.  I'm sorry.

18        A.   Yes, Liz Pelletier wrote the synopsis on Covet.

19        Q.   And was that based on her idea for the story line

20   or a combination or brainstorming or what?

21        A.   I believe it was based on brainstorming.

22        Q.   Okay.  When you say brainstorming on both Crush

23   and Covet, but I take it it was all based on a

24   continuation of Crave, the book Crave?

25        A.   It's a series, so it progresses from Crave.

1   Q.  Was the subsequent phone call before you sent

2   them the five ideas?

3   A.  I don't recall if it was before or directly

4   after.  I don't recall.  I'm sorry.  I don't.

5   Q.  What do you specifically remember from that phone

6   call?

7   A.  I remember her saying that Liz had read some

8   articles and that she was excited about bringing

9   vampires back.

10  Q.  Anything else?

11  A.  I remember her saying that when they were talking

12  about someone that they knew who could write quickly, I

13  came to mind because I had just signed another contract

14  with Entangled for the first time in several years.  I

15  signed a contract with them, to be clear, before the

16  Crave series contract.

17  Q.  And what book was that?

18  A.  That was a book that never came out.  I do not

19  remember the exact title of it.  It was an adult

20  rom-com.  Rom-com, meaning romantic comedy.

21  Q.  How long did it take you to write each book in

22  the Crave book series?

23  A.  I feel like that differs.  Crave, I believe took

24  a couple of months.  And then more writing during the

25  editing process.  Crush took, I believe, a couple of

**Confidential**

1   months as well.  Maybe three, I don't know.  Somewhere

2   between two and three.  I feel like most of them did.

3   Court took longer, but it was the longest book.

4       Q.  And what about Covet?  I think we skipped Covet

5   unless I missed it.

6       A.  Yeah, I think approximately the same amount of

7   time.  That seems about right.

8       Q.  And is it fair to say --

9       A.  Two to three months.

10      Q.  -- that you write -- you can write a book faster

11  than most authors write?

12      A.  I don't think -- I don't know how fast other

13  authors can write a book.  So I don't think that is a

14  question I can answer.

15      Q.  But you seem to have a reputation for being able

16  to write books quickly.  Is that correct?

17      A.  I do believe that I can -- I can write books

18  quickly, yes.

19      Q.  When did you start and when did you finish

20  writing each one of the books in the Crave book series?

21  And then you can limit it to the four that are the

22  subject of this litigation.

23      A.  I honestly cannot give you exact dates.  I

24  believe with Crave, they contacted me in late April, so

25  I believe I probably started writing in May.  I believe

Tracy Wolff                          **Confidential**                    Freeman vs.
                                                                              Deebs

1    introduced me to Liz and then I went and had a drink

2    with the friends I had planned on meeting at the bar.

3        **Q.  Would you characterize Mrs. Pelletier as a good**

4    **friend?**

5        A.  Now, yes.

6        **Q.  How would you describe your relationship with**

7    **her?**

8        A.  She is my editor.  She is my friend and we are

9    close.

10       **Q.  And do you socialize with each other?**

11       A.  Sometimes, yes.

12       **Q.  Over the last three years, how often would you**

13   **estimate that you speak with her?**

14       A.  Sometimes often in a week.  Sometimes once a

15   week, once every couple of weeks.

16       **Q.  Over the three years, how often would you**

17   **estimate that you text with her?**

18       A.  Sometimes a lot, sometimes days go by.

19       **Q.  And are they -- do you communicate about personal**

20   **matters or only about business matters?**

21       A.  We communicate about business and personal

22   matters.

23       **Q.  And over the last three years, how often do you**

24   **estimate that you've seen her?**

25       A.  Much more since she's moved to Austin.  In the

1   first couple of years, I didn't see her very much at

2   all.  I saw her -- so in Austin, I see her probably

3   every couple of months.

4       Q.   Okay.  Did she -- when did she move to Austin?

5       A.   I don't know the exact month.  I really don't.

6       Q.   What about what year?

7       A.   It wasn't 2022.  I believe it was 2021.  As you

8   said, COVID makes things run together.

