**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN, | Case No. 1:22-cv-02435-LLS-SN |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF** |
| v. | |
| TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al., | |
| Defendants. | |

i

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………...1

ARGUMENT………………………………………………………………………...1

I.    FACTUAL BACKGROUND……………………………………………………..1

     A.  Freeman's Work and Agency Agreement with Kim……………………………...1

     B.  Wolff's Career and the creation of Crave…………………………………………2

     C.  Freeman Discovers Infringement……………………………………………………4

     D.  The Works are Substantially Similar………………………………………………...8

        i.  A subplot of BMR is copied for the main plot of *Crush* (book
          2)…………………………………………………………………………..9

       ii.  Another subplot of BMR is copied for the main plot of *Covet*
          (book 3)…………………………………………………………………..10

      iii.  Another subplot of BMR is copied for the main plot of *Court*
          (book 4)…………………………………………………………………..10

II.   LEGAL STANDARD……………………………………………………………11

III.  THIS COURT SHOULD ADJUDICATE OWNERSHIP IN FAVOR OF
     FREEMAN………………………………………………………………………12

IV.  THIS COURT SHOULD ADJUDICATE ACCESS IN FAVOR OF
     FREEMAN………………………………………………………………………12

     A.  Defendants Wolf, Pelleier, Kim and Abrams Collaboratively Created
       the *Crave* Series and Each had Access to the Freeman Copyrighted
       Material……………………………………………………………………..13

     B.  Striking Probative Similarity Also Establishes Access…………………………14

V.    THIS COURT SHOULD ADJUDICATE SUBSTANTIAL SIMILARITY

       IN FAVOR OF FREEMAN……………………………………………………..18

       A.  The Freeman Copyrighted Material is properly compared in the

           aggregate to the Crave Series……………………………………………19

       B.  The Works are Substantially Similar…………………………………………22

            i.  This Court may properly consider expert testimony to evaluate

               substantial similarity…………………………………………………..23

           ii.  The Characters in BMR and Crave are substantially similar…………….26

          iii.  Settings are similar…………………………………………………….27

          iv.  Plot/Scenes are similar..………………………………………………27

           v.  Substantially Similar Language / Fragmented Literal Similarity………..28

VI.    CONCLUSION……………………………………………………………………30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Arnstein v. Porter*,
   154 F.2d 464 (2d Cir. 1946)............................................................................20

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001)............................................................................23

*Buttner v. RD Palmer Enters., Inc.*,
   2015 WL 1472084,& n.5 (N.D.N.Y. Mar. 31, 2015)......................................15

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*,
   150 F.3d 132 (2d Cir. 1998)..............................................................12, 21, 22

*Cates v. Schlemovitz*,
   2023 WL 6200196 (N.D.N.Y. Sept. 22, 2023) ..............................................13

*Computer Associates International, Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992)............................................................................24

*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*,
   409 F.2d 1315 (2d Cir. 1969)....................................................................19, 27

*Craft v. Kobler*,
   667 F.Supp. 120 (S.D.N.Y. 1987)...............................................................21, 22

*Currin v. Arista Records*,
   724 F.Supp.2d 286 (D. Conn. 2010)...............................................................24

*DiTocco v. Riordan*,
   815 F. Supp. 2d 655 (S.D.N.Y. 2011).......................................................18, 26

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
   499 U.S. 340 (1991)........................................................................................12

*Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*,
   2019 WL 1382341 (S.D.N.Y. Mar. 27, 2019) ..........................................13, 14

*Gal v. Viacom Intern., Inc.*,
   518 F. Supp. 2d 526 (S.D.N.Y. 2007).............................................................12

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
   22 F.3d 1219 (2d Cir. 1994)............................................................................12

*Gaste v. Kaiserman*,
   863 F.2d 1061 (2d Cir. 1988)..........................................................................13

*Hamil Am. Inc. v. GFI*,
   193 F.3d 92 (2d Cir. 1999)..............................................................................12

*Horizon Comics Productions Inc. v. Marvel Entm't, LLC*,
   2019 WL 3080847 (S.D.N.Y. July 15, 2019) ................................................13

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003)..............................................................12, 14, 15

*Lessem v. Taylor*,
   766 F. Supp. 2d 504 (S.D.N.Y. 2011).............................................................13

*Lewinson v. Henry Holt & Co.*, LLC,
   659 F. Supp. 2d 547 (S.D.N.Y. 2009).............................................................15

*Marvel Entm't, LLC*,
   246 F. Supp. 3d 937 (S.D.N.Y. 2017).............................................................23

*May v. Sony Music Entm't*,
   339 F. Supp 3d. 169 (S.D.N.Y. 2019) ................................................................19

*McDonald v. Multimedia Entm't, Inc.*,
   1991 WL 311921 (S.D.N.Y. July 19, 1991) ........................................................15

*Mowry v. Viacom International*,
   2005 WL 1793773 (S.D.N.Y. 2005) ...................................................................24

*New Old Music Group, Inc. v. Gottwald*,
   122 F. Supp. 3d 78 (S.D.N.Y. 2015) ..................................................................15

*Nichols v. Universal Pictures*,
   45 F.2d 119 (2d Cir. 1930) ..................................................................19, 27, 28

*Paramount Pictures Corp. v. Carol Publ'g Group*,
   11 F. Supp. 2d 329 (S.D.N.Y. 1989) ..................................................................18

*Porto v. Guirgis*,
   659 F. Supp. 2d 597 (S.D.N.Y. 2009) ................................................................18

*Price v. Fox Entertainment Group, Inc.*,
   499 F.Supp.2d 382 (S.D.N.Y. 2007) ..................................................................24

*Price v. Fox Entm't Grp., Inc.*,
   2007 WL 241389 (S.D.N.Y. Jan. 27, 2007) ..................................................13, 14

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997) ..............................................................................20

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir.1976) ..................................................................................23

*Ringgold v. Black Entertainment Television, Inc.*,
   126 F.3d 70 (2d Cir. 1997) ................................................................................23

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ..........................................................................21, 22

 Shaw v. Lindheim,
   919 F.2d 1353 (9th Cir. 1990) ...........................................................................28

*Smith v. Weinstein*,
   578 F. Supp. 1297 (S.D.N.Y. 1984) ...................................................................26

*Towler v. Sayles*,
   76 F.3d 579 (4th Cir. 1996) ...............................................................................14

*Twin Peaks Prods., Inc. v. Publications International, Ltd.*,
   996 F.2d 1366 (2nd Cir. 1993) .................................................................18, 21, 22

*Wainwright Secs. Inc. v. Wall St. Transcript Corp.*,
   558 F.2d 91 (2d Cir. 1977) ..........................................................................21, 22

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d. Cir. 1986) ...............................................................................18

*Walker v. Time Life Films, Inc.*,
   788 F.2d 44 (2d. Cir. 1986) ...............................................................................24

*Warner Bros. Entm't Inc. v. RDR Books*,
   575 F. Supp. 2d 513 (S.D.N.Y. 2008) .........................................................18, 19, 22

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir.1996) ..................................................................................23

*Zalewski v. Cicero Builder Dev., Inc.*,
   754 F.3d 95 (2d Cir. 2014) .................................................................................15

Statutes

17 U.S.C. § 106 ...................................................................................................................21, 22
17 U.S.C. § 410(c) ..................................................................................................................12

Rules

Fed. R. Civ. P. 56(a) ..............................................................................................................12

## INTRODUCTION

After Lynne Freeman ("Freeman") entrusted her literary agent, Defendant Emily Kim ("Kim"), with dozens of iterations of her original manuscript and notes (collectively the "Freeman Copyrighted Material"),[1] Kim disclosed that material to her close friend and client, Defendant Tracy Wolff ("Wolff") and worked with Wolff to turn it into the first four books of the best-selling *Crave* Series—*Crave*, *Crush*, *Covet*, and *Court*. Because access and substantial similarity are beyond reasonable dispute, liability for infringement is ripe for summary judgment.

