## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN,

                Plaintiff,

vs.

TRACY DEEBS-ELKENANEY P/K/A
TRACY WOLFF, et al.,

                Defendants.

Case No.:  1:22-cv-02435-LLS-SN

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT ON THE COPYRIGHT CLAIMS
## AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
*Attorneys for Defendants Tracy Deebs-
Elkenaney p/k/a Tracy Wolff, Entangled
Publishing, LLC, Holtzbrinck Publishers,
LLC d/b/a Macmillan, and Universal City
Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Sylvan
Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN &
GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
*Attorneys for Defendant Tracy
Deebs-Elkenaney p/k/a Tracy Wolff*

# TABLE OF CONTENTS

GENERAL BACKGROUND................................................................................................... 3

   A.  Parties ........................................................................................................... 3

   B.  Procedural History ........................................................................................ 4

ARGUMENT ....................................................................................................................... 6

I.  SUBSTANTIAL SIMILARITY ...................................................................................... 7

   A.  Summary Of The Parties' Works ................................................................. 7

      1.  The Crave Series ................................................................................. 7

      2.  Plaintiff's Manuscript *Blue Moon Rising/Masqued*............................ 15

      3.  Importance Of *Tempest Rising*........................................................... 20

   B.  No Reasonable Jury Could Find Crave And *BMR* Substantially Similar. .................. 20

      1.  The Works Do Not Have Substantially Similar Plots.......................... 23

      2.  The Works Do Not Have Substantially Similar Characters................. 28

      3.  The Works Do Not Have Substantially Similar Settings...................... 34

      4.  The Works Do Not Have Substantially Similar Themes. ..................... 35

      5.  Pace Does Not Support Substantial Similarity. .................................. 36

      6.  The Works Starkly Differ In Their Total Concept And Feel............... 36

   C.  Plaintiff May Not Rely On Freeman's Similarity Indexes, Expert Opinions, Or Additional Manuscripts.......................................................... 38

      1.  Plaintiff's Indexes And Expert Opinions Are Unreliable And Irrelevant............ 39

      2.  The Other Manuscripts Are Forbidden And Would Not Change The Result. ..... 44

   D.  Plaintiff Cannot Prevail Via "Fragmented Literal Similarity." .................................. 46

II.  ACCESS AND INDEPENDENT CREATION ................................................................ 48

   A.  The Actual Genesis Of The Crave Series ................................................... 48

   B.  No Reasonable Jury Could Find For Plaintiff On Access. ......................... 51

      1.  No Reasonable Jury Could Find Direct Access................................... 52

      2.  No Reasonable Jury Could Find Indirect Access Through Kim Or Abrams........ 54

      3.  Plaintiff Woefully Fails To Establish Striking Similarity.................... 57

   C.  Plaintiff Fails To Rebut The Strong Evidence Of Independent Creation. .................. 58

CONCLUSION.................................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Allen v. Scholastic Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011)................................................................ passim

*Amanze v. Adeyemi*,
   2019 WL 2866071 (S.D.N.Y. July 3, 2019)
   *aff'd*, 824 F. App'x 86 (2d Cir. 2020)............................................................... passim

*Beaudin v. Ben & Jerry's Homemade, Inc.*,
   95 F.3d 1 (2d Cir. 1996)..................................................................................... 21

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*,
   150 F.3d 132 (2d Cir. 1998)............................................................................... 46

*Chapman, v. Universal*,
   2010 WL 517480 (S.D.N.Y. Feb. 4, 2010).......................................................... 58

*Computer Assocs. Int'l v. Altai, Inc.*,
   982 F.2d 693  (2d Cir. 1992).............................................................................. 42

*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*,
   409 F.2d 1315 (2d Cir. 1969)............................................................................. 28

*Cox v. Abrams*,
   1997 WL 251532 (S.D.N.Y. May 14, 1997) ............................................... 52, 55, 58

*Currin v. Arista Records, Inc.*,
   724 F. Supp. 2d 286 (D. Conn. 2010)................................................................. 43

*Davis v. United Artists, Inc.*,
   547 F. Supp. 722 (S.D.N.Y. 1982) ..................................................................... 43

*Dean v. Cameron*,
   53 F. Supp. 3d 641 (S.D.N.Y. 2014).................................................................. 45

*DiTocco v. Riordan*,
   496 F. App'x 126 (2d Cir. 2012) ....................................................................... 21

*DiTocco v. Riordan*,
   815 F. Supp. 2d 655 (S.D.N.Y. 2011)
   *aff'd,* 496 F. App'x 126 (2d Cir. 2012)........................................................... passim

*Dreamtitle Publ'g, LLC v. Penguin Random House LLC*,
   2023 WL 4350734 (S.D.N.Y. July 5, 2023) ...................................................... passim

*Gal v. Viacom Int'l, Inc.*,
    518 F. Supp. 2d 526 (S.D.N.Y. 2007)..................................................................... passim

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988)................................................................................. 51, 52

*Giannullo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003)......................................................................................... 40

*Giurca v. Good Samaritan Hosp.*,
    2023 WL 254611 (S.D.N.Y. Jan. 18, 2023) .............................................................. 40

*Green v. Harbach*,
    750 F. App'x 57 (2d Cir. 2019) ............................................................................. 42, 43

*Guity v. Santos*,
    2020 WL 4340417 (S.D.N.Y. July 28, 2020) ........................................................ 46, 47

*Hogan v. DC Comics*,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999)............................................................ 28, 32, 38

*Jorgensen v. Careers BMG Music Pub.*,
    2002 WL 1492123 (S.D.N.Y. July 11, 2002) ........................................................ 51, 52

*Mallery v. NBC Universal*,
    2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007)
    *aff'd*, 331 F. App'x 821 (2d Cir. 2009)................................................................. 28, 38

*Montgomery v. Holland*,
    408 F. Supp. 3d 353 (S.D.N.Y. 2019)
    *aff'd*, 833 F. App'x 361 (2d Cir. 2020)........................................................ 23, 36, 40

*Montgomery v. NBC Television*,
    833 F. App'x 361 (2d Cir. 2020) ......................................................................... passim

*Mowry v. Viacom Int'l, Inc.*,
    2005 WL 1793773 (S.D.N.Y. July 29, 2005) .................................... 40, 43, 51, 52

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)..................................................................................... 21, 36

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930)............................................................................................ 28

*Price v. Fox Ent. Grp., Inc.*,
    499 F. Supp. 2d 382 (S.D.N.Y. 2007)....................................................................... 43

iii

*Procter & Gamble Co. v. Colgate-Palmolive Co.*,
    199 F.3d 74 (2d Cir. 1999) ............................................................ 6, 58

*Reyher v. Children's Television Workshop*,
    533 F.2d 87 (2d Cir. 1976) ................................................................ 36

*Sheldon Abend Revocable Tr. v. Spielberg*,
    748 F. Supp. 2d 200 (S.D.N.Y. 2010) ........................................... 38, 43

*Shine v. Childs*,
    382 F. Supp. 2d 602 (S.D.N.Y. 2005) ................................................ 43

*Tomasini v. Walt Disney Co.*,
    84 F. Supp. 2d 516 (S.D.N.Y. 2000) ...................................... 6, 52, 55

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986) ........................................................ passim

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996) ........................................................ passim

**Statutes**

17 U.S.C. § 102 .................................................................. 22, 27, 55

**Rules**

Fed. R. Civ. P. 37 ............................................................................ 40

Fed. R. Civ. P. 56(a) ......................................................................... 6

Fed. R. Civ. P. 56(c) ....................................................................... 40

Fed. R. Evid. 701 ........................................................................... 39

Fed. R. Evid. 702 ........................................................................... 39

L.R. 56.1(d) ................................................................................... 40

**Other Authorities**

1 William F. Patry, *Copyright Law & Practice* (1994) ............................. 52

Defendants respectfully move for summary judgment on Plaintiff's copyright claims and oppose Plaintiff's unusual and meritless summary judgment motion ("Pl.'s Mem.," ECF No. 284).[1]

This has been a baseless case from the beginning. It concerns young adult (YA) paranormal romance novels that are so wildly different in so many significant respects that no reasonable jury could ever find them similar at all, let alone substantially similar. The works themselves have vastly different plots, characters, and settings, and are so different in scope, world building, tone, voice, and writing quality that the thesis that Tracy Wolff resorted to copying from Lynne Freeman is not plausible let alone supported. Across a year of discovery, Plaintiff failed to adduce ***any*** evidence that her unpublished manuscript was copied (or even accessed) by Wolff or Elizabeth Pelletier, and then delayed summary judgment with voluminous expert disclosures that are irrelevant to substantial similarity and will not withstand *Daubert*. The Court may now at last compare the parties' "works themselves"—and will see from the first few chapters alone why Defendants have been stressing the need to do this from the outset.

Plaintiff continues to avoid and distract from the requisite "detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996), in favor of expert reports and self-serving similarity "indexes" assembled by Lynne Freeman personally, which grossly distort the works and fail to create a triable issue. Even if Plaintiff's extraneous materials were admissible (they are not), they are inapposite because "the works themselves supersede and control contrary descriptions of them." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir.

---

[1] Defendants collectively are Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal"). As used herein, "*BMR*" refers to all versions of Plaintiff's manuscript, including those entitled either *Blue Moon Rising* or *Masqued*. "Crave" (non-italics) refers to the Crave series as a whole, while "*Crave*" (italics) refers to book one. The parties' respective Rule 56.1 statements are referred to as "PSUF" (ECF Nos. 281, 289) and "DSUF." Defendants' response to the PSUF is "CSUF." Internal citations are omitted from, and emphasis added to, all citations herein.

1986). Plaintiff's heavy reliance on experts only proves that her claims fail, since if the alleged copying is purportedly too subtle for ordinary readers to notice without the aid of experts, it necessarily follows that ordinary readers could not find the works substantially similar.

Instead, any reasonable reader would find that Plaintiff's misleading similarity claims are false. For example (and this is just the tip of the iceberg):

- Plaintiff claims the books share "overall storylines." But storyline ideas are unprotected—only an author's specific expression of a plot idea is copyrightable. Plaintiff claims her central storyline of "a teenaged heroine who turns out to be paranormal and must fight a supernatural war" was infringed, but this generic idea is common in fiction and the works here could not express it more differently.

- Plaintiff claims the books' protagonists Anna (*BMR*) and Grace (Crave) are similar, but, *inter alia*: (1) Grace has a feisty and quirky personality while Anna is more insecure and reserved; (2) Grace is a gargoyle who can fly and heal, while Anna is a witch who practices Tarot and has premonitions; (3) Grace initially doesn't know she's paranormal, while Anna knows she's a witch from the outset; (4) Grace's parents died tragically right before the story begins, while Anna's mother is living and it turns out her father is too; and (5) Grace attends a remote paranormal boarding school in the mountains, while Anna goes to a normal public school in a city.

- Plaintiff claims that Grace's initial boyfriend Jaxon is similar to Anna's boyfriend Ash, ignoring that Grace's main love interest is Hudson, not Jaxon. In any event, Jaxon is a pale vampire with a jagged facial scar and the power of telekinesis, while Ash is a rosy-cheeked, sun-kissed werewolf with "supermodel" looks. Jaxon has conflicting emotions toward Grace while Ash's feelings for Anna are straightforward.

- Plaintiff claims the books' villains are similar, but Crave's main villain Cyrus (Jaxon/Hudson's father) is a megalomaniac vampire king who leads large armies to try to take over the world, while *BMR's* main villain Ronan (nobody's father) is a Druid priest who privately stalks Anna as a raven.

- Plaintiff claims the books' settings are similar, but she does not own the idea of "a high school in Alaska" and her own expert admits the works' schools are "very different." Crave visits multiple fully realized paranormal settings across the globe while *BMR* mostly takes place at ordinary locations (like restaurants and stores) in Anchorage.

- Plaintiff all but concedes that the books wildly differ in total concept and feel—the most important consideration. The capacious Crave story, spread across four long books, is written in a fun, casual, and quirky tone with an emphasis on humor. *BMR* is a single story written in a more serious tone with little humor, and it does not address

Crave's many unique themes such as diversity/inclusion. Here again, Plaintiff's own expert concedes that the works differ in "tone and voice."

Plaintiff resorts to claiming infringement of unprotected elements such as general ideas, *scènes à faire*, and short phrases. But Plaintiff does not have a monopoly on any of these elements. She is not the only one allowed to set paranormal stories in Alaska, write about dangerous romance with "hot" boyfriends, or feature a "unique" heroine who must "maintain balance." And Plaintiff obviously cannot protect short phrases like "oh my god" or "well, well, well," or single words like "yogurt" (remarkably alleged to be infringed in one of Freeman's indexes). None of these, themselves or in combination, supports substantial similarity across novel-length books. As fully shown below, only Defendants are entitled to summary judgment due to (1) a resounding lack of substantial similarity; (2) no evidence that Wolff or Pelletier accessed *BMR*; and (3) strong, credible, and unrefuted evidence of Crave's independent creation.

## GENERAL BACKGROUND

### A.   Parties

Plaintiff Lynne Freeman, a non-practicing family law attorney primarily residing in California, is the alleged author of *BMR*. (DSUF ¶ 1.)[2] Plaintiff's husband Trent Baer, an investment advisor, has been actively involved in prosecuting this lawsuit. (DSUF ¶ 2.) *BMR* was revised around 50 times and rejected by over 20 different publishers. (DSUF ¶¶ 23, 58.)

Tracy Wolff, the author of Crave, is an award-winning and bestselling author of over 70 books that span the genres of adult and YA literature. (DSUF ¶ 3.) Beginning in 2008, Wolff has written for Penguin Random House, Hachette, HarperCollins, and many other major publishers. (*Id.*) She first appeared appearance on the *New York Times* and *USA Today* bestseller lists in 2014.

---

[2] Defendants do not contest Plaintiff's claim of ownership of her works for the purposes of this motion.

(*Id.*) Entangled is Crave's publisher. (DSUF ¶ 6.) Entangled's CEO Elizabeth Pelletier co-created the concept of Crave with Wolff and served as content editor (meaning substantive edits and changes). (DSUF ¶¶ 7, 92-94.) Entangled editor Stacy Abrams served as copy editor (meaning proofreading edits). (DSUF ¶ 95.) Literary agent Emily Kim represents Wolff and previously represented Plaintiff. (DSUF ¶¶ 9-10.) Macmillan is Crave's distributor. (DSUF ¶ 12.) Universal has licensed certain rights in a film adaptation of *Crave* from Entangled. (DSUF ¶ 13.) Macmillan and Universal were not involved in writing or creating Crave. (DSUF ¶ 14.)

### B.   <u>Procedural History</u>

Plaintiff filed suit on March 25, 2022 and a First Amended Complaint ("FAC," ECF No. 24) on May 23, 2022. The FAC asserts three claims for copyright infringement against Wolff, Kim, Prospect, Entangled, and Macmillan (Counts V-VII) and a declaratory judgment that Universal may not produce a *Crave* movie (Count VIII) (there is no copyright claim against Universal). (FAC pp. 78-83.) Because Plaintiff did not provide a copy of her unpublished manuscript with any of her pleadings (or for months thereafter), Defendants could not move to dismiss and were forced to answer (ECF No. 43) and proceed to discovery.

Since obtaining Plaintiff's manuscript, Defendants have repeatedly stressed that this case will be resolved on substantial similarity when the books themselves are compared. To that end, Defendants recently sought an expedited ruling on substantial similarity—a request that Judge Stanton first granted (ECF No. 218) but then vacated and withdrew (ECF No. 253). The parties then timely completed expert discovery and have proceeded to summary judgment.

***Fact discovery.*** Fact discovery lasted nearly a year due to Plaintiff's multiple extension requests. Defendants collectively produced 41,569 documents, including approximately 32,700 emails, 19,414 pages of text messages (often long chains spanning months of conversation), and various stand-alone documents including numerous Crave drafts. (DSUF ¶ 76; Cole Decl. ¶ 21.)

Plaintiff first produced copies of her manuscript on August 2, 2022. (*Id.*) Plaintiff took 10 fact depositions, including of Wolff, Pelletier, Abrams, Kim, and three of Kim's employees (none of these lasted the full seven hours). Defendants deposed Plaintiff and Baer.

