# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LYNNE FREEMAN, | Case No.:  1:22-cv-02435-LLS-SN |
| Plaintiff, | |
| vs. | |
| TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al., | |
| Defendants. | |

## DEFENDANTS' CONSOLIDATED LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Sylvan Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN & GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
*Attorneys for Defendant Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

Pursuant to Rule 56.1 of the Local Rules for the United States District Court for the Southern and Eastern Districts of New York (the "Local Rules"), Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal") respectfully collectively submit the following Statement of Undisputed Material Facts in support of their motions for summary judgment against and in opposition to Plaintiff's motion for summary judgment.[1]

**A.      The Parties**

1.      Plaintiff is a non-practicing family law attorney and primarily resides in California. (Freeman Dep. 15:9-13, 22:11-24; Baer Dep. 24:8-17.)

2.      Plaintiff's husband Trent Baer, an investment advisor, has been actively involved in the prosecution of this lawsuit. (Baer Dep. 15:23-25, 19:25-20:1; 87:14-19; 104:17-105:18, 114:14-115:21, 116:19-25.)

3.      Defendant Tracy Wolff is a #1 *New York Times*, #1 International, and *USA Today* bestselling author of nearly 70 novels that span the genres of adult and YA literature. (Wolff Dep. 34:6-8; 51:24-52:6, 53:7-10, 69:1-5; December 22, 2023 Decl. of Tracy Wolff ("Wolff Decl.") ¶ 5; December 22, 2023 Decl. of Elizabeth Pelletier ("Pelletier Decl.") ¶ 3.) Wolff first appeared on the *New York Times* and *USA Today* bestseller lists in 2014. (Wolff Decl. ¶ 10.) Wolff published her first novel in 2007. (Wolff Dep. 33:15.) Beginning in 2008, Wolff has written for Penguin Random House, HarperCollins, Little Brown (Hachette), Harlequin, Bloomsbury, Entangled, and others. (Wolff Decl. ¶ 10.) Wolff has, *inter alia*, been nominated for the Romance Writers of

---

[1] This statement uses the same defined terms as in Defendants' copyright summary judgment brief. For example, *"BMR"* refers to all drafts of Plaintiff's manuscript, including those entitled *Blue Moon Rising* and *Masqued*. "Crave" (non-italics) refers to the Crave series as a whole whereas "*Crave*" (italics) refers to book 1.

America's RITA Award (the highest award of distinction for romance fiction). (*Id.*) Her YA novel *Doomed* was chosen for a Texas state reading list and her novel *Tempest Rising* went back to print six times in the two years after it was first published. (*Id.*) Wolff has consistently published three-to-ten books per year since 2008. (*Id.*)

4.     Wolff, whose legal name is Tracy Deebs-Elkenaney, is the author of the Crave series, which is written under her pen name Tracy Wolff. (Wolff Dep. 10:7-9, 179:7-9.) Wolff has also written under the pen names Tracy Deebs, Ivy Adams, and Tessa Adams. (Wolff Dep. 9:21-25.)

5.     Wolff grew up and went to high school in San Diego. (Wolff Dep. 37:8-11; Wolff Decl. ¶ 18(a).)

6.     Defendant Entangled is the publisher of the Crave series. (Wolff Dep. 13:9-10; Pelletier Dep. 14:2-4.)

7.     Elizabeth Pelletier is the majority owner and Chief Executive Officer of Entangled. (Pelletier Dep. 12:23-24; Abrams 28:15-16.)

8.     Defendant Prospect Agency is a literary agency founded by Defendant Kim in 2005. (Kim Dep. 40:13-41:7; December 22, 2023 Declaration of Emily Sylvan Kim ("Kim Decl.") ¶ 7.)

9.     Kim is the principal of Prospect and has served as Wolff's literary agent since 2007. (Wolff Dep. 44:3-4, 45:18-46:16; Kim Dep. 40:13-41:7; Kim Decl. ¶¶ 7, 60; Doniger Ex. 39 (Wolff-Kim Agency Agreement).)

10.     Plaintiff and Kim entered into a written agency agreement, which was executed by Freeman on December 8, 2010. (Doniger Ex. 39; Kim Dep. 43:12-44:4; Kim Decl. ¶ 15)

11.    The Plaintiff-Kim agency relationship ended on March 25, 2014. (Doniger Ex. 39; Doniger Ex. 24 (3/24/2014 email from Freeman to Kim stating "I don't believe Entangled will want Masqued as it is…. So I believe that brings us to a parting of ways."); Kim Dep. 144:20-144:18; Kim Decl. ¶ 41.) Aside from emailing Plaintiff once to check in, Kim did not have any contact with Plaintiff between March 2014 and April 2021, when Plaintiff contacted Kim asking for a copy of her agency agreement while preparing for this lawsuit. (Kim Decl. ¶¶ 43-44.)

12.    Defendant Macmillan is the distributor of the Crave series. (Tzetzo Dep. 16:6-16; Wolff Dep. 13:11-12; Pelletier Dep. 17:21-23.)

13.    Defendant Universal, a film studio, has licensed certain rights in a film adaptation of *Crave* from Entangled. (Loveall Dep. 18:13-19:8.)

14.    Neither Macmillan nor Universal was involved in creating or writing the Crave series. (Tzetzo Dep. 98:19-24; Loveall Dep. 51:20-23.)

**B.    The Crave Series And *BMR***

15.    The Crave series currently consists of six published novels—*Crave*, *Crush*, *Covet*, *Court*, *Charm*, and *Cherish*. (Wolff Dep. 99:6-9.)

16.    Only the first four books of the series—*Crave*, *Crush*, *Covet*, and *Court*—are presently at issue in this litigation. (First Amended Complaint ("FAC," ECF No. 24) at ¶¶ 1, 8, 39, 44; *see also Crave*, *Crush*, *Covet*, *Court* (Cole Exs. A-D).)

17.    Wolff wrote *Crave* from roughly April/May 2019 to December 2019/January 2020. Wolff wrote *Crush* from roughly February 2020 to Summer 2020. Wolff wrote *Covet* from roughly Summer 2020 to December 2020. Wolff wrote *Court* from roughly February 2021 to October 2021. (Wolff Decl. ¶¶ 18-21.)

18.     *Crave* was published in April 2020. *Crush* was published in September 2020. *Covet* was published in March 2021. *Court* was published in February 2022. (Wolff Dep. 11:20-12:2; Wolff Decl. ¶¶ 18-21; *see also Crave*; *Crush*; *Covet*; *Court*.)

19.     *Crave*, *Crush*, *Covet*, and *Court* are respectively 571, 684, 680, and 689 pages, totaling 2,624 pages; they are respectively 167,792; 208,223; 241,710; and 261,376 words, totaling 879,101 words. (*See Crave*; *Crush*; *Covet*; *Court*.)

20.     Crave is often described as "Harry Potter meets Twilight," in that it melds the magical, boarding school elements of Harry Potter with the vampire romance made popular by the Twilight series. (Cole Ex. AA (Easton Rep.) at 15-16); Pelletier Dep. 99: (12-25); Pelletier Decl. ¶ 7; *see also, e.g.*, *Court* at Praise for Tracy Wolff's Crave Series ("'Twilight in Hogwarts with dragons.'" – books_and_crafts on *Crush*", "'Twilight meets Harry Potter meets CW Drama.' – Heybiancaj on *Crave*").)

21.     The Crave series and *BMR* are Young Adult (YA) Paranormal Romance books. (Pl.'s Mem. at 8; Easton Rep. at 24; Pelletier Dep. 13:17-21; Baer Dep. 31:13-16.)

22.     YA books, including the Crave series and *BMR*, are written at a 12-to-18-year-old reading level. (Abrams Dep. 30:13-17); Easton Rep. at 13-14; Easton Rebuttal Rep. at 1; Baer Dep. 31:2-12.)

23.     *BMR* was revised around 50 times. (Pl.'s Mem. at 1.)

