# EXHIBIT G

Videotaped Deposition of

# Tracy Wolff

March 07, 2023

Freeman

vs.

Deebs

**Confidential**



www.aptusCR.com | 866.999.8310

```
 1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2
    LYNNE FREEMAN,              )
 3  AN INDIVIDUAL               )
    PLAINTIFF,                  )
 4                              )
    VS.                         )
 5                              )
    TRACY DEEBS-ELKENANEY       )
 6  P/K/A TRACY WOLFF, AN       )
    INDIVIDUAL, EMILY SYLVAN    )
 7  KIM, AN INDIVIDUAL,         )
    PROSPECT AGENCY, LLC, A     )
 8  NEW JERSEY LIMITED          )   CASE NO. 1:22-CV-02435-LLS
    LIABILITY COMPANY,          )
 9  ENTANGLED PUBLISHING,       )
    LLC, A DELAWARE LIMITED     )
10  LIABILITY COMPANY,          )
    HOLTZBRINCK PUBLISHERS,     )
11  LLC D/B/A MACMILLAN,        )
    A NEW YORK LIMITED          )
12  LIABILITY COMPANY, AND      )
    UNIVERSAL CITY STUDIOS,     )   JOB NO. 10115799
13  LLC, A DELAWARE             )
    LIMITED LIABILITY COMPANY   )
14      DEFENDANTS.             )

15  ********************************************************

16           ORAL AND VIDEOTAPED DEPOSITION OF
                      TRACY WOLFF
17                  MARCH 07, 2023

18  ********************************************************

19


20          ORAL AND VIDEOTAPED DEPOSITION of TRACY WOLFF,
    produced as a witness at the instance of the Plaintiff,
21  and duly sworn, was taken in the above-styled and
    numbered cause on the 7th day of March, 2023, from 8:54
22  a.m. to 4:34 p.m., before Gabriela S. Silva, CSR, RPR in
    and for the State of Texas, reported by stenograph, at
23  the Law Offices of Kowert, Hood, Munyon, Rankin &
    Goetzel, 1120 S. Capital of Texas Hwy,  Building 2,
24  Austin, Texas, pursuant to the Federal Rules of Civil
    Procedure and the provisions stated on the record or
25  attached hereto.
```

```
 1                    A P P E A R A N C E S

 2

 3    COUNSEL FOR THE PLAINTIFF:

 4          MARK D. PASSIN
            CSREEDER, PC
 5          11766 Wilshire Blvd., Ste. 1470
            Los Angeles, California 90025
 6          (310) 861-2470
            Mark@csrlawyers.com
 7

 8    COUNSEL FOR THE DEFENDANTS:

 9          DWAYNE GOETZEL
            KOWERT, HOOD, MUNYON, RANKIN & GOETZEL
10          1120 S. Capital of Texas Hwy, Building 2
            Austin,  Texas 78746
11          (512) 853-8800
            Dgoetzel@intprop.com
12
            NANCY E. WOLFF
13          CECE COLE
            COWAN, DEBAETS, ABRAHAMS & SHEPPARD, LLP
14          41 Madison Avenue, 38th Floor
            New York,  New York 10010
15          (212) 974-7474
            Nwolff@cdas.com
16

17    ALSO PRESENT:

18          Mr. Walter Bryan, Videographer
            Mr. Trent Baer, Plaintiff's Husband
19          Mr. Lance Koonce (via Zoom)
            Mr. Zachary Press (via Zoom)
20          Mr. Stephen Doniger (via Zoom)
            Mrs. Lynne Freeman (via Zoom)
21

22

23

24

25
```

**Confidential**

1   have to answer the question unless she instructs you not

2   to answer the question.  So it's very important that you

3   understand my questions because you'll be testifying

4   under penalty of perjury.  You understand what that

5   means?

6      A.  I do, yes.

7      Q.  So if you don't understand one of the questions,

8   you know, feel free to tell me that and I'll try to

9   rephrase it so that you can understand it.

10     A.  Okay.

11     Q.  You understand those instructions?

12     A.  I do, yes.

13     Q.  Is there any reason today because of lack of

14  sleep or medication that you can't testify?

15     A.  No.

16     Q.  Okay.  And are you represented by counsel today?

17     A.  I am, yes.

18     Q.  And who is that?

19     A.  My counsel is Dwayne Goetzel, Nancy Wolff and

20  CeCe Cole.

21     Q.  You've definitely lawyered up.  All right.  What

22  names have -- what pen names have you used over the

23  years?

24     A.  I've written as Tracy Deebs, Tracy Wolff, Ivy

25  Adams and Tessa Adams.

**Confidential**

1    Q.  I will refer to you most of the time throughout

2    this deposition as Tracy Wolff or Mrs. Wolff.  Is that

3    understood?

4    A.  Yes.

5    Q.  Okay.  And that's okay with you?

6    A.  Yes.

7    Q.  Is it correct that you used the pen name Tracy

8    Wolff when you wrote the Crave book series?

9    A.  Yes, it is.

10    Q.  Another thing I should mention is you have to

11    answer audibly because as good as the court reporter is,

12    and I'm sure she's excellent, she can't take down nods

13    of the heads or shaking of the heads.

14    A.  Okay.

15    Q.  So please answer audibly.  What books are

16    currently in the Crave books series?

17    A.  Are you asking in reference to what is in the

18    litigation or the total number of books in the Crave

19    series?

20    Q.  No.  Right now the total number of published

21    books in the Crave book series.

22    A.  The total number of published books in the Crave

23    series is five.

24    Q.  And what are the names of those books?

25    A.  Crave, Crush, Covet, Court, Charm.

**Confidential**

1    Q.  Now, prior to being called Crush, was Crush

2    called crown?

3    A.  I believe it was.

4    Q.  Do you know when the name was changed?

5    A.  I don't recall an exact date, no.

6    Q.  Do you know why it was changed?

7    A.  I believe we wanted to go with each of the words

8    in the Crave series of the titles means something having

9    to do with love.  Crush means having a crush on someone,

10   crown does not mean that.

11       I believe that was part of the reason.  I don't

12   know everything else that went into it.  Mrs. Pelletier

13   is in charge of that kind of a thing.

14   Q.  And who made the change?  Do you know?

15   A.  Mrs. Pelletier would've been the one to make the

16   change.

17   Q.  And I hesitate to ask this, but what does court

18   have to do with love?

19   A.  If you court somebody.

20   Q.  Okay.  I was looking at it the way that a lawyer

21   would look at the word court.  All right.  Now, when

22   were each of these five books that you mentioned

23   published?

24   A.  Crave was published April 2020.  Crush was

25   published September 2020.  Covet was published in 2021.

1   Court was published February of 2022.  And Charm was

2   published November, I believe.

3              MR. PASSIN:  By the way, I want to ask the

4   court reporter a question.  Are there anyone -- who is

5   attending by video?  Do you know?  Or the videographer,

6   I should ask you.

7              THE VIDEOGRAPHER:  We have Tracy Wolff,

8   obviously.  Our plaintiff, Lynne Freeman, Lance Koonce

9   and Zachary Press.

10             MR. PASSIN:  Okay.  I just thought that

11  should be on the record.  Thank you.

12             THE VIDEOGRAPHER:  Yes, sir.

13             MR. PASSIN:  And obviously Tracy Wolff.

14  Tracy Wolff is the witness.

15             THE VIDEOGRAPHER:  Right, which is attending

16  on the Zoom as well.

17             MR. PASSIN:  I don't understand.

18             THE VIDEOGRAPHER:  That web cam sitting in

19  front of the witness --

20             MR. PASSIN:  Oh, I see.

21             THE VIDEOGRAPHER:  -- brings Mrs. Wolff into

22  the Zoom.

23             MR. PASSIN:  Okay.

24             THE VIDEOGRAPHER:  Yes, sir, just for

25  clarity.

**Confidential**

1    MR. BAER:  For the record, should I state my

2  name?

3    MR. PASSIN:  I already said your name.

4    **Q.  (By Mr. Passin) And who is the publisher of each**

5  **of the books in the Crave books series?  And by the way**

6  **I'll refer to those books as the Crave books series.  Is**

7  **that understood?**

8    A.  Yes.

9    **Q.  Okay.  Who is the publisher of the books?**

10   A.  The publisher is Entangled.

11   **Q.  And who distributes the books?**

12   A.  Macmillan.

13   **Q.  Now, what did you do to prepare for your**

14  **deposition today?**

15   A.  I read over some of the papers from the case that

16  had been filed with the court and I met with my lawyers

17  yesterday.

18   **Q.  When you said you read some of the papers from**

19  **the case, did you pick those out yourself or did your**

20  **lawyers send those to you?**

21    MR. GOETZEL:  Object to the form of the

22  question.  You're getting into a privileged area here.

23    MR. PASSIN:  Right, it's just -- I'm trying

24  to lay the foundation so that I won't.  All I want to

25  know is did she get them herself or did the lawyer pick

**Confidential**

1   one or two stop working?

2       A.   Every time I got a new one.

3       Q.   But did you recall approximately the year?

4       A.   Probably 2019, maybe early 2020.

5       Q.   But the two that -- the one or two that you no

6   longer have, you did use to write and edit the Crave

7   book series?

8       A.   Yes.

9       Q.   Did you use the computer at Austin Community

10  College for some of your early writing in the book,

11  Crave?

12      A.   It wouldn't have been at Austin Community College

13  because I was teaching early college start at local high

14  schools.  So it was a college class to high school

15  students and I was in a local high school.

16      Q.   And did that local high school provide you access

17  to their computer?

18      A.   They did.

19      Q.   And did you use that computer to write any

20  portions of the Crave book?

21      A.   I don't remember, but it is not beyond the realm

22  of possibility.  I --

23      Q.   And what was the name of the high school?

24      A.   Lake Travis High School was one of them.  Round

25  Rock Early College Start.

1    A.  Some time in the last -- some time since COVID

2  started.

3    Q.  What e-mail programs do you have on each one of

4  the computers, meaning Outlook or Gmail?

5    A.  I don't use -- G mail.

6    Q.  They're all Gmail?

7    A.  Uh-huh.

8        MR. GOETZEL:  Was that yes?

9        THE WITNESS:  Yes.

10    Q.  (By Mr. Passin) So is it fair to say that you use

11  your Gmail address more than any of the other addresses?

12    A.  Yes, that is true.

13    Q.  And then the other addresses, where are those?

14  On your phone?

15    A.  No.  They're not on my phone.  Only my Gmail is

16  on my phone.

17    Q.  So then how do you access the other addresses?

18  By the web?

19    A.  Yes.  I only access -- the only other one I

20  access very occasionally is ███████.

21    Q.  And you access by going on the Internet and then

22  on the web?

23    A.  Yes.  I go to Yahoo.com.

24    Q.  What kind of software did you use to write and

25  edit the books in the Crave book series?

