# EXHIBIT H

Videotaped Deposition of

# Elizabeth Pelletier

March 09, 2023

Freeman

vs.

Deebs

**Confidential**



www.aptusCR.com | 866.999.8310

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2
    LYNNE FREEMAN, an          )
 3  individual,                )
          Plaintiffs,          )
 4                             )
    VS.                        )  Case No. 1:22-cv-02435-LLS
 5                             )
    TRACY DEEBS-ELKENANEY      )
 6  P/K/A TRACY WOLFF, an      )
    individual, EMILY SYLVAN   )
 7  KIM, an individual,        )
    PROSPECT AGENCY, LLC, a    )
 8  New Jersey limited         )
    liability company,         )
 9  ENTANGLED PUBLISHING,      )
    LLC, a Delaware limited    )
10  liability company,         )
    HOLTZBRINCK PUBLISHERS,    )
11  LLC D/B/A MACMILLAN, a     )
    New York limited           )
12  liability company, and     )
    UNIVERSAL CITY STUDIOS,    )  Job No. 10115763
13  LLC, a Delaware limited    )
    liability company,         )
14      Defendants.            )

15

16

        *************************************************
17          ORAL AND VIDEOTAPED DEPOSITION OF

18                  ELIZABETH PELLETIER

19                    MARCH 9, 2023

20                  ***CONFIDENTIAL***
        *************************************************
21

22      ORAL AND VIDEOTAPED DEPOSITION OF ELIZABETH

23  PELLETIER, produced as a witness at the instance of the

24  Plaintiff, and duly sworn, was taken in the

25  above-styled and numbered cause on March 9, 2023, from
```

**Confidential**

1   8:58 a.m. to 1:34 p.m., before Donna Wright, CSR in and

2   for the State of Texas, reported by machine shorthand,

3   at the law offices of KOWERT, HOOD, MUNYON, RANKIN &

4   GOETZEL, 1120 South Capital of Texas Highway,

5   Building 2, Suite 300, Austin, Texas, pursuant to the

6   Federal Rules of Civil Procedure and the provisions

7   stated on the record or attached hereto.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Elizabeth Pelletier

1    Q.   And did you read Stacy Abrams' deposition

2  transcript?

3    A.   No.

4    Q.   Did you talk to Tracy Wolff about her

5  deposition?

6    A.   No.

7    Q.   Did you read Tracy Wolff's deposition

8  transcript?

9    A.   No.

10   Q.   Did you review any documents in preparation

11  for the deposition?

12   A.   No.

13   Q.   What type of entity is Entangled Publishing,

14  LLC?

15   A.   It's an LLC.

16   Q.   Who are the members?

17   A.   Myself, Stacy Abrams, Jessica Turner, Meredith

18  Johnson, and Katie Clapsadl.

19   Q.   Who is the last person?

20   A.   Clapsadl.  Do you need me to spell it?

21   Q.   Yes.

22   A.   C-l-a-p-s-a-d-l.

23   Q.   And what percentage of Entangled do you own?

24   A.   80 percent.

25   Q.   And what percentage does Stacy Abrams own?

**Confidential**

1      A.   She owns 5 percent.

2      Q.   And the other three, I assume, own 5 percent

3  each?

4      A.   They do.

5      Q.   How many imprints does Entangled have?

6      A.   I don't know off the top of my head.

7      Q.   Is it more than ten?

8      A.   I don't know.

9      Q.   If I ask you to recall the names of the

10  imprints, could you do it?

11      A.   I can count them, yes.

12      Q.   What are the names of the imprints?

13      A.   Amara, Entangled Teen, Red Tower, Embrace,

14  Brazen, Indulgence, Love Struck, Scandalous.  I feel

15  like I'm forgetting.  That's as many as I can recall

16  right now.

17      Q.   And what imprint is the Crave book series in?

18      A.   Entangled Teen.

19      Q.   And is that imprint you use for young adult

20  paranormal books?

21      A.   It's the imprint that I use for young adult.

22      Q.   Now, how is Entangled different than other

23  publishing companies?

24      A.   I work here.  We all work virtually.  I don't

25  know if that's different than other publishers.  I

Elizabeth Pelletier                                              Freeman vs.
                                                                      Deebs

1   really don't know.

2       Q.   Is Entangled the publisher of the Crave book

3   series?

4       A.   We are.

5       Q.   By the way, when I refer to the Crave book

6   series, I'm referring to the books, obviously, Crave,

7   Crush, Covet, Court, Charm, and Cherish.  Is that

8   understood?

9       A.   It is.  If you are only referring to the first

10  book, Crave, will you just say Crave, the book?

11      Q.   Yes, yes.

12      A.   Thank you.

13      Q.   If you are ever not sure, ask me and I'll

14  clarify.

15      A.   I appreciate that.

16      Q.   Were you the content editor on the Crave book

17  series?

18      A.   I was.

19      Q.   Did Emily Kim ask you on occasion to make

20  content changes in the books -- in the Crave book

21  series?

22      A.   Did she ask me?

23           MS. WOLFF:  Did you understand the

24  question?

25      A.   I don't think that question is clear enough.

**Confidential**

1  Could you clarify?

2  **Q.   Well, did Stacy Abrams occasionally ask you to**

3  **make changes to the book -- books?**

4  A.   I thought you said did Emily Sylvan Kim.

5  **Q.   I'm sorry.  Did Emily Kim ask you occasionally**

6  **to make changes to any of the books in the Crave book**

7  **series?**

8  A.   Not as you're referring to make changes, no.

9  **Q.   Explain to me the distinction you're making.**

10  A.   Sometimes she would suggest some things, point

11  out things that she thought might be mistakes.  I did

12  not always agree with her.

13  **Q.   And did you sometimes correct those mistakes?**

14  A.   If they were typos or actual mistakes to the

15  fact of the book, yes.

16  **Q.   Didn't Stacy Abrams -- did she make -- strike**

17  **that.**

18  **Didn't Emily Kim also make changes to the**

19  **book herself?**

20  A.   No.

21  **Q.   Didn't she have access to the book online?**

22  A.   No.

23  **Q.   Didn't she make changes to the actual physical**

24  **copy of the drafts?**

25  A.   She made comments that were then relayed to me

**Confidential**

1    and I chose whether or not I agreed or disagreed.

2        **Q.    Who did she relay the comments through?**

3        A.    Stacy.

4        **Q.    In general, what does a content editor in the**

5    **publishing business do?**

6        A.    The content editor is responsible for

7    reviewing the work and making sure that a number of

8    things are the best that they can be.

9             For instance, your typical structure is a

10   three-act structure.  You want to make sure Act 1 and

11   Act 3 are the same length.  You want the midpoint to be

12   in the middle of the book.  So that's a well-formed

13   plot.

14            You want to make sure that each character

15   has a growth arc, which means they start in one place

16   mentally, by the end of the book they have learned

17   something and they have grown.

18            You want to make sure that the beats are

19   in the right place.  You want to make sure that --

20   these are all what we call a first pass edit, which is

21   content edit.  You also want to make sure that there

22   are no mistakes in the book, that if -- for every

23   action there must be a reaction.  So if a phone rings,

24   somebody needs to answer it or acknowledge it.  That's

25   called a reaction beat.  So an editor makes sure that

1  there are no phones ringing that nobody is not -- not

2  addressed in the book.

3          You want to make sure that there are no

4  continuity issues, no blocking issues where you have

5  like character one minute is standing and the next

6  minute they're sitting, hair is in a ponytail and now

7  it's not.

8          Smooth out characterization.  You want to

9  make sure that the character at the beginning of the

10  book halfway through hasn't changed to a different

11  character or made decisions that are authentic to that

12  character.  Yeah, you just -- and then, you know,

13  you're drilling down each successive time that you're

14  looking at the manuscript, getting more and more into

15  the granularity of -- of the words that are used, could

16  a stronger verb be used here to convey more emotion,

17  things like that.

18      **Q.   Now, what did you do as the content editor on**

19  **the Crave books?**

20      A.   All of that.

21      **Q.   Who is the distributor of the Crave book**

22  **series for print and eBooks?**

23      A.   Macmillan.

24      **Q.   What rights specifically does Macmillan have?**

25      A.   They have the right to distribute the books.

Elizabeth Pelletier                                                  Freeman vs.
                                                                          Deebs

1      Q.    In what formats?

2      A.    Print and E in English.

3      Q.    And what territory?

4      A.    Can you clarify if you are referring to the

5    Crave book or the Crave series?

6      Q.    I'm referring -- well, I'm referring to the

7    agreement.  I'll change that.

8              The agreement you have with Macmillan,

9    what territory does it include?

10             MS. WOLFF:  Object to the form.  You can

11   answer.  It's ambiguous.

12             THE WITNESS:  It is.

13     A.    Are you asking any book or specifically the

14   Crave books?

15     Q.    I'm asking any -- is it correct you have just

16   reached an agreement with --

17     A.    Yes, the distribution agreement -- sorry.

18     Q.    And is that for all of the books in

19   Entangled's catalog?

20     A.    It is.

21     Q.    ██████████████████████████████████████████

22   ███████████████████████████████

23     A.    ██████████████████████████████████████████

24   ████████████████████████████████████████████

25     Q.    ██████████████████████████████████████████

**Confidential**

Elizabeth Pelletier

Freeman vs.
Deebs



1

2    A.

3    Q.

4    A.

5

6    Q.

7    A.

8    Q.

9

10   A.

11

12

13   Q.

14

15

16   A.

17   Q.

18              MS. WOLFF:  Wait for him to finish the

19   question.

20              THE WITNESS:  Sorry.

21              MS. WOLFF:  Otherwise, someone, like the

22   Court reporter --

23              THE WITNESS:  Sorry, Donna.

24              MS. WOLFF:  -- will become schizophrenic.

25   Q.

Elizabeth Pelletier                                      Freeman vs.
                                                              Deebs

1    Q.   Explain to me what Submittable is.

2    A.   Submittable is an online piece of software

3    that allows agents and un-agented authors to submit

4    their manuscripts for review by editors.

5    Q.   And why would someone submit a book to

6    Submittable as opposed to directly to an agent or

7    directly to someone at Entangled?

8              MS. WOLFF:  Object to form.  You can

9    answer if you know.

10   A.   I don't know why they would choose.  I can't

11   speak for them.  That's our protocol.  We encourage you

12   to use Submittable.

13   Q.   All right.  And how does Submittable work?

14   A.   I don't use it, so I don't know.

15   Q.   What is the protocol at Entangled for

16   destruction of rejected manuscripts submitted by an

17   agent?

18             MS. WOLFF:  At what time?

19             MR. PASSIN:  In 2013.

20   A.   I would assume you just delete it from your

21   e-mail.

22   Q.   You said you assume.  Do you know?

23   A.   Each editor probably had a different timeline

24   that they went through their inbox and looked at that

25   your manuscripts.

Elizabeth Pelletier

1    A.   I did.

2    Q.   What is your understanding of what this

3  document is?

4    A.   This document is a distribution agreement.

5    Q.   Now, is it -- if you look at Paragraph 1A on

6  the first page of the document, it lists the imprints

7  that are subject to the agreement.  Is that all of the

8  imprints of Entangled Publishing?

9    A.   No.

10   Q.   Okay.  So certain imprints are left off of

11 this agreement?

12   A.   They didn't exist at the time.

13   Q.   Pursuant to this agreement, if imprints came

14 into existence at a later time, are they automatically

15 added to this agreement?

16   A.   Define "added."

17   Q.   Well, let me ask you this.  Those imprints

18 that didn't exist in 2013, are the books and those

19 imprints distributed by Macmillan?

20   A.   They are.

21   Q.   Next I would like to mark as Exhibit 56 a

22 document that is Bates stamped MACMILLAN000071 through

23 0000072.

24               (Exhibit 56 marked)

25   Q.   Can you please turn to Page 2 of the document?

**Confidential**

1    gaming rights yourself?

2              MS. WOLFF:  Object to the form.  Are you

3    talking about Liz as an individual or with Entangled?

4              MR. PASSIN:  Entangled.

5              MS. WOLFF:  Okay.

6        A.    I'm sorry, can you repeat the question?

7        Q.    **Let me rephrase it.**

8              **Does Entangled, with respect to the books**

9    **that it controls, license the film and television and**

10   **gaming rights itself?**

11       A.    We use an agent.

12       Q.    **And you use APA as the agent?**

13       A.    Yes.

14       Q.    **What gaming --**

15       A.    For film, to clarify.  For film.

16       Q.    **What gaming rights has -- have been licensed**

17   **with respect to any of the Crave books?**

18       A.    We licensed the first book, only two chapters,

19   Crazy Maple Studios.  Crazy Maple Studios.

20       Q.    **And those are the only gaming rights with**

21   **respect to all of the books in the Crave book series**

22   **that have been licensed?**

23       A.    I believe so.

24       Q.    **And with respect to motion picture rights, is**

25   **the only license been entered into is the option**

Elizabeth Pelletier                    **Confidential**                    Freeman vs.
                                                                              Deebs

