# EXHIBIT I

Videotaped Deposition of

# Stacy Abrams

March 03, 2023

Freeman

vs.

Deebs

**Confidential**



www.aptusCR.com | 866.999.8310

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4   LYNNE FREEMAN, an

5   individual,

6          Plaintiff,

7     vs.                           No. 1:22-cv-02435-LLS

8   TRACY DEEBS-ELKENANEY P/K/A

9   TRACY WOLFF, an individual;

10  et al.,

11         Defendants.
    _____

12

13

14                 CONFIDENTIAL

15       VIDEO DEPOSITION OF STACY ABRAMS

16     Reported Remotely through Videoconference

17               March 3, 2023

18

19

20

21

22

23  Reported by:
    Margaret A. Smith
24  RPR, CRR, CSR No. 9733

25  Job No.:  10115785

**Stacy Abrams**                                                                Freeman vs.
                                                                                Deebs

1                      UNITED STATES DISTRICT COURT

2                     SOUTHERN DISTRICT OF NEW YORK

3

4    LYNNE FREEMAN, an

5    individual,

6            Plaintiff,

7      vs.                              No. 1:22-cv-02435-LLS

8    TRACY DEEBS-ELKENANEY P/K/A

9    TRACY WOLFF, an individual;

10   et al.,

11           Defendants.
     _____

12

13

14

15

16

17

18

19

20

21     Deposition of STACY ABRAMS taken on behalf of

22   Plaintiff, reported remotely through videoconference,

23   beginning at 6:57 a.m. PST, and ending at 1:05 p.m. PST,

24   on Friday, March 3, 2023, before Margaret A. Smith, RPR,

25   CRR, Certified Shorthand Reporter No. 9733.

```
 1    APPEARANCES (via videoconference):

 2

 3    FOR PLAINTIFF:

 4         CSREEDER, PC

 5         BY:  MARK PASSIN, ESQUIRE

 6         11766 Wilshire Boulevard, Suite 1470

 7         Los Angeles, California  90025

 8         310.861.2470

 9         mark@csrlawyers.com

10

11    FOR DEFENDANTS TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF;

12    ENTANGLED PUBLISHING, LLC; HOLTZBRINCK PUBLISHER, LLC,

13    D/B/A MACMILLAN; UNIVERSAL CITY STUDIOS, LLC:

14         COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

15         BY:  BENJAMIN HALPERIN, ESQUIRE

16         BY:  CECE COLE, ESQUIRE

17         9454 Wilshire Boulevard, Suite 901

18         Beverly Hills, California  90212

19         310.492.4392

20         bhalperin@cdas.com

21         ccole@cdas.com

22

23

24

25
```

**Confidential**

```
1   APPEARANCES (via videoconference):

2

3   FOR DEFENDANTS EMILY SYLVAN KIM; PROSPECT

4   AGENCY, LLC:

5        KLARIS LAW

6        BY:  ZACHARY M. PRESS, ESQUIRE

7        29 Little W 12th Street

8        New York, New York  10014

9        917.822.7468

10       zpress@klarislaw.com

11

12  Also present:

13       Kevin Gonzalez, Aptus videographer

14       Trent Baer

15       Lynne Freeman

16       Tracy Deebs

17

18

19

20

21

22

23

24

25
```

1   someone in New York book publishing.

2       Q     And what is your relationship between Walker

3   and Bloomsbury.

4       A     So Walker is considered an imprint.  They were

5   an independent publisher for many years.  And then they

6   were purchased by Bloomsbury before I started there.

7   And so they became almost a subsidiary.  I don't know if

8   that's the correct legal term.  But in book publishing,

9   they're called an imprint.

10      Q     So you were the editor -- at Bloomsbury -- I'm

11  sorry.

12            At Entangled, you were the editorial director

13  of publishing?

14      A     Yes.

15      Q     Was that your sole title the whole time you

16  were there?

17      A     For many years.  I have now moved into V.P. of

18  operations as well.

19      Q     And what were your job duties as the editorial

20  director?

21      A     At Entangled?

22      Q     Excuse me?

23      A     At Entangled?

24      Q     At Entangled.

25      A     Consider books for acquisition, sit on the

**Confidential**

1   recall right now.

2       Q    And what about books you edited, would it be

3   the same list --

4       A    Yes.

5       Q    -- or would it be additional books?

6       A    Yes.

7       Q    Same list?

8            All right.  Was Tempest series the only YA

9   book?

10      A    No.  Many of the books that I worked on were

11  YA, including the titles I just listed by Jessica

12  Warman.

13           MR. HALPERIN:  Just for the record, can we just

14  say what YA stands for.  I don't believe that's been

15  said yet.

16           THE WITNESS:  Yes.  Young adult.  Essentially

17  books for ages 12 to 18.

18  BY MR. PASSIN:

19      Q    Were any of the books you mentioned young adult

20  paranormal books?

21      A    Between by Jessica Warman, and the Tempest

22  series by Tracy Deebs.

23      Q    Who is Emily Kim?

24      A    She is a literary agent.

25      Q    And when did you first meet Ms. Kim?

**Confidential**

1    A    It was a Tempest book.

2    **Q    All right.  And then what about at Entangled?**

3    A    At Entangled, we did a series together for the

4  Brazen line.  It was called the Shaken Dirty series.

5  And I do not recall each individual title.

6    **Q    How many titles were there?**

7    A    Four.

8    **Q    And what other books were published by**

9  **Entangled of Tracy Wolff's?**

10    A    The Crave series.

11    **Q    And how many books have currently been**

12  **published?**

13    A    Seven.  Oh, I'm sorry.  Six.

14    **Q    Six.  So you've actually published closer to 13**

15  **books of Tracy Wolff's.  Is that correct?**

16    A    This is why I'm asking published, because I am

17  an employee of Entangled.  But, as I've said, I'm very

18  peripherally involved in the creative series.  I did not

19  count it in my numbers.

20    **Q    Why do you say you're very peripherally**

21  **involved in the Crave series?**

22    A    Because I was the copy editor, not the content

23  editor.

