# EXHIBIT M

**In the Matter Of:**

*Freeman vs*

*Deebs-Elkenaney*

---

*TRENT BAER*

*March 21, 2023*

---



1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4   LYNNE FREEMAN, an individual,   )
                                    )
5              Plaintiff,           )
                                    )
6          vs.                      ) Case No.
                                    ) 1:22-cv-02435-AT
7   TRACY DEEBS-ELKENANEY P/K/A     )
    TRACY WOLFF, an individual,     )
8   EMILY SYLVAN KIM, an            )
    individual, PROSPECT AGENCY,    )
9   LLC, a New Jersey limited       )
    liability company, ENTANGLED    )
10  PUBLISHING, LLC, a Delaware     )
    limited liability company,      )
11  HOLTZBRINCK PUBLISHERS, LLC     )
    D/B/A MACMILLAN, a New York     )
12  limited liability company, and  )
    UNIVERSAL CITY STUDIOS, LLC, a  )
13  Delaware limited liability      )
    company,                        )
14                                  )
               Defendants.          )
15  _____ )

16

17

18               CONFIDENTIAL

19      REMOTE VIDEOTAPED DEPOSITION OF

20               TRENT BAER

21        TUESDAY, MARCH 21, 2023

22

23

24
    Reported in Stenotype by:
25  Cody R. Knacke, RPR, CSR No. 13691
    Job No.:  886197

2

1            REMOTE VIDEOTAPED DEPOSITION OF TRENT BAER,

2    taken before Cody R. Knacke, RPR, CSR No. 13691, a

3    Certified Shorthand Reporter for the State of

4    California, commencing on Tuesday, March 21, 2023,

5    at 9:01 a.m., Pacific time.

6

7    (All Appearances Via Videoconference.)

8    APPEARANCES OF COUNSEL:

9        For the Plaintiff Lynne Freeman:

10           DONIGER/BURROUGHS
             BY:  STEPHEN DONIGER, ESQ.
11           603 Rose Avenue
             Venice, California 90291
12           310.590.1820
             stephen@donigerlawfirm.com
13
             CSREEDER
14           BY:  MARK PASSIN, ESQ.
             1766 Wilshire Boulevard, Suite 1470
15           Los Angeles, California 90025
             310.861.2475
16           mark@csrlawyers.com

17       For the Defendants Tracy Deebs-Elkenaney p/k/a
         Tracy Wolff, Entangled Publishing, LLC,
18       Holtzbrinck Publishers, LLC d/b/a Macmillan,
         and Universal City Studios LLC:
19
             COWAN, DEBAETS, ABRAHAMS & SHEPPARD
20           BY:  BENJAMIN HALPERIN, ESQ.
                  CECE COLE, ESQ.
21           41 Madison Avenue, 38th Floor
             New York, New York 10010
22           212.974.7474
             bhalperin@cdas.com
23           ccole@cdas.com

24

25

3

```
 1   APPEARANCES OF COUNSEL:  (Continued)

 2        For Prospect Agency, LLC and Emily Sylvan Kim:

 3           KLARIS LAW
             BY:  LANCE KOONCE, ESQ.
 4           29 Little West 12th Street
             New York, New York 10014
 5           917.822.7468
             lance.koonce@klarislaw.com
 6
          Also Present:
 7
             Rick Majewski, Videographer
 8           Lynne Freeman
             Tracy Wolff
 9           Emily Sylvan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

15

```
       1   you're not beholden to have the corporate office,

       2   you're not beholden to the corporate-sponsored

       3   plans.  You are -- you can pick and choose where

       4   your location is, your rent.  You have more control

09:12  5   over your costs and expenses.

       6       Q.   And just to clarify again, what is

       7   CVG Wealth Management in this scheme that you're

       8   describing?

       9       A.   So we do business as CVG Wealth Management.

09:13 10   It's Coast Village Management, Coast Village Group

      11   Management, and it's just -- it was -- my

      12   previous -- the previous name of my firm was Baer --

      13   what was it?  Baer Investment -- not Baer Investment

      14   Group, but The Baer Consulting Group.  Prior to CVG

09:13 15   and when I am trying to bring on new advisors to

      16   work with, I needed a group name versus being a

      17   single name.

