UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al.,<br><br>Defendants. | Case No.: 1:22-cv-02435-LLS-SN |

# DECLARATION OF
# TRACY DEEBS-ELKENANEY

Tracy Deebs-Elkenaney declares as follows:

1. I am professionally known as Tracy Wolff and am one of the defendants in this case. I make this declaration in support of Defendants' Motion for Summary Judgment and in opposition to Plaintiff's Motion for Summary Judgment. The following is based on my personal knowledge and experience, and if called upon, I could testify competently to same.

2. To be abundantly clear, I believe plagiarism is abhorrent and I have never plagiarized from anyone in my entire career, nor have I done anything or used anything to help me plagiarize. As a writing and English teacher/professor, I have always stressed the importance of original work and not plagiarizing to my students. I abhor even the idea of stealing something from another author. I have never and will never do so.

3. Trying to explain how horrifying and traumatizing these last two years have been for me is difficult to put into words, even for a woman who has made a living with her writing for almost two decades. I received the demand letter from Freeman the day after hospice told me that my terminally ill mother—whom I had been caring for in my home since 2016—had weeks rather than months left to live. I spent hours feeling shell shocked, outraged, violated, and confused as I

read and re-read the demand letter and tried to understand what on earth Freeman could possibly be talking about. I had no idea who she was and had written all four Crave books without having seen, read, or even heard of her novel *BMR*. Those are hours that I should have spent with my mother, hours that I will never get back as she died two days later.

4. Instead of being able to grieve my mother's death, I was immediately thrust into a world in which I had to find an attorney and defend myself against a claim so bizarre and untrue that I barely knew where to start. Unlike Freeman, who is an attorney and has wielded her knowledge of the law like a weapon against me from the very beginning, I had no knowledge of how a legal case works beyond what I've seen on TV shows through the years. The only times I have ever been in a courtroom in my life are for jury duty and my divorce proceeding. Which Freeman uses as another weapon against me, claiming that my depression over my mother's terminal diagnosis and the demise of my 20-plus-year marriage led me to steal from her.

5. To make matters worse, Freeman's claims got more awful as the case went on. She accused me of stealing from *BMR* with potentially every book I've written since she first queried my agent, Emily Sylvan Kim, in 2010. From 2010 to now, I have written over 60 books (46 full-length novels in the paranormal romance, urban fantasy, young adult, new adult, erotic, and contemporary romance genres; eight children's books; and ten novellas, with another two novellas and eight novels predating Freeman's acquaintance with Emily).

6. One example of Freeman's baseless claims is when she accused me of stealing parts of *Tempest Rising* from her. *Tempest Rising* is my first young adult novel, written and edited in 2009 and the first half of 2010, and a book that is very important and personal to me. Freeman accused me of stealing her idea to use the name of a famous Ducati motorcycle model, among several other things just as nonsensical, like referring to a double-double burger from the famous

California fast food chain In-N-Out Burger. All of this is false because *Tempest Rising* was finished as of June 2010, before Freeman sent anything to Emily.

7. From there, Freeman's accusations have become only more bizarre and threatening. For example, she's accused me of "text spinning," which I've never even heard of before. She claims I "text spun" *BMR* with the simple plagiarism checker Turnitin.com (which I used last as an English teacher at Marian Catholic High School in 2005 to check my students' papers for plagiarism, as required by the school where I was teaching). Technology is not my strong suit at the best of times and the idea that I would have the capability or desire to "text spin" a novel in 2019 is absurd, insulting, and absolutely not true. The idea that I would do so to steal common idioms such as "well, well, well" and "oh my god" is even more absurd.

8. Even more ridiculous and insulting is Freeman's claim that I would somehow steal her characters, such as the trope of a gay, mixed race best friend. Just to be clear, that particular character, Flint Montgomery, is actually an homage to my second son—who is tall, mixed race (half-Egyptian and part Irish, as is Flint), loves dragons, and always hides his pain behind a smile or a joke. The accusation that I would steal what is clearly a reference to my son from a woman whose work I never knew existed is both laughable and incredibly violating.

