UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al.,<br><br>Defendants. | Case No.:  1:22-cv-02435-LLS-SN |

## DECLARATION OF ELIZABETH PELLETIER

I, Elizabeth Pelletier, declare as follows:

1. I am the President of Entangled Publishing, LLC, one of the defendants in this case. I make this declaration in support of Defendants' Motion for Summary Judgment and in opposition to Plaintiff's Motion for Summary Judgment. The following is based on my personal knowledge and experience, and if called upon, I could testify competently to same.

2. The allegation that Tracy Wolff and I secretly copied from Plaintiff's manuscript *BMR* to create and write the Crave series is absolutely false. As I stated repeatedly at my deposition, *BMR* had nothing whatsoever to do with the creation of the Crave series. I have never received or possessed a copy of *BMR*. I certainly have never read any version of *BMR*, nor any part of any version of *BMR*. Prior to this lawsuit, I never discussed *BMR* with Tracy, Emily Kim, Stacy Abrams, or anyone else. The first time I recall ever hearing about Plaintiff or her manuscript is when I was shown the February 2022 demand letter that Plaintiff's lawyer sent my lawyers about this case. The allegations that we plagiarized *BMR* are shocking and horrifying and go against everything I stand for as a book publisher and person.

3. There is no reason why we would want to plagiarize *BMR*. Tracy is an exceptionally talented author who has published nearly 70 books, several of which were New York Times or USA Today bestsellers before she wrote *Crave*. Tracy has the ability to create expansive worlds filled with interesting characters and scenes. Above all else she tells great stories. She also has a compelling voice—her writing is easy and fun to read, exciting, funny, and quirky. All of this is exactly what we look for in YA publishing. It makes no sense that someone as talented as Tracy would need to copy from another author, let alone someone whose manuscript was rejected by over 20 other publishers.

4. If someone told me that an author had rewritten her manuscript 50 times as Freeman claims to have done, I would never want to acquire it. That there were so many revisions itself tells me that this will not be a successful book. A book becomes a bestseller because its story is so interesting, and the author's voice so compelling, that you can't put it down. Bestselling stories strike chords that resonate with readers. This is why, for example, many stories have main characters who were orphaned—it puts the protagonist at an immediate disadvantage in a way that readers fundamentally sympathize with. An author who believes that revising her story over and over again will turn it into a bestseller just because something is "missing" simply doesn't get it. It is the storytelling that matters, not adding random sentences or making other small changes here and there in ways that don't affect how the reader bonds with characters and the story.

5. Continually revising a manuscript is actually counterproductive. Each revision "breaks" the author's original voice and could harm the storytelling. I frequently teach writing workshops and tell authors to write stories exactly as they would tell them orally to a friend, which ensures you use your natural voice. The #1 rule I give writers is to not over-edit. Storytelling has a natural cadence. While editing and "tightening" may be helpful for more formal writing, every

time you edit, you dilute your natural storytelling voice (something even Plaintiff's expert Reiss acknowledges is important). (Reiss Rep. ¶ 32.) The Crave books read like compelling stories told to a friend. I haven't read *BMR*, but the fact that it was revised 50 times alone tells me it does not.

6.      I cannot fathom why anybody would believe that Tracy or I combed through 30 different versions of *BMR* to datamine supposed nuggets to use in the Crave series. For one thing, this would have taken forever. We were under enormous time pressure to complete the Crave books due to the escalating print schedule I explained at my deposition (when there is a demand for quick sequels of a successful book). It would have been physically impossible to do what Plaintiff accuses us of under our tight schedule. But even if we wanted to comb through someone else's work for supposed gems—and we never would do that because it is both wrong and fundamentally contradicts how great stories are told—the last thing we would use as source material is a 50-times-revised unpublished manuscript that was rejected by over 20 book publishers.

7.      I stand by everything I said at my deposition about the true creation of the Crave series. I came up with the idea for a "Harry Potter meets Twilight" series that would bring back vampire romance in a fun and fresh way, and thought the timing was ripe because I had read an article explaining that consumer trends recycle every ten years and it had been ten years since *Twilight*. During this time, another author dropped out of our printing lineup and we needed to fill the empty spot. I asked my editors to think of potential authors; Stacy recommended Tracy, and the rest is history. Plaintiff and *BMR* had nothing do with this.

