# EXHIBIT PP

Videotaped Deposition of

# Emily Kim

March 16, 2023

Freeman

vs.

Deebs



www.aptusCR.com | 866.999.8310

**Emily Kim**

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ----------------------------------------x
    LYNNE FREEMAN, an individual,
3
                          Plaintiff,
4
5              -against-        Case No:
                               1:22-cv-02435-LLS
6

7

8   TRACY DEEBS-ELKENANEY, P/K/A
    TRACY WOLFF, an individual,
9   EMILY SYLVAN KIM, an individual
    PROSPECT AGENCY, LLC, a New Jersey
10  Limited liability company,
    ENTANGLED PUBLISHERS, LLC, a
11  Delaware limited liability company
    HOLTZBRINCK PUBLISHERS, LLC
12  D/B/A MACMILLAN, a New York
    Limited liability company, and
13  UNIVERSAL CITY STUDIOS, LCC,
    A Delaware limited liability company,
14                        Defendants.
    ----------------------------------------x
15

16         EXAMINATION BEFORE TRIAL of EMILY KIM, taken

17  by the Plaintiff, pursuant to Notice, held at 885 Third

18  Avenue, 20th Floor, New York, New York 10022, on March

19  16, 2023, at 9:00 a.m., before a Notary Public of the

20  State of New York.

21
    *********************************************
22

23

24  Job No. 10116380

25
```

```
 1   A P P E A R A N C E S:

 2     CSREEDER, PC
                 Attorneys for Plaintiff
 3               11766 Wilshire Boulevard, Suite 1470
                 Los Angeles, California 90025
 4
       BY:      MARK PASSIN, ESQ.
 5               mark@csrlawyers.com

 6
       DONIGER/BURROUGHS
 7               Attorneys for Plaintiff
                 603 Rose Avenue
 8               Venice, California 90291

 9     BY:      STEPHEN M. DONIGER, ESQ.

10
       KLARIS LAW
11               Attorneys for Defendants
                 29 Little West 12th Street
12               New York, New York 10014

13     BY:      LANCE KOONCE, ESQ.
                 ZACH PRESS, ESQ.
14

15     COWAN, DeBEATS, ABRAHAMS & SHEPPARD LLP
                 Attorneys for Defendants
16               41 Madison Avenue, 38th Floor
                 New York, New York 10010
17
       BY:      CECE COLE, ESQ. Via Zoom
18               ccole@cdas.com

19
       ALSO PRESENT:
20
       JASON DUBINSKI-Videographer
21                    Aptus
       TRENT BAER
22     LYNNE FREEMAN via Zoom

23

24

25
```

**Emily Kim**

**Freeman vs.
Deebs**

```
 1                          INDEX

 2   WITNESS                EXAMINATION BY              PAGE

 3   Emily Kim              Mr. Passin                  9; 245

 4   Emily Kim              Mr. Koonce                  242

 5

 6

 7                         EXHIBITS

 8   EXHIBIT                DESCRIPTION                 PAGE
     Exhibit 84             Wolff_0097494-99            19
 9
     Exhibit 85             Wolff_0095695-98            23
10
     Exhibit 86             Kim00352321 and 00352413    32
11
     Exhibit 87             Kim00352651-54              43
12
     Exhibit 88             Kim00075469-71              44
13
     Exhibit 89             Kim00351461-4               49
14
     Exhibit 90             Kim00351468                 54
15
     Exhibit 91             Lf 126632-33                57
16
     Exhibit 92             Kim00189607-11              65
17
     Exhibit 93             Kim00183740                 71
18
     Exhibit 94             Kim00189670-1               72
19
     Exhibit 95             Kim00190352                 74
20
     Exhibit 96             Kim00190557                 75
21
     Exhibit 97             Kim00191198-99              77
22
     Exhibit 98             Lf 036942-44                81
23
     Exhibit 99             Kim00184553-60              84
24
     Exhibit 100            Kim00185178-87              88
25
```

**Emily Kim**

| | | | |
|---|---|---|---|
| 1 | Exhibit 101 | Kim00186377-84 | 91 |
| 2 | Exhibit 102 | Kim00187056-60 | 92 |
| 3 | Exhibit 103 | Kim00156008-14 | 96 |
| 4 | Exhibit 104 | Kim00185194-765 | 103 |
| 5 | Exhibit 105 | Kim00347988 and Kim00348541 | 110 |
| 6 | Exhibit 106 | Kim00163954-5 | 142 |
| 7 | Exhibit 107 | Kim00352321 and 00352513 | 173 |
| 8 | Exhibit 108 | Kim00347758-93 | 185 |
| 9 | Exhibit 109 | Kim00134635-41 | 188 |
| 10 | Exhibit 110 | Kim00138447-56 | 192 |
| 11 | Exhibit 111 | Kim00139438-39 | 193 |
| 12 | Exhibit 112 | Kim00140044 | 195 |
| 13 | Exhibit 113 | Kim00143915-20 | 196 |
| 14 | Exhibit 114 | Kim00154158 | 197 |
| 15 | Exhibit 115 | Kim00195362-64 | 198 |
| 16 | Exhibit 116 | Kim00198163 | 199 |
| 17 | Exhibit 117 | Kim00198164-87 | 200 |
| 18 | Exhibit 118 | Kim00159810 | 202 |
| 19 | Exhibit 119 | Lf 126056 and Wolff_0092136 | 205 |
| 20 | Exhibit 120 | Lf 125866 and Wolff_0092404 | 208 |
| 21 | Exhibit 121 | Lf 125664 and Wolff_0092225 | 211 |
| 22 | Exhibit 122 | Lf 126100 and Wolff_0092325 | 213 |
| 23 | Exhibit 123 | Lf 126027 and Entangled_0014491 | 215 |
| 24 | Exhibit 124 | Lf 125813 and Entangled_0014588 | 216 |
| 25 | (Exhibits retained by Reporter.) | | |

www.aptusCR.com

