# EXHIBIT QQ

**In the Matter Of:**

*LYNNE FREEMAN vs*

*TRACY DEEBS-ELKENANEY*

---

*LYNNE FREEMAN*

*March 24, 2023*

---



1

1            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
2         Civil Action No. 1:22-cv-02435-LLS-SN

3

4    LYNNE FREEMAN, an individual,

5            Plaintiff,

6        -vs-

7    TRACY DEEBS-ELKENANEY P/K/A
     TRACY WOLFF, an individual,
8    EMILY SYLVAN KIM, an
     individual, PROSPECT AGENCY,
9    LLC, a New Jersey limited
     liability company, ENTANGLED
10   PUBLISHING, LLC, a Delaware
     limited liability company,
11   HOLTZBRINCK PUBLISHERS, LLC
     D/B/A MACMILLAN,  a New York
12   limited liability company, and
     UNIVERSAL CITY STUDIOS, LLC, a
13   Delaware limited liability
     company,

14
             Defendants.
15   _____/

16              DEPOSITION OF
               Lynne Freeman
17      CONFIDENTIAL - ATTORNEYS' EYES ONLY

18           Friday, March 24, 2023
           9:04 a.m. - 6:19 p.m.
19             Pacific Time

20            Remote Location
          Via Zoom Videoconference
21           All Parties Remote

22

23

24   STENOGRAPHICALLY REPORTED BY:
     ERICA FIELD, RPR
25   JOB NO. 886198

2

1   APPEARANCES:

2

3

4   On behalf of the Plaintiff:
        DONIGER BURROUGHS
5       603 Rose Avenue
        Venice, California 90291
6       (310) 590-1820
        BY: STEPHEN DONIGER, ESQUIRE
7       stephen@donigerlawfirm.com

8

9

10  On behalf of the Plaintiff:
        CSREEDER
11      11766 Wilshire Boulevard
        Suite 1470
12      Los Angeles, California 90025
        (310) 861-2475
13      BY: MARK PASSIN, ESQUIRE
        mark@csrlawyers.com

14

15

16  On behalf of Prospect Agency and Emily
    Sylvan Kim:
17      KLARIS LAW
        29 Little West 12th Street
18      New York, New York 10014
        (917) 822-7468
19      BY: LANCE KOONCE, ESQUIRE
        ZACHARY PRESS, ESQUIRE
20      lance.koonce@klarislaw.com
        zach.press@klarislaw.com

21

22

23

24

25

3

```
 1   APPEARANCES CONTINUED:

 2

 3

 4   On behalf of Tracy Deebs-Elkenaney p/k/a
     Tracy Wolff, Entangled Publishing, LLC,
 5   Holtzbrinck Publishers, LLC d/b/a Macmillan,
     and Universal City Studios LLC:
 6        COWAN, DEBAETS, ABRAHAMS & SHEPPARD
          41 Madison Avenue
 7        38th Floor
          New York, New York 10010
 8        (212) 974-7474
          BY: NANCY WOLFF, ESQUIRE
 9        CECE COLE, ESQUIRE
          BENJAMIN HALPERIN, ESQUIRE
10        nwolff@cdas.com
          ccole@cdas.com
11        bhalperin@cdas.com

12

13

14   ALSO PRESENT:
          Tracy Wolff
15        Elizabeth Pelletier

16

17

18   VIDEOGRAPHER:
          Adriel Olvera
19        Isaac Orihuela

20

21

22

23

24

25
```

