## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN, | Case No.:  1:22-cv-02435-LLS-SN |
| Lynne, | |
| v. | |
| TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al., | |
| Defendants. | |

## <u>DECLARATION OF EMILY SYLVAN KIM</u>

I, Emily Sylvan Kim, declare as follows:

1.      I am an individual defendant in this case and also the President of Prospect Agency LLC, another named defendant. I make this declaration in support of Defendants' Motion for Summary Judgment, the Prospect Defendants' Motion for Summary Judgment, and in opposition to Plaintiff's Motion for Summary Judgment. The following is based on my personal knowledge and experience, and if called upon, I could testify competently to same.

2.      The allegations that either I provided Tracy Wolff with Plaintiff's manuscript *BMR* or any other of her written material, or helped to create and write Tracy's *Crave* series using *BMR*, are categorically false. As I have testified and as all the documents in my and Prospect Agency's possession demonstrate, the facts are that Plaintiff Lynne Freeman approached me in late 2010 about representing her, and I did so diligently for over three years, working with her to bring her manuscript into publishable form. Ultimately, I sent her manuscript (in several iterations) to editors at over 20 publishing houses, all of whom rejected it. I never provided her manuscripts to any other party except readers (which is very standard in publishing) who provided reviews of the

manuscript in its various iterations. I certainly never provided her manuscript, or any portion thereof, to Wolff.

3.      One of those publishing houses to which I sent Freeman's manuscript was Defendant Entangled Publishing. On October 10, 2013 I sent a query to Elizabeth Pelletier; she forwarded that query to her colleague Stacy Abrams, who then asked to see the manuscript, and I sent that to her on October 30, 2013. However, after those initial emails with Pelletier and Abrams pitching the manuscript on Freeman's behalf, I never spoke to them again about *BMR*, and a few months later I had my assistant pull the manuscript from consideration at Entangled at Freeman's request when she terminated our author-agent relationship.

4.      After October 2013 at very latest, I never looked at Freeman's manuscripts again until this case was filed, nor did I ever provide them or any portion of them to any third party other than the editors and readers who saw it while I was still representing Freeman.  I never discussed *BMR* with Wolff, Pelletier, Abrams or anyone else before this dispute was raised. The accusations that I somehow abused my role as her agent and assisted in the infringement of her works by another author are not just ludicrous, they are deeply hurtful and go to the very core of the professional reputation I have worked so hard to build over the two decades I have acted as a literary agent.

5.      To be clear, the things Freeman now accuses me of doing go against the very fiber of my being and would be fatal to the career of any literary agent. They also make no logical sense at all. She accuses me of taking her on as a client only because I thought her work was so extraordinary that I would be able to steal her manuscript and give it to another author; of thereafter working with her extensively for three years solely to sabotage her writings and make them unpublishable or conversely to "cherry-pick" more of her writing; of convincing her to abandon

that project and not to touch it again until her son was out of high school; of pitching her work to Entangled just so that Entangled could steal it and years later give it to another author; and then of waiting for half a decade to begin work on the infringing manuscript, which she says I helped write. None of these outrageous claims are backed up by any emails or other correspondence, or any documents, because none of them are true.

## My Background as a Literary Agent

6.     I began my career as an agent at Writers House Literary Agency, where I worked from 2000 to 2005. Although Freeman now claims that I told her I discovered the book *Twilight* by Stephanie Meyers while at Writers House, and I did not do so and I never told her that.

7.     In 2005, I founded my company Prospect Agency LLC.  Prospect Agency is a small literary agency that specializes in romance, women's fiction, historical fiction, mysteries, fantasy and sci-fi, and young adult/children's literature. Prospect Agency has always had a limited staff, at most employing a few agents and a few assistants or interns.  Despite our size, we have always had a healthy roster of wonderful writers and illustrators, including but not limited to *New York Times* best-selling author, Kristen Ashley; *New York Times* best-selling author and illustrator, Cori Doerrfeld; historical fiction writer and Canadian best-selling author, Julia Kelly; Piper Huguley, Michelle Stimpson and many more women's fiction writers; young adult author and former *New York Times* journalist, Hayley Krischer, whose work is currently under film option with Bruna Papandrea; fantasy writer C.S Pacat; romance writers such A.J. Pine, Janice Maynard, Mia Vincy, Claudia Connor, Serena Bell and Rhonda McKnight among many others, many of whom have been RITA (the romance version of the Oscar) award winners.  My author Tim Tharp's novel, *The Spectacular Now*, was a National Book Award finalist in 2008 and was subsequently made into a movie that is nationally distributed by A24 Entertainment.

8. We regularly place books with major publishers such as Simon and Schuster, HarperCollins, Penguin Random House and Macmillan, as well as quality smaller publishers such as Candlewick, Scholastic, Lerner, Crooked Lane and others. Over the 18 years since its founding, Prospect Agency has seen an increasing profitability, until this lawsuit was filed. Once this lawsuit has filed, the expense of paying for our attorneys to defend the case has virtually eliminated any profits the agency might have made since March 2022.

9. Generally, I strive to advocate for each of my clients in a way that meets their specific needs. For example, some of my clients prefer to have a private creative process and I focus primarily on making sales for them and managing the business side of their career. Other of my clients like me to join creative calls with their editors. Still other authors prefer more hand-holding which can include frequent check-ins to hold them accountable to their deadlines. For unpublished authors, we often go through many rounds of edits before a manuscript is ready to submit. If that manuscript fails to sell, it is very rare that we part ways; rather we usually brainstorm together and the author attempts to write a book that meets a slightly different market. Many of my most successful authors have come to me with an original project that we did not sell, but ended up taking off with their next project as they learned and grew as authors. I love to work with writers who are willing to be challenged and see the publishing industry as both art and commerce. I very much enjoy getting to know each of my clients as people and do my very best to make sure they have long, sustainable careers that match their skills and interests and suit their personal lives. My role as an agent varies depending on the stage of a particular project. With new authors, my role is to assist that author in finding a publisher, and depending on the state of the manuscript, I may offer some editorial suggestions or very few suggestions.

10.     When I do provide editorial assistance, I see myself as more of a "big picture" editor rather than a more detailed, line-by-line editor. At this stage, I frequently offer my comments via phone in order to provide the kind of collaborative environment I am hoping to foster, rather than a role where I "tell" an author what to do. In any event, once an author has a publisher my role changes, as the substantive editing process then occurs between the author and editor. I then primarily will be involved in the business details of that relationship, but will have little role in the creative process except as acting as an enthusiastic supporter of my author and in some cases making limited suggestions for improvement, at a very high level.

11.     In 2016, I along with a partner founded a separate company called et al Creative, a literary production company that turns editors' prompts into finished books. Contrary to what Freeman has claimed, I did not found et al Creative because of any downturn in Prospect Agency's or my own financial status (there was no such downturn), but rather as an exciting offshoot of an evolving and rewarding career. Through et al Creative, we can seek out projects that initiate with editors' ideas or needs that meet market demands and match them with authors and other creatives in our network. Since its conception, et al Creative has worked with major publishers such as Simon and Schuster, DK Publishing, Hachette, Audible and St. Martin's.

