# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN,

      Plaintiff,

vs.

TRACY DEEBS-ELKENANEY P/K/A
TRACY WOLFF, et al.,

      Defendants.

Case No.:  1:22-cv-02435-LLS-SN

## <u>DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS</u>

Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
*Attorneys for Defendants Tracy Deebs-
Elkenaney p/k/a Tracy Wolff, Entangled
Publishing, LLC, Holtzbrinck Publishers,
LLC d/b/a Macmillan, and Universal City
Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Sylvan
Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN &
GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
*Attorneys for Defendant Tracy
Deebs-Elkenaney p/k/a Tracy Wolff*

Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal") collectively hereby respond to Plaintiff Lynne Freeman's Rule 56.1 Statement Of Undisputed Facts In Support Of Her Motion For Summary Adjudication ("PSUF," ECF Nos. 280, 289.)

Defendants respond to the PSUF as it was filed on November 22, 2013. On November 28, Plaintiff filed an errata notice (ECF No. 297) that withdrew ¶ 162 and made substantive changes to ¶¶ 97, 108, 110, 111, 120, 132, 133, 135, 141, 148, 152, 155, 156, 157, 159, 161, and 166. Defendants do not take a position on whether the Court should accept Plaintiff's errata, but have reviewed these changes and they do not alter any of Defendants' responses.

### *Background on Parties:*[1]

1.      Freeman is the sole author of the Freeman Copyrighted Material ("FCM"), which collectively consists of seventeen versions of the then-titled manuscript "*Masqued*" or "*Blue Moon Rising*" (referred to as "BMR") and thirteen sets of notes. Lynne Freeman Declaration ("Freeman Decl.") ¶ x, Exh. X.

**Response:** Admitted.

2.      The FCM is registered with the United States Copyright Office under Registration Numbers TXu002276330; TXu002282260; TXu002276335 and TXu002276337. Freeman Decl. ¶ 5, Exh. 50. [LF 169372 - 169379]

**Response:** Admitted.

---

[1] Headings from the PSUF are reproduced herein for the sake of convenience only. This response uses the same abbreviations and defined terms as in Defendants' copyright summary judgment brief. For example, "*BMR*" refers to all drafts of Plaintiff's manuscript, including those entitled *Blue Moon Rising* and *Masqued*. "Crave" (non-italics) refers to the Crave series as a whole whereas "*Crave*" (italics) refers to book 1.

3.      Defendant Emily Kim ("Kim") is a literary agent and a member of Defendant Prospect Agency. Stephen Doniger Declaration ("Doniger Decl.") ¶ 2, Exh. 1 (Deposition of Emily Kim ("Kim Depo.") 40:13 - p. 41:7).

**Response:** Admitted.

4.      Defendant Entangled Publishing, LLC ("Entangled") is a publishing company. Doniger Decl  ¶ 4, Exh. 3 (Deposition of Elizabeth Pelletier ("Pelletier Depo.") p.57, Ls.15 - L.19).

**Response:** Admitted.

5.      Elizabeth Pelletier ("Pelletier") is a member of defendant Entangled and its Publisher and CEO. Doniger Decl. ¶ 4, Exh. 3; Pelletier Depo., p.12, Ls. 13-18. Pelletier owns 80% of Entangled Publishing. Abrams, Jessica Turner, Meredith Johnson, and Katie Clapsadl each own 5% respectively of Entangled Publishing. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 12:3 – p. 13:4).

**Response:** Admitted.

6.      Stacy Abrams ("Abrams") is a member of defendant Entangled and its Editorial Director of Publishing and Vice President of Operations. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p.12, Ls. 13-18) and ¶ 3, Exh. 2 (Abrams Depo. 23:10 - 25:15).

**Response:** Admitted. Abrams "also worked for Entangled a copy editor, which is a different role [than Editorial Director.] That role is solely [for editing] grammar, spelling, inconsistencies, and like." (Doniger Decl. ¶ 3, Exh. 2 (Abrams Depo. 24:10-13).)

***Crave Series Ownership***

7.      Defendant Wolff is credited as the author of the books entitled *Crave*, *Crush*, *Covet* and *Court* (hereinafter referred to collectively as the *Crave* series) and claims to have written each

of the books. Doniger Decl ¶ 5, Exh. 4 (Wolff Depo. 10:7 - 9); Freeman Decl. ¶ 13, Exh. 31, ¶ 15, Exhs. 33-35.

**Response:** Admitted.

8.      The *Crave* series currently consists of six books. At the time of filing this Complaint, four books in the *Crave* series were published by Entangled (*Crave*, *Crush*, *Court*, *Covet*), and only those four are the subject of this suit.

**Response:** Admitted.

9.      Abrams and Pelletier were editors of the books in the *Crave* Series. Doniger Decl. ¶ 3, Exh. 2 (Abrams Depo. p.34, Ls. 8 - 23) and ¶ 4, Exh. 3 (Pelletier Depo. p.14, Ls. 16-18).

**Response:** Admitted but clarified. Abrams was the copy editor (edits for proofreading). (*See, e.g.*, Abrams Dep. 34:20-35:14, 157:21-158:23, 169:13-170:20; Pelletier Dep. 119:20-120:2.) Pelletier was the content editor (edits for substance). (*See* Pelletier Dep. 14:16-18, 16:4-17:20, 110:4-7, 112:11-16; Wolff Dep. 41:8-9; Kim 169:8-170:4.)

10.      Entangled published each of the books in the *Crave* series. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo., p. 119, Ls. 11-15), ¶ 4, Exh. 3 (Pelletier Depo. p. 14, Ls. 2-4), and ¶¶ 5, 62-66, Exhs. 4, 61-65 (Deposition of Tracey Wolff ("Wolff Depo.") Exhs. 25-29, p. 88:9 - 95:10).

**Response: A**dmitted.

11.      Defendant Holtzbrinck Publishers, LLC, d/b/a Macmillan ("Macmillan") is the the exclusive worldwide distributor of all print books and e-books that are published by Engangled and pursuant to an agreement with Entangled has distributed each of the books in the *Crave* book series. Doniger Decl. ¶ 4, Exhs. 3 (Pelletier Depo. 17:21–20:5, 27:8-30:5), ¶ 67-68, Exhs. 66-68 (Pelletier Depo. Exh. 55-57); Doniger Decl. ¶ 24, Exh. 23, Tzeto Depo. 15:20 - 18:1.

**Response:** Disputed to the extent that Macmillan does not have worldwide distribution rights as to all the books in the *Crave* Series but otherwise admitted. Macmillan only has worldwide distribution rights for *Covet* and *Court* but not for *Crave* and *Crush*. (*See* Pelletier Dep. 18:25-19:17.)

12.    Entangled has licensed gaming rights to the first two chapters of the first Crave book to Crazy Maple Studios. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 35, Ls. 16-23).

**Response:** Disputed to the extent that Entangled licensed the gaming rights to the entire *Crave* book to Chapters, which is a Crazy Maple Studios product, but otherwise admitted. (*See* Pelletier Dep. 35:16-23.)

13.    The book *Crave* has generated more revenue for Entangled than any other book published by Entangled. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 117:23- 118:12).

**Response:** Disputed. This was accurate as of the date of Pelletier's deposition but is no longer the case. (Pelletier Decl. ¶ 16.) Regardless, this is not a material fact at summary judgment.

### *BMR/Relationship to parties*

14.    In 2010, Freeman requested that Kim be her agent and, at Kim's request, sent Kim a copy of her manuscript entitled *Blue Moon Rising* (later called "Masqued" and referred herein as "BMR"), which was a young adult paranormal romance story. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. p.57, L. 15 - p. 58, L.10), ¶ 41, Exh. 40 (Kim Depo. Exh. 91); Freeman Decl. ¶ 2.

**Response:** Admitted.

15.    Freeman and Defendants Prospect Agency and Kim entered into a valid Agreement whereby Defendant Kim individually and on behalf of Prospect acted as Freeman's literary agent. Freeman Decl. ¶ 2; Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. 43:12 - 44:5), ¶ 40, Exh. 39 (Kim Depo. Exh. 87).

**Response:** Admitted.

16.     Freeman worked with Kim for more than three years revising and rewriting BMR. Freeman Decl. ¶ 3.

**Response:** Admitted but clarified that Kim worked with Freeman for over three years, but stopped working on revisions and rewrites of BMR in July 2013. (Kim Decl. ¶¶ 17, 35.)

17.     During Freeman and Kim's agency relationship, Freeman sent Kim approximately 50 versions of BMR, along with notes and emails which are all part of the same continuous body of work, including, but not limited to, all of the manuscripts and notes contained in the FCM. Freeman Decl. ¶ 3.

**Response:** Disputed. Kim received three major revisions of *BMR* while she worked with Freeman, and between 10 to 15 versions total, many of which include only modest revisions. (Kim Decl. ¶ 45.) Kim identified a total of 31 email attachments from Freeman in Prospect Agency's archives, many of which detail only small revisions, are versions of the same book sent in Word or PDF, or contain a synopsis of the book that Kim assisted Freeman in drafting. (Kim Decl. ¶ 45.) The last full version of Freeman's manuscript that Kim received was in July 2013. (Kim Decl. ¶ 35.) Freeman never provided Kim with manuscript drafts created prior to late-2010, or after July 2013. (Kim Decl. ¶ 45.)

18.     Kim admits receiving 10-15 versions of the manuscript, along with numerous accompanying notes. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. p. 57:15 - 58:25, 188:5-202:24), Doniger Decl. ¶¶ 41-61, 40-60 (Kim Depo. Exhs. 91-103, 109-116, 118). She also acknowledged that she may not still have all of her e-mails (Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. at p. 99, Ls. 17 - 18)) and that e-mails in her sent file may have been deleted prior to being archived, and that

older versions of Freeman's manuscripts may have been deleted when she received new ones. Id. at 236:10 - 237: 7.

**Response:** Admitted that Kim received 10-15 versions of *BMR* from Freeman. Admitted that Kim received some emails containing contemporaneous notes and comments from Freeman regarding edits and suggested edits. Denied that Freeman provided Kim with notes written either before or after the time period during which Kim and Prospect Agency acted as Freeman's agent. (Kim Decl. ¶ 45.) Denied that Freeman sent Kim all notes counted among the FCM, which is not supported by the evidence cited by Plaintiff. Admitted that Prospect Agency may not have all of its emails from the time period during which Freeman worked with the agency (Kim Dep. 99:14-18) and as a result some e-mails in Kim's sent file may have been deleted prior to being archived. Denied that older versions of Freeman's manuscripts may have been deleted when Kim received new ones, as the cited testimony does not support this. Denied to the extent Plaintiff's statement implies spoliation of evidence, as any such routine deletion of emails occurred long before Kim was on notice of this litigation.

19.    While there are numerous rewrites and edits in the various interactions of the FCM, the overall story is the same and the original expression of the main story elements are captured in six versions of the copyrighted manuscript along with nine sets of Freeman's copyrighted notes. Freeman Decl. ¶ 7 and Exhs. 3-11, 14-19 attached thereto. It is those versions and notes on which this motion focuses, thus comparing 2,650 pages of Freeman's work with an analogous 2,750 pages in *Crave* series. Freeman Decl. ¶ 7. Although Freeman is using the foregoing for purposes of comparing both sides' works, Freeman is alleging infringement of all of the FCM. Freeman Decl. ¶ 7.

**Response:** Disputed to the extent this statement contains legal argument rather than facts. Denied that Plaintiff may rely on versions of *BMR* besides the two she selected pursuant to the Court's Manuscripts Order (ECF Nos. 105, 111). Admitted that the various drafts of *BMR* contain the same basic story and characters. However, disputed insofar as this statement implies that all of these different versions of *BMR* were sent by Plaintiff to Kim. Exhibits 15, 16 and 21 to the Freeman Declaration were created after the end of the Plaintiff-Kim agency relationship. (Declaration of CeCe M. Cole dated December 22, 2023 ("Cole Decl.") ¶¶ 18-20 and Exs. P-R.)

20.    Judge Stanton's Order (ECF 141) and subsequent Clarification Order (ECF 181) made clear that while the Order requiring Freeman to identify two final manuscripts for purposes of substantial similarity was "a fair place to start the comparison process" (ECF 181 at i.e), it "did not admit or exclude evidence." (ECF 141 at 3.)

**Response:** Denied. This statement contains legal argument, not facts, and must be stricken. *See* Fed. R. Civ. P. 56(c); Local Rule for the United States District Courts for the Southern and Eastern Districts of New York ("LR") 56.1(d). Defendants' position on this is set forth in their accompanying copyright brief.

21.    While attending the Romance Writers of America conference in 2012, Kim introduced Freeman to Wolff, as her good friend and client who wrote erotica. Freeman Decl. ¶ 12.

**Response:** Disputed. Kim testified that she did not remember introducing Wolff to Plaintiff at the Romance Writers of American conference in 2012 or ever. (Kim Dep. 128:10-24.) Wolff testified that (i) she has never met Plaintiff; (ii) only heard Plaintiff's name for the first time in February 2022, when Plaintiff sent the initial demand letter; (iii) does not have any recollection of meeting Plaintiff at the 2012 Romance Writers of America conference; and (iv) does not have any

recollection of Kim introducing Freeman to Wolff at the 2012 Romance Writers of America conference. (Wolff Dep. 82:9-25.) Admitted that Kim and Wolff both attended the Romance Writers of American conference in 2012 (Kim Dep. 128:10-14; Wolff Dep. 82:17-14.)

22.     In 2013, it was protocol for agents to email editors at Entangled directly to submit books for publication consideration. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 23, L. 7-10).

**Response:** Admitted.

23.     In 2013, Kim emailed Defendant Pelletier, the publisher and CEO of Entangled, a summary of BMR. Doniger Decl. ¶ 2 (Kim Depo. 136:5 - 137:6), ¶ 27, Exh. 26 (Kim Depo. Exh. 4).

**Response:** Admitted that Kim sent a 297-word pitch of *BMR* to Pelletier's Entangled email address in October 2013. (Doniger Decl. Ex. 26; Kim Decl. ¶ 38.) Clarified that Pelletier herself is not a named defendant in this action. (*See* ECF No. 24 (First Amended Complaint).)

24.     In 2013, Kim also sent a copy of BMR, then-titled *Masqued*, to Abrams, the Executive Editorial Director of Entangled. Doniger Decl. ¶ 22, Exh. 21 (KIM 00157612). Shortly thereafter, Kim told Freeman in an e-mail that Abrams is reading the manuscript and "I know her really well and like her a lot" and that "[h]onestly, I think your best bet for this one is going to be Entangled." Doniger Decl. ¶ 15, Exh. 14 (KIM00193730, p. 00193730).

**Response:** Admitted that this October 2013 email chain shows Kim directly sending Stacy Abrams a copy of *BMR* (then titled *Masqued*). Disputed to the extent that this statement implies that Abrams' role with respect to the Crave series was more than copy editor. (Abrams Dep. 34:20-35:14, 157:21-158:23, 169:13-170:20, 170:12-171:14, 178:23-180:16, 184:21-185:6; 191:14-192:4; Wolff Dep. 180:1-4; Pelletier Dep. 119:20-120:2; Kim 169:8-170:4; Kim Decl. ¶ 64.)

25.     After failing to find a publisher for BMR, Kim pressured Freeman to write contemporary adult romance or she would have to remove her from the Prospect website. Freeman Decl. ¶ 10.

**Response:** Denied. (Kim Decl. ¶ 50-51.)

26.     In spring 2014, after declining to pivot between genres, Freeman and Kim amicably parted ways. Freeman Decl. ¶ 9; Doniger Decl. ¶ 2 (Kim Depo. 143:5 - 144:18), ¶ 25, Exh. 24 (Kim Depo. Exh. 106).

**Response:** Denied that Freeman and Kim parted ways because Freeman refused to pivot between genres (Kim Decl. ¶ 50-51.) Admitted that Freeman and Kim parted amicably. (Kim Decl. ¶ 41.)

27.     Freeman asked Kim to withdraw the *Masqued* submission from Entangled and Kim testified that she e-mailed Abrams withdrawing the submission, but was unable to produce the email to Abrams indicating the submission was withdrawn. Doniger Decl. ¶ 2 (Kim Depo. 47:4 – 150:10) ¶ 25, Exh. 24 (Kim Depo. Exh. 106).

