UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN,

  *Plaintiff*,

-against-

TRACY DEEBS-ELKENANEY, et al.,

  *Defendants*.

Case No. 1:22-cv-02435 (LLS)(SN)

# MEMORANDUM IN SUPPORT OF PROSPECT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim and Prospect Agency, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND................................................................................................... 3

ARGUMENT...........................................................................**Error! Bookmark not defined.**

    I.    The Applicable Standard on Summary Judgment .............**Error! Bookmark not defined.**

    II.    Plaintiff's State Law Claims Must Be Dismissed If Her Copyright Claim Is Dismissed .. 7

    III.    Plaintiff Cannot Sustain a Claim for Breach of Contract. ..................................................... 7

    IV.    Plaintiff Cannot Sustain a Claim For Fraud and Fraudulent Concealment ...................... 10

    V.    Plaintiff Cannot Sustain a Claim for Breach of Fiduciary Duty...................................... 13

CONCLUSION........................................................................................................................ 15

## TABLE OF AUTHORITIES

**STATUTES**

Fed. R. Civ. P. 56(a) ...................................................................................................................6

**CASES**

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...........................6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................6

*34–06 73, LLC v. Seneca Insurance Company*, 39 N.Y.3d 44 (N.Y. 2022)..................................7

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (N.Y. 1995) ..........................................................8

*Skillgames, LLC v. Brody*, 1 AD3d 247 (1st Dept 2003)...............................................................8

*MetLife Investors USA Ins. Co. v. Zeidman*, 734 F.Supp.2d 304 (E.D.N.Y. 2010)......................10

*De Sole v. Knoedler Gallery, LLC*, 139 F.Supp.3d 618 (S.D.N.Y. 2015) ....................................10

*Cronos Group Ltd. v. XComIP, LLC*, 156 A.D.3d 54 (1st Dep't 2017) .......................................11

*Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148 (2d Cir. 2012) ..................................................13

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................................13

*Meisel v. Grunberg*, 651 F.Supp.2d 98 (S.D.N.Y. 2009) .............................................................14

*Clifford v. Janklow*, 1:22-cv-1259, 2023 WL 2711353 (S.D.N.Y. Mar. 30, 2023)......................14

*Balta v. Ayco Company, LP*, 626 F.Supp.2d 347 (W.D.N.Y. 2009).............................................14

*Brooks v. Key Trust Co. Nat'l Assoc.*, 626 F.Supp.2d 347 (3d Dept. 2006) .................................14

## INTRODUCTION

This case represents an extraordinary attempt by an unpublished author to leverage her long-ago relationship with a literary agent – who worked diligently for years to find a publisher for the author's novel – to reap an undeserved windfall simply because one of the agent's other authors later found success with a book series in the same genre, also set in Alaska.[1] However, as Defendants[2] have made clear since before this lawsuit was filed, and as addressed in Defendants' brief addressing Plaintiff's copyright claim, the works at issue are not substantially similar as a matter of copyright law, and for this reason this case should be dismissed. Separately, as addressed herein, Plaintiff's paper-thin state law claims also must be dismissed, as Plaintiff cannot proffer a shred of evidence supporting those claims against Emily Sylvan Kim ("Kim") or Prospect Agency, LLC ("Prospect") (collectively, the "Prospect Defendants").

Many of the arguments found in Plaintiff's motion papers are smokescreens and red herrings – attempts by Plaintiff to focus the Court on *anything* other than a comparison of the works at issue, as required under Second Circuit law. Plaintiff has exploited the fact that Kim worked as an agent for both Plaintiff and for Tracy Wolff, and submitted Plaintiff's manuscript (at Plaintiff's request) to Entangled Publishing back in 2013, to speculate about motive and posit a far-fetched scheme by the Prospect Defendants to conspire with others to steal all of Plaintiff's manuscripts and papers for use by Wolff a decade later. Not only are these fantasies entirely unmoored from fact, they are irrelevant to the issue of substantial similarity – if the works are not similar, the Court must dismiss this case. And make no mistake: Kim has testified in no uncertain

---

[1] As discussed at length in Defendants' copyright brief, any similarities between the books are superficial or driven entirely by genre. Even the Alaska setting is expressed entirely differently in each: Freeman's book is set in a typical public school in a city, whereas *Crave* is set in a Hogwarts-like boarding school in a remote area.

