**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN, an individual,<br><br>*Plaintiff,*<br><br>-against-<br><br>TRACY DEEBS-ELKENANEY, et al.,<br><br>*Defendants.* | Case No. 1:22-cv-02435-LLS-SN<br><br>**PLAINTIFF'S DAUBERT MOTION TO EXCLUDE  A PORTION OF THE TESTIMONY OF MALCOLM COULTHARD AND THE TESTIMONY OF ROSE HILLIARD IN ITS ENTIRETY**<br><br>**[Declaration of Stephen Doniger, Declaration of Carole Chaski, and Request for Judicial Notice filed concurrently]** |

## TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................................................. 1

   **A.  An Expert Must be Qualified.** ................................................................. 1

   **B.  An Expert's Testimony Must be Relevant and Reliable.** ....................... 2

II.  **ROSE HILLIARD IS NOT QUALIFIED OR COMPETENT TO OFFER RELEVANT EXPERT TESTIMONY AND IS AN INTERESTED WITNESS** ............................................. 5

   A.  Hilliard's challenges to Marlene Stringer's expert opinions lack qualification, competence, and relevance. ................................................................................................. 7

   B.  **Hilliard's opinion that Kim's adjacent packaging business is "standard practice" lacks qualification, competence, and relevance.** ................................................. 8

   C.  **Hilliard's opinions regarding similarities between Crave and BMR are not proper rebuttal expert testimony, are cumulative, and are unsupported by proper qualifications or methodology.** ................................................................................................. 9

   D.  **Hilliard should be excluded as an expert because she is a biased, partisan witness incapable of giving objective expert opinions to the jury.** ................................... 11

III.  **MALCOLM COULTHARD'S REBUTTAL CRITIQUE OF CAROLE CHASKI'S CONCEPTUAL PLAGIARISM FINDINGS SHOULD BE STRICKEN AS, *INTER ALIA*, BEYOND HIS EXPERTISE.** ................................................................................... 12

   A.  **Coulthard's qualifications to address Dr. Juola's findings do not extend to Dr. Chaski's methodology and findings detecting conceptual plagiarism.** ................... 12

   B.  **Dr. Chaski's Methodology and Findings.** ........................................................... 14

   C.  **Coulthard lacks the qualifications to rebut Dr. Chaski's testimony re mosaic and conceptual plagiarism.** ......................................................................................... 16

IV.  **CONCLUSION** ........................................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**

*Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 488–89 (S.D.N.Y. 2002) ............... 1

*Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 92 (2d Cir.2000) .................................................. 4

*Bruno v. Toyotomi U.S.A., Inc.,* 203 F.R.D. 77, 80 (N.D.N.Y.2001)................................................. 1

*Byrne v. Liquid Asphalt Systems, Inc.,* 238 F.Supp.2d 491, 494–95 (E.D.N.Y.2002) ..................... 2

*Caccioloa v. Selco Balers, Inc.,* 127 F.Supp.2d 175, 184 (E.D.N.Y.2001) .................................... 11

*Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022) ................... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ................................ 1, 2, 3, 4

*Franklin v. Consolidated Edison Co.,* 37 Fed.Appx. 12, 15, No. 01–7559, 2002 U.S.App. LEXIS
6518, at *5 (2d Cir. Apr. 9, 2002) ................................................................................................ 4

*GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc*., 2023 WL 6614486, at *22 (S.D.N.Y. Sept. 20,
2023)............................................................................................................................................. 1

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)........................................................................ 2

*In re Omeprazole Patent Litig*., 84 Fed. Appx. 76 (Fed. Cir. 2003) ................................................ 1

In re *Pfizer Inc. Sec. Litig*., 819 F.3d 642, 665 (2d Cir. 2016)........................................................ 4

*Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 ............................................................................. 2, 3

*Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 923-24 (7th Cir. 2000) ........................................ 4

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11 Civ. 681
(KBF), 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015).................................................... 2

*Mancuso v. Consol. Edison*, 56 F.Supp.2d 391 (S.D.N.Y.1999) .................................................... 1

*Marshall v. Perez Arzuaga,* 828 F.2d 845, 852 (1st Cir. 1987) .................................................... 12

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013) ......................................... 6

*Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005) ............................................... 1

*Proteus Books Ltd. v. Cherry Lane Music Co., Inc.*, 873 F.2d 502, 515 (2d Cir. 1989)................ 11

*Radio Sys. Corp. v. Lalor,* No. C10-828RSL, 2014 WL 4626298, at \*2-3 (W.D. Wash. Sept. 12, 2014)........................................................................................................................................... 3

*Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997) ....................................................... 3

*Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) ................................... 5

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ....................... 2

*T.N. Incorp., Ltd. v. Fid. Nat'l Info. Servs., Inc.*, No. Civ. 18-5552, 2021 WL 5980048, at \*14 (E.D. Pa. Dec. 17, 2021) ..................................................................................................... 2

*United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018) ......................................... 3

