**CONFIDENTIAL LITIGATION MATERIAL SUBJECT TO PROTECTIVE ORDER**

*Freeman v. Deebs-Elkenaney et al.*, No. 1:22-cv-02435-LLS-SN (S.D.N.Y.)

**EXPERT REPORT AND DISCLOSURE OF ROSE HILLIARD**

I.  **PROFESSIONAL BACKGROUND AND EXPERIENCE**

1. I, Rose Hilliard, am currently an Executive Editor at Audible Originals, where I acquire, edit and publish original audiobooks in the Romance and Wellbeing genres. I have worked in the publishing industry for over 20 years, and have held positions at 3 major print publishers: St. Martin's Press, Penguin Book Group (now Penguin Random House) and Time Warner Book Group (now Hachette Book Group). Before moving from print publishing to audiobook publishing in 2017, I specialized in Romance and romantic Young Adult (YA) Fiction. During my years in print publishing, 22 of my titles hit the *New York Times* bestseller list. Among these *New York Times* bestsellers were titles in the following romantic paranormal YA series: *The Immortals* series by Alyson Noel; *The Trylle Trilogy*, the *Watersong* series and *The Kanin Chronicles* by Amanda Hocking; and the *Shadow Falls* series by C. C. Hunter. These series were in the same genre as the works in the Complaint.

2. A major part of an editor's job is developing a network of agent contacts to attract the strongest pool of submissions possible, and then maintaining a harmonious relationship with each agent and author throughout the publication process. While publishing an estimated 270 titles over the course of my career, all but 6 of them were represented by literary agents. As a result of working closely with numerous literary agents for over two decades, I have witnessed the working styles of various literary agents and developed an understanding of standard agency practices.

3. I have consistently acquired projects from Emily Sylvan Kim since 2005 until the present, which has given me a clear understanding of her working style. Since 2005, I have contracted and published 25 works from Kim, 5 of which were developed through her packaging group et al Creative.

4. I have met the Plaintiff's two expert witnesses, Marlene Stringer and Christine Witthohn, at various conferences and office visits. I have received submissions from them both, and I have contracted and published 4 works from Stringer.

5. A copy of my resume is attached as Exhibit A. I have received no compensation for this assignment.

## II.  ASSIGNMENT AND DOCUMENTS REVIEWED

1. I have reviewed the First Amended Complaint filed by Lynne Freeman, and the Expert Reports from Marlene Stringer, Christine Witthohn and Eric W. Ruben, Esq. *See* Exhibit B.

2. I reviewed emails connected with revising and submitting Freeman's work to publishers over the course of 2011 through 2013, as well publishers' responses to Freeman's work in 2012 through 2013. This includes rejections from genre-appropriate editors at Simon and Schuster, Penguin, Scholastic, St. Martin's Press, Disney, Bloomsbury and others. *See* Exhibit B.

3. I have reviewed Wolff and Freeman's published work/manuscripts: *Crave, Blue Moon Rising,* and the edited version entitled *Masqued*. I have also reviewed the contract between Entangled and Wolff for the book *Crave*, and emails relating to Wolff's work on *Crave*. *See* Exhibit B.

4. I will draw upon my experience of the inner workings of the publishing industry, the editor-agent relationship, the submission process, and direct experience with Kim's et al Creative to offer a rebuttal to inaccurate statements made in Stringer and Witthohn's Expert Reports.

5. I will draw upon my experience publishing romantic paranormal YA to opine on supposed similarities between the works.

## III.  STRINGER'S STATEMENT THAT LITERARY AGENTS DON'T DO SUBSTANTIAL EDITORIAL WORK TO THEIR CLIENTS' WORK PRIOR TO SUBMISSION TO EDITORS IS FALSE.

1. Stringer's statement that "Agents are not hired to act as editors" and will not take on representation of a manuscript that needs substantial work may be true for her, but it is not true for agents across the board. As Stringer asserts, "There is no one way to become an agent…Thus, not all agents are trained the same way." Due to these differences in training and background, agents tend to have a wide range of working styles, including the level of editorial support that they provide. Many agents do offer substantial editorial notes before submitting an author's work to editors to ensure that the work is in the best shape possible.

