# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN,

               Plaintiff,

vs.

TRACY DEEBS-ELKENANEY P/K/A
TRACY WOLFF, et al.,

               Defendants.

Case No.:  1:22-cv-02435-LLS-SN

## DEFENDANTS' MEMORANDUM IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S LIABILITY EXPERTS AND OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION

Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Sylvan Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN & GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
*Attorneys for Defendant Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

## TABLE OF CONTENTS

BACKGROUND ................................................................................................................ 2

    A. Plaintiff's Copyright Experts ...................................................................................... 2

        1.  Kathryn Reiss ................................................................................................. 2

        2.  Dr. Patrick Juola ........................................................................................... 3

        3.  Dr. Carole Chaski ......................................................................................... 5

    B. Plaintiff's Remaining Liability Experts ..................................................................... 8

ARGUMENT ................................................................................................................... 9

I.  PLAINTIFF'S EXPERTS' DIRECT COMPARISON OF THE PARTIES' NOVELS IS
    FORBIDDEN, IRRELEVANT, AND USURPS THE FACTFINDER. ............................... 10

II.  THE REISS, JUOLA, AND CHASKI METHODOLIGIES ARE UNRELIABLE AND DO
    NOT FIT THE FACTS OF THE CASE. ....................................................................... 13

    A. The Reiss, Juola, And Chaski Opinions Fail The *Daubert* Factors. .......................... 13

    B. Reiss's Subjective Comparison Grossly Misrepresents The Works, Cherry-Picks
        Purported Similarities, And Disregards Differences. ................................................ 16

        1.  Reiss's Subjective, Cherry-Picked Comparison Is Not Reliable. ............................... 16

        2.  Reiss Misrepresents The Works And Draws Unreasonable Conclusions. ................. 17

        3.  Reiss Opines Based On Inapposite Post-Kim *BMR* Versions. .................................. 19

        4.  Reiss's Discussion Of Obvious General Writing Concepts Is Unhelpful ................... 20

    C. Dr. Juola's Methodology Is Unreliable For Many Reasons. ...................................... 20

        1.  Dr. Juola Failed To Correctly Apply His "Seven-Word" Methodology. ................... 20

        2.  Dr. Juola's Google Books N-Grams Analysis Is Unreliable. ................................... 21

        3.  Dr. Juola's "Katm" and "Baseline" Analyses Are Irrelevant And Unreliable. .......... 24

    D. Dr. Chaski's Mosaic Plagiarism Analysis Is Irrelevant And Unreliably Based On
        Allegations In Plaintiff's Pleadings. ...................................................................... 25

    E. Dr. Chaski's Conceptual Plagiarism Analysis Is Irrelevant, Does Not Fit The Facts, And
        Is Based On Unreliable Methods And Data ............................................................ 26

        1.  Dr. Chaski Seeks To Prove Theft Of Uncopyrightable Ideas. ................................... 26

        2.  Dr. Chaski's Analysis Is Based On Inapposite Additional *BMR* Versions ................. 27

        3.  Dr. Chaski Unreliably Reduced The Parties' Novels To Misleading And Distorted
            "Keyword Clusters." ..................................................................................... 29

        4.  Dr. Chaski Utilized A Biased And Unreliable Data Set. ......................................... 29

III. WITTHOHN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE. ........................... 33

IV. RUBEN AND STRINGER USURP THE FACTFINDER AND OFFER IMPROPER
    LEGAL CONCLUSIONS, AND STRINGER'S OPINIONS ARE UNSUPPORTED. ........ 35

V.  PLAINTIFF'S MERITLESS *DAUBERT* MOTION SHOULD BE DENIED. ..................... 37

CONCLUSION .............................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
    185 F. Supp. 3d 401 (S.D.N.Y. 2016) ................................................................ 16

*Alto v. Sun Pharm. Indus., Inc.*,
    2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021)…………………………………………...38

*Amanze v. Adeyemi*,
    2019 WL 2866071 (S.D.N.Y. July 3, 2019) ................................................... 20, 27

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)................................................... 9, 20, 22, 30

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996)................................................................... 17, 19

*Chalmers v. City of New York*,
    2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022)................................. 20, 28

*Chiaracane v. Port Auth. Trans-Hudson Corp.*,
    2020 WL 906277 (S.D.N.Y. Feb. 25, 2020)................................................. 13

*Computer Assocs. Int'l v. Altai, Inc.*,
    982 F.2d 693 (2d Cir. 1992)................................................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)............................................................................... 1, 9

*Est. of Jaquez v. City of New York*,
    104 F. Supp. 3d 414 (S.D.N.Y. 2015)................................................. 12

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................... 24, 33, 35

*Green v. Harbach*,
    750 F. App'x 57 (2d Cir. 2019) ....................................................... 10

*In re Acetaminophen–ASD-ADHD Prod. Liab. Litig.*,
    2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023)................................. 16, 17

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    2020 WL 2280144 n.2 (E.D.N.Y. May 5, 2020) ............................... 39

*Kemp v. CSX Transp., Inc.*,
    993 F.Supp.2d 197 (N.D.N.Y. 2014)................................................. 39

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)................................................................. 14, 15, 34

*LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009)................................................. 26

*Mowry v. Viacom Int'l, Inc.*,
    2005 WL 1793773 (S.D.N.Y. July 29, 2005) ................................ passim

*Price v. L'Oreal USA, Inc.*,
    2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)................................. 31

*Rowe Ent., Inc. v. William Morris Agency, Inc.*,
    2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003)............................ passim

*Saavedra v. Montoya*,
    2022 WL 2065031 (E.D.N.Y. June 8, 2022) ................................... 39

*Santoro ex rel. Santoro v. Donnelly*,
  340 F. Supp. 2d 464 (S.D.N.Y. 2004)..................................................................... 13
*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) .................................................................... passim
*U.S. Info. Sys., Inc., v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004) ......................................................... 9, 23, 30
*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)............................................................................... 12
*United States v. Percoco*,
  2018 WL 879499 (S.D.N.Y. Feb. 13, 2018)........................................................ 18
*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986).................................................................................. 10
*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996)................................................................ 10, 12, 27, 29

Statutes

17 U.S.C § 102.................................................................................................. 27

Rules

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................. 17
Fed. R. Evid. 702 ............................................................................................. 1, 9
Fed. R. Evid. 403 .............................................................................................. 28

Other Authorities

Carole E. Chaski, *Best Practices and Admissibility of Forensic Author Identification*,
  21 J.L. & Pol'y 333 (2013).................................................................................. 13
*Federal Reference Manual On Scientific Evidence* § 211,
  (3d ed.), 2011 WL 7724256 ................................................................................ 30

In a case involving YA novels written at a high school reading level, Plaintiff has tendered six expert witnesses to attempt to prove liability for copyright infringement and state-law claims premised on such infringement. These experts' opinions should be excluded under Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) because they are irrelevant, unhelpful, and unreliable for many reasons.[1]

***First***, Plaintiff's three copyright experts (Kathryn Reiss and Drs. Patrick Juola and Carole Chaski) engage in irrelevant and forbidden direct comparisons of the parties' novels. YA books do not fit the narrow category of highly technical works for which expert testimony on similarity is permissible in the Second Circuit. Since the parties' novels themselves can be easily understood by laypeople, expert testimony as to the works' purported similarities is irrelevant and would not aid the factfinder. This is especially true because Reiss and Chaski do not confine their opinions to the versions of *BMR* at issue at summary judgment, and instead each consider numerous others, including at least one version significantly postdating the Freeman-Kim relationship.

***Second***, Reiss, Juola, and Chaski did not apply reliable methodologies for many reasons. Reiss's comparison of the works is purely subjective and flatly inaccurate when reads the novels themselves. Juola, *inter alia*, set out to find examples of identical seven-word sequences in *BMR* and Crave, but wound up with ***zero*** sequences that met his own stated criteria. And Chaski—whose opinions have been excluded as "more confusing than helpful," *Mowry v. Viacom Int'l, Inc.*, 2005 WL 1793773, at *13 (S.D.N.Y. July 29, 2005)—slices and dices the parties' novel-length books into unrecognizable and inapposite "lexical clusters" constructed from "keywords" she hand-selected from Plaintiff's FAC with no methodology.

---

[1] This brief uses the same defined terms as in Defendants' copyright summary judgment brief ("Copyright Br.," ECF No. 298). Among others, "*BMR*" refers to all versions of Plaintiff's manuscript, including those entitled either *Blue Moon Rising* or *Masqued*. "Crave" (non-italics) refers to the Crave series as a whole, while "*Crave*" (italics) refers to book one. Internal citations are omitted from, and emphasis added to, all citations herein.

**Third**, Christine Witthohn's attempt to establish a motive to commit copyright infringement is irrelevant, and her opinions are inadmissible because she refused to disclose the sales data she relied on in erroneously concluding that Wolff and Kim had struggling careers.

**Fourth**, Eric Ruben and Marlene Stringer directly opine that Kim breached a fiduciary duty or contractual obligation, which are legal issues off-limits to experts. Stringer also exceeds her qualifications and does not base her opinions on record evidence or any reliable data.

**Finally**, Plaintiff's *Daubert* motion ("Pl.'s Mot.," ECF No. 314) should be denied. Rose Hilliard's opinions, offered to rebut Stringer and Witthohn, are based on her years of experience working with agents and in the publishing industry, and her testimony is unbiased and reliable. Dr. Malcolm Coulthard—essentially the godfather of forensic linguistics, whom Juola and Chaski repeatedly cite—does not exceed his qualifications in rebutting Chaski, as he focuses on non-technical issues that are well within his substantial expertise in forensic linguistics.

## **BACKGROUND**

### A.   **Plaintiff's Copyright Experts**

#### 1.   Kathryn Reiss

Reiss is an English professor and purportedly "an award-winning author of twenty novels for children and young adults." (Reiss Rep. (ECF No. 278-36) ¶ 1.) She was retained "to evaluate the similarities between" six versions of *BMR* and the Crave books, "catalogue what I believe to be the notable similarities," and "render an opinion as to whether those similarities are qualitatively significant." (*Id.* ¶ 5.) Reiss directly compares numerous characters, settings, plot points, and scenes in the parties' novels, mostly based on her own descriptions of the parties' novels rather than their actual text. (*See, e.g.*, *id.* ¶¶ 33-36 (not even citing works until ¶ 36(d)).) Reiss does not identify any specific methodology used for her comparisons, besides purportedly "t[aking] copious notes whenever I came across examples of similarities" and "narrow[ing] down the list of

similarities to those which I believe to be notable/qualitatively significant." (*Id.* ¶¶ 7-8.) While Reiss claims to have considered "differences" and whether similarities were attributable to "genre convention or trope" (*id.* ¶¶ 7-9), she scarcely addressed these issues in practice.[2]

### 2.   Dr. Patrick Juola

Dr. Juola is a "computational forensic linguist" who became famous in 2013 when he used his proprietary computer program "JGAAP" to prove that J.K. Rowling wrote the novel *A Cuckoo's Calling*, published under a different name. (Juola Dep. (Halperin Ex. A) 26:17-32:8.) Juola did not use that methodology, or JGAAP at all, for his opinions in this case. (*Id.* 32:12-14, 39:6-12.) Nor did Juola even read the parties' novels. (*Id.* 21:12-25.) Instead, he did the following:

***Seven-word sequences.*** Juola first investigated whether *BMR* and the four Crave books share any identical sequences at least seven words long, relying on publications by Dr. Coulthard for the supposed premise that shared seven-word sequences are evidence of copying. (Juola Rep. (ECF No. 278-37) ¶¶ 18-20.)[3] To qualify, a shared sequence must not be or contain "a common stereotyped phrase." (*E.g.*, *id.* ¶ 18.) Juola identifies only ***three*** shared sequences—"in the air as I try to," "that million-dollar smile of his," and "on my arms and the back of my neck"—as meeting his criteria. (*Id.* ¶ 19; Juola Dep. 102:14-105:2 (confirming only those three potentially qualified).) However, Juola was forced to concede that none of these qualifies because each contains a common stereotyped phrase, such as "million-dollar smile" or "the back of my neck." (*E.g.*, *id.* 119:5-120:4.) As such, having set out to find shared seven-word sequences as purported evidence of copying, Juola wound up with ***zero*** examples that met his criteria.

