# EXHIBIT B

**In the Matter Of:**

*FREEMAN v*

*DEEBS-ELKENANEY*

---

*CAROLE CHASKI, PH.D.*

*September 28, 2023*

---

LEXITAS™

1

2              UNITED DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    --------------------------------X
     LYNNE FREEMAN, an individual,
5
                         Plaintiff,
6                                        Civil Action No.
                    VS.                  1:22-cv-02435-LLS-SN
7
     TRACY DEEBS-ELKENANEY P/K/A
8    TRACY WOLFF, an individual,
     EMILY SYLVAN KIM, an individual,
9    PROSPECT AGENCY, LLC, a New
     Jersey Limited Liability Company,
10   ENTANGLED PUBLISHING, LLC, a
     Delaware Limited Liability
11   Company, HOLTZBRINCK PUBLISHERS,
     LLC D/B/A MACMILLAN, a New York
12   Limited Liability Company, and
     UNIVERSAL STUDIOS, LLC, a
13   Delaware Limited Liability Company,

14                       Defendants.
     --------------------------------X
15

16

17

18        REMOTE VIDEOTAPED DEPOSITION

19                    OF

20        CAROLE E. CHASKI, Ph.D.

21      Thursday, September 28, 2023

22

23

24              Reported by:
        AYLETTE GONZALEZ, RPR, CLR, CCR
25            JOB NO. 2023-911535

2

1

2                    DATE:  September 28, 2023

3                    TIME:  12:00 p.m.

4

5

6          Remote videotaped deposition of

7    CAROLE E. CHASKI, Ph.D., pursuant to

8    NOTICE, before AYLETTE GONZALEZ, a

9    Registered Professional Reporter, Certified

10   LiveNote Reporter, Certified Court Reporter

11   and Notary Public of the States of New

12   York, New Jersey, Pennsylvania, Delaware

13   and Texas.

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2        R E M O T E   A P P E A R A N C E S:

3

4   DONIGER / BURROUGHS  LAW FIRM

5   Counsel for Plaintiff

6   LYNNE FREEMAN

7            603 Rose Avenue

8            Venice, California  90291

9   BY:      STEPHEN M. DONIGER, ESQ.

10  EMAIL:    stephen@donigerlawfirm.com

11

12

13  COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP

14  Counsel for Defendants

15  TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF,

16  ENTANGLED PUBLISHING, LLC, HOLTZBRINCK

17  PUBLISHERS, LLC d/b/a MACMILLAN and

18  UNIVERSAL CITY STUDIOS LLC

19            41 Madison Avenue

20            New York, New York  10010

21  BY:      BENJAMIN HALPERIN, ESQ.

22  EMAIL:    bhalperin@cdas.com

23

24

25

4

1

2      R E M O T E   A P P E A R A N C E S:

3

4   ALSO PRESENT:

5            JACOB FIGUEROA, Videographer

6            TRENT BAER

7            EMILY KIM

8            MARK PASSIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:22-cv-02435-LLS-SN  Document 322-3  Filed 02/07/24  Page 7 of 88
FREEMAN v                                      Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                September 28, 2023

                                                                  17

```
 1              DR. CHASKI (9/28/2023)

 2    Freeman wrote?

 3         A.    No, I do not.

 4         Q.    If I told you it was more than

 5    50 versions, would you have any reason to

 6    dispute that?

 7         A.    I wouldn't.  I wouldn't know

 8    anything about that.

 9         Q.    You just said, I believe, that

10    you considered six different versions of

11    BMR for your opinions in this case,

12    correct?

13         A.    Yes.

14         Q.    How many of those six versions

15    did you read cover to cover, the way you

16    would read a novel for pleasure?

17         A.    I didn't read any of them cover

18    to cover, because I ran them through text

19    analysis programs instead.

20         Q.    Which specific books from Tracy

21    Wolff's Crave series are at issue in this

22    case?

23         A.    To the best of my recollection,

24    without looking at my report, Crave, Crush,

25    Covet and Court.
```

18

```
1              DR. CHASKI (9/28/2023)

2        Q.    Great job, you nailed it.

3              Did you read any of those four

4    books cover to cover the way you would read

5    a novel?

6        A.    No.  Could I say that as I was

7    preparing the documents for textual

8    analysis, I did read them, but I didn't

9    read them as I would read a novel cover to

10   cover.  I read them for stray punctuation

11   that would get in the way of textual

12   processing, icons at the header,

13   subchapters, that kind of thing.

14       Q.    Thank you for clarifying.

15             So to be clear, as to both

16   Lynne -- the various versions of Lynne

17   Freeman's manuscripts, BMR and four Crave

18   books at issue, you scanned them for things

19   like punctuation and graphics, but you did

20   not sit down and read them every word of

21   them cover to cover the way you would read

22   a novel, correct?

23       A.    That's right.  I read them as

24   data.

25       Q.    I just need to ask you a couple
```

```
1              DR. CHASKI (9/28/2023)

2    the works were created independently; do

3    you understand that?

4         A.   Yes.

5         Q.   And my understanding is that is

6    an issue that you are offering an opinion

7    on, probative similarities?

8         A.   Yes.

9         Q.   As I just defined it?

10        A.   Yes.  I am offering statistical

11   expectation with regard to similarities.

12        Q.   There's a separate concept in

13   copyright law called "substantial

14   similarity"; are you familiar with that?

15        A.   No.

16        Q.   One definition of substantial

17   similarity is that it addresses whether an

18   average observer would find that the

19   allegedly infringing work is substantially

20   similar to the plaintiff's work; does that

21   make sense?

22        A.   Yes.

23        Q.   My question is, is substantial

24   similarity an issue that you are offering

25   an opinion on?
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 10 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

21

1          DR. CHASKI (9/28/2023)

2               MR. DONIGER:  I'm going to

3          object as calling for speculation,

4          lacking foundation, potentially

5          calling for the mental impressions

6          and opinions of counsel.  As I noted

7          yesterday, her testimony is what it

8          is.  The facts that she found are

9          what they are, how we use those and

10         what we argue out of them is

11         attorney, you know, mental

12         impressions and opinions.

13              If the witness knows how her

14         testimony will be used based on

15         conversations with counsel about

16         their mental impressions and

17         opinions, I'm going to instruct her

18         not to answer.  If she has some other

19         basis to answer, she can go ahead.

20         A.   I don't think my report

21    addresses substantial similarity in terms

22    of the -- of -- as I understand it now,

23    Mr. Halperin, in terms of estimating how an

24    average reader would read these books.

25         Q.   Do you consider yourself to be

```
 1              DR. CHASKI (9/28/2023)

 2         A.    No, I didn't count pages.  I

 3    counted words.

 4         Q.    So how many words collectively

 5    are the Crave books?

 6         A.    About eight -- I have here 800

 7    on my Table 15 -- excuse me, Table 1 on 15,

 8    884,140 words.

 9         Q.    Approximately 884,000?

10         A.    Right.

11         Q.    And collectively, how many

12    words in the six BMR versions that you

13    looked at?

14         A.    Approximately, 671,000.

15         Q.    Okay.  You're better at math

16    than me, can you do the total?

17         A.    About 1.5 million.

18         Q.    Okay.  Also in the Table 1 on

19    page 16, it has a section called Baseline,

20    and there are ten novels listed there,

21    correct?

22         A.    Yes.

23         Q.    And those ten novels were

24    written by authors other than Tracy Wolff

25    or Lynne Freeman, correct?
```

```
 1              DR. CHASKI (9/28/2023)

 2    those ten novels as your comparator novels?

 3         A.    Yes.

 4         Q.    I might also use the term

 5    baseline novel, but sometimes in my head, I

 6    think comparator, sometimes I think

 7    baseline, so can we agree that either of

 8    those terms is okay to cover them today?

 9         A.    Certainly.

10         Q.    Thank you.

11              Did you select the ten

12    comparator novels yourself?

13         A.    No.

14         Q.    Were they provided by

15    Mr. Doniger?

16         A.    Yes.

17         Q.    Do you believe that the ten

18    comparator novels constitute a

19    representative sample of the YA paranormal

20    romance genre?

21         A.    Yes.  We discussed the novels

22    and to the best of my recollection, they

23    were first of all published.  Secondly,

24    they were well recognized.  Several of them

25    won awards.  Some of them were bestsellers.
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 13 of 88
FREEMAN v                                                  Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                            September 28, 2023

40

1        DR. CHASKI (9/28/2023)

2            Several of them have been, you

3    know, held up as good examples of this

4    genre or forerunners in the genre.  And so

5    I do think they are a good representative,

6    plus they constitute a little over a

7    million words, so they are a good quantity.

8            A second issue that I discussed

9    with Mr. Doniger is the fact that I wanted

10   at least ten examples in a baseline set.

11   And I do that because statistically, I know

12   that we need to have at least that many

13   examples of something for something

14   eventually to become statistically

15   significant if it is statistically

16   significant.

17       Q.   Would it be okay if we just

18   went off the record for a second?  The

19   reason for this is I forgot to log into the

20   realtime, which lets me see your realtime

21   answers before the deposition and I just

22   need to do that really quick.

23           MR. HALPERIN:  Steve, any

24       objection just to going off the

25       record for like a minute so I can do

```
 1              DR. CHASKI (9/28/2023)

 2      that?

 3              MR. DONIGER:  That's fine.

 4              MR. HALPERIN:  Thanks.

 5              THE VIDEOGRAPHER:  The time is

 6      12:43 p.m.  We're going off the

 7      record.

 8              (Whereupon, at this time, a

 9      short break was taken.)

10              THE VIDEOGRAPHER:  The time is

11      12:44 p.m.  We're back on the record.

12  BY MR. HALPERIN:

13      Q.   Do you know what specific

14  methodology Mr. Doniger used to select the

15  ten comparator novels that he provided to

16  you?

17      A.   No.  I know that they met the

18  criteria that I wanted:  quantity, quality

19  and total amount of words.

20      Q.   So is it correct that you

21  provided Mr. Doniger with criteria that you

22  wanted in a set of comparator novels and

23  those criteria were quantity, quality and

24  total amount of words?

25      A.   Yes, I might not have said it
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 15 of 88
FREEMAN v                                              Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                        September 28, 2023

46

```
 1              DR. CHASKI (9/28/2023)

 2    of the six versions of BMR and all of the

 3    four books of Crave?

