# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
LYNNE FREEMAN, an individual,
Plaintiff,
-against-
TRACY DEEBS-ELKENANEY P/K/A
TRACY WOLFF, an individual,
EMILY SYLVAN KIM, an individual,
PROSPECT AGENCY, LLC, a New Jersey limited    Case No. 1:22-cv-02435-AT
liability company, ENTANGLED PUBLISHING,
LLC, a Delaware limited liability company,
HOLTZBRINCK PUBLISHERS, LLC, D/B/A/
MACMILLAN, a New York limited liability company,
UNIVERSAL CITY STUDIOS, LLC, a Delaware
limited liability company, CRAZY MAPLE STUDIO,
INC, a California corporation
Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


# EXPERT REPORT OF ERIC W. RUBEN, ESQ.

1

1. I am Eric W. Ruben, I am president of Eric W. Ruben, Esq. Attorney at Law, P.C. I have expertise in publishing, agency relationships, and contracts. My business address is 30 Wall Street, 8th Floor, New York, New York, 10005. My law firm offers legal services including drafting and negotiating contracts in publishing for authors and other entertainment industry professionals.

**Assignment**

2. I have been retained by the plaintiff, Lynne Freeman, to review and evaluate the relationship between her and Emily Sylvan Kim and Prospect Agency LLC. My review includes the agency contract between Lynne Freeman and the defendants as well as the Canon of Ethics of the Association of American Literary Agents ("AALA"). I am informed and believe that Emily Kim is currently a member of the AALA and was at the time of the events alleged in the First Amended Complaint ("FAC") filed in the action by Lynne Freeman against Emily Sylvan Kim, Prospect Agency LLC and others.

2

## Summary of Opinions

3. My overall opinion is that Emily Sylvan Kim and Prospect Agency LLC owed a fiduciary duty to Lynne Freeman and, assuming they gave access to Lynne Freeman's manuscript and related material to Tracy Wolff for the purpose of copying the material, they breached that duty.

## Qualifications

4. I have a B.A. in Political Science from Union College in Schenectady, New York, and a J.D. from Yeshiva University's Cardozo School of Law in New York, New York. From 1995 to the present, I have represented creative clients (such as New York Times bestselling writers, Oscar nominated producers, actors, and musicians) in matters as diverse as film and theater production, intellectual property issues, and the negotiation of contracts. I have represented parties involving transactions with multi-national corporations and reality television.

5. From 2008 to 2018, I founded and operated my own literary agency. During that decade I represented many authors and secured publishing deals with Random House, Harper Collins, Harlequin Publishing, Sourcebooks, and other publishing houses. My work as an agent

3

involved managing numerous clients' writing careers. This included (but was not limited to) reviewing client manuscripts, editing manuscripts with clients as needed, determining appropriate editors and publishing houses for submitting manuscripts (taking into account the genre and subgenre), communicating with editors and publishing houses, negotiating publishing contracts, and reviewing contracts with clients. I also assisted clients with release dates, publicity, and marketing.

6. I have appeared as a publishing industry speaker and panelist at numerous conferences across the United States and Europe for the annual Publishers Weekly Conference in New York City, the annual national conventions of the Romance Writers of America and Romantic Times Magazine in various major cities, regional chapters of the Romance Writers of America, annual national meetings of the Mystery Writers of America, the Geneva Writers Association annual meeting, and many others.

4

## Documents Reviewed

7. As part of my assignment, I reviewed the FAC in this case, the expert report of Kathryn Reiss, the contract between Lynne Freeman and Emily Sylvan Kim and Prospect Agency LLC, and the Canon of Ethics of the Association of American Literary Agents, and various other documents listed in Exhibit A.

## Background

8. The FAC in this case alleges, among many other things, that Kim sent the various versions of the manuscript, as well as the additional materials Freeman provided her, to Wolff, a client and good friend of Kim's, and possibly others, for the purpose of Wolff and possibly others copying the manuscript. If she did so, that would be a clear violation of Kim's fiduciary duty to Freeman. Further, if she intentionally allowed Freeman's manuscript to be obtained by Wolff by other means, that would also be a violation of Kim's fiduciary duty to Freeman.

9. Under New York law, a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."

5

(Restatement [Second] of Torts § 874, Comment a). Such a relationship is grounded in a higher level of trust than normally present in the marketplace between those involved in arms' length business transactions (see *Northeast Gen. Corp. v. Wellington Adv.*, 82 N.Y.2d 158, 162 ([1993]). When a person has a fiduciary duty to act on behalf of another, he must act in good faith to carry out the intention of the other. Where such a relationship exists and influence has been acquired and abused, or where one places trust or confidence in another, and that trust or confidence has been betrayed, there is a breach of that duty. *JP Morgan Chase Bank, N.A. v. IDW Group, LLC*, No. 08 Civ 9116, 2009 WL 321222 at *8 (S.D.N.Y. February 9, 2009).

