# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYNNE FREEMAN, an individual,

*Plaintiff*

v.

TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF,
an individual, EMILY SYLVAN KIM, an individual, PROSPECT AGENCY, LLC, a New
Jersey limited liability company, ENTANGLED PUBLISHING, LLC, a Delaware limited
liability company, MACMILLAN PUBLISHERS, LLC, a New York limited liability company,
UNIVERSAL CITY STUDIOS, LLC, a Delaware limited liability company

*Defendants*

---

**EXPERT REPORT AND DISCLOSURE OF
MARLENE STRINGER**

## I.      PROFESSIONAL BACKGROUND AND EXPERIENCE

1. I, Marlene Stringer, am the principal of the Stringer Literary Agency, LLC, a full-service literary agency with offices in Florida and New York specializing in commercial fiction & select nonfiction. I have been a literary agent for over 20 years. I apprenticed with Barbara Bova at Barbara Bova Literary Agency for almost eight years. I was not permitted to build a list for about three years, as BBLA, a NYC agency founded in 1974, wanted to ascertain I would do no harm to an author or the agency's good name. I focused on learning acquisitions, foreign sales, royalty statements, and everything in between, then went on to agent. I took this knowledge and started my own agency, The Stringer Literary Agency LLC ("StringerLit") in 2008.

2. StringerLit is a smaller agency, similar in size to Defendant Prospect Agency (approximately 30-50 clients). StringerLit, however, has only one other agent, who is based in New York, who handles different genres than I. We have no interns.

3. I am a member of the AALA (formerly AAR) and the Authors Guild. Over the course of my career as a literary agent, I have sold in excess of 250 books in various formats, as well as film and television options. Some of these books have gone on to be bestsellers.

4. I maintain an active presence on social media to support my clients' books and the agency. Pre-Covid, I regularly attended various live writers' conferences. Since that time, I have attended one live conference and one video conference where I have spoken and taken pitches from writers.

5. A copy of my resume is attached as Exhibit 1. I have not previously provided trial or deposition testimony as an expert witness.

## II.     SCOPE OF ASSIGNMENT AND DOCUMENTS REVIEWED.

6. I have been retained in this case to review the agreement and relationship between Lynne Freeman and Emily Kim / Prospect Agency to opine on whether Kim / Prospect fulfilled or breached their contractual and fiduciary obligations to Lynne Freeman. My hourly rate is $200 per hour to perform this assignment.

7. In conducting this review and reaching the opinions below, I reviewed and relied on the list of documents attached hereto as Exhibit 2.

8. I then drew on my knowledge and experience as an agent, who prides myself on ethical and fair practice with clients and publishers.

## LITERARY AGENT BASICS

9. There is no one way to become a literary agent, and there is no formal licensing requirement for literary agents. Former editors have joined the ranks of agents, a number of attorneys function as agents separate from their law practices, and agents may come from different creative fields such as film. Thus, not all agents are trained the same way. In fact, anyone may hang out a shingle and start up an agency business without any training.

10. Regardless of the agent's training or background, it is the agent's job and duty to work in the best interests of the client. The agent holds a position of trust and confidence for the client and is a fiduciary entrusted to responsibly care for the client's work. Many of these obligations extend beyond the termination of the agency relationship.

11. Agents are not hired to act as editors. Agents only get paid when they secure publishing deals for their clients and given how competitive the publishing world is there is no point to take on representation of a manuscript that needs substantial revisions and is far from being ready to submit to publishers.

12. I will not offer to work with an author whose manuscript ("ms" or "mss" plural) is not 90% there – i.e., just about ready to submit to publishers. While I am an editorial agent, I do a final pass for plot holes and line edits. I do not do developmental editing. I don't have time.

13. When I receive a submission, I read straight through, or enough of it until I know a ms isn't right for me. This read determines if I make an offer of representation, along with my knowledge of the market that the project is saleable. I may love a project, but if there's no market, it won't sell. If a project is too idiosyncratic, it won't sell. An agent working on commission can't afford to fill a list with projects that are not saleable.

14. When I do offer representation, I do a close, second, editorial read, which allows me to spot plot holes, continuity issues, pacing problems, line edits such as typos and word/phrase repeats. By pointing out a plot hole, or questioning an author that "something isn't right here?" I am not developmentally editing, nor am I telling the writer how to fix the issue or how to write. It is totally up to the author if and how they make the revision.

