**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN, <br><br> Plaintiff, <br><br> v. <br><br> TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al., <br><br> Defendants. | Civil Action No.: 1:22-cv-02435 (LLS)(SN) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS**

## TABLE OF CONTENTS

I.    Factual Background…………………………………………………………………1

      A.  Prospect and Kim's working relationship with Freeman and BMR……………1

      B.  The relationship between the Defendants…………………………………………3

II.   Legal standard………………………………………………………………………..4

III.  Substantial evidence supports Freeman's Breach of Fiduciary Duty and

      Breach of the Implied Covenant of Good Faith and Fair Dealing claims……………...4

      A.  There is ample evidence that Prospect and Kim breached their

          fiduciary duties to Freeman by using her BMR work to create the Crave

          series…………………………………………………………………………4

            1.  Prospect and Kim owed Freeman a fiduciary duty……………………...5

            2.  Kim and Prospect breached their duties to Freeman……………………7

                a.  Prospect and Kim accessed Freeman's proprietary work…………7

                b.  There is at least a question of fact as to whether Kim

                    conveyed Freeman's work to Wolff………………………………7

                c.  The remarkable similarities between the works strongly

                    suggests that Kim shared BMR's characters, scenes and

                    plot with Wolff………………………………………………...10

                d.  Kimm had strong incentive to convey Freeman's work

                    to Wolff………………………………………………………..12

      B.  Freeman's fiduciary duties and contract claims are not dependent on her

          copyright infringement claims…………………………………………………...13

      C.  Freeman's breach of implied covenant of good faith and fair dealing

          claim is supported by substantial evidence………………………………………15

IV.   Conclusion…………………………………………………………………………16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1357 Tarrytown Rd. Auto, LLC v Granite Properties, LLC*,
   142 AD3d 976 (2d Dept 2016)...............................................................................15

*Abraham Zion Corp. v. Lebow*,
   593 F. Supp. 551 (S.D.N.Y. 1984)..........................................................................6

*Abramson v. Pataki*,
   278 F.3d 93 (2d Cir. 2002)......................................................................................4

Am. Fed. Grp.,
   2003 WL 22349673...................................................................................................6

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................4

*Aventine Inv. Mgt., Inc. v Can. Imperial Bank of Commerce*,
   265 AD2d 513 (2d Dept 1999)..............................................................................15

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004)...................................................................................14

*Byrne v. Barrett*,
   268 N.Y. 199 (1935)................................................................................................6

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................................4

*Clifford v. Janklow*,
   2023 WL 2711353 (S.D.N.Y. Mar. 30, 2023).........................................................6

*Computer Associates Intern., Inc. v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992)...................................................................................14

*Est. of Re v. Kornstein Veisz & Wexler*,
   958 F. Supp. 907 (S.D.N.Y. 1997).........................................................................13

*Executive Trim Construction, Inc. v. Gross*,
   525 F. Supp. 3d 357 (S.D.N.Y. 2021).....................................................................7

*Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd.*,
   2019 WL 1382341 (S.D.N.Y. Mar. 27, 2019) .........................................................8

*Friedman v. Kuczkir*,
   272 F. Supp. 3d 613 (S.D.N.Y. 2017).....................................................................5

*Hamil Am. Inc. v. GFI*,
   193 F.3d 92 (2d Cir. 1999).......................................................................................8

*Hay v. Gernert Co., Inc.*,
   2023 WL 402511 (S.D.N.Y. Jan. 25, 2023).....................................................4, 5, 7

*Horizon Comics Productions Inc. v. Marvel Entm't, LLC*,
   2019 WL 3080847 (S.D.N.Y. July 15, 2019) ..........................................................8

*James B. Nutter & Co. v County of Saratoga*,
   215 A.D. 3d 1183 (3d Dept. 2023)...........................................................................8

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003).......................................................................................8

*Kaumagraph Co. v. Stampagraph Co.*,
   235 N. Y. 1, 138 N. E. 485........................................................................................7

