# EXHIBIT 1

**In the Matter Of:**

*LYNNE FREEMAN vs*

*TRACY DEEBS-ELKENANEY*

---

*LYNNE FREEMAN*

*March 24, 2023*

---



15

```
 1   documents that demonstrate that Tracy Wolff

 2   had access to your manuscripts?

 3        A.   No.

 4        Q.   Have you ever seen any written

 5   documents that demonstrate that Liz Pelletier

 6   had access to your manuscripts?

 7        A.   I'm not sure about that.  I don't

 8   know.

 9        Q.   Where do you live right now?

10        A.   Where do I live?

11        Q.   Yes.

12        A.   I'm living in Santa Barbara right

13   now.

14        Q.   And do you also have a home in

15   Alaska?

16        A.   We sold our family home in Alaska.

17   We have another office and residence that

18   we -- it's an office where you can also

19   sleep.  There's a bedroom.

20        Q.   So do you split your time between

21   Alaska and California?

22        A.   Generally speaking, we had moved

23   back to Alaska to live and had not intended

24   to split our time between Alaska and

25   California, but I am what I view as stuck
```

16

```
 1   here right now.
 2        Q.    Why do you say you're stuck here?
 3        A.    I can't get on a plane to fly back
 4   home, and I can't drive back home right now.
 5        Q.    And why is that?
 6        A.    I have a disability.  I have panic
 7   attacks, and when I am -- if there's been a
 8   trauma that triggers me, I'm not able to fly,
 9   and I'm not able to drive long distances, so
10   I'm here right now.
11        Q.    And did you have a trauma that
12   triggered you recently?
13        A.    Yes.
14        Q.    What was that?
15        A.    The trauma is going into the
16   bookstore and finding the Crave series of
17   books.
18        Q.    And why is that traumatizing?
19        A.    Because those books contain my
20   life's work, my stories as I wrote them, and
21   information that I shared privately with my
22   agent about not only my life but about
23   developments that we discussed from my books
24   and elements from my stories.  And they are
25   in Crave, all of them.
```

LYNNE FREEMAN vs
TRACY DEEBS-ELKENANEY                  Attorneys Eyes Only

Lynne Freeman
March 24, 2023

19

```
1      Q.    And how was that resolved?

2      A.    I won the fee arbitration.

3      Q.    Are you currently practicing law?

4      A.    At the moment, no -- well, I'm not

5  practicing law in traditional sense.  I am

6  doing consultant work for people who can't

7  afford attorneys, and I do that for free.

8           I don't have a lot of time for

9  that, but I have one case where I'm serving

10 as a free consultant -- well, two cases where

11 I'm serving as a free consultant for people

12 who can't afford attorneys.  And they have

13 someone who is maybe assigned by the state or

14 something, and I will given consultant advice

15 for them.

16     Q.    And in what state is this in?

17     A.    It's California.  I'm not allowed

18 to practice here without being licensed, but

19 I can give consulting advice with another

20 attorney who is helping that person.

21     Q.    Is this through another attorney's

22 office or another organization?

23     A.    Yeah, yeah, through another

24 attorney's office.  If somebody needs it, and

25 they know about me, I will help them.
```

176

```
 1        A.    Can you define for me the basis,

 2   please?

 3        Q.    What is this belief based -- what

 4   is your belief based on?

 5        A.    Okay.  The belief that Tracy

 6   copied my manuscripts is based on three

 7   things.  One, it is based upon some documents

 8   that I've seen in production of early

 9   versions of Crave that have my exact language

10   or pieces from my book that didn't make it

11   into the published version.

12             It is based on the overwhelming

13   similarities of plot, subplot, characters,

14   scenes, dialogue, sequences.  And there's a

15   third thing, but this is -- it is also based

16   on communications that I had with Emily over

17   the years about my life, personal things

18   about me and my family, personal developments

19   that we had in mind for my book series that

20   would be nowhere else, and they're in the

21   Crave series.

22             That is the answer to that

23   question.

24        Q.    What types of personal things did

25   you talk about with Emily that you allege are
```

1   now in the Crave series?

