**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN, an individual, | Civil Action No.: 1:22-cv-02435-LLS |
| Plaintiff, | |
| v. | |
| TRACEY DEEBS-ELKENANEY P/K/A TRACY WOLFF. et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE COPYRIGHT CLAIMS AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

ARGUMENT……………………………………………………………………………...2

I.    THIS COURT MAY PROPERLY CONSIDER MORE THAN JUST TWO ITERATIONS OF FREEMAN'S MANUSCRIPTS, FREEMAN'S INDEXES SHOWING THE SIMILARITIES HER CLAIMS ARE BASED ON, AND THE TESTIMONY OF HER EXPERT WITNESSES…………………………………………2

    a.    The Court has not limited its comparison to only two BMR manuscripts, and Defendants have no colorable claim of prejudice……………………………3

    b.    Defendants had access to each of the six representative manuscripts and Notes……………………………………………………………………………5

    c.    Freeman's indexes are admissible………………………………………………..7

    d.    Expert testimony is also appropriately considered by this Court…………………8

        1.    Expert testimony is appropriate to assist the fact finder in evaluating substantial similarity of protectable expression……………..9

        2.    Expert testimony is appropriate to assist the factfinder in evaluating access / probative similarity, and Defendants' independent creation claims…………………………………………10

II.    DEFENDANTS' ACCESS TO BMR CANNOT BE REASONABLY DISPUTED……11

III.    TREMENDOUS SIMILARITIES EXIST BETWEEN BMR AND THE CRAVE SERIES THAT GO WELL BEYOND IDEAS, TROPES, SCENES A FAIRE, SCATTERED DETAILS, AND GENERALIZE "SUBPLOTS"……………14

    a.    Characters…………………………………………………………………………..17

1. Heroines (Anna/Grace)…………………………………………...18

2. First romantic lead…………………………………………………20

3. Villains………………………………………………………………22

4. Gay best friend……………………………………………………23

5. First voice in heroine's head…………………………………...23

6. Mean girls………………………………………………………...24

7. Aunt/Uncle…………………………………………………………25

8. Grandmother……………………………………………………...25

9. Other minor characters…………………………………………26

10. Character names…………………………………………………26

b.  Scenes/Plot………………………………………………………………27

1. Beginning…………………………………………………………27

2. Motorcycle/snow mobile ride…………………………………27

3. Death of family…………………………………………………...27

4. Brendan/Flint……………………………………………………27

5. Romantic lead meeting………………………………………...28

6. Heroine goes home……………………………………………28

7. Realization of romantic leads moods…………………………29

8. Crying at school…………………………………………………29

9. French castle……………………………………………………...29

10. First Attack Scene………………………………………………...29

11. Mean girls………………………………………………………...30

12. Party………………………………………………………………30

13. Spiked drink…………………………………………………………30

14. Injury………………………………………………………………...31

15. First kiss scene…………………………………………………………31

16. First Voice…………………………………………………………...32

17. Kidnapping scene…………………………………………………………32

18. Second kiss scene…………………………………………………………33

19. Healing bite…………………………………………………………33

20. Northern lights scene…………………………………………………..33

21. Second voice………………………………………………………...34

22. The similarities continue throughout the series………………………34

c.   Setting……………………………………………………………………36

IV.   THE DIFFERENCES BETWEEN THE WORKS OFFER NO DEFENSE……………38

a.   The total concept and feel of each work is substantially similar, although
      that is not the proper primary method of analyzing similarity…………………...39

b.   The differences between Cave and BMR are no different from those the
      writers made when revising their work…………………………………..42

V.   THE EVIDENCE OF INDEPENDENT CREATION IS NOT CREDIBLE
      NOR DISPOSITIVE………………………………………………………..44

VI.   CONCLUSION……………………………………………………………..46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Scholastic Inc.*,
  739 F. Supp. 2d 642 (S.D.N.Y. 2011) ................................................................. 41

*Arden v. Columbia Pictures Indus., Inc.*,
  908 F. Supp. 1248 (S.D.N.Y. 1995) ................................................................... 43

*Arnstein v. Porter*,
  154 F.2d 464 (2d Cir. 1946) .............................................................................. 11

*Atari, Inc., v. North American Philips Consumer Electronics Corp.*,
  672 F.2d 607 (7th Cir. 1982) ............................................................................ 43

*Baker v. Coates*,
  2023 WL 6007610 (S.D.N.Y. July 26, 2023) ................................................... 41

*Blakeman v. The Walt Disney Co.*,
  613 F. Supp. 2d 288 (E.D.N.Y. 2009) ............................................................. 38

*Boone v. Jackson*,
  2005 WL 1560511 (S.D.N.Y. July 1, 2005) ..................................................... 11

*Bouchat v. Baltimore Ravens, Inc.*,
  241 F.3d 350 (4th Cir. 2001) ............................................................................ 13

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) ................................................................... 4, 5, 41

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) ...................................................................... 10, 11

*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*,
  409 F.2d 1315 (2d Cir. 1969) .......................................................................... 43

*Cox v. Abrams*,
  1997 WL 251532 (S.D.N.Y. May 14, 1997) .................................................... 13

*Craft v. Kobler*,
  667 F.Supp. 120 (S.D.N.Y.1987) ...................................................................... 5

*De Acosta v. Brown*,
  146 F.2d 408 (2d Cir. 1944) ............................................................................ 11

*DiTocco v. Riordan*,
  815 F. Supp. 2d 655 (S.D.N.Y. 2011) .............................................................. 42

*Fernandez v. Zoni Language Centers, Inc.*,
  2016 WL 2903274 (S.D.N.Y. May 18, 2016) ................................................... 12

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir. 1988) .................................................................... 12, 14

Harper & Row Publishers, Inc. v. Nation Enterprises,
  471 U.S. 539 (1985) ......................................................................................... 37

*Hoehling v. Universal City Studios, Inc.*,
  618 F.2d 972 (2d Cir. 1980) ............................................................................ 16

*Hogan v. DC Comics*,
  48 F.Supp.3d 298 (S.D.N.Y. 1999) ................................................................. 10

*Hogan v. DC Comics*,
  48 F. Supp. 2d 298 (S.D.N.Y. 1999)......................................................................40
*Jorgensen v. Epic/Sony*,
  351 F.3d 46 (2d Cir. 2003)...................................................................................13
*L. Batlin Son, Inc. v. Snyder*,
  536 F.2d 486 (2d Cir. 1976).................................................................................16
*Laureyssens v. Idea Grp., Inc.*,
  964 F.2d 131 (2d Cir. 1992).................................................................................11
*Lessem v. Taylor*,
  766 F. Supp. 2d 504 (S.D.N.Y. 2011)..................................................................14
*Lewinson v. Henry Holt & Co., LLC*,
  659 F. Supp. 2d 547 (S.D.N.Y. 2009)..................................................................39
*Littel v. Twentieth Century Fox Film Corp.*,
  1995 WL 404939 (S.D.N.Y. July 7, 1995) ...........................................................15
*Lone Wolf McQuade Associates v. CBS Inc.*,
  961 F.Supp. 587 (S.D.N.Y. 1997)..................................................................18, 19
*Mena v. Fox Entertainment Grp., Inc.*,
  2012 WL 4741389 (S.D.N.Y. Sept. 29, 2012)......................................................15
*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
  345 F. Supp. 3d 482 (S.D.N.Y. 2018)..................................................................37
*Monbo v. Nathan*,
  623 F. Supp. 3d 56 (E.D.N.Y. 2022)....................................................................42
*Montgomery v. Holland*,
  408 F. Supp. 3d 353 (S.D.N.Y. 2019)....................................................................8
*Mowry v. Viacom Int'l, Inc.*,
  2005 WL 1793773 (S.D.N.Y. July 29, 2005) ......................................................12
*New Old Music Grp., Inc. v. Gottwald*,
  122 F. Supp. 3d 78 (S.D.N.Y. 2015)....................................................................15
*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F.3d 57 (2d Cir. 2010)...................................................................................42
*Repp v. Webber*,
  132 F.3d 882 (2d Cir. 1997).................................................................................14
*Residential Funding Corp. v. DeGeorge Financial Corp.*,
  306 F.3d 99 (2d Cir. 2002)...................................................................................13
*Rogers v. Koons*,
  960 F.2d 301 (2d Cir. 1992).................................................................................39
*Salinger v. Random House, Inc.*,
  811 F.2d 90 (2d Cir.1987).......................................................................................5
*Sheldon v. Metro–Goldwyn Pictures Corp.*,
  81 F.2d 49 (2d Cir. 1936).............................................................................39, 44
*Smith v. Jackson*,
  84 F.3d 1213 (9th Cir. 1996)..................................................................................9
Starobin v. King,
  137 F. Supp. 2d 93 (N.D.N.Y 2001) ....................................................................15
*Suntrust Bank v. Houghton Mifflin Co.*,
  268 F.3d 1257 (11th Cir. 2001)............................................................................10

*Swirsky v. Cary*,
 376 F.3d 841 (2004) ..................................................................................................9

*Tomasini v. Walt Disney Co.*,
 84 F. Supp. 2d 516 (S.D.N.Y. 2000) ...............................................................12, 14

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
 338 F.3d 127 (2d Cir. 2003) ....................................................................................42

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
 996 F.2d 1366 (2d Cir.1993) ...............................................................................5, 41

*Universal Pictures Co., Inc. v. Harold Lloyd Corp.*,
 162 F.2d 354 (9th Cir. 1947) ...................................................................................44

*Wainwright Secs. Inc. v. Wall St. Transcript Corp.*,
 558 F.2d 91 (2d Cir.1977) ..........................................................................................5

*Walker v. Time Life Films, Inc*,
 784 F.2d 44 (2d Cir. 1986) .................................................................................10, 11

*Walkie Check Prods., LLC v. ViacomCBS Inc.*,
 2022 WL 2306943 (S.D.N.Y. June 27, 2022) .........................................................38

*Warner Bros. Ent. Inc. v. RDR Books*,
 575 F. Supp. 2d 513 (S.D.N.Y. 2008) .................................................................5, 41

*Warner Bros. v. American Broadcasting Cos.*,
 720 F.2d 231 (2d Cir. 1938) ....................................................................................17

*Williams v. Crichton Knopf, Inc.*,
 84 F.3d 581 (2d Cir. 1996) ............................................................................... Passim

**Statutes**

17 U.S.C. § 101 ............................................................................................................22, 26
17 U.S.C. § 106 ..............................................................................................................5, 37

## INTRODUCTION

It is common for copyright infringement defendants to not only deny all involvement in that infringement but deny the existence of even the most obvious similarities and/or aver that nothing copied is protectable. It is thus no surprise that Defendants deny their malfeasance and argue that Freeman's claims are based on *scenes a faire*. What is surprising is the strength of the circumstantial evidence that Kim shared Freeman's work such that the total concept and tremendous amounts of specific details regarding characters, scenes, and plotlines from BMR appear throughout *Crave* without any other reasonable explanation. Summary judgment in Freeman's copyright claims should therefore be entered in Freeman's favor, not Defendants.

Defendants' opposition brief (also its affirmative motion) rests on mirror propaganda, claiming that Freeman is resisting a comparison of the underlying works when she has prepared indexes that point the Court *directly* to where in the underlying works each similarity can be found and *they* strenuously object to this Court even looking at (1) those indices, (2) any of her manuscripts other than the two that this Court stated were merely a "starting point" for comparison, and (3) her expert reports which, *inter alia*, also identify where similarities that cannot be chalked up to genre convention or trope can be found in the over 5,400 relevant pages of the underlying works. Ultimately it is Defendants who are desperate for this Court to not look at the underlying works because they know that there are just too many similarities of protectable artistic expression to be coincidence, no matter that Wolff reworked and rewrote Freeman's story in her "voice."