9       Q.   And did she move her to be near to you?

10      A.   I believe she moved here to be near one of her

11  best friends.

12      Q.   And what's that best friend's name?

13      A.   Her name is Jessica.

14      Q.   Excuse me?

15      A.   Jessica.

16      Q.   Do you have a last name?

17      A.   Not off the top of my head.

18      Q.   Is it fair to say that you and Liz Pelletier

19  share personal information with each other about your

20  lives, like good friends typically do?

21      A.   I believe that is fair.

22      Q.   And you both currently live in the same city.

23  Correct?

24      A.   Yes.  I was trying to -- she does live in Austin

25  and I live in Austin.

1  and for Sweet Vengeance.

2  **Q.  Are you saying that you didn't enter into an**

3  **agreement for all the books?**

4  A.  I don't understand the question.

5  **Q.  I missed the ones you listed, but you listed to**

6  **me 11 books that you did for Entangled.  Did you enter**

7  **into contracts with Entangled for all those books?**

8  A.  Yes.

9  **Q.  Okay.  Let's look -- let's mark as Exhibit 25 a**

10  **contract.  It's called Contract with Author, and Bates**

11  **Stamp Number 0073254 through 0073271.**

12              (Exhibit Number 25 was marked.)

13  **Q.  (By Mr. Passin) I'd like you to take a look at**

14  **the last page of the contract or the penultimate page of**

15  **the document, which is Page 17 of the contract.**

16  A.  Is this the one you're referring to?

17  **Q.  Yeah, Page 17 of the contract.**

18  A.  Oh, there's two contracts here.

19  **Q.  Oh, did you get two?**

20  A.  Yeah.  Page 17?

21  **Q.  Page 17 of the contract.  There's, you know,**

22  **after the contract, there's a certification.**

23  A.  Oh, okay.  Thank you.

24  **Q.  You're welcome.  So Page 17 of the contract, is**

25  **that your electronic signature that appears above your**

1   name?

2      A.  Yeah.

3      Q.  Okay.  And then turn the page to the last page of

4   the document.  Is that a certification that the

5   electronic signature we just looked at is your

6   electronic signature?

7      A.  It says, Signature Certificate at the top.

8      Q.  Yeah.  But that's your understanding of what it

9   is?

10     A.  All parties have signed -- that is my

11  understanding.

12     Q.  Now, what is this agreement?

13     A.  It says here that it is concerning the following

14  work or works presently titled or described as three

15  novels, Crave plus two additional books, hereinafter

16  referred to collectively and individually as the work to

17  be published.

18     Q.  And it was for the publication of those three

19  books by Entangled.  Correct?

20     A.  Which three books?

21     Q.  The three novels, Crave plus two additional

22  books.

23     A.  Yes.

24     Q.  Okay.  And those two additional books, is it

25  correct became Crush and Covet?

**Confidential**

1     A.   Yes.

2     **Q.   Okay.**

3     A.   I believe so.

4     **Q.   So your understanding is this is an agreement for**

5     **Crave, Crush and Covet?**

6     A.   Yes.   Plus two additional books.

7     **Q.   Well, Crush and Covet were --**

8     A.   Oh, yes.

9     **Q.   -- the two additional books?   Okay.   All right.**

10    **You can put that one down.   Next, I'm going to mark as**

11    **Exhibit 26 a document entitled Addendum to Contract with**

12    **Author, which is Bates-numbered Kim 0021027.**

13            (Exhibit Number 26 was marked.)

14    **Q.   (By Mr. Passin) Can you please look at Page 2 of**

15    **the addendum?**

16            MR. GOETZEL:   Can you hand her one, please?

17    A.   I don't have it.

18            MR. PASSIN:   Oh, I apologize.

19    **Q.   (By Mr. Passin) So look at the second page of the**

20    **addendum.   Is that your electronic signature that**

21    **appears above your name?**

22    A.   Yes.

23    **Q.   And the last page of the document, is that a**

24    **certification that certifies that the electronic**

25    **signature we just looked at is your electronic**

1   signature?