## ARGUMENT

### I.    FACTUAL BACKGROUND

#### A.    Freeman's Work and Agency Agreement with Kim

On December 8, 2010, Freeman hired Kim and Prospect Agency as her literary agent. [SSUF 15]. Freeman then worked with Kim for more than three years revising and rewriting the manuscript for her young-adult paranormal romance story entitled *Blue Moon Rising* (later called *Masqued* and referred herein as "BMR"). [SSUF 16]. During that time, Freeman sent Kim approximately 50 versions of BMR, along with notes and emails which all comprise the same continuous body of work. [SSUF 17]. Kim admits receiving at least 10-15 versions and accompanying notes, and that older versions of Freeman's manuscripts may have been deleted when she received new ones. [SSUF 18]. The Freeman Copyrighted Material reflects iterations and edits of one overarching story, and the original expression of the main story elements are captured in a subset of six versions of the manuscript and select notes. [SSUF 19].

In the summer of 2013, Kim emailed Defendant Liz Pelletier ("Pelletier") of Entangled Publishing about the BMR manuscript, then-titled *Masqued,* and e-mailed a copy of the manuscript

---

[1] The Freeman Copyrighted Material includes 17 manuscript versions and 13 sets of notes registered with the U.S. Copyright Office on September 12, 2021.  [SSUF 1-2].

to Stacy Abrams ("Abrams") at Entangled. [SSUF 23-24]. She told Freeman that she knew Abrams "really well" and that Entangled was her "best bet" for a publisher. [SSUF 24].

By the end of 2013, Kim advised Freeman that the market for young adult paranormal romance was over-saturated, that she was unable to find a publisher for BMR, and that Freeman must write something new in the adult romance or erotica genres, or else she would be removed from the Prospect website. [SSUF 25]. In Spring 2014, after Freeman rejected changing genres, she and Kim parted ways. [SSUF 26]. Relying on Kim's advice that the publishing industry was oversaturated with young-adult paranormal romance, and that it wouldn't be a good time for a story like Freeman's until at least the time her son graduated from high school in 2021, Freeman decided to revisit BMR later as Kim advised and continued working on her craft. [SSUF 29]. Of Freeman's book Kim said: "It was good…she should have kept working on it." [SSUF 28]

B.    Wolff's Career and the creation of "Crave"

At the 2012 Romance Writers of America conference, Kim introduced Freeman to Wolff as her good friend and client who wrote erotica. [SSUF 21]. Wolff had achieved modest success, but by 2018 her career was on the decline as she ███████████████████████████ ██████████████████████████████████████ [SSUF 33]. ████████████████████ ████████████████████████████████████████████████████████ ███████████████████. [SSUF 34]. Kim asked █████████████████████ ██████████████████████. [SSUF 35].

Abrams approached Wolff and asked her if she could write a book quickly for Entangled because another project had fallen through and told Wolff they were looking for something paranormal. [SSUF 46]. Wolff then wrote up five ideas and sent them to Abrams. [SSUF 47]. Pelletier and Abrams chose idea Number 2 because it was the one closest to what Pelletier was

looking for. [SSUF 47]. Pelletier admits that the synopsis[2] for the *Crave* books was written *before* the books and that while there was no synopsis for the book *Crave* she wrote the synopsis for *Crush, Covet and Court*.[3] [SSUF 59]. Wolff confirmed this in her deposition, and further admitted that Pelletier provided substantial input for the plot of *Crave*. [SSUF 50, 61 and 62]. In a curious text exchange Wolff asked Pelletier how to respond if asked about her inspiration for writing *Crave* in an interview and Pelletier responded: "S██████████████████████████████████ ██████████████████████████████████████████████████████." [SSUF 79] And Wolff has admitted that Pelletier was "v██████████████████████████ ██████████████████████████████████.[4] [SSUF 79]

   Wolff claims that it only took her two-to-three months to write each of the books *Crave*, *Crush*, and *Covet*. [SSUF 48]. *Crave* was released in April 2020. Five months later, in September 2020, the second book, Crush, was published. [Id.] The third book, Covet, was released in March 2021. [Id.] These 600-800 pages long books were, incredibly, written and completed mere months apart. The fourth book, *Court*, was released February 2022.  [SSUF 48].

   Kim was also actively involved in creating the *Crave* series. [SSUF 49]. Kim testified that most of the decisions about the *Crave* series were made by Pelletier and Wolff. [SSUF 80]. But in a text to Kim, Wolff says, "████████████████████████████████████████████ ██████████████████████████████████████. [SSUF 80]. Kim also created a

---

[2] As noted in ThoughtCo.'s article, *What is a Synopsis and How Do You Write One*, "a synopsis is a general overview of an article, essay, story, book, or other written work. In the field of publishing, a synopsis may serve as a proposal for an article or book." *See* *https://www.thoughtco.com/synopsis-composition-and-grammar-1692020.*

[3] Pelletier's counsel also confirmed to Plaintiff that "Pelletier created the basic storyline for the Crave book series, selecting the writer, Tracy Wolff, not based on a prepared manuscript but due to her writing voice." [SSUF 75]

[4] As set forth more fully in section I(C) below, there are eleven character names in common between BMR and the *Crave* series including the unusual names Bloodletter, Marise, and Fiona.

joint Google Doc with chapter titles and outlines to "make it easier" when they were in a time crunch to complete the books and started the "*Crave* Series Bible" while Wolff was writing the stories. [SSUF 88 & 89].

And Kim directly participated in the writing of the *Crave* books. [SSUF 82]. At one point Kim stayed up in "█████████████████████████" while she was writing. [SSUF 82]. Another time, after Wolff told Kim she has a whole new chapter to write and is exhausted, Kim replies "D████████████████" And Wolff replied: "W█████████ ████████████████████" [SSUF 84, 85]. In another text message Wolff asks Kim: "W██████████████████?" [SSUF 86]. Kim tells Abrams, "██████ ████████████████████." [SSUF 55]. In text messages between Kim and Pelletier discussing writing in the *Crave* Google Doc, Pelletier asks Kim "███████████████ ███████████████████." [SSUF 87]. Kim then sends Pelletier ████████████████████ seemingly indicating that those paragraphs should be included in the *Crave* book. [SSUF 87].

C.    Freeman Discovers Infringement

In late March 2021, Freeman discovered *Crave*, written by Tracy Wolff, edited by Stacy Abrams and Liz Pelletier, and published by Entangled. [SSUF 95]. It was apparent to Freeman after reading *Crave* that it was copied from the Freeman Copyrighted Material since the main plot of BMR was the same as *Crave* Book 1, and the main characters and supporting cast were substantially the same. [SSUF 96]. Specifically, *Crave* and BMR share the following plot:

Both works concern an approximately 17-year-old girl from San Diego who moves to Alaska after an accident kills her family members. [SSUF 97]. Her last words with them were part of a fight for which she harbors guilt, and she suffers panic and anxiety from the trauma. [Id.] She

now lives with the only two family members she believes she has left and they are both supernatural witches, which she doesn't know. She's been kept ignorant of the supernatural world by her family, and they have kept her powers bound to protect her. [Id.] On the first school day scene, she meets the romantic lead who she later learns is suffering from and feels responsible for the death of his older brother (who was 19 in BMR and looked about 19 in *Crave*). [Id.] As their romantic bond develops, she learns that he is a supernatural being trying to stop a supernatural war. [Id.] At the climax of the story, she is kidnapped by a vampire who wants to bring back his / her dead mate (who isn't dead and is alive in another dimension) and needs the heroine in order to do so. [SSUF 148.] This vampire believes the heroine will be the *reincarnation* of his dead mate / will be used in a spell to *resurrect* her dead mate. [Id.] This vampire also wants to use the heroine as an act of vengeance against the person believed to be responsible for the mate's death. [Id.] The heroine turns out to be a unique supernatural being made of magic who is a protector of supernaturals, humans, and other creatures. [SSUF 97.] She is in danger because of what she is, and others are seeking to destroy her so that she can't be used in the war. At the end of the book, the Bloodletter character turns into a raven / winged creature and flies away. [SSUF 97.]