To resolve a dispute regarding how many *BMR* manuscripts are at issue, the Court ordered the parties to draft "infringement letters" outlining how they intended to prove and defend Plaintiff's copyright claims, which the parties filed on January 4, 2023. (ECF Nos. 102, 103 ("Pl.'s Inf. Ltr.").) In response to the infringement letters, Your Honor ordered Plaintiff to select two versions of *BMR* to use for a substantial similarity comparison. ("Manuscripts Order," ECF No. 105.) Plaintiff selected a 2011 draft entitled *Blue Moon Rising* with Bates LF03750-LF04352 ("*BMR 2011*," Cole Ex. E) and a 2013 draft entitled *Masqued* with Bates LF06904-LF07371 ("*BMR 2013*," Cole Ex. F). (ECF No. 111.)[3] Judge Stanton upheld the Manuscripts Order ("Manuscripts Affirmation," ECF No. 141), and then issued a Clarifying Memo Endorsement ("CMO," ECF No. 181) that did not alter the prior rulings as explained below.

***Expert discovery.*** Even though this case concerns YA books written at a high school level, Plaintiff tendered **six** liability experts. Kathryn Reiss, an author and writing teacher, was retained to "catalogue what I believe to be the notable similarities" between *BMR* and Crave and then "render an opinion as to whether those similarities are qualitatively significant." (Reiss Rep. (Doniger Ex. 36) ¶ 5.) Drs. Carole Chaski and Patrick Juola are "forensic linguists" who purport to "have performed a computational and statistical analysis" to "determine the degree of similarity between [the parties'] works." (*E.g.*, Juola Rep. (Doniger Ex. 37) ¶ 1; Chaski Rep. (Doniger Ex. 35) ¶ 17.) Defendants' single affirmative expert, YA publisher Emily Easton, identifies common

---

[3] For unknown reasons, Plaintiff did not include the manuscripts with these Bates ranges as exhibits to her summary judgment motion. However, it appears that Exs. 14 and 17 to the Freeman Declaration are, respectively, *BMR 2011* and *2013*, but with different Bates numbers. (*See* Cole Decl. ¶ 15.) To avoid any doubt, the Court should rely on Cole Exs. E and F (the actual Bates versions) instead.

tropes used throughout the YA paranormal romance genre, including in many books predating *BMR* and *Crave*. (Easton Rep (Cole Ex. AA) at 5-8, 15-49.)[4] Defendants' rebuttal expert Dr. Malcolm Coulthard—the forensic linguist whose work Drs. Chaski and Juola principally rely on— mostly rebuts their opinions (which should not be considered). However, Dr. Coulthard's detection of Plaintiff's own verbatim copying from the script of a TV show (Coulthard Rep. (Cole Ex. Z) ¶¶ 33-37) is relevant because it helps show what real plagiarism might look like.

## ARGUMENT

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is appropriate when the evidence "is so one-sided that one party must prevail as a matter of law." *Williams*, 84 F.3d at 587. Courts "have regularly granted summary judgment" on copyright claims "where it is 'clear' that the plaintiff cannot make out the essential elements of the claim." *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000).

Plaintiff must prove that (1) Defendants "actually copied" her manuscripts (which includes establishing access); and (2) "the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Montgomery v. NBC Television*, 833 F. App'x 361, 363 (2d Cir. 2020); *Walker*, 784 F.2d at 48 (similar). Additionally, Defendants may prevail by showing that unrebutted "evidence of independent creation" negates the claim of infringement. *Procter & Gamble Co. v. Colgate-Palmolive Co.*, 199 F.3d 74, 77 (2d Cir. 1999).

---

[4] Easton also provided a rebuttal report (Cole Exs. BB-CC) out of an abundance of caution in case Reiss's opinions are not excluded. Defendants do not presently rely on Easton's rebuttal analysis and her rebuttal report is not an admission that experts may directly opine on whether the works are substantially similar.

I.    **SUBSTANTIAL SIMILARITY**

A.    **Summary Of The Parties' Works**

Since "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams*, 84 F.3d at 583, a summary of each of the works at issue follows:

1.    The Crave Series

The Crave series currently consists of six published novels—*Crave* (2020); *Crush* (2020); *Covet* (2021); *Court* (2022); *Charm* (2022); and *Cherish* (2023). (DSUF ¶ 15.) Only the first four are currently at issue. (DSUF ¶ 16.)

Crave is often described as "Harry Potter meets Twilight," in that it melds the magical, boarding school elements of Harry Potter with the vampire romance made popular by the Twilight series. (DSUF ¶ 20.) The plot of each Crave book is detailed and distinct. Collectively, they tell a sprawling story in which teenaged protagonist Grace Foster is introduced to a paranormal world of witches, vampires, gargoyles, dragon shifters, and wolf shifters, becoming a major player in a centuries' old strategic chess game between the forces of Order and Chaos. Through all of this, Grace falls in and out of love, repeatedly overcomes dangerous paranormal obstacles, and develops a mature understanding of relationships, love, leadership, the complexities of the world, and how to cope with life's inevitable challenges.

The Crave books are written in a modern tone with an emphasis on humor, diversity/inclusion, and teen culture. The first four books primarily take place at and around Katmere Academy, a gothic castle and magical boarding school hidden within the remote Denali mountains in Alaska. Numerous additional locations, both supernatural and not, are introduced over the course of the series. The first four books take place over eight months, including a four-month time gap between books one and two.

Crave explores numerous themes, many of which are common in YA romance and teen literature, including: coming of age; love and family; self-discovery and self-reliance; feminism; pushing past stereotypes and preconceptions; trust, loyalty, betrayal, and forgiveness; grappling with mortality, grief and forces beyond one's control; bravery, sacrifice, and leadership; the nature, responsibility, and abuse of power; chaos versus order and checks and balances; the nature of evil; and the power of humor, friendship, compassion, and (per the heroine's name) grace.

While the Crave books speak for themselves, a brief summary of each follows:

a)      *Crave*

*Crave* begins when short, curvy, curly-haired Grace moves from San Diego to remote Katmere Academy mere weeks after both her parents die suddenly in a car crash. (*Crave* (Cole Ex. A) pp. 1-11.) Her Uncle Finn is Katmere's headmaster and her younger cousin Macy is a junior and Grace's roommate. (*E.g., id*. pp. 6, 18-19.) Unbeknownst to Grace, Katmere is a bona fide magical school (like Hogwarts in Harry Potter), where the student body is divided into four factions—vampires, witches, wolf shifters, and dragon shifters—who variously align with and/or distrust each other. (*E.g., id*. pp. 313-321, 398-504.) Paranormal power is woven into the fabric of the school; the students take classes about supernatural topics and regularly discuss and display their powers openly (except in front of Grace at first). (*E.g., id*. pp. 96, 317-323, 342-369.)

Grace begins mired in grief at the loss of her parents and struggling to accept her starkly different new life. (*E.g., id*. pp. 1-11, 28-29, 50-51, 248-249.) Throughout the book, Grace believes she is a normal girl with no paranormal powers. (*E.g., id*. pp. 322-338.) Grace's initial love interest is the mysterious and surly Jaxon Vega, eventually revealed to be a nearly 200-year-old vampire with telekinetic powers and prince of the royal vampire family. (*E.g., id*. pp. 391-392, 439-441, 559-562.) He hangs out with a diverse group of five other vampires (the "Order"), the coolest clique in school. (*E.g., id*. pp. 135, 348.) Unbeknownst to Grace, she and Jaxon magically bond as

"mates" upon their first meeting. (*Id*. pp. 21-31, 86-87, 538-547.) Jaxon acts distant at first (mostly for Grace's safety), but as the story goes on, he saves Grace from other paranormal students who try to hurt and kill her, and the two fall in love. (*Id*. pp. 56-60, 330-334, 553-555.)

The other main characters in *Crave* are: (1) Macy, a kind, fun, and girly witch who emotionally supports Grace as she transitions to life at Katmere and joins the paranormal world; (2) Lia, a female vampire of East Asian descent who appears to be quiet, nerdy, and friendly, but is secretly plotting to use Grace as a human sacrifice in a magical spell to resurrect Jaxon's (believed to be deceased) older brother Hudson; (3) Flint, a tall and muscular half-Egyptian, half-Irish dragon shifter who is friendly and flirty with Grace even as he plans to kill her to prevent her from being used in Lia's plot; and (4) Heather, a feisty, gay, Black girl who is Grace's best friend from home and regularly texts with Grace, providing a contrast between Grace's old and new lives. Major series character Hudson only appears briefly at the very end of *Crave* but is often discussed and Lia's plan to "resurrect" him drives the book's central conflict.

Over the course of the book, Grace continually experiences oddities and dangers as she eventually learns the "truth" about Katmere and its paranormal denizens. (*E.g., id*. pp. 344-345.) On her first night, two wolf shifter students try to intimidate her by throwing her out into the cold, but Jaxon intervenes and saves her. (*Id.* pp. 52-60.) Later, Grace leaves an intimidating welcome party and meets Lia, who secretly poisons her. (*Id*. pp. 97-107.) Flint later knocks Grace out of a tree during a snowball fight in an attempt to kill her to prevent her role in Lia's plot. (*Id.* pp. 152-152; *see also id*. pp. 403-417, 553-555 (later revealing Flint's motivation).) Over the course of the book, Grace and Jaxon's relationship escalates, and the two first kiss in a climactic scene where Jaxon is so overcome by passion that he loses control of his powers and causes an earthquake. (*Id*. pp. 260-272.) At the end of *Crave*, Jaxon manages to interrupt Lia's spell and rescue Grace (Lia

9

is killed). (*Id.* pp. 469-497.) A week later, after things seem back to normal, Hudson appears in a puff of smoke in the school hallway, swinging a sword toward Jaxon. (*Id.* pp. 522-537.) Grace steps in to take the blow, and then immediately and mysteriously turns to stone. (*Id.*)

     b)   *Crush*

  *Crush* begins four months after *Crave* ends. Hudson is now a major character, and a central plot point of *Crush* involves him being trapped inside Grace's head where only she can hear and see him, creating romantic tension and leading to an emotional climax where Jaxon and Grace's mating bond is broken. Another running plot point is "Ludares"—a sports game much more bloody, dangerous, and high-stakes than Quidditch (Harry Potter).

  Grace, Jaxon, Hudson, Macy, and Flint remain major characters (Flint notably admits to Grace that he is gay and in love with Jaxon (*Crush* (Cole Ex. B) p. 388), as do members of Jaxon's clique the Order, including Mekhi. Other notable characters include: (1) Cyrus—Jaxon and Hudson's father, the Vampire King and ultimate villain of *Crush*, *Covet*, and *Court*; (2) Cole, the wolf shifter alpha, who was briefly introduced in *Crave* and now plays a bigger role as a minor villain; (3) Cassia, nicknamed the "Bloodletter," Jaxon's thousand-year-old mentor and the most feared vampire in the world, who looks like a harmless little old lady and is magically imprisoned in an ice cave; (4) the Unkillable Beast, a huge, fearsome, rock-covered creature who has been alone and restrained with unbreakable cuffs in a volcano for a millennium; and (5) Xavier, a charming and fun wolf shifter who is new to Katmere and with whom Macy falls in love.

  *Crush* begins with Grace finding out that she has been frozen in stone for four months and that she is a "gargoyle"—a type of paranormal creature long believed extinct. (*Id.* pp. 12-24, 31.) Grace has newfound paranormal gargoyle powers such as flight (*e.g.*, *id.* pp. 102-103) and the ability to heal others (*id.* pp. 513-518)—in a major scene, Flint shifts into a dragon and takes Grace for a ride on his back as her first flying lesson (*id.* pp. 273-285). But she soon realizes something

is wrong, waking up bloody to find that she has unconsciously been stealing high-value magical objects from throughout the school. (*Id.* pp. 82-121.) She eventually learns that Hudson is trapped inside her head and is manipulating her actions. (*Id.* pp. 121-129.)

The Bloodletter reveals that a special spell is needed to free Hudson, requiring one elusive magical item from each of Katmere's paranormal factions. (*Id*. pp. 167-171.) Grace's group proceeds to search for the objects, variously competing in Ludares to win a vampire bloodstone and completing a near-fatal mission to recover a dragon bone from an underground dragon boneyard. (*See id*. pp. 402-409, 449-466.) They travel to the Unkillable Beast's volcanic island near the North Pole to retrieve the final magical object (the gargoyle's heartstone), where Xavier is killed and others are badly injured during the ensuing violent struggle. (*Id*. pp. 523-550.)  The Unkillable Beast turns out to be a gargoyle with whom Grace can communicate telepathically; he offers Grace his actual heart but she refuses to take it. (*Id*.)

Returning to Katmere, Grace and her mate (then Jaxon) must prevail in an unfairly lopsided Ludares match to establish Grace's rightful gargoyle seat on the "Circle," the royal paranormal governing body. (*See id*. pp. 486-494 (explaining backstory).) As the match starts, Cole suddenly approaches and severs the Grace-Jaxon mating bond, leaving them devastated. (*Id*. pp. 563-567.) Grace is nearly defeated when Hudson manages to feed her his power, allowing her to regroup and prevail. (*Id*. pp. 624-632.) But as she goes to claim her seat on the Circle, Cyrus bites her, injecting her with deadly venom. (*Id*. pp. 633-642.) Hudson carries Grace into the mountains and buries her alive to use the earth to heal her. (*Id*. pp. 649-656.) Grace finally puts her full trust in Hudson—a major climax and turning point. (*Id.*) Hudson saves Grace and the book ends with him saying: "Jaxon, if you wouldn't mind, take your f***ing hands off my mate." (*Id*. pp. 657-663.)

c)      *Covet*

*Covet* begins the day after *Crush* ends and spans about eight weeks, during which Grace turns 18 and graduates from high school. Throughout the novel, Grace must balance her deep feelings for both Hudson and Jaxon, who continually damage each other in uncontrollable ways. Major new settings include the Aethereum (a fearsome prison in New Orleans), Giant City in the California redwoods, and the Dragon Court in New York City.

Returning major characters include Grace, Jaxon, Hudson, Macy, Flint, Cyrus, the Bloodletter (revealed to be the God of Chaos), and the Unkillable Beast. Notable new characters include: (1) Nuri and Aidan, Flint's parents and the Dragon Queen and King; (2) several giants, including Vander, the "Blacksmith"; (3) Luca, a vampire, member of the Order, and Flint's boyfriend; (4) Adria, nicknamed the "Crone" (revealed in *Court* to be the Bloodletter's sister and God of Order); (5) Remy, a teenaged time wizard who speaks with a New Orleans drawl and his female manticore prison roommate Calder; and (6) Aethereum prison warden Charon.

*Covet* opens at Katmere with Grace devastated by how her decisions led to her close friend Xavier's death. (*Covet* (Cole Ex. C) pp. 1-4.) As Grace struggles to graduate, she learns that Jaxon is deeply hurting and that she may need to break her mating bond with Hudson to save him. (*Id.* pp. 65-69.) The Bloodletter instructs Grace and friends to retrieve a magical object from the Unkillable Beast to defeat Cyrus, and also to find the Blacksmith (Vander) to obtain the key to the Unkillable Beast's unbreakable cuffs (it is later revealed the Bloodletter is manipulating them as part of a larger scheme). (*Id.* pp. 116-122.) Meanwhile, Cyrus has put a warrant out for Grace and Hudson's arrest, which could result in them being imprisoned in the Aethereum. (*Id.* pp. 134-137.) Grace and her friends fly (mostly via dragon back) to Giant City to search for Vander, but learn that he has long been imprisoned in the Aethereum. (*Id.* pp. 208-256.) Flint later invites the group to attend a festival at the Dragon Court in New York City. (*Id.* pp. 287-300.) Grace and friends

attend the lavish ball, followed by a huge festival in Times Square, after which Grace and Hudson dance on the roof of the Dragon Court and then make love all night. (*Id*. pp. 330-377.)

The group later visits a tropical island to meet the Crone, who reveals that Jaxon no longer has a soul following the severance of his and Grace's mating bond. (*Id*. pp. 386-390, 414-417.) After the group returns to Katmere and graduates, vampire guards storm the school and arrest Hudson, Grace, and Flint. (*Id*. pp. 428-432.) The three are sent to the Aethereum, where they meet Vander and are forced by Charon to battle giants to escape. (*Id*. pp. 433-574.) Grace's group then travels to the Unkillable Beast's volcanic island to free him. (*Id*. pp. 618-619.) But Cyrus and his allies are lying in wait and an epic battle ensues, in which Luca dies and others are badly injured. (*Id*. pp. 620-642.) Cyrus is ultimately defeated but flees. (*Id*. pp. 620-648.) Grace frees the Unkillable Beast, who then shifts into a man. (*Id*. pp. 649-654.) The book concludes with an epilogue from Hudson's point of view, where he resolves to finally reveal to Grace what the green string inside her (previously introduced in a scene in *Crush*) really is. (*Id*. pp. 655-680.)