24.     The three *BMR* manuscripts (each entitled *Masqued*) included as Exhibits 15, 16, and 21 to the Freeman Declaration were all created after the Freeman-Kim relationship ended in March 2014. Specifically: (1) the manuscript that is Freeman Ex. 15 was created on October 10, 2016 (Cole Decl. ¶ 18 & Ex. P); the manuscript that is Freeman Ex. 16 was created on July 20,

2014 (Cole Decl. ¶ 19 & Ex. Q); and the manuscript that is Freeman Ex. 21 was created on July 20, 2014 (Cole Decl. ¶ 20 & Ex. R).

**C.**     ***Tempest Rising***

25.     Wolff is the author of the YA book *Tempest Rising*, which was published by Bloomsbury Publishing Inc in May 2011. (Abrams Dep. 108:11-13, 110:23-111:2; Hard Drives Order (ECF No. 180) at 2.)

26.     Wolff's draft of *Tempest Rising* was completed by June 30, 2010. (Hard Drives Order (ECF No. 180) at 4-5; Easton Rep. at 3 (explaining personal involvement with publishing *Tempest Rising* at Bloomsbury); Wolff Decl. ¶ 6.)

27.     Plaintiff had not sent Kim any *BMR*-related materials as of June 30, 2010. (Hard Drives Order at 2 ("Plaintiff alleges in her motion that she sent Kim the first three chapters of her work Blue Moon Rising on October 27, 2010. There is no evidentiary support for this allegation, and Freeman does not assert it in her sworn declaration."); *see also* Baer Dep. 177:2-9 ("Q. And you personally have not seen any documents showing that your wife sent her a writing sample in October 2010; correct? A. No. Q. Have you seen any documents showing that your wife sent Kim her entire novel on November 17, 2010? A. No.")

28.     An advanced reader copy (ARC) of *Tempest Rising*, based on the draft that was completed by June 30, 2010, was printed in October 2010. (Easton Rep. at 3; Hard Drives Order (ECF No. 180) at 1-2; Cole Ex. X (the June 30, 2010 draft used for the ARC).)

29.     The October 2010 ARC of *Tempest Rising* includes mention of a Ducati Streetfighter motorcycle. (Cole Ex. X (*Tempest* 6/30/10 draft/ARC) at p. 111; March 3, 2023 Wolff Decl. (ECF No. 150) ¶¶ 13-14; *see also* Wolff Decl. ¶ 6.)

30.     Baer admitted that all alleged similarities in Plaintiff's Tempest List identifying 56

purportedly similar phrases appearing in Tempest and BMR, as well as various alleged plot and

character similarities, "have to just be coincidences." (Baer Dep. 184:7-22; *see also* Pl.'s Tempest

List (ECF No. 103-2) at 11-26.)

**D.     Unprotected Ideas**

31.     Other books in the YA Paranormal Romance genre—including books published

before *BMR* was written—have utilized at least the following character, storyline, and setting

components:

- **Protagonist:** is supernatural; initially thinks she is a normal human; has supernatural family; death of parents; lives with surrogate parents; is a teenager; moves/is new in town; doesn't feel attractive or special; experiences anxiety, depression, or panic attacks; loves books/is a good student; is the "chosen one" (special power or prophecy); must choose between Light/Dark or bring balance; has prophetic dreams/visions; powers are hidden/bound for safety; "kicks butt"; saves love interest's life; has "hot guy" friend, sometimes gay; is kidnapped; is attacked by supernatural creatures.

- **Romantic lead:** has model-like looks; is "bad boy with a good heart"; is powerful supernatural creature; heroine meets him right away; has instant connection with heroine; heroine and he have initial aversion/annoyance but end up falling in love; heroine and he are soul mates or "bonded"; heroine and he are conflicted by attraction; breaks heroine's heart to save her; heroine and he profess love; heroine and he share epic kiss; rescues heroine or vice versa; has dark secrets; dangerous for heroine to be with him.

- **Setting:** remote setting; supernatural school; public school with supernatural students; Gothic architecture/castle setting; cold/dark setting for vampires or other paranormals.

- **Other paranormal romance:** supernatural creatures (vampires, werewolves, witches, etc.); love triangle; rival houses/supernatural war; choosing light or dark, good and evil, or restoring "balance"; secret organization of supernatural creatures; secret sanctuary location; mythology/fairy tale roots; magical guide or mentor; entering other realms; objects of power and magic; vengeance for death of loved one; magical creatures forbidden to mix; vortexes, portals, or similar magical travel devices; time freezing, dream sequences, or similar time-displacement devices; elusive magical artifacts.

(Easton Rep. at 5-8, 16-49; Freeman Dep. 55:2-69:1, 71:20-76:15; Pelletier Decl. ¶¶ 4, 8; *see also* Defendants' Request for Judicial Notice ("Defs.' Notice Req.") at 1-2 (advising that Court may take judicial notice of all published prior third-party works).)

32.    Other vampire books, including books published by Entangled, have been set in Alaska. (Pelletier Dep. 65:10-25; Wolff Dep. 36:8-37:2 ("I do know that one of my favorite vampire novels ever was in Alaska. It's – and I always thought that was a very cool setting for vampires. Q. And which novel was that? A. Dancing in the dark by Sherrilyn Kenyon."); Pelletier Decl. ¶ 8; Defs.' Notice Req. at 1-2.)

33.    Other books, including books published by Entangled, have featured a heroine who moved to Alaska from southern California. (Pelletier Dep. 65:7-25 (discussing *Wild in Captivity* by Samantha Beck (Entangled, 2021)); Pelletier Decl. ¶ 8; Defs.' Notice Req.)

34.    Other books have featured a search for elusive magical artifacts, including *Harry Potter and the Half-blood Prince* (2005) (horcruxes), *Harry Potter and the Deathly Hallows* (2007) (horcruxes and deathly hallows), *City of Bones* (2007) (search for "mortal instruments"); *Shadow and Bone* (2013) (search for "amplifiers"); and *Children of Blood and Bone* (2018) (search for sacred objects to perform a ritual). (Easton Rep. at 8, 19, 49; Defs.' Notice Req. at 1-2.) The search for artifacts goes back to Greek myth (the Golden Fleece) and Arthurian legend (the Holy Grail), and has been used in popular series like Lord of the Rings and *Raiders of the Lost Ark*. (*Id.*)

35.    Other books, TV shows, movies, and video games have named characters and/or weapons the "Bloodletter." (Pelletier Dep. 109:11-18 (Q. And how did you come up with that name? A. I play a lot of video games and it was a weapon in a video game.'); Easton Rebuttal Rep. at 5 ("Many other books have used it, including J.R. Ward's best-selling vampire series Black Dagger Brotherhood, specifically in book 5, *Lover Unbound* (published 2007), *The Bloodletter's*

*Daughter: A Novel of Old Bohemia* by Linda Lafferty (2012), *Bloodletter (Star Trek: Deep Space Nine)* by K.W. Jeter (2000), and *Bloodletter* by Warren Newton Beath (1994).”); Defs.’ Notice Req. at 1-2.)

36.    Wolff’s pre-*BMR* book *Tempest Rising* featured a heroine “from [San Diego] California who thinks she’s human but discovers she is supernatural”; a heroine who “comes into her powers on her 17th birthday and will shift to her supernatural form”; a heroine with a strange growing rash on her neck, a voice inside her head, magical tattoos; a love interest who rides a Ducati Streetfighter S motorcycle; and is the balance in a battle between good and evil and the only one who can stop it. (Tempest List at 11; Wolff Decl. ¶¶ 6, 9, 18(a); *see generally* Cole Ex. X (*Tempest* 6/30/10 draft/ARC).)

37.    Wolff has used San Diego in multiple books, such as the Ethan Frost series and the Shaken Dirty series, both bestsellers. (Wolff Decl. ¶ 18(a); *see generally* Cole Ex. X (*Tempest* 6/30/10 draft/ARC); *see also* Defs.’ Notice Req. at 1-2.)