Confidential

1    A.  I used Microsoft Word; and occasionally, I used a

2  Google Doc.

3    Q.  **Do you have an online subscription for any**

4  **editing software?**

5    A.  I have an online subscription for Book Brush,

6  which helps me make ads for Instagram.  Not ads.  Like,

7  what goes on your Instagram.

8    Q.  **Do you have a subscription for Microsoft Word?**

9    A.  No.

10    Q.  **Do you have a subscription for Google Docs?**

11    A.  I pay $1.99 a month for -- to keep my storage on

12  Google Docs.  I don't know if that counts as an online

13  subscription.

14    Q.  **All right.  And you still have that storage?**

15    A.  Yes.

16    Q.  **Okay.  And when you produced documents in the**

17  **case, did you provide access to that storage to the**

18  **vendors who are gathering the documents?**

19    A.  I did, yes.

20    Q.  **As a professor at a community college, have you**

21  **used turn it on -- excuse me -- Turnitin or any other**

22  **plagiarism software to review student's papers?**

23    A.  Not at Austin Community College.

24    Q.  **Did you at some other teaching facility?**

25    A.  I did, yes.

**Confidential**

1    Q.   And where was that?

2    A.   Marian Catholic High School in San Diego.

3    Q.   And during what years were you there?

4    A.   I believe 2002 to 2005.

5    Q.   And what type of software did you use?

6    A.   Turnitin.com.

7    Q.   Any other kind?

8    A.   Microsoft Word to create my tests.

9    Q.   Okay.  And what kind of information did Turnitin

10   provide to you if you ran the student's papers through

11   it?

12   A.   It would provide what percentage of the paper had

13   -- might've occurred somewhere else.  I believe it's

14   been 17 years since I've used it.

15   Q.   Okay.  Now, going back to Google Docs, did Google

16   Docs send you an e-mail every time someone made an edit

17   to any of the Crave books?

18   A.   The Crave books weren't on Google Docs.

19   Q.   So you didn't use Google Docs to edit the Crave

20   books?

21   A.   No, I did not.

22   Q.   None of the Crave books?

23   A.   The book?

24   Q.   The --

25   A.   No.

**Confidential**

1    Q.  Any of the books in the Crave book series.

2    A.  Not the book, no.

3    Q.  Well, what did you use the Google Docs for?

4    A.  I used them for chapter titles and a few random

5    scenes in Court and I don't -- I don't believe -- I

6    don't recall using them in Crave, Crush or Covet.

7    Q.  All right.  But you did use it in Court.

8    Correct?

9    A.  Yes.

10   Q.  So you did use it for some of the books in the --

11   A.  Not to edit the book, Court, no.

12   Q.  What did you use it for?

13   A.  To write a couple of random scenes and for

14   chapter titles.

15   Q.  Did you use Google Docs to write any of the other

16   books in the Crave book series?

17   A.  Can you clarify in terms of this?  I'm in the

18   understanding that in terms of this lawsuit we are

19   referring to Crave, Crush, Covet and Court --

20   Q.  Right.

21   A.  -- as the Crave book series.

22   Q.  Right now, I'm asking about all the books in

23   Crave book series.

24   A.  We used -- I used a couple for Cherish and I

25   don't recall if I used them for Charm, any for Charm.

**Confidential**

1    A.  I don't recall.

2    **Q.  Do you know which documents Stacy Abrams had**

3  **access to?**

4    A.  I know she had access to the Crave chapter

5  titles.  I believe she has access to the Crave Bible

6  because I believe she does.  I'm not sure about other

7  ones.

8    **Q.  Okay.  And when the vendor in this case gathered**

9  **documents, did you provide to him all the documents**

10  **relating to the Crave chapter titles that was on Google**

11  **books?**

12           MR. GOETZEL:  Objection.  Google books?

13           MR. PASSIN:  Excuse me, Google Docs, thank

14  you.

15    A.  I tried.  I couldn't because they weren't started

16  by me.  I can't provide access if I don't start the doc.

17    **Q.  (By Mr. Passin) And did -- so of all the**

18  **documents you had on Google Docs, did you provide any of**

19  **those documents to the vendor?**

20    A.  If -- if -- he looked at all of the Google Docs.

21  My recollection is that none of them were started by me,

22  so he couldn't get them from me.  But if there had been

23  any that I had started, he would have gotten them.

24    **Q.  And who started them?**

25    A.  Emily Sylvan Kim and I don't know if Stacy Abrams

**Confidential**

1   started any.  Liz Pelletier, I believe, started one or

2   two.

3      Q.  Are you aware, was there an access log to the

4   Google Docs?

5      A.  I don't know what an access log is.

6      Q.  Well, access log would be a listing that shows

7   who had accessed the Google Docs at any time.  Did you

8   ever see anything like that?

9      A.  No.

10     Q.  And maybe because you're not the owner?

11     A.  Yeah, I -- I don't know.

12     Q.  Did you use any text spinning software to write

13  any of the books in the Crave book series?

14     A.  I'm sorry.  I don't understand the question.

15     Q.  Are you familiar with text spinning software?

16     A.  I have no idea what that is.

17     Q.  Well, did you use any other kind of software --

18  did you use any kind of software to write or edit the

19  books in the Crave book series other than what we've

20  already discussed?

21     A.  I used Microsoft Word.

22     Q.  Did you use any artificial intelligent bots that

23  are able to reword sentences in writing any of the books

24  in the Crave book series?

25     A.  I did not.

**Confidential**

1    A.   I taught writing and literature.

2    **Q.   And then when you moved to Austin, you said you**

3    **took a year off and then you taught at Virginia College**

4    **and you taught composition and literature?**

5    A.   Yes.

6    **Q.   And you told me what you taught at Austin**

7    **Community College?**

8    A.   I also, in that time period, worked for a very

9    brief time at a learning center tutoring.

10   **Q.   And you tutored English I assume?**

11   A.   English and math.

12   **Q.   That's a big switch.  All right.  Let's go on**

13   **your second career path.  You said in 2007 you wrote**

14   **your first -- you had your first book published?**

15   A.   2007 is when my first novel was published.

16   Before that, I had a short story/novella published by

17   Spice, which was an imprint of Harlequin.  And I believe

18   it came out February of 2007, but I am not positive.

19   **Q.   And what was that book called?**

20   A.   It was called No Apologies.

21   **Q.   Okay.  You can continue.**

22   A.   2007, I had my first book published by Harlequin.

23   In the beginning of 2008, I had my first single title

24   published by Penguin.  The imprint was NAL and I believe

25   that stands for New American Library.  After that, I've

**Confidential**

1    had numerous books published with Walker, a division of

2    Bloomsbury, with Harlequin Super Romance and Harlequin

3    Desire, with New American Library, with Entangled and

4    with Little, Brown, with ABDO Publishing and a short

5    story and an anthology published by Harper.

6        **Q.   Approximately, how many books have you had**

7    **published?**

8        A.   69.   I believe the one that I just wrote is 70.

9        **Q.   All right.   We'll probably get more into the**

10   **books a little later.   Are you familiar with the**

11   **manuscript that Lynne Freeman wrote that is the subject**

12   **of this lawsuit?**

13       A.   I am familiar with it now.

14       **Q.   And how did you become familiar with it?**

15       A.   I was served papers.

16       **Q.   Referring -- well, you weren't served papers in**

17   **this case?**

18       A.   Well --

19       **Q.   Well, technically referring to the complaint?**

20       A.   Yes, the complaint.

21       **Q.   Okay.   Or are you referring to the demand letter**

22   **that you got prior to the complaint?**

23       A.   Whatever came the second week in February,

24   whatever that was is when I became aware of it.

25       **Q.   Okay.   That was probably the demand letter.**

Tracy Wolff

1    A.   Okay.

2    **Q.   Okay.  Have you ever heard the novel called Blue**

3    **Moon Rising or Masked?**

4    A.   I first heard of them on whatever day it was in

5    February when I was -- received the -- you call it a

6    demand letter?

7    **Q.   Yeah, just we can refer to it as the February 7th**

8    **letter.**

9    A.   February 7th letter.

10   **Q.   February 7th, 2020.**

11   A.   2022.

12           MR. GOETZEL:  2020.

13           MR. PASSIN:  2020?

14           MR. GOETZEL:  I believe --

15           MR. PASSIN:  Yeah, 2020.

16           THE WITNESS:  2022.

17           MR. GOETZEL:  You might want to check your

18   dates.

19           MR. PASSIN:  Oh, 2022.  Yeah, you're right.

20   2022.  Okay.  I apologize.  COVID sort of -- yeah.

21   **Q.   (By Mr. Passin) Okay.  So for the rest of the**

22   **deposition, I'll refer to the manuscript either as Blue**

23   **Moon Rising or Masked.  Is that understood?**

24   A.   Yes.

25   **Q.   Okay.  Did you ever read any part of Blue Moon**

**Confidential**

1   Rising or Masked?

2      A.   No.

3      Q.   Why did you choose Alaska as the setting for the

4   Crave book series?

5      A.   I think there were several reasons.

6      Q.   And you were the one who chose Alaska?

7      A.   I chose it, yes.

8      Q.   And what were those several reasons?

9      A.   The first reason was when I was writing a

10  snowboarding book many years ago, I watched a

11  documentary called The Art of Flight and there was a

12  line in it where they were walking in Alaskan wilderness

13  and they made the comment that they were walking where

14  no human being had ever stepped before, and it seemed to

15  me that that would be a good place to put paranormals.

16         The second reason is in the first ideas I gave

17  Stacy Cantor Abrams regarding what would become the

18  Crave series, one of the ideas was vampires set in

19  Alaska.  And I believe -- I don't know specifically what

20  made me choose that except for The Art of Flight

21  documentary and the fact that Alaska tends to be dreary

22  and have civil twilight and be dark.

23         I do know that one of my favorite vampire novels

24  ever was in Alaska.  It's -- and I always thought that

25  was a very cool setting for vampires.

1      Q.   And which novel was that?

2      A.   Dancing in the dark by Sherrilyn Kenyon.

3      Q.   Okay.  I didn't mean to cut you off there.  Are

4   there other reasons?

5      A.   Other reasons is when I was brainstorming, I

6   really wanted a fish out of water story.  It's one of --

7   well, Liz really wanted a fish out of water story and I

8   thought that was a really great idea.  And being from

9   San Diego, the thing -- like, I tried to imagine where

10  in North America I would feel most uncomfortable.  And

11  Alaska came to mind.

12          When I was brainstorming, it was one of the

13  places I had listed and then when I was brainstorming

14  with Emily Sylvan Kim, we were talking over cold and

15  dark places in North America and she reminded me -- I

16  believe it was she reminded me of Alaska, that I had put

17  it -- you know, that I had mentioned it.  And I thought

18  about it and decided that was a really great place.

19          And then when I went and talked to Liz about it,

20  Liz had just come back on a cruise from Alaska and she

21  was very excited about Alaska as well because she had

22  just been on the cruise.  And it just seemed like

23  overall, all those things came together and seemed like

24  a great place to set the book.

25      Q.  All right.  Well, you had mentioned that Alaska

**Confidential**

1   getting your approval?