```
1        A.   When it was requested.  I don't know what

2   date.

3        Q.   Did you maintain backup for your computers?

4             MS. WOLFF:  Object to the form.  You can

5   answer if you understand.

6        A.   I do not.

7        Q.   What e-mail program is on each computer?  In

8   other words, Outlook, Apple Mail, anything like that?

9        A.   Outlook is on both.

10       Q.   And did you access it on your computer or

11  through the web?

12       A.   My computer.

13       Q.   What kind of software did you use to edit the

14  books in the Crave book series?

15       A.   I used Microsoft Word.

16       Q.   Didn't you also use Google Docs?

17       A.   To edit the books, no, I did not.

18       Q.   Did you use Google Docs in connection with the

19  books at all?

20       A.   I had access to Google Docs, but I personally

21  did not.

22       Q.   What do you mean, you had access to Google

23  Docs?

24       A.   It is my understanding that the bible was kept

25  in a Google Doc, but I didn't use it.
```

Page 46

Elizabeth Pelletier                                          Freeman vs.
                                                                 Deebs

1        Q.   And how did you get --

2        A.   To the best of my recollection, I did not use

3    it.

4        Q.   How did you get that understanding?

5        A.   I was told.

6        Q.   By whom?

7        A.   Emily Sylvan Kim.

8              THE REPORTER:  Who?

9              THE WITNESS:  Emily Sylvan Kim.

10       Q.   Do you have an online subscription to any

11   editing software?

12       A.   I do not.

13       Q.   Do you have your own Google Docs account?

14       A.   I do.

15       Q.   You do.  Was that used at all in connection

16   with editing of the -- any of the Crave books?

17       A.   It was not.

18       Q.   Was that account used at all in connection

19   with the bible?

20       A.   In the sense that I was given access through

21   that account to the bible.

22       Q.   So your own Google account was used to create

23   the bible?

24       A.   No.

25              MS. WOLFF:  Object to form.

1    Q.    Whose account was used, do you know?

2    A.    No.   Sorry.

3    Q.    When -- do you use Google Docs with -- to edit

4    other books?

5    A.    I don't use Google Docs to edit any books.

6    Q.    And I'm not talking about the Crave book

7    series.   I'm talking about any books.

8    A.    No books.

9    Q.    Do you use Google Docs for anything?

10   A.    Yes.

11   Q.    When you make changes to a book on Google

12   Docs, does it send you an e-mail?

13            MS. WOLFF:   Objection to form.

14   Q.    Does it send you an e-mail advising you --

15            MS. WOLFF:   You're mischaracterizing her

16   statement.   She said she makes no changes to books

17   using Google Docs.

18            MR. PASSIN:   All right.   I object to your

19   speaking objection.   You're coaching the witness.

20   Please refrain from doing that.

21   Q.    Have you ever used Google Docs to edit any

22   books?

23   A.    I have never used Google Docs to edit any

24   book.

25   Q.    What do you use Google Docs for?

**Confidential**

1    Q.   How did you physically edit the books in the

2    Crave book series?

3    A.   I typed on my laptop in a word processing

4    application called Microsoft Word.

5    Q.   Did Tracy Wolff also make edits to the books

6    in the Crave book series?

7    A.   From time to time, yes.

8    Q.   So how did that work?  Did you pass back and

9    forth drafts of the books?

10   A.   Yes.

11   Q.   So you made -- did you make the edits usually

12   on the same draft or did you have -- each have

13   different drafts?

14            MS. WOLFF:  Object to the form.  You can

15   answer if you can.

16   A.   We try as much as possible to always have the

17   document that we're working on linearly passed.

18   Q.   And --

19            MR. PASSIN:  Can you read her answer

20   back, please?

21         (The requested testimony was read back)

22            THE WITNESS:  Linearly, like one, then

23   the other, then back.  Like sequentially, I guess, is a

24   better word.

25   Q.   Do you keep the drafts in the Cloud or

Confidential

1   somewhere where you can both access the drafts at the

2   same time?

3        A.   No.

4             MS. WOLFF:  Object to form.  You can

5   answer.

6        A.   No.

7        Q.   So, in other words, you have the draft in your

8   computer, you make edits, and then you send the draft

9   to Tracy Wolff; is that correct?

10        A.   Correct.

11        Q.   And vice versa?

12        A.   Correct.

13        Q.   How do you send it back and forth to each

14   other?

15        A.   Via e-mail.

16        Q.   Did you produce those e-mails in this

17   litigation?

18        A.   I produced every e-mail in this litigation.

19        Q.   What phone numbers did you use to text from

20   when -- during the time period you were editing the

21   Crave books?

22        A.   My phone number.

23        Q.   And what is that?

24        A.   ███████████████

25        Q.   Did you turn over to Entangled's lawyers all

**Confidential**

1          (The requested testimony was read back)

2      **Q.   So you said you were in IT for many years.**

3  **What did you do in IT?**

4      A.   I worked on software that turns pages into

5  digital images.

6      **Q.   And during what years did you do that?**

7      A.   19 -- gosh, I don't remember.  1990 through --

8  17 years ago maybe, 16.  I don't know exactly.

9      **Q.   And then when did you create and run the**

10  **workshop for writers?**

11      A.   After that, right after.

12      **Q.   Do you know what years?**

13      A.   I don't remember the exact years, but right

14  after that.

15      **Q.   Well, when did you start Entangled?**

16      A.   2011.

17      **Q.   Was that the first publishing company you**

18  **started?**

19      A.   Yes.

20      **Q.   And did you work at any publishing company**

21  **before then?**

22      A.   I did not.

23      **Q.   When did you first meet Emily Sylvan Kim?**

24      A.   In person.  I think it was in New York.  I

25  don't remember when.  It was years ago, maybe six years

Elizabeth Pelletier

1    ago.

2         Q.    Under what circumstances did you meet her?

3         A.    I was in the city.  And as is common for

4    editors, you take agents out to lunch, and she was one

5    of the agents that I met with that day.

6         Q.    Over the years have you worked with her a lot?

7         A.    No.

8         Q.    Approximately how many books of her clients

9    have you published?

10        A.    I don't know.

11        Q.    Well, was it more than just Tracy Wolff's

12   books?

13        A.    Yes.

14        Q.    Can you give me an estimate of how many

15   different authors?

16        A.    Between six and ten.

17        Q.    Between six and ten?

18        A.    Maybe.

19        Q.    How many books?  Just give me a best estimate.

20        A.    This would be just a wild guess.  Maybe 20

21   or 30.

22        Q.    And you don't consider that a lot?

23        A.    No, because --

24        Q.    Go ahead.

25        A.    If I may clarify.

Elizabeth Pelletier

1   was estimating in my head, we tend to do three-book

2   contracts.  That's where I was getting those numbers

3   from.  I just -- I don't remember.  I'm sorry.

4       **Q.    Approximately how many manuscripts has Emily**

5   **Sylvan Kim sent Entangled over the years?**

6       A.   I would have no way of knowing.

7       **Q.    Would you characterize Emily Sylvan Kim as a**

8   **good friend of yours?**

9       A.   I would now.

10      **Q.    Excuse me?**

11      A.   I would now.

12      **Q.    For how long would you characterize her as a**

13  **good friend?**

14      A.   The last 2-1/2 years.

15      **Q.    And how would you describe your relationship**

16  **with her?**

17      A.   Good.

18      **Q.    Do you socialize together?**

19      A.   We do not.

20      **Q.    Over the last two years, how often would you**

21  **estimate that you speak to her?**

22      A.   Could you be more specific about "speak"?

23      **Q.    How about over the telephone?**

24      A.   I speak to her frequently when we're in the

25  middle of editing one of Tracy's books.  I speak to her

Elizabeth Pelletier                                      Freeman vs.
                                                              Deebs

1    quite infrequently when we're not.

2        Q.   And other the last three years, how often

3    would you estimate that you text with her?

4        A.   I would say the same.  I text with her

5    frequently when we're working on a book or working

6    towards a deadline, and less frequently when we're not.

7        Q.   Does she edit -- does she text you suggested

8    edits for the book?

9        A.   No.

10       Q.   What kind of things do you text about?

11       A.   When will Tracy be delivering the manuscript;

12   oh, my God, we hit the New York Times list; look at

13   this amazing post that somebody made about the Crave

14   series, they said it changed their lives; hey, do you

15   know where Tracy is?  I need to ask her a question.

16             Yeah, things like that.

17       Q.   Over the last three years, how often would you

18   estimate that you see her?

19       A.   I think I have only seen her once.

20       Q.   Do you attribute that in part to COVID?

21             MS. WOLFF:  Object to form.  You can

22   answer.

23       A.   I have no idea.  I don't live in New York.

24       Q.   Is it fair to say that Emily Kim was involved

25   in editing the books in the Crave book series?

1       A.    No.

2       Q.    Is it fair to say that Ms. Kim was involved --

3    strike that.

4               Didn't Emily Kim actually make

5    contributions to the story line in the Crave book

6    series?

7       A.    Not with me.

8       Q.    She may have with Tracy?

9       A.    I don't know what she did with Tracy.

10      Q.    Is it accurate to say that Emily Sylvan Kim

11   also contributed to the writing in the Crave book

12   series?

13      A.    No, that would not be accurate.

14      Q.    Well, you don't know what she did with Tracy

15   Wolff, correct?

16      A.    Correct.

17      Q.    How would you describe Emily Sylvan Kim's

18   contributions to the Crave book series?

19      A.    She was our cheerleader.

20      Q.    Well, didn't she write some of the chapter

21   titles?

22      A.    Not that I'm aware of.