24    **Q    So does that mean that you were not involved at**

25  **all in creating the story voice -- the story or voice of**

**Confidential**

1    the Crave book series?

2        A    Can you clarify what you mean by "involved."

3        **Q    Well, what involvement did you have in creating**

4    **the -- the story and line voice -- story and voice of**

5    **the Crave series?**

6            MR. HALPERIN:  Object to form.

7            THE WITNESS:  So Tracy was my author.  I

8    introduced her to Liz.  From my time at Bloomsbury.  I

9    suggested that she would be a great person to write this

10   series.  And so I was peripherally involved in some of

11   the early discussions between Tracy and Liz, coming up

12   with ideas.

13           That was where my involvement ended until I was

14   helping with the copy edits.

15   BY MR. PASSIN:

16       **Q    And when did you introduce her to Liz?**

17       A    I do not know an exact date.

18       **Q    Well, was it when you were working at**

19   **Bloomsbury, or Entangled?**

20       A    When I was working at Entangled.

21           MR. HALPERIN:  Just give me a moment to object,

22   please, Ms. Abrams.

23           THE REPORTER:  And Counsel, if there was an

24   objection, the reporter would need to hear again,

25   please.

1   Wolff a lot?

2         MR. HALPERIN:  Object to the form.

3         THE WITNESS:  Can you define "a lot."

4   BY MR. PASSIN:

5     Q    Over the years, how often have you worked with

6   Tracy Wolff?

7     A    Fairly frequently.  I think we've already

8   covered I've done a lot of books with her.

9     Q    Would you characterize Tracy Wolff as a friend?

10        MR. HALPERIN:  Object to the form.

11        THE WITNESS:  A friend and a colleague.

12  BY MR. PASSIN:

13    Q    Would you characterize her as a good friend?

14        MR. HALPERIN:  Object to the form.

15        THE WITNESS:  No.

16  BY MR. PASSIN:

17    Q    Do you socialize with her?

18        MR. HALPERIN:  Object to the form.

19        THE WITNESS:  Can you define "socialize."

20  BY MR. PASSIN:

21    Q    I think you know what socialize means.  Go out

22  to dinner, go out to parties, nonwork events.

23    A    No.

24    Q    Do you go out to work dinners or work parties

25  with her?

Confidential

1    THE WITNESS:  As you can see, nothing.  She

2  just forwarded.

3  BY MR. PASSIN:

4    Q    Well, it says in the email Liz asked me to

5  respond to you.  So she -- I'm assuming she said

6  something.

7    A    No.  This is how she works.

8    Q    Okay.  What did you mean when you said Liz is

9  currently closed to acquisitions?

10   A    It's fairly standard in the publishing industry

11  to close to submissions periodically when your workload

12  is just too high.

13   Q    Meaning, you're not accepting any new

14  submissions?

15   A    Yes.

16   Q    What did you mean when you said "It definitely

17  sounds like it could be up my alley"?

18   A    It was a young adult novel, and I was currently

19  acquiring young adult novels.

20   Q    Well, if Liz was closed to acquisitions, why

21  did you ask Ms. Kim to send you the manuscript?

22   A    Because I was not --

23    MR. HALPERIN:  Objection.  Asked and answered.

24    THE WITNESS:  -- closed.  Sorry.

25

1      A    I believe so, yes.

2      **Q    And when you say "you're done with them,"**

3    **meaning you reject them?**

4      A    Yes.

5      **Q    So do you have any idea what happened to the**

6    **copy of Masqued that Emily Sylvan Kim sent you?**

7           MR. HALPERIN:  Object to form.

8           THE WITNESS:  I don't know.

9    BY MR. PASSIN:

10     **Q    All right.  When she sent it to you, did you**

11   **read it?**

12     A    No, I don't believe so.

13     **Q    Why would you not read it?**

14     A    I have a long list of submissions.  And so I do

15   not read them right away.

16     **Q    But don't you read them eventually?  You told**

17   **me you were interested in the book, please send it to**

18   **me.  And then you wouldn't have the courtesy of reading**

19   **it?**

20          MR. HALPERIN:  Object to the form.  That's very

21   argumentative.  And she already said she didn't read it.

22          MR. PASSIN:  And don't coach the witness.  If

23   you do that one more time, I'm getting the judge on the

24   phone.

25          THE WITNESS:  Can you repeat the question.

Confidential

1          MR. PASSIN:  Read the question back, please.

2          (The following was read by the reporter:

3          Q.  But don't you read them eventually?  You

4          told me you were interested in the book, please

5          send it to me.  And then you wouldn't have the

6          courtesy of reading it?)

7          THE WITNESS:  As you said, not right away.

8   BY MR. PASSIN:

9      Q    **But you did eventually read it?**

10     A    Not that I recall.

11     Q    **Why wouldn't you read it?  That's your job.**

12          MR. HALPERIN:  Object to form for the same

13   reasons stated.

14   BY MR. PASSIN:

15     Q    **So you're telling me you didn't do your job?**

16          MR. HALPERIN:  Object to form.  You're arguing

17   with her.

18          MR. PASSIN:  I'm arguing with her because I

19   don't find her story believable.

20          THE WITNESS:  I receive anywhere from five to

21   20 manuscripts a day.  There are definitely not enough

22   hours in the day to read every manuscript.  I would

23   estimate that from the time I receive a submission, it

24   takes about three to four months before I actually read

25   it.

Confidential

1   BY MR. PASSIN:

2       Q    All right.  And what I'm asking you, did you

3   eventually read this manuscript?

4           MR. HALPERIN:  Objection.  Asked and answered.

5   No.

6   BY MR. PASSIN:

7       Q    Why didn't you read it?

8           MR. HALPERIN:  Objection.  Asked and answered.

9           THE WITNESS:  I don't recall.

10  BY MR. PASSIN:

11      Q    Is it your normal practice to tell an agent

12  that you work with all the time that I'm interested in

13  the manuscript, send it to me, and then not read it?

14          MR. HALPERIN:  Object to the form.

15          THE WITNESS:  It is my normal practice to say

16  I'm interested and read it as soon as my time allows.

17  BY MR. PASSIN:

18      Q    So are you saying to me you never read it

19  because your time didn't allow?