      18       Q.   So if I'm understanding correctly, CVG is

      19   your group's name, but you operate under the

09:13 20   umbrella or under the auspices of LPL Financial; is

      21   that correct?

      22       A.   Correct, correct.

      23       Q.   And your specific role, are you an

      24   investment advisor?

09:14 25       A.   Correct.
```

19

1    finished manuscript to the publisher?

2        A.   Yes.

3        Q.   A manuscript might undergo a number of

4    revisions in between when it was first submitted to

09:17 5   the agent and the final version submitted to the

6    publisher; correct?

7            MR. DONIGER:  Objection.  Incomplete

8    hypothetical.  Calls for speculation.

9            To the extent you can answer, go ahead.

09:18 10         THE WITNESS:  I don't know the extent of

11   that.

12   BY MR. HALPERIN:

13       Q.   Do you know how long it takes to publish a

14   book from the point the final manuscript is

09:18 15  submitted to the publisher or editor?

16       A.   I don't.  I don't know.

17       Q.   Would it surprise you to learn that the

18   time frame between submission of a final manuscript

19   to the printing of a book is often a year and a

09:18 20  half?

21       A.   I can't comment on that.  I don't know.

22       Q.   Do you have any reason to dispute it?

23       A.   I -- no, I don't -- I have no reason to

24   dispute it.

09:18 25      Q.   Who's Lynne Freeman?

20

```
         1      A.   My wife.

         2      Q.   Is she your first wife?

         3      A.   Yes.

         4      Q.   Are you her first husband?

09:18    5      A.   No.

         6      Q.   She was married before?

         7      A.   Briefly.

         8      Q.   Who was she married to?

         9      A.   John -- I can't recall his name.  He lives

09:19   10   in San Diego.

        11      Q.   You don't know your wife's ex-husband's

        12   last name?

        13      A.   I -- at the moment, John -- his last name's

        14   slipped my mind.  I can't -- I normally know it, and

09:19   15   I just can't recall it right now.

        16      Q.   How long was she married to him?

        17      A.   A year.

        18      Q.   Did they get a divorce?

        19      A.   I think it was an annulment.

09:19   20      Q.   Do you know why they broke up?

        21      A.   He wanted to surf and live in San Diego and

        22   she wanted to stay in Alaska.

        23      Q.   How long from when they broke up until you

        24   and her met?

09:19   25      A.   I think it was about three years,
```

24

```
          1      A.    Divorce law, family law.

          2      Q.    Does that practice include litigation?

          3      A.    Yes.

          4      Q.    Does it include copyright litigation?

09:23     5      A.    No.  No.

          6      Q.    Where is her practice located?

          7      A.    In Anchorage, Alaska.

          8      Q.    Do you know how many clients she has

          9   approximately?

09:23    10      A.    Currently?

         11      Q.    Currently.

         12      A.    I think she's put everything on hold,

         13   currently.

         14      Q.    When did she start putting everything on

09:23    15   hold?

         16      A.    When this -- when we were alerted of this

         17   issue.

         18      Q.    When you refer to this issue, do you mean

         19   the lawsuit that we're currently having a deposition

09:24    20   for?

         21      A.    (No audible response.)

         22      Q.    Has your wife ever lied to you about

         23   anything in all your years of marriage?

         24      A.    No.

09:24    25      Q.    Has she ever been wrong about anything in
```

31

```
     1   BY MR. HALPERIN:

     2       Q.   Do you understand what young adult

     3   paranormal means?

     4       A.   Yes.

09:31 5       Q.   Can you describe it to me, please.

     6       A.   It is -- they are books focused on young

     7   teens between the ages of maybe 12 and 18 or 20 that

     8   are focused on paranormal, you know, things that go

     9   bump in the night, werewolves, vampires, you know,

09:31 10  all the creepy things that come out at night.  So

    11   romance just adds additional, you know, romance

    12   scenes to it.

    13       Q.   And is young adult paranormal romance the

    14   genre that you would describe Masqued as fitting

09:32 15  into?

    16       A.   Yes.

    17           MR. HALPERIN:  And just for our court

    18   reporter, I realized I should probably clarify the

    19   spelling of Masqued.  It's M-A-S-Q-U-E-D.