9. Freeman also accuses me of spreading various subplots of hers throughout Crave, such as a character hearing a voice in her head. This idea dates back as far as Socrates (who said he let his inner voice/daemon direct his life) and the Old Testament of the Bible, where both Abraham and Moses heard God's voice in their heads. Furthermore, in *Tempest Rising*, my first YA novel, my main character Tempest hears a voice in her head from the very first pages of the prologue. Other subplots Freeman accuses me of stealing, such as a quest for magical objects and the concept of fated mates, also permeate literature from the beginning of time.

10. Freeman's claim that I resorted to stealing from her because my career was floundering at the time is equally offensive. Over the course of my career, I have written books for Penguin, Random House, Penguin Random House (after they merged), Harper Collins, Little Brown (Hachette), Harlequin, Bloomsbury, Entangled, Sourcebooks, and Abdo. I have never in my career been without a contract—a mark of success among writers. I hit the USA Today and New York Times bestseller lists as early as 2014. My YA novel *Doomed* was chosen for a prestigious state reading list. My first YA novel *Tempest Rising* went back to print six times in the two years after it was first published. I was nominated for the Romance Writers of America's RITA Award (the highest award of distinction for romance fiction) and have been nominated for and won several other awards. Long before Crave, I was asked to speak at local RWA chapters and other writing organizations around the country. I have consistently published between three and ten books a year since 2008—except for this year, when I only published two novels because I have been struggling to write since this lawsuit began.

11. I cannot begin to explain how upsetting and violating it is that Plaintiff publicly draws attention to a time in my life when I went through depression. I was depressed because of my divorce, my mother's terminal diagnosis, and the diagnosis of my oldest son with a mental illness, all at a time when I was under contract to three major New York publishers and Entangled for a total of approximately 20 books. Being depressed made me struggle with writing for the first time in my career and made me write slower and miss deadlines that were stacked tightly on top of each other at a time when I needed to write faster than I ever had. This is what I was referencing when Plaintiff quotes me saying in a text message "I was tanking my career," even though my editors were very understanding at the time. Emily has been my agent throughout my entire career, so she knew exactly what I was referencing.

12. To be clear, though, my depression never stopped me from writing well and successfully. At one point in the middle of all this, I had three full-length novels coming out in the space of a month with Penguin Random House, Harlequin, and Entangled. I also have an advanced degree in English, which I have used to teach for most of my adult life. If writing ever became too difficult, I could simply stop doing it and teach instead. Depression did not, and would not, make me resort to plagiarism. This lawsuit has been the most challenging thing ever I've experienced in terms of being able to write and I have still managed to successfully write four books without plagiarizing from anyone in any way.

13. I was no longer depressed in 2019 when Stacy Abrams contacted me (as she and other editors have done before) about writing a vampire novel. My divorce was final, my mom's health had plateaued in a decent place, my son was thriving at college and work despite his diagnosis, I had been through therapy, and I had met and was falling in love with my current partner of almost five years. Even if someone chooses to believe Freeman's absolutely false assertion that I could not write during my depression, my depression was long over by 2019 and I very much enjoyed writing Crave, which I did with absolutely no knowledge of Freeman or *BMR*.

14. I was finishing up the last of the three novellas I had been working on for Harlequin when Stacy told me that Entangled had a book fall through for their April 2020 slot (meaning the other author could not write it in time). She explained to me that Liz Pelletier wanted to fill the slot with a paranormal novel because she believed it was time for paranormals, and vampires in particular, to circle back. Stacy said that when they were thinking about writers who could write quickly and well, I immediately came to mind. That night, I finished my novella for Harlequin and then brainstormed five paranormal ideas for Entangled, including one about a boarding school for warlocks or vampires. I had been wanting to write a boarding school book forever, and was very

excited when Stacy notified me that Liz liked that idea the best. From there, Stacy met with Liz and got some notes on what Liz wanted for the book, then met with me to convey those notes. I got to work immediately and after I sent in a writing sample, we formalized the agreement for the vampire novel and series, which I titled Crave.