8.      As I explained at my deposition, Alaska was Tracy's idea, and I liked it because I had just returned from an Alaskan cruise. We absolutely did not steal that idea (or any other idea) from Plaintiff. Anyway, while I am not a lawyer, I don't see how Freeman has a monopoly on the

3

idea of setting a paranormal romance series in Alaska. Entangled has published other books set in Alaska, including the Arctic Bite vampire series by N.J. Walters. We've also published the Captivity, Alaska series by Samantha Beck, where the heroine moves from Southern California to Alaska. There are only a few places in the world that make great settings for vampire stories, since vampires need to avoid the sun. For example, *Twilight* is set in Forks, WA—a dark and overcast place. Authors who don't want to set vampire stories in remote places like Alaska or Forks often choose locations steeped in lore, like New Orleans.

9. Plaintiff seems to be focusing the fact that I wrote synopses of certain Crave books. It is true that I (with Tracy) wrote the synopsis of *Crush* and that I wrote the synopses of *Covet* and *Court*, to help provide plot and character roadmaps to guide Tracy's writing of those books (there was no formal written synopses for *Crave*). There is nothing unusual or wrong with this. This also has nothing to do with *BMR*.

10. As I explained at my deposition, I communicate with Emily Kim frequently when we are in the middle of editing one of her author's books. The Crave books were no exception. But this does not mean that we ever discussed *BMR* or that Emily provided any ideas or content from *BMR*. Prior to this lawsuit, Emily and I never discussed Plaintiff or *BMR* even once, period.

11. As to Emily's actual role during the writing and editing process, I stand by what I said at my deposition. Emily is an amazing cheerleader and motivator, and she is particularly great at relaying my often-heavy content edits to the author, to make sure I haven't made changes that the author would disagree with—especially given that authors often won't see my edits before a book goes to print. Emily also sometimes helps with more logistical issues, such as keeping track of details like character hair and eye color, to help us make sure things like that stay consistent across multiple books in a series. But Emily absolutely does not write the books or make

substantive edits to them. That's what the author (Tracy) and I do. Emily might sometimes suggest very minor changes to sentences or paragraphs here and there when she notices a typo or sees something she thinks the author won't like. We may or may not accept these minor suggestions, but they are ultimately trivial—especially in books that are around 500-700 pages long.

12. I discuss some of Plaintiff's supposed evidence of Emily's involvement below. Note up front that Plaintiff is mostly relying on messages we sent during the editing of the fourth Crave book, *Court*. I don't see how any of this is relevant to the earlier books, especially *Crave*. As I explained at my deposition, *Court* was unique because we had planned it to be the final book in the series, but we couldn't tie up all the loose ends and needed to expand the series to six books. *Court* is much longer than each of the first three books (this isn't obvious from the page counts because we shrunk the font to use fewer pages, but *Court* is the longest book by word count and substantially longer than *Crave*). So we were "all hands on deck" during certain particularly hectic points of the *Court* editing process. This explains why there are more messages during *Court* where Emily might put a second set of eyes on things. She did not, however, write any of *Court* or suggest more than trivial edits to discrete paragraphs here and there (in a roughly 260,000-word book).

13. Through this litigation, I was reminded that Emily sent a short pitch email about *BMR* to my Entangled email address in October 2013. I stand by what I said about this document at my deposition. I have no recollection of ever reading Emily's pitch when she sent it. My practice when I want to delegate responding to a pitch email is to forward it to one of my editors who is actively acquiring manuscripts. This email chain shows I did that here—and based on the fact that I forwarded to Stacy Abrams without comment, I seriously doubt that I even read the whole pitch email at the time. As Stacy later told Emily in the email chain, I was closed to acquisitions at the time (Stacy was not). I don't know what Stacy did after I forwarded her this email. She certainly

5

never gave me a copy of *BMR* or talked to me about it. Again, I have never seen or read *BMR*, and never spoke to Stacy, Emily, Tracy, or anyone else about it before this lawsuit.

14. As I explained at my deposition, I was the content editor for the Crave books, which means editing for big-picture substance issues like story structure and character arcs. Stacy was only the copy editor, which means editing for things like typos and grammar. Stacy did not write any part of the Crave books or contribute to them substantively.