```
 1                221.  UNIFORM RULES FOR THE
                     CONDUCT OF DEPOSITIONS
 2

 3        221.1 Objections at Depositions

 4             (a) Objections in general.  No objections
          shall be made at a deposition except those, pursuant to
 5        subdivision (b), (c) or (d) of Rule 3115 of the Civil
          Practice Law and Rules, would be waived if not
 6        interposed, and except in compliance with subdivision
          (e) of such rule.  All objections made at a deposition
 7        shall be noted by the officer before whom the deposition
          is taken, and the answer shall be given and the
 8        deposition shall proceed subject to the objections and
          to the right of a person to apply for appropriate relief
 9        pursuant to Article 31 of the C.P.L.R.
               (b) Speaking objections restricted.    Every
10        objection raised during a deposition shall be stated
          succinctly and framed so as not to suggest an answer to
11        the deponent and, at the request of the questioning
          attorney, shall include a clear statement as to any
12        defect in form or other basis of error or irregularity.
          Except to the extent permitted by C.P.L.R. Rule 3115 or
13        by this rule, during the course of the examination
          persons in attendance shall not make statements or
14        comments that interfere with the questioning.

15        221.2 Refusal to answer when objection is made

16             A deponent shall answer all questions at a
          deposition, except (I) to preserve a privilege or right
17        of confidentiality, (ii) to enforce a limitation set
          forth in an order of the court, or (iii) when the
18        question is plainly improper and would, if answered,
          cause significant prejudice to any person.  An attorney
19        shall not direct a deponent not to answer except as
          provided in C.P.L.R. Rule 3115 or this subdivision.  Any
20        refusal to answer or direction not to answer shall be
          accompanied by a succinct and clear statement of the
21        basis therefor.  If the deponent does not answer a
          question, the examining party shall have the right to
22        complete the remainder of the deposition.

23

24

25
```

1           221.   UNIFORM RULES FOR THE
                CONDUCT OF DEPOSITIONS
2

221.3 Communication with the deponent
3           An attorney shall not interrupt the deposition
    for the purpose of communicating with the deponent
4   unless all parties consent or the communication is made
    for the purpose of determining whether the question
5   should not be answered on the grounds set forth in
    section 221.2 of these rules and, in such event, the
6   reason for the communication shall be stated for the
    record succinctly and clearly.
7

8           IT IS FURTHER STIPULATED AND AGREED that the
    transcript may be signed before any Notary Public with
    the same force and effect as if signed before a clerk or
9   a Judge of the court.

10          IT IS FURTHER STIPULATED AND AGREED that the
    examination before trial may be utilized for all
11  purposes as provided by the C.P.L.R.

12          IT IS FURTHER STIPULATED AND AGREED that all
    rights provided to all parties by the C.P.L.R. cannot be
13  deemed waived and the appropriate sections of the
    C.P.L.R. shall be controlling with respect hereto.
14

15          IT IS FURTHER STIPULATED AND AGREED by and
    between the attorneys for the respective parties hereto
    that a copy of this examination shall be furnished,
16  without charge, to the attorneys representing the
    witness testifying herein.
17
                    - oOo -
18

19

20

21

22

23

24

25

1          EMILY KIM

2          THE VIDEOGRAPHER:  Good morning.  We

3    are now on the record, today's date is March

4    16, 2023, and the time is approximately 9:00

5    a.m.  This is the video deposition of Emily

6    Kim, being taken in the matter of Lynne Freeman

7    versus Tracy Deebs- Elkenaney, P/K/A Tracy

8    Wolff.  We are at 885 Third Ave., New York, New

9    York, 10022.  My name is Jason Dubinski of

10   Aptus Court Reporting.

11          Will counsel please identify themselves

12   and state who you represent.

13          MR. PASSIN:  Good morning.  Mark Passin

14   of CS Reeder, PC.  I represent the plaintiff,

15   Lynne Freeman, and with me today is Trent Baer.

16          MR. DONIGER:  Steve Doniger, Doniger

17   Burroughs also representing the Plaintiff.

18          MR. KOONCE:  Lance Koonce with Klaris

19   Law representing Emily Sylvan Kim and Prospect

20   Agency, and with me --

21          MR. PRESS:  Zach Press from Klaris Law,

22   representing Prospect Agency, LLC and Emily

23   Sylvan Kim.

24          MS. COLE:  And my name is CeCe Cole and

25   I'm from the firm Cowan, DeBaets, Abrahams and

1          EMILY KIM

2          Sheppard, appearing on behalf of defendants

3          Entangled Publishing, LLC, Universal, MacMillan

4          and Tracy Deebs-Elkenaney.

5               THE VIDEOGRAPHER:  The Court Reporter

6          today is Brooke Perry.  Will you please swear

7          in the witness.

8    E M I L Y   K I M,  the witness herein, having been

9    first duly sworn by a Notary Public of the State of New

10   York, was examined and testified as follows:

11   EXAMINATION BY

12   MR. PASSIN:

13   **Q.      State your name for the record, please.**

14   A.      Emily Kim.

15   **Q.      State your address for the record, please.**

16   A.      551 Valley Road PMB 377 Upper Montclair, New

17   Jersey 07043.

18               MR. PASSIN:  Before we start, I just

19          want to make one comment for the record,

20          Mr. Koonce's firm produced some documents last

21          night at 7:24 p.m., New York time.  I have not

22          had a chance to look at those documents.  It

23          may be and it may not be that I need to ask

24          some follow up questions based on those

25          documents, so I reserve my right to call the

1                          **EMILY KIM**

2   for what years?

3   A.      I don't recall the exact years I used my

4   computers, but immediately preceding this computer, I

5   used a MacBook Air.

6   **Q.      And where is that computer now?**

7   A.      It broke and we recycled it.

8   **Q.      So you used that computer until what year?**

9   A.      Until I started using my current computer.

10  **Q.      Approximately what year is that though?**

11  A.      Maybe 2017.

12  **Q.      Do you maintain backups for your computers?**

13  A.      No.

14  **Q.      Do you access your e-mail from the web or from**

15  **your computers?**

16  A.      From the web.

17  **Q.      Do you know what type of e-mail programs on**

18  **your MacBook?**

19  A.      I access it via the web.

20  **Q.      Um, okay.  Understood.  So I take it you have**

21  **probably Apple mail on it, but you don't use it?**

22  A.      I think I deleted that app, but I'm not sure.

23  **Q.      But you don't recall ever using the Apple mail?**

24  A.      Never.

25  **Q.      What kind of software did you use to edit the**

1                        EMILY KIM

2   books in the Crave book series?

3                        MR. KOONCE:   Object to the form of the

4            question.

5   A.     I didn't edit the books in the Crave series.

6   Q.     I've seen plenty of documents where you are on

7   Google Docs working on the book, I've also seen

8   documents where you talk about helping Tracy Wolff write

9   books on Google Docs.  So, I'll rephrase it, and we'll

10  get into it in more detail in the future.

11         What kind of software did you use to do any

12  work whatsoever on the Crave book series?

13                       MR. KOONCE:   Object to the form.  I

14           also object to testifying on the record by

15           counsel.

16                       You can answer.

17  A.     I've used Microsoft Word and Google Docs.

18  Q.     What did you use Microsoft Word for?

19  A.     To read portions of the Crave series.

20  Q.     So when you said "read portions of the Crave

21  series", meaning that someone would write portions and

22  then you would read it?

23  A.     Correct.

24  Q.     And who would be the person that would write

25  them?