4

```
 1                    INDEX OF PROCEEDINGS

 2   WITNESS                                    PAGE
     LYNNE FREEMAN
 3   DIRECT EXAMINATION BY MS. WOLFF               7
     EXAMINATION BY MS. COLE                     104
 4   CROSS-EXAMINATION BY MR. KOONCE             210
     CERTIFICATE OF REPORTER                     356
 5

 6

 7                       EXHIBITS
     EXHIBIT                DESCRIPTION         PAGE
 8   Exhibit 137  LF03750                        119
     Exhibit 138  LF06404                        135
 9   Exhibit 139  LF06404                        181
     Exhibit 140  LF269917                       185
10   Exhibit 141  2010 Printout of the Home      216
                  Page of the Prospect Agency
11                Website from 2010
     Exhibit 142  2010 Web Page Printout         218
12                Listing Prospect Agency's
                  Authors
13   Exhibit 143  Letter from CSReeder to        231
                  Honorable Sarah Netburn,
14                February 22 , 2023
     Exhibit 144  KIM00352651                    242
15   Exhibit 145  KIM00189607                    248
     Exhibit 146  LF168408                       267
16   Exhibit 147  KIM00188308                    269
     Exhibit 148  KIM00184281                    270
17   Exhibit 149  KIM00156741                    271
     Exhibit 152  KIM00148150                    273
18   Exhibit 153  KIM00152844                    274
     Exhibit 154  KIM00148192                    275
19   Exhibit 155  KIM00148448                    278
     Exhibit 156  KIM00150882                    293
20   Exhibit 157  KIM00155044                    295
     Exhibit 158  KIM00155926                    296
21   Exhibit 159  KIM00198431                    298
     Exhibit 167  KIM00163954                    329
22   Exhibit 170  KIM0011500783                  338
     Exhibit 176  Twilight Book 1                313
23   Exhibit 177  Common Phrases in BMR          313
                  Manuscript and Twilight
24

25
```

5

1    Thereupon,

2    the proceedings began at 9:04 a.m.:

3              THE VIDEOGRAPHER:  We are now on

4         the record.

5              Today's date is March 24, 2023,

6         and the time is 9:04 a.m. Pacific

7         Time.

8              This is the video deposition of

9         Lynne Freeman in the matter of Lynne

10        Freeman v.  Tracy Deebs-Elkenaney

11        P/K/A Tracy Wolff, et al., filed in

12        the United States District Court,

13        Southern District of New York, Case

14        No. 1:22-cv-02435-LLS-SN.

15             This deposition is taking place

16        via web videoconference with all

17        participants attending remotely.

18             Counsel on the conference,

19        please identify yourselves and state

20        whom you represent, beginning with the

21        questioning attorney.

22             MS. WOLFF:  It's Nancy Wolff of

23        Cowan, DeBaets, Abrahams & Sheppard,

24        and I represent defendants Entangled,

25        Macmillan, Universal, and Tracy Deebs

6

```
 1    Wolff.

 2         MS. COLE:  My name is CeCe Cole

 3    also from the law firm of Cowan,

 4    DeBaets, Abrahams & Sheppard on behalf

 5    of defendants Entangled Publishing,

 6    Universal, Macmillan, and

 7    Tracy Deebs-Elkenaney.

 8         MR. HALPERIN:  I'm Benjamin

 9    Halperin, also representing those same

10    defendants and from the same law firm.

11    I'm not going to be asking any

12    questions, but I'm announcing my

13    appearance.

14         MR. KOONCE:  Lance Koonce with

15    Klaris Law representing Prospect

16    Agency, LLC and Emily Sylvan Kim, and

17    with me I have Zachary Press from

18    Klaris Law as well.

19         MR. DONIGER:  Stephen Doniger of

20    Doniger Burroughs representing the

21    plaintiff.

22         MR. PASSIN:  And Mark Passin,

23    also on behalf of plaintiff, but I

24    will not be asking -- or be speaking

25    today.
```

7

```
 1              THE VIDEOGRAPHER:  Anyone else?

 2              Thank you.  My name is Adriel

 3         Olvera.  I'm the videographer

 4         representing Lexitas.

 5              Our court reporter today is

 6         Erica Field, representing Lexitas as

 7         well.  The court reporter will now

 8         swear in the witness.

 9    Whereupon,

10                   LYNNE FREEMAN,

11      having been first duly sworn or affirmed, was

12      examined and testified as follows:

13              THE WITNESS:  I do.

14                 DIRECT EXAMINATION

15      BY MS. WOLFF:

16         Q.   Good morning, Ms. Freeman.

17         A.   Good morning.

18         Q.   I'm going to be -- could you just

19      please state your name for the record?

20         A.   It's Lynne Freeman.

21         Q.   And spell Freeman.

22         A.   F-R-E-E-M-A-N.

23         Q.   Have you ever been deposed before,

24      Ms. Freeman?

25         A.   No.
```

1   beauty of the nature of it.  And the aurora

2   borealis, we know that's magical too.

3        Q.    I would agree.

4             So you took your notes and then

5   you -- did you write a first draft of the

6   book or an outline or what was the process?

7        A.    Well -- okay.  So I took my notes,

8   and I wrote about a hundred 50 pages.  And I

9   sent it to two friends that I think are very,

10  very smart.  And I just asked them, look, I'm

11  crazy maybe, that I think that I can write,

12  or is this interesting to you what I'm put

13  together.  And I need you to be brutally

14  honest with me because I'm super busy.