12.     Tracy Wolff has not handled any projects through et al Creative. Rather, her authorship of the *Crave* series and her other books on which I have acted as literary agent have gone through Prospect Agency.

### My Work With Lynne Freeman

13.     In 2010, Freeman approached Prospect Agency seeking representation. While we no longer have records of this, our practice at the time was to have authors submit three chapters of a manuscript for review, and if we liked the sample, we would ask to see the full manuscript. I

have no doubt that we followed the same process with Freeman, because documents produced in discovery show that on November 17, 2010 I asked Freeman to send us her full manuscript. *See* Doniger Ex. 40 at LF126632.

14.     Freeman alleges that she "hired Prospect and Kim because she needed an agent to sell and/or license certain rights in or to a manuscript written by her . . . because HarperCollins UK was considering publishing the manuscript." Am. Cplt. ¶ 23. I am aware through reviewing documents produced in this case and attending Freeman's deposition that prior to approaching me and other US agents, in September 2010 Freeman first sent her manuscript to a friend, who then sent it unsolicited to Lucy Vanderbilt, who was Rights Director at Harper Collins UK. *See* Declaration of Lacy H. Koonce, III, dated November 22, 2023, Exs. A-B; *see also* Freeman Tr. 39:12-40:16. Vanderbilt then reviewed 50 pages of the book, and passed it along to two other employees of HarperCollins UK, stating: "From a friend of one of my oldest friends--I've just read fifty pages and wonder, too much of a Twilight homage meets Samantha the Teenage Witch via Sweet Valley High? Or just enough? I'm strangely intrigued and wonder if either of you cares to have a flick through." *See* Koonce Ex. B at LF1286448.  One of those recipients, fantasy editor Emma Coode, wrote back that she planned to read it "over the weekend." Koonce Ex. A at LF178102. Another, children's editor Rachel Denwood responded 3 weeks later and expressed interest in the portion she had read but said she needed to read more, and asked if the book was with an agent. *See* Koonce Ex. B at LF1286448. It was apparently as a result of the conversations between Freeman's friend and editors at HarperCollins UK that Freeman began looking for an agent. *See* Freeman Tr. 43:20 – 45:7; 212:14-18.

15.     On December 8, 2010, Freeman signed Prospect's standard agency agreement. *See* Doniger Ex. 39 ("Agency Agreement"). I counter-signed on December 23, 2010. *Id.*

16.     Our standard agency agreement sets forth all of the obligations of my agency to the author, and by the author to the agency.  For instance, it states that I will be the author's exclusive agent during the time we work together, and that the author will only submit work for which he or she is the sole author and will pay Prospect Agency a commission on sales. *Id.* at KIM0035265-52. I do not make separate, affirmative representations to potential authors or illustrators other than what is contained in the agreement. Moreover, the Agency Agreement also includes an integration clause which says that the agreement supersedes and cancels any previous agreements or understandings between the parties, whether written or oral, and requires any future modifications to be in writing.  *Id.* at KIM00352653.   At no time would I have made any affirmative representations to Freeman except those in the Agency Agreement.  I also certainly did not tell her that her "manuscript would only require a few minor edits before it was ready to send to publishers," as she now claims. Freeman Decl. ¶ 3. I never had any intent whatsoever to show Freeman's work to other third parties, or to induce Freeman to enter the Agency Agreement under false pretenses.

17.     I worked with Freeman from December 2010 until March 2014, attempting to sell her book to a publisher.  During this time, I had approximately forty active clients and was selling young adult paranormal romance to places such as Holt, Bloomsbury and Razorbill, not to mention selling romance novels, woman's fiction and more adult projects elsewhere. I received up to twenty queries or pitches a day and additionally read widely for enjoyment. I work closely with all my clients and going through three rounds of submissions over the course of three years, as I eventually did with Freeman, was very manageable and represented quite a small part of my overall work load during the years we worked together.  I likely spent less time working with Freeman than a typical author, as she often had to take off for extended periods due to family or work-

related conflicts.  Eventually, it became clear that Freeman and I were not connecting on a vision for her work and that she was not able to be successfully guided by my expertise.  But I have long felt it is my duty to stand by my authors once I commit to them and not abandon them, so I continued for a significant amount of time to try my hardest to help her improve her work.  I also remember enjoying working with her as a person and wishing the very best for her.

18.    Over the first nine months of our relationship, I worked with Freeman to bring the *Blue Moon Rising* manuscript into a form suitable for pitching to book editors, and made numerous editorial suggestions. In early January, Freeman and I had an email exchange in which I asked her to send her entire manuscript to me again because she had made significant changes since we signed the Agency Agreement.  On January 11, 2011, Freeman forwarded a new version to me and said: "I am too close to this project now to say much about it -- will have to see what you think now that the changes are in place. I've re-written the intro pages and subtly added the foreshadowing we discussed while trying to polish the writing as I went." *See* Koonce Ex. C at KIM00189608.

19.    On February 15, 2011, Freeman wrote to me – after I had provided additional suggestions to her – to explain her delay in providing new revisions, stating: "I'm just checking in to let you know I'm about 3/4 of the way through the re-write. I'm incorporating all of the elements we discussed. If you'd like to read any part of what I have so far, let me know. Otherwise, I am really strongly shooting for completion by the end of this weekend before I head back to Alaska on Monday for work. (It's been slow going due to work commitments with my practice AND trepidation on my part with some of the changes). But, I'm excited with where all of this has taken Anna's character -- !" *Id.* at KIM00189607.

20.    When Freeman provided the new version, I sent it to one of my readers for review. On March 30, 2011, I emailed with Freeman to pass along comments on her manuscript from the reader, noting that "my main concern there is how [the main character] slips into all these different realities and it's hard to keep track of what's entirely 'real.'" *See* Koonce Ex. D at KIM00184281. The reader's report was positive, but noted issues that needed to be addressed in the last 100 pages:

> *I really, really enjoyed this story. I started it yesterday afternoon and read it all in one go--it was just that engaging. At first I felt as though it were just a rehashing of Twilight, but as I got further into the story things got a lot more interesting. What really worked for me was how the author makes it unclear whether or not Ash is the "good guy" or the "bad guy" until we are very far into the book. The mystery of it kept me interested and engaged. That said, I have to admit that I was really disappointed by the ending. The first 400 pages felt very controlled, as though the author knew exactly where she was going. But then in the last 100 pages, things start to feel somewhat chaotic. So much new information is introduced even while old information is not totally resolved.*

*Id.* at KIM00184282.

21.    In response, Freeman pushed back against the reader's reaction to the end of the book, citing the reaction of Lucy Vanderbilt at HarperCollins as one of the reasons: "The last 100 pages were carefully crafted on my part to be action after action after action with the reader intentionally left in the lurch wanting to know how it is all resolved. The editors at HarperCollins (and the publishing rights director) only saw the very first version and they felt it was risky but they liked it. And the story has come a long, long way from there with your suggestions and direction. The people I've had read it like the ending and want the 2nd book." *Id.* at KIM00184281.