**Response:** Admitted, except denied to the extent Plaintiff's statement implies that the submission was not withdrawn.

28.     Kim's view of Freeman's book: "It was good…she should have kept working on it." Doniger Decl. ¶ 2 (Kim Depo. 48:25 - 52:25) ¶ 26, Exh. 25 (Kim Depo. Exh. 89).

**Response:** Admitted that Kim said this to her assistant Ellen in a text message. Disputed that this statement encompasses Kim's complete view as to Freeman's manuscript. (Kim Decl. ¶¶23, 28, 36.)

29.     Freeman never intended to abandon BMR, but merely took time off to raise her son. Freeman Decl. ¶ 11.

**Response:** Denied, as Freeman never did abandon BMR but continued to work on it consistently for years after she terminated her relationship with Prospect Agency. (Kim Decl. ¶¶ 50-59.)

***Tracey Wolff's Career***

30.     Kim has been Tracey Wolff's ("Wolff") literary agent since 2007. Doniger Decl. ¶¶ 2, Exh. 1 (Kim Depo. 105, Ls. 17 - 24), ¶ 28, Exh. 27 (Kim Depo. Exh. 24), ¶ 5, Exh. 4, (Wolff Depo. 44:3-46:22); ¶ 28, Exhs. 27, (Wolff Depo. Exh. 24). Kim receives 15% commission for domestic sales and 20% for foreign rights for all of Wolff's books, including the *Crave* series. Doniger Decl. ¶¶ 2, Exh. 1 (Kim Depo. p. 106, L. 8 – 25) ¶ 28, Exh. 27 (Kim Depo. Exh. 24), ¶ 5, Exh. 4 (Wolff Depo. p. 49, L. 4-17).

**Response:** Admitted.

31.     Kim tailors her agent duties for her clients. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. p. 36:21 - 37:5).

**Response:** Admitted.

32.     Wolff is not a fantasy writer. Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00349538) (Wolff states in texts to Kim, "the fact that I am not a fantasy writer"); Joint Stipulation On Authenticity of Evidence.

**Response:** Disputed. The lines between different book genres can be blurry and this message alone does not prove that Wolff "is not a fantasy writer." The Crave series is not properly considered fantasy (it is paranormal). (Pelletier Decl. ¶ 17.) Additionally, even if the Crave series were considered fantasy, whether Wolff is a "fantasy writer" is not material to the issues at summary judgment.

33.     Wolff had achieved modest success as a writer of erotica, but by 2018 her career was on the decline as she admits to having writer's block, trouble meeting deadlines, and was "tanking" her career. Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. KIM00348229) [Wolff's career is declining], ¶ 10, Exh. 9 (KIM00016907, p. KIM00016907-16914) [Kim acknowledges that Wolff previously had difficulty meeting deadlines], ¶ 39, Exh. 38; Plaintiff's Request for Judicial Notice ("RJN") (Hank Garner Interview, March 12, 2021, Author stories Podcast Episode 1072 [00:15:00-16:00]); Joint Stip. On Authenticity of Evidence.

**Response:** Disputed. Wolff achieved substantial success prior to Crave; *inter alia*, two of Wolff's pre-*Crave* books were *New York Times* best sellers and several others were *USA Today* best sellers. (Wolff Dep. 51:24-52:6, 69:1-5; *see also* Wolff. Decl. ¶ 10; Kim Decl. ¶ 60 (both summarizing Wolff's career success).) Regardless, this statement does not contain material facts because motive is irrelevant to strict-liability copyright infringement.

34.     Wolff lost book deals and was soliciting "work for hire" opportunities rather than writing her own original stories, and was experiencing financial stress. Doniger Decl. ¶ 11, Exh. 10 (Kim 00012369, p. 00012377, 00012376) (Kim emails Pelletier noting Wolff's interest in a work for hire opportunity), ¶ 10, Exh. 9 (KIM00016907, p. 00016907) (Kim tells Pelletier about Wolff's financial difficulty).

**Response:** Disputed. Doniger Ex. 10 is an email between Kim and Sasha Henriques at Penguin Random House (***not*** Pelletier) wherein Henriques reaches out to Kim looking for an author to audition a writer for a *Stranger Things* novel. (Doniger Ex. 10 at KIM00012377.) Doniger Ex. 10 does not make any reference to Wolff's financial situation (Doniger Ex 10.) Doniger Decl. Ex. 9 is an email between Kim and Sue Grimshaw at Penguin (***not*** Pelletier). (Doniger Ex. 9 at KIM00016907.) In this email Kim explained to Grimshaw that Wolff is not

willing to write on a "book by book basis" as it does not financially make sense for Wolff. (*Id.*) Regardless, this paragraph does not identify material facts because motive is not an element of strict-liability copyright infringement.

35.     Kim asked Pelletier to give Wolff a chance because she was the sole support for her family. Doniger Decl. ¶ 10, Exh. 9 (KIM00016907, p. 00016907, 00016908).

**Response:** Disputed. Doniger Ex. 9 is an email between Kim and Sue Grimshaw at Penguin (***not*** Pelletier). (Doniger Ex. 9 at KIM00016907.) In this email Kim explained to Grimshaw that Wolff is not willing to write on a "book by book basis" as it does not financially make sense for Wolff. (*Id.*) This email does not show that Kim asked Pelletier to "give Wolff a chance," which in any event would not be a material fact because motive is irrelevant to copyright infringement.

36.     Kim considers Wolff "the best client! But more importantly [sic] best friend and partner in world domination!" Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00349454); Kim said Wolff is her "best client/friend!!" Doniger Decl. ¶ 7, Exh. 6 (KIM000347988, p. KIM00348451); Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. 108:15 - 109:6); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent the cited document speaks for itself. Clarified that the comment about "world domination" refers to a joke between Wolff and Kim that Wolff was going to dominate the publishing industry and in doing so, help solve some of society's ills through her work illuminating the power of love, friendship, and kindness. (Kim Decl. ¶ 81.)

37.     Wolff considers Kim a close friend, they speak regularly, and text several times a week. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. p. 54, Ls. 8 – 23). And Wolff texts Kim "You're truly the best agent in the world". Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00348541); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent the cite documents and testimony speak for themselves.

38.    Wolff and Pelletier are close friends, they communicate about business and personal matters, and socialize together. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. p. 85:3 - p. 86:3).

**Response:** Admitted, but this is not a material fact.

39.    Abrams also considers Wolff her friend. Doniger Decl. ¶ 3, Exh. 2 (Abrams Depo. p. 45, Ls. 9 - 11).

**Response:** Admitted to the extent Abrams testified that she considers Wolff "[a] friend and a colleague" (Abrams Dep. 45:9-11), but this is not a material fact.

40.    Abrams considers Kim her friend and colleague. Doniger Decl. ¶ 3, Exh. 2 (Abrams Depo. p. 36, Ls. 16-25).

**Response:** Admitted, but this is not a material fact.

41.    Both Pelletier and Wolff live near Austin, Texas and see each other about once every three months. Pelletier and Wolff share news with each other. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 72:5 – p. 73:10).

**Response:** Admitted to the extent that Pelletier testified that she has seen Wolff "[m]aybe once every three months" "in the last three years" (Pelletier Dep. 73:8-10), but this is not a material fact.

42.    Entangled has published around 20-30 books authored by around 6-10 authors represented by Kim. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 57:23 – 58:21).

**Response:** Disputed because this mischaracterizes the testimony. At her deposition, Pelletier made a "wild guess" that Entangled published around "20 or 30" books by an "estimate" of "six and ten" other authors represented by Kim but otherwise admitted. (Pelletier Dep. 58:8-21.)

43.     Pelletier and Kim are also close friends. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 60, Ls. 7 – 17). Pelletier texts Kim "Love ya!" Doniger Decl. ¶ 12, Exh. 11 (KIM00351667, p. 00351686); Joint Stip. On Authenticity of Evidence. Kim testified that she had "grown close to [Pelletier] working with the Crave ·series, but we have a primarily business relationship." (Kim Dep. 120:15-18.)

**Response:** Admitted to the extent that Doniger Ex. 11 speaks for itself but otherwise disputed. Pelletier testified that she would characterize Kim as a "good friend" for "[t]he last 2-1/2 years" and that they have a "good" relationship but do not socialize together. (Pelletier Dep. 60:7-19.)

### *Creation of Crave*

44.     Pelletier was looking to publish a young adult book because there was an opening in her schedule after a different book fell through. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 133:14 – 134:15).

**Response:** Admitted that a schedule opening is among numerous other reasons why Pelletier wished to develop a new YA vampire romance series at the relevant time. (Pelletier Dep. 133:14-134:13; Pelletier Decl. ¶ 7; Kim Decl. ¶ 64.)

45.     Abrams introduced Pelletier and Wolff. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 94:22 – 95:7).

**Response:** Admitted, except the cited portion of the Pelletier deposition does not say this. (*See* Abrams Dep. 35:3-14.)

46.     Abrams approached Wolff and asked her if she could write a book quickly for Entangled because they had a book fall through. Abrams told her they were looking for something

paranormal. Doniger Decl. ¶¶ 4, Exh. 3 (Pelletier Depo. 93:11-95:7), ¶ 29, Exh. 28 (Pelletier Depo. Exh. 7).

**Response:** Disputed to the extent that the cited testimony does not support Plaintiff's statement. Pelletier did not testify Entangled was "looking for something paranormal." At her deposition, Pelletier testified that she told Abrams to tell Wolff that "[Pelletier] was looking for a book with a fish out of water trope" which could also mean that Pelletier was "looking for a book about an ordinary girl in a super rarified world." (Pelletier Dep. 95:8-12; Abrams Dep. Ex. 7.) Admitted that Abrams approached Wolff and asked her if she could write a book quickly for Entangled because they had a book fall through. (Pelletier Dep. 92:6-17, 133:14-20; Abrams Dep. Ex. 7; Abrams Dep. 113:20-116:16; Wolff Dep. 64:15-65:19.)

47.    Wolff then wrote up five ideas and sent them to Abrams. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 96, Ls. 16-22). Pelletier and Abrams chose idea number two because it was the one closest to what Pelletier was looking for. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 127:12 - 129:19), ¶ 29-30, Exh. 28-29, (Pelletier Depo. Exhs. 7-8), ¶ 5, Exh. 4 (Wolff Depo. p. 37:25 – 38:6, 128:9 – 131:16), ¶¶ 30-31, Exhs. 29-30 (Wolff Depo. Exhs. 8-9).

**Response:** Admitted.

48.    Wolff claims that it only took her two to three months to write each of the books *Crave*, *Crush*, and *Covet*. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 66:21– 67:7). *Crave* was released in April 2020. Five months later, in September 2020, the second book, *Crush*, was published. Id. The third book, *Covet*, was released in March 2021. Id.. The Crave books are 600-800 pages long and were, incredibly, written and completed mere months apart. The fourth book was released February 2022. RJN, Freeman Decl. ¶ 13, Exh. 31, ¶ 15, Exhs. 33-35.

**Response:** Admitted that it took Wolff several months to initially draft each of the books in the Crave series (Wolff Dep. 66:21-67:9), but the total writing process was longer (Wolff Decl. ¶¶ 18-21). Admitted as to the publication dates but disputed that the books were "written and completed mere months apart," as *Court* was published almost a year after *Covet*. (Wolff Dep. 11:20-12:2, Wolff Decl. ¶¶ 20-21; *see also* Pelletier Dep. 64:5-19.) Admitted that each Crave book is between 600-800 pages long.

49.     Abrams and Pelletier were very involved in the writing of the *Crave* series. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 179:10 – 181:10), ¶ 32, Exh. 31 (Wolff Depo. Exh. 47). Kim was also very involved in the writing of the *Crave* series. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. p. 47:3 – 48:4).

**Response:** Disputed. Pelletier was "very involved" in creating the Crave series but not "in the writing" of it. (*See, e.g.*, Wolff Dep. 179:10-25; Pelletier Dep. 112:8-114:16; *see also* Kim Dep. 170:5-171:5.) Abrams was not involved in the writing of the Crave series or the content editing process. (Abrams Dep. 170:12-171:14, 178:23-180:16, 184:21-185:6; 191:14-192:4; Wolff Dep. 47:19-23.) Abrams was only a copy editor (meaning proofreading edits). (*See* Abrams Dep. 34:20-35:14, 157:21-158:23, 169:13-170:20; Wolff Dep. 180:1-4; Pelletier Dep. 119:20-120:2; Kim 169:8-170:4.) Kim was not involved in the writing of the Crave series. (*See, e.g.*, Kim Dep. 166:3-167:14; Wolff Dep. 57:7-59:6; Pelletier Dep. 62:4-63:25, 117:20-22; Kim Decl. ¶ 65, 69.) Kim acted as a "cheerleader" and would suggest some chapter titles, "some of which [Wolff] took, most of which [she] did not," and contributed to the series bible. (Wolff 57:7-59:6; Pelletier Dep. 62:17-63:25, 117:20-22; Kim Dep. 166:3-167:14; Kim Decl. ¶ 65-67, 69.)

50.     Pelletier provided substantial input for the plot of *Crave*. Doniger Decl. ¶¶ 5, Exh. 4 (Wolff Depo. p. 180:12 - 181:5, 183:9 – 184:16), ¶ 32, Exhs. 31 (Wolff Depo. Exh. 47).

16

**Response:** Admitted.

51.     Wolff refers to the Crave series as a "group project" between her, Pelletier, and Kim. Doniger Decl. ¶¶ 5, Exh. 4, (Wolff Depo. 187:2 – 188:18) ¶ 32, Exh. 31 (Depo. Exh. 47).

**Response:** Disputed. It is not true that the Crave series was a collaborative project with Kim, and Plaintiff's cited evidence is taken out of context and does not support this. (Kim Decl. ¶ 72.) Instead, Wolff testified that the "Crave series was a collaborative project with Pelletier." (*E.g.*, Wolff Dep. 187:2-17; *see also, e.g.*, Kim Dep. 166:3-167:14; Wolff Dep. 57:7-59:6; Pelletier Dep. 62:4-63:25, 117:20-22.)

52.     Kim texts Wolff "We'll [Kim and Pelletier] comment in Google docs." Doniger Decl. ¶ 8, Exh. 7 (WOLFF 0095695, p. 0095698).

**Response:** Denied. Doniger Ex. 7 does not include the cited Bates number or quoted language. It does not appear that any of Plaintiff's exhibits include this Bates number or the quoted language.

53.     Wolff texts Kim "But I don't have time to read it yet and really want an opinion I trust on it going into edits[...] If you have time, I would love yours. If not, that's okay :)" Kim responds "OK, I'm on it! I can do Google docs if you like[...] Are you kidding me??? I definitely have time!" Doniger Decl. ¶ 8, Exh. 7 (WOLFF_0095695, p. 0095695-98).

**Response:** Denied. Doniger Ex. 7 does not include the cited Bates number or quoted language. It does not appear that any of Plaintiff's exhibits include this Bates number or the quoted language.

54.     Wolff also texts Kim "This rewrite in the game to put in the arena is brutal. I should have just rewritten instead of edited". Doniger Decl. ¶ 8, Exh. 7 (WOLFF_0095695, p. 0095696).

**Response:** Denied. Doniger Ex. 7 does not include the cited Bates number or quoted language. It does not appear that any of Plaintiff's exhibits include this Bates number or the quoted language.

55.     Kim, Wolff, and Pelletier frequently discussed edits each of them made to the drafts as well as scenes and portions each of them wrote. Doniger Decl. ¶ 19, Exh. 18 (ENTANGLED 0073444, p. 0073445–0073466) (Kim texting Pelletier about her edits and how great they are); Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352450) (Kim texts Abrams "Tracy and I are team speed writing new scenes"; Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. KIM00352450) (Kim texts Abrams "I was with Tracy [Wolff] for literally every page she wrote"); Doniger Decl. ¶ 16, Exh. 15, (KIM00352321, p. KIM00352513) (Kim texts Abrams "I convinced Tracy [Wolff] to let me help her write the guide"); Doniger Decl. ¶ 6, Exh. 5, (WOLFF_0097494, p. 0097498) (Wolff is tired and asks Kim to log in to the Google docs and help her write); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that Wolff, Pelletier, and Kim frequently communicated during the writing/editing of the Crave series, but denied that they "frequently discussed edits each of them made" or "portions each of them wrote." The cited documents speak for themselves and do not show Kim making any substantive edits to the Crave series or writing any scenes or portions thereof. Kim did not write or substantively contribute any of the Crave books. (*See, e.g.*, Kim Dep. 166:3-167:14; Wolff Dep. 57:7-59:6; Pelletier Dep. 62:4-63:25, 117:20-22; Kim Decl. ¶ 65; *see also* Pelletier Decl. ¶ 21; Wolff Decl. ¶¶ 23-24, 29.)