[2] This memorandum uses the same defined terms as in Defendants' copyright brief. *"BMR"* refers to all drafts of Plaintiff's manuscript, including those entitled *Blue Moon Rising* and *Masqued*.

terms that she never provided Plaintiff's materials to Wolff or any other party (except submitting Plaintiff's manuscripts to publishers), never spoke to Wolff, Pelletier or Abrams about Plaintiff's manuscripts, and did not write any portion of any book in the Crave series. Defendants' Rule 56.1 Statement of Undisputed Material Facts ("DSUF") ¶¶ 61-64, 72, 74, 106.

This same rank speculation also animates Plaintiff's state law claims for fraud, breach of fiduciary duty and breach of contract against the Prospect Defendants. Plaintiff claims that the Prospect Defendants fraudulently induced Plaintiff to enter into an agency agreement and show her manuscript to editors at publishing houses, but that the Prospect Defendants' true intent was to provide the manuscript to Tracy Wolff as part of the purported decade-long scheme to infringe Plaintiff's copyright. Her claims for breach of contract and fiduciary duty are based on the very same conjecture. Yet there is not a scintilla of evidence that any such scheme existed, much less that the Prospect Defendants made any fraudulent statements in furtherance of that scheme, or provided Plaintiff's manuscript to Wolff or any other third party, except as part of the typical manuscript submission process. Further, the alleged "injury" Plaintiff purportedly suffered as a result of the breaches and acts of fraud is the same as under Plaintiff's copyright claim: Violation of her copyright interests. Thus her state law claims also fail if her copyright claim fails, as it must.[3]

## FACTUAL BACKGROUND

Emily Kim founded Prospect Agency, LLC, a literary agency, in 2005. DSUF ¶ 8. Prospect specializes in romance, women's fiction, historical fiction, mysteries, fantasy and sci-fi, and young

---

[3] Plaintiff may try to bolster her claims through expert testimony suggesting that the Prospect Defendants were motivated to commit copyright infringement by purported financial pressures, but this too is based on wholly unsupported speculation. Moreover, motive is not an element of Plaintiff's state law claims (or copyright claims for that matter). To the extent the Court does not exclude these experts as a result of Defendants' forthcoming *Daubert* motion, such testimony cannot provide a *factual* basis for Plaintiff's claims that is otherwise absent.

adult/children's literature. DSUF ¶ 135. Prospect Agency is a small business, but has always had a strong roster of writers and illustrators, including but not limited to *New York Times* best-selling author, Kristen Ashley; *New York Times* best-selling author and illustrator, Cori Doerrfeld; historical fiction writer and Canadian best-selling author, Julia Kelly; Piper Huguley, Michelle Stimpson and many more women's fiction writers; young adult author and former *New York Times* journalist, Hayley Krischer, whose work is currently under film option with Bruna Papandrea; fantasy writer C.S Pacat; romance writers such A.J. Pine, Janice Maynard, Mia Vincy, Claudia Connor, Serena Bell and Rhonda McKnight among many others, many of whom have been RITA (the romance version of the Oscar) award winners. DSUF ¶ 135; Kim Decl. ¶ 7. Prospect regularly sells to all the major publishers and wide array of smaller high quality publishers. Kim Decl. ¶ 8. Over the nearly two decades since its founding, Prospect Agency has seen a steady and increasing profitability. DSUF ¶ 136.