*United States v. Mazzeo,* 205 F.3d 1326, 2000 WL 232032, at \*2, No. 99–1223, 2000 U.S.App. LEXIS 818, at \*6 (2d Cir. Jan. 21, 2000)............................................................................ 4

*United States v. Walker*, 910 F. Supp. 861, 863 (N.D.N.Y. 1995) ................................... 10

*Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420, 1425–26 (E.D. Tex.1986)................. 11

*Washburn v. Merck & Co.,* 213 F.3d 627, 2000 WL 528649, at \*2, No. 99–9121, 2000 U.S.App. LEXIS 8601, at \*5 (2d Cir. May 1, 2000)........................................................................... 4

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 311 (S.D.N.Y. 2015) ................... 1, 2

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) ...... 5, 17

**Rules**

Fed. R. Evid. 401.................................................................................................................. 2

Fed. R. Evid. 403................................................................................................................ 10

Fed. R. Evid. 702.................................................................................................................. 6

**Treatises**

Coulthard, Malcolm. 2004. "Author Identification, Idiolect and Linguistic Uniqueness." APPLIED LINGUISTICS 25, 4, 2004 ........................................................................................... 17

Koehler, Jonathan J., Mnookin, Jennifer L., and Saks, Michael, J. 2023. "The Scientific

Reinvention of Forensic Science." PUBLICATIONS OF THE NATIONAL ACADEMY OF SCIENCE

Volume 120, No. 41 ................................................................................................................ 14

I.    **<u>INTRODUCTION</u>**

By this motion, Plaintiff Lynne Freeman moves to exclude expert testimony offered by Defendants which is lacking in proper expert qualifications, irrelevant, and/or and plainly unreliable. Specifically, she moves to exclude (1) all rebuttal testimony from Rose Hilliard, and (2) Malcolm Coulthard's rebuttal testimony offered in response to Dr. Carole Chaski's findings regarding mosaic and conceptual plagiarism. That testimony should be excluded.

### A.    <u>An Expert Must be Qualified.</u>

An expert witness must be qualified in the scientific fields that govern the topics covered in his or her report, otherwise that testimony will not meet the requirements mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)*.* Courts therefore must first determine whether each expert is qualified to testify as an expert witness on the designated topics. *Mancuso v. Consol. Edison,* 56 F.Supp.2d 391 (S.D.N.Y.1999), *aff'd in relevant part, vacated in part*, 216 F.3d 1072 (2d Cir. 2000); A*stra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 488–89 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Patent Litig*., 84 Fed. Appx. 76 (Fed. Cir. 2003).

Even if "a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc*., 2023 WL 6614486, at *22 (S.D.N.Y. Sept. 20, 2023) (quoting *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005)). Thus, courts routinely exclude experts who are not qualified on the topics on which they are testifying.  *See Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 311 (S.D.N.Y. 2015) (finding expert was not qualified to testify about marketing and promotional efforts where he lacked expertise or educational background in marketing other than the promotion of his own businesses); *Bruno v. Toyotomi U.S.A., Inc.,* 203 F.R.D. 77, 80 (N.D.N.Y.2001) (excluding witness who would "opine on the

properties of kerosene as compared to other flammable materials."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Byrne v. Liquid Asphalt Systems, Inc.*, 238 F.Supp.2d 491, 494–95 (E.D.N.Y.2002).

The analysis is no different when applied to rebuttal experts. Although "[t]he 'task of a rebuttal expert is different from that of an affirmative expert,"[1] "rebuttal experts must [still] meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (collecting cases). And like any expert, a rebuttal expert may not usurp the role of the trial court to "act as 'gatekeepers' to ensure the relevance and reliability of all expert testimony." *T.N. Incorp., Ltd. v. Fid. Nat'l Info. Servs.*, *Inc.*, No. Civ. 18-5552, 2021 WL 5980048, at *14 (E.D. Pa. Dec. 17, 2021) (citing *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167. *See also Washington*, 105 F. Supp. 3d at 307 ("Still, while a district court has broad latitude in deciding both how to determine reliability and in reaching its ultimate reliability determination, it may not abandon its gatekeeping function" (cleaned up)).  [Is "cleaned up" supposed to be left in]

## B. <u>An Expert's Testimony Must be Relevant and Reliable.</u>

Expert testimony must also be relevant, which means the evidence must have the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786. Thus, even if the methodology used by the expert is considered reliable (discussed below), the expert's testimony should be excluded if the data relied upon by the expert is

---

[1] See *Aluminum Warehousing*, 336 F.R.D. at 29 (explaining: "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis.'") (quoting *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11 Civ. 681 (KBF), 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015)); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 138 (S.D.N.Y. 2022), motion to certify appeal denied, No. 19CIV1422PAEVF, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022).

materially different from the data relevant to the facts of the case. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997). And where the proffered testimony is based on a methodology transposed from one area to a completely different context without independent research supporting the transposition, the "fit" requirement may not be satisfied. *Id*. *See Radio Sys. Corp. v. Lalor,* No. C10-828RSL, 2014 WL 4626298, at \*2-3 (W.D. Wash. Sept. 12, 2014) (holding that an expert's "significant credentials and experience in computer science and digital processing" did not qualify the expert to testify regarding "the configuration and construction of the housing of an animal collar").