2. Offering editorial guidance is in the best interest of the author for several reasons. The biggest reason is that when an agent submits a work to an editor, that's generally their one shot at publication with that editor's imprint.  Each publishing house is made up of

finite number of imprints (for example, Dutton, Riverhead, Crown and Knopf are all imprints of Penguin Random House), and once an editor at a given imprint has passed on a work, it's generally not welcome to be resubmitted to that editor or any other editor at that imprint ever again. Resubmitting a work to an editor who has already passed on it or submitting it to a colleague at the same imprint is frowned upon in the industry because it infringes on editors' reading time, which is always in short supply. Therefore, when an agent submits a manuscript to their editorial contact, they are usually using their one and only chance to have that work acquired by that imprint. Accordingly, making sure the work is in the strongest shape possible by offering editorial notes ahead of submission is a common practice among agents. Here, for example, a reader that Kim had asked to review Freeman's manuscript had provided a fairly negative review, and it would have been inappropriate for Kim to send out the manuscript to editors without suggesting changes consistent with that review.

3. While Stringer reports that she will "not offer representation unless the manuscript is 90% there," this is particular to her working style and not the industry as a whole. Many agents, particularly those at high-caliber agencies or those working on nonfiction or celebrity projects, will offer intensive editorial shaping before submitting the work. Some agents even offer continued editorial guidance and collaboration even after they've made a sale. The amount of editorial guidance offered varies from agent to agent, and from work to work. After reviewing the emails between Freeman and Kim during their editorial process, what I see is an agent going the extra mile for her client by offering comprehensive editorial guidance prior to submission.

4. Stringer's testimony paints a picture of agents as submission service, asserting "Freeman was not hiring an editor. She was partnering with a literary agent to guide her and submit her manuscript promptly." But many agents I've worked with describe themselves as being the author's guide throughout the publication process, which includes offering editorial guidance. The editorial guidance Kim offered Freeman is well within industry standard practice.

5. In addition to serving the author's best interest by giving her the best possible chance of publication, submitting the strongest version of a manuscript also protects the agent's standing with publishers. If an agent routinely goes out with high-caliber projects, editors will value their incoming submissions. When a submission from a valued agent contact comes in, an editor will read and respond quickly, and will assess it with a positive frame of mind. On the other hand, when an agent routinely goes out with sub-par submissions, they get deprioritized and end up on the bottom of the submission pile, where they may wait months for a response, which is usually a rejection. By ensuring that Freeman's work was in the strongest form possible before summitting it, Kim would also be protecting her own professional standing. Once she felt that the manuscript was ready, the documents produced in this case show that Kim sent the manuscript out to over

   20 genre-appropriate editors to review, over the course of more than two years, which represents an extraordinary effort by Kim to get the manuscript published.

6. Stringer refers to the paranormal market being hot during the 2011-2012 period, which necessitated the submission being sent out with speed. But she fails to mention that the market for paranormal YA was also extremely crowded and competitive at this time. Numerous other bestselling paranormal YA series had joined *Twilight* on the bestseller lists in the years since 2005. While speed was important, this type of story had been wildly popular for 6-7 years, so taking time to ensure that Freeman's work was as strong as possible before submission would be more important than speed. Many of the rejections that were received from editors with respect to Freeman's manuscript reflect that editors were looking for works in this genre that truly stood out from the competition.

7. Stringer's asserts that "it is also remarkable that the edits were provided orally and documented through notes that Freeman kept—I put all revision requests in writing." This is another case where Stringer claims that her own her business practice is true industry-wide, which simply isn't the case. It's extremely common for editorial discussions to happen by phone. I have editorial calls regularly, as do many of my colleagues. Phone calls to discuss editorial notes allow the editor or agent to discuss the issues in depth and brainstorm possible solutions together. In addition to being more collaborative, calls can also be more time efficient than typing out written notes. For these reasons, having editorial conversations by phone is an extremely common industry practice. Kim did nothing unusual or inappropriate by conducting editorial discussions this way.

IV.   **KIM'S ADJACENT PACKAGING BUSINESS ET AL CREATIVE ENGAGES IN STANDARD INDUSTRY PRACTICES.**

1. In addition to Prospect Agency, Kim operates an adjacent company that pairs authors with publisher-generated ideas and then guides the project from start to finish. I have used her service on 5 projects in the past 4 years, and I've recommended et al Creative to three other editorial colleagues looking for ghostwriters or writers to take on an idea, all of whom have used et al Creative and reported being pleased with the experience. However, based on my review of the documents produced in this case, it is my understanding that the *Crave* book series was *not* a project of et al Creative, but rather a traditional publishing deal brokered by Prospect Agency.