---

[2] Reiss acknowledges "the difference in tone and voice between" the novels and that the protagonists attend "very different" schools. (Reiss Rep. ¶¶ 32, 36(c).)

[3] In unchallenged rebuttal, Coulthard denies the seven-word standard and explains that it is erroneous. (Coulthard Rep. (ECF No. 300-26) ¶¶ 41-42, 49, 83.) To the extent the requisite sequence length is legitimately disputed, the Court need not resolve it because Juola did not reliably apply his purported seven-word standard.

***Google Books N-Grams.*** Having failed his initial test, Juola pivoted to investigating whether a handful of ***even shorter*** phrases could be evidence of copying because they (1) appear in both *BMR 2011* and a Crave book; and (2) do not appear in Google Books N-Grams ("GBN," a limited and nonrepresentative database as shown below). (Juola Rep. ¶¶ 20-28; Juola Dep. 148:6-25, 233:9-22.) Juola's candidates for this analysis were provided by Plaintiff's husband Trent Baer. (Juola Rep. ¶ 21 (he "took advantage of Baer's prior work").) From Baer's list, Juola considered the following four phrases: (1) "tree stump seats" in *BMR* and "tree-stump seats" in Crave; (2) "small Stonehenge" in *BMR* and "Stonehenge lite" in Crave; (3) "air as I try to" appearing in both, but admittedly "in wildly different contexts"; and (4) "that million-dollar smile of his" appearing in both. (*Id.* ¶¶ 20-22.) Juola purports to calculate the odds of these phrases appearing in the parties' works but not GBN as "a tiny fraction of a percent," making it "very much more likely than not that they were not independently written." (*Id.* ¶¶ 28-30.)

***Additional analyses.*** Juola also considered whether Wolff copied "Katmere" from Freeman's "Katmai" because "both contains [sic] the highly unusual character cluster 'katm.'" (*Id.* ¶ 34.) He found that the odds of both authors using "katm" was an "unlikely-but-not-incredible" "21.3.%." (*Id.* ¶ 35.) Notably, "Katmai" (the name of a real national park in Alaska) only appears in a set of Freeman's notes, not *BMR* itself—although Juola was not aware of this. (Juola Dep. 247:7-248:7.) Finally, Juola purports "to have excluded genre conventions" as an explanation because he found that "tree stump seats," "Stonehenge lite," "air as I try to," and "katm" did not appear in ten third-party "baseline" novels selected by Plaintiff's counsel (the same "baseline" novels Chaski considered, discussed below). (Juola Rep. ¶¶ 16, 36-37; Juola Dep. 258:6-260:6.)

All told, Juola believes that "four independent analyses" show that "it is more likely than not" that *BMR* and Crave "derive from the same specific sources," yet "it is not unbelievable that

[they] are independently written." (Juola Rep. ¶ 37.) But this conclusion does not rule out that the authors were merely "alluding to or describing a common concept." (Juola Dep. 265:18-266:17.)

   3. <u>Dr. Carole Chaski</u>

  Dr. Chaski is a professional expert witness who has been involved in at least 100 cases (Chaski Rep. (ECF No. 278-35) Annex 1 pp. 3-14) and earns approximately 50% of her income from litigation-related work each year (Chaski Dep. (Halperin Ex. B) 246:24-247:24). The only federal court that has examined Chaski's opinions attempting to prove copyright infringement excluded them on multiple grounds. *Mowry*, 2005 WL 1793773, at *13-14. Here, Chaski claims to have identified three types of plagiarism: "copy paste" (literal copying of text); "mosaic" (paraphrasing); and "conceptual" (theft of ideas). An overview of these analyses follows.

  ***Copy-paste.*** Chaski states that she "considered," or "reviewed," "over 700 examples of 6-words-in-a-row-exact matches" in the parties' works. (Chaski Rep. ¶¶ 3, 61.) Chaski did not find these purported examples herself—it appears that Baer did (*see* Chaski Dep. 75:15-76:20)—or even provide the 700 examples with her report. When Defendants asked Plaintiff to disclose them, Plaintiff withdrew this portion of Chaski's opinions instead. (Halperin Decl. Ex. C (parties' email exchange); *see also* Pl.'s Mot. at 17; Chaski Dep. 74:16-75:14 (both stating opinions withdrawn).)

  ***Mosaic.*** Chaski first claims that Wolff's books show "proof of the ability to perform mosaic plagiarism" because the Crave chapter titles contain "allusions" to common popular culture phrases, which "there is nothing illegitimate about." (Chaski Rep. ¶¶ 68-69.) Chaski lists all *Crave* chapter titles and indicates which are allusions to well-known phrases, showing for example that "Sweet Home Alaska" alludes to "Sweet Home Alabama." (Chaski Rep. pp. 23-28 & tbl. 2A.)[4]

---

[4] Other examples include the *Crave* chapter title "Turns Out the Devil Wears Gucci" alluding to "The Devil Wears Prada"; "Knock, Knock, Knocking on Death's Door" alluding to "Knock Knocking on Heaven's Door"; and "Vampires, Dragons, and Werewolves, Oh My!" alluding to "lions, tigers and bears oh my!" (Chaski Rep. pp. 23-28 & tbl. 2A.) These are just a few examples and the remainder are equally uncompelling.

Chaski then attempts to show that other authors do not use allusions in chapter titles as frequently, ergo Wolff must possess particularly strong mosaic plagiarism skills. (*See id.* ¶¶ 73-75 & tbl. 3; Chaski Dep. 92:25-93:12 ("She's extremely skilled and she has a propensity to do it[.]").) Chaski then lists only ten purported examples of Wolff's mosaic plagiarism from *BMR*. (Chaski Rep. ¶¶ 78-87.) Chaski did not find these examples herself, and instead took them directly from the FAC. (Chaski Dep. 96:19-22.) As with similar comparisons filed by Plaintiff, Chaski's ten examples are merely short phrases, presented without context, and heavily altered with bracketing and ellipses. (*See* Chaski Rep. ¶¶ 78-87.) Still, Chaski opines that these ten examples, plus "many more examples" in the FAC, are reliable evidence of Wolff mosaic plagiarizing *BMR*. (*Id.* ¶ 88.)

*Conceptual.* This analysis principally seeks to prove theft of Freeman's ideas. (*E.g., id.* ¶¶ 55, 99 (conceptual plagiarism is "in which ideas are taken from the uncredited source").) Chaski considered the following materials: (1) six versions of *BMR*, including one labeled "2016"; (2) the four Crave books; and (3) ten "baseline" YA paranormal novels written by third parties. (Chaski Rep. ¶ 42 & tbl. 1.) The ten "baseline" novels were selected and provided by Plaintiff's counsel with no apparent methodology. (Chaski Dep. 39:11-16; *see also id.* 41:13-19, 46:14-25, 47:25-48:4 (does not know counsel's methodology or how many total books in the genre).) Chaski nevertheless believes the ten novels counsel selected are a representative sample of the YA paranormal romance genre because they are "published," "well recognized," "[s]ome of them were bestsellers," and simply because there are ten of them. (*Id.* 39:17-40:16.) She acknowledges that her results could be different if she considered different "baseline" novels. (*Id.* 197:9-13.)

Chaski's methodology did not include actually reading the novels at issue. (*E.g., id.* 17:14-18:24 ("I didn't read any of them cover to cover").) While difficult to follow, it appears that her method included the following steps:

- First, using her proprietary software called "ALIAS TATTLER," Chaski "scrubbed" and "lemmatized" the entirety of the works she was analyzing. (Chaski Rep. ¶ 103(a)-(b).)[5] She then used her software to remove all "function words" (e.g., prepositions and articles), leaving only "content words." (*Id.* ¶ 103(d).)

- Second, Chaski personally selected 35 "keywords" from *BMR* and Crave ***based on her review of the allegations in Plaintiff's FAC.*** (*Id.* ¶ 103(e)-(f) ("I selected keywords based on the complaint's description of similarities").) The 35 keywords include Alaska-specific words like "Alaska," "northern," and "aurora," as well as "vampire," "werewolf," and "witch." (Chaski Rep. pp. 41-42 & tbl. 5 (full list).)

- Third, using her 35 "keywords" from the FAC, Chaski reduced the novels to "lexical clusters" (or "keyword clusters") consisting of 12 lemmatized content words on either side of a given keyword each time it was used in the works at issue. (*Id.* ¶ 103(g).)[6]

- Fourth, Chaski used her software to compare the various authors' keyword clusters and calculate an "overlap rate." (*Id.* ¶ 103(j)-(i).) She found that Wolff had the highest overlap with Freeman for "31 of 35 keyword clusters," which she believes shows that Wolff "uses the keywords in ways that are more similar to [Freeman] than any of the other baseline author[s]." (*Id.* ¶¶ 122-123 & tbl. 5.)

- Finally, Chaski ran "binomial probability" and "vector measurement" statistical tests (the latter including calculating "cosine similarity scores"), purportedly to calculate the odds of Wolff having the highest "overlap rate." (*Id.* ¶¶ 124-133.) She concludes "in light of my findings" that "it is virtually impossible" that *BMR* and Crave were "independently created." (*Id.* ¶ 135.)

Chaski "formulated [this] specific methodology … specifically for this case." (Chaski Dep. 255:13-21.) She has not published, tested, or even used her methodology outside this litigation. (*See, e.g.*, *id.* 215:13-23 (believes testing "built into the methodology"), 216:21-220:22 (didn't test on cases of known plagiarism or non-plagiarism and hasn't published), 224:24-226:5 (hasn't used before or published), 243:14-245:21, 250:4-252:2, 254:13-21 (all similar).)

---

[5] "Scrubbing" refers to removing formatting, spacing, and the like. (Chaski Rep. ¶ 45.) "Lemmatizing" means converting each word in the analyzed text "to its base lemma (or dictionary) form." (*Id.* ¶ 46 (explaining that lemmatizing would convert the words "was," "is," and "been" all to "be").) Lemmatizing therefore fundamentally alters the analyzed text by replacing the words the author actually chose with different words.

[6] Chaski did not disclose her actual keyword clusters until Defendants requested them. Examples of Chaski's clusters are shown in §§ I and II.E.4 below and are included in Exhibit D to the Halperin Declaration.

### B.     Plaintiff's Remaining Liability Experts

***Christine Witthohn.*** Witthohn is a literary agent (only through her own agency) who also has "23 years of experience as a legal assistant." (Witthohn Rep. (Halperin Ex. E) ¶ 1.) She attempts to show that Wolff and Kim had a motive to infringe Freeman. (*E.g.*, Witthohn Dep. (Halperin Ex. F) 63:11-16 (opines on "why [she] believe[s] Tracy Wolff needed to resort to copying from Ms. Freeman").) Specifically, she opines that Wolff's "writing success was seriously waning" prior to Crave (Witthohn Rep. ¶¶ 2, 21-30) and that Kim's similar declining success prompted her to focus on "work for hire"[7] representation and feed *BMR* to Wolff (*id.* ¶¶ 3, 13-20). This purportedly "support[s] the likelihood that Wolff and Kim would have been looking to sources other than Wolff for a story for Wolff to write." (*Id.* ¶ 31.) Witthohn based her analysis on sales and publishing data (*id.* ¶¶ 15-16, 28-29) that she did not disclose in her report and refused to provide once requested (*see* Witthohn Dep. 71:16-74:15). Despite accusing Kim of stealing Freeman's work to create a new series, Witthohn admits that "I would probably not have picked [Freeman] up as a client" based on what she read of *BMR*. (*Id.* 71:3-6.)