 4         A.    As well as the ten novels, the

 5    ten baseline novels, yes.

 6         Q.    Is quality of a novel something

 7    that can be objectively measured?

 8         A.    Probably.  I've never

 9    operationalized the definition of it.  I've

10    relied more on external criteria like, you

11    know, recognition in the community, how

12    well did something sell, did it win any

13    awards, that kind of thing.

14         Q.    Do you know whether Mr. Doniger

15    did a systematic analysis of all books in

16    the YA paranormal romance genre to

17    objectively determine that the ten baseline

18    novels he gave you are the most

19    representative?

20         A.    Am I to answer that?

21         Q.    Yeah, it was a question.

22              MR. DONIGER:  Do you know?

23         A.    I don't know.  I know that the

24    final result met the criteria that I would

25    need for a fair and objective analysis.
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 16 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

47

```
 1              DR. CHASKI (9/28/2023)

 2         Q.   If someone else were to attempt

 3   to choose the ten books from the YA

 4   paranormal romance genre that they thought

 5   were the most representative of that genre,

 6   do you think they would necessarily choose

 7   the same ten that Mr. Doniger provided to

 8   you?

 9              MR. DONIGER:  Objection.  Calls

10       for speculation.  Lacks foundation.

11       Incomplete hypothetical.

12         Q.   You can answer.

13         A.   I don't know, but I do know

14   that if anyone suggested any other novels

15   to me, I could apply my method and still --

16   and use -- and use other novels as

17   comparator novels, I'm not against that.

18         Q.   But these are the only ten you

19   used, correct?

20         A.   Yes.

21         Q.   You did not do any tests on any

22   other comparator novels besides the ten

23   that are listed in Table 1 of your report?

24         A.   No.  No.

25         Q.   How many total books are there
```

48

```
 1              DR. CHASKI (9/28/2023)

 2   in the YA paranormal romance genre, to your

 3   knowledge?

 4         A.   I don't know.

 5              MR. DONIGER:  Objection.  Calls

 6         for speculation.  Lacks foundation.

 7         A.   I don't know because I'm not a

 8   bookseller.

 9         Q.   I'm sorry to go back to this.

10   I just want to understand, because I

11   thought you first said that you didn't read

12   any of the works, including these ten

13   comparator novels, the way you would read a

14   book cover to cover for enjoyment, but then

15   you said you did intensely look at every

16   single word in the books as part of your

17   methodology to assess the data; is that

18   correct?

19         A.   Yes.  I earlier said I read

20   them as data.

21         Q.   Right.

22         A.   And there is -- I have a degree

23   in reading, in psychology of reading, so

24   maybe I'm very sensitive to what you're

25   asking me about, you know, the different
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 18 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                               September 28, 2023

50

```
 1              DR. CHASKI (9/28/2023)

 2   to get a feel for the plot or the story

 3   line or the characters or events that

 4   happened in the books?

 5        A.    That's incidental, but of

 6   course, it happens while you're reading

 7   something as data.  You do pick up on some

 8   of the plots and characters and twist of

 9   the plots and that sort of thing.

10              I have to tell you it's been so

11   long since that I've looked at these that I

12   couldn't tell you, well, exactly what

13   happens in The Vampire Academy, I couldn't

14   tell you that right now.

15        Q.    Fair to say you couldn't go

16   through the ten comparator novels and give

17   me a summary of the plot for each of them?

18        A.    No, not at this time.

19        Q.    Could you tell me how many of

20   the comparator novels are set in Alaska?

21        A.    I can look at my report and it

22   will tell you how many times the word

23   "Alaska" appears in these novels, the whole

24   entire set.

25        Q.    Where -- where is that in your
```

51

```
 1              DR. CHASKI (9/28/2023)

 2  report?

 3         A.    Let me look at my hardcopy.

 4  It's easier for me to find it.  On page 40

 5  of my report is a list of the keywords that

 6  I used.  Alaska is the second one and that

 7  table summarizes a lot of the annex, which

 8  in your downloaded version starts on

 9  page 83, and page 84 shows the word

10  "Alaska" and the average rate at which all

11  the authors used this term, who used it

12  more, who used it less is in the background

13  material for this and this shows that the

14  target author Lynne Freeman used 389 terms

15  clustering with the keyword Alaska.  Tracy

16  Wolff had 184 terms clustering with the

17  word "Alaska" and the -- Tracy Wolff's

18  companion terms or words that clustered

19  with Alaska had an overlap rate of 47.3

20  with Lynne Freeman's.  So that means that

21  47 percent of Freeman's terms around the

22  keyword Alaska were also in Tracy Wolff's

23  words around the keyword Alaska.

24             You asked me what novels are

25  set in Alaska.  I know that Lynne Freeman's
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 20 of 88
FREEMAN v                                          Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                    September 28, 2023

                                                              52

```
 1              DR. CHASKI (9/28/2023)

 2   are and at this time, I can't remember how

 3   much of the Crave series was actually set

 4   in Alaska.  I'm sorry.  I don't read these

 5   as literary and I don't remember them as

 6   literary documents.

 7         Q.    So you just pointed out the

 8   table on page 41 of your report and a page

 9   on the annex, which is PDF page 85 of your

10   report.  And I'm sorry, but I'm not seeing

11   where either of those says how many times

12   the word "Alaska" appeared in any of the

13   comparator novels?

14         A.    Yes, I think that was what I

15   sent to Professor Coulthard.  I think that

16   list is in all the materials that I sent to

17   Professor Coulthard.

18         Q.    Sitting here today, do you know

19   how many of the comparator novels mention

20   the word "Alaska"?

21         A.    May I look it up?  I know I can

22   find it.

23         Q.    Sure.

24         A.    Okay.

25         Q.    Let me just stop.  If this is
```

74

```
 1            DR. CHASKI (9/28/2023)

 2       short break was taken.)

 3            THE VIDEOGRAPHER:  The time is

 4       1:42 p.m.  We are back on the record.

 5  BY MR. HALPERIN:

 6       Q.   Welcome back, Dr. Chaski.  Just

 7  a quick housekeeping item I forgot to ask

 8  about before, could you please tell me how

 9  many total hours you spent preparing for

10  today's deposition?

11       A.   Oh, I would say about 15.

12       Q.   Where we left off, I had asked

13  you to look at paragraph 61 of your report,

14  correct?

15       A.   Yes.

16       Q.   All right.  And that paragraph

17  reads, "A preliminary study of

18  6-words-in-a-row segments in the TW and LF

19  documents shows a large number of matches.

20  I reviewed 700 matches that do not occur in

21  the ten baseline documents."  Was that

22  correct?

23       A.   Yes.

24       Q.   Now, I understand from

25  conversations with Mr. Doniger that you
```

75

```
1              DR. CHASKI (9/28/2023)

2    have now withdrawn your analysis of those

3    700 examples, correct?

4              MR. DONIGER:  We're not --

5         we're not going to be offering that

6         at trial.

7              MR. HALPERIN:  In trial also

8         means summary judgment, correct?

9              MR. DONIGER:  We're not going

10        to be offering that part of her

11        analysis as evidence in support of

12        our claims.

13             MR. HALPERIN:  Okay.  Thank you

14        for that.

15        Q.   So I don't think we need to

16   talk too much about this then.  But I just

17   wanted to confirm, you did not find those

18   700 examples yourself, right?

19        A.   I reviewed a study that was

20   done by somebody else and then I ran my

21   own, and as I mentioned in the report, I

22   didn't finish my analysis of my own, but I

23   trust that the original report I read, I

24   know the software that was used is good

25   software.  I could tell by the results that
```