10. Generally, where parties enter a contract, courts look to that agreement to discover the nexus of the parties' relationship and the contractual expression establishing the parties' interdependency. However, it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation. See (Restatement

6

[Second] of Torts § 874, Comment b). Also *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y. 3d 11, 19–20, 799 N.Y.S.2d 170, 175 (2005).

11. Further, "an agent's duty not to use or disclose the now-former principal's confidential information for the agent's own purposes or those of a third party **survives termination of the agency relationship**, as does the agent's duty not to retain or use the principal's property without the principal's consent" (emphasis added, citations omitted). Fiduciary Duties on the Temporal Edges of Agency Relationships, Deborah A. DeMott, Professor of Law, Duke University School of Law.

**The Agency Contract**

12. The contract between Lynne Freeman and Emily Sylvan Kim and Prospect Agency LLC states that the Emily Sylvan Kim and Prospect Agency, LLC "will negotiate on my behalf with my best interests in mind."

**AALA Canon of Ethics**

13. The AALA Canon of Ethics is not legally binding. However, it reflects what the organization of literary agents believe their

7

responsibilities are and the way in which they should conduct their business. The Canon includes statements like:

a. "The members of the Association of American Literary Agents, Inc. are committed to the highest standard of conduct, integrity, and accountability in the performance of their professional activities."

b. "They pledge not to . . . mislead, deceive, dupe, defraud, or victimize their clients . . . ."

c. "Members must always act as a fiduciary to their clients."

**Agent and Agency Violation of Fiduciary Duties**

14. If Kim provided Freeman's manuscript to Wolff, it would be a clear and blatant breach of the agent's and agency's fiduciary duty. The laws of the State of New York, the contract between Lynne Freeman and Emily Sylvan Kim and Prospect Agency LLC, and even the AALA Canon of Ethics clearly show that such a duty was owed Lynne Freeman by Emily Sylvan Kim and Prospect Agency LLC. Emily Sylvan Kim and Prospect Agency LLC were under a duty to act for or to give advice for the benefit of Lynne Freeman upon matters within the scope of their client, agent, and agency relationship.

8

15. In the event that Emily Sylvan Kim and Prospect Agency LLC intentionally allowed Lynne Freeman's manuscript to come into the possession of Tracy Wolff without giving it directly to her, it would also be a breach of the agent's and agency's fiduciary duty.

16. As the courts of this state have held, influence had been acquired and abused, one placed trust and confidence in another, and that trust and confidence was betrayed. Therefore, there was a breach of Emily Sylvan Kim's and Prospect Agency LLC's duty to Lynne Freeman. Trust was taken and broken. There can hardly be a more egregious breach of a literary agent's fiduciary duty to an author/client than to take their hard work and give it to another author for the agent's and second author's gain while not providing any recompense for the actual author of the work. It would also be a breach of that duty to allow an author/client's intellectual property to come into another of their client's possession and then allow that second client/author to exploit that intellectual property for the financial gain of the agent and agency.

17. Given the nature of how literary agents and agencies work, an agent and agency would be fully familiar with each of their client's

9

manuscripts the represent as they would naturally review them from the beginning of their relationship through edits and ultimately before submitting them to editors and publishers. There is no way the agent or agency would not know that one of their clients was exploiting the work of another of their clients. They would only need to read the manuscripts in question which is a necessary part of an agent's job.

18. The emails between Emily Sylvan Kim and Lynne Freeman, as well as the emails between Emily Sylvan Kim's and Tracy Wolff that I reviewed make it clear that Emily Sylvan Kim's and Prospect Agency LLC were fully familiar with their clients' manuscripts.

19. It must be remembered that as a fiduciary, an agent's and agency's duty not to use or disclose the now-former client's confidential information for their own purposes, survives the termination of the relationship. The agent and agency are under a duty to act for the benefit of the client. They must not seek their own gain at the expense of their client. Knowingly or negligently allowing Lynne Freeman's work to be exploited by another author for the agent and agency's gain at Lynne

10

Freeman's expense would indicate that Sylvan Kim and Prospect Agency LLC did not have Lynne Freeman's best interests in mind.

Dated: May 9, 2023

                                                          Respectfully submitted,

*DocuSigned by:*
*Eric Ruben*
E1F1CCB4D4F54FC...
Eric W. Ruben, Esq.