**III.**   **THE CRUX OF EMILY KIM'S AGREEMENT WITH LYNNE FREEMAN WAS TO
GET HER MS OUT TO THE RIGHT PUBLISHERS PROMPTLY, WHICH SHE DID
NOT DO.**

15.  It is clear to me that Kim/Prospect breached their agency agreement with Freeman.
They were hired to get her YA paranormal romance manuscript out to the right editors promptly
in the middle of a hot market for YA paranormal romance literature but did not do that. Instead,
they had Freeman do extensive rewrites, delayed in sending the ms out, sent to some of the
wrong editors/publishers, missed the market, and essentially destroyed Freeman's chances of
getting her work published.

16.  Based on the documents I reviewed, it appeared that Freemans's ms was reviewed by
a UK HarperCollins editor, who seemingly thought it quite good and passed it up the food chain.
Although HC UK had reportedly completed acquisitions in the genre for that year, and thus
could not take on the ms, the editor apparently encouraged Freeman to get an agent, and
recommended a few in the UK.

17.  Because Freeman was US-based, she preferred a US agent and focus on the US
market. Freeman discussed representation with two agencies, Writers House, a highly reputable
& esteemed agency, and Prospect, a smaller boutique-type agency owned by agent Kim.
Freeman opted to go with Prospect after heavy campaigning by Agent Kim. Agents call this
competition for clients a "beauty contest."

18.  It's my understanding that Kim learned of the UK editor's interest and support, as
well as the fact that another agent from a highly regarded large agency was discussing
representation with the author. Interest from other publishing professionals signaled a strong
manuscript.

19.  At that time the YA paranormal romance market was still hot, but I understand that
Freeman was told by publishing professionals (rightly) that she should get her ms out right away.
The clock was ticking on the YA paranormal romance market. Only a unique, ready-to-go
manuscript stood a chance in such a crowded market. Freeman apparently had exactly that type
of manuscript.

20.  Freeman signed with Kim / Prospect in order to get her ms out promptly, and I understand she was told by Kim that her ms only needed minor edits and would be circulated promptly.

21. However, after signing with agent Kim Freeman was subjected to round upon round of edits, that continued long after the market had evaporated, on the manuscript by everyone from Kim (many of which were not in writing, made via extended telephone conversations and possibly difficult for a novice writer to understand), to a summer intern, as well as another intern, and an assistant, working with Kim's agency.

22.  In her deposition, Kim claims not to recall having any phone calls with Freeman. I have seen sample notes Freeman made of conversations. (Bates## KIM00184553, 554, 556, 557, 558, 559 and 560; Bates## LF273694, 695, 696, 697, 698, 699, 700, 701,702, 703,705)

23.  These facts are extremely concerning. Agents simply do not spend that much time editing client manuscripts. There simply aren't enough hours in a day to spend the kind of time it appears Kim spent doing round after round of edits on Freeman's ms if she were to do that with all of her active clients as she claims. (Videotaped Deposition of Emily Kim, Mar. 16, 2023, 95:12, 13) It is also remarkable that the edits were provided orally and documented through notes that Freeman kept—I put all revision requests in writing. If a client wants to clarify, we can speak, but because writing is a visual art form, it's best for a writer to see questions and edits.

24.  What is equally concerning is that Kim had Freeman lengthen her already long ms. At the time Freeman's manuscript was undergoing revisions with Kim, I represented several active Paranormal YA and crossover clients (including bestseller Charlie N. Holmberg and Alyxandra Harvey). I was very familiar with the market. Had I received the submission from Freeman at that time, I likely would have passed without reading the ms as it was already at 135,000 words, which for YA paranormal was long and would generally turn most editors off. There were exceptions, of course (*Twilight*), but for the most part word count in the subgenre was 80-90k. Yet the edits Kim/Prospect instructed Freeman to make expanded rather than tightened the ms.

25.  Kim asked for and received unnecessary expanded and additional materials from Freeman. There are only three things needed for an agented submission: a good pitch/query letter from the agent, a final, polished ms, and a synopsis. Kim had a good pitch and a polished ms from the author from the beginning. (Kim's submission emails were not provided.) To ask for

supplemental material from an author beyond those three items is curious at best. What was she going to do with these extra materials? Of course, as a novice writer Freeman did not see this as unusual or wrong. To ask a writer to prepare submission materials, such as writing letters to editors,  is asking the client to do the agent's job.