iii

*Kennedy v Atlas Fence, Inc.*,
  90 A.D. 3d 1122. (3d Dept. 2011)................................................................8, 15
*Lessem v. Taylor*,
  766 F. Supp. 2d 504 (S.D.N.Y. 2011)..............................................................8
*Little v. Gallus*,
  4 App. Div. 569 (N.Y. App. Div. 1896)............................................................7
*Matter of Caton*,
  168 N.Y.S.3d 860 (2d Dep't 2022)...................................................................4
*Morgan Art Found. Ltd. v. Brannan*,
  2020 WL 469982 (S.D.N.Y. Jan. 28, 2020).....................................................5
*North Atlantic Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999)...............................................................................7
*Parlux Fragrances, LLC v S. Carter Enterprises, LLC*,
  204 AD3d 72 (1st Dept 2022).........................................................................15
*Peter Lampack Agency, Inc. v Grimes*,
  29 Misc. 3d 1208(A) (Sup. Ct. 2010)...............................................................5
*Poller v. BioScrip, Inc.*,
  974 F. Supp. 2d 204 (S.D.N.Y. 2013)...............................................................6
*Price v. Fox Entm't Grp., Inc.*,
  2007 WL 241389 (S.D.N.Y. Jan. 26, 2007)......................................................8
*Sleppin v. Thinkscan.com*, LLC,
  55 F. Supp. 3d 366 (E.D.N.Y. 2014)...............................................................14
*Spinelli v. Natl. Football League*,
  903 F.3d 185 (2d Cir. 2018)............................................................................15
*Steinbeck v. McIntosh & Otis, Inc.*,
  2009 WL 928189 (S.D.N.Y. Mar. 31, 2009) ...................................................5
*Towler v. Sayles*,
  76 F.3d 579 (4th Cir. 1996)...............................................................................8
*U.S. Naval Inst. v. Charter Commun., Inc.*,
  936 F.2d 692 (2d Cir. 1991)............................................................................13
*Ulico Cas. Co. v Wilson, Elser, Moskowitz, Edelman & Dicker*,
  56 AD3d 1 (1st Dept 2008).............................................................................13
*Vetere v Pembrooke Land Dev. LLC*,
  156 A.D. 3d 1195 (3d Dept 2017)...............................................................8, 15
*Village On Canon v. Bankers Tr. Co.*,
  920 F. Supp. 520 (S.D.N.Y. 1996)....................................................................5

**Rules**

Fed. R. Civ. P. 56(c) ..........................................................................................4

**Other Authorities**

*Are Literary Agents (Really) Fiduciaries?*,
  86 Tenn. L. Rev. 825 (2019) .............................................................................5
Restatement (Third) of Agency &#167; 1.01 (Am. Law Inst. 2006) ...........................7

iv

Restatement (Third) of Agency § 8.02 (Am. L. Inst. 2006) ............................................................6

Restatement (Third) of Agency 8.04 (2006) ................................................................................6

Restatement (Third) of Agency § 8.05(1) (Am. L. Inst. 2006) ......................................................6

Restatement (Third) of Agency § 8.10 (Am. L. Inst. 2006) ..........................................................5

Restatement (Third) of Agency § 8.12(1) (Am. L. Inst. 2006) ......................................................5

Restatement (Third) of Agency § 8.12(2) (Am. L. Inst. 2006) ......................................................5

## **DEFENDANT'S MOTION SHOULD BE DENIED**

Prospect Agency ("Prospect"), through its president and literary agent Emily Kim, exploited Lynne Freeman's manuscript in concert with the other Defendants in this action to create the *Crave* book series. Doing so breached her ongoing fiduciary duties and duty of good faith and fair dealing toward Freeman. Defendants argue that all of Freeman's claims fail because her copyright infringement claims fail, but her state law claims are *not* dependent on those copyright claims and, in any event, there is at least a question of fact as to the validity of Freeman's copyright infringement claims. The Prospect Defendants also argue that literary agents have no fiduciary duties to their clients, but that argument flouts well-established case law and is meritless.

Defendants disingenuously claim that Freeman seeks to avoid comparing the underlying books[1] while doing everything they can to distract from the fact that an agent unquestionably has a fiduciary duty to her client, that duty continues in many respects after the agent ceases acting as an agent for her client, and that duty includes a duty of confidentiality regarding and a prohibition on using her former client's work without that client's consent—even if what is used is limited to ideas not protectable under copyright law. And in this case, there are material questions of fact as to whether Kim violated those duties by exploiting Freeman's work to create the *Crave* series with Tracy Wolff and the other Defendants.

This motion must be denied to the extent it challenges Freeman's claims for breach of fiduciary duties and breach of the implied covenant of good faith and fair dealing.[2]

---

[1] If Defendants believed Freeman's claims lacked merit, they would not move to strike her indexes and expert reports which specifically points the Court to the pages in the underlying works where claimed similarities of plot elements, scenes, characters, and specific language between can be found. But they did, and strenuously object to the Court even considering whether those similarities in fact exist in the underlying works.

[2] Freeman maintains that the Prospect Defendants also defrauded her but to streamline the issues before the court and focus on the primary claims she agrees that her fraud claim may be dismissed.

PLAINTIFF'S OPPOSITION TO THE PROSPECT DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

I.    **Factual Background**
   A.  **Prospect and Kim's working relationship with Freeman and *BMR***

On December 8, 2010, Freeman hired Kim and Prospect Agency as her "exclusive" literary agent. See Plaintiff's SUF 15.[3] Freeman then worked with Kim for more than three years revising and rewriting the manuscript for her young-adult paranormal romance story entitled *Blue Moon Rising* (later called *Masqued* and referred herein as "BMR"). SUF 16. During that time, Freeman sent Kim approximately 50 versions of BMR, along with notes and emails which all comprise the same continuous body of work. SUF 17. Kim admits receiving at least 10-15 versions and accompanying notes, and that older versions of Freeman's manuscripts may have been deleted when she received new ones. SUF 18. The Freeman Copyrighted Material ("FCM") reflects iterations and edits of one overarching story, and the original expression of the main story elements are captured in a subset of six versions of the manuscript and select notes. SUF 19.