2        A.    There's a lot to unpack with that

3   one.  So one would be the importance of the

4   heroine having panic and anxiety, what that

5   feels like, why I wrote a character like that

6   for these books, why it was so important to

7   me.

8             Emily felt hesitant about that.

9   She didn't want to have a weak character, and

10  I felt that having a heroine with panic

11  attacks from trauma of losing family and

12  being courageous in the face of the trauma in

13  a supernatural world was really huge.  And

14  this was at a time when -- back in 2010 and

15  the early time when you didn't find -- at

16  least I didn't find young adult book books

17  like that with a heroine written that way.

18             And it's personal to me because

19  that's my story.  These are based on a

20  semi-autobiographical story that I created as

21  a child growing up in Alaska based on my own

22  life, and that was discussed with Emily.

23             Where the book was going to go;

24  the ideas we had; gargoyles, for example.  We

25  specifically discussed my heroine turning

1  into a gargoyle.  Emily wanted a name for

2  what she was.  I didn't have a name.  She was

3  of these different bloodlines, part goddess,

4  part witch, part werewolf, and she wanted a

5  name for that.  And she didn't know what

6  gargoyles were, and I have a gargoyle

7  collection.

8          They were all over my writing

9  room.  And we discussed that specifically for

10  my book.

11          We discussed the heroine being in

12  a Harry Potter-like boarding school, and

13  Harry Potter was big at that time, coming out

14  with all the movies and everything.  And it

15  would seem -- at the time that Emily and I

16  discussed it, I thought it would be cool.

17  What if the -- because what if the heroine is

18  a new girl?  What if she comes to this

19  boarding school?

20          And Emily felt like Harry Potter

21  was so big at the time that we couldn't do

22  it.  And these were developments discussed

23  for my story and my book, and they are in

24  Crave.  And there's more.

25      Q.    You said that you had discussed

219

1      A.    Yes, I do.

2      Q.    And do you recall whether you knew

3   when you submitted your manuscript to

4   Prospect Agency for review whether you had

5   seen that Tracy Wolff was one of

6   Prospect Agency's authors?

7      A.    Absolutely not.

8      Q.    And why do you say, absolutely

9   not?

10     A.    Because I had no knowledge of who

11  Tracy Wolff was or any of the authors on the

12  Prospect website before I went on to sign

13  with Emily.

14     Q.    Were you familiar at that point in

15  time with young adult authors in general?

16     A.    Not really, no.

17     Q.    And I think earlier you testified

18  that you did not know that your book -- if

19  I'm remembering this right -- was a young

20  adult paranormal romance or fit into that

21  genre; is that correct?

22     A.    I don't believe I testified to

23  that.

24     Q.    No?

25     A.    No.

220

```
 1        Q.    I thought at one point, you said

 2   you did not know -- that when you showed it

 3   to friends, they -- maybe you said they

 4   didn't know what it was?

 5        A.    I don't recall that.

 6        Q.    Okay.  What happened after you

 7   submitted -- well, strike that.

 8             How many chapters of your

 9   manuscript BMR did you submit to Prospect

10   Agency for review?

11        A.    I'm not sure because as I recall,

12   Emily's website you had to upload the writing

13   sample into it.  This is my recollection of

14   how it was done.  And I'm not sure it was by

15   chapters or -- it seems like it would have

16   been a number of pages, and I don't know how

17   many page numbers.

18        Q.    Do you recall about when you would

19   have done that?

20        A.    I would have done it at the same

21   time that I sent it to Jodi Reamer.  That was

22   October 2nd of 2010.  I tried to do them in

23   small batches of, like, two people at a time.

24        Q.    So since you had sent -- you said

25   you sent to more than two.  So had you done a
```

Case 1:22-cv-02435-LLS-SN    Document 331-1    Filed 02/08/24    Page 11 of 31
LYNNE FREEMAN vs                                              Lynne Freeman
TRACY DEEBS-ELKENANEY          Attorneys Eyes Only            March 24, 2023

239

1   and that sales had the number -- quota of

2   books that they were doing for that year,

3   that with the success of Twilight, the market

4   was really getting flooded and I needed to

5   try to get out with publishers in -- in the

6   US or -- yeah.

7        Q.    And that was advice from

8   HarperCollins UK through your friend

9   Michelle, that you should go to other

10  publishers; is that right?