Defendants' motion for summary judgment as to Freeman's copyright claims should be denied, and Freeman's should be granted.

//

//

1

## ARGUMENT

The evidence of both access and substantial similarity of protectable expression in this case is overwhelming. Rather than offer any credible, let alone dispositive, defense, Defendants urge this Court to *not* look at the similarities identified by Freeman, *not* confirm whether those similarities are in the underlying works, *not* consider expert testimony that properly weighs on, *inter alia*, probative similarity, Defendants' independent creation claims, and whether any of the innumerable specific similarities are of only unprotectable "trope" or "*scenes a faire,*" and instead just take their word for it that no protectable expression was copied. To the extent they address the similarities, it is through mental gymnastics that either (1) zoom-out to the generalized idea while ignoring the protectable expression of those ideas, or (2) zoom-in on superficial differences. But it is irrelevant if there are also dissimilarities where substantial similarity exists, especially where the dissimilarities are little more than the type to be expected where authors rewrite and edit their works to figure out how best to tell the story. Ultimately, Defendants cannot avoid the conclusion that protectable expression of Freeman's BMR—specific details of and connections between characters, storyline, plot, and scenes—permeates Wolff's *Crave* series. Therefore, judgment in favor of Freeman is warranted.

I. **THIS COURT MAY PROPERLY CONSIDER MORE THAN JUST TWO ITERATIONS OF FREEMAN'S MANUSCRIPTS, FREEMAN'S INDEXES SHOWING THE SIMILARITIES HER CLAIMS ARE BASED ON, AND THE TESTIMONY OF HER EXPERT WITNESSES.**

In their bid to avoid having this Court properly compare Freeman's BMR work to the *Crave* series, Defendants limit their substantial similarity analysis to two versions of Freeman's manuscripts, *BMR 2011* and *BMR 2013*,[1] and argue that this Court should not consider any other

---

[1] See Dkt. 298, pages 15-19.

versions based on a misreading of this Court's prior rulings[2] and a dubious suggestion that they did not have access to the contents of some of those versions. But this Court held nothing more than that two versions of Freeman's manuscript was a reasonable place to *start* its comparison, and there is at least a factual question as to whether Defendants had access to the materials that Freeman has put forth for comparison.

Defendants also object to Freeman's indexes which direct this court to where the similarities underpinning her claims can be found in the underlying works, and to her experts' reports, but each is proper evidence which will facilitate the evaluation of the over 5,400 pages of material at issue to determine, *inter alia*, probative similarity, what is trope in YA novels, substantial similarity, and Defendants' claims of independent creation.

Defendants took the heart of Freeman's creative work—its overall concept, feel and core characters and plotlines—and used it as the basis of the *Crave* series. The evidence properly before this Court compels the finding that judgment in favor of Freeman is appropriate.

### a. The Court has not limited its comparison to only two BMR manuscripts, and Defendants have no colorable claim of prejudice.

Defendants assert that it would be improper and prejudicial for this Court to consider anything other than Freeman's *BMR 2011* and *BMR 2013* manuscripts based on this Court's prior rulings. But Judge Stanton explained that "when comparing the books to the two test manuscripts the goal is only to determine in a <u>*preliminary*</u> degree 'whether a lay observer would consider the works as a whole substantially similar to one another.'" ECF 181 (emphasis added). Judge Stanton made clear that the two manuscripts were only "a fair place to start" the comparison and that "[a]ll... claims remain available with regard to the other iterations of Plaintiff's work" *Id*. Yet

---

[2] See Dkt. 298, pages 44-45.

Defendants suggest that "preliminary" should be read to mean "final" such that the final determination of substantial similarity should rest solely and exclusively on those two manuscripts.

Indeed, their motion *solely* addresses those two manuscripts even though Freeman has made clear throughout this litigation that her claim was based on more than just those two versions (see, e.g., ECF 160), including by specifically identifying the six manuscripts and notes that her comparison would be based on long before her Motion for Summary Judgment was filed. *See* Passin Decl., ¶ 20, Exh. 19. And Defendants examined Freeman at her deposition about the creation of many of her manuscripts, including the 2014 and 2016 versions. Id. ¶21. Defendants' argument that relying on the additional manuscripts "at this late hour" would unfairly prejudice them (ECF 298 at 45) is disingenuous.

On the other hand, Freeman's claims would be severely prejudiced by the Court refusing to compare the *Crave* series to anything more than a tiny subset of her BMR work, even after Freeman has already agreed to reduce the focus of her comparison to a small subset of that work (the six manuscripts plus notes). As Freeman argues in her summary judgment motion—and as Defendants' motion admits—Freeman changed some scenes, character traits, and character interactions from version to version to see what best told the BMR story, shared those versions with Kim, and then Kim and Wolff seemingly selected the best of each version to put together the *Crave* series. Limiting this case to two manuscripts would frustrate Freeman's ability to show that.

In the Second Circuit, a plaintiff may establish substantial similarity by comparing an allegedly infringing work to a combination or series of related works in the aggregate. *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 138 (2d Cir. 1998) ("Where the secondary work focuses on an entire continuous television series . . . there is no basis for looking in isolation at the amount copied from each separately copyrighted episode."). In *Castle Rock*, the defendant copied

"643 fragments from 84 individually copyrighted *Seinfeld* episodes" to create what was deemed to be an infringing trivia game. *Id*. at 138 ("By copying not a few but 643 fragments from the *Seinfeld* television series . . . *The SAT* has plainly crossed the quantitative copying threshold"). In holding that it was appropriate to aggregate Plaintiff's 84 individually copyrighted works to determine whether they were substantially similar to defendant's trivia game, then-Judge Sotomayor cited a history of Second Circuit precedents[3] and explained:

> Although 17 U.S.C. § 106 speaks in terms of a singular copyrighted 'work,' it would elevate form over substance to conclude that [defendant's] copying of 643 fragments from 84 individually copyrighted *Seinfeld* episodes is indistinguishable from a case in which a 634–question trivia quiz book poses a few questions from each of 84 unrelated television programs, books, movies, or any combination of creative works that do not constitute a discrete series of works.

*Id.* Justice Sotomayor's reasoning still holds true in this Circuit. *See, e.g.*, *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 535 n.14 (S.D.N.Y. 2008) ("The Court analyzes the amount of expression copied from the *Harry Potter* series in the aggregate, rather than from each individual novel in the series, following the Second Circuit's reasoning in *Castle Rock*").

To be sure, there are substantial similarities between *BMR 2011* and *BMR 2013*, on the one hand, and the *Crave* series, on the other. But those similarities reflect only part of what Defendants copied and it would be an error for this Court to refuse to consider the subset of six manuscripts and accompanying notes which Freeman has put forward for comparison.

---

[3] *See, e.g.*, *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1372–73, 1381 (2d Cir.1993) (finding substantial similarity between infringing book and 8 episodes of *Twin Peaks* weekly television series seen as a whole); *Wainwright Secs. Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 94 (2d Cir.1977) (abstracts of a number of research reports treated cumulatively in fair use analysis); *Craft v. Kobler,* 667 F.Supp. 120, 124–25 (S.D.N.Y.1987) (passages taken from 15 separate books of copyright holder treated cumulatively in finding infringement); *Salinger v. Random House, Inc.,* 811 F.2d 90, 98 (2d Cir.1987) (copying of Salinger letters not fair use because, among other factors, secondary work copied one-third of 17 letters and 10 percent of 42 letters).

**b. Defendants had access to each of the six representative manuscripts and notes**

Defendants next seem to argue that even if the Court were inclined to consider more than just the 2 initial BMR manuscript versions, it should not consider the 2014 and 2016 manuscripts because they contain metadata showing "creation" dates after Freeman stopped working with Kim in 2014, such that Defendants could not have had access to them. This argument rests on faulty factual assumptions and non sequiturs. As set forth more fully in Freeman's Supplemental Declaration (filed concurrent with this brief), two of the three challenged manuscripts were created by Freeman and give to Kim while Freeman was still working with Kim, and the third was created in 2015 and provided to Kim that year. Supp. Freeman Decl. ¶¶ 6-15. The "creation" date reflected in the metadata reflects nothing more than the last date the document was opened and saved, not the date the contents were created. *Id*., Declaration of Ron Kaplan, ¶6.

And the similarities between those versions and the *Crave* series are themselves striking and highly probative of copying. For example, developments unique to the 2016 Manuscript which also appear in *Crave* include the twin goddess creation story (ASUF 432),[4] the God of Chaos character (ASUF 434), the lifeless bodies and smell of flesh in the "Attack on the Beach" scene (ASUF 289-300), the romantic leads casting or fading so quickly it seems they disappear (ASUF 561), the heroine learning about the "Watch" or "Watchers" who are "magical police" that will harm her (ASUF 443), the heroine walking a long way to a set of golden double doors when arriving at a magical place (ASUF 305), the heroine's tattoos that begin to glow when she attempts healing (ASUF 292, 423, 425), the heroine going to a place that is like a "planetarium" (ASUF 444), and every candle "burst[ing] into light (BMR 2016)/Flame (*Crush*)" when the heroine uses her magic for the first time (ASUF 430). Simply put, these similarities are far too significant and

---

[4] As used throughout this brief, "ASUF" refers to Plaintiff's Additional Undisputed Facts provided in its response to Defendants' Rule 56.1 statement, followed by the enumerated fact.

unique to be explained by coincidence; instead, they are probative of copying and establish that Defendants had access to the manuscripts created and/or saved after Kim ceased formally acting as Freeman's agent in 2014.

Because there is at least a question of fact as to whether Kim received each of the 6 BMR iterations upon which Freeman's comparison analysis are based, it would be improper for the Court to categorically exclude any of those manuscripts.

### c.   Freeman's indexes are admissible.

In their next attempt to keep this Court from reviewing the similarities upon which Freeman's claims are based, Defendants suggest that Freeman's indexes are improper and should not be considered. But, as set forth more fully in Freeman's Opposition to Defendants' Motion to Strike Evidence, it would be improper for this Court to *not* consider the similarities identified by Freeman so long as they are in fact in the underlying works—which they are. Defendants' real objection is not that Freeman is trying to avoid having the Court look at the underlying works but that her indices make it too easy for the Court to do so.

Defendants then argue that the similarities in Freeman's indexes are "insufficient" to establish substantial similarity as a matter of law. But evaluating that argument requires reviewing the similarities, not ignoring them wholesale as Defendants have done. And the cases on which their argument relies—*Williams* and *Montgomery*—offer them no support.

In *Williams v. Crichton*, the Court compared *Jurassic Park* to the *Dinosaur World* series. 84 F.3d 581 (2d Cir. 1996). The court found that a mere eight similarities scattered between four *Dinosaur World* books and both the *Jurassic Park* novel and movie constituted nothing more than "random similarities scattered throughout the works" which were insufficient for a colorable claim of substantial similarity. *See id.* at 591 fn. 3. Freeman's indexes identify hundreds of detailed similarities, dwarfing *Williams* "few" and "scattered" similarities.

Similarly, the *Montgomery* court found the plaintiffs list of similarities insufficient because they only identified a few "abstract common plot elements." *Montgomery v. Holland*, 408 F. Supp. 3d 353, 377 (S.D.N.Y. 2019), *aff'd sub nom. Montgomery v. NBC Television*, 833 F. App'x 361 (2d Cir. 2020). Defendants misrepresent *Montgomery* as finding that the 110-page list of similarities offered by Montgomery was insufficient to establish substantial similarity when in fact the court found the list insufficient *because the similarities identified were false. Montgomery,* 408 F. Supp. 3d. at 377. Here, the similarities identified by Freeman truly reflect the works themselves. Of course, the Court will need to look at them to confirm that—exactly what Defendants do not want it to do.