2      A.  It says, Signature Certificate, yeah.

3      Q.  ███████████████████████████████████

4   ████

5      A.  ███████████████████████████████████

6      **Q.  And was this something you asked for or something**

7   **that Entangled asked for?**

8      A.  It is something that -- yeah, I suppose.

9           MR. GOETZEL:  If you know.  Don't guess.

10     **Q.  (By Mr. Passin) I'm sorry.  What was the answer?**

11     A.  I don't know exactly.

12     **Q.  All right.  Next I'd like to mark as Exhibit 27**

13  **--**

14          MR. PASSIN:  I made a mistake then.  Yes,

15  Exhibit 27, a document entitled Second Addendum to

16  Contract with Author Bates-stamped Kim 0021024.

17          (Exhibit Number 27 was marked.)

18     **Q.  (By Mr. Passin) Can you please take a look at**

19  **that document?**

20     A.  (Witness complies.)

21     **Q.  Can you please turn to the second page?  Is that**

22  **your electronic signature that appears above your name?**

23     A.  It is, yes.

24     **Q.  And if go to the last page, is that a**

25  **certification that certifies that the electronic**

**Confidential**

1  signature we just looked at is your electronic

2  signature?

3     A.  It says, Signature Certificate.

4     Q.  And is it correct that the addendum increased the

5  term that the books, the three books we just talked

6  about a few minutes ago, Crave, Crush and Covet, that

7  they -- they will now remain in publication for 48

8  months -- excuse me -- for eight years instead of 48

9  months?

10    A.  That's not the one I'm looking at.

11         MR. GOETZEL:  I think we're looking at a

12  different document.

13    A.  That is not the one I'm looking at.

14    Q.  (By Mr. Passin) I apologize.  Yes, was this

15  changed to give you an additional 5,000 dollar advance?

16    A.  It is, yes.

17    Q.  You can put that one down.  Next we'll mark as

18  Exhibit 28 a document entitled Third Addendum to

19  Contract with Author.  And it's Bates Stamp number Kim

20  0021030.

21         (Exhibit Number 28 was marked.)

22    Q.  (By Mr. Passin) Could you please turn to the

23  second page of the addendum?

24    A.  (Witness complies.)

25    Q.  Is that your electronic signature that appears

**Confidential**

1   above your type written name?

2   A.  It is, yes.

3   Q.  And if you turn to the last page, is that a

4   certification that certifies that the electronic

5   signature we just looked at is your electronic

6   signature?

7   A.  It says, Signature Certificate.

8   Q.  And is it correct that the addendum increased the

9   term that the books Crave, Crush and Covet were in

10  publication from 48 months to eight years?

11  A.  It says in Subparagraph 2A(i), 48 months shall be

12  deleted and replaced with 8 years.

13  Q.  And who wanted that change?

14          MR. GOETZEL:  For the record, I'm pointing

15  out the Section 2A of the original contract, Exhibit 25,

16  so she'll have context for your question.

17  A.  I don't believe I wanted that change.

18  Q.  (By Mr. Passin) So it was -- your recollection is

19  Entangled wanted that change?

20  A.  I don't recall.

21  Q.  But it wasn't you?

22  A.  I don't recall asking for that change.

23  Q.  Okay.  Next I'm going to mark as Exhibit 29 a

24  document entitled Amendment to Contract with Author.

25  And it's Bates stamped Entangled 006635.

**Confidential**

1          (Exhibit Number 29 was marked.)

2     **Q.   (By Mr. Passin) Can you please take a look at the**

3   **second page of this document?**

4     A.   (Witness complies.)

5     **Q.   Is that your electronic signature that appears**

6   **above your printed name?**

7     A.   Yes.

8     **Q.   And if you look at the last two pages of this**

9   **document, is this a certification that the signature we**

10  **just looked at is your electronic signature?**

11    A.   It says, Signature Certificate.

12    **Q.   Now, is it correct that this addendum added a**

13  **fourth book to the contract you had with Entangled?**

14          MR. GOETZEL:   You mean in the Crave series.

15  Right?

16          MR. PASSIN:   We're going to get there.

17          MR. GOETZEL:   Well, I have to object to the

18  form then since she's written other books.