Then, as discussed in section I(D) below, subplots of BMR mirror the main plots in *Crush* (Book 2), *Covet* (Book 3), and *Court* (Book 4). [SSUF 96]. Moreover, the same characters from the book *Crave* appear in each book of the *Crave* series, as would be expected given that later books are derivative of the *Crave* book. [SSUF 96]

With regard to characters, Freeman found that BMR and the *Crave* series share at least 11 character names, some of which are highly unusual, like the Bloodletter, Marise, Fiona, God of Chaos, and Collin/Colin. [SSUF 98 & 99]. And the particulars of many of the parallel characters are eerily similar as well. [SSUF 98]. The ultimate villain is a strikingly similar Vampire Prince in

BMR and Vampire King in Crave. [SSUF 116-123]. The two voices the heroine hears in her head are also parallel characters. [SSUF 132-142]. One voice turns out to be her long-lost father in BMR and long-lost grandfather in *Crave*, who speaks **Gaelic**, has "smokey-gray eyes," and has been trapped in his supernatural form on an island by the vampire prince / vampire king. The heroine visits him by portal and tries to free him. She "promises" she'll "be back" and tells him she's a "friend." [SSUF 132-136]. The second voice in her head is the second romantic lead who was to be the heroine's true mate and is originally believed to be evil and is living in another dimension until the heroine accidentally brings him back to our world and discovers that he is in fact good. [SSUF 137-142]. Each heroine has a remarkably similar mixed-race part Black male friend who is gay, and only she knows it. [124-125]. He is beautiful and smart, has a smile and sense of humor he's known for, and calls the heroine nicknames (BMR) a nickname (*Crave*). The romantic lead doesn't like the heroine being around this character and the heroine thinks he's jealous. [SSUF 124-125]. In each story the heroine has a female nemesis who is a school mate of the heroine but also a supernatural creature who gives the heroine a spiked drink which foreshadows the events at the climax of the story when the heroine is abducted. [SSUF 126-128].

Another parallel character is the grandmother the heroine didn't know she had who was / is a vampire with green eyes and has "more than a hint of danger / avarice" in them. [SSUF 129]. She is the daughter of a deity, lives in a remote place/ice cave, and explains the "twin goddesses" and their creation story to the heroine and tells her that she is descended from a twin goddess and her purpose is to balance the opposing forces in their world to bring peace since she contains both within her. [SSUF 129-130]. Each heroine also lives with a parallel aunt/uncle who is kind and gives her her father's amulet with stones / rune stones and urges her to never take it off/have it on her at all times. [SSUF 143-144]. Freeman has created a series of character indexes demonstrating

the remarkable similarities between the works' parallel characters. [SSUF 98].

The works also tell their stories through similar scenes. For example, the first "attack" scene in both involves two guys who remind the heroine of 1980s rockers and aren't dressed for the winter weather. [SSUF 154]. They attack the Heroine in scenes that play out remarkably similarly. [*Id.*]. There are also very similar kidnapping scenes, a first kiss scene which is the catalyst for the heroine's discovery of the supernatural world, a scene where it's winter in Alaska and the heroine steps into a room and it's summer, etc. [SSUF 154, 158]. In another scene, the Heroine chooses the same tarot card, the Tower, in a reading. [SSUF 163]

The same combination of pop culture references are also curiously shared between the two works, including *Humpty Dumpty, Peter Pan, Sleeping Beauty, Snow White, Star Wars, a Grey's Anatomy* reference, the *Hulk, Superman,* and Lois Lane, a *Wizard of Oz* reference, Tom Cruise, French philosophers, Alexandre Dumas quote from *The Three Musketeers,* Shakespeare plays, Stonehenge, etc. [SSUF 170]. Shakespeare is quoted when the heroine and romantic lead first meet. [SSUF 147, 170]. Both stories feature a castle that is described using the same vivid descriptions, and when the heroine in *Crave* is inside the castle she says she feels like she is in a "Salvador Dali" painting, while the heroine in BRM describes a similar place for supernaturals as feeling like she is in "Dante's Inferno," a famous Salvador Dali painting. [SSUF 165]. In yet another scene, the Heroine walks for a long time with a friend, only to arrive at a pair of golden double doors. [SSUF 153]. And there are many more similarities – far too many to be mere coincidence - as set forth in granular detail in the indices prepared by Freeman [SSUF 107-172].

On April 1, 2021, Freeman emailed Kim requesting a copy of her contract. Kim advised Freeman that she would send it but then in a text exchange with her assistant Kim wrote that "there's no way she's getting that contract ever!" [SSUF 100]. In that text string Kim clearly

remembered Freeman, her manuscript and her story, and immediately voiced concern that Freeman was going to sue Wolff for copyright infringement. [SSUF 100].

D.   The Works are Substantially Similar

This motion focuses on a subset of the Freeman Copyrighted Material, comparing 2,650 pages of Freeman's six manuscript drafts and notes with an analogous 2,750 pages of the first four *Crave* books. [SSUF 19]. That comparison makes clear that substantial portions of BMR's plots and subplots, character development, and scenes appear throughout the *Crave* series in service of what is in sum and substance the same story. [SSUF 96-99, 107-172].

Both *Crave* and BMR are young adult paranormal fantasy romances that tell essentially the same story about an approximately 17-year-old girl from San Diego who moves to Alaska after an accident kills her family members.[5] [SSUF 97]. The story begins with the heroine on her way to school in Alaska thinking about the frozen land, the weather in California, and her loss. [SSUF 146]. She meets the romantic lead at the end of chapter two at the beginning of school. [SSUF 147]. Through their relationship she begins to learn about the supernatural world when he accidentally loses self-control of his powers during their first kiss. [SSUF 147, 158].

Not only are the romantic leads similar, but their parents are leaders of their kind and would want the heroine for their own purposes and/or to destroy her if they knew what she was. [SSUF 147]. The heroine in both works is a unique being made of magic who is a protector of supernaturals, humans, and other creatures, and her kind has not been seen in a very long time. [SSUF 110]. She is a queen and the descendant of a twin goddess. [SSUF 111]. Her purpose is to restore "the balance." [*Id*.] Others are seeking to destroy her so that she can't be used in the war.

---

[5] *Crave's* first edition has the heroine land in Anchorage, then changes that to Fairbanks in later editions, and places the school in Healy, Alaska. [SSUF 169]. In *Crave* drafts, the heroine is about to turn seventeen just like BMR. [SSUF 100].

[*Id*.] These wars disrupt the human world and have caused storms. [SSUF 149].

The climax of BMR and *Crave* (Book 1) occurs when the heroine is kidnapped by a vampire who wants to use her to bring back their dead mate as an act of vengeance against the person they believe is responsible, and they need the heroine in order to do so. [SSUF 155-156]. This vampire tells her they murdered her family members by causing the accident which killed them. [*Id*.] She feels sorry for this vampire at first but is then infuriated at them for the murder. [*Id*.] The romantic lead comes to rescue her but she ends up saving his life. [*Id*.]

The ultimate villain, the vampire prince/king, wants to bring supernaturals out of hiding and into the world. [SSUF 117]. He is good-looking, tall with short dark hair, intense blue eyes, and the heroine describes him as being like a "cobra." [SSUF 119]. He has a special bite he is known for which he wants to give the heroine and ultimately does. [*Id*.]. At the end of the first book, "the Bloodletter" turns into a raven in Freeman's work and a "winged creature" in Wolff's and flies away. [SSUF 149].