<div align="center">d)    <em>Court</em></div>

*Court* begins immediately after *Covet*. Major *Court* plot threads include discovering the truth about Grace's lineage; the increased role of Grace's multicolored internal strings; new tension between Grace and Hudson; awkward sexual tension between Flint and Jaxon; Grace's struggle to earn dismissive gargoyle general Chastain's approval; and freezing time.

The main non-deceased Crave characters return (the Unkillable Beast now a man named Alistair). Notable additional characters include: (1) gargoyle general Chastain, who dislikes Grace, and his more friendly second-in-command Artelya[5]; (2) Jikan, the God of Time, a largely comic

---

[5] Named after the nurse who cared for Wolff's terminally ill mother at the time. (Wolff Decl. ¶ 21.) Another character, Middle Eastern non-binary wolf shifter Dawud, is named after Wolff's father who died when she was 22. (*Id*.)

relief character who is Japanese, dresses outrageously, and speaks in malapropisms; (3) Izzy Vega, Jaxon and Hudson's previously unknown half-sister, who is half-Latinx, dresses in black leather, and wields multiple knives; (4) Macy's mother Rowena, who has long been Cyrus's prisoner; and (4) Hudson/Jaxon's mother Delilah, the Vampire Queen, turned vicious from centuries of Cyrus's abuse. Major new settings include: (1) the Gargoyle Court, located in the Cliffs of Moher, Ireland; (2) the ornate, Venetian-styled Witch Court in Turin, Italy; (3) an elaborate lighthouse Airbnb where the group hangs out and recuperates; and (4) the Vampire Court in London, including its crypts and dungeons. Katmere Academy is destroyed early in the book but its grounds host an epic battle at the end.

*Court* begins with Grace's group returning to Katmere, grieving Luca and finding that all students have been kidnapped. (*Court* (Cole Ex. D) pp. 5-9.) Alistair magically transports Grace to the Gargoyle Court, where she meets the Gargoyle Army, a group of thousand-year-old soldiers who have been frozen in time to prevent their death from a poison Cyrus had long ago given them. (*Id*. pp. 30-44.) Cyrus's army then arrives at Katmere, and Grace's group narrowly escapes through a Macy-created portal after the nearly defeated Hudson and Jaxon combine powers and turn the beloved Katmere to dust as a last-ditch effort to escape. (*Id*. pp. 59-75.)

After the group is turned away at the Witch Court (who fear Cyrus) and cannot access the frozen-in-time Gargoyle Court, Hudson treats them to an epic stay at the lighthouse Airbnb where hijinks ensue, including Jaxon walking in on Hudson and Grace in flagrante delicto. (*Id*. pp. 80-89, 118-123; 226-230.) The group visits the Bloodletter, who reveals that she is Grace's many-great grandmother, making Grace a demigod of chaos. (*Id*. pp. 153-182.) She instructs that Grace must free the gargoyles to defeat Cyrus, but this requires an antidote to Cyrus's poison, obtaining which in turn requires winning the deadly Impossible Trials. (*Id*. pp. 183-205.) The group then

travels to an outdoor mall in St. Augustine, Florida to obtain the antidote (the "tears of Elios"), guarded by a sexy witch named Tess who works in a taffy shop. (*Id*. pp. 206-217.)

The group travels to the Vampire Court in London, where Izzy arrives in a flurry of knives and throws them in the dungeons, where they find the kidnapped Katmere students and learn that Rowena is alive and Cyrus's prisoner. (*Id*. pp. 249-257.) Cyrus offers to spare them after Grace reluctantly agrees to obtain the magical "God Stone" from the Gargoyle Court. (*Id*. pp. 273-283.) After Grace retrieves this from Chastain (*id*. pp. 284-288, 394-401), Cyrus reneges and imprisons Grace's group, but they escape with the aid of Grace's time-freezing power (*id*. pp. 413-455). The group later competes in the Trials, which prove fatal for several characters and culminates with a battle against a horrifying and ever-growing beast. (*Id*. pp. 471-569.) Grace shows mercy to the beast, who cries, revealing that its tears are the searched-for antidote. (*Id*. pp. 569-580.)

Back at Katmere (now a pile of rubble), Cyrus with his huge army captures Grace's group, traps them in a power-transfer machine activated by the God Stone, and successfully becomes a false god. (*Id*. pp. 587-646.) When all appears lost, Izzy switches sides and Grace harnesses her powers as the demigod of chaos, finally able to command the Gargoyle Army. (*Id*. pp. 645-661.) Cyrus and his army are vanquished in an epic battle. (*Id*. pp. 662-665.) Grace magically traps Cyrus in the Bloodletter's ice cave with Delilah, who can eternally feed off of him to make up for years of abuse. (*Id*. pp. 666-670.) The now-freed Bloodletter congratulates Grace for a chess game well played, and Grace's group returns to the lighthouse Airbnb for much deserved R&R. (*Id*.) In a final cliffhanger, Grace tells Hudson "I remember *everything*" (referring to her months trapped in stone after *Crave*). (*Id*. pp. 671-677.)

2.   Plaintiff's Manuscript *Blue Moon Rising*/*Masqued*

As noted above, Plaintiff selected *BMR 2011* and *BMR 2013* to serve as the basis for a substantial similarity comparison pursuant to the Manuscripts Order. Plaintiff now backtracks and

attempts to rely on four additional versions of *BMR* plus nine sets of informal notes (Pl.'s Mem. at 1; Freeman Decl. ¶ 7), which should be rejected as explained below. Notably, three of these additional *BMR* drafts were created after the Plaintiff-Kim relationship ended in March 2014. (Cole Decl. ¶¶ 18-20 & Exs. P-R; DSUF ¶ 24.)

*BMR* centers around Anna (Annelise) St. Claire, a 16-year-old high school junior who lives in Anchorage, Alaska in a private home with her mother Marcheline and aunt Brienne. (*BMR 2011* pp. 8-13; *BMR 2013* pp. 11-15.) Anna descends from a family of witches and has the power to read Tarot cards; her Tarot readings and myriad prophetic dreams/visions are a recurring plot point. (*E.g.*, *BMR 2011* pp. 2-6, 461; *BMR 2013* pp. 2-10, 90.) Anna has a strained relationship with the controlling and secretive Marcheline, who discourages Anna's witchcraft (*e.g.*, *BMR 2011* pp. 8-14) (the relationship is less strained in *BMR 2013*). Depending on the version of *BMR*, Anna had moved to Anchorage at age seven from either "San Diego" (*BMR 2011*) or "California" (*2013*) with Marcheline and Brienne following her father and grandparents' deaths. Beyond Tarot and witchery, Anna is a typical frustrated teenager who attends a normal, non-magical public high school where she confronts typical teen issues like social status, crushes, and jealous frenemies. (*E.g.*, *BMR 2011* pp. 28, 30, 84; *BMR 2013* pp. 20, 96, 138.)

*BMR's* main characters are Anna, Marcheline, Brienne, and Ash Mackay—a mysterious new student with "supermodel" looks who becomes Anna's love interest and turns out to be a powerful and protective werewolf. Other notable characters include: (1) Taylor, the jealous and vindictive alpha of Anna's friend trio, described as blonde, blue-eyed, and conventionally attractive; (2) Brendan, a stereotypical "gay best friend"; (3) Lily, Ash's also conventionally attractive sister, also a werewolf; (4) Drs. Baen and Caitlin MacKay, Ash and Lily's parents, who ostensibly came to Anchorage to teach Ancient Global Studies but are really shapeshifters fighting

a supernatural war; (5) an evil (*BMR 2011*) or perhaps less evil (*2013*) Druid priest named Ronan O'Faiolain (*2011*) or Ronan Faiolain (*2013*), who stalks Anna in raven form for much of the story; (6) Julian, a British vampire (*2011*) or French incubus (*2013*) who abducts Anna to try to marry her; (7) Elise, revealed to be the High Priestess of Avalon and Anna's real mother (*2011*) or grandmother (*2013*); and (8) Dante, Anna's father, who Anna believes died in an elevator accident (*2011*) or place crash (*2013*), but is alive in wolf form in another dimension.

      *BMR* primarily takes place at Anna's and Ash's homes; the public high school, including its parking lot, cafeteria, classrooms, and hallways; other local spots like a Barnes & Noble, a restaurant, and a bluff; the Sanctuary (a neutral supernatural territory accessed through a famous bar in Anchorage); and in *BMR 2013* only, an enchanted forest called "the Gloaming." *BMR* unfolds across approximately four months, beginning with Anna's third week of school and ending around her birthday in December. *BMR* could be construed as expressing common YA romance themes including: overcoming personal insecurities and internal conflict; family dynamics and secrets; love and attraction; social challenges, including the desire to fit in; trust, loyalty, betrayal, sacrifice, and forgiveness; and regret and responsibility.

      a)    *BMR 2011*

      *BMR 2011* introduces Anna while she is having a vision during a Tarot reading. (*BMR 2011* p. 2-7.) Anna is having increasing visions and knows that her mother and aunt are keeping secrets from her. (*E.g.*, *id*. pp. 65-73.) As the school year starts, mysterious new students Ash and Lily arrive, looking "rock-star-chic" on a motorcycle. (*Id*. pp. 15-20.) Anna initially doesn't think Ash is her type, but they proceed to fall for each other, to Taylor's jealous chagrin. (*E.g.*, *id*. pp. 24-29, 161-166.) As the story unfolds, Anna repeatedly performs Tarot readings (including about Ash) and has numerous foreboding dreams/visons; is continually stalked by a raven; develops a strange tingling and growing rash on her neck; probes her mother and aunt for information about

17

her family; and butts heads with Taylor (in one scene seeming to manifest a zit on Taylor's face, and later fighting at a party). (*E.g.*, *id*. 85-93, 107-108, 139-140, 152-155, 209-214, 350-355.) Meanwhile, teen girls are being mysteriously abducted. (*Id*. pp. 59-60.)

Ash takes Anna to a bluff to watch the Northern Lights and his eyes frighteningly glow as they have their first kiss, reminding Anna of a vision. (*Id*. pp. 167-173.) Later, at a Barnes & Noble, Ash reveals that he is a werewolf and that a paranormal war is afoot, featuring demons who are searching for "the one" who is "tied to both houses, light and the dark" and the "key to tipping the balance of the war." (*Id*. pp. 221-250.) Anna later returns to school and rescues Ash's mother from an attacking "buidseachd" demon[6] but is stabbed in the belly and badly bleeding, prompting Ash to bite her to save her (confirming a previous vision about being bitten). (*Id*. pp. 391-415.)

Anna and Ash later visit the Sanctuary, where she notices an apparent vampire eyeing her. (*Id*. pp. 487-497.) Anna leaves but is abducted by thugs in the parking lot and brought to a Tudor mansion, where the vampire (Julian) tells Anna about Elise (also previously seen in a vision). (*Id*. pp. 512-537.) Julian explains that Elise is Anna's real mother, he believes Anna in fact is Elise, and he wants to take Anna as his lover. (*Id*. pp. 538-550.) Ash bursts in and fights Julian, and then Taylor joins in, under the control of a demon via a cursed ring on her finger. (*Id*. pp. 557-569.)

Elise appears to Anna in a mirror and beckons her to portal through the mirror to an alternate dimension (Avalon, sometimes called Annwyn) where she confirms she is Anna's mother and explains that a wolf from Anna's visions is Anna's father. (*Id*. pp. 569-581.) Anna then follows a raven (Ronan) to come upon two trapped wolves who look familiar (one her father as seen in a vision). (*Id*. pp. 581-583.) Anna frees the wolf she thinks is her father, who snatches her and pushes her out through the mirror as she goes to rescue the second wolf. (*Id*. pp. 583-586.) The story

---

[6] An Irish wizard who gives a demon his soul in exchange for powerful magic and immortality.

returns to Anna's initial Tarot vision from the beginning of the book. (*Id*. pp. 586-589.) A large black wolf appears and shifts into a man, Ronan. Ash appears as a bear and lunges at Ronan, who shifts into a raven and flies away. (*Id*. pp. 590-603.)

b)   *BMR 2013*

*BMR 2013* tells the same general story, albeit with edits reflecting revisions and tightening (it is 15,000 words shorter than *BMR 2011*). Tarot cards are featured more prominently and are used to organize chapters, each of which starts with a picture of a different card. *BMR 2013* starts with a prologue and ends with a new chapter in which a distraught Anna flees in a car, has an accident, and is rescued by Ronan. (*BMR 2013* pp. 4-10, 461-467.) This is followed by two pages of Plaintiff's apparent notes, which include 89 words of dialogue copied verbatim from the script of the TV show *Roswell*. (*Id*. pp. 467-468; Coulthard Rep. ¶¶ 33-37.)

Several characters are portrayed differently, including: (1) Marcheline, who is less harsh and meanspirited and now is Anna's actual biological mother; (2) Taylor, who has changed significantly and is now portrayed as a pure interloper rather than initial friend; (3) Ronan (sometimes now called "Ronan the Bloodletter"), now portrayed as possibly less evil; (4) Julian, now a French incubus rather than a British vampire, and now Anna's biological father; and (5) Elise, now Anna's real grandmother instead of mother, and no longer Julian's dead lover. Towards the end of *BMR 2013*, Anna suddenly learns that her school friends are all secretly supernatural— for example Brendan is a faery and Taylor and Amanda are succubi. (*BMR* 2013 pp. 405-407, 423.) *BMR 2013* also refers to the sought-after chosen one (revealed to be Anna) as the "Nyx." (*E.g.*, *id*. 211, 379.)[7]

---

[7] The idea of a "Nyx" was used in the 2007 book *Marked* by P.C. and Kristin Cast. (Easton Rep. at 18-19, 34-35.)

3.      Importance Of *Tempest Rising*

Wolff's earlier novel *Tempest Rising* ("*Tempest*") has become relevant based on allegations that Wolff "gradually copied larger and larger amounts of Freeman Copyright Material in her prior books to test if she would get caught using the unauthorized material," implying that Kim allegedly began feeding Wolff Plaintiff's work as soon as she received it in late 2010. (Pl.'s Inf. Ltr. at 4.) With her infringement letter, Plaintiff provided a list identifying 56 purportedly similar phrases appearing in *Tempest* and *BMR*, as well as various alleged plot and character similarities. ("Tempest List" (ECF No. 103-2) at 11-26.) This includes telling "the story of a girl from California who thinks she's human but discovers she is supernatural," and "comes into her powers on her 17th birthday and will shift to her supernatural form." (*Id.* at 11.)

Plaintiff later moved to compel inspection of Wolff's hard drives (ECF No. 131) under an email fraud theory Your Honor rejected as "weak" ("Hard Drives Order" (ECF No. 180) at 4). Your Honor examined Plaintiff's evidence and found that Plaintiff was "unable to effectively undermine the evidence that *Tempest Rising* was completed by June 30, 2010, well before Plaintiff is alleged to have had any contact with Kim." (*Id.* at 4-5; DSUF ¶¶ 26-27.) In addition to evidence previously accepted, Easton avers in an unrebutted declaration that she was personally involved with the publication of *Tempest* and that "the final draft of *Tempest Rising* was submitted to Bloomsbury around June 2010 and that an advanced reader copy (ARC) of it was printed in October 2010." (DSUF ¶¶ 26, 28; Easton Rep. at 3).)

Plaintiff's *Tempest* theory is conspicuously absent from her summary judgment motion.

**B.      No Reasonable Jury Could Find Crave And *BMR* Substantially Similar.**

Summary judgment is necessary because "no reasonable trier of fact could find the works substantially similar." *Williams*, 84 F.3d at 587. Instead, any claimed similarities "concern[] only noncopyrightable elements of [Plaintiff's] work," such as unprotected ideas, *scènes à faire*, and

"trivial, scattered details" that cannot support substantial similarity across thousand-page novels. *Id.* at 587, 591; *Walker*, 784 F.2d 44 at 48 (plaintiff must show "that his expression was 'improperly appropriated,' by proving that the similarities relate to copyrightable material").

Because the works at issue contain "both protectible and unprotectible elements," the Court must apply the "more discerning" ordinary observer test and consider "only whether 'the protectible elements, standing alone, are substantially similar.'" *E.g.*, *Williams*, 84 F.3d at 588; *DiTocco v. Riordan*, 496 F. App'x 126, 128 (2d Cir. 2012) (similar). As Judge Stanton put it, "the Court must extract the unprotected elements and ask whether the protected elements standing alone are substantially similar." (Manuscripts Affirmance at 2.)[8]

When analyzing literary fiction, "[a] court examines the similarities between the two literary works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting of the works." *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 665 (S.D.N.Y. 2011); *Williams*, 84 F.3d at 588 (same). However, this analysis does not require "dissection" of the works and remains "'principally guided' by the 'total concept and overall feel' of the works." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010); *Amanze v. Adeyemi*, 2019 WL 2866071, at *6 (S.D.N.Y. July 3, 2019), *aff'd*, 824 F. App'x 86 (2d Cir. 2020) (courts take "special care to compare 'the contested [work's] total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common sense'").