38.    Plaintiff did not invent numerous ideas and phrases allegedly stolen by Defendants, including the phrase “well well well. Looks like”; describing “a male romantic lead as gorgeous, beautiful, and hot”; describing Alaska as “freezing cold in the winter”; and referring to “civil twilight in Alaska”; and “a fight scene with a group of guys where the hero comes to save the protagonist.” (Freeman Dep. 151:16-20 (“Q. Do you think it’s copyright infringement if two books describe a male romantic lead as gorgeous, beautiful, and hot? A. No.”), 164:24-165:1 (“Q. Is describing Alaska as freezing cold in the winter copyright infringement? A. No.”), 169:18-21 (“Q. So if two writing refer to civil twilight in Alaska, is that considered copyright infringement? A. No.”), 309:5-8 (“Q. Do[es] both [*BMR* and *Twilight*] have a fight scene with a group of guys where

the hero comes to save the protagonist? A. Yes."); Baer Dep. 47:14-16 (Q. [...] Lynne Freeman didn't create the phrase 'Well, well, well. Looks like'; right? A. No.").)

39.    The idea of naming a supernatural refuge the "Sanctuary" was used in the 2009 novel *Bad Moon Rising* by bestselling author Sherrilyn Kenyon. (Easton Rep. at 22; Defs.' Notice Req. at 1-2.)

40.    The idea of naming a "chosen one" character the "Nyx" was used in the 2007 novel *Marked* by P.C. and Kristin Cast. (Easton Rep. at 18-19; Defs.' Notice Req. at 1-2.)

41.    The idea of a dead relative speaking to a protagonist in her head has been used in many fictional works, including Star Wars (Obi-wan Kenobi, Yoda, and Anakin speaking to Luke). (Defs.' Notice Req. at 1-2.) The idea of a character hearing a voice in her head goes as far back as the Bible. (Wolff Decl. ¶ 9; Defs.' Notice Req. at 1-2.)

42.    The idea of going through vortexes and/or portals has been used in many fictional works, including the 2007 YA paranormal romance novel *City of Bones* by Cassandra Clare, and in Harry Potter (the Pensieve). (Easton Rep. at 19, 46; Defs.' Notice Req. at 1-2.)

43.    At Stacy Abrams' deposition, Plaintiff's counsel was not familiar with the character Professor Snape from Harry Potter (referred to by counsel as "Snap") and conceded: "I guess it shows that I -- I don't know Harry Potter." (Abrams Dep. 130:3-11.)

44.    Baer, who has himself been falsely accused of wrongdoing, agreed that sometimes allegations of wrongdoing turn out to be false upon investigation of the facts. (Baer Dep. 192:21-24.)

45.    Dr. Chaski admitted that her opinions do not address substantial similarity. (Chaski Dep. (Cole Ex. EE) 20:16-21:24 ("Q. My question is, is substantial similarity an issue that you are

offering an opinion on? … [objection] … A. I don't think my report addresses substantial similarity in terms of … estimating how an average reader would read these books.").)

46.     The longest shared sequence Dr. Juola found upon investigating the parties' works is "on my arms and the back of my neck." (Juola Rep. (Doniger Ex. 37) ¶ 19.)

47.     Dr. Juola conceded that the phrase "on my arms and the back of my neck" is not evidence of plagiarism. Dr. Juola applied a methodology that requires finding shared sequences at least seven words long. (Juola Rep. ¶¶ 17-20.) Dr. Juola conceded that because "on my arms and the back of my neck" includes the common expression "the back of my neck," it only qualifies as a five-word sequence. (Juola Dep. (Cole Ex. DD) 114:9-116:1.)

48.     The final pages of *BMR 2013* contain 89 words of dialogue copied verbatim from the television show *Roswell*. (Coulthard Rep. (Cole Ex. Z) ¶¶ 33-37.)

**E.     Plaintiff's Theory of Access**

49.     During the roughly three years Kim represented Plaintiff as her literary agent, Plaintiff sent Kim an estimated 10-15 drafts of *BMR*. (Kim Dep. 58:15-25; Kim Decl. ¶ 45; Kim Decl. ¶ 45.)

50.     The last draft of *BMR* Kim received from Plaintiff was in July 2013. (Kim Decl. ¶ 35, Ex. 26; Kim Decl. ¶ 45.) The last time Kim reviewed any draft of *BMR* was October 2013 at the latest. (Kim Decl. ¶ 4.)

51.     During the time she represented Plaintiff from December 2010 until March 2014, Kim received up to twenty queries or pitches a day and additionally read widely for enjoyment. (Kim Decl. ¶ 17.)

52.     On October 10, 2013, Kim sent a 297-word pitch email regarding *BMR* (then titled *Masqued*) to Pelletier's Entangled email address, at Plaintiff's direction. (Doniger Ex. 21; Kim

Dep. 137:2-14; Kim Decl. ¶¶ 37-38.) Only 224 words of the pitch email address *BMR's* plot—the rest of the email contains greetings and brief a summary of Freeman's biography. (Doniger Ex. 21; Kim Decl. ¶ 38; Pelletier Decl. ¶ 13.)

53.     The *BMR* (*Masqued*) manuscript itself was not attached to Kim's Oct. 10, 2013 pitch email, which closes with the phrase "I'd love to send you the full manuscript." (Doniger Ex. 21 at 3; Kim Decl. ¶ 38.)

54.     Pelletier was closed to acquisitions when Kim sent the Oct. 10, 2013 *BMR* pitch. (Doniger Ex. 21; Abrams Dep. 81:4-15; Pelletier Dep. 81:9-18.) Pelletier forwarded the pitch email, without comment, to Abrams, who replied to Kim confirming that Pelletier was "closed to submissions." (Doniger Ex. 21; Abrams Dep. 81:4-15; Pelletier Dep. 81:9-18; Pelletier Decl. ¶ 13; Kim Decl. ¶ 38.)

55.     Pelletier does not recall ever reading the October 2013 *BMR* pitch email. (Pelletier Dep. 80:1-16, 80:25-81:8; Pelletier Decl. ¶ 13.)

56.     On October 30, 2013, Kim sent one version of *BMR* (the *Masqued* version mentioned in the pitch email) directly to Abrams. (Doniger Ex. 21 at 1.)

57.     Abrams, who typically receives between 5 and 20 manuscripts every day, does not believe that she ever read the *BMR* manuscript Kim sent her in October 2013. (Abrams Dep. 90:10-93:8.) Abrams did not give Pelletier a copy of the manuscript or talk to her about it. (Abrams Dep. 174:17-18 (never gave a "copy of *Masqued* to anyone"), 174:24-175:3 (same as to Pelletier), 175:24-176:2 (never "discuss[ed] *Masqued* with Liz Pelletier); Pelletier Decl. ¶ 13.)

58.     *BMR* was rejected by over 20 book publishers. (Kim Decl. ¶¶ 2, 26-27, 30-32, 37-39; Kim Exs. 8-12, 14-15, 28-33 (rejection letters).)

59.   After the efforts to publish *BMR* proved unsuccessful, Plaintiff and Kim amicably ended their relationship in March 2014. (Doniger Ex. 24; Kim Dep. 144:16-18; Kim Decl. ¶ 41.)

60.   As part of this, Plaintiff asked Kim to withdraw *BMR* from Entangled, and Kim did so. (Kim Decl. ¶ 41; Doniger Ex. 24.)

61.   Neither Kim nor Abrams ever shared a copy of *BMR* with Wolff. (Kim Dep. 159:6-8 (never gave "a copy or any of the contents of [*BMR*] to Tracy Wolff"), 159:20-21 (never "discuss[ed] [*BMR*] with Tracy Wolff"); Abrams Dep. 174:17-175:3 (never gave "a copy of [*BMR*] to anyone" including Wolff or Pelletier), 175:22-177:1 (never "discuss[ed] [*BMR*]" with Wolff or Pelletier); 178:7-11 (similar); Kim Decl. ¶ 46; Wolff Dep. 188:23-190:12 ("No one has ever sent [Wolff] any portion of [*BMR*]"); Wolff Decl. ¶¶ 3, 17.)