2       A.   Liz Pelletier has made several changes to the

3   books, not Crave.

4       **Q.   Which books did Liz Pelletier make changes to?**

5       A.   And she got my approval when she made them.  She

6   made changes to Crush, to Covet and to Court, as any

7   editor does.

8       **Q.   And she was a content editor.  Correct?**

9       A.   She was a content editor.

10      **Q.   And you said that on Crush, Covet and Court, she**

11  **got permission to make all your -- her changes?  She got**

12  **permission from you?**

13      A.   If she made a change that was any kind of

14  substance, certainly she would call me and read it to

15  me.

16      **Q.   How many substantive changes did she make to**

17  **Crush?**

18      A.   I don't know off the top of my head.

19      **Q.   Can you give me an estimate?**

20      A.   I don't -- I don't want to do that.  I don't know

21  off the top of my head.  It should be in the documents.

22      **Q.   In the documents?  Which documents are those?**

23      A.   Anything that was provided to you from, I

24  would...

25      **Q.   Well, we don't have the Google documents.  Would**

**Confidential**

1   to?

2       A.   I am not.

3       **Q.   Who is Emily Kim?**

4       A.   Emily Sylvan Kim is my agent.

5       **Q.   And when did you first meet Emily Kim?**

6       A.   I first met Emily Sylvan Kim at an RWA conference

7   before she represented me.  So prior to 2006, I believe.

8       **Q.   And what does RWA stand for?**

9       A.   It stands for Romance Writers of America.

10      **Q.   And where did that one take place?**

11      A.   I don't know.

12      **Q.   And how did you meet her at the conference?**

13      A.   She was on a panel.  I went to her panel.  After

14  her panel, I walked up and I introduced myself to her

15  and told her I had sent her some material to read and

16  that I hoped to work with her one day or something of

17  that gist.  Those may not have been my exact words.

18      **Q.   And when did she become your literary agent?**

19      A.   I believe it was 2006.

20      **Q.   Did you have a different literary agent before**

21  **Emily Sylvan Kim?**

22      A.   I did not.

23      **Q.   And why did you choose Emily Sylvan Kim?**

24      A.   There were various reasons.

25      **Q.   And what were those reasons?**

**Confidential**

1  A.  The first reason was she had interned or trained

2  at Writers House, which was at the time the most

3  prestigious or certainly one of the most prestigious

4  literary agencies in America and I liked that she had

5  had that training and those connections.

6      Two, I liked that she had started her own agency

7  and that she was young and wanting to build her business

8  the way that I wanted to build my career.  And three, I

9  remember really liking her website at the time.  It had

10  little poetry quotes on it and I liked it.  I thought

11  that was cool.

12  **Q.  When you refer to starting her own business, that**

13  **was Prospect Agency?**

14  A.  I believe so, yes.

15  **Q.  Were you friends with Mrs. Kim before you became**

16  **-- before she became your agent?**

17  A.  I was not.

18  **Q.  Let me mark for identification as Exhibit 24 a**

19  **document that is Bates-stamped Number Kim 00352674**

20  **through Kim 00352676, and it's entitled Agreement for**

21  **Authors.**

22      (Exhibit Number 24 was marked.)

23  **Q.  (By Mr. Passin) Can you please take a look at the**

24  **exhibit?**

25  A.  (Witness complies.)

1      Q.   Now, on --

2           MR. GOETZEL:  Excuse me, Mark, I think you

3   gave several different copies to her.

4           MR. PASSIN:  Yeah, I knew I had extra

5   copies.

6      Q.   (By Mr. Passin) So is that your signature on Page

7   3 --

8      A.   It is, yes.

9      Q.   -- on behalf of yourself?

10     A.   Yes.

11     Q.   And you entered into this agreement on or about

12  November 25, 2007?

13     A.   I suppose it was 2007 and not 2006.

14     Q.   Do you know when this agreement became effective?

15     A.   I would believe when she received it back from

16  me.

17     Q.   And can you describe for me briefly what this

18  agreement is, your understanding of what the agreement

19  is?

20     A.   My understanding is that she agrees to be my

21  literary agent and represent me, represent me in

22  discussions with literary publishers.

23     Q.   And what's your understanding of what Mrs. Kim

24  was supposed to do as your literary agent?

25     A.   Mrs. Kim was supposed to negotiate contracts for

Tracy Wolff

1   me and submit my work to publishers and explain

2   contracts to me.

3       Q.  **Does she sometimes edit manuscripts for you?**

4       A.  No, she does not edit manuscripts for me.

5       Q.  **Does she get involved in editing manuscripts?**

6       A.  Editing --

7              MR. GOETZEL:  Object to the form.  Are you

8   talking about specifically with her or for anyone?

9       Q.  **(By Mr. Passin) For you.**

10      A.  Editing manuscripts?

11      Q.  **Yes.**

12      A.  Can you clarify?

13      Q.  **Well, isn't it true that Emily Kim made changes**

14  **to various books in the Crave book series?**

15      A.  I don't believe that's true, no.

16      Q.  **It's true she wrote some chapter titles.  Isn't**

17  **it?**

18      A.  She did.

19      Q.  **Okay.  What else did she do in connection with**

20  **the Crave book series?**

21      A.  She always read the books, and I believe if she

22  saw any proofreading errors or typos, she would let

23  Stacy or Liz know about them.

24      Q.  **Did she make any story line suggestions?**

25      A.  Story line suggestions?  Not to the best of my

Confidential

1  recollection.

2      Q.  Did she make any content edits?

3      A.  Edits?

4      Q.  Yes.

5      A.  No, not that I'm aware of.

6      Q.  Does she sometimes help you write any books?

7      A.  She does not help me write books.

8      Q.  Were there any amendments to the agreement which

9  we've marked as Exhibit 24?

10     A.  Not that I am aware of.

11     Q.  And was this the first agency agreement you

12  entered into with Mrs. Kim and Prospect?

13     A.  It is, yes.

14     Q.  And is it the only agency agreement you entered

15  into with Mrs. Kim and Prospect?

16     A.  It is, yes.

17     Q.  Do you have any other agreements with either Mrs.

18  Kim or Prospect relating to Crave or any of the books in

19  the Crave book series?

20     A.  I do not, no.

21     Q.  Did you pay any money to Emily Kim or Prospect in

22  connection with the books in the Crave book series or

23  any other books other than what Prospect is paid

24  pursuant to Exhibit 24?

25              MR. GOETZEL:  Object to the form of the

Tracy Wolff                                          Freeman vs.
                                                          Deebs

1  remember all 69?

2           MR. GOETZEL:  If you have a list of all the

3  books that you've written and published, I don't have an

4  objection to providing the list.

5      A.  I can provide you with a list.

6      **Q.  (By Mr. Passin) Okay, thank you.**

7      A.  Where would I provide it?

8      **Q.  If they have dates --**

9           THE WITNESS:  I would give it to you.

10          MR. GOETZEL:  Give it to me.

11     **Q.  (By Mr. Passin) If they have dates of publication**

12  **on, that would be helpful and publisher, that's it.**

13     A.  Okay.  I don't know.  I can give you titles.

14          MR. GOETZEL:  Generally speaking, we don't

15  have to create something.  If you have a list.

16          MRS. WOLFF:  Yeah, just take it under

17  advisement.  Yeah.

18          THE WITNESS:  Okay.  Okay.

19     **Q.  (By Mr. Passin) Were any -- so is it correct to**

20  **say that what?  There are about 68 or 69 books?  How**

21  **many books when you take out the first book that she**

22  **wasn't involved with?**

23     A.  I feel like that is about right, yes.

24     **Q.  Okay.  Were any of those books, other than the**

25  **books in the Crave book series, on the New York Times**

1  best seller list?

2     A.  Yes.

3     Q.  How many of them?

4     A.  Two were on the New York Times best seller list.

5     Q.  And what books were those?

6     A.  Ethan Frost, Ruined and Addicted.

7     Q.  Ethan Frost?

8     A.  It wasn't actually named Ethan Frost.  That was

9  the name of the series, the Ethan Frost series.  Book

10  one was Ruined.  Book two was Addicted.

11     Q.  And they were both part of the Ethan Frost

12  series?

13     A.  Yes.

14     Q.  And when were those published?

15     A.  2014 or 2015.

16     Q.  Of those 68 or 69 books, would you characterize

17  any of them as financially successful?

18     A.  I actually need to change something based on this

19  date, November 2007.  I was off by a year then.  My

20  first book came out the end of 2008 and my next one came

21  out the beginning of 2009.

22     Q.  So in other words --

23     A.  I was off by a year all the way across.

24     Q.  So in other words, all the books were covered by

25  Exhibit 24?

Tracy Wolff

1    A.  No, no, because I sold the first book on my own.

2    Q.  Okay.  So what are you correcting on this?

3    A.  I'm correcting -- I told you earlier on the

4  record that my first book came out in the end of 2007

5  and my second book came out at the beginning of 2008.

6  That -- I must -- I am off a year.

7        My first book came out at the end of 2008 and my

8  first book -- and my second book came out the beginning

9  of 2009.  The first book that came out in 2008, I sold

10  to Harlequin by myself.

11    Q.  So did you specifically exclude it from this

12  agreement because the agreement's dated in 2007?

13    A.  It was not -- it would have already been excluded

14  because I had already signed the contract.  The contract

15  was signed many months, maybe a year before this.

16    Q.  Okay.  So going back to where we left off, we

17  were discussing the 68 or 69 books.  Would you

18  characterize any of them as financially successful?

19    A.  Yes.

20    Q.  How many of them?

21    A.  Several.

22    Q.  And which books were those?

23    A.  Can you define financially successful to me?

24    Q.  Well, made a substantial amount of money.

25    A.  What is a substantial amount of money?

**Confidential**

1    answered.

2              MR. GOETZEL:  Same objection.

3      A.  I was worried she was very sad after the death of

4    her father.

5              MR. PASSIN:  Can you mark that question,

6    please, and answer?  Thank you.

7      **Q.  (By Mr. Passin) Is it fair to say that Mrs. Emily**

8    **Kim was involved in editing the books in the Crave book**

9    **series?**

10     A.  No, it is not fair to say she was involved in

11   editing the books.

12     **Q.  Well, didn't Emily Kim also make contributions to**

13   **the story line in the Crave book series?**

14     A.  She did not make contributions to the story line

15   in the Crave book series.

16     **Q.  Isn't it accurate to say that Emily Kim**

17   **contributed to the writing of the Crave book series?**

18     A.  She did not contribute to the writing of the

19   Crave book series.  She did not write.

20     **Q.  Well, how would you describe Emily Kim's**

21   **contributions to the Crave book series?**

22     A.  Emily is an amazing cheerleader.

23     **Q.  Meaning that all she did is acted as a**

24   **cheerleader in connection with the Crave book series?**

25     A.  She kept a document and made suggestions for

Tracy Wolff

1  chapter titles, some of which I took, most of which I

2  did not.  But she kept, like, the summary of what

3  happened in that chapter so that when I went to do the

4  chapter titles...