23      Q.    Didn't she write the series bible?

24      A.    Actually, no, I believe her assistant did.

25      Q.    And what's her assistant's name?

**Confidential**

1    A.   I don't know.

2       Q.   **How do you know that her assistant wrote it?**

3    A.   I have a recollection of her going, "I asked

4  my assistant to read the series and create a bible,"

5  and I have a separate recollection of her going, "My

6  assistant just re-read them and updated the bible."

7       Q.   **What else, if anything, did Emily Sylvan Kim**

8  **do in connection with the series?**

9    A.   After I would finish edits and it would go to

10  Stacy Abrams for copy edits, since I made a lot of

11  changes that Tracy wouldn't see, Emily would

12  essentially read the manuscript and make sure there

13  wasn't anything that she felt Tracy would object to

14  that I had done to the book.

15       Q.   **And did she have objections from time to time?**

16    A.   She had one objection once saying she felt

17  something wasn't Tracy's voice that I had written.  She

18  was wrong.  Tracy had written that passage.  And most

19  of the time, again, she was just a cheerleader saying,

20  "Keep going, it's amazing, I love it."

21       Q.   **What passage was that that Tracy had written**

22  **that she --**

23    A.   It was a sentence in Court.  I can't remember

24  exactly what the sentence was.  I just remember it

25  because it was humorous.  It was Tracy's.

Elizabeth Pelletier                                          Freeman vs.
                                                                   Deebs

1        Q.   Was she more involved than an agent would

2    typically be involved?

3        A.   It's hard to answer that question because this

4    book process is atypical as well.

5        Q.   Why was this book process atypical?

6        A.   Because I collaborated more on this book.

7    It's not the only book I have done that with.  I have

8    done it with many books.  But on this particular book I

9    collaborated a lot.

10             Because of the crunched timeline, which

11   was not in the original plans, we had to edit these

12   incredibly fast.  So a lot of times I had to do edits

13   and make changes without getting the author.

14       Q.   Why were you on a crunch timeline?

15       A.   Because the first book sold so well that

16   they -- they -- my distributor felt we could get more

17   books into book stores faster.  It's called escalating

18   a print schedule and you do it when you have -- when

19   you have a hit sometimes.

20       Q.   Is it customary for agents to write a series

21   bible?

22       A.   Oh, yes.

23       Q.   It is customary for a book agent to do that?

24       A.   Yes.

25       Q.   Is it customary for a book agent to write

1    chapter titles?

2        A.    Not many books have chapter titles.  So --

3        Q.    Approximately how many books have you -- has

4    Entangled published since 2010?

5        A.    I believe the number is somewhere

6    around 3,000.

7        Q.    How many YA books set in Alaska have you --

8    has Entangled published?

9        A.    I don't know.

10       Q.    Has there been any -- any others than Crave?

11       A.    I'm sure we have books in Alaska.  I know -- I

12   don't know about why you specifically -- I mean, off

13   the top of my head, we have two.  But I don't know

14   specifically -- I don't know every YA book that we

15   publish.

16       Q.    You have two what?

17       A.    Books in Alaska.

18       Q.    Are they YA books?

19       A.    Those two, no.

20       Q.    What are the names of the books?

21       A.    One of them is called Arctic Bite and is a

22   vampire in Alaska.  Another, I don't know the title of

23   it, but it was -- Samantha Beck was the author.  It's

24   about a woman living in Southern California who

25   relocates to Alaska.

1    Q.   Well, tell me which part you know.

2              MS. WOLFF:  You can answer if you can

3    understand, yes.

4    A.   Okay.  I don't know about Anchorage other than

5    it violated the plans for the series to make it

6    isolated, to put in a boarding school that was

7    isolated.  And Fairbanks to Healy, my recollection is I

8    had a lot of knowledge about Healy.  I had just gone on

9    a cruise that summer and had taken tours and was able

10   to inform her of how remote Healy was.  There was only

11   one traffic light in Healy, they told us, and everybody

12   navigates in that town based on how far away you're

13   from the traffic light.

14             So we wanted to make the school as remote

15   as possible.  It's a paranormal school.  You don't want

16   average people stumbling into it.  It was a unique

17   special school.  So we wanted to get remote.

18   Q.   Whose idea was it to use Alaska as the setting

19   for the Crave book series?

20   A.   I don't recall.

21   Q.   Was it your idea?

22   A.   I don't recall.  It could have been.  I went

23   on a cruise that summer to Alaska.

24   Q.   Do you know why Alaska was used as a setting

25   in the series?

**Confidential**

1    A.   When we're working on a book, all day, every

2  day.  When we're not, if I have some news to share.

3    **Q.   And over the last three years, how often would**

4  **you estimate you text with her?**

5    A.   I would say the same thing.  During a book,

6  frequently.  Not during a book, when I have something

7  to share.

8    **Q.   And in the last three years, how often do you**

9  **estimate that you see Tracy Wolff?**

10    A.   Maybe once every three months.

11    **Q.   Do you have a reputation amongst Tracy Wolff**

12  **and Emily Kim as being a liar?**

13    A.   Not that I'm aware of before yesterday, no.

14    **Q.   Why do you say "before yesterday"?**

15    A.   Because I reviewed documents.

16    **Q.   And who showed you those documents?**

17    A.   My attorney.

18    **Q.   Let me show you what's been previously marked**

19  **as Exhibit 50, a text message string.**

20        **Is this a document you saw?  Because**

21  **there are other documents similar to this.**

22    A.   I would like to clarify "saw."  I didn't read.

23  I just saw, like that.

24    **Q.   And they told you -- well, strike that.**

25        **I'm going to read out loud part of it,**

**Confidential**

1    A.   Yes.

2    **Q.   And did you give it to them?**

3    A.   I did.

4    **Q.   And why did they think you didn't give it to**

5    **them?**

6    A.   Because there are six versions of the

7    synopsis.  We were struggling about how to end the

8    series.  I especially was struggling with -- in

9    fiction, there are these things called Chekhov guns.

10   You take them out of a drawer, you set them there, and

11   later on you have to fire them.  A Chekhov gun is

12   something that you know a reader is going to want to

13   know how it concludes.

14              This is the fourth book in what was

15   supposed to be the final book in a series.  We had set

16   off -- we had taken a number of Chekhov guns out of the

17   drawer throughout the series and I was struggling with

18   how to fire all of them in a competent and cohesive

19   manner for the final book.  So I would start a synopsis

20   in one direction, let's fire these and then these and

21   then this, closing loopholes.  It wouldn't work.  I

22   would have to back up, I would have to start all over

23   again.

24              Anytime I would tell them, "At this

25   particular time, I don't know where we are going,"

**Confidential**

1    Tracy -- anger is a masking emotion.  The real emotion
2    here is fear.  She's afraid I'm not going to be able to
3    fire all of these guns in a final book in time for her
4    to write it.
5              She was right to be afraid because you
6    couldn't fire them all, and we ended up having to make
7    this a six-book series.  And that was the -- the
8    solution to it.
9        Q.   Were you going -- strike that.
10   ███████████████████████████████████████████████
11   ███████████████████████████████████
12   ████████████████████████████████████████████
13   ████████████████████████
14       A.   No.
15       Q.   Do you have any idea why Tracy would've said
16   that?
17       A.   Yes.
18       Q.   Why?
19       A.   Because I said we had to have a tax planning
20   meeting because we postponed the book from November to
21   a February release, and the way that publishing -- the
22   way that the world works in the United States, you have
23   to pay taxes on cost of the goods sold.
24              So that means we created a tax event with
25   inventory and then we had to meet with our accountants

Confidential

1  on what to do with the inventory.  She just doesn't

2  understand.

3      Q.   Do you know who Lynne Freeman is?  Strike

4  that?

5              So you wrote this synopsis, you said, for

6  the book Court, correct?

7      A.   Correct.

8      Q.   Did you write a synopsis for any of the other

9  books in the Crave book series?

10     A.   I did.

11     Q.   Which ones?

12     A.   Crush, Covet.

13     Q.   So you wrote them for Crush, Covet, and Court.

14     A.   Yes.

15     Q.   Who wrote the synopsis for Crave?

16     A.   I don't believe there was one.

17     Q.   Are you sure -- okay.  And who wrote it for

18  the rest of the books in the Crave book series?

19     A.   I did.

20     Q.   Well, you didn't mention Cherish or -- who

21  wrote for Cherish?

22     A.   I apologize, I thought I was only supposed to

23  mention the first four.

24     Q.   No.

25     A.   I wrote them all.  I'll clarify that

Confidential

1  occasionally Tracy would start one, but I would end up

2  writing it.

3      Q.   So you wrote them all but for Crave?

4      A.   I'm not aware there was one for Crave.

5      Q.   So you didn't write it for Crave?

6      A.   Yeah.  No one did.

7      Q.   Do you know who Lynne Freeman is?

8      A.   I do now.

9      Q.   Have you ever met Lynne Freeman?

10     A.   Not to my knowledge.

11     Q.   When did you first hear or see her name?

12     A.   The date of the demand letter.

13     Q.   And explain the context in which you first

14  heard or saw her name.

15     A.   It was in the demand letter.

16     Q.   Are you familiar with a manuscript that

17  Ms. Freeman wrote that is the subject of this lawsuit?

18     A.   I am now.

19     Q.   Do you know the name of the manuscript?

20     A.   I believe it's Blue Moon Rising.

21     Q.   When did you first become aware of the

22  manuscript?

23     A.   The date of the --

24          MS. WOLFF:  Object to the form.  You can

25  answer.