20          MR. HALPERIN:  Objection.  Asked and answered.

21  BY MR. PASSIN:

22      Q    And I'll remind you you're testifying under

23  penalty of perjury.

24          MR. HALPERIN:  Objection.  You're threatening

25  the witness.  And you've asked this question, like, five

**Confidential**

1   in your life have you read all or any portion of

2   Masqued?

3           MR. HALPERIN:  Objection to form.

4           THE WITNESS:  I do not know.

5   BY MR. PASSIN:

6       **Q    But you may have read all or a portion of it.**

7   **Correct?**

8       A    I believe I already stated I didn't know.

9           MR. HALPERIN:  Objection.  Asked and answered.

10  BY MR. PASSIN:

11      **Q    Please answer the question.**

12      A    I have already stated that I did not.

13      **Q    I thought you said you might have but that you**

14  **just don't recall.**

15      A    I suppose.  I just do not recall.

16      **Q    Was any of the material or ideas from Masqued**

17  **used in any of the Crave books?**

18          MR. HALPERIN:  Objection to form.

19          THE WITNESS:  No.

20  BY MR. PASSIN:

21      **Q    Was any of the material or ideas from Masqued**

22  **used in any of the Tempest Rising books?**

23          MR. HALPERIN:  Objection to form.

24          THE WITNESS:  No.

25

1          THE WITNESS:  I suppose it's possible.

2     BY MR. PASSIN:

3        **Q    Are you aware of whether or not Tracy Wolff**

4     **ever read all or any part of Masqued?**

5          MR. HALPERIN:  Objection to form.

6          THE WITNESS:  I do not know.

7     BY MR. PASSIN:

8        **Q    Was any of the material or ideas from Masqued**

9     **that you are aware of ever used in any drafts of any of**

10    **the Crave books?**

11         MR. HALPERIN:  Objection.  Asked and answered.

12         THE WITNESS:  No.

13    BY MR. PASSIN:

14       **Q    As far as you're aware?**

15         MR. HALPERIN:  Objection.  Asked and answered.

16    BY MR. PASSIN:

17       **Q    Well, you're not the only one that contributed**

18    **to the Crave books.  Isn't that correct?**

19         MR. HALPERIN:  Objection.  That assumes facts

20    not in evidence and objection to form.

21    BY MR. PASSIN:

22       **Q    Answer the question, please.**

23       A    Can you repeat it.

24         MR. PASSIN:  Can the reporter read the question

25    back, please.

1          (The following was read by the reporter:

2          Q.  Well, you're not the only one that

3          contributed to the Crave books.  Isn't that

4          correct?)

5          THE WITNESS:  That I am aware of?  No.

6     BY MR. PASSIN:

7       Q    Did you -- did you or Tracy Wolff ever discuss

8     Masqued -- Masqued?

9       A    Absolutely not.

10      Q    Did you or Tracy Wolff ever discuss Lynne

11    Freeman?

12      A    No.

13      Q    Did you or Liz Pelletier ever discuss Masqued?

14      A    No.

15      Q    Why did you hesitate?

16      A    I suppose you might need to clarify time frame.

17      Q    Did you -- prior to my sending a demand letter

18    to Tracy Wolff's counsel, did you and Liz Pelletier ever

19    discuss Masqued?

20      A    No.

21      Q    Did you ever discuss Masqued with Liz Pelletier

22    subsequent to that?

23      A    Yes.

24      Q    What did you discuss?

25          MR. HALPERIN:  And I would just caution the

1          Please repeat.

2          (The following was read by the reporter:

3          Q. All right.  Did she tell you to tell -- to

4          testify that you never read the book Masqued?)

5          THE WITNESS:  No.

6    BY MR. PASSIN:

7      **Q    Was Tempest Rising the first young adult book**

8    **written by Tracy Wolff?**

9      A    It was the first one published.  I have no idea

10   what else she wrote before that.

11     **Q    Who published Tempest Rising?**

12     A    The Walker imprint of Bloomsbury children's

13   books.

14     **Q    Was it published while you were at Bloomsbury?**

15     A    Yes.

16     **Q    And what was your involvement?**

17         MR. HALPERIN:  Objection to form.

18         THE WITNESS:  I was the acquiring editor.

19   BY MR. PASSIN:

20     **Q    And was it a series of books?**

21     A    Yes.

22     **Q    And how many books were in the series?**

23     A    Three.

24     **Q    And what were the names of the books?**

25     A    The first one was Tempest Rising.  I should

Confidential

1            THE WITNESS:  In part, yes.

2    BY MR. PASSIN:

3        Q    What do you mean "in part"?

4        A    I was the first one who suggested her to Liz.

5        Q    And why did you suggest her?

6        A    We worked very well together.  She has a great

7    voice.  She's very commercial.  And I thought she would

8    understand what we hoped to do with this series.

9        Q    With the series.

10            But the series didn't exist yet.  Correct?

11       A    Correct.

12       Q    Is it accurate to say that Tempest Rising's

13   books set the stage for the Crave series?

14            MR. HALPERIN:  Objection to form.

15            THE WITNESS:  I wouldn't actually say that was

16   accurate.  The books were quite old back list at that

17   time.  The only connection I would give is -- is me.  It

18   established our relationship.

19   BY MR. PASSIN:

20       Q    When did Tracy Wolff write the first draft of

21   Tempest Rising?

22       A    I have no way of knowing that.

23       Q    When did Tracy Wolff complete the last draft of

24   Tempest Rising?

25       A    Well, it was published in 2011.  So going off

**Confidential**

1  of standard publishing time, it was probably completed

2  in late 2009 or early 2010.

3     **Q     Do you have in your possession any drafts of**

4  **Tempest Rising?**

5     A    No.

6          MR. PASSIN:  You know, we're getting into a

7  whole new topic now.  Do you want to take a break now

8  for lunch?

9          THE WITNESS:  Sure.

10          MR. PASSIN:  Ben?

11          MR. HALPERIN:  I'm good with whatever the

12  witness would like.

13          MR. PASSIN:  All right.  So what do you want to

14  say?  A half hour?