09:32 20  BY MR. HALPERIN:

    21       Q.   What other young adult paranormal books

    22   have you read, besides Masqued?

    23       A.   Offhand, I mean, I have looked at Twilight,

    24   I have looked at Shiver.  I have a whole library

09:32 25  full of these things on my iPad.  Arctic Bites.  I
```

Freeman vs                                                          Trent Baer
Deebs-Elkenaney                    Confidential                    March 21, 2023

47

```
 1      A.   Correct.

 2      Q.   And one of them has blonde hair, I think

 3   you said, in your wife's book and platinum hair in

 4   Tracy Wolff's book?

10:02 5      A.   White-blonde hair in my wife's book and

 6   platinum blonde hair in Tracy's book.

 7      Q.   And is it two guys in both books that

 8   confront the heroine?

 9      A.   Two guys in both books.

10:02 10     Q.   And they both say:  "Well, well, well.

11   Looks like"?

12      A.   Correct.

13      Q.   Tracy -- sorry.  Strike that.

14           Lynne Freeman didn't create the phrase

10:02 15   "Well, well, well.  Looks like"; right?

16      A.   No.

17      Q.   Lots of books probably include the phrase

18   "Well, well, well.  Looks like."

19           MR. DONIGER:  Objection.  Calls for

10:02 20   speculation.

21           THE WITNESS:  I don't know.  I can't answer

22   that.

23   BY MR. HALPERIN:

24      Q.   Would it surprise you if the phrase "Well,

10:02 25   well, well.  Looks like" is in many different books
```

87

1    Q.   Did you have any role in selecting those

2    versions?

3    A.   My wife was the -- Lynne Freeman is the

4    writer, and she knows the material better than

11:13  5  anybody; so I defer to her on that.

6    Q.   So did she select the versions?

7    A.   Mm-hmm.

8    Q.   And she selected one version of Blue Moon

9    Rising from April 2011 and one version entitled

11:14 10  Masqued from February 2013; is that correct?

11   A.   Correct.

12   Q.   And have you read both of those versions?

13   A.   I have.

14   Q.   Did you help your wife register any of her

11:14 15  drafts of Masqued with the copyright office?

16   A.   Yes.

17   Q.   What was your role in that process?

18   A.   Helping her get them uploaded into the

19   system.

11:14 20  Q.   Do you know how many different applications

21   she filed?

22   A.   I believe four.

23   Q.   When did she submit the applications?

24   A.   Approximately September 2021.

11:14 25  Q.   When did she receive her registrations from

104

```
 1      Q.   The whole story wraps up in about

 2   nine months?

 3      A.   Well, I mean, the intended story was going

 4   to be a trilogy; so it would continue to go on from

11:36  5   there.

 6      Q.   It would have gone on longer; right?

 7      A.   Correct.

 8      Q.   In the Crave book series, do you have an

 9   understanding, having read it, of, kind of, start to

11:36 10   finish, how much time that takes?

11      A.   Approximately, no.

12      Q.   Approximately what?

13      A.   I would believe it's about a year or two

14   years, a year.

11:36 15      Q.   Are you sure?

16      A.   No, I'm not sure.

17      Q.   Let's talk a little bit more about the

18   lawsuit.  And I appreciate that I've been asking you

19   questions about things you might not know about.

11:37 20   And I'm sorry.  I don't always ask good ones.

21           It's fair to say you've been helping your

22   wife and her counsel with this lawsuit; right?

23      A.   I've -- Yes, I've assisted her in her

24   requests.

11:37 25      Q.   Did you help your wife find a lawyer?
```

105

```
     1      A.   Yes.

     2      Q.   What did you do to help her find a lawyer?

     3      A.   I just called and left messages and see who

     4   would -- I just left her number to call back and see

11:37 5   who would call back.

     6      Q.   Did you send any e-mails out to lawyers on

     7   behalf of your wife?

     8      A.   I don't believe so.  I don't recall.

     9      Q.   Did you send any e-mails out to try to find

11:38 10  a lawyer -- like to anybody to help try to find a

    11   lawyer?

    12      A.   Yes, I did.  We're friends with attorneys,

    13   friends with, you know, people that may have

    14   attorney -- other attorney, you know, business

11:38 15  owners and whatnot that are in different industries

    16   that may have access to patent attorneys or

    17   copyright attorneys, and we were just looking for

    18   referrals.