15. I wrote the first draft of *Crave* on my own from that point. Liz began editing *Crave* toward the end of 2019, and had me add several scenes that she believed were missing. For example, she wanted another scene between Jaxon and Grace to cement him as a swoony hero, so I wrote the scene where Jaxon sends Grace waffles (a scene that is so iconic that fans create art of it and name Instagram accounts after it).

16. Around this time, Liz also suggested the idea of using fun chapter titles, as well as the idea of putting bonus scenes at the end of each book. For one of these bonus scenes, she told me she wanted me to write about a powerful vampire with a frightening name who looked very non-threatening. She suggested something like "The Bloodletter," which was from a videogame she had been playing at the time. I loved the idea of calling a vampire the Bloodletter, so I used it for a little old lady vampire who lives in a regularly redecorated ice cave that smells like cookies.

17. I testified in my deposition that I have never read or seen any version of *BMR*, and this remains true today. I have never read any of Freeman's manuscripts or notes, nor was I ever granted access to these manuscripts or notes as she asserts. Before this case, I have never spoken to anyone about Freeman or any of her manuscripts or notes. The only knowledge that I have regarding any version of *BMR* and Freeman's notes—including that they even exist—comes solely from the papers she has filed with this Court.

18. I personally wrote the book *Crave* from approximately April/May 2019 to December 2019/January 2020. It was published in April 2020. Besides reading *Crave*, as she does

with all of my books, Emily Kim had no input whatsoever. Here's the truth about where some of the ideas in *Crave* came from:

    a. I made Grace originally from San Diego because that's where I grew up and went to high school. I've done the same in many other books (for example the main character from *Tempest Rising* is also from San Diego).

    b. I named the boarding school in *Crave* Katmere Academy as an homage to the Lion King and Harry Potter. My children and I are huge Lion King fans and my oldest son and I have been Harry Potter fans since the first movie came out when he was in first grade. So, when I was trying to come up with the name for the boarding school/castle in *Crave*, I hit on the idea of naming it after two of the things my children and I enjoyed doing together. Hogwarts is Warthog roughly reversed and our favorite characters in the Lion King are Timon and Pumba, a meerkat and a warthog. So I flipped meerkat around and came up with Katmere.

    c. I put the wolves who threaten Grace at the beginning of *Crave* in Motley Crüe t-shirts because one of my favorite students was obsessed with a Motley Crüe documentary that had come out on Netflix and constantly talked to me about. I carry this through in *Crush* by putting Xavier, another wolf, in a Guns N' Roses t-shirt.

19. I personally wrote the book *Crush* from approximately February 2020 to Summer 2020. It was published in September 2020. I wrote the dragon boneyard scene and the subsequent discussion of death the day after I had to put our beloved family dog to sleep.

20. I personally wrote the book *Covet* from approximately Summer 2020 to December 2020. It was published in March 2021. I set Giant City in the California redwoods because it was

one of my favorite places to go with my father when I was very young and we lived in San Francisco.

21.     I personally wrote the book *Court* from approximately February 2021 to October 2021. It was published in February 2022. I named the character Artelya after the nurse who was caring for my terminally ill mother at the time and Dawud, a wolf character, after my father who died when I was 22.

22.     I have always been a very quick writer—it's something that first my mother, then my teachers, friends, and professors, and then my agent, editors, and writing friends have always been shocked by. When I was in high school, I could write 20-page research papers for my AP classes in an afternoon and get As on them. I also wrote a one-act play in less than a week that was chosen to be directed and performed professionally in San Diego when I was a junior in high school. When I sit down to write a regular length novel (between 80,000-100,000 words), once I have made up the characters and the plot and struggled through the worldbuilding in the first few chapters, I can usually write the rest of the novel in approximately two weeks. The Crave novels took me a little longer because of their length, but I finished most of them quickly as well (*Court* being the exception). When I'm writing, I become laser focused on the story and it comes very fast. I am not the only author I know who can do this.