15. Entangled has never had a physical office. We work remotely from around the country (for example, me in Austin and Stacy in Chicago). Because there is no physical office, there is no central physical slush pile where hard copies of submitted manuscripts are kept and can be accessed by company-wide employees.

16. Plaintiff points out that *Crave* was Entangled's highest grossing book ever. As of the date of my deposition, it was true that *Crave* had generated more gross revenue for Entangled than any other book we had published (this is no longer true today). Plaintiff fails to mention where I clarified that *Crave* was not our most ***profitable*** book—there is a big difference between revenue and earnings. Regardless, *Crave's* success has nothing to do with the allegation that we copied *BMR*. I attribute the success to Tracy being a great storyteller and me being right that the YA market was ripe for a fresh new take on vampire romance.

17. Plaintiff claims that Tracy is not a "fantasy writer." I don't know what Plaintiff is attempting to imply with this or how it is relevant. However, to clarify based on my experience as a book publisher, the Crave series is not fantasy. Fantasy involves other worlds and realities (such as Middle Earth in the Lord of the Rings series). Paranormal involves supernatural elements set in the "real world." The Crave series is best classified as paranormal, not fantasy. Anyway, it can

actually work out great when authors try new genres because it presents something fresh. Entangled's #1 book right now is written by a non-fantasy author.

18.     My deposition in this case was taken on March 9, 2023. I testified truthfully and answered all questions accurately to the best of my recollection, including regarding all documents shown to me. I have now seen that Plaintiff's summary judgment motion relies on additional documents that I was not shown or given an opportunity to explain at my deposition. This is surprising considering my deposition lasted just over three hours. Since I wasn't asked about these documents, I think it's only fair that I be allowed to explain them under oath, and now do so in the remainder of this declaration.

19.     Exhibit 8 to the Doniger Declaration is a text message chain where Tracy, Emily, and I were marveling at how successful *Crave* was turning out to be, and the media attention from it. In the portion that Plaintiff focuses on, we talked about how Tracy was about to give an interview about *Crave* and what she might say when asked about her inspiration for the series. I wrote: "Say WHATEVER you want, I don't care, just try not to get too far off of when it was actually written and that I at least came to you to write a vampire book, b/c that's been stated in two town halls. Otherwise, the world is your oyster." (Ex. 8 at 8.) This was completely unrelated to *BMR*. I certainly was not instructing Tracy to cover up the absurd notion that we somehow got the idea for *Crave* from *BMR*. Instead, I was encouraging Tracy to be honest about where the idea for Crave came from, but also didn't want to take public credit for it.

20.     Exhibit 12 to the Doniger Declaration is a text message chain between me and Emily from around December 2020, which was during the editing of *Covet*. Plaintiff highlights where Emily says "Anyway, mine is at your service" (referring to her brain) and "I can be a good repetitive word thesaurus too!" (Ex. 12 at 10.) I have no idea what Emily was referring to when

7

she wrote that her brain was at my service, but this could not have referred to writing or editing, which was not her role. The same goes for her offering to be a thesaurus—thinking of synonyms is not writing in substance. What Plaintiff doesn't focus on is where Emily later says "Tracy is writing with her phone off for a while by the way" or where I say "And Tracy, holy fuck, she can write all the feels. The characters just feel like real people." (Ex. 12 at 5.)

21.     Exhibit 18 to the Doniger Declaration is more of the same, this time apparently during the editing of *Crush*. It shows Emily being a cheerleader and liaising between me and Tracy, not Emily writing or substantively editing. I sometimes bounced ideas off Emily and asked for her thoughts on very specific minor points, since as Tracy's longtime literary agent, she knows what Tracy will and will not like. But that isn't the same as her writing or doing anything in substance. To the extent Emily mentions cutting lines or providing notes, I believe this just referred to her serving as the go-between with me and Tracy and looking out for when Tracy might not like my edits. And as with all our text messages, this chain doesn't mention *BMR*.

22.     Exhibit 20 to the Doniger Declaration is a text chain between me and Emily from October 2021, which was during the writing and editing of *Court*. This again just shows Emily's role as a cheerleader and liaison. To the extent Emily mentions adding things to a Google Doc, that likely meant for the purpose of conveying things from me to Tracy. We did it that way because we wanted Tracy to keep her head down during writing and didn't want to kill her momentum. Of course, we don't mention *BMR* in this message either.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 22, 2023

_____
Elizabeth Pelletier