```
1                        EMILY KIM

2    A.      Tracy Wolff.

3    Q.      Would you both have access to the same

4    Microsoft Word or would she just e-mail it to you?

5    A.      She would e-mail it to me.

6    Q.      And what would you use Google Docs for?

7    A.      We use Google Docs to create a series bible,

8    work on chapter titles, and on occasion, Tracy would

9    work in Google Docs and I would read her writing from

10   Google Docs.

11   Q.      When you say, "on occasion Tracy would work on

12   Google Docs" -- first of all, when you refer to Tracy,

13   you're referring to Tracy Wolff, correct?

14   A.      Yes.

15   Q.      So she sometimes wrote on Google Docs?

16   A.      Yes.

17   Q.      How often would she write on Google Docs?

18   A.      She didn't start writing on Google Docs until

19   the ending of the book Court.

20   Q.      And then how often did she write on Google

21   Docs?

22   A.      Just for the last few chapters.

23   Q.      And what about the books after that?

24   A.      She would, again, work on Microsoft Word, and

25   maybe for the last few chapters work on Google Docs.
```

1               EMILY KIM

2   those chapters, she would have to give you permission to

3   enter Google Docs to read it; isn't that correct?

4   A.      I think what you do is you share a link and

5   then the person can join the Google Docs.

6   Q.      Do you have any online subscription to any

7   editing software?

8   A.      No.

9   Q.      So you mentioned that you only used Google Docs

10  to, sort of, babysit Tracy Wolff while she wrote.

11  A.      I would say keep her company.

12  Q.      Did you get involved in giving her suggestions?

13  A.      Not really.  Usually I would say, Are you

14  awake, kind of thing.

15              MR. PASSIN:  Let's take a look at some

16          documents.  I'd like to mark as Exhibit 84 a

17          document that's Bate stamp numbers Wolff

18          0097494 through 0097498.

19              (Whereupon, WOLFF_0097494-99 was marked

20          as Exhibit 84, for identification, as of this

21          date.)

22  Q.      Can you review the document, please?

23  A.      (Witness complies.)

24              MR. PASSIN:  Lance, just so you know,

25          this one is consecutive Bates numbers, but

1                          **EMILY KIM**

2    A.      That's correct.

3    **Q.      And I want to read to you the highlighted text**

4    **message towards the bottom.  "I still can't believe you**

5    **sat in a Google Doc with her for 19 hours a day.  Wow.**

6    **I've nominated you for sainthood."**

7            **Do you know what Ms. Pelletier is referring to**

8    **there?**

9    A.      Yes, at the end of Court, I sat with Tracy in

10   Google Doc to give her motivation and to help her get

11   through the hardest part of Court.

12   **Q.      And did you sit with her for 19 hours a day?**

13   A.      Probably.

14   **Q.      For how many days?**

15   A.      Maybe one or two.

16   **Q.      Did you make any comments during that period of**

17   **time?**

18   A.      Can you please explain what you mean by

19   comments?

20   **Q.      Did you make any comments to Court, suggested**

21   **changes?**

22   A.      Again, I told you it just would be in the

23   course of keeping someone company and saying, great job,

24   I really like what you did here; that kind of comment.

25   **Q.      Well, she asked you at various times to help**

1                          EMILY KIM

2    write.   I mean did you help write or did you give her

3    comments on suggested changes?

4                      MR. KOONCE:   Object to form.

5            Mischaracterizes her testimony.

6    A.      I did not help her write the book.

7    Q.      Did you help her write this particular part of

8    Court?

9    A.      Just to be clear, she wrote the book, and I

10   kept her company.

11                      MR. PASSIN:   I understand that, but

12           you're not answering the question.   We're going

13           to be here all day.

14                      MR. KOONCE:   Objection.

15                      MR. PASSIN:   Can you read the question

16           back, please

17            (Whereupon, the record was read by the

18   reporter.)

19   A.      I kept her company and I provided encouragement

20   and she wrote the book.

21   BY MR. PASSIN:

22   Q.      Did you provide her any suggested edits?

23   A.      I don't believe so.

24   Q.      Did you provide her any comments?

25   A.      I think I probably offered a comment or two.

1                          EMILY KIM

2    Like I like what you're doing here, kind of comment.

3    **Q.        Excuse me.**

4    A.        Like an encouraging comment, that kind of

5    comment.

6                          MR. PASSIN:  Next I'd like to mark

7              another text message.  Let's mark this as 86.

8                          (Whereupon, KIM00352321 and 00352413

9              was marked as Exhibit 86, for identification,

10             as of this date.)

11   **Q.        Please take a look at this Exhibit.**

12   A.        Okay.

13   **Q.        Is this a text exchange between you and Stacy**

14   **Abrams?**

15   A.        Correct.

16   **Q.        And did you have this exchange with Stacy**

17   **Abrams on October 24, 2021?**

18   A.        Again, I can see in the -- actually I don't

19   really see that.

20   **Q.        Do you see above each of the text messages?**

21   A.        Okay, yes.

22   **Q.        And do you have any reason to dispute that?**

23   A.        No.

24   **Q.        I'd like to read to you the top text message**

25   **from you to Stacy Abrams.  "I'll give you access to the**