15            I have a young kid at home, and

16  I'm full-time practicing law, and I'm doing

17  this at night, and I really feel excited

18  about what I'm doing, so I need you to tell

19  me what I think.  And that's what I did.

20       Q.    Who are your two friends?

21       A.    Jennifer Holland, who is an

22  attorney, and who is very intimidating

23  because she's very smart.  And then Michael

24  Garner is a guy that I've known since high

25  school, and we were in an honors -- super

1   smart honors class together, and he's a very

2   bright guy who also writes.

3       Q.    What honors class is that?

4       A.    Enriched Intensive Studies

5   Institute, EISI.  You had to -- that's the

6   class.

7       Q.    Enriched -- Enriched --

8       A.    Enriched Intensive Studies

9   Institute at West Anchorage High School back

10  in the day.

11      Q.    Was that an English class or math

12  class?

13      A.    No.  I don't know how to describe

14  what it is.  But you had to be really

15  proficient or extraordinary in some area to

16  get in the class, whether it was mathematics

17  or science.  It could be art.  They pick -- I

18  don't know.  It might have been 10 or 15

19  students to be in it, and it was one of the

20  classes I was in with Mike.  That's how I met

21  him.

22      Q.    What was your proficiency?

23      A.    I have no idea why they let me in

24  there.  I don't know.  I went and

25  interviewed.  I'm somebody who took a lot of

1   what did you do?

2        A.   Well, I didn't -- I didn't know if

3   I was really finished or not.  But I went to

4   my smart friends, two of them that I consider

5   scary because they're much smarter that I am.

6   And they're attorneys.  And I gave a draft to

7   them to read and said could you just please

8   read it and give me a critique, which they

9   were both willing to do it.

10       Q.   And so they critiqued it?

11       A.   Well, yeah.

12       Q.   And what was the critique?

13       A.   Well, what ended up happening is

14  that I didn't get a critique back.  One of my

15  friends sent it to a contact of hers at

16  HarperCollins and that -- that's what

17  happened.

18       Q.   Without asking you?

19       A.   She told me after the fact because

20  she didn't want me to be upset, but yes.

21       Q.   Okay.  And do you know when that

22  took place?

23       A.   Yeah.  So that would have been --

24  I think it's like September of -- and I can't

25  be exact with this, but I feel like it's

40

1    about September of 2010.

2         Q.   And how did you find out about it?

3         A.   Well, she told me.  She told me

4    what she had done.  She's, like, look, I

5    don't want to you to be mad but I'm sending

6    this to Lucy, and I really hope that's going

7    to be okay with me.  I'm, like, yes, it's

8    okay with me.  I'm just -- yes.  So it was

9    fine.

10        Q.   And who is Lucy?

11        A.   Lucy Vanderbilt.  She has a

12   different title right now, but it's basically

13   she's the publishing rights director of

14   HarperCollins UK, and I think nowadays they

15   changed the title to something like

16   international rights director.

17        Q.   Why did she think you might be mad

18   at her --

19        A.   I thought she was doing me a

20   tremendous favor.  She loved the book, and my

21   friend couldn't put it down and really

22   thought I had something exciting, and Lucy is

23   a very smart, no-nonsense person, who my

24   friend didn't even think would maybe have

25   time to read it but wanted her to see it.

1  again?  I don't want to ramble.

2      Q.    No.  I just was wondering what was

3  the next step after it went to the publisher.

4  What happened --

5      A.    So then it went to the fantasy and

6  children's editors.  Yes.

7      Q.    Do you know what editor that was?

8      A.    I can't tell you who is who, but

9  one was Rachel Denning.  And the other was

10  Emma, I think it's Kantor.

11      Q.    And did these editors accept your

12  book for publication?

13      A.    When you say, publication, does

14  that mean did they -- did they read it --

15      Q.    No.  Did they offer you a

16  publishing contact?  Did they want to publish

17  the book?

18      A.    No.  There were other steps that

19  happened before all that comes in --

20      Q.    What would those -- can you tell

21  me what happened next then after --

22      A.    Sure.

23      Q.    -- you went to the fantasy editor?

24      A.    Sure.  So I was given an e-mail to

25  see from both of those people that they liked

44

1    it.  They loved it.  It went to readers.  The

2    readers loved it, and then it went to sales.