22.    On May 1, 2011, Freeman wrote to me and stated: "First, I want to say THANK YOU for the careful attention you are giving my ms. I believe that each edit I've made has really made a difference to the story -- and I'm a bit too close to the project to see these things for myself." *See* Koonce Ex. E at KIM00187056.  She then provided a summary of extensive changes to the

manuscript, saying "So here we go with the changes. Let me know what you think – and hopefully I'm getting closer!!!" *Id.* at KIM00187056-60.

23.     On June 12, 2011 I received another reader's review of Freeman's manuscript from one of my interns.  The review was thorough and incisive, but framed very negatively, so I asked the reader to revise it "so it is more suited for the author's eyes...same great thoughts but with a kinder, more encouraging presentation. You mentioned you had more detailed notes and sharing these with the author would be great too. The more you offer her, the better. I have been working with  this author for some time and agree with your assessment but would also like to help her raise this to the level where we would be able to find it a home, even if it never becomes a great work of literature." *See* Koonce Ex. F at KIM00156267.

24.     The reader rewrote her comments and I shared them with Freeman on June 16.  In my cover email I stated: "I was surprised that she seemed to find room for improvement in areas of the book I hadn't been focusing on and seemed fine with the ending...which I think means you've done a great job revising! (though on a separate note I did want to mention that I thought the ending was much much better and I'd only really like to see one little tweak in regards to Taylor and who exactly was talking through her in the end which I found a bit confusing...) But on a larger note, this letter took me aback and I hesitated to share it with you but I figured all feedback is useful and we can go through this together and figure out what makes sense to take to heart and what doesn't. I hope you'll agree with this decision. You've been a real pro throughout this revision process so I'd figure you'd want to really wade in those final slogging steps and be rewarded with true greatness!"  *See* Koonce Ex. G at KIM00156741-42.

25.     When Freeman responded, she again pushed back against making changes based on the reader's comments, and again cited the reaction of Lucy Vanderbilt at HarperCollins as a reason:

> *Thank you for sharing her comments with me. All feedback IS useful for discussion and I'm sure there is always room for improvement. I'm not offended! I would like to go through her comments with you and let's decide what should be explored further and what shouldn't. I do want to proceed with caution from this point, however. I don't want to lose the voice of the character or any of the elements that have made the story compelling. The publishing rights director and the children and fantasy editors from Harper Collins, London (and their readers) loved the story and the character as she was written back in December. Lucy (PR director) reads many ms each week and said that she couldn't put this one down -- she ate it up in 4 days. That has been the reaction I've had from everyone who has read the ms. And what they all have liked is the character's voice and her internal struggles with teen angst and something more. I will pass these comments along to three of my readers who know the ms as it is and get their feedback as well. Sometimes when you see the critique of another person that's different from your own thoughts, it can help and add more to discussion.*

*Id.* at KIM00156741.

26.     After additional edits by Freeman to the manuscript, on October 26, 2011 we sent it out to a first round of four major U.S. publishers: Penguin Group, Bloomsbury, Simon & Schuster, and Little Brown (Hachette). *See* Koonce Exs. H-L. On varying dates in January and February 2012, we heard back from all four rejecting the manuscript for publication. *Id.*

27.     Some editors rejected the book because the market for paranormal romance was oversaturated; some did not connect with the writing. For instance, the editor at Little Brown said that they "especially enjoyed getting to know Anna's character, though we felt that her voice could be inconsistent at times. In addition, we worried that certain aspects of the paranormal romance felt familiar, and that elements of the plot might overlap with forthcoming titles on our list." *See* Koonce Ex. K at KIM00150862. The editor at Simon & Schuster noted: that "as much as I wanted to absolutely love it, I found that the narrative dragged in places and I worry that readers need

more from the plot to invest in the story sooner so they'll hang on until the end." *See* Koonce Ex. L at KIM00152936. I shared every response I received from editors with Freeman, and tried to cheer her on and help motivate her during this process.

28.     During this time, Freeman decided to change the name of her book from *Blue Moon Rising* to *Masqued.* I continually gave her high level suggestions such as the need to give her character "more agency" and have her do things rather than have things happen to her, but she remained focused on changing the characters to more unusual paranormal creatures and other such surface alterations in an attempt to differentiate herself.  This misdirection is in large part where I feel that my feedback did not resonate with her.

29.     In mid-November 2011, Freeman informed me that although a new copy of her manuscript had been sent to Lucy Vanderbilt at HarperCollins UK, it turned out that she had not read it, and suggested that Freeman have her agent submit the manuscript directly to her contact at HarperCollins.  *See* Koonce Ex. M at KIM00148448-49.  I responded to Freeman as follows: "Too bad your contact wasn't able to follow through! Quite disappointing after that amazing initial enthusiasm...seems odd, doesn't it? I still think it's smart to hold off on HC. If the US office rejects, it won't do wonders for UK enthusiasm and the book is currently out with a large number of excellent US publishers." Freeman then asked if it "[w]ould it be bad form to ask your US contact at HC to give it a read explaining the history with the UK? I hate to leave any stone unturned but this is your area of expertise so I defer to your judgment." *Id.* at KIM00148448.

30.     Thereafter, we submitted the book to Rachel Denwood at HarperCollins UK through our foreign rights agent, Whitney Lee. *See* Koonce Ex. N at KIM00134463. In February 2012, I also sent the manuscript to HarperCollins US at Freeman's request. *See* Koonce Ex. O at

KIM00156578. In my cover letter, I tried to capitalize on the prior dealings between Freeman and

Harper Collins UK:

> *I hope this email finds you well. I am getting the long weekend started with a little work, but I don't mind because it means I get to email you about a wonderful book I am currently sending out on submission, MASQUED by Lynne Freeman. Before she had an agent, one of Lynne's friends shared the book with some editors at Harper UK and they were all wild about the project and encouraged her to get an agent, which as you can see she did! Our foreign rights agent is currently sharing the book with Harper UK, but I wanted to share it with someone in the US as well, and I think this book might be right up your alley with its blend of strong writing and commercial hook. Set in Alaska (where Lynne lives), this is the story of a girl who is slowly finding out that she is the child of an ancient prophecy, one so powerful that both evil and good forces are looking to annihilate her. And the guys she's falling in love with, one of the good guys, will destroy her too if he figures out what she has the potential to be. The book is out with a few other editors as well in the US, so I've taken the liberty of attaching it here. If it's not for you, no problem, just let me know, but I hope you will read it and love it!*

*Id.*

31.     Both HarperCollins UK and HarperCollins US rejected the manuscript. The editor

at Harper Collins US provided the following reason: "So! I did indeed read the manuscript, and I

was intrigued by the prologue, as I wrote--and then I felt things sort of lost steam! Not in terms of

pacing, which was great, but some of the plot elements were feeling a little familiar. I liked the

tarot twist on things, but was hoping for something a bit more off the beaten paranormal path!"