56.     Kim also talked with Pelletier about cutting Wolff's lines from the draft. Doniger Decl. ¶ 19, Exh. 18 (ENTANGLED_0073444, p. 0073469, 0073468); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that in the cited document, Kim writes "But that's funny I keep cutting her lines," but this is taken out of context. The full text exchange shows Pelletier and Kim discussing how much Kim's daughter was enjoying the book and how Kim felt there were a few lines that might be repetitive or not in Wolff's voice. (Kim Decl. ¶ 75.)

57.     Kim offers to help Pelletier as a good repetitive word thesaurus, . Doniger Decl. ¶ 13, Exh. 12 (ENTANGLED 0073726, p. 0073734); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that in the cited document Kim writes "I can be a good repetitive word thesaurus too!," but this is taken out of context and not a material fact. (*See, e.g.*, Pelletier Decl. ¶ 20 (providing context).) Kim was merely offering to be a sounding board for Pelletier as she edited, if she could not think of a good word. (Kim Decl. ¶ 70.)

58.     While making edits, Pelletier refers to herself as a "wordbuilding god." Doniger Decl. ¶ 13, Exh. 12 (ENTANGLED_0073726, p. 0073729); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that the cited document contains the quoted language, but this is taken out of context and not a material fact. Clarified that Pelletier immediately then writes: "And Tracy, holy fuck, she can write all the feels. The characters just feel like real people. … She is a god as well." (Doniger Ex. 12 at 5.)

59.     A synopsis is a basic plot plan for the book. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo, p. 61, Ls. 22-23). Pelletier admits that the synopsis for the *Crave* books was written before the books and that she wrote the synopsis for Crush, *Covet* and *Court* and there was no synopsis for the book *Crave*. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo, 77:5 - 78:4).

**Response:** Admitted that a synopsis is a basic plot plan for the book and that synopses are written before the books. Otherwise disputed as factually inaccurate. Wolff wrote the first half of

the synopsis for *Crush* (Wolff Dep. 61:9-21, 181:1-10, 184:17-21; Pelletier Dep. 115:22-116:8)

and there was no formal synopsis for *Crave* (Pelletier Dep 77:15-16, 78:3-6; Wolff Dep. 182:71-

183:8). This is not a material fact because Wolff and Pelletier did not have access to *BMR*.

60.      Wolff states in texts to Kim that "Crave is me, and crush and covet have been the 3

of us." Doniger Decl. ¶ 7, Exh. 6 (KIM000347988, p. 00349454); Joint Stip. On Authenticity of

Evidence.

      **Response:** Admitted that the cited document contains the quoted language, but this is taken

out of context.

61.      Wolff did not write the synopsis for each book in Crave. Doniger Decl. ¶ 5, Exh. 4

(Wolff Depo. p. 61, Ls. 9 – 11).

      **Response:** Disputed. Wolff wrote the first half of the synopsis for *Crush*, but it was not

used. (Wolff Dep. 181:1-10, 184:17-21; Pelletier Dep. 115:22-116:8; Pelletier Decl. ¶ 9.) There

was no formal synopsis for *Crave*. (Pelletier Dep 77:15-16, 78:3-6; Wolff Dep. 182:71-183:8;

Pelletier Decl. ¶ 9.) This is not a material fact because Pelletier (who otherwise wrote any

synopses) did not have access to *BMR*.

62.      Wolff also states that for *Crush* (Book 2) she wrote the first half of the synopsis and

Pelletier wrote the rest. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo, p. 61, Ls. 9 – 21). For *Covet* (Book

3) Wolff states that Pelletier created the entire synopsis. Id. And for *Court* (Book 4) Pelletier also

created the synopsis. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo, p. 62, Ls. 14-18). Wolff confirmed

Kim and Pelletier's involvement in her deposition, and further admitted that Pelletier provided a

substantial input for the plot of *Crave*. Doniger Decl. ¶¶ 5, Exh. 4 (Wolff Depo. p. 180:12 –

181:17), ¶ 32, Exh. 31 (Depo. Exh. 47).

**Response:** Denied that "Wolff confirmed Kim['s] … involvement in her deposition," which the cited evidence does not support. Otherwise admitted.

63.     Pelletier emailed Wolff and Kim "I owe you the rest of the synopsis no later than Saturday." Doniger Decl. ¶ 23, Exh. 22 (KIM00074211, p. 00074211).

**Response:** Admitted that the cited document contains the quoted language, but this is not a material fact because Pelletier did not have access to *BMR*.

64.     Kim, Pelletier, and Wolff used Google Docs to write since at least 2020. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo, 23:11 - 26:20); Doniger Decl. ¶ 8, Exh. 7 (WOLFF 0095695). Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 22:24 – 23:2).

**Response:** Disputed. Pelletier did not use Google Docs in connection with the Crave series and did not edit the books using Google Docs. (Pelletier Dep. 46:16-48:8.) Further disputed because Kim did not write any of the books in the Crave series via Google Docs or otherwise. (*See, e.g.*, Kim Dep. 166:3-167:14; Wolff Dep. 57:7-59:6; Pelletier Dep. 62:4-63:25, 117:20-22; Kim Decl. ¶ 65.) Instead, Kim kept Wolff company in a Google Doc to motivate and keep Wolff awake while Wolff revised the ending to *Court*. (*E.g.*, Wolff Dep. 25:7-14; Wolff Decl. ¶¶ 23-24; Kim Decl. ¶¶ 65, 74.) Wolff otherwise wrote and edited the Crave series using Microsoft Word, not Google Docs. (Wolff Dep. 22:24-23:2, 28:17-21; Wolff Decl. ¶ 23.)

65.     Abrams, Kim, and Pelletier had access to several of Wolff's documents on Google Docs. Wolff testified that she believes Abrams had access to the Crave titles and possibly the Crave bible. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 26:12 – 27:7).

**Response:** Admitted that Wolff states this in the cited testimony. Clarified that, per the cited testimony, the Google documents referred to are a document containing chapter titles and the

series bible. These facts are accordingly not material because Plaintiff does not claim that Crave's chapter titles or the series bible infringe *BMR*.

66. Kim texts Abrams asking for the "link to chapter titles" and Abrams responds with a google docs link. Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352450); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that the cited document contains the quoted text, but this is not a material fact because Plaintiff does not allege that Crave chapter titles infringe *BMR*.

67. Kim admitted that she would occasionally invite people into the Crave Google doc, including Abrams. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. 34: 8 – 35:5).

**Response:** Disputed to the extent that the cited evidence does not support Plaintiff's statement that there was a "Crave Google doc." Kim agreed with Plaintiff's counsel statement that "on occasion [she] would invite Tracy Wolff onto Google Docs" and that she invited Abrams and others "in connection with the Crave bible." (Kim Dep. 34:8-35:5; *see also* Kim Decl. ¶ 68.) This is not material because the series bible does not allegedly infringe *BMR*.

68. In texts to Abrams, Kim states, "I'll give you access to the Google doc and you can pop in" Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, KIM00352413) and "Stacy, can you find the scene where Cryus is bathed in fire and gets coated in ash[?]" and "But I think there are a lot of great ones. I just don't want to delete the other good ones". Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352413). Abrams responds to Kim, "Keep doing that. We can always add in titles later. Let me scroll through again and see if any can be repurposed" Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352413); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that the cited document contains the quoted text, except denied that Adams "responds to Kim." The text chain must be read from bottom to top, not top to

bottom. Regardless, these are not material facts because these messages concern the use of Google Docs for creating and tracking chapter titles, which are not alleged to be infringing.

69.     Abrams texts Kim, "OK I'm going back to 151 if you want to start with 155." Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352413); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that the cited document contains the quoted text, but this is taken out of context and not material. (Kim Decl. ¶ 66 (describing proofreading role).)

70.     Kim also texts Abrams, "I'm feeling overwhelmed because I'm also helping Tracy [Wolff] write" "She [Wolff] is so much faster when I literally sit with her". Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352413); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that the cited document includes the quoted text, but this is taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 29 (providing full context for this exhibit, including that Kim virtually sat in a Google Doc with Wolff to motivate and keep Wolff awake while Wolff revised the ending of *Court*); Kim Decl. ¶ 78.)

71.     Kim texts Abrams "I've stopped copy editing because I helped write all of this". Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352440); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that the cited document contains the quoted text, but this is taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 29 (providing full context for this exhibit, including that Kim sat virtually in a Google Doc with Wolff to motivate and keep Wolff awake while Wolff revised the ending of *Court*) Kim Decl. ¶ 76 (clarifying that text referred to the fact that Kim sat with Wolff while she wrote and often read along, and thus did not have fresh eyes to look for copyediting mistakes in the version that had been edited by Pelletier and copyedited by Abrams).)

72.     Abrams texts Kim, "Have been adding in details for you guys on the chapter titles if you want to look at that?" Doniger Decl. ¶ 16, Exh. 15 (KIM00352321, p. 00352455); Joint Stip. On Authenticity of Evidence.

**Response**: Admitted that the cited document contains the quoted text, but this is not a material fact because the Crave chapter titles are not alleged to be infringing.

73.     Kim made comments on drafts of Crave that were relayed through Abrams and Pelletier. Pelletier determined if she agreed with the comments and corrected typos and factual mistakes. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 15:5 – 16:3).

**Response**: Disputed as this misrepresents the cited testimony. The cited testimony states that Kim would "point out things she thought might be mistakes," like "typos or actual mistakes to the fact of the book." It further states that Kim did not "make changes to the book herself" or ask Pelletier to make changes. This testimony also does not state that any of this was "relayed through Abrams." (Pelletier Dep. 15:5-16:3.)

74.     Wolff wrote the chapter titles. Kim drafted some titles but they were never used. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 117, Ls. 18-22; Kim Decl. ¶ 67 (clarifying that she suggested some chapter titles, but that Wolff typically did not use them).)

**Response**: Disputed as mischaracterizing the testimony. In the cited testimony, Pelletier states that Kim "wrote some draft" chapter titles, not that Kim "drafted some titles." Pelletier then clarifies "but I don't think they were used." (Pelletier Dep. 117:18-22; Kim Decl. ¶ 67 (clarifying that she suggested some chapter titles, but that Wolff typically did not use them).)

75.     Pelletier claims to have created the basic storyline for the *Crave* series. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 126, Ls. 8-15), ¶ 32, Exh. 31 (Depo. Exh. 47).

**Response**: Admitted.

76.     The Crave series bible was kept in a Google Doc by Kim. Pelletier does not know whose Google account was used to create the Crave series bible. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 47:13 – 48:2).

**Response:** Disputed to the extent that in the cited testimony, Pelletier does not testify that "the Crave series bible was kept in a Google Doc by Kim." (Pelletier Dep. 46:18-48:2; Kim Dep. 17:6-10.) Regardless, this is not a material fact because the Crave series bible is not allegedly infringing.

77.     Drafts of the Crave series were emailed back and forth between the editors. The drafts were not kept on a cloud drive. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 50:1 – 51:3).

**Response:** Admitted that drafts of the Crave books were exchanged via email and were not kept on a cloud drive. Disputed that this was "between the editors," which is not stated in the cited testimony. (Pelletier Dep. 50:1-51:3.) Wolff (the writer) and Pelletier (the content editor) exchanged drafts via email. (*See, e.g.*, Cole Exs. S-W; *see also* Pelletier Dep. 14:16-18, 16:4-17:20, 110:4-7, 112:11-16; Wolff Dep. 41:8-9; Kim 169:8-170:4.)

78.     Pelletier was content editor of the Crave series and reviewed and edited structure, character growth arch, beats, continuity, and characterization issues of each book in the series. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 16:4 – 17:20).

**Response:** Admitted.

79.     In a curious text exchange just prior to an interview Wolff was doing, in response to a question from Wolff asking her how to respond to a question asking her what her inspiration was for writing *Crave*, Pelletier wrote: "Say whatever you want, I don't care, just try not to get too far off of when it was actually written and that I at least came to you to write a vampire book." Doniger Decl. ¶ 9, Exh. 8 (ENTANGLED 0074452, p. ENTANGED_0074458); Joint Stip. On

Authenticity of Evidence. And Wolff has stated that Pelletier was "very involved with everything", Doniger Decl. ¶ 6, Exh. 5 (Wolff Depo. 183:9 – 184:10), and even suggested many of the key names and plots within the series. *Id*.

**Response:** Admitted to the extent that Doniger Exs. 5 and 8 respectively contain the above-quoted text, but denied that the text exchange was "curious," which is improper argument rather than facts. Further denied that the quoted line implied an effort to cover up the alleged plagiarism of *BMR*. (Pelletier Decl. ¶ 19; Pelletier Dep. 78:7-79:13, 83:5-85:19, 89:22-90:13 110:8-111:17; Abrams Dep. 99:16-19, 101:8-12, 171:18-23; Kim Dep. 154:3-10.)

80.   Kim testified that most of the decisions about the Crave series were made by Pelletier and Wolff. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. p. 127, L. 17 – L. 22). But in a text to Kim, Wolff says, "*Crave* was me, and *Crush* and *Covet* have been the 3 of us." Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00349454); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that Doniger Ex. 6 contains the above-quoted language, but this is taken out of context. (*See* Wolff Decl. ¶ 27(a) (explaining that she meant in this message that Kim sent her food while she was writing and otherwise provided moral support).)

81.   Wolff admits that Kim suggested the *Crave* series take place in Alaska, and stated in a text string to Kim: "About the fact that my agent came up with Alaska. I think they (fans) are impressed, too, at how much of a group project it is." Doniger Decl. ¶ 18, Exh. 17 (WOLFF 0095644, p. 0095646); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to that Doniger Ex. 17 contains the above-quoted language, but this is not Wolff "admit[ting]" that Kim suggested the *Crave* series take place in Alaska." Wolff came up with the idea for Alaska, and Kim merely reminded her of this at one point. (*E.g.*, Wolff Decl.

¶¶ 30-31; Wolff Dep. 36:6-37:2, 197:5-198:4; Kim Dep. 163:18-20; Kim Decl. ¶ 71.) This is not a material fact because setting a book in Alaska is an unprotected idea.

82.     Kim also directly participated in the writing of each *Crave* book. Doniger Decl. ¶ 5, Exh. 4, (Wolff Depo. 57:20 – 58:10). At one point Kim stayed up with Wolff writing "in a Google Dock (sic) with her for 19 hours a day." Doniger Decl. ¶ 12, Exh. 11 (KIM00351667, p. 00351687) (Pelletier texts Kim "I still can't believe you said [sic] in a Google dock [sic] with her [Wolff] for 19 hours a day. Wow. I've been [sic] nominated you for sainthood"); Joint Stip. On Authenticity of Evidence.

        **Response:** Denied. Kim did not "directly participate in the writing of each *Crave* book," which is untrue and not shown in Plaintiff's cited evidence. (*See, e.g.*, Kim Dep. 166:3-167:14; Wolff Dep. 57:7-59:6; Pelletier Dep. 62:4-63:25, 117:20-22; Kim Decl. ¶ 65.) Admitted that Doniger Ex. 11 includes a text message where Pelletier comments that Kim stayed up with Wolff writing "in a Google Dock (sic) with her for 19 hours a day," but denied that this supports the claim that Kim wrote any of the Crave books. (*See, e.g.*, Wolff Dep. 47:13-15; 47:24-48:5; 57:7-19; Pelletier Dep. 15:18-20; 57:20-23; 58:11-14, 61:24-62:19; Kim Dep. 15:25-16:5, 16:18-17:2, 132:16-132:21, 133:11-19, 134:3-11; Kim Decl. ¶¶ 65, 74, 77.)