In late 2010, Lynne Freeman approached Prospect Agency seeking representation for a manuscript entitled *Blue Moon Rising* ("*BMR*"), and indicating that she had strong interest in her manuscript from a publisher, HarperCollins UK. DSUF ¶ 139. On November 17, 2010, Kim asked Freeman to forward the full manuscript for review and thereafter notified Freeman that Prospect Agency would represent her. DSUF ¶ 139. On December 8, 2010, Freeman signed Prospect's standard agency agreement. DSUF ¶¶ 10, 139; Doniger Ex. 39 ("Agency Agreement"). At no time did Kim make any affirmative representations to Freeman except those expressly set forth in the written agreement.[4] DSUF ¶ 140. The Agency Agreement also includes an integration clause which supersedes and cancels any previous agreements or understandings between the parties,

---

[4] In the Agency Agreement, Freeman agrees that Emily Kim will be her exclusive agent during the time they work together, will only submit work for which she is the sole author, and will pay Prospect Agency a commission on any sales. Agency Agreement at KIM00352651-52.

3

whether written or oral, and requires any future modifications to be in writing DSUF ¶ 140; Doniger Ex. 39 at KIM00352653.

Over the subsequent months, Kim worked with Freeman to try to bring the *BMR* manuscript into a form suitable for pitching to book editors. DSUF ¶ 142. During this period, Kim made numerous editorial suggestions and Freeman attempted to incorporate some of those edits, as is common in many author-agent relationships prior to the author finding a publisher. *Id.* Kim also asked several "readers" at Prospect to review the manuscript and provide comments; at least one reader did not feel that the manuscript was ready to send to editors. *Id.* Freeman regularly expressed thanks to Kim for the time and care Kim was paying to her manuscript, but also pushed back against some suggested changes to her manuscript. (Kim. Decl. ¶ 42; DSUF ¶ 142). Freeman's aunt also reviewed many of the changes and agreed with them (DSUF ¶ 142).

In October 2011, with the full knowledge of Freeman, Kim sent the *BMR* manuscript to editors at four major publishers for review. DSUF ¶ 143. Each rejected the manuscript. DSUF ¶ 143. In November 2011, Freeman informed Kim that although a copy of her manuscript had been sent again to Lucy Vanderbilt at HarperCollins UK, Vanderbilt had not actually read it, and suggested that Freeman have her agent submit the manuscript directly to her contact at HarperCollins. DSUF ¶ 145. Kim then sent Freeman's manuscript to both HarperCollins US and HarperCollins UK, but both rejected it. DSUF ¶ 146.

After additional revisions by Freeman, who also decided to change the title to *Masqued*, Kim sent the manuscript out to seven additional editors in April 2012. DSUF ¶¶ 144, 147. Each editor rejected it. DSUF ¶ 147. After these rejections, Freeman continued to work on her manuscript, as well as supporting documents such as a pitch letter and a synopsis and Kim continued to offer suggestions and to have readers review the book. DSUF ¶ 148. The manuscript draft Freeman sent to Kim on July 30, 2013 was the last new version Kim ever saw. DSUF ¶ 148.

In September 2013, Kim suggested to Freeman that the parties end their relationship because Kim believed the manuscript still needed improvement and that her suggestions to Freeman and her attempts to help Freeman address major structural problems with her manuscript were not bearing fruit. DSUF ¶ 149; Kim Decl. ¶ 36. However, Freeman asked her to send out one last round of submissions, and on October 10, 2013 Kim submitted Freeman's manuscript to Entangled, Holiday House, Thomas Dunne, and another editor at Penguin, and then later two submissions to CarolRhoda and Scholastic. DSUF ¶ 149. By February 2014, all of the publishers except Entangled had rejected the manuscript. DSUF ¶ 150.

With respect to Entangled, Kim sent a query to Elizabeth Pelletier, who referred the query to Stacy Abrams; Abrams then emailed Kim and asked her to send a copy of the manuscript, and Kim did so on October 30, 2013. DSUF ¶¶ 52-56. On March 25, 2014, Freeman terminated her relationship with Kim and Prospect Agency, noting that "I don't believe Entangled will want Masqued as it is," and asking Kim to withdraw her manuscript from Entangled, which Kim then asked her assistant to do. DSUF ¶ 151.