While district courts have broad discretion in analyzing reliability, "such discretion does not include the decision 'to abandon the gatekeeping function.'" *Kumho Tire*, 526 U.S. at 158–59, 119 S.Ct. 1167 (Scalia, J., concurring). "Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky." *Kumho Tire*, 526 U.S. at 159, 119 S.Ct. 1167 (Scalia, J., concurring).

Because Rule 702 grants experts "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," "[e]xpert evidence can be both powerful and quite misleading." *Daubert*, 509 U.S. at 592, 595, 113 S.Ct. 2786 (citations and internal quotation marks omitted). As such, "the importance of [the] gatekeeping function cannot be overstated." *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018) (citation and internal quotation marks omitted); *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786 ("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167 (extending *Daubert* to "all expert testimony"); Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("The trial court's gatekeeping function applies to testimony by any expert.").

When faced with expert testimony that contains both reliable and unreliable opinions, district

courts often exclude only the unreliable testimony. In re *Pfizer Inc. Sec. Litig*., 819 F.3d 642, 665 (2d Cir. 2016) (other citations omitted). The Supreme Court has identified the following non-dispositive, non-exclusive factors as "flexible" guidelines to determine reliability*:* (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error associated with the technique along with the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 592–95, 113 S.Ct. 2786.

In addition to the five factors explicitly discussed in *Daubert,* a variety of other factors have been considered by district courts in the Second Circuit when determining the admissibility of expert testimony. Some of the more commonly used factors include consideration of the foundation for the opinion, its subjectivity, any failure to test, the expert's consideration of alternative causes, and a comparison of the methodology to the expert's regular professional work. *See, e.g., Franklin v. Consolidated Edison Co.,* 37 Fed.Appx. 12, 15, No. 01–7559, 2002 U.S.App. LEXIS 6518, at *5 (2d Cir. Apr. 9, 2002); *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 92 (2d Cir.2000); *United States v. Mazzeo,* 205 F.3d 1326, 2000 WL 232032, at *2, No. 99–1223, 2000 U.S.App. LEXIS 818, at *6 (2d Cir. Jan. 21, 2000); *Washburn v. Merck & Co.,* 213 F.3d 627, 2000 WL 528649, at *2, No. 99–9121, 2000 U.S.App. LEXIS 8601, at *5 (2d Cir. May 1, 2000).

Further, an expert opinion must be based on "sufficient facts or data" to be considered reliable "expert testimony." *Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 923-24 (7th Cir. 2000) (holding that an expert that opined on whether a plaintiff could perform the essential functions of a store clerk failed to consider sufficient facts or data when he only viewed a list of clerk duties identifying objectives without any analysis of what clerks actually did to meet those objectives). Reliance upon "expertise" or curriculum vitae, by itself, is not a sufficient method for

4

purposes of admissibility. *Zenith Elecs. Corp. v. WH-TV Broad. Corp*., 395 F.3d 416, 418 (7th Cir. 2005) (holding that the expert "all but conceded that he had not applied 'reliable principles and methods'. Asked repeatedly during his deposition what methods he *had* used to generate projections, [the expert] repeatedly answered 'my expertise' or some variant ('my industry expertise', '[my] awareness,' and 'my curriculum vitae')—which is to say that he either had no method or could not describe one. He was relying on intuition, which won't do."). *See also*, *Sardis v. Overhead Door Corp*., 10 F.4th 268, 282 (4th Cir. 2021) (emphasis in original) (reiterating that the "hallmarks of reliability" are "testing, peer review, literature, rate of error or general acceptance").

## II.   ROSE HILLIARD IS NOT QUALIFIED OR COMPETENT TO OFFER RELEVANT EXPERT TESTIMONY AND IS AN INTERESTED WITNESS

The Prospect Defendants have offered Rose Hilliard ('Hilliard') as a rebuttal expert to (1) criticize the opinions of literary agent Marlene Stringer, (2) criticize the opinions of literary agent Christine Witthohn, and (3) opine that the similarities between the Crave series and the Freeman Manuscripts are the result of character, story, and romantic tropes common in paranormal YA genre. A true and correct copy of her rebuttal report in this case is attached to the Declaration of Stephen Doniger ("Doniger Decl.) as Exhibit "1." That testimony should be excluded because, *inter alia*, Hilliard is not competent or qualified to offer it, fails to provide her methodology, and fails to even identify her assignment.

Page 2 of Hilliard's report begins with the heading "II. Assignment and Documents Reviewed" but nowhere in the five paragraphs that follow does Ms. Hilliard identify her assignment or the methodology used. The closest she comes is her statement in ¶4 of that section that she "will draw upon [her] experience of the inner workings of the publishing industry, the editor-agent relationship, the submission process, and direct experience with Kim's et al Creative

to offer a rebuttal to inaccurate statements made in Stringer and Witthohn's Expert Reports."