2. Regardless, it is a common practice for editors at publishing houses to generate story concepts and then seek out writers to execute them. I've acquired numerous projects this way, and I have participated in many content brainstorming sessions with other editors who have acquired projects this way. One of my *New York Times* bestselling YA series, the *Shadow Falls* series by C. C. Hunter, was based on a one-sentence story concept ("a

summer camp for kids with paranormal powers") generated internally at St. Martin's Press and then shared with an author who I selected. It appears *Crave* was a project that was based on an idea that was generated internally at Entangled and shared with an author Pelletier selected.

3. In her statement, Stringer asserts "In all of my time as a literary agent, I have never heard of a publisher being involved in the creation of a book as Kim/Prospect and Entangled were in the case of the *Crave* series." Again, this is a reflection of Stringer's own business model and experience rather than standard industry practice. As an editor, I have brought specific ideas to authors and have been deeply involved in shaping story details. I have worked this way alongside a number of agents who helped me facilitate projects with their authors. In any event, I have seen no evidence that Kim wrote any portion of the *Crave* series.

4. The publishing industry has a number of Packaging Agencies that act as "think tanks" that generate commercially saleable ideas from their own internal creative teams. They then select an author from their own internal roster who fits the project idea; the Packager then oversees all story details while the writer is crafting it; the Packager then submits the project to publishers in the capacity of an agent, negotiating the contractual terms for the work. An example of a top Packaging Agency is Alloy Entertainment, the Packager that created *Gossip Girl, The Vampire Diaries, The Sisterhood of the Traveling Pants, Pretty Little Liars, You*, and more. I have visited their offices and have met with agents from their group over the years, where we discussed their creative and business processes. Kim's et al Creative performs many of the same functions, except that the ideas come from publishers instead of her own internal creative team, and projects are contracted by publishers before they are written rather than after they are semi-complete. Kim's et al Creative taps into the existing practice of editors generating story concepts which are then paired with writers whose voice, style and sensibility are a good match for the project. Kim's service helps publishers find the right authors for these kinds of projects, and then adds value by overseeing their creation the way any Packaging Agency would.

5. It is my professional opinion that et al Creative is a smart business venture that complements Kim's literary agency. It ensures that publishers buy a given project (since they came up with the idea), often with minimal sample material required from the author. This provides opportunities and income for unpublished or unknown authors, giving them a foothold in the publishing world that they may not have accessed otherwise.

6. Stringer and Witthohn imply in their reports that both Emily Kim and Tracy Wolff were experiencing downturns in their professional success in the late 2010's. Specifically, Witthohn speculates that a downturn in business caused Kim to launch et al Creative, but this seems to be based on Witthohn's own struggles and her reading reported deals on Publishers Marketplace. Publishers Marketplace is a self-reporting website where editors

7. and agents publicly post their deals. Since publishing deals routinely go unposted on Publishers Marketplace, it's not an accurate indicator of business performance. I have seen no evidence that Prospect Agency was in decline and I was consistently buying books from Kim during the time she launched et al Creative, directly contributing to the health of her business.

8. I also have not seen any evidence that Tracy Wolff's career was in decline at any point, as she was a *New York Times* and *USA Today* bestselling author long before she wrote the *Crave* series. Additionally, Witthohn claims that a move to digital-only publishing indicates a career decline, but this is misleading, as digital publishers often generate large royalties for authors. Finally, my understanding is that Tracy Wolff never stopped writing Young Adult fiction and did not "pivot" to it as Witthohn suggests.

V. **SIMILARITIES BETWEEN *CRAVE* AND *BLUE MOON RISING* ARE A RESULT OF CHARACTER, STORY AND ROMANTIC TROPES COMMON IN THE PARANORMAL YA GENRE.**

1. In Freeman's complaint, the plot of *Blue Moon Rising* is described as "a young adult paranormal fantasy romance set in a high school in Alaska, with a protagonist who moves to the state from San Diego, after a tragic accident killed her family. The story follows a teenage girl who believes she's human, but is not, and who must navigate her way in the supernatural world she never knew existed, while falling in love with a dangerous boy with dark secrets; all set against the backdrop of a supernatural war between the factions of beings." This plot construct and the story elements listed in the Complaint can be found across many published paranormal Young Adult novels of the time.