***Eric Ruben, Esq.*** Ruben is an attorney who once ran his own literary agency. (Ruben Rep. (Halperin Ex. G) ¶¶ 1, 5.) He opines, based on an analysis of the law, that Kim/Prospect owed a fiduciary duty to Freeman (*id.* ¶¶ 3, 8-13) and "assuming they gave access" to Freeman's materials to Wolff for the purpose of copying the material, "they breached that duty" (*id.* ¶¶ 3, 14-19).

***Marlene Stringer.*** Stringer is a literary agent who worked at one prior agency before starting her own. (Stringer Rep. (Halperin Ex. H) ¶ 1.) She opines that Kim breached the agency agreement with Freeman by not submitting *BMR* to publishers "promptly" and making Freeman

---

[7] When a writer is "hire[d] to write a specific story that fits the publisher's needs." (Witthohn Rep. ¶ 12.)

work on it when the market was no longer "hot." (*Id.* ¶¶ 15-27.) She also opines that Kim violated purported fiduciary duties to Freeman by allegedly feeding *BMR* to Wolff. (*Id.* ¶ 28-50, 52.)

## ARGUMENT

"Trial courts serve as gatekeepers for expert evidence," "responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 42 (S.D.N.Y. 2016) (Netburn, J.). Courts must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Under Rule 702 and *Daubert*, expert testimony is admissible only if it: (a) will be helpful to the factfinder; (b) "is based on sufficient facts or data"; (c) "is the product of reliable principles and methods"; and (d) those methods were reliably applied to the facts. FRE 702; *Daubert*, 509 U.S. at 591-93. To be helpful to the factfinder, expert testimony must be relevant and "fit" the facts of the case. *Id.* at 591-92. In evaluating whether expert testimony is reliable, courts may consider the following factors (the "*Daubert* factors"): (1) whether the methodology "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) the "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) the extent to which the methodology has gained widespread acceptance in the scientific community. *Id.* at 593-94. The analysis remains "flexible" and focuses "on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

It is Plaintiff's burden to show that her experts' opinions are reliable and admissible. *E.g.*, *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004). Plaintiff cannot make that showing here for numerous reasons.

I.      **PLAINTIFF'S EXPERTS' DIRECT COMPARISON OF THE PARTIES' NOVELS IS FORBIDDEN, IRRELEVANT, AND USURPS THE FACTFINDER.**

Reiss, Juola, and Chaski apply different methodologies to directly compare the parties' works and opine regarding supposed similarities. (*See* Pl.'s SJ Mem. (ECF No. 283) at 15-16, 23-25 (relying on all three experts as to both "probative *and* substantial similarity").) These opinions are inadmissible because expert comparisons of literary works are irrelevant and forbidden in the Second Circuit, and they usurp rather than aid the factfinder.

As Defendants have shown, "[o]utside a limited class of cases involving highly technical works such as computer software, [expert] testimony is *'irrelevant and not permitted'*" as to whether two works are substantially similar. *Green v. Harbach*, 750 F. App'x 57, 59 (2d Cir. 2019); *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693, 713-14 (2d Cir. 1992). (Manuscripts Order at 3 n.2 (similar); *see generally* Copyright Br. at 42-43 (collecting cases).) In other words, substantial similarity requires a "detailed examination of the works themselves" from the perspective of an ordinary reader, not an expert witness. *See, e.g.*, *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986) ("[T]he works themselves supersede and control contrary descriptions of them.").[8]

This principle squarely applies here and requires that Plaintiff's experts' comparisons of the works be excluded. Nobody could credibly claim the parties' YA novels are technical works like computer code that lay readers cannot understand on their own. Chaski even admits that "I don't think my report addresses substantial similarity" in terms of "how an average reader would read these books" (Chaski Dep. 20:16-21:24)—even though Plaintiff offers her opinions (plus

---

[8] Defendants showed in their copyright brief that this case requires applying the "more discerning" ordinary observer test, which applies the "ordinary observer" test but considers only the copyrightable elements of the parties' works. (Copyright Br. at 21.) The distinction between the "ordinary" and "more discerning" observer approaches is inapposite to this motion because they are ultimately both conducted from the standpoint of a lay factfinder, not an expert.

those of Reiss and Juola) for that very purpose (Pl.'s SJ Mem. at 23). To the extent Plaintiff argues that the parties' works are too voluminous to be read by the factfinder, that fails because (1) volume is not a recognized basis for allowing expert testimony on substantial similarity; (2) the volume is actually manageable, especially when only *BMR 2011* and *2013* are considered as required; and (3) attempting to introduce additional *BMR* versions and various notes sets to create a supposed "volume issue" is a problem of Plaintiff's own making. (Copyright Br. at 43.)

The bar on expert comparisons should extend beyond substantial similarity to the issues of probative similarity and striking similarity. While courts sometimes allow experts to opine on probative or striking similarity, others have excluded such opinions when the factfinder can decide those issues herself based on a review of the works. *See, e.g.*, *Mowry*, 2005 WL 1793773, at *13 (excluding Chaski's opinions offered to prove striking similarity of screenplays where "[u]nlike in specialized areas like music, the trier of fact can compare the works without the need of expert assistance"). To the extent anyone needs to decide probative similarity (unnecessary at least because Plaintiff cannot establish access) or striking similarity (a higher showing than substantial similarity that is not seriously in dispute (Copyright Br. at 57-58)), the factfinder can do so by reading the parties' novels without Plaintiff's experts' views.

Chaski's "more confusing than helpful" opinions show just how far afield Plaintiff's experts go from the simple one-to-one ordinary reader comparison that is the true test for copyright infringement in the Second Circuit.[9] Chaski (and Juola) did not even read the parties' works, at least not the way one would read a novel. (Chaski Dep. 17:14-18:24, 50:15-52:6, 147:4-23; Juola

---

[9] Tellingly, Plaintiff now argues that to "fairly evaluate" Chaski's methodology, an **expert** would need to be fluent in "linguistic data collection," "experimental linguistics," "computational linguistics text analysis," "statistics or machine learning," "psycholinguistics," and "computational linguistics or computer science with a specialty in natural language processing." (Pl.'s Mot. at 14.) If an expert witness would require such credentials just to understand Chaski, one wonders how a lay factfinder would stand any chance.

Dep. 21:12-25).) Chaski instead took numerous steps to reduce the parties' novels to unrecognizable "keyword clusters," an example of which looks like this:

> guess Ash be worried brightness moon just right see northern
> light Borealis Galileo name glimmer ribbon color flash sky
> Alaska dark winter live particular location face tense
> experience sudden increase solar flare activity due change
> gravitational pull pole shift know ask incrediously there direct
> link date criminal peak phenomena especially full aurora more
> opportunity thing go wrong find object now

(Halperin Ex. D-2 at 1 (Chaski's keyword cluster for Freeman's use of "aurora").) It would not aid the factfinder to consider Chaski's reductive transformation of the parties' works into keyword cluster "data" rather than the requisite "works themselves." *See, e.g.*, *Williams*, 84 F.3d at 583.

Meanwhile, Juola's analysis purportedly proves only that the several phrases he considered "derive from the same specific sources containing these linguistic features," which is not necessarily *BMR*. (Juola Rep. ¶ 37.) Juola admits that his opinions do not actually show that Wolff copied Freeman; rather, both authors could have simply been "alluding to or describing a common concept" when they used a phrase like "million-dollar smile" or "tree stump seats." (Juola Dep. 265:18-266:17.) This is irrelevant because two authors referencing the same common concept is not copyright infringement.

In sum, the Reiss, Juola, and Chaski comparisons are irrelevant, forbidden in the Second Circuit, and would usurp the factfinder by "tell[ing] the jury what result to reach" on the ultimate similarity issues at the heart of this case. *See, e.g.*, *Est. of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015), *aff'd sub nom. Est. of Jaquez by Pub. Adm'r of Bronx Cnty. v. City of New York*, 706 F. App'x 709 (2d Cir. 2017) (expert improperly usurped factfinder in opining on "that which a lay jury would so clearly understand"); *United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) ("testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible"). These opinions should be excluded for these reasons alone.

## II.     THE REISS, JUOLA, AND CHASKI METHODOLIGIES ARE UNRELIABLE AND DO NOT FIT THE FACTS OF THE CASE.

While the above is dispositive, these opinions fail *Daubert* for many additional reasons.

### A.     The Reiss, Juola, And Chaski Opinions Fail The *Daubert* Factors.

The *Daubert* factors strongly favor excluding Reiss, Juola, and Chaski, whose methods have never been tested or published, have no known error rate, and are not generally accepted.[10]

*Testing.* Reiss does not claim to have done any testing, and her subjective assessment of "qualitative" similarities would be impossible to test. Juola admits he did not "test this methodology before deploying it here." (Juola Dep. 234:25-235:5.) Rather than testing his method on known non-plagiarized books, Juola simply "relied on the list that Trent Baer gave me." (*Id.* 235:6-236:23.) Chaski claims that testing is "baked into" her methodology because it considers ten "baseline" novels. (Chaski Dep. 215:13-23, 243:14-20.) But this fails because testing must be done ***independent of litigation***. *See, e.g.*, *Chiaracane v. Port Auth. Trans-Hudson Corp.*, 2020 WL 906277, at *7 (S.D.N.Y. Feb. 25, 2020) (excluding expert who "did not conduct any: (1) tests; (2) observations; or (3) research independent of this litigation"); *Santoro ex rel. Santoro v. Donnelly*, 340 F. Supp. 2d 464, 476-77 (S.D.N.Y. 2004) (excluding expert who failed to "conduct an independent study to test the accuracy of this conclusion").

Notably, outside the courtroom, Chaski has published that a reliable scientific method must be "developed independent of any litigation," "tested for accuracy outside of any litigation," and "tested for accuracy on 'ground truth' data." Carole E. Chaski, *Best Practices and Admissibility of Forensic Author Identification*, 21 J.L. & Pol'y 333, 334-37 (2013) ("Chaski 2013").[11] She wrote

---

[10] This discussion focuses on Chaski's conceptual plagiarism methodology but applies with equal force to her mosaic plagiarism methodology, which she does not claim to have published or tested and is even less rigorous.

[11] Per Chaski, "[a] ground-truth dataset contains known, verified examples with features relevant to the experiments being run." Chaski 2013 at 336. Chaski agrees that cases of known plagiarism or non-plagiarism would be ground truth data (Chaski Dep. 97:18-21, 219:8-220:6), while allegations in the FAC are not "data" at all (*id.* 98:4-10).

that failing to take these steps makes a methodology "a sophisticated form of guessing" that "may look scientific, but it is not real science." *Id.* at 337.