76

```
 1              DR. CHASKI (9/28/2023)

 2    it was a scrub, no-punctuation version,

 3    that's a good thing to do, so I think it's

 4    trustworthy.

 5         Q.    Do you know who ran it?

 6         A.    No.  Could have been Mr. Baer.

 7    It could have been somebody else.

 8         Q.    You just don't know either way?

 9         A.    I'm not sure, but I know that

10    the -- Mr. Doniger and I discussed AntConc

11    and I know that AntConc is good software.

12         Q.    Can you just spell AntConc,

13    please.

14         A.    A-N-T-C-O-N-C.

15         Q.    So whoever did this used

16    software AntConc, but you don't know who it

17    was who did it?

18         A.    No, I'm assuming, I think it

19    was Mr. Baer, Mr. Baer, but I didn't see

20    him do it.

21         Q.    Can we spell Baer please for

22    the record.

23         A.    B-A-E-R, I believe.

24         Q.    And who is Mr. Baer?

25         A.    I think he's been introduced
```

```
 1              DR. CHASKI (9/28/2023)

 2    could go to paragraph 81 of your report.

 3         A.    Okay.  Okay.

 4         Q.    So in paragraph 81, you

 5    identified a phrase -- two phrases from

 6    2011 BMR and one from Tracy Wolff's Crave

 7    book.  In the first one is the example from

 8    BMR and that reads, "I wanted the ground to

 9    just open up and swallow me," correct?

10         A.    Yes.

11         Q.    So that is not the same as "the

12    ground to open up and swallow me," because

13    it also includes the word "just," correct?

14         A.    Yes.

15         Q.    So it would be wrong to say

16    based on what you write in paragraph 81,

17    that both works contain the phrase, the

18    exact phrase, "the ground to open up and

19    swallow me," correct?

20         A.    Right.  I would see

21    paragraph 81 as an example of mosaic

22    plagiarism, and I'm assuming Dr. Juola saw

23    it as an example of words in a row

24    copy-paste plagiarism.

25         Q.    Sitting here today, are you
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 25 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

80

1           DR. CHASKI (9/28/2023)

2    aware of any evidence showing that Tracy

3    Wolff copied a ten-word sequence from BMR?

4        A.    Not in my -- I don't believe I

5    have that in my report.

6        Q.    Sitting here today, are you

7    aware of any evidence that Tracy Wolff

8    copied a single nine-word sequence from

9    BMR?

10       A.    I don't know because my focus

11   was not on words in a row.

12       Q.    Sitting here today, are you

13   aware of any evidence that Tracy Wolff

14   copied a single eight-word sequence from

15   BMR?

16       A.    Well, my examples are all about

17   mosaic plagiarism so we're not going to

18   find that in my report.

19       Q.    And you're not aware of any

20   other examples?

21       A.    I wasn't looking for them.

22       Q.    Have you seen any evidence that

23   Tracy Wolff copied a whole paragraph from

24   BMR in writing the Crave books?

25       A.    No, I wasn't looking for that

81

1            DR. CHASKI (9/28/2023)

2    either.

3         Q.    Have you seen any evidence that

4    Tracy Wolff also copied a single complete

5    sentence from BMR?

6         A.    Word-for-word, you mean

7    copy-paste?

8         Q.    Yes.

9         A.    No.

10        Q.    So one thing you did focus on

11   was mosaic plagiarism, correct?

12        A.    Yes.

13        Q.    What's mosaic plagiarism?

14        A.    Mosaic plagiarism is where the

15   source document is paraphrased using the

16   standard syntactic techniques,

17   substitution, insertion, deletion,

18   permutation, so that the source material is

19   transformed into mostly different syntactic

20   structures, but says the same thing as the

21   source.

22        Q.    Explain to me what specifically

23   step-by-step your methodology is for

24   detecting mosaic plagiarism into novel

25   length books.

82

```
 1            DR. CHASKI (9/28/2023)

 2       A.    You basically create a

 3   concordance and from the concordance, you

 4   can look at -- what a concordance is each

 5   word in a document with the right context

 6   and the left context on either side of it.

 7   And you look for the same words in

 8   different documents and you study the

 9   context from the right or the left.

10            So for instance, in the example

11   paragraph that you just had me look at,

12   paragraph 81, if I use the concordance and

13   looked at the word "ground," I would see

14   that the right context for ground in Blue

15   Moon Rising is "to just open up and swallow

16   me."  The right context in Crave is "to

17   open up and swallow me."  The left context

18   in Blue Moon Rising is "I wanted the" and

19   the left context in Crave is "I pray for

20   the."

21            And given what we know about

22   mosaic plagiarism that it deploys things

23   like substitution, deletion, insertion, "I

24   wanted" and "I prayed for" are synonymous

25   phrases, so we have substitution of "pray
```

83

```
1              DR. CHASKI (9/28/2023)

2   for" to substitute for "wanted" and "just"

3   is an example of insertion between the "to"

4   infinitive and the infinitive "open up."

5   So "just" in the Blue Moon Rising was

6   deleted in the Crave version.

7         Q.    Can we go to paragraph 66 of

8   your report, please.

9         A.    Okay.

10        Q.    Let me know when you're there.

11        A.    Okay.

12        Q.    So paragraph 66 reads, "Mosaic

13  plagiarism can be detected using software

14  that creates a concordance.  A concordance

15  is a list of all words in a document.  For

16  each word, its context to the left (before

17  the word) and to the right (after the word)

18  are provided.  The window into the left and

19  right contexts can sometimes be set, in

20  different concordance software, to

21  different lengths so that smaller or larger

22  contexts can be examined."

23             And then I'm just going to go

24  to the last sentence.  "ALIAS TATTLER

25  includes the ability to make concordance
```

84

```
 1              DR. CHASKI (9/28/2023)

 2    with contexts from six to twelve words to

 3    the right and left of each word in a

 4    document."

 5         A.    Yes.

 6         Q.    Section of that paragraph that

 7    I read, did I read that correctly?

 8         A.    Yes.

 9         Q.    ALIAS TATTLER is your

10    proprietary software?

11         A.    Yes.

12         Q.    Correct?

13         A.    Yes.

14         Q.    For your opinions in this case,

15    did you run the versions of BMR and the

16    Crave books through ALIAS TATTLER to create

17    the sort of concordance that you discuss in

18    paragraph 66?

19         A.    Yes, but I only did that after

20    I read Professor Coulthard's report.

21         Q.    So the opinions in the expert

22    report that we are discussing, that were

23    disclosed in your expert report are not

24    based on the concordance analysis that is

25    described in paragraph 66, correct?
```

```
 1            DR. CHASKI (9/28/2023)

 2       A.    Right, because you don't need

 3   to when you have examples that are already

 4   provided to you, you can see.  I mean, I

 5   could have found a whole bunch more of

 6   examples but again, my focus was really not

 7   on copy-paste or mosaic, because I think

 8   we're dealing with very sophisticated

 9   authors here.

10       Q.    So the whole explanation that

11   you just gave about you can use a

12   methodology to create concordances using

13   software to detect mosaic plagiarism, that

14   is not what you did for -- to find the

15   examples of mosaic plagiarism that are

16   identified in the expert report we are

17   discussing, correct?

18       A.    No, I used the examples that

19   were given in the Complaint because I

20   recognized them.  Now, will I find them,

21   are they in the concordance results; yes.

22   I could certainly provide the concordance

23   results.

24       Q.    We'll get there if we have

25   time.
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 31 of 88
FREEMAN v                                              Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                        September 28, 2023

91

1              DR. CHASKI (9/28/2023)

2   titles.

3        Q.    Let's talk about the chapter

4   titles.  This is in Table 2A of your

5   report, correct?

6        A.    Yes.

7        Q.    All right.  And Column 1 of

8   Table 2A contains Tracy Wolff's chapter

9   titles?

10       A.    Yes.

11       Q.    And Column 2 contains

12  Allusions, correct?

13       A.    Yes.

14       Q.    Lynne Freeman is not the person

15  who created any of the Allusions in

16  Column 2, correct?

17       A.    No, I did.

18       Q.    All right.

19       A.    Do you remember when you asked

20  me did I read these things?  This is how

21  closely I read them, that as I read even

22  the chapter titles, I was thinking isn't

23  this interesting.  They're -- there's so

24  many allusions going on.  This is -- these

25  -- this is the same linguistic manipulation

92

```
1              DR. CHASKI (9/28/2023)

2    that goes on in mosaic plagiarism:

3    permutation, substitution, insertion and

4    deletion.

5              MR. HALPERIN:  Move to strike

6         that as non-responsive.

7         Q.    I was saying, for example, the

8    first allusion in Table 2A is Knight in

9    Shining Armor, correct?

10        A.    Yes.

11        Q.    Lynne Freeman did not create

12   the phrase Knight in Shining Armor to your

13   knowledge, correct?

14        A.    No.  The point of an allusion

15   is that everybody has to get the joke.  So

16   Knight in Shining Armor is a common idiom,

17   especially related to romance themes.  So

18   Lynne Freeman didn't have to write that.

19        Q.    All right.  So all of the

20   allusions in Table 2 are common idioms,

21   would you say that?

22        A.    Not all are idioms, but they're

23   common phrases.  An idiom has a specific

24   meaning in linguistics, sir.

25        Q.    So what you're trying to show
```

```
 1              DR. CHASKI (9/28/2023)

 2   in Table 2 is that Tracy Wolff has the

 3   skillset to engage in mosaic plagiarism,

 4   not that she, in fact, did it here,

 5   correct?

 6        A.    I'm saying that she has the

 7   skillset.  She's extremely skilled and she

 8   has a propensity to do it because if you go

 9   to the table after this table, I think I

10   give, you know, how many times does she

11   manipulate language in this way, paragraph

12   71.

13              And you might be ready to ask

14   me a question about this, I don't know, but

15   she has a propensity to do it, and she's

16   very good at it, whereas when you look at

17   the baseline authors, they're not, and

18   doesn't do it either.  It's an interesting

19   observation that she definitely knows how

20   to do mosaic plagiarism.

21        Q.    What's a pun, Dr. Chaski?

22        A.    A pun is usually where a word

23   is used with different meanings.  One word

24   can take on different meanings in one

25   context, it can be semantic or syntactic.
```

```
 1            DR. CHASKI (9/28/2023)

 2   indicator of Tracy Wolff's distinctive

 3   style.

 4        Q.   Let's look at the examples,

 5   specific examples in mosaic plagiarism in

 6   your report.  Those are in paragraphs 78

 7   through 87, correct?

 8        A.   Yes.

 9        Q.   Now, you did not find these

10   specific examples yourself using your

11   program ALIAS TATTLER, correct?

12        A.   That's right.  I'd be happy to

13   do it.  I've run the concordance now.  I've

14   run the concordance now, but I didn't do it

15   at the time for this report.

16             I recognize mosaic plagiarism

17   in the Complaint.  These examples would be

18   known as mosaic plagiarism.

19        Q.   So these are taken from the

20   allegations in Plaintiff's Complaint,

21   correct?

22        A.   Yes.

23        Q.   Are you -- I believe before you

24   mentioned a concept called ground truth

25   data?
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 35 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

97

```
1                DR. CHASKI (9/28/2023)

2        A.    Yes.

3        Q.    What is ground truth data?

4        A.    Ground truth data is -- in this

5   case, it's really our baseline novels

6   because it's -- it's data where we know

7   something about the important issue.