11

EXHIBIT A

Documents Considered

- Expert Witness Report by Kathryn Reiss prepared in connection with this action
- The contract between Lynne Freeman and Emily Sylvan Kim and Prospect Agency LLC
- The Canon of Ethics of the Association of American Literary Agents
- KIM00200122 – KIM00200123
- KIM00208514 – KIM00208515
- LF091917
- LF037759 - 037762
- LF167132 – LF167136
- Freeman e-mail Summary Notes Timeline with Bates Numbers
- KIM00145671 – KIM00145676
- LF140444 – LF140446
- LF036977 – LF036986
- LF069561 – LF069572
- LF055460 – LF55461
- LF041790 - LF041793
- LF087534
- E-mail chain (1) March 10, 2011 Freeman to McCauley & (2) March 11, 2011 McCauley to Freeman
- LF071086
- LF036877 – LF036878
- KIM00352450
- KIM00352440
- KIM00352321 & KIM00352513
- WOLFF0097494 – WOLFF0097499
- WOLFF0095695 – 0095698
- KIM00352321 & KIM00352413
- ENTANGLED0074284 & ENTANGLED0074295

DocuSign Envelope ID: 6781C543-9041-4F55-B6E1-75378E0F30B1

Association of American Literary Agents  /  Ethics  /  Ethics Committee

# Canon of Ethics



One of the hallmarks of AALA membership is a steadfast commitment to our code of ethics. As agents, we not only manage the writing careers of our authors, but also counsel their business decisions and manage the financial aspects of those choices. Full commitment to honorable and ethical business practices is crucial to our work. Please review our full Canon of Ethics below.

*Revised AALA Canon of Ethics (Effective Date: April 29, 2022)*

1. The members of the Association of American Literary Agents, Inc. are committed to the highest standard of conduct, integrity, and accountability in the performance of their professional activities. While affirming the necessity and desirability of maintaining their full individuality and freedom of action, the members pledge themselves to loyal service to their clients' business and artistic needs, and will allow no conflicts of interest that would interfere with such service. They pledge their support to the Association itself and to the principles of honorable coexistence, directness, and honesty in their relationships with their co-members. They pledge not to abuse (sexually, verbally, physically or otherwise), discriminate against, harass, mislead, deceive, dupe, defraud, or victimize their clients, other members of the Association, the general public, or any person in their workplace or with whom they work or do

DocuSign Envelope ID: 6781C543-9041-4F55-B6E1-75378E0F30B1



Home    About    News    Ethics    Advocacy    Events    Membership    Contact

Find an Agent

business as a member of the Association

who have control over the accounts of an agency. Members who are not owners or administrators of an agency are encouraged to advocate for their agency to adopt these practices as well. Members shall take responsible measures to protect the security and integrity of clients' funds. Members must maintain at least two separate bank accounts, one for money due their clients and one for business operating expenses, so that there is no commingling of clients' and members' funds. Members shall account faithfully to their clients and deposit funds received on behalf of clients promptly upon receipt, and shall make payment of earnings due clients promptly, including any returned fees, refunded co-agent commissions, or other refunds made on behalf of the client. Members shall use reasonable best efforts to pay clients within ten business days after clearance and attribution but no later than twenty-one days, unless otherwise agreed in writing with the client.

However if funds for a client are received more frequently than quarterly and if those funds do not exceed a total of $100, then payments to clients may be made quarterly, so long as when funds received exceed $100 or upon the client's specific request, payment to the client shall be made within ten days thereafter. In all cases, members shall exercise due diligence in seeking supporting and attribution information for payments received. Further, on stock and similar rights, statements of royalties and payments shall be made not later than the month following the member's receipt, each statement and payment to cover all royalties received to the 25th day of the previous calendar month. Payments for amateur rights shall be made not less frequently than every six months.

A member's books of account must be open to the client at all times with respect to transactions concerning the client.

If a member receives in writing a claim to funds otherwise due to a client, the member shall immediately so advise the client in writing. If the member determines that the claim is serious, and that the funds should not be remitted to the client because of the claim, the member shall proceed in accordance with the following:

For a period not to exceed ninety days, the member may deposit the funds in question into a segregated interest-bearing account pending possible resolution of the dispute. No later than the expiration of that ninety-day period, if the dispute remains unresolved and the claimants do not otherwise agree with respect to the disposition of the disputed funds, the member shall take such steps as may be necessary to deposit the funds with a court of competent jurisdiction, with appropriate notice to the claimants, so that the claimants will have an opportunity to present to that court their claims to the funds. Upon so depositing the funds, the member will have complied with the member's obligations under this Canon of Ethics.