26.  At no point did Kim ask Freeman if it was OK with her if they waited so long to submit the manuscript. Kim told her it needed *minor edits*, but then had her do substantial, multiple rounds of revisions over nearly a year before getting it out to editors, only when Freeman repeatedly asked Kim to submit.

27.  Freeman was not hiring an editor. She was partnering with a literary agent to guide her and submit her manuscript to editors at publishing houses. Kim was contractually obligated to submit the manuscript promptly to fulfil her obligations to her client, and her failure to do so—as well as sending it to some middle grade (instead of YA) editors, or editors she knew had already told her the market had evaporated—was a major violation of her contractual agreement with Freeman and frustrated any chance Freeman had of getting a publishing deal at that time.

## IV.   KIM'S OPERATIONS ARE RIPE FOR CONFLICTS OF INTEREST AND SHE APPEARS TO HAVE VIOLATED HER FIDUCIARY DUTIES TO FREEMAN

28.  I do not know Agent Emily Sylvan Kim save by name & reputation as a selling, established agent. I know Stacy Cantor Abrams and Elizabeth Pelletier, and I have placed client manuscripts with Entangled Publishing.

29.  Kim, is an owner/agent of a second publishing-oriented business involved in writing for hire, *et al* **Creative, LLC,** (etalcreative.com) that states on its website:

> "We provide publishers a way to fill gaps in their lists and meet market demands.
> We listen to editors and then turn their big ideas over to a hand-picked creative
> team of working professionals in the industry. Depending on the project, these can
> include active writers building their own name, established authors looking to
> expand their brand, and members of the editorial community looking to
> participate creatively."

30. Kim was actively soliciting work for clients in work-for-hire avenues as another source of income, and the potential for double-dipping and conflicts, especially using clients from her agency, is high.

31. Documents that I understand to have been produced by Kim in this case show that Kim proposed client Wolff for work-for-hire projects. (KIM00016603), and the fact she had sold her multiple times to work-for-hire publishers under various names is public record.

32. Any writing work takes time. To propose a client for such work implies that the client is not busy working on a current contracted project and could use income. While there is some creativity in work-for-hire, it is written strictly within the guidelines of the publisher. It is work: specific job for specific pay.

33. Based on review of the documents in Exhibit 2, including emails, texts, depositions, contracts, and amendments, it seems evident that "Crave" was initially "a way to fill a gap" in Entangled's list, which may have started out as a "fill the gap" potential work-for-hire project and evolved into a collaborative work between and among the writer, the agent, the publisher, and the copy editor.

34. I have known many writers writing on deadline. None, to my knowledge, were edited on the spot or "babysat" through the process by their agent. In fact, it has been pretty much the opposite, with writers locking themselves away to be alone and away from distraction to finish their projects on deadline. Some go so far as to temporarily move out of their homes to hotel rooms so they may write undisturbed by their families.

35. I have also had writer clients perform work-for-hire. (Liane Merciel, among others). Work-for-hire is a totally legitimate form of publishing, usually used for series books based on other forms of IP such as television, film or games, or can be educational publishers that publish books to support curricula in schools.

36. Work-for-hire writers are presented with a bible by the Publisher through the editor to the agent and writer, and the writer comes up with a storyline incorporating the characters, plot points, settings, and worlds already developed or owned/copyrighted by the publisher. The writer takes these elements and writes a story based on either an idea of the publisher or comes up with an idea to forward the overall project storyline arc. Write to order, in effect.

37. I have never heard of a publisher or agent giving an author a bible other than for work-for-hire projects. In this case, Kim testified that she created the bible in support of what appears to have been a collaborative effort with Tracy and the publisher:

> Again, I told you it was my idea to create the
> 3  bible, and I think I made it as like a Christmas gift
> 4  for Liz and Tracy so that they can have -- you know,
> 5  they had a lot of trouble with the world building and
> 6  continuity.  So it was to keep track of all the
> 7  characters in the Crave series.  But once I sort of put
> 8  some of the initial things down on the document, it went
> 9  out of my hands and people like Stacy worked on it, an
> 10  intern worked on it, and my assistant Ellen worked on
> 11  it, and a lot of people worked on the bible.]