In the summer of 2013, Kim emailed Defendant Liz Pelletier ("Pelletier") of Entangled Publishing about the BMR manuscript, then-titled *Masqued,* and e-mailed a copy of the manuscript to Stacy Abrams ("Abrams") at Entangled. SUF 23-24. She told Freeman that she knew Abrams "really well" and that Entangled was her "best bet" for a publisher. SUF 24.

By the end of 2013, Kim advised Freeman that the market for young adult paranormal romance was over-saturated, that she was unable to find a publisher for BMR, and that Freeman must write something new in the adult romance or erotica genres, or else she would be removed from the Prospect website. SUF 25. In Spring 2014, Freeman and Kim parted ways. SUF 26. Of Freeman's book Kim said: "It was good…she should have kept working on it." SUF 28.

---

[3] "SUF" as used in this motion refers to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (ECF 290) and is followed by the relevant enumerated fact from that document.

### B.  The relationship between the Defendants

At the 2012 Romance Writers of America conference, Kim introduced Freeman to Wolff, identifying Wolff as her good friend and client who wrote erotica. SUF 21. Wolff had achieved some success, but by 2018 her career was on the decline as she ███████████████████████ ████████████████████████████████████████ SUF 33. ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ SUF 34.

In 2018, Kim negotiated a deal for Wolff to write a book for Entangled after another project had fallen through. SUF 46. Wolff then wrote up five ideas and sent them to Abrams at Entangled. SUF 47. Pelletier and Abrams chose idea Number 2 because it was the one closest to what Pelletier was looking for. SUF 47. That idea became the *Crave* series, and Wolff claims that it only took her two-to-three months to write each of the first three books *Crave*, *Crush*, and *Covet.* SUF 48. *Crave* was released in April 2020. Five months later, in September 2020, the second book, *Crush*, was published. *Id.* The third book, *Covet*, was released in March 2021. *Id.* The fourth book, *Court*, was released February 2022. SUF 48.

Kim was actively involved in creating the *Crave* series. SUF 49. ████████████████ ████████████████████████████████████████████████████ SUF 80. Kim also created a collaborative Google Doc with chapter titles and outlines to "make it easier" for them to work together during in a time crunch to complete the books and started the "*Crave* Series Bible" while Wolff was writing the stories. SUF 88-89. And Kim directly participated in the writing of the *Crave* books. SUF 82. At one point Kim stayed up in ██████████████████████████████ ███ while she was writing. SUF 82. Another time, after Wolff told Kim she has a whole new chapter to write and is exhausted, Kim replies ██████████████████████ And Wolff replied: ██████████████████████████████████████████ SUF 84-85. In other text message Wolff asks Kim: ██████████████████████████████████ SUF 86. Kim tells Abrams, ██████████████████████████████ SUF 55. In text messages between Kim and Pelletier discussing writing in the *Crave* Google Doc, Pelletier asks Kim ███████

- 3 -

███████████████████████████████████████████████████████ SUF 87.

Kim then sends Pelletier ████████████████████████████████ seemingly indicating

that those paragraphs should be included in the *Crave* book. SUF 87.

## II.    Legal standard

Summary judgment is appropriate only where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to establish the lack of any factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether there is a genuine issue of material fact, "the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

Here, Defendants have not established that questions of fact do not exist as to Freeman's claims of breaches of fiduciary duty and covenant of good faith and fair dealing nor that these claims are fatally tethered to Freeman's claim of copyright infringement.

## III.    Substantial evidence supports Freeman's Breach of Fiduciary Duty and Breach of the Implied Covenant of Good Faith and Fair Dealing claims

A writer caught copying from a colleague will almost always deny all involvement in that misappropriation, and Kim and her cohorts are no different. But those denials are belied by the substantial circumstantial evidence establishing that Kim shared Freeman's work with Wolff and the other defendants in violation of her duties to Freeman. So owing, this motion must be denied.

### A.  There is ample evidence that Prospect and Kim breached their fiduciary duties to Freeman by using her BMR work to create the *Crave* series.

Freeman can and will prove her claim of breach of fiduciary duty under New York law by showing "(1) the existence of a fiduciary duty; (2) knowing breach of that duty; and (3) damages directly caused by such breach." *Hay v. Gernert Co., Inc.*, 2023 WL 402511, at *3 (S.D.N.Y. Jan. 25, 2023), citing *Matter of Caton*, 168 N.Y.S.3d 860, 860 (2d Dep't 2022)."