11            MR. DONIGER:  Objection.  Lacks

12       foundation.

13       A.    Yes, they did.  She did.

14  BY MR. KOONCE:

15       Q.    Before entering into your -- the

16  agency agreement with Prospect Agency, did

17  Ms. Kim make any recommendations to you about

18  to whom she would show your manuscript?

19       A.    Can you repeat that question,

20  please?

21       Q.    Sure.

22            Before you entered into your --

23  the agency agreement with Prospect Agency,

24  did Emily Kim make any representations to you

25  about who she would show your manuscript to?

1        A.    Before we entered -- I'm trying to

2   understand.  Before we entered into an

3   agreement to be represented together, you're

4   asking if Emily said to me who she was going

5   to show my manuscript to?

6        Q.    Or who she was not going to show

7   your manuscript to?

8        A.    I don't understand the question.

9   I'm so sorry.

10        Q.    That's fine.

11              Did she ever represent to you that

12   the only people she would show your

13   manuscript to were editors at publishing

14   houses and readers?

15        A.    Yes.

16        Q.    When did she make that

17   representation to you?

18        A.    I don't recall the when of it.  I

19   just recall the specificity of it.

20        Q.    And what was the context for that

21   conversation with her?

22        A.    My mom told me that I should be

23   getting my book registered with the copyright

24   office.  You know, my mom was concerned

25   about, you know, somebody stealing the idea

256

1  the time to read every version of everything

2  I wrote.  So I literally just made a best

3  guess.

4       Q.   So is the first time you

5  registered anything with the copyright office

6  relating to your manuscript, after you had

7  picked up the -- picked up Crush in the

8  bookstore?

9       A.   Yes.

10      Q.   Did you keep working on your

11 manuscript after you eventually parted ways

12 with Prospect Agency?

13      A.   Yes.

14      Q.   And I take it you did not send any

15 versions of your manuscript that you worked

16 on after you parted ways with Prospect Agency

17 to Ms. Kim?

18      A.   I don't recall.

19      Q.   Would there have been a reason for

20 you to send her versions of your manuscript

21 after you parted ways with Prospect Agency?

22      A.   Yes.

23      Q.   Why -- why would you have done

24 that?

25      A.   Emily reached out to me in 2015

257

1  when I was headed to a Santa Barbara Writers

2  Conference with a piece of what I was working

3  on at that time, and she said she was

4  interested in it and I -- for the Santa

5  Barbara Writers Conference, I was preparing

6  that to give to them.

7       Q.    And you believe you sent that to

8  Ms. Kim?

9       A.    I do.

10      Q.    Okay.  Are there e-mails between

11 you and Ms. Kim when she reached out to you?

12      A.    There's only the one that I have.

13      Q.    As you sit here today, do you

14 recall definitively whether you sent Ms. Kim

15 anything in 2015?

16      A.    I do not recall definitively.

17      Q.    And is that -- when you say it was

18 a piece of the manuscript that you were going

19 to show at the Santa Barbara conference, was

20 it the entirety of what was then called

21 Masqued?

22      A.    No.  No.

23      Q.    What portion -- how large of

24 portion was it?

25      A.    What I did is that I took the

258

1   first -- don't quote me about exact number of

2   pages, but it's 150-ish pages.  It could be

3   180.  It could be 120, but something around a

4   150 pages for my 2014 manuscript, and there

5   were different versions of 2014 I had been

6   working on simultaneously when I was with

7   Emily.  And I took those 140 pages, and I

8   saved them and used it for the Santa Barbara

9   Writers Conference.

10       Q.    Okay.  And do you have a copy of

11  that version of your work somewhere?