Admittedly, a list of similarities will fail to establish substantial similarity if it either contains only a small handful of isolated similarities or lists similarities that do not actually exist in the underlying works. But Defendants argument that the Court should not even look at the 569 pages of similarities identified in Freeman's indexes must be rejected.

### d. Expert testimony is also appropriately considered by this Court.

In addition to asking this Court to limit its comparison to two manuscripts and exclude Freeman's comparison indexes, Defendants argue that this Court should not consider relevant and admissible expert testimony that will be helpful to the factfinder. That argument too should be rejected for two reasons: (1) expert testimony is appropriate, if not necessary, to rebut the Defendants *scenes a faire* defenses and (2) expert testimony is admissible both in determining access or striking similarity and in evaluating Defendants' independent creation defense.

In challenging the use of Freeman's experts at summary judgment, Defendants again suggest (wrongly) that Freeman is trying to avoid having the works themselves analyzed. Freeman

would love every juror to read the entirety of the works[5] as she believes Wolff's copying will be clear but, unless those jurors have significant familiarity with young adult paranormal romance literature, Defendants "just compare the works" mantra does not end this inquiry since the factfinder must know what genre conventions in YA literature are. While both BMR and *Crave* broadly share the idea of a heroine learning about the supernatural world and her place in it, it is the specific expression of that story which is at issue in this case and Defendants' efforts to exclude expert testimony are plainly aimed at discommoding the Court's ability to address *that* issue.

1. **Expert testimony is appropriate to assist the factfinder in evaluating substantial similarity of protectable expression.**

Although there is a dearth of Second Circuit law addressing the use of experts to address a *scenes a faire*, other circuits have made clear that such testimony is proper and admissible. For example, the Ninth Circuit explained in *Swirsky v. Cary*, 376 F.3d 841, 850 (2004) that "[i]t is inappropriate to grant summary judgment on the basis of *scenes a faire* without independent evidence, unless the allegations of *scenes a faire* is uncontested." *See also, Smith v. Jackson*, 84 F.3d 1213, 1220 (9th Cir. 1996) ("The district court carefully compared the scenes a faire assertions made by appellees' expert, Dr. Eskelin, to the declaration of appellants' experts, Dr. Argersinger and Dr. Parsons, and granted summary judgment only when the declarations of appellants' experts were silent as to one of Dr. Eskelin's *scenes a faire* conclusions or when appellants' experts agreed with the assessment of Dr. Eskelin").

Plaintiff does not suggest that a court can never evaluate *scenes a faire* without expert testimony—there are certainly archetype characters and stock scenes that ordinary observers understand to be unprotectable. But even in those cases "*scenes a faire* 'at some point cross the

---

[5] Notably, Defendants' own expert could not even be bothered to do so—Emily Easton provided an expert report in this case addressing the similarity of the works based on her review of only *Crave* (book 1) and two versions of Freeman's manuscript. *See* Declaration of Cece Cole, Ex. AA (ECF 300-27).

line… into [protectable] expression' and are 'protected by copyright' when 'plots become more intricately detailed, and characters become more idiosyncratic." *Latele Television, C.A. v. Telemundo Comm. Group*, LLC, 215 WL 427817, *18 (S.D. Fla. 2015) (quoting *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1266 (11th Cir. 2001)).

In *this* case, expert testimony is highly relevant to determining what similarities are shared *scenes a faire* and, to the extent they are, whether the similarities "cross the line into protectable expression." *Hogan v. DC Comics*, 48 F.Supp.3d 298, 311 (S.D.N.Y. 1999) (citing *Walker*, 784 F.2d at 50 (*scenes a faire* copyrightable to the extent they are "given unique… expression")). Defendants claim there are no protectable similarities but fail to provide the Court with a method to verify this, insisting that expert testimony be excluded outright. But the Second Circuit has made clear that the general rule against using experts to evaluate substantial similarity is "not so literal." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992).

Rather, in cases that are complicated or "likely to be somewhat impenetrable by lay observers" expert testimony may be considered as part of the substantial similarity analysis. *Id.* This is such a case given the nature of the infringement, the volume of the works, and the intertwined *scenes a faire* issues. The jury (or this Court on this motion) faces the daunting task of comparing four full-length novels to a series of manuscripts and notes that will collectively require days just to read. Then, both the visual comparison and understanding the bounds of *scenes a faire* within YA literature pose significant challenges. It should not be lost on this Court that Defendants found it appropriate to offer an expert on *scenes a faire* but then object to Plaintiff doing the same.

### 2.   Expert testimony is appropriate to assist the factfinder in evaluating access / probative similarity, and Defendants' independent creation claims.

The expert testimony offered by Freeman is not only relevant towards a determination of substantial similarity, but it is also relevant towards a determination of probative similarity and

thus access. "Copying may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, **and expert testimony**." *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992), *as amended* (June 24, 1992); *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Altai*, 982 F.2d at 713 ("expert testimony may be used to assist the fact finder in ascertaining whether the defendant had copied any part of the plaintiff's work."); *Boone v. Jackson*, 2005 WL 1560511, at *4 (S.D.N.Y. July 1, 2005) ("Proof of actual copying may also include weighing expert testimony.").

Here, the expert testimony offered by Freeman directly addresses whether the similarities between the works are probative of copying—i.e., access or striking similarity. And because the issue of access is "inextricably intertwined with evidence of illicit copying," such expert testimony may, in part, be used to assist in the determination of substantial similarity. *See e.g., Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1986) (affirming the district courts consideration of expert testimony within the copying analysis, even where there is overlap with the substantial similarity analysis). In this case, the expert testimony offered by Freeman shows that the similarities between the two works are *so striking* that independent creation is unlikely. There is no basis to strike that testimony.

## II.    DEFENDANTS' ACCESS TO BMR CANNOT BE REASONABLY DISPUTED

It is well-established that the existence of an intermediary connected to both a plaintiff and defendant may be sufficient to prove access. *See De Acosta v. Brown*, 146 F.2d 408, 410 (2d Cir. 1944); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir. 1988). In this case, Kim, and to a lesser degree Abrams and Pelletier, were clearly such intermediaries. Therefore, this Court should adjudicate access in Freeman's favor.

Defendants' contrary arguments rest on readily distinguishable cases in which the "particular chain or link" between the third party and defendant was absent. *See e.g., Mowry v. Viacom Int'l, Inc.*, 2005 WL 1793773, at *5 (S.D.N.Y. July 29, 2005)("[plaintiff] has not presented any evidence that these recipients, *who do not work for defendants*, passed [the work] on directly or indirectly to any of the defendants."); *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 521 (S.D.N.Y. 2000)(holding that an inference of access based on third party's possession was insufficient where there were *no intermediary contacts* between the third party and defendant). But this case presents well-established intermediaries connecting Wolff and her work—Kim and Abrams—each of whom not only had direct access to BMR but was directly involved in the creation of the *Crave* series. None of this is based on speculation.

Defendants also claim that Kim, Abrams, and Pelletier's contributions to *Crave* were minimal and not creative. But Kim, Abrams, and Pelletier were each direct intermediaries who provided input into the creation of Wolff's *Crave*, including through shared Google Docs. Notably, Google Docs stores information regarding who makes what contributions or changes, yet Defendants failed to produce that information.[6] From this fact alone a factfinder can and should conclude that their input was far more significant than they claim.[7] If Kim, Abrams, and Pelletier's contributions were truly insignificant, why haven't the Defendants produced the Google Docs

---

[6] Since "Courts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned'" (*Fernandez v. Zoni Language Centers, Inc.*, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016), *aff'd*, 858 F.3d 45 (2d Cir. 2017)), Freeman requests judicial notice of: *https://support.google.com/docs/answer/190843?hl=en&co=GENIE.Platform%3DDesktop#zippy=%2Cview-an-earlier-version%2Crestore-an-earlier-version%2Ccopy-an-earlier-version%2Ccreate-a-named-version%2Csee-who-changed-a-part-of-a-document-in-google-docs%2Csee-who-changed-a-specific-cell-in-google-sheets* (Google Support's instructions on how to "find what's changed in a file").

[7] An adverse inference may be drawn where the party had an obligation to produce the evidence in a timely way, the party failed to do so with "a culpable state of mind," and the evidence is relevant to the party's claim or defense. *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

evidence detailing each Defendant's specific changes? The only logical conclusion is that such evidence was withheld because it would prove the substantial involvement of Pelletier, Abrams, and Kim.

Defendants' claims at best create factual questions for the jury as to *actual sharing* that do nothing to overcome a finding of access. *See Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 55 (2d Cir. 2003) ("[Plaintiff] is not requires to establish *actual* access" (emphasis in original)), citing *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 353 (4th Cir. 2001) ("A copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work.").

And Defendants' claim that Wolff and Pelletier's testimony that they never actually "received or read a copy of BMR" once again falls short even under the cases on which they rely. In *Cox v. Abrams*, 1997 WL 251532, at *4 (S.D.N.Y. May 14, 1997), the defendants swore that prior to the action's commencement they had not heard of the plaintiff or her work, "and that they neither saw a copy of the manuscript ***nor were informed of its contents***." *Id.* (emphasis added). The court found such testimony reliable considering the lack of an intermediary. *Id.* Here, Wolff and Pelletier only testify that they "never received or read a copy of BMR." Dkt. 298 at 52. Setting aside their strong motivation to lie, that testimony says nothing about whether Kim and Abrams informed them of BMR's contents, or otherwise suggested storylines, character traits, scenes, or any of the other specific elements of BMR. And neither Wolff nor Pelletier can dispute that Kim and Abrams were intermediaries through whom they had ***a reasonable opportunity*** to access the BMR manuscripts or be informed of BMR's contents. Their self-serving testimony is thus

insufficient since Freeman has established "a particular chain of events by which the defendant *might have* gained access to the work." *Tomasini*, 84 F. Supp. 2d at 519 (emphasis added).

Finally, the similarities between the two works are also so striking that they alone establish access. Indeed, when considering the striking similarities alongside the voluminous evidence establishing a chain of access, access is irrefutable. *Gaste*, 863 F.2d at 1067(where the copyrighted and infringing works are "strikingly similar" the test for proof of access is less rigorous). Expert testimony may be used to demonstrate probative or striking similarity. *Lessem v. Taylor*, 766 F. Supp. 2d 504, 511 (S.D.N.Y. 2011), citing *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997). And Freeman submitted three expert reports on this issue, all of which concluded that the similarities were so striking, independent creation was either impossible or extremely unlikely.

Specifically, after analyzing the empirical results of her computational linguistical analysis, Dr. Chaski concluded that "[s]tatistically speaking, it is virtually impossible that the two works could have been independently created in light of my findings." SUF 178. Similarly, Dr. Joula qualitative and computational analysis resulted in the conclusion that "the odds in favor of these works having a common origin as more than 1000:1." SUF 179. And after accounting for trope and genre conventions, Professor Reiss concluded that "the similarities are so striking as to preclude the possibility of independent creation." SUF 180 All of this is precisely the type of testimony that courts routinely allow.

### III.    TREMENDOUS SIMILARITIES EXIST BETWEEN BMR AND THE *CRAVE* SERIES THAT GO WELL BEYOND IDEAS, TROPES, *SCENES A FAIRE*, SCATTERED DETAILS, AND GENERALIZED "SUBPLOTS"

Freeman's moving papers, including her Rule 56.1 statement of material facts, identified remarkable similarities between BMR and the *Crave* series. Defendants refuse to acknowledge, let alone discuss, most of them, instead making a generalized conclusory objection that they either

14

"misrepresentation of the works" or "are not material to whether the parties' works are substantially similar as a whole."[8] But their claim that all similarities are *scenes a faire* requires *first* identifying whether the claimed similarities actually exist in the works, and *then* addressing the factual question of whether they are similarities of protectable expression. Their refusal to acknowledge that most similarities between the works even exist is thus improper.