19          MR. PASSIN:   All right.   But I'm just

20  reading what it said, that they added a fourth book.

21    A.   It said it added four novels in the -- replace

22  three novels, Crave plus two additional books shall be

23  deleted and replaced with the following, four novels in

24  the Crave series, Crave, Crush, Covet and Court.

25    **Q.   (By Mr. Passin) Right.   So it added Court as the**

**Confidential**

1   fourth book.  Correct?

2      A.  I believe so.

3      Q.  Okay.  And who wanted that change?

4      A.  I don't think it was about wanting the change.

5   It was about the fact that there was more story to tell

6   after while we were writing Covet.  And together, Liz

7   and I decided that we -- that I would write a fourth

8   book and we would do a fourth book together.

9      Q.  Okay.

10     A.  In the Crave series.

11     Q.  Okay.  Now I'm going to show you and mark as

12  Exhibit 30 a document entitled Amendment to Contract

13  with Author.  It's Bates-stamped Entangled 0006640.

14            (Exhibit Number 30 was marked.)

15     Q.  (By Mr. Passin) Can you please look at the second

16  page of the addendum and tell me if that electronic

17  signature above your printed name is your electronic

18  signature?

19     A.  Yes.

20     Q.  And then if you look at the last two pages of the

21  document, is that a certification that certifies that

22  the signature we just looked at is your electronic

23  signature?

24     A.  It says, Signature Certificate.

25     Q.  Now, is it correct that this addendum added the

**Confidential**

```
 1      A.   Yes.   Can you please repeat back the question?

 2               COURT REPORTER:   Did you want me to read it

 3      back?

 4               MR. PASSIN:   I can say it.

 5      Q.   (By Mr. Passin) Is this the document that was

 6      attached to Exhibit 7 that you just looked at a few

 7      minutes ago?

 8      A.   It appears to be.

 9      Q.   And does this Exhibit 8 contain the five basic

10      ideas that you prepared that you wanted Stacy Abrams to

11      look at?

12      A.   It appears to, yes.

13      Q.   And is it fair to say that this document is the

14      creation of the Crave book series?

15      A.   The creation of the Crave book series?

16      Q.   Yes.

17      A.   I do not think this document is the creation of

18      the Crave book series.

19      Q.   Well, isn't Idea 2 what eventually became the

20      Crave book series?

21      A.   Idea 2, a warlock or vampire boarding school

22      book?

23      Q.   Yes.

24      A.   Became a boarding school for paranormals, all

25      paranormals, eventually when we fleshed out the idea for
```

1    the Crave book series.

2        Q.  Right, but 2 was the germ that formed the

3    beginning of the Crave book series.  Isn't it?

4        A.  The germ being a boarding school book that has

5    super natural creatures?

6        Q.  Well, the idea.  They eventually said, Yes, we

7    like Idea 2 and that became the Crave book series?

8        A.  They liked the idea of a boarding school book

9    with a hero as a vampire.

10       Q.  And that became the Crave book series?

11       A.  And that became the Crave book series.

12       Q.  All right.  Let me show you a document that was

13   previously marked as Exhibit 9.  Let's take a look at

14   the second e-mail in the e-mail chain.  Do you see where

15   it says, in the first paragraph of that e-mail -- I'm

16   talking about the April 26th, 2019, 4:29 e-mail that

17   Stacy Abrams wrote to you.

18           She says, I spoke with Liz about it and we both

19   agreed that the one closest to specifically what she's

20   looking for is Number 2.  Do you see that?

21       A.  I do see that.

22       Q.  And is it your understanding that Liz refers to

23   Liz Pelletier?

24       A.  Yes, I believe that it refers to Liz Pelletier.

25       Q.  Okay.  So was it your understanding at the time

**Confidential**

1    that Stacy Abrams and Liz Pelletier thought that Idea 2

2    in Exhibit 8, which you looked at a minute ago, was the

3    closest to, quote, an ordinary girl in a super rarified

4    world, end quote, idea that Liz Pelletier wanted to make

5    into a book?