### i.   A subplot of BMR is copied for the main plot of *Crush* (book 2):

*Crush* mirrors a secondary storyline of BMR in which powerful, magical objects must be found to stop the second "voice in her head" character (Ronan in *Crush* / Hudson in BMR) from rising again. [SSUF 150]. The heroine learns that she accidentally brought him back with her from another dimension where they were together. [*Id*.] She learns he is good, not evil, and he ultimately gives the heroine his magic. [*Id*.] There is an attraction between them which she tries to resist, because she's in love with the romantic lead. [*Id*.] Once the objects are found the heroine must pass a trial, and the evil vampire prince / king gives the heroine his special bite (the Kiss of Life or Death / the eternal bite), which could kill her. [*Id*.] The heroine escapes his clutches and survives. [*Id*.] The vampire prince / king will be after her now. [SSUF 150].

### ii.   Another subplot of BMR is copied for the main plot of *Covet* (book 3):

Book 3 of *Crave* mirrors another subplot of BMR. [SSUF 151]. The vampire prince / vampire king wants to bring supernaturals out of hiding from the human world and wants power. [*Id.*] The heroine is told about twin goddesses and that she is a descendant of one of them. [*Id.*] She is told she is a queen. [*Id.*] She learns that her kind of being are protectors of humans, supernaturals, and other creatures, and that she is to *maintain / keep the balance*. [*Id.*] She is a special being with *magic in her veins / in her blood*. [SSUF 151]. She is *magic / made of magic*. [*Id.*] She must accomplish another task (restore the Compact / find the Crown) in order to stop the supernatural war and bring balance. [*Id.*] A tarot reading is performed and the heroine draws the *Tower card* (a standard Tarot deck has 78 cards). [*Id.*] Magical tattoos appear on her and they are spells. [*Id.*] Her tattoo "itches and burns" and she is *lit up* with pin pricks / needle pricks of magic. [*Id.*] The heroine learns more about what she is and her role in the supernatural world throughout the story and that her kind "don't walk the earth" in many numbers anymore due to a betrayal. [SSUF 151].

### iii.   Another subplot of BMR is copied for the main plot of *Court* (book 4):

In *Court*, the heroine meets the first voice in her head character, who is trapped / was trapped in chains on an island which she visited by portal earlier in the story. [SSUF 152]. He is a creature like her, and she now learns he is her *father / grandfather.* [*Id.*] His kind of supernatural beings speak *Gaelic* and communicate with one another telepathically. [*Id.*] He tells her to call him *Athair / Alistair.* [*Id.*] The vampire prince / king is responsible for him being trapped in his supernatural form. [SSUF 157]. He has kidnapped students at the heroine's school and is holding them hostage to get what he wants. [*Id.*] Taking them may cause the supernatural war. [*Id.*] He is draining them of their powers. [*Id.*] He threatens to drain the heroine's friends unless she does what

he wants. [*Id*.] She makes a deal with him to save her friends; she sacrifices herself. But the heroine ends up tricking him and he is injured. [*Id*.] She and her friends are free. [*Id*.] A structure like Stonehenge, a "small" Stonehenge / "Stonehenge Lite" is mentioned. [*Id*.] It is revealed that the vampire prince / king has a daughter by a woman who is not his mate. [SSUF 152]. This daughter is related to the heroine by blood. [*Id*.] She is a supernatural being, like the heroine and her friends, but is aligned with her father, the vampire prince / king. [*Id*.] The heroine feels sorry for her and offers her a chance to be on the heroine's side, but she chooses to stay with her father's side. [*Id*.] War is on the horizon, the vampire prince / king is not dead, and there is fear that he is going to come after the heroine. [SSUF 152].

The similarities in characters and storyline are not merely reflective of tropes. [SSUF 180]. Professor Kathryn Reiss has offered an expert report explaining that the qualitative similarities in story, scenes, character, language, and dialogue between the *Crave* Series and BMR far exceed those one would expect when reading two books in the same genre. [SSUF 174-180].

## II. LEGAL STANDARD

The court may summarily adjudicate issues where "there is no genuine dispute as to any material fact" and a party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted).

To establish a claim of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc*., 499 U.S. 340, 361 (1991).

A certificate of registration from the United States Register of Copyrights constitutes *prima facie* evidence of the valid ownership of a copyright. 17 U.S.C. § 410(c); *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).

To satisfy the second element of an infringement claim—the "unauthorized copying" element—a plaintiff must show both that his work was "actually copied" and that the portion copied amounts to an "improper or unlawful appropriation." *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially "by demonstrating that the person who composed the defendant's work had access to the copyrighted material," and/or that there are similarities between the two works that are "probative of copying." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999); *Gal v. Viacom Intern., Inc.*, 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007).

### III.   THIS COURT SHOULD ADJUDICATE OWNERSHIP IN FAVOR OF FREEMAN

Plaintiff holds a valid copyright in the Freeman Copyrighted Material as they are original works of literary authorship created by Mrs. Freeman, and her copyright registrations establish *prima facie* evidence of ownership. [SSUF 1-2]. Therefore, ownership is ripe for adjudication.

### IV.   THIS COURT SHOULD ADJUDICATE ACCESS IN FAVOR OF FREEMAN

Access is also beyond reasonable dispute because each person involved in the creation of the *Crave* Series—Wolff, Kim, Abrams, and Pelletier—had direct or indirect access and there are overwhelming probative similarities between the works.

#### A.   Defendants Wolff, Pelleier, Kim and Abrams Collaboratively Created the *Crave* Series and Each Had Access to the Freeman Copyrighted Material.

Access exists where an alleged infringer (or his intermediary) had a reasonable opportunity to view or copy the plaintiff's work. *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988);

*Price v. Fox Entm't Grp., Inc.*, No. 05 Civ. 5259, 2007 WL 241389, at *8 (S.D.N.Y. Jan. 27, 2007). Importantly, "a copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work." *Cates v. Schlemovitz*, No. 21C-00805AMNML, 2023 WL 6200196, at *5 (N.D.N.Y. Sept. 22, 2023) (internal quotations omitted). Thus, a "chain of events" theory of access may "rel[y] on a somewhat attenuated chain of events extending over a long period of time and distance." *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd*., No. 16-CV-9987 (PKC), 2019 WL 1382341, at *5 (S.D.N.Y. Mar. 27, 2019).

Access through an intermediary may be inferred if the intermediary "has a close relationship with the infringer." *Lessem v. Taylor*, 766 F. Supp. 2d 504, 508–09 (S.D.N.Y. 2011) (citations omitted); see also *Horizon Comics Productions Inc. v. Marvel Entm't, LLC*, No. 16-CV-2499 (JPO), 2019 WL 3080847, at *4 (S.D.N.Y. July 15, 2019) ("a court may infer that a reasonable possibility of access exists if 'the author sent the copyrighted work to a third party intermediary who has a *close relationship* with the infringer.'") (emphasis in original); *Price v. Fox Entm't Grp., Inc.*, 2007 WL 241389, at *8 (inferring a reasonable possibility of access when the intermediary and the defendant are "business friends"). This includes where the intermediary "supervises or works in the same department as the infringer or contributes creative ideas to [the infringer]." *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd*., No. 16-CV-9987 (PKC), 2019 WL 1382341, at *6 (S.D.N.Y. Mar. 27, 2019), citing *Jorgensen*, 351 F.3d at 53, quoting *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996).

Here, Kim worked with Freeman for *years* to develop BMR and received *many* versions of her manuscripts and notes. And Kim admits both that she delivered Freeman's work to

Entangled (Pelletier and Abrams) and that she is close personal friends with Wolff. [SSUF 22-24, 36-37]. Similarly, Kim has had a long-standing relationship and is friends with both Pelletier and Abrams. [SSUF 38-40, 43]. These facts establish access as a matter of law.

But the evidence here is even more compelling as it is beyond reasonable dispute that Kim, Pelletier and Abrams all worked collectively on the development and writing of the *Crave* series. Among other things, Pelletier created the original *Crave* series outline and several of the *Crave* series synopses, Kim co-wrote the books in a shared Google Doc, and Wolff has admitted that the *Crave* series was a "group project." [SSUF 51-53, 59, 62-64]. Access is thus clear.