The following general principles of copyright law apply in this analysis:

---

[8] Plaintiff claims that the analysis should "consider[] both copyrightable and non-copyrightable elements" (Pl.'s Mem. at 22), but *Williams* and numerous other decisions squarely refute this. To the extent Plaintiff is arguing that she can prevail by showing that *BMR* contains a copyrightable selection, coordination, and arrangement of otherwise non-protectible elements, such a claim would result in at most a "thin" copyright that requires the defendant's work to be nearly identical in order to infringe. *See, e.g.*, *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996).

First, ideas and generalized themes are not protected by copyright—only an author's specific expression of them. *E.g.*, 17 U.S.C. § 102 ("In no case does copyright protection for an original work of authorship extend to any idea, ... concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *Williams*, 84 F.3d at 587 ("It is 'a principle fundamental to copyright law' that 'a copyright does not protect an idea, but only the expression of an idea.'"). Because "copyright protection ... extends only to [an author's] particular expression of ideas, not to the ideas themselves," "courts therefore must decide 'whether the similarities shared by the works are something more than mere generalized idea[s] or themes.'" *Walker*, 784 F.2d at 48.

Second, copyright does not protect *scènes à faire* or "stock characters and themes" in a particular genre. *Montgomery*, 833 F. App'x at 363; *Williams*, 84 F.3d at 587 (similar); *Amanze*, 2019 WL 2866071, at *6 (the *scènes à faire* doctrine "renders 'unprotectable elements that follow naturally from a work's theme rather than from an author's creativity'"). For instance, the "bad boy" love interest and the "gay best friend," are stock characters in YA fiction. *See, e.g.*, *Dreamtitle Publ'g, LLC v. Penguin Random House LLC*, 2023 WL 4350734, at *14 (S.D.N.Y. July 5, 2023) ("Elements of a work that are indispensable, or at least standard, in the treatment of a given topic— like cowboys, bank robbers, and shootouts in stories of the American West—get no protection."). This concept reflects that in fiction and "life ... generally," there is "rarely anything new under the sun." *Williams*, 84 F.3d at 588.

Third, "trivial, scattered details" do not support substantial similarity. *See id.* at 591; *Montgomery*, 833 F. App'x at 365 (rejecting "trivial element of the works [that] is not an original expression protectable by copyright"); *Allen*, 739 F. Supp. 2d at 663 (rejecting "attempts to portray similarities by selectively extracting various trivialities from each book"). The same goes for

"isolated word choices" and "short common phrases." *Montgomery*, 833 F. App'x at 364 (rejecting claim that "portions of dialogue" were copied "'verbatim'" because these were "limited to isolated word choices, short common phrases, and purportedly similar expressions of common ideas," which "lack the originality required for copyright protection"); *Dreamtitle*, 2023 WL 4350734, at *14 ("[I]t is axiomatic that words [and] short phrases … are not subject to copyright.").

Finally, a plaintiff cannot survive summary judgment by assembling "list[s] [of] random similarities scattered throughout the works." *Williams* 84 F.3d at 590; *Walker*, 784 F.2d at 51 ("[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement."). Such lists are "inherently subjective and unreliable" and "cannot support a finding of substantial similarity" because "[s]uch a scattershot approach … fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590-91. Courts thus routinely reject claims premised on even voluminous similarity lists. *See, e.g., id.*; *Montgomery v. Holland*, 408 F. Supp. 3d 353, 377 (S.D.N.Y. 2019), *aff'd sub nom. Montgomery v. NBC*, 833 F. App'x 361 (2d Cir. 2020) (rejecting "110 pages of purported 'resemblances'" because "[r]eview of Plaintiff's list shows that nearly every instance of similarity" is false or "concerns an unprotectable element"); *Allen*, 739 F. Supp. 2d at 663 (no substantial similarity despite plaintiff's "attempt[] to portray similarities by selectively extracting various trivialities from each book").

Applying the foregoing principles, no reasonable jury could find that the parties' ***works themselves*** are substantially similar in their protectible elements, for the following reasons.

### 1.    The Works Do Not Have Substantially Similar Plots.

Any reasonable jury would find that the Crave and *BMR* plots wildly differ and that any limited similarities result from unprotectible generalized ideas and genre tropes. *See, e.g.*, *Montgomery*, 833 F. App'x at 364 (affirming where "a review of the … works at issue in this case

reveals that their plots are entirely dissimilar"). The works' plots are generally described above and fully set forth in the novels themselves, and simply do not share material overlap.

Crucial Crave plot points—including Grace's whirlwind trip to Katmere and Lia's evil resurrection scheme in *Crave*; Hudson being trapped in Grace's head and the search for relics to free him, Ludares matches, and the emotional Grace/Hudson/Jaxon love triangle and mating bond severance in *Crush*; the trip to Giant City, Aethereum sequences, and violent struggle to free the Unkillable Beast in *Covet*; and the stay at the lighthouse Airbnb, various time freezing sequences, and Impossible Trials in *Court*—are simply absent from *BMR*. The same goes for overarching Crave plot points such as Grace's evolving love/friendship story with Jaxon and Hudson; her repeated epic battles with and narrow escapes from Cyrus and his army; the Bloodletter and Crone's eternal manipulative chess game; and Grace coming into her own as a long-lost Gargoyle Queen, healer, leader, and demigod of chaos. None of this is present in *BMR*.

Meanwhile, major *BMR* plot points—including Anna's pervasive Tarot readings and prophetic visions; constant friction with her (living) mother; struggles with stereotypical high school mean girl Taylor; stalking by a raven revealed to be Ronan; encounter with her wolf father and true mother Elise in another dimension; release of Ronan from the dimension; and the abrupt final confrontation where Ronan transforms into a raven to escape Ash's bear jaws—are nowhere to be found in Crave.

Plaintiff attempts to assert plot similarities based on unprotectible general ideas, *scènes à faire*, misleading abstractions, gross distortions of the works, or all of the above. *See, e.g.*, *Allen*, 739 F. Supp. 2d at 661-63 (no substantial similarity even though "both works 'tell the story of a wizard competition'" since the plots "share no similarities beyond this level of abstraction" and "many, if not all, of the allegedly infringing features constitute scenes a faire"); *Amanze*, 2019 WL

2866071, at *7 ("alleged similarities, such as characters falling in love, betrayal, … imprisonment, fleeing antagonists, magical powers, escape scenes, and spectral visions, are likewise unprotectable ideas expressed in strikingly dissimilar ways, and constitute nothing more than paradigmatic *scènes à faire* of fairytales and fantasies, among other genres").

For example, Plaintiff argues that the works' plots are substantially similar because "both stories focus on the heroine's purpose of 'maintaining the balance'[9] in the supernatural world." (Pl.'s Mem. at 27-28.) But this is the epitome of an unprotected general plot idea. Countless fictional stories (paranormal and far beyond) have focused on a hero/heroine tasked with restoring or maintaining balance. (DSUF ¶ 31.) For example, this trope has been employed in at least the bestselling YA paranormal romance books *Marked*, *Fallen*, *Beautiful Creatures*, *Shadow and Bone*, and *The Kingdom of Light and Shadow* (Easton Rep. at 45; DSUF ¶ 31)—and figures prominently in widely popular mainstream works like Star Wars and Harry Potter.[10] Wolff even used this trope in her pre-*BMR* book *Tempest*. (DSUF ¶ 36.) And there is no colorable claim that the parties here have specifically expressed this common trope in a similar way. (*Compare BMR 2011* pp. 573-54 (briefly discussing the idea of restoring balance and Anna choosing between light and dark) *with, e.g.*, *Covet* pp. 397-400 (explaining that gargoyles were created to balance the forces of Chaos and Order (represented by the Bloodletter and Crone).)

Similarly, to the extent Plaintiff relies on other general plot devices such as moving from a warm place to a cold remote one, dangerous or forbidden romance, dead parents, and battles

---

[9] A phrase that does not appear in any of the Crave books (or even in *BMR 2011*).

[10] The Court may take judicial notice of any relevant third-party books. (*See* Defs.' Req. for Jud. Notice at 1-2.) The Court may also consult Easton's analysis describing applicable genre tropes and summarizing prior art. Plaintiff concedes that expert testimony is permissible regarding "what are the unprotected, generic tropes of a genre." (Pl.'s Mem. at 25 n.12.) The key difference between Easton and Reiss's reports is that Easton expressly limits herself to describing genre tropes and prior art, whereas Reiss conducts an impermissible direct comparison of the parties' works that usurps the role of the factfinder (as will be fully shown at *Daubert*).

between "light and dark" or good and evil (just to name a few), these too are ubiquitous genre tropes that cannot support substantial similarity as a matter of law. (*See* DSUF ¶ 31; Easton Rep. at 5-8, 16-23, 28-49 (explaining these and other tropes' appearance in popular YA series such as Twilight, the Vampire Diaries, Vampire Academy, the Morganville Vampires, and many more).) *See, e.g.*, *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546 (S.D.N.Y. 2007) (rejecting similarity where "examination of the context of … the genre as a whole indicates that many of the similarities shared by the works are common to the mystery/thriller genre as a whole"). And again, the parties' "particular expression of th[ese] general plot idea[s] differs dramatically." *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 670 (S.D.N.Y. 2011), *aff'd,* 496 F. App'x 126 (2d Cir. 2012).

Plaintiff briefly argues that the allegedly shared plot "develops using very similar scenes" (Pl.'s Mem. at 28 (citing PSUF ¶¶ 145-163)), but this does not hold up either. As a threshold issue, the cited PSUF paragraphs do not cite actual evidence (i.e., the works themselves), and instead exclusively rely on Freeman's unreliable and inadmissible similarity indexes. In any event, examples of scenes Plaintiff and her expert Reiss claim are similar—including the allegedly infringed "attack" and "first kiss" scenes (Pl.'s Mem. at 7)—are set forth side by side in the Appendix to Easton's rebuttal report (included as Cole Ex. CC).[11] Any reasonable jury reading the scenes ***themselves*** would find that "even those scenes that appear similar in their abstract description prove to be quite dissimilar once examined in any detail." *Williams*, 84 F.3d at 590.

Plaintiff argues that purported "climax" scenes where "the heroine is kidnapped by a vampire who wants to use her to bring back their dead mate" are similar. (Pl.'s Mem. at 9.) But these scenes share nothing beyond the unprotectible idea of someone being kidnapped by a

---

[11] Reiss claims that the works share numerous scenes that are "qualitative[ly]" similar. To rebut this, Easton provided examples of these actual scenes side by side, without commentary, in the appendix to her rebuttal report. Easton's entire appendix is included (in four sub-parts due to file size) as Ex. CC of the Cole Declaration. These examples alone show that Plaintiff's claim that the works contain similar scenes cannot be taken at face value.

vampire. Most notably, Lia in *Crave* has restrained Grace and is trying to ***kill*** her as a human sacrifice in a magical spell to resurrect Hudson, whereas Julian in *BMR* wants to ***marry*** Anna because he believes she ***is*** his deceased lover Elise. (*Compare BMR 2011* pp. 523-550 *with Crave* pp. 452-492.) In *BMR 2013*, Julian is not even a vampire (he's an incubus).

Plaintiff also argues that the Crave books gradually misappropriate her plot idea to have the heroine's "father called 'Athair'" speak to her in a vision while "trapped in his supernatural form in chains at the hands of the ultimate villain, the Vampire Prince." (Pl.'s Mem. at 24-25.) But the idea of a character being spoken to in her head by a dead relative has been used countless times (for example Luke in Star Wars having visions of Obi-wan, Yoda, and his dead father Anakin). (*See also* Wolff Decl. ¶ 9 (explaining that this general premise appears in the Bible).) Plaintiff also seriously misrepresents the way the works use this device. (*Compare, e.g.*, *BMR 2013* pp. 437-445 (Anna hearing the raven (Ronan) inside her head) *with, e.g.*, *Court* pp. 33-36 (explaining that all gargoyles can communicate telepathically with one another).) Among many issues, Plaintiff misleadingly omits that the character in Anna's head is her stalker Ronan, not her father Dante.

Finally, Plaintiff's argument that *Crush*, *Covet*, and *Court* infringe because they used generalized "subplots" from *BMR* (Pl's Mem. at 9-11, 24-25) fails outright. This argument expressly concerns mere "storylines," and plot ideas themselves are not copyrightable. *See, e.g.*, 17 U.S.C. 102. Illustrating the absurdity of this, Plaintiff accuses *Crush* of stealing her idea to have the heroine go on a quest to find elusive magical artifacts (Pl.'s Mem. at 9), ignoring that a search for elusive magical artifacts is a plot device virtually as old as human civilization, and was in fact a central plot of the sixth and seventh Harry Potter books back in 2005 and 2007.[12]

[12] Beginning in book six, Harry must find Lord Voldemort's magical "horcruxes" and also the "deathly hallows." (DSUF ¶ 34.) Perhaps explaining why this was overlooked, Plaintiff's counsel conceded "I don't know Harry Potter." (DSUF ¶ 43.) Other examples of searches for magical artifacts can be found in *City of Bones* (2007) (search for "mortal

In sum, the books themselves have wildly different plots and any alleged similarities arise from unprotectible ideas or Plaintiff's gross distortions of the works. Plaintiff mainly contends that the works' "overall storyline[s]" are substantially similar (Pl.'s Mem. at 26), but this is untrue and general storylines are not protectible. Finally, even if the cherry-picked scenes Plaintiff points to did share some very minor overlap, Plaintiff cannot prevail because she must prove that the works "*as a whole*" are "*substantially* similar." *See Williams*, 84 F.3d at 590. Sharing some general ideas or scattered trivialities in a few scenes across thousands of pages does not come close to meeting this standard.

## 2.     The Works Do Not Have Substantially Similar Characters.

"The bar for substantial similarity in a character is set *quite high*." *DiTocco*, 815 F. Supp. 2d. at 667. Even when characters have shared many more specific characteristics than those alleged here—such as both being half-vampires named Nicholas Gaunt, *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999), minority artists who can paint the future, *Mallery v. NBC Universal*, 2007 WL 4258196, at *7 (S.D.N.Y. Dec. 3, 2007), *aff'd*, 331 F. App'x 821 (2d Cir. 2009), or "famous male wizards" who are "chosen to compete in year-long wizard competitions," *Allen*, 79 F. Supp. 2d at 659—courts have found no substantial similarity because these traits are general prototypes too indistinct to merit protection.[13] No reasonable jury could find the characters at issue here substantially similar under this exacting standard.

---

instruments"); *Shadow and Bone* (2013) (search for "amplifiers"); and *Children of Blood and Bone* (2018) (search for sacred objects to perform a ritual). (DSUF ¶ 34.) The idea of searching for artifacts goes back to Greek myth (the Golden Fleece) and Arthurian legend (the Holy Grail), and has been used in popular canon like the Lord of the Rings series and *Raiders of the Lost Ark*. (*Id.*)

[13] Plaintiff claims that "minor [character] differences only emphasize the extent of deliberate copying." (Pl.'s Mem. at 26.) The case Plaintiff cites in support—*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969)—is a summary order from 1969 addressing similarities in fabric patterns, not characters in literature. Plaintiff's citation to the century-old decision *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (cited in Pl.'s Mem. at 26), is unavailing because Wolff's characters are significantly more developed than Freeman's.

*Heroines.* Grace and Anna have almost nothing in common besides being female teenagers with supernatural abilities. Grace is short and curvy, with curly, auburn hair and freckles, whereas Anna is tall with dark, long, layered hair. Grace has a snarky and feisty personality and is quirky, funny, sarcastic, selfless, and sometimes stubborn, whereas Anna lacks self-confidence and is otherwise much less nuanced. Grace has no remaining immediate family and rooms with her cousin at a remote magical boarding school, whereas Anna lives with her (alive) mother and aunt in a private home in Alaska's largest city. Anna routinely practices Tarot and has many prophetic visions, while Grace does not practice Tarot or have any prophetic visions. Grace struggles to adapt to her sudden new life in Alaska, whereas Anna has been living in Alaska since age seven and is well acclimated. Both heroines are supernatural—they typically are in YA paranormal—but this generic idea is expressed very differently. Grace is a gargoyle (a rare paranormal species believed to be extinct) with specific gargoyle powers like the abilities to fly and heal people. Anna is a witch who does not yet have supernatural powers beyond her prophetic visons.