62.   Neither Kim nor Abrams ever shared a copy of *BMR* with Pelletier. (Kim Dep. 158:18-159:5 (never gave "a copy of any of the contents of [*BMR*] to Liz Pelletier"), 159:9-19 (never "discuss[ed] [*BMR*] with Liz Pelletier" and the submission to Abrams was "all of the communications we had about that book"), 159:22-24 (never "discussed [*BMR*] with Stacy Abrams or anyone else at Entangled"), 160:4-14 (never "orally or in writing provided any language from [*BMR*] to Liz Pelletier" or "Stacy Abrams or anyone else at Entangled" aside from the initial submission to Abrams and never "discuss[ed] Lynne Freeman with Liz Pelletier"), 160:18-20 (same as to Abrams aside from the initial submission); Abrams Dep. 174:17-18 (never gave a "copy of [*BMR*] to anyone"), 174:24-175:3 (same as to Pelletier), 175:24-176:2 (never "discuss[ed] [*BMR*] with Liz Pelletier"), 176:9-177:1 (never "discuss[ed] Lynne Freeman with anyone" including Wolff or Pelletier), 178:7-11 (similar); Kim Decl. ¶ 46.)

63.   Neither Kim nor Abrams ever discussed *BMR* or its contents with Wolff prior to this litigation. (Kim Dep. 159:6-8 (never gave "a copy or any of the contents of [*BMR*] to Tracy

Wolff"), 159:20-21 (never "discuss[ed] [*BMR*] with Tracy Wolff"), 159:25-160:3 (never "orally

or in writing provided any language from [*BMR*] to Tracy Wolff"), 160:15-17 (never "discuss[ed]

Lynne Freeman with Tracy Wolff"); Abrams Dep. 102:7-12 (never discussed *BMR* with Wolff),

175:22-23 (same), 176:9-15 (never "discuss[ed] Lynne Freeman with anyone"), 176:16-18 (same

as to Wolff); Wolff Dep. 35:2-6 ("first heard" of *BMR* upon receiving Plaintiff's "demand letter"

in February 2022), 189:1-190:9 (no one ever "sent" or "communicated to" Wolff "language from

[*BMR*]" and Wolff never "discussed any of the contents of [*BMR*] with Kim…

Pelletier…Abrams…or anyone") ; Kim Decl. ¶ 46; Wolff Decl. ¶¶ 3, 17.)

  64. Neither Kim nor Abrams ever discussed *BMR* or its contents with Pelletier prior to

this litigation. (Pelletier Dep. 85:11-19 (never discussed *BMR* or its contents with "Stacy Abrams

or anyone else"), 90:9-13 (same as to *BMR* and Freeman), 110:20-111:17 (same as to Kim and

Wolff); Kim Dep. 158:18-159:5 (never gave "a copy of any of the contents of [*BMR*] to Liz

Pelletier"), 159:9-19 (never "discuss[ed] [*BMR*] with Liz Pelletier" and never sent Abrams [*BMR*]

outside of the original submission to her), 159:22-24 (never "discussed [*BMR*] with Stacy Abrams

or anyone else at Entangled"), 160:4-14 (never "orally or in writing provided any language from

[*BMR*] to Liz Pelletier" or "Stacy Abrams or anyone else at Entangled" aside from the initial

submission to Abrams and never "discuss[ed] Lynne Freeman with Liz Pelletier"), 160:18-20

(same as to Abrams aside from the initial submission); Abrams Dep. 102:13-20 (never "discuss[ed]

[*BMR*]" with Pelletier), 175:24-176:2 (never "discuss[ed] [*BMR*] with Liz Pelletier"), 176:9-15

(never "discuss[ed] Lynne Freeman with anyone"), 176:19-177:1 (never "discuss[ed] Lynne

Freeman with anyone" including Wolff or Pelletier); Kim Decl. ¶ 46; Pelletier Decl. ¶ 2.)

  65. Pelletier and Wolff never discussed Plaintiff or *BMR* or its contents with one

another (prior to this litigation). (Pelletier Dep. 90:4-8 (never "discuss[ed] [*BMR*]" or "Freeman"

with Wolff), 110:20-23 (never discussed *BMR* with "Tracy Wolff" or "anyone"), 111:6-11 (same

as to discussing Freeman); Wolff Dep., 189:14-16 ("Q. Have you ever discussed any of the

contents of [*BMR*] with Liz Pelletier? A. I have not."), 189:20-22 (same as to "with anyone"),

190:1-3 (never "discussed any of the language [of *BMR*] with Liz Pelletier"), 190:7-12 (same as

to "with anyone"); Pelletier Decl. ¶ 2; Wolff Decl. ¶¶ 3, 17.)

66.     Entangled has always maintained virtual offices, meaning there is no physical

depository where hard copies of manuscripts submitted to Entangled for consideration would be

stored and could be accessed by company-wide employees. (Pelletier Dep. 87:19-24, 97:5-10;

Pelletier Decl. ¶ 15.)

67.     Wolff has never been in possession of a complete or partial copy of *BMR*. (Wolff

Dep. 188:23-189:10 ("No one has ever sent me any portion of [*BMR*]."; "No one has [ever] sent

me any language from [*BMR*]"), 190:10-12 ("Q. Have you ever had in your possession a partial or

a complete copy of [*BMR*]? A. I have not."); Wolff Decl. ¶¶ 3, 17.)

68.     Wolff has never read any portion of *BMR*. (Wolff Dep. 35:23-36:2 (never read any

part of *BMR* and first heard of it with demand letter), 188:19-22 ("I have never read any portion

of [*BMR*]"); Wolff Decl. ¶¶ 3, 17.)

69.     Pelletier has never been in possession of a complete or partial copy of *BMR*.

(Pelletier Dep. 83:20-25 (Abrams did not send Pelletier a copy of *BMR*), 110:8-19 (never gave "a

copy of [*BMR*]" to or "discuss[ed] [*BMR*]" with anyone including Wolff, Abrams, and Kim);

Pelletier Decl. ¶ 2; *see also* Doniger Ex. 26.)

70.     Pelletier never read any portion of *BMR*. (Pelletier Dep. 79:10-13 (never "read all

or any part of [*BMR*]"); Pelletier Decl. ¶ 2.)

71.     Neither Wolff nor Pelletier had heard of Freeman or *BMR* before Plaintiff's counsel sent a demand letter to Defendants' counsel in February 2022. (Wolff Dep. 35:2-6 ("first heard" of *BMR* upon receiving Plaintiff's "demand letter" in February 2022), 82:9-83:4 (never met Plaintiff), 176:11-14 (never heard of Plaintiff at the time *Crave* was published in 2020), 190:13-17 (never spoke with Kim about Freeman until Wolff received Plaintiff's demand letter in February 2022); Pelletier Dep. 78:7-79:13 (only learned about Plaintiff and *BMR* in February 2022 when she received Plaintiff's demand letter); Pelletier Decl. ¶ 2; Wolff Decl. ¶¶ 3, 17.)

72.     Wolff, Pelletier, Kim, and Abrams never discussed *BMR* with one another prior to this litigation. (Pelletier Dep. 85:11-19 (never discussed *BMR* or its contents with "Stacy Abrams or anyone else"), 90:4-13 (same as to *BMR* and Freeman), 110:8-111:17 (never gave "a copy of [*BMR*]" to or "discuss[ed] [*BMR*]" with anyone including Wolff, Abrams, and Kim); Wolff Dep. 35:2-6 ("first heard" of *BMR* and *Masqued* upon receiving Plaintiff's "demand letter" in February 2022), 189:4-190:17 (no one, including Kim, Pelletier, or Abrams, ever "communicated to" and Wolff never "discussed any of the contents of [*BMR*]"); Kim Dep. 159:17-160:20 (same as to Kim), Abrams Dep. 175:5-177:1 (same as to Abrams); Kim Decl. ¶ 46; Wolff Decl. ¶¶ 3, 17; Pelletier Decl. ¶ 2.)