5     Q.  Did she write the series Bible?

6     A.  I believe she contributed to the -- yeah.  I

7  believe she started and did some of the series Bible,

8  yes.  I don't believe she did all of it, but the series

9  Bible is not story lines.  The series Bible is what is

10 already written.

11    Q.  But isn't it fair to say that she was more

12 involved in the creation of the Crave book series than

13 acting as a cheerleader?

14    A.  No.  I don't think that's fair to say.

15    Q.  You just said she wrote some of the chapter

16 titles, you just said she wrote the series Bible.  Is

17 that acting as a cheerleader or is that more involved?

18    A.  The series Bible is not about the creation of the

19 series.  The series Bible took place after the book was

20 written --

21    Q.  What about the chapter --

22    A.  -- so that is not about the creation.

23    Q.  What about the chapter titles?

24    A.  The chapter titles are titles of chapters, but

25 the chapters were not written by Emily Sylvan Kim.

Confidential

1    Q.  But the chapter titles were?

2              MR. GOETZEL:  Object to the form of the

3    question.  You're mischaracterizing her testimony.

4    A.  I said that she made suggestions on chapter

5    titles, some of which I took, most of which I did not.

6    And that did not happen even until Covet.

7    **Q.  (By Mr. Passin) Which chapter titles in the Crave**

8    **book series did you write?**

9    A.  All of -- all of the ones in Crave.  My son

10   suggested a few with me.  We would talk about it at

11   dinner.  Crush, I believe Elizabeth Pelletier made

12   several suggestions in Crush.  I also do not think I

13   took them.  Emily Sylvan Kim started, I believe, making

14   suggestions in Covet, not for all of them, not even for

15   close to all of them in Covet.

16          And she began keeping a document in Court where

17   she would list the summary of what was going on in each

18   chapter.  And sometimes, I do not know if it was in all

19   of them she made suggestions.  I think sometimes she

20   would be, like, you know, some phrase or something.

21   Again, most of them would be to jog me and make me think

22   of something else that I thought was funny.

23          I'm actually very possessive of the chapter

24   titles and I want them to be as perfect as I can make

25   them.  So like I said, my children have made

**Confidential**

1   suggestions, my partner has made suggestions, Liz has

2   made suggestions, Emily has made suggestions.  Some of

3   my friends have made suggestions, but I choose them in

4   the end.

5       Q.  All right.  Now, you mentioned a couple of

6   minutes ago a document that Emily Sylvan Kim wrote.  Is

7   that the Bible or is that another document?

8       A.  Can you clarify?  I don't know what document

9   you're referring to.

10      Q.  Well, a couple of minutes ago you said that Mrs.

11  Kim wrote some document that, let's see, what was going

12  on in each of the chapters?

13      A.  That is the chapter title document.

14      Q.  Okay.  So she wrote the chapter title document

15  and she also wrote a Bible?

16      A.  She wrote a summary, a one to -- one-line summary

17  of what happened in the chapters that I wrote because

18  sometimes in editing, Liz would break the chapters

19  differently.  So if I had a chapter that was too long,

20  maybe Liz would break that up.

21      Q.  Okay.  Then you mentioned something about Emily

22  Kim would remind you about something that was funny for

23  chapter titles.  Did you try and make your chapter

24  titles funny?

25      A.  Yes, I did try to make my chapter titles funny.

**Confidential**

1      Q.  Did -- were your chapter titles structured sort

2   of as innuendos or comments about certain things?

3      A.  I wouldn't call them innuendos.

4      Q.  What was the purpose -- what did you try in

5   achieve in a chapter title?

6      A.  To get a laugh and set the tone of what the

7   chapter was.  So if a chapter was very somber, it would

8   not have a funny title.

9      Q.  Did you write a synopsis for each book in the

10   Crave book series?

11      A.  I did not.

12      Q.  Did someone else?

13      A.  For each book?  No.

14      Q.  For some of the books?

15      A.  Some of the books, there are synopses for.

16      Q.  Which books?

17      A.  I believe I wrote something for Crave.  Crush, I

18   wrote the first half of the synopsis.  I believe Liz

19   Pelletier wrote the second half.  Covet, Liz Pelletier

20   wrote the synopsis.  Court, the synopsis was more

21   nebulous in Court.

22      Q.  First of all, describe for me what a synopsis is.

23      A.  A synopsis is the basic plot plan for the book.

24      Q.  And when you say that Liz Pelletier wrote the

25   second half of the synopsis for Crush, was it based on

**Confidential**

1    your plot plan for the book or hers?

2        A.   Brainstorming and also a dream she had.

3        Q.   **What was the dream she had?**

4        A.   She dreamt about one of the heroes walking over a

5    cliff and trees exploding around him.

6        Q.   **And when did she tell you about that dream?**

7        A.   On a phone call, an early morning phone call.

8        Q.   **Excuse me?**

9        A.   An early morning phone call.  I don't know what

10   day.  I couldn't tell you.

11       Q.   **Well, how far along in the process of writing the**

12   **Crave book series?**

13       A.   It was while we were writing Crush.

14       Q.   **And then on Court, you said Liz Pelletier wrote**

15   **the synopsis?**

16       A.   I said the synopsis was nebulous on Court.

17       Q.   **I'm sorry, Covet.  I meant Covet.  I'm sorry.**

18       A.   Yes, Liz Pelletier wrote the synopsis on Covet.

19       Q.   **And was that based on her idea for the story line**

20   or a combination or brainstorming or what?

21       A.   I believe it was based on brainstorming.

22       Q.   **Okay.  When you say brainstorming on both Crush**

23   **and Covet, but I take it it was all based on a**

24   **continuation of Crave, the book Crave?**

25       A.   It's a series, so it progresses from Crave.

**Confidential**

1    Q.  So it has its limit -- it was limited by Crave?

2              MR. GOETZEL:  Object to the --

3    A.  Can you define limited?

4    Q.  (By Mr. Passin) Well, it had to follow in the

5    sequence of Crave, it had to be a follow up to Crave?

6    In other words, it would involve the same characters, et

7    cetera?

8    A.  Yes, it does involve the same characters with

9    some new additional characters.

10   Q.  And when you say the synopsis for Court was

11   nebulous, was there any synopsis at all?

12   A.  I believe there was some, yes.  I do not believe

13   it was a cohesive document the same way.

14   Q.  And who wrote it?

15   A.  Liz, I believe.

16   Q.  And was that based on brainstorming?

17   A.  Yes.

18   Q.  Is that common for --

19   A.  And --

20   Q.  Go ahead.

21   A.  And some of her ideas that she had had in maybe a

22   dream, yeah.

23   Q.  The same dream we talked about before?

24   A.  I don't believe so, no.

25   Q.  What other dreams?

**Confidential**

1   A.  I -- Liz -- I tend -- I can't say everything

2   about Liz's dreams.  I don't know.  I know that she's

3   had a couple.

4   **Q.  Well, did she communicate them to you?**

5   A.  I'm not sure.  I know Covet.  I remember the

6   dream from Covet very clearly.  Court, I'm not sure.

7   **Q.  Now, is it usual for a content editor to write a**

8   **synopsis?**

9   A.  That would depend on the project.

10  **Q.  Explain that to me.**

11  A.  Some projects -- if a project is conceived of by

12  an editor or a publisher, they tend to have much more

13  say in, like, the synopsis than if a project is

14  conceived of solely by a writer.

15  **Q.  Well, who conceived of Crave?**

16  A.  Liz -- Stacy Cantor Abrams and I spoke because

17  they had a book fall through.  And by fall through, I

18  mean a writer would not be able to write the book that

19  they were contracted to write.

20      When that happens for a publisher, it creates an

21  opening in the line that needs to be filled.  It is my

22  understanding that that happened with Entangled and

23  Stacy told me -- asked me if I would be interested in

24  writing a book quickly for the Entangled team line.

25  **Q.  And did she tell you what that book was about?**

Confidential

1    A.  She told me something -- I don't remember the

2  exact words, something paranormal.  And I wrote up five

3  ideas in response to that and sent them to Stacy.

4    **Q.  So is that all she told you?  Something**

5  **paranormal?**

6    A.  I don't remember exactly.

7    **Q.  Didn't she tell you exactly, it was an ordinary**

8  **girl in a super rarified world?**

9    A.  I don't think she told me that before.  I believe

10  the first time we spoke was on the phone.

11    **Q.  And what'd she tell you on that phone**

12  **conversation?**

13    A.  She told me that they had had a book fall through

14  in the line and that she was wondering if I would be

15  interested and if I had room in my writing schedule to

16  write a book quickly for Entangled team, that it needed

17  -- that it should be paranormal.

18        I do not remember if she mentioned vampires

19  specifically on that phone call or not.

20    **Q.  Do you remember anything else about that phone**

21  **call?**

22    A.  We spoke several times and it was several years

23  ago, so I do remember a couple of other things, but I am

24  not sure it was from that phone call or a subsequent

25  phone call.

**Confidential**

1   Q.  Was the subsequent phone call before you sent

2   them the five ideas?

3   A.  I don't recall if it was before or directly

4   after.  I don't recall.  I'm sorry.  I don't.

5   Q.  What do you specifically remember from that phone

6   call?

7   A.  I remember her saying that Liz had read some

8   articles and that she was excited about bringing

9   vampires back.

10   Q.  Anything else?

11   A.  I remember her saying that when they were talking

12   about someone that they knew who could write quickly, I

13   came to mind because I had just signed another contract

14   with Entangled for the first time in several years.  I

15   signed a contract with them, to be clear, before the

16   Crave series contract.

17   Q.  And what book was that?

18   A.  That was a book that never came out.  I do not

19   remember the exact title of it.  It was an adult

20   rom-com.  Rom-com, meaning romantic comedy.

21   Q.  How long did it take you to write each book in

22   the Crave book series?

23   A.  I feel like that differs.  Crave, I believe took

24   a couple of months.  And then more writing during the

25   editing process.  Crush took, I believe, a couple of

**Confidential**

1   months as well.  Maybe three, I don't know.  Somewhere

2   between two and three.  I feel like most of them did.

3   Court took longer, but it was the longest book.

4      **Q.  And what about Covet?  I think we skipped Covet**

5   **unless I missed it.**

6      A.  Yeah, I think approximately the same amount of

7   time.  That seems about right.

8      **Q.  And is it fair to say --**

9      A.  Two to three months.

10     **Q.  -- that you write -- you can write a book faster**

11  **than most authors write?**

12     A.  I don't think -- I don't know how fast other

13  authors can write a book.  So I don't think that is a

14  question I can answer.

15     **Q.  But you seem to have a reputation for being able**

16  **to write books quickly.  Is that correct?**

17     A.  I do believe that I can -- I can write books

18  quickly, yes.