```
 1        A.    -- the demand letter.

 2        Q.    Well, didn't you become aware of it in 2013

 3   when Emily Sylvan Kim sent you a letter about the

 4   manuscript?

 5        A.    No.

 6        Q.    For the rest of the deposition, I'm going to

 7   refer to Blue Moon Rising either as Blue Moon Rising or

 8   Masked.  Is that understood?

 9        A.    Sure.

10        Q.    Did you ever read all or any part of Masked?

11        A.    No.

12        Q.    Excuse me?

13        A.    No.

14        Q.    I'm going to show you what has been previously

15   marked as Exhibit 4.  Please look at this e-mail, which

16   is an e-mail dated October 18 -- well, there's two

17   e-mails.  The one at the bottom is dated October 10,

18   2013, and it's from Emily Kim -- Emily Sylvan Kim to

19   you.  And the top e-mail is from Stacy Abrams back to

20   Emily Kim.

21              Have you ever seen this e-mail before?

22        A.    No.

23        Q.    No, you have never seen it?

24        A.    It's got my name on it.  I have no

25   recollection.
```

Elizabeth Pelletier                                        Freeman vs. Deebs

1      Q.   Do you doubt that you received this e-mail

2    from Emily Sylvan Kim on or about October 10, 2013?

3      A.   No.

4           MS. WOLFF:  Object --

5           MR. PASSIN:  Excuse me?

6           MS. WOLFF:  Just object to form.  You can

7    answer.

8      A.   No.

9      Q.   Did you read the e-mail when you received it?

10     A.   I don't believe I did based on how I forwarded

11   it.

12     Q.   What does that mean?

13          THE REPORTER:  "How I" what?

14          THE WITNESS:  How I forwarded it.

15     Q.   And what does that mean?

16     A.   There's no writing in my forward.

17     Q.   Well, how did you know it was something to

18   forward to Stacy Abrams if you didn't read it?

19     A.   It's an e-mail from an agent with a

20   submission.

21     Q.   Well, how did you know it was -- it had a

22   submission unless you read it?

23     A.   I would assume that the subject line somehow

24   informed it because there is the title of a book in it.

25     Q.   Isn't it true to also assume that you read it

**Confidential**

1   when you received it?

2          MS. WOLFF:  Object to form.  You can

3   answer.

4     A.   Maybe.  I don't recall.  But typically if I

5   would have read it, I would have made an idea if I

6   thought it was something that we would want to acquire,

7   and I would have put that in the message to Stacy,

8   "This looks interesting."  But I didn't say anything.

9     Q.   Why did you forward it to Stacy Abrams as

10  opposed to a different person at Entangled?

11    A.   Stacy was the editorial director of Teen and

12  she was acquiring a ton of manuscripts.  She worked

13  with Emily Sylvan Kim before.  She was also acquiring

14  on Brazen and Bliss a lot, Brazen a lot.

15          She was an editor that I really thought

16  very highly of and she was taking on a lot of

17  submissions while it was closed for me because I knew

18  she would handle them.

19    Q.   How did you know it was a Teen book unless you

20  read the e-mail?

21    A.   I didn't know it was a Teen book.  I'm saying

22  she was the editorial director of Teen.  She was

23  somebody that I revered.

24    Q.   But obviously you must have known it was a

25  Teen book if you sent it to her because she was

**Confidential**

1  that we got were Teen.  So she was the natural person

2  to receive that.

3          MR. PASSIN:  Move to strike as

4  nonresponsive.

5      Q.  Did you discuss with Stacy Abrams at the time

6  you sent her this e-mail, anything about it?

7      A.  No, I can't recall.

8      Q.  So you may have, and you just don't recall?

9      A.  I don't.

10     Q.  Excuse me?

11     A.  I can't imagine why I would.

12     Q.  I'm going to show you what's previously been

13 marked as Exhibit 5.  Can you please take a look at

14 this exhibit?  Do you see that Emily Kim forwarded a

15 copy of Masked to Stacy Abrams?

16     A.  Yes.

17     Q.  Did you see this e-mail on or about

18 October 30, 2013?

19     A.  I have never seen this e-mail before today.

20     Q.  After Stacy Abrams received a copy of Masked,

21 did she or anyone else forward you a copy of the Masked

22 manuscript?

23     A.  No, they wouldn't.

24     Q.  What do you mean, "no, they wouldn't"?

25     A.  I was closed to submissions.

Elizabeth Pelletier                                                   Freeman vs.
                                                                           Deebs

1      Q.   Well, but if Stacy Abrams was going to agree

2  to publish a book, wouldn't she have to discuss it with

3  you?

4      A.   Not the entire manuscript, no.

5      Q.   But she would have to discuss it with you,

6  correct?

7      A.   She would have to bring it to an acquisitions

8  meeting.

9      Q.   Right.  And at the acquisitions meeting, I

10  assume she would have to discuss the contents of the

11  book?

12      A.   She would have to discuss the blurb, the first

13  three chapters, why she thought the book would sell,

14  who she thought the target market was.  We don't go in

15  these acquisition meetings through the plots and

16  everything.  But, yes, she would have discussed the

17  book in some form.

18      Q.   Did Stacy Abrams bring Masked to an

19  acquisition meeting?

20      A.   No.

21      Q.   Did she ever raise Masked at an acquisition

22  meeting?

23      A.   No.

24      Q.   You remember this even though it was back

25  in 2013?

Confidential

Elizabeth Pelletier

Freeman vs.
Deebs

1    A.   I remember most of our acquisitions because I

2  would acquire anything that they brought, typically.

3    Q.   Well, but in an acquisitions meeting, I assume

4  you discuss many books that you don't eventually

5  acquire; isn't that correct?

6    A.   Back then, not many because we were just

7  starting out.

8    Q.   But do you remember all of the books that were

9  raised in acquisition meetings back in 2013?

10   A.   That is a fair statement, no.

11   Q.   Did Stacy Abrams or anyone else ever discuss

12 Masked with you?

13   A.   No.

14   Q.   Did Stacy Abrams or anyone else ever

15 communicate any contents of Masked to you?

16   A.   Not to my recollection.

17   Q.   Did Stacy Abrams or anyone else ever

18 communicate any of the language from Masked to you?

19   A.   No.

20   Q.   Do you know if Stacy Abrams ever read Masked?

21   A.   I do not.

22   Q.   When you send Stacy Abrams a potential

23 acquisition, is it fair to say you assume she's going

24 to read the book?

25   A.   No.

**Confidential**

1    Q.   Do you know if Stacy Abrams ever got back to

2    Emily Sylvan Kim about Masked?

3    A.   I do not.

4    Q.   Excuse me?

5    A.   I do not.

6    Q.   Do you know what Stacy Abrams told Emily

7    Sylvan Kim about Masked?

8    A.   I do not.

9    Q.   Does Entangled still have the copy of Masked

10   that Emily Sylvan Kim sent to Stacy Abrams in 2013?

11   A.   I don't know.

12   Q.   Did you or someone else at Entangled look for

13   the manuscript in response to the plaintiff's document

14   request in this case?

15   A.   Yes, a third party did.

16   Q.   Who was the third party?  Are you referring to

17   the discovery vendor?

18   A.   Yes.

19   Q.   Well, the discovery vendor didn't go in your

20   office and look for hard copies of documents, did it?

21   A.   I don't have any hard copies of documents.

22   Q.   You don't have any books lying around, any

23   manuscripts?

24   A.   Not manuscripts, no.

25   Q.   Well -- strike that.

1      So where did this person look for the

2 book?

3    A.   On our hard drives.

4    **Q.   Okay.  And who sent the vendor their hard**

5 **drives?**

6    A.   I sent my -- my laptop.  Everyone else, I

7 believe, gave logins.

8    **Q.   Did you send both your laptops or just one?**

9    A.   I sent one.

10    **Q.   Excuse me?**

11    A.   I sent one.

12    **Q.   Well, you used two laptops to edit the Crave**

13 **books.  Why did you only send one?**

14    A.   I need the other one to make a living.  I'm

15 working on it.

16    **Q.   So which one did you give them of the two Mac**

17 **Pros?**

18    A.   The older one.

19    **Q.   The older one.**

20      MR. PASSIN:  Counsel, I ask that you

21 immediately have that other computer sent to the vendor

22 and have it searched immediately.

23      MS. WOLFF:  Objection.

24      MS. COLE:  To -- do you mind?  To

25 clarify, if I may, on the record --

Elizabeth Pelletier                                            Freeman vs.
                                                                     Deebs

1             MR. PASSIN:  No, I don't want you to

2    clarify.

3             MS. COLE:  Okay.  Well, then, objection

4    that the -- an eDiscovery vendor searched for and

5    reviewed both computers, and Ms. Pelletier can explain

6    the reasoning why one computer was physically shipped

7    to the eDiscovery vendor and why one computer was not

8    physically shipped to the eDiscovery vendor.

9             MR. PASSIN:  All right.  I'll ask her.

10        Q.   Why wasn't the other one shipped to the

11   eDiscovery vendor?

12        A.   Because I'm using it.

13        Q.   Did you give them access somehow?

14        A.   Absolutely.

15        Q.   How did you give them access?

16        A.   I gave him the login to my laptop and he

17   logged in and took control of it.

18        Q.   Do you have any idea what happened to the

19   Masked script -- or manuscript that Emily Southern Kim

20   sent to Stacy Abrams in 2013?

21        A.   I don't know.

22        Q.   Was any of the material or ideas from Masked

23   used in any of the Crave books?

24        A.   No.

25        Q.   Was any of the material or ideas from Masked

1    ever used in any of the drafts of any of the Crave

2    books?

3         A.    No.

4         Q.    Did you and Tracy Wolff ever discuss Masked?

5         A.    No.

6         Q.    Did you and Tracy Wolff ever discuss Lynne

7    Freeman?

8         A.    No.

9         Q.    Did you and Stacy Abrams ever discuss Masked?

10        A.    No.

11        Q.    Did you and Stacy Abrams ever discuss Lynne

12   Freeman?

13        A.    No.

14        Q.    Are you familiar with the book written by

15   Tracy Wolff called Tempest Rising?

16        A.    I'm familiar with it, yes.

17        Q.    What impact did the Tempest Rising series have

18   on Tracy's career that you're aware of?

19        A.    I believe it catapulted her career.

20        Q.    Is it accurate to say that Tempest Rising

21   books set the stage for the Crave series?

22        A.    No.

23        Q.    Is it accurate to say that Tracy got the Crave

24   series because of the Tempest series?

25        A.    No.

Elizabeth Pelletier                                              Freeman vs.
                                                                      Deebs

```
 1      A.   I don't recall.

 2      Q.   And did other people write samples?

 3      A.   No.

 4      Q.   Just her?

 5      A.   Uh-huh.

 6      Q.   How many people, approximately, were

 7   approached?

 8      A.   That's not how I would say that sentence, so I

 9   don't know how to respond.

10      Q.   How would you say it?

11      A.   I would say that I put it out there that I

12   wanted a new vampire series to my editors and my

13   editors were free to go and see if they had any author

14   who wanted to write that series.  Tracy found Tracy and

15   asked Tracy if she wanted to.

16      Q.   You mean Stacy found Tracy?

17      A.   Sorry.  Stacy, yeah.  Sorry.

18      Q.   And you have no idea how many other authors

19   were spoken to about the possibility of writing a book?

20      A.   It could be zero -- sorry.

21      Q.   Go ahead.

22      A.   It could be zero.  I have no idea.

23      Q.   But you said earlier that other people were

24   approached.

25      A.   I said the editors.  That's why I was having
```

Confidential

1   an issue with the phrasing.

2       Q.   So you are saying that you asked more than

3   Stacy Abrams to see if there was anyone interested in

4   writing the vampire series, you just don't know whether

5   or not those editors spoke to actual authors?

6       A.   Yes.

7       Q.   All right.  Is it fair to say that they likely

8   did because that's what they do for a living and

9   they --

10      A.   I don't know.  Honestly, I don't know.

11      Q.   I would like to show you what has previously

12  been marked as Exhibit 7, an April 26, 2019 e-mail from

13  Tracy Deebs to Stacy Abrams.  By the way, I'm going to

14  refer to Tracy Deebs as Tracy Wolff.  Is that

15  understood?

16      A.   That would be better, thank you.

17      Q.   Tracy Wolff was one of her pen names, correct?

18      A.   Yeah, and that's how I think of her.  So I

19  appreciate that.

20           MS. WOLFF:  And I remember the name.

21      Q.   I'm going to read this e-mail out loud.

22           "Hi, Stacy.  I'm so excited that you

23  thought of me for this.  I put together five basic

24  ideas for you to look at.  Everything is of course

25  flexible when it comes to creatures, plot, et cetera,

**Confidential**