15          MR. HALPERIN:  Would you like longer than that?

16          THE WITNESS:  What is standard?

17          VIDEOGRAPHER:  Would you like to have this

18  conversation off the record, Counsel?

19          MR. PASSIN:  Yeah.

20          MR. HALPERIN:  Yes, please.  Let's go off the

21  record.

22          VIDEOGRAPHER:  Going off the record, the time

23  is 9:40 a.m.

24          (Lunch recess from 9:40 a.m. to 10:32 a.m.)

25          VIDEOGRAPHER:  The time is 10:32 a.m.  We are

1   them up separately.  Yes.  Let's do that.

2          VIDEOGRAPHER:  And are they both Exhibit 7, or

3   is one Exhibit 7 and the other Exhibit 8?

4          MR. PASSIN:  You know, I was going to make them

5   one exhibit.  Let's do them 7 and 1eight.  That's a good

6   idea.  Can you put them both up at the same time or not?

7   Let's do them one at a time.  Let's do 7.

8          VIDEOGRAPHER:  I can put them both at the same

9   time if you'd like.

10         MR. PASSIN:  Okay.

11         (Exhibit 7 was marked for identification.)

12         (Exhibit 8 was marked for identification.)

13  BY MR. PASSIN:

14     **Q    Stacy, let me know when you're able to download**

15  **them.**

16     A    I've got it.  I just might need a minute to

17  read it.

18     **Q    Okay.**

19     A    Okay.

20     **Q    Okay.  So the Exhibit 7 is an email from Tracy**

21  **Wolff. Tracy Deebs, who we decided I'll call Tracy**

22  **Wolff, to you and Emily Kim, dated April 26th, 2019.**

23  **And it says, "Hi, Stacy.  I'm so excited that you**

24  **thought of me for this.  I've put together five basic**

25  **ideas for you to look at.  Everything is, of course,**

Confidential

1  flexible when it comes to creatures, plot, et cetera.

2  But I wanted to give you a rough idea of what I was

3  thinking for each of them.  I'm on my way to my cousin's

4  wedding, but I'm happy to talk/answer emails later

5  tonight or early tomorrow morning and would be happy to

6  take another go at this if none of these ideas appeal.

7  I have a few more, but I need to get on the road.  LOL.

8           "Also, the fifth idea is contemporary, based on

9  Meteor Garden/Boys over Flowers, the most successful

10  Anime turned TV show for girls in Asia's history --

11  Asia's history (and also HUGELY popular over here). I

12  fleshed it out into a serial format but it can easily be

13  combined into a four-book series, or one-book, even if

14  it's something you might be interested in.  But the

15  dynamic is EXACTLY what Liz is looking for, ordinary

16  girl into super rarefied world.  Hence the huge

17  worldwide response to it.

18           "Can't wait to hear what you think!"

19           Did you send -- excuse me.

20           Did you receive this email from Tracy Dibbs --

21  Deebs on or about April 26th, 2019?

22     A    It appears I did, yes.

23     Q    You notice it says in the first paragraph that

24  "I'm so excited that you thought of me for this."  And

25  in the penultimate paragraph, it says that "The dynamic

1    is exactly what Liz is looking for, ordinary girl into

2    super rarefied world."

3            Do you see?

4        A    Yes.

5        Q    Okay.  Based on that, is it accurate to say

6    that you communicated to Tracy Wolff prior to

7    April 26th, 2019 that Entangled wanted to hire her to

8    write a book about an ordinary girl in a super rarefied

9    world?

10            MR. HALPERIN:  Objection to form.  And let me

11   just clarify.  You're asking only based on what is

12   written to this email and not --

13            MR. PASSIN:  You know, it's objection -- a

14   speaking objection.  If you have an objection, make it.

15   I'm really close to calling the magistrate.

16            If you have an objection, make it.

17            MR. HALPERIN:  I wasn't --

18            MR. PASSIN:  Make your objection.

19            MR. HALPERIN:  I'm making my objection.

20            MR. PASSIN:  No.

21            MR. HALPERIN:  You interrupted me.

22            MR. PASSIN:  No.

23            MR. HALPERIN:  And I just wanted to clarify.

24            MR. PASSIN:  You're asking questions.  Make an

25   objection.

1    MR. HALPERIN:  I can't clarify a question?  I'm

2  sorry.  I don't --

3         MR. PASSIN:  No, you can't.

4         MR. HALPERIN:  If you're asking based on this

5  email or based on like, without her having --

6         MR. PASSIN:  I asked a question.  Would you

7  read it back, please.

8         (The following was read by the reporter:

9         Q.  Okay.  Based on that, is it accurate to say

10         that you communicated to Tracy Wolff prior to

11         April 26th, 2019 that Entangled wanted to hire

12         her to write a book about an ordinary girl in a

13         super rarefied world?)

14         MR. HALPERIN:  You can answer the question if

15  you understand it.

16         THE WITNESS:  Yes.

17  BY MR. PASSIN:

18    **Q    Okay.  Was the communication oral, or written?**

19    A    Oral.

20    **Q    Was it face to face, or over the telephone?**

21    A    Telephone.

22    **Q    Was anyone else on the phone other than you and**

23  **Tracy Wolff?**

24    A    No.

25    **Q    And when did that communication take place?**

Confidential

1     A    I don't recall exactly.  But, likely, a few

2  days before Friday, April 26th of 2019.

3     Q    Did you approach Tracy Wolff, or did she

4  approach you about working with Entangled?

5          MR. HALPERIN:  Objection to form.

6          THE WITNESS:  I approached her.

7  BY MR. PASSIN:

8     Q    What did Liz Wolff say in the conversation in

9  response to your saying that Entangled wanted her to

10 write a book about an ordinary girl in a super rarefied

11 world?

12    A    She was excited to send me some ideas.

13    Q    Let's take a look at the attachment, Exhibit 8.

14    A    I have not downloaded it yet.

15    Q    You're pretty efficient at that, I must say.

16    A    I have a fast WiFi connection.  It's up.  But

17 it's a handful of pages long.  Do you need me to --

18    Q    I'll direct you.  Do you want to read it -- I

19 mean, I'm going to direct you to the one you need to

20 read.