    19      Q.   I'm going to do my first attempt to add an

11:38 20  exhibit to this deposition.  The way I'm going to do

    21   this is I'm going to drop it into the chat in Zoom

    22   for you.  These kind of work multiple ways in Zoom.

    23   As you may have seen, sometimes people share their

    24   screens.  Sometimes people drop it into the chat.  I

11:38 25  tend to think it's better if you can download it and
```

114

```
 1    role has been helping out with this lawsuit.

 2        A.   I have assisted --

 3             MR. DONIGER:  Hold on.

 4             I'm going to object to the extent you're

 5    asking for things that he's done that may be at the

 6    direction of counsel and may constitute work product

 7    and are privileged.

 8             I would -- I'll let him answer to the

 9    extent he can without divulging those things, but I

10    would request that you ask a more specific question.

11             MR. HALPERIN:  I'm happy to ask more

12    specific questions, and I totally get it.

13    BY MR. HALPERIN:

14        Q.   So, for example, have you attended

15    depositions?

16        A.   Yes.

17        Q.   How many depositions have you attended?

18        A.   I guess we've had Abrams -- whatever's been

19    done thus far.

20        Q.   Have you attended every deposition thus

21    far?

22        A.   I believe so, except I have not attended

23    the Macmillan or the Entangled depositions.

24        Q.   Did you read the transcripts for those

25    depositions?
```

115

```
 1      A.   I have not.

 2      Q.   Why have you attended these depositions?

 3           Is it out of personal interest or is it to

 4   be of help?

 5      A.   I think it's help -- I've been an agent of

 6   my wife in a sense that, you know, she's been unable

 7   to attend, so I've been -- I think it's important to

 8   get things firsthand.  So that's why.

 9      Q.   Are you using your financial knowledge, in

10   any way, to help?

11      A.   No.

12      Q.   Have you reviewed documents that were

13   produced by defendants in this litigation?

14      A.   I have assisted the attorneys in their

15   review.

16      Q.   Have you reviewed text messages that were

17   produced in this litigation?

18      A.   Yes.

19      Q.   Is it fair to say you're very familiar with

20   the facts of this litigation?

21      A.   Yes.

22      Q.   And you're so familiar that Mr. Passin

23   actually asked the Court's permission to have you

24   review unredacted versions of the text; correct?

25      A.   Correct.
```

Timestamps in left margin: 11:55 (line 5), 11:55 (line 10), 11:56 (line 15), 11:56 (line 20), 11:56 (line 25)

116

```
  1         Q.   Did you help investigate the facts for this
  2    lawsuit at all?
  3              And I'm just asking did you or did you not,
  4    not the contents of any investigation.
11:56 5          MR. DONIGER:  Vague and ambiguous as to
  6    "investigate the facts."
  7              MR. HALPERIN:  I thought I worded it to get
  8    around an objection there, Steve, but I appreciate
  9    it.
11:56 10         MR. DONIGER:  Well, I mean, he said he had
  11   read some of the books.  I don't know what you mean
  12   by "investigate the facts."  He's already testified
  13   as to some things he's done.
  14             MR. HALPERIN:  Sure, totally.
11:57 15   BY MR. HALPERIN:
  16        Q.   Have you conducted any investigation of any
  17   of the defendants for this case?
  18        A.   Can you be more specific?
  19        Q.   Did you research Tracy Wolff online at all?
11:57 20        A.   I looked at her books.  I looked at her
  21   blog.  Yes, I tried to get familiar with what her --
  22   what information she had available on -- on herself
  23   out there.  I mean, she does blogs, she does social
  24   media, and I wanted to know what she was commenting
11:57 25   on.
```

Confidential

```
 1        A.   I don't -- I personally do not.

 2        Q.   And you personally have not seen any

 3   documents showing that your wife sent her a writing

 4   sample in October 2010; correct?

 5        A.   No.

 6        Q.   Have you seen any documents showing that

 7   your wife sent Kim her entire novel on November 17,

 8   2010?