23.     I understand that Plaintiff argues that Emily, Liz, and I used Google Docs to write the Crave books together. This is absolutely false and completely misleading. As I testified at my deposition, I wrote all of the Crave books in Microsoft Word, except for the very end of the fourth book, *Court*. The end of the writing/editing process of *Court* was very challenging. My fiancée, who has lupus, nearly died of Covid and fell and broke both her wrists. At the same time, my mother's health took a sharp decline and she was in and out of the hospital. In the last few days

before *Court* had to go to print, Liz and I were working on revising the ending for the third time. So, with my mother and my fiancée both in the hospital, I had to also write many hours a day to make sure we made our deadline. I was absolutely exhausted. Emily offered to virtually sit with me while I wrote to keep me from falling asleep and to cheer me on. So, for a very short time at the very end of me revising the ending of *Court*, Emily "sat" in a Google Doc with me. While I was writing, she was helping her daughter with homework, cooking dinner, baking a cake, doing laundry, and having multiple discussions with her family members, while also talking to me if I stopped writing for too long to ensure I hadn't fallen asleep. Emily was not helping me actually write the ending of *Court*—she was **making sure I was writing**, a huge distinction. Emily also did not, under any circumstances, contribute any ideas from *BMR*.

24.  The most Emily did on Google Docs was, occasionally, correct a typo or grammar error when she was proofreading what I wrote. Besides that, all she did was regularly check to make sure I was still awake and tell me "You can do it, Tracy!" or "This is amazing!" or "Keep going! You've got this!" while I continued to write. She was also liaising with Liz while Liz contemporaneously edited, keeping Liz updated on where I was, since time was of the essence. Emily did this during the last few days when I was glued to the Google Doc, and provided accountability so that if I had to turn to an urgent issue with my mother or fiancée, I knew I had to rush back to the keyboard and not fall asleep. For Plaintiff to now scrutinize this very painful part of my life with malicious intent is devastating and only compounds the emotional pain I went through during this period.

25.  Besides those scenes in *Court*, there were only two other things we used a Google Doc for. One was for the series bible, which was used to document things like character names, eye colors, etc. To be clear, this was not a creative document. It was an internal reference document

that was added to *after* completion of each book. It has never been published. The second thing we used a Google Doc for was to keep track of chapter titles and summaries after Liz edited and sometimes moved or cut chapters. Emily did suggest ideas for some chapter titles in that document, but a lot of people suggested chapter titles. My sons, partner, agent, editor, copy editor, and best friend have all helped me brainstorm chapter titles for the Crave series through the years.

26. My deposition in this case was taken on March 7, 2023. I testified truthfully and answered all questions accurately to the best of my recollection, including regarding all documents shown to me. I have now seen that Plaintiff relies on documents that I was not shown or given an opportunity to explain at my deposition. I believe it is only fair that I be allowed to explain these documents under oath, and now do so in the remainder of this declaration.

27. Exhibit 6 to the Doniger Declaration contains excerpts of my text messages with Emily in 2020 and 2021. I was not shown any of these text messages at my deposition. Plaintiff has highlighted some of them in her motion and statement of facts. What follows is the truth about these messages:

    a. Plaintiff draws attention to a text message where I stated to Emily: "And I said crave is me, and crush and covet have been the 3 of us. It makes things so much better." (Ex. 6 at 11.) When I said this, I was referring to the fact that I wrote *Crave* with almost no discussion with Emily at all. But after *Crave* had become successful, we were on an accelerated timeline. So Emily regularly sent me coffee, bagels, or granola from Vermont, or Korean food, to keep me going or make my life and feeding my family easier (this was all during the pandemic). When I had to bow out of cooking Thanksgiving dinner to keep writing *Covet*, she sent my family Thanksgiving dinner from a local restaurant. She also proofread the books for me,

kept me motivated when I was exhausted, and acted as a go-between between Liz and me when I was frustrated (for example, when I had to write a number of scenes in *Crush* in less than a day so that Liz could start editing the book and ensure we made our deadline). Emily is the one who called me up to tell me that news and when I burst into tears because I was already writing as fast as I could, Emily calmed me down and got me back to work.

b. Plaintiff points out that I wrote to Emily on October 21, 2021: "Want tonget in a google.doc and help me write? I am falling asleep?" (Ex. 6 at 5.) This referred to her keeping me company as I revised the ending of *Court*, discussed above.