```
 1                        EMILY KIM
 2    Q.        And this was Court?
 3    A.        Court.
 4    Q.        Who had access to the Google Docs in connection
 5    with the books in the Crave book series?
 6                        MR. KOONCE:   Objection.
 7    A.        Can you be more specific?
 8    Q.        Well, with respect to your Google Docs account,
 9    who had access to that account?
10    A.        My particular Google Docs?
11    Q.        Yes.
12    A.        Me and Ellen.
13    Q.        You and who?
14    A.        My assistant Ellen.
15    Q.        And then you could either send a link to
16    someone or you could invite them onto Google Docs?
17    A.        Correct.
18    Q.        And on occasion you would invite Tracy Wolff
19    onto Google Docs, correct?
20    A.        Correct.
21    Q.        And on other occasions, would you invite other
22    people?
23    A.        Correct.
24    Q.        And who would you invite in connection with the
25    Crave book series?
```

**EMILY KIM**

1

2  A.      It looks like I invited Stacy Abrams and I know

3  in connection with the Crave bible other people were

4  invited.  I can't tell who they are off the top of my

5  head.

6  **Q.      Well what about the books?  Did you sometimes**

7  **invite Ms. Pelletier on your Google Docs in connection**

8  **with the books in the Crave book series?**

9  A.      To the best of my recollection, Liz Pelletier

10  never worked in Google Docs.

11  **Q.      Did you use the track change feature in Google**

12  **Docs?**

13  A.      No.

14  **Q.      Was there any sort of access log in connection**

15  **with Google Docs?**

16  A.      I'm not sure.

17  **Q.      There may have been?**

18  A.      I'm not proficient in computers enough to know

19  exactly what an access log is.

20  **Q.      If you had such a log, would you turn it over**

21  **to your e-discovery people?**

22  A.      I turned everything, I gave access to my

23  accounts to my e-discovery people.

24  **Q.      Can you still access your Google Docs in your**

25  **computer?**