3    And during this time -- somewhere in this

4    time, I started looking for agents.

5              And your question was what all

6    happened, so then that calls for me to tell

7    you, one or both of these editors -- I can't

8    recall now.  It's been a long time.  They

9    gave me the name of four UK agents to contact

10   and use their names with them.  And then I

11   was also, at that point, querying in the US

12   for an agent.

13        Q.   So were they saying that you

14   should get an agent for what reason?

15        A.   I think the idea was --

16              THE WITNESS:  Go ahead.  I'm

17        sorry.

18              MR. DONIGER:  Sounds like it's

19        calling for speculation as to what

20        their intention was.

21              But you can answer to the extent

22        that you know.

23        A.   Yeah, I am not -- nobody is making

24   me a promise that anything is getting

25   published.  I don't know.  But the idea was

45

1   that it was, you know, time.  Michelle

2   suggesting that I should get an agent, and I

3   saw some communications about whether I was

4   agented.

5            Also they passed along the name of

6   four UK agents for me somewhere in this.  And

7   that's when I went about the process of

8   looking for an agent --

9   BY MS. WOLFF:

10       Q.    So they didn't --

11       A.    -- while this is pending.

12       Q.    So they didn't agree that they

13  were going to publish the manuscript as it

14  was delivered to them?

15       A.    No.  What they said is they were

16  taking it to sales.

17       Q.    And do you know what happened when

18  they took it to sales?

19       A.    I know that ultimately what I was

20  told is that sales had purchased the quota of

21  books in this genre for the year, that the

22  market was very hot with Twilight right now

23  and that the feeling was that I needed to get

24  it out as soon as I could to agents and to

25  publishers, that they felt it should get

212

1    for a literary agent?

2        A.    I feel like it was -- I don't

3    know -- late September, early -- I don't

4    know.  Sometime in that fall range.  Late

5    September, early October.

6        Q.    Of 2010?

7        A.    Yes.  Correct.

8        Q.    And you did so at the suggestion

9    of individuals at HarperCollins who had said

10   you should have an agent?

11       A.    They didn't speak to me directly,

12   so it would have been through Michelle

13   Bittner.

14       Q.    Okay.  But it was as a result of

15   her conversations with HarperCollins that it

16   was suggested to you that you look for an

17   agent?

18       A.    Yes, correct.

19       Q.    Did you submit inquiries to any

20   other agents before Ms. Kim?

21       A.    I believe I did.  I believe I --

22   yes.

23       Q.    Do you recall how many?

24       A.    I don't recall.

25       Q.    Was it more than five?

230

1   very excited.

2        Q.    Understood.

3        A.    Yeah.

4        Q.    Let me ask a question similar to

5   what I asked before.  Is it your contention

6   in this lawsuit that at the time that Ms. Kim

7   asked you to be a client of Prospect Agency

8   that she was already planning to show your

9   manuscript to Tracy Wolff for the purposes of

10  committing copyright infringement?

11       A.    I don't know what her intentions

12  were.

13       Q.    Do you -- is there -- is there a

14  point in time at which you do contend Emily

15  Kim was actively planning to show your

16  manuscript to Tracy Wolff for the purposes of

17  committing copyright infringement?

18       A.    Well, that would be why we are in

19  this lawsuit presently right now.

20       Q.    Well, you have seen documents.

21  You have heard testimony.  What is your

22  belief as you sit here today as to when Emily

23  Kim allegedly starting developing a plan to

24  show your manuscript to Tracy Wolff?

25       A.    I don't know when she started

231

1   developing a plan to show my manuscript to

2   Tracy.

3        Q.    Let me show you -- I'm going to

4   mark as Exhibit 143 a letter dated

5   February 22, 2023, from your counsel

6   CSReeder, PC to Judge Sarah Netburn.

7             Let me know when you have had a

8   chance to see -- to take a quick look at

9   that.

10       (Exhibit 143 was marked for

11       identification.)

12       A.    What exhibit number is that?

13  BY MR. KOONCE:

14       Q.    143.

15       A.    Okay.

16       Q.    On the second page of that

17  document, there's a paragraph, Paragraph A,

18  and I will note that there's a redacted

19  sentence in this document.  I elected to --

20  I'm electing to show you the redacted version

21  just because I wasn't sure who would be on

22  the call, and I don't think it's relevant to

23  the question I'm going to ask.