*See* Koonce Ex. O at KIM00156577. The HarperCollins UK editor turned down the manuscript

because "we have a number of new YA authors who we are currently building . . . and accordingly

we have to be increasingly selective when taking on new titles." See Ex. N at KIM00134463. I

was particular disappointed with the rejection from HarperCollins UK, and said to my foreign

rights agent: "Oh darn! I wish they could have been more specific especially since they seemed so

wild about the book (at least according to my author!)." *Id.*

32.     Along with sending the book to Harper and Harper UK, in April 2012 I sent out another round of submissions to seven more editors on behalf of Freeman, and with her blessing. *See* Koonce Exs. P-V. This included editors at Disney-Hyperion, St. Martins, and Tor, and different editors at Penguin and Bloomsbury. We received responses turning down these submissions over the next several months.   Some of the negative comments we received from editors were as follows:

- *Unfortunately, however, we didn't find other aspects of the manuscript different enough from books that we have recently published, so we are going to pass on this opportunity.*  Koonce Ex. P at KIM00155016.

- *I'm afraid I'm going to have to say no to this one. My team is just so fatigued on paranormal now. And we do have a book coming from our UK office about a girl who discovers secrets about her past that put her in the middle of a battle between good and evil, so it would be difficult to set this one apart.* Koonce Ex. Q at KIM00155037.

- *. . . I worry that there are not enough new and different elements to the story here that would set it apart from the rest of the novels in the competitive paranormal / romance / YA market out there right now. I wanted to feel more of the Alaskan setting, or the mythological background (outside of what we initially learn in the classroom). The characters here were compelling, but I did not find myself loving this as much as I'd hoped to.* Koonce Ex. R at KIM00155920.

- *But I'm afraid I just didn't love it enough which, as you point out about the glut of paranormal out there, is a must. Competition is so stiff, and I'm afraid our list here in-house is quite full of paranormal, that in order to take more on, I've got to be head over heels.* Koonce Ex. S at KIM00155917.

- *Paranormal YA is so crowded these days, and it's a hard sell for my team without something really exceptional and new to make it stand out.* Koonce Ex. V at KIM00134221.

33.     After this round of rejections, Freeman kept working on her manuscript.  In late November 2012, she sent a new version to me and I responded that "I have read the beginning and it didn't feel as different as I was expecting…"  See Koonce Ex. W at KIM00138021.  Freeman's revisions continued into the spring of 2013, and on April 28 she wrote to me and said: "This is

your long-lost client, Lynne! How have you been?  I have taken my time revising Masqued--I took some time away from it as you suggested and worked on a new project (nothing that we discussed BTW -- how funny is that?) and then came back to Masqued with a vengeance and am really really pleased with the way it's come together."  See Koonce Ex. X at KIM00195585.

34.    Shortly thereafter, I had one of my readers review the manuscript again and her overview was as follows:

> *I read through MASQUED and like a lot of the revisions the author has done since the last time I looked at it. As always, I like the mystery surrounding the story with the Order of the Sphinx and the abductions, and I also like the fact that it takes place in Alaska. However, I don't really feel a strong connection to Anna or truly understand who she is as a character. We are told a lot of things about her, but I didn't find all of these things weaving together to form a comprehensive whole. For instance, we are told that her friend Brendan knows just what to say to bring out her stubborn streak, but I don't really see that stubborn streak in play anywhere before this. I also worry that the manuscript is sticking with some cliched/overdone story lines: a hot guy who's new in school; a girl friend who suddenly gets popular and leaves the other friend behind; a half angel/half demon girl destined to save or destroy the world depending on how things go with her bad boy love whom she trusts even though she shouldn't, etc. I was intrigued by Anna because of her expertise with Tarot and the mysteries surrounding her about her father and about Ash and his family, and wonder if we can get over these cliches by simply moving past them and moving the plot forward quickly.*

See Koonce Ex. Y at KIM00195815.

35.    On July 30, 2013, Freeman wrote to me and said "Hope you're having a great summer. Masqued is done done. I had a dozen readers review it and after their feedback, it's polished and ready to go. I would like to discuss the plan with you before we send it out. Is there a good day next week for us to check in?" See Koonce Ex. Z at KIM00159810.  This was the last revision of her manuscript that Freeman ever sent us (although she did send us a "clean" version to use for the final round of submissions as discussed below). We did not work on any further revisions after July 2013.

36.     Upon reviewing the newly-revised book, it was becoming clear to me that Freeman's edits to the book were still not moving it in the right direction, and that my attempts to help her address the major structural problems with her manuscript were not bearing fruit.  In September, I wrote to Freeman and said:

> I hope these thoughts help. Lynne, I really love working with you. You are such a fantastic person and I always deeply enjoy our talks. However, I feel like I am not doing justice to you as an agent. My comments don't always seem to lead your book to the next level and this may just be because you and I are looking for different things from this project...believe me, I in no way claim I have any or even some of the answers regarding this mysterious endeavor called writing! What I do know is that I was not able to successfully sell this project and though I know it's changed a great deal, I worry that the same editors who passed initially may not be the best candidates for acquiring it right now. This is just a tough reality of publishing. There are a few more place to try, of course, but I really think you owe it to yourself to be really certain you are putting the best book out there. And at this point, I am not sure my comments are the most useful medium to getting you there. It sounds like you've had a lot of amazing feedback from people in your community and I really value their insights and this makes me doubt my own judgment regarding this book which essentially is that I really love the voice, the story and so on but feel it has to go to the next level in terms of a really coherent theme and high level plot with lots of forward momentum and character responsibility.  I know this email is long and perhaps long overdue. You deserve honesty from me above all else. I am happy to try sending this out once more. Or have a phone conversation if you think that would be useful. But the bottom line is you need to move forward and I need to more forward too...not to mention the book.

*See* Koonce Ex. AA at KIM00198298.

37.     Even after this exchange, Freeman asked me to send out another round of submissions to editors, and I agreed to do so.  (She also asked me to re-send to editors who had already seen the manuscript in earlier forms, but I explained that this was against industry practices.)  On October 10, 2013 I submitted the manuscript to Entangled, Holiday House, Thomas Dunne, and another editor at Penguin. *See* Koonce Exs. BB-EE. Later in October I sent out submissions to CarolRhoda and Scholastic. *See* Koonce Exs. FF-GG.

38.     With respect to Entangled, I first sent a query letter to Elizabeth Pelletier. *See* Doniger Ex. 21. I did not attach the full manuscript for *Masqued* to my Oct. 10, 2013 submission email, but noted that "I'd love to send you the full manuscript." *Id.* at KIM00157613-14. On October 18, Stacy Abrams at Entangled wrote back and said "Liz asked me to respond to you about this submission because she's currently closed to acquisitions. It definitely sounds like it could be up my alley, if you wouldn't mind sending it along!" *Id.* at KIM00157612.  I sent her the manuscript on October 30, 2023. *Id.* at KIM00157612.

39.     In early November, I responded to a request from Freeman regarding the various publishers to which we had sent the manuscript, and in my response I noted that I thought "your best bet for this one is going to be Entangled. The editor is reading now and I know her really well and like her a lot so fingers triple crossed!!" See Doniger Ex. 14 at KIM00193730. By February 14, 2014 we had received rejections from all of these publishers except for Entangled.