83.     Kim texts Wolff "Then when I hand [sic] a moment to catch your breath, you ready to get in Google docs and puts this to bed?!!??!" [Talking about Kim wanting to get into Google Docs and write]. Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00348162). Then Kim texts Wolff, "I want to help you rage finish the rest of this book" "Let's get send [sic] coffee and crash it out." Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00348161). Later, Kim texts Wolff "I'm here to [sic] Google Doc it with you when you're ready." Id.; Joint Stip. On Authenticity of Evidence.

**Response:** Admitted that Doniger Ex. 6 contains the above-quoted language, but this is taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 27(b) (providing context); Kim Decl. ¶¶ 77-79 (same).)

84.     In yet another Wolff says she has a whole new chapter to write and she is exhausted, Kim replies "Do you want to write together again?" Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00348183); Doniger Decl. ¶ 6, Exh. 5 (WOLFF 0097494, p. 0097498); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that Doniger Exs. 5 and 6 respectively contain the above-quoted language, but this is taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 27(b) (providing context; Kim Decl. ¶¶ 77-79 (same).)

85.     Wolff texts Kim later: "Want tonget [sic] in a google doc and help me write, I am falling asleep." Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00348183), ¶ 6, Exh. 5 (WOLFF 0097494, p. 0097498); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that Doniger Exs. 5 and 6 respectively contain the above-quoted language, but this is taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 27(b) (providing context; Kim Decl. ¶¶ 77-79 (same).)

86.     And in another text message Wolff asks Kim: "Want to get in Google Doc and help me write?" Doniger Decl. ¶ 12, Exh. 11 (KIM0351667, pp. KIM00351686 - KIM00351687); Joint Stip. On Authenticity of Evidence.

**Response:** Disputed to the extent that the cited document does not support Plaintiff's statement; the quoted text instead appears in Doniger Ex. 6 at KIM00348183, and is taken out of context. Admitted to the extent that Doniger Ex. 6 contains the above-quoted language, but this is

taken out of context. (*See, e.g.*, Wolff Decl. ¶¶ 23-24, 27(b) (providing context; Kim Decl. ¶¶ 77-79 (same).)

87.     In text messages between Kim and Pelletier discussing writing in the *Crave* Google Doc, Pelletier asks Kim "what did you edit in?" Doniger Decl. ¶ 21, Exh. 20 (ENTANGLED_0074207, p. 0074213). Kim also texts Pelletier, "I'm cutting it to put in the Google Doc." Doniger Decl. ¶ 21, Exh. 20 (ENTANGLED_0074207, p. 0074208). Kim texts Pelletier, "Tracey [Wolff] and I are working in Google Docs." Doniger Decl. ¶ 21, Exh. 20 (ENTANGLED_0074207, p. 0074213). Kim then sends Pelletier entire paragraphs followed by "use this instead," seemingly indicating that those paragraphs should be included in the *Crave* book. Doniger Decl. ¶ 21, Exh. 20 (ENTANGLED_0074207, p. 0074214); Joint Stip. On Authenticity of Evidence.

**Response:** Admitted to the extent that Doniger Ex. 20 contains the above-quoted language, but this is taken out of context. (*See, e.g.*, Pelletier Decl. ¶ 22; Kim Decl. ¶ 80 (providing context).)

88.     Kim also created a joint Google Doc with chapter titles and outlines to "make it easier" when they were in a time crunch to complete the book. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. p. 167, Ls. 3-6).

**Response:** Disputed to the extent that the cited testimony does not support the statement that "Kim also created a joint Google Doc." (Kim Dep. 166:24-167:6 ("I "created a document with chapter titles to make it easier when we got to the very, very end, crunch time"); Wolff Dep. 27:8-28:2.) This is not a material fact because the Crave chapter titles are not alleged to be infringing.

89.     And Kim started the "*Crave* Series Bible" while Wolff was writing the story. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 57:20 – 58:10), ¶ 20, Exh. 21 (ENTANGLED_0012114, p. 0012114).

**Response:** Disputed to the extent that the cited evidence does not support Plaintiff's statement. Kim started writing the Crave series bible, which served as a reference guide and "archive" of the world already created in the Crave series and includes information like the "color of a character's eyes" after *Crush* was written. (Kim Dep. 168:22-169:1, 244:7-21; Kim Decl. ¶ 68.) This is not a material fact because the Crave series bible is not alleged to be infringing.

90.     Around 3,000 books have been published by Entangled since 2010 and only two of those were set in Alaska. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 65, Ls. 3 – 19).

 **Response:** Disputed. Pelletier testified that she could only recall two books "off the top of [her] heard" that were set in Alaska and published by Entangled. (Pelletier Dep. 65:3-19; Pelletier Decl. ¶ 8) Entangled has in fact published a different vampire book set in Alaska and a different book series set in Alaska where the heroine moved there from southern California. (*Id*.)

91.     No one involved in the writing of the Crave series is an "expert on Alaska." Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. p. 111, Ls. 18 – 21).

**Response:** Admitted.

92.     Both the Crave series and FCM are Young Adult Paranormal Fantasy Romances. Doniger Decl. ¶ 37, Exh. 36, Kathrine Reiss Expert Report ("Reiss Report") at p. 8, ¶ 29.

**Response:** Disputed. The Crave books are best classified as young adult paranormal romance, not fantasy. (Pelletier Decl. ¶ 17.) Defendants do not take a position on how Plaintiff classifies her own work. Regardless, this is not a material fact.

***Plagiarism software experience:***

93.     Wolff used turnitin.com plagiarism software between 2002 and 2005. The software indicated what percentage of a paper might have been plagiarized. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 23:20 – 24:14).

**<u>Response</u>:** Admitted but clarified that Turnitin.com is plagiarism detection software, not "plagiarism software." Wolff used Turnitin.com to check student papers for plagiarism while she was teaching at Marian Catholic High School in San Diego in 2005, as required by the school. (Wolff Dep. 23:20-24:14; Wolff Decl. ¶ 7.)

94.     Wolff states "I SPUN all of them" in a text to Kim about chapter titles. Doniger Decl. ¶ 7, Exh. 6 (KIM00347988, p. 00349411); Joint Stip. On Authenticity of Evidence. However, Wolff tried to cover up at her deposition that she even knew what text spinning was. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. p. 28, Ls. 12-16).

**<u>Response</u>:** Admitted that Doniger Ex. 6 contains the above-quoted language, but otherwise denied. Plaintiff's statement takes this message out of context, as Wolff is referring to making puns for chapter titles, not "spinning" text or anything related to plagiarism. (Doniger Ex. 6; Wolff Decl. ¶¶ 7, 27(c).) Denied that Wolff "tried to cover up at her deposition that she even know what text spinning was," which misrepresents the cited testimony and is improperly argumentative. (*See* Wolff Dep. 28:15-16.)

### *<u>Freeman Discovers Infringement</u>*

95.     In late March 2021, Freeman discovered *Crave*, written by Tracy Wolff, edited by Stacy Abrams and Liz Pelletier, and published by Entangled. Freeman Decl. ¶ 13.

**<u>Response</u>:** Admitted, except clarified that Pelletier was the content editor and Abrams the copy editor. (*See, e.g.*, Pelletier Dep. 14:16-18, 16:4-17:20, 110:4-7, 112:11-16, 119:20-120:2; Abrams Dep. 34:20-35:14, 157:21-158:23, 169:13-171:14, 178:23-180:16, 184:21-185:6; 191:14-192:4.)

96.     It was apparent to Freeman after reading *Crave* that it was copied from the Freeman Copyrighted Materials since the main plot of BMR is the same as *Crave* Book 1, and the main

characters and supporting cast are substantially the same. Freeman also discovered that the subplots of BMR mirror the main plots in *Crush* (Book 2), *Covet* (Book 3), and *Court* (Book 4). Freeman Decl. ¶¶ 13-15. Moreover, the same characters for the book *Crave* appear in each book of the *Crave* series. Freeman, Decl. ¶¶ 13-15 16 & 29 - 38.

**Response:** Denied. The parties' works speak for themselves. (*See generally Crave*; *Crush*; *Covet*; *Court*; *BMR 2011*; *BMR 2013*.) Plaintiff's statement contains impermissible argument and legal conclusions. Plaintiff's characterization of the parties' works also is exclusively based on Freeman's own declaration statements and similarity "indexes," which are not admissible evidence as shown in Defendants' accompanying Evidentiary Objection. This paragraph accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d); *see also, e.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("unsupported assertions [in a Local Rule 56.1 statement] must ... be disregarded").

97.    Specifically, both *Crave* and BMR share the following plot. Both works concern an approximately seventeen year old girl from San Diego who moved to Alaska after an accident kills her family members. In Crave drafts, the heroine is about to turn seventeen, just like BMR. The heroine's last words with her family before the accident were in a fight and she feels guilty. She suffers panic and anxiety from the trauma. She now lives with the only two family members she believes she has left and they are both supernatural witches, which she doesn't know because she's been kept ignorant of the supernatural world by her overprotective family. On the first day of school she meets the romantic lead who is also suffering from the murder of his older brother for which he feels responsible. As their romantic bond develops, she learns that he is a supernatural being trying to stop a supernatural war. She is kidnapped by a vampire who wants to bring back his / her dead mate (who isn't really dead and is alive in another dimension), and needs the heroine

in order to do so. This vampire believes the heroine will be the reincarnation of his dead mate / will be used in a spell to resurrect her dead mate. Also, uniquely, this vampire wants to use the heroine as an act of vengeance against the person believed to be responsible for the mate's death. The heroine turns out to be a unique supernatural being made of magic who is a protector of supernaturals, humans, and other creatures. She is in danger because of what she is, and others are seeking to destroy her so that she can't be used in the war. At the end of the book, the Bloodletter character turns into a raven / winged creature and flies away. Freeman Decl. ¶ 14, Exh. 32.

**Response:** Denied. The parties' works speak for themselves. (*See generally Crave*; *Crush*; *Covet*; *Court*; *BMR 2011*; *BMR 2013*.) Plaintiff's statement misrepresents the works and contains impermissible argument and legal conclusions. To the extent this statement identifies any minor similarities between the works, they are not material to whether the parties' works are substantially similar as a whole, including in total concept and feel, as shown in Defendants' summary judgment brief. Further disputed to the extent this statement exclusively relies on Freeman's own declaration statements and similarity "indexes," none of which is admissible evidence as shown in Defendants' accompanying Evidentiary Objection. This statement accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

98.    Freeman also found that BMR and the *Crave* series share 11 -character names, some of which are highly unusual, like the Bloodletter, Marise, Fiona, and Collin/Colin. Freeman Decl. ¶ 29, Exh. 41. And the particulars of those characters were eerily similar–each heroine hears a voice in her head which turns out to be her long-lost father in BMR / long-lost Grandfather in *Crave*, he speaks Gaelic and has been trapped in his supernatural form on an island accessible by portal which the heroine visits and cannot free him. Freeman Decl. ¶ 17, Exh. 36. Freeman has

created character indexes demonstrating the remarkable similarities between these and other shared characters. Freeman Decl. ¶¶ 17-18, 29-39, Exhs. 36-45.

**Response:** Denied. The parties' works speak for themselves. (*See generally Crave*; *Crush*; *Covet*; *Court*; *BMR 2011*; *BMR 2013*.) Plaintiff's statement misrepresents the works and contains impermissible argument and legal conclusions. To the extent this statement identifies any minor similarities between the works, they are not material to whether the parties' works are substantially similar as a whole, including in total concept and feel, as shown in Defendants' summary judgment brief. Further disputed to the extent this statement exclusively relies on Freeman's own declaration statements and similarity "indexes," none of which is admissible evidence as shown in Defendants' accompanying Evidentiary Objection. This paragraph accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d); *see also, e.g.*, *Giannullo*, 322 F.3d at 140.

99.     Bloodletter, Marise, and Alaska when searched on Google, which produces all web content beyond books, only results in producing the *Crave* series. Meaning that for these names to exist together in another work besides Wolff's and Freeman's is statistically impossible. See Doniger Decl. ¶ 38, Exh. 37 (Juola Rep.).

**Response:** Denied. This statement misrepresents what is stated in the Juola expert report, which is in any event not admissible evidence as will be shown at *Daubert*. Plaintiff also does not provide any proof of the alleged Google search (the results of which Defendants dispute) or identify the specific search methodology. The results of such a Google search are also not material to whether the parties' works are substantially similar. Otherwise denied because the works speak for themselves. (*See generally Crave*; *Crush*; *Covet*; *Court*; *BMR 2011*; *BMR 2013*.) This statement also contains improper argument and legal conclusions and is exclusively based on inadmissible

evidence, and accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d); *see also, e.g.,* *Giannullo*, 322 F.3d at 140.

100.    On April 1, 2021 Freeman emailed Kim asking for a copy of her contract. Kim told Freeman she would send it (Doniger Decl. ¶¶ 2, Exh. 1 (Kim Depo. 44:8 - 46:8), ¶ 35, Exh. 34 (Kim Depo. Exh. 88) but then in a text exchange with her assistant Kim wrote that "[a]fter contemplating I decided I never want to send it to her." (Doniger Decl. ¶¶ 2, Exh. 1, (Kim Depo. 48:25-51:16), ¶ 26, Exh. 25 (Depo. Exh. 89). And "there's no way she's getting that contract ever!" Id. In that text string Kim clearly remembered Freeman, her manuscript and her story, and immediately voiced concern that Freeman was going to sue Wolff for copyright infringement. Doniger Decl. ¶¶ 2, Exh. 1 (Kim Depo. 49:2 – 54:6), ¶ 26, Exh. 25 (Depo. Exh. 89),

    **Response:** Admitted to the extent the documents speak for themselves, but denied that the text string implied that Kim clearly remembered Freeman, her manuscript and her story, or that Kim believed there was any legitimate basis for a copyright infringement suit. Rather, the full text string makes clear that Kim only remembered a few general points about Freeman and her manuscript, and was concerned about an infringement suit because she had observed other authors become famous and parties bringing baseless lawsuits against them. (Kim Decl. ¶ 44.)

***Entangled Submission/Publishing Policy:***

101.    Each editor at Entangled has different timelines for when they would delete a manuscript submission they did not want to pursue. In 2013, there was no formal protocol for deleting the manuscript submissions. After the present lawsuit was filed, Entangled enacted a 30-day deletion for manuscript submissions. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 24:15–25:5).

    **Response:** Disputed to the extent this misrepresents Pelletier's testimony. Pelletier testified that in 2013, Entangled's editors "probably" had different timelines for going through their email

inboxes and deleting rejected manuscripts. (Pelletier Dep. 24:15-25.) Pelletier "believes" that rejected manuscripts that are submitted to Submittable ("an online [ ] software that allows agents and un-agented authors to submit their manuscripts for review by editors [at Entangled]") are destroyed after 30 days but is "not entirely sure" since she does not use it (*Id.* 24:1-14, 25:22-26:4).

102.    When Entangled did not want to pursue a manuscript that was submitted, Entangled occasionally sent rejection letters, but it was not policy to send rejection letters nor did Entangled always send rejection letters. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. P. 133, Ls. 5-13).

**Response:** Admitted.

103.    From 2010 to 2014, Prospect Agency did not have a practice of keeping a log of when manuscripts were received or how to handle former clients' manuscripts and rejected manusctipts. Doniger Decl. ¶ 2, Exh. 1 (Kim Depo. 103:24 – 104:9).

**Response:** Admitted.

### *Discovery*

104.    Pelletier used two MacBook Pros to edit the *Crave* series books. Only one was given to a third party eDiscovery company. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo., p. 88, Ls. 8-11). Pelletier did not backup the computers on a separate drive or cloud service. Pelletier used MS Outlook email and MS Word to edit the works. Doniger Decl. ¶ 4, Exh. 3 (Pelletier Depo. 45:9 – 46:25.