After Freeman and Prospect Agency terminated their professional relationship in March 2014, there was no contact between the parties until this dispute arose, except once in 2015 when Kim emailed Freeman just to touch base, and in the exchange Freeman stated that she had "really needed to take some time away from Masqued and then get perspective. The story just didn't work. I've written a new story, using parts of Masqued that I loved, and a completely different mythology with Egyptian gods….! Not quite done but very close.". DSUF ¶ 152. After the termination of their relationship, Freeman never sent Kim any further copies of her manuscript; again, the last new version Kim had received was in July 2013. DSUF ¶ 148.

Other than sending the pitch copy of *Masqued* to Stacy Abrams at Entangled, neither Kim nor anyone else at Prospect Agency ever provided any of Freeman's manuscripts or other written

material to Entangled Publishing, Pelletier or Abrams. DSUF ¶¶ 62, 64, 72, 74; Kim Decl. ¶ 46. Neither Kim nor anyone else at Prospect Agency ever provided any of Freeman's manuscripts or other written material to Tracy Wolff. DSUF ¶¶ 61, 63, 72, 74. Neither Kim nor anyone at Prospect discussed *BMR* with any third party (other than editors and readers), including Wolff and Pelletier or Abrams (aside from submitting her the manuscript after she requested it). DSUF ¶¶ 62-64, 72, 74; Kim Decl. ¶ 46. Kim did not write or substantively contribute to any of the Crave books. DSUF ¶ 106.

In 2016, Kim and a partner founded a separate company called et al Creative, a literary production company that turns editors' ideas into finished books. DSUF ¶ 138. Kim did not found et al Creative because of a downturn in Prospect Agency's or her own financial status but rather as an exciting offshoot of an evolving and rewarding career. Kim Decl. ¶ 11.

## ARGUMENT

### I. The Applicable Standard on Summary Judgment

Summary judgment is proper where the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial, but rather need only point out to the Court that there is an absence of evidence to support the non-moving party's case.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla

6

of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Additionally, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.

## II. Plaintiff's State Law Claims Must Be Dismissed If Her Copyright Claim Is Dismissed

All of Plaintiff's state law causes of action require Plaintiff to prove injury as an element. *See infra* Sections III-V (listing elements of each claim). Here, the *only* injury Plaintiff pleads is that the purported fraud, breaches of fiduciary duty, and breaches of contract led to Wolff receiving Freeman's manuscript and committing copyright infringement. First Amended Complaint ("FAC," ECF No. 24) ¶¶ 46, 55, 60, 68. If, as Defendants demonstrate in their copyright brief, Plaintiff cannot prove copyright infringement because, *inter alia*, the works are not substantially similar, neither can she sustain her state law claims which depend upon infringement as the injury. As such, the state law claims fail for the same reasons the infringement claim fails.

## III. Plaintiff Cannot Sustain a Claim for Breach of Contract

Under New York law, claims for breach of contract require a plaintiff to show (a) the existence of a valid, enforceable contract, (b) performance by the plaintiff, (c) material breach by the defendant, and (d) damages directly caused by the breach. *See, e.g., 34–06 73, LLC v. Seneca Insurance Company*, 39 N.Y.3d 44, 52 (N.Y. 2022).

Here, Plaintiff claims that the Prospect Defendants materially breached the Agency Agreement by providing Freeman's copyrighted material to Wolff for the purpose of committing copyright infringement. FAC ¶ 68. Plaintiff points to no express contractual provisions that have been breached, but argues that there is an implied term of good faith and fair dealing requiring "[t]hat none of the parties thereto shall act in such manner as to destroy the other's expected fruits of the Agreement." FAC ¶ 66. In other words, Plaintiff argues that the Agency Agreement

7

contained an implied term that the Prospect Defendants would only share Freeman's copyrighted material with editors and readers, which they breached by allegedly sharing the material with Wolff or others.

Under New York law, "[t]he duty of good faith and fair dealing . . . is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995). "A claim for breach of the implied covenant of good faith and fair dealing cannot substitute for an unsustainable breach of contract claim." *Skillgames, LLC v. Brody*, 1 AD3d 247, 252 (1st Dept 2003).