Stringer has been a literary agent for over 20 years and is the principal of the Stringer Literary Agency, LLC, a full-service literary agency with offices in Florida and New York.  *See* Stringer Report, ¶1.  She opines on whether Kim/Prospect fulfilled or breached their contractual and fiduciary obligations to Freeman based on the custom and practice of literary agents. Witthohn also owns her own agency and has been a literary agent for 18 years.  *See* Withhohn Report, ¶1. Based on her vast industry expertise, she opines on the state of Wolff's writing career just before writing the Crave series and the changes in the industry that led Kim to set up a separate company to hire writers, including Wolff, out on "work for Hire" projects."

Where, as here, an expert's opinion is based solely or predominantly upon experience, the expert must explain how that experience lends to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. 2000 Advisory Committee Notes, Fed. R. Evid. 702; *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013) (recognizing that an expert historian could be admissible under certain circumstances but affirming exclusion of expert historians who based opinions largely on hearsay statements by artists and speculated on the motivations and made credibility determinations of other witnesses).

Hilliard's five short paragraphs on the first page of her report under "Professional Background and Experience" fail to do that. While they establish a lack of impartiality (she has "consistently acquired projects from Emily Sylvan Kim since 2005 until the present" -discussed further below) and that she works with some agents as an editor, it also establishes that she is not (and has never) been a literary agent and has no qualifications to speak to the custom and practices of those agents—with the possible exception or how she receives submissions from them. Thus, she has failed to establish her qualifications to rebut the opinions of either Stringer or Witthohn.

And, as set forth below, none of her individual "expert" opinions are properly admitted either.

### A.  Hilliard's challenges to Marlene Stringer's expert opinions lack qualification, competence, and relevance.

Offering no competent basis to testify regarding the regular practices of agents when interacting with their clients, Hilliard's first set of substantive opinions—her opinions under Section III of her report—collectively purport to challenge Stringer's "statement that literary agents don't do substantial editorial work to their clients' work prior to submission to editors." Nothing in her report establishes that she is qualified to opine on the amount of editorial work an average agent does on their clients' work prior to submission to an editor, yet she has been offered to testify that "[m]any agents do offer substantial editorial notes before submitting an author's work to editors…" See Section III, Par. 1.

Hilliard's second and fifth paragraphs under Section III are irrelevant to anything in this case. In those paragraphs she simply argues that there may be good reasons for an agent to offer editorial guidance and therefore some do. But this is not inconsistent with anything in Stringer's report, which admits that agents offer certain editorial reviews and guidance. See e.g., Stringer Report, Pars. 12-14.

Hilliard's third enumerated paragraph under Section III asserts, again without proper foundation, that "[m]any agents…will offer intensive editorial shaping before submitting the work" before cheerleading for Kim by trying to frame her unusual involvement in Freeman's work as "going the extra mile for her client." That is neither proper rebuttal nor expert testimony. Then again, without laying any proper foundation for the claim, Hilliard claims in the fourth paragraph of Section III that "[t]he editorial guidance Kim offered Freeman is well within industry standard practice." Hilliard offers no competent basis for making that statement.

In paragraph 6 of Section III, Hilliard falsely asserts that Stringer "fails to mention that the

market for paranormal YA was also extremely overcrowded and competitive" at the time. But in fact, Paragraph 19 of Stringer's report specially explained that at the time "[o]nly a unique, ready-to-go manuscript stood a chance in such a crowded market." Hilliard's criticism is thus objectively factually wrong and unreliable.

Finally, Hilliard's seventh paragraph under Section III should be excluded for lack of proper qualifications, relevance, and reliability. In that paragraph, Hilliard again asserts without basis that "it is extremely common for editorial discussions to happen by phone," but her sole stated basis for this statement is that she regularly has such discussions with agents. But Stringer's opinion—which Hilliard purports to challenge—addresses editorial suggestions that *agents* provide to their writing clients. Hilliard offers no basis to dispute that literary agents generally provide written notes to their clients, and it is entirely irrelevant how editors provide their feedback to agents.

Based on the above, Hilliard's first set of opinions regarding Marlene Stringer's report should be excluded.

      **B.**  **Hilliard's opinion that Kim's adjacent packaging business is "standard practice" lacks qualification, competence, and relevance**.

Section IV of Hilliard's report concerns her second opinion that "Kim's adjacent packaging business et al Creative engages in standard industry practice." But while she may have worked with et al Creative on multiple occasions and been "pleased with the experience," that fact does not qualify her to state what is "standard industry practice" for literary agents. Hilliard simply offers no competent basis for this opinion.

In Paragraph 4 of Section IV Hilliard states that "the publishing industry has a number of packaging agencies" that she has met with over the years. Assuming the truth of this statement, it is still irrelevant to this case since the existence of packaging agencies does nothing to establish

that it is "common practice" for a literary agent representing writers to also act as a packaging agent for publishing houses and editors. Similarly, Hilliard's self-serving statement in Paragraph 5 that "it is my professional opinion that et al Creative is a smart business venture" (since she is an editor who has used Kim to find writers for her projects) is irrelevant as it does nothing to establish that packaging for editors is "standard industry practice" for literary agents representing writers.