2. For example, I published a YA series called *The Immortals* by Alyson Noel, which launched in 2009 and was a #1 *New York Times* bestseller. *The Immortals* has a nearly identical story set up to the one described in the Complaint (Freeman herself even compares her work to Noel's follow up series, *Fated*, in her Sept 23, 2012 email). Like *Blue Moon Rising*, *The Immortals* series is about a teenage girl who moves across the country (from Oregon to California) when her family dies in a tragic accident. At her new high school, she begins to develop supernatural powers, and must navigate a supernatural world she never knew existed, all while falling in love with a dangerous boy with dark secrets and paranormal powers of his own. While Noel's Immortals series is not set in Alaska and the heroine must battle supernatural enemies rather than fight an all-out supernatural war, the overall story set-up is nearly identical to the one described in the Complaint. In addition, Freeman and Noel's works both feature a main character who lives with her aunt, a high school friendship circle that include a goth girl and a gay teen boy, a subplot about reincarnation and ancient symbols representing infinity (Freedman's work features Celtic knot imagery and Noel's work features the ouroboros.) The second book in *The Immortals* series is even entitled *Blue Moon,* which is similar to Freeman's title *Blue Moon Rising*. This is not to say that the Freeman plagiarized Noel, because the

stories contain many differentiating factors. But it does demonstrate that most of the story elements that Freeman claims were stolen from her work were story tropes being used by other writers in the paranormal YA genre years before both *Blue Moon Rising* and *Crave* were written.

3. Most of the romantic story elements that Freeman claims were stolen from her were not her original ideas, but are found in Stephanie Meyer's 2005 blockbuster *Twilight*. The side-by-side comparison in the Complaint lists both *Blue Moon Rising* and *Crave* as having a romantic hero who exerts a dark, mesmerizing pull on the heroine, her intense and obsessive love for him, the hero's warnings that he's dangerous because he's a supernatural being and his inability to stay away from her. But these elements are not Freeman's invention; they are found in *Twilight* and appeared across many other published paranormal YA works, such as Noel's *Immortals* series. The second book in the *Twilight* saga is even entitled *New Moon*. Just as there are clear similarities between the book titles *New Moon, Blue Moon*, and *Blue Moon Rising*, there are also many overlapping plot, character and romantic elements that are found widely in the genre. Several of the publisher rejection letters that Freeman's work received stated that *Blue Moon Rising* wasn't unique enough to stand out in the crowded paranormal YA market, reflecting that she was using common story elements already found in the genre.

4. While the Alaskan setting seems like the strongest overlap between *Crave* and *Blue Moon Rising*, it's worth noting that the latter is set in an urban setting (Anchorage) while the former is set in a rural remote location. I would also note that a major story element in the *Twilight* saga is its moody, remote setting in Forks, Washington. While Forks is rainy rather than snowy like Alaska, a remote Alaskan setting would be in keeping with the genre. Other books are set in Alaska, such as the 2013 release *Hidden Wings* by Cameo Renae, where the main character moves from San Diego to Alaska. And Amanda Hocking's 2015 Kanin Chronicles series, which I acquired and edited, is set in a snowy tundra in Northern Canada, and closely resembles the Alaskan setting evoked in *Crave*. Even the titles in Hocking's Kanin series (*Frost Fire, Ice Kissed* and *Crystal Kingdom*) play up the series' remote, snow-covered backdrop. Setting a romantic paranormal YA series in a remote, snowy corner of the world is not unique to Freeman or Wolff's works.

## VI. CONCLUSION

1. The claims by Stringer and Witthohn that Kim mishandled her client's manuscript and engaged in unscrupulous behavior is based on their own working styles and preferences, and are not reflective of broader publishing industry practices. Kim invested her time and energy in improving her client's manuscript, which was done in the best interest of her client. This level of author care and support is common among high-caliber agents who know how to identify, nurture and grow authorial talent. Kim offered this guidance to give her client a better chance at publication, not in conspiracy to steal her ideas.

2.  Kim's et al Creative business is not an attempt at double dealing or dishonest business practices. It's an intelligent business venture that operates in a similar manner to established Packaging Agencies and employs standard industry practices.

3.  The material listed in the Complaint as being lifted from Freeman's work and the overall plotline for *Blue Moon Rising* can be found across many published books in the paranormal YA genre. They did not originate with Freeman. She did not invent the story of a teen girl whose family dies, forcing her to move to a remote setting to live with relatives, where she starts at a new high school only to realize she has paranormal powers, and at the same time falls irrevocably in love with a mysterious, darkly-sexy teen boy with supernatural powers of his own, and they must battle evil supernatural beings together. These story elements can be found in bestselling paranormal YA novels that were published prior to the writing of *Blue Moon Rising* and *Crave*. Similarities between Freeman and Wolff's works are not the result of a carefully orchestrated conspiracy to steal her work but the result of their sharing a common literary background.