Here, Chaski agrees that true independent testing would require testing her methodology on cases of known non-plagiarism to verify it does not pick up false positives. (Chaski Dep. 216:21-217:16, 219:8-220:1 (agreeing that "to really do a test" of her "whole methodology, … not just part of it" she would need to make a known non-plagiarized book her "target work").) This is "something [Chaski] would do if [she] were going to publish this methodology." (*Id.* 220:3-6.) Yet Chaski never did this testing because she purportedly didn't have time. (*Id.* 216:21-217:16 ("If I had had time, I definitely would have done that"), 219:8-220:1 (similar), 243:21-245:21 ("no other empirical testing").)[12] Chaski's methodology fails both *Daubert* and the basic rules for reliability that she published before being retained in this case. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

***Error rate.*** Reiss's subjective approach has no error rate—unless one counts egregious misrepresentation of the works as substantial error. Juola and Chaski fail to provide any error rate derived from independent testing. While they provide lengthy statistical calculations purporting to serve as validation (*e.g.*, Juola Rep. ¶¶ 43-48; Chaski Rep. ¶¶ 124-133), these calculations do not actually test for error in the methodologies. Instead, the calculations are ***affected by*** earlier steps in the methodologies that introduced substantial error (such as Chaski arbitrarily selecting keywords and comparing against counsel's ad hoc "baseline" novels, and Juola using prior work from Baer and unreliable GBN). Because Juola and Chaski have not tested their methods on known

---

[12] Chaski also did not test her methodology on any of Wolff's other YA books, and was not even aware that Wolff has written other YA books. (Chaski Dep. 223:3-224:8.) Wolff's other novels (such as *Tempest Rising*) that are not colorably accused of plagiarism would seemingly be most informative, since one could directly test whether the writing in the allegedly infringing Crave books is different than Wolff's own "baseline."

cases of non-plagiarism outside this litigation (*e.g.*, Chaski Dep. 219:8-220:1; Juola Dep. 236:3-23), they have no idea how often their methods find false positives. And outside the courtroom, Juola has published that "little is known about the type or rate of errors for" his authorship attribution methodology. (*Id.* 84:9-85:23.)

**Peer review and publication.** Reiss does not claim to have published her subjective comparison methodology, which no peer-reviewed publication would ever accept. Juola has published a ***different*** methodology—the J.K. Rowling methodology—but concedes that he did not use that methodology here (or even the computer program that helped him crack the Rowling case). (Juola Dep. 32:12-14, 39:6-12.) Chaski freely admits that her conceptual plagiarism methodology is a work in progress that has not been published, and that she would need to conduct the independent testing described above in order to do so. (Chaski Dep. 219:8-220:6, 225:24-226:5.) Far from applying a methodology she has published, Chaski "formulated [her] specific methodology … specifically for this case" (*id.* 255:13-21) and is applying it for the first time ever in a plagiarism case (*id.* 224:24-225:16, 226:6-227:23). When Chaski cites publications by others, she admits "I am not using the particular methods described in" them. (Chaski Rep. ¶ 99 n.22.)[13]

**Standards and general acceptance.** Reiss identifies no standards governing her subjective comparison beyond what she herself claims is "qualitatively" important. *See Kumho Tire*, 526 U.S. at 157 (courts should not admit "evidence that is connected to existing data only by the *ipse dixit* of the expert"). Nor is there any scientific community that accepts Reiss's informal, subjective comparison of two literary works for purported similarities as reliable science. Juola has published that "one of the major weaknesses in" his authorship attribution methodology is "the absence of

---

[13] To the extent Plaintiff argues that Chaski's method was published in a 1997 paper by Alison Johnson, Johnson's method was different (*see* Coulthard Rep. ¶ 72 n.18), was used on short student essays rather than novel-length books, and was expressly designated "experimental" (*see, e.g.*, Chaski Dep. 183:16-185:14).

clearcut standards for accurate analytical practice." (Juola Dep. 86:19-89:5.) And Chaski's conceptual methodology necessarily lacks established standards and general acceptance because she invented it for this case. (*See, e.g.*, Chaski Dep. 255:13-21.)[14]

**B.      Reiss's Subjective Comparison Grossly Misrepresents The Works, Cherry-Picks Purported Similarities, And Disregards Differences.**

Reiss's opinions are also unreliable because her comparison is purely subjective and relies on cherry-picked summaries that grossly misrepresent the parties' works.

1.      Reiss's Subjective, Cherry-Picked Comparison Is Not Reliable.

Reiss's comparison of the parties' novels should be excluded because it is purely subjective, not based upon any discernible standards, and relies on extreme cherry picking. *See, e.g.*, *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 419 (S.D.N.Y. 2016) (excluding handwriting comparison that "bears none of the indicia of science and suggests, at best, a form of subjective expertise" where expert claimed she simply "knows what 'to look for ... in a way that the everyday layperson would not'"); *Mowry*, 2005 WL 1793773, at *13 (excluding Chaski because "the subjectiveness of comparing self-created summarizations of literary works that the trier of fact is able to read/view, creates too great a risk of jury confusion"); *see also In re Acetaminophen–ASD-ADHD Prod. Liab. Litig.*, 2023 WL 8711617, at *17-18 (S.D.N.Y. Dec. 18, 2023) ("an expert must not cherry-pick," which "is a form of 'result-driven analysis which undermines principles of the scientific method'").

---

[14] To the extent some of the techniques Juola and Chaski employ are accepted in the nascent forensic linguistics community, they are ***not*** generally accepted for detecting plagiarism in novel-length books. Rather, as Dr. Coulthard explains: "These techniques … have been used to examine relatively short (typically maximum 500 words) texts, such as University admissions personal statements, police reports of interviews, and sworn witness statements." (Coulthard Rep. ¶ 3.) Forensic linguistics does appear to have gained widespread acceptance for investigating who wrote an unknown text, such as authorship of a suicide or ransom note, but is not being used for such purposes here.

Reiss's comparison is merely her own subjective assessment of ways the parties' works seem similar to ***her***. Her methodology, to the extent there was one, merely entailed "t[aking] copious notes whenever I came across examples of similarities" and then "narrow[ing] down the list of similarities to those which ***I believe*** to be notable/qualitatively significant." (Reiss Rep. ¶¶ 7-8.) If Reiss applied any standards or requirements for deeming something a "qualitatively significant" similarity, she did not identify them in her report. *Cf.* Fed. R. Civ. P. 26(a)(2)(B) (expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them"). Her opinions should be excluded due to this alone.

Reiss's report also shows that she applied a "one-way ratchet" approach that looked only for similarities while ignoring virtually all the myriad and significant ways the parties' works differ. (*See generally* Reiss Rep. ¶¶ 33-213.) For example, Reiss does not seriously address (or even mention) Anna and Grace's starkly different personalities, physical appearances, and powers; Hudson's unparalleled crucial role as hero and main love interest beginning with *Crush*; or Crave's numerous, unparalleled, and fully realized magical settings such as the dragon/witch/vampire courts. (*See generally* Copyright Br. at 2-3.) Nor does Reiss seriously engage with the authors' vastly different writing styles (including Wolff's pervasive use of humor), other than briefly acknowledging a "difference in tone and voice." (*See* Reiss Rep. ¶ 32). Reiss's "fail[ure] to address evidence that is highly relevant to … her conclusion[s]" further renders her opinions unreliable and inadmissible. *See Acetaminophen*, 2023 WL 8711617, at *17-18.

## 2.   Reiss Misrepresents The Works And Draws Unreasonable Conclusions.

Reiss's comparisons unreliably misrepresent the parties' novels and could not be accepted by a rational factfinder. *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (expert testimony inadmissible when "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison'");

17

*United States v. Percoco*, 2018 WL 879499, at *8 (S.D.N.Y. Feb. 13, 2018) (excluding expert who "injected numerous assumptions into her analysis that lack support in data or common sense"). To show this, Defendants provide the Easton Appendix, which contains the actual text of numerous scenes Reiss compares, with the scenes at issue placed side by side without commentary. (*See generally* Easton App'x (ECF Nos. 301–7-10) (showing actual text for scenes discussed in Reiss Rep. ¶¶ 35(g), 38, 39, 42, 46, 49-54, 57-60, 68-73).) Looking at the scenes themselves shows how wildly off base Reiss's opinions are. Several examples (nowhere near exhaustive) are as follows:

- Reiss claims that scenes where the "heroine travel[s] through the snow" are similar because both roads are "snowy" and the trips end with arrivals at a "huge manor" or "huge castle." (Reiss Rep. ¶ 39.) Any reasonable observer would see that: (1) Anna is getting a ride home from school on a normal road on Ash's motorcycle, while Grace is trekking off-road on a snowmobile with her cousin Macy through the Alaskan wilderness; (2) the "manor house" and "huge castle" are actually, respectively, Anna's private house in the suburbs and magical boarding school Katmere Academy; and (3) the *BMR* scene serves to build romance between Anna and Ash, while the *Crave* scene isn't romantic and instead coveys Grace's bewilderment at her arrival in remote Alaska. (*See generally* Easton App'x pp. 21-36.)[15]

- Reiss claims that the "first kiss" scenes are similar because the boyfriends both "lose[] self-control" and the kisses occur "outdoors under a dazzling night sky." (Reiss Rep. ¶¶ 49-54.) But any reasonable observer would see that, *inter alia*: (1) the *Crave* kiss is far more vivid, sensual, and passionate; (2) Ash's eyes briefly appear to glow during the kiss (he does not "lose self-control"), whereas Jaxon is so overcome by passion that he does lose self-control and causes an earthquake, with Grace wounded by flying glass as she tries to escape; and (3) the *Crave* kiss occurs inside Jaxon's tower suite, not "outdoors" or under a "night sky" as Reiss claims. (*See* Easton App'x pp. 58-76.)

- Reiss opines that scenes where the "heroines go to parties and imbibe a spike drink" are similar (Reiss Rep. ¶¶ 68-71), but any reasonable observer would see that, *inter alia*, Anna attends a typical high school party where frenemy Taylor acts outright mean and spikes Anna's punch with hard liquor, whereas Grace has a quiet one-on-one with Lia in Lia's dorm room, where Lia acts empathetic and friendly yet perhaps secretly poisons Grace's tea causing Grace to later vomit (*see* Easton App'x pp. 132-145).

---

[15] The Easton Appendix inadvertently omits page 51 of *BMR 2011*, which occurs before the motorcycle ride and does not affect the comparison. That page can be found at ECF No. 301-1 p. 51.

These examples alone show that Reiss distorts the works and emphasizes random trivialities (such as roads in Alaska being "snowy") to falsely assert similarity when she is really comparing "apples and oranges." *See Boucher*, 73 F.3d at 21. This approach not only usurps the role of the factfinder, but could not be accepted by any reasonable factfinder in light of what the works actually say. Finally, this is not merely a "battle of the experts" because Defendants are directing the Court only to the scenes themselves, not Easton's analysis of them in her rebuttal report (which Defendants do not ask the Court to consider).[16] The works themselves are all that is needed to show that Reiss's opinions do not reliably describe or analyze the parties' novels.

### 3.    Reiss Opines Based On Inapposite Post-Kim *BMR* Versions.

Reiss's opinions do not fit the facts and are inadmissible to the extent they are based on (1) *BMR* versions post-dating the Freeman-Kim relationship or (2) Freeman's informal notes. After the Court required Plaintiff to rely only on *BMR 2011* and *2013* (in part to avoid litigating over versions that could not have been accessed), Reiss nevertheless considered six versions of *BMR*, including versions labeled "2014" and "2016." (Reiss Rep. ¶ 7; *see also id.* p. 53 (materials considered).) She also considered Freeman's "notes on worldbuilding, characters, and plans for her trilogy." (*Id.* ¶ 7.) The Freeman-Kim relationship ended in Spring 2014. (DSUF ¶ 11.) Neither Wolff, nor any other Defendant, could have accessed a "2016" *BMR* version written two years later. Plaintiff also has not met her burden to show that the "2014" version—which Reiss does not identify by Bates or otherwise specify—was written early enough that year to be potentially relevant. Finally, there is no colorable claim for copyright infringement of Freeman's notes because informal notes inherently contain general ideas rather than protected expression.