8              So in this issue, in this case,

9   our ground truths are our baseline because

10  we know that they were written before

11  Freeman and Wolff, so they could be

12  plagiarizing either one of them.

13             We have ground truth in the

14  Freeman documents.  We know she authored

15  them.  We have ground truth in the Wolff

16  documents.  We know -- we have no reason to

17  disbelieve that Wolff authored them.

18        Q.    Would a case of known

19  plagiarism be an example of ground truth

20  data for a plagiarism analysis?

21        A.    Yes.  Yes.  I mean if you --

22  this is what John Olsson does in his books,

23  you know, he presents those three cases of

24  known plagiarism and shows how mosaic

25  plagiarism -- this is in the 2008 book, how
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 36 of 88
FREEMAN v                                           Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                      September 28, 2023

98

```
 1              DR. CHASKI (9/28/2023)

 2   mosaic plagiarism is performed in these

 3   three known cases.

 4        Q.    Are the allegations in Lynne

 5   Freeman's Complaint an example of ground

 6   truth data?

 7              MR. DONIGER:  Objection.  Vague

 8         and ambiguous as phrased.

 9        A.    Yeah, I don't -- the

10   allegations are not data.

11        Q.    Do you understand that Lynne

12   Freeman's Complaint contains unproven

13   allegations?

14              MR. DONIGER:  Vague and

15         ambiguous as to unproven.  Vague and

16         ambiguous.

17        A.    For me, a Complaint contained

18   data, okay.  And it was up to me as a

19   linguist to understand, well, what does

20   that data mean, and is any of that data

21   really worth considering.

22              Now, when I read these examples

23   out of the Complaint, I recognized them for

24   what they are, mosaic plagiarism.

25        Q.    So do all the examples in
```

101

```
 1              DR. CHASKI (9/28/2023)

 2   decent response."

 3              Did I read that correctly?

 4       A.    Uh-hmm.

 5       Q.    What does "..." mean in that

 6   example?

 7       A.    That's an ellipsis.

 8       Q.    So does that mean that text was

 9   removed by whoever did this quote?

10       A.    Yes.

11       Q.    So look at paragraph 42(a)(11)

12   of the First Amended Complaint, and that's

13   on the bottom of page 36.

14       A.    Okay.  I'm getting there.

15   Could you give me the paragraph again.

16       Q.    Yeah, 42(a)(11).

17       A.    Okay.

18       Q.    Bottom of page 36.  Are you

19   there?

20       A.    I'm almost there.

21       Q.    No worries.  Let me know when

22   you're there.

23       A.    Yes.

24       Q.    So -- so you didn't actually

25   take this one exactly from the Complaint,
```

1          DR. CHASKI (9/28/2023)

2    because it looks like in the Crave example,

3    you removed the words "stunned" -- you

4    removed the word "stunned" and you

5    capitalized "his," correct?

6          A.   Yes.

7          Q.   So you actually removed a word

8    from whoever put this together for the

9    Complaint, you removed a word when you took

10   the example and put it in your expert

11   report, right?

12         A.   Right.

13         Q.   By the way, do you know who

14   specifically found these examples of

15   alleged mosaic plagiarism in the First

16   Amended Complaint?

17         A.   No.

18         Q.   Do you know if it was Lynne

19   Freeman herself?

20         A.   No, I don't know who authored

21   this -- this Complaint.

22         Q.   Do you know if it was Trent

23   Baer?

24         A.   No, I don't.

25         Q.   It could have been one of the

**103**

```
 1              DR. CHASKI (9/28/2023)
 2   lawyers, right?
 3        A.    Right, or it could have been, I
 4   don't know who.
 5        Q.    Do you know specifically what
 6   methodology whoever found these alleged
 7   examples of mosaic plagiarism used to find
 8   them?
 9        A.    I think they probably used the
10   way, you know -- I think a linguist would
11   have done a concordance, okay, but I think
12   that most readers would have simply been
13   reading and taking notes.
14        Q.    But you don't know for certain
15   what methodology was --
16        A.    Right.  Right.
17        Q.    Let's look at --
18        A.    And -- and the issue is what's
19   in yellow in the Complaint.
20        Q.    Let's look at example -- so
21   example in your paragraph number 84.
22        A.    Okay.
23        Q.    Look at that in your report
24   first.  So the one at paragraph 84(a) reads
25   "The coppery tang of blood fills my mouth."
```

108

1              DR. CHASKI (9/28/2023)

2         A.    Well, they definitely refer to

3    Stonehenge and they definitely refer to a

4    version of it that is not the real one.

5         Q.    Would seeing additional context

6    for this or any of your other examples help

7    determine whether there really was mosaic

8    plagiarism taking place?

9         A.    No, I don't need the context to

10   explain mosaic plagiarism.  I only need the

11   paraphrastic techniques, where two

12   statements can be related to one another

13   using these paraphrastic techniques.

14        Q.    Your analysis -- your

15   methodology for mosaic plagiarism does not

16   consider the context; it only considers the

17   paraphrastic techniques, correct?

18        A.    Right, yes.

19        Q.    Would you like to see some of

20   the context for some of these examples or

21   you're just not interested in it?

22        A.    I'm really not interested in

23   it, because I think the most important

24   contribution is the conceptual plagiarism,

25   and the fact that that's a standardized

114

1              DR. CHASKI (9/28/2023)

2    my team assembled for this deposition and

3    what --

4              MR. DONIGER:  Ben, sorry,

5         similar to yesterday, are we -- are

6         these going to be exhibits to -- I

7         remember yesterday about halfway

8         through the depo, you marked them as

9         1, 2, 3, and made sure they were so

10        marked.  Are we doing the same thing

11        here?

12             MR. HALPERIN:  Yeah.  Can we

13        call this one Chaski -- Chaski 4,

14        Chaski Exhibit 4, and the previous

15        ones Chaski 3, 2, 1 in reverse order

16        from when they came in.

17             MR. DONIGER:  Thanks.

18        Q.   So this takes a few of your

19   examples of mosaic plagiarism from the

20   Complaint and then finds these in the works

21   at issue and looks at what the works really

22   say.

23        A.   Um-hmm.

24        Q.   You didn't do this sort of

25   analysis when looking at these examples of

1              DR. CHASKI (9/28/2023)

2    mosaic plagiarism for your Complaint,

3    correct?

4         A.    I don't believe I did.

5         Q.    Let's look at the first one on

6    -- this is from paragraph 85.

7         A.    Yes.  Wait a minute.  Hold on.

8    I might have made a comment in my report

9    about this, because this brings up the

10   really interesting phenomenon that both

11   Olsson and Coulthard discussed, and that is

12   that typically in sophisticated plagiarism,

13   the context is not the same because

14   plagiarists like to add a lot of stuff.

15              You know, it's a forest and the

16   trees issues.  So if -- if I just have two

17   trees standing there and gee, you know,

18   here's a maple and here's a maple, but if I

19   suddenly surround them with oaks and pines

20   and all kinds of other trees, then suddenly

21   those two maples are no longer easy to

22   spot.  And Olsson refers to this as padding

23   and purple pros, how the length of a

24   plagiarized document is often much longer

25   than the source document.

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 43 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

132

```
 1              DR. CHASKI (9/28/2023)

 2   context and will put a whole lot of forest

 3   in, will pad, will -- because you know,

 4   that's what you do, you try to hide the

 5   source.  Even Malcolm Coulthard said that,

 6   that the plagiarist is trying to hide the

 7   source.

 8        Q.    So fair to say that for all ten

 9   examples of mosaic plagiarism in your

10   report, you did not go back and look at the

11   full scenes to see the context for each of

12   those examples?

13        A.    No.  As I complained in my

14   report, examples of mosaic plagiarism are

15   localized.

16        Q.    And you say in paragraph 88 of

17   your report, "There are many more examples

18   of mosaic plagiarism provided in the

19   Complaint," you see that?

20        A.    Yes.

21        Q.    And did you for any of the

22   examples of mosaic plagiarism provided in

23   the Complaint, go back and look at the

24   context in which the examples are used in

25   the actual books?
```

133

```
 1           DR. CHASKI (9/28/2023)

 2           A.    No, because mosaic plagiarism

 3   is localized.  It's a basically --

 4   paraphrasing is a localized function.

 5           Q.    You did not conduct any sort of

 6   statistical analysis when it comes to

 7   mosaic plagiarism, correct?

 8           A.    No, did not, that's right.

 9           Q.    If you go to the remainder of

10   my exhibit, this has the contents from your

11   paragraphs 90 through 97 laid out

12   side-by-side.  And I know you asked me

13   before, so I'll answer now, and the answer

14   is yes, I do know which works paragraphs 90

15   through 93 come from and which works

16   paragraphs 94 through 97 come from.

17                The answer is 90 through 93

18   come from the Tracy Wolff work and 94

19   through 97 come from the Freeman work

20   Masqued.

21                And I would just ask you to go

22   verify that by doing a quick read of this.

23   Let me know when you've been able to find

24   any of these phrases on either side of

25   this?
```

143

1            DR. CHASKI (9/28/2023)

2    don't know what else to say, go ahead,

3    because I'm afraid you think I'm not

4    responsive when I try to explain myself so

5    I'm kind of hesitant now.

6        Q.   Okay.  Why don't we just keep

7    moving and we're both doing our jobs and

8    we'll just try to keep working through it

9    and I'm sure Steve will jump in if I do

10   anything out of bounds.

11           Okay.  Did you do any analysis

12   of whether Tracy Wolff and Lynne Freeman

13   expressed the ideas that you believe were

14   stolen in similar or different ways?

15       A.   Yes, that's the whole point of

16   the keyword cluster analysis is we look to

17   see whether a keyword has the same

18   companion words or cluster of words around

19   it or are those clusters different.

20           So the method is not built to

21   just find similarity.  It can find

22   difference as well as similarity.