3. In addition to the compensation for agency services that is agreed upon between a member

DocuSign Envelope ID: 6781C543-9041-4F55-B6E1-75378E0F30B1
Canon of Ethics - Association of American Literary Agents
Case 1:22-cv-02435-LLS-SN   Document 322-18   Filed 02/07/24   Page 16 of 19
4/22/23, 6:48 AM

and a client, a member may, subject to the approval of the client, pass along charges incurred by the member on the client's behalf, such as copyright fees, tax form fees, manuscript retyping, digital book scanning, photocopies, copies of books for use in the sale of other rights, long distance calls, postage, special messenger fees, etc. Such charges shall be made only if the client has agreed to reimburse such expenses. Members must communicate a full, clear, and honest accounting of services, fees, charges, and commissions prior to commencement.

4. A member shall keep each client apprised of matters entrusted to the member and shall promptly furnish such information as the client may reasonably request.

5. Members must always act as a fiduciary to their clients. Subject to the terms of this Canon, members shall not represent both buyer and seller in the same transaction. Members are prohibited from participating in packaging fees on deals for television and film adaptations of their client's work that are completed after the Effective Date of this Canon of Ethics. Members are prohibited from accepting producer fees without the client's prior written informed consent.

6. Members may not receive a secret profit in connection with any transaction involving a client. If such profit is received, the member must promptly pay over the entire amount to the client. Members may not solicit or accept any payment or other thing of value in connection with their referral of any author to any third party for any purpose, provided that the foregoing does not apply to arrangements made with a third party in connection with the disposition of rights in the work of a client of the member.

7. Members shall treat their clients' financial affairs as private and confidential, except for information customarily disclosed to interested parties as part of the process of placing rights, as required by law, or, if agreed with the client, for other purposes.

8. A) The Association believes that the practice of literary agents charging clients or potential clients for reading and evaluating literary works (including query letters, outlines, proposals, and partial or complete manuscripts) is subject to serious abuse that reflects adversely on our profession. Members should be primarily engaged in selling or supporting the selling of rights and services on behalf of their clients, i.e. members should not be primarily pursing freelance editorial work and misrepresenting themselves as literary agents or support staff of a literary agency. Members may not charge any reading fees for evaluating work for possible representation. However, members may provide editorial services in exchange for a fee to authors who are not clients, provided members adhere to the following provisions:

I) Members who render such services must make clear to the author in writing in advance that the rendering of such services does not indicate or imply that the member will represent the author as a literary agent and must provide to the author at the outset a copy of this Paragraph (8A-8B) of the AALA Canon of Ethics; and

II) if during or after the rendering of such services the member agrees to represent the author,

DocuSign Envelope ID: 6781C543-9041-4F55-B6E1-75378E0F30B1
Canon of Ethics - Association of American Literary Agents
Case 1:22-cv-02435-LLS-SN Document 322-18 Filed 02/07/24 Page 17 of 19
4/22/23, 6:48 AM

the member must then return in full all payments received for such services prior to submitting the work and waive any further payments for such services for that author; and

III) to help prevent confusion, abuse, and to further separate paid editorial services from literary representation, at no time may members respond to an author who approaches them only for literary representation by instead suggesting or directing the author to pay for editorial services by the member or by anyone else financially associated with the member or member's agency. Members must provide paid editorial services only to authors who have approached them directly for such services.

B) Literary representation of any author must not be contingent upon the author engaging any such paid editorial services, nor shall a member retroactively charge for editorial services in the event a client's project is not sold. For avoidance of doubt, the intent of this clause is to allow members flexibility and independence in their payment structures while avoiding the conflict of interest that may arise from members making a profit on top of commission from the sale of both their client's works and separate paid services rendered to that client.

C) The foregoing provisions shall not apply where a member provides services with respect to a non-client's work if all of the following conditions apply:

I) any payment therefor is made directly to a charity, as part of a fundraising effort for a third party, or to an established educational institution;

II) the member shall personally create the evaluation and provide it within a reasonable time;

III) the member does not in any way benefit financially from the activity; and

IV) the member conducts the activity in an honorable way fully consistent with the AALA Canon of Ethics.

For purposes of clarification, payments received by members for teaching classes or from writers' conferences, whether virtual or in-person, which may include payments that specifically apply to such evaluations, shall not be a violation of this paragraph.

**An Ethical Approach to Paid Editorial Services**

DocuSign Envelope ID: 6781C543-9041-4F55-B6E1-75378E0F30B1
Case 1:22-cv-02435-LLS-SN   Document 322-18   Filed 02/07/24   Page 18 of 19
Canon of Ethics - Association of American Literary Agents                                       4/22/23, 6:48 AM







Find a Member Agent     Privacy Policy

Become a Member

**Champion Change**     **Contact Us**

**Supporters**