A novel (or series of novels) is supposed to be the writer's project and job. NOT the publisher's. If one is writing under direction, it is work-for-hire. Usually, in work-for-hire, the writer doesn't own the copyright, the writer is paid a set fee, and receives a limited amount, if any, of royalties.

38. In CRAVE, the writer does own the copyright. The initial contract (ENTANGLED 0073254-0073271) was for no advance, but that was amended eight times (Amendment: KIM00332726-00332728; Amendment 2: KIM00332719-00332721; Amendment 3: KIM00332729-0033731; Amendment 4: KIM00332774-00332777; Amendment 5: KIM00332750-00332753; Amendment 6: KIM00332778-00332781; Amendment 7: KIM00332722-00332725; Amendment 8: KIM00332715-00332718), including two amendments to provide advances of $5,000 each, a reasonable and potentially generous advance amount for a work-for-hire.

39. The documents I have reviewed leave this project looking like an assignment disguised as a totally new endeavor by writer Wolff, through the direction and oversight of the publisher and the agent, appropriating Freeman's work. Kim previously sought out various work-for-hire projects for writer Wolff (Kim00012369-00012379); the CRAVE project looks to have followed that pattern, then evolved into something else entirely. There appear to have been group-write sessions for the CRAVE series, and for some of the books the writer was presented with already-prepared synopses, written by Elizabeth Pelletier, the publisher of Entangled, for the writer to follow. Wolff's writing was basically edited as she wrote, and changes were made and suggestions given.

40. In all of my time as a literary agent, I have never heard of either an agent or a publisher being as involved in the creation of a book as Kim/Prospect and Entangled were in the case of the Crave series. That involvement is shown in the following documents:

- KIM "About to do a few more chapter titles as Stacy finishes her chapters. We're right behind you!!! (Bates# KIM00351749)
- KIM "I was rereading my chapter titles. At least 70% are not terrible." (Bates# KIM00348335)
- KIM "I answered your bible questions in the chapter headings Google Doc" (Bates# KIM00348724)
- KIM instructed her assistant Ellen to fill in KIM'S Bible Google Doc (Bates #KIM00349290)
- KIM'S CRAVE series Bible Doc (Bates# ENTANGLED 0037373)
- KIM "I told Tracy I'd Google Doc write with her (Bates# KIM00351741)
- PELLETIER to KIM "Tracy wrote that moonstone description?" (Bates #KIM351750)
- KIM "The Alaska thing is really brilliant btw" "It's also going to kill my but I love it: (Bates# KIM00351751)
- KIM "Tracy and I are working in Google Docs" (Bates# KIM 00351752)
- KIM "Damn" "My notes on Alaska didn't make it through" "Resent" "With Alaska notes" (Bates# KIM00351752)
- WOLFF "I've actually never been to Alaska…" "But when I was brainstorming settings with my agent, she kind of tossed Alaska out as a throwaway suggestion…" (The Nerd Daily, Q&A: Tracy Wolff, Author of 'Crave', April 6, 2020)
- KIM "Let's get send coffee and crash it out." "She's busy harassing me. I want to help you rage finish the rest of this book" (Bates # KIM00348161)
- KIM "Did you find a tarot expert?" "I mean Entangled" "Well I love it as is. Tarot is different for everyone" (Bates# KIM00349415)
- KIM "Do you want to write together again?" WOLFF "Want to get in a goole.doc and help me write? I'm falling asleep?" If you have time" KIM "I do!!" "Give me half an hour??" (Bates# WOLFF0097498)
- KIM "Are all the bonus scenes fully ready?" "Tracy and I are team speed writing new scenes" ABRAMS "They are! You guys are writing for the book right? Not new bonus?" KIM "That's right" (Bates# KIM00352450
- PELLETIER to KIM "I still can't believe you said in a Google dock with her for 19 hours a day. Wow. I've been nominated you for sainthood." *Sat KIM "I did  I gave it my all, Liz" (Bates# ENTANGLED 0074295)
- KIM and WOLFF text exchange Dec 12, 2020:
  WOLFF: "I will say this about Liz doing the lifting on the synopsis. It leaves me free to just explore the world and the characters and add in what I want to." "Oh my gosh, I am so lucky"
  KIM: "We all make a great team. I love you both so much"
  WOLFF: "You sincerely are the best agent ever" "Right?" "We make a great team" "Steph was talking about how each book gets deeper"
  KIM: "And you're the best client! But more importantly best friend and partner in world domination!"