- 4 -

1.        **Prospect and Kim owed Freeman a fiduciary duty**

It is well settled that "[a] literary agent has a fiduciary duty to the agent's client and is required to act in the best interests of the client." *Friedman v. Kuczkir*, 272 F. Supp. 3d 613, 618 (S.D.N.Y. 2017); *see also, e.g., Steinbeck v. McIntosh & Otis, Inc.*, 2009 WL 928189, at *6 (S.D.N.Y. Mar. 31, 2009) ("M & O concedes that the literary agency owes a fiduciary duty to its clients[.]"); *Hay,* 2023 WL 402511, at *4 (breach of fiduciary duty claim was adequately alleged because it alleged "sufficient facts to show that Defendants owed Plaintiff a fiduciary duty over and above, or independent of, any contractual obligations that existed. Defendants, who by trade are literary agents, agreed to act in that role on behalf of Plaintiff. By its nature, this is a fiduciary relationship."); *Cf. Peter Lampack Agency, Inc. v Grimes*, 29 Misc. 3d 1208(A), at *6 (Sup. Ct. 2010), aff'd, 93 AD3d 430 [1st Dept 2012] (stating that, although literary agents have fiduciary duties to authors, authors do not have fiduciary duties to agents).

Here, the evidence shows that Prospect and Kim were agents for Freeman. Indeed, this relationship is confirmed in a written agreement. *See* SUF 15. When the language of the agreement between the parties lists the agent as the "exclusive agent" and the author relies on the agent to act on her behalf, the agent becomes a fiduciary of the author subject to all traditional duties and obligations of an agent-principal relationship, even if other language of the agreement precludes the existence of an agency relationship. *See Morgan Art Found. Ltd. v. Brannan*, 2020 WL 469982, at *19-20 (S.D.N.Y. Jan. 28, 2020); *see also Village On Canon v. Bankers Tr. Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996) ("…an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law.").

As Freeman's agents, the Prospect Defendants owed Freeman fiduciary duties including duties to refraining from conduct that is likely to damage their client's financial interests, protect the client's confidential information, not to mingle the client's property with anyone else's, and not to deal with the client's property as if it belongs to the agent. Jacqueline Lipton, *Are Literary Agents (Really) Fiduciaries?*, 86 TENN. L. REV. 825, 836 (2019), *citing* Restatement (Third) of Agency §§ 8.10, 8.05(2), 8.12(2), 8.12(1) (Am. L. Inst. 2006). Most importantly here, however,

are the *ongoing* duties, even after termination of the agency-principal relationship, not to acquire a material benefit from a third party in connection with transactions conducted on behalf of the client nor to use the client's property for the agent's purposes or those of another person. *See* Restatement (Third) of Agency §§ 8.02, 8.05(1) (Am. L. Inst. 2006); *compare with* Restatement (Third) of Agency §8.04 (the duty of an agent to refrain from competing with the principal or assisting the principal's competitors is explicitly stated to be applicable "[t]hroughout the duration of an agency relationship").

Defendants cannot dispute that "the Second Circuit, and New York, both recognize that 'an employee's fiduciary duty may continue after termination of the employment relationship.'" *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (citing Am. Fed. Grp., 2003 WL 22349673, at *13). As explained by the Court in *Poller*, "this duty may include 'the specific duty not to divert business in which a former employer has the requisite 'tangible expectancy,' and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment." Id. at 227-228, citing *Abraham Zion Corp. v. Lebow*, 593 F. Supp. 551, 569 (S.D.N.Y. 1984), *aff'd,* 761 F.2d 93 (2d Cir. 1985). And that ongoing duty is "an absolute and not a relative duty." *Byrne v. Barrett*, 268 N.Y. 199, 206 (1935). Thus, Kim and Prospect owed these duties to Freeman even after their official relationship ended.

Defendant's reliance on *Clifford v. Janklow*, 2023 WL 2711353 (S.D.N.Y. Mar. 30, 2023), an unpublished district court opinion that no subsequent case has relied on (at least as of this filing), misreads that case and is misplaced. In *Clifford* the court considered the plaintiff's claims that her literary agent breached its fiduciary duties by sending payments owed to the plaintiff to her attorney (Michael Avennati, who seemingly absconded with the money) instead of directly to her. It found those allegations insufficient to state a claim for breach of fiduciary duties because the contract at issue permitted the agent to remit those payments to plaintiff *or her representative*, and in any event the allegations concerned "[p]urely commercial transactions," i.e., the forwarding of funds owed. *Id.* While the court granted the defendant's motion to dismiss plaintiffs' breach of

fiduciary duties claims, it did *not* state that literary agents owe no fiduciary duties to their clients. Indeed, interpreting *Clifford* otherwise would contravene the very foundations of agency law. *See* Restatement (Third) of Agency § 1.01 cmt. e (Am. L. Inst. 2006) (defining agency as a "fiduciary relationship").

### 2. Kim and Prospect breached their duties to Freeman

The evidence also establishes at least a triable issue as to the second element, the Prospect Defendants' breach of their duties to Freeman. *Hay,* 2023 WL 402511, at *3. Crucially, "an agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999); *see also Executive Trim Construction, Inc. v. Gross*, 525 F. Supp. 3d 357, 375 (S.D.N.Y. 2021)(finding that the plaintiff stated a claim for breach of fiduciary duty where a former employee used confidential information at subsequent job). If a fiduciary exploits "confidential knowledge acquired in his employment in competition with his principal" that fiduciary has breached their duties. *Kaumagraph Co. v. Stampagraph Co*., 235 N. Y. 1, 6, 138 N. E. 485; *Little v. Gallus*, 4 App. Div. 569, 38 N. Y. S. 487; *Executive Trim Construction, Inc.*, 525 F. Supp. 3d at 376("even former employees may not misappropriate and utilize confidential information[.]").