12       A.    We all do.  It's in production.

13  It's -- yes.

14       Q.    What's it called?

15       A.    It's -- I call it 2016, but that's

16  what it is.

17       Q.    Even though this is something you

18  prepared in 2015?

19       A.    And 2014, actually, yes.  I opened

20  it up and at some point saved over it.  It's

21  what's in my computer that way.

22       Q.    Let's go back in time.  You

23  clearly created versions of your manuscript,

24  which at the time was called Blue Moon

25  Rising, prior to the time you worked with

259

 1   Prospect Agency and Ms. Kim, correct?

 2        A.    Yes.

 3        Q.    Did you ever send the earlier

 4   versions of your manuscript to Ms. Kim after

 5   you started working with her?

 6        A.    Yes.

 7        Q.    You did.  And when was that?

 8        A.    That would be at the Romance

 9   Writers of America Conference in 2012.

10        Q.    And what did you provide to her at

11   the romance writers' conference of 2012?

12        A.    I provided to Emily all of the

13   notes that I had that she had not previously

14   received.  I provided old -- an old version

15   of the manuscript that she had not received.

16   I provided photos to her of certain items she

17   and I discussed prior to me going to the

18   writers' conference.

19        Q.    And how did you provide that

20   material to her?

21        A.    So the notes and the old

22   manuscript bits were provided on a thumb

23   drive.  And then the photos were printed in

24   eight-by-ten pictures from my printer.

25        Q.    And do you have any record of

260

1    providing that to Ms. Kim?

2           MR. DONIGER:  Vague and

3       ambiguous as to record.

4           THE WITNESS:  Can you say that

5       again, please.

6           MR. DONIGER:  I said vague and

7       ambiguous as to record.

8       A.    Yeah.  Can you please explain what

9    you mean?

10   BY MR. KOONCE:

11      Q.    Do you have any evidence, other

12   than your memory, that you provided all of

13   that material on a thumb drive to Ms. Kim at

14   the romance writers' conference?

15      A.    Any other evidence?  Well, my

16   husband is the one who did all the work for

17   me to do it because I'm technologically

18   challenged on the best of days, so Trent put

19   together the thumb drives for me, and it was

20   Trent who uploaded the photos and printed

21   everything out for me and put it in the

22   folder for me.

23      Q.    And why were you delivering this

24   material to Ms. Kim?

25      A.    Emily told me that she wanted to

1    really have some time to really focus in on

2    what had inspired me for the books, what made

3    them interesting to me, where I was thinking,

4    you know, what my thoughts were, what my,

5    creative process was.

6           You know, I talk about the Dario

7    Campanile painting.  I spoke about it earlier

8    today.  That was one of the things that we

9    printed out for her to see.  And some of the

10   things that I had in my house, she didn't

11   believe were really real.

12          Like, I have a sconce in my

13   house -- in my old house that looks like it's

14   a real candle sconce attached to the walls,

15   and it was one of the things that I had in

16   the story, and she was concerned about it

17   being a fire hazard or whatever, and she

18   wanted to see pictures of it.  And the

19   gargoyles, the -- some of the furnishings and

20   things like that.  The dragon and dragon claw

21   feet, the fantastical chess set.

22          Those were the things that she

23   wanted me to bring, and she thought we would

24   have a chance to brainstorm and do all that

25   during the conference was what my

1   directing her to do that.

2       Q.    Did -- let me ask it differently.

3   Did she send your manuscript to Entangled

4   without your permission?

5       A.    No.

6       Q.    So it was at your behest that she

7   sent it to Entangled.  Is that fair to say?

8       A.    Emily asked my permission to send

9   the novel to a contact at Entangled.

10      Q.    Okay.  And is that true for --

11  would your answer be the same for all the

12  other publishers that she sent the book to,

13  that it was her idea and you approved it?

14      A.    I believe that's right.  I can't

15  recall with every publisher how it came about

16  or who mentioned it to whom first.

17      Q.    And did there come a time when you

18  asked Prospect to withdraw your manuscript

19  from consideration by Entangled?