Defendants argue, in essence, that they need not address every similarity because they have determined that none of the individual similarities are "material." But "excessive splintering" of the elements of the work would "result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectible elements." *New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 94 (S.D.N.Y. 2015), quoting *Mena,* 2012 WL 4741389, at *4. *See also Starobin*, 137 F. Supp. 2d at 97 ("Comparing works of artistic expression, such as the novels at issue in this case, by dissection neglects to pay proper attention to the works as a whole."), quoting *Littel v. Twentieth Century Fox Film Corp.*, 1995 WL 404939 at *17 n. 7 (S.D.N.Y. 1995). It is for precisely this reason that the Second Circuit has warned that "[b]y factoring out similarities based on non-copyrightable elements, a court runs the risk of overlooking wholesale usurpation of a prior author's expression," explaining that "in distinguishing between themes, facts, and *scenes a faire* on the one hand, and copyrightable expression on the other, courts may lose sight of the forest for the trees." *Hoehling v. Universal City Studios, Inc*., 618 F.2d 972, 979–80 (2d Cir. 1980).

Defendants concede—as they must—that both heroines relocated from San Diego to Alaska, are living with their last known relatives, and are discovering their powers and role as a

---

[8] See Defendants' response to Freeman's SSUF 107 in Dkt. 310, which they then incorporate by reference in response to Freemans SSUF 108-172, regardless of whether Freeman also included cites to the underlying works (as with SSUF 117-119, for example).

key figure tasked with maintaining the balance to avoid an impending supernatural war throughout the story. Yet, Defendants dismiss these similarities, and numerous others, as tropes by abstracting each (e.g., recasting "moving from San Diego to Alaska" as "moving to somewhere remove") and/or identifying similar elements in other works.

But novelty is not the standard for copyright protection,[9] and Defendants have failed to meet their burden to establish that the claimed similarities are trope. It is simply not trope for a heroine to hear two voices in her head which are two different characters (ASUF 588 435),[10] initially think the first voice is her "wolf half" / "witch side" (ASUF 436) but later discover that it is actually her father/grandfather (ASUF 440) who she visits through a portal (ASUF 576-577) and discovers that he speaks Gaelic (ASUF 441), has smoky/smoke gray eyes (ASUF 583), and has been trapped in a steel trap attached to a tree/wall for a very long time (ASUF 575) in his supernatural form (ASUF 581). Nor is it trope that when the heroine frees a voice in her head character, he releases a piercing howl/bellow, shifts into a man wearing a tunic and old-fashioned clothing with blue and gold, and gives the heroine a magical object before disappearing. (ASUF 633-640.) And it is not trope that Ronan/Hudson is a royal vampire with "stormy blue eyes" who is believed to be evil, depraved, and responsible for the deaths of many (even though he is not). (ASUF 612-613, 620-621, 625.) As set forth more fully below, the similarities in this case extend well beyond what can fairly be considered trope or *scenes a faire* and into a clear recasting of

---

[9] As the Second Circuit explained in *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490, originality, as required for copyright protection is "distinguished from novelty; there must be independent creation, but it need not be invention in the sense of striking uniqueness, ingeniousness, or novelty, since the Constitution differentiates 'authors' and their 'writings' from 'inventors' and their 'discoveries'…Originality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying… The test of originality is concededly one with a low threshold in that '(a)ll that is needed . . . is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" (Citations omitted.)

[10] The voices make the heroine feel fractured or like the voice is separate from her. (ASUF 435.) The heroine also thinks the voice is crazy for telling her what to do. (Id.)

Freeman's original work.

> ***a. Characters***: Defendants attempt to dismiss every similarity between the characters as the necessary result of a generalized idea, *scenes a faire*, or trope is without merit. The Second Circuit has provided:

> > [w]hat the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character…

> > Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

*Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 241–42 (2d Cir. 1938).

In *Warner Bros.*, the Second Circuit rejected "defendants' mode of analysis whereby every skill the two characters share is dismissed as an idea rather than a protected form of expression." *Id.* at 243. That each one may begin as "an idea does not diminish the expressive aspect of the combination… and [the] similarity cannot be rejected by isolating as an idea each characteristic the characters have in common[.]" *Id.* Indeed, "[t]hat approach risks elimination of any copyright protection for a character, unless the allegedly infringing character looks and behaves exactly like the original." *Id.*

Even if "bad boy love interest" and "gay best friend" are stock characters in YA (Dkt. 298 at 22), the characters are still infringing because the similarities identified by Freeman go beyond the generic *scenes a faire* elements; instead, the similarities concern protectable similarities in expression of motivations, skills, credentials, unique personalities, and interpersonal relationships—each of which cannot be "isolate[ed] as an idea" as Defendants suggest. In *Lone Wolf McQuade Assoc. v. CBS, Inc.*, the court found two characters to be substantially similar,

despite both resulting from the underlying "trope" of law enforcement officers, where the similarities went beyond the "trope." There, both law enforcement officers shared similar approaches to law enforcement, fighting technique, characteristic behavior, methods of operation, attitudes towards rules and authority, style, and choice of vehicle. 961 F.Supp. 587, 594 (S.D.N.Y. 1997). The similarities between the characters here are even more striking than those in *Lone Wolf McQuade*.

     ***1.***     ***Heroines (Anna/Grace)***: At the beginning of BMR and *Crave* respectively, the heroines believe their close family members have recently died in a crash. (ASUF 445-448.) Both heroines feel guilty about the crash that killed their family members because they had an argument with them just before the accident. (ASUF 449-450.) The loss greatly affects the heroine and is the reason she has panic attacks. (ASUF 452, 450.) In both works, the heroine believes her grandparents are dead. (ASUF 453.) And in both works, the heroine later discovers that her father (BMR) / grandfather (*Crave*) is alive. (ASUF 582, 584.)The heroines are both rare paranormal creatures.[11] Both miss California and struggle to adapt to life in Alaska.[12] Both heroines have the same interest and express their personality in the same way.[13] The heroines note what dressing like a "newbie" in Alaska is and describes the same clothing. (ASUF 337.)

---

[11] Grace's (*Crave*) father was a witch, her mother was a gargoyle, and her grandmother is the daughter of a deity. (ASUF 346, 348-349.) Grace is a descendant of one of the twin goddesses. (Id.) Anna's (BMR) mom was a witch, her father was a werewolf, and her grandmother is the daughter of a deity. (ASUF 346, 348-349.) Anna is a descendant of one of the twin goddesses. (Id.) Heroine is special and first of her kind. (ASUF 421.)

[12] Both heroines describe Alaska negatively. (ASUF 155, 335.) Both heroines miss California. (ASUF 336.) Both heroines describe the sky in Alaska. (ASUF 334.)

[13] Love to read and quote Shakespeare: ASUF 370-375. Are described as a "dork": ASUF 352. "Babble" when nervous: ASUF 378. She also gets tongue-tied, flush / blush, around the guy she is attracted to. ASUF 379. Loves cookies: ASUF 395. Loves tea and cookies: ASUF 396. Heroine grabs apple between classes: ASUF 394. Heroine eats yogurt at school: ASUF 393.

Defendants falsely claim that the heroines have "almost nothing in common besides being female teenagers with supernatural abilities." Dkt. 298 at 29. This claim rests on numerous assertions regarding dissimilar traits that lack any citation to the underlying works (ironically, given Defendants' strong objections to Freeman's indexes) and in fact do not find support in the works themselves. Accordingly, the claimed dissimilarities are unreliable and irrelevant and should not be considered by this Court. *Williams*, 84 F.3d at 583 (the works themselves supersede any contrary allegation otherwise). For example, Defendants argue that the heroine in BMR (Anna) is insecure and reserved while the heroine in *Crave* (Grace) is feisty and quirky. In fact, the underlying works show that both Anna and Grace are feisty, have a sarcastic sense of humor (ASUF 781, 782, 783), fight back when attacked (ASUF 195, 308), and want to be their own hero (ASUF 784). Both give other characters funny nicknames in their head (ASUF 398-399), quote and talk about literature (ASUF 370, 371, 374, 375), talk about French philosophers (ASUF 371-373), take advanced level classes (ASUF 368, 369), and are sometimes shy (ASUF 377, 382).

Defendants also incorrectly assert, *albeit* without citations, that Anna is a witch. Anna is a mix of a witch, a werewolf, and something else that is unknown at the beginning of the works. (ASUF 346-347.) Similarly, Grace is also a mix of a witch, gargoyle, and something else that is unknown at the beginning of the works. (ASUF 346, 348-349.) In both works, the readers later discover that the "unknown something" is that she is the descendant of a twin goddess. (ASUF 347-348.) And both heroines can shift forms. (ASUF 474-476.) However, any difference in the heroine's supernatural abilities are superficial and irrelevant when considering the numerous similarities that go far beyond such superficial attributes.

Defendants claim that Anna believes she is supernatural from the beginning, in only 1 of the 6 BMR manuscripts at issue was that the case. Just as in *Crave*, every other BMR manuscript

has the heroines—both Anna and Grace—believing she is an ordinary human girl in the beginning. (ASUF 344.) *See also* Reiss Rep. pp. 10-11 (discussing how the heroine in BMR originally believes she is human). Indeed, both heroines are kept ignorant of their supernatural powers by family members using a special tea blend that binds her powers. (ASUF 392, 345.)

And the above is just the metaphorical tip of the iceberg. As set forth more fully in the separate statement of undisputed facts, Grace is a loose reworking of Anna with the same thoughts, comments, personality traits, behaviors, and feelings towards each other character and occurrence role in the story.

    **2.    *First romantic lead***: Defendants wrongly assert that Freeman "misinterprets" the relationship between the characters in *Crave* and that the heroine in the *Crave* series has a singular love interest—denying any love triangle. Nonsense. In the first two Crave novels, Jaxon is the primary love interest; however, in the third, the heroine faces a choice between Jaxon and Hudson. The heroine's relationships in both the Crave series and BMR mirror each other: the main romantic leads (Ash/Jaxon) want to protect the heroine, whereas the second romantic lead (Ronan/Hudson) encourage the heroine's independence. (ASUF 422, 604-605.) Ultimately, the heroine is attracted to Ronan/Hudson, who is said to be evil, depraved, and would bring an apocalypse if brought back to earth.[14]

Jaxon and Ash are parallel characters—the heroine is immediately drawn to him, and she is irritated by this. He has full red lips, chiseled features, dark hair, is lean and muscled, tall, and his smile turns one corner of his mouth up with a twist of his lips. (ASUF 518.) His eyes are like gemstones and have "flecks" in them. (ASUF 511-513.) His scent, a mix of citrus and water (ASUF

---

[14] The similarities between Ronan/Hudson are addressed below.

525),[15] frequently wraps itself around the heroine (ASUF 527). In both works, the heroine meets him at the end of chapter two and he is wearing black jeans and a t-shirt. (ASUF 517.) He wears designer clothes and black v-neck sweaters. (ASUF 519.) The heroine connects with the romantic lead over their mutual feeling of loss.[16] (ASUF 554, 607.) He is also the catalyst for the heroine discovering the supernatural world when he loses self-control during their first kiss.