6        A.   I don't believe those words are in this e-mail.

7    I have not read the entire e-mail.

8        Q.   Well, but isn't it your understanding that both

9    Stacy and Liz thought that Idea 2 was closest to what

10   Liz was looking for for her book that she wanted to

11   create as a result of some other author dropping out?

12       A.   I'd like to clarify.   You're asking me if this

13   e-mail says that idea Number 2 from the list that you

14   showed me earlier is the one that Liz was most

15   interested in?

16       Q.   Yes.

17       A.   Yes, this says that this is Number 2.

18       Q.   Okay.   And it's fair to say that Number 2 in

19   Exhibit 8 eventually became the Crave book series?

20       A.   It eventually -- an idea different than idea

21   Number 2, but set at a boarding school eventually became

22   the Crave book series.

23       Q.   But that was sort of the first generation of the

24   Crave book series, but then it sort of -- it was sort of

25   the germ for it, but then it changed over time.   Is that

Tracy Wolff                    **Confidential**                    Freeman vs.
                                                                        Deebs

1    **fair?**

2        A.  I think that it's fair to say that -- I'm sorry.

3    Can I see that exhibit again for Number 2, please?

4    Thank you.  I think that it is fair to say that the

5    premise of a boarding school book with a vampire hero,

6    which is not what idea Number 2 was, it was just that it

7    was a boarding school book because the main hero here is

8    a warlock, I do say or vampire, became the Genesis or

9    the very beginning of what would become the Crave

10   series.

11       **Q.  But didn't Liz and Stacy say, Number 2 is the one**

12   **that we want and that became the Genesis of the series?**

13       A.  She said, the one closest to specifically what

14   she's looking for is Number 2.

15       **Q.  Right.**

16       A.  Those were her exact words.

17       **Q.  So they said Number 2 was the closest and that**

18   **you built on that to create the Crave series.  Is that a**

19   **fair statement?**

20       A.  I built on the concept of a boarding school book

21   with a vampire hero to create the Crave series.

22       **Q.  Which was idea Number 2?**

23           MR. GOETZEL:  It's been asked and answered.

24   I'm going to object on that basis.

25       A.  Idea Number 2 says a warlock or vampire boarding

**Confidential**

```
 1    it was -- the flight pattern was from San Diego to

 2    Seattle to either Fairbanks or Anchorage.  And I must

 3    have, at one point, picked Anchorage.

 4         And then -- whether I changed it to Fairbanks

 5    because I forgot that I had chosen Anchorage and started

 6    writing Fairbanks instead or if somebody realized that I

 7    had Fairbanks and Anchorage in there and might've told

 8    me to pick one and I -- when towards the end of the book

 9    realized that Fairbanks is closer to Healy, I believe, I

10    might've chosen Fairbanks at that point.

11    Q.  Didn't you take it out because Lynne Freeman uses

12    Anchorage in her book?

13    A.  I had never heard of Lynne Freeman or her book at

14    the time Crave was published.

15    Q.  Anchorage was mentioned five times in the first

16    147 pages of Exhibit 21.  Are you aware that Masked

17    mentions Anchorage five times in the first 150 pages?

18    A.  I have absolutely no idea what Masked mentions.

19    Q.  In various drafts of your manuscript for Crave,

20    you used the phrase frozen wasteland, and then in the

21    final version change it to hell has actually frozen

22    over.  Are you aware that Masked uses the term frozen

23    wasteland?

24    A.  I am not aware.

25    Q.  In the drafts of Crave, you spell rakes
```

**Confidential**

1   W-R-A-C-K-S and in the final version, you spell it

2   R-A-C-K.  Are you aware that in Masked Freeman writes,

3   uncontrollable shivers wracked, W-A-C-K-E-D, my body?

4        Moreover, you also wrote in one early draft and

5   changed it in the final version, I've always wracked,

6   W-R-A-C-K-E-D, my brain.  Why did you change wracked,

7   the way you spelled it with a W, to rack, R-A-C-K?