### B.    Striking Probative Similarity Also Establishes Access

As discussed in Section V below, there is indisputable similarity between the protectable expression of the BMR and the *Crave* series. But there are also striking similarities in the works' character names, short phrases, and other elements (such as the pulling of the Tower card, which is one of 78 cards in that particular deck) that can only be a result of access and copying.

"There is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less proof of access is required." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003). "Probative similarity is a less demanding test than substantial similarity and requires only that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Lewinson v. Henry Holt & Co*., LLC, 659 F. Supp. 2d 547, 563 (S.D.N.Y. 2009) "Similarities between works are 'probative of copying' if the 'similarities between the two works ... would not be expected to arise if the works had been created independently.'" *New Old Music Group, Inc. v. Gottwald*, 122 F. Supp. 3d 78, 85 (S.D.N.Y. 2015) (other citations omitted). When determining whether probative similarity exists, the court must consider the entire work, not just the protectable elements. *Buttner v. RD Palmer Enters., Inc*., No.

5:13-CV-0342 (LEK/ATB), 2015 WL 1472084, at *6 & n.5 (N.D.N.Y. Mar. 31, 2015) ("Similarity that relates to unprotected elements is probative only of copying—not wrongful copying—and is referred to as 'probative similarity'"), quoting *Zalewski v. Cicero Builder Dev., Inc*., 754 F.3d 95, 101 (2d Cir. 2014).

"Evidence admissible on the issue of 'probative similarity' includes expert testimony 'dissecting' the two works and discussing the works' relationship to other earlier works, for the purpose of illuminating whether similarities between the two works are more likely due to copying or independent creation." *New Old Music Group, Inc. v. Gottwald*, 122 F. Supp. 3d 78, 85 (S.D.N.Y. 2015), quoting *McDonald v. Multimedia Entm't, Inc*., No. 90–CV–6356 (KC), 1991 WL 311921, at *2 (S.D.N.Y. July 19, 1991).

Here, three expert witnesses, Dr. Carol Chadski, Dr. Patrick Joula, and Professor Kathryn Reis have opined on "probative similarity" between the works and found the similarities overwhelming. See Doniger Decl. ¶¶ 36-38, Exhs. 35-37 (the Reports of Dr. Chadski, Dr. Joula and Professor Reiss). The methodologies used by these experts reflect the scientific and industry norms and standards. Indeed, Dr. Chaski alone has been involved in approximately 100 matters, including various copyright infringement and authorship cases. [SSUF 177].

Dr. Chadski in her report states as follows:

> [B]ased on these empirical results using standard procedures for detecting plagiarism, I conclude that it is extremely likely that the [*Crave* book] series plagiarize the Freeman Manuscripts. The plagiarism takes place at the three levels of plagiarism: copy-paste, mosaic and conceptual, and has been found using standard methods of plagiarism detection. **Statistically speaking, it is virtually impossible that the two works could have been independently created in light of my findings.** (Emphasis Added). See Chadski Report, p. 45. [SSUF 178].

Similarly, Dr. Joula in his report states as follows:

> Quantitative and computational analysis indicates that there are similarities between the Crave novels and the 2011 manuscript for Blue Moon Rising, and that

these similarities are unlikely to have arisen by chance. Based on the evidence described in this report, I consider it to be more likely than not that these works have a common origin. **In fact, based on the calculations above, I would consider the odds in favor of these works having a common origin as more than 1000:1.** (Emphasis Added)  *See* Joula Report, p. x [SSUF 179].

And Professor Reiss in her report states as follows:

> The remarkable similarities between the storylines, plot, setting, characters— including mental states of characters, reactions of characters, physical conditions of characters—and the other elements of Freeman's material and the first four books of Wolff's CRAVE series are substantial. **These striking similarities go far beyond genre conventions or tropes, and would not be expected to occur in works that were independently created. Given the myriad ways characters can be created and story and plotlines can unfold, it is my opinion that the similarities are so striking as to preclude the possibility of independent creation.** I believe it is far more likely that Wolff appropriated them from Freeman's work. (Emphasis Added) *See* Reiss Report, p. 50 [SSUF 180].

Thus, in addition to the substantial similarity of protectable expression addressed in the next section, the *many* similarities of elements that are not independently protectable compel a finding of access. This includes the many similarities in character names, descriptions and interactions, pop culture references, and the vivid descriptions of certain settings in both works. For example, while a castle in a paranormal romance story is not unique, here both castles are in Alaska (which has no castles) and are described the same way–e.g., each has "gleaming gemstones" on the walls, wall sconces with live candles, "ornately carved double doors," stone walls, "crystal chandeliers," long driveway, and security that requires a code at the entrance. [SSUF 165]. And in *Crave*, when Heroine is inside the castle, she says she feels like she is in a "Salvador Dali" painting while in *BMR* she describes a similar place for supernaturals as feeling like she is in "Dante's Inferno," which is a famous Salvador Dali painting. [SSUF 165].

There are also notable similarities between the works within specific scenes. In one scene, the heroine walks for a long time with a friend, only to arrive at a pair of gold double doors. [SSUF 153]. In another scene, the heroine randomly describes the setting being "like the Library of

Alexandria" in *Crave* and "like the Lighthouse of Alexandria" in BMR. [SSUF 168]. In BMR there is a "Sanctuary" that is similar to a town described in the *Crave* Series–both the Sanctuary and the town feature colorful tents and symbols or carvings that call to the heroine. [SSUF 153].

Other remarkable similarities include that the heroine's powers are bound by their families through tea, and that the tea in BMR is "lemon verbena" and in Crave is "lemon-thyme-verbena." [SSUF 110]. In cafeteria scenes where nothing else looks appetizing, each heroine gets a yogurt. [Id.] The vampire prince is described as "like a king cobra" while the vampire king is described as "like a cobra." [SSUF 119] The heroine uses the same negative language to describe Alaska [SSUF 107] and the same language to describe herself and others [SSUF 109, 114, 119, 126].

And BRM shares many other lexical overlaps with the *Crave* books that are either extremely rare or entirely missing in Google Books N-Grams,[6] such as "tree stump seats"/ "tree-stump seats," "small Stonehenge"/"Stonehenge lite," and "air as I try to." [SSUF 179]. Renowned forensic linguist Patrick Juola, PhD explains that "999 times out of a thousand we would see no overlap of this type if there were no shared authorial influence, so it… follows that it is very much more likely than not that [BMR and the *Crave* Series] were not independently written." [*Id.*]. These similarities are thus highly probative of copying because they would not be expected to arise if the works were created independently, and further establish access as a matter of law.

## V.   THIS COURT SHOULD ADJUDICATE SUBSTANTIAL SIMILARITY IN FAVOR OF FREEMAN

Outside of verbatim copy-and-paste plagiarism, this Circuit recognizes two distinct types of copying when analyzing substantial similarity in literary cases: "comprehensive nonliteral similarity" and "fragmented literal similarity." *Paramount Pictures Corp.* v. *Carol Publ'g Group*,

---

[6] Google Books N-Grams contains the contents of roughly 15,000,000 books and allows a user to search its database of over 150 billion words to see how many of those books share the searched words or phrases. [SSUF 179 (Juola report, Par. 25)].

11 F. Supp. 2d 329, 333 (S.D.N.Y. 1989); *see also Twin Peaks Prods., Inc. v. Publications International, Ltd.*, 996 F.2d 1366, 1372 (2nd Cir. 1993) (citing 4 Nimmer on Copyright §13.03[A][2]); *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,* 90 Supp. 2d 431, 460 (S.D.N.Y. 2000); and *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 537 (S.D.N.Y. 2008). Freeman easily satisfies both tests in this case.