While both heroines have deceased (or supposedly deceased) family members, this trope is also expressed very differently. Grace's parents suddenly died in a car crash right before *Crave* begins; they are dead and remain dead. The situation with Anna's parents is completely different. Anna lives with her mother Marcheline. She believes her father Dante died long ago (not suddenly right before the story), and it turns out he has really been living in another dimension.[14] Most importantly, the effect of having "dead" parents is expressed far differently. Grace deeply misses and grieves her parents, which is an important component of her character and story. (*E.g.*, *Crave* pp. 50-51.) *BMR* mentions Dante's death on a single page without exploring how it affects Anna.

---

[14] The different versions of *BMR* are not consistent as to whether Marcheline and Dante versus Julian and Elise are Anna's biological parents, but this is immaterial because all four of them are alive.

(*BMR 2011* p. 62.) Anna's strained relationship with (the living) Marcheline (*e.g.*, *id.* pp. 1-11, 28-29, 50-51, 248-249) is central to *BMR* and entirely absent from Crave.

While Grace is originally from San Diego and Anna is either originally from "San Diego" (*BMR 2011*) or the more general "California" (*BMR 2013*), this idea is expressed differently as well. Grace deeply misses her hometown, constantly reminisces about it, and texts with her best friend from home. *BMR* mentions that Anna once lived in San Diego/California on a single page, without even touching on what this means for Anna. (*BMR 2011* p. 124; *BMR 2013* p. 14.) It is also established that Wolff came up with San Diego independent of *BMR*; Wolff is herself from San Diego, and the heroine of her pre-*BMR* book *Tempest* is from San Diego. (DSUF ¶¶ 5, 36.)

Finally, the purported similarities Freeman identifies in her "Heroine" index result from misrepresentations, misleading abstractions, random trivialities, and ubiquitous traits that virtually everyone shares. (*See, e.g.*, Freeman Ex. 38 at 2, 52 (identifying aspects such as having parents who "were very much in love with one another," being "concerned about dying," loving Mexican food, and "grab[bing] an apple between classes").) As fully set forth below and in Defendants' Evidentiary Objections ("Evid. Obj."), Freeman's indexes are not admissible evidence and are irrelevant to substantial similarity.[15]

**Boyfriends.** Ash from *BMR* is not substantially similar to either of the two romantic leads in Crave (Jaxon and Hudson). Indeed, the fact that Plaintiff tries to compare Ash and Jaxon while ignoring that Hudson becomes the Grace's love interest beginning with *Crush* suggests a deep misunderstanding of the parties' works. Plaintiff's Ash-Jaxon comparison should be rejected due to this alone. It otherwise does not hold up for numerous reasons.

---

[15] This applies to all of Freeman's 14 indexes. Defendants do not concede any of the purported similarities identified in Freeman's indexes but have refrained from rebutting them point by point because it would be a tremendous waste of time when the indexes are inadmissible and irrelevant under controlling Second Circuit law.

For starters, Ash and Jaxon (as well as Hudson) are different paranormal creatures with vastly different powers. Jaxon is a vampire with classic vampire attributes (such as drinking blood) and also has the power of telekinesis. Ash is a werewolf (plus Viking berserker and Sentinel) with classic werewolf shape-shifting powers. While both Ash and Jaxon are tall and handsome—it would be surprising if they were not given they are YA boyfriends—they differ noticeably in appearance. Ash has "rosy cheeks, red lips, and sun-kissed skin" and radiates "vibrant, good health." (*BMR 2011* p. 16.) He is "bewitchingly good-looking" and "heart-stoppingly gorgeous," like a "super model." (*Id.* pp. 15-16.) Jaxon is pale—he could not have "sun-kissed skin" because he is a vampire—and has "a jagged scar from the center of his left eyebrow to the left corner of his mouth." (*Crave* p. 30.) He has "a jaw so sharp it could cut stone" and "the kind of face nineteenth-century poets loved to write about—too intense to be beautiful and too striking to be anything else." (*Id.* pp. 21, 30.)

Finally, Jaxon's evolving relationship with Grace (and other characters, such as Hudson and Flint) is much more nuanced and developed than Ash's more straightforward role as an initially mysterious but overall kind and protective boyfriend. And Plaintiff's claim that Ash and Jaxon each "feels responsible for the death of his older brother" (Pl.'s Mem. at 5) is a serious distortion. Jaxon's (not actually dead) older brother Hudson is one of the most important Crave characters. Ash's brother is not mentioned at all in *BMR 2013* and only on a few pages without exploration in *BMR 2011*. (*BMR 2011* pp. 125-128.)

***Villains.*** To the extent *BMR* has an overall villain, it is Ronan, who stalks Anna in raven form throughout the book and appears briefly at the end before being chased away by Ash. The more minor character Julian at one point abducts Anna, but is not squarely a villain, as he believes Anna is his deceased lover and wants to marry her. Neither of these are anything like Crave arch

villain Cyrus—an unambiguously evil megalomaniac Vampire King who repeatedly leads powerful armies to attempt to variously harm, kill, and capture Grace and her friends as part of his plot for world domination. Nor is Julian anything like *Crave* initial (book one) villain Lia. Both kidnap or abduct the heroines, and both are vampires (Julian in *BMR 2011* only), but these generic traits are expressed differently, for example with Julian wanting to marry Anna and Lia wanting to kill and sacrifice Grace.

*Side characters.* The works' various friends and side characters have nothing in common beyond genre tropes and generalities. Macy, Grace's friendly, girly cousin and best friend, has no parallel in *BMR* (extremely minor friend character Amanda comes nowhere close). *BMR's* stereotypical high school mean girl antagonist Taylor is nothing like Lia, who is nerdy, quiet, and isolated rather than a popular "queen bee." Flint and Brendan have nothing in common besides being gay and mixed race, which again are mere generalities and unprotected ideas. Among many other differences in expression, Flint is a powerful dragon shifter that Wolff created as an homage to her son, who is the same mixed ethnicity as Flint (half Irish/Egyptian) and loves dragons. (DSUF ¶ 134.) Flint has a complex initial relationship with Grace and later an awkward romance with Jaxon, whereas Brendan is a stereotypical "gay best friend" without substantial nuance.

*Character names.* Any contention that the works are substantially (much less strikingly) similar due to character names (*see* Pl.'s Mem. at 14, 16) is frivolous. Even unique character names do not support substantial similarity. *See, e.g.*, *Hogan*, 48 F. Supp. 2d at 311 ("Nicholas Gaunt" not infringed). Plaintiff mostly highlights common (unprotected) names used for minor characters, and there actually is no "Marise" in *BMR* or "Collin" in Crave. (Pl.'s Mem. at 5.)

Plaintiff's comparison of the Bloodletter in Crave and "Ronan the Bloodletter," as he is called a few times in *BMR 2013* only, is weak. Calling a character, especially a blood-drinking

vampire, the "Bloodletter" is an unprotected idea, used before in many books, TV shows, movies, and video games. (DSUF ¶ 35.) And no reasonable reader would find Ronan anything like the Bloodletter in Crave. The latter is a centuries-old little old lady vampire trapped in an ice cave, revealed to be Grace's many-great grandmother, the God of Chaos, eternal chess-game player, and all-powerful manipulator of globe and time-spanning events. Ronan is a male Druid priest and shapeshifter who stalks Anna as a raven. Plaintiff points out that Ronan "turns into a raven" at the end of *BMR* and that the Bloodletter in *Crave* turns into a "'winged creature.'" (Pl.'s Mem. at 9.) These scenes are nothing alike. (*Compare BMR 2013* pp. 461-467 *with Crave* pp. 522-527.) Plaintiff omits that the Crave Bloodletter turns into a ***bat***—perhaps the most classic vampire trope.

<p style="text-align:center">*   *   *</p>

In sum, Plaintiff does not remotely approach the "quite high" bar for character similarity. *DiTocco*, 815 F. Supp. 2d. at 667-68 (rejecting "commonplace" similarities like "[y]oung male heroes who must cope with missing parents and display their strength in battles with otherworldly forces"); *Dreamtitle*, 2023 WL 4350734, at *16 (rejecting "very close to frivolous" argument that characters shared generic traits); *Allen*, 739 F. Supp. 2d at 660 (rejecting "list of common attributes between" characters as concerning "unprotectible idea[s]" rather than "protected expression").

Tellingly, Plaintiff cannot even decide which characters are purportedly parallel. For example, Plaintiff first argues that Taylor and Lia are parallel as "a female nemesis who is a school mate." (Pl.'s Mem. at 6.) But then she argues that Lia is parallel to *BMR's* Julian. (*Id.* at 9 (discussing vampire "climax" scenes).) She then immediately claims that Julian is parallel to Crave's Cyrus. (*Id.* ("ultimate villains").) Plaintiff also compares Ronan to Hudson (*id.* at 6 ("second voice in her head")), but then compares Ronan to the Bloodletter (*id.* at 9 ("'winged creature'")), whom she had previously compared to *BMR's* Elise (*id.* at 6 ("grandmother[s]")). The

fact that not even Plaintiff can keep track of which characters are supposed to be parallel only proves that they are not.

        3.    <u>The Works Do Not Have Substantially Similar Settings.</u>

No reasonable jury could find the books' settings substantially similar, for many reasons.

First, the extremely general setting of "a high school in Alaska" (Pl.'s Mem. at 27) falls far short of creating a triable issue as to setting similarity. Setting a paranormal story in Alaska is an unprotected idea, and not even original to Plaintiff. Wolff explained that she in part got the idea from a documentary she'd seen and a different vampire book. (DSUF ¶¶ 120-122.) Entangled has published another vampire series set in Alaska, which is well-suited to vampires because it is naturally remote and dark. (DSUF ¶ 32.) And any notion that Defendants stole Plaintiff's idea to set *Crave* in a high school is absurd because high schools are an essential and expected component of any fictional material involving teens.

Regardless, the works express the general idea of "a high school in Alaska" far differently. Even Plaintiff's expert Reiss concedes that the books' schools are "very different." (Reiss Rep. ¶ 36(c).) That is inescapable because *BMR* features a normal, non-magical public high school, whereas Katmere is an elaborate magical boarding school filled with overt paranormal activity. *BMR* is also set in Anchorage, Alaska's largest city, whereas Crave is set in the remote Denali mountains, so far from civilization that Grace initially has to access Katmere via a snowmobile trek across the wilderness. And the sub-settings with the schools are radically different. For example, *BMR* has no parallel to Jaxon's tower suite or Hudson's underground lair, the Ludares field where major events in *Crush* occur, or even Grace and Macy's shared dorm room.

Plaintiff also ignores the numerous, varying, and nuanced additional settings introduced throughout the Crave books, including the elaborate Dragon, Vampire, Witch, and Gargoyle Courts, respectively in New York, London, Turin, and the cliffs of Ireland; important magical

destinations like Giant City in the California redwoods, the Aethereum in New Orleans, and the magical taffy shop in a Florida mall where the Impossible Trials are launched; as well as other important recurring locations like the Bloodletter's ice cave, the Unkillable Beast's volcanic island, and the Crone's tropical island. Plaintiff claims that several cherry-picked minor settings are similar, i.e., a "vortex that is a portal" and "a refuge for supernatural beings." (Pl.'s Mem. at 27.) Among many issues with this,[16] these concepts are *scènes à faire* in paranormal fiction.

### 4. The Works Do Not Have Substantially Similar Themes.

Crave and *BMR* also do not have materially similar themes. Both could be construed as expressing common YA paranormal romance themes such as coming of age; falling in love; family and friendship; trust and betrayal; and good versus evil. But Plaintiff does not own these themes and they are expressed differently (for example, Anna's family issues primarily concern friction with her living mother, and Grace's complex evolving love for Jaxon and Hudson is nothing like the more straightforward Anna-Ash courtship). *See, e.g.*, *Dreamtitle*, 2023 WL 4350734, at *15 (dismissing where allegedly similar general "theme is not protectible by copyright law"). Meanwhile, Crave explores many unique themes that no reasonable reader could find present in *BMR*, including feminism; diversity/inclusion and overcoming stereotypes (the Crave cast is thoroughly diverse as shown above); grief and mortality; the nature, responsibility, and abuse of power; and the power of humor, friendship, compassion, and grace. To the extent Plaintiff argues

---

[16] The "vortex" in *BMR* is either Alaska's "Devil's Triangle" (*BMR 2011* pp. 243-44) or a portal to the alternate realm Annwyn (*BMR 2013* pp. 427-30). None of this is like the portals Macy can magically create in Crave, which transport the characters to multiple real-world locations. (*E.g.*, *Crush* pp. 453, 508; *Covet* p. 203; *Court* p. 69.) As for supernatural refuges, Plaintiff's purported refuge "Katmai" is the name of a real national park in Alaska. (DSUF ¶ 128.) And Katmai only appears in a set of Freeman's notes (not any manuscript), making it necessarily an undeveloped idea that cannot be infringed by the fully realized Katmere Academy. Wolff's independent creation of Katmere as an homage to the Lion King and Harry Potter is explained below and in her declaration. (Wolff. Decl. ¶ 18(b); DSUF ¶ 126.) The actual "refuge" in *BMR* is called the Sanctuary, and notably the novel *Bad Moon Rising* (2009) by bestselling author Sherrilyn Kenyon features a magical refuge by the same name. (DSUF ¶ 39.)

that *BMR* covers any of these themes (e.g., with the passing mention of Anna's father's death), no reasonable jury could find that they are expressed similarly or explored to the same degree.

5.    Pace Does Not Support Substantial Similarity.

*BMR* unfolds across roughly four months, while most of *Crave* occurs in a single week and the four Crave books collectively unfold across eight months. *Court* heavily features a time freezing subplot, which is absent from *BMR*. And *BMR* is repeatedly interrupted with Anna's many Tarot readings and dreams/visions, none of which occurs in Crave. Even if the overall time frames were construed as similar, Plaintiff cannot monopolize a four-to-eight-month plot period.

6.    The Works Starkly Differ In Their Total Concept And Feel.

Finally, and most importantly, no reasonable jury could find the total concept and feel of *BMR* and the Crave series substantially similar. Tellingly, Plaintiff does not even attempt to tackle this issue (*see* Pl.'s Mem. at 23 (deferring to experts))—even though total concept and feel is the ***most important consideration*** when analyzing substantial similarity, *see, e.g.*, *Gaito*, 602 F.3d at 66 (analysis is "'principally guided' by the 'total concept and overall feel' of the works").

In evaluating total concept and feel, courts variously consider: (1) scope, length, and structure; (2) tone, mood, and style, including the use of humor; and (3) the "overall feel" of the works, including whether they "engender very different visceral responses." *See, e.g.*, *Allen*, 79 F. Supp. 2d at 657; *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976); *DiTocco*, 815 F. Supp. 2d. at 672; *Montgomery*, 408 F. Supp. 3d at 376. One thing courts ***do not consider*** is expert opinion—indeed, the notion that one can judge the total concept and feel of two literary works by reviewing expert reports rather than the "works themselves" is absurd.

Crave is written in a fun, engaging, and casual tone; although it conveys heartbreak, death, and other serious subjects, its mood and tone remain light-hearted, optimistic, and funny (for example, Grace and Jaxon's recurring "bad joke" competition in *Crave*). *BMR* is much more

serious and less quirky in tone and mood, with more workmanlike writing and little if any humor. Even Plaintiff's expert Reiss acknowledges that the works are "differen[t] in tone and voice." (Reiss Rep. ¶ 32.) The obvious differences in writing style and quality beg the question of why Wolff, who has written 70 novels and multiple bestsellers, would want or need to copy from Freeman. It also might explain why over 20 publishers turned down *BMR*.

The sheer imagination and capacious worldbuilding of Crave is also unparalleled in *BMR*. Crave presents an elaborate and fully realized paranormal world—variously consisting of vampires, witches, dragons, wolves, and gargoyles, each with ruling families from elaborate royal courts, together with powerful, manipulative, and unique freelancers like the omnipotent little-old-lady Bloodletter. *BMR* attempts to construct its own (very different) paranormal world, but the vision is less cohesive and developed, with untethered disparate details—such as a random attack by a "buidseachd" demon and the unexplained eleventh-hour reveal in *BMR 2013* that Anna's friends are all various supernatural creatures.