73.     Pelletier never discussed *BMR* or Plaintiff with anyone, including Wolff, Abrams, or Kim, before this litigation. (Pelletier Dep. 90:4-13 (never "discuss[ed] [*BMR*]" or "Freeman" with Wolff or Abrams), 110:20-111:17 (same as to Kim and Wolff); *see also id.* 83:5-85:19 (never discussed Kim's 10/30/2013 email to Abrams with Abrams); Pelletier Decl. ¶ 2; Wolff Decl. ¶¶ 3, 17.)

74.     Wolff, Pelletier, Kim, and Abrams all testified that no material or ideas from *BMR* were used in any books in the Crave series. (*E.g.*, Pelletier Dep. 89:22-90:13 (no "materials or

ideas from [*BMR*]" were used in Crave and never "discuss[ed] [*BMR*]" or "Freeman" with Wolff or Abrams); Wolff Dep. 35:2-36:2 ("first heard" of *BMR* upon receiving Plaintiff's "demand letter" in February 2022), 176:11-24 (never heard of Plaintiff at the time *Crave* was published in 2020), 188:19-190:17 ("I have never read any portion of [*BMR*]"); Kim Dep. 154:3-10 (no "material or ideas from" *BMR* used in Crave), 158:18-160:20 (never gave "a copy of any of the contents of [*BMR*] to Liz Pelletier"), 159:9-19 (never "discuss[ed] [*BMR*] with Liz Pelletier", never sent Abrams [*BMR*] outside of the original submission to her, never "discuss[ed] [*BMR*]" or Freeman with or "provided any language from [*BMR*] to" Pelletier, Wolff, or Abrams); Abrams Dep. 99:16-19 (no "material or ideas from *Masqued*" were used in Crave), 101:8-12 (same), 171:18-23 (same); *see also, e.g.*, Wolff Decl. ¶¶ 3, 17; Pelletier Decl. ¶ 2.)

75.     Wolff was completely shocked when she received Plaintiff's February 2022 demand letter since she had never heard of Plaintiff or her manuscript before seeing that letter. (Wolff Dep. 191:14-21 ("I was – honestly, I was in complete shock. I had no idea what manuscript they were referring to. I had no idea of what person they were referring to"); Wolff Decl. ¶ 3; *see also* Wolff Dep. 193:8-194:9 ("I've never copied anything in my life from anybody else").)

76.     Defendants collectively produced 41,569 documents in this litigation, including numerous drafts of the Crave books and numerous communications sent while writing and/or editing the Crave books. (*See* Cole Decl. ¶ 21.)

77.     None of the drafts of any of the Crave books mention Plaintiff or *BMR*, including in redline edits and comment bubbles. (*See, e.g.*, Cole Exs. S-W (examples of Crave book drafts); *see also e.g.*, Doniger Exs. 13, 19, 28-30.)

78.     None of Defendants' communications sent during the writing and/or editing of the Crave books mentions Plaintiff or *BMR*. (*See e.g.*, Doniger Exs. 5-8, 11-12, 15-18, 20, 22.)

79.     Plaintiff did not give Wolff a copy of *BMR* at their alleged meeting at a writing conference in 2012 (Defendants dispute this alleged meeting took place). (*See* Wolff Dep. 82:9-84:14 (never met Plaintiff).)

**F.     The Actual Genesis of the Crave Series**

80.     Pelletier came up with the general idea for a book series that would later become the Crave series around April 2019. (Pelletier Dep. 93:11-98:5, 100:11-14; Wolff Dep. 64:15-24, 179:10-25, 180:12-181:17, 183:9-184:10; Doniger Ex. 31; Pelletier Decl. ¶ 7.)

81.     Around that time, Pelletier had read several news articles explaining (1) how consumer trends cycled back around every ten years; (2) that YA sales had dipped because young women were not relating to the way authors had been portraying their heroines; and (3) that *Twilight*, the first book in the YA paranormal romance phenomenon series, was about to be ten years old. (Pelletier Dep. 98:8-100:5 (Pelletier read a news article and thought a "vampire book" would be a "bestseller" because consumer "trends cycle back every ten years", YA sales had dipped because "young girls couldn't relate" to the way authors had been portraying their heroines, and "Twilight was about to be ten years old"); Pelletier Decl. ¶ 7; Wolff Decl. ¶ 14.)

82.     These news articles gave Pelletier the idea to bring back vampires in a fun and fresh way that combined the hallmarks of Twilight and Harry Potter where the protagonist was a "fish out of water" and the fantastical setting was its own character. (*E.g.,* Pelletier Dep. 95:8-21, 98:8-100:5 (article gave Pelletier "the idea of bringing vampires back" in "a fun, fresh way" and wanted "to take Twilight meets Harry Potter and put those two together," which included "something fish out of water and fantastical and set someplace that … would be its own character"), 126:12-24, 129:4-25; Pelletier Decl. ¶ 7.)

83.    Pelletier instructed Entangled's editors, including Abrams, to find an author to write a book in the paranormal genre for Entangled's teen line. (Pelletier Dep. 92:10-14 (instructed Entangled's editors, including Abrams to "see if they had any author who wanted to write that series"), 98:8-100:5; Pelletier Decl. ¶ 7.)

84.    This occurred when a slot in Entangled's publishing schedule opened because an unrelated third-party author was unable to complete a project. (Pelletier Dep. 133:14-134:22; Wolff Dep. 64:15-24, 124:20-125:4; Pelletier Decl. ¶ 7.)

85.    Abrams thought of and immediately called Wolff because she had previously worked with Wolff and thought she would be a good stylistic fit. (Abrams Dep. 116:18-117:6; Wolff Dep. 65:11-19, 124:10-19; Pelletier Dep. 92:10-17, 96:3-7; Pelletier Decl. ¶ 7; Wolff Decl. ¶ 14.) Kim was not a part of this. (*E.g.*, Abrams Dep. 116:18-24.)

86.    On April 26, 2019, Wolff emailed Abrams with five basic ideas for potential series aligned with Pelletier's idea, including one for a "Warlock or Vampire boarding school book." (Doniger Ex. 30 at 3 (Wolff's email); Ex. 29 (the ideas); *see also, e.g.*, Wolff Decl. ¶ 14.) Another of the ideas featured characters named Hudson and Grace and took place in Alaska. (Doniger Ex. 29 at 2; *see also* Wolff Decl. ¶ 30.)

87.    In response to Wolff's five ideas, Abrams told Wolff that the boarding school idea was the closest idea to what Pelletier was looking for. (Doniger Ex. 30 at 2; Wolff Decl. ¶ 14.)

88.    Abrams relayed a number of Pelletier's further ideas, including needing a compelling and never-done-before reason a vampire (Jaxon) couldn't be with a human (Grace) and that Grace's parents' sudden death in a car wreck was the catalyst for Grace being sent to the boarding school, where her uncle was headmaster. (Doniger Ex. 30 at 2-3.)

89.     Wolff worked on the "meet cute" between Jaxon and Grace, which she sent to Abrams and proposed title ideas and rough plot points for what would become *Crave*. (Doniger Ex. 30 (April 27, 2019 email from Wolff to Abrams proposing possible title ideas for what would be named Crave); Cole Ex. Y (May 3, 2019 email from Wolff to Abrams and Kim attaching the "meet cute" scene); *see also* Wolff Decl. ¶ 14.)

90.     A "meet cute" is an industry term that means where the two romantic leads meet for the first time. (Abrams Dep. 125:2-6.)