19     **Q.  When did you start and when did you finish**

20  **writing each one of the books in the Crave book series?**

21  **And then you can limit it to the four that are the**

22  **subject of this litigation.**

23     A.  I honestly cannot give you exact dates.  I

24  believe with Crave, they contacted me in late April, so

25  I believe I probably started writing in May.  I believe

**Confidential**

1   it took a couple of months.  I know that it didn't get

2   edited until December, I believe.  I think it was -- it

3   was November or December.  It was -- it was in the

4   wintertime and that required more writing as well.

5          Crush, I believe was a couple of months.  I

6   believe I was -- I don't know when exactly.  I do

7   believe I was writing it in June, and I only remember

8   that because my dog died.  Covet was over Thanksgiving,

9   so some time in the Fall.  Court, Court was Summer, and

10  I remember that because my partner got COVID in August

11  when I was writing Court.  And those are the four books.

12      **Q.  Is it fair to say that Crave is the most**

13  **commercially successful book you've ever written?**

14      A.  I believe that's fair to say, yes.

15      **Q.  How many copies of Crave in all formats have you**

16  **sold?**

17      A.  I have no idea.

18      **Q.  Is it fair to say that you sold more copies of**

19  **Crave in all formats than you've ever sold of any other**

20  **book?**

21      A.  I believe that's fair.

22      **Q.  Okay.  Other than any of the books in the Crave**

23  **book series, what was the greatest number of copies in**

24  **all the formats of any other book that you sold?**

25      A.  I have no idea.

Confidential

1   Q.  Do you know what the name of the book would be

2   that was your second most --

3   A.  I would assume it was probably the Ethan Frost

4   series and the Shaken Dirty series.  The Ethan Frost hit

5   New York Times and Shaken Dirty hit USA Today.

6   Q.  How did you come up with the names Grace and

7   Jaxon for the Crave book series?

8   A.  Grace came to me.  Sometimes characters do that,

9   they come into my head, talking to me fully formed and

10  she did.  I was laying in bed and I was trying to sleep

11  and she just started talking in my head and right away,

12  I knew her name was Grace.

13  Q.  And when that happens, do you jump out of bed and

14  take notes?

15  A.  No.  I should, but I don't.

16  Q.  You're lucky.

17  A.  I remind myself.  I go over and over it in my

18  head and tell myself to remember in the morning.

19  Sometimes I do, sometimes I don't.

20  Q.  And was she pretty much fully formed in those

21  thoughts?

22  A.  She had her voice where she was, you know, a

23  little funny.  I had a picture of what she looked like.

24  Like I said, I knew her name was Grace.  I did not know

25  she was a gargoyle at that point.  Jaxon, I got his name

**Confidential**

```
 1    the way I get -- I believe what I did for Jaxon was I

 2    Googled whatever year he would've been born, if he was

 3    17 and not 100, and Googled the most popular names.  You

 4    can do that, like, U.S. Census or Social Security has a

 5    list that comes up very often, and you can just go

 6    through.

 7        And I tend to go through and pick names that I

 8    like that were popular in the years that my characters

 9    were born.

10    Q.  And how did you create his character traits?

11    A.  Well, he was a vampire, so I assumed he would be

12    dark and broody.  Liz Pelletier suggested the scar on

13    his face and the rest, I mean, I just kind of figured

14    out around him.  Like, why she had -- I believe it was

15    Liz who made a comment, it might've been Stacy, I don't

16    remember, it might've been -- about how he needed to be

17    -- like, there needed -- or maybe I made the comment.

18        I don't -- the problem with writing a

19    contemporary story is if two people want to be together,

20    they are together.  So you have to come up with reasons

21    for them to be apart besides -- and I didn't want it to

22    just be -- and I don't think Liz wanted it to just be,

23    oh, he might kill her.  Like, that's not a good enough

24    conflict.

25        And so then I started thinking about what
```

Confidential

1  conflict, internal conflict, and external conflict, I

2  could put between these two characters that would keep

3  them apart.

4      **Q.  And who are the other main characters in Crave?**

5      A.  I believe Grace, Jaxon and Hudson are the three

6  main characters.

7      **Q.  All right.  And how did you conceive of Hudson?**

8      A.  When I write characters, they usually come to --

9  besides like when I'm first starting, when I'm really

10  thinking, okay, I need to lay out a romantic conflict, I

11  need to lay out a setting, I need to lay out some kind

12  of plot.

13      As I move along in a book or in a series, the

14  characters tend to come to me when I need them.  So

15  Hudson, when I got to the ice cave, and I was writing

16  the ice cave with the Bloodletter and Grace and Jaxon,

17  Hudson needed to show up.  And all of a sudden, he

18  showed up leaning an elbow, like super sarcastic.  And I

19  was, like, There you are.  Okay.  Because I found that

20  for me if I spend too much time, like, trying to put

21  them on paper, like, how they're -- like I said, Grace

22  came to me just talking in my head.

23      But if I spend too much time trying to really lay

24  it out, like oh, this person's going to be snarky and

25  this person's going to be angry or whatever, it tends to

**Confidential**

 1   not feel natural in dialogue.  So I've learned to just

 2   trust my process and that the character will show up

 3   when I need them and Hudson did.

 4       **Q.  And then how did you decide that Grace should**

 5   **become a gargoyle?**

 6       A.  I think my subconscious always knew because I

 7   wrote in to Crave that her stomach sank like a stone or

 8   that she went as still as a statue or that she froze.

 9   And that was in several places because I wasn't sure

10   which she was.  Like, witch seemed too easy.  I didn't

11   want her to be a witch, I didn't want her to be a

12   dragon, I didn't want her to be a vampire and I didn't

13   want her to be a werewolf, so they couldn't be any of

14   those four things.

15       So I knew she needed to be something different

16   and I didn't really know what it was until -- I think I

17   brainstormed with my kids several times.  My youngest

18   son was pulling for Windigo because he loves them and I

19   did not want her to be a flesh-eating monster.  So I

20   brainstormed with my youngest, my kids who are big into

21   fantasy and lore all of that, Dungeons & Dragons.

22       I brainstormed with myself, I brainstormed with

23   Liz, and I think it was in a brainstorming with Liz that

24   gargoyle first came up.

25       **Q.  And then how did you come up with the Bloodletter**

Confidential

1   character?

2      A.   That was in the editing process of Crave.  Liz

3   told me she wanted a character that sounded really scary

4   but was very sweet.  No, that sounded scary but when you

5   looked at her, she looked sweet.  Like, she thought, I

6   just want her to be a dichotomy, right?  Like, you don't

7   expect it, but also that she really is scary.  And I

8   believe in that, she said she needs to have a scary name

9   like Bloodletter or something.

10         And I thought that was a really cool name.  So I

11  wrote the scene, it was an epilogue or it was a bonus

12  scene, epilogue or bonus scene to Crave and I kept the

13  name Bloodletter because I thought it sounded like a

14  cool name.  And I figured she would tell me if she

15  wanted me to change it.  Do you mind if we take a break?

16  I need to use the restroom.

17     Q.   That's fine.

18             THE VIDEOGRAPHER:  We're off the record at

19  10:53 a.m.

20                   (Brief recess.)

21             THE VIDEOGRAPHER:  This is Media 3.  We're

22  on the record at 11:05 a.m.

23                DIRECT EXAMINATION (cont'd.)

24  BY MR. PASSIN:

25     Q.   Have you ever referred to a Windigo in any book

**Confidential**

1   the Tempest series, you would not have gotten the Crave

2   series?

3       A.  I don't know if that is true or not because I've

4   done several other books with her.

5       Q.  Fair enough.  Is it fair to say that Stacy Abrams

6   did make some contributions to the story line of the

7   Crave book series?

8       A.  I don't -- I don't believe she did.

9       Q.  Have you ever met Lynne Freeman?

10      A.  I have no recollection of meeting Lynne Freeman.

11      Q.  When did you first hear or see her name?

12      A.  On the document you told me to refer to as the

13  February 2022 document.

14      Q.  Okay.  Did you attend the Romance Writers of

15  America conference in Anaheim, California in July of

16  2012?

17      A.  I believe I did.

18      Q.  Do you remember meeting Lynne Freeman while in

19  Anaheim for the conference?

20      A.  I do not remember -- recollect meeting Lynne

21  Freeman.

22      Q.  Do you remember Emily Kim introducing you to

23  Lynne Freeman outside the hotel you were staying while

24  attending the conference?

25      A.  I don't remember that, no.

Confidential

1    Q.  When you say you don't remember, is it possible

2    that you met her, you just don't remember?

3    A.  I don't know if it's possible or not.  I don't

4    remember meeting her.

5    Q.  Okay.  Did you give a lecture at the conference

6    in 2012 on erotic language in books?

7    A.  I did not.

8    Q.  Did you give a conference at that -- did you give

9    a lecture at that conference?

10   A.  I did give a lecture at that conference.

11   Q.  And what was the subject?

12   A.  It was on sexual -- seven steps to sizzling

13   sexual tension and how to use that in everything from YA

14   through erotica.

15   Q.  Do you remember on the morning that you gave the

16   lecture riding from your hotel to the conference in

17   Emily Kim's rental vehicle?

18   A.  I stayed at the conference hotel.  I always stay

19   at the conference hotel.

20        MR. PASSIN:  Can you read the question back,

21   please?

22        (Previous question read back.)

23   A.  I would not have been riding in any car because I

24   would've been at the hotel already because I would've

25   stayed there.

**Confidential**

1    Q.   (By Mr. Passin) Yeha, but do you remember the

2  morning you gave the lecture riding from your hotel to

3  the conference -- oh, I see you're saying the conference

4  is at the hotel?

5    A.   Is at the hotel.

6    Q.   Okay.

7    A.   And I would not be in any vehicle.

8    Q.   Okay, all right.  Do you remember that during the

9  ride Lynne Freeman -- okay.  Strike that.

10         Do you remember riding in Emily Kim's rental

11  vehicle with other clients of Mrs. Kim, including Lynne

12  Freeman?

13    A.   Emily Sylvan Kim has never rented a vehicle that

14  I've ridden in.

15    Q.   Who is the owner of Entangled?

16    A.   Liz Pelletier owns the majority.  I do not know

17  all of the other owners.

18    Q.   When did you meet Liz Pelletier?

19    A.   I met Liz Pelletier at an RWA conference.  I do

20  not remember which one.

21    Q.   Under -- well, what were the circumstances that

22  you met her at the conference?

23    A.   I was walking through the bar and a number of

24  Entangled authors and Entangled employees were sitting

25  there.  I saw Stacy Abrams, I said hello.  She

Confidential

1    Q.  And then please look at the last two pages of

2    this document.  Is that a certification that certifies

3    that the electronic signature we just looked at is your

4    electronic signature?

5    A.  Yes.  It says, Signature Certificate.

6    Q.  You can put that document down.  Do you plan for

7    there to be any more books in the Crave series other

8    than Crave, Crush, Covet, Court, Charm and Cherish?

9    A.  I do not.

10   Q.  Now, the agreements in the addendum, addenda,

11   that we just went over, did you use a lawyer to

12   negotiate them or does your -- or did your agent

13   negotiate them?