```
1    but I wanted to give you a rough idea of what I was
2    thinking for each of them.  I'm on my way to my
3    cousin's wedding, but I'm happy to talk/answer e-mails
4    later tonight or early tomorrow morning and would be
5    happy to take another go at this if none of these ideas
6    appeal.  I have a few more, but I need to get on the
7    road.  LOL.  Also, the fifth idea is contemporary based
8    on Meteor Garden/Boys Over Flowers, the most successful
9    anime turned TV show for girls in Asia's history, and
10   also usually popular over here.  I fleshed it out into
11   a serial format, but it can easily be combined into a
12   four-book series or one book, even if it is something
13   you might be interested in.  But the dynamic is exactly
14   what Liz is looking for.  Ordinary girl in a super
15   rarified world, hence the huge worldwide response to
16   it.  Can't wait to hear what you think."
17             You notice it says in the first paragraph
18   that, quote, "I'm so excited that you thought of me for
19   this," end quote, and in the penultimate paragraph that
20   "... the dynamic is exactly what Liz is looking for.
21   Ordinary girl in a super rarified world."
22             So based on the foregoing, is it accurate
23   to say that you communicated to Stacy Abrams prior to
24   April 26, 2019 that Entangled wanted to hire Tracy
25   Wolff to write a book about an ordinary girl in a super
```

1   rarified world?

2            MS. WOLFF:  Object to form.  You can

3   answer.

4       A.   I would have spoken to Tracy -- Stacy that I

5   was looking for a book, but I would not have said,

6   "Contact Tracy."  I was surprised when she brought me

7   Tracy.

8       **Q.   But did you tell her you were looking for a**

9   **book about an ordinary girl in a super rarified world?**

10      A.   I told her that I was looking for a book with

11  a fish out of water trope, and that's what that sounds

12  like.

13      **Q.   What does that mean, a fish out of water**

14  **trope?**

15      A.   Fish out of water is where you take a

16  character who is used to one world and then you put

17  them in a completely different world, much like --

18  think Arizona to Seattle for Twilight; Harry Potter,

19  from the suburbs to this exotic paranormal castle; Star

20  Wars from farming to the galaxy, traveling the galaxy.

21  It's fish out of water.

22      **Q.   In Crave, it would be Grace to the Katmere**

23  **Academy?**

24      A.   Yeah.

25      **Q.   Now, was this conversation you had with Stacy**

Confidential

1   Abrams, was it an oral or written communication?

2       A.   Oral.

3       Q.   Okay.  And when did it take place in relation

4   to April 26, 2019?

5       A.   I don't recall exactly, but very close because

6   I remember being surprised at how fast Stacy wrote

7   Tracy.

8       Q.   Was it face-to-face or over the telephone?

9       A.   Over the telephone.

10      Q.   Was anyone else --

11      A.   With Stacy.  With Stacy.

12      Q.   Stacy?

13      A.   Yes.

14      Q.   Was anyone else on the phone call?

15      A.   I can't recall.

16      Q.   Do you see in the first paragraph it says, "I

17  put together five basic ideas for you to look at"?

18      A.   I do.

19      Q.   On or about April 26, 2019, did Stacy Abrams

20  show you the first -- or the five basic ideas that

21  Tracy Wolff put together?

22      A.   I believe so, yes.

23      Q.   Do you know how she sent it to you?

24      A.   Probably e-mail, but I don't know.

25      Q.   Well, is it fair to say that Stacy works --

1    Abrams works remotely, correct?

2        A.   She does.

3        Q.   And she lives in Chicago?

4        A.   She does.

5        Q.   Did she ever work in the office -- where is

6    the Entangled office?

7        A.   We do not have one.

8        Q.   Oh, you don't have one.  So everyone works

9    remotely?

10       A.   Everyone.

11       Q.   Okay.  I would like to show you what's been

12   previously marked as Exhibit 8.  And it's a document

13   containing the five ideas that were just referred to in

14   Exhibit 7.

15            MS. WOLFF:  I have got several copies

16   here.

17       Q.   Is this document containing the five ideas put

18   together by Tracy Wolff that Stacy Abrams showed you on

19   or about April 26, 2019?

20       A.   I don't recall.

21       Q.   You don't recall if this was it?

22       A.   Do you mind if I take a minute?

23       Q.   Yeah, go ahead.  Please take as long as you

24   need.

25       A.   (Witness reading document.)

**Confidential**

1          I remember this now.

2     Q.   Okay.  So is it the document containing the

3   five basic ideas put together by Tracy Wolff that Stacy

4   Abrams showed you on or about April 26, 2019?

5     A.   It is.

6     Q.   Okay.  By the way, I want to go back to

7   something.

8          Do you recall anything else said in the

9   conversation between you and Stacy Abrams in which you

10  told her you were looking for a book about a fish out

11  of water?

12    A.   I remember that I communicated to her why I

13  wanted to do a Crave -- at the time it wasn't called

14  Crave -- a book, a vampire book, and why I thought it

15  would be a bestseller.

16    Q.   What did you tell her?

17    A.   I had recently seen an article.  I'm a

18  voracious consumer of news articles and things like

19  that.  I flip through them all day.  And I had recently

20  seen an article that was talking about how trends -- I

21  believe it was clothing trends in particular, but how

22  trends cycle back every ten years.

23          I read a separate article -- YA sales

24  were soft at this time, and somebody had interviewed a

25  bunch of book store managers and asked them why they

**Confidential**

1    thought YA sales were depressed, and the book store

2    managers, a lot of them were saying that, the women

3    who -- the people, but a lot of women write YA

4    romance -- who were writing these heroines were writing

5    the kind of heroine they wish they had been in high

6    school, having agency, understanding who they are,

7    where they want to go, just having all of the answers.

8    And they felt, in their opinion, that's why YA sales

9    had been depressed recently.  That young girls couldn't

10   relate to that, they don't have all the answers, they

11   don't know what's going on.

12              And then I read a separate article

13   completely unrelated that was talking about how

14   Twilight was about to be ten years old, and so I had

15   the idea of bringing vampires back.  I said, "But we

16   have do it in a fun, fresh way.  We need a new angle on

17   it."  And my idea was to take Twilight meets Harry

18   Potter and put those two together.  So I needed

19   something fish out of water and fantastical and set

20   someplace that, you know, would be its own character.

21   And that's -- I really wanted the romance of Twilight,

22   though, which is like heart-pounding, does he like me,

23   does he not like me, like all of that that was missing

24   that, you know, isn't in a Harry Potter because that

25   was middle grade.

1          So I remember telling her about -- you

2    know, I had this idea, this is what I wanted to do.

3    And then I remember it distinctly because I said,

4    "That's right, I'm bringing vampires back.  Watch me do

5    it."  And we all kind of laughed.  We both laughed.

6      **Q.   And you told this all in this conversation you**

7    **originally had with Stacy Abrams?**

8      A.   I had this conversation many times.  So I know

9    I said it at least once to Stacy because Stacy was the

10   first person to find someone.

11     **Q.   And was it many times prior to April 26, 2019?**

12     A.   Prior to April 26, but within the same

13   timeframe.  As soon as I had the idea, I was telling a

14   lot of people about it.

15     **Q.   Now, I don't think I brought it here today,**

16   **but do you know whether or not Stacy Abrams forwarded**

17   **those articles to Tracy Wolff?**

18     A.   I can't imagine she did because I didn't give

19   them to Stacy.  I do this sort of thing often.  I take

20   news articles and I put a book idea together.  We have

21   another book that's based on it, too.

22     **Q.   I would like to show you what's previously**

23   **been marked as Exhibit 9, an e-mail chain between you**

24   **and Tracy Wolff and sometimes Emily Kim, dated April 26**

25   **through 27, 2019.**

Elizabeth Pelletier                                    Freeman vs.
                                                           Deebs

1              It says, "Yes.  I'm sorry I did not say

2      that yesterday.  I was racing to get the e-mail off

3      before I had to go pick up the kids.  She sent a few

4      notes, which I will send you separately, but she would

5      like to move forward."

6              Did you have conversation with Stacy

7      Abrams around May 7, 2019 in which you said you would

8      like to move forward with the Crave book series?

9          A.    I vaguely recall this, yes.

10         Q.    And I take it in that conversation you said

11     that you wanted -- you wanted Tracy Wolff to write the

12     series?

13         A.    I believe so.

14         Q.    Was that -- was that an oral conversation or

15     in writing?

16         A.    I don't recall.

17         Q.    Take a look at the top e-mail, which is a

18     May 7, 2019 e-mail from Stacy Abrams to Tracy Wolff.

19              The last sentence says, "One question.

20     Are we looking at this as a standalone or a trilogy or

21     a standalone with potential to be a trilogy?  Just so I

22     know what I need my art to look like."

23              Do you see that?

24         A.    I do.

25         Q.    Is it correct that you told Stacy originally

**Confidential**

1      A.   I don't recall.

2      Q.   What is your understanding on how the names

3   Grace and Jaxon were created?

4      A.   It's my understanding Tracy came up with them.

5      Q.   Do you know whether there was any input from

6   Emily Kim in the selection of the names?

7      A.   I do not.

8      Q.   What is your understanding of how the name

9   Bloodletter was created?

10     A.   I apologize.

11     Q.   What was your understanding of how the name

12   Bloodletter was created?

13     A.   I believe I came up with it.

14     Q.   And how did you come up with that name?

15     A.   I play a lot of video games and it was a

16   weapon in a video became.

17     Q.   Which video game is that?

18     A.   Bloodborne.

19     Q.   And how did you -- what is your understanding

20   of how the name Maris was created?

21     A.   The nurse, Maris?

22     Q.   Yeah, Maris.

23     A.   Tracy, I believe.

24     Q.   And what is your understanding of how the name

25   Gwen was created?

Elizabeth Pelletier

Freeman vs.
Deebs

```
 1        A.    I don't remember a character named Gwen.

 2   Gwen?  Oh, Gwen, Gwen, yes, I remember now.  I'm sorry,

 3   big cast.  Tracy.

 4        Q.    As the content editor, was there input from

 5   you on selection of the names and the books in the

 6   Crave series?

 7        A.    No.

 8        Q.    Did you ever give a copy of Masked to anyone?

 9              MS. WOLFF:  Object to form.  You can

10   answer.