21    A    Okay.

22    Q    It's up to you.

23    A    No, go ahead.

24         MR. HALPERIN:  She's entitled to read it if she

25 wants to read it.

Confidential

1    statement.

2        A    You want me to define what the meet cute is?

3        Q    Yes.

4        A    So this is essentially an industry term that

5    means where the two romantic leads meet for the first

6    time.

7        Q    Okay.  Then let's go back to Exhibit 9.  You

8    see at the bottom of the first page in the top of the

9    second page, there are two comments that you claim were

10   copied and pasted from Liz's notes.

11           Do you see that?

12       A    Yes.

13       Q    Okay.  Were those two sections in the

14   April 26th, 2019 email that you sent to Ms. Wolff, or

15   were they added to the email after April 26th, 2019?

16       A    They --

17           MR. HALPERIN:  Objection to form.

18           THE WITNESS:  They appear to be part of this

19   email.

20   BY MR. PASSIN:

21       Q    All right.  But you don't know for a fact?

22       A    I don't really understand the question.

23       Q    You said it appears.  But you don't know

24   whether or not it was at the time or it was added later?

25           MR. HALPERIN:  I'm sorry.  Are you asking --

**Confidential**

1   "Pattern the uncle after Snap (sic)"?

2      A    Yes.

3           MR. HALPERIN:  I believe it says Snape.

4   BY MR. PASSIN:

5      Q    And who is Snap?

6      A    That would be Snape.  He is the bad guy in

7   Harry Potter.

8      Q    Oh, okay.  All right.

9      A    Played by Alan Rickman in the movies.

10     Q    I guess it shows that I -- I don't know Harry

11  Potter.

12          So let's look at the email at the top of the

13  first page.

14          Do you see where Tracy Wolff suggests that the

15  series of books be called oh, Gods and Monsters?

16     A    I see all Of Gods and Monsters.

17     Q    Yes, I'm sorry.  Let me read it to you.  It

18  says "Absolutely!!! I will work on the most cute this

19  weekend, and I will see what I can come up with on the

20  notes.  As for a title, I really want to stuck -- I

21  really want to stuck" -- I guess it's supposed to be

22  stick -- "with something around monster, that way if it

23  becomes a series and she was her own powers, we can

24  totally riff off that in the title.  What do you think

25  of Of Gods and monsters?  Or Among Gods and Monsters?

**Confidential**

1  which is an email chain between Tracy Wolff and you,

2  dated June 12th and 13, 2019.

3          Can you put that up, please.

4          (Exhibit 19 was marked for identification.)

5          THE WITNESS:  Okay.

6  BY MR. PASSIN:

7     Q    All right.  So do -- by the way, let's go back

8  to the -- no.  Strike that.  Okay.

9          With respect to Exhibit 19, did you exchange

10  these emails on or about June 12th and June 13 with

11  Tracy Wolff?

12     A    Yes, it appears so.

13     Q    Okay.  Let's look at the bottom email.  The

14  bottom email says from you to Tracy, "Came across a few

15  interesting articles on YA trends and wanted to share!"

16  Then you have a link, it looks like, to two articles.

17          Do you remember those articles?

18     A    No.

19     Q    So you don't remember what they were about?

20     A    I gather YA trends.

21     Q    Okay.  Then if you look at the next paragraph,

22  there's a sentence at the end of the paragraph that

23  says:  Since Liz and I will be working on it together

24  too, I want to make certain you're on her queue since I

25  can -- since I (sic) can be so overloaded.

**Stacy Abrams**

Freeman vs.
Deebs

1          What does that mean, that you and Liz will be

2     working on it together too?

3          MR. HALPERIN:  And it says "since it can be so

4     overloaded," not since I can be so overloaded.

5          MR. PASSIN:  Okay.  I copied it wrong.  Thank

6     you.

7          THE WITNESS:  That is an important distinction,

8     because I meant Liz's queue can be so overloaded.  She's

9     very busy.  I'm not overloaded.

10          Essentially, what I've already explained, which

11    is that Liz was going to be the content editor, and I

12    would be the copy editor at the end.  We would be

13    working on it together, but she would be doing the

14    majority of the editing, which is why we needed to get

15    Tracy into her queue.

16    BY MR. PASSIN:

17    Q     Okay.  And then explain to me what a content

18    editor does.

19    A     A content editor works on story plotting,

20    pacing, characterization, a broad overview of the story.

21          The copy editor comes in at the very end and

22    fixes grammar, spelling, sense, inconsistencies, things

23    like that.

24    Q     And is it typical for all publishers to have

25    both a copy editor and a content editor?

Stacy Abrams

```
 1   BY MR. PASSIN:

 2       Q    Oh.  I typed it wrong.

 3       A    I do not --

 4       Q    Yes or no?

 5       A    -- recall.

 6       Q    Excuse me?

 7       A    I do not recall if I gave her any feedback.

 8       Q    Did you give her suggestions on how to make it

 9   better?

10            MR. HALPERIN:  Objection to form.

11            THE WITNESS:  I do not recall.

12   BY MR. PASSIN:

13       Q    Now, you pointed out earlier that you were

14   the -- I'm sorry.  What kind of editor was it called?

15   Copy editor?

16       A    Yes.

17       Q    Copy editor.

18            So explain to me what kind of changes you made

19   to the Crave -- each of the books in the Crave book

20   series.

21       A    Generally speaking, I would be looking for

22   typos, grammatical errors, punctuation errors, spelling

23   errors, continuity errors.  That's it.

24       Q    So you did not make changes to the storylines?

25       A    No.  That was not my role.
```

Stacy Abrams                                               Freeman vs.
                                                              Deebs

1      Q     And did you -- were you the comment editor on

2   all the books, the Crave books series?

3           MR. HALPERIN:  Objection to form.  She said the

4   copy editor.

5   BY MR. PASSIN:

6      Q     Copy editor.  I'm sorry.

7      A     Yes.

8      Q     And other than you and Liz Pelletier, who else

9   was involved in editing the books in the Crave book

10  series?