 9        A.   No.

10        Q.   Going a little bit further down, there are

11   four titles in bolds and then some numbers next to

12   them.  So first the titles listed are:  Deserving of

13   Luke, Hidden Embers, and then asterisk

14   Tempest Rising, and then asterisk Tempest Unleashed;

15   correct?

16        A.   Correct.

17        Q.   What do you understand these titles to be?

18        A.   Let me go back here.  These look like her

19   adult novel -- her previous works.

20        Q.   And by "previous," what do you mean?

21        A.   Other books done by Wolff.

22        Q.   Before she wrote Crave?

23        A.   Let me look.

24             It appears so, yeah.

25        Q.   Have you read any of these books, Deserving
```

02:00 5
02:00 10
02:00 15
02:00 20
02:01 25

184

1 A. I'm not going to speculate on that.

2 Q. Put it simply, if Tracy Wolff wrote:  "I'm

3 not an idiot" in June 2010, before your wife sent

4 the manuscripts in October 2010, then this simple

02:09 5 similarity here is just a coincidence; right?

6 A. This particular one could be.

7 Q. And all 56 of the examples in this exhibit,

8 if it is true that Tracy Wolff wrote Tempest Rising

9 in June 2010, are just coincidences; right?

02:09 10 A. Well, can I ask you when was the final

11 draft of Tempest Rising?

12 Q. So as I represented -- and we can do it as

13 a hypothetical if you want.  But as I represented,

14 Tracy Wolff stated, in her sworn declaration under

02:10 15 oath, that the final draft was completed in

16 June 2010.

17   All I'm asking is if that is true -- and

18 I'm not asking you to acknowledge it's true -- but

19 if that is true, then all 56 examples in this

02:10 20 exhibit, involving Tempest Rising, would have to

21 just be coincidences; right?

22 A. If that is true.

23 Q. You can put that one away.

24   Are you familiar with a book called

02:11 25 Dark Embers by Tessa Adams?

192

1    the client had forged her signature and passed it

2    through our office.  And she filed a complaint,

3    thinking that it was my responsibility.

4         I said, well, I have documented phone calls

02:21  5    here with your -- her office, trying to get her to

6    return phone calls.  We have a phone log, check

7    logs, mail logs, all of that gets processed

8    properly.

9         And when the corporate office and the --

02:21  10    you know, the mediator, whoever was doing this

11    reviewed the file, they said, you know, I had done

12    everything properly.  This was a matter of -- for

13    the attorneys to discuss.  You know, he forged a

14    document on his wife's behalf, and it was not -- I

02:22  15    was not in the equation.  So it was unjustified,

16    correct.

17    Q.   It states on this document that after an

18    investigation, "The case was found unjustified."

19         That's what it states; right?

02:22  20    A.   Correct.

21    Q.   Sometimes it just happens in the world that

22    there are allegations and after all the facts come

23    out, the allegations are unjustified; right?

24    A.   Correct.

02:22  25         MR. HALPERIN:  I'm going to pass the

237

1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I hereby declare under penalty of perjury

4   that the foregoing is my deposition under oath; that

5   I have read same; and that I have made the

6   corrections, additions, or changes to my answers

7   that I deem necessary.

8

9          In witness thereof, I hereby subscribe my

10  name this      day of            , 2023.

11

12

13

14

15          _____

16                    TRENT BAER

17

18

19

20

21

22

23

24

25

239

```
 1   COUNTY OF LOS ANGELES, )
                            )
 2   STATE OF CALIFORNIA,   )

 3

 4          I, Cody R. Knacke, Registered Professional

 5   Reporter, Certified Shorthand Reporter in and for

 6   the State of California, License No. 13691, hereby

 7   certify that the deponent was by me first duly sworn

 8   and the foregoing testimony was reported by me and

 9   was thereafter transcribed with computer-aided

10   transcription; that the foregoing is a full,

11   complete, and true record of said proceedings.

12          I further certify that I am not of counsel

13   or attorney for either or any of the parties in the

14   foregoing proceedings and caption named or in any

15   way interested in the outcome of the cause in said

16   caption.

17          The dismantling, unsealing, or unbinding of

18   the original transcript will render the reporter's

19   certificate null and void.

20          In witness whereof, I have hereunto set my

21   hand this day:  March 24, 2023.

22

23

24

25          CODY R. KNACKE, RPR, CSR No. 13691
```