c. Plaintiff draws attention to a message where I stated to Emily: "Which isn't true. I spun all of them." (Ex. 6 at 9.) This is taken completely out of context. I was referring to the fact that I use funny phrases or song titles for chapter titles. To change them up and make them my own, I spin them ***around in my head***. For example, instead of the cliché "carpe diem," I played with it/spun it around throughout the series to be other things like Carpe Kill-Em, Carpe Seize-Em, and Carpe Queen-Em. As another example, I spun the phrase "to be or not to be" from Hamlet around in my head until I thought of To Bite or Not to Bite. I had never heard of "text spinning software" until Freeman's attorney asked me about it. I would not know how to use it, and I would never use it.

d. Plaintiff relies on a message in this exhibit to claim that my career was at one point declining, apparently referring to a message where I said to Emily: "When I was so depressed and tanking my career, you, Emily, shelly, Sherry, martin, all talked to me. So yeah, really sad." (Ex. 6 at 6.) I explained this above as well.

11

28. Exhibit 11 to the Doniger Declaration is a text message chain between Liz and Emily, where Liz wrote: "I still can't believe you said in a Google dock with her for 19 hours a day. Wow. I've been nominated you for sainthood." (Ex. 11 at 4.) I was not party to this message, but I do know what truthfully happened with respect to Emily and me spending time in a Google Doc together, and explained it above.

29. Exhibit 15 to the Doniger Declaration contains text messages between Emily and Stacy Abrams in October 2021, which was during the editing of *Court*. Emily comments in these messages that she "helped write" certain content and that she and I were "speed writing new scenes." (Ex. 15 at 5, 7.) While I was not party to these text messages, I reiterate that it simply is not true that Emily helped me actually write *Court* (or any other Crave book), or that she herself wrote any part of any Crave book. I defer to Emily on what she meant in these messages, but it appears that Emily is just using shorthand to refer to her sitting in a Google Doc with me as discussed above. Because Emily was already reading everything I wrote and correcting for typos and grammar mistakes, she probably didn't think her doing more proofreading would be helpful.

30. Exhibit 17 to the Doniger Declaration (which appears duplicative of Exhibit 7) contains text messages between Emily and me in April 2020. Again, I was not shown these at my deposition. Plaintiff draws attention to where I wrote: "People have DM'd me 1 nights in a row . . . About the fact that my agent came up with Alaska :) . . . I think they are impressed, too, at how much of a group project it is." (Ex. 17 at 4.) Let me be clear: I first came up with the idea of Alaska. Emily only later reminded me of it as I explain below. Alaska was included in the first five ideas I sent Stacy in April 2019. I have always been intrigued by Alaska and had wanted to set a book there. In my 2012 novel *Doomed*, I sent the protagonist's mother to Alaska on a business trip. I mentioned Alaska in my 2010 novel *Tempest Rising*. One of my favorite romance novels by


Sherilynn Kenyon, *Dance with the Devil*, also has a vampire who was sent to Alaska for hundreds of years.

31. I became fascinated with the Denali region of Alaska when writing my Extreme Risk snowboarder series for Random House in 2014. I watched a documentary called *The Art of Flight*, and one of the snowboarders, after being dropped by helicopter into a remote area of Denali commented that he was walking where no other human had ever walked. That intrigued me and I made a mental note to set a book—probably some kind of paranormal book—in this area in the future. When I sat down to write *Crave*, I originally put it in Seattle, which Liz did not like. Emily reminded me of locations through the years that I've mentioned wanting to use—including Vermont, Montana, and Alaska. From there, I chose Alaska. Liz had just come back from Alaska and liked the idea, so I went with it. To the extent I did not tell this full story when asked about Alaska in an interview, that was simply because I thought it was too much information.

32. Exhibit 38 to the Doniger Declaration is a transcript of an interview I gave to Hank Garner. Plaintiff highlights portions where I recounted the depression and writer's block/slow writing issues I experienced back in 2016 and 2017. I covered this above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 22, 2023

Tracy Deebs-Elkenaney