```
1                        EMILY KIM
2   A.      Correct.
3   Q.      And what were your duties as her assistant?
4   A.      I reviewed contracts.  I communicated with
5   clients.  I read manuscripts.  I answered the phone.  I
6   talked to Robin about issues that came up in her daily
7   work.  I helped order lunch for the agency.
8   Q.      While you were there, did you discover Twilight
9   and the Slash Fics?
10  A.      No, I did not.
11  Q.      Did you ever tell Lynne Freeman that?
12  A.      No.
13  Q.      And then in 2005, you started Prospect Agency?
14  A.      Correct.
15  Q.      What type of entity is Prospect Agency?
16  A.      It's an LLC.
17  Q.      And who are the members?
18  A.      I am the member.
19  Q.      You are 100 percent the one -- the only member
20  and own 100 percent membership?
21  A.      I'm not 100 percent sure about that.
22  Q.      Who else would own a membership interest in it?
23  A.      I believe that my husband may own a membership,
24  but I'm not sure.
25  Q.      Do you have any idea what percentage he owns?
```

1                          **EMILY KIM**

2   A.        No.   I think I'm the sole member, but I just

3   want to be clear that I'm not sure.

4   **Q.        What does Prospect Agency do?**

5   A.        We are a literary agency.

6   **Q.        What do you personally do at Prospect Agency?**

7   A.        I represent clients and I manage the agency.

8   **Q.        What do you typically in connection with a**

9   **client's manuscript from submission to Prospect Agency**

10  **to publication of the final book?**

11                    MR. KOONCE:   Object to the form.

12  A.        There's no typical process for any given

13  client.

14  **Q.        Well, explain to me the various different**

15  **scenarios that may occur.**

16                    MR. KOONCE:   Object to the form.

17  A.        Sometimes a client comes to me with the

18  contract and I help them review the contract and manage

19  the relationship with their editor.   Sometimes a client

20  will come to me with a project and I will help edit it

21  and then try to sell it.   Sometimes a client will come

22  to me with a project, but will put that project aside

23  and work on another project.   Those are three common

24  scenarios.

25  **Q.        And what scenario would you put Tracy Wolff in?**

1                            EMILY KIM

2    Q.      What were the circumstances in which you met

3    Lynne Freeman?

4    A.      I do not recall.

5    Q.      You have no recollection?

6    A.      No.

7    Q.      Have you ever met Lynne Freeman face to face?

8    A.      Yes, at the Romance Writers Convention.

9    Q.      We'll discuss that a little later.

10           Is that the only time you met her face to face?

11   A.      I believe so.

12                   MR. PASSIN:  Next I'd like to mark as

13           next in order as Exhibit 87 an agreement for

14           artists.

15                   (Whereupon, KIM00352651-54 was marked

16           as Exhibit 87, for identification, as of this

17           date.)

18   Q.      Are you familiar with this document?

19   A.      Yes.

20   Q.      Can you please turn to page 4 of the document,

21   which is Bate stamped Number Kim 00352654.

22           Is that your signature that appears above your

23   name?

24   A.      Yes.  Below my name, I should say.

25   Q.      Below your name.  I apologize.  And is it your

1                    **EMILY KIM**

2   understanding this is an agreement between Lynne Freeman

3   on the one hand and Prospect Agency and yourself on the

4   other hand?

5   A.      Correct.

6                    MR. PASSIN:  You can put this Exhibit

7           down.

8                    Next I'm going to mark as Exhibit 88 a

9           document which is Bate stamped Number Kim

10          00075469 through 00075471.

11                   (Whereupon, KIM00075469-71 was marked

12          as Exhibit 88, for identification, as of this

13          date.)

14  **Q.      This is an e-mail between Lynne Freeman and you**

15  **between 2015 and 2021.  Please take a look at the**

16  **Exhibit.  Tell me when you're done, please.**

17  A.      Okay.

18  **Q.      Please take a look at the second page, the**

19  **e-mail dated April 1, 2021, at 8:00 p.m. from Lynne**

20  **Freeman to you.**

21          **Do you see that e-mail?**

22  A.      I do.

23  **Q.      Let me read it out loud.**

24          **"It's been so long since we've been in touch.**

25  **I hope you're well during these crazy times and**

1                          **EMILY KIM**

2     late 2010?

3     A.      Could you repeat the question?

4                      MR. PASSIN:  Could you read it back,

5            please.

6            (Whereupon, the record was read by the

7     reporter.)

8                      THE WITNESS:  Yes.

9     **Q.      And what was the name of the manuscript?**

10    A.      Blue Moon Rising.

11    **Q.      Please be advised that I will refer throughout**

12    **this deposition to the manuscript as either Blue Moon**

13    **Rising or Masqued; is that understood?**

14    A.      Understood.

15    **Q.      Isn't it correct that Ms. Freeman actually sent**

16    **you or gave to you various versions of Blue Moon Rising**

17    **between late 2010 and March 2015?**

18    A.      Correct.

19    **Q.      Approximately how many different versions did**

20    **she send or give you during that time period?**

21    A.      I couldn't say.

22    **Q.      Well, was it more than 10?**

23    A.      I would hesitate to guess on the record.

24    **Q.      You can't make any sort of estimate at all?**

25    A.      I would say about 10 to 15 perhaps.

1                      **EMILY KIM**

2    A.      I cannot say with certainty, but I don't think

3    so.

4    **Q.      Is it correct that Stacy Abrams was one of the**

5    **editors of the Crave book series?**

6    A.      Tracy Abrams was a copy editor of the Crave

7    series.

8    **Q.      Is fair to say that Stacy Abrams made**

9    **contributions -- strike that.**

10           **Did you attend the Romance Writers of America**

11   **conference in Anaheim, California, in July of 2012?**

12                      MR. KOONCE:   Objection.   Asked and

13           answered.

14   A.      Yes.

15   **Q.      Do you remember Lynne Freeman also attending**

16   **the conference?**

17   A.      Yes.

18   **Q.      Do you remember introducing Tracy Wolff to**

19   **Lynne Freeman outside the hotel where were you staying**

20   **when you attended the conference?**

21   A.      No.

22   **Q.      Do you remember introducing Tracy Wolff to**

23   **Lynne Freeman at all?**

24   A.      No.

25   **Q.      What hotel did you stay at during the**

1                    EMILY KIM

2   very complex process.

3   Q.      I would like your answer no matter how broad.

4   A.      Crave, I believe, Tracy shared some ideas with

5   Liz that she thought would be good for a book that would

6   later become known as Crave, and she and Liz worked

7   together, picked the idea they liked the best, then

8   Tracy wrote the book, and then Liz edited it.  And then

9   she and Tracy worked together on the final edit.

10          That's the broad overview of the Crave

11  series -- of the Crave book.

12                    MR. PASSIN:  Can you read that answer

13          back, please?

14          (Whereupon, the record was read by the

15  reporter.)

16  Q.      When you say "Liz edited it," what did that

17  consist of?

18  A.      I wasn't part of that process at all.  Like, I

19  was -- like, I became more involved with later books.

20  So I can't say what she and Tracy did for the Crave

21  series.  I had no part of it.

22  Q.      Well, typically, what does it mean when a

23  publisher edits a book?

24                    MR. KOONCE:  Object to the form.

25  Q.      A content editor edits.

**EMILY KIM**

1

2  A.     It's really different for every content editor.

3  **Q.     And then you said Tracy and Liz wrote it after**

4  **the editing.  What does that mean?**

5  A.     I think that they have -- the last few days of

6  the book, they worked closely together to make, you

7  know, last minute changes.

8  **Q.     Were they major changes or minor changes?**

9  A.     Again, I wasn't part of the that process, so I

10  don't know.

11  **Q.     Please describe for me the creation and the**

12  **writing of Crush?**

13                  MR. KOONCE:  Object to form.

14  A.     Crush was written more quickly than Crave, and

15  I believe Tracy only had a few months to write it.  And

16  again, Liz provided -- I wasn't really part of this

17  process, but Liz and Tracy worked together on some sort

18  of synopsis, and then Tracy wrote the book and Liz

19  edited it as she was writing, I believe.

20                  MR. PASSIN:  Can you read that answer

21          back, please?

22          (Whereupon, the record was read by the

23  reporter.)

24  **Q.     When you say edit it as she was writing, edit**

25  **it as who was writing it?**

1                          EMILY KIM

2    A.       Tracy Wolff.

3    Q.       And then can you please describe for me the

4    creation and writing of Covet?

5    A.       I believe Covet was very similar to the

6    creation of Crush.

7    Q.       Were there any differences you're aware of?

8    A.       I think that the outline was created even as

9    the book itself was being created, whereas in Crush, I

10   think the outline was created from the outset.  But

11   again, I wasn't that involved in the actual creation.

12   Q.       When you say outline, are you referring to the

13   synopsis?

14   A.       A synopsis.

15   Q.       Please describe for me the creation writing of

16   Court?

17   A.       Court was written in -- the outline or synopsis

18   was written in more of an ongoing process as the book

19   was being written, maybe even than the other two, and

20   near the end, Tracy was -- this was the book where Tracy

21   was very tired and I kept her company on a Google Doc.

22   Q.       So on Court was the synopsis not finished until

23   after the book was done?

24   A.       I think it was created alongside the creation

25   of the book.