24            The letter says:  In December of

25  2010, Kim asked plaintiff what is the coolest

240

1      A.    Before we entered -- I'm trying to

2   understand.  Before we entered into an

3   agreement to be represented together, you're

4   asking if Emily said to me who she was going

5   to show my manuscript to?

6      Q.    Or who she was not going to show

7   your manuscript to?

8      A.    I don't understand the question.

9   I'm so sorry.

10      Q.    That's fine.

11           Did she ever represent to you that

12   the only people she would show your

13   manuscript to were editors at publishing

14   houses and readers?

15      A.    Yes.

16      Q.    When did she make that

17   representation to you?

18      A.    I don't recall the when of it.  I

19   just recall the specificity of it.

20      Q.    And what was the context for that

21   conversation with her?

22      A.    My mom told me that I should be

23   getting my book registered with the copyright

24   office.  You know, my mom was concerned

25   about, you know, somebody stealing the idea

241

1  or copying the book, doing something with it

2  and that I should register it.

3          She had seen something on a legal

4  program.  So I brought the issue up to Emily

5  about, should I register my book.  That's the

6  context of how that conversation came to be.

7      Q.    Okay.  During the time that you

8  worked with Prospect Agency, did you ever

9  learn that Emily Kim showed your manuscript

10  to anyone other than editors and readers?

11      A.    No.

12      Q.    Before entering into the agency

13  agreement, did Ms. Kim make any other

14  expressed representations or promises to you?

15      A.    Can you define expressed

16  representations and promises, please.

17      Q.    As opposed to -- well, let me ask

18  it differently.

19          Before entering into your

20  agreement with Prospect Agency, did Ms. Kim

21  make any representations or promises to you

22  separate and apart from the writing of the

23  agreement itself?

24      A.    Again, do you mind explaining

25  representations and promises?  I don't

1  understand what you're asking me.

2      Q.    Okay.  Do you know what a promise

3  is?

4      A.    Yes.

5      Q.    Did Ms. Kim make any promises to

6  you before entering -- you entered into the

7  agreement other than what was in writing in

8  the agreement itself?

9      A.    No.

10          MR. KOONCE:  Let's -- let me

11      move -- this may have been marked at a

12      prior deposition, but I'm going to

13      remark it because I wasn't sure.

14          This is the -- we are going to

15      mark this as Exhibit 144.  I apologize

16      to the other counsel if it's

17      duplicative.

18          This is the agency agreement

19      version from Prospect Agency files

20      between Prospect Agency and

21      Ms. Freeman.

22      (Exhibit 144 was marked for

23      identification.)

24  BY MR. KOONCE:

25      Q.    Ms. Freeman, let me know when you

1    the time to read every version of everything

2    I wrote.  So I literally just made a best

3    guess.

4         Q.    So is the first time you

5    registered anything with the copyright office

6    relating to your manuscript, after you had

7    picked up the -- picked up Crush in the

8    bookstore?

9         A.    Yes.

10        Q.    Did you keep working on your

11   manuscript after you eventually parted ways

12   with Prospect Agency?

13        A.    Yes.

14        Q.    And I take it you did not send any

15   versions of your manuscript that you worked

16   on after you parted ways with Prospect Agency

17   to Ms. Kim?

18        A.    I don't recall.

19        Q.    Would there have been a reason for

20   you to send her versions of your manuscript

21   after you parted ways with Prospect Agency?

22        A.    Yes.

23        Q.    Why -- why would you have done

24   that?

25        A.    Emily reached out to me in 2015

283

1   many publishers Prospect Agency sent your

2   manuscript to during the time you worked with

3   it?

4        A.    I believe that the 2011 version --

5   I consider that my flagship version -- went

6   to five editors, and the other versions over

7   time went to a bunch of other editors.  I

8   can't recall the totals.

9        Q.    Okay.  Does it surprise you to

10  learn it was over 20?

11       A.    No.

12       Q.    Is it your contention in this case

13  that Ms. Kim did not really submit your

14  manuscript to those publishers?

15       A.    No.

16       Q.    Is it your contention that she was

17  somehow working against your interests when

18  she sent those submissions to publishers on

19  your behalf?

20       A.    I have no idea.  I don't think so.

21       Q.    Okay.  But if any one of those

22  publishers had said yes, they wanted to

23  publish your manuscript, wouldn't that have

24  ruined any plan for her to hand that

25  manuscript to Tracy Wolff to use?