40.     In February and March 2013, I was effectively on maternity leave. I say "effectively" because as owner and principal agent at Prospect Agency, I was still called on to do work during this period, but was very occupied with my new baby and two small children and had to focus most of my attention on current clients, not new clients or outstanding submissions.

41.     On March 25, 2014, Freeman wrote to me terminating our author-agent relationship. In that email she stated: "I had the pleasure of attending a three day children's writing workshop a few weeks ago and am more than ever convinced that writing YA fantasy is my thing. I know the fantasy element is not yours. I don't believe Entangled will want Masqued as it is. I actually brought this ms to the workshop and had so much fun with it. I'd like to see Masqued make it and I'd like to keep my adult ms in fantasy. So I believe that brings us to a parting of the ways. I've really enjoyed working with you and getting to know you. I'd of course prefer that we

talk but I know how very busy life is with a new baby (not to mention 2 other wee ones) and owning your own business:).  Doniger Ex. 24 at KIM00163955. I wrote back on March 31 and said: "I am sorry to hear this news but understand if you want to take your books in this direction. I think you are a very talented writer and so enjoyed our many conversations. Would you like me to withdraw the manuscript from Entangled?" *Id.* at KIM00163954. Freeman confirmed that she wanted me to withdraw the manuscript from Entangled, and I asked my assistant to do so. *Id.* at KIM00163954. The termination of our agency relationship was entirely amicable.

42.     During the three years that we worked together, Freeman repeatedly asked me for my feedback on her manuscript and would check in with me, eagerly awaiting my reactions to her changes. She regularly thanked me for the time and care I was paying to her manuscript. In documents produced during fact discovery in this case I saw that she passed on most of my emails and recaps of our conversations to her aunt who reviewed my feedback and typically agreed with it, encouraging Freeman to heed my advice.  I have set out our correspondence at length above to demonstrate the attention and diligence given to Freeman's manuscript, and the extensive efforts undertaken to find her a publisher.

43.     After we terminated our professional relationship in March 2014, I had no contact with Freeman before the current dispute arose except once in 2015, when I emailed her just to touch base.  In that email exchange, Freeman stated "I really needed to take some time away from Masqued and then get perspective.  The story just didn't work. I've written a new story, using parts of Masqued that I loved, and a completely different mythology with Egyptian gods….! Not quite done but very close."  Doniger Ex. 34. at KIM00075471.

44.     In early April 2021, I was contacted out of the blue by Freeman, seeking a copy of our Agency Agreement from December 2010.  *Id.* at KIM00075470.  I thought this was

exceedingly odd, as no former client of mine had ever asked for their old agency agreement. It was also somewhat perturbing, as I felt she was treating me a bit like her assistant when we had not had a professional relationship for over seven years, especially since she would not tell me why she wanted the agreement. I raised this in a text exchange with my assistant, and we speculated about why Freeman might be asking for that document. One thought was that perhaps she wanted to crib from our agreement in connection with some new literary agent with whom she was working. Freeman's email included a footer with her business address in Alaska which helped me recall both that she was an attorney and that her manuscript had been a paranormal romance set in Alaska. *Id.* at KIM00075470. At the time, Tracy Wolff was becoming famous for a paranormal romance also set in Alaska and I knew that bad actors often come out of the woodwork and claim infringement in order to try to generate a financial windfall when an author is successful, as has happened with both the *Twilight* and *Harry Potter* series. Given Freeman's unusual request and the caginess of her response, I surmised that this might be the case here and as it turns out, I was correct. But I set my speculations aside, because I recalled Freeman's book was a "werewolf romance" whereas Tracy's book was as "vampire romance," two very different subgenres.

45.     During the time we worked together, Freeman created three major revisions of her work. I have a total of 31 email attachments from her in my archives, many of which detail small revisions, are versions of the same book sent in Word or PDF, or contain a synopsis or pitch of the book (documents often requested by editors) that I assisted her in drafting. While I do not have all of my emails from the entire period we worked together, I recall at most receiving between 10 to 15 drafts of her work, again most of which consisted of relatively modest revisions. As noted, the last full version of her manuscript that I received was in July 2013. At no time after the termination of our relationship did she ever send me any other versions of her manuscript. Also, while I

understand she now claims she shared prior drafts of her manuscripts and notes written before she engaged me as her agent in 2010, and manuscripts she wrote after we parted ways, none of that is true. We also searched our files during fact discovery and I had no manuscript drafts predating late 2010 or post-dating 2013.

46.     Other than sending the submission copy of *Masqued* to Stacy Abrams at Entangled, neither I nor anyone else at Prospect Agency ever provided any of Freeman's manuscripts or other written material to Entangled Publishing. Nor did I or anyone else at Prospect Agency ever provide any of Freeman's manuscripts or other written material to Tracy Wolff. I also did not convey (nor did anyone else at Prospect) any content authored by Freeman to any third party (including Entangled or Wolff) verbally or through other means, other than the submissions we made to publishers during my time working as Freeman's agent. I also never even spoke to Wolff, Pelletier, Abrams or anyone else about Freeman or her manuscripts aside from my submission to them, until the start of this dispute.

47.     I would note that in multiple places in her papers Freeman appears to argue that Wolff somehow used material from versions of her manuscript post-dating 2013. As noted, I never saw or received any of those manuscripts, so I could not and did not provide any material from those manuscripts to Wolff or anyone else. For example, at one point Plaintiff says that "[t]he Crave series bleeds other BMR characters into the heroine's grandmother. . . . in BMR the "God of Chaos" is the heroine's father and the "Bloodletter" is another name given to the heroine's second love interest, but in Crave the heroine's grandmother is also both the Bloodletter and the God of Chaos. SSUF ¶ 131. In the course of this lawsuit, I have reviewed the three major revisions Freeman completed while she as at my agency and none of them contain the idea of a "God of Chaos." I am not sure what she means by "bleeds other BMR characters into the heroine's

grandmother" but it is not true that Cassia, aka The Bloodletter, was inspired in any way by BMR. She is an original character created by Wolff in collaboration with Pelletier as her content editor. I had absolutely no role in creating this character. To the extent that the idea of "The God of Chaos" exists in versions of Freeman's manuscripts that post-date our working relationship that officially ended in March 2014, again, I never saw or received any manuscripts from her after we parted ways and to this day, have not reviewed those manuscripts, even during the course of this lawsuit.

48.     As another example, Plaintiff claims that "[t]he Heroine has a special initiation with the witches/priestesses (BMR) / the Bloodletter (*Crush*), in which she comes into her powers and is fully accepted as Kindred (BMR) / accepted into the Circle (*Crush*)"; that "[i]n *Crush*, the trials are called the 'Ludares' trials, but they are the same in both Works; and that "[t]he Heroine must go through the initiation alone and must choose shadows or light." (SSUF ¶157.) The special initiation scene, however, is not present in any version of *BMR* Freeman worked on during our time together and I highly doubt it is a deadly game inspired by both rugby and Quidditch, as Ludares is in the Crave books.

49.     In sum, no part of *BMR* inspired any part of *Crave* but it is important to emphasize that I never even saw or ever had access to many of the things Freeman alleges are similar, and the fact that she jumbles all the supposed similarities from all of her versions together in single index is just a further attempt to confuse matters.  It is horrifying to be accused of stealing things I once read many year ago, but to be accused of stealing things I never saw is beyond outrageous.