**Response:** Denied. Discovery is closed, there are no pending discovery motions, and discovery issues are not relevant to the parties' summary judgment motions. Defendants deny any allegation that relevant documents were improperly destroyed or withheld. That is false any such issues needed to be raised during discovery. In any event, Plaintiff's statement is factually inaccurate as to document collection. Pelletier gave a third-party eDiscovery vendor access to ***both***

her Mac laptops: Pelletier mailed her old laptop to the eDiscovery vendor and as for the second laptop, which Pelletier actively uses, she gave the eDiscovery vendor her log in credentials who then accessed her laptop remotely. (Pelletier Dep. 88:4-89:17 ("Q. Why wasn't the other [laptop] shipped to the eDiscovery vendor? A. Because I'm using it. Q. Did you give them access somehow? A. Absolutely. Q. How did you give them access? A. I gave [the eDiscovery vendor] the login to my laptop and [the eDiscovery vendor] took control of it.").) Further disputed to the extent that the cited evidence does not support Plaintiff's statement Pelletier used "MS Outlook email" to edit the books in the *Crave* Series. Pelletier testified that "Outlook" is on each of her computers. (Pelletier Dep. 46:7-9.) Admitted that Pelletier does not maintain backup for her computers and used Microsoft Word to edit the books in the *Crave* Series.

105.    Wolff used four or five computers to write and edit the Crave Series; Wolff claims to typically go through a laptop a year. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 18:22 – 20:8). It is possible that Wolff used a computer at the high school where she taught to write portions of Crave. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. p. 20, Ls. 9–22). Kim admitted at her deposition that she did not give her computers to Defendants' e-discovery people. She merely "provided them with my e-mail and passwords." Doniger Decl. ¶ 2, Exh. 1 (Kim Depo, p 100, Ls. 9 - 24). Nor does she believe that she allowed them to log onto her computers and make image copies of them. Id. at p. 102, Ls. 16-20. She also acknowledged that she may not still have all of her e-mails (Id. at p. 99, Ls. 17 - 18) and that some of her e-mails in her sent file may have been deleted prior to being archived. Id. at 236:10 - 237:7.

**Response**: Denied for the reasons stated in response to ¶ 104, *supra*. Otherwise disputed to the extent that Wolff testified she "[does not] remember, but it is not beyond the realm of possibility" that she used a computer at a high school where she taught to write portions of *Crave*.

(Wolff Dep. 20:19-25.) Admitted that Wolff used four or five computers to write and edit the *Crave* Series and that she usually goes through a laptop a year. Admitted that Kim did not physically turn over to any "e-discovery people," but rather made all of her emails and other documents available for download for discovery purposes by providing all of her log-in credentials. Kim Dep. 101:9-18. Admitted that Kim may not have all of her emails from the time she worked with Freeman, in particular some of her sent emails, because they were from so many years before this litigation commenced. (Kim Dep. 99:14-18.)

106.   Wolff could not provide access to all of her Google Docs to the discovery vendor, and she believes that either Kim or Abrams created the Google Docs. Doniger Decl. ¶ 5, Exh. 4 (Wolff Depo. 27:8 – 28:2).

**Response:** Denied for the reasons stated in response to ¶ 104, *supra*. Otherwise disputed because this statement mischaracterizes the testimony. Wolff could not provide the third-party eDiscovery vendor with access to Google Docs that she herself did not start. (Wolff Dep. 27:8-28:2.)

### *Similarities between BMR and Crave*

### *Characters:*

### *Heroine* (Freeman Decl. ¶ 30, Exh. 38)

107.   The Heroine uses the same metaphors, descriptive words, and references throughout the Works. The Heroine has the same experiences, thoughts, opinions, worries, and fears in both Works. She has the exact same feelings towards Alaska and her move there from San Diego, California. Freeman Decl. ¶¶ 7, 13, Exhs. 14, 31, Crave p. 3, 98, 278; BMR 2011 p. 124; Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶¶ 2-4). The Heroine uses the same

negative language to describe Alaska – "a frozen wasteland[2]" *Id*., Crave p. 90; BMR 2011 p. 12, "[Alaska] feels like the moon." *Id*., *Crave* p. 34; BMR 2011 p. 274; Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 3). See also, Freeman Decl. ¶ 40, Exhs. 46, (BMR v. Crave Lanugage Index ¶ 16, 121, 140).

**Response:** Denied. The parties' works speak for themselves. (*See generally Crave*; *Crush*; *Covet*; *Court*; *BMR 2011*; *BMR 2013*.) Plaintiff's statement misrepresents the works and contains impermissible argument and legal conclusions. To the extent this statement identifies any minor similarities between the works, they are not material to whether the parties' works are substantially similar as a whole, including in total concept and feel, as shown in Defendants' summary judgment brief. Further disputed to the extent this statement exclusively, or nearly exclusively, relies on Freeman's own declaration statements, her similarity "indexes," and/or her expert reports, none of which is admissible evidence as shown in Defendants' accompanying Evidentiary Objection and/or at *Daubert*. This paragraph accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d); *see also, e.g.*, *Giannullo*, 322 F.3d at 140.

108.    The Heroine in both works come from the same background – e.g., both are moving to Alaska because close family members recently died in an accident and the only family she has left is in Alaska. Freeman Decl. ¶¶ 7, 13, Exhs. 14, 31; Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 5). The Heroine later learns that the accidents were not "accidents" at all; in fact, her family members were murdered by the Vampire Prince (in BMR) and the Vampire Prince's friend (in *Crave*). *Id*. (Heroine Character Index, ¶¶ 5-7.) In both Works, her only family members left in Alaska are witches. *Id*. (Heroine Character Index, ¶ 8.) The deaths hit the Heroine particularly hard considering she was fighting with the family members right before their sudden

---

[2] Tellingly, Wolff used "frozen wasteland" the exact same words as Freeman, in her drafts of Crave. There are many examples of Wolff's direct copying. See Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 4.)

deaths. *Id*. (Heroine Character Index, ¶ 5.) The guilt Heroine feels due to the fighting right before their death is developed throughout both Works and is the root of Heroine's anxiety and panic attacks. *Id*. Freeman Decl. ¶ 30, Exh. 38 (Heroine Index, ¶ 5, 14.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

109.   The Heroine uses the same vivid descriptions of herself and others. For example, in both Works, the Heroine loves to read (Freeman Decl. ¶ 7, Exh. 14 (*Crave* p. 91, 93, 197), ¶ 13, Exh. 31 (BMR 2011 p. 10, 464, 385), ¶ 7, Exh. 17 (BMR 2013 p. 34, 117), ¶ 30, Exh. 38 (Heroine Character Index, ¶ 94), the Heroine describes herself as a "dork" (Freeman Decl. ¶¶ 7, 13, Exhs. 14 (Crave p. 44), ¶ 13, Exh. 31 (BMR 2011 p. 41), ¶ 30, Exh. 38 (Heroine Character Index, ¶ 173)), the Heroine is taking advanced classes at school because she is very smart (Freeman Decl. ¶ 7, Exhs. 14 (Crave p. 247), ¶ 13, Exh. 31 (BMR 2011 p. 29, 39), ¶ 30, Exh. 38 (Heroine Character Index, ¶ 93) and she frequently feels like she is being watched. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 128). In both Works, the Heroine exhibits her personality in identical ways – she tucks her head when she's nervous, babbles when nervous, feels left out of social circles, and her panic attacks present the same way – sweaty palms, weight on heart "roil"ing stomach, and a "tight"ening stomach. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶¶ 14-21, 101-109). The Heroine also deals with her panic attacks in the same way – using breath work and counting to manage them. *Id*.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

110.   The heroine in both works turns out to be a unique being in their world made of magic who is a protector of supernaturals, humans, and other creatures, and her kind has not been

seen in a very long time. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶¶ 43-48). In the beginning she thinks of herself as a human, but as her character develops, the Heroine learns that "there's magic in [her] veins" (Freeman Decl. ¶ 7, Exh. 14 (BMR 2011, p. 440)) "there's magic in her blood" (Freeman Decl. ¶ 15, Exh. 35 (*Court*, p. 477)) and that she is not human. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 45). The reason the Heroine believes she is human at first is largely due to the fact her family has been giving her a special tea that binds her powers. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶¶ 113-116). In both Works, herbal tea is used to bind the Heroine's powers and the same tea is described – lemon thyme tea. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 116). In a cafeteria scene where nothing else looks appetizing the heroine in both works eats a yogurt. Id. (Heroine Character Index, ¶ 116); Freeman Decl. ¶ 40, Exh. 47 (Crush BMR Language Index, ¶ 54).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

111.    She learns that she is something unique in the supernatural world, coming from mixed bloodlines and that she is a queen, descending from a twin goddess – her grandmother is a twin goddess in both Works. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 70). The Heroine is the first of her kind in 1000 years (*Crush*) or ten generations (BMR). Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 63). Heroine discovers that she is "Thrice born Nyx" (BMR) or "three-fold supernatural creature" (Crave), is the Chosen One, and will save the world. *Id*. In both Works, the Heroine's supernatural purpose is to restore the balance, as she is the "protector." *Id*. She is in danger because of what she is, and others are seeking to destroy her so that she can't be used in the war. *Id*.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

112.    The heroine also hears two voices in her head, and at first, she believes the voices mean there are two of her. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 72)[3] As discussed further below, she learns that one of the voices is her long-lost father / grandfather and the other is her true mate. Id. (Heroine Character Index, ¶ 77).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Romantic Lead:*** Freeman Decl. ¶ 31, Exh. 40.

113.    In BMR, the Romantic Lead is a werewolf and in the *Crave* series he is a vampire. Even so, the differences between the generalizations of such supernatural species only makes the similarities between the two that much more substantial. Freeman Decl. ¶ 31, Exh. 40. Despite the difference in supernatural species, the characters' similarities go so far beyond simple generalizations–and include so much of the same expression–that one would still conclude that the Romantic Lead in both works is the same person based on the similarity amongst the character traits and development thereof. Freeman Decl. ¶ 31, Exh. 40.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

114.    The Romantic Lead is described as having gemstone eyes, full red lips, chiseled features, dark hair that is messy, tall, and lean with muscle. (Doniger Decl. ¶ 37, Exh. 36, Reiss Report; Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Index, ¶¶ 9-10, 15) In both Works the

---

[3] **Crave**: About the voice: "In some ways, it felt almost sentient, like it existed away from my own consciousness and subconsciousness." Freeman Decl. ¶ 13, Exh. 31, p. 418.
**BMR**: About the voice: "I wondered if I would always feel fractured, like there were two of me sharing the same skin." Freeman Decl ¶ 7, Exh. 14, 2011 p. 430.

Romantic Lead wears all black designer clothes, a black v-neck sweater. *Id*. (Romantic Lead Index, ¶ 16.) The Heroine describes the Romantic Lead as smelling like citrus and water. Freeman Decl. ¶¶ 13, Exh. 14 (*Crave* p. 161), ¶ 7, Exh. 31 (BMR 2011 p. 460; BMR 2013 p. 158), ¶ 31, Exh. 40 (Romantic Lead Index, ¶ 24).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

115.   Further, the Romantic Lead's older brother was murdered and was 19 (in BMR) and looked 19 (in *Crave*). Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Character Index, ¶ 49). The romantic lead carries the burden of guilt about this death because he believes he was responsible. *Id*. The Romantic Lead frequently gives an infamous half grin or smirk to the Heroine, has a crooked smile, and loves to play with the Heroine's hair. Id. (Romantic Lead Index, ¶ 22, 50.) He has mind control powers; he is "telekinetic." Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Index, ¶ 53.) Throughout the Works, the Romantic Lead has a strong desire to protect the Heroine but feels like he should stay away from her because he is dangerous. Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Index, ¶ 36). And the Romantic Lead believes that he and the Heroine are bonded together and that she is his mate but in truth she is not. Id. (Romantic Lead Index, ¶ 47.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***The Villian: Vampire Prince/King:*** Freeman Decl. ¶ 33, Exh. 43.

116.   In both works, the Heroine is being hunted by the ultimate villian. In BMR, it is Julian, the Vampire Prince, who is the same character as *Craves'* Cyrus, the Vampire King. Freeman Decl. ¶ 33, Exh. 43.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

117.    In both Works, the Vampire Prince/King is the ultimate villain of the story who must be stopped because he is trying to take over the world and wants to bring supernaturals out of hiding and into the real world. The Vampire Prince/King's ultimate goal is war and humans are the excuse for such goal.[4] Freeman Decl. ¶ 33, Exh. 43 (The Villian Chracter Index, ¶ 21-22.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

118.    The Vampire Prince/King belongs to a royal court.[5] Freeman Decl. ¶ 33, Exh. 43 (The Villian Character Index, ¶ 2.) The Vampire Prince/King is also the character hunting the Heroine throughout the Works because the Council (Crave)/Order (BMR) fears that the Heroine will tip the balance of the war because she is a rare kind of supernatural being. Freeman Decl. ¶ 33, Exh. 43.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

119.    There are numerous unique similarities between both characters that make the characters substantially similar. In both Works the Vampire Prince/King has a British accent,[6] is

---

[4] Freeman Decl. ¶ 7, Exh. 6 (2013 Pitch Notes to Emily Kim), ¶ 15, Exh. 33 (Crush, p. 459), ¶ 7, Exh. 17 (BMR 2013, p. 201), ¶ 15, Exh. 33 (Crush, p. 457), ¶ 7, Exh. 14 (BMR 2011, p. 123, 293), ¶ 15, Exh. 33 (Crush, p. 458).
[5] Freeman Decl. ¶ 7, Exh. 14 (BMR 2011, p. 542), ¶ 15, Exh. 33 (Crush, p. 485).
[6] **BMR**: Heroine describes his accent: "His voice is captivating with a lilting British accent." Freeman Decl. ¶ 7, Exh. 19 (BMR 2012 p. 272, 274).
**Court**: Heroine describes his accent: "Cyrus's British accent is on stark display…" Freeman Decl. ¶ 15, Exh. 35 (Court, p. 629).

described as like a "cobra",[7] tall, has dark short hair,[8] and deep blue eyes. Freeman Decl. ¶ 33, Exh. 43 (The Villian Character Index, ¶¶ 2-6.) The Vampire Prince/King is an elitist/supremacist. Freeman Decl. ¶ 33, Exh. 43 (The Villian Character Index, ¶ 20). The Vampire Prince/King has the special bite, i.e., "Kiss of Life or Death (BMR) or "Eternal Bite" (Crave series) – which is given the "the old-fashioned way." Freeman Decl. ¶ 33, Exh. 43 (The Villian Chracter Index, ¶ 7.) The Vampire Prince/King wants to give the special bite to the Heroine and he eventually does. Id. (The Villian Character Index, ¶ 8.) He also calls heroine "little girl." Id. (The Villian Character Index, ¶ 14.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

120.    The Vampire Prince/King has also trapped another character, the Abomination (*Crave*)/Unkillable Beast (BMR), in his supernatural form (discussed supra). Freeman Decl. ¶ 17, Exh. 36 (First Voice in Heroine's Head Index, ¶ 12.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

121.    The Vampire Prince/King also has a daughter with a woman who is not his mate, and the daughter is related to the Heroine by blood. Freeman Decl. ¶ 33, Exh. 43 (The Villian Character Index, ¶ 15).