Here, the factual contours of Plaintiff's claim of contract breach are entirely opaque. Plaintiff has not specified either in its pleadings or in its summary judgment papers *when* in time the alleged sharing of Plaintiff's copyrighted material took place, *which* specific works were allegedly shared by the Prospect Defendants with whom, or *what* the method was by which the material was shared. In the FAC, Plaintiff seemed to allege that Kim planned in 2010 to steal Plaintiff's work and deliver it to Wolff immediately, and even induced Plaintiff to enter the Agency Agreement in order to do so[5] (FAC ¶¶ 46-47, 55, 61); but in Plaintiff's summary judgment papers, she seems to assert that the purported sharing of materials did not occur until 2019 or 2020, when Wolff began working on the *Crave* series, and that the "sharing" consisted of Kim and/or Pelletier helping Wolff write some aspects of the series (*see* Plaintiff's Rule 56.1 Statement Of Undisputed Material Facts, ECF No. 280 ("SSUF") ¶¶ 46-89).[6] In any event, on her breach of contract claim, Plaintiff cannot just point vaguely to an unspecified breach occurring sometime in some unstated

---

[5] Notably, Freeman initially asserted that Kim began feeding material from Freman to Wolff as soon as their relationship commenced, in order to use in Wolff's book *Tempest Rising*, but abandoned that argument when it became apparent that *Tempest Rising* was completed well before Freeman ever reached out to Kim. *See* Defendants' copyright brief, at p. 20.

[6] At her deposition, Freeman conceded that "I don't know when she started developing a plan to show my manuscript to Tracy." Koonce Decl. Ex. QQ (Freeman Tr. 230:25 – 231:2).

manner; she must put forward specific, plausible facts demonstrating an actual, cognizable breach of contract. For instance, if Plaintiff believes the contract was breached because Kim provided Wolff with her manuscript in 2010, she must identify the manuscript at issue, and some set of facts that demonstrates that Kim did in fact provide the manuscript to Wolff. After extensive fact discovery, Plaintiff's allegations are as bare and unsupported as they were when her pleading was filed.[7]

Notwithstanding the above gaps in Plaintiff's legal arguments and the evidentiary record, the Prospect Defendants do not disagree that a literary agent should not share a client's materials with a third party with the intent of enabling that party to commit copyright infringement, but notably Plaintiff cannot present any facts demonstrating that the Prospect Defendants did so here. There is no evidence whatsoever in the record that the Prospect Defendants provided Freeman's copyrighted material to Wolff. Rather, every relevant individual has testified precisely to the contrary: That other than sending one copy of the *Masqued* manuscript to Entangled for review in the fall of 2013, the Prospect Defendants never provided any material from Freeman's manuscripts to Wolff, Entangled or anyone involved in the *Crave* series. DSUF ¶¶ 61-64, 72, 74; Kim Decl. ¶ 46. Despite the production of thousands text messages and emails between Kim, Wolff, Pelletier and Abrams in discovery, not one of those documents remotely suggests that the Prospect Defendants disclosed Freeman's materials.[8] DSUF ¶¶ 76-78. Indeed, a number of the manuscripts

---

[7] The Agency Agreement was terminated in March 2014, and thus if Plaintiff is claiming a breach of the implied covenant of good faith and fair dealing a half a decade later, she must also put forward facts demonstrating that the implied covenant (or any other contract provision) survived termination, and the facts surrounding the alleged breach.

[8] As noted, Plaintiff argues that certain texts from Kim indicate that Kim helped *write* the fourth book in the *Crave* series, *Court*. SSUF ¶¶ 49, 80, 82-87. Yet the texts do not say this. Rather, they are consistent with the deposition testimony and declarations of Kim, Wolff and Pelletier that Kim sat up with Wolff online during a key few-day stretch when Wolff was finishing *Court*, helping her stay awake and acting as a cheerleader to keep Wolff motivated. DSUF ¶¶ 106-12. Kim did not author any part of any of Wolff's books, beyond suggesting chapter titles or minor edits in the role of an agent. DSUF ¶¶ 106-14.