Paragraphs 6 and 7 of Section IV purport to take issue with the Stringer and Witthohn "imply[ing] in their reports that both Emily Kim and Tracy Wolff were experiencing downturns in their professional success in the late 2010s." But her rebuttal opinion is unreliable as it ignores the actual evidence underlying those assertions, including admissions by Wolff of the same, and does not appear to be based on anything more than Hilliard's experience "consistently buying books from Kim." Remarkably, Hilliard does not appear to have looked at the Publishers Marketplace reporting on Wolff's sales, does not appear to have reviewed any records to evaluate whether Wolff or Prospect were experiencing a significant financial downturn, or done any other objective analysis to justify her opinion.

Hilliard's statements regarding Kim's et al creative are offered despite the lack of her qualifications, the lack of any proper methodology, and the failure to even review and consider the majority of facts and data upon which the opinions she purports to challenge are based. The opinion in Section IV should therefore be excluded.

C. **Hilliard's opinions regarding similarities between Crave and BMR are not proper rebuttal expert testimony, are cumulative, and are unsupported by proper qualifications or methodology**.

As noted above, Hilliard does not identify her assignment except to state in the most general terms that she is using her experience to correct misstatements by Stringer and Witthohn.

9

But then in Section V of her report she inexplicably offers 4 paragraphs with "opinions" regarding the similarities between Crave and BMR. Nowhere do these paragraphs reference the reports or opinions of Stringer or Witthohn or explain what misstatements of theirs she is purporting to correct by asserting that the similarities are common to many works. Indeed, neither Stringer nor Witthohn addressed the extent to which Crave and BMR share similarities and whether those similarities are tropes. Hilliard's opinions in Section V are thus not proper rebuttal expert testimony.

Indeed, Defendants offered expert testimony on that very topic from Emily Easton, who also provided a rebuttal expert report to the report of Plaintiff's other expert, Professor Katherine Reiss. Doniger Decl. ¶¶4-5, Exhibits 3&4.  Defendants submitted a 53-page expert report of Easton in which she opines that the alleged similarities between the Crave series and Freeman's Manuscripts are based on tropes common in the paranormal YA genre and a 35 page rebuttal rebut by Easton in which she revisits that issue. *See* Easton rebuttal report, p.2. See also pp. 3-4.

Federal Rule of Evidence 403 allows a Court to exclude relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A party may not "make its case through the sheer weight of successive expert testimony ... as to their identical conclusions on identical issues." *United States v. Walker*, 910 F. Supp. 861, 863 (N.D.N.Y. 1995).

Section V of Hilliard's report should also be excluded because it is not based on any proper qualifications or methodology. Being an editor in the book publishing industry does not qualify her to know what common tropes in the paranormal YA genre are, and her ability to identify another book which has some high-level storyline similarities does not make those similarities tropes or genre conventions.

10

Section V of Hilliard's report is not proper expert rebuttal, is cumulative of Defendants' other expert (Emily Easton), and is offered by a witness without proper qualifications and who has not used any reliable methodology. It should therefore be excluded.

### D. Hilliard should be excluded as an expert because she is a biased, partisan witness incapable of giving objective expert opinions to the jury.

Finally, Hilliard lacks any credible claim of impartiality. For each of these reasons, her testimony should be excluded. She worked for over 10 years at St. Martin's Press (*see* Hilliard's Report Section I, ¶1 and her CV) which is part of the Macmillan Publishing Group. https://us.macmillan.com/publishers/st-martins-press/.  Of course, Holtzbrink Publishers, LLC, d/b/a Macmillan ("Holtzbrinck") is a defendant in this lawsuit and Macmillan Publishers is part of Holtzbrinck.  https://us.macmillan.com/about/.  And she admits that her business is closely tied to Emily Kim and Prospect Agency, stating in her report: "I was constantly buying books from Kim during the time she launched et al creative," "I have used her service (referring to Kim's company Creative) on 5 projects in the past 4 years" and "I've recommended et al Creative to three other editorial colleagues looking for ghostwriters or writers to take on an idea."  *See* Hilliard Report, Sectoiin IV., ¶¶1 & 6.

"When expert witnesses become partisans, objectivity is sacrificed to the need to win.". *Caccioloa v. Selco Balers, Inc.,* 127 F.Supp.2d 175, 184 (E.D.N.Y.2001) Thus, in *Proteus Books Ltd. v. Cherry Lane Music Co., Inc*., 873 F.2d 502, 515 (2d Cir. 1989), the court upheld the lower court's decision that the expert witness could not be qualified as an expert witness because he was an "interested party ... a party in the case" where the expert introduced plaintiff and defendant and facilitated their first agreement. The Second Cirt agreed that in this situation, it could have been unduly prejudicial for the interested expert to testify. *Id*., citing *Viterbo v. Dow Chemical Co.,* 646 F.Supp. 1420, 1425–26 (E.D. Tex.1986), *aff'd,* 826 F.2d 420 (5th Cir. 1987); *cf. Marshall v. Perez*

11

*Arzuaga,* 828 F.2d 845, 852 (1st Cir. 1987) (assuming, without deciding, that expert could be disqualified for partiality), *cert. denied,* 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988).