Dated: 8/30/2023

Respectfully submitted,

*Rose Hilliard* (DocuSigned by: 78BE77C22D374D2...)

Rose Hilliard

8/31/2023

EXHIBIT A

# ROSE HILLIARD

646-363-4777 • rhillia@audible.com

**PROFESSIONAL PROFILE**

- Executive Editor with 20 + years of experience guiding titles through the complete publication process, from acquisition to the retail marketplace
- Stellar track record of developing bestsellers across the audio, print and digital formats
- Reputation for providing top-notch author care that has resulted in publishing partnerships with numerous bestselling authors

**PROFESSIONAL EXPERIENCE**

**AUDIBLE (An Amazon Company), Newark, NJ** *Executive Editor, 2017 to Present*

- Publishing 14 Original audiobooks per year in the Romance and Wellness categories
- Responsible for shaping the Romance list as a whole and managing a second editor
- Scouting potential authors, pitching them to internal teams, overseeing offer details
- Liaising with internal teams to ensure that Romance Originals are supporting key initiatives
- Selecting freelance cover designers and working closely with them to create irresistible cover art
- Collaborating with the Audible studios team to cast narrators that will excite the target audience
- Overseeing the recording process to ensure the highest quality possible
- Writing product page descriptions that will excite and entice customers
- Securing merchandising and promotional support upon and after publication
- Maintaining strong relationships with authors and agents, and communicating all steps of the publication process and promotional campaign with them

**ST. MARTIN'S PRESS, New York, NY** *Senior Editor, 2006 to 2017*

- Developed and maintained a powerhouse list that included 22 *New York Times* bestsellers
- Generated a total of $17.5 million in net profits, according to annual company-compiled editorial profit and-loss statements
- Participated in auctions and high stakes negotiations with major bestselling authors
- Wrote cover copy, online sales copy, strategized cover art and oversaw marketing and publicity campaigns for numerous successful titles

**PENGUIN BOOK GROUP (New American Library), New York, NY** *Assistant Editor, 2003 to 2006*

- Acquired and edited frontlist titles for publication
- Provided office support for two senior editors while growing and maintaining my own list

**TIME WARNER BOOK GROUP (iPublish), New York, NY** *Editorial Assistant, 2001 to 2002*

- Provided office support for two senior editors at the country's first major eBook publisher

**EDUCATION**

**NEW YORK UNIVERSITY, New York, NY** *Bachelor of Arts in English and Journalism, 2000*

## EXHIBIT B

## MATERIALS CONSIDERED

*Crave* (Tracy Wolff)
*Blue Moon Rising* (Lynne Freeman), LF03750
*Masqued* (Lynne Freeman), LF06904
First Amended Complaint
Export Report and Disclosure of Marlene Stringer
Export Report and Disclosure of Christine Witthohn
Export Report of Eric W. Ruben, Esq.
KIM00189607
KIM00183740
KIM00189670
KIM00190352
KIM00190557
KIM00184281
KIM00184482
KIM00186377
KIM00187056
KIM00149774
KIM00156741
KIM00134635
KIM00138839
KIM00141874
KIM00143293
KIM00145671
KIM00146291
KIM00146917
KIM00148150
KIM00148191
KIM00148192
KIM00148448
KIM00149756
KIM00150447
KIM00150724
KIM00150862
KIM00150886
KIM00150891
KIM00151509
KIM00152149
KIM00152844
KIM00152848
KIM00152936
KIM00155016
KIM00155037
KIM00155798

KIM00155917
KIM00155920
KIM00156327
KIM00156577
KIM00134221
KIM00134463
KIM00138021
KIM00195362
KIM00198163
KIM00195585
KIM00195815
KIM00159611
KIM00198244
KIM00159057
KIM00198298
KIM00158888
KIM00198385
KIM00198389
KIM00198390
KIM00198431
KIM00198458
KIM00157664
KIM00157646
KIM00157612
KIM00193730
KIM00157474
KIM00157457
KIM00157411
KIM00163967
KIM00164445
KIM00163317
KIM00163954
KIM00332732
KIM00354355
KIM00354356
KIM00354372
LF050080
LF050082
LF272292
LF272293
LF272295
LF272298
LF272300
LF272304
LF272312
LF272314

LF272320
LF272327

KIM00332732
KIM00354355
KIM00354356
KIM00354372