---

[16] Defendants cited Easton's rebuttal report itself in the DSUF for only two points regarding the YA genre and prior art, not for a comparison of the parties' works. (DSUF ¶¶ 22, 35.)

4.      Reiss's Discussion Of Obvious General Writing Concepts Is Unhelpful.

Finally, Reiss's analogy of novels to "houses" (Reiss Rep. ¶¶ 17-18) and overview of "'mosaic' or 'patchwork' writing" (*id.* ¶¶ 214-25) would not aid the factfinder. *See, e.g.*, *Chalmers v. City of New York*, 2022 WL 4330119, at *8 (S.D.N.Y. Sept. 19, 2022) (expert testimony does not aid the factfinder when "based on 'common sense, the antithesis of expert knowledge'").

Reiss claims that novels are akin to houses in that each can have a porch or garage, but each should not have same furniture, wallpaper, or "food in the fridge." (Reiss Rep. ¶¶ 17-18.) This analogy is pointless because the factfinder can review two novels (especially YA novels) and determine whether they are similar based on her "good eyes and common sense,'" *Amanze v. Adeyemi*, 2019 WL 2866071, at *6 (S.D.N.Y. July 3, 2019), *aff'd*, 824 F. App'x 86 (2d Cir. 2020), without a superfluous and potentially misleading analogy to "houses" guiding how to do this. Reiss later explains that "mosaic" and "patchwork" writing refer to the general process of cutting, pasting, and rearranging elements of a piece of writing—a "revision technique" that is "perfectly normal and expected of writers." (Reiss Rep. ¶¶ 216-19.) This discussion is unhelpful because the factfinder will intuitively understand how writing and editing work; indeed, virtually anyone who has ever written anything longer than a few pages likely has engaged in the basic revision process Reiss describes. Further, Reiss's discussion is mostly offered to justify Plaintiff's attempt to amalgamate her various manuscript versions (*see id.* ¶¶ 218, 225), which is a legal issue, and one the Court has already decided against Plaintiff.

**C.      Dr. Juola's Methodology Is Unreliable For Many Reasons.**

1.      Dr. Juola Failed To Correctly Apply His "Seven-Word" Methodology.

Juola's opinions are unreliable and inadmissible because he failed to satisfy his own flawed standard for detecting textual plagiarism. *See, e.g.*, *Amorgianos*, 303 F.3d at 268 (affirming exclusion of expert who "failed to apply his own methodology reliably"). As explained above,

20

Juola applied a methodology that required him to find identical seven-word sequences in the parties' works that did not contain or constitute "a common stereotyped phrase." (Juola Rep. ¶¶ 18-20.) Of the *three* potentially qualifying sequences Juola found, only two were seven words long to begin with, and *zero* qualified in the end because each contained a common stereotyped phrase that reduced the sequence length to fewer than seven words. (Juola Dep. 119:5-120:4.)[17]

Specifically, "on my arms and the back of my neck" fails Juola's test because "the back of my neck" is a common expression, which Juola agreed "drops this [sequence] down to five words." (*Id.* 114:9-116:1.) Likewise, "in the air as I try to" includes the common phrase "in the air," which Juola explained "would reduce it from seven words to five, effectively." (*Id.* 112:19-113:12, 114:4-8.)[18] And "that million-dollar smile of his," not even seven words to begin with, "would basically drop down to the equivalent of a four-word phrase" because "million-dollar smile" is a common idiom. (*Id.* 112:3-18; *see also id.* 105:10-106:8 (further agreeing that linguists might count "million-dollar" as one word due to the hyphen).) Juola's failure to satisfy his own seven-word standard for detecting plagiarism is fatal to his analysis.

2.   Dr. Juola's Google Books N-Grams Analysis Is Unreliable.

Juola's attempt to show that four phrases appearing in *BMR* and Crave are "rare" because they do not appear in GBN (Juola Rep. ¶¶ 20-21, 28) is also unreliable.[19]

---

[17] Meanwhile, Chaski testified that she is not aware of *BMR* and Crave sharing a single ten-, nine-, or eight-word sequence. (Chaski Dep. 79:25-80:21.) She also has not seen any evidence that a whole paragraph, or even whole sentence, was copied from *BMR*. (*Id.* 80:22-81:9.)

[18] Juola states in his report that the entire phrase "in the air as I try to" "appears only seven times in this set" (Juola Rep. ¶ 19)—"this set" referring to Google.com (Juola Dep. 116:3-10). After a Google search was run live on screen at Juola's deposition and returned 207,000 results, Juola acknowledged that the opinion stated in his report was "off by a factor of over 200,000." (*Id.* 116:11-117:14.)

[19] GBN is accessed at https://books.google.com/ngrams/. An "n-gram" is "a sequence of n consecutive items." (Juola Dep. 160:25-161:10.) For example, a five-word sequence is a "5-gram."

***First***, Juola unreliably premised this analysis on "prior work" conducted by Baer. (Juola Rep. ¶ 21.) Juola admitted that Baer "indeed" has an interest in the outcome of the litigation (Juola Dep. 142:22-25) and Juola knows nothing about what Baer did to locate the phrases he gave Juola for consideration (*id.* 143:1-21, 145:13-16 (does not know whether Baer cherry-picked favorable examples)). Rather than testing his methodology on cases of known non-plagiarism, Juola "relied on the list that Trent Baer gave me." (*Id.* 236:3-23.) Uncritically accepting Baer's work was a fatal first step that invalidates Juola's entire analysis. *See, e.g.*, *Amorgianos*, 303 F.3d at 267 ("it is critical that an expert's analysis be reliable at every step," as "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible").

***Second***, GBN is an inherently limited and unreliable database for investigating whether a phrase is "rare." GBN is not the same as ordinary Google Books[20]—a much larger database containing 40 million books as of January 2023—which Juola eschewed without explanation. (*See* Juola Dep. 172:25-173:20.) Juola has stated that GBN contains either 15 million books (uncited figure in his report) or 5 million books (stated in a published 2022 book chapter). (*See* Juola Rep. ¶ 25; Juola Dep. 156:14-158:15.)[21] Either way, ordinary Google Books contains over twice as many books as GBN and would have been at least twice as comprehensive. (*Id.* 174:4-16.)

GBN notably does not include n-grams longer than five words, meaning that searching for a longer sequence (like "that million-dollar smile of his") will return no hits. (*Id.* 162:24-163:20, 183:5-11.) GBN does not include any books published after 2019. (*Id.* 164:12-22.) Most importantly, it does not include any phrase that does not appear at least 40 times in the database (*id.* 165:10-22)—meaning that when Juola says a phrase did not appear in GBN, he really means

---

[20] Google Books, https://books.google.com.

[21] Juola admits that the number of actual books in GBN "would affect my calculations." (Juola Dep. 158:16-20.)

it did not appear at least 40 times in GBN. Further, not all the books in GBN are full-length novels, and many are non-English. (*Id.* 159:19-160:16, 165:23-25.) And Juola did not even search all GBN, limiting his search to books from the last 20 years. (*Id.* 189:10-21.) Yet he assumes that the portion he searched is "a representative sample of English language books." (*Id.* 229:18-25.)

Unsurprisingly, Juola cannot cite any source that endorses using GBN to investigate the rarity of phrases as part of a plagiarism detection methodology. (*Id.* 177:5-13, 183:17-23.) Rather, the scientists who created GBN say that its main purpose is to analyze language and cultural trends over time. (*See id.* 151:18-23, 182:5-17.) Juola's use of GBN for a different purpose is unreliable and ignores the database's substantial limitations, which directly impact his results. *See, e.g.*, *U.S. Info. Sys.*, 313 F. Supp. 2d at 232-35; *Rowe Ent., Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3-4 (S.D.N.Y. Sept. 15, 2003) (both excluding experts who relied on biased and unreliable data sets).

**Third**, while GBN itself was the wrong tool for the job, Juola did not even reliably use it when searching for phrases to see if they were "rare." Juola conceded that one of his phrases— "air as I try to"—actually ***does*** appear in GBN when properly searched, meaning it is not "rare" under Juola's definition. (Juola Dep. 197:23-198:5.) He conceded that a second phrase—"that million-dollar smile of his"—likely will not appear in GBN because it is six words long and GBN does not include n-grams longer than five words. (*Id.* 195:4-24.)[22] Two of Juola's four phrases can admittedly be "cross[ed] … off the list." (*Id.* 195:4-199:20, 211:6-14.)

Juola is then left with only "tree stump seats"/"tree-stump seats" and "small Stonehenge"/"Stonehenge lite" as potential "rare" phrases used in *BMR* and Crave (*Id.*) But those remaining phrases are not reliable evidence of copying because: (1) they are not actually identical

---

[22] "Million-dollar smile" does appear in GBN when properly searched. (Juola Dep. 196:9-197:11.)

(*id.* 210:19-22, 206:23-207:7, 209:21-210:22); (2) Freeman did not create them (*id.* 202:3-20, 208:7-209:20); and (3) "tree stump seats" and "small Stonehenge" have each been used by over 200 authors when one searches regular Google Books rather than GBN (*id.* 204:2-205:14).[23] Remarkably, according to Google Books, Wolff is the ***only*** author who has ever used the "exceptionally rare" phrase "Stonehenge lite," whereas ***Freeman*** used the much more common "small Stonehenge." (*Id.* 205:10-206:22.) Ultimately, there is "is simply too great an analytical gap" in deeming the non-identical "tree stump" and "Stonehenge" phrases evidence of copying. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

***Finally***, because GBN is unreliable and Juola did not use it correctly, his statistical calculations depending on that analysis (Juola Rep. ¶¶ 28-31, 43-48; Juola Dep. 229:13-230:6) are unreliable too. "'[A]n analysis is only as good as the data upon which it rests.'" *Rowe*, 2003 WL 22124991, at *4 (quoting *Fed. Reference Manual on Sci. Evid.*). As Juola agreed, "garbage in, garbage out." (Juola Dep. 267:6-22.)

       3.     <u>Dr. Juola's "Katm" and "Baseline" Analyses Are Irrelevant And Unreliable.</u>

Juola's milquetoast conclusion that there is an "unlikely-but-not-incredible" "21.3%" chance of Freeman and Wolff independently using "katm" (Juola Rep. ¶¶ 34-35) is irrelevant and unreliable. "Katm" does not appear in *BMR* at all, rather only in a document called "The World.doc," which Juola did not review and was not aware is a set of Freeman's informal notes. (Juola Dep. 247:7-21.) Freeman's notes inherently contain only undeveloped and unprotected ideas (i.e., to name a location "Katmai" after a real national park), making this irrelevant to

---

[23] The concept of a tree stump seat notably appears in Shel Silverstein's *The Giving Tree*, while the concept of a small Stonehenge was notably used in the movie *This Is Spinal Tap*. (Juola Dep. 202:3-20, 208:7-209:20.)

Plaintiff's copyright claims.[24] Juola's conclusion is also unreliable because he switched databases without explanation and searched for "katm" in the "Brown corpus" rather than GBN. (*See* Juola Rep. ¶¶ 34-35.) Had he checked GBN instead, he would have found that "katm" ***does*** appear in it. (Juola Dep. 250:16-252:5.) And had he checked the more comprehensive Google Books, he would have gotten 11,300 hits for "katm". (*Id.* 252:6-16.) Finally, the fact that "katm" and the phrases "tree stump seats," "Stonehenge lite," and "air as I try to" do not appear in the ten "baseline" novels selected by Plaintiff's counsel (Juola Rep. ¶¶ 36-37) is not reliable evidence of anything, for the same reasons that Chaski's use of the baselines novels is unreliable, explained below.