23       Q.   But so does your analysis of

24   the lexical clusters, you're telling me

25   that is the portion of your methodology

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 46 of 88
FREEMAN v                                                    Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                              September 28, 2023

144

```
 1               DR. CHASKI (9/28/2023)

 2     that addresses how the two authors

 3     expressed the ideas and concepts you were

 4     investigating?

 5          A.    Yes.  See -- may I give an

 6     example?

 7          Q.    Sure.

 8          A.    That everyone immediately gets.

 9     Let's take the keyword bank.  Now, if I

10     cluster that, if my companion words for

11     bank are picnic, boat, river, dock, you get

12     a keyword meaning from that.  In linguists,

13     we call that the lexical field or the

14     lexical cluster, so you have a specific

15     meaning for bank.

16               But what if another author

17     comes along and they use the word "bank,"

18     but their companion words are money, ATM,

19     payday, now, do you have a different

20     conception of bank?  Yes, you have two very

21     different concepts of bank based on the

22     cluster, based on the companion words.

23     That's just well-known.

24               There's a whole theory in

25     psycholinguistics about, you know, how we
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 47 of 88
FREEMAN v                                                  Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                            September 28, 2023

145

```
 1            DR. CHASKI (9/28/2023)

 2   store words in memory.  It's

 3   psychologically real, you know, grounding

 4   to talk about words in this way.

 5            So the method really says well,

 6   let's see, do these two authors use these

 7   keywords with a whole lot of the same

 8   companion words or a whole lot of different

 9   companion words.  That's why you can tell

10   if they're the same or different.

11       Q.   If I wanted to figure out

12   whether two authors expressed the same

13   concept in different ways or similar ways,

14   would another way to do that be to just

15   read the books themselves and make a

16   judgment as the way a reader would?

17       A.   Well, yes, it would.  That's

18   doable.  And I wouldn't do it that way,

19   even though I have a degree in psychology

20   of reading.  You know, I would use more

21   standard linguistics techniques than rely

22   on my, you know, personal opinion.  But I

23   think that there are people with expertise,

24   you know, literature professors, writing

25   coaches, you know, there are people who
```

146

1                DR. CHASKI (9/28/2023)

2    have expertise in this kind of thing, but

3    I'm not -- I don't put myself out as one of

4    them, okay.

5         Q.    Do you think that ordinary

6    people on a jury can read two works and

7    make a judgment about whether the two

8    authors expressed the same idea or concept

9    in a similar or different way?

10               MR. DONIGER:  Objection.

11          Incomplete hypothetical.  Compound.

12          Calls for speculation.  Lacks

13          foundation.

14               If you have an answer you can

15          give, Dr. Chaski, subject to those

16          objections.

17         A.    That sounds to me like

18    something maybe a jury consultant would

19    know, but not something that I would know.

20         Q.    So --

21         A.    A lot of it has to do with like

22    speaking of a psychology of reading.  I

23    mean, so much goes into reading that we're

24    -- we bring our own personal experiences to

25    it, you know, that I'm not sure, I don't

 1              DR. CHASKI (9/28/2023)

 2    know about the hypo -- the scenario you

 3    explain.

 4         Q.    So fair to say what you were

 5    offering -- strike that.

 6              You did not -- for any of the

 7    ideas or concepts that you discuss in your

 8    report, you did not read the books

 9    themselves and make a determination of

10    whether these ideas or concepts were

11    expressed in a similar way, the same way

12    someone reading the books for pleasure

13    would, correct?

14              MR. DONIGER:  Objection.  Calls

15         for speculation.  Lacks foundation.

16         Vague and ambiguous.

17         A.    Well, I -- as I said before,

18    when I read the books, I read for data, I

19    analyze the frequencies of everything.  I

20    analyze the collocations of everything, you

21    know, what words are occurring with other

22    words, how much overlap is there between

23    the two clusters.

24              For instance, in the example of

25    bank, when I said, you know, picnic, river,

153

1              DR. CHASKI (9/28/2023)

2    25 times, that means I've got 25 list, 12

3    content words on either side of it, and I

4    have -- and I combine them into one grand

5    list with only unique words in it and that

6    gives us an idea how is this person

7    thinking and expressing the concept alien.

8         Q.   So is it fair to say that in

9    order to avoid trying to make a subjective

10   judgment about whether the authors were

11   expressing these -- the same ideas or

12   concepts similarly, you did what you

13   believe is an objective statistical and

14   linguistic analysis of the lexical

15   clusters, including the 12 content words on

16   either side of a given keyword?

17        A.   I couldn't have said it better

18   myself.  Thank you, Mr. Halperin, that's

19   exactly what I did.

20        Q.   Every once in a while, I get

21   one right.

22        A.   And I wasn't being sarcastic.

23   I mean I was impressed because you really

24   do understand what I did.

25        Q.   And that was using lemmatized

156

```
 1            DR. CHASKI (9/28/2023)

 2    weren't in any of the baselines.  Well,

 3    then the baselines don't serve any purpose.

 4          Q.    So -- and you yourself picked

 5    these 35 words, right?

 6          A.    Yes.

 7          Q.    These aren't words that someone

 8    else gave to you?

 9          A.    No.

10          Q.    And you picked them based on

11    reviewing the allegations in the First

12    Amended Complaint, correct?

13          A.    Yes, because my goal was to

14    test, do these allegations hold water.

15          Q.    Okay.  Can you explain to me

16    what your methodology was for picking these

17    35 words based on the allegations in the

18    First Amended Complaint?

19          A.    So when I read the scenes that

20    were alleged to be very similar, I knew I

21    wanted content words.  I knew I wanted

22    content words.  I looked at a lot of the

23    bolded words, because I thought oh, okay,

24    these are important, and I just wanted to

25    make sure that I got 30.
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 52 of 88
FREEMAN v                                           Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                     September 28, 2023

161

1          DR. CHASKI (9/28/2023)

2          A.    No.  No.  That's not in my

3     report.  It's just something that I did do

4     so that I could verify that I wasn't crazy

5     for picking these words.

6          Q.    So, but that data hasn't been

7     given to defendants, correct?

8          A.    No.

9          Q.    And did you do that same

10    exercise for the four Crave books?

11         A.    No, because really what we're

12    interested in here is are Freeman's

13    concepts -- are the 35 words out of

14    Freeman, are they part- -- how do they

15    compare with Crave and how do they compare

16    with the baseline.

17              Now, if I'd been asked about

18    Crave, I obviously would have selected 35

19    keywords that seemed to be important for

20    the Crave series.

21         Q.    Okay.  And I think you said

22    that based on sorting all the -- sorting

23    all the content words of BMR by frequency,

24    you think that the 35 keywords that you

25    selected, five were among the most

                                                                              183
1             DR. CHASKI (9/28/2023)

2   end up with.  I want to make sure that my

3   list contains only types.

4        Q.   One thing that she does say, if

5   you look at page 224, is that her

6   methodology in this paper is experimental,

7   correct?

8        A.   Right, and then again, it was

9   presented in 2007 by Coulthard and Johnson

10  as a done deal.

11       Q.   So if I wanted to --

12       A.   Maybe by that time, she felt

13  that it was a done deal.

14       Q.   So if you -- if I wanted to --

15  strike that.

16            So we agree that Dr. Johnson

17  states in this paper that the methodology

18  she's using is experimental, correct?

19            MR. DONIGER:  The document

20       speaks for itself.

21       Q.   Let's just read it.

22            MR. DONIGER:  Asked and

23       answered.

24       Q.   Let's just read it on page 224.

25  It says, "Whilst this method of analysis is

184

```
 1              DR. CHASKI (9/28/2023)
 2   experimental, it does contribute usefully
 3   to the investigation carried out into this
 4   case of plagiarism.  It represents an
 5   investigative approach to text and applies
 6   a number of methods, which readers may want
 7   to experiment with themselves."
 8              Did I read that --
 9        A.   And I think it's important to
10   note that this was part of her dissertation
11   and it was 1997, and she was using, you
12   know, unpublished software that was at
13   Professor Coulthard's department.  So yes,
14   I'm not surprised that she used this kind
15   of -- you know, this is the -- this is
16   academic -- well, like legalese, this is
17   academes.
18              MR. HALPERIN:  Move to strike
19        as non-responsive.
20        Q.   My question was did I read that
21   correctly?
22        A.   Yes.
23        Q.   And then the next sentence
24   says --
25        A.   -- is the issue.
```

185

1              DR. CHASKI (9/28/2023)

2        Q.    Just all I asked was did I read

3    that correctly.

4              "The programs were not

5    originally developed to investigate

6    plagiarism.  In fact, I am using them in my

7    doctoral research for the analysis of

8    interview texts."

9              Did I read that correctly?

10       A.    Where are you?

11       Q.    I'm in the next paragraph, the

12   second paragraph of page 224.

13       A.    Um-hmm.  Yes.  You read that,

14   the first two sentences correctly.

15       Q.    Okay.  Now, and if I wanted to

16   go and see whether the experimental method

17   that Dr. Johnson discusses in her 1997

18   paper was later adopted by the body of

19   forensic linguists, you would direct me to

20   Coulthard and Johnson 2007, correct?

21       A.    Yes, but I would also say that

22   while her work is known within forensic

23   linguistics, there's a lot more work that

24   some forensic linguists don't know about

25   obviously, but uses the same ideas of

193

```
 1              DR. CHASKI (9/28/2023)
 2   sure that the algorithm is working
 3   probably, and it is.  It's a co-sign
 4   similarity of one.
 5              Now, we want to see, well, how
 6   about Freeman and these baseline novels,
 7   are they different?  And they are.  So if
 8   you look at page 120, for the keyword
 9   accident, Freeman and Wolff have together
10   combined, they get a similarity score of
11   one, but look how different Freeman
12   combined with Noel is or Freeman combined
13   with Pike.  Everybody else is different.
14       Q.   And this as the co-sign, this
15   annex is the co-sign similarity scores for
16   all 35 of the your keywords?
17       A.   Yes.
18       Q.   If no co-sign similarity score
19   is presented for a given keyword, does that
20   mean that the keyword did not appear in the
21   book?
22       A.   Yes.
23       Q.   So let's look at the next page,
24   which is the results for the --
25       A.   Alaska.
```

194

1          DR. CHASKI (9/28/2023)

2          Q.    -- Alaska.  So based on that,

3    Alaska only appeared in two out of ten of

4    your baseline novels, correct?