WOLFF: "And I said crave was me, and crush and covet have been the 3 of us. It makes things so much better" "Yes, Best friend ever. Remember when we used to plot world domination????" "And here we are ;)" "Also, I am NEVER writing a historical novel. NEVER." "I mean, maybe the edelweiss pirates, but that is it" "Can you believe a year ago we thought this was going to be a bust?!?!?!"
KIM: "I never thought that!
WOLFF: "I did, lol?
KIM: "Liz and I were talking while I was at the Bryant Park craft fair and she was calling it the million dollar book" "One year ago!"
WOLFF: "I was like, well, one more pipe dream…" (Bates# KIM00349453-KIM00349455)

41. I understand that both the publisher and the agent had access to Freeman manuscripts and/or the bonus materials provided to the agent. There was access to the manuscript by the publisher which had previously been submitted to Entangled by Agent Kim. The documents that show this include:

- KIM told FREEMAN during the third round of edits "Honestly, I think your best bet for this one is going to be Entangled. The editor is reading now and I know her really well and like her a lot so fingers triple crossed." (Bates# KIM00193730)

- KIM sent a MASQUED query to PELLETIER at Entangled on 10-10-13. On 10-18-13 CANTOR then responds to KIM and says, "Liz asked me to respond to you about this submission because she's currently closed to acquisitions. It definitely sounds like it could be up my alley, if you wouldn't mind sending it along." KIM doesn't send the manuscript to CANTOR until 10-23-13 and says, "Hi Stacy, Sorry for the delay. Here you go! And aren't you happy about Tracy? I am!" (Bates# KIM00157458-KIM00157459)

42. While I have not read either book/manuscript in full, I have read language comparisons between BLUE MOON RISING and CRAVE and a report discussing the similarities in the storylines, plot, characters, etc. created by Kathryn Rees. In my professional opinion, it is impossible to have so many idiosyncratic similarities – of phrase, of description, of setting, of character, of pop culture, that are so close to being exact it feels as if these are variations of the same work—without one work being based on the other.

43. As a literary agent, I read a lot of manuscripts and published books. In particular, when a genre becomes overly popular due to a successful breakout book, stories begin to sound familiar because writers unconsciously absorb what they are reading. There are no surprises for

the reader. At that point, many stories are derivative, i.e., coming from a similar inspirational source, with very similar characters and plotlines. In a nod to pop culture, we'd say the genre had "jumped the shark."

44. What makes a story stand out and special, is how an author takes the usual and customary expectations, the tropes, of a familiar and even overcrowded genre, and bends those expectations in a different direction. Put together with a compelling voice makes for story magic. Language is an author's toolbox, and words their tools.

45. In publishing, there is sometimes synchronicity. This means a very similar idea floating in the "ether" strikes different authors at the same time, and a similar story evolves written by each of them. When these stories, published by different publishers, are released readers notice. But the samples of BLUE MOON RISING and CRAVE are not merely similar, and the timeframe isn't simultaneous. Between the involvement of the agent and publishing house in developing Crave and the many specific similarities between these works, it seems impossible to me that this is simply a case of publishing synchronicity.

46. Attorney Nancy E. Wolff's letter dated Feb. 9, 2022, on the Letterhead of Cowan, DeBaets, Abrahams & Sheppard LLP, to Mark D. Passin, Esq. stated: "The agent, Kim, recalls nothing of this manuscript…." This is not credible. When an agent represents a project over several years and makes major revisions with the writer, there is no way to forget the story. One might not recall a title, or even an author's name, but a story resonates. And it appears that Kim did in fact recall both Lynne Freeman and her manuscript because after Freeman emailed Kim on 04-01-21 to request a copy of her contract, Kim exchanged a series of texts with her assistant Kim in which she clearly recalled that both stories were paranormal romances set in Alaska. (Bates# KIM00351309, KIM00351460-KIM00351464)