### a. Prospect and Kim accessed Freeman's proprietary work

After accessing *many* versions of Freeman's manuscripts and corresponding notes through which Freeman developed her characters and plotlines and having countless discussions with Freeman how best to present her story and set up sequels, the Prospect Defendants worked with Kim to create the *Crave* series. They had an absolute duty to keep Freeman's information confidential and not use it to create a different competing book with a preferred writer, and the evidence strongly suggests they breached that duty.

### b. There is at least a question of fact as to whether Kim conveyed Freeman's work to Wolff

The Prospect Defendants wrongly argue that there is "no evidence whatsoever in the record that [they] provided Freeman's copyrighted material to Wolff." First, the record includes ample

circumstantial evidence establishing just that. And second, Freeman need not show that Kim provided *copyrighted* material to defendants (as discussed in Section II(B) below).

New York courts have made clear that "[c]ircumstantial evidence may be used to defeat a motion for summary judgment" in a case like this. *Vetere v Pembrooke Land Dev. LLC*, 156 A.D. 3d 1195, 1198 (3d Dept 2017), *citing Kennedy v Atlas Fence, Inc.*, 90 A.D. 3 1122, 1124. (3d Dept. 2011); *see also James B. Nutter & Co. v County of Saratoga*, 215 A.D. 3d 1183, 1185 (3d Dept. 2023). And the Second Circuit has explained that since direct evidence of access is seldom available, a plaintiff may establish the unauthorized sharing and use of a work circumstantially "by demonstrating that the person who composed the defendant's work had access to the… material," and/or that there are similarities between the two works that are "probative of copying." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).

Moreover, it may be inferred that Kim shared Freeman's work with Wolff given her "close relationship with the infringer." *Lessem v. Taylor*, 766 F. Supp. 2d 504, 508–09 (S.D.N.Y. 2011) (citations omitted); see also *Horizon Comics Productions Inc. v. Marvel Entm't, LLC*, 2019 WL 3080847, at *4 (S.D.N.Y. July 15, 2019) ("a court may infer that a reasonable possibility of access exists if 'the author sent the copyrighted work to a third party intermediary who has a *close relationship* with the infringer.'") (emphasis in original); *Price v. Fox Entm't Grp., Inc.*, 2007 WL 241389, at *8 (inferring a reasonable possibility of access when the intermediary and the defendant are "business friends"). This includes where the intermediary "supervises or works in the same department as the infringer or contributes creative ideas to [the infringer]." *Feuer-Goldstein, Inc. v. Michael Hill Franchise Pty. Ltd*., 2019 WL 1382341, at *6 (S.D.N.Y. Mar. 27, 2019), citing *Jorgensen*, 351 F.3d at 53, quoting *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996).

Here, Kim worked with Freeman for *years* to develop BMR and received *many* versions of her manuscripts and notes.[4] And Kim admits both that she delivered Freeman's work to

---

[4] Defendants have suggested that Kim could not have had access to versions of the *BMR*/*Masqued* manuscripts that have "creation" dates in their metadata indicating they were created after Kim stopped representing Freeman in 2014. But Kim admits that she remained in contact with Freeman

Entangled (Pelletier and Abrams) and that she is close personal friends with Wolff. [SSUF 22-24, 36-37]. Similarly, Kim has had a long-standing friendship with both Pelletier and Abrams. [SSUF 38-40, 43]. This is ample evidence, when combined with the similarities between the works (discussed below), upon which to find that Kim exploited Freeman's work to Wolff.

But the evidence here is even more compelling as it is beyond reasonable dispute that Kim was actively involved in the creation of the *Crave* series. She not only created Google Docs for chapter titles and outlines and started the "*Crave* Series Bible," (SUF 88-89) but actively participated in writing with Wolff. For example, after Wolff told Kim she has a whole new chapter to write and is exhausted, Kim replies "Do you want to write together again?" And Wolff replied: "Want tonget [sic] in a google doc and help me write, I am falling asleep." SUF 84-85. In other text message Wolff asks Kim: "Want to get in Google Doc and help me write?" SUF 86. Kim tells Abrams, "Tracy and I are team speed writing new scenes." SUF 55. In text messages between Kim and Pelletier discussing writing in the *Crave* Google Doc, Kim texts Pelletier, "Tracy [Wolff] and I are working in Google Docs." SUF 87. Kim then sends Pelletier entire paragraphs followed by "use this instead," seemingly indicating that those paragraphs should be included in the *Crave* book. SUF 87. And at one point Kim stayed up in "a Google Doc with [Wolff] for 19 hours a day" while she was writing. SUF 82. Simply put, Kim was involved in writing the *Crave* series from the beginning and co-wrote the books in a shared Google Doc, and Wolff has admitted that the *Crave* series was a "group project." SUF 51-53, 59, 62-64. Access is thus clear.