20      A.    Yes.

21      Q.    Okay.  And when was that?

22      A.    That would have been in the first

23  quarter of 2014.

24      Q.    Okay.  And why did you ask her to

25  withdraw your manuscript from Entangled?

1      A.    Because the version that we had

2  sent Entangled in October of 2013 was, in my

3  mind, not different enough from the version

4  that we submitted in 2014.

5      Q.    Okay.  So you ask her to withdraw

6  from Entangled because the -- well, strike

7  that.

8            Between the time that Emily Kim

9  submitted your manuscript to Entangled, about

10 four months passed, correct, and where you

11 told her to withdraw it, yeah?

12     A.    Four to five months.

13     Q.    Okay.

14     A.    But there were two versions that

15 went to Entangled.

16     Q.    What do you mean by that?

17     A.    I mean, that the 2014 manuscript

18 came to be a rewrite because Emily told me

19 that Stacy Abrams liked the 2013 version, but

20 there were changes that needed to happen in

21 order for it to be -- for her to want see it

22 again.  And so I revised it, I think, over

23 the Christmas break that year and gave it

24 back to Emily to submit is what I remember.

25     Q.    Do you have any e-mails or any

Case 1:22-cv-02435-LLS-SN   Document 331-1   Filed 02/08/24   Page 21 of 31
LYNNE FREEMAN vs                                                    Lynne Freeman
TRACY DEEBS-ELKENANEY            Attorneys Eyes Only                March 24, 2023

327

1  documentation that that occurred?

2      A.    No, I don't.

3      Q.    So I just want to make sure I

4  understand your testimony.  So you're saying

5  that after the manuscript was submitted to

6  Entangled, that Stacy Abrams indicated that

7  she liked it but wanted a revision to it?

8      A.    That's what I understood from

9  Emily.

10     Q.    Okay.  And then you did a rewrite

11 of the manuscript, and did what with it?

12     A.    I can't tell you the differences

13 between 2013's version and 2014, but I made

14 some changes to it and that was the 2014

15 version.

16     Q.    And did that -- did you have

17 Ms. Kim send that version to Entangled?

18     A.    That was my understanding, yes.

19 That's why I said to withdraw the submission.

20     Q.    Okay.  So you asked her to

21 withdraw it because you wanted to submit

22 the -- I guess I'm not understanding.

23         If Ms. Abrams at Entangled asked

24 for a revision to the book she -- you had

25 sent, why would she ask -- why would you need

328

```
 1   to withdraw what she had in order to send a

 2   new version?

 3             Wouldn't you just send a new

 4   version?

 5       A.    I'm not understanding your

 6   question.  I'm sorry.

 7       Q.    I'm not following your testimony,

 8   I guess.

 9             So you -- you had a submission out

10   to Entangled.  An editor there told Ms. Kim

11   that she liked it and wanted to have a

12   revision and you created revision.  And

13   rather than having Ms. Kim send it to

14   Ms. Abrams, you wanted to withdraw the prior

15   version?

16       A.     No.  My understanding was that

17   Stacy -- this is what my recollection is.

18   Stacy Abrams liked what she had read.  She

19   read it before Christmas and that it was a

20   pass but she was really interested and liked

21   the writing, and if certain things were

22   different, if certain this or that, you know,

23   she would be interested in seeing something

24   from me.

25             And Emily and I discussed revising
```

Case 1:22-cv-02435-LLS-SN   Document 331-1   Filed 02/08/24   Page 23 of 31
LYNNE FREEMAN vs                                                      Lynne Freeman
TRACY DEEBS-ELKENANEY              Attorneys Eyes Only                March 24, 2023

                                                                          329

1    it and making some of the changes based on

2    what Emily told me, which I did, and that is

3    when the 2014 version was born.  And I

4    thought that it was sent to Entangled, and

5    that is why I said to her to withdraw the

6    submission in 2014, that they wouldn't like

7    it as it is and feel like it was different

8    enough.  I was unhappy with it.