Notwithstanding that Wolff made Jaxon a different paranormal creature than Ash, the similarities within the character development and personalities—the most important considerations—are remarkable. Both romantic leads have conflicting feelings for the heroine and distance themselves from her, fearing she is endangered by association with him. (ASUF 192, 480, 550). Both have the magical ability to cast/fade (ASUF 561) and their kind is due to a "genetic mutation" (ASUF 568). When he first meets the heroine at school, he reaches out and touches the heroine's hair before warning her to be careful. (ASUF 169.) He tries to give the heroine the impression that he is not into her, which she finds irritating. (ASUF 535.) His moods are also inconsistent towards the heroine. (ASUF 536.) Later, he realizes he is selfish and cannot stay away from the heroine. (ASUF 539.) He warns the heroine that it will not be easy for them to be together. (ASUF 224.) He is also intense and dominant. (ASUF 528.) [17]

Defendants emphasize that in *Crush*, Jaxon discovers that his older brother is alive. But this twist does nothing to erase the remarkable parallels between BMR and *Crave* (Book 1), nor does such recasting avoid infringement of Freeman's rights under 17 U.S.C. § 101(defining a

---

[15] BMR 2011 pp. 456, 460 ("his scent–citrus and spice now…waterfalls"); *Crave* p. 435 ("orange and freshwater scent of him"), *Crush* p. 10. His scent is part of his allure to the heroine. BMR 2011 p. 59; *Crave* p. 165.
[16] The romantic lead's older brother was murdered, and he feels responsible. (ASUF 551.) The romantic lead also helps the heroine heal her emotional wounds from the loss of family members. (ASUF 554.) Ash/Jaxon's older brother was nineteen in BMR and "looked about nineteen" in *Crave*. (ASUF 553.)
[17] Romantic lead is dangerous. (ASUF 522.)

"derivative work" as "a work based upon one or more preexisting works, […] in which a work may be recast, transformed, or adapted.").

**Second romantic lead/second voice in heroine's head**: In both works, the heroine finds herself attracted to someone else, Ronan/Hudson, who first appears as a voice in her head. Defendants misrepresent Ronan as BMR's overall villain. In fact, Ronan is the "second romantic lead" and is parallel to *Crave's* Hudson. As stated above, he has blue eyes (ASUF 610), and the heroine initially thinks he is evil and that if he is freed a supernatural war and apocalypse will result (ASUF 597-598, 609, 612-614, 623, 625). He is royalty (ASUF 589) and gives the heroine his magic (ASUF 593). The heroine is attracted to Ronan/Hudson because he wants to help her learn how to stand on her own.[18] In one scene, Ronan/Hudson bites the heroine's lip during a kiss and tastes her blood (ASUF 592). Ronan/Hudson are both intended to be the true mate of the heroine and share numerous other similarities addressed above and play the same role throughout the story as described in the plot sequence below.

   **3.    *Villains***: The villain in both BMR and *Crave* is the vampire prince/king (a/k/a Julian/Cyrus)—he is an elitist (ASUF 705) and wants supernatural's to take over the earth (ASUF 777). They are both vampires (ASUF 696), belong to the royal court (ASUF 697), sit on a throne (ASUF 698), have British accents (ASUF 699), are tall (ASUF 701), have dark hair with a short modern haircut (ASUF 702), intense blue eyes (ASUF 703), call the heroine "little girl" (ASUF 724), have a daughter with a woman who is not his mate and the daughter is related to the heroine by blood (half-sister (BMR) / cousin (*Crave*)) (ASUF 726). Both believe that humans are an excuse for war because they are overpopulated, and both have a special bite (the "Kiss of Life or Death" in BMR and the "eternal bite" in *Crave*). (ASUF 706, 778.) Both bite the heroine, which could,

---

[18] The World Notes 2010; BMR 2013 pp. 448-449; *Crush* p. 156, *Covet* p. 194.

but does not kill her. (ASUF 707.) Both have also kidnapped kids from the high school--the heroine's friends--and are draining them of their life force and magic, which could kill them. (ASUF 716-721.) Both are responsible for imprisoning a grieving woman's mate (ASUF 708), which the heroine learns about through a similar scene in both works in which the heroine is reminded of Sleeping Beauty (ASUF 709). Both are also responsible for imprisoning the first voice inside heroine's head character (father/grandfather) by trapping him in his supernatural form with a magical steel trap.

Defendants also assert that Taylor is *BMR*s overall villain, but Freeman's work makes clear she is not—she is the mean girl nemesis (which parallels *Crave*'s Lia, as discussed below).

*4.    Gay best friend*: Defendants claim that a mixed race gay best friend is *scenes a faire* based on the testimony of their purported expert. This claim is specious as the existence of such a character in a handful of prior works does not make it a "trope." And it is certainly not a trope for that character to change into a winged supernatural creature (a "dragon shifter" / Faery) which the heroine finds beautiful. (ASUF 735-736.) And it is not a trope that each character is half black (ASUF 728-729), gay (and only the heroine knows he is gay at first) (ASUF 730), wears funny clothing with an animal on it (ASUF 734), is known for their big smile (ASUF 738), "waggles" their brows at heroine (ASUF 731), calls the heroine nicknames (ASUF 732-733), hold leadership positions at school (ASUF 739-740, 742), and the romantic lead is jealous of their relationship (ASUF 737, 743). Wolff having a half-Egyptian son does nothing to explain how all these specific similarities came to be.

*5.    First voice in heroine's head*: As addressed above, the first voice in heroine's head is a character trapped in their supernatural form in a place only accessible by portal, speaks Gaelic, has smokey gray / smoke gray eyes, is known as an "Abomination" / the "Unkillable Beast," who

provides guidance to the heroine. (ASUF 440, 441, 583, 585, 577.) The heroine eventually learns

that the voice is her father / grandfather. (ASUF 440.) There are numerous other similarities as

follows. At first, the voice makes the heroine feel fractured / like the voice is separate from her.

(ASUF 435.) The heroine thinks the voice is "crazy" or that she is crazy for hearing it. (ASUF

435.) The heroine wonders if the voice means that she is "something more." (ASUF 436.) The

heroine talks back to the voice when it gives her warnings or tells her what to do. (ASUF 785, 786,

437). At the climax of the story, when the heroine is kidnapped, the heroine notices that the voice

is absent. (ASUF 438.) The heroine eventually falls through a portal / vortex and ends up in a

forest where the voice is trapped. (ASUF 576-577.) The heroine learns that steel trap the voice is

in has special properties to keep him in his supernatural form. (ASUF 581.) His face is "sad".

(ASUF 787.) The voice tells her that she can call him Athair / his name is Alistar. (ASUF 585.)

She also learns that he is the kind of supernatural being who can communicate telepathically.

(ASUF 586.) In BMR, the heroine accidentally frees Ronan/Hudson, but in *Crave*, the heroine

successfully frees the first voice as planned. Both scenes are expressed in nearly identical ways as

follows: the heroine frees him from an iron trap / cuff restraint, he releases a piercing howl/bellow,

he shifts into a man with blond hair, is wearing a tunic and old-fashioned clothing with colors of

blue and gold, he thanks the heroine for freeing him, and gives her a magical object before

disappearing. (ASUF 633-640.)

  *6.*   ***Mean girls***: Defendants also fail to address any of the similarities cited by Freeman

regarding Taylor/Lia. Defendants allege that BMR's Taylor is a popular "queen bee" who is

nothing like *Crave's* "nerdy, quiet, and isolated" Lia. But, again, Defendants' descriptions are

divorced from the underlying works. In fact, both *Crave* and BMR describe Taylor/Lia as the

"popular girl" in school. (ASUF 679.) Both are also described as the most beautiful girl the heroine

has ever seen. (ASUF 678.) Both are supernatural beings who feed on others for sustenance (ASUF 680) and are responsible for drugging the heroine in the "spiked drink scene" (ASUF 215). She also tries to make the heroine believe that she and the romantic lead are romantically linked. (ASUF 692-694.) She also is responsible for the heroine's kidnapping. Taylor/Lia are the same character both of whom are bold "mean girls"—certainly not shy, nerdy, or quiet.

7.    ***Aunt/Uncle:*** The Defendants notably ignore all similarities identified between the aunt/uncle character in the works. The heroine's aunt/uncle are one of only two relatives the heroine believes that she has left in the world, they are witches, and she lives with them. (ASUF 658.) The aunt/uncle give heroine advice about the supernatural world and want her to leave Alaska to keep her safe. (ASUF 660.) They also exhibit similar behavior during similar scenes in both works—such as kissing her on her head (ASUF 661) and patting her hand while talking about the family members' deaths (ASUF 662). The aunt/uncle also discuss the special stone / stone necklace her father gave her and advise the heroine not to take it off. (ASUF 468-473.) If anything, these characters are the opposite of the typical, *scenes a faire* cruel relatives found across stories from *Cinderella* to *Harry Potter.*

8.    ***Grandmother***: The Defendants also ignore the numerous similarities between the grandmother of the heroine. Wolff moved around some names and ideas surrounding the grandmother character—in BMR, the God of Chaos is the heroine's father, but in *Crave*, the God of Chaos is the heroine's grandmother. (ASUF 434.) Similarly, in BMR, the Bloodletter is the heroine's second love interest (Ronan/Hudson) but in *Crave*, the Bloodletter is also the heroine's grandmother/the God of Chaos. (ASUF 434, 643.) In BMR, the heroine's grandmother is the "High Priestess." (*Id*.) [19] But despite playing musical chairs with character names, Anna's grandmother

---

[19] BMR 2013 p. 436.

is the same character as Grace's—each heroine initially did not know she existed but then discovered her living in a place that is difficult to find (ASUF 642), each was/is a vampire (ASUF 644), with "more than a hint of danger" / "more than a little avarice" in her "green eyes" (ASUF 646). When the heroine is with her, she is reminded of a fortune-teller. (ASUF 647.) She also tells the heroine the twin goddess creation story and how the heroine's purpose is to maintain the balance. (ASUF 645.) She also tells the heroine that her purpose is a great gift that requires sacrifice. (ASUF 652, 654.) The grandmother's eyes glisten with unshed tears when she talks to the heroine about the vampire prince/king's actions that have caused "strife." (ASUF 656.)

9.     ***Other minor characters***: The works have so many more parallel characters with striking similarities, such as Mason (BMR) / Xavier (*Crave*) and Rachel (BMR) / Eden (*Crave*). Mason/Xaiver are known for telling jokes, friends with Brendan/Flint, participate in school activities with Brendan/Flint, and enamored with Macy/Jenny (heroine's best friend) and is a supernatural creature. (ASUF 744.) Rachel/Eden have black hair, piercings, are a tough "force to be reckoned with" / "badass," stand out in a crowd, close friends with Brendan/Flint, have wings, and wear platform / combat boots. (ASUF 745.) These similarities are not a coincidence and the combination of all of them is certainly not *scenes a faire* or trope.

10.     ***Character names***: While the character names themselves are not protectable, the vast number of character names in common is striking: "Marise" (ASUF 746), "Gwendolyn"/ "Gwen" (ASUF 747), "Bloodletter" (ASUF 317), "Aedan"/"Aidan" (ASUF 748), "Lily" (ASUF 749), "Fiona" (ASUF 750), "Emma" (ASUF 751 ), and "Morrigan" (ASUF 752). While the Defendants acknowledge the presence of a character named "Colin" in Crave, they misleadingly argue that a spelling variation ("Collin" in BMR; "Colin" in Crave) signifies a distinct character name. (ASUF 753.)

**b.  Scenes/Plot**: Supernatural battles, love triangles, and quests may be common characteristics of YA paranormal novels, but the original expression of those ideas that Freeman alleges were copied from BMR go well beyond those generalities.

Defendants wrongly argue that only plot similarity between the works are generalized plots such as "both stories focus[ing] on the heroine's purpose of 'maintaining the balance' in the supernatural world." Dkt. 298 at 25. In fact, BMR and *Crave* unfold through the ***same*** combination of scenes as follows.

1.      **Beginning**: Both stories begin with the heroine on her way to school in Alaska, thinking about her loss of family, her negative feelings about Alaska, the weather, and California. (ASUF 154-158.)