8        A.   Spell check probably.

9        Q.   In a draft in one of the books in the Crave book

10  series you had the heroine using the word hallelujah.

11  Do you remember what book that was?

12       A.   No.

13       Q.   Well, do you remember that Emily Kim removed the

14  word hallelujah from the draft?

15       A.   From my draft?

16       Q.   Yes.

17       A.   No.

18       Q.   Do you remember you said in the text that in 65

19  books you had never used the word hallelujah and you

20  were glad that Mrs. Kim caught it?

21       A.   I don't remember that, but that sounds accurate.

22       Q.   Well, if you didn't write the word in the draft,

23  who did?  Do you know?

24       A.   I don't know that I didn't write the word.  I

25  just don't recall writing the word.

1    question.  Go ahead.

2        A.  Stacy Abrams did not content edit Crave.

3        Q.  (By Mr. Passin) I didn't say that.  She was a

4    copy editor, so she made edits.  Didn't she?

5        A.  That is between Liz and Stacy how she would make

6    those edits.

7        Q.  Please describe to me the contributions you made

8    to each of the books, Crave, Crush, Covet and Court?

9        A.  I wrote them.

10       Q.  Please describe to me the contributions that Liz

11   Pelletier made to each of the books, Crave, Crush, Covet

12   and Court?

13       A.  Liz helped me plot them and she edited them.

14       Q.  I'm sorry.  You said she helped you plot them?

15       A.  She helped me plot them.  We brainstormed and

16   plotted together, yes.

17       Q.  Okay.  And what does that mean exactly?

18       A.  It means that we would talk about the books, we

19   would throw out ideas about the books, we would decide

20   on ideas about the books.

21       Q.  But then ultimately you are the one that would

22   make the changes.  Correct?

23       A.  I am the one that wrote the books and turned them

24   over to her after they had been fully plotted and

25   written.

Tracy Wolff                          **Confidential**                    Freeman vs.
                                                                         Deebs

1      Q.  And describe to me the contributions that Stacy

2   Abrams made to each of the books, Crave, Crush, Covet

3   and Court.

4      A.  Stacy Abrams was the copy editor.

5      Q.  And who else was involved in editing any of the

6   books in the Crave book series?

7      A.  I believe there were proofreaders involved.  I

8   don't know who the proofreaders are.

9      Q.  Okay.  I'd like to --

10      A.  And I believe Emily Sylvan Kim read each book

11   because she reads all of my books.

12      Q.  I would like to mark as Exhibit 47 a letter dated

13   May 9th, 2022 from Nancy Wolff to me.

14           (Exhibit Number 47 was marked.)

15      Q.  (By Mr. Passin) You see on the last page -- did

16   you receive a carbon copy of this letter on or about

17   February 9 of 2022?

18      A.  I believe I received it after it was sent, yes.

19      Q.  Look at the third paragraph.  The first line

20   says, In this instance, Pelletier created the basic

21   story line for the Crave book series.  Is that a true

22   statement?

23      A.  She created the -- for Crave?

24      Q.  Yes.

25      A.  The one -- the first book --

Tracy Wolff                            **Confidential**                            Freeman vs.
                                                                                        Deebs

1      Q.  Yes.  Well, no, it says the Crave series.

2      A.  I know.  For Crave the first book, I created with

3   much input from Liz the plot.  For Crush, I created a

4   synopsis of approximately the first half of the book.

5   Liz Pelletier created the synopsis for the rest of the

6   book.

7         For Covet, Liz Pelletier created the synopsis.

8   For Crave, there was not, to the best of my

9   recollection, a full synopsis of the book.  What there

10  was --

11     Q.  For which book are we talking about?

12     A.  For Court.  I'm sorry if I misspoke.  For Court,

13  there was not, to the best of my recollection, a full

14  synopsis for the book.  But what there was, Liz

15  Pelletier -- Liz Pelletier wrote, but we spoke and

16  brainstormed over Court a lot because it was a difficult

17  book.

18     Q.  Why was it so difficult?

19     A.  At the time we wrote it, we thought we were

20  wrapping up the series as we were brainstorming for it.