"Comprehensive nonliteral similarity exists where the allegedly infringing work does not copy the original work word-for-word, but the 'fundamental essence or structure of [the original work] is duplicated in [the infringing work].'" *See, e.g., Best Cellars, Inc.* at 460; *and* 4 Nimmer on Copyright §13.03[A][1]. To determine if comprehensive non-literal similarity exists, the trier of fact examines factors such as similarity in plot, theme, dialogue, mood, setting, pace and sequence. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d. Cir. 1986). *See also, Porto v. Guirgis*, 659 F. Supp. 2d 597, 614 (S.D.N.Y. 2009); *DiTocco v. Riordan*, 815 F. Supp 2d 655, 667 (S.D.N.Y. 2011), aff'd, 496 Fed. App'x 126 (2d Cir. 2012).

"By contrast, 'fragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure.'" *May v. Sony Music Entm't,* 339 F. Supp 3d. 169, 180 (S.D.N.Y. 2019). Fragmented literal similarity "focuses upon copying of direct quotations or close paraphrasing." *Castle Rock Entm't, Inc.* at 140. The approach is called fragmented literal similarity precisely because the similarity exists in discrete instances rather than throughout the works as a whole. *Best Cellars, Inc.* at 460. "[T]he law in the Second Circuit is clear, "the concept of similarity embraces not only global similarities in structure and sequence, but localized similarity in language." *Warner Bros.* at 537. "In evaluating fragmented literal similarity, or 'localized similarity in language, the Court examines the copying of direct quotations or close paraphrasing of the original work." *Id*.

Importantly, "[t]he mere fact that the defendant has paraphrased rather than literally copied will not preclude a finding of substantial similarity." *Id*. "Copyright 'cannot be limited literally to the text, else a plagiarist would escape by immaterial variations.'" *Id*. (citing *Nichols v. Universal Pictures Co.,* 45 F.2d 119, 121(2d Cir. 1930). To the contrary, the "minor differences" between the two works "only tends to emphasize the extent to which the defendant has deliberately copied from the plaintiff." *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp*., 409 F.2d 1315, 1316 (2d Cir. 1969) (per curium).

In this case, both types of similarities exist. The *Crave* series duplicates both the "fundamental essence" of BMR (comprehensive nonliteral similarity) and has copied substantial portions of localized original descriptions, dialogue and other language through close paraphrasing (fragmented literal similarity). And Freeman has offered experts that go to both types of infringement. She has offered Professor Reiss to address where the fundamental essence or structure of Freeman's work is substantially similar to the *Crave* series *and* to establish that the similarities are not merely of tropes. And she has offered Drs. Joula and Chadski to establish the copying of Freeman's work by near direct quotations or close paraphrasing (lexical clusters).

Despite the recasting of Freeman's Copyrighted Material, the resulting *Crave* series in its aggregate is not only substantially similar, but strikingly so such that infringement should be found irrespective of this Court's finding on access.[7]

### A.   The Freeman Copyrighted Material is properly compared in the aggregate to the Crave Series

The Freeman Copyrighted Material tells a single story, essentially setting forth different options of how best to present that story with notes explaining the characters and their backstories.

---

[7] *Arnstein v. Porter*, 154 F.2d 464, 468-69 (2d Cir. 1946); *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) ("If the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.").

Although it is properly considered a single work in the aggregate–a single work from which Defendants seemingly picked and chose which parts and options they liked best to create the *Crave* series–Plaintiff expects Defendants to argue that this Court should only look to two primary manuscripts of Plaintiff's work and compare it to just the first book of the *Crave* series (as their literary expert did). That argument must be rejected as it ignores the essence of Freeman's claims and is inconsistent with both the law of the case and law of this Circuit.

Although this Court required Freeman to identify two "primary" manuscripts as a starting point to analyze substantial similarity, Judge Stanton's Order (ECF 141) and subsequent Clarification Order (ECF 181) made clear that those two manuscripts were merely "a fair place to start the comparison process" and that all "claims remain available with regard to the other iterations of the plaintiff's work." (ECF 181). Indeed, if *Crave* misappropriated substantial protectable expression from the Freeman Copyrighted Material it is no excuse that Defendants took that expression from different iterations in Freeman's development process.

The same conclusion would follow even if this Court found the different iterations of Freeman's manuscripts to be discrete works since a plaintiff may establish substantial similarity by comparing an allegedly infringing work to a combination or series of related works in the aggregate. *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 138 (2d Cir. 1998). In *Castle Rock*, the defendant copied "643 fragments from 84 individually copyrighted *Seinfeld* episodes" to create what was deemed to be an infringing trivia game. *Id*. at 138 ("By copying not a few but 643 fragments from the *Seinfeld* television series . . . *The SAT* has plainly crossed the quantitative copying threshold"). In holding that it was appropriate to aggregate Plaintiff's 84 individually copyrighted works to determine whether they were substantially similar to

defendant's trivia game, then-Judge Sotomayor cited a history of Second Circuit precedents[8] and explained:

> Although 17 U.S.C. § 106 speaks in terms of a singular copyrighted 'work,' it would elevate form over substance to conclude that [defendant's] copying of 643 fragments from 84 individually copyrighted *Seinfeld* episodes is indistinguishable from a case in which a 634–question trivia quiz book poses a few questions from each of 84 unrelated television programs, books, movies, or any combination of creative works that do not constitute a discrete series of works.

*Id.* Justice Sotomayor's reasoning remains the law. *See, e.g., Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 535 n.14 (S.D.N.Y. 2008) ("The Court analyzes the amount of expression copied from the *Harry Potter* series in the aggregate, rather than from each individual novel in the series, following the Second Circuit's reasoning in *Castle Rock*").

Freeman's Copyrighted Material—drafts, notes, outlines, subplots, character descriptions, etc., all relating to the same original manuscript—represent a far more cohesive and intertwined body of work than the 84 individually copyrighted television programs at issue in *Castle Rock*, where aggregation was permitted. *Castle Rock,* 150 F.3d at 138.  They also represent a more cohesive and related series of works than the eight episodes at issue in *Twin Peaks,* 996 F.2d 1366; the research reports at issue in *Wainwright,* 558 F.2d 91; the 15 separate books at issue in *Craft,* 667 F.Supp. at 120; and the 59 letters at issue in *Salinger,* 11 F.2d 90.

---

[8] See, e.g., *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372–73, 1381 (2d Cir. 1993) (finding substantial similarity between infringing book and 8 episodes of Twin Peaks weekly television series seen as a whole); *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977) (abstracts of a number of research reports treated cumulatively in fair use analysis); *Craft v. Kobler*, 667 F.Supp. 120, 124–25 (S.D.N.Y. 1987) (passages taken from 15 separate books of copyright holder treated cumulatively in finding infringement); *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987).

The relevant comparison therefore must be between the entire body of the Freeman Copyrighted Material (although Freeman has effectively narrowed it down to a small subset) and the challenged portion of the *Crave* Series–i.e., the first four books. As set forth below, that comparison compels the conclusion that *Crave* infringes the Freeman Copyrighted Material.

### B. **The Works are Substantially Similar**

The similarities between the protectable expression in BMR and the *Crave* series are certainly substantially similar with respect to the plot, dialogue, setting, characters, pace, and sequence of events.

As the Second Circuit has explained, "substantial similarity" requires "that the copying [be] quantitatively *and* qualitatively sufficient to support the legal conclusion that infringement (*actionable* copying) has occurred. The qualitative component concerns the copying of expression, rather than ideas.... The quantitative component generally concerns the amount of the copyrighted work that is copied, which must be more than "*de minimis.*" *Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 75 (2d Cir. 1997) (emphasis added).

Under the "total concept and feel" test, courts analyze "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" of the original and the allegedly infringing works. *Williams v. Crichton,* 84 F.3d 581, 588 (2d Cir.1996) (comparing children's books with novel and movie); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.1976) (comparing children's book with a story in *Sesame Street Magazine*). And this review of the overall similarities considers both copyrightable and non-copyrightable elements since the selection and arrangement of unprotectable elements is itself entitled to copyright protection and may serve as the basis of an infringement claim. *Boisson v. Banian, Ltd*., 273 F.3d 262, 272-73 (2d Cir. 2001); *Horizon Comics Prods. Ins. v. Marvel Entm't, LLC*, 246 F. Supp. 3d 937, 941 (S.D.N.Y. 2017).