The scope and length of Crave also dwarf that of *BMR*. Crave is a sprawling story spread across four long books (883,191 total words and 2,624 total pages). *BMR 2011* and *2013* are respectively 135,000 and 120,000 words, and there are no sequels. As counsel put it, *BMR* is "a single story that has some revisions here and there." (6/2/23 Hr'g Tr. (ECF No. 222) 30:18-31:6.) Plaintiff may claim that she intended to create a series as vast as Crave, but she cannot protect her unrealized aspirations, only her actual creative expression.

In sum, "the contrast between the total concept and feel of the works is so stark that any serious comparison of the two strains credulity." *Allen*, 79 F. Supp. 2d at 657; *see also, e.g.*, *Dreamtitle*, 2023 WL 4350734, at *14 (dismissing where "the tone, mood, plot, text, and imagery of the wor[k]s as a whole are so evidently different that no reasonable layperson would find the

works to be substantially similar"). The "visceral response" one gets from reading the Crave books and *BMR* is that they are completely different stories occurring in completely different worlds, written by completely different authors with completely different voices and skills—and that is because they were.

<p style="text-align:center">*      *      *</p>

Defendants' summary judgment motion should be granted for the foregoing reasons alone. *See, e.g.*, *Williams*, 84 F.3d at 588, 590-91 (affirming summary judgment after "[h]aving reviewed both parties' works in detail, [and] find[ing] that nearly all the similarities between the works arise from noncopyrightable elements"). Indeed, "courts have declined to find substantial similarity in situations where there has been far greater overlap" in relevant aspects than there is here. *Allen*, 739 F. Supp. 2d at 664 & n.161 (collecting examples).[17]

## C.      Plaintiff May Not Rely On Freeman's Similarity Indexes, Expert Opinions, Or Additional Manuscripts.

Besides being an obvious gambit to create the false impression of a "both sides" issue on substantial similarity, Plaintiff's motion advances frivolous arguments that the Court should decide substantial similarity based on indexes Freeman personally assembled and expert opinions, rather than the parties' works themselves. (*See* Pl.'s Mem. at 6-7; PSUF ¶¶ 96-98, 108, 111-113, 115-138, 140-144, 146-152, 154-158, 160-161, 163-172 (exclusively citing Freeman's indexes rather

---

[17] *See, e.g.*, *Hogan*, 48 F. Supp. 2d at 311-12 (no substantial similarity even though the works' main characters "share the same name: Nicholas Gaunt" and "both Gaunts are half-vampire and half-human"); *DiTocco*, 815 F. Supp. 2d at 670 (same even though, *inter alia*, "plaintiffs' books and the Percy Jackson Books both tell the story of modern-day young heroes who must prevent destruction of the world by forces from Greek mythology"); *Mallery*, 2007 WL 4258196, at *6 (same where works both involved "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic death in the light of the future."); *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (same where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave of boredom, ... discovers that one of his neighbors is a murderer, ... is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated.").

than the works).) Plaintiff also flouts previous Court Orders by introducing numerous additional manuscripts and note sets besides the two versions she was required to (and did) select in January. All of this should be rejected.

>    1.    Plaintiff's Indexes And Expert Opinions Are Unreliable And Irrelevant.

As shown in numerous literary infringement decisions (including *Williams*, *Walker*, *Montgomery*, *Allen*, *Amanze*, *DiTocco*, *Dreamtitle*, *Hogan*, and many more), Second Circuit courts adjudicate literary substantial similarity by reading and directly comparing the "works themselves." *E.g.*, *Williams*, 84 F.3d at 583 ("a determination of substantial similarity requires a detailed examination of the works themselves"); *Walker*, 784 F.2d at 52 ("the works themselves supersede and control contrary descriptions of them"); *Allen*, 739 F. Supp. 2d at 645 n.1 (accepting allegations regarding works only "to the extent that they are consistent with the works themselves"). (Manuscripts Order at 2 (Your Honor recognizing this and citing *Walker*).) Plaintiff points to ***no case*** where a court has done what she is proposing and eschewed literary works themselves in favor of expert reports and party-generated similarity lists. Plaintiff's approach would abrogate established law and seeks to escape summary judgment without having anyone read and directly compare the very books that are the subject of this lawsuit.

***Freeman's indexes.*** Freeman's similarity indexes must be disregarded for multiple reasons. Initially, they are inadmissible for the numerous reasons set forth in Defendants' Evidentiary Objections. For example, Freeman's indexes violate FRE 701 and 702 because they are undisclosed opinion testimony and usurp rather than assist the factfinder. (Evid. Obj. at 2-6.) Indeed, Freeman's indexes and 18 additional pages of opinion testimony in her declaration are collectively ***569 pages***—about as long as any of the parties' works—begging the questions of why

it makes sense to read them rather than the requisite "works themselves."[18] Freeman's indexes also violate the Best Evidence Rule because the works themselves are available and are the best evidence of their contents. (*Id.* at 6-7.) And they cannot be cited as "evidence" because they were not disclosed during discovery as required by FRCP 37. (*Id.* at 8-10.) Numerous PSUF paragraphs (at least 71 of 181 paragraphs) exclusively rely on these and other inadmissible materials and must be stricken. *See* FRCP 56(c); LR 56.1(d); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("unsupported assertions [in a Local Rule 56.1 statement] must ... be disregarded"). (Evid Obj. at 13-14.) Seven more PSUF paragraphs nearly exclusively rely on them. (*Id.*)

Plaintiff's indexes are also irrelevant to substantial similarity under *Williams* and its progeny. *See, e.g.*, *Williams*, 84 F.3d at 590-591; *Montgomery*, 408 F. Supp. 3d at 377; *Allen*, 739 F. Supp. 2d at 663 (all rejecting such lists); *accord Mowry v. Viacom Int'l, Inc.,* 2005 WL 1793773, at *13 (S.D.N.Y. July 29, 2005) (excluding Dr. Chaski's opinions because "a major defect … is that her comparisons were not based on the screenplays themselves but on her charts, in which she summarized or paraphrased aspects of" the works). *Williams* is controlling appellate authority as to the role of a party's similarity lists in the substantial similarity analysis, and Plaintiff does not address it or attempt to explain why it does require rejecting her indexes outright. (*See* Pl.'s Mem at 22 (citing *Williams* for an unrelated general point).)

Underscoring this, Plaintiff's indexes are misleading, inaccurate, and emphasize unprotected or immaterial trivialities rather than protected expression. For example, Plaintiff's

---

[18] One might view Freeman's indexes as additional argument egregiously in excess of the Court's briefing page limits. *See Giurca v. Good Samaritan Hosp.*, 2023 WL 254611, at *1 n.1. (S.D.N.Y. Jan. 18, 2023) (counsel's declaration containing "an argumentative summary of the evidence" "may be an improper attempt to bypass the page limits on memoranda of law set by my individual practices"). To the extent Plaintiff would argue that there are 569 pages of opinion testimony because there are so many purported similarities, that would be baseless. Freeman's indexes are not evidence and prove nothing. At most, they show that Freeman (unlike Wolff when writing Crave) had enough time to cherry-pick through the parties' works to amass long lists of trivialities that she attempts to frame as similar.

character indexes identify basic characteristics that millions of fictional works have used—such as a boyfriend being "hot," a close friend having "a sense of humor," and a villain that "disgusts the heroine." (*E.g.*, Freeman Ex. 40 at 1; Ex. 42 at 1; Ex. 43 at 2.) Meanwhile, Freeman's language indexes are riddled with ellipses used to cut content and obscure how different the book passages themselves are. (*See generally, e.g.*, Freeman Exs. 46, 47 (pervasive ellipses).)

Freeman's language indexes also attempt to show copying of uncopyrightable words and short phrases—such as "well, well, well. Looks like"; "You lost a lot of blood"; "things that go bump in the night"; "two sides of the same coin"; "Oh my god!"; and "yogurt." (*E.g.*, Freeman Ex. 46 at 4-5, 10; Ex. 47 at 4, 24, 31; *see also, e.g.* Ex. 48 at 18, 31 ("Let's make a deal" and "million dollar question"); Ex. 49 at 15, 20 ("You think you're so smart" and "I feel exactly the same way").) As Judge Stanton recognized: "Plaintiff[']s use of the listed phrases did not give her ownership of them. They remained, as they were before their use by plaintiff, common phrases free for use by anyone." (Manuscripts Affirmance at 2.) *See also Montgomery*, 833 F. App'x at 364 (rejecting copying of "isolated word choices" and "short common phrases," which "lack the originality required for copyright protection"); *Dreamtitle*, 2023 WL 4350734, at *14 ("words [and] short phrases … are not subject to copyright").

Finally, if there were any doubt, Plaintiff's demonstrably false allegations regarding *Tempest* prove that her indexes are unreliable and filled with false positives. As shown above, it is **impossible** that Wolff had Plaintiff's manuscripts when she wrote *Tempest*, since *Tempest* was completed months before the Plaintiff-Kim relationship began. (DSUF ¶¶ 26-28; Hard Drives Order at 4-5.) Yet Plaintiff's Tempest List (nowhere to be found in her moving papers) purports to show the very same sort of similarities as the indexes now relied on. (*Compare* Tempest List at 12-26 *with, e.g.*, Freeman Exs. 32, 38, 40.) As Baer was forced to admit, all purported similarities

in the Tempest List "have to just be coincidences." (DSUF ¶ 30.) In attempting to pretend the Tempest List never happened, Plaintiff fails to show why any of her lists should be credited. The Tempest List also further proves Wolff's independent creation, as fully explained in § II.C below.

**Expert opinions.** Plaintiff's expert opinions must be disregarded on substantial similarity as well. Initially, the Reiss, Chaski, and Juola reports are irrelevant to substantial similarity and unreliable and inadmissible as will be shown in Defendants' *Daubert* motion. Dr. Chaski in fact admits that "I don't think my report addresses substantial similarity." (DSUF ¶ 45.) Instead, Plaintiff's heavy reliance on expert witnesses only proves that no reasonable jury could find for her. The test for copyright infringement is whether an "ordinary reader," not an "expert witness" would find the works at issue substantially similar, especially in total concept and feel. Attempting to substitute the judgment of expert witnesses for ordinary readers under the theory that the alleged plagiarism is too subtle for ordinary readers to notice is really an admission that the "ordinary reader" test could never be satisfied.

In any event, "[t]he well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar.'" *Green v. Harbach*, 750 F. App'x 57, 59 (2d Cir. 2019); *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693, 713-14 (2d Cir. 1992) (approving experts for "highly complicated and technical subject matter" but not "disturb[ing] the traditional role of lay observers in judging substantial similarity in copyright cases that involve the aesthetic arts, such as music, visual works *or literature*"). Your Honor has recognized this. (Manuscripts Order at 3 n.2.) Thus, "[o]utside a limited class of cases involving highly technical works such as computer software, [expert] testimony is **'irrelevant and**

*not permitted.*'" *Green*, 750 F. App'x at 59.[19] Plaintiff's approach would abrogate these decisions. Plaintiff does not mention *Green* and cites *Altai* in a footnote without acknowledging what it said regarding the use of experts in literary infringement cases. (Pl.'s Mem. at 23 n.10.)[20]

Because nobody could credibly claim that the YA books at issue here are overly technical and fit within the narrow *Altai* exception, Plaintiff instead argues that experts are necessary because it would be too much work to compare the materials at issue directly. (Pl.'s Mem. at 23-25; *see also* Manuscripts Order at 3 (observing that Plaintiff's issue "is with the volume, not the subject matter").) Plaintiff's volume concern is not only illegitimate, but hypocritical given that she would instead have the factfinder review 569 pages of her own opinion testimony plus almost 250 pages of expert opinions. And the volume concern is overblown; most complex litigation involves voluminous record materials (deposition transcripts, public filings, white papers, and more). The factfinder here can, and must, read the Crave books and *BMR 2011* and *2013*. The parties' novels may well be more engaging than standard litigation materials. In short, Plaintiff cannot escape established Second Circuit law forbidding the use of experts on substantial similarity by unilaterally adding voluminous materials to the record so that she can claim there is too much material for anyone to read.

---

[19] District court decisions are widely in accord. *See, e.g.*, *Dreamtitle*, 2023 WL 4350734, at *11 ("The expert reports appended to the complaint are largely irrelevant to the assessment of whether the two works are substantially similar."); *Spielberg*, 748 F. Supp. 2d at 204 & n.4; ("opinions of experts or other third parties are irrelevant to a determination of substantial similarity"); *Shine v. Childs*, 382 F. Supp. 2d 602, 614 (S.D.N.Y. 2005) ("[T]he Second Circuit has long held that substantial similarity should be determined not with the help of or solely by experts in the relevant field, but from the perspective of the ordinary observer"); *Davis v. United Artists, Inc.*, 547 F. Supp. 722, 724 & n.8 (S.D.N.Y. 1982) (rejecting "affidavit of a literary expert who opines that the two works share substantial similarities," quoting Learned Hand that experts "'ought not to be allowed at all'" in copyright cases).

[20] Plaintiff's additional cases (Pl.'s Mem. at 23 nn.9, 10) are inapposite. *Mowry* **excluded** Dr. Chaski's opinions as "more confusing than helpful." 2005 WL 1793773, at *13. *Price v. Fox Entertainment Group* largely rejected experts where "[t]hese are not highly technical works" and "the jury is capable of recognizing and understanding the similarities between the works without the help of an expert." *See* 499 F. Supp. 2d 382, 389 (S.D.N.Y. 2007) (proceeding to allow the plaintiff an opportunity to **disclose** an unspecified substantial similarity expert who would then be subjected to *Daubert*). *Currin v. Arista Records, Inc.*, 724 F. Supp. 2d 286 (D. Conn. 2010), is a music case—an exception area to the traditional bar on experts.

2.    <u>The Other Manuscripts Are Forbidden And Would Not Change The Result.</u>

Despite previously selecting *BMR 2011* and *2013*, Plaintiff now asks the Court to consider "six versions of the copyrighted manuscript along with nine sets of Freeman's copyrighted notes." (Pl.'s Mem. at 14.)[21] But three of these manuscripts (Freeman Exs. 15, 16, 21) were created ***after*** Plaintiff ended her relationship with Kim in March 2014. (Cole Decl. ¶¶ 18-20 & Exs. P-R.) In any event, Plaintiff's attempt to suddenly aggregate 15 different materials should be rejected and only confirms that she cannot prevail on simple side-by-side comparison.

***First***, it is already settled that *BMR 2011* and *2013* must be the basis for a comparison against Crave at summary judgment. Your Honor held that "Plaintiff must identify the work she alleges was copied and cannot rely on an amalgam of bits and pieces of her work in progress." (Manuscripts Order at 3.) This is "especially appropriate because Plaintiff does not allege that her copyright works are a series but rather a collection of works-in-progress leading to a final single manuscript." (*Id.*) Judge Stanton overruled Plaintiff's objection to this, explaining that "[r]elying on a primary version of the manuscripts allows the fact finder to be able to effectively" determine whether protectible elements are substantially similar and whether *BMR* gives "some special use or effect" to common words and short phrases. (Manuscripts Affirmance at 3.)

The CMO did not change this. It states that "the process" of comparing the parties' works to "to reveal and define substantial similarities" "must start somewhere," i.e., by comparing the Crave books "against two of the final manuscripts embodying plaintiff's drafts." (CMO at 1.) It adds that "comparing the books to the two test manuscripts" will be done "to determine in a preliminary degree 'whether a lay observer would consider the works as a whole substantially

---

[21] Plaintiff claims she has done this in part to attempt to match the overall page count. (*See* Pl.'s Mem. at 8.) This ignores the obvious difference between bona fide sequels and mere revisions to a standalone novel.

similar to one another'"—meaning a comparison at summary judgment. (*Id.*) The CMO makes clear that a direct comparison must occur without needing to "sift[] through thirty iterations" to evaluate substantial similarity. (*Id.*) The CMO **cannot** be plausibly read as fully reversing both the Manuscripts Order and Affirmance and allowing Plaintiff free reign to rely on a hodgepodge of her different manuscripts. If that were the case, the CMO would have "reversed" or "vacated" the prior Orders rather than "endorse[d]" them. When Judge Stanton wishes to fully reverse and vacate a prior Order, he says so. (*See* ECF No. 253 (prior order "vacated and withdrawn").)