91.     On May 7, 2019, Abrams informed Wolff that Pelletier liked her writing sample and wished to move forward with Wolff as the author of what would become *Crave*. (Doniger Ex. 30 at 1; *see also* Pelletier Dep. 107:6-13; Wolff Decl. ¶ 14.)

92.     As a general process for the entire series, Wolff wrote and provided drafts and Pelletier edited those drafts. (*E.g.*, Wolff Dep. 179:7-25 (Wolff "wrote the books and turned them over to" Pelletier who edited them), 178:6-7; Pelletier Dep. 112:22-113:15; Kim Dep. 210:10-25; Cole Exs. S-W (examples of Crave drafts and them being sent); Wolff Decl. ¶¶ 15, 18-20.)

93.     Pelletier was the content editor for the Crave series meaning that she edited for big picture issues like story structure and character arcs. (Pelletier Dep. 14:16-18 (Pelletier was the "content editor" of Crave), 16:4-17:20 (as a "content editor" Pelletier edited for big-picture issues like improving story structure and character arcs and consistency); Pelletier Decl. ¶ 14; Wolff Dep. 41:8-9; Abrams Dep. 157:21-158:15.)

94.     As content editor for the Crave series, Pelletier was generally responsible for reviewing the books; making sure each book's structure is balanced; that there's growth in each character arc; that the beats are in the right place meaning that for every action there is a reaction; catching plot holes; fixing any continuity or blocking issues; and making sure characters remain

consistent and authentic. (Pelletier Dep. 16:4-17:17; Pelletier Decl. ¶ 14; *see also* Abrams Dep. 158:17-20.)

95.     Abrams was a copy editor for the Crave series, which means editing for things like grammar, spelling, punctuation, and typos. (Abrams Dep. 34:20-35:14, 157:21-158:23, 169:13-170:20 (Abrams "did not make changes to the storylines" and was "looking for typos, grammatical errors, punctuation errors, spelling errors, continuity errors"—"[t]hat's it." She was "not involved in the content editing"); Wolff Dep. 180:1-4; Pelletier Dep. 119:20-120:2; Pelletier Decl. ¶ 14; Kim Dep. 169:8-170:4.)

96.     Abrams was not involved in the content editing and did not make any substantive contributions or changes to the storylines in any of the Crave series books. (Abrams Dep. 170:12-171:14 (Abrams "not involved in the content editing" of Crave), 178:23-180:16 (same), 184:21-185:6 (same); 191:14-192:4 (Abrams was "the original sort of conduit between Tracy and Liz" but "[a]fter that [she] was uninvolved until the copy editing stage where [she] was in charge of grammar, sense, punctuation, and collating the entire thing […] into a master file"); Pelletier Decl. ¶ 14.)

97.     Abrams was peripherally involved in early discussions regarding *Crave*, in that she liaised between Pelletier and Wolff while the two were coming up with ideas, but was otherwise not involved besides copy editing. (Abrams Dep. 35:3-14, 191:14-192:4; Wolff Dep. 173:22-174:1.)

98.     Pelletier also contributed to the synopses (the basic plot plan for a book), plot arcs, subplots, character arcs and development for each book in the Crave series, which she brainstormed and plotted with Wolff. (Pelletier Dep. 75:4-76:8, 111:8-16, 112:22-113:15; Pelletier

Decl. ¶ 9; Wolff Dep. 61:17-23, 63:10-15, 64:7-24, 179:10-25 (Wolff and Pelletier "brainstormed and plotted together"), 181:22-182:6, 183:9-184:21, 185:9-13; *see also* Cole Exs. S-W.)

99.     Pelletier wrote synopses for all books except *Crave*, which did not have a formal synopsis. (Pelletier Dep. 77:5-78:6, 114:17-20; Pelletier Decl. ¶ 9; *see also* Wolff Dep. 61:9-21, 62:14-18, 63:10-15, 182:7-183:8.)

100.     Wolff collaborated with Pelletier on the synopsis for *Crush*. (Pelletier Dep. 115:22-116:8; Pelletier Decl. ¶ 9; Wolff Dep. 184:17-21, 185:9-13.)

101.     It generally took Wolff several months to initially draft each Crave book. (Wolff Dep. 66:21-68:11 (it took Wolff "a couple of months" to initially write the Crave books); 168:15-21.) This is relatively slow by Wolff's typical standards, as she can usually write the rest of a novel in two weeks after figuring out world building and characters. (Wolff Decl. ¶ 22.) Wolff then did more writing during the editing process. (Wolff Dep. 66:21-67:3.)

102.     Because *Crave* was a huge hit with readers and there was a demand for sequels, the printing schedule was "escalated," which pushed up the timelines to publish and edit the rest of the Crave series. (Pelletier Dep. 64:14-19 (because *Crave* "sold so well" the sequels were put on an "escalating [] print schedule"); Pelletier Decl. ¶ 6.)

103.     *Court*, the longest of the four Crave books, was particularly challenging to plot, write, and edit because it was intended to be the final book in the series, yet there were too many loose ends that could not all be resolved, resulting in two more books being added to the series. (*See* Pelletier Dep. 75:4-78:8; Wolff Dep. 181:11-21; Pelletier Decl. ¶ 12.)

104.     *Covet* is the **only** book in the Crave series that mentions Tarot cards, in a single scene where a character who is literally a troll uses a Tarot card to "troll" Grace as a joke. (*Covet* pp. 540; Wolff Dep. 211:16-212:23.)

105.    Pelletier, Wolff, and Kim communicated frequently during the writing and editing process of each book in the Crave series, which is typical when they were in the middle of editing the Crave series. (Pelletier Dep. 60:23-61:16; Pelletier Decl. ¶ 10; Kim Decl. ¶ 65, 69.)

106.    Kim did not write or substantively contribute to any of the Crave books. (*E.g.*, Wolff Dep. 47:3-48:7 (Kim "does not edit manuscripts for me" and "does not help me write books"), 57:7-16 ("it is not fair to say [Kim] was involved in editing the books" and Kim "did not make contributions to the story line in the Crave book series" or "contribute to the writing of the Crave book series"); Pelletier Dep. 15:18-20 (denying Kim made "changes to the book herself"), 61:7-9 (Kim would not "text [Pelletier] suggested edits for the book"), 61:24-62:16 (denying Kim made "contributions to the story line" or "contributed to the writing"); Kim Dep. 132:16-132:21 ("Tracy wrote the book, and then Liz edited it"), 166:20-23 (Kim did not "take any part in the writing of any of [the Crave] books"), 133:11-19 (similar), 169:6-7 (not "involved in editing any of the books"); Kim Decl. ¶¶ 61, 65; Pelletier Decl. ¶¶ 10-12, 20-22; Wolff Decl. ¶¶ 23-25, 27-31.)

107.    Kim's role was primarily to be a "cheerleader" and motivator. (Wolff Dep. 57:20-22 ("Emily is an amazing cheerleader."), 58:11-14 (similar); Pelletier Dep. 62:17-19 ("She was our cheerleader."); Kim Dep. 166:3-19; Kim Decl. ¶ 65; Wolff Decl. ¶¶ 23-24, 27-29; Pelletier Decl. ¶ 11.)

108.    Kim read the books and would let Abrams or Pelletier know if she noticed any proofreading errors or typos. (Wolff Dep. 47:19-23; Kim Dep. 16:18-23; Kim Decl. ¶ 66; Wolff Decl. ¶ 23.)

109.    Since Pelletier would make a lot of edits to the draft manuscripts that Wolff would not otherwise see before publication, Kim would sometimes read the manuscripts to make sure she

did not notice anything she thought Wolff would object to. (Pelletier Dep. 63:7-14; Kim Decl. ¶ 66; Pelletier Decl. ¶ 11.)

110.   One time that Kim voiced an objection to one of Pelletier's changes was to a single sentence in *Court*, where Kim felt that something she thought Pelletier had written was not in Wolff's voice, but as it turned out this was a line written by Wolff. (Pelletier Dep. 63:15-25; Kim Decl. ¶¶ 66, 70.)