14   A.  My agent negotiated them.  I do not know if she

15   used an attorney as well.

16   Q.  Well, let me ask you this.  On your answers to

17   interrogatories where you listed expenses, you had some

18   legal fees charged.  Do you know what lawyer that was

19   to?

20   A.  It was to LegalZoom.

21   Q.  And what do you use, in general, I don't want to

22   get into any details, but what do you use LegalZoom for?

23   A.  My partner helped me set up an LLC through

24   LegalZoom.

25   Q.  Okay.  And other than that, do you use a lawyer

**Confidential**

1    even if it's something you might be interested in.  But

2    the dynamic is exactly what Liz is looking for; ordinary

3    girl in a super rarified world, hence the huge worldwide

4    response to it.  I can't wait to hear what you think.

5          So my questions are, do you notice it says in the

6    first paragraph that, I'm so excited that you thought of

7    me for this and in the penultimate paragraph that the

8    dynamic is exactly what Liz is looking for, ordinary

9    girl in super rarified world.

10          Based on the foregoing, is it accurate to say

11    that prior to April 26th, 2019, Stacy Abrams

12    communicated to you that Entangled wanted to hire you to

13    write a book about an ordinary girl in a super rarified

14    world?

15    A.  It is accurate to say that Stacy Abrams and I

16    spoke on the phone about the project that would become

17    the Crave series.  I do not know if she used those words

18    or if I took something that she said and put them into

19    those words.  That, I do not know.

20    Q.  Well, tell me specifically what you recall was

21    said in that conversation.

22    A.  I mentioned earlier this very same conversation.

23    And Stacy and I spoke by phone.  She explained to me

24    that a book that they had planned had fallen through,

25    and by fallen through it meant that for some reason the

**Confidential**

1  author was unable to write the book.  This left a hole

2  in Entangled's schedule and she and Liz were speaking

3  about what they could fill the hole with.  And at some

4  point, they decided they wanted a paranormal romance.

5     **Q.  All right.  Now, didn't -- she must have said**

6  **something similar to, ordinary girl in a super rarified**

7  **world, don't you agree, or you wouldn't have written it**

8  **in this e-mail?**

9     A.  I think that all paranormal romances are either a

10  girl or a boy who is ordinary and who has fallen into a

11  super rarified world.  If not all, then a large

12  majority.  I cannot speak for all because I have not

13  read all.

14     **Q.  So you think that the phrase "ordinary girl in a**

15  **super rarified world" is basically the same thing as**

16  **saying a young adult paranormal novel?**

17     A.  I think that it is saying that a large percentage

18  of young adult paranormal novels, and to a certain

19  extent adult paranormal novels, involve a super rarified

20  world, a world that not many people know about.  And

21  it's usually the thing that shakes up, the inciting

22  incident as we refer to in writing, is that somebody or

23  something comes in to this world and changes it.

24        And that, in some way or another, encompasses --

25  again, I cannot speak to all because I have not read

1  the form.  You mischaracterized or misstated what's

2  written here.

3      **Q.   (By Mr. Passin) That was in two weeks?**

4            MR. GOETZEL:  Getting the first three

5  chapters is always my hardest hurdle and I spent a week

6  on that?

7            MR. PASSIN:  A week, I'm sorry.

8      **Q.   (By Mr. Passin) Is one week a long or short time**

9  **to do the first three chapters?**

10     A.   For me, usually a short time, the first, I don't

11  know, about the first ten chapters are always my

12  hardest.

13     **Q.   Did you meet the deadline for the book?**

14     A.   I don't remember.

15     **Q.   How long does it typically take for you to write**

16  **a book?  I realize it depends on the length of the book.**

17     A.   It depends on the length of the book and what it

18  is.

19     **Q.   But what about a book like the Crave book series**

20  **that's 500-600 pages?**

21     A.   I would say two to three months.

22     **Q.   Okay.**

23     A.   If it goes well.

24     **Q.   Next I'm going to mark as Exhibit 45 a 78-page**

25  **draft of Crave, which is Bates-stamped Number 0038155**

**Confidential**

1  how many pages it is, so I can't tell you if it is half

2  of the book.

3     Q.  Okay.  Do you have any idea when this was

4  completed, this draft?

5     A.  (Witness shakes head.)

6     Q.  Well, if it was attached to the exhibit --

7     A.  Some time in the summer.

8     Q.  Yeah, if it was attached to the exhibit, it

9  would've been --

10          THE VIDEOGRAPHER:  Counselor, you need to

11  raise your microphone up a little bit more.

12     Q.  (By Mr. Passin) If it was attached to the

13  exhibit, it would've been July 2, 2019.  Does that make

14  sense to you?

15     A.  If it was attached to the exhibit, then yes.

16     Q.  All right.  Did Stacy ever get back to you on

17  what she thought about Jaxon or Grace?

18     A.  I don't recall her getting back to me or what she

19  said, but if the book continued to move forward, I'm

20  sure I spoke with her or I don't remember if I was

21  speaking with Liz at this point.

22     Q.  Did Stacy ever give you any suggestions on how to

23  make it better, the book better?

24     A.  I remember Stacy giving me suggestions from Liz.

25  Liz thinks you should do this, Liz thinks you should do

**Confidential**

```
 1    that.

 2       Q.  Do you recall any other specific suggestions?

 3       A.  At this juncture?

 4       Q.  Yes.

 5       A.  No.

 6       Q.  Do you recall how many suggestions she made?

 7            MR. GOETZEL:  I'm sorry.  She being Stacy or

 8    Liz?

 9       Q.  (By Mr. Passin) Stacy making suggestions that Liz

10    supposedly said.

11       A.  Stacy making suggestions from Liz?

12       Q.  Yes.

13       A.  I don't know how many suggestions.

14       Q.  A lot or a little?

15       A.  The one that -- I don't know.  I don't know.

16       Q.  And did you ever talk directly to Liz about

17    suggestions or was it always through Stacy?

18       A.  No, I did speak with Liz for -- at one point, we

19    spoke for many hours.

20       Q.  And when did that take place?

21       A.  I don't remember.  She was in an airport and we

22    spoke about her ideas for the book and my ideas for the

23    book and we went back and forth.  Stacy was on the phone

24    call, but she -- I believe she hung up because Liz and I

25    were going back and forth.  And I know that when I got
```

Tracy Wolff

1   it was -- the flight pattern was from San Diego to

2   Seattle to either Fairbanks or Anchorage.  And I must

3   have, at one point, picked Anchorage.

4       And then -- whether I changed it to Fairbanks

5   because I forgot that I had chosen Anchorage and started

6   writing Fairbanks instead or if somebody realized that I

7   had Fairbanks and Anchorage in there and might've told

8   me to pick one and I -- when towards the end of the book

9   realized that Fairbanks is closer to Healy, I believe, I

10  might've chosen Fairbanks at that point.

11      **Q.  Didn't you take it out because Lynne Freeman uses**

12  **Anchorage in her book?**

13      A.  I had never heard of Lynne Freeman or her book at

14  the time Crave was published.

15      **Q.  Anchorage was mentioned five times in the first**

16  **147 pages of Exhibit 21.  Are you aware that Masked**

17  **mentions Anchorage five times in the first 150 pages?**

18      A.  I have absolutely no idea what Masked mentions.

19      **Q.  In various drafts of your manuscript for Crave,**

20  **you used the phrase frozen wasteland, and then in the**

21  **final version change it to hell has actually frozen**

22  **over.  Are you aware that Masked uses the term frozen**

23  **wasteland?**

24      A.  I am not aware.

25      **Q.  In the drafts of Crave, you spell rakes**

Confidential

1    question.  Go ahead.

2        A.  Stacy Abrams did not content edit Crave.

3        Q.  (By Mr. Passin) I didn't say that.  She was a

4    copy editor, so she made edits.  Didn't she?

5        A.  That is between Liz and Stacy how she would make

6    those edits.

7        Q.  Please describe to me the contributions you made

8    to each of the books, Crave, Crush, Covet and Court?

9        A.  I wrote them.

10       Q.  Please describe to me the contributions that Liz

11   Pelletier made to each of the books, Crave, Crush, Covet

12   and Court?

13       A.  Liz helped me plot them and she edited them.

14       Q.  I'm sorry.  You said she helped you plot them?

15       A.  She helped me plot them.  We brainstormed and

16   plotted together, yes.

17       Q.  Okay.  And what does that mean exactly?

18       A.  It means that we would talk about the books, we

19   would throw out ideas about the books, we would decide

20   on ideas about the books.

21       Q.  But then ultimately you are the one that would

22   make the changes.  Correct?

23       A.  I am the one that wrote the books and turned them

24   over to her after they had been fully plotted and

25   written.

Confidential

1      Q.  And describe to me the contributions that Stacy

2    Abrams made to each of the books, Crave, Crush, Covet

3    and Court.

4      A.  Stacy Abrams was the copy editor.

5      Q.  And who else was involved in editing any of the

6    books in the Crave book series?

7      A.  I believe there were proofreaders involved.  I

8    don't know who the proofreaders are.

9      Q.  Okay.  I'd like to --

10     A.  And I believe Emily Sylvan Kim read each book

11   because she reads all of my books.

12     Q.  I would like to mark as Exhibit 47 a letter dated

13   May 9th, 2022 from Nancy Wolff to me.

14             (Exhibit Number 47 was marked.)

15     Q.  (By Mr. Passin) You see on the last page -- did

16   you receive a carbon copy of this letter on or about

17   February 9 of 2022?

18     A.  I believe I received it after it was sent, yes.

19     Q.  Look at the third paragraph.  The first line

20   says, In this instance, Pelletier created the basic

21   story line for the Crave book series.  Is that a true

22   statement?

23     A.  She created the -- for Crave?

24     Q.  Yes.

25     A.  The one -- the first book --

**Confidential**

1    Q.  Yes.  Well, no, it says the Crave series.

2    A.  I know.  For Crave the first book, I created with

3    much input from Liz the plot.  For Crush, I created a

4    synopsis of approximately the first half of the book.

5    Liz Pelletier created the synopsis for the rest of the

6    book.

7        For Covet, Liz Pelletier created the synopsis.

8    For Crave, there was not, to the best of my

9    recollection, a full synopsis of the book.  What there

10   was --

11   Q.  For which book are we talking about?

12   A.  For Court.  I'm sorry if I misspoke.  For Court,

13   there was not, to the best of my recollection, a full

14   synopsis for the book.  But what there was, Liz

15   Pelletier -- Liz Pelletier wrote, but we spoke and

16   brainstormed over Court a lot because it was a difficult

17   book.

18   Q.  Why was it so difficult?

19   A.  At the time we wrote it, we thought we were

20   wrapping up the series as we were brainstorming for it.

21   And I think we were both a little intimidated by that.

22   Q.  And what's the relationship between the synopsis

23   and the book?

24   A.  The relationship between the synopsis and the

25   book is that the book tends to follow -- the synopsis is

Confidential

1  the basic plot line of the book.  The book tends to

2  follow that plot to a certain extent.