11        A.    No.

12        Q.    Excuse me?

13        A.    No.

14        Q.    Did you ever give a copy of Masked to Tracy

15   Wolff?

16        A.    No.

17        Q.    Did you ever give a copy of Masked to Stacy

18   Abrams?

19        A.    No.

20        Q.    Did you ever discuss Masked with anyone?

21        A.    No.

22        Q.    Did you ever discuss Masked with Tracy Wolff?

23        A.    No.

24        Q.    Did you ever discuss Masked with Stacy Abrams?

25              MS. WOLFF:  Didn't you do all of these
```

**Confidential**

```
 1    questions before?

 2                    MR. PASSIN:  It's different.

 3                    MS. WOLFF:  It sounds familiar.  Sorry.

 4        Q.   Did you ever discuss Masked with Emily Kim?

 5        A.   No.

 6        Q.   Did you ever discuss Lynne Freeman with

 7    anyone?

 8        A.   No.

 9        Q.   Did you ever discuss Lynne Freeman with Tracy

10    Wolff?

11        A.   No.

12        Q.   Did you ever discuss Lynne Freeman with Stacy

13    Abrams?

14        A.   No.

15        Q.   Did you ever discuss Lynne Freeman with Emily

16    Kim?

17        A.   No.

18        Q.   Who in connection with the Crave series was

19    the expert on Alaska?

20        A.   I don't know that any of us are an expert on

21    Alaska.

22        Q.   Well, who provided the majority of the

23    information about Alaska that appears in the books --

24    in the Crave book series?

25        A.   I would say it's a collaboration.  Again, I
```

1  had just gone on a trip to Alaska, so I know I provided

2  some of the feedback.  But I believe that Tracy also

3  Googled Alaska.

4  **Q.  Emily Kim had notes on Alaska.  Were those**

5  **used in connection with the books in the Crave book**

6  **series?**

7  A.  I don't know.

8  **Q.  Please describe for me the contributions you**

9  **made to each of the books, Crave, Crush, Covet, and**

10  **Court.**

11  A.  I contributed to the synopses, the plot arcs,

12  the subplots, the character arcs, developments.  I

13  contributed to editing the books, both content and line

14  edits.  I published the books.  I was involved in the

15  marketing plans for the books.

16            I think that's about it.

17  **Q.  What did you do in connection with the plot --**

18  **first of all, what are plot arcs?**

19  A.  As I said previously, most books have a

20  three-act structure.  A plot arc is the movement from

21  Act 1 to Act 2, Act 2 to Act 3.

22  **Q.  And what specifically did you do in connection**

23  **with that?**

24  A.  Each of those doorways can be called beats.  I

25  helped design the beats.  I'm a stickler for structure.

Elizabeth Pelletier

1   So I made sure that the midpoint was always in the

2   middle of the book, that Act 1 and Act 2 were as

3   balanced as it could possibly be.  Tracy tends to write

4   really long Act 1s, really short Act 3s, so I had to

5   juggle some stuff there.

6               She was writing the books as I was

7   editing them, which made it incredibly challenging to

8   find the midpoint.  So I'm constantly reassessing how

9   far are you in, how many pages is this going to be.

10  When I think I've got the midpoint or exactly where the

11  midpoint is going to show up physically, I may have to

12  artificially move the midpoint during edits.

13              That's all relating to structure.  And

14  then subplots, and then we have to decide how many

15  Chekhov guns.

16      **Q.   Now, when you are involved in the structure --**

17              MS. WOLFF:  Will you let her finish that

18  sentence?

19      **Q.   Go ahead.**

20      A.   We also have to decide how many Chekhov guns

21  on that plot are unfired.

22      **Q.   When you're working on the structure, do you**

23  **actually change the story line or you just make edits**

24  **that don't really change the story line?**

25              MS. WOLFF:  Object to form.  You can

Elizabeth Pelletier                                    Freeman vs.
                                                          Deebs

1   answer.

2      A.   I prefer to work from synopsis.  So the main

3   story has been mapped out, but sometimes -- as the

4   books got later, it was harder and harder to know what

5   Act 3 was going to be.

6               In a typical book, Act 1 introduces the

7   questions, Act 2 is where you evolve the questions, and

8   Act 3 is where you answer the questions.  So if you

9   don't really have exactly what you want in Act 1 or you

10  don't have the evolution that you need in Act 2, Act 3

11  is very hard sometimes to come back.

12              So in regards to your question about the

13  synopsis and what I'm changing, sometimes Act 3 was

14  fluid or we don't wouldn't know exactly, but I like to

15  know exactly the original beats of one and two if I can

16  help it.

17     **Q.   Let me ask a question.  You testified earlier**

18  **that you wrote the synopsis for all of the books except**

19  **there was no synopsis for Crave, correct?**

20     A.   Correct.

21     **Q.   Do those synopses still exist?**

22     A.   They do.

23     **Q.   Were they produced in this case, do you know?**

24     A.   They were.

25     **Q.   How can I tell what's the synopsis versus**

**Confidential**

1  what's just a draft of the book?

2     A.   Many ways.  One, I believe every file says

3  "synopsis" in the file title.  Two, it doesn't read

4  like a book.  It reads like a summary.  Three, I

5  believe I have a tendency to write Scene 1, Scene 2,

6  Scene 3, Scene 4, and a summary.

7     **Q.   And how long are approximately each one of**

8  **these synopses?**

9     A.   They vary.  I believe the one for Covet was 55

10  pages.  It depends how many times I had to start and

11  stop on some of them.  It also depends if Tracy had

12  started one and then I was going back in and trying to

13  use some of -- some of -- some of the ideas that she

14  might have had in the synopsis.  That was really more

15  Crush and Cherish.

16          So when I'm plotting a book, I tend to do

17  it while I'm talking to you, like in a conversation.

18  That's how my thought process works.  And when I get

19  stuck, I tend to -- to tell Tracy, "I'm stuck here,"

20  and then like let her be my sounding board.  And then I

21  would go back and put it in writing.

22     **Q.   So how many of the synopses did -- was Tracy**

23  **involved in writing?**

24     A.   She started the synopsis for Crush.  You have

25  that.

**Confidential**

1     Q.   What about -- was she involved in writing any

2   of the other ones?

3     A.   Let me finish on Crush.  I don't know that I

4   ended up using it.  I would have to look at it again.

5          And then with Charm, I told her what I

6   wanted and then she reduced it to writing and sent it

7   back to me and said, "Is this what you wanted for

8   Charm?"

9     Q.   And was it?

10    A.   For the most part, yes.

11    Q.   And did you rewrite it?

12    A.   No.

13    Q.   Excuse me?

14    A.   No.

15    Q.   What's a character arc?

16    A.   A character arc is where you take a character

17   from a position of flaws to a position of realizing how

18   their life could be different without -- how wrong they

19   were with those flaws.  Like Pride and Prejudice, the

20   main character, Mr. Darcy says, "Once my good fortune

21   is lost, it is lost forever," right?  That is his flaw.

22   He doesn't forgive people and by the end of the book

23   you realize his arc is -- he realizes that's a terrible

24   way to live, that you have to be forgiving and

25   understanding of people.

1    Q.    I apologize.  What did you call them, guns?

2    What are they called?

3    A.    Chekhov guns.

4    Q.    Chekhov guns.  Explain to me again what that

5    is.  I apologize.

6    A.    So let's say you want to -- say there is a

7    path that you are walking down -- your character is

8    walking down and you want them to go to the right.  You

9    happen to mention there is a scary tree off to the