11     A     Each book would have had two proofreaders.

12     Q     All right.  But wasn't Emily Kim also involved

13  in editing the books?

14     A     I cannot speak to that, as I was not involved

15  in that process.

16     Q     You just said you were involved in editing.  So

17  I don't understand how you were not involved in that

18  process.

19     A     I'm not involved in the content editing.  I

20  believe that's what you are asking.

21     Q     All right.  So you -- you believe that Emily

22  Kim was involved in the content editing?

23           MR. HALPERIN:  That is not what she said.

24  Objection.  That misstates --

25           MR. PASSIN:  I didn't say she said that,

Confidential

1   Counsel.

2   BY MR. PASSIN:

3       Q    Do you believe that Emily Kim was involved in

4   the content editing?

5       A    And I said I was not involved in that process.

6   So I cannot speak to her level of involvement.

7       Q    But did she have some involvement --

8           MR. HALPERIN:  Objection.  Asked and answered.

9           THE REPORTER:  And may the reporter hear the

10  tail end of the question after did she have some

11  involvement.

12  BY MR. PASSIN:

13      Q    -- in the content editing?

14      A    As I said, I cannot speak to that.

15          THE REPORTER:  And if I could just ask everyone

16  to give a little pause.

17  BY MR. PASSIN:

18      Q    Did you use any material from Masqued in any of

19  the Crave books?

20      A    No.

21      Q    Did anyone include any material from Masqued in

22  any of the books in the Crave series?

23      A    No.

24      Q    How many computers did you use to edit the

25  books?

Confidential

1           Excuse me?

2     A    I don't even know what a technological log is.

3     Q    Well, it wasn't a technological log.  That's --

4  because he interrupted.  It was an access log.

5     A    I do not know what that is either.

6     Q    Did you use any bots to do any of the editing?

7           MR. HALPERIN:  Objection to form.

8           THE WITNESS:  What is a bot?

9  BY MR. PASSIN:

10    Q    That's -- that's probably sufficient an answer.

11  Okay.

12          Well, did you use any computer software

13  programs that automatically made changes?

14          MR. HALPERIN:  Objection to form.

15          THE WITNESS:  No.

16  BY MR. PASSIN:

17    Q    Did you ever give a copy of Masqued to anyone?

18    A    No.

19    Q    Did you ever give a copy of Masqued to Tracy

20  Wolff?

21          MR. HALPERIN:  Objection.  Asked and answered.

22          THE WITNESS:  Again, no.

23  BY MR. PASSIN:

24    Q    Did you ever give a copy of Masqued to Liz

25  Pelletier?

Stacy Abrams                                          Freeman vs.
                                                          Deebs

```
 1              MR. HALPERIN:  Objection.  Asked and answered.

 2   That's twice for the same question.

 3              THE WITNESS:  Again, no.

 4   BY MR. PASSIN:

 5       Q    Did you ever -- did you ever discuss Masqued

 6   with anyone?

 7       A    Are we talking before February of 2022 or not?

 8              MR. HALPERIN:  Excuse me.  Let me --

 9              MR. PASSIN:  Yes.  Before February 22, 2022.

10              MR. HALPERIN:  And objection.  Asked and

11   answered.

12              THE WITNESS:  No.

13   BY MR. PASSIN:

14       Q    Did you ever discuss Masqued with Tracy Wolff?

15              MR. HALPERIN:  Objection.  Asked and answered.

16              MR. PASSIN:  I've got a few more questions.

17   I'm going to get through them.  Okay?

18              MR. HALPERIN:  That's fine.  I'm just lodging

19   my objections, Mark.  I understand.

20              THE WITNESS:  Please repeat.

21   BY MR. PASSIN:

22       Q    Did you ever discuss Masqued with Tracy Wolff?

23       A    No.

24       Q    Did you ever discuss Masqued with Liz

25   Pelletier?
```

Confidential

1      MR. HALPERIN:  Objection.  Asked and answered.

2      THE WITNESS:  Again, no.

3  BY MR. PASSIN:

4      Q    Have you ever discussed Masqued with Emily Kim?

5      MR. HALPERIN:  Objection.  Asked and answered.

6  BY MR. PASSIN:

7      Q    Other than what you testified to today?

8      A    Beyond the initial acquisition, no.

9      Q    Did you ever discuss Lynne Freeman with anyone?

10      MR. HALPERIN:  Objection.  Asked and answered

11  and to form.

12      THE WITNESS:  Before February of 2022?

13  BY MR. PASSIN:

14      Q    Correct.

15      A    No.

16      Q    Did you ever discuss Lynne Freeman with Tracy

17  Wolff prior to February 22, 2022?

18      A    No.

19      Q    Did you ever discuss Lynne Freeman with Liz

20  Pelletier?

21      MR. HALPERIN:  Objection to form -- to asked

22  and answered.

23      THE WITNESS:  Again, before February of 2022?

24  BY MR. PASSIN:

25      Q    Yes.

Confidential

1      A     No.

2      Q     All right.  So let me ask you this:  Have we

3   already discussed today every conversation you had about

4   Lynne Freeman whether it be either before or after

5   February 2, 2022?

6            MR. HALPERIN:  Object to form.

7            THE WITNESS:  That's a very broad question.  I

8   think I will need more clarification.

9   BY MR. PASSIN:

10     Q     Well, you've testified earlier about a

11  conversation you had about -- and I don't -- about -- I

12  don't even remember if it was about Lynne Freeman or if

13  it was about Masqued -- with someone after February 2,

14  2022.

15           Do you remember that?

16     A     Yes.

17     Q     What was that about?  I don't remember.

18           MR. HALPERIN:  Objection.

19           MR. PASSIN:  Is this about Freeman or about

20  Masqued?

21           MR. HALPERIN:  You can answer whether it was

22  about Lynne Freeman or about Masqued.  But you cannot

23  divulge -- I'm instructing you not to divulge defense

24  strategy items that were discussed on that call.