```
1                        EMILY KIM
2    Q.      Can you read that e-mail, please?
3    A.      Okay, I've read it.
4    Q.      Is it correct that you were writing to see if
5    Entangled is interested in publishing Masqued?
6    A.      Correct.
7    Q.      And why did you write to Stacy Abrams instead
8    of -- initially you had written to Liz Pelletier,
9    correct?
10   A.      Yes.
11   Q.      And why did you write her instead of Stacy
12   Abrams?
13   A.      I think I must have thought she would be the
14   best match for the book.
15   Q.      At that time who did you have a better
16   relationship with, Stacy Abrams or Liz Pelletier?
17   A.      I do not recall.
18   Q.      You can't recall?
19   A.      No.
20   Q.      Look at the e-mail at the top of first page,
21   and let me read it out loud.  "Liz asked me to respond
22   to you about the submission because she's currently
23   closed to acquisitions.  It definitely sounds like it
24   would be up my alley, if you wouldn't mind sending it
25   along."  Do you see that?
```

1                        EMILY KIM

2    and am more than ever convinced that writing YA fantasy

3    is my thing.  I know the fantasy element is not yours.

4    I don't believe Entangled will want Masqued as it is.  I

5    actually brought this manuscript to the workshop and we

6    had so much fun with it.  I'd like to see Masqued make

7    it and I'd like to keep my adult manuscript in fantasy.

8    So I believe that brings us to a parting of the ways.  I

9    really enjoyed working with you and getting to know you.

10   I'd of course prefer that we talk, but I know how very

11   busy life is with a new baby, not to mention two other

12   wee ones, and owning your own business.  When you have a

13   chance, a goodbye is always nice voice-to-voice.  Best,

14   Lynne."  Do you see that?

15   A.      Yes.

16   Q.      Is it fair to say that on March 25, 2014, you

17   and Lynne Freeman parted ways?

18   A.      Yes.

19   Q.      Do you see that Ms. Freeman states that she

20   does not believe Entangled will want Masqued as it is?

21   A.      Yes.

22   Q.      Now, she also says that -- she says, "I know

23   the fantasy element is not yours."

24           Was that true at the time?

25                   MR. KOONCE:  Object to the form.

EMILY KIM

1

2   how many times I've read something over a decade ago.

3   Q.       Was any of the material or ideas from Masqued

4   use in any of the Crave books?

5   A.       No.

6   Q.       Was any of the material or ideas from Masqued

7   ever used in any drafts in any of the Crave books?

8                    MR. KOONCE:  Object to form of the

9           question.

10  A.       No.

11  Q.       There was some testimony the other day about

12  Tracy Wolff giving five ideas to Stacy Abrams and Liz

13  Pelletier for them to review for her possibly writing

14  what eventually became the Crave series.  You're

15  familiar with that?

16                   MR. KOONCE:  Object to form.  You're

17          asking if she is familiar with the testimony

18          from two days ago?

19                   MR. PASSIN:  No.

20  Q.       Are you familiar with that happening?

21  A.       Yes.

22  Q.       Did you review the list of five ideas before

23  she submitted it to Stacy Abrams?

24  A.       I don't believe so, no.

25  Q.       When's the first time you learned that

```
 1                        EMILY KIM
 2   book of Crave.
 3   Q.      Excuse me?
 4   A.      In the book Crave I had no --
 5   Q.      I'm asking about the Crave book series?
 6   A.      Can you be more specific?
 7   Q.      Any of the books?
 8                    MR. KOONCE:  Objection.  Are we talking
 9           about the four that are at issue in this case
10           or are we including --
11   Q.      Any of the books?  Any of the books?
12   A.      I think I helped pick the name Queen Cleo, but
13   I can't think of any others off the top of my head.
14   Q.      And how did that come about?
15   A.      I think Tracy was talking to me on the phone
16   one day and I mentioned that I babysat a girl named Cleo
17   and I like it.  That's the one I can remember.
18   Q.      Did you ever give a copy of any of the contents
19   of Masqued to Liz Pelletier?
20   A.      No.
21   Q.      Well, you did in that e-mail you sent her,
22   didn't you?
23   A.      I didn't give her a copy of Masqued.  I sent
24   her a submission letter.
25   Q.      I asked about a copy or any of the contents?
```

1                        **EMILY KIM**

2    A.       I sent her a submission letter for the book

3    Masqued.

4    **Q.       Other than that, though, you did not?**

5    A.       That is correct.

6    **Q.       Did you ever give a copy or any of the contents**

7    **of Masqued to Tracy Wolff?**

8    A.       No.

9    **Q.       Did you ever give a copy or any of the contents**

10   **of Masqued to Stacy Abrams or anyone else at Entangled**

11   **other than Liz Pelletier to the extent you already**

12   **testified?**

13   A.       I sent Stacy Abrams the manuscript upon her

14   request, and that is all of the communications we had

15   about that book, aside from the withdrawal, which I

16   don't have a record of but I think happened.

17   **Q.       Did you ever discuss Masqued with Liz**

18   **Pelletier?**

19   A.       No.

20   **Q.       Did you ever discuss Masqued with Tracy Wolff?**

21   A.       No.

22   **Q.       Did you ever discussed Masqued with Stacy**

23   **Abrams or anyone at Entangled?**

24   A.       No.

25   **Q.       Did you ever orally or in writing provided any**

```
1                        EMILY KIM

2    language from Masqued to Tracy Wolff?

3    A.      No.

4    Q.      Have you ever orally or in writing provided any

5    language from Masqued to Liz Pelletier?

6    A.      No.

7    Q.      Have you ever orally or in writing provided any

8    language from Masqued to Stacy Abrams or anyone else at

9    Entangled?

10   A.      Aside from my submission to Stacy Abrams of

11   Masqued, no.

12   Q.      Did you ever discuss Lynne Freeman with Liz

13   Pelletier?

14   A.      No.

15   Q.      Did you ever discuss Lynne Freeman with Tracy

16   Wolff?

17   A.      No.

18   Q.      Did you ever discuss Lynne Freeman with Stacy

19   Abrams or anyone else at Entangled?

20   A.      Aside from my submission to Stacy Abrams, no.

21   Q.      Who in connection with the Crave series was the

22   expert on Alaska?