**Lynne Freeman's Continued Work on Her Manuscript**

50.     I understand that Freeman alleges that near the end of our professional relationship I "pressured" her to switch to writing adult contemporary romance and even erotica, and that I told her that "if she could not write a contemporary romance book and give her something new, [I]

21

would need to remove Freeman from her website" (a fact that is belied by the reality that she had to remind me to remove her from the site during my maternity leave after we parted ways). Am. Cplt. ¶ 31. She also says that she relied on my advice that "the publishing industry was oversaturated with young-adult paranormal romance, and that it wouldn't be a good time for a story like Freeman's until at least the time her son graduated from high school in 2021," and thus "decided to revisit BMR later as Kim advised and continued working on her craft." SSUF ¶ 29; *see also* Am. Cplt. ¶ 31. *Id.*

51.     None of this is true; I never told her any of these things. While it is certainly possible that we discussed various avenues she might try to become a published author, these were at most brainstorming discussions and I never pressured her to take any particular actions. In fact, the reason I first suggested we end our relationship despite my general aversion to parting ways with an author was because I knew there were only a few more editors left to query, but that she was committed to selling that project, and I was worried my comments would not help her reach a place where she could make that sale.

52.     I have reviewed documents produced in fact discovery, and contrary to her claim that she put her manuscript aside for years at my advice, her correspondence indicates that Freeman continued to work on her manuscript *Masqued* continuously, long after we parted ways. In October 2014, she corresponded with a "book doctor," William Greenleaf, who thanked her for "sending *Masqued* back to me for another look," provided some comments on the book, and offered a "complete edit" of the manuscript for $3800. See Koonce Ex. HH at LF272329-31. In reply, Freeman thanked him and said that "[y]our critique was beyond helpful. I couldn't have figured out what was wrong with the plot and how to fix it without your critique and suggestions." *Id.* at

LF272328.  She noted that she was concerned about the price, but that "a top literary agent in my genre," Laurie McClean, had asked her to submit her manuscript for review.  *Id.*

53.     By early December 2014, Freeman was working with an editor for hire who provided unfavorable critique of Freeman's manuscript, stating that the story ends "right as it should be beginning." See Ex. II at LF272317-19. She goes on to note that "[a]ll of the potential you have to differentiate yourself in the market is linked to your rendering of the magical world you've created.  There is a lot of competition out there for run-of-the-mill paranormal stories.  You run the risk of being classified as one of them because you take a kitchen sink approach to your paranormal elements." *Id.* at LF272318. In response, Freeman said she understood the critique about the plot, but confessed "I have no idea what to do right now to fix it.  Chuck it in the trash is where I'm headed (wink wink). A significant re-write of the entire story, start to finish, is what it sounds like." *Id.* at LF272318.

54.     Also in December 2014, after hearing from the editor for hire, Freeman wrote to Greenleaf again and told him that she had sent *Masqued* to the editor, and the response that she received was "beyond terrible" and that the editor said the book needed "a significant re-write because of significant plot problems." *See* Koonce Ex. JJ at LF272299. She asked Greenleaf for help with the re-write; in response he stated that she should be cautious about making changes based on just one agent's advice. *Id.* at LF272298. Freeman responded that it was not just the editor for hire who read the book and had problems with it, but also Andrea Brown, principal of the agency where the editor used to work. She said "[b]oth agents had the same reaction, though [the editor for hire]'s critique was much harsher. My former agent also had problems with the plot moving too slowly, so I figure that's 3." *Id.* at LF272298. A month later, in January 2015, Freeman emailed the editor for hire with a re-working of the plot. *See* Koonce Ex. II at LF272314.

55.     In early October 2015, Freeman had a long email exchange with a fellow writer and friend from high school (*see* Freeman Tr. 36:3-37:21), Michael Garner, about their respective manuscripts.  In one email she noted that she had not made much progress since they last spoke because "[b]asically, I don't want to do any more edits until I'm absolutely positive that my plot is right on.  That was the thing that nasty editor really carped on me about."  *See* Koonce Ex. KK at LF267089.  She asked Garner to share his process for approaching a book's plot, and when he did so, noted that "[y]ou really did a thorough and well-thought out job on how you approached your plot.  I did not.  Which is probably why my first stab at this didn't ultimately sell."  *Id.* at LF267087-88.

56.     In a later email she says: "What I've been going through – this crisis of confidence – is mental quicksand.  Manuscript written and a plot problem.  It's been from hell but it's turning around. I think – I'm almost scared to say it – but I think I'm almost there."  *See* Koonce Ex. LL at LF266724. In a follow-up email she states: "Bottom line for me:  I'm just not satisfied with my plot and how it will play out – yet."  *Id.* at LF266722. Interestingly, in this same email she tells Garner that "I firmly believe that money is to be made on paranormal romance **series**. And that they can be done quickly once a formula is in place (maybe 3 a year?). Taking a tried and true formula from commercially successful authors and applying it to your own idea and getting a rocking book cover—can't hurt. The writing has to be decent and the story compelling or there will be no sales. No volume. No readers." *Id.* at LF266722.  In yet another email she advises Garner that if he is "going to write adult paranormal romance, I have some books you should check out. I'd like to take one of those (they're all sexy and funny) and turn it into a YA series.  No one is doing that.  Yet. !!!"  *Id.* at LF266725.  Clearly during this time period she was still working – if also struggling – with her manuscript, and contemplating how to sell her work.

57.     Later, on August 17, 2016, Freeman wrote again to Garner and announced that "*Masqued* is a fait accompli . . . Yay me!"  Koonce Ex. MM at LF266678.  Garner wrote back and congratulated here, noting that "[y]ou've been working so hard on it for so long. " *Id.* at LF266678. In a further email, Freeman stated: "How satisfied am I with the results? Pretty satisfied I'd say. This book has been an albatross around my neck. I figure I've written 5 iterations of the story. This last one is honestly a completely new book. Not the original in any way.  And that's been part of my frustration with writing it.  I've wanted to keep to the original and it just couldn't happen. Not with the characters and not with the story." *Id.* at LF266676.  In a follow-up email, Freeman made it clear that she planned to try to sell this new version of *Masqued*:  "I'm reading Masqued again this week and sending it to a guy named William Greenleaf.  "Bill" charges $285 to read your book and give you feedback. . . . After I've gotten any kinks worked out, I would love for you to be the first reader of the finished product before I shop it." *Id.* at LF266673.

58.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

59.    In October 2017, Freeman was still working on *Masqued*, and sent several chapters to author and consultant Jennifer Fink, stating "I've made some changes to the story and have a lot of doubts about the chapter that occurs at the mudflats.  See what you think." Koonce Ex. OO at LF267829.

### My Work with Tracy Wolff and the Creation of the Crave Series

60.    I have represented Tracy Wolff as an agent since 2006. Tracy came to me as a published author and is now an award-winning and NYTs best-selling author of over 70 books spanning multiple genres in adult and young adult literature.  She has written for Harlequin, Penguin Random House, Hachette, ABDO, Entangled, Sourcebooks and HarperCollins.   Her first appearance on the NYTs  and USA Today bestseller lists dates back to 2014.