---

[7] **BMR**: Heroine describes him: "Julian…he walked up to her slowly, like a king cobra moving in for the strike." Freeman Decl. ¶ 7, Exh. 14 (BMR 2011 p. 552), ¶ 7, Exh. 18 (BMR 2010 p. 447), ¶ 7, Exh. 19 (BMR 2012 p. 472). **Crush** (book 2): Heroine describes him: "I turn back to Cyrus--who is like a cobra, because it serves everyone best if you don't take your eyes off him for longer than a second or two…" Freeman Decl. ¶ 15, Exh. 33 (Crush, p. 380).
[8] **BMR**: *Heroine describing Prince Julian's hair*: "They had shiny black hair, the man's in a short, stylish modern cut…" Freeman Decl. ¶ 7, Exh. 18 (BMR 2010 p. 398), ¶ 33, Exh. 43.
**Court**: *Heroine describing King Julian's hair*: "The king is wearing his dark hair buzzcut short…" Freeman Decl ¶ 15, Exh. 35 (Court p. 86), ¶ 33, Exh. 43.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

122.    The Vampire Prince/King's daughter helps the Heroine, despite remaining with her father. The heroine offers her a choice to come with her. Freeman Decl. ¶ 33, Exh. 43 (The Villian Character Index, ¶ 16.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

123.    The Vampire Prince/King's daughter is also the same character in both Works – in BMR she is "Taylor" and in the *Crave* series she is "Isadora". Freeman Decl. ¶ 33, Exh. 43 (The Villian Index, ¶ 16.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

**_Heroine's Male Friend:_** Freeman Decl. ¶ 32, Exh. 42.

124.    In both Works, the Heroine's best guy friend is gay, but only the heroine knows this, and of mixed race, part Black. Freeman Decl. ¶ 32, Exh. 42 (Heroine's Male Friend Index, ¶¶ 1-2.). He is described as "beautiful" and "gorgeous" and very smart as well. Freeman Decl. ¶ 32, Exh. 42 (Heroine's Male Friend Index, ¶ 10.) He has warm brown skin, "molten-amber" eyes, and wings in his supernatural form. Freeman Decl. ¶ 32, Exh. 42 (Heroine's Male Friend Index, ¶ 1, 7.) The Best Guy Friend also has a leadership position at school, a silly sense of humor and smile he's known for, "waggles" his brows at the Heroine, calls her a nickname. Freeman Decl. ¶ 32, Exh. 42 (Heroine's Male Friend Index, ¶¶ 3-4, 12.) He is smart, like the heroine. Id. (Heroine's Male Friend Index, ¶ 12.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

125.    The Romantic Lead does not like Heroine hanging out with the guy friend, and she believes he is jealous. Freeman Decl. ¶ 32, Exh. 42 (Heroine's Male Friend Index, ¶ 9.) He and this character are often in a staring contest and the romantic lead wins. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

**_Female Nemesis_**: Freeman Decl. ¶ 34, Exh. 39.

126.    In both the *Crave* Series and BMR, the Heroine has frequent encounters with "mean girls." The heroine's nemesis is Taylor (BMR) / Lia (*Crave*). Freeman Decl. ¶ 34, Exh. 39. She is described as one of the most beautiful girls the heroine has ever seen and is a supernatural being that sucks the life out of others. Freeman Decl. ¶ 34, Exh. 39 (Heroine's Female Nemesis Index, ¶¶ 1, 3). She is mean to the heroine and tries to slap the heroine's face. Id. (Heroine's Female Nemesis Index, ¶¶ 5, 12.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

127.    The female nemesis character attempts to ruin her relationship with the romantic lead by implying that she and the romantic lead are involved. Freeman Decl. ¶ 34, Exh. 39 (Heroine's Female Nemesis Index, ¶ 15-16). At first, the heroine is hurt but then decides she doesn't believe it. Id. (Heroine's Female Nemesis Index, ¶ 17.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

128.    Specifically, in both books, the Nemesis spiked the Heroine's drink and aides in / is responsible for the heroines kidnapping. Freeman Decl. ¶ 34, Exh. 39 (Heroine's Female Nemesis Index, ¶¶ 6-11, 13-14.) She rolls her eyes at the Heroine, tries to make the Heroine jealous by making the Heroine think she has a superior claim to the Romantic Lead, and calls the Heroine "pathetic." Id. (Heroine's Female Nemesis Index, ¶¶ 12, 15.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Bloodletter / Heroine's Grandmother / God of Chaos:* Freeman Decl. ¶ 38, Exh. 45.

129.    In both works, the heroine discovers that she has a grandmother who is a vampire with green eyes with "more than a hint" of danger/avarice. Freeman Decl. ¶ 38, Exh. 45 (Heroine's Grandmother Index, ¶ 1.) She is the daughter of a deity, lives in a remote place/ice cave, and explains the "twin goddesses" and their creation story to the heroine. Id. (Heroine's Grandmother Index, ¶ 5.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

130.    The heroine's grandmother tells the heroine that she descends from one of the twin goddesses, that she has great gifts that demand sacrifice and is to restore the balnace/bring balance in the world. Id. (Heroine's Grandmother Index, ¶¶ 2, 5.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

131.    The Crave series bleeds other BMR characters into the heroine's grandmother. For example, in BMR the "God of Chaos" is the heroine's father and the "Bloodletter" is another name given to the heroine's second love interest, but in Crave the heroine's grandmother is also both the

Bloodletter and the God of Chaos. Freeman Decl. ¶ 38, Exh. 45 (Heroine's Grandmother Index, ¶ 2.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### Voices in Head:

### First Voice in Heroine's Head – the "Abomination" (BMR) / "Unkillable Beast" (Crave)

132.     In both Works, the Heroine hears two voices in her head. The first voice is the "Abomination" (BMR) or the "Unkillable Beast" (*Crave*) (collectively, "Voice 1"), who was imprisoned by the Vampire Prince/King. Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶ 8, 12.) Despite the difference in names, the characters are overwhelmingly similar. Voice 1 speaks Gaelic, can communicate telepathically, has smokey gray (BMR) / smoke-gray (Crave series) eyes, and wants to help the heroine. Id. (First Voice Inside Heroine's Head, ¶¶ 16, 19-20.) Voice 1 guides her when she is in danger but was noticeably absent when the Heroine was kidnapped. Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶ 7.) The Heroine visits Voice 1 through a portal on an island. Id. (First Voice Inside Heroine's Head, ¶ 9.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

133.     Voice 1 shrieks (BMR) / screams (Crush) in the heroine's head. Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head, ¶ 5.) Voice 1 frequently warns the heroine of danger and tells her to run.[9] Id. (First Voice Inside Heroine's Head, ¶ 5.) Voice 1 also gives heroine advice. Id. (First Voice Inside Heroine's Head, ¶ 6.)

---

[9] Freeman Decl. ¶ 7, Exh. 14 (BMR 2011, p. 5, 472, 499); ¶ 13, Exh. 31 (Crave, p. 449, 472-473, 479).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

134.    The heroine feels like there are two of her, or like voice 1 is separate from her but her and the voice are one. Yet, the heroine wonders if she or the voice is "crazy". Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶¶ 2-3.)

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

135.    In BMR, the readers learn that the voice is actually her long-lost father (BMR) / grandfather (*Crave* series) called "Athair" (BMR) / "Alistair" (*Crave* series) who is trapped in his supernatural form in steel shackles (*Crave*) / steel trap (BMR) at the hands of the ultimate villain, the Vampire Prince. Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶¶ 12, 14-15, 19). The Heroine learns that voice 1 lives in clans and speaks telepathically to their kinds, and the Heroine initially meets him in his supernatural form on an island through a portal. Id. (First Voice Inside Heroine's Head Index, ¶ 9-10, 20). This storyline is used in the *Crave* series through mosaic plagiarism as follows: *Crave* (Book 1): The Heroine begins hearing the voice in her head. *Crush* (Book 2): The Heroine learns that the voice is a creature trapped in his supernatural form in chains on an island and she visits him by portal there. She tries to free him but can't. She promises him she'll be back. *Covet* (Book 3): The Heroine discovers that this character is trapped by the ultimate villain in the story, the Vampire King. *Court* (Book 4): The Heroine discovers that this character speaks Gaelic, lives in clans, speaks to his kind telepathically, and is actually her grandfather, "Alistar."

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

136.    The Heroine works to free Voice 1 throughout both Works. Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶¶ 10-11, 13). After Voice 1 is freed, Voice 1 shifts into a man wearing a tunic and gold, dressed from another era. Id. (First Voice Inside Heroine's Head Index, ¶¶ 22-23). He also gives Heroine a magical object and disappears. Id. (First Voice Inside Heroine's Head Index, ¶ 24).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Second Voice Inside Heroine's Head – Romantic Lead Two:*

137.    In both Works, the Heroine encounters a second love interest, the "Romantic Lead 2" (also known as "Ronan" (BMR) or "Hudson" (*Crave*)), first appearing as a second voice in her head. Freeman Decl. ¶ 36, Exh. 37. The heroine's second voice in her head occurs in book two of the *Crave* series, *Crush*. Freeman Decl. ¶ 36, Exh. 37. In both Works, the Heroine inadvertently brings this character, who is to be her true mate, back with her from another dimension. Id. (Second Voice Inside Heroine's Head Index, ¶¶ 8, 25). The Romantic Lead 2 is tied to the heroine. Id. (Second Voice Inside Heroine's Head Index, ¶ 24).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

138.    The heroine cannot remember Romantic Lead 2 even though she knew him in another deminision. Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶ 17).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

139.     Romantic Lead 2 is said to be depraved and evil and to have been responsible for the deaths of many.[10] Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶ 13-14, 19). It would be an "apocalypse" if he was free. Id. (Second Voice Inside Heroine's Head Index, ¶ 20). Later, the heroine learns that he is not evil and did what he did for the greater good. Id. (Second Voice Inside Heroine's Head Index, ¶ 22).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

140.     The Romantic Lead 2 is royalty, part vampire, and has an accent that Heroine cannot fully identify. Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶¶ 1-2, 5). He also gives the Heroine some of his magic. Id. (Second Voice Inside Heroine's Head Index, ¶ 3). The Romantic Lead 2 has "stormy blue" eyes. Id. (Second Voice Inside Heroine's Head Index, ¶ 12). And he can take away a person's free will. Id. (Second Voice Inside Heroine's Head Index, ¶ 18). If the Romantic Lead 2 is freed, a supernatural war will commence. Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶ 20).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

141.     In both Works, the Romantic Lead 2 is tied to the Heroine, and he is her true mate, despite being in love with the first Romantic Lead. Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶ 24). After he is freed, he gives the heroine a magical object, shifts into a man, and flees the area. Id. (Second Voice Inside Heroine's Head Index, ¶ 30-32, 35). When he is freed he lets out a piercing howl. Id. (Second Voice Inside Heroine's Head Index, ¶ 30).

---

[10] Freeman Decl. ¶ 7, Exh. 19 (BMR 2012, p. 356), ¶ 15, Exh. 34 (Crush, p. 185).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

142.    Romantic Lead 2 also bites the heroine's lip during a kissing scene and tastes her blood. Freeman Decl. ¶ 36, Exh. 37 (Second Voice Inside Heroine's Head Index, ¶ 2).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Heroine's Aunt/Uncle:*** Freeman Decl. ¶ 37, Exh. 44.

143.    BMR's Aunt Brie and Crave's Uncle Finn are parallel characters. Freeman Decl. ¶ 37, Exh. 44. They are one of only two releatives the heroine believes she has left in the world. Freeman Decl. ¶ 37, Exh. 44 (Aunt / Uncle Character Index, ¶ 1). They are supernatural witches and she lives with them. Id (Aunt / Uncle Character Index, ¶ 2). The heroine sees this character as her parental figure, and they have a loving relationship. Freeman Decl. ¶ 37, Exh. 44. This character gives the heroine advice and information about the supernatural world after having kept her ignorant about it. Freeman Decl. ¶ 37, Exh. 44 (Aunt/ Uncle Character Index, ¶¶ 10, 15-19). They discuss the loss of her family, the character is protective of her and concerned for her safety, and at one point wants her to leave Alaska to keep her safe. Id. (Aunt / Uncle Character Index, ¶¶ 13-14). Heroine believes her Uncle and Romantic Lead have a woodsy scent. Id. (Aunt / Uncle Character Index, ¶ 20).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

144.    They also discuss the romantic lead with the heroine. Freeman Decl. ¶ 37, Exh. 44 (Aunt / Uncle Character Index, ¶¶ 17-18). They also give the heroine her father's amulet with

stones / rune stones and urges her not to ever take it off / to keep it on at all times. Id. (Aunt / Uncle Character Index, ¶ 4).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Plot:*

145.     The *Crave* series and BMR follow the Heroine throughout.

**Response:** Admitted; however this is not material to whether the parties' works are substantially similar. Further, this statement does not cite to any evidence in violation of Rule 56(c) and LR 56.1.

146.     In both works the heroine frequently thinks about the "frozen land" that Alaska is, the weather in California, and her loss on her way to school. Freeman Decl. ¶ 14, Exh. 32 (Summary Supporting Index, ¶ 8).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

147.     The Heroine meets the romantic lead at the end of chapter at school. Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Character Index, p. 14, ¶ 5). Shakespeare is quoted. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 196.) The romantic lead is suffering from the murder of his older brother for which he feels responsible. Freeman Decl. ¶ 31, Exh. 40 (Romantic Lead Character Index, ¶ 49). The brother was 19 in Freeman's work and "looks about 19" in Wolff's. Id. (Romantic Lead Character Index, ¶ 49). He tries to stay away from the heroine because he believes she is human, and he feels he has a duty to stop the supernatural war, thus being with him would expose her to danger. Id. (Romantic Lead Index, ¶ 36). The heroine learns about the supernatural world through him, beginning during their first kiss when he loses control of his

powers. Id. (Romantic Lead Index, ¶ 44). He later says he's "selfish" and can't resist her. Id. (Romantic Lead Index, ¶ 36). He and the heroine connect through their mutual losses. Id. (Romantic Lead Index, ¶ 49). She is drawn to the dangerousness of him, though she isn't usually that type. Id. (Romantic Lead Index, ¶ 57). He believes they have a special bond and are mates, which they ultimately are not. Id. (Romantic Lead Index, ¶ 47).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

148.     The climax in the book *Crave* and BMR is when the vampire prince in BMR/vampire prince's mate in *Crave* kidnaps the heroine in order to use her to bring back their dead mate and at the same time take revenge against the one they believe is responsible. Freeman Decl. ¶ 23, Exh. 39 (Heroin's Female Nemesis Index, ¶¶ 19-51). In both works, *the mate is alive in another dimension.* Freeman Decl. ¶ 23, Exh. 39 (Heroin's Female Nemesis Index, p.8). This vampire tells her they murdered her family members by causing the accident which killed them. Id. (Heroine's Female Nemesis Index, ¶ 30). She feels sorry for this vampire at first but is then infuriated at them for the murder and wants vengeance. Id. The romantic lead comes to rescue her but she ends up saving his life. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

149.     The war within the supernatural world disrupts the human world and causes storms. Freeman Decl. ¶ 14, Exh. 32 (Summary and Supporting Index, ¶ 70). At the end of the first book, the Bloodletter turns into a raven in Freeman's work and a "winged creature" in Wolff's and flies away. Freeman Decl. ¶ 14, Exh. 32 (Summary and Supporting Index, ¶ 412).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

150. **A subplot of BMR is used as the main plot of *Crush* (book 2)**: *Crush* mirrors a secondary storyline of BMR in which powerful, magical objects must be found in order to stop a character (Ronan in *Crush* / Hudson in BMR) from rising again. Freeman Decl. ¶ 19, Exh. 32. The heroine learns that she accidentally brought him back with her from another dimension where they were together. Id. She believes he is evil, responsible for the deaths of many, and that if he is free, he will bring war and it would be an apocalypse. Id. In truth, he is not evil and is offended she would think so. Id. He did what was necessary for the greater good and ultimately gave the heroine his magic. Id. There is an attraction between them, and he is presented as her true mate. Id. Once the objects are found the heroine must pass a trial, and the evil vampire prince / king gives the heroine his special bite (the Kiss of Life or Death / the eternal bite), which could kill her. Id. The heroine escapes his clutches and survives. The vampire prince / king will be after her now. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

151. **Another subplot of BMR is used as the main plot of *Covet* (book 3)**: the heroine must accomplish another task (restore the Compact / find the Crown) in order to stop the supernatural war and bring balance. Freeman Decl. ¶ 20, Exh. 32. The vampire prince / vampire king wants to bring supernaturals out of hiding from the human world and wants war and power. Id. The heroine is told about twin goddesses and that she is a descendant of one of them. Id. She is told she is a queen. Id. A tarot reading is performed and the heroine draws the *Tower card* (a standard Tarot deck has 78 cards). Id. Magical tattoos appear on the heroine and they are spells. Her tattoo "itches and burns" and she is *lit up* with pin pricks / needle pricks of magic. Id. She

learns that her kind of being are protectors of humans, supernaturals, and other creatures, and that she is to *maintain / keep the balance*. Id. She is a special being with *magic in her veins / in her blood. She is magic / made of magic*. Id. The heroine learns more about what she is and her role in the supernatural world throughout the story and that her kind "don't walk the earth" in many numbers anymore. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

152.   **Another subplot of BMR is used as the main plot of *Court* (book 4)**: The heroine meets the first voice in her head character, who was trapped / is trapped in chains on an island which she visited by portal earlier in the story. Freeman Decl. ¶ 21, Exh. 32. He is a creature like her, and she now learns he is her *father / grandfather*. Id. His kind of supernatural beings live in clans and they speak Gaelic. Id. Their kind communicate with one another telepathically. He tells her to call him *Athair / Alistair*. Id. The vampire prince / king is responsible for him being trapped in his supernatural form. Id. He has kidnapped students at the heroine's school and is holding them hostage to get what he wants. Id. Taking them may cause the supernatural war. He is draining them of their powers by taking their magic into himself. Id. He threatens to drain the heroine's friends unless she does what he wants. She makes a deal with him to save her friends; she sacrifices herself. But the heroine ends up tricking him and he is injured. Id. She and her friends are free. A structure like Stonehenge, a "small" Stonehenge / "Stonehenge Lite" is mentioned. *It is revealed that the vampire prince / king has a daughter by a woman who is not his mate. This daughter is related to the heroine by blood.* Id. She is a supernatural being, like the heroine and her friends, and is nasty because she is aligned with her father, the vampire prince / king. Id. The heroine feels sorry for her and offers her a chance to be on the heroine's side. This character chooses to stay with her father's

side. Id. War is on the horizon, the vampire prince / king is not dead, and there is fear that he is going to come after the heroine. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Scenes:*

153.    There are notable similarities between the Works within specific scenes. In one scene, the Heroine walks for a really long time with a friend, only to arrive at a pair of <u>gold double doors</u>. Freeman Decl. ¶ 40, Exh. 48 (Covet BMR Language Index, ¶ 16). In another scene, the Heroine randomly describes the setting being "like the *Libarary of Alexandria*" in *Crave* and "like the *Lighthouse of Alexandria*" in BMR. Id. In BMR there is a "Sanctuary" that is similar to a town described in the Crave series. Specifically, both the Sanctuary and the town feature <u>colorful tents</u> and symbols or carvings that call to Heroine.[11] Freeman Decl. ¶ 28, Exh. 32 (Summary and Supporting Index, ¶ 153, 156).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***First Attack:*** Freeman Decl. ¶ 22, Exh. 38 (Heroine's Character Index, ¶¶ 119-144).