9

Plaintiff claims were infringed were never even provided by Freeman to Prospect Agency at all, but were created *after* that relationship terminated. DSUF ¶ 24.

Ultimately, Plaintiff's argument that her materials were provided to Wolff is not based on facts demonstrating that such materials were actually shared, but rests entirely on Plaintiff's claim that the *Crave* series of books is substantially similar to Freeman's manuscripts. Defendants are unaware of any cases holding that a finding of substantial similarity on a copyright claim can substitute for a factual showing of breach on a contract claim. Even if it could, her claim must fail if her copyright claim fails.

## IV. Plaintiff Cannot Sustain a Claim for Fraud and Fraudulent Concealment

The elements of a fraud claim under New York law are: (a) a material misrepresentation or omission of fact (b) made by defendant with knowledge of its falsity and (c) an intent to defraud, (d) reasonable reliance on the part of the plaintiff, and (e) resulting damage to the plaintiff. *See*, *e.g.*, *MetLife Investors USA Ins. Co. v. Zeidman*, 734 F.Supp.2d 304, 312 (E.D.N.Y. 2010). For fraudulent concealment, a plaintiff must prove (a) a duty to disclose material facts, (b) knowledge of material facts by a party bound to make such disclosures, (c) failure to discharge a duty to disclose; (d) scienter; (e) reliance; and (f) damages." *See*, *e.g.*, *De Sole v. Knoedler Gallery, LLC*, 139 F.Supp.3d 618, 640 (S.D.N.Y. 2015) (*citation omitted*).

In Count I of the FAC, Plaintiff alleges that the Prospect Defendants "falsely represented to Freeman that she would only show the Freeman Copyrighted Material to book publishers for the purpose of publishing Freeman's book and to Prospect's readers to critique the book" (FAC ¶ 46), but that the "true facts . . . were that Prospect and Kim intended to show the Freeman Copyrighted Material to Wolff and possibly others for the purpose of committing copyright infringement" (FAC ¶ 47). Plaintiff further alleges that the Prospect Defendants knew these

10

representations were false, and were made to induce Freeman to enter into the Agency Agreement and allow the Prospect Defendants to shop her manuscript to book publishers.[9] FAC ¶¶ 49-50.

In Count III, Plaintiff alleges that the Prospect Defendants had a fiduciary relationship with Freeman, and that this imposed "a duty upon Prospect and Kim to disclose material information and Prospect and Kim failed to do so with the intent to defraud Freeman." FAC ¶ 60. Specifically, Plaintiff asserts that the Prospect Defendants "failed to disclose that they provided the Freeman Copyrighted Material to Wolff and possibly others for the purpose of committing copyright infringement." *Id.* Plaintiff further alleges that "[i]n justifiable reliance on the failure to disclose, Freeman was induced to and did enter into the Agency Agreement and allow the Prospect Defendants to shop her manuscript to book publishers," which she would not have done had she been aware of the "true facts." FAC ¶ 61.

As a threshold matter, Plaintiff's fraud claims are duplicative of her contract claim. New York courts have made clear that "a fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of contract, enhanced only by conclusory allegations that the pleader's adversary made a promise while harboring the concealed intent not to perform it." *Cronos Group Ltd. v. XComIP, LLC*, 156 A.D.3d 54, 62 (1st Dep't 2017). That is precisely the situation here: Freeman makes only a conclusory allegation that the Prospect Defendants promised not to share her work beyond editors and readers and that the "true facts" were that they intended to show the work to Wolff for the purposes of infringement. As such, the claims are duplicative.

---

[9] It is unclear how "allow[ing] the Prospect Defendants to shop her manuscript to book publishers" could be deemed an act of reliance leading to any injury to Freeman, as presumably her own intent in hiring an agent was to shop her manuscript to publishers. There is no evidence in the record that allowing the Prospect Defendants to dutifully shop Freeman's manuscript harmed her in any way.