Based on her lack of qualification, lack of impartiality, lack of any cognizable methodology, and in certain cases the objective unreliability and lack of relevance of her opinions, Hilliard's testimony is not properly put before the jury and should be excluded.

III. **MALCOLM COULTHARD'S REBUTTAL CRITIQUE OF CAROLE CHASKI'S CONCEPTUAL PLAGIARISM FINDINGS SHOULD BE STRICKEN AS, *INTER ALIA*, BEYOND HIS EXPERTISE.**

Defendants have designated Malcolm Coulthard as a rebuttal expert to respond to Plaintiff's experts, Dr. Patrick Juola and Dr. Carole Chaski. While Coulthard is qualified to evaluate and critique Dr. Juola's opinions in this case, he is not qualified to evaluate and critique those of Dr. Chaski. Although not well understood outside of academe, linguistics is a broad field and expertise in one area of forensic linguistics does not make one an expert in all types of forensic linguistics. Coulthard is a recognized expert in discourse analysis but has no real experience or expertise in data collection and curation, empirical linguistics (sometimes called experimental linguistics), computational linguistics/text analysis, statistics, or statistics and machine learning techniques—each of which underlies Dr. Chaski's findings in this case. There are certainly experts qualified to critique Dr. Chaski's findings, Coulthard is just not one of them. His testimony should therefore be excluded to the extent it purports to rebut Dr. Chaski computational analysis of lexical word clusters which evidence conceptual plagiarism in this case.

A. **Coulthard's qualifications to address Dr. Juola's findings do not extend to Dr. Chaski's methodology and findings detecting conceptual plagiarism.**

Dr. Chaski and Dr. Coulthard know each other well. Among other things, they were designated as experts opposite each other in the *Yukos* case which Professor Coulthard mentions in

his report. But in that case, Professor Coulthard partnered with his colleague Tim Grant who was responsible for all statistical analysis (akin to Plaintiff in this case retaining Dr. Juola to conduct an n-gram analysis and Dr. Chaski for a distinct computational / statistical analysis). Their report in *Yukos*, a copy of which is Exhibit A to the attached declaration of Dr. Chaski, explains Professor Grant's expertise in statistical analysis but offers no such qualifications for Coulthard. And in that case Dr. Chaski's counter-rebuttal showed that Grant's statistical critiques were not only wrong, but contradicted by the main statistics textbook that Professor Grant relied on, as well as other sources in statistics and machine learning that Chaski referenced. *See* Declaration of Carole Chaski ("Chaski Decl.") ¶11.

In addition to being an expert in syntax and language change, Chaski is an expert in computational linguists. *Id.* at ¶13. Computation linguistics is a combination of computer science and linguistics which is the technology underlying Google search, Microsoft Word and current developments such as ChapGPT, QuillBot paraphrasing tool, Spinbot for test rewriting, and other text spinning software. *Id.* As a computational linguist, Chaski has worked on teams that developed spell checkers, grammar checkers and question-answering systems and she has developed software for forensic text analysis, coining the terms forensic computational linguistics and computations forensic linguistics to describe her work. *Id.* She has taught graduate and undergraduate courses in computational linguistics. *Id.*

Coulthard is not an expert in computational linguistics. As discussed below, he lacks the qualifications for evaluating Chaski's report because he has not demonstrated evidence of expertise in data collection, experimental linguistics, computational linguistics/text analysis or statistics and machine learning. Coulthard represents the pre-Daubert standard called "trust the expert" instead of the new paradigm in forensic science, introduced by *Daubert* called "trust the

13

scientific method." [2]

In order to fairly evaluate Chaski's report, an expert would need to have demonstrated expertise in four areas: (i) linguistic data collection; (ii) experimental linguistics; (iii) computational linguistics text analysis; and (iv) statistics or machine learning.  Chaski Decl. ¶14. Any doctoral-level individual who is trained in psycholinguistics, computational linguistics or computer science with a specialty in natural language processing and who has experience in linguistic standards for data collection is qualified in these four areas of normal science that Chaski has applied in the context of forensic linguistic evidence.  *Id.* While there are quite a few experts who have this demonstrated expertise (e.g., Professor Pascual Cantos Gómez, Professor Angela Almela, Professor Efstathios Stamatatos, and Dr Blake Howald), Coulthard does not.  See Coulthard Report, pp. 4- 9; Chaski Decl. ¶14.

To further explain this point, Plaintiff offers the following explanation of Dr. Chaski's methodology.