### D.   Dr. Chaski's Mosaic Plagiarism Analysis Is Irrelevant And Unreliably Based On Allegations In Plaintiff's Pleadings.

Chaski's "mosaic plagiarism" opinions should be excluded because (1) the fact that Crave's chapter titles contain allusions to popular phrases is irrelevant; and (2) the ten examples of supposed mosaic plagiarism Chaski identified were accepted wholesale from the FAC.

***First***, the fact that Wolff created funny chapter titles by alluding to common popular phrases like "sweet home Alabama," "the devil wears Prada," and "lions, tigers and bears oh my!" is obviously irrelevant to any issue the factfinder must decide in this case. The popular phrases in question were neither created by Freeman nor appropriated from *BMR* (there is no claim that they even appear in *BMR*). (*See* Chaski Dep. 91:7-17, 92:7-24.) The fact that Wolff is a skilled wordsmith is simply not evidence (let alone reliable evidence) that she plagiarized *BMR*.

***Second***, the mere ten examples of purported mosaic plagiarism identified in Chaski's report were taken directly from the FAC (Chaski Dep. 96:19-22) and are therefore inherently unreliable under well-established law. As one court explained, "any expert should be aware that a party and

---

[24] Juola was not aware that Wolff came up with "Katmere" as an homage to the Lion King and Harry Potter. (Wolff Decl. (ECF No. 302) ¶ 18(b); Juola Dep. 253:14-254:17.) Wolff's testimony on this issue is unrebutted.

counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply." *Rowe*, 2003 WL 22124991, at *3-4 (analysis "was further compromised by [expert's] reliance, not on his own independent study and analysis of the concert promotion industry, but on Plaintiffs' information"); *see also, e.g.*, *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424, 428-29 (S.D.N.Y. 2009) (collecting cases and explaining that "[a]n expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge").

Chaski testified that she would ordinarily detect mosaic plagiarism by using her software to create a "concordance" of the documents, but that she did not use that methodology here because she felt she could simply rely on the FAC. (Chaski Dep. 81:22-85:23.) She does not know who found the FAC examples she drew from, or what methodology was used to identify and catalog them (*id.* 102:13-103:16), and did not bother to check the FAC examples for context or accuracy (*id.* 108:9-18 ("I don't need the context to explain mosaic plagiarism."), 114:18-115:4 (didn't check "what the works really say"), 132:8-133:8 (similar)). Chaski's ten examples are also facially unreliable because they employ brackets and ellipses to obscure the novels' real text, and were even **further** altered by Chaski after taking them from the FAC. (*See* Chaski Dep. 101:24-102:12 (admitting further altering).) Regurgitating the FAC's similarity allegations easily fails *Daubert*.

## E.   Dr. Chaski's Conceptual Plagiarism Analysis Is Irrelevant, Does Not Fit The Facts, And Is Based On Unreliable Methods And Data.

### 1.   Dr. Chaski Seeks To Prove Theft Of Uncopyrightable Ideas.

Chaski's conceptual plagiarism analysis is irrelevant and unhelpful because it attempts to establish theft of Freeman's uncopyrightable ideas. (*See* Chaski Rep. ¶¶ 55, 99.) Indeed, theft of ideas, or "concepts," is what "conceptual" plagiarism means. Even if the factfinder accepts Chaski's conclusion that Wolff stole Freeman's ideas/concepts via conceptual plagiarism, that

would not impact liability for copyright infringement because ideas and concepts are not protected by copyright. *See, e.g.*, 17 U.S.C § 102 (copyright protection does not "extend to any idea" or "concept"); *Williams*, 84 F.3d at 587 ("It is 'a principle fundamental to copyright law' that 'a copyright does not protect an idea, but only the expression of an idea.'"). There is no good reason to expend judicial and factfinder resources adjudicating a highly technical methodology that attempts to establish theft of that which is not protected. Chaski's analysis should be excluded as unhelpful and irrelevant for this reason alone.

To the extent Chaski claims her methodology addresses similarity of ***expression*** (*see* Chaski Dep. 143:11-145:10), that is neither credible nor reliable. Chaski admits that similarity of expression can be assessed by "just read[ing] the books themselves and mak[ing] a judgment as the way a reader would." (*Id.* 145:11-146:4.) But Chaski did not read any of the works "the way you would read a novel"; instead, she "read them as data." (*Id.* 17:14-18:24, 147:4-23.) Chaski was not even familiar enough with her "baseline" novels to say whether any were set in Alaska. (*Id.* 50:15-52:6.) Chaski believes her purportedly "objective statistical and linguistic analysis" is superior because it avoids an ordinary reader's "subjective" impressions. (*Id.* 153:9-24). That is fatal because the ordinary reader test is necessarily subjective; indeed, courts take "special care to compare 'the contested [works'] total concept and overall feel … as ***instructed by our good eyes and common sense***.'" *Amanze*, 2019 WL 2866071, at *6. Chaski's approach of assessing similarity of expression with math would abrogate Second Circuit law requiring "a detailed examination of the works themselves" from the prospective of an ordinary reader. *See, e.g.*, *Williams*, 84 F.3d at 583.

2.    Dr. Chaski's Analysis Is Based On Inapposite Additional *BMR* Versions.

Chaski's conceptual plagiarism analysis is unreliable, overly prejudicial, and does not fit the facts because it is impossible to confine her analysis to the specific versions of *BMR* that are

relevant and at issue. *See, e.g.*, *Mowry*, 2005 WL 1793773, at *13 (excluding Chaski because her analysis depended on the particular screenplay versions she considered and the results "would have been different" with other versions); *Chalmers*, 2022 WL 4330119, at *9 (excluding expert whose analysis "includes extraneous and irrelevant data").[25]

Chaski states in her report that her conceptual plagiarism analysis considered six versions of *BMR*. (Chaski Rep. ¶ 42 & tbl. 1.) While it appears that *BMR 2011* and *2013* are among the six versions Chaski considered, her use of four additional versions without differentiation poisons her analysis because she cannot confine her results just to *BMR 2011* and *2013* versus the other four. This is especially problematic because at least one of the four additional versions (labeled "Masqued 2016") was written years after the Freeman-Kim relationship ended and could not possibly have been accessed by any Defendant.[26]

Unlike Reiss, who improperly relies on six *BMR* versions but at least occasionally cites them so that it is sometimes possible to ascertain which she is discussing, Chaski combines data from all six versions into a single "running text" of "content words" and "lexical clusters," without differentiation or citation. (*See* Chaski Rep. ¶ 103(h)-(j) & Annexes 2, 3 (Chaski's detailed findings without specifying *BMR* version); Halperin Ex. D (examples of lexical clusters with no differentiation as to which version they came from).) As a result, if Chaski's opinions were admitted, the case could be decided based on an analysis of at least one work that Wolff indisputably never had access to. Her opinions should therefore be excluded as both not fitting the facts of the case and as inherently prejudicial and inadmissible under FRE 403.

---

[25] Unlike Chaski, Juola considered only *BMR 2011* "to avoid oversampling nonindependent texts (different versions of the same work)," which helps "ensure that your data are not biased." (Juola Rep. ¶ 15; Juola Dep. 19:17-20:17.) Chaski never explains how it is possible to get sensible numbers from comparing four independent Crave books to six significantly overlapping versions of the same underlying work.

[26] It is possible that other versions Chaski considered were created after the Freeman-Kim relationship, but this cannot be readily verified because Chaski did not provide the Bates numbers for the *BMR* versions she analyzed.

3.  Dr. Chaski Unreliably Reduced The Parties' Novels To Misleading And Distorted "Keyword Clusters."

Chaski's methodology is unreliable because she transformed the novels Freeman and Wolff actually wrote into unrecognizable, misleading, and inapposite "keyword clusters" in which the vast majority of the novels' text was removed or altered. First, Dr. Chaski "scrubbed" and "lemmatized" the parties' novels—the latter changing the words the authors actually chose into ***different words***, i.e., their base "lemma" forms. (Chaski Rep. ¶ 103(a-b).) She then removed roughly 90% of the novels' text, reducing their collective 1.5 million actual words to a "running text" of 130,000 "content words." (*Id.* ¶ 103(d, h).) Chaski then further sliced and diced the parties' novels into "keyword clusters" consisting of 12 lemmatized content words on either side of a given keyword. (*Id.* ¶ 103(g).) She then "deduplicate[d]" words that appeared more than once in her keyword clusters—removing even more words the authors chose to use. (*Id.* ¶ 103(i).) This is an extreme departure from an "examination of the works themselves." *Williams*, 84 F.3d at 583.

Chaski's opinions have been excluded for this reason before. As in *Mowry*, "a major defect in Dr. Chaski's report is that her comparisons were not based on the [parties' works] themselves but on her charts, in which she summarized or paraphrased aspects of [the works]." 2005 WL 1793773, at *13. Here as well, the various "intermediate step[s]" Chaski took to reduce the parties' works to keyword clusters of lemmatized content words resulted in "distortions" that "seriously affect[ed] her later comparisons." *Id.* While Chaski claims to be applying a different methodology than in *Mowry*, her analysis is still based on her manipulation of the works into unrecognizable "data" rather than the "works themselves." This, too, requires exclusion.

4.  Dr. Chaski Utilized A Biased And Unreliable Data Set.

Chaski's conceptual plagiarism methodology is also unreliable because it is based on a miniscule and biased data sample that is nowhere near representative of the parties' works or the

YA paranormal romance genre. *See Amorgianos*, 303 F.3d at 266 (exclusion mandatory "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached"). Courts, including Your Honor, have explained that "the reliability of any analysis depends upon an unbiased selection of sample data." *E.g., Scott*, 315 F.R.D. at 51. Conclusions based on a data sample are only "justified when the sample is representative." *Fed. Reference Manual* § 211 (3d ed.), 2011 WL 7724256, at *4; *Rowe*, 2003 WL 22124991, at *1 ("[T]o be properly admitted into evidence, 'the sample must be adequate, the data gathering techniques reliable, and the conclusions drawn demonstrated to be statistically significant.'"). While the validity of an expert's data set may be an issue for cross-examination, courts exclude experts whose data are so obviously biased and flawed that it renders their entire methodology unreliable. *See, e.g.*, *id.* at *2 (excluding expert who "did not obtain his sample set in a manner that provided assurance that it was representative"); *U.S. Info. Sys.*, 313 F. Supp. 2d at 234, 239 (excluding expert who relied on a "skewed data sample" and whose data selection "process was systematically biased" to support his desired conclusion). Chaski's approach easily qualifies.

**First**, the 35 "keywords" Chaski selected are a miniscule and inherently biased sample that was not selected with any discernible methodology. Chaski selected her 35 keywords ***based solely on her review of the allegations in the FAC.*** (Chaski Rep. ¶ 103(e)-(f).) Although she could have used software to objectively scan the parties' works and identify commonly used words, she instead subjectively selected words that seemed "important" based on what she read in the FAC. (Chaski Dep. 156:10-25 ("I thought oh, okay, these are important").)[27] That is the antithesis of objective and reliable data sampling. *See, e.g.*, *Rowe*, 2003 WL 22124991, at *3 (excluding where

---

[27] Chaski claimed at her deposition to have run a post-hoc validation of her keywords in response to Coulthard's critiques, but that is inapposite because she did not disclose this in her report and did it only after subjectively selecting her keywords from the FAC.

expert selected sample data based on the Complaint which made "the 'sample' … neither random nor representative" and instead "biased or weighted towards" the expert's desired conclusion).