5          A.    Yes, that's right.  Kami Garcia

6    and Stephanie Meyer talked about Alaska, as

7    did Freeman and Wolff.

8          Q.    And if we go forward to Aurora,

9    which is on page 5 of the annex.

10         A.    Right.

11         Q.    That word appeared in zero of

12   your baseline novels, right?

13         A.    Right.  So that was one of the

14   reasons I wanted to have more than 30,

15   okay, and also why, when I did the

16   statistical analysis of the binomial

17   probability, I said well, let's just get

18   rid of that keyword.  We don't have to use

19   it.  We can say how many times out of 35.

20   We'll get rid of Aurora, and say, well, how

21   many times out of 34.

22         Q.    All right.

23         A.    What's interesting is that --

24   it is interesting though that -- isn't it

25   interesting, in my opinion, it is, that

195

1            DR. CHASKI (9/28/2023)

2   these would show up in Wolff and Freeman,

3   Aurora, but not in the ten baseline novels.

4   So the Freeman and Wolff books are

5   different from the baseline novels and

6   similar to each other.

7            Q.   So the fact that both Freeman

8   and Wolff use the word "Aurora" and the ten

9   baseline novels did not, is that in and of

10  itself is evidentially significant to you?

11           A.   Yes, because it shows that

12  these books were different from the

13  baseline, but similar to each other.

14           Q.   You can base that --

15           A.   I wouldn't say that's the whole

16  thing.  I mean, obviously, I'm -- I go on

17  to do the whole binomial, because I want to

18  know, well, if I've got 35 keywords, how

19  many times is this similarity between Wolff

20  and Freeman happening.

21           Q.   Okay.  But you can't analyze

22  the overlap of lexical clusters if the

23  other works that you're comparing this to

24  don't have the lexical cluster, correct?

25           A.   Right.  So I said the -- no,

```
 1              DR. CHASKI (9/28/2023)

 2    you are a representative sample of the

 3    genre?

 4         A.    I would say just based on the

 5    -- that these ten baseline novels, you

 6    know, meet the criteria of being in a

 7    genre, having high quality, having good

 8    quantity.

 9         Q.    If you had used different

10    novels than the ten that Mr. Doniger gave

11    you, you might have gotten different

12    results, correct?

13         A.    Oh, yes, that's possible.

14              MR. DONIGER:  Calls for

15         speculation.  Lacks foundation.

16         Incomplete hypothetical.

17         Q.    And at the same time, if you

18    had used different keywords than the 35

19    that you selected based on the allegations

20    in the Complaint, you might have gotten

21    different results, correct?

22              MR. DONIGER:  Calls for

23         speculation.  Lacks foundation.

24         A.    I might have, but I think that

25    you can't -- the problem is the -- getting
```

Case 1:22-cv-02435-LLS-SN   Document 322-3   Filed 02/07/24   Page 60 of 88
FREEMAN v                                          Carole Chaski, Ph.D.
DEEBS-ELKENANEY                                    September 28, 2023

205

```
1          DR. CHASKI (9/28/2023)

2    maybe they're not going to occur in the

3    baseline.  And then they tell us something

4    interesting, oh, these -- these -- these

5    are peculiar, they're indicative of

6    Freeman --

7          Q.    Do you think --

8          A.    But I wanted to have enough

9    that I got a lot of words that did occur.

10   So you'll see that it -- most of the words

11   do occur in over half of the baseline

12   novels.

13         Q.    Do you think it's -- it

14   indicates something peculiar about Freeman,

15   that she used the word "mutation" and the

16   ten baseline novels did not?

17         A.    Yeah, she was obviously on the

18   cutting edge of something new, because she

19   wasn't -- she wasn't -- she was using

20   terminology in a genre that wasn't using

21   it.

22         Q.    So do you think that the fact

23   that both Tracy Wolff and Lynne Freeman

24   used the word "mutation" is evidence that

25   Tracy Wolff committed conceptual
```

206

```
 1          DR. CHASKI (9/28/2023)

 2  plagiarism?

 3      A.    It is interesting that these

 4  two novelists would use a term that's so

 5  rare in the baseline vocabulary, you know,

 6  or the baseline -- even the themes that --

 7  but nobody is talking about that, and yet

 8  here they are talking about aliens and

 9  talking about vampires, and nobody is

10  saying mutation.

11      Q.    Do you know how many -- how

12  many books have used the word "mutation"

13  according to Google Books?

14      A.    No, I'm sure thousands of

15  chemistry and biology textbooks use it and

16  that's one of the problems with, you know,

17  using Google Books as a baseline is that

18  you're not -- you're not getting the right

19  kinds -- you're not controlling for genre,

20  for fiction, for -- you know, you're just

21  getting everything.

22      Q.    But you don't know how many

23  books in the YA paranormal romance genre

24  use the word "mutation," correct?

25      A.    No, I don't have a database of
```

207

```
 1            DR. CHASKI (9/28/2023)

 2    all the books in the world that are in this

 3    genre.

 4         Q.   I believe we agreed before that

 5    there are 1.5 million words collectively in

 6    BMR and the four Crave books you looked

 7    at --

 8         A.   Yes.

 9         Q.   -- if you consider all

10    versions, right --

11         A.   Yes.

12         Q.   -- will agree 1.5 million?

13         A.   1.5 tokens.

14         Q.   Tokens, okay.

15              Do you know how many of those

16    are content words?

17         A.   Yes.  I think about around

18    130,000 which just goes to show that most

19    of language is made up of function words.

20         Q.   All right.  And you looked at

21    35 out of 130,000 content words in the

22    corpus that you looked at?

23         A.   Yes.

24         Q.   Can you tell me what

25    percentage that --
```

208

1           DR. CHASKI (9/28/2023)

2        A.    Oh, it's a small percentage.

3        Q.    Can you do the math and tell me

4    what percentage --

5        A.    No, I can't do the math in my

6    head.  I mean, it is a small percentage, I

7    recognize that.

8        Q.    Would you dispute that my

9    calculator says -- I'll show it to you --

10   0.00026923?

11       A.    Okay.  Okay.  Yes.

12       Q.    If we convert that to a

13   percentage, I think I have to remove two

14   zeros, so that would make it .026 percent,

15   right?

16       A.    Right.

17       Q.    I think -- I think I probably

18   have maybe one more set of questions, not

19   to guarantee that, but I would suggest

20   that, like, we take a ten-minute break, so

21   can we go off the record for ten minutes.

22       A.    Great.

23             THE VIDEOGRAPHER:  The time is

24       4:49 p.m.  We're going off the

25       record.

211

```
1              DR. CHASKI (9/28/2023)

2    possibility that the words in a row are of

3    linguistic formula.

4                "Thank you very much for your

5    prompt attention."  I mean, that's not

6    going to get you to authorship, because it

7    is so common that it's actually a

8    linguistic formuli.  But the good thing

9    about doing six words in a row is that

10   linguistic formuli are typically very

11   short, so that, you know, you could see

12   them immediately.  And you can get to

13   longer strings in a row because the longer

14   words in a row will be adjacent six in a

15   row.

16                So if you're looking for a

17   ten-word in a row, you really have it when

18   you have two adjacent words in a row of

19   six, right, you know, because you've got

20   the first six and then the next four.

21        Q.    You just gave the example

22   "thank you very much" -- "thank you very

23   much for your prompt attention," eight

24   words, correct?

25        A.    Right.
```

212

```
 1              DR. CHASKI (9/28/2023)

 2         Q.    But if two authors use that

 3    phrase, you wouldn't find it to be evidence

 4    of textual borrowing because it's a very

 5    common phrase?

 6         A.    Right, especially if they were

 7    writing letters.

 8         Q.    Two authors, I will give you a

 9    five-word example even though we've been

10    talking about six.

11         A.    Right.

12         Q.    Two authors use the phrase "who

13    let the dogs out"?

14         A.    Right.

15         Q.    You wouldn't consider that

16    evidentiary significant?

17         A.    No, probably not.  I would

18    think that's pretty much become formulaic

19    in our -- in American English now.

20         Q.    Have you empirically tested the

21    methodology that you used for conceptual

22    plagiarism to determine how accurate it is?

23         A.    Yes, and I report those results

24    in the report.

25         Q.    Where is that reported in the
```

215

```
 1            DR. CHASKI (9/28/2023)
 2   conceptualizing these keywords the same
 3   way.
 4            If there's low overlap, that
 5   means well, no, they're different from each
 6   other.  Okay.  So when we have these four
 7   from the baseline and we know the baseline
 8   couldn't have plagiarized because they
 9   published before Freeman and Wolff, okay,
10   so that could be counted as an error.  So
11   that says, wow, you know, that's really
12   low.
13       Q.   So I asked you if you had
14   empirically tested your methodology to
15   determine how accurate it is and if I'm
16   understanding correctly what you're saying
17   is the empirical testing to determine an
18   error rate for methodology is actually
19   built into the methodology itself because
20   you're considering the ten baseline
21   authors --
22       A.   Yes.  Yes.  That's why you have
23   to have the baseline authors in there.  And
24   also, I mean, I gave a talk about this to
25   the American Academy of Forensic Sciences a
```

216

1              DR. CHASKI (9/28/2023)

2    couple years ago, that really you want your

3    method to have an error rate for that

4    particular case and that particular data,

5    not just an error rate in, you know, well,

6    it's always right, you know, or it's five

7    percent or whatever.  I mean, you really

8    want your methods to show the error rate in

9    the case, so that you can judge that case

10   fairly.