47. It was also clear to me that Kim, Wolff, and the publisher have not been entirely forthcoming about the truth of how the Crave Series was created. For example, in a group Text dated April 6, 2020 PELLETIER writes to WOLFF:

> "Actually, all of these people have read the book, so say whatever. I have the following questions asked TEN TIMES: What was your inspiration for writing Crave? Say WHATEVER you want, I don't care, just try not to get too far off of when it was actually written and that I at least came to you to write a vampire book, b/c that's been stated in two town halls. Otherwise, the world is your oyster." (Bates# ENTANGLED 0074458)

48. Even if Kim was not actively involved in writing the Crave Series, which appears undeniable, it is inconceivable to me that any agent who represented a manuscript like Freeman's in the way Kim did would not know in her gut that something was wrong if she later received another submission from another author with such obvious similarities. I personally would never pursue such a project in light of what I see as my ongoing fiduciary relationship with a former client.

49. When I part ways with a client, either by my instigation or theirs, I still have a fiduciary duty to them as well as a fiduciary duty to my current clients. Agents sometimes handle money and/or royalty statements, but we mostly deal in trust.

50. If I were to receive a manuscript extremely similar to one I'd read in the past, I'd know it was familiar. Having that déjà vu feeling, I would not take on the manuscript. Stories may be similar but there is a point at which it feels "wrong." I would also feel it was my professional obligation to advise the later writer that there was a remarkably similar manuscript that had previously been sent to numerous editors and may still be being shopped. It raises the question how is Kim's claim possible that she didn't recognize similarities between what she worked on with Wolff, and what she had worked on for more than a year and over the course of numerous edits with Freeman?

## V.    CONCLUSION

51. How Entangled Publishing decides to publish or hire authors is its prerogative. How agent Kim chooses to support the authors she works with is her prerogative. However, an agent cannot take on a client on the agreement and understanding that she will get that client's work out to publishers after minor edits and instead require the writer to edit the manuscript to make it less sellable (by making it longer) and prepare all kinds of other unnecessary things over the course of a year while missing the market. What is reprehensible is not telling the client they'd missed the market at any time, and have her continue to work on the ms. Here, that was a breach of the agency agreement.

52. And as a fiduciary for her clients, including with respect to the work entrusted to her by a former client, Kim can reasonably be expected to avoid self-dealing and the feeding of one client's story to another client. It appears that she did that here, turning Tracy Wolff into an

amanuensis rather than a creator, and if that is what happened then Kim failed in her ongoing
fiduciary duty to former client, Freeman, as well as to her current client, Wolff.

All opinions I have expressed herein are held by me to a reasonable degree of certainty.

Dated:  May 9, 2023

Marlene Stringer

**Exhibit 1**

Marlene S. Stringer
8429 Lorraine Rd., #408
Lakewood Ranch, FL  34202
(941)210-4417

**EXPERIENCE:**

**The Stringer Literary Agency LLC—**2008-present
*Owner & Managing Agent*
- Owns and operates a full-service literary agency; represents clients in all aspects of book publishing: submission, contract negotiation, support, and sub-rights sales, including translation & film rights
- Assists clients in preparation of final edit/proof manuscript prior to submission to publishers
- Guides clients in career-planning and strategy; provides marketing and support for clients' books; maintains an active presence on various social media outlets in support of Agency and client work

**Barbara Bova Literary Agency—**1999-2008, Naples, FL
*Apprentice, Literary Agent*
- Learned the publishing business as an apprentice of Barbara Bova
- Handled foreign sales; managed Agency during Agent's summer absences; handled correspondence with clients; visited publishers and made industry contacts; established own client list and sales

**Freelance Writer and Editor –**1996-2000; 1980-1996, NJ & Naples, FL
- Co-authored novel, wrote articles including for the "Naples Daily News"
- Writing & editing for private clients including throw-away local papers

**Real Estate Agent--1991-1996, Wyckoff, NJ**
- Coldwell Banker Schlott Realtors
  Listed and sold homes in NW Bergen County, NJ; Specialized Courses in Antique Houses & Realtor Member of National Register of Historic Places
- Abbott & Caserta Realtors
  Listed and sold homes in NW Bergen County, NJ

**Childrearing--1980-1986, NJ**

**Traveline, Inc.—1978-1980, NYC**
*Assistant to President & Director of Operations, In-house Editor & Publisher*

- Coordinated business for US offices and Athens; edited and managed publications for clients and travel agencies; wrote materials for tour books, brochures, and itineraries