Kim not only had access to Freeman's materials but based on her involvement and close friendship with Wolff and the publishers of *Crave*, she also had ample opportunity to—and likely did—share those materials with Wolff and the other defendants, and a jury would readily find that she did so.

---

after that date and that "creation" date in the Word versions of the manuscripts is simply the date the document was saved and does not reflect the date the contents were created. As testified by Freeman, each version of BMR on which her comparison rests was provided to Kim. *See* Freeman's response to Defendants' SSUF 24; Freeman Supp. Decl. ¶¶6-18.

      c.     **The remarkable similarities between the works strongly suggests that Kim shared BMR's characters, scenes and plot with Wolff.**

Since this Court will be considering this motion concurrently with the parties cross-motions for summary judgment and this brief is limited to 20 pages, Freeman will not reiterate here all of the remarkable similarities between BMR and the *Crave* Series but directs the Court to her Opposition to Defendants Rule 56.1 statement of undisputed facts and the additional undisputed facts she incorporated therein. *See* Plaintiff's Additional Stated Undisputed Facts ("ASUF") 154 through 780. Those facts establish, *inter alia* that:

Both works concern an approximately 17-year-old girl from San Diego who moves to Alaska after an accident kills her family members.[5] Her last words with them were part of a fight for which she harbors guilt, and she suffers panic and anxiety from the trauma.[6] She now lives with the only two family members she believes she has left, and they are both supernatural witches, which she doesn't know at first.[7] She's been kept ignorant of the supernatural world by her family, and they have kept her powers bound to protect her using a specific tea blend.[8] On the first school day scene, she meets the romantic lead who she later learns is suffering from and feels responsible for the death of his older brother (who was 19 in BMR and looked about 19 in *Crave*).[9] As their romantic bond develops, she learns that he is a supernatural being trying to stop a supernatural war.[10] At the climax of the story, she is kidnapped by a vampire who wants to bring back his / her dead mate (who isn't dead and is alive in another dimension) and needs the heroine in order to do so.[11] This vampire believes the heroine will be the *reincarnation* of his dead mate / will be used in a spell to *resurrect* her dead mate.[12] This vampire also wants to use the heroine as an act of vengeance against the person believed to be responsible for the mate's death.[13] The heroine turns

---

[5] ASUF 154, 445.
[6] ASUF 449, 456.
[7] ASUF 339.
[8] ASUF 345, 392.
[9] ASUF 164-165.
[10] ASUF 244
[11] ASUF 261, 266.
[12] ASUF 266.
[13] ASUF 267.

out to be a unique supernatural being made of magic who is a protector of supernaturals, humans, and other creatures.[14] She learns this from her grandmother, who she initially did not even know existed but who he then learned was one of the twin goddesses underlying the creation story of the supernaturals.[15] At the end of the book, the Bloodletter character turns into a raven / winged creature and flies away.[16]

Then, subplots of BMR mirror the main plots in *Crush* (Book 2), *Covet* (Book 3), and *Court* (Book 4).[17] Moreover, the same characters from the book *Crave* appear in each book of the *Crave* series, as would be expected given that the later books are derivative of the *Crave* book. *Id.*

With regard to characters, Freeman found that BMR and the *Crave* series share at least 11 character names, some of which are highly unusual, like the Bloodletter, Marise, Fiona, God of Chaos, and Collin/Colin. And the particulars of many of the parallel characters are eerily similar as well. The ultimate villain is a strikingly similar Vampire Prince in BMR and Vampire King in *Crave*.[18] The two voices the heroine hears in her head are also parallel characters with striking similarities. One voice turns out to be her long-lost father in BMR and long-lost grandfather in *Crave*, who speaks **Gaelic**, has "smokey-gray eyes," and has been trapped in his supernatural form on an island by the vampire prince / vampire king.[19] The heroine visits him by portal and tries to free him.[20] She "promises" she'll "be back" and tells him she's a "friend."[21] The second voice in her head is the second romantic lead who was to be the heroine's true mate and is originally believed to be evil and is living in another dimension until the heroine accidentally brings him back to our world and discovers that he is in fact good.[22] Each heroine has a remarkably similar mixed-race part Black male friend who is gay, and only she knows that he is gay.[23] In each story

---

[14] ASUF 397, 404.
[15] ASUF 642-645
[16] ASUF 283.
[17] SUF 96, ASUF 313-331.
[18] ASUF 696-727.
[19] ASUF 576, 580, 582-583, 585.
[20] ASUF 576.
[21] ASUF 578-579.
[22] ASUF 605, 612, 617, 628.
[23] ASUF 728-730.

the heroine has a female nemesis who is a school mate of the heroine but also a supernatural creature who gives the heroine a spiked drink which foreshadows the events at the climax of the story when the heroine is abducted.[24] ASUF 210, 680, 684, 691.