9         Q.    Okay.  So what you were asking

10   Emily to withdraw was a revised version that

11   had been sent to Ms. Abrams in between

12   October of 2013 and March of 2014?

13        A.    That's what I recall, yes.

14        Q.    All right.  Let me pull up a

15   document.  And we're now somewhat out of

16   order, but this has not been used as a

17   document number.  So I'm going to put into

18   the chat Exhibit 167, KIM00163954.

19        (Exhibit 167 was marked for

20        identification.)

21        A.    Okay.

22   BY MR. KOONCE:

23        Q.    So down at the bottom is an e-mail

24   from you to Emily Kim dated March 25, 2014.

25        A.    Hold on.

333

1    me in production or not or if I'm just

2    remembering them.  So I don't recall.

3         Q.    There's a statement about

4    two-thirds of the way through that paragraph

5    that said -- that says:  She, meaning Kim,

6    said that young adult books and movies in

7    this genre were oversubscribed and that

8    Freeman would need to wait until her son

9    graduated from high school in 2021 to

10   resubmit her original manuscript.

11            Are you aware of any documents in

12   any party's production that support this

13   allegation?

14        A.    No.

15        Q.    I'm just trying to sort of

16   streamline since we only got a little bit

17   left.

18            Since you stopped working with

19   Prospect, have you submitted your manuscript

20   to any other publishers?

21        A.    No.

22        Q.    Have you made any inquiries to

23   agents?

24        A.    No.

25        Q.    Have you ever used any -- worked

334

1   with any book doctors on your manuscript?

2        A.    Define what you mean by book

3   doctor.

4        Q.    Do you know what a book doctor is?

5        A.    No.

6        Q.    Someone who consults with you to

7   help make a book better.

8        A.    Professional editor, who -- like a

9   writing teacher?  Is that what --

10       Q.    Have you worked --

11       (Simultaneous unreportable crosstalk.)

12       A.    -- what you mean by, book doctor?

13       Q.    It could be.

14             Have you worked with a

15   professional -- a writing teacher on your

16   manuscript?

17       A.    Yes.

18       Q.    Okay.  And who was that?

19       A.    Let me think.  There's a William

20   Greenleaf, and there's a woman who used to be

21   a literary agent, whose name is escaping me

22   right now.

23       Q.    And did you -- have you made

24   changes to the manuscript based on their

25   suggestions?

1       A.    No.

2       Q.    Why not?

3       A.    Because I didn't know what was

4   wrong with my book by the end.  All the edits

5   in and edits out, I didn't know what was

6   wrong, and I, at the time, back after I left

7   Emily, I don't even think I really understood

8   how much had been edited.

9            So the reason for hiring those

10  people -- they're not book doctors.  They are

11  people who give you a critique of your

12  manuscript and explain to you as the writer

13  where you are going right and where you're

14  going wrong.  And that's what I felt I needed

15  after that time period.

16           And then you did ask me one

17  question, and I need to correct my answer on

18  it.

19           You asked me if after working with

20  Prospect, I had sent my book to another

21  literary agent or any literary agents, and I

22  did send it to one literary agent during this

23  time period, which is what precipitated me in

24  wanting to have a critique done of my book.

25      Q.    And who was that agent?

336

1          A.     Andrea Brown that I met at a

2     writers' conference.

3          Q.     And did Andrea Brown read your

4     manuscript?

5          A.     She did.

6          Q.     And did she decline to represent

7     you as an agent until you made changes to the

8     manuscript?

9          A.     She did.

10         Q.     And yet you did -- you have not

11    gone back and made any changes to the

12    manuscript based on hearing from her?

13         A.     No.

14         Q.     And why not?

15         A.     Because I wanted to use the time

16    to improve my writing and to go back to the

17    original story that I wrote and loved

18    following Emily's advice, letting a number of

19    years go by for this particular genre that my

20    first novel was written in and enjoy the time

21    that I had to do it when my son graduated

22    from high school.

23         Q.     So it's your testimony that

24    Ms. Kim advised you to wait until your son

25    graduated high school to do anything with

1   this manuscript?

2       A.    That's not the words that the

3   complaint says, but what is in the complaint

4   is what I was advised by my agent to do.