2.      **Motorcycle/snow mobile ride**: On the first school day, the heroine is given a ride on a motorcycle/snow mobile—the heroine is given an extra helmet, is told to hold on tight, and the driver speeds along into darkness that stretches on seemingly forever. (ASUF 159-160.)

3.      **Death of family**: The heroine suffers from panic attacks due to her family's death, feeling guilty for arguing with them prior to the fatal crash. (ASUF 445-446, 449-452.) The panic attacks exhibit in similar ways. (ASUF 460-463, 466.) The death involved an accident in which the car they were in fell a long distance. (ASUF 788) Initially, introverted and uncomfortable with attention (ASUF 377, 378, 380 213), she resides in Alaska with her mother and aunt / cousin and uncle, both of whom are witches (ASUF 339-341). Despite being initially unaware of the supernatural abilities, she later discovers the truth and is angry that she has been kept ignorant by her family. (ASUF 344-345.)

4.      **Brendan/Flint**: On the first school day scene, the heroine meets her male friend (Brendan/Flint), who is secretly gay (only the heroine knows) (ASUF 730.) She describes him as

appearing the same way, which is addressed above. The heroine feels like she is being watched, the hairs on the back of her neck prickle / stand up. (ASUF 403.) At the castle, heroine is told "home sweet home" and gives her cousin / friend the "universal look." (ASUF 161.) Despite feeling unwell and lacking appetite, she tries a little soup/orders soup. (ASUF 162.) Brendan/Flint provides support, and she initially resists. (SUF 163.) Heroine is reminded of Barbie. (ASUF 762.) Brenden/Flint offers her a supporting arm as they go down the hall to the cafeteria / Macy's room and she thinks about the romantic lead. (ASUF 163.)

5.    *Romantic lead meeting*: The heroine is driven to school by one of her relatives. (ASUF 164.) The heroine meets the romantic lead at school at the end of chapter two. She is instantly attracted to him, which she finds annoying. (ASUF 481.) The heroine has to remind herself to breathe / catch her breath when her gaze collides with the romantic lead. (ASUF 516.) She describes him appearing the same way in both works as addressed above. (ASUF 510-513, 517-518.) The heroine and romantic lead share a Shakespeare quote (ASUF 482) and have verbal banter (ASUF 167). At the end of this scene, the romantic lead tells the heroine to be careful and reaches out to touch the heroine's hair. (ASUF 169.) His warning is the last thing he says to her. (ASUF 170.) Unknown to heroine, there is a war between the races of supernatural beings causing serious storms and affecting the balance. (ASUF 776.) The heroine finds the romantic lead compelling, overwhelming, and different. (ASUF 223, 233, 521, 509, 522.) The heroine wears her emotions on her sleeve and worries that others will see how she feels about the romantic lead. (ASUF 385.)

6.    *Heroine goes home*: After meeting the romantic lead, she visits with her Aunt / Uncle who discuss her day and express their concerns for her. (ASUF 173.) The walls in heroine's home / in the school are decorated with gemstones. (ASUF 789) The heroine thinks about her day

at school, friends, romantic lead, and her family before bed and the heroine's inner dialogue is similar in both works. (ASUF 172-173.)

7. ***Realization of romantic leads moods***: At school, she notices the romantic lead's moods are different every day. (ASUF 536.) The romantic lead wants to know what kind of drink/movies/food the heroine likes. (ASUF 174.) Heroine and romantic lead begin to connect over mutual loss.[20] (ASUF 554, 607.) The romantic lead tells heroine that they should stay away from each other. (ASUF 538.)

8. ***Crying at school***: The heroine cries at school over loss of her family and the romantic lead finds her. (ASUF 226-228.) She is embarrassed, and instead of trying to comfort her, he tries to distract her by walking her to class / his room at school. (ASUF 228-229.)

9. ***French Castle***:[21] Heroine arrives at a castle with a long driveway, stone walls, and security gates with a keypad that requires a code. (ASUF 301, 305.) The place is a fortress, isolated, and on the hillside. (Id.) The heroine is reminded of a Salvador Dali painting. (ASUF 302.) In *Crave* the castle is the school, while in BMR it is the romantic lead's home. As addressed further below, the castles are curiously similar especially considering that there are no castles in Alaska of any kind.

10. ***First Attack Scene***: The first big scene occurs within the first 50 pages of each work – an attack by two supernatural creatures (unknown to heroine) who remind her of 80s rockers. They are wearing jeans, shirts, no coat and one is blond and stocky / muscular. (ASUF 175, 176.)

---

[20] When the heroine is with the romantic lead, she says that "it feels like home." (ASUF 489.)

[21] BMR's French castle in Alaska is an Old-World European Chateau. (ASUF 779.) (Chateau is French for the word castle). *Crave's* French castle in Alaska is described as "Gothic." (ASUF 779.) Outside of the castle: ASUF 303, 779, 780. Inside the castle: ASUF 304, 307.

The attack is expressed in identical ways.[22] The heroine also fights back in identical ways.[23] The romantic lead saves her. (ASUF 189.) She thanks the romantic lead, and he shakes his head, believing he is not deserving of her "thanks" because he has put her in danger by his association with her. (ASUF 192.) Heroine is worried about the attackers hurting someone else. (ASUF 790.) He leaves suddenly, and she is left wondering. (ASUF 484.)

11.    ***Mean girls***: The heroine talks about the mean girls at school, and she thinks about them several times throughout the story. (ASUF 209, 214, 219, 350.) In one scene, the mean girls try to trip her / throw a ball at her head. (ASUF 209.) In another scene with the mean girls, the heroine is at a school party, and she chokes on soda and a friend pats her on the back to help. (ASUF 208.) Taylor/Lia also tries to make heroine upset by implying that she is involved with the romantic lead. (ASUF 692-694.)

12.    ***Party***: The heroine gets ready to go to a party with her best friend. Clothing options for the heroine is discussed and they are trying on outfits. (ASUF 202-203.) Her mom/cousin suggest that she wear a red dress to a school party, but heroine believes it is too revealing and does not want to wear it. (ASUF 204.)

13.    ***Spiked drink***: Heroine's nemesis (Taylor/Lia) gives a drink to heroine at the party / after the party and it tastes fruity/floral. (ASUF 215.) She tells the nemesis she has to go home, but the nemesis rolls her eyes and is unpleasant trying to convince her to stay. (ASUF 216-217.) Later the heroine becomes extremely sick, exhibiting the same symptoms in both works (ASUF 218), and does not initially know what happened but later discovers the truth.[24]

---

[22] One reached out and grabs her. (ASUF 181.) Heroine is pinned against him: her back to his front. BMR 2013 p. 60, BMR 2014 p. 49; *Crave* p. 56. (ASUF 182.) Attackers grab the heroine's hair. (ASUF 188.)
[23] Heroine tries to break the attacker's nose. (ASUF 184.) Heroine stomps on his feet / thinks about stomping on his feet. (ASUF 183.) Heroine tastes blood in her mouth. (ASUF 186.) Heroine puts her fists up. (ASUF 187.)
[24] BMR 2013 p. 293; *Crave* p. 451.

14.    ***Injury***:[25] The heroine is injured by being attacked by a demon/falling out of a tree. The heroine collapses on her knees / hits the ground and twists her ankle. Despite the heroine's protest, the romantic lead carries the heroine home, and she decides she kind of enjoys it. She notices his smell and says "Et tu Brute?." The romantic lead carries the heroine into the great room / her room and sets her down on a divan / bed. He then removes her boots and wraps her in an "oh-so-soft blanket" / his touch-already soft gets even gentler. The heroine's female family member puts a black choker/black tie around the heroine's neck and compliments on how it looks.

15.    ***First kiss scene***: In both works, the heroine and romantic lead are outside watching a phenomenon in the sky; the northern lights (BMR) / a meteor shower (*Crave*). (ASUF 231.) The air between them is electric. (ASUF 791.) It is cold, but the romantic lead keeps heroine warm. (ASUF 792.) The romantic lead looks at heroine with yearning / craving and the heroine cannot look away. (ASUF 233.) He cups her face in his hand and leans in / down, presses his lips to hers for a soft kiss. (ASUF 234.) His hands are in her hair and her arms are around his neck. (ASUF 235.) She is delirious / light-headed. (ASUF 235.) The romantic lead begins to lose control of his powers, his eyes begin to change and the ground shakes. (ASUF 236.) She wonders what he is. The next day, she confronts the romantic lead and learns the truth: he is a werewolf / vampire.[26]

//

//

//

//

//

---

[25] This scene can be found at ASUF 220-225.

[26] ASUF 241-244. Heroine also learns that werewolves are wolf shifters, it is a "technicality." ASUF 252. Heroine also learns that romantic lead has power with his mind. ASUF 558.

16.     *First voice*: She begins hearing the first voice in her head character, which gives her warnings. She wonders if it is her wolf / gargoyle half speaking or "something more." (ASUF 436.) She calls it her "inner voice" and thinks it is crazy that she hears it. (ASUF 435.) As addressed above, she learns that the voice is the abomination / unkillable beast, who is actually her long lost father / grandfather, and in his supernatural form on an island which the heroine visits by portal. (ASUF 576.)

17.     *Kidnapping scene* (the climax of BMR and Crave (Book 1)): The heroine is kidnapped by the vampire prince / vampire prince's mate, who has taken the heroine to use her to bring back their dead mate. (ASUF 261, 266.) In BMR, Taylor helped the vampire prince kidnap the heroine; whereas in *Crave* Lia did the kidnapping on her own. (ASUF 262.) She feels panic and wishes she had the power to escape. (ASUF 263.) The heroine's arms are in cuffs/tied to an iron ring and she is on a cold surface. (ASUF 264.) She realizes that she was kidnapped by the vampire prince (BMR)/the vampire prince's mate (Lia) and refers to them as a crazy vampire. (ASUF 271, 262.) The kidnapper tells the heroine that they have been waiting a long time for her (ASUF 265), and that her family members deaths were not an accident (ASUF 268). The kidnapping is an act of vengeance against the person they believe killed their mate. (ASUF 267.)

Each heroine worries that she will be Frankenstein's bride/Frankenstein if the plan to resurrect the dead friend works. (ASUF 269.) Then, the heroine is choked by another supernatural being. (ASUF 272.) During the fight, the heroine is dragged and tries to resist (ASUF 271), she realizes that they could turn her brain to mush, her head is slammed against the wall, and she feels disconnected to her body/tries to disconnect from her body. (ASUF 273.) The voice in her head is noticeably absent in this scene. (ASUF 438, 270.) Taylor/Lia tells the heroine that she is pathetic. (ASUF 683.) The heroine is then saved when the vampire prince/romantic lead throws the

supernatural being across the room. (ASUF 272.) The romantic lead rescues the heroine by causing the wall/door to shudder and fall. (ASUF 275.) A jealous female vampire is thrown across the room (ASUF 277), there is a sickening crunch of bone (ASUF 277), and the demon / vampire prince's mate is stabbed and disintegrates/explodes into dust (ASUF 282).

18.     *Second kiss scene*: The heroine wants to kiss the romantic lead. The heroine moves in towards the romantic lead, but he does not respond. (ASUF 544.) She is embarrassed. (*Id*.) Their fingers are laced. (ASUF 545.) The romantic lead wants assurance from the heroine that she knows what she is getting into with him.[27] The romantic lead pulls the heroine towards him / leans in towards the heroine until their faces are inches apart. (ASUF 545.) They eventually kiss and the romantic lead "groans low in his throat" and the heroine's hands glide down his back. (ASUF 547.)