21  And I think we were both a little intimidated by that.

22     Q.  And what's the relationship between the synopsis

23  and the book?

24     A.  The relationship between the synopsis and the

25  book is that the book tends to follow -- the synopsis is

1   the basic plot line of the book.  The book tends to

2   follow that plot to a certain extent.

3        Q.  What do you mean by a certain extent?

4        A.  Any synopsis I have ever written or Liz has

5   written, I have deviated from in small ways because you

6   go as the book calls you.

7        Q.  All right.  With respect to the synopsis for

8   Crave, how long was that synopsis?

9        A.  I have no recollection.  I'm not -- I don't -- I

10  don't know if it was just a couple of pages of the notes

11  that you've already shown me -- shown or if it was

12  longer.

13       Q.  So it could be only a couple of pages?

14       A.  I don't know.  I don't remember.

15       Q.  But you're saying -- how long is a synopsis

16  usually?

17       A.  Synopses can be anywhere from 2 pages to 100

18  pages.  It just depends on the writer and the book.

19       Q.  And you have no recollection on how long the one

20  in Crave was?

21       A.  I do not.

22       Q.  Does it still exist today?

23       A.  If there was one that was longer than the pages

24  of notes, I would imagine that it would, but I don't

25  have a recollection of -- the way I -- the way I have a

**Confidential**

1  severe -- like, I have an actual recollection of writing

2  the first half -- or the first part of the synopsis for

3  Crush and then Liz looking it over and writing the rest

4  because she didn't like it, because she had a dream,

5  because any number, you know?  I don't remember if there

6  is an actual synopsis the same way there was for Crush

7  and Covet.  If there was for Crave, I do not remember

8  that.

9      Q.  All right.  So you don't remember if there was

10  one for Crave, but didn't you say you created the plot.

11  Right?

12      A.  For Crave?

13      Q.  Yes.

14      A.  I created a lot of the plot points.  As the back

15  and forth, we've looked at all afternoon shows, Liz was

16  very involved with everything from where it was

17  eventually set, not in Barrow, Alaska, to very involved

18  in the uncle and, you know, the main idea of who these

19  characters were and, like, as archetypes and wanting --

20  certainly inciting incidents of wanting her to go to the

21  school and her parents being dead or not around, I don't

22  remember exactly.

23      Very involved in she wanted Jaxon to not be

24  perfect, which is where the scar on his face came from

25  and several other things.  She told me during editing

**Confidential**

1   that there was -- she thought there was a scene missing

2   for example.  I think more than that she told me she did

3   not like the meet cute and I had to rewrite the meet

4   cute again.

5         And then I think the secondary, second half of it

6   when I was writing it where everything happens with Lia,

7   I believe that was -- I believe I remember, but I don't

8   know how many notes she had before I wrote the draft,

9   particularly of the second half of how everything

10  unfolds.

11       Q.  Did Liz put any of these -- any of this input in

12  writing other than what you've seen today?

13       A.  I don't remember.  I don't.  I don't recall.  I

14  know that she and Stacy e-mailed back and forth or

15  talked.  I know that I had several long conversations

16  with her.

17       Q.  And what about Crush?  How long was the synopsis

18  in Crush?

19       A.  I don't remember.

20       Q.  But you wrote the first half?

21       A.  Yeah.

22       Q.  How long was the first half you wrote?

23       A.  I don't know.

24       Q.  Do you still have it?

25       A.  I believe if I do have it, it would be in the

1    today.

2       Q.  All right.  Is the following a correct sentence

3    -- a true sentence?  The Crave book series was a

4    collaborative project with Pelletier providing to Wolff

5    in the writing the main plot, location, characters and

6    scenes?

7       A.  May I see that?  Oh, it's in front of me, I'm

8    sorry.

9       Q.  That's in the third paragraph, it's down three

10   lines.  Three and -- lines three and four.

11      A.  The Crave series was a collaborative project with

12   Pelletier.  It absolutely was a collaborative project

13   with Pelletier.  Providing to Wolff in writing the main

14   plot, location, characters and scenes.