In this case, there is overwhelming evidence of substantial similarities in the total concept and feel, theme, characters, plot, setting, sequence, and dialogue of BMR and the *Crave* series.

### i. This Court may properly consider expert testimony to evaluate substantial similarity

Comparing the "total concept and feel" of the relevant elements of each work, including the original selection and arrangement of non-copyright protectable elements, is a substantial undertaking. It requires not only comparing 2,750 pages of the first four *Crave* series books with 2,650 representative pages of the Freeman Copyright Material where the undeniable similarity has been fragmented, rearranged, and dispersed, but also requires an understanding of what is trope or genre convention in young-adult paranormal romance literature. [SSUF 119.] Therefore, Freeman retained Professor Reiss to identify the similarities in story, plot, characters, setting, and language, including where the artistic expression is not identical but closely paraphrased, and to explain where those similarities cannot be attributed to genre conventions or tropes. [SSUF 174, 180]. She has also retained Drs. Chaski and Jouala to address the significance of portions of BMR that have been copied verbatim in the *Crave* series. [SSUF 173, 176-179].

Courts in the Circuit have allowed expert testimony on the issue of substantial similarity in literary infringement cases[9] even though it is not typically used. And this is far from a typical for at least two reasons. First, as with "technical areas" such as comparison of musical compositions, computer software or computer programing code,[10] it can be challenging and complicated for a lay observer, or even the Court, to compare thousands of pages of material

---

[9] *See Price v. Fox Entertainment Group, Inc.*, 499 F.Supp.2d 382, 389 (S.D.N.Y. 2007); *Walker v. Time Life Films, Inc.*, 788 F.2d 44, 48,53 (2d. Cir. 1986) (the bar against expert testimony on the substantial similarity issue should not be "taken literally"); *Currin v. Arista Records*, 724 F.Supp.2d 286, 291 (D. Conn. 2010).

[10] *See, e.g, Computer Associates International, Inc. v. Altai, Inc.* 982 F.2d 693, 713 (2d Cir. 1992); *Mowry v. Viacom International*, Case No. Civ.3090(AJP), 2005 WL 1793773, *10 (S.D.N.Y. 2005).

where Defendants did not appropriate the infringing material wholesale or from only one version of the BMR manuscript, but rather cherry-picked language, scenes, and other story elements from multiple iterations of the BMR and related notes.[11]

Defendants may argue that the *Crave* series does not align perfectly with BMR, but that argument is irrelevant. BMR was designed to be a single novel with multiple storylines whereas Book 1 of the *Crave* series appears to have adapted BMR's main storyline into a stand-alone novel and the subsequent books in the *Crave* series did the same with other storylines taken out of BMR. The result is that the relationships and storylines developed in BMR are revealed more gradually over the *Crave* series. This is a particular type of unauthorized copying that is well-known in the literary world and referred to as "mosaic plagiarism." Mosaic plagiarism uses substitution, insertion, deletion, and premutation of the source material to create a "new" version of an existing work. (SSUF 176, 178, Chaski Rep., ¶ 54.)

The *Crave* series does just that, scattering scenes, character developments, and subplots from BMR across multiple books to tell the same story. One example of this is a storyline from BMR in which the heroine hears a voice in her head. In BMR, the readers learn that the voice is actually her long-lost father called "Athair" who is trapped in his supernatural form in chains at the hands of the ultimate villain, the Vampire Prince. [SSUF 135.] The heroine learns that Athair speaks Gaelic, his kind live in clans and speak telepathically to their kind, and the heroine initially meets him in his supernatural form on an island through a portal. [Id.] This storyline is used in the Crave series through mosaic plagiarism as follows:

---

[11] Relatedly, Wolff has experience with plagiarism software and modifying a work just enough to avoid the obvious signs of plagiarism. [SSUF 93] And she admits ███████████████████████ ███████████████████████████████████. [SSUF 94]. Use of this type of technology is above and beyond the typical knowledge of a lay observer but has been revealed with mathematical certainty by Freeman's forensic linguists.

Crave (Book 1): The Heroine begins hearing the voice in her head.

Crush (Book 2): The Heroine learns that the voice is a creature trapped in his supernatural form in chains on an island and she visits him by portal there. She tries to free him but can't. She promises him she'll be back.

Covet (Book 3): The Heroine discovers that this character is trapped by the ultimate villain in the story, the Vampire King.

Court (Book 4): The Heroine discovers that this character speaks Gaelic, lives in clans, speaks to his kind telepathically, and is actually her grandfather, "Alistar."

As shown in the example above, the storyline is slowly drawn out over the course of several books in *Crave*, but it is the same story with the same development, concept, and feel as originally expressed in BMR. [Id.] Expert testimony will be extremely helpful given the sheer volume of the works and the challenge in seeing the substantial similarity without looking at the entire body of each work.

Second, expert testimony is also critical to addressing Defendants' claims that the similarities are attributable to unprotectable ideas and tropes. Many lay persons will have only a passing familiarity with the young adult paranormal romance genre and what are the shared tropes of such a genre.[12] This is exactly what Professor Reiss teaches and is qualified to evaluate.

Professor Reiss has taken what is voluminous and complicated to compare and made it readily understandable. Her report makes clear that BMR and the first 4 books of the *Crave* series contain substantial–if not striking–similarity of non-trope expression in their original storyline and characters, as discussed above and further below.

---

[12] Although there do not appear to be any published holdings addressing this issue, a number of courts have held that expert testimony may be necessary to determine what are the unprotected, generic tropes of a genre, including in the widely publicized case re the Pirates of the Caribbean film, *Alfred v. Walt Disney Company*, 821 Fed.Appx.727 (9th Cir. 2020)(unpublished).

### ii. The Characters in BMR and Crave are substantially similar

Not only is the overall storyline of the two works remarkably similar, as discussed above (*see* Sec. I(D) above), but there are at least 10 characters between the books that parallel each other in their characteristics, actions, and functions in the respective stories.

"In determining whether characters are similar, a court looks at the 'totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011). Substantial similarity between characters exists where defendants copy the plaintiff's original conception and development of the character. *Smith v. Weinstein,* 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984), *aff'd mem.,* 738 F.2d 419 (2d Cir. 1984). And minor differences only emphasize the extent of deliberate copying. *See e.g., Concord Fabrics, Inc. v. Marcus Brothers Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969) (minor differences emphasize the extent of deliberate copying).

The similarities amongst the characters in each work is abundant, and certainly involves much more than just character names or generalizations. Indeed, each character is significantly developed in both works, making the characters distinct and highly protectable. *See cf., Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."). As shown in Exhibits 36-45 to the Freeman Decl. (Pars. 17-18, 22-23, 26, 29, 32-33, 37-38), the characters in both works do not simply share general traits, they share the same traits expressed through the same combination of unique details. The characters in Freeman's Work are highly developed and distinct, making the similarities between the characters that much more abundant and striking. *See c.f., Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d

Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

### iii. The settings are similar

As discussed above, both works take place in the same overall setting – a high school in Alaska–and there are remarkably similar descriptions of a castle (of which there are in fact none in Alaska). But both also involve scenes that take place in very specific, fairly unique settings within Alaska that are the same. For example:

In both Works, the heroine's witch relative created a vortex that is a portal the Heroine can go through to visit the trapped supernatural being, i.e., the "Abomination" or "Unkillable Beast" (collectively, "Voice 1"). [SSUF 166]. The portal is vortexed and tied to the north and south poles, operating on the energy in Alaska. Upon arriving in the vortex, the heroine notices that the chains holding Voice 1 are mounted to a tree (BMR)/wall(*Crush*). [Id.] The chains are also acting as a magical deterrent that keeps Voice 1 stuck in his supernatural form. [Id.]