   **Second**, it would unfairly prejudice Defendants to permit additional manuscripts at this late hour. Defendants have relied on the Manuscripts Order and Affirmance (unchanged by the CMO) in completing fact and expert discovery and generally defending the case. (*Cf.* Manuscripts Order at 3 ("Defendants cannot defend on [the issue of access] without identity of the work.").) Defendants would have, at a minimum, cross-examined Plaintiff at her deposition about the fact that three of her additional manuscripts were created after the Plaintiff-Kim relationship ended. (*See* Cole Decl. ¶¶ 15-17 (explaining how Defendants determined this using metadata).)[22]

   **Finally**, even if Plaintiff had free reign to rely on any combination of manuscripts/notes, Defendants would still easily be entitled to summary judgment. Initially, allowing additional manuscripts would not change that infringement is assessed by directly comparing one work to another, not comparing a defendant's work to a plaintiff's set of works viewed in the aggregate. *See, e.g., Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014) ("a court must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently")

---

[22] Plaintiff exclusively relies on post-Kim manuscripts to assert certain similarities, such as that the series villains each have "a daughter [who] is related to the heroine by blood." (*E.g.*, Freeman Ex. 43 at 10 (citing Freeman Ex. 16).) And several rows of the chart at the end of Plaintiff's brief quote text from post-Kim manuscripts. (*See* Pl.'s Mem. at 28-29 (rows 6 and 10); Cole Ex. FF (showing that these rows quote from Freeman Exs. 15 and 16).)

(cited in Manuscripts Affirmance at 3). Even if additional materials were considered, they would need to be compared one by one with each Crave book, not amalgamated without differentiation.

But none of this is necessary because Plaintiff has admitted that all the various versions of her manuscript are "a single story that has some revisions here and there." (6/2/23 Hr'g Tr. 30:18-31:6; *see also* Pl.'s Mem. at 1 ("one overarching story").) Plaintiff's expert Reiss likewise admits that all versions share the same "basic story, plot, characters." (Reiss Rep. ¶ 225.) Since *BMR 2011* and *2013* are so facially dissimilar from the Crave books as shown above, it is incumbent on Plaintiff to show how her remaining manuscripts are ***unlike*** *BMR 2011* and *2013* in ways that make them ***more like*** the Crave books. Plaintiff does not attempt to show this, and her prior admissions concede that she never could.

Finally, Plaintiff's notes are inapposite because informal notes necessarily contain only undeveloped ideas rather than protected expression. Plaintiff also does not allege that the notes themselves were duplicated or paraphrased in any of the Crave books.

### D.   Plaintiff Cannot Prevail Via "Fragmented Literal Similarity."

Finally, Plaintiff cannot alternatively prevail by establishing fragmented literal similarity ("FLS") (Pl.'s Mem. at 28-30).[23] The rarely applied FLS doctrine requires that there be "direct quotations or close paraphrasing" of a "qualitatively important or crucial element" of the work. *See Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) (rejecting FLS because "undue focus upon these isolated quotations could improperly distract us from inquiring as to whether substantial similarity exists"); *Guity v. Santos*, 2020 WL 4340417, at *1 (S.D.N.Y. July 28, 2020) (rejecting FLS where "[t]he common elements in these two works are

---

[23] Plaintiff additionally discusses "[c]omprehensive nonliteral similarity" but fails to explain how that analysis differs from the standard substantial similarity analysis applied above. (*See* Pl.'s Mem. at 18-19.)

trivial, insubstantial, and insufficient"). FLS has never to Defendants' knowledge been held a basis for infringement of a novel. As one court observed, "the terminology 'fragmented literal similarity' has not been widely accepted by Courts in this Circuit." *Guity*, 2020 WL 4340417, at *1.

Plaintiff asserts FLS mostly based on twelve relatively short quotes from different *BMR* manuscripts. (Pl.'s Mem. at 28-29.) But there is no colorable claim that these short, non-descript excerpts are "qualitatively important or crucial element[s]" of either party's works as required. *See, e.g.*, *Guity,* 2020 WL 4340417, at *1. Moreover, Plaintiff's several examples were not in fact directly quoted or closely paraphrased. Instead, Plaintiff heavily excerpted them with ellipses—removing paragraphs if not pages of text—to attempt to falsely show similarity. Exhibit FF to the Cole Declaration shows exactly how much Plaintiff omitted with ellipses alone.[24] One illustrative example, hardly the most egregious, follows (content Plaintiff omitted with ellipses in **bold red**):

| Pl.'s Mem. at 28 (fourth example left, quoting Freeman Ex. 19 p. 455): | Pl.'s Mem. at 28 (fourth example right, quoting *Court* pp. 630-631): |
|---|---|
| <span style="color:red">**Desperately,**</span> I tried to think of an out to save Rachel's life. "Please," I cried. "She-they're all my best friends! I couldn't bear it if any of them ... died."<br><br>He patted my hand. "Hmm. We can't have that, now can we? As important as you are to me ... What are you willing to barter if I agree to let them live?"<br><br>"I-I can't think of anything I have that you'd want."<br><br>He just looked at me, saying nothing.<br><br>I shook my head, my mind scrambling for an idea. <span style="color:red">**What would an incubus-a soul sucker-**</span>consider fair trade for my friends' lives? <span style="color:red">**I could think of only one thing and it was a promise I didn't want to make. But a heroine would do it. And I was good-so now was my chance to prove it.**</span> "Let's make a deal." I said it confidently. | The crowd boos and jeers and I rack my brain, trying to figure out the perfect thing to say next. "What I actually want is protection for my friends and myself. Promise me you and your army won't harm or kill us, ever, <span style="color:red">**and I'll tell you everything the Crone told me about this little altar situation you have going on."**</span><br><br><span style="color:red">**"You're really going to waste this opportunity on my worthless sons and a couple of mangy strays?"**</span><br><br>"Yes," I say simply, "I am." Because if I say any more, he'll see just how angry I am that he referred to my friends like that. Who the hell is he to call my friends anything?<br><br>"If that's what you want," he says, walking forward with a slow, measured step. "Let's make a deal." |

In sum, Plaintiff claims that Crave quoted short sequences from various versions of *BMR*, when there in fact was no direct quoting or even close paraphrasing, and nobody would find these

---

[24] Cole Ex. FF only highlights content Plaintiff omitted specifically with ellipses. It does not begin to address the more fundamental problem that Plaintiff has plucked random paragraphs from the books without showing the full context of the pages and chapters where they appear.

short excerpts qualitatively important across novel-length texts. Far from being qualitatively important, Plaintiff's examples include common phrases like "skitters down my spine" and "doing the math in my head," which are unoriginal to Plaintiff and expected in paranormal books.

In notable contrast, Dr. Coulthard found and proved that *Plaintiff herself* verbatim copied 89 words of dialogue from the script of the TV show *Roswell* into her apparent notes at the end of *BMR 2013*. (Coulthard Rep. ¶¶ 33-37.) Nobody has found anything even remotely like this in *any* Crave book or draft, including in redlines and comments. (*See generally* Chaski and Juola Reps.) Instead, Plaintiff's expert Dr. Juola (a famous forensic linguist who discovered that J.K. Rowling wrote the unattributed book *A Cuckoo's Calling*) has examined the parties' works, and the *longest* shared sequence he was able to find is "on my arms and the back of my neck." (Juola Rep. ¶ 19; DSUF ¶ 46.) Dr. Juola was forced to concede that this is not evidence of copying because "the back of my neck" is common expression. (DSUF ¶ 47 (citing Juola Dep. 114:9-116:1).)

## II.     ACCESS AND INDEPENDENT CREATION

While the lack of substantial similarity is dispositive, Defendants are additionally entitled to summary judgment because no reasonable jury could find that Wolff or Pelletier had access to *BMR*. Plaintiff also fails to rebut the strong and credible evidence of Crave's independent creation.

### A.     The Actual Genesis Of The Crave Series

Pelletier came up with the general idea for a book series that would later become the Crave series around April 2019. (DSUF ¶ 80.) Pelletier had read several recent news articles explaining (1) how consumer trends "cycle back every ten years"; (2) that YA sales had dipped because "young girls couldn't relate" to the way authors had been portraying their heroines; and (3) that "Twilight was about to be ten years" old. (DSUF ¶ 81.) This collectively gave her "the idea of bringing vampires back" in "a fun, fresh way." (DSUF ¶ 82.) She wanted "to take Twilight meets Harry Potter and put those two together," which included "something fish out of water and

fantastical and set someplace that … would be its own character." (*Id.*) Pelletier instructed Entangled's editors, including Abrams, to "see if they had any author who wanted to write that series." (DSUF ¶ 83.) This occurred when a slot in Entangled's publishing schedule opened because an unrelated third-party author was unable to complete a project. (DSUF ¶ 84.)

Abrams thought of and immediately called Wolff because she had previously worked with her and thought she would be a good stylistic fit (Kim was not a part of this). (DSUF ¶ 85.) On April 26, 2019, Wolff sent Abrams "5 basic ideas" for potential series aligned with Pelletier's idea, including one for a "Warlock or Vampire boarding school book" and another featuring characters named Hudson and Grace that was set in Alaska. (DSUF ¶ 86.) Abrams replied that Wolff's boarding school idea was the "closest to specifically what [Pelletier was] looking for." (DSUF ¶ 87.) Abrams relayed a number of Pelletier's further ideas, including needing "a creative reason a vampire can't be with a human, something that hasn't been done before" and "'what if her parents died in a car wreck and she's sent to live with her uncle who is the dean of the academy.'" (DSUF ¶ 88.) After Wolff sent a writing sample, Abrams informed her on May 7, 2019 that Pelletier wished to move forward. (DSUF ¶ 91.)

Wolff "wrote the books and turned them over to" Pelletier who edited them. (DSUF ¶ 92.) Pelletier was the "content editor," meaning she edited for big-picture issues like improving story structure and character arcs and consistency. (DSUF ¶ 93-94.) Pelletier also drafted or helped draft plot synopses and otherwise "brainstormed and plotted" with Wolff. (DSUF ¶ 98.) It generally took Wolff "a couple months" to initially draft each Crave book, which is relatively slow by her standards. (DSUF ¶ 101.) Pelletier explained that the Crave sequels needed to be completed quickly because they were under an "escalating [] print schedule," which happens when a book is a hit and there is a demand for quick sequels. (DSUF ¶ 102.)

It was Wolff's idea to set the series in Alaska. (DSUF ¶¶ 120-123.) Wolff had seen a snowboarding documentary that showed how remote and unpopulated the Alaskan wilderness is, making it "a really cool place to set something [featuring] paranormals that didn't want to be around humans or, like, giant dragons could fly free." (DSUF ¶ 121.) Additionally, one of Wolff's "favorite vampire novels ever" (*Dance With The Devil* by Sherrilyn Kenyon) is set in Alaska. (DSUF ¶ 122.) Alaska also fit Pelletier's "fish out of water" idea, and Pelletier endorsed it after having recently returned from a cruise there. (DSUF ¶¶ 123-124.)

Wolff testified expansively regarding how she came up with major characters in the Crave series, including Grace, Jaxon, and Hudson. (DSUF ¶¶ 129-133.) Flint is an homage to Wolff's son (DSUF ¶ 134) and Katmere is an homage to the Lion King and Harry Potter (DSUF ¶ 126). Pelletier suggested the name "the Bloodletter" for a character who "sounded scary" but "looked sweet" based on a video game she played called Bloodborne. (DSUF ¶ 125.) The single time Crave briefly mentions Tarot (in *Covet*), it was "as a joke," where a character who was literally a troll used a Tarot card to "troll" Grace. (DSUF ¶ 104; *Covet* p. 540.)

Numerous documents produced in the litigation reflect the actual creation of Crave, including numerous drafts of the four Crave books in various stages of completion. (*E.g.*, Cole Decl. Exs. S-W; DSUF ¶ 76.) None of these drafts mentions Plaintiff or *BMR*, including in redline edits and comments. (DSUF ¶ 77.) Defendants also produced voluminous emails and text messages sent while writing/editing each Crave book. (DSUF ¶ 76.) None of these mentions Plaintiff or *BMR* either. (DSUF ¶ 78.) Plaintiff would have filed them with her motion if they did.

Wolff and Pelletier deny any access to *BMR*, and no evidence shows otherwise. For example, Wolff denies that she has ever "had in [her] possession a partial or a complete copy of [*BMR*]," that she has ever "read any portion of [*BMR*]," or that "anyone ever communicated to

[her] all or any portion of the contents of [*BMR*]." (DSUF ¶¶ 61, 67-68.) Similarly, Pelletier has never possessed *BMR* or "read all or any part of" it. (DSUF ¶¶ 62, 69-70.) Wolff and Pelletier deny that they "ever discussed any of the contents of [*BMR*] with" Kim, Abrams, or "anyone." (DSUF ¶¶ 63-65, 72-73.) Wolff and Pelletier "had never heard of Lynne Freeman or her book" until receiving Plaintiff's demand letter in February 2022. (DSUF ¶ 71.) Wolff "was in complete shock" when she saw the demand letter and had "no idea who Lynne Freeman is," no idea what manuscript they were referring to," and wondered "[w]hy is she suing me." (DSUF ¶ 75.)

Emails reflect that Kim directly sent Abrams a copy of *BMR* (then titled *Masqued*) in October 2013. (DSUF ¶ 56.) Abrams believes she did not read that manuscript, as she "receives anywhere from five to 20 manuscripts a day" and does not have time to "read every manuscript." (DSUF ¶ 57.) Abrams did not send the manuscript to Pelletier or discuss it with her. (DSUF ¶¶ 57, 62, 64.) Abrams served only as copy editor for Crave; she "was not involved in the content editing" and "did not make changes to the storylines." (DSUF ¶ 95-96.) Rather, she was "looking for typos, grammatical errors, punctuation errors, spelling errors, continuity errors"—"[t]hat's it." (*Id.*)

## B.    No Reasonable Jury Could Find For Plaintiff On Access.

Defendants are the only parties entitled to summary judgment on access. Plaintiff "bears the burden of presenting 'significant, affirmative and probative' evidence to support [her] claim of access." *Jorgensen v. Careers BMG Music Pub.*, 2002 WL 1492123, at *3 (S.D.N.Y. July 11, 2002). "Access means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of seeing the prior work." *Mowry*, 2005 WL 1793773, at *3 (cleaned up). While a plaintiff may establish that "a particular chain of events exists by which the defendant might have gained access," this "cannot be based on mere 'speculation or conjecture.'" *Gal*, 518 F. Supp. 2d at 538; *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988) (cited in Pl.'s Mem. at 12)

(similar). "'Bare corporate receipt' is insufficient to establish access." *E.g.*, *Jorgensen*, 2002 WL 1492123, at *3; *Gal*, 518 F. Supp. 2d at 539.

Access through an intermediary "connected to both a plaintiff and a defendant **_may be_** sufficient to prove a defendant's access to a plaintiff's work." *Gaste*, 863 F.2d at 1067. However, "'attempts to establish an inference of access through intermediaries such as literary agents, while theoretically possible, are seldom successful in practice'" because "'[w]hat must be established in each case is probative evidence that the individual(s) who **_actually created_** the allegedly infringing work had a reasonable opportunity to see, hear, or read the plaintiff's work.'" *Mowry*, 2005 WL 1793773, at *3 (quoting 1 William F. Patry, *Copyright Law & Practice* at 698-700 (1994)).

Courts accordingly reject intermediary access theories when the evidence shows that the intermediary did not share the material with the creator defendant. *See, e.g.*, *Cox v. Abrams*, 1997 WL 251532, at *4 (S.D.N.Y. May 14, 1997) (rejecting intermediary theory where book publisher staff "swore under oath that they did not provide the manuscript or communicate its substance to any of the defendants" and defendants "swore under oath that they had never heard of the Coxes or of the manuscript before this litigation"); *Tomasini*, 84 F. Supp. 2d at 520 (same where relevant Disney staff "stated under oath that they personally never received, reviewed, or heard of such a submission" and plaintiff "presented no evidence upon which a jury could base an inference that [such testimony was] not truthful"); *Mowry*, 2005 WL 1793773, at *5 (same where "Mowry has not presented any evidence that" alleged industry intermediaries "passed [his work] on directly or indirectly to any of the defendants").

### 1.   No Reasonable Jury Could Find Direct Access.

Plaintiff does not seriously attempt to show that Wolff or Pelletier ever directly gained access to *BMR* (*see* Pl.'s Mem. at 12-14), and for good reason. All witnesses uniformly testified that Wolff and Pelletier never received or read a copy of *BMR*, through Kim or otherwise. Through

all the voluminous materials submitted with Plaintiff's motion, there is ***not a single document*** that contradicts this. None of Plaintiff's exhibits shows Wolff or Pelletier accessing or even mentioning *BMR*—let alone actively using multiple plagiarism strategies to secretly and substantially copy from it. *See, e.g.*, *Gal*, 518 F. Supp. 2d at 539 (rejecting access where relevant "individuals testified unequivocally and without contradiction that they had never heard of Gal or of her Screenplay").