111.   While Wolff was writing a few particularly challenging scenes in *Court*, Kim joined her in a shared Google Doc to help Wolff stay awake and motivate her. (Doniger Ex. 11 at 4; Wolff Dep. 25:3-14; Kim Dep. 19:9-11, 30:3-32:5; Wolff Decl. ¶¶ 23-24, 27-29; Kim Decl. ¶¶ 65, 74, 77-79.)

112.   Pelletier relayed comments to Wolff through Kim so as to not interrupt Wolff during Wolff's writing. (Pelletier Decl. ¶ 11; Kim Decl. ¶ 80)

113.   Wolff wrote all of the chapter titles for *Crave*, with her son suggesting a few titles. (Wolff Dep. 59:7-11.) Wolff is very possessive of the chapter titles used in Crave series and ultimately decides the names for all chapter titles. (Wolff Dep. 59:23-60:4.) Pelletier suggested several chapter titles for *Crush*, which Wolff did not use. (Wolff Dep. 59:11-13). Kim suggested some of the chapter titles for *Covet*, some of which Wolff took but most of which she did not. (Wolff Dep. 47:16-18; 57:23-58:4; 58:23-60:4; Kim Dep. 166:24-167:14; Kim Decl. ¶ 67.) Lots of people suggested Crave chapter titles to Wolff, including her sons, partner, and best friend. (Wolff Decl. ¶ 25.)

114.   For *Court*, Kim created and kept updated a document with short summaries of each chapter and would sometimes make suggestions for chapter titles to help prompt Wolff's creativity. (Wolff Dep. 58:5-10, 59:16-22; 60:16-20; Kim Dep. 166:24-167:14; 173:15-174:8.)

115.    Plaintiff does not allege that the Crave chapter titles infringe *BMR*. (*See generally* FAC; Pl.'s Mem.)

116.    In publishing, a "series bible" is a guide used to ensure the books in the series remain consistent in aspects such as character hair and eye color, spelling of names and locations, and any other details provided in earlier books that must be kept consistent when raised in later books. (Abrams Dep. 183:4-10, 188:10-189:2; Kim Dep. 244:7-21 ("[A] bible is the term that we're using in the publishing industry to create -- to sort of archive a world that's created in a fantasy series or a long-running series."); Wolff Dep. 58:5-22, 60:14-20; Kim Decl. ¶ 68; Wolf Decl. ¶ 25.)

117.    Kim and Abrams contributed to the Crave series bible, which was used for the purposes described in ¶ 116, *supra*. (Wolff Dep. 58:5-22, 60:14-20; Abrams Dep. 183:4-10; Kim Dep. 167:15-170:4; Kim Decl. ¶ 68.)

118.    The Crave series bible has never been published or publicly displayed. (Abrams Dep. 188:20-189:2; Kim Decl. ¶ 68; Wolff Decl. ¶ 25.)

119.    Plaintiff does not allege that the Crave series bible infringes *BMR*. (*See generally* FAC; Pl.'s Mem.)

120.    It was Wolff's idea to set the Crave series in Alaska. (Wolff Dep. 36:6-7, 37:3-24, 38:15-39:8, 197:5-14; Wolff Decl. ¶¶ 30-31; Pelletier Decl. ¶ 8; Kim Decl. ¶ 71; *see also* Doniger Ex. 29 at 1.)

121.    Wolff got the idea to set the Crave series in Alaska from a snowboarding documentary called *The Art of Flight*, wherein a character was walking through the Alaskan wilderness and commenting that no human being ever stepped foot there before. Based on this, Wolff thought to herself that the Alaskan wilderness would be a good place to put paranormals

who wanted to stay hidden from ordinary people. (Wolff Dep. 36:8-22, 197:15-198:4 (after seeing a snowboarding documentary that showed the Alaskan wilderness, Wolff thought it was Alaskan wilderness is, making it "a really cool place to set something [featuring] paranormals that didn't want to be around humans or, like, giant dragons could fly free"); Wolff Decl. ¶ 31; *see also Crush* pp. 281 (Grace narrates: "A few years ago, I watched a documentary called *The Art of Flight*. It was about snowboarding in the most difficult and breathtaking locations in the world, and Denali was one of the places spotlighted in the movie. They took a helicopter up to some of the areas that are off-limits to normal climbers and skiers and made a big deal about walking in places where no other human had ever been.")

122.    Wolff was also inspired to set the Crave Series in Alaska by one of her favorite vampire novels, *Dance With The Devil* by Sherrilyn Kenyon, which is set in Alaska. (Wolff Dep. 36:23-37:2 (one of Wolff's "favorite vampire novels ever" (*Dance With The Devil* by Sherrilyn Kenyon) is set in Alaska), 197:5-14; Wolff Decl. ¶ 30.)

123.    Additionally, Wolff thought Alaska would fit the "fish out of water" trope that Pelletier was looking for. (Wolff Dep 37:3-24 (Alaska fit Pelletier's "fish out of water" idea); *see also, e.g.*, Pelletier Dep. 95:8-24 (same).)

124.    Pelletier liked the idea of setting the Crave series in Alaska after having recently returned from a cruise there. (Pelletier Dep. 69:18-23; Pelletier Decl. ¶ 8; Kim Decl. ¶ 71.)

125.    It was Pelletier's idea to name a Crave character "the Bloodletter" based on a video game called Bloodborne that Pelletier played. (Pelletier Dep. 109:11-18; *see also* Wolff Dep. 72:25-16; Wolff Decl. ¶ 16.) Pelletier thought this would be a good name for a character for a character who "sounded scary" but "looked sweet." (Wolff Dep. 72:25-73:16 ("Q. And then how did you come up with the Bloodletter? A. That was in the editing process of Crave. Liz told me

she wanted a character that sounded really scary but was very sweet. No, that sounded scary but when you looked at her, she looked sweet. Like, she thought, I just want her to be a dichotomy, right? Like, you don't expect it, but also that she really is scary. And I believe in that, she said she needs to have a scary name like Bloodletter or something."); Wolff Decl. ¶ 16.) Pelletier also came up with the idea of the heroine's parents dying in a car crash and her needing to go live with her uncle who is the school dean. (Doniger Ex. 30 at 2-3 (email including this idea).)

126.    Wolff came up with the name "Katmere" as a homage to Harry Potter and the Lion King. Hogwarts in Harry Potter is "warthog" roughly reversed and Katmere is "meerkat" roughly reversed—a warthog and meerkat being a famous duo in the Lion King. (Wolf Decl. ¶ 18(b).)

127.    Wolff dressed the wolves who threaten Grace at the beginning of *Crave* in 80's rock t-shirts because one of her favorite students at the time was obsessed with and had been telling her about a Netflix documentary about Motley Crüe. (Wolff Decl. ¶ 18(c).)

128.    "Katmai" is the name of a real national park in Alaska. (*See* Defs.' Notice Req. at 2 (requesting notice of https://www.nps.gov/katm/index.htm).)

129.    The name "Grace" and her character came fully formed to Wolff in her head, with Wolff knowing what Grace sounded and looked like. (Wolff Dep. 69:6-70:9.)

130.    Wolff came up with the name "Jaxon" by researching via Google popular names from the year Jaxon would have been born. (Wolff Dep. 69:6-70:9.)

131.    Since Jaxon is a vampire, Wolff gave him classic vampire character traits such as being dark and broody and thought about what internal and external conflicts would keep him and Grace apart and Pelletier suggested he have a scar on his face. (Wolff Dep. 70:10-71:3.)

132.    Wolff came up with the idea for Hudson's character as she was writing a scene for *Crave*. (Wolff Dep. 71:7-72:3.)

133.    Wolff knew Grace could not be a vampire, witch, dragon, or werewolf and after brainstorming with her kids and Pelletier, it was decided that Grace should be a gargoyle. (Wolff Dep. 72:4-24.)