3      Q.  What do you mean by a certain extent?

4      A.  Any synopsis I have ever written or Liz has

5  written, I have deviated from in small ways because you

6  go as the book calls you.

7      Q.  All right.  With respect to the synopsis for

8  Crave, how long was that synopsis?

9      A.  I have no recollection.  I'm not -- I don't -- I

10  don't know if it was just a couple of pages of the notes

11  that you've already shown me -- shown or if it was

12  longer.

13      Q.  So it could be only a couple of pages?

14      A.  I don't know.  I don't remember.

15      Q.  But you're saying -- how long is a synopsis

16  usually?

17      A.  Synopses can be anywhere from 2 pages to 100

18  pages.  It just depends on the writer and the book.

19      Q.  And you have no recollection on how long the one

20  in Crave was?

21      A.  I do not.

22      Q.  Does it still exist today?

23      A.  If there was one that was longer than the pages

24  of notes, I would imagine that it would, but I don't

25  have a recollection of -- the way I -- the way I have a

1  severe -- like, I have an actual recollection of writing

2  the first half -- or the first part of the synopsis for

3  Crush and then Liz looking it over and writing the rest

4  because she didn't like it, because she had a dream,

5  because any number, you know?  I don't remember if there

6  is an actual synopsis the same way there was for Crush

7  and Covet.  If there was for Crave, I do not remember

8  that.

9     **Q.  All right.  So you don't remember if there was**

10  **one for Crave, but didn't you say you created the plot.**

11  **Right?**

12     A.  For Crave?

13     **Q.  Yes.**

14     A.  I created a lot of the plot points.  As the back

15  and forth, we've looked at all afternoon shows, Liz was

16  very involved with everything from where it was

17  eventually set, not in Barrow, Alaska, to very involved

18  in the uncle and, you know, the main idea of who these

19  characters were and, like, as archetypes and wanting --

20  certainly inciting incidents of wanting her to go to the

21  school and her parents being dead or not around, I don't

22  remember exactly.

23          Very involved in she wanted Jaxon to not be

24  perfect, which is where the scar on his face came from

25  and several other things.  She told me during editing

Confidential

1   that there was -- she thought there was a scene missing

2   for example.  I think more than that she told me she did

3   not like the meet cute and I had to rewrite the meet

4   cute again.

5        And then I think the secondary, second half of it

6   when I was writing it where everything happens with Lia,

7   I believe that was -- I believe I remember, but I don't

8   know how many notes she had before I wrote the draft,

9   particularly of the second half of how everything

10  unfolds.

11  **Q.  Did Liz put any of these -- any of this input in**

12  **writing other than what you've seen today?**

13      A.  I don't remember.  I don't.  I don't recall.  I

14  know that she and Stacy e-mailed back and forth or

15  talked.  I know that I had several long conversations

16  with her.

17  **Q.  And what about Crush?  How long was the synopsis**

18  **in Crush?**

19      A.  I don't remember.

20  **Q.  But you wrote the first half?**

21      A.  Yeah.

22  **Q.  How long was the first half you wrote?**

23      A.  I don't know.

24  **Q.  Do you still have it?**

25      A.  I believe if I do have it, it would be in the

**Confidential**

1    documents that you received.

2      Q.  So in other words -- well, was it one of the

3    documents we saw today?

4      A.  It was not one of the documents that we saw

5    today.

6      Q.  Okay.  I haven't seen the synopsis, but you think

7    if -- if you had it, it was produced?

8      A.  If I had it, it would've been produced.

9      Q.  And then you said you wrote the first half.  Did

10   anyone finish it?

11     A.  Liz Pelletier.  Are we speaking of the synopsis?

12     Q.  Yes.

13     A.  Liz Pelletier finished the synopsis.

14     Q.  How long was the part she wrote?

15     A.  I have no idea.

16     Q.  Have you seen that today in any of the documents?

17     A.  I have not seen it today in any of the documents.

18     Q.  Do you know if it's been produced?

19     A.  I have no idea if it's been produced.  I know

20   that we had a long phone conversation and I took many

21   notes on the second half of the book based on that phone

22   conversation.

23           MR. PASSIN:  I'm sorry, can you read that

24   last thing back?

25               (Previous answer read back.)

**Confidential**

1   today.

2      Q.  All right.  Is the following a correct sentence

3   -- a true sentence?  The Crave book series was a

4   collaborative project with Pelletier providing to Wolff

5   in the writing the main plot, location, characters and

6   scenes?

7      A.  May I see that?  Oh, it's in front of me, I'm

8   sorry.

9      Q.  That's in the third paragraph, it's down three

10  lines.  Three and -- lines three and four.

11     A.  The Crave series was a collaborative project with

12  Pelletier.  It absolutely was a collaborative project

13  with Pelletier.  Providing to Wolff in writing the main

14  plot, location, characters and scenes.

15     Q.  That's not true.  Is it?

16     A.  She provided -- there were the text messages --

17  the messages and the e-mails that we saw.

18     Q.  The messages --

19     A.  Again, I don't --

20     Q.  Wait, wait, stop.  We didn't see any messages and

21  e-mails.  What we saw -- well, we saw some things from

22  Stacy.  Okay.  So you're saying that was the things we

23  saw from Stacy?

24     A.  The lines that Liz wrote in those things from

25  Stacy.

Confidential

1    Q.  Right, yeah, but did that include the plot,

2    location, characters and scenes?  I don't think so.

3            MR. GOETZEL:  Object to the form.  That's

4    not a question.  You're arguing with the witness.

5    A.  I don't remember --

6            MR. GOETZEL:  Hold on, hold on.

7            THE WITNESS:  Sorry.

8            MR. GOETZEL:  Please don't argue with the

9    witness.

10   A.  I don't remember -- I don't remember what was

11   provided in writing and what was oral.

12   Q.  (By Mr. Passin) So as you sit here, you're saying

13   you cannot tell me whether the sentence, Pelletier

14   provided to Wolff in writing the main plot, location,

15   characters and scenes is true or false.  Is that

16   correct?

17   A.  I do not remember what was provided in writing

18   and what was over the -- over orally, over the phone.

19   Q.  Have you ever read all or a portion of Masked?

20           MR. GOETZEL:  Objection, asked and answered.

21   You can answer it again, but...

22   A.  I have never read any portion of Masked.

23   Q.  (By Mr. Passin) Has anyone ever sent you all or

24   any portion of Masked?

25   A.  No one has ever sent me any portion of Masked.

Confidential

1    Q.  Has anyone ever sent you any language from

2  Masked?

3    A.  No one has any sent me any language from Masked.

4    Q.  Has anyone ever communicated to you all or any

5  portion of the contents of Masked?

6    A.  No one has ever communicated -- or I'm sorry.

7  Can you repeat the question?

8    Q.  Has anyone ever communicated to you all or any

9  portion of the contents of Masked?

10    A.  No one has ever communicated to me.

11    Q.  Have you ever discussed any of the contents of

12  Masked with Emily Kim?

13    A.  No, I have not.

14    Q.  Have you ever discussed any of the contents of

15  Masked with Liz Pelletier?

16    A.  I have not.

17    Q.  Have you ever discussed any of the contents of

18  Masked with Stacy Abrams?

19    A.  I have not.

20    Q.  Have you ever discussed any of the contents of

21  Masked with anyone?

22    A.  I have not.

23    Q.  Have you ever discussed any of the language from

24  Masked with Emily Kim?

25    A.  Any -- I have not.

Confidential

1    Q.  Have you ever discussed any of the language with

2    Masked with Liz Pelletier?

3    A.  I have not.

4    Q.  Have you ever discussed any of the language from

5    Masked with Stacy Abrams?

6    A.  I have not.

7    Q.  Have you ever discussed any of the language with

8    Masked with anyone?

9    A.  I have not.

10   Q.  Have you ever had in your possession a partial or

11   a complete copy of Masked?

12   A.  I have not.

13   Q.  Did you ever discuss Lynne Freeman with Emily

14   Kim?

15   A.  I have spoken to Emily Kim about Lynne Freeman

16   after the February 7th letter because I did not know who

17   she was.

18   Q.  How many times have you spoken with her?

19   A.  Since the February 7th letter?

20   Q.  Yes.

21   A.  Several times.

22   Q.  And let's take the first time.  Who else was

23   present besides the two of you?

24   A.  I was on a phone call with her.

25   Q.  And no one else was on the call?

**Confidential**

1    A.  At some point, I believe Liz Pelletier was also

2    on the call.

3        Q.  And when did this call take place?

4    A.  I -- the -- I believe the day they got -- that

5    Emily got the letter of -- the February 7th letter.

6        Q.  And describe for me as best you can what everyone

7    said in that conversation.

8              MR. GOETZEL:  Hold on one second.  I just

9    want to object to make sure if there weren't any

10   attorneys on the phone call.  If there were --

11             THE WITNESS:  There were no attorneys on the

12   phone call.

13             MR. GOETZEL:  Okay.  Then you can answer.

14   A.  I said, I have no idea who Lynne Freeman is.  Why

15   is she suing me or whatever this is?  Emily told me she

16   was a former client of hers.  I was -- honestly, I was

17   in complete shock.  I had no idea what manuscript they

18   were referring to.  I had no idea of what person they

19   were referring to, and I believe I kept asking, Who is

20   this person?  What is this -- what is this book?  Who is

21   this person?  I've -- I don't know anything about this.

22       Q.  (By Mr. Passin) And what did Emily say on the

23   call?

24   A.  Emily told me Lynne Freeman was a former client

25   of hers.

1      Q.  Anything else?

2      A.  She told me -- I don't remember exactly what she

3   told me.  To put this in context, my mother died that

4   week and a lot of that week is a blur to me.

5      Q.  I'm sorry to hear that.

6      A.  Thank you.  I was -- I had -- that morning, I had

7   been told that she would be dying in the next week or

8   so, and I remember very little of that week.

9      Q.  Do you recall what Liz Pelletier said in the

10  conversation?

11     A.  I believe Liz's answers were very similar to

12  mine.  I have no idea who Lynne Freeman is.  I have no

13  idea what this manuscript is.  What is going on?  What

14  is happening?  I believe that is the gist of the entire

15  conversation.

16     Q.  All right.  And what about the second

17  conversation you had regarding Lynne Freeman?  When did

18  that take place?

19     A.  I don't remember if it was that week or the next

20  week.  Again, that week is very much a blur for me.  My

21  mother died on Thursday morning.

22     Q.  I apologize.  I still have to go through the

23  questions.

24     A.  Yeah, I just -- I honestly do not remember

25  because I was very fixated on the fact that my mother

**Confidential**

1   was dying down the hall from my office and...

2   **Q.  And do you recall what anyone said during that --**

3   **was that a phone call again?**

4   A.  It would not have been in person as Emily lives

5   in New Jersey.