10   left, but they don't take that path.  I have taken a

11   Chekhov gun and set it on counter and I have told you

12   there is probably something down that path, but I

13   haven't fired the gun.  I haven't told you what's down

14   there yet.

15   Q.    Did you write any of the chapter titles for

16   the Crave book series?

17   A.    I don't believe so.

18   Q.    Do you know who wrote the chapter titles?

19   A.    I believe they were Tracy.

20   Q.    Did Emily Kim write any of the chapter titles?

21   A.    I believe she wrote some draft of ones, but I

22   don't think they were used.

23   Q.    Is Crave the most commercially successful book

24   that Entangled has ever published?

25   A.    Define "successful."

Elizabeth Pelletier                                      Freeman vs.
                                                              Deebs

1    Q.   When was that?

2    A.   That was in, I believe, the fall of -- I'm

3    terrible with dates -- 2011, I believe.  It might have

4    been earlier.

5    Q.   And under what circumstances did you

6    communicate with her in the fall of 2011?

7    A.   Bloomsbury in the U.S. was laying off a number

8    of people and they were incredibly talented and I

9    reached out and -- and scooped up a few, and she was

10   one.

11   Q.   So she was being laid off by Bloomsbury?

12   A.   She wasn't.  But Bloomsbury was changing the

13   way that they were operating, so I just knew there was

14   a restructure going on.

15   Q.   And when did Stacy Abrams start working at

16   Entangled?

17   A.   I don't remember.

18   Q.   Was it sometime in 2011?

19   A.   I believe so.

20   Q.   Is it correct that Stacy Abrams was one of the

21   editors on the Crave book series?

22   A.   No.

23   Q.   Wasn't she the copy editor?

24   A.   She was the copy editor.  That's not an

25   editor.

**Confidential**

1    Q.   A copy editor is not considered an editor?

2    A.   They are considered a copy editor.

3    Q.   And a content editor is a content editor?

4    A.   Content editors are often referred to as just

5    editor.

6    Q.   Would you characterize Stacy Abrams as a good

7    friend?

8    A.   Uh-huh.

9    Q.   How would you characterize your relationship

10   with her?

11   A.   Very good.

12   Q.   Do you socialize together?

13   A.   We don't live in the same state.

14   Q.   Over the last three years, how often would you

15   estimate you speak to her?

16   A.   She's a colleague, so weekly.

17   Q.   And how often over the last three years would

18   you estimate you text with her?

19   A.   Infrequently.  I think we e-mail.

20   Q.   And over the last three areas, how often would

21   you estimate that you have actually seen her?

22   A.   I'm terrible at this.  I think twice, but I'm

23   not certain.

24        MR. PASSIN:  I know it's a little early,

25   but would you mind taking a lunch break now?

Confidential

1    the best person to ask.  But that's what it looks like.

2        Q.   So you are not that familiar with it?

3        A.   Huh-uh.

4        Q.   Do you know if they are payments for just the

5    Crave books or is it for all of the books that

6    Entangled pays Tracy Wolff for?

7        A.   I have no idea.

8        Q.   All right.  You can put it aside.  I'm going

9    to show you what was previously marked as Exhibit 47.

10   And on this, look at the third paragraph.  I'm going to

11   read you a sentence.

12                "In this instance, Pelletier created the

13   basic story line for the Crave book series."

14                Is that true?

15       A.   Yes.

16       Q.   Tell me exactly for the book Crave what's the

17   story line that you created?

18       A.   The story line is about a young girl whose

19   parents die and she's forced to go to a boarding school

20   with paranormal creatures.  And she is a fish out of

21   water and then slowly discovers that the school is

22   filled with all kinds of paranormal creatures and it's

23   a school specifically for these paranormal creatures

24   and she's the only human among them.

25       Q.   Did you create that on your own or did you do

1   Stacy.

2       Q.   Right.  Well, you already told us what it was?

3       A.   Yeah.

4       Q.   Okay.  And it wasn't as detailed as Idea

5   No. 2?

6       A.   Let me now go through No. 2 and point out -- I

7   was just pointing -- relating to the boarding school

8   part.  That's what I was responding to.

9            Vampires I was looking for.  A reboot on

10  Twilight, but more feminist.  So the Volturi instead of

11  Edward Cullen was also what I'm looking for.  The

12  hottest bad boy at this very rich boarding school,

13  again, would be -- that's Edward Cullen with the

14  boarding school.  However, the -- the parts about "The

15  dark power he wields is nearly unimaginable.  As his

16  18th birthday approaches he knows he will be expected

17  to step into his role in the family," that is -- that

18  is not part of my original idea.  All of the rest of

19  her idea is a reboot on Twilight.

20      Q.   All right.  Now, what were you saying about

21  Cullen?  Are you saying that was your idea?

22      A.   No.  I'm saying that -- when I told Stacy what

23  I was looking for, I said I was looking for Twilight

24  meets Harry Potter.  Volturi instead of Cullen is

25  Twilight.

**Confidential**

Elizabeth Pelletier

Freeman vs.
Deebs

1     A.

2     Q.   Is Prospect and Emily Kim being indemnified by

3  anyone?

4     A.   Not that I'm aware of.

5     Q.   If an agent submits a manuscript to Entangled

6  and Entangled decides not to pursue that manuscript, is

7  it Entangled's policy -- or was it their policy in 2013

8  to send a written rejection letter to the agent?

9     A.   We try to send rejection letters, but we

10  didn't always.

11     Q.   Okay.  And is it your policy now?

12     A.   Even now we try and send rejection letters,

13  but we don't always.

14     Q.   When Tracy Wolff testified -- and I'll try to

15  get this as best I can based on my recollection -- I

16  recall her giving me the impression that one of the

17  reasons you were looking to write the YA book is there

18  was an opening in your schedule, that some book dropped

19  out and wasn't going to be completed.

20     A.   Correct.

21     Q.   Okay.  So what -- explain that situation to

22  me.

23     A.   It's very often in publishing, publishing is a

24  creative art form, that an author will commit to

25  writing a book and delivering it by a certain date.

**Page 133**

**Confidential**

Elizabeth Pelletier                                      Freeman vs.
                                                             Deebs

1   They will promise over and over again they are going to

2   hit it, they are going to hit it, give them an

3   extension, and then you sometimes run into trouble that

4   they did not finish the book, it's not going to make

5   the printer deadline or it just didn't develop the way

6   that you hoped it would develop in edits and it needs

7   more time.

8              I don't remember specifically why a book

9   dropped out.  My vague recollection is this particular

10  author had -- was struggling with depression and

11  couldn't write.  And she was a very large author, if

12  it's who I'm thinking of, and it left a hole in the

13  schedule for a very large book to slide in.

14       Q.   Was it two books or just one book?

15       A.   I believe it was just the one book.

16       Q.   But it was one author or two authors?

17       A.   Oh, it's -- if it's what I'm remembering, it

18  is one author.

19       Q.   ███████████████████████████████████

20       A.   ███████████████████████████████

21       Q.   ████████████████████████████

22       A.   ███████████████████

23       Q.   One thing I wanted to ask you is --

24              THE VIDEOGRAPHER:  The microphone slid

25  all the way down your jacket.

**Page 134**

**Elizabeth Pelletier**                    **Confidential**                    **Freeman vs. Deebs**