25           THE WITNESS:  I suppose both.

Confidential

```
 1   BY MR. PASSIN:
 2       Q    All right.  So my question is:  Other than what
 3   you already testified today at your deposition, did you
 4   have any discussions with anyone else after February 2,
 5   2022 about Lynne Freeman?
 6       A    No.
 7       Q    All right.  And same question but about
 8   Masqued.  Have you had any discussions with anyone about
 9   Masqued after February 2, 2022, other than what you
10   testified about today?
11       A    No.
12       Q    Okay.  Did you ever discuss Lynne Freeman with
13   Emily Kim -- we talked about that.  Okay.
14            Who in connection with the Crave series was the
15   expert on Alaska?
16            MR. HALPERIN:  Objection to form.
17            THE WITNESS:  Different expert.
18   BY MR. PASSIN:
19       Q    Well, the person supplied most of the factual
20   information about Alaska.
21       A    Google.
22       Q    Google.
23            Okay.  And who did the research on Google?
24       A    I don't know.  I was not involved in the
25   content editing.
```

**Confidential**

1    Q    Now, Emily Kim has notes on Alaska.

2         Were those used in connection with the books in

3    the Crave book series?

4         MR. HALPERIN:  Objection to form.

5         THE WITNESS:  I don't know.  I wasn't involved

6    in that part of the process.

7    BY MR. PASSIN:

8    Q    All right.  Are you able to describe for me the

9    contributions that Liz Pelletier made to each of the

10   books in the Crave book series?

11        MR. HALPERIN:  Objection.  Asked and answered.

12   She said she was not involved in that part of the

13   process.

14   BY MR. PASSIN:

15   Q    I was not involved in that part of the process.

16   So I really can't say.

17        Are you able to describe for me the

18   contribution that Tracy Wolff made to each of the books

19   in the Crave book series?

20        MR. HALPERIN:  Same objection.

21        THE WITNESS:  Same answer.  I was not involved

22   in the process of content editing.

23   BY MR. PASSIN:

24   Q    Typically, what is a book agent's role in his

25   or her client's writing of a book?

**Confidential**

1        MR. HALPERIN:  Objection to form.

2        THE WITNESS:  Well, you say "typically," but

3   each agent is different.  Some get very, very involved.

4   And others stay uninvolved.

5   BY MR. PASSIN:

6      **Q    When you say "Some get very, very involved,"**

7   **involved in what?**

8      A    In editing.  Content editing.  Story creation.

9      **Q    Did Emily Kim have a greater role in writing**

10  **books in the Crave book series than a typical agent**

11  **would normally have in his or her client's writing of a**

12  **book?**

13        MR. HALPERIN:  Objection to form.  Asked and

14  answered.

15        THE WITNESS:  I can't say.  I was not involved

16  in the content editing.

17  BY MR. PASSIN:

18     **Q    Do most agents typically write chapter titles**

19  **for their clients' books?**

20        MR. HALPERIN:  Objection to form.

21        THE WITNESS:  I don't know what most agents do.

22  BY MR. PASSIN:

23     **Q    Did Emily Kim create a series Bible for the**

24  **Crave book series?**

25     A    She first created the document, yes.

Stacy Abrams                                              Freeman vs.
                                                              Deebs

1           What's the truth?  Do you make edits on Google

2    docs, or do you not make edits on Google Docs?

3           MR. HALPERIN:  Objection to form.

4           THE WITNESS:  You're misunderstanding me.

5    Google Docs is being used for the series Bible only.  If

6    I make edits to the series Bible in my role as the copy

7    editor.

8           If there's a brand-new character being

9    introduced, if there's a new location, it's up to me to

10   make sure that we're consistent from book to book.

11   BY MR. PASSIN:

12       Q    I see.

13       A    So -- do I --

14           MR. HALPERIN:  Mark, excuse me.  Let the

15   witness finish.

16           THE WITNESS:  So do I edit the series Bible?

17   Yes.  That's my role as the copy editor.

18           Do I do editing on the book in Google Docs?

19   No.  As I've already stated, I used Microsoft Word.

20   BY MR. PASSIN:

21       Q    All right.  And you're sure when you make edits

22   on this series Bible in Google Docs, it doesn't --

23   they -- it doesn't send you an email relating to those

24   changes?

25           MR. HALPERIN:  Objection to form.

1          THE REPORTER:  And I'm sorry, it seems like

2     there may have been something that cut out in the

3     question.  May I have the question again, please.

4     BY MR. PASSIN:

5          Q    And when you -- excuse me.

6               And when you make edits on the series Bible on

7     Google Docs, are you sure that it doesn't send you an

8     email relating to those changes?

9          A    Yes.

10         Q    Okay.  Did Emily Kim direct you to make any

11    specific editing changes to any of the books in the

12    Crave book series?

13         A    I don't understand the question.

14              Can you be more specific?

15         Q    Did Emily Kim ever tell you to make any

16    specific editing changes to any of the books in the

17    Crave book series?

18              MR. HALPERIN:  Objection to form.

19              THE WITNESS:  No.

20    BY MR. PASSIN:

21         Q    Were specific drafts of any of the books in the

22    Crave book series made specifically for Emily Kim?

23              MR. HALPERIN:  Objection to form.

24              THE WITNESS:  I was not involved in that

25    process.  So I cannot say.

**Confidential**

1   BY MR. PASSIN:

2      **Q    Was a synopsis written for each book in the**

3   **Crave series prior to it being written?**

4           MR. HALPERIN:  Objection to form.

5           THE WITNESS:  Again, possibly.  But I was not

6   involved in that process.

7   BY MR. PASSIN:

8      **Q    Do you typically work with book agents when**

9   **editing an author's book?**

10          MR. HALPERIN:  Objection to form.

11          THE WITNESS:  Again, no agent is typical.  It

12  depends on the agent and how involved they want to be.

13  BY MR. PASSIN:

14     **Q    Well, did you work at all with Emily Kim in**

15  **editing the books -- the books in the Crave book series?**

16          MR. HALPERIN:  Objection.  Asked and answered.

17          THE WITNESS:  I was not involved in that part

18  of the process.  So I really can't say.