23              MR. KOONCE:  Object to form.

24   A.      No one was the expert on Alaska.

25   Q.      Well who provided the majority of the
```

```
 1                    EMILY KIM
 2   few scenes later, like maybe after they've had a break,
 3   now they're going to start fighting again.  Now we're
 4   going to take a scene from the earlier fight scene and
 5   put it in a later fight scene.
 6   Q.      But you moved one section into another fight
 7   scene?
 8                   MR. KOONCE:  Object to form.
 9   A.      I don't remember.  And I didn't move it.  It
10   was Tracy Wolff.
11   Q.      You suggested it?
12   A.      I didn't suggest it.
13   Q.      Tracy moved it and you agreed to it?
14   A.      I didn't agree to it.
15   Q.      What did you do?
16   A.      I checked to make sure the transitions flowed
17   smoothly through the scenes.
18   Q.      Who chose Alaska as the setting for the Crave
19   book series?
20   A.      Tracy chose Alaska.
21   Q.      Are you aware that Tracy Wolff stated in an
22   interview with Hank Garner that it was a suggestion from
23   her book agent?
24   A.      I often suggest -- I often talk about the
25   settings with authors, but ultimately, their decision
```

```
 1                    EMILY KIM
 2  A.      I don't recall.
 3  Q.      What about Crush?  What were your contributions
 4  you made to your book Crush?
 5  A.      With Crush, Tracy was in a time crunch, so I
 6  did more cheerleading and supporting her in terms of
 7  encouraging her to write a lot of pages every day, and
 8  just telling her she was doing a great job, and just
 9  being more of a cheerleader than I had for Crave.
10  Q.      And what about Covet?
11  A.      I played a very similar role in Crush and Covet
12  in terms of a cheerleader and encouraging Tracy to write
13  quickly and being a support system for her.
14  Q.      What about Court?
15  A.      Again, Court was even -- you know, Tracy was
16  tired. She had written three books very quickly. So I
17  was the same support system I'd been in the past two
18  books, but at the very end, I kept her company as she
19  finished the last few chapters on the Google Doc.
20  Q.      And is it your testimony as you sit here today,
21  that you did not take any part in the writing of any of
22  those books?
23  A.      That is correct.
24  Q.      Well, didn't you also write some of the chapter
25  titles for some of the books?
```

1                     **EMILY KIM**

2                     MR. KOONCE:  Object to the form.

3   A.     I created a document with chapter titles to

4   make it easier when we got to the very, very end, crunch

5   time.  But my ideas were meant to be jumping-off places

6   not the titles themselves.

7   **Q.     What do you mean by "jumping off places"?**

8   A.     Like, I would suggest what we would call a bad

9   title, and then they would say, "Oh, well, I don't like

10  that.  And that helps me think of a title that I do

11  like."

12  **Q.     So you purposely chose bad titles?**

13  A.     No.  I always try do give a great title. I just

14  know that I'm not as talented of a writer as Tracy.

15  **Q.     Did you also write the bible for the Crave**

16  **series?**

17                    MR. KOONCE:  Object to the form.

18  A.     No, I didn't write the bible.  I got the idea

19  to create the bible, and I made a stab at getting it

20  started, but it a lot of other people jumped in to

21  create the bible.

22  **Q.     Well, would it surprise you to know that a lot**

23  **of people testified that you wrote the bible?**

24                    MR. KOONCE:  Object to the form.  Do

25           you want to put in testimony, Mark?

**Emily Kim**