61.    I do not help write or substantively edit Tracy's books.  Once Tracy has made a sale, I occasionally offer high-level suggestions but even this is relatively rare, as I leave the creative matters to Tracy and her editor.

62.    I understand that Freeman characterizes Tracy's career Wolff as being "modestly successful" prior to 2018, but that by 2018 her career was on the decline because she had writer's block and had trouble meeting deadlines. SSUF ¶ 33 As a result, Freeman says, Tracy lost book deals,  experienced financial stress, and began soliciting "work for hire" deals "rather than writing her own original stories." SSUF ¶ 34. Freeman says I "asked publishers to give Wolff a chance because she was the sole support for her family." SSUF ¶ 35.

██

63.     The fact is that Wolff's career was on the rise throughout the 2010s and right up until the present day.  She has been one of Prospect Agency's most successful authors throughout that period. To the extent that Wolff – like any writer – has ever had writer's block, the fact that she wrote 70 novels between 2008 and 2023 speaks for itself as to the extent of that issue. Further, to the extent she ever ran up against deadlines, that was indicative of how in-demand she was as a writer and the torrid pace of her writing. Wolff is indeed the sole support for her family, so I have always worked hard to ensure that she always has another project in hand when she is finishing an existing project. However, she has been financially *more* successful than most of our authors, not less. Freeman presents all of this misinformation in an apparent effort to suggest that Wolff would have been motivated to steal from an unpublished author, but nothing could be further from the truth.

64.     In 2019, Wolff was approached by Stacy Abrams because, among other reasons, Entangled had a slot to fill in its publishing schedule and Elizabeth Pelletier wanted to fill it with a teen paranormal romance novel and Abrams thought that Wolff would be a good fit for this project.  (I will note that it is an honor for a publisher to approach an agent about a client based on the strength of their voice and their professional demeanor but this has happened to Wolff on many occasions, notably with Kara Sargent at Hachette and Angela James at Carina Press.) Wolff then shared some ideas with Entangled that she thought would be good for a book, one of which was an idea for a book set at a boarding school with warlocks or vampires. This was the idea that they chose to work on, and then Wolff wrote the book.  Pelletier was the content editor for the book, and Abrams was the copy editor.

65.     I communicated regularly with Wolff and Pelletier while the Crave series was being written and edited.  However, I did not write or substantively contribute to any of the books in the

Crave series. My primary role was to support and motivate Wolff, and this included several extensive sessions during the writing of the fourth book in the series, *Court*, where I sat up with her while she was writing the book in a Google document, and helped to keep her awake and focused.

66.     I did review books in the Crave series when drafts were completed, and passed along any proofreading errors or typos that I saw to Entangled. Also, because Pelletier frequently made extensive edits to the drafts, I would on occasion review those edits to make sure there had been no changes that I thought would be objectionable to Wolff. One instance that comes to mind was with respect to one sentence in *Court*, which to me sounded like it was not in Wolff's "voice"; as it turned out, I was wrong and the sentence had been written by Wolff after all.

67.     I did suggest some chapter titles for books in the Crave series.  Wolff typically did not adopt these, but may have used a few of my suggested chapter titles.

68.     After Wolff completed the second book in the series, *Crush*, it became obvious she and the publisher were having trouble keeping up with the details of this complex, ever-enlarging imaginary world.  Prospect Agency helped create a series "bible" for the Crave series, a working document that we began assembling after the first two books in the series were completed.  Such a bible is common for long, complex books series (especially fantasy and science fiction) where it is important to maintain continuity throughout the books, in particular with respect to details such as character and setting descriptions, spelling and the like. I made contributions to the Crave bible, as did my assistants and Abrams at Entangled, as well as other Entangled employees. A bible like this is never published, and does not contain substantive text used in the books, but again just manages already created, in-universe facts used throughout the series.

### Plaintiff's Cherry-Picked Examples from Text Chains

69.     Freeman points to various text chains between me and Pelletier, Wolff and Abrams, mischaracterizing them in order to suggest that I helped write books in the Crave series. To begin with, and most importantly, *none* of her examples show anyone discussing any material originating with Freeman. Moreover, although Freeman tries to make it appear as if Pelletier and I were writing books with Wolff, what they really show is a very accelerated writing and editing process in which at the same time that Wolff was writing, Pelletier was following behind her and editing, and I was adding my support to both of them and sometimes acting as a go-between. I would note that the four books in the *Crave* series ultimately totaled over 2500 pages, and Plaintiff's cherry-picking of small examples of Wolff, Pelletier and I working collaboratively – mostly on the latter two books in the series – in our respective roles and sometimes using shorthand for what we were doing utterly misrepresents the process. I would note that I was not asked about any of these text messages at my deposition, or I would have explained all of this at that time.

70.     For instance, Freeman notes that in December 2020, while the third book, *Covet*, was being edited, I texted Pelletier and said of my brain, "mine is at your service" and "I can be a good repetitive word thesaurus too!" (Doniger Ex. 12 at 10.) In this instance, I was merely offering to be a sounding board for Pelletier as she edited, if she could not think of a good word. The text chain found at Exhibit 18 to the Doniger Declaration is similar, as it shows Tracy writing *Court* while Pelletier and I discuss Pelletier's following edits, with me occasionally making suggestions based on my knowledge of Wolff's preferences. This included the instance I mentioned previously where I suggested that Pelletier cut a line that I thought did not sound like Wolff, only for Pelletier to tell me that it in fact was written by Wolff.  Finally, the text chain in Exhibit 20 to the Doniger Declaration, from October 2021, again during the writing and editing of *Court*, shows me providing suggestions and edits from Pelletier to Wolff, by putting them directly into a Google

Doc in which Wolff was working and sometimes by pasting Wolff's passages directly into the text for Pelletier to see.  Again, not a single word of those edits found in any of these text chains originated in Freeman's manuscripts.

71.     Plaintiff also draws attention to Wolff's statement "[a]bout the fact my agent came up with Alaska."  (Doniger Decl. Ex. 17.) While I did not make this statement, I can say that I did not choose the Alaska setting. Any decisions any of my authors make about their books are always their own. I do often brainstorm with my clients about various aspects of their books, so it is likely Wolff and I had a discussion about setting and that I offered suggestions based on places I knew she had been interested in setting novels in the past.  In this case, I know one of the five ideas she initially sent to Abrams (without any input from me) was set in Alaska.  Further, Pelletier had just returned from an Alaskan cruise, so she was receptive to that setting.

72.     Plaintiff notes that in one text chain Wolff refers to the Crave series as a "group project" between her, Pelletier, and me. SSUF ¶ 51. She fails to note that I respond to this comment by Wolff to say: "That is very kind but the brilliant writing is the result of all your hard work on this book and the many that came before." *Id.* I stand by those words. Wolff worked very hard throughout her career to advance her craft and as a result of that and all her incredibly hard work, created a book series that is completely unique and beloved by many, and did not rely on the work of anyone else, including me.