154.    The first attack on the Heroine sets the stage for her being in danger in the story, and it is for the very same reason: she is a unique supernatural being whose purpose is to bring balance but everyone doesn't know that. She is faced with two supernatural beings (vampires in

---

[11] BMR: "...gorgeously canopied tents in rich, colorful fabrics are set up…" Freeman Decl. ¶ 7, Exh. 17 (BMR 2013 p. 378).
Covet: "...it's filled to the brim with huge, colorful tents in shades of red, blue, and green." Freeman Decl. ¶ 15, Exh. 34 (Covet, p. 230).
BMR: "Something about the mirror is familiar...it's calling me…. It's exceptionally large with intricate carvings..." Freeman Decl. ¶ 7, Exh. 17 (BMR 2013 p. 425-426).
Covet: "...display case of rings...Something about the symbols feels like it's calling to me…" Freeman Decl. ¶ 15, Exh. 34 (Covet, p. 233).

BMR and werewolves in *Crave*) who are wearing jeans and shirts, no coats in the winter weather. Freeman Decl. ¶ 22, Exh. 38 (Heroine Character Index, ¶ 119). They remind the Heroine of "eighties" rockers and have piercings. Id. (Heroine Character Index, ¶ 120). One is tall and thin, the other is stocky. Id. (Heroine Character Index, ¶ 122). One has short blond hair. Id. The "rules" are mentioned. One guy asks her a question and gets too close to her and says, "Well, well, well. Looks like…" Id. (Heroine's Character Index, ¶ 121). She's reminded of a movie and the supernatural / ghosts, and is grabbed: he "reaches a hand out and grabs me." Id. (Heroine's Character Index, ¶ 125). The stocky guy restrains her the same way: "my back to his front." Id. (Heroine's Character Index, ¶ 127). She "struggles" and hits his nose in BMR and tries to hit his nose in *Crave*. Id. (Heroine's Character Index, ¶ 128). She "bucks" "kicks," head butts and stomps on his toes in BMR and thinks about stomping on his toes in *Crave*. Id. (Heroine's Character Index, ¶ 129). She tastes her own blood in her mouth. Id. (Heroine's Character Index, ¶ 131). She puts her "fists up." Id. (Heroine's Character Index, ¶ 132). She gets angry. Id. The romantic lead rescues her but she doesn't realize it at first, he wraps his arms around her, and scares the two guys. Id. (Heroine's Character Index, ¶ 133). Afterward, she thinks about a self-defense class in BMR and self-defense training in *Crave*. Id. (Heroine's Character Index, ¶ 134). The romantic lead looks her over, a secret is mentioned, he asks her if she's okay and he lets her know the attackers won't be back. Id. (Heroine's Character Index, ¶ 137). She thanks him for saving her but he doesn't feel he deserves her thanks and "shakes" his head. Id. (Heroine's Character Index, ¶ 138-140). In fact, he blames himself for putting her in danger. Id. (Heroine's Character Index, ¶ 140).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Kidnapping Scene:*** Freeman Decl. ¶ 23, Exh. 39 (Heroine's Female Nemesis Index, p. 8).

155.    When the Heroine is kidnapped, there are cuffs to bind her hands in this scene. Freeman Decl. ¶ 23, Exh. 39 (Heroine's Female Nemesis Character Index, ¶ 22). Heroine is choked (Id. (Heroine's Female Nemesis Character Index, ¶ 36)) and Heroine is dragged across the ground while resisting (Id. (Heroine's Female Nemesis Character Index, ¶ 38)). Heroine hears someone/something "howl like a banshee" (Id. (Heroine's Female Nemesis Character Index, ¶ 41)) and worries about the kidnappers' plans, the Heroine mentions Frankenstein when kidnapped. (Id. Heroine's Female Nemesis Character Index, ¶ 31)). The voice Heroine typically hears in her head is noticeably absent during this scene. (Id. (Heroine's Female Nemesis Character Index, ¶ 32.))

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

156.    The Romantic Lead shows up to save the Heroine, and the Heroine joins the fight. Id. (Heroine's Female Nemesis Character Index, ¶ 44-45, 49). During this scene in both Works, the scenes end with a vampire killing a jealous girlfriend. Id. (Heroine's Female Nemesis Character Index, ¶ 45-50). In BMR, the Vampire Prince kills Selene, the vampire girlfriend who is jealous of Heroine, when she tries to attack the Heroine. Id. In *Crave*, Jaxon, the vampire, kills Lia, the vampire girlfriend who is jealous of Heroine, when she tries to kill Heroine. Id. The vampire /demon explodes into a cloud of dust and the heroine saves the romantic lead's life. Id. Immediately following this scene, the Romantic Lead tells the Heroine that he loves her for the first time. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Special Initiation:*

157.    The Heroine has a special initiation with the witches/priestesses (BMR) / the Bloodletter (*Crush*), in which she comes into her powers and is fully accepted as Kindred (BMR)

60

/ accepted into the Circle (*Crush*). Freeman Decl. ¶ 19, Exh. 32 (Summary and Supporting Index, ¶ 216). In *Crush*, the trials are called the "Ludares" trials, but they are the same in both Works. Freeman Decl. ¶ 40, Exh. 46 (Crush BMR Language Index, ¶ 67). The Heroine must go through the initiation alone and must choose shadows or light. Freeman Decl. ¶ 30, Exh. 38 (Heroine Character Index, ¶ 48).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***First Kiss:*** Freeman Decl. ¶ 25, Exh. 38.

158.    The first kiss between the Heroine and the Romantic Lead is the catalyst for the Heroine to discover the supernatural world and the romantic lead's place in it. Freeman Decl. 25, Exh. 38 (Romantic Lead Character Index, ¶ 44). The scene begins when Heroine and Romantic Lead go outside to view a special phenomenon in the sky. Id. In *BMR*, the phenomenon is the Northern Lights, and in *Crave* it is a meteor shower. Id. It is winter and cold outside, but the Romantic Lead keeps Heroine warm. Id. The Heroine begins thinking about her desire to kiss the Romantic Lead, and how the energy around them feels like a kiss is meant to be in that moment. Id. The Romantic Lead "cups" her cheek/ his face and they kiss "softly." Id. Freeman Decl. ¶ 40, Exh. 46 (Crave BMR Language Index, ¶ 174). During the kiss, the Romantic Lead loses control of his supernatural powers. Freeman Decl. 25, Exh. 38 (Romantic Lead Character Index, ¶ 44). The Heroine takes note of his appearance which is monstrous. Id. She is scared and thinks about running away in *BMR* and runs away in *Crave*. Id. She later finds marks on her neck and wonders if the Romantic Lead is an "alien" or supernatural being. Id. The next day she demands answers and soon finds out that he is a supernatural being, that there is a supernatural world, and that he feels he has a duty to stop the supernatural war. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Drugging:*** Freeman Decl. ¶ 24, Exh. 39.

159.    In both works, the Heroine goes to a party and is drugged by the female nemesis with a spiked drink. In Freeman's work, the heroine wants to leave early, is given the drink and later feels nauseous then vomits, falling into a "fitful sleep" that night. Freeman Decl. ¶ 24, Exh. 39 (Heroine's Female Nemesis Index, ¶ 7-13). In *Crave*, the heroine leaves early, and is given the drink by the female nemesis. Id. She feels nauseous and vomits, and later goes to sleep. Id. This scene serves the same function in both Works. The heroine believes she is human and unknown to her at this time, she is a powerful supernatural being. Id. (Heroine's Female Nemesis, ¶ 14). The nemesis knows this and wants to take her out of the way. Id. The nemesis tells her she'll like the drink in BMR and hopes she'll like it in Crave. Freeman Decl. ¶ 24, Exh. 39 (Heroine's Female Nemesis Index, ¶ 8). The heroine takes a sip and describes the taste (fruity in BMR and floral in Crave). Id. *See* Reiss Rep. p. 20. The heroine tells the nemesis she has to leave but the nemesis tries to get her to stay. Freeman Decl. ¶ 24, Exh. 39 (Heroine's Female Nemesis Index, ¶ 10). The nemesis rolls her eyes in this scene and is unpleasant. Id. (Heroine's Female Nemesis Character Index, ¶ 12). The scenes are used for the same reason; to advance the plot and demonstrate early that the heroine is in danger, and to set up the later climax when she is kidnapped.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Northern Lights:*** Freeman Decl. ¶ 25, Exh. 38.

160.    In BMR, the Romantic Lead takes the Heroine outside to see the Northern Lights at a school dance. Freeman Decl. ¶ 25, Exh. 38 (Heroine Character Index, ¶ 245). In *Crave*, the

Romantic Lead takes the Heroine to dance under the Northern Lights at a school dance. Id. *Crave* takes this scene directly from BMR 2011 and 2013.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Attack on Beach*** Freeman Decl. ¶ 27, Exh. 32 (Heroine's Closest Male Friend Character Index, ¶ 15-27).

161.    In both Works, Brendan (BMR)/Flint (*Crave*) is mortally injured during a fight scene. In BMR, he is injured with a "cobra" bite that has no cure. Freeman Decl. ¶ 27, Exh. 32 (Heroine's Closest Male Friend Character Index, ¶ 15). In the *Crave* series, Flint is bitten by the Vampire King, who is "like a cobra" and his bite has no cure. Id. In both Works, the Heroine and her aunt try to save Brendan/Flint. Id. (Heroine's Closest Male Friend Character Index, ¶ 16). The sequence of events in this scene, the setting, and the dialogue is substantially similar.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

162.    [Withdrawn per ECF No. 287 at 5]

**Response:** N/A

***Tarot Card:*** Freeman Decl. ¶ 20, Exh. 32.

163.    In another scene, the Heroine chooses the same tarot card, the Tower, in a reading. Freeman Decl. ¶ 20, Exh. 32 (Summary and Supporting Index, ¶ 89).

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

***Setting:***

164.    Crave's first edition has the heroine land in Anchorage, then changes that to Fairbanks in later editions, and places the school in Healy, Alaska. Freeman Decl. ¶ 20, Exh. 32 (Summary and Supporting Index, ¶ 2) Both stories take place in the same overall setting – a high school in Alaska. But both also involve scenes that take place in specific settings within Alaska that are the same. For example, some scenes also take place in a vortex, a refuge, and a castle, amongst others.

**Response**: Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Castle:*

165.    Both works feature a castle that is described using the same vivid descriptions, indicating that it is, in fact, the same castle. Freeman Decl. ¶ 20, Exh. 32 (Summary and Supporting Index, ¶ 148-155). Notably, it is a castle in *Alaska*, a place where there are no such structures. The castle has wall sconces with live candles, "ornately carved double doors" stone walls, "crystal chandeliers," long driveway, and security that requires a code at the entrance. Id. In *Crave*, when Heroine is inside the castle, the Heroine says she feels like she is in a "Salvador Dali" painting. Freeman Decl. ¶ 20, Exh. 32 (Summary and Supporting Index, ¶ 157). In *BMR*, Heroine describes a similar place for supernaturals as feeling like she is in "Dante's Inferno," which is a famous Salvador Dali painting. Id.

**Response**: Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Vortex:*

166.    In both Works, the Heroine's witch relative created a vortex that is a portal Heroine can go through to visit the trapped supernatural being, i.e., the "Abomination" or "Unkillable

Beast" (collectively, "Voice 1"). Freeman Decl. ¶ 35, Exh. 36 (First Voice Inside Heroine's Head Index, ¶ 9). Upon arriving in the vortex, the Heroine notices that the chains holding Voice 1 are mounted to a tree (BMR)/wall(*Crush*). (First Voice Inside Heroine's Head Index, ¶ 12). The chains are also acting as a magical deterrent that keeps Voice 1 stuck in his supernatural form. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Refuge for Supernatural Beings:*

167.    Both Works involve a refuge for supernatural beings. In BMR, the refuge is called "Katmai" and in *Crave*, the refuge is "Katamere." Freeman Decl. ¶ 28, Exh. 32 (Summary and Supporting Index, ¶ 156). The refuges are both in Alaska and are a remote magical place where supernatural beings can meet and live together. Id. A small plane must be taken to reach them. In BMR there is a "Sanctuary" that is similar to a town described in the Crave series. Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Alexandria:*

168.    In another scene, the Heroine randomly describes the setting being "like the Libarary of Alexandria" in Crave and "like the Lighthouse of Alexandria" in BMR. Freeman Decl. ¶ 40, Exh. 48.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Dialouge:*

169.    Both BMR and the *Crave* series contain extraordinarily similar language and dialogue which often follow in page proximity. Freeman Decl. ¶ 40, Exhs. 46-49.

**Response:** Denied. This is a legal conclusion and relies exclusively on Ms. Freeman's declaration statements and similarity "indexes," which are not inadmissible evidence as shown in Defendants' Evidentiary Objections. This paragraph accordingly must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

170.     The Heroine quotes Shakespeare when she and the romantic lead meet. Freeman Decl. ¶ 40, Exh. 46. The same combination of pop culture references are curiously scattered between the two works, including Humpty Dumpty, Peter Pan, Sleeping Beauty, Snow White, Star Wars, Grey's Anatomy reference, the Hulk, Superman and Lois Lane, the Wizard of Oz reference, Tom Cruise, French philosophers, Alexandre Dumas quote from The Three Musketeers, Shakespeare plays, Stonehenge / Stonehenge lite, clickety clack, Barbies, etc. Freeman Decl. ¶ 40, Exhs. 46-49.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

171.     In BMR, the heroine says "let's make a deal" to the Vampire Prince who has kidnapped some kids from her school and drains their life force in front of her. She bargains for their lives. Freeman Decl. ¶ 40, Exh. 49. In *Court*, the heroine says "let's make a deal" to the Vampire King who has kidnapped kids at her school and is draining them of their life force and magic. Id. He does this in front of the Heroine. Id. In another BMR scene between the heroine and the romantic lead reads: "*He claimed he wasn't a werewolf but could shift into a wolf. It seemed like a bit of a technicality*…." Freeman Decl. ¶ 40, Exh. 46. In a different scene in Crave the heroine's cousin says to her: "*Well, if you're going to get technical, they're wolf shifters really, more than werewolves*." Id.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

172.    The both Works, the Vampire Prince/King calls the heroine "little girl". Freeman Decl. ¶ 33, Exh. 44 (The Villian Character Index, ¶ 14). Freeman has detailed dozens of pages of paraphrased scenes, including scenes in which (1) the heroine's relative pulls out a black choker/black tie, puts it around the heroine's neck, and compliments how she looks, (2) the heroine talks about dressing like a "newbie" in Alaska, (3) an evil vampire is thrown "across the room" with a loud/giant "wrenching sound," and (4) the heroine describes being embraced by the romantic lead in a bedroom with his scent of "citrus… and waterfalls" (BMR) / "sexy orange and fresh water" (*Crave*). Freeman Decl. ¶ 40, Exhs. 46-49.