11

Further, upon inspection there are no genuine disputes as to any material fact regarding any element of Plaintiff's fraud/deceit claims that would preclude summary judgment in favor of the Prospect Defendants. First, there is no plausible evidence in the record that Kim made any affirmative representation to Freeman that she would only show Freeman's works to publishers and readers. The parties' agreement was in writing, and that agreement contains no such representation, and contains an integration clause which says that the agreement supersedes and cancels any previous agreements or understandings between the parties, whether written or oral, and requires any future modifications to be in writing. *See* Doniger Ex. 39 at KIM00352653; DSUF ¶ 140. In any event, no correspondence has been produced in which the Prospect Defendants made this type of broad representation, and Kim denies having made any such representation to Freeman.[10] Kim Decl. ¶ 16.

In the absence of any plausible proof of the Prospect Defendants ever making a representation they would only show Plaintiff's manuscript to editors and readers, Plaintiff cannot demonstrate the remaining elements of her claim (falsity, deception, inducement) and the claim must fail. Further, although Kim denies having made a broad, affirmative representation along the lines alleged by Plaintiff, Kim does not disagree that a literary agent should not show an author's work to third parties except in the service of attempting to sell the book to an editor. But here, neither Kim nor the Prospect Agency ever *did* show Freeman's works to any parties other than book publishers and readers. Rather, Kim merely acted diligently as Freeman's literary agent throughout the course of their three-year professional relationship.[11]

---

[10] Although Freeman testified vaguely that she recalled a representation being made, she could not recall when, and testified that Kim did not make *any* promises to her prior to the time the parties executed the Agency Agreement, meaning that Freeman could not have relied upon it when entering into that agreement or when deciding to allow the Prospect Agency to shop her manuscript to agents. Koonce Decl. Ex. QQ (Freeman Tr. 240:11 - 242:9).

[11] Plaintiff's narrative also simply defies logic. Why would Kim, on the basis of a first read of Freeman's book, concoct a scheme to show that manuscript to Wolff in order to help Wolff commit

12

Finally, to the extent that Plaintiff argues that Prospect and Kim formed an intent to show Freeman's manuscript to Wolff and others for the purpose of committing copyright infringement, there is simply no evidence in the record supporting such a conclusion. Kim has expressly stated that she never had any intent to show Freeman's work to other third parties, or to induce Freeman to enter into the parties' agency agreement under false pretenses. Kim Decl. ¶ 16. While a plaintiff "may satisfy the scienter requirement by producing 'evidence of conscious misbehavior or recklessness,'" *see Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (*quoting ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)), no such evidence has been adduced here at all. At her deposition, Freeman herself was asked whether it was her "contention in this lawsuit that at the time that Ms. Kim asked you to be a client of Prospect Agency that she was already planning to show your manuscript to Tracy Wolff for the purposes of committing copyright infringement?"; Freeman conceded: "I don't know what her intentions were." Koonce Decl. Ex. QQ (Freman Tr. 230:4-12). She also could not say when such an intention allegedly arose. Koonce Decl. Ex. QQ (Freman Tr. 230:20-231:2). Plaintiff's assertions about the Prospect Defendants' intent are pure speculation.

## V. Plaintiff Cannot Sustain a Claim for Breach of Fiduciary Duty

To prove a breach of fiduciary duty, a plaintiff must show (a) the existence of a fiduciary relationship, (b) misconduct by the defendant, and (c) damages directly caused by the defendant's misconduct. *See*, *e.g.*, *Meisel v. Grunberg*, 651 F.Supp.2d 98, 114 (S.D.N.Y. 2009). A recent decision by this Court clearly held that a literary agent holds no such duties to his or her client.

---

infringement nearly a decade later. Why would Kim agree to represent Freeman in order to carry out this scheme and do so *for three years*, given that she already had Freeman's manuscript in her possession before even signing the agency agreement? And why would Kim send out the manuscript to over 20 editors, as if any editor had accepted the manuscript for publication, this would have ruined Kim's supposed scheme. This argument is simply not plausible, is denied in its entirety by Kim, and is not supported by evidence, as opposed to pure speculation.