### B. <u>Dr. Chaski's Methodology and Findings.</u>

Dr. Chaski's expert report in this case is attached to the Doniger Decl. as Exhibit 5. That report explains that there are three general categories of plagiarism, (1) copy-paste plagiarism, (2) mosaic plagiarism, and (3) conceptual plagiarism. One way to find the first type, and potentially the second, is through an n-gram analysis, i.e., finding strings of the same words in the same order. That is the analysis that Dr. Juola has done in this case and is an analysis that Dr.

---

[2] Koehler, Jonathan J., Mnookin, Jennifer L., and Saks, Michael, J. 2023. "The Scientific Reinvention of Forensic Science." PUBLICATIONS OF THE NATIONAL ACADEMY OF SCIENCE Volume 120, No. 41. www.pnas.org/doi/10.1073/pnas.2301840120. From the Abstract: "Forensic science is undergoing an evolution in which a long-standing "trust the examiner" focus is being replaced by a "trust the scientific method" focus. This shift, which is in progress and still partial, is critical to ensure that the legal system uses forensic information in an accurate and valid way. In this Perspective, we discuss the ways in which the move to a more empirically grounded scientific culture for the forensic sciences impacts testing, error rate analyses, procedural safeguards, and the reporting of forensic results. However, we caution that the ultimate success of this scientific reinvention likely depends on whether the courts begin to engage with forensic science claims in a more rigorous way."

Coulthard is well qualified to do and evaluate. But it is not the analysis underlying any part of Dr. Chaski's findings in this case.[3]

Rather, given that Ms. Wolff is well-educated and sophisticated, having even worked with plagiarism software, Chaski focused her attention on more advanced methods to find likely mosaic and conceptual plagiarism. As she explains, the typical methods of mosaic plagiarism are substitution, insertion, deletion and permutation. *Id.* at ¶4.  Conceptual plagiarism uses the same paraphrastic disguises as mosaic plagiarism, i.e., substitution, insertion, deletion, and permutation, but it relies heavily on insertion and permutation. *Id. at ¶5.*  She analyzed the similarities between the Freeman Manuscripts and the Crave series using two independent statistical tests which included ten YA novels as a baseline for expected similarity. *Id.* at ¶2. The results evidence that the similarity between the Freeman Manuscripts and the Crave series, in relation to the baseline novels, cannot be explained as chance: instead the statistical analysis shows that the similarity between the Freeman Manuscripts and the Crave series is so far from the baseline that it can only be explained by deliberate re-use of material in the Freeman Manuscripts. *Id.* at ¶8.

Specifically, Chaski selected 35 keywords based on the similarities of plot, character and setting outlined in the complaint. *Id.* at ¶9.  She then calculated the way that the 35 keywords operate in the Freeman Manuscripts, the Crave series and the baseline novels. *Id.* at ¶10.  Each keyword is central to a lexical cluster, the words that co-occur with it, or the keyword's collocations. One adage in linguistics is that you know a word by the company it keeps, that is, you know a word by the words that appear with it, or the lexical cluster around a keyword, (in linguistics terminology, collocations). *Id.* One way to measure similarity is to determine how much overlap there is between lexical clusters of the same keyword in different texts. *Id.*

---

[3] Although Dr. Chaski acknowledged that there appears to be a significant number of common n-grams word strings, Plaintiff has confirmed with Defendants that she will not be offering opinions regarding those n-grams.

When lexical clusters from different authors have high overlap, the concept of the keyword in those authors is similar: the authors are thinking and using the keyword in a similar way because they put the keyword with similar companion words. *Id.* at ¶11.  When lexical clusters from different authors have low (or no) overlap, the concept of the keyword in those authors is different: the authors are thinking and using the keyword in different ways because they use different sets of companion words with the keyword. *Id.* at ¶12.

Chaski's second test uses the binomial probability which calculates how often an event can be expected over a series of tests. *Id. at 15.* This test ranked the 35 keywords across the baseline authors and Wolff to determine who has the highest overlap with Freeman. Wolff had by far the highest lexical overlap with Freeman in 32 of the 35 keyword clusters. *Id.*  Using binomial probability, Chaski determined that the odds of this happening by chance are astronomically miniscule—nineteen in ten million times (p = .00000019). *Id.*

Chaski confirmed these results using another way to compare the lexical overlaps shown by Freeman and Wolff and the lexical overlaps of the baseline authors. *Id.* at ¶16.  Chaski then used document vectors to turn the overlapping word lists into a list of numbers, and then used cosine distance to get a cosine similarity score. *Id.*  Again, the baselines authors' overlaps with Freeman were each strikingly different from the overlaps of Wolff with Freeman. *Id.*

C. **Coulthard lacks the qualifications to rebut Dr. Chaski's testimony re mosaic and conceptual plagiarism.**

Professor Coulthard lacks any training or demonstrated experience in experimental/ empirical linguistics (i.e., designing and conducting experiments testing linguistic hypotheses— outside of arguably n-gram analysis), computational linguistics, statistical analysis, or machine learning techniques. To be sure, text analysis by computer algorithm provides an objective, fatigue-resistant way to quantify patterns of language, and is a long-standing part of linguistics,

with computational linguistics for machine translation starting in the 1950's. Chaski Decl. Par.