Chaski's 35 "keywords" are also an egregiously small sample size. *See, e.g.*, *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020) (excluding expert whose "methodology is made more unreliable by the small sample size used"). The 35 keywords amount to just ***0.002%*** of the roughly 1.5 million total words in the Freeman/Wolff works Chaski considered. (*See* Chaski Dep. 37:4-17.) And they are just ***0.027%*** of the works' 130,000 total "content words." (*Id.* 207:20-208:16.) Courts have held that even much larger samples were unreliably small. *See, e.g.*, *Rowe*, 2003 WL 22124991, at *2 (excluding expert who sampled 1,561 of "possibly over 100,000" contracts (approx. 1.5%) and did so in a biased way based on allegations in the Complaint). Finally, Chaski concedes that her 35 keywords are not even representative of the Crave books ***at all***—she attempted to select keywords that she thought were "important" just to *BMR*, again based on the FAC. (*See* Chaski Dep. 161:9-20.)

***Second***, the ten "baseline" novels Chaski used are also a miniscule and non-representative sample, again the opposite of objective systematic data sampling. Chaski does not know and did not attempt to find out how many total published novels there are in the YA paranormal romance genre. (*Id.* 206:22-207:3.) Without knowing the denominator, Chaski cannot begin to reliably show that her 10-novel "baseline" sample is sufficiently robust.  Making matters worse, the ten "baseline" novels were hand-selected by Plaintiff's counsel with no disclosed (or apparent) methodology. *See, e.g.*, *Rowe*, 2003 WL 22124991, at *2-3 (excluding where expert's data was provided by counsel, who "'didn't have any method of determining what contracts they were selecting'"). Chaski admits, as she must, that her results would be different if she used different "baseline" novels. (Chaski Dep. 197:9-13.) Her opinions are unreliable for this reason as well.

***Third***, Chaski's biased and unsystematic approach to selecting "keywords" and "baseline" novels left her woefully short of having a robust data set for comparison purposes. For example, Chaski's keywords "Alaska," "protector," and "waggle" were each used in only two of her ten baseline books. (Chaski Rep. Annex 3 at 3, 23, 32; *see also* Chaski Dep. 193:18-194:7 (confirming that blank entries in Annex 3 mean a word did not appear in the given novel).) The keywords "Diego," "herbal," and "Stonehenge" each appeared in only one of the baseline novels. (Chaski Rep. Annex 3 at 9, 16, 27.) And the keywords "aurora" and "mutation" were used in ***zero*** of the baseline novels. (*Id.* at 5, 21.) That is not a robust dataset, to say the least.[28]

To illustrate what Chaski really looked at, consider her keyword cluster data for the word "Diego"—the keyword with her purported highest "overlap rate" as to Wolff. (*See* Chaski Rep. p. 41 tbl. 5.) As just explained, only one of the ten baseline authors (Cassandra Clare) used the word Diego at all, and Clare and Freeman each used the word only once (Wolff used it 57 times according to Chaski). (Halperin Ex. D-3 at 1, 3, 11-13.) Below is the keyword cluster data Chaski actually examined for "Diego" as to Freeman, Clare, and Wolff:

| Freeman "Diego" cluster | shake head mom pick Alaska do family here live San talk extreme roll eye s know art think want hide accident | |
|---|---|---|
| Clare "Diego" cluster | six inch short be thin bone big dark eye honey color skin Rivera painting wear black slack open necked white shirt gold chain neck | |
| Wolff "Diego" cluster*<br><br>*Abridged (the cluster is several pages long) | look tiny really way small than just neighborhood San let alone whole city then again be pretty hard see anything here patch concrete sure pass airport Healy far cry s bustling terminal Philip overtake easily large suitcase dangle hand start tell dryly wonder too late reconsider foster care emancipation live situation get town consist one runway parking lot climb back plane demand fly Fairbanks home feeling bad Macy say do | |

---

[28] Chaski argued that the fact that *BMR* and Crave used "aurora" and "mutation" shows that they are "different from the baseline novels and similar to each other" and that Freeman "was obviously on the cutting edge of something new" in using these particular words. (Chaski Dep. 194:23-195:13, 205:13-21.) No sane person would agree with this.

Based on comparing the above alone, Chaski somehow concludes that Wolff's "overlap rate" with Freeman for "Diego" is a whopping "76.19." (*See* Chaski Rep. p. 41 tbl. 5; Halperin Ex. D-3 at 11.) That meaningless number does not reliably show plagiarism.

Chaski ultimately agreed that "you can't analyze the overlap of lexical clusters if the other works that you're comparing this to don't have the lexical cluster." (Chaski Dep. 195:21-25.) Yet she opines anyway that Wolff had the highest overlap rate with Freeman for "31 out of 35 keywords." (Chaski Rep. ¶ 123.) Chaski later admits that only 24 of her keywords appeared in at least half of her baseline novels. (*Id.* ¶ 127.) This leaves Chaski opining—to a purported reasonable degree of scientific certainty—that Wolff committed conceptual plagiarism based on how ***24 words*** (out of millions in the books) appeared in her transmuted and inherently biased lexical clusters. Here again, there is "simply too great an analytical gap" between the actual data and Chaski's conclusions. *See Joiner*, 522 U.S. at 146.[29]

***Finally***, Chaski's "binomial probability" and "vector measurement" statistical tests are unreliable because they are based on her unreliable underlying data. As with Juola's statistical analysis, garbage in, garbage out. *See, e.g.*, *Rowe*, 2003 WL 22124991, at *4.

## III.   WITTHOHN'S OPINIONS ARE IRRELEVANT AND UNRELIABLE.

Witthohn's opinions attempting to establish Wolff and Kim's motive to steal from Freeman are irrelevant to Plaintiff's claims for copyright infringement (a strict liability tort) and breach of contract/fiduciary duty (neither of which requires proof of mental state). Motive is also "outside of the bounds of expert testimony," for any claims. *Scott*, 315 F.R.D. at 45-46. And it is impossible

---

[29] These issues result in part from Chaski subjectively selecting keywords such as "Alaska," "aurora," and "northern" that are far more likely to appear in Alaska-based novels than other books, as well as words like "blood," "fang," "vampire," "witch," "wolf," and "werewolf," which are far more likely to appear in books that feature those specific paranormal creatures.

to square the notion that Wolff and Kim were motivated to steal from Freeman with Witthohn's admission that *BMR* wasn't saleable. (*See* Witthohn Dep. 71:3-6 (wouldn't have signed Freeman).)

Witthohn's opinions are also unreliable due to fatal problems with the book sales and publishing deal data she considered in concluding that Wolff and Kim had floundering careers before Crave. When Defendants asked Witthohn to disclose the specific data she reviewed (from the websites Publishers Marketplace ("PM") and NPD BookScan ("NBD")), she refused to provide the data, purportedly concerned that doing so would violate the websites' terms. (*Id.* 71:16-74:2.)[30] Witthohn's refusal to disclose her data violates Rule 26 and renders her opinions inadmissible *ipse dixit*. *See, e.g.*, *Kumho Tire*, 526 U.S. at 157.

In any event, Witthohn's data from PM and NPD are much too limited to give an accurate appraisal of Wolff and Kim's pre-Crave careers. Witthohn admits that these sites do not include the many sales and deals that were not voluntarily reported by booksellers or agents.[31] (Witthohn Dep. 75:20-77:2 (PM is "a voluntary site" that "[a]bsolutely" does not show all sales/deals); *id.* 77:3-78:24 (NPD "is a very small screenshot" that "does not" capture all sales).) NPD in fact does not include sales data from *Amazon*, the largest bookseller in the world. (*Id.* 78:19-24.) Witthohn claims she considered data from Amazon (*e.g.*, Witthohn Rep. ¶ 26), but this was "[p]rimarily just the reviews and the rating," not actual sales numbers (Witthohn Dep. 78:25-79:22). Her review of sales data was also imprecise and subjective, done "just to get an idea of the trajectory of" Wolff/Kim's careers. (*Id.* 80:10-21.) Her opinion that Wolff/Kim must have resorted to plagiarism

---

[30] Defendants reminded Witthohn of the Protective Order and promised to keep the data strictly confidential. (Witthohn Dep. 73:12-74:7.) Plaintiff informed Defendants after Witthohn's deposition that after further discussion with counsel, Witthohn still would not disclose her data. Even if one can visit the websites and conduct similar searches as Witthohn, it is not possible to verify her conclusions without seeing exactly what data she considered.

[31] In particular, Prospect did not routinely post all of its deals, including all of the deals it struck for books by Wolff. (Kim. Daubert Decl. ¶¶ 2-5.) Further, Prospect's deal data do not actually show a pre-*Crave* downward trend as Witthohn claims. (*See id.* ¶ 6; Witthohn Dep. 162:12-182:17 (unable to reconcile conclusions with actual data).)

is therefore a significant and unfounded logical leap. *See Joiner*, 522 U.S. 146 ("analytical gap"). In short, Witthohn's opinions would be unreliable even if they had been properly disclosed.

## IV.   RUBEN AND STRINGER USURP THE FACTFINDER AND OFFER IMPROPER LEGAL CONCLUSIONS, AND STRINGER'S OPINIONS ARE UNSUPPORTED.

This Court has stated that "[w]hile an expert 'may opine on an issue of fact within the jury's province,' an expert 'may not give testimony stating ultimate legal conclusions based on those facts.'" *Scott*, 315 F.R.D. at 48. On the face of their reports, Ruben and Stringer offer bald legal conclusions as to an alleged breach of fiduciary duty by Kim/Prospect. Indeed, Ruben's report is no more than a memorandum of law on fiduciary duty, replete with citations to case precedent, Restatements, and journals. (*See* Ruben Rep. ¶¶ 8-11, 13 (explaining law); *see also id.* ¶¶ 14-19 (applying law to assumed facts).)[32] Similarly, Stringer improperly opines that "the feeding of one client's story to another client," "if that is what happened," was a breach of Kim's "ongoing fiduciary duty." (Stringer Rep. ¶ 52; *see also id.* ¶ 51 (similar opinion regarding breach of agency agreement).) Such opinions usurp the Court by instructing about the law and usurp the factfinder by instructing on how the law ultimately applies to the facts.

Ruben identifies no facts suggesting an actual fiduciary relationship, let alone a breach of one. Beyond citing a boilerplate line in Prospect's agency agreement regarding negotiating in a client's "best interests" and the non-binding AALA Canon of Ethics, he identifies no discussions or understandings between the parties establishing a fiduciary relationship. Nor does he opine on any facts related to any supposed breach; his opinion begins and ends with his legal conclusion.

Stringer, for her part, just assumes Kim had a fiduciary duty, without supporting this assumption in any way. (*See* Stringer Rep. ¶ 52.) Further, the steps Stringer takes to reach her

---

[32] Notably, however, Ruben fails to cite recent case law in this Circuit holding that a literary agent is ***not*** a fiduciary. (*See* Prospect SJ Mot. (ECF No. 312) at 13-14.)

ultimate conclusion that Kim breached this duty are illogical and unmoored from fact. Stringer opines that Kim hired out Wolff through et al Creative on work-for-hire projects (*id.* ¶ 31),[33] that Crave was such a project but evolved into something more "collaborative" (*id.* ¶ 33), and that this collaboration was unusual because the agent and editor were overly involved in the writing process (*id.* ¶¶ 34-40). She then opines that because Reiss identified purported similarities between the works (*id.* ¶¶ 40-42), there had to have been a breach of duty (*id.* ¶ 45 ("it seems impossible to me that this is simply a case of publishing synchronicity")).

There is no expert methodology at work here, merely speculation. First, Stringer's "experience" is limited to her own idiosyncratic practices; she does not purport to have knowledge of how other agents work and thus has no basis for opining that the Crave writing process was unusual. Even if she did, she provides no support for her conclusion that because the writing process was unusual, this somehow demonstrated a breach by Kim of a duty to an author she represented years earlier. Ultimately, Stringer does nothing more than opine that if Plaintiff prevails on her copyright claim (which she cannot), this must mean there was a breach of duty by Kim—an opinion that is neither reliable nor helpful to the Court or factfinder.