11        Q.   I believe -- so we've talked

12   about Olsson and he identified, I think,

13   three cases of known plagiarism.  There was

14   the Helen Keller example and the Martin

15   Luther King example and I'm sure you

16   yourself have uncovered many, many

17   instances of plagiarism in your career

18   where nobody seriously contest it, correct?

19        A.   I wouldn't say many, many, but

20   enough, okay.

21        Q.   So one thing you could have

22   done to test your methodology is you could

23   have taken two works where we know there

24   was plagiarism where either because it's

25   reflected in the literature or because

217

1           DR. CHASKI (9/28/2023)

2    nobody seriously contests it and you could

3    have made one of those the suspect work and

4    one of those, the target work, and you

5    could have taken ten different baselines

6    and you could have run an experiment to see

7    how accurate is my method at actually

8    picking up plagiarism based on this case of

9    known plagiarism, that's something that

10   could have been done, right?

11          A.   Yes.  If I had had time, I

12   definitely would have done that and I'm

13   actually working on that right now.  I

14   mean, that's -- I have 11 researchers at my

15   institute and we're working on all kinds of

16   cool things, that included.

17          Q.   And that would be actually a

18   great example of what you call ground truth

19   data, right, because it's a case of known

20   plagiarism?

21          A.   Well, one of the big problems

22   with plagiarism is actually getting ground

23   truth data.  It's really -- you know, you'd

24   have to have ten baseline plagiarisms, not

25   just -- and they'd have to be in the same

218

1                DR. CHASKI (9/28/2023)

2    genre, okay.  You know, so it's getting

3    harder and harder to find the data that is

4    realistic and really ground truth.

5                But in the case, we know that

6    the method should not tell us that one of

7    these non-plagiarizing authors is too close

8    to Freeman, right, we know that, that's

9    their ground truth.

10        Q.    Okay.  So -- but finding real

11   ground truth data and plagiarism

12   investigation is hard, you would need at

13   least ten examples of known plagiarists?

14        A.    Well, yeah, or 11, right, you

15   know, you'd have to have the target and the

16   suspect and then you'd have to have the

17   baseline ones.  And those baseline ones

18   should have all plagiarized, you know,

19   something similar.

20        Q.    And you here did not test your

21   methodology against 10 or 11 cases of known

22   plagiarism to figure out an accuracy rate?

23        A.    What I did here was I tested

24   against ten cases of non-plagiarism, right,

25   because the baseline we know didn't

219

1              DR. CHASKI (9/28/2023)

2   plagiarize.  So it's testing it against ten

3   cases of non-plagiarism, which is just as

4   good and better in a way than testing

5   against plagiarism, because we can't be

6   sure, right.  Non-plagiarism, we can know

7   that they did not plagiarize Freeman.

8          Q.    I mean, to be fair, to really

9   do a test against known cases of

10  non-plagiarism, to test your whole

11  methodology, right, not just part of it,

12  against a case of known non-plagiarism,

13  what you would have to do is you would have

14  to take one of those non-plagiarized works

15  and make that your target work and then

16  another one your suspect work and then you

17  would have to come up with 35 keywords

18  based on the target work, and then you'd

19  have to compare it to ten other baseline

20  authors, right?

21         A.    Yes, and that can all be done.

22         Q.    But you did not do that for

23  this analysis?

24         A.    I didn't do it for this report

25  because of time constraints, but it's being

220

```
 1            DR. CHASKI (9/28/2023)
 2   done.
 3        Q.   That is something you would do
 4   if you were going to publish this
 5   methodology, right?
 6        A.   Yes.
 7        Q.   Have you published this
 8   specific methodology that you've used in
 9   this case?
10        A.   Well, I have a book coming out
11   on methods and it's in there.
12        Q.   When's your book coming out?
13        A.   I hope first quarter of next
14   year, if I can't get it out last quarter of
15   this year.
16        Q.   Do you have a current draft of
17   that book written?
18        A.   Well, it's in rough form.
19        Q.   Okay.  I take it you wouldn't
20   be able to -- willing to share?
21        A.   No, I don't consider it
22   shareable.  It's rough form.  It's like --
23        Q.   Okay.  No.  No.  Fair enough.
24   I wouldn't want anybody to see my rough
25   drafts either.
```

223

```
 1              DR. CHASKI (9/28/2023)

 2   entre into the young adult genre.

 3        Q.   If Tracy Wolff has other books

 4   that are in the young adult genre, you

 5   could have used one of those books to test

 6   your methodology, right?

 7        A.   You mean as either suspect or

 8   target or?

 9        Q.   Either suspect or target.

10        A.   Well, I would have to have a

11   whole new baseline, right, I mean, because

12   you're saying -- has she written?  I don't

13   know.  I mean, I'm asking this sincerely,

14   like, has they written other young adult

15   novels that this set of baselines would be

16   a good baseline for; that's what I'd have

17   to know, okay.

18        Q.   But hypothetically, if she had,

19   that's something used in your -- to test

20   your methodology by putting that in as the

21   target or the suspect book, right?

22        A.   No, I might -- maybe I would

23   have put her in as a baseline.

24        Q.   You could have -- you could

25   have used it?
```

224

1              DR. CHASKI (9/28/2023)

2        A.    Right.  And you know, she

3   should be closer to herself all the

4   sometime.

5        Q.    But you haven't done that sort

6   of testing of your methodology?

7        A.    No.  As far as I know, the data

8   is hypothetical.

9        Q.    All right.  Is it fair to say

10  that you have a lot of experience

11  attempting to detect plagiarism in your

12  career?

13       A.    Well, I was a high school

14  English teacher.  I thought middle school

15  English.  I taught college composition.  I

16  -- I was a professor.

17       Q.    Is it --

18       A.    So I think that I -- I think

19  that I've spotted, you know, academic

20  plagiarism plenty.  I have worked on cases

21  that didn't go to trial, by the way, having

22  to do with other plagiarism of other novels

23  and plagiarism regarding dissertations.

24       Q.    So you have, prior to this

25  case, attempted to detect plagiarism in

225

```
 1            DR. CHASKI (9/28/2023)

 2    novel length books?

 3         A.    Yes.

 4         Q.    And did you use the exact same

 5    methodology you're using here to do that?

 6         A.    No, because the writers were

 7    both very unsophisticated and, you know, it

 8    was smoking guns on six words in a row,

 9    that kind of thing.

10         Q.    So this is the first case where

11    you've used the conceptual plagiarism

12    methodology that you're using here to

13    attempt to detect conceptual plagiarism in

14    two novel length works, fair?

15         A.    Yes.  Yes.  My first case, but

16    it's in the literature.

17         Q.    Did you develop your particular

18    approach to conceptual plagiarism

19    specifically as part of your work for this

20    case?

21         A.    No, because I was toying with

22    it.  That was why it was an interesting

23    case to take.

24         Q.    But if I wanted to find where

25    you have published your specific conceptual
```

226

```
1             DR. CHASKI (9/28/2023)

2   plagiarism methodology, I would have to

3   look at your forthcoming book that isn't

4   ready to share yet, right?

5        A.    That's right.  That's right.

6        Q.    So what are some of the other

7   context where you detected plagiarism

8   besides in novel length books?

9        A.    Well, as I mentioned, you know,

10  academic plagiarism, these young writers, I

11  guess those are novels.  So you're

12  interested in not novels?

13       Q.    Yes, outside -- outside of

14  novels.

15       A.    Yeah.  Academic context.

16  Judicial rulings, that's right, yes.  So

17  with regard to judicial rulings, where

18  people claim that a judge plagiarized from

19  one the party's briefs rather than writing

20  his own brief, that kind of thing.

21       Q.    And you didn't use the same

22  methodology you used here because they were

23  different contexts, right?

24       A.    Well, also, it's really hard to

25  get baselines for judicial rulings because
```

227

```
1              DR. CHASKI (9/28/2023)

2    as you know, judges often use clerks and so

3    when you're trying to, you know, look at --

4    compare rulings, it's easy to compare

5    rulings to the parties' briefs, but it's

6    really hard to get a baseline because you

7    don't know whether the clerk was writing

8    for the judge at that time or was it a

9    different clerk, was it the same clerk.

10             So it's really hard in that

11   environment to do this kind of work with

12   a -- now, Alison Johnson had as her control

13   or baseline, you know, she had essays that

14   the professors had ruled as

15   non-plagiarized.  You know, so she -- I

16   used the control group -- she used -- she

17   called it control group.  I call it

18   baseline.  Again, different terminology for

19   the same thing.

20             But she had, like, essays that

21   the professors had said were not

22   plagiarized and she could use that as her

23   control.

24        Q.   Based on all your experience

25   detecting plagiarism throughout your
```

243

```
 1              DR. CHASKI (9/28/2023)
 2   references in footnote 22, they are all
 3   using overlap as a way to measure
 4   similarity between text.
 5              Even in the -- even in the
 6   n-gram analysis group, people use
 7   overlapping n-grams as a measure of
 8   similarity between different texts.
 9              Now, a. and b. are simply
10   explaining what it means to have high
11   overlap and what it means to have low
12   overlap.
13        Q.   I believe earlier you said that
14   -- I think you said that one of the good
15   things about your methodology is that the
16   empirical testing to ascertain an error
17   rate is baked into the methods because you
18   were testing against the base -- the ten
19   baseline authors; was that fair?
20        A.   Yes.
21        Q.   What empirical testing did you
22   do apart from your analysis in this case?
23        A.    In this case, I did no other
24   empirical testing than what I reported,
25   except for the three that
```

244

```
 1            DR. CHASKI (9/28/2023)
 2   Professor Coulthard just gave me, I did
 3   them, the three new words he wanted to add
 4   to it.
 5         Q.    Before you got involved in this
 6   case, did you empirically test your
 7   methodology against either known cases of
 8   plagiarism or known cases of
 9   non-plagiarism?
10         A.    Well, we did a study one time
11   on a -- one a set of -- a dissertation that
12   was accused of plagiarism.  It was quite
13   long.  And the biggest problem was having
14   the -- who's going to give dissertations
15   and say, well, yeah, I plagiarized mine,
16   too, here's one, you know, so that was a
17   problem.
18                And the other issue is that it
19   was highly technical, which meant that
20   everybody basically used the keyword
21   clusters in the same way, because when
22   you're talking about a scientific invention
23   or a scientific procedure, you must use the
24   same words.
25         Q.    So apart from this -- what you
```

                                                              245

 1            DR. CHASKI (9/28/2023)

 2    did for this case, the testing you can

 3    refer me to is that time you analyzed the

 4    dissertation and it was problematic because

 5    of the nature of the work that you were --

 6            A.    Yeah.   Yeah.   This kind of

 7    thing works well.   You're doing literature

 8    or philosophical, you know, but for highly

 9    technical language, it -- it doesn't really

10    work, because people don't synonyms in

11    highly technical -- they have to use the

12    jargon of the field.