**Anjos Netter—1970-1972, NYC**
*Freelance Reader, Copyeditor, and Proofreader, Magazine Short Stories*
- Read open submissions from slush; copyedited and proofread projects

**SHEARMAN & STERLING—1970-1973, NYC**
*Legal proofreader; legal assistant*
- Proofread legal documents from all departments

**SHEARMAN & STERLING--1975-1978, NYC**
*Supervisor, Uptown Proofreading Dept.*
- Received work from Attorneys & evaluated; attended closings

**Education:**
- Thomas Edison State College, NJ, Associates Degree; Certificate in Paralegal Studies
- Florida Gulf Coast University, Paralegal Studies Program
- John Jay College of Criminal Justice, CUNY

**Licenses:**
- NJ Real Estate License – 1991-Present (maintained as a referral license)

**Professional Associations:**
- AALA
- Authors Guild

## Exhibit 2

## Additional Documents Reviewed by Marlene Stringer

First Amended Complaint, Lynne Freeman v. Tracy Deebs-Elkenaneney et al. Case 1:22-cv-02435-LLS-SN Document 24 Filed 05/23/22

Videotaped Deposition of Elizabeth Pelletier, March 9, 2023, Freeman vs. Deebs , Case No. 1:22-cv-02435-LLS

Videotaped Deposition of Tracy Wolff, March 7, 2023, Freeman vs. Deebs, Case No. 1:22-cv-02435-LLS

Expert Report and Disclosure of Kathryn Reiss

Videotaped Deposition of Stacy Abrams, March 3, 2023, Freeman vs. Deebs, Case No. 1:22-cv-02435-LLS

Agreement for Artists, Emily Sylvan Kim to Lynne Freeman, Bates## KIM00352651-KIM00352654

Entangled Publishing, "Bible" Bates ##0037373, 74, 75, 76, 77

Entangled Contract, Bates#KIM00332732-49

Addendum Entangled Publishing , BatesKIM00021027, 28, 29, Amendment Dated January 6, 2020; Bates# KIM00332726-28; Amendment Dated February 3, 2020 Bates#KIM00332719-21; Amendment dated March 7, 2020, BatesKIM00332729-31; Amendment Dated September 15, 2020, Bates# KIM00332774-77; Amendment Dated November 4, 2020, Bates#KIM00332750-53; Amendment Dated September 8, 2021, Bates#KIM00332778-81; Amendment Dated January 11, 2022, Bates#KIM00332722-25; Amendment Dated February 26, 2022 Bates# KIM00332715-18

Emily S. Kim, Lynne Freeman, Julie Scheina, Bates KIM00150882-3
Emily S. Kim, Alexandra Penfold, Bates KIM00152936-37-38
Emily S. Kim, Katherine Jacobs, Bates KIM00156327,28,29
Emily S. Kim, Sara Goodman, BatesKIM00156034,035,036
Emily S. Kim, Lynne Freeman, Becky Shapiro, Bates KIM00157419,420
Emily S. Kim, Jenny Bent, Bates KIM00162414,2415,2416,2417,24182419,2420,2421
Emily S. Kim, Julie Ham, BatesKIM00198458,459

Emily S. Kim regarding Assistant filling in Bible, Bates KIM00347988, KIM00349290
Emily S. Kim/Amy Fitzgerald, Bates KIM00137257
Emily S. Kim/Sasha Henriques, Bates KIM0012369,70,71,7273,74,75,76,77,78, 79
Emily S. Kim/Alexandra Chipkin, Bates KIM00016603,04
Emily S. Kim/Ellen, Bates KIM00351309,000351460,61,62,63,64

Interviews & Videos:
Tracy Wolff Interview Mysterious Galaxy Virtual Event Discussing Charm 11/16/22
Tracy Wolff podcast – Author Stories – Episode 855
#BNEvents: Tracy Wolff (COURT) with Brigid Kemmerer
Book Hoarders and the Writing Process – Tracy Wolff/Rob Kent
Crave the Book Podcast #58 (Spain)- Tracy Answers Fan Questions - Crave Series by Tracy Wolff
Author Tracy Wolff Chats Live In The Nest