A jury could readily find it more likely than not that the similarities between Freeman's BMR work and the *Crave* series are the result of Kim sharing Freeman's work with Wolff, either directly or by feeding her key character, plot, and scene points from BMR throughout the writing process. And if a jury finds so, then it must find that Kim violated her fiduciary duties to Freeman. Therefore, this motion must be denied.

### d. Kim had strong incentive to convey Freeman's work to Wolff

In her declaration filed in support of these motions, Pelletier states:

> "There is no reason why we would want to plagiarize BMR. Tracy is an exceptionally talented author who has published nearly 70 books, several of which were New York Times or USA Today bestsellers before she wrote Crave… It makes no sense that someone as talented as Tracy would need to copy from another author…"

Decl. of Liz Pelletier (ECF 303) ¶3. Similarly, Kim claims that "Wolff's career was on the rise throughout the 2010s and right up to the present day" to suggest that she would not have had any need to share Freeman's work with Wolff. Decl. of Emily Kim (ECF 306) ¶ 63.

But the evidence belies that testimony and establishes that Wolff's career was on a significant decline, and she had writer's block. Indeed, Wolff admits that by 2018 she had writer's block, trouble meeting deadlines, and felt she was "tanking" her career. [SSUF 33]. She lost book deals, was experiencing financial stress, and was soliciting "work for hire" opportunities rather than writing her own original stories. [SSUF 34]. And it appears from a review of information available on Publisher's Marketplace both that Prospect's agency business was losing its biggest earners to independent or hybrid publishing, which was disrupting the publishing industry at the time, and that Wolff's career itself was in sharp decline. [Witthohn report, Pars. 14-29]

---

[24] ASUF 210, 680, 684, 691.

- 12 -

On the other hand, Kim knew that Freeman had a great story that Wolff could rework. Not only does Kim admit that Freeman's work "was good…she should have kept working on it," (SUF 28) but she admits that in 2011 one of her readers provided the following feedback on Freeman's work: "*I really, really enjoyed this story. I started it yesterday afternoon and read it all in one go—it was just that engaging.*" *See* Dkt. 306, Par. 20. And that was before Kim worked with Freeman to refine and improve the work across the next two years.

Kim had a gem in Freeman's manuscript, a good friend in desperate need of a boost, and a financial incentive to put the two together. A jury could readily find that she did just that in utter disregard of her fiduciary duties to Freeman. Therefore, this motion must be denied.

### B. Freeman's fiduciary duties and contract claims are not dependent on her copyright infringement claims

Defendants argue, repeatedly and with no supporting authority, that Freeman's state law claims are somehow dependent on the success of her copyright claims. They are not.

A finding that a defendant is not liable for copyright infringement does not preclude liability for state court claims. *U.S. Naval Inst. v. Charter Commun., Inc*., 936 F.2d 692, 695-8 (2d Cir. 1991) (holding that defendant was still liable for breach of contract despite not being liable for copyright infringement). An action for breach of fiduciary duty is similarly unaffected because it requires not a showing of copying but a breach of confidence or conflict of interest that amounts "merely to a substantial factor in [the plaintiff's] loss." *Ulico Cas. Co. v Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 AD3d 1, 10 (1st Dept 2008), *citing Est. of Re v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 924 (S.D.N.Y. 1997). And as set forth above, an agent improperly shares (or uses for her own benefit) information or materials provided by her client regardless of those materials are protectable under copyright law.

A breach of fiduciary duty claim is thus not dependent on the outcome of a copyright infringement claim because the causes of action are qualitatively different from one another. For a breach of fiduciary duty claim, we must determine if the defendant owed the plaintiff a fiduciary obligation and if it was violated. *See Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296,

307 (2d Cir. 2004), *citing Computer Associates Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992).

Indeed, Second Circuit has held that Copyright Act claims are discrete from state law claims if they contain "any extra elements that make it qualitatively different from a copyright infringement claim." *Sleppin v. Thinkscan.com*, LLC, 55 F. Supp. 3d 366, 374 (E.D.N.Y. 2014)(citations omitted). And a "breach of fiduciary" duty requires elements "qualitatively different" from a copyright claim. *Id.* at 306; *Computer Assocs. Intern., Inc.*, 982 F.2d at 717 ("However, many state law rights that can arise in connection with instances of copyright infringement satisfy the extra element test, and thus are not preempted by section 301 [of the Copyright Act]. These include unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets." (citation omitted)).

To be clear, Freeman does not claim that Prospect and Kim breached their fiduciary duties to her because they committed copyright infringement—she claims that they breached their fiduciary duties by exploiting her work with a third-party competitor to her detriment regard;ess of whether that also constitutes copyright infringement. And she makes these claims because it is evident that Prospect and Kim shared her work—both protectable *and unprotectable* ideas for the storyline, characters, mythology, etc. with the other Defendants to create the *Crave* series. That claim remains viable even if this Court somehow found that all similarities to be of elements that are unprotectable under copyright law.