5       Q.    Well, what's your recollection of

6   what you were advised by your agent?

7       A.    The genre where I was -- the

8   writing was oversubscribed.  All the Twilight

9   movies were out.  It was an oversubscribed

10  time for that genre, and a number of years

11  needed to pass.  She said six to ten.  And I

12  said that's when my son graduates high

13  school.  And she said that's probably a good

14  time to pick up that original story.

15           So I used the time to work on my

16  writing.  This is the story I wanted to tell.

17      Q.    And so you used that time to work

18  on editing this book?

19      A.    No.  To work on my writing as a

20  craft.  To be a better writer.

21      Q.    So after -- was there a point

22  after you stopped working with Prospect -- a

23  period of time, rather, during which you did

24  make any substantive edits to Masqued, or did

25  you stop editing it at that point in time?

338

```
 1        A.    I called whatever I was working on

 2   Masqued.  I never changed the title of it and

 3   just played around with some of the concepts

 4   and writing from it for -- I don't know --

 5   for a couple of years.

 6        Q.    So going back a little bit in

 7   time, you did change your title at one point

 8   from Blue Moon Rising to Masqued.

 9              Why did you do that?

10        A.    Emily and I discussed that

11   together, and I think some of the changes

12   that had happened with the story -- the edits

13   were changing, what the original love story

14   to me, in my mind a bit, and so -- I don't

15   know.  She was talking about a one-word title

16   might be easier, and I think -- I came up

17   with Masqued.

18        Q.    Okay.  But is it -- she didn't

19   tell you you needed to change the title, did

20   she?

21        A.    No, I don't recall her saying

22   that.

23        Q.    And let me -- let me mark as

24   Exhibit 170 KIM0011500783.

25              (Exhibit 170 was marked for
```

341

1   agent about not only your life but

2   developments that you discussed from your

3   books and elements from your stories, and

4   that they were all found in Crave.

5          What information about your life

6   that you provided privately to Ms. Kim are

7   found in Crave other than the one example you

8   gave previously which was panic -- a focus on

9   panic attacks?

10      A.    So Emily and I talked about the

11  heroine turning into a gargoyle.  I didn't

12  have a name for what she was, and she's this

13  unique being who hasn't been seen in ten

14  generations.  And gargoyle was discussed for

15  mine.  Emily didn't know what they were.  I

16  talked about what they were.  I explained how

17  they're protectors.

18          It was a concept and idea that we

19  discussed having in my books, especially

20  since I had the gargoyle collection, and, you

21  know, they're neat and unusual paranormal

22  creatures.

23          The character names of Grace and

24  Jaxon -- Grace is my niece, my only niece,

25  and I asked my brother and sister-in-law's

Case 1:22-cv-02435-LLS-SN   Document 331-1   Filed 02/08/24   Page 31 of 31

LYNNE FREEMAN vs
TRACY DEEBS-ELKENANEY           Attorneys Eyes Only
Lynne Freeman
March 24, 2023

342

1    permission way back in the day about using

2    that name as the heroine's name.

3              Jaxon was my first dog.  Emily and

4    I discussed that name for being for the

5    romantic lead.  We even discussed the

6    spelling of it as J-A-X-O-N, which I worried,

7    and I probably shouldn't have, that The

8    Dragonriders of Pern series by Anne McCaffrey

9    features a Jaxom, J-A-X-O-M, and I thought,

10   gee, if we spell it J-A-X-O-N is that too

11   similar with what was going on with Anne

12   McCaffrey's old books, The Dragonriders of

13   Pern.

14             Phil -- Uncle Phillip is my

15   brother.  He's the only uncle that my, you

16   know, little guy has from my side of the

17   family, Uncle Phil.  And --

18        Q.    And -- I'm sorry, go ahead.

19   Finish, please.

20        A.    And so these names, while they --

21   they were names that were discussed for my

22   book about what I would do and what my

23   character name changes would be.

24             So to see them all in Crave was

25   unsettling for the heroine and the romantic