19.     *Healing bite*: The heroine suffers blood loss, and she sees the romantic lead snarl, exhibiting fangs/canines and bite her.[28] His bite is not what caused her blood loss—it was given to save her. (ASUF 237-238.) She is told to rest and drink a sweet drink by the doctor/nurse. (ASUF 239.) She wonders if she will sprout fur/fangs after the bite. (ASUF 240.)

20.     *Northern lights scene*:[29] The romantic lead takes the heroine to see the northern lights. The heroine in BMR wonders about the scientific explanation for the colors in the sky. (ASUF 254.) In *Crave*, the heroine explains the science behind the colors in the sky. (ASUF 259.) The heroine learns that when the romantic lead makes a transgression, his family imposes the sanction in a physically punitive way. (ASUF 569.) The heroine is horrified that his family would do something so painful to him—he laughs and tells her not to worry. (ASUF 569, 570.) Heroine

---

[27] ASUF 538, 539. Romantic lead / heroine is concerned about walking away and not experiencing what they have. ASUF 546.
[28] ASUF 250.  Heroine has lost a lot of blood. ASUF 237.
[29] This scene can be found at ASUF 254-260. Heroine doesn't feel cold with the romantic lead. ASUF 254. Green and purple swirl across the sky. ASUF 255. Heroine and romantic lead kiss. ASUF 260. They dance and laugh together. ASUF 256.

and romantic lead go to a special room where they transport from Alaska into a summer meadow. (ASUF 411.)

21.    ***Second voice***: Heroine then hears a second voice, and she is in a state of shock at first. (ASUF 588.) As discussed, the second voice is Ronan/Hudson and thought to be evil even though he is not. He gives the heroine some of his magic. (ASUF 539.) He is to be her true mate and there is an attraction between them even though she loves the romantic lead. (ASUF 604, 605.)

While the above analysis primarily addresses *Crave* (Book 1), BMR is scattered throughout the *Crave* derivatives, *Crush, Court*, and *Covet*, such that each are derivatives of BMR. Indeed, each book steals a substantial portion of the character development, plot development, and overall story that was originally developed by Freeman. And *Crush* goes far beyond simply finding magical objects to save the world. To wit:

**22. *The similarities continue throughout the series.***

*Crush* (Book 2) and the first drafts of BMR begin with the heroine having an injury and not remembering how she got hurt. (ASUF 313.) She realizes that she has accidentally brought the second romantic lead (Ronan/Hudson) back from another dimension and that she is tied to him. (ASUF 627, 628, 629, 314.) The heroine believes that if she would have known the truth from the beginning, she would not have brought Ronan/Hudson back from the other dimension. (ASUF 314, 630.) His character development throughout BMR is used in *Crush*, as indicated above. When the heroine tries to remember what happened, she has terrible head pains. (ASUF 315.) In both works, the heroine's spirit was with Ronan/Hudson in another dimension, but she does not remember. (ASUF 314.) Powerful objects must be found to stop the war and Ronan/Hudson.[30]

---

[30] In BMR there are 13 objects, one for each council member and for Ronan. In Crave, there are 5, one for each fraction. ASUF 316. Each is located in Alaska. *Id*.

(ASUF 316, 412.) Ronan/Hudson's spirit is trapped in the objects / heroine's head.[31] The Bloodletter is an integral part of the objects. (ASUF 317.)

Throughout *Crush*, the heroine's character is developed in many ways that are taken directly from BMR. For example, the heroine discovers her purpose is to maintain the balance, she is immune to certain magic, and that her kind were nearly wiped out due to extinction.[32] In *Crush*, the heroine also discovers that the first voice is her father / grandfather. (ASUF 576.) She also visits the first voice in her head through a portal and sees him trapped in his supernatural form, as addressed above. Heroine also wonders if she will become a werewolf since she was bitten by one. (ASUF 408.)

In BMR and *Crush*, the heroine's relationship with the romantic lead also begins to suffer. The heroine does not want to be protected, but the romantic lead wants to protect her. (ASUF 386, 442.) When she is close to him or they try to kiss, she hears a voice in her head telling her "no" and the romantic lead becomes weakened when they are together. (ASUF 318.) The heroine learns that she is inadvertently feeding on the romantic lead's life force. (ASUF 319.)

In *Crush*, Wolff copies BMR's Order, Council, Circle, Factions, Covens, Compact / Covenant, and the Court—each of which the heroine learns about in *Crush*. In BMR, the Order and Council are used interchangeably; in *Crush*, the Circle and Council are used interchangeably. The Council is the ruling body over all supernatural beings. (ASUF 320.) The romantic lead's parents are on the Council. (ASUF 321.) The Order / Circle has become corrupt. (ASUF 322.) In both works, factions are types of supernatural beings. (ASUF 323.) Covens are used to practice magic. (ASUF 324.)    Compact and covenants are agreements that bind supernatural beings.

---

[31] BMR 2013 pp. 46, 330, 244; *Crush* p. 162.
[32] Heroine is immune to magic. ASUF 422. The heroine's supernatural purpose is to bring balance. ASUF 405. Heroine's kind were wiped out/nearly extinct. ASUF 419.

(ASUF 325). In both works, there have already been two great wars amongst the supernaturals and the third war is on the horizon. (ASUF 326).

The vampire prince/king is also searching for the heroine and wants to give her his special bite (ASUF 706). The heroine learns how to shift.[33] In both works, the heroine must also pass an initiation test to become fully accepted as "Kindred"/to earn a seat in the circle.[34] The heroine is bitten by the vampire prince/king but survives (ASUF 706, 707).

It is black-letter law that creating a derivative is copyright infringement. *Michael Grecco Prods., Inc,* 345 F. Supp. 3d at 499–500 ("The Copyright Act grants the owner of the copyright the exclusive right to authorize the reproduction, distribution, and preparation of derivatives of the owner's work."), citing 17 U.S.C. § 106; *Harper & Row Publishers, Inc.*, 471 U.S. at 546–47. And that is exactly what has happened in this case. The *Crave* series tells essentially the same story using the same combination of characters and substantially similar scenes. The *Crave* series is an unlawful derivative.

c. **Setting:** Again, Defendants try to avoid the similarities between BMR's castle and *Crave's* high school (that is a castle) by comparing BMR's high school to *Crave's* high school. Freeman acknowledges that BMR's high school is not substantially similar to *Crave's* high school. Rather, she asserts that *Crave* took her original expression of BMR's French castle where supernatural beings live and made it into a high school and that her ***original expression*** of the building—specifically, a castle on a mountain near a remote town (ASUF 301), which is an architectural masterpiece, built from stone and surrounded by a huge stone wall and gate requiring a code (ASUF 301), with ornately carved double doors (ASUF 303), vaulted ceilings, crystal

---

[33] ASUF 474. The romantic lead also looks the same when shifting in both works—the air ripple/blurs, romantic lead is on all fours, there is a shimmer, and the air is affected for a moment. ASUF 477.
[34] ASUF 327. There is an offer of training before the test, but the heroine declines. ASUF 328.

chandeliers, fireplace, and tapestries (ASUF 304, 307)—is a protectable expression that was copied. This is especially so since there are in fact no castles in Alaska.

Further, Defendants erroneously argue that *Crave* features unique settings all over the world, while BMR takes place in ordinary locations in Alaska. However, this is not so. Both works involve fully realized paranormal settings which the characters access by portals. For example, the heroine steps into a room in the Alaskan winter and finds herself outside in the summer somewhere else (ASUF 410, 411). The heroine also falls through a portal/vortex to another place (ASUF 576). The portals lead to paranormal places—certainly not ordinary locations in Alaska (ASUF 577, 772). Both works use wards or "safeguards" which are magical devices the supernaturals use as protection and ensure no fighting occurs (ASUF 329).[35] The heroine also learns about a "sanctuary" which is a safe place for supernaturals located among trees in a forest and is "magic". (ASUF 793) Both have ice caves for dragons/the Bloodletter (ASUF 331).

In BMR, there is also Katmai, which is a place the heroine and her friends go after discovering that she is a supernatural being. (ASUF 794) It is a school for supernaturals that is accessible by small plane. And, of course, in *Crave* the school is called Katmere.

In sum, the similarities identified above establish that both works feature substantially similar characters, plots, story development, and settings. When considering the totality of the similarities, the works are undeniably substantially similar and have the same overall concept and feel. And the similarities are within the expression, not the underlying ideas or *scenes a faire* tropes. Defendants unsupported assertions otherwise are simply belied by the works themselves.

//

//

---

[35] Wards and safeguards are magical projections "woven into place." ASUF 330.

IV.    THE DIFFERENCES BETWEEN THE WORKS OFFER NO DEFENSE

Defendants take great pains to point out the differences between the works, but "dissimilarity between some aspects of the works will not automatically relieve the infringer of liability, for no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated." *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 305 (E.D.N.Y. 2009), citing *Williams*, 84 F.3d at 588; *Walkie Check Prods., LLC v. ViacomCBS Inc.*, 2022 WL 2306943, at *9 (S.D.N.Y. June 27, 2022). A finding of copyright infringement only requires the "copying of **constituent elements** of the work that are original," not that a work be copied in its entirety. *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 559 (S.D.N.Y. 2009) (emphasis added). "[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir. 1936). It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of "small import quantitatively or qualitatively" that the defendant will be found innocent of infringement. *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.), *cert. denied*, 506 U.S. 934 (1992). Therefore, Defendants' copying of **any** substantial portion of original elements of Freemans' expression amounts to copyright infringement.

That Wolff may have added scenes and made changes certainly cannot excuse Defendants copying of ***substantial*** portions of Freeman's work identified above—such as where the heroine is drugged by her female nemesis or the first kiss scene between the heroine which is the catalyst for the heroine's discovery of the supernatural world. Similarly, the minor differences between the characters pointed out by Defendants, do not negate the numerous similarities between the heroines'—both of whom are around seventeen (ASUF 332), from San Diego (ASUF 154), of mixed supernatural bloodlines and the first of their kind seen in a long time (ASUF 421),

descendants of a twin goddess (ASUF 432, 348), initially kept ignorant of the magical world (ASUF 344, 345, 392), feel out of place,[36] have magic in her blood,[37] is a protector of humans, non-humans, creatures, and the balance (ASUF 397, 405, 406, 645). Nor can the differences overcome the similarities between the heroines' expression of feelings and development, such as describing Alaska in substantially similar ways,[38] feeling "fury" when discovering her family was actually murdered,[39] locking her feelings "in a box" (ASUF 457), wrapping her arms around herself when she begins to panic,[40] describing the same panic attack symptoms.[41] The superficial changes in scenery, writing style, or supernatural powers have zero effect on the substantial similarity between the expression copied.

And even if these similarities are not individually protectable, Freeman's original selection and arrangement of such elements and expressions are certainly protectable. See e.g., *Hogan*, 48 F. Supp. 2d at 311. The similarities identified are not ones of "small import" or small enough to succumb to the superficial differences Defendants' identify.

> **a.  The Total Concept and Feel of each work is substantially similar, although that is not the proper primary method of analyzing similarity.**

---

[36] The heroine feels out of place due to both her ignorance of the supernatural world and difficulties adjusting to her new life in Alaska. ASUF 362, 155.

[37] ASUF 364 ("There's magic in your veins." (BMR)), ("There's magic in your blood" (Court)).

[38] ASUF 335 (describing Alaska as a frozen wasteland/hell frozen over); ASUF 155 (complaining about the cold in Alaska).

[39] ASUF 455 ("Something within me, deep and far down, rose up like hot acid. A fury so strong I actually felt on fire with it and yearned to destroy him." (BMR)), ("…the hopelessness deep inside me turn to anger and the anger turns to rage. It fills up the emptiness, fills up the aching, until all that's left is a fire in the pit of my stomach. A white-hot flame that wants nothing more than it wants justice." (Crave). ASUF 268 ("I felt a stirring of pity for him and was surprised by it." (BMR)), ("… and though I know Lia's crazy and that she plans to kill me, there's still a tiny piece of me that might actually feel sorry for her." (Crave)).

[40] ASUF 459 ("I wrap my arms around my middle leaning forward and curling into a ball. The room is spinning out of control." (BMR)), ("I wrap my arms around my waist, the walls of the room closing in as a I take a shallow breath." (Covet)).

[41] When anxious, heroine feels weight on her chest (ASUF 460), voice sounds thin (ASUF 461), heart pounds (ASUF 462), mouth feels like its full of cotton (ASUF 463), stomach does gymnastics (ASUF 465), throat gets tight (ASUF 466).

Defendants suggest that the works at issue cannot be deemed substantially similar because they have a very different "total concept and feel." Setting aside whether that is true (it is not), that is not the proper method of analyzing substantial similarity in this case.

In *Williams,* the Second Circuit Court held that comparing the total concept and feel was the proper method of analyzing similarity between children's books because they lacked deep character development or plot. *Williams*, 84 F.3d at 589 ("Consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience."). Similarly, in *Allen v. Scholastic Inc*., 739 F. Supp. 2d 642, 656–57 (S.D.N.Y. 2011), the court explained that "[b]ecause the works at issue are primarily created for children, the total concept and feel of the works—rather than their plot and character development—is the most important factor for purposes of establishing copyright infringement."

But in this case, the works at issue are not children's books—they have complex stories, plots, and characters. As such, even a lack of similarity in the "total concept and feel" of the work will not insulate a defendant from liability for creating an unauthorized derivative work. *See e.g., Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc*., 150 F.3d 132 (2d Cir. 1999)(where defendants infringed on plaintiffs' copyright in a TV show by publishing a quiz book about the show), *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd*., 996 F.2d 1366 (2d Cir. 1993) (defendants infringed on plaintiffs' copyright in a TV show by publishing a guide about the show), and *Warner Bros. Ent. Inc. v. RDR Books*, 575 F.Supp.2d 513 (S.D.N.Y. 2008) (defendants infringed on plaintiffs' copyright in books and movies by publishing an encyclopedia based on them).

Of course, Defendants claim that the works have a different total concept and feel is based

on only their self-serving evaluation of each author's writing style. But writing style, or methods of storytelling is not protectable. *Baker v. Coates*, 2023 WL 6007610, at *17 (S.D.N.Y. July 26, 2023), r*eport and rec. adopted*, 2023 WL 6289964 (S.D.N.Y. Sept. 27, 2023) ("[w]hile similar writing styles may contribute to similarity between works' total concept and feel, a particular writing style or method of expression standing alone is not protected by the Copyright Act." (citations omitted); *Monbo v. Nathan*, 623 F. Supp. 3d 56, 94 (E.D.N.Y. 2022) ("[M]ethods of story-telling are not protectable."). Their subjective and unreliable contentions that one work has a more "lighthearted" tone provides no defense—otherwise anyone could simply recast any author's book—from JK Rowling to Tom Clancey—by changing the names, moving a few things around, and rewriting any given story in their own "style."

In fact, under Second Circuit law it is error to granting summary judgment for the defendants based on the "total concept and feel," or "overall aesthetic," of the works without considering whether "material portions of the [defendants' work] infringed on corresponding parts of the [plaintiff's work.]" *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc*., 338 F.3d 127, 135 (2d Cir. 2003). *Tufenkian* teaches that the primary question in a case like this is whether the two works feature the same expression of elements that are selected, coordinated, or arranged in a substantially similar way. This is because, as the Second Circuit explained some years later, a defendant may be found to have infringed the plaintiff's copyrights by "parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art—the excerpting, modifying, and arranging of [unprotectible components] —are considered in relation to one another." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (citation omitted).

Defendants may have hired Wolff for her writing voice, but recasting substantial portions of Freeman's work through that voice provides no defense. Rather, this Court must evaluate the similarities between the protectable expression of scenes, settings, characters, and plot—and how they relate to each other—just as it has done in numerous other literary infringement cases. *See e.g., DiTocco v. Riordan*, 815 F. Supp. 2d 655, 667 (S.D.N.Y. 2011), aff'd, 496 F. App'x 126 (2d Cir. 2012); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1262 (S.D.N.Y. 1995). Upon doing so, Freeman submits that Defendants' copying will be evident.

### b. The differences between Crave and BMR are no different from those the writers made when revising their work.

Many of the differences Defendants point to are what one would expect an author to make in the process of editing and revising her story. Indeed, Defendants' motion acknowledges that Freeman made precisely the same kind of changes between her *BMR 2011* and *BMR 2013* manuscripts, acknowledging that *BMR 2013* tells the same story, but "(1) Marcheline, is less harsh and meanspirited is now Anna's actual biological mother; (2) Taylor… is now portrayed as a pure interloper rather than initial friend… (4) Julian, now a French incubus rather than a British vampire…" etc. (See. Dkt. 298, p. 19). These are the same sort of differences that Defendants point out between BMR and the *Crave* series to argue a lack of substantial similarity.[42] But such changes do not ultimately alter the fact that both works tell the same unique story with substantially similar plot points and a roughly equivalent cast of parallel characters, as discussed above.

---

[42] For example, Defendants argue (wrongly) that "Grace has a snarky and feisty personality… whereas Anna lacks self-confidence and is otherwise much less nuanced" (Dkt. 298, p.29), and "Jaxon is a vampire… Ash is a werewolf" (Dkt. 298, p.31) Notably, Wolff's decision to make Jaxon a vampire instead of a werewolf required other superficial changes (e.g. to his skin color) but he and Ash share a remarkable number of attributes, including mind powers, the ability to move so quickly (called casting in BMR and fading in Crave series) that they seem to disappears and a scent of citrus and water.

On the other hand, such changes may be evidence of "deliberate" or willful copying. *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969) ("we feel that the very nature of these differences only tends to emphasize the extent to which the defendant has deliberately copied from the plaintiff."); *Atari, Inc., v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 619 (finding that defendant's "changes . . . may be viewed as an attempt to disguise an intentional appropriation of [Plaintiff's] expression."), *superseded on other grounds*; *Universal Pictures Co., Inc. v. Harold Lloyd Corp*., 162 F.2d 354, 360 (9th Cir. 1947) ("[An] infringement is not confined to literal and exact repetition or reproduction; it includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy."); *Sheldon*, 81 F.2d at 56.

The evidence in this case compels the conclusion that the Crave series merely carried forward the development of BMR. A telling example of this concerns the ancient Egyptian references and mythology throughout BMR, with the 2010-2014 versions featuring hieroglyphs, Egyptian tattoos, and papyrus, and BMR 2016 then incorporated Egyptian twin-goddess mythology as a creation story to explain the supernatural world (with the twin goddesses described as two sides of the same coin and the God of Chaos threatening the balance). The heroine's grandmother becomes a twin goddess, and the heroine a descendant of one of the twin goddesses. Wolff then incorporates this into the Crave story by telling the twin goddess creation story in Covet (book 3), and having the God of Chaos introduced as part of the story in Book 4 when the heroine also learns her grandmother is a twin goddess and Wolff explains that the heroine is a demi goddess since she descends from the twin goddesses.

## V.      THE EVIDENCE OF INDEPENDENT CREATION IS NOT CREDIBLE NOR DISPOSITIVE.

Defendants insist—as they must to avoid liability in this case—Wolff had no access to BMR and wrote the *Crave* series without reference to BMR. But the evidence in this case paints a very different picture. Wolff wrote Crave in collaboration with Pelletier, Abrams, and Kim, and therefore had access as a matter of law. And the remarkable similarities between the works all but compel the conclusion that she created *Crave* with reference to BMR since Wolff offers no other reasonable explanation for the myriad of similarities in storyline, character, or plot points between the works.

Wolff's claims of independent creation become more incredible yet given the statistical improbability of both works having both similarities of limited key words and phrases. As noted above, renowned computational linguist Dr. Chaski ran, *inter alia*, a lexical word cluster analysis of BMR and Crave and concluded that "[s]tatistically speaking, it is virtually impossible that the two works could have been independently created in light of my findings." SUF 178. Similarly, Dr. Joula's qualitative and computational analysis found "the odds in favor of these works having a common origin as more than 1000:1." SUF 179. And after accounting for trope and genre conventions, Professor Reiss concluded that "the similarities are so striking as to preclude the possibility of independent creation." SUF 180.

Importantly, these conclusions are not dependent on the inclusion of the 2014 and 2016 manuscripts that Defendants allege were created after the termination of Freeman's agency agreement with Kim. Both Dr. Chaski and Professor Reiss looked at their prior findings to assess what impact, if any, removing the 2014 and 2016 manuscripts would have and found little to none.

As set forth in the concurrently filed Declaration of Carole Chaski, running the same analysis on the same materials without those manuscripts yielded results in line with her initial findings. Chaski Decl., ¶4. Far more interesting was Dr. Chaski's findings when she ran the same analysis on _only_ the 2014 manuscript and then _only_ the 2016 manuscript. In each case the results were, again, in line with her prior findings demonstrating that the lexical overlap between the Freeman manuscript 2016 and the Wolff books is not only very high but "strikingly different from baseline novels in the same genre," which was "extremely unlikely to happen merely by chance" (with an overlap rage of between .0004 and .00000033). Id. at ¶¶5-6.

And as set forth in the concurrently filed Declaration of Professor Reiss, while there are only 3 unique references in her report to BMR 2014 and 5 to BMR 2016—a very small fraction of the non-trope similarities she identified in her 2023 report. Reiss Decl. ¶¶5-6. But she found the similarities between Crave and the 2016 manuscript to be striking given how specific and unique they are. Id. at ¶¶7-12.

Finally, Defendants include a section in their brief entitled "Importance of Tempest Rising" (See ECF 298, p. 25 of 67) in what can only be seen as an improper attempt to bolster their independent creation defense and/or suggest that Freeman's allegations regarding _Crave_ are specious. As this Court knows, Freeman previously sought discovery regarding the creation of Wolff's _Tempest Rising_ work which Defendants strenuously opposed, and on December 12, 2022, this Court concluded that Wolff's other books were irrelevant and denied "any written discovery into the other books than the Crave series at issue in this case." (Court Trans. 33:1-3.) Given the Court's ruling, it is in no way noteworthy that _Tempest Rising_ is not discussed in Freeman's motion but is incredible that Defendants have raised it after failing to identify it as relevant to any claim

or defense in its Rule 26 disclosures and discovery responses and refusing Freeman's discovery regulating it.

## VI.    CONCLUSION

The core question for this Court is whether a finding of copyright infringement may be proper where an agent and publishing company (1) receive copies of and provide feedback on an author's draft novel, and then (2) hire/work with another author to develop a novel in the same genre set in the same location that shares not only an overall concept and story, but a substantially similar cast of characters and innumerable similar plot points, scenes, character interactions, and specific details. Because the answer is "yes" and Defendants have failed to put forward credible— let alone dispositive—evidence in support of any defense, their motion must be denied, and Lynne Freeman's should be granted.

                                        Respectfully submitted,

Dated: February 8, 2024              By:    */s/ Stephen M. Doniger*
Los Angeles, CA                              Stephen M. Doniger
                                             (admitted *pro hac vice*)
                                             DONIGER / BURROUGHS
                                             247 Water Street, First Floor
                                             New York, New York 10038
                                             (310) 590-1820
                                             stephen@donigerlawfirm.com

                                             **Reeder McCreary, LLP**
                                             11766 Wilshire Boulevard,Suite 1470
                                             Los Angeles, California 90025
                                             (310) 861-2475

                                             mark@reedermccreary.com