15      Q.  That's not true.  Is it?

16      A.  She provided -- there were the text messages --

17   the messages and the e-mails that we saw.

18      Q.  The messages --

19      A.  Again, I don't --

20      Q.  Wait, wait, stop.  We didn't see any messages and

21   e-mails.  What we saw -- well, we saw some things from

22   Stacy.  Okay.  So you're saying that was the things we

23   saw from Stacy?

24      A.  The lines that Liz wrote in those things from

25   Stacy.

**Confidential**

1    **Q.  Right, yeah, but did that include the plot,**

2    **location, characters and scenes?  I don't think so.**

3              MR. GOETZEL:  Object to the form.  That's

4    not a question.  You're arguing with the witness.

5        A.  I don't remember --

6              MR. GOETZEL:  Hold on, hold on.

7              THE WITNESS:  Sorry.

8              MR. GOETZEL:  Please don't argue with the

9    witness.

10       A.  I don't remember -- I don't remember what was

11   provided in writing and what was oral.

12       **Q.  (By Mr. Passin) So as you sit here, you're saying**

13   **you cannot tell me whether the sentence, Pelletier**

14   **provided to Wolff in writing the main plot, location,**

15   **characters and scenes is true or false.  Is that**

16   **correct?**

17       A.  I do not remember what was provided in writing

18   and what was over the -- over orally, over the phone.

19       **Q.  Have you ever read all or a portion of Masked?**

20             MR. GOETZEL:  Objection, asked and answered.

21   You can answer it again, but...

22       A.  I have never read any portion of Masked.

23       **Q.  (By Mr. Passin) Has anyone ever sent you all or**

24   **any portion of Masked?**

25       A.  No one has ever sent me any portion of Masked.

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2
     LYNNE FREEMAN,              )
 3   AN INDIVIDUAL               )
     PLAINTIFF,                  )
 4                               )
     VS.                         )
 5                               )
     TRACY DEEBS-ELKENANEY       )
 6   P/K/A TRACY WOLFF, AN       )
     INDIVIDUAL, EMILY SYLVAN    )
 7   KIM, AN INDIVIDUAL,         )
     PROSPECT AGENCY, LLC, A     )
 8   NEW JERSEY LIMITED          )   CASE NO. 1:22-CV-02435-LLS
     LIABILITY COMPANY,          )
 9   ENTANGLED PUBLISHING,       )
     LLC, A DELAWARE LIMITED     )
10   LIABILITY COMPANY,          )
     HOLTZBRINCK PUBLISHERS,     )
11   LLC D/B/A MACMILLAN,        )
     A NEW YORK LIMITED          )
12   LIABILITY COMPANY, AND      )
     UNIVERSAL CITY STUDIOS,     )
13   LLC, A DELAWARE             )
     LIMITED LIABILITY COMPANY   )
14        DEFENDANTS.            )

15
                    REPORTER'S CERTIFICATION
16                  DEPOSITION OF TRACY WOLFF
                         March 07, 2023
17
          I, Gabriela S. Silva, Certified Shorthand
18   Reporter in and for the State of Texas, hereby certify
     to the following:
19        That the witness, TRACY WOLFF, was duly sworn by
     the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
     the witness;
21        I further certify that pursuant to FRCP Rule
     30(f)(1) that the signature of the deponent:
22
        __X__ was requested by the deponent or a party before
23   the completion of the deposition and that the signature
     is to be before any notary public and returned within
24   30 days from date of receipt of the transcript.  If
     returned, the attached Changes and Signature Page
25   contains any changes and the reasons therefor;
```

**Page 218**

**Confidential**

1      _____ was not requested by the deponent or a party
before the completion of the deposition.

2

3          I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorney in the action in which this proceeding was

4    taken, and further that I am not financially or
otherwise interested in the outcome of the action.

5

6          Certified to by me this 13th day of
March, 2023.

7

8

9          _____
Gabriela S. Silva, Texas CSR(8706), RPR

10          Expiration Date:  01-31-25
Aptus Court Reporting

11          600 West Broadway, Suite 300
San Diego , CA 92101

12          Phone: 866.999.8310

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 219**