In addition, both works involve a refuge for supernatural beings. In BMR, the refuge is called "Katmai" and in *Crave*, the refuge is "Katamere." [SSUF 167]. The refuges are both remote magical places in Alaska where supernatural beings can meet and live together. A small plane must be taken to reach them. And there are many other similar settings. [SSUF 164-168].

### iv. The plot and scenes are similar

In *Shaw v. Lindheim*, the Court found that "where plot is… properly defined as 'the sequence of events' by which the author expresses his 'theme' or 'idea,' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff and defendants work." 919 F.2d 1353, 1363 (9th Cir. 1990). Here, no other conclusion can be reached as both stories focus on the heroine's purpose of "maintaining the

balance" in the supernatural world and the plot unfolds and develops using very similar scenes. [SSUF 145-163].

### v. Substantially Similar Language / Fragmented Literal Similarity.

Finally, even if the storyline and character interactions are not the same (they are), there is an overwhelming amount of common language and close paraphrasing as can be seen in the language indexes that Freeman put together. [SSUF 169-172]. While many of these similarities in isolation could be coincidence, the sheer magnitude of seemingly paraphrased descriptions and dialogue between the works compels a finding of fragmented literal similarity. For example:

| **BMR:** He claimed he wasn't a werewolf but could shift into a wolf. It seemed like a bit of a technicality…." | **Crave:** Well, if you're going to get technical, they're wolf shifters really, more than werewolves." |
| --- | --- |
| **BMR:** A long moment of intense silence descends between us, his fingers locked around my wrist …2013 p. 105 | **Covet:** An awkward silence descends between us, and I honestly don't know …"p. 126 |
| **BMR:** A shiver skitters down my spine. 2013 p. 57 | **Covet:** …and then our gazes collide, and a shiver of fear skitters down my spine. p. 448 |
| **BMR:** …I tried to think of an out to save Rachel's life. "Please," I cried. "She—they're all my best friends! I couldn't bear it if any of them. . . died." He patted my hand. "Hmm. We can't have that, now can we? As important as you are to me . . . What are you willing to barter if I agree to let them live?" "I—I can't think of anything I have that you'd want." He just looked at me, saying nothing. I shook my head, my mind scrambling for an idea….consider fair trade for my friends' lives? …. "Let's make a deal." I said it confidently. 2012 p. 455 | **Court**: The crowd boos and jeers and I rack my brain, trying to figure out the perfect thing to say next. "What I actually want is protection for my friends and myself. Promise me you and your army won't harm or kill us, ever, … "Yes," I say simply, "I am." Because if I say any more, he'll see just how angry I am that he referred to my friends like that. Who the hell is he to call my friends anything? "If that's what you want," he says, walking forward with a slow, measured step. "Let's make a deal." p. 630-631 |
| **BMR:** I took a slow breath as I tried to do the math in my head. "That means he's—he's like—" "Over a thousand years old, give or take a few years. 2010 p. 337 | **Court:** "So then how could she be a thousand years old and still look … At least not until I start to do the math in my head …" p. 369 |
| **BMR**: Meret and I walk for what feels like a mile until we come to a large set of golden double doors… 2016 p. 97 | **Covet:** Either way, we walk down a really, really, really long corridor until we come to a pair of gold double doors. p. 567 |
| **BMR:** "The mirror is a portal between our worlds, child."…She released my hands and I was suddenly pitched forward, falling out of space, out of time, into the nothingness… Finally, after | **Covet:**  I can't wrap my head around it as they walk us into the forest-and straight into a portal …This portal isn't like the ones at the Ludares tournament….There's nothing but a free fall |

| | |
|---|---|
| what felt like a very long time the air stilled; in slow-motion I landed with a solid thump on my knees.  adrenaline coursing through my body….I took in the smell of the pine and the soft sounds of the woods around me. …only the darkness surrounding me and the pale light of the full moon above. Heart pumping, I leapt to my feet and scanned the trees in front of me—..I noticed twinkling candle lights were strewn through the branches… A loud flutter of wings caught me off-guard as a huge raven,…settled itself on the ground ahead of me….My heart pulsed with fear and anticipation….. "Come on!" it seemed to shriek in that inhuman voice. …"All right, all right," I grumbled. "I'll follow…..The forest around us opened to a clearing. …almost as if the forest were lit with lantern light. 2012 p. 495-508 | through darkness that goes on and on and on….I don't know how long the portal takes-probably only a couple of minutes. But it's the longest couple of minutes of my life,….The portal vomits me out in the middle of an obscenely bright room, the lights like giant needles being shoved into my eyes after the absolute darkness of the last few minutes. "I'm disoriented, ..and am more scared than I want to admit when I land on my knees with a hard *thud* that sends pain ricocheting through me…..I'd rather be on my feet … a woman in a severe black business suit and black sunglasses… she is very much watching me, like I'm an animal in a cage…. "You may turn back around now," she says. "And follow me." p. 435-438 |
| **BMR**: …something sparkly caught the light…Tattoos! And they were moving on his fingers, swirling in a strange dance. 2011 289 | **Covet**: …captured by the tattoo that's so bright now, it's practically blinding as it swirls and dances up and down my biceps and forearm. p. 605 |
| **BMR:** "I can smell the demon in you." 2014 p. 329 | **Covet**: "…I definitely smell the gargoyle in you…" p. 229 |
| **BMR:** "You're immune. And you shouldn't be." He looks at me curiously. Why would I be immune when my mother and aunt aren't?"  2013 p. 238 | **Covet:** "Maybe you're, I don't know, immune," he tells him. "Why would I be immune?" p. 560 |
| **BMR:** He reached out and with his thumb and forefinger tilted my chin up, forcing my gaze to meet his. 2010 p. 426; 2013 p. 364 | **Court:** Hudson reaches out and tilts my chin up with his finger until he's holding my gaze in his fathomless blue depths. p. 593 |

Freeman has detailed dozens more pages of similarly paraphrased sentences and paragraphs, including scenes in which (1) the heroine's relative pulls out a black choker/black tie, puts it around the heroine's neck, and compliments how she looks, (2) the heroine talks about dressing like a "newbie" in Alaska, (3) an evil vampire is thrown "across the room" with a loud/giant "wrenching sound," and (4) the heroine describes being embraced by the romantic lead in a bedroom with his scent of "citrus… and waterfalls" (BMR) / "sexy orange and fresh water" (*Crave*). [SSUF 172].

The multitude of similarities amongst character dialogue and idioms used in both works would appear, to any reasonable observer, substantially similar. Indeed, nearly indistinguishable evidence of unauthorized paraphrasing led Little, Brown and Co. to stop distributing Kaavya Viswanthan's debut novel "*How Opal Mehta Got Kissed, Got Wild, and Got a Life*" and cancel her 2-book publishing deal. [SSUF 181]. Therefore, summary judgment is appropriately granted in favor of Freeman in this case.

## VI. CONCLUSION

Freeman worked closely with her trusted agent, Kim, to create a unique and magical work that would meaningfully impact the readers with whom she hoped to connect. After Kim properly shared Freeman's work with Defendants Abrams and Pelletier of Entangled, the three of them improperly worked together with Wolff to turn Freeman's work into a best-selling series for which Freeman received no credit or compensation. But there can be no substantial factual dispute that Freeman holds a valid copyright in the Freeman Copyrighted Materials, that Defendants had access to those materials, and that the first four books of the *Crave* Series are substantially similar to those materials. This motion should therefore be granted.

Respectfully submitted,

Dated: November 22, 2023          By:     */s/ Stephen M. Doniger*
Los Angeles, CA                            Stephen M. Doniger
                                           (admitted *pro hac vice*)
                                           DONIGER / BURROUGHS
                                           247 Water Street, First Floor
                                           New York, New York 10038
                                           (310) 590-1820
                                           stephen@donigerlawfirm.com

                                           **Reeder McCreary, LLP**
                                           11766 Wilshire Boulevard,Suite 1470
                                           Los Angeles, California 90025
                                           (310) 861-2475

mark@reedermccreary.com