Plaintiff heavily relies on a single email chain from October 2013, in which Kim sent a 297-word high-level pitch for *BMR* (then titled *Masqued*) to Pelletier's email account (only 224 words of substance). (Pl.'s Mem. at 1-2; PSUF ¶ 23 (citing Doniger Ex. 26 at 1-2); DSUF ¶ 52.) But it is undisputed that the manuscript itself was not included in this submission, which closes with the phrase "I'd love to send you the full manuscript." (DSUF ¶ 53 (citing Doniger Ex. 21 at 3); Pl.'s Mem. at 1 (characterizing this as Kim emailing "***about the*** BMR manuscript").) Pelletier, who was closed to acquisitions at the time, does not recall even reading the pitch. (DSUF ¶¶ 54-55.) Kim later sent the manuscript directly to Abrams, but there is no evidence that Abrams then shared or even discussed it with Pelletier or Wolff. (DSUF ¶¶ 57, 61-64.) Plaintiff additionally suggests that Kim must have given Wolff a copy because they are "close personal friends" (Pl.'s Mem. at 13-14), but all witnesses deny this and no documents support Plaintiff's rank speculation.

Plaintiff's remaining evidence is, if possible, even weaker. For example, Plaintiff appears to argue that a text thread where Pelletier instructed Wolff to "[s]ay WHATEVER you want" regarding the origin of Crave is "curious" and evidence of a cover up. (Pl.'s Mem. at 3; PSUF ¶ 79 (citing Doniger Ex. 8).) That is pure innuendo; the text thread nowhere mentions Plaintiff or *BMR* and there is no evidence or context suggesting otherwise. Since Plaintiff's counsel did not show Pelletier this exchange at her three-hour deposition, Pelletier now explains that she was just telling Wolff to be honest while not wanting public credit for her own role. (Pelletier Decl. ¶ 19.)

Plaintiff also falsely asserts that Wolff was "experiencing financial distress" before *Crave* (not true and not a material fact) and claims that Wolff "incredibly" wrote the *Crave* series very quickly. (Pl.'s Mem. at 2-3). None of this has anything to do with *BMR* or supports access beyond "speculation or conjecture." *See, e.g.*, *Gal*, 518 F. Supp. 2d at 538-39, 542-43 (rejecting "theory of access based on speed of creation" as "both unpersuasive and insufficient to raise a jury question," observing that "[s]peed of creation alone has never raised an issue of fact as to access"). Plaintiff alleges that "Kim introduced Freeman to Wolff" at a writing conference (Pl.'s Mem. at 2), which is false and not material because *BMR* was not exchanged (CSUF ¶ 21; DSUF ¶ 79). Plaintiff also points out that Pelletier "was 'very involved with everything about the [*Crave* series'" (Pl.'s Mem. at 3)—but that is inapposite because **Pelletier** did not have access to *BMR*.

In sum, there is no non-speculative evidence of a "particular chain of events" through which Wolff or Pelletier directly accessed *BMR*, and the evidence to the contrary is overwhelming. This is fatal because Plaintiff's theory of plagiarism **requires** direct access. For example, Plaintiff argues that "Wolff cherry-picked through Freeman's materials" (PSUF ¶ 175), which is not possible without direct access. Plaintiff's experts argue that Wolff employed a sophisticated and comprehensive form of plagiarism that combined extensive verbatim copying with "mosaic" and "conceptual" plagiarism strategies. (*See, e.g.*, Pl.'s Mem. at 24-25; Chaski Rep. at 22-37.) This is also not possible without direct access. Summary judgment is necessary for this reason alone.[25]

2.  No Reasonable Jury Could Find Indirect Access Through Kim Or Abrams.

Unsurprisingly in light of the above, Plaintiff mostly pursues a theory of indirect access through Kim or Abrams. (*See* Pl.'s Mem. at 13-14.) This theory fails for numerous reasons.

---

[25] Besides failing to show **how** Wolff could have performed such a complex exercise, Plaintiff has not plausibly shown why Defendants would **want to** do this. Picking through 30 versions of Plaintiff's manuscript (rejected by over 20 other publishers) as source material would have required tremendous work and time when time was of the essence, and doing this would result in disjointed writing rather than natural storytelling. (*See* Pelletier Decl. ¶¶ 3-6.)

**First**, there is no evidence that Kim or Abrams ever discussed *BMR* with, or even mentioned *BMR* to, Wolff or Pelletier. Not **one** email or text shows this occurring, and all four witnesses resoundingly testified that it did not. *See, e.g.*, *Cox*, 1997 WL 251532, at *4 (rejecting intermediary access where intermediary and creator defendants both "swore under oath" that they did not respectively provide or receive the manuscript); *Tomasini*, 84 F. Supp. 2d at 520 (similar). One would expect that if these four individuals collectively engaged in a complex scheme to misappropriate *BMR* (requiring extensive layers of plagiarism including hundreds of instances of alleged verbatim copying), there would be some trace of evidence for this across 41,569 documents produced in this litigation, or that at least one of the four witnesses would have been caught in a lie at her deposition. But there is no such evidence, least of all in anything cited by Plaintiff.

**Second**, and more fundamentally, no reasonable jury could find that Kim or Abrams could have remembered or communicated protected expression from *BMR* five years after being last shown a draft of it, especially without sharing the actual manuscript. Abrams received a single *BMR* draft in October 2013 and denies ever reading it. (DSUF ¶¶ 56-57.) Kim last received a *BMR* draft in July 2013, and October 2013 was the latest she ever read one. (DSUF ¶ 50.) Crave was conceived roughly five years later in April 2019. (DSUF ¶ 80.) It is implausible that anyone—let alone someone who receives numerous submissions a day like Kim and Abrams (DSUF ¶¶ 51, 57)—could remember specific copyrightable expression (i.e., detailed writing) from a book last read five years ago. And no evidence shows Kim or Abrams ever consulting from *BMR*.

But even if Plaintiff could clear that hurdle, it would have been impossible for Kim or Abrams to convey **specific protected expression** from *BMR* without sharing the manuscript itself. Anything short of this would necessarily only convey the book's unprotected ideas. *See, e.g.*, 17 U.S.C. § 102 ("ideas" and "concepts" not protected). To be clear, not even an informal

conversation about *BMR* ever occurred—all witnesses deny discussing *BMR* and not one piece of evidence shows otherwise. But even if Plaintiff's idea-sharing theory is accepted *arguendo*, it would fail as a matter of law because it is **legal** for person A to tell person B about person C's ideas, and for B to then write a book expressing C's ideas in B's own way. *See, e.g.*, *Dreamtitle*, 2023 WL 4350734, at *22 (dismissing where "Plaintiff seeks to use its copyright to monopolize the idea of an illustrated children's book that promotes self-esteem for Black boys" but "[t]he Copyright Act allows room for the different expressions of that concept").

*Third*, no reasonable jury could find that Kim or Abrams themselves materially contributed to writing Crave. As shown above, all witnesses consistently testified that Abrams was initially only a conduit for Wolff and Pelletier's idea exchanges and later merely a copy editor. The evidence Plaintiff cites to does not show Abrams doing anything more than this.

There is also no evidence showing that Kim "directly participated in the writing of" Crave. (Pl.'s Mem. at 3-4.) All witnesses uniformly testified that Kim was a "cheerleader" and that she did not actually write, substantively edit, or materially contribute to Crave's substance. (DSUF ¶¶ 106-108.) The documents Plaintiff cites do not create a material dispute.

For example, Plaintiff cites text messages from October 2021 that variously mention "writ[ing] together" or Kim "helping Tracy write" in a Google Doc. (Pl.'s Mem. at 3-4; PSUF ¶¶ 55, 80, 82, 84-87 (citing Doniger Exs. 5-6, 11, 15, 20).) First, these messages were sent during *Court* only; they are irrelevant to the earlier three books. Moreover, Wolff and Kim, who were not shown these messages at their depositions, now explain what they meant. Kim sat with Wolff virtually in a Google Doc to motivate and keep Wolff awake and on task while Wolff was revising the ending of *Court* while simultaneously caring for her terminally ill mother and sick and injured partner. (Wolff Decl. ¶¶ 23-24, 27-29; Kim Decl. ¶¶ 74, 77.) As Wolff summarizes, Kim was

"making sure I was writing," not "helping me actually write." (Wolff Decl. ¶ 23.) These texts do not show Kim actually contributing to the substance of *Court* (or any Crave book), much less contributing material from *BMR*.

Plaintiff also points out that Kim, like many others in Wolff's orbit, suggested some chapter titles for Crave, few of which Wolff accepted. (Pl.'s Mem. at 3-4; DSUF ¶ 113.) But this is not material because Plaintiff does not allege that the chapter titles are infringing. (DSUF ¶ 115.) The same goes for Kim's contributions to the Crave series bible, a post-hoc internal reference document used to keep track of character traits like hair and eye color that has never been published and also is not alleged to be infringing. (DSUF ¶¶ 116-119.) Finally, the evidence overwhelmingly shows that Wolff, not Kim, came up with setting Crave in Alaska. (DSUF ¶¶ 120-123.) To the extent this is disputed (*see* Pl.'s Mem. at 3; CSUF ¶ 81), it is immaterial because setting a paranormal story in Alaska is an unprotected idea.

<p style="text-align:center">3.    <u>Plaintiff Woefully Fails To Establish Striking Similarity.</u></p>

Plaintiff has come nowhere close to establishing striking similarity. (*See* Pl.'s Mem. at 14-17.) First, there is no such thing as "[s]triking [p]robative [s]imilarity." (*Id.* at 14 (section heading).) Plaintiff conflates the concept of "probative similarity," which means threshold similarities probative of copying that must be proven ***in addition to*** access, with "striking similarity," a much more exacting showing that allows a plaintiff to bypass the need to prove access. *See, e.g.*, *Gal*, 518 F. Supp. 2d at 537-38. Plaintiff fails to establish either.[26]

Striking similarity exists "when two works are so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later was copied from the first." *E.g.*, *Gal*, 518 F. Supp. 2d at 537. The "test is stringent" and "requires, not surprisingly, ***more than*** a

---

[26] The works do not share similarities probative of copying for all of the reasons set forth herein.

showing of substantial similarity." *Id.* (cleaned up). Because no reasonable jury could find substantial similarity as shown in § I above, it follows perforce that a jury could not go even further and find striking similarity. Instead, the works' radical dissimilarity refutes any notion that *BMR* was accessed and copied. (*See* Pl.'s Mem. at 14 (acknowledging "inverse relationship" between degree of similarity and proof needed for access).) Plaintiff mostly attempts to establish striking similarity through her experts' opinions and via Freeman's similarity indexes, but these materials are unreliable and inadmissible as shown in Defendants' Evidentiary Objection and at *Daubert*.

### C.        Plaintiff Fails To Rebut The Strong Evidence Of Independent Creation.

Defendants are additionally entitled to summary judgment because "[t]he evidence of independent creation in this case overwhelms" and "negates" "any inference of copying." *Procter & Gamble*, 199 F.3d at 77 (affirming this finding, including that "the likelihood that similarities between the parties works are the product of conventions in the field"); *Cox*, 1997 WL 251532, at *3, *7 (granting summary judgment where "deposition testimony demonstrates that [defendant] independently created" work at issue and "plaintiffs have not submitted any evidence to contradict that testimony"); *Chapman v. Universal Motown Recs. Grp.*, 2010 WL 517480, at *5 (S.D.N.Y. Feb. 4, 2010) (same where defendant's unrebutted "testimony that he … had never heard Plaintiff's song before composing his own song" "establishes Universal's prima facie entitlement to summary judgment").

The true story of Crave's creation (described in § II.A above) is credible, supported by the record, and unrefuted. Defendants have produced their documents evincing Crave's creation—including numerous book drafts and their communications during the drafting/editing process—and ***none*** of these documents mentions let alone shows copying from *BMR*. (*See, e.g.*, Cole Exs. S-W (examples of Crave drafts).) Wolff has credibly explained where major ideas she is accused of stealing really came from. (DSUF ¶¶ 120-127.) For example, she came up with Alaska based

on a snowboarding documentary and other vampire book, and included Alaska as a setting in the initial list of five ideas she first sent Entangled. (DSUF ¶¶ 120-123; Doniger Ex. 29 at 1.) She named the Crave school "Katmere" based on the Lion King and Harry Potter. (DSUF ¶ 126.) She modeled Flint after her son and put characters in 80s rock t-shirts because one of her students was obsessed with a Motley Crüe documentary. (DSUF ¶¶ 127, 134.) Pelletier came up with the "Bloodletter" from a video game. (DSUF ¶ 125.) Pelletier came up with the idea of the heroine's parents dying in a car crash and her needing to go live with her uncle who is the school dean. (DSUF ¶¶ 88, 125; Doniger Ex. 30 at 2-3 (email including this idea).) Besides innuendo and rank speculation, Plaintiff provides no evidence refuting any of this.

Defendants have also shown that Plaintiff's infringement theory is impossible and implausible. It would have been physically impossible to comb dozens of manuscripts to find discrete nuggets to steal in the short time period when the Crave books were written and edited. (Pelletier Decl. ¶ 6.) Such an exercise would be counterproductive because it would result in disjointed writing rather than Wolff's natural storytelling voice. (*See id.* ¶ 5; Reiss Rep. ¶ 32 (emphasizing importance of "an original narrative voice").) And it is not plausible that, of all the possible works in the world to steal from, Defendants would choose a 50-times-revised unpublished manuscript that was rejected by over 20 other editors. (Pelletier Decl. ¶ 6.)

Finally, *Tempest* and Plaintiff's Tempest List prove that Wolff had written allegedly infringing aspects of the Crave series before Freeman ever sent any materials to Kim. For example, the Tempest List accuses Wolff of stealing Plaintiff's idea to feature "a girl from California who thinks she's human but discovers she is supernatural" and "comes into her powers on her 17th birthday and will shift to her supernatural form." (*See* Tempest List at 11.) *Tempest* itself notably includes a protagonist from San Diego (Wolff's hometown) who hears voices in her head, has

magical tattoos, and is the balance in a battle between good and evil and the only one who can stop it. (DSUF ¶ 36.) It also contains the famous Ducati Streetfighter motorcycle over which Plaintiff moved to compel Wolff's hard drives, but has now conspicuously abandoned with her motion. (*See, e.g.*, Pl.'s Inf. Ltr. at 4; Tempest List at 11; ECF No. 131; DSUF ¶ 136.) These are Wolff's own ideas, and it is impossible that she stole them from Plaintiff.

In sum, the allegations of access and copying are not borne out by the evidence and instead are refuted by clear and credible evidence of Crave's independent creation. Summary judgment is necessary for this reason too. This includes as to Macmillan (which cannot be liable for distributing non-infringing books) and Universal (to which *Crave* film rights were legally licensed).

## CONCLUSION

This has been a baseless case from the beginning. Plaintiff has harmed Defendants' reputations and cost Defendants millions of dollars in legal fees litigating a case that could have been dismissed if she had disclosed her manuscript up front. The parties' works are now before the Court and speak for themselves. Plaintiff has presented her best evidence of access, and it entirely depends on speculation and innuendo. Defendants have met the standard for summary judgment and their motion should be granted.[27]

Dated: New York, New York
      December 22, 2023

Respectfully submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**

By: /s/ Nancy E. Wolff
Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
41 Madison Avenue, 38th Floor
New York, New York 10010

---

[27] Plaintiff's claims for contributory and vicarious copyright infringement fail because her claims for direct infringement fail. Further, as fully set forth in the Prospect Defendants' motion, Plaintiff's state-law claims essentially depend on her copyright claims and fail as well.

Telephone: (212) 974-7474
Fax: (212) 974-8474
nwolf@cdas.com
bhalperin@cdas.com
ccole@cdas.com
*Attorneys for Defendants Tracy Deebs-*
*Elkenaney p/k/a Tracy Wolff, Entangled*
*Publishing, LLC, Holtzbrinck Publishers,*
*LLC d/b/a Macmillan, and Universal City*
*Studios LLC*
Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim*
*and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN &
GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendant Tracy Deebs-*
*Elkenaney p/k/a Tracy Wolff*

## <u>CERTIFICATE OF SERVICE</u>

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of Defendants'
Memorandum of Law in Support of Their Motion for Summary Judgment on the Copyright Claims
and in Opposition to Plaintiff's Motion for Summary Judgment has been served on all counsel of
record via the Court's CM/ECF service.

/s/ Nancy E. Wolff
Nancy E. Wolff