134.    Wolff created the character Flint Montgomery as an homage to her second son, who is tall, half Irish/Egyptian (like Flint), and loves dragons. (Wolff Decl. ¶ 8.)

## G.   Additional Facts Relevant to Defendants Kim and Prospect Agency's State Law Motion

135.    Prospect Agency is a small literary agency that specializes in romance, women's fiction, historical fiction, mysteries, fantasy, and sci-fi, and young adult/children's literature. Its clients include *New York Times* best-selling authors and illustrators, and winners of the RITA award (for romance novels). (Kim Decl. ¶ 7.)

136.    Over the 18 years since its founding, Prospect Agency has realized a steady and increasing profitability, at least until this lawsuit was filed. (Kim Decl. ¶ 8.)

137.    As a literary agent, Kim varies her approach to working with clients depending on their needs and on the stage of a particular project. With new authors, her role is to assist that author in finding a publisher, and depending on the state of the manuscript, may offer some editorial suggestions or very few suggestions. Once an author has a publisher Kim primarily will be involved in the business details of that relationship but will have little role in the creative process. (Kim Decl. ¶¶ 9-10.)

138.    Kim co-founded et al Creative, a literary production company that turns editors' prompts into finished books, in 2016, as a new project separate from Prospect Agency. Since its conception, et al Creative has worked with major publishers such as Simon and Schuster, DK Publishing, Hachette, Audible and St. Martin's. Et al Creative has not handled any projects involving Tracy Wolff. (Kim Decl. ¶¶ 11-12.)

139.    Freeman approached Kim in late 2010 seeking representation. Freeman indicated that she had strong interest in her manuscript from HarperCollins UK. (FAC ¶ 23; Kim Decl. ¶ 14; Freeman Dep. 39:12-40:16, 43:20-45:7, 212:14-18.) On November 17, 2010, Kim asked Freeman to send her full manuscript for review. (Doniger Ex. 40; Kim Decl. ¶ 14.) On December 8, 2010, Freeman signed the Wolff-Kim Agency Agreement. (*See supra* ¶ 10; Doniger Ex. 39; Kim Decl. ¶ 15.)

140.    Neither Kim nor anyone at Prospect made any independent representations or promises to Freeman before the parties signed the Wolff-Kim Agency Agreement, or after signing that agreement. (Kim Decl. ¶ 16.) The Wolff-Kim Agency Agreement includes an integration clause which states that the agreement supersedes and cancels any previous agreements or understandings between the parties, whether written or oral, and requires any future modifications to be in writing. (Doniger Ex. 39 at 3 (Wolff-Kim Agency Agreement).)

141.    Freeman was one among approximately 40 active clients for which Kim was working during the time Freeman was represented by Prospect Agency. (Kim Decl. ¶ 17.)

142.    Kim worked with Freeman from December 2010 until March 2014. *See supra* ¶¶ 16-17. Over the first nine months Kim worked with Freeman to bring the *BMR* manuscript into a form suitable for pitching to book editors, including having multiple readers review the book, some of whom were critical of certain aspects of Freeman's story. (Kim Decl. ¶¶ 20-25, Exs. 5-7.) Kim also provided multiple rounds of editorial suggestions to try to help strengthen the manuscript, as is common in author/agent relationships prior to an author finding a publisher. (Kim Decl. ¶¶ 17-19, 22, Exs. 3-7.) Freeman regularly offered thanks for the time and care Kim was paying to her manuscript, but also sometimes pushed back against changes. (Kim Decl. ¶ 42.) Freeman often

shared Kim's emails and recaps of their conversations with her aunt, who typically agreed with Kim's advice. (Kim Decl. ¶ 42.)

143.    In October 2011 Kim sent Freeman's manuscript out to editors at four major U.S. publishers: Penguin Group, Bloomsbury, Simon & Schuster, and Little Brown (Hachette). (Kim Decl., ¶ 26, Exs. 8-12.) Each rejected the manuscript. (Kim Decl. ¶¶ 26-27, Exs. 8-12.)

144.    During this timeframe, Freeman changed the name of her manuscript to *Masqued*. Kim provided high-level suggestions, for instance to give her character more agency, but Freeman remained focused on changing the characters to more unusual paranormal creatures and other such surface alterations. Kim felt that her feedback was not resonating with Freeman. (Kim Decl. ¶ 28.)

145.    In mid-November 2011, Freeman informed Kim that although a copy of her manuscript had been sent again to Lucy Vanderbilt at HarperCollins UK, Vanderbilt had not read it, and suggested that Freeman have her agent submit the manuscript directly to her contact at HarperCollins. (Kim Decl. ¶ 29, Ex. 13.)

146.    Thereafter, Kim sent Freeman's manuscript to both HarperCollins US and HarperCollins UK, but both rejected it. (Kim Decl. ¶¶ 30-31, Exs. 14-15.)

147.    In April 2012, Kim sent out another round of submissions to seven different editors on behalf of Freeman, including editors at Disney-Hyperion, St. Martins, and Tor, and new editors at Penguin and Bloomsbury. (Kim Decl. ¶¶ 32, Exs. 16-22.) Each rejected the manuscript. *Id.*

148.    After these rejections, Freeman continued to work on her manuscript, and Kim continued to offer suggestions and have readers review the book. (Kim Decl. ¶¶ 33-35, Exs. 23-26.) The manuscript draft Freeman sent to Kim on July 30, 2013 was the last version Kim ever saw. (Kim Decl. ¶ 35, Ex. 26.)

149.    Upon reviewing the newly-revised book, it was becoming clear to Kim that Freeman's edits to the book were still not moving it in the right direction, and in September, she wrote to Freeman and suggested they part company. (Kim Decl. ¶ 36, Ex. 27.) However, Freeman asked her to send out one last round of submissions, and on October 10, 2013 Kim submitted Freeman's manuscript to Entangled, Holiday House, Thomas Dunne, and another editor at Penguin. (Kim Decl. ¶ 37, Exs. 28-31), and then later two submissions to CarolRhoda and Scholastic (Kim Decl. ¶ 37, Exs. 32-33.)

150.    By February 14, 2014, Prospect had received rejections from all of the above publishers except for Entangled. (Kim Decl. ¶ 39, Exs. 27-31, 32-33.)

151.    On March 25, 2014, Freeman terminated her relationship with Kim and Prospect Agency, noting that "I don't believe Entangled will want Masqued as it is," and asking Kim to withdraw her manuscript from Entangled, which Kim then had her assistant do. (Doniger Ex. 24; Kim Decl. ¶ 41.)

152.    After Freeman and Prospect terminated their professional relationship in March 2014, they had no further contact before the current dispute arose except once in 2015, when Kim emailed Freeman just to touch base. (Doniger Ex. 34.) In that email exchange, Freeman stated "I really needed to take some time away from Masqued and then get perspective. The story just didn't work. I've written a new story, using parts of Masqued that I loved, and a completely different mythology with Egyptian gods….! Not quite done but very close." (Doniger Ex. 34.)

153.    Freeman continued to revise on her manuscript extensively over the next several years with an eye towards pitching it to publishers, working with a book doctor and a freelance editor, and showing it to agents, other authors, and readers; but she struggled to fix perceived problems with the plot. (Kim Decl. ¶¶ 43, 50-49, Exs. 34-41; Doniger Ex. 34.)

Dated: New York, New York
       December 22, 2023

Respectfully submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**

By: /s/ Nancy E. Wolff
Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
nwolf@cdas.com
bhalperin@cdas.com
ccole@cdas.com
*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC*

Lacy H. Koonce, III
**KLARIS LAW PLLC**
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
**KOWERT, HOOD, MUNYON, RANKIN & GOETZEL, P.C.**
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendant Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

## <u>CERTIFICATE OF SERVICE</u>

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of Defendants'
Consolidated Local Rule 56.1 Statement of Material Facts has been served on all counsel of
record via the Court's CM/ECF service.

/s/ Nancy E. Wolff
Nancy E. Wolff