6   **Q.  So was it just you and Emily or was someone else**

7   **on the call?**

8   A.  I believe it would've been just Emily and me and

9   I believe -- almost every time that we have spoken

10  follows the same pattern.  This is so unfair, we didn't

11  do this, I have no idea why anyone would think that I

12  would do this.  I've never copied anything in my life

13  from anybody else.  I don't know why Lynne Freeman would

14  think that I would do this.

15  **Q.  All right.  Do you recall anything else said on**

16  **that call or was that it?**

17  A.  No, I mean, that tends to be the gist of our

18  conversations about Lynne Freeman.

19  **Q.  And I thought there was a third conversation?**

20  **When did that take place?**

21  A.  There have been several conversations over the

22  course of the year and they all follow the same

23  situation, the same scenario.  This is not fair, I don't

24  understand why it's happening.  I don't understand why

25  she would think that I would do this.  I don't remember

**Confidential**

1  meeting this woman.  This is so unfair.

2      Q.  All right.  So did you --

3      A.  I've never read this book, I've never heard of

4  this book.  That's what the conversations tend to be.

5      Q.  Have you told me now everything you discussed

6  about Lynne Freeman with Liz Pelletier?

7      A.  Pretty much the same gist.  This doesn't make

8  sense.  We've never done this.  Why would we do this?

9  We totally created this series all by ourselves.

10     Q.  Did you ever discuss Lynne Freeman with Stacy

11 Abrams?

12         MR. GOETZEL:  Again, sorry, object.  What

13 timeframe are you talking about or referring to?

14         MR. PASSIN:  Ever, ever.

15     A.  I don't believe that we've ever discussed Lynne

16 -- I believe we spoke when we met -- when we -- at some

17 point in Chicago.  I think I said, Oh, my gosh, this

18 lawsuit is a nightmare.  I can't even believe this is

19 happening and she's just, like, You didn't do anything.

20 It's going to be fine.  You didn't do anything.

21     Q.  And when did that conversation take place?

22     A.  Whatever date I was signing in Chicago, which

23 would've been in December.

24     Q.  December of last year?

25     A.  December of 2022.

**Confidential**

1    Q.  Okay.  And --

2           MR. GOETZEL:  Excuse me just a second.  I'm

3    curious, the -- are you recording this by phone or --

4           MR. BAER:  Oh, no.  No.  There's no --

5           MR. GOETZEL:  Yeah, I meant to ask when you

6    had it set up vertically like you were recording us.

7           MR. BAER:  Yeah, sometimes my office will

8    text me and I have no -- there's no recording going.

9    There's no --

10          MR. GOETZEL:  Okay, thanks.

11   Q.  (By Mr. Passin) Was anyone else present during

12   that conversation in Chicago?

13   A.  I don't remember.

14   Q.  Did you ever discuss Lynne Freeman with anyone

15   else other than what you just discussed with me the last

16   ten minutes?

17   A.  I have discussed Lynne Freeman with my fiancée.

18   Q.  And what did you discuss with your fiancée?

19   A.  Exactly the same thing.  I don't understand how

20   she could possibly think that I would do this.  I've

21   never seen her book.  I've never heard of her book.  I

22   would never steal from anybody.

23   Q.  How many YA books set in Alaska are you aware of?

24   A.  I have no idea.

25   Q.  Are you aware of any?

**Confidential**

1      A.   Crave.

2      **Q.   Do you know anyone from Alaska?**

3      A.   I know that I've met people from Alaska, but do I

4   know somebody closely from Alaska?  I do not believe so.

5      **Q.   Whose idea was it to use Alaska as a setting for**

6   **the Crave book series?**

7           MR. GOETZEL:  Objection, asked and answered.

8   You can answer it again.

9      A.   It was my idea to set a paranormal in Alaska.

10  And Emily Sylvan Kim was excited about the idea of

11  setting a paranormal in Alaska for my book and Liz

12  Pelletier had just come back I from a cruise and was

13  also very excited about using Alaska because she was

14  very excited about her cruise.

15     **Q.   (By Mr. Passin) All right.  Now, I may have asked**

16  **you and if I did I apologize, so why did you think**

17  **Alaska would be a good setting for the Crave book**

18  **series?**

19     A.   Because it is dark, because there is civil

20  twilight, because vampires do well in darker climates

21  that are not sunshiny, because there was a line from a

22  documentary called The Art of Flight and they had made

23  the comment, one of the snowboarders, I do not remember

24  which one, had made the comment that they were walking

25  in a place where no human beings had ever walked or

**Confidential**

1   something to that effect.  And it just stayed with me

2   and I always thought, that would be a really cool place

3   to set something where paranormals that didn't want to

4   be around humans or, like, giant dragons could fly free.

5      **Q.  I would like to mark next as Exhibit 48**

6   **Declaration of Tracy Deebs Elkenaney p/k/a Tracy Wolff.**

7             (Exhibit Number 48 was marked.)

8      **Q.  (By Mr. Passin) First question is, is that your**

9   **signature on Page 6?**

10     A.  Yes.

11     **Q.  Okay.  And you recall signing this on or about**

12  **March 2, 2023?**

13     A.  I do, yes.

14     **Q.  Okay.  Turn to Paragraph 7.  At the end --**

15  **towards the end of the paragraph, you say, I e-mailed**

16  **Mrs. Abrams on March 16, 2010 telling her that I thought**

17  **Tempest Rising was a better title than riptide or**

18  **Tempest.  Do you see that?**

19     A.  I do.

20     **Q.  Do you have a copy of that e-mail?**

21     A.  I saw the e-mail when I wrote this, yes.

22     **Q.  You saw the e-mail when you wrote it?  So did you**

23  **turn that over to your counsel?**

24     A.  I told my counsel about it and I know that they

25  had Ben Rose, the e-vendor, come into my computer and

**Confidential**

1  to the status of the synopsis?

2     A.  About the synopsis, specifically about the

3  synopsis.

4           MR. PASSIN:  Can we go off the record for

5  one minute?

6           THE VIDEOGRAPHER:  We are now going off the

7  record.  The time is 4:13 p.m.

8                  (Brief recess.)

9           THE VIDEOGRAPHER:  This is Media 6.  We're

10 now back on the record at 4:27 p.m.

11           DIRECT EXAMINATION (cont'd.)

12 BY MR. PASSIN:

13    **Q.  All right.  Do you know how many cards in a tarot**

14 **deck?**

15    A.  Off the top of my head?  No.

16    **Q.  Okay.  Which tarot cards were used in the Crave**

17 **series?**

18    A.  There was only one tarot card used in the Crave

19 series.

20    **Q.  And which one was that?**

21    A.  And I don't remember what it is.  I remember that

22 it was a joke because it was done by a troll, he was

23 trolling her.  I believe it was, like, whatever the

24 worst tarot card is.

25    **Q.  And you used it as a joke?**

1    A.  I did use it as a joke.

2    **Q.  Explain to me the joke.**

3    A.  I used it in the prison and it was at the bottom

4    level.  And Remy was walking Grace around and showing

5    them, you know, all these different things in the bottom

6    of the prison.

7        And he brought Grace in and said, Hey, why don't

8    you do a tarot -- I -- this is roughly paraphrasing.

9    Why don't you do a tarot card reading of, you know,

10   whatever, get a tarot card or whatever.  Well, the guy

11   pulling it was a troll, and the whole concept is you're

12   being trolled.  Have you heard of that term?

13   **Q.  Yes.**

14   A.  She was being trolled.  So the troll gave her a

15   -- like, a really bad card.  And she started -- you

16   know, she was, like, a little nervous and then she

17   realized the joke and she and Remy kind of laugh about

18   it.

19            THE VIDEOGRAPHER:  Counselor, your

20   microphone.

21   **Q.  (By Mr. Passin) And why'd you put that in the**

22   **book?**

23   A.  Because I thought it was a funny joke.

24   **Q.  Has Emily Kim ever requested you send drafts or**

25   **manuscripts as RTF rich text files?**

**Confidential**

1      I, TRACY WOLFF, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5

6   _____

7                    TRACY WOLFF

8   THE STATE OF TEXAS)

9   COUNTY OF TRAVIS)

10      Before me, _Leslie Walter Haas_____, on this

11   day personally appeared TRACY WOLFF, known to me (or

12   proved to me under oath or through _Driver License_)

13   (description of identity card or other document) to be

14   the person whose name is subscribed to the foregoing

15   instrument and acknowledged to me that they executed the

16   same for the purposes and consideration therein

17   expressed.

18      Given under my hand and seal of office this

19   _23rd_ day of _March_____, 2023.

20

21   _____

22   Notary Public in and for

23   The State of Texas

24        LESLIE WALTER HAAS
         Notary ID #7023972
25      My Commission Expires
        October 21, 2024

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    LYNNE FREEMAN,                   )
     AN INDIVIDUAL                     )
     PLAINTIFF,                        )
4                                      )
     VS.                              )
5                                      )
                                       )
     TRACY DEEBS-ELKENANEY            )
6    P/K/A TRACY WOLFF, AN            )
     INDIVIDUAL, EMILY SYLVAN         )
7    KIM, AN INDIVIDUAL,              )
     PROSPECT AGENCY, LLC, A          )
8    NEW JERSEY LIMITED               )    CASE NO. 1:22-CV-02435-LLS
     LIABILITY COMPANY,               )
9    ENTANGLED PUBLISHING,            )
     LLC, A DELAWARE LIMITED          )
10   LIABILITY COMPANY,               )
     HOLTZBRINCK PUBLISHERS,          )
11   LLC D/B/A MACMILLAN,             )
     A NEW YORK LIMITED               )
12   LIABILITY COMPANY, AND           )
     UNIVERSAL CITY STUDIOS,          )
13   LLC, A DELAWARE                  )
     LIMITED LIABILITY COMPANY )
14        DEFENDANTS.                 )

15
                    REPORTER'S CERTIFICATION
16              DEPOSITION OF TRACY WOLFF
                     March 07, 2023
17
          I, Gabriela S. Silva, Certified Shorthand
18   Reporter in and for the State of Texas, hereby certify
     to the following:
19        That the witness, TRACY WOLFF, was duly sworn by
     the officer and that the transcript of the oral
20   deposition is a true record of the testimony given by
     the witness;
21        I further certify that pursuant to FRCP Rule
     30(f)(1) that the signature of the deponent:
22
     __X__ was requested by the deponent or a party before
23   the completion of the deposition and that the signature
     is to be before any notary public and returned within
24   30 days from date of receipt of the transcript.  If
     returned, the attached Changes and Signature Page
25   contains any changes and the reasons therefor;

1    _____ was not requested by the deponent or a party
before the completion of the deposition.

2

3    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorney in the action in which this proceeding was

4    taken, and further that I am not financially or
otherwise interested in the outcome of the action.

5

6    Certified to by me this 13th day of
March, 2023.

7

8

9    _____
Gabriela S. Silva, Texas CSR(8706), RPR

10   Expiration Date:  01-31-25
Aptus Court Reporting

11   600 West Broadway, Suite 300
San Diego , CA 92101

12   Phone: 866.999.8310

13

14

15

16

17

18

19

20

21

22

23

24

25