```
 1        I, ELIZABETH PELLETIER, have read the foregoing

 2    deposition and hereby affix my signature that same is

 3    true and correct, except as noted above.

 4                                    ELIZABETH PELLETIER

 5

 6    THE STATE OF  Texas  )

 7    COUNTY  OF  Williamson

 8        Before me, Teonna L Ward Boley on this day personally

 9    appeared ELIZABETH PELLETIER, known to me (or proved to

10    me under oath or through driver license ) (description

11    of identity card or other document) to be the

12    person whose name is subscribed to the foregoing

13    instrument and acknowledged to me that he executed

14    the same for the purposes and consideration therein

15    expressed.

16

17        Given under my hand and seal of office, this

18    12 day of April        , 2023 .

19

20                                NOTARY PUBLIC IN AND FOR

21                                THE STATE OF  Texas

22

23    My commission expires:  01/07/2025

24    _____ No Changes Made   X  Amendment Sheet(s) Attached

25
```

TEONNA L. WARD BOLEY
Notary Public, State of Texas
Comm. Expires 01-07-2025
Notary ID 132855891

```
 1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK
 2
     LYNNE FREEMAN, an          )
 3   individual,                )
          Plaintiffs,           )
 4                              )
     VS.                        ) Case No. 1:22-cv-02435-LLS
 5                              )
     TRACY DEEBS-ELKENANEY      )
 6   P/K/A TRACY WOLFF, an      )
     individual, EMILY SYLVAN   )
 7   KIM, an individual,        )
     PROSPECT AGENCY, LLC, a    )
 8   New Jersey limited         )
     liability company,         )
 9   Entangled Publishing,      )
     LLC, a Delaware limited    )
10   liability company,         )
     Holtzbrinck Publishers,    )
11   LLC D/B/A MACMILLAN, a     )
     New York limited           )
12   liability company, and     )
     Universal CITY STUDIOS,    )
13   LLC, a Delaware limited    )
     liability company,         )
14       Defendants.            )

15

16        REPORTER'S CERTIFICATION OF THE ORAL
            DEPOSITION OF ELIZABETH PELLETIER
17                  MARCH 9, 2023

18        I, Donna Wright, a Certified Shorthand

19   Reporter and Notary Public in and for the State of

20   Texas, hereby certify to the following:

21        That the witness, ELIZABETH PELLETIER, was

22   duly sworn by the officer and that the transcript of

23   the oral deposition is a true record of the testimony

24   given by the witness;

25        That the original deposition was delivered to
```

Elizabeth Pelletier                                              Freeman vs.
                                                                      Deebs

1   Ms. Nancy Wolff;

2          That a copy of this certificate was served on

3   all parties and/or the witness shown herein on

4   March 9th, 2023;

5          I further certify that pursuant to FRCP Rule

6   30(3) that the signature of the deponent:

7          __X__ was requested by the deponent or a party

8   before the completion of the deposition and that the

9   signature is to be before any notary public and

10  returned within 30 days from date of receipt of the

11  transcript.  If returned, the attached Changes and

12  Signature Page contains any changes and the reasons

13  therefore:

14          ____ was not requested by the deponent or a

15  party before the completion of the deposition.

16          I further certify that I am neither counsel

17  for, related to, nor employed by any of the parties or

18  attorneys in the action in which this proceeding was

19  taken, and further that I am not financially or

20  otherwise interested in the outcome of the action.

21

22

23

24

25

**Page 140**

Elizabeth Pelletier

1          Certified to by me on this, the 13th day of

2     March, 2023.

3

4

5

6                    DONNA WRIGHT, Texas CSR 1971
                     Expiration Date:  11/30/24
7                    APTUS COURT REPORTING
                     401 West A Street, Suite 1680
8                    San Diego, California 92101
                     (619) 546-9151
9                    Firm Registration No. 722

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25