19  BY MR. PASSIN:

20     **Q    Well, now I'm asking about your content**

21  **editing --**

22          MR. HALPERIN:  Objection.  It

23  mischaracterizes --

24  BY MR. PASSIN:

25     **Q    -- copy editing.**

Confidential                    Freeman vs.
                                                                  Deebs

1          MR. HALPERIN:  And I would just instruct the

2     witness to read the whole chain if she needs to.

3          THE WITNESS:  Yes, if you could just give me a

4     minute.

5          Okay.

6     BY MR. PASSIN:

7     Q    Okay.  Now, it says there -- this is a text

8     message.  That's from you.  Correct?

9     A    Yes.

10    Q    ████████████████████████████████████████████

11    ████████████████████████████████████████

12    ████████████████████████████████████████████

13    ████████████████████████████████████████████

14    ██████████

15         Now, is that the Bible, or is that the

16    manuscript that you went on?

17    A    So it's neither.  So, as I mentioned, there

18    were two different things that I used Google Docs for,

19    neither of which is related to content editing.

20         The first was the series Bible, which just to

21    confirm for anyone who might not know what that is, a

22    series Bible is all the descriptions of characters' hair

23    color, eye color, spellings of names, locations, any

24    detail that you would need in Book 5 that might have not

25    popped up since Book 1.  So it is not text that is ever

Stacy Abrams

1   published.  It is just a guide for knowing how to keep

2   consistency in your series.

3            The other is chapter titles.  So this is a

4   file -- sorry if I'm speaking too quickly.  I'll slow

5   down.

6            The second is the chapter title, Google Doc.

7   This was a file that we used at the very end after the

8   books were written to write the chapter titles.  There

9   are many, many chapters in these books, over 100.  So we

10  had to be sure that the titling followed from what the

11  book -- or what each chapter was about.

12           So my job, as I was copy editing, was to leave

13  a very short description of each chapter so that Tracy

14  could go in and write the chapter title based on the

15  description of what happened in that chapter.

16           This was something that Emily was willing to

17  help out with and provide ideas.  But the final titles

18  were generally written by Tracy.

19      **Q    I don't recall you mentioning the chapter**

20  **titles before.  Maybe -- maybe -- excuse me.  Maybe I'm**

21  **wrong.**

22           MR. PASSIN:  Then can you please pull up

23  0074315.

24           And I have to find it somewhere.

25           VIDEOGRAPHER:  Standby, Counsel.

Confidential

1        A     It appears to be.

2        Q     **When you say "it appears to be," is it or is it**

3     **not?**

4        A     I believe it is.

5        Q     **Okay.  All right.  I don't have any further**

6     **questions.**

7              MR. HALPERIN:  I would like to do a very brief

8     redirect.  I'm ready to start if it's okay with Madam

9     Court Reporter and the witness.

10             THE WITNESS:  Yes.

11             THE REPORTER:  Yes.  Thank you.

12                          EXAMINATION

13    BY MR. HALPERIN:

14       Q     **Ms. Abrams, you've testified a bit today about**

15    **your involvement or lack thereof in the creation and/or**

16    **drafting of the Crave series.**

17             **Would you just please clarify once and for all**

18    **what specifically your role was on those issues?**

19             MR. PASSIN:  Objection.  Mischaracterizes her

20    testimony.

21             THE WITNESS:  Yes.  So, as I have stated, I was

22    the original sort of conduit between Tracy and Liz.  I

23    first suggested her to come over to the series and

24    helped provide feedback back and forth between her and

25    Liz for the creation of the series.

**Stacy Abrams**                                                    Freeman vs.
                                                                        Deebs

1          After that, I was uninvolved until the copy

2     editing stage where I was in charge of grammar, sense,

3     punctuation, and collating the entire thing, including

4     chapter titles into a master file.

5     BY MR. HALPERIN:

6          **Q    Earlier in the deposition, I believe you**

7     **answered a series of questions with the phrase "it's**

8     **possible."**

9          **Do you recall those questions?**

10    A    Yes.

11         **Q    Could you please clarify what you mean when you**

12    **say the phrase "it's possible."**

13         MR. PASSIN:  Objection.  Vague and ambiguous.

14         THE WITNESS:  By that, I mean questions were

15    relating to things that happened anywhere from ten to 15

16    to longer years ago.  And so when it is very hard to say

17    for certain, I felt it's possible was a truthful answer

18    to whether or not something may have occurred, but that

19    in no way means that it did occur.

20    BY MR. HALPERIN:

21         **Q    Does the phrase "it's possible," to you, mean**

22    **it's probable?**

23    A    No.

24         **Q    And one particular -- particularly important**

25    **issue I would like to ask you to clarify is earlier in**

Confidential

1    I, the undersigned, a Certified Shorthand Reporter of

2    the State of California, do hereby certify:

3    That the foregoing proceedings were taken before me

4    at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript ( X ) was ( ) was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed

19   by name.

20   Dated:  03/17/2023

21

22   _____

23        Margaret A. Smith

24        RPR, CRR, CSR No. 9733

25

1    DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Freeman vs. Deebs

3    Date of Deposition: 03/03/2023

4    Job No.: 10115785

5

6         I, STACY ABRAMS, hereby certify

7    under penalty of perjury under the laws of the State of

8    Virginia_____ that the foregoing is true and correct.

9              Executed this 25____ day of

10   April_____, 2023, at  Glenview, Illinois_____.

11

12   *Stacy Abrams*

13   Stacy Abrams (Apr 25, 2023 09:31 CDT)

14                   STACY ABRAMS

15        Completed via Remote Online Notarization using 2way Audio/Video technology

16   NOTARIZATION (If Required)

17   State of  Virginia_____

18   County of  Chesterfield_____

19   Subscribed and sworn to (or affirmed) before me on

20   this 25th____ day of April_____, 20 23,

21   by Stacy Abrams_____,      proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____  (Seal)

25   Notary Public -Lauren N Fridley
     Commission 7699515
     Expires June 30, 2024
     Notary Public of Chesterfield County, Virginia

LAUREN N FRIDLEY
ELECTRONIC
NOTARY
PUBLIC
REG # 7699515
EXPIRES
6/30/2024
COMMONWEALTH OF VIRGINIA