```
 1                         EMILY KIM
 2   A.       Again, I told you it was my idea to create the
 3   bible, and I think I made it as like a Christmas gift
 4   for Liz and Tracy so that they can have -- you know,
 5   they had a lot of trouble with the world building and
 6   continuity.  So it was to keep track of all the
 7   characters in the Crave series.  But once I sort of put
 8   some of the initial things down on the document, it went
 9   out of my hands and people like Stacy worked on it, an
10   intern worked on it, and my assistant Ellen worked on
11   it, and a lot of people worked on the bible.
12   Q.       Well, how much of it did you draft before other
13   people took over?
14   A.       I don't remember.
15   Q.       50 percent?
16   A.       Honestly, I don't remember.  I think, you know,
17   I just went through the book and listed the character
18   and some of their eye colors and things like that, just
19   to sort of give them a sense of what the bible could be,
20   and then a lot of other people jumped in to make it what
21   it is today.
22   Q.       After which book was written in the series did
23   you start writing the bible?
24   A.       I think it was either -- I think it was Covet
25   or maybe after Crush, but before Covet, or it could have
```

Page 168

1                      EMILY KIM

2   been after Covet but before Court. I don't remember.

3   **Q.      Did you -- were you involved in writing any**

4   **portions of any of the synopses?**

5   A.      No.

6   **Q.      Were you involved in editing any of the books?**

7   A.      No.

8   **Q.      Please describe to me the contributions that**

9   **Stacy Abrams made to each of the books, Crave, Crush,**

10  **Covet and Court.**

11                      MR. KOONCE:  Object to the form.

12  A.      Stacy Abrams primarily acted as a copy editor.

13  But I know that she also had a back-end dealings with

14  the printers and the paper distributor, things like

15  that.

16  **Q.      You're going to have to speak up.  It's hard**

17  **for me to hear.**

18                      THE REPORTER:  Can you repeat the whole

19          thing.

20  A.      Sure.  I said Stacy Abrams acted as a copy

21  editor primarily in the Crave series, and she also did

22  some administrative work, like working with the printers

23  and paper suppliers, et cetera.

24  **Q.      And that's all she did?**

25  A.      She also acted as a support system for Tracy.

EMILY KIM

1
2   And I think for Court, she helped me fill in some of the
3   chapter titles, and she was involved in filling out the
4   series bible as well.
5   Q.      Please describe for me the contributions that
6   Liz Pelletier made for each of the books, Crave, Crush,
7   Covet and Court?
8                   MR. KOONCE:  Object to the form.
9   Q.      Take them one at a time, please.
10  A.      Liz edited the Crave series.  Liz helped craft
11  the plot line and also edited Crush and Covet and Court.
12  Q.      Is that it?
13  A.      Liz and Tracy worked very collaboratively on
14  those books, and she was a very involved editor.
15  Q.      What does that mean, "very involved editor"?
16  A.      The books, when they were written, Liz -- Tracy
17  would write them and Liz would go in and edit them, but
18  they were written in such a time crunch that Liz
19  wouldn't often show the book to Tracy after she had
20  edited it.  So she took, you know, a lot of -- most of
21  the time, when a book is edited by another, the author
22  reviews the edits before it goes to print, but that
23  didn't happen in this case.
24  Q.      So you're telling me that Liz Pelletier made
25  edits to the books without getting Tracy's approval?

1                **EMILY KIM**

2           MR. KOONCE:  Object to the form.

3  A.    I'm telling you that Liz edited the book, and

4  then Stacy copy edited the book, and it could go to

5  print. So it wasn't a traditional publishing process.

6  **Q.    Now, which books are we talking about that she**

7  **did that?**

8  A.    Crush, Covet and Court.

9  **Q.    Describe for me the contributions that Tracy**

10  **Wolff made to each of the books, Crave, crush, Covet and**

11  **Court?**

12          MR. KOONCE:  Object to the form.

13  A.    Tracy wrote each of those books.

14  **Q.    Excuse me?**

15  A.    Tracy was the author for each of those books.

16  **Q.    By the way, did you help Tracy Wolff write The**

17  **Guide to Katmere?**

18  A.    The guide?

19  **Q.    The Guide to Katmere.**

20  A.    I helped her come up with some ideas, and I

21  helped her come up with some, like, quizzes and things

22  like that, like character trait things, just tried to be

23  helpful in terms of helping her think of some ideas

24  and -- so guess I would say I tried to be as helpful as

25  I could in that circumstance.

1               **EMILY KIM**

2    say, "I convinced Tracy to let me help her write the

3    guide." Is that a true statement?

4    A.     Yes.

5    Q.     And did you do anything -- explain to me

6    everything you did to help write the guide?

7    A.     I believe I helped create some quizzes about

8    the characters, and I think, I don't recall, but I think

9    I helped make some like, either, dating profiles or some

10   sort of funny element to bring to the book, but I don't

11   know if they were actually used in the actual book.

12   Q.     Now, did you help similarly with any of the

13   books in the Crave book series?

14   A.     No.

15   Q.     So I'd like you to tell me who wrote the

16   chapter titles for each book in the Crave book series,

17   one at a time.

18               MR. KOONCE:  Object to the form.

19   A.     For the chapter titles for Crave, I didn't have

20   any involvement in that, so I can't tell you who wrote

21   the chapter titles for that one.  For Crush, I believe

22   it was Tracy, her partner, her children. I'm not sure if

23   I helped out with that book or not.  And for Covet, I

24   think that's when I started to make a Google Doc with

25   chapter titles, so one or two may be mine.  And then,

1             EMILY KIM

2   you have -- most are Tracy's.  Some might be her

3   partner's, her children, Liz, Stacy, everybody weighed

4   in on ideas, even my daughter Eden.

5   Q.      What about Court?

6   A.      Same.

7   Q.      Same as Covet?

8   A.      Yes.

9   Q.      Is Crave the most commercially successful book

10  of any client you've ever had?

11  A.      I'm not sure how to answer that question.

12  Like, can you quantify commercially successful?

13  Q.      Has it made more money than any book any of

14  your clients have ever had?

15  A.      I'm not sure.

16  Q.      Is it close?

17  A.      It's definitely one of my best-selling titles,

18  but I don't want to say what is my best-selling title.

19  I'd have to look at my numbers.

20  Q.      What other books might have exceeded it as

21  financially successful?

22               MR. KOONCE:  Object to form.

23  A.      I have an author named Kristen Ashley who

24  internationally is very successful and many of her books

25  might have been as successful as the Crave series.

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | EMILY KIM                                                     |
| 2  | MR. PASSIN:  Well, they're speaking                           |
| 3  | objections.                                                   |
| 4  | BY MR. PASSIN:                                                |
| 5  | **Q.      Then on the second page, which is from Crave,**     |
| 6  | **do you know who wrote the words, "things that go bump in**  |
| 7  | **the night"?**                                               |
| 8  | A.     I don't know who wrote that phrase, but Tracy          |
| 9  | is the author of Crave and Liz is the editor of Crave.        |
| 10 | **Q.      So you're saying it was one of those two**          |
| 11 | **people?**                                                   |
| 12 | A.     I'm say saying that Tracy is the author of             |
| 13 | Crave and Liz it is editor of Crave, and I didn't have        |
| 14 | anything to do with the writing of the word "things that      |
| 15 | go bump in the night," but I can't speculate.  I don't        |
| 16 | know what you're asking.                                      |
| 17 | **Q.      I'm asking you who wrote those words?**             |
| 18 | A.     I don't know, but Tracy is the author of this          |
| 19 | book.                                                         |
| 20 | **Q.      Meaning that she wrote those words?**               |
| 21 | A.     Meaning, it is very likely that she wrote those        |
| 22 | words.  I just want to be clear that I don't -- you           |
| 23 | know, I don't -- I wasn't present for Tracy writing this      |
| 24 | book, but it is my understanding that she wrote every         |
| 25 | word in the book.  She's the author of the book.             |

1                    EMILY KIM

2    A.      My husband drives.

3    Q.      How long is that drive?

4    A.      It's three hours and a few minutes.

5    Q.      From your home in New Jersey?

6    A.      Correct.

7    Q.      Mr. Passin asked you some questions about the

8    Crave bible.  Can you just describe what the Crave bible

9    is?

10   A.      The Crave bible was created so that when people

11   have questions in future books, like copy editors or

12   editors or even Tracy herself about what color a

13   character's eyes are or what -- where -- trying to

14   think -- what they were wearing on a specific occasion

15   that seemed notable, they can refer to the bible and get

16   that answer quickly.  So it's a document that was

17   created after several books in the creative series were

18   written to -- a bible is the term that we're using in

19   the publishing industry to create -- to sort of archive

20   a world that's created in a fantasy series or a

21   long-running series.

22   Q.      Is the phrase thing that is go bump in the

23   night a common phrase in your experience?

24   A.      It is a very common phrase.

25   Q.      Is the quote et tu Brute a commonly used