73.     Plaintiff notes that at one point Wolff texted me and said: "I don't have time to read it yet and really want an opinion I trust on it going into edits[...] If you have time, I would love yours. If not, that's okay :)" and that I responded "OK, I'm on it! I can do Google docs if you like[...] Are you kidding me??? I definitely have time!" SSUF ¶ 53.  While Plaintiff did not include this text chain as an exhibit, on the face of this language I can see that Wolff was only asking me

to review part of the manuscript before the publisher began editing it. The schedule was often so tight that Wolff often did not have a chance to review the book herself either before or after Pelletier edited it because she was busy writing new scenes, so she would on occasion ask me to read the revised version to make sure everything looked good.  I rarely made any suggestions about anything I read either after Wolff wrote it or Pelletier edited it.

74.     Plaintiff says that "Kim, Wolff, and Pelletier frequently discussed edits each of them made to the drafts as well as scenes and portions each of them wrote," identifying texts where I texted Abrams that "Tracy and I are team speed writing new scenes," that "I was with Tracy [Wolff] for literally every page she wrote," and that "I convinced Tracy [Wolff] to let me help her write the guide." SSUF ¶ 55. She also points to a text in which Wolff says she is tired and asks me to log in to Google Docs to "help her write". *Id.*  These texts refer to me keeping Tracy company and providing accountability while she wrote, as described in more detail below.  Again, I did not actually write any of the book myself.  With respect to the text in which I said that "I convinced Tracy [Wolff] to let me help her write the guide," this referred to the Katmere Academy guide which included things like character quizzes and dating games.  That book is not a subject of this lawsuit, but as it turned out none of my ideas were ever used in the guide.

75.     Plaintiff says that I once "talked with Pelletier about cutting Wolff's lines from the draft." SSUF ¶ 56. First of all, it is entirely an editor's prerogative (and indeed her job) to suggest edits to a book, including cutting lines and suggesting new language. Moreover, this text is taken completely out of context. The full text exchange shows Pelletier and I talking about how much my daughter was enjoying the book so far and also how I felt there were a few lines that might be repetitive or not in Wolff's voice. It appears Pelletier ultimately rejected all my ideas. But again,

the point of the conversation was to spread encouragement and share with her that I was enjoying the book as was my pre-teen aged daughter.

76.    In one text chain that Plaintiff identified, I texted Abrams and said "I've stopped copy editing because I helped write all of this". SSUF ¶ 71. For prior books in the series before *Court*, I had read the book at this stage and made minor copyediting suggestions, but the end of *Court* was so challenging that I did not have the energy or desire to do so.  I was focused instead on keeping Wolff writing, and this text referred to the fact that I sat with Wolff while she wrote and often read along, so I did not have fresh eyes to look for copyediting mistakes in the version that had been edited by Pelletier and copyedited by Abrams.

77.    Plaintiff points to a text chain in which Pelletier purportedly says that "[a]t one point Kim stayed up with Wolff writing 'in a Google Dock (sic) with her for 19 hours a day.'" SSUF ¶ 81.  First, the text chain does not say I was "writing" in the Google Doc – that is a word Plaintiff has inserted -- it says only that I stayed with Wolff in the Google Doc. At the end of *Court,* Pelletier and Wolff were working on perfecting the ending and there were a great many new scenes that needed to be written. (I did not ever accompany Wolff in a Google Doc until the end of the writing of *Court*.)  At the time, Wolff was dealing with her very ill mother and a sick fiancé, and caring for her children, not to mention the challenges of life during the pandemic, especially isolation. She was also exhausted from the strenuous past few months of writing *Court.* We decided it would raise her spirits and provide her accountability if I would join her on a Google Doc and keep track of her progress while she wrote.  We would often take snack breaks together and I would monitor her progress as she wrote, often while I did other things in the background such as completing paperwork tasks or even doing the dishes and checking my screen occasionally. Having my company kept her more awake and alert and able to complete this challenging task.  At

no point did I ever contribute more than correcting a missing comma if I happened to notice it. The truth is I would never presume I could match Tracy's distinctive writing voice and she would never want me or allow me to write her books. Further, it is true that Tracy often worked for up to 19 hours a day near the end of *Court* and knowing someone else was putting in the hours too made her feel less alone, not to mention helped her stay awake.

78.     Similarly, Plaintiff identifies a text from me to Abrams in which I said "I'm feeling overwhelmed because I'm also helping Tracy [Wolff] write" and that "[s]he is so much faster when I literally sit with her".  SSUF ¶ 70.  Again, this referred to the fact that Wolff wrote more quickly when I kept her company on a Google Doc. She often got distracted by the many things going on with her family and I provided accountability. This example shows exactly what happened.

79.     Plaintiff identifies other texts where I told Wolff "when I hand [sic] a moment to catch your breath, you ready to get in Google docs and puts this to bed?!!??!"; "I want to help you rage finish the rest of this book" "Let's get send [sic] coffee and crash it out."; and "I'm here to [sic] Google Doc it with you when you're ready." SSUF ¶ 83.  Plaintiff mischaracterizes these texts as showing that I was "writing" the book. Again, I kept Tracy company while she completed *Court* but I never contributed to the writing of *Court.*  As noted above, I was talking to my family, doing the dishes, doing laundry, knitting, or texting with Liz to keep her awake. These text messages all express a shorthand for keeping Tracy company, and providing accountability, not writing the book myself.

80.     Plaintiff also highlights text messages between me and Pelletier discussing a Google Doc, where she asked me ""what did you edit in?"" and I texted back that I was "cutting it to put in the Google Doc" and that Wolff and I were "working in Google Docs."  Plaintiff notes

that I sent Pelletier "entire paragraphs followed by 'use this instead,' seemingly indicating that those paragraphs should be included in the *Crave* book. SSUF ¶ 87.  However, when Pelletier asks "what did you edit in" she is asking me what Wolff edited in.  I am not sure what I was specifically referring to when I said "I am cutting it to put it in the Google Doc" but likely it was a scene Pelletier wanted Wolff to edit and once it was complete, I sent it back to Pelletier in Word because she never or rarely used Google Docs.  I often helped relay material between Pelletier and Wolff when they were writing.  For example, if Wolff finished a scene Pelletier needed, I might email it to her. Or if Pelletier had a scene where she wanted Wolff to revise, I would send it along to Wolff. One reason I did this was that they were very busy writing and editing and this was an administrative task I could do.

81.     Finally, Plaintiff points to a text in which I call Wolff "the best client! But more importantly [sic] best friend and partner in world domination!" and where I say she is my "best client/friend!!" SSUF ¶ 36.  The first comment refers to a joke between Tracy and me that she was going to dominate the publishing industry and in doing so, help solve some of society's ills through her work illuminating the power of love, friendship and kindness. I think of all of my clients as friends, and I truly am blessed to work with so many wonderful people. However, the idea that I would steal or help commit infringement with someone because I liked them is absolutely offensive and untrue. To the contrary, to me a friend is someone who helps you be your best self and live a moral and ethical life.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 22, 2023

_____
Emily Sylvan Kim