**Response:** Denied and this paragraph must be stricken for the reasons stated in response to ¶ 107, *supra*.

### *Expert Reports*

173.    Freeman has retained three expert witnesses who speak directly to the issue of probative similarity.

**Response:** Admitted that Plaintiff has retained three expert witnesses who attempt to address the issue of probative similarity, but otherwise denied. This statement does not contain material facts and is rather an argument or legal conclusion regarding the merits and/or admissibility of these experts' opinions. Further, Plaintiff's experts' opinions on "probative similarity" are unreliable and inadmissible as will be shown at *Daubert*. Finally, this statement does not cite any evidence. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

174.     Professor Kathrine Reiss has offered an expert report explaining the qualitiative similarities between each of the books in the *Crave* series and BMR far exceed those one would expect when reading two books in the same genre. Doniger Decl. ¶ 37, Exh. 36, Reiss Report, p. 3, ¶ 7.

**Response:** Admitted that Reiss's expert report purports to identify "qualitative similarities" between the works but otherwise denied. This statement does not contain material facts and is rather an argument or legal conclusion regarding the merits and/or admissibility of the Reiss report. The Reiss report is unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

175.     The expert report from Professor Reiss makes clear that Wolff cherry-picked through Freeman's material and used the way one scene was initially written in 2010, and then added the parts Freeman added in 2011, 2012, 2013, 2014 and so on.

**Response:** Denied. This statement does not contain material facts and is rather an argument or legal conclusion regarding the merits and/or admissibility of the Reiss report. The Reiss report is unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

176.     There is a tremendously large amount of language that was copied by use of close paraphrasing or as it is referred to by Dr. Chadski, mosaic copying. The copying of the language can be seen in Exs. 46 through 49 attached to the declaration of Freeman.

**Response:** Denied. This statement does not contain material facts and is rather an argument or legal conclusion based on the Chaski report and Freeman's similarity "indexes," none of which is admissible evidence as shown in Defendants' Evidentiary Objections and at *Daubert*. This statement must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

177.    The methodologies used by Drs. Chaski and Juola are scientifically accepted. Indeed, Dr. Chaski alone has been involved in approximately 100 matters, including various copyright infringement and authorship cases. (*See* Doniger Ex. 35 (Chaski Report) pp. 3-14.)

**Response:** Admitted that Dr. Chaski claims to have been "involved in approximately 100 matters," but denied that this is relevant or material. However, as will be shown at *Daubert*, few of these matters involved copyright infringement allegations and Dr. Chaski has never previously used or published the particular methodology she has attempted to use here. Otherwise denied. This statement does not contain material facts and is rather an argument or legal conclusion regarding the merits and/or admissibility of the Chaski and Juola reports. The Chaski and Juola reports are unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

178.    In Dr. Chadski's report, she states as follows: "[B]ased on these empirical results using standard procedures for detecting plagiarism, I conclude that it is extremely likely that the [*Crave* book] series plagiarize the Freeman Manuscripts. The plagiarism takes place at the three levels of plagiarism: copy-paste, mosaic and conceptual, and has been found using standard methods of plagiarism detection. **Statistically speaking, it is virtually impossible that the two works could have been independently created in light of my findings.**" (Emphasis Added). See Doniger Decl. ¶ 36, Exh. 35, Chadski Report, p. 45.

**Response:** Admitted to the extent that Dr. Chaski's report speaks for itself. Otherwise denied. The Chaski report is unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

179.    In Dr. Joula's report, he states as follows: "Quantitative and computational analysis indicates that there are similarities between the Crave novels and the 2011 manuscript for Blue

Moon Rising, and that these similarities are unlikely to have arisen by chance. Based on the evidence described in this report, I consider it to be more likely than not that these works have a common origin. **In fact, based on the calculations above, I would consider the odds in favor of these works having a common origin as more than 1000:1."** (Emphasis Added) *See* Doniger Decl. ¶ 38, Exh. 37 (Joula Report, p. 7, ¶ 41). Dr. Joula also identifies many other lexical overlaps that are either not present or extremely rare or entirely missing in Google Books N-grams, such as "tree stump seats", "small stonehenge", and "air as I try to." Id. (Joula Report, ¶ 25). Joula explains that "999 times out of a thousand we would see no overlap of this type if there were not shared authorial influence, so it … follows that it is very much more likely than not that [BMR and Crave series] were not independently written." Id. (Joula Report, ¶ 30).

   **Response:** Admitted to the extent that Dr. Juola's report speaks for itself. Otherwise denied. The Juola report is unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

   180.   In Professor Reiss' report, she states as follows: The remarkable similarities between the storylines, plot, setting, characters— including mental states of characters, reactions of characters, physical conditions of characters—and the other elements of Freeman's material and the first four books of Wolff's CRAVE series are substantial. **These striking similarities go far beyond genre conventions or tropes, and would not be expected to occur in works that were independently created. Given the myriad ways characters can be created and story and plotlines can unfold, it is my opinion that the similarities are so striking as to preclude the possibility of independent creation.** I believe it is far more likely that Wolff appropriated them from Freeman's work. (Emphasis Added) See Doniger Decl. ¶ 37, Exh. 36, Reiss Report at p. 50.

**Response:** Admitted to the extent that Reiss's report speaks for itself. Otherwise denied. The Reiss report is unreliable and inadmissible as will be shown at *Daubert*. This paragraph must be stricken. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

181.    As set forth in Lynne Freeman's language indexes (Freeman Decl., Exhibits 46-49) there are a tremendous number of *Crave* Series sentences and paragraphs that appear to have been plagiarized from BMR. As was widely reported back in 2006, evidence of virtually indistinguishable unauthorized paraphrasing led Little, Brown and Co. to stop distributing Kaavya Viswanthan's debut novel "*How Opal Mehta Got Kissed, Got Wild, and Got a Life*" and cancel her 2-book publishing deal. See Plaintiff's Request for Judicial Notice; The Harvard Crimson, "'*Opal Mehta' Gone for Good; Contract Canceled*" (May    2,      2006), www.thecrimson.com/article/2006/5/2/opal-mehta-gone-for-good-contract/;                      PBS, "*Publisher Pulls Harvard Student's Novel Over Alleged Plagiarism*" (May 2, 2006), www.pbs.org/newshour/show/publisher-pulls-harvard-students-novel-over-alleged-plagiarism;  A sampling of the paraphrasing from that case, as reported in David Zhou's Harvard Crimson article "*Examples of Similar Passages Between Viswanathan's Book and   McCafferty's   Two   Novels*" (April  23,      2006),      www.thecrimson.com/article/2006/4/23/examples-of-similar-passages-between-viswanat hans/, is below:

| McCafferty's *Sloppy Firsts* and *Second Helpings* | Viswanathan's *Opal Mehta* |
|---|---|
| *Sloppy Firsts*, page 7: "Bridget is my age and lives across the street. For the first twelve years of my life, these qualifications were all I needed in a best friend. But that was before Bridget's braces came off and her boyfriend Burke got on, before Hope and I met in our seventh grade Honors classes."[29] | page 14: "Priscilla was my age and lived two blocks away. For the first fifteen years of my life, those were the only qualifications I needed in a best friend. We had bonded over our mutual fascination with the abacus in a playgroup for gifted kids. But that was before freshman year, when Priscilla's glasses came off, and the first in a long string of boyfriends got on."[29] |
| *Sloppy Firsts*, page 6: "Sabrina was the *brainy* Angel. Yet another example of how every girl had to be one or the other: Pretty or smart. Guess which one I got. You'll see where it's gotten me."[1][29] | page 39: "Moneypenny was the *brainy* female character. Yet another example of how every girl had to be one or the other: smart or pretty. I had long resigned myself to category one, and as long as it got me to Harvard, I was happy. Except, it hadn't gotten me to Harvard. Clearly, it was time to switch to category two."[1][29] |
| *Second Helpings*, page 67: "... but in a truly sadomasochistic dieting gesture, they chose to buy their Diet Cokes at Cinnabon."[1][29] | page 46: "In a truly masochistic gesture, they had decided to buy Diet Cokes from Mrs. Fields ..."[1][29] |
| *Sloppy Firsts*, page 23: "He's got dusty reddish dreads that a girl could never run her hands through. His eyes are always half-shut. His lips are usually curled in a semi-smile, like he's in on a big joke that's being played on you but you don't know it yet."[29] | page 48: "He had too-long shaggy brown hair that fell into his eyes, which were always half shut. His mouth was always curled into a half smile, like he knew about some big joke that was about to be played on you."[29] |
| *Sloppy Firsts*, page 68: "Tanning was the closest that Sara came to having a hobby, other than gossiping, that is. Even the webbing between her fingers was the color of coffee without cream. Even for someone with her Italian heritage and dark coloring, it was unnatural and alienlike." | page 48: "It was obvious that next to casual hookups, tanning was her extracurricular activity of choice. Every visible inch of skin matched the color and texture of her Louis Vuitton backpack. Even combined with her dark hair and Italian heritage, she looked deep-fried." |
| *Second Helpings*, page 69: "Throughout this conversation, Manda acted like she couldn't have been more bored. She lazily skimmed her new paperback copy of Reviving Ophelia —she must have read the old one down to shreds. She just stood there, popping another piece of Doublemint, or reapplying her lip gloss, or slapping her ever-present pack of Virginia Slims against her palm. (Insert oral fixation jokes, here, here and here.) Her hair—usually dishwater brown and wavy—had been straightened and bleached the color of sweet corn since the last time I saw her...Just when I thought she had maxed out on hooter hugeness, it seemed that whatever poundage Sara had lost over the summer had turned up in Manda's bra."[29] | page 48: "The other HBz acted like they couldn't be more bored. They sat down at a table, lazily skimmed heavy copies of Italian Vogue, popped pieces of Orbit, and reapplied layers of lip gloss. Jennifer, who used to be a bit on the heavy side, had dramatically slimmed down, no doubt through some combination of starvation and cosmetic surgery. Her lost pounds hadn't completely disappeared, though; whatever extra pounds she'd shed from her hips had ended up in her bra. Jennifer's hair, which I remembered as dishwater brown and riotously curly, had been bleached Clairol 252: Never Seen in Nature Blonde. It was also so straight it looked washed, pressed and starched."[29] |
| *Sloppy Firsts*, page 23: "Though I used to see him sometimes at Hope's house, Marcus and I had never, ever acknowledged each other's existence before. So I froze, not knowing whether I should (a) laugh (b) say something (c) ignore him and keep on walking ... 'Uh, yeah. Ha. Ha. Ha.' ... I turned around and saw that Marcus was smiling at me."[3] | page 49: "Though I had been to school with him for the last three years, Sean Whalen and I had never acknowledged each other's existence. I froze, unsure of (a) what he was talking about and (b) what I was supposed to do about it ... 'Ha, yeah. Uh, ha. Ha.' ... I looked up and saw that Sean was grinning."[3] |

| | |
|---|---|
| *Sloppy Firsts*, page 237: "Finally, four major department stores and 170 specialty shops later, we were done."[1][29] | page 51: "Five department stores, and 170 specialty shops later, I was sick of listening to her hum along to Alicia Keys..."[1][29] |
| *Second Helpings*, page 68: "'Omigod!' shrieked Sara, taking a pink tube top emblazoned with a glittery Playboy bunny out of her shopping bag."[29] | page 51: "...I was sick of listening to her hum along to Alicia Keys, and worn out from resisting her efforts to buy me a pink tube top emblazoned with a glittery Playboy bunny."[29] |
| *Sloppy Firsts*, page 217: "But then he tapped me on the shoulder, and said something so random that I was afraid he was back on the junk."[29] | page 142: "...he tapped me on the shoulder and said something so random I worried than he needed more expert counseling than I could provide."[29] |
| *Sloppy Firsts*, page 46: "He smelled sweet and woodsy, like cedar shavings."[29] | page 147: "...I had even begun to recognize his cologne (sweet and woodsy and spicy, like the sandalwood key chains sold as souvenirs in India.)"[29] |
| *Second Helpings*, page 88: "By the way, Marcus wore a T-shirt that said THURSDAY yesterday, and FRIDAY today."[29] | page 170: "He was wearing an old, faded gray sweatshirt that said 'Tuesday' on it. Except that today was Thursday."[29] |
| *Sloppy Firsts*, page 209:"Pause.<br><br>'So I don't need a ride...'<br>Another pause.<br>'But do you want one?' he asked.<br>God, did I want one.<br>He knew it, too. He leaned over the front seat and popped open the passenger-side door. 'Come on, I want to talk to you,' he said."[29] | page 172:"Pause.<br><br>'So I can't really stay...'<br>Another pause.<br>'But you want to?' he asked.<br>Did I? Yes...<br>He knew it, too. He patted the chair again. 'Come on, I want to talk to you,' he said."[29] |
| *Sloppy Firsts*, page 213: "He was invading my personal space, as I had learned in Psych. class, and I instinctively sunk back into the seat. That just made him move in closer. I was practically one with the leather at this point, and unless I hopped into the backseat, there was nowhere else for me to go."[29] | page 175: "He was definitely invading my personal space, as I had learned in Human Evolution class last summer, and I instinctively backed up till my legs hit the chair I had been sitting in. That just made him move in closer, until the grommets in the leather embossed the backs of my knees, and he finally tilted the book toward me."[29] |
| *Sloppy Firsts*, page 223: "Marcus finds me completely nonsexual. No tension to complicate our whatever relationship. I should be relieved."[29] | page 175-176: "Sean only wanted me as a friend. A nonsexual female friend. That was a good thing. There would be no tension to complicate our relationship and my soon-to-be relationship with Jeff Akel. I was relieved."[29] |

**Response:** Denied. The parties' works speak for themselves. (*See generally Crave*; *Crush*;

*Covet*; *Court*; *BMR 2011*; *BMR 2013*.) Plaintiff's statement misrepresents the works and contains

impermissible argument and legal conclusions. The first sentence of ¶ 181 exclusively relies on

73

Freeman's own similarity "indexes," which are not admissible evidence as shown in Defendants' accompanying Evidentiary Objection. The remainder of ¶ 181 does not cite admissible evidence (*see* Defs.' Evid. Obj. at 11-12) and does not state material facts. Whether a third party was privately found to have committed plagiarism by other third parties, under unknown standards that are not applicable in federal court, is irrelevant to whether the works at issue in this case are substantially similar under U.S. copyright law. Plaintiff's statement also fails to show that she is accurately representing the facts of her third-party plagiarism example, or fairly applying them to this case. Any application of the third-party example to this case is invalid, including because the examples of alleged "fragmented literal similarity" supplied in Plaintiff's brief are misleading and heavily edited using ellipses. (*See* Pl.'s Mem. at 28-29; Cole Ex. EE.) Controlling Second Circuit law requires a "detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996), not misleading discrete comparisons based on heavily edited clips from the works. For all of these reasons, ¶ 181 must be stricken in its entirety. *See* Fed. R. Civ. P. 56(c, e); LR 56.1(d).

Dated: New York, New York
        December 22, 2023

Respectfully submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**

By: /s/ Nancy E. Wolff

Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
nwolf@cdas.com
bhalperin@cdas.com
ccole@cdas.com

*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim
and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN &
GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendant Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

## **CERTIFICATE OF SERVICE**

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of Defendants'
Response to Plaintiff's Local Rule 56.1 Statement of Material Facts has been served on all
counsel of record via the Court's CM/ECF service.

/s/ Nancy E. Wolff
Nancy E. Wolff