13

*Clifford v. Janklow*, 1:22-cv-1259 (MKV), 2023 WL 2711353, *6-7 (S.D.N.Y. Mar. 30, 2023). Here, Plaintiff has adduced no evidence that the relationship between the parties was one of trust and confidence where the Prospect Defendants were in a superior position or were in a position to exercise influence over Freeman, as required to show the existence of a fiduciary duty, rather than an ordinary commercial relationship such as in *Clifford v. Janklow*. *Id.* at *7.

Nevertheless, Prospect alleges that the Prospect Defendants violated their purported fiduciary duty by (1) making the false representations set forth in Plaintiff's fraud claim; and (2) failing to disclose that Freeman's manuscript was provided to Wolff for the purpose of committing copyright infringement. FAC ¶¶ 55-56.

Under New York law, "a plaintiff cannot pursue a separate breach of fiduciary duty claim based on allegations of fiduciary wrongdoing that 'are either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith.'" *Balta v. Ayco Company, LP*, 626 F.Supp.2d 347 (W.D.N.Y. 2009) (*citing Brooks v. Key Trust Co. Nat'l Assoc.*, 626 F.Supp.2d 347, 361 (3d Dept.2006) (citation omitted)). Here, Plaintiff's breach of fiduciary duty claim arises from the same purported facts as its contract claim, which is based on a purported violation of the implied covenant of good faith and fair dealing, and thus she cannot maintain a separate claim for breach of fiduciary duty based on that same conduct. Plaintiff's claim is also, on its face, duplicative of her fraud claim.

Further, as demonstrated at length in Emily Kim's declaration, she and Prospect Agency worked with Freeman in absolute good faith for the entire tenure of their relationship, as documented by the many emails documenting their extensive work together. Kim Decl. ¶¶ 17-39; DSUF ¶¶ 142-51. Over the course of approximately three years, Kim sent out over 20 manuscript submissions to editors on behalf of Freeman, with Freeman's blessing. Kim Decl. ¶¶ 26, 30, 32,

14

37. When asked at her deposition whether she thought Kim was somehow working against her interests when sending submissions out to publishers on her behalf, Freeman testified "I don't think so." Koonce Decl. Ex. QQ (Freeman Tr. 283:12-20).

As none of these claims are supported by the evidentiary record and are based on pure speculation, Plaintiff's breach of fiduciary duty claim fails for all of the reasons set forth above.[12]

## CONCLUSION

For the foregoing reasons, the Court should grant the Prospect Defendants' motion for summary judgment as to Plaintiff's state law claims.

Dated:  New York, New York
        December 22, 2023

Respectfully submitted,

KLARIS LAW PLLC

By:

_____
Lacy H. Koonce, III
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim and Prospect Agency, LLC*

## CERTIFICATE OF SERVICE

---

[12] In Plaintiff's Motion for Summary Judgment, she alleges: "Relying on Kim's advice that the publishing industry was oversaturated with young-adult paranormal romance, and that it wouldn't be a good time for a story like Freeman's until at least the time her son graduated from high school in 2021, Freeman decided to revisit BMR later as Kim advised and continued working on her craft." (SSUF ¶ 29.) To the extent Plaintiff intends to argue that this purported advice was a breach of Kim's fiduciary duty (or fraud), the argument is entirely belied by produced documents that demonstrate that Plaintiff kept working on her manuscript with a plan to publish it for years after she terminated Prospect Agency. *See* Kim Decl. ¶¶ 50-59; *see also* Koonce Decl. Ex. QQ (Freeman Tr. 256: 10-13) ("Q. Did you keep working on your manuscript after you eventually parted ways with Prospect Agency?  A. Yes.").

15

I, Lacy H. Koonce, III, hereby certify that a true and correct complete copy of the Prospect Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Plaintiff's State Law Claims has been served on all counsel of record via the Court's CM/ECF service.

<u>/s/ Lacy H. Koonce, III</u>
Lacy H. Koonce, III