___. And other than his n-gram work, he lacks any training or demonstrated experience in

designing or running empirical, repeatable, scientific exercises to find meaningful statistical

results—precisely what Dr. Chaski and many other colleagues in the world of forensic linguistics

do. *See* Chaski Decl. ¶¶ 2-10.

Knowing this, Coulthard writes: "I will not discuss the apparently sophisticated statistical

tests that Dr. Chaski applied to her results (beginning Chaski Rep. ¶108) because the input data

were flawed and consequently the results are worthless." *Id.* The truth of the matter is that he does

not have the expertise to discuss the "sophisticated statistical tests that Chaski applied to her

results" and thus attempts to apply what he knows to a methodology he does not—like a hammer

insisting that a screw works the same as a nail.

Coulthard was educated and taught in the U.K.  See Coulthard Report, ¶11.  He has

explained that the British and Australian judicial systems as using the "trust the expert"

paradigm.[4] But in United States District Courts his proffered testimony must be based on relevant

expertise and scientific protocols—an impressive curriculum vitae by itself is not a sufficient to

warrant admissibility of his testimony.  *Zenith Elecs. Corp, supra,*  395F.3d at 418. In this case,

Coulthard lacks that relevant expertise.

Coulthard's critique of Dr. Chaski's findings are set forth in paragraphs 44-78 of his

report. Initially, Paragraphs 45-50 address Dr. Chaski's claims that she has "reviewed over 700

examples of 6-words-in-a row exact matches between the Tracy Wolff ("TW") documents and

Lynne Freeman ("LF") manuscripts." But Dr. Chaski will be offering no testimony at trial

regarding those examples, and as such Coulthard's rebuttal rebuts nothing and is irrelevant.

---

[4] Coulthard, Malcolm. 2004. "Author Identification, Idiolect and Linguistic Uniqueness." APPLIED LINGUISTICS 25, 4,
2004, pages 443-44.

Paragraphs 51-59 of Coulthard's report addresses Dr. Chaski's findings re "mosaic" plagiarism, of which she "provides ten specific examples" in ¶¶ 77-78 of her report. (Coulthard's report, ¶54). Coulthard first complains that it "appears that Dr. Chaski did not find these examples herself (*id*.), but that is entirely irrelevant so long as the examples are accurate—which Coulthard does not dispute.

Then in ¶¶ 55-58 Coulthard complains that Dr. Chaski has made no "attempt to show that any of the allegedly cited mosaic phrases are unique, let alone rare," (sic) and does a Google search to show that those phrases can be widely found across the vast internet. On this point, Coulthard's opinion must again be excluded as irrelevant. For copyright infringement purposes what is relevant is whether the work was copied, not whether it is "rare or unique."

Next, beginning with his ¶60, Coulthard critiques Dr. Chaski's conceptual plagiarism analysis despite his utter lack of relevant expertise. Essentially, as he sums up in ¶78 of his report, he opines that her analysis is flawed because neither her "keywords" nor her "baseline" works were objectively selected. But Coulthard does not appear to have ever created a dataset of forensic linguistic evidence, nor has he ever independently collected ground-truth data for forensic linguistic evidence. This lack of experience stands in sharp contrast to other forensic linguists, including Dr. Chaski, who have collected, curated, and published such datasets. Similarly, Coulthard has no expertise in establishing guidelines for data collection / data requirements for forensic linguistics, while Dr. Chaski does. *See* Chaski Decl. ¶¶3-5.

Experimental and computational linguists must curate their data sets to ensure that the data can reliably do / test certain things. In this case, Chaski ensured that baseline data was in, *inter alia*, the same genre, timeframe, and caliber of works using methods generally accepted among computational linguists. Chaski Decl. ¶4. While counsel for the defense is free to argue over Dr. Chaski's methodology and data sets, it would be improper to permit Coulthard to opine whether

18

the dataset used in Dr. Chaski's methodology was appropriate since he has no training or experience to speak of in either data set collection/curation or computational linguistical and statistical methodologies.

Based on the foregoing, Coulthard's offered critique of Dr. Chaski's opinions and findings should be excluded.

**IV.**    <u>CONCLUSION</u>

It was incumbent on Defendants to offer expert testimony from retained experts with the appropriate qualifications and to ensure that the testimony offered by those experts was relevant and reliable. In the case of Rose Hilliard and Malcolm Coulthard's rebuttal of Dr. Chaski they failed to do this. That testimony should therefore be excluded.

Dated: December 22, 2023                    Respectfully submitted,
Venice, CA

                                      By:   */s/ Stephen Doniger*
                                              Stephen Doniger, Esq.
                                              Scott Alan Burroughs, Esq.
                                              DONIGER / BURROUGHS
                                              247 Water Street, First Floor
                                              New York, New York 10038
                                              (310) 590-1820
                                              stephen@donigerlawfirm.com
                                              scott@donigerlawfirm.com
                                              Attorneys for Plaintiff