Stringer's opinion that Kim breached the agency agreement by failing to submit Freeman's manuscript "promptly" (*id.* ¶¶ 15-27) is likewise unreliable. First, she identifies no evidence of any written understanding between the parties on point. Second, while any oral agreement would have contravened the integration clause in the agency agreement, in any event Stringer identifies

---

[33] et al Creative helps match writers with work-for-hire projects, which Stringer admits "is a totally legitimate form of publishing." (Stringer Rep. ¶¶ 28, 35.) But Stringer's claim that Kim matched Wolff with projects through et al Creative is not true. The document Stringer cites (KIM00016603, Halperin Ex. I) is a draft email to editors that does not mention any authors by name, much less Wolff. Kim herself has stated that Wolff was never hired out through et al Creative, and Stringer fails to cite anything in the supposed "public record" supporting this point.

no such oral agreement either.[34] Third, Stringer fails to define her own term "promptly," thus providing no standard against which evidence—if any existed—could be judged.[35] Even if Stringer's anecdotal points that a UK editor purportedly had shown interest (*id.* ¶ 16) and that the market for books in Plaintiff's genre was "hot" (*id.* ¶¶ 15, 19)[36] were true, neither demonstrates any contractual agreement to submit Freeman's work "promptly," much less that it was breached.

## V.    PLAINTIFF'S MERITLESS *DAUBERT* MOTION SHOULD BE DENIED.

*Hilliard.* Plaintiff argues that Hilliard (1) is not qualified to rebut Stringer or Witthohn (Pl.'s Mot. at 7-9); (2) lacks a reliable basis to address similarities in *BMR* and Crave (*id.* at 9-11); and (3) is biased (*id.* at 11-12). All of these points are meritless.

First, Plaintiff's critique of Hilliard's qualifications are baseless and hypocritical. Hilliard is a book and audiobook editor with over 20 years' experience in the publishing industry, who states that she has worked on approximately 270 titles and worked closely with a range of literary agents. (Hilliard Rep. § I ¶ 2.) She is easily qualified to rebut Stringer and Witthohn—who have mostly only worked for themselves—regarding the practices of literary agents. Hilliard's rebuttal is directed *precisely* at Stringer's attempts to extrapolate, with no support whatsoever, from her own idiosyncratic practices as an agent to claim that all literary agents act the same way.

---

[34] Stringer ignores both Freeman's deposition testimony declining to identify any such oral agreements between herself and Prospect/Kim (Freeman Dep. (ECF No. 304) 242:5-9) as well as Freeman's summary judgment declaration, which does not identify any actual agreement to submit the manuscript promptly (Freeman Decl. (ECF No. 276) ¶ 3).

[35] The evidence shows that Kim first provided comments on the manuscript in January 2011; that Freeman then made three significant rounds of edits; and that Kim submitted the manuscript to four major publishers in October 2011. (Kim SJ Decl. (ECF No. 307) ¶¶ 18-26.) Stringer does not opine that this was an unusual timeframe for submissions.

[36] Stringer also argues it was a contractual breach not to tell Freeman she had "missed the market" and to stop working on *BMR*. (Stringer Rep. ¶ 51.) But her only support is an opinion that the YA paranormal romance market was "hot" and "crowded" in 2011, and that "the clock was ticking" (*id.* ¶ 19)—not that the market vanished or that no novel could ever be published in this genre again. The fact that *Stringer* apparently would have told Freeman to abandon *BMR* is not a basis to conclude that Kim breached the agreement by continuing to try to help get *BMR* published.

In any event, Rule 702 does not mandate that an expert be employed in the precise role about which she opines, so long as her experience provides a reliable basis for her opinion. *See, e.g.*, *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *5 (S.D.N.Y. Oct. 13, 2021) (collecting cases and explaining that an expert does not need "experience tailored to the precise product or process" at issue). Hilliard's rebuttal opinions are based on "working closely with numerous literary agents for over two decades" and "witness[ing] the working styles of various literary agents and develop[ing] an understanding of standard agency practices," plus "experience [with] the inner workings of the publishing industry, the editor-agent relationship, [and] the submission process." (Hilliard Rep. § I ¶ 2, § 2 ¶ 4.) This is ample experience for rebutting Stringer and Witthohn's claims regarding what is typical of literary agents. (*See id.* § III.) Hilliard in fact has ***more*** relevant experience than Stringer, who identifies no experience with agents besides herself and one mentor. (*See* Stringer Rep. ¶¶ 1-5 & Ex. 1.)[37]

Plaintiff later seeks to exclude Hilliard's brief discussion of the parties' works (Hilliard Rep. § V) as purportedly unsupported and cumulative (Pl.'s Mot. at 9-11)—which is ironic considering that Plaintiff offers hundreds of pages of Freeman's own opinion testimony about the parties' works, plus 250 collective pages of analysis by Reiss, Juola and Chaski. In any event, Hilliard's opinions are not cumulative because they are offered to rebut Stringer's baseless assertion (based on Reiss's analysis, not her own) that the parties' works contain "many idiosyncratic similarities - of phrase, of description, of setting, of character, of pop culture, that are so close to being exact it feels as if these are variations of the same work." (Stringer Rep. ¶¶ 42-

---

[37] Plaintiff's specific criticism is of Hilliard's statements that "[m]any agents…will offer intensive editorial shaping before submitting the work" and that "it is extremely common for editorial discussions to happen by phone." (Pl.'s Mot. at 8; Hilliard Rep. § III ¶ 7.) Yet Hilliard provides the industry practices supporting her opinion right in the paragraph at issue, explaining that it is "extremely common for editorial discussions to happen by phone"; she and colleagues "regularly" do so; such calls "allow the editor or agent to discuss the issues in depth and brainstorm possible solutions together"; and that such calls are more "collaborative" and "efficient than typing out written notes." (*Id.*)

45.) Hilliard does not directly compare the parties' works as Plaintiff argues, and instead merely explains from her own deep industry experience why the *alleged* similarities identified by Reiss and relied on by Stringer are in fact no more than tropes common to the genre. (Hilliard Rep. § V.) Plaintiff's experts are the only ones who offer direct comparisons of the parties' work that are forbidden in the Second Circuit and usurp the role of the factfinder.[38]

Finally, Plaintiff's argument that Hilliard's opinions are inadmissible due to purported bias (Pl.'s Mot. at 11-12) is exceedingly weak. Hilliard is a long-time publishing professional who has worked with many agents, including both Kim and Stringer. That Hilliard years ago worked for a subsidiary of defendant Macmillan does not make her "partisan" (*id.* at 11) and falls far short of establishing any current bias.  In any event, it is well-established that "experts' potential bias goes to [] weight, not admissibility." *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2020 WL 2280144, *2 n.2 (E.D.N.Y. May 5, 2020); *Kemp v. CSX Transp., Inc.*, 993 F.Supp.2d 197, 218 (N.D.N.Y. 2014); *see also Saavedra v. Montoya*, 2022 WL 2065031, *2 (E.D.N.Y. June 8, 2022) (because alleged bias only goes to weight, courts "routinely" allow even *current* employees of a company to give expert testimony). Finally, Plaintiff had a chance to depose Hilliard to explore whether her supposed bias impacted her analysis, but chose not to.

*Coulthard*. Plaintiff challenges a small portion of Coulthard's opinions (which Defendants do not rely on here or at summary judgment) because he is purportedly not qualified to critique certain highly technical elements of Chaski's methodology. (Pl.'s Mot. at 12-14, 16-19.) This is ironic given that Chaski and Juola repeatedly rely on Coulthard's work—collectively citing him thirteen times and more than any other source or scholar. (*See* Juola & Chaski Reps.; *accord, e.g.*, Juola Dep. 120:12-15 (Coulthard is "one of the most important scholars in forensic linguistics").)

---

[38] Defendants do not rely on Hilliard's discussion of the works here or otherwise at summary judgment.

In any event, Coulthard is fully qualified to levy his specific, non-technical criticisms of Chaski. (*See* Coulthard Rep. ¶¶ 60-75.) For example, he explains that Chaski's "keyword" selection was unreliable because she subjectively selected her keywords from the FAC, leaving her with certain keywords that were scarcely used in *BMR* or Crave. (*Id.* ¶¶ 62-72 (showing, e.g., that "Diego" appeared once in *BMR 2011* and zero times in *BMR 2013*).) Coulthard shows this based on Chaski's admissions, rudimentary math, and the works themselves, not anything technical. (*See id.*) He then explains that Chaski unreliably compared *BMR* and Crave to comparator novels selected subjectively by Plaintiff's counsel (*id.* ¶¶73-74), another non-technical observation freely admitted by Chaski. Rather than addressing the more technical elements of Chaski's method, Coulthard states: "I will not discuss the apparently sophisticated statistical tests that Dr. Chaski applied to her results … because the input data were flawed and consequently the results are worthless." (*Id.* ¶ 75.) None of this exceeds Coulthard's substantial qualifications.[39]

## CONCLUSION

In a copyright infringement case involving easy understandable YA books that are nothing alike, Plaintiff tendered six liability experts whose opinions are so facially irrelevant and unreliable that one wonders whether Plaintiff's true intention was to muddy the waters and introduce confusion in hopes of reaching trial, rather than legitimately try to prove her claims. While these opinions are easily inadmissible for the many reasons shown above, it has unfairly caused months of delay and cost Defendants hundreds of thousands of dollars to vet and rebut them. Plaintiff's experts' opinions should be excluded and Plaintiff's *Daubert* motion should be denied.

---

[39] Plaintiff briefly argues that Coulthard's rebuttal of Chaski's mosaic plagiarism methodology is "irrelevant" because "whether [a phrase] is 'rare or unique'" does not matter as to copyright infringement. (Pl.'s Mot. at 18.) This misunderstands Coulthard's opinion, which is that two authors' use of a non-unique phrase is not evidence of copying in the first instance. (*E.g.*, Coulthard Rep. ¶ 57.) That point is not only relevant but essential (*see* Manuscripts Affirmance at 2), and both Chaski and Juola agree with it (*e.g.*, Chaski Dep. 211:21-212:19; Juola Rep. ¶ 18).

Dated: New York, New York
      February 7, 2024

Respectfully submitted,

**COWAN DEBAETS ABRAHAMS
& SHEPPARD, LLP**

By: /s/ Nancy E. Wolff
Nancy E. Wolff
Benjamin S. Halperin
CeCe M. Cole
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
bhalperin@cdas.com
ccole@cdas.com
*Attorneys for Defendants Tracy Deebs-
Elkenaney p/k/a Tracy Wolff, Entangled
Publishing, LLC, Holtzbrinck Publishers,
LLC d/b/a Macmillan, and Universal City
Studios LLC*

Lacy H. Koonce, III
KLARIS LAW PLLC
430 West 14th Street
New York, NY 10014
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Emily Sylvan Kim
and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
KOWERT, HOOD, MUNYON, RANKIN &
GOETZEL, P.C.
1120 S. Capital of Texas Hwy.
Building 2, Suite 300
Austin, Texas 78746
Telephone: (512) 853-8800
Facsimile: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendant Tracy Deebs-
Elkenaney p/k/a Tracy Wolff*

**<u>CERTIFICATE OF SERVICE</u>**

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of Defendants'

*Daubert* Motion to Exclude Plaintiff's Liability Experts and Opposition to Plaintiff's *Daubert*

Motion has been served on all counsel of record via the Court's CM/ECF service.

/s/ Nancy E. Wolff
Nancy E. Wolff