13            Q.    And you didn't publish that

14    testing via the dissertation that you just

15    described?

16            A.    No.   It was a private case and

17    I didn't publish it and I basically told

18    the client I don't think I could do this.

19    You know, we -- we could run n-grams, but

20    even there, we have to be careful because

21    technical language will overlap.

22            Q.    Okay.   I'm ready to turn to, I

23    think, my last set of questions now.   Would

24    you like a short break before we do it or

25    should we just get into it?

246

```
 1              DR. CHASKI (9/28/2023)

 2        A.    Let's go.

 3        Q.    All right.

 4              MR. HALPERIN:  Steve, is that

 5        okay with you?

 6              MR. DONIGER:  Let's go.

 7              MR. HALPERIN:  All right.

 8        Q.    So I just want to ask some

 9   questions about your qualifications section

10   in your report, please.  So let's look at

11   paragraph 23.  Let me know when you're

12   there.

13        A.    Okay.

14        Q.    So there you mention that you

15   founded ALIAS Technology LLC in 2007,

16   correct?

17        A.    Yes.

18        Q.    And that's your company?

19        A.    Yes.

20        Q.    And you use your own

21   proprietary software, which is called ALIAS

22   TATTLER, T-A-T-T-L-E-R, correct?

23        A.    Yes.  Yes.

24        Q.    All right.  What percentage of

25   the work that ALIAS Technology does is for
```

247

```
 1              DR. CHASKI (9/28/2023)

 2    litigation?

 3         A.    I would say probably about 50

 4    percent.  We do a lot of research for

 5    people and we -- we have a our sister

 6    organization, Institute For Linguistic

 7    Evidence, which I founded in 1998, works

 8    with ALIAS on research projects.

 9         Q.    Can you ballpark the percentage

10    of income that you receive from expert

11    witness work and litigation?

12         A.    I'm sorry.  Of -- in what year

13    or what are you talking about, like?

14         Q.    Okay.  In a given year, for

15    your own income, can you ballpark what

16    percentage of income is from expert witness

17    work in litigation?

18              MR. DONIGER:  Vague and

19         ambiguous as to given year.

20         Essentially overbroad.

21         A.    Well, it really does depend on

22    the year, and I would say from -- for --

23    you know, on average, for most years, it's

24    probably 50 percent of my income.

25         Q.    Do you typically work for
```

250

1              DR. CHASKI (9/28/2023)

2   consulting starts on -- it would be page 50

3   of my report.

4         Q.    Let me just say, you list a lot

5   of previous cases in your CV, correct?

6         A.    Right.  I don't list all of

7   them because some of them, I'm under, you

8   know, nondisclosure agreements forever and

9   sometimes the cases are more like a

10  research project for the client where they

11  just want to know something and they have

12  no intention of going to trial or anything

13  like that.

14        Q.    Why don't you just take a look,

15  do a scan of it and let me know if you can

16  identify any cases in your CV that involved

17  allegations of copyright infringement

18  besides the Mowry case, which is discussed

19  in your report, and Mowry is spelled

20  M-O-W-R-Y.

21        A.    Yes.

22              MR. DONIGER:  Again, object as

23         potentially calling for speculation.

24         Lacking foundation of this deponent

25         to know what the allegations in each

251

1          DR. CHASKI (9/28/2023)

2      case were.

3          A.    Yeah, because I will know, you

4   know, what my job is and not necessarily --

5   what was interesting in the Mowry case is

6   that I never knew it was about copyright

7   infringement until later.

8          Q.    Let me -- let me strike and

9   rephrase then if that's okay, because I

10  think Steve raised a fair objection.  And

11  say out of all the cases in your CV, can

12  you identify -- which ones can you identify

13  besides the Mowry case that involved

14  allegations of plagiarism?

15         A.    Oh, okay, and we're using

16  plagiarism in the sense that we defined it

17  earlier as textual similarity, not

18  authorship, correct?

19         Q.    Correct.

20         A.    Okay.

21         Q.    I think the definition you gave

22  earlier was textual similarity without

23  citing the original source.

24         A.    Right.  So in the -- this was a

25  -- in -- I got to find it, sorry, keep --

252

```
1         DR. CHASKI (9/28/2023)

2    okay.  So in 2002, I was contacted by Art

3    Science Research Laboratory about the World

4    Trade Center Living History Project and

5    plagiarism in Langewiesche's American

6    Ground, and I was called in, you know, sort

7    of to verify Olsson's analysis, and it was

8    really obvious plagiarism.  I mean, it did

9    not require conceptual plagiarism.  It

10   didn't even require mosaic plagiarism.  It

11   was, like, verbatim word-for-word.

12        Q.   So fair to say in that instance

13   in 2022, you did not use the same

14   methodology you used here?

15        A.   No.

16        Q.   Maybe I can shortcut this and

17   say out of all the cases you list in your

18   CV, I think that starts on page 3 of the CV

19   and then goes several pages longer to page

20   14 of the CV, fair to say you didn't use

21   the specific methodology you used in this

22   case in any of those prior cases?

23        A.   Right.  Because I'll actually

24   say, right, on the -- on the CV, case

25   involving trademark similarity, case
```

254

1          DR. CHASKI (9/28/2023)

2              MR. DONIGER:  Ben, the top of

3          13, you'll see where it says World

4          Trade Center Living History Project,

5          you see that?

6              MR. HALPERIN:  Okay.

7              MR. DONIGER:  Read the next

8          line.

9              MR. HALPERIN:  I see it now.  I

10         was confused because the heading for

11         it starts on the previous page as I

12         think Dr. Chaski pointed out.

13         Q.   So you did not in that 2002

14    case for Art Science Research Laboratory,

15    you did not use the methodology you used in

16    in case, correct?

17         A.   No, I was verifying what John

18    Olsson had already done and he had already

19    done a good n-gram analysis that made it

20    quite clear that there were too many

21    n-grams in a row.

22         Q.   You tailored your methodology

23    specifically to this case in light of the

24    works at issue and sophistication of the

25    authors, fair?

255

```
 1            DR. CHASKI (9/28/2023)
 2            MR. DONIGER:  Vague and
 3       ambiguous as to tailored.
 4       A.    Yes.
 5            MR. DONIGER:  Go ahead.
 6       A.    Yeah, I disagree with tailored
 7  too.  I would say that, you know, you don't
 8  bring a hammer when you're trying to screw
 9  something together.  You don't bring a
10  screwdriver when you're trying to get nails
11  in something.  You bring the methods that
12  are most appropriate.
13       Q.    So maybe we can do it without
14  the word tailored.  You formulated your
15  specific methodology particularly --
16  specifically for this case in light of the
17  sophistication of the authors and the
18  particular works at issue, correct?
19       A.    Yes, I looked at all three ways
20  of what we know of, of solving plagiarism,
21  words in a row, mosaic, and conceptual.
22            MR. HALPERIN:  I have no
23       further questions.
24            MR. DONIGER:  Nothing further
25       here.
```

257

1            DR. CHASKI (9/28/2023)

2

3                  J U R A T

4

5

6            I, CAROLE E. CHASKI, Ph.D., do

7       hereby certify under penalty of

8       perjury that I have read the

9       foregoing transcript of my deposition

10      taken on September 28, 2023; that I

11      have made such corrections as appear

12      noted herein in ink, initialed by me;

13      that my testimony as contained

14      herein, as corrected, is true and

15      correct.

16

17      _____

18            CAROLE E. CHASKI, Ph.D.

19

20   Subscribed and sworn to before me

21   This _____ day of _____, 2023.

22

23   _____
              NOTARY PUBLIC

24

25

260

```
1              DR. CHASKI (9/28/2023)

2               C E R T I F I C A T E

3
    STATE OF NEW YORK        )
4                             :  SS.:
    COUNTY OF RICHMOND       )
5

6              I, AYLETTE GONZALEZ, a Notary

7   Public for and within the State of New

8   York, do hereby certify:

9              That the witness, CAROLE E.

10  CHASKI, Ph.D., whose examination is

11  hereinbefore set forth was duly sworn and

12  that such examination is a true record of

13  the testimony given by that witness.

14             I further certify that I am not

15  related to any of the parties to this

16  action by blood or by marriage and that I

17  am in no way interested in the outcome of

18  this matter.

19             IN WITNESS WHEREOF, I have

20  hereunto set my hand this 7th day of

21  October, 2023.

22

23  _____
                 AYLETTE GONZALEZ
24

25
```