Similarly, Freeman does not claim that Prospect and Kim breached their duty of good faith and fair dealing to her because they committed copyright infringement—she claims that they breached that duty because, as set forth below, Kim unreasonably frustrated the very purpose of her agency agreement by helping Wolff to create and publish a story that hews so closely to BMR's story and characters that it likely destroyed any market for Freeman's work. Neither of these state court claims are thus dependent on Freeman's copyright claims.

- 14 -

### C. Freeman's breach of implied covenant of good faith and fair dealing claim is supported by substantial evidence

Freeman's claim for breach of implied covenant of good faith and fair dealing breach are equally supported by substantial evidence—much of it the same as the evidence in support of her breach of fiduciary duties claim. Defendants claim the "factual contours" of Freeman's claim are opaque, but there is ample evidence that Kim shared Freeman's BMR manuscript with Wolff as they wrote the *Crave* book series, frustrating the very purpose for which Freeman contracted with Kim. Accordingly, this motion must be denied as to that claim as well.

A "breach of the implied covenant of good faith and fair dealing is a breach of the contract itself." *Parlux Fragrances, LLC v S. Carter Enterprises, LLC*, 204 AD3d 72, 91-2 (1st Dept 2022). "The implied covenant of good faith and fair dealing is breached when a party acts in a manner that would deprive the other party of the right to receive the benefits of their agreement[,]" which includes "any promises which a reasonable promise would be justified in understanding were included" that are not inconsistent with terms of the contract. *1357 Tarrytown Rd. Auto, LLC v Granite Properties*, *LLC*, 142 AD3d 976, 977 (2d Dept 2016). The party claiming the breach "must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Aventine Inv. Mgt., Inc. v Can. Imperial Bank of Commerce*, 265 AD2d 513, 514 (2d Dept 1999). Additionally, circumstantial evidence is sufficient to defeat a motion for summary judgment. *Vetere v Pembrooke Land Dev. LLC*, 156 AD3d 1195, 1198 (3d Dept 2017), *citing Kennedy v Atlas Fence, Inc.*, 90 AD3d 1122 (3d Dept 2011).

In cases involving intellectual property, a breach of the implied covenant of good faith and fair dealing can occur when the plaintiff "plausibly" alleges that she was deprived "the [fruit] of" the agreement as a result of the defendant using the plaintiff's intellectual property for pecuniary gain without sharing the proceeds with the plaintiff. *See Spinelli v. Natl. Football League*, 903 F.3d 185, 205-6 (2d Cir. 2018) (holding that claims that parties made a secret arrangement to purportedly license the plaintiff's photographs and deprived plaintiff of a "significant revenue stream" was sufficient to plausibly allege a breach of implied covenant of good faith and fair dealing).

Here, it is undisputed that Freeman retained Kim to help her publish her BMR work and provided Kim and Prospect with at least ten to fifteen (10-15) versions of the *BMR* manuscript. It is also undisputed that in the summer of 2013, Kim emailed Pelletier about Freeman's manuscript and sent Pelletier's colleague at Entangled, Abrams, an actual copy of the *BMR* manuscript. [SSUF 23-24]. And it is beyond reasonable dispute that Kim worked with Wolff, Abrams and Pelletier to create the *Crave* series and had had ample opportunity to share Freeman's work and ideas with Wolff and the other defendants. And, again, a jury could readily conclude that there are far too many similarities for that to be a coincidence.

The result of Kim's apparent malfeasance was, of course, that Kim and her good friend Tracy Wolff enjoyed the fruits of Freeman's labors while Freeman's manuscript became all but worthless—given the remarkable similarities between its characters, scenes and plot anyone familiar with the best-selling works in the genre would immediately see that her work mirrors the *Crave* series. Thus, a jury could readily find that Kim has utterly and unreasonably frustrated the purpose of Freeman's agreement with her in violation of her obligations of good faith and fair dealing.

### V.      Conclusion

Defendants' attempts to mischaracterize Plaintiff Freeman's pleadings, arguments, and the law remain unconvincing. A reasonable trier of fact can, considering the substantial direct and circumstantial evidence presented by Freeman, find Kim and Prospect liable for breaches of fiduciary duties and the implied covenant of good faith and fair dealing for unlawfully disclosing and/or misappropriating the *BMR* manuscripts to create the *Crave* books. This motion should therefore be denied.

Respectfully submitted,

Dated: February 7, 2024            By:     */s/ Stephen M. Doniger*
Los Angeles, CA                              Stephen M. Doniger, Esq.
                                             (admitted *pro hac vice*)
                                             Mackenzie Paladino, Esq.
                                             DONIGER / BURROUGHS
                                             247 Water Street, First Floor
                                             New York, New York 10038

PLAINTIFF'S OPPOSITION TO THE PROSPECT DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

(310) 590-1820
stephen@donigerlawfirm.com

Mark Passin, Esq.
**Reeder McCreary, LLP**
11766 Wilshire Boulevard,Suite 1470
Los Angeles, California 90025
(310)861-2475
mark@reedermccreary.com

PLAINTIFF'S OPPOSITION TO THE PROSPECT DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS