**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LYNNE FREEMAN,

Plaintiff,

v.

TRACEY DEEBS-ELKENANEY P/K/A
TRACY WOLFF; et al.,

Defendants.

Civil Action No.: 1:22-cv-02435-LLS

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE PLAINTIFF'S LIABILITY EXPERTS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………………………...1

I.  Professor Reiss is well qualified to offer opinion testimony on at least probative

    similarity and what similarities are attributable to trope / *scenes a faire*………………………1

    A.  Professor Reiss testimony is helpful to the factfinder in addressing

        issues of *scenes a faire*…………………………………………………………………1

    B.  Reiss' testimony is also helpful to evaluate probative and substantial

        similarity……………………………………………………………………………..2

    C.  Professor Reiss's testimony is based on sufficient facts and data………………..4

    D.  Reiss's testimony is the product of reliable principles and methods……………..4

    E.  Professor Reiss' Testimony is reliably applied to the facts………………………5

II.  Dr. Juola has fairly applied a reliable methodology……………………………………6

    A.  Dr. Juola's Testimony is Helpful to the Trier of Fact…………………………….7

    B.  Dr. Juola's report is based on sufficient facts and date……………………………8

    C.  Dr. Juola's applied a reliable methodlogy to the facts……………………………8

        1.  Dr. Juola's "seven-word sequence" findings are reliable and

            proper……………………………………………………………………9

        2.  Dr. Juola's reliance on Google Books-N-Grams was proper…………10

        3.  Dr. Juola's "Katm" opinions are proper and admissible………………11

        4.  Dr. Juola's genre conventions findings are proper and

            admissible……………………………………………………………...12

III.  Dr. Chaski Conceptual Plagiarism Analysis is Relevant and Reliable…………………12

    A.  Dr. Chaski's testimony is helpful to the trier of fact…………………………….13

B.  Dr. Chaski's opinions are based on sufficient facts and data……………………15

C.  Dr. Chaski's properly applied a well-established methodlogy…………………..15

IV.   Witthohn's Testimony is Relevant and Reliable………………………………………...17

V.   Ruben and Stringer Offer Helpful and Proper Testimony Defining the Fiduciary

Duties of a Literary Agent……………………………………………………………19

VI.   Conclusion……………………………………………………………………………20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

A*morgianos v. Nat'l R.R. Passenger Corp*.,

  303 F.3d 256 (2d Cir. 2002) ...................................................................................................4, 5

*Arista Recs. LLC v. Usenet.com, Inc.*,

  608 F. Supp. 2d 409 (S.D.N.Y. 2009) .........................................................................................16

*Arnstein v. Porter*,

  154 F.2d 464 (2d Cir. 1946) ..........................................................................................................2

*Aventis Env't Science v. Scotts Co*.,

  383 F. Supp. 2d 488 (S.D.N.Y. 2005) ...........................................................................................6

*Bersin Properties, LLC v. Nomura Credit & Cap., Inc.*,

  178 A.D.3d 449, 111 N.Y.S.3d 178 (2019) ...............................................................................18

*Better Holdco, Inc. v. Beeline Loans, Inc*.,

  666 F. Supp. 3d 328 (S.D.N.Y. 2023) ...........................................................................................5

*Bocoum v. Daimler Trucks N. Am. LLC*,

  2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) .................................................................................6

*Bonnie Briar Country Club, Inc. v. Bonnie Briar Syndicate, Inc.*,

  260 A.D.2d 336, 687 N.Y.S.2d 662 (1999) ...............................................................................18

*Computer Associates Intern., Inc. v. Altai*,

  982 F.2d 693 (2d Cir. 1992) ..........................................................................................................2

*Daubert v. Merrell Dow Pharms., Inc*.,

  509 U.S. 579 (1993) .................................................................................................................5, 6

*Gal v. Viacom Intern., Inc.*,

    518 F. Supp. 2d 526 (S.D.N.Y. 2007) ................................................................7

*Gaste v. Kaiserman*,

    863 F.2d 1061,fn 3 (2d Cir. 1988) ....................................................................4

*Hamil Am. Inc. v. GFI*,

    193 F.3d 92 (2d Cir. 1999) ................................................................................7

*Hogan v. DC Comics*,

    48 F. Supp. 3d 298 (S.D.N.Y. 1999) .................................................................2

*In re Platinum-Beechwood Litig.*,

    469 F. Supp. 3d 105 (S.D.N.Y. 2020) .............................................................18

*Kane v. Lewi*,

    2010 WL 11549577, 2010 U.S. Dist. LEXIS 164819 (D. Md. Dec. 7, 2010) ..........................19

*Kumho Tire Co. v. Carmichael*,

    526 U.S. 137 (1999) ..........................................................................................5

*Laureyssens v. Idea Grp., Inc.*,

    964 F.2d 131 (2d Cir. 1992) ...........................................................................2, 3

*Lipton v. Nature Co.*,

    71 F.3d 464 (2d Cir. 1995) ................................................................................4

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,

    97 F. Supp. 3d 485 (S.D.N.Y. 2015) .................................................................4

*Mowry v. Viacom Int'l, Inc.*,

    2005 WL 1793773 (S.D.N.Y. 2005) ................................................................14

*National Comics Publ. v. Fawcett*,

    191 F.2d 594 (2d Cir. 1951)........................................................................................2

*New Old Music Grp., Inc. v. Gottwald*,

    122 F. Supp. 3d 78 (S.D.N.Y. 2015)..........................................................................2

*Pretter v. Metro-North Commuter R. Co.*,

    2002 WL 31163876 (S.D.N.Y. Sept. 30, 2002)........................................................18

*Repp v. Webber*,

    132 F.3d 882 (2d Cir. 1997)........................................................................................4

*Scott v. Chipotle Mexican Grill, Inc.*,

    315 F.R.D. 33 (S.D.N.Y. 2016) ..................................................................................3

*Smith v. Jackson*,

    84 F.3d 1213 (9th Cir. 1996).......................................................................................2

*Suntrust Bank v. Houghton Mifflin Co.*,

    268 F.3d 1257 (11th Cir. 2001)...................................................................................2

*Swirsky v. Cary*,

    376 F.3d 841 (2004)....................................................................................................1

*Terrydale Liquidating Tr. v. Barness*,

    611 F. Supp. 1006 (S.D.N.Y. 1984)..........................................................................18

*Tyler v. Bethlehem Steel Corp.*,

    958 F.2d 1176 (2d Cir. 1992)......................................................................................6

*United States v. Bilzerian*,

    926 F.2d 1285 (2d Cir. 1991)....................................................................................20

*United States v. Scop*,

   846 F.2d 135 (2d Cir. 1988)........................................................................................20

*Walker v. Time Life Films, Inc.*,

   784 F.2d 44 (2d Cir. 1986).....................................................................................2, 3

## INTRODUCTION

Defendants motion to exclude all of Freeman's liability experts must be denied because each expert is competent and qualified to speak to their respective topics and their testimony is based on reliable methodology and experience which will be helpful to the fact finder to understand and evaluate, *inter alia*, (1) what are tropes in YA paranormal literature and substantial similarity of protectable expression (Reiss), (2) access and probative similarity (Reiss, Juola, Chaski), (3) Defendants' claims of independent creation (Reiss, Juola, Chaski), (4) Defendants' claims that they had no need to copy Freeman's work (Witthohn), and (5) the fiduciary duties literary agents have to their clients (Ruben and Stringer). This motion should thus be denied in its entirety.

I.    **Professor Reiss is well qualified to offer opinion testimony on at least probative similarity and what similarities are attributable to trope / *scenes a faire*.**

A.    **Professor Reiss testimony is helpful to the factfinder in addressing issues of *scenes a faire***

Professor Reiss is a Full Professor of English and Creative Writing at Northeastern University who has taught countless published authors, including New York Times bestselling writers of Young Adult literature. The topics she teaches includes "the elements of a story that are required by the genre." See ECF 278-36 ("Reiss Report") ¶¶ 3-4. She is thus perfectly qualified to address the argument Defendants' have made since the start of this case that the similarities between BMR and *Crave* are all attributable to tropes and genre conventions. Indeed, Defendants have even retained an expert witness—Emily Easton—to opine "that the plaintiff's allegations of copyright infringement are based on commonalities and building blocks that can be readily found throughout the YA Paranormal Romance genre." See ECF 301-27 ("Easton Report"), p.53.

Although there is a dearth of case law in the Second Circuit addressing the use of experts to evaluate a *scenes a faire* defense, other circuits have made clear that such testimony is proper and admissible. For example, the Ninth Circuit explained in *Swirsky v. Cary*, 376 F.3d 841, 850

(2004), that "[i]t is inappropriate to grant summary judgment on the basis of *scenes a faire* without independent evidence, unless the allegations of *scenes a faire* is uncontested." *See also Smith v. Jackson*, 84 F.3d 1213, 1220 (9th Cir. 1996) ("The district court carefully compared the *scenes a faire* assertions made by appellees' expert, Dr. Eskelin, to the declarations of appellants' experts, Dr. Argersinger and Dr. Parsons, and granted summary judgment only when the declarations of appellants' experts were silent as to one of Dr. Eskelin's *scenes a faire* conclusions or when appellants' experts agreed with the assessment of Dr. Eskelin").[1]

In *this* case, expert testimony is highly relevant to determining what similarities are shared *scenes a faire* and what shared scenes a faire "descends so far into what is concrete… as to invade . . . (its) expression." *National Comics Publ. v. Fawcett Publ.*, 191 F.2d 594, 600 (2d Cir. 1951).

**B. Reiss' testimony is also helpful to evaluate probative and substantial similarity**

Expert testimony is admissible for purposes of establishing probative similarity (also referred to as actual copying). *Laureyssens v. Idea Grp., Inc*., 964 F.2d 131, 140 (2d Cir. 1992), *as amended* (June 24, 1992) ("Copying may be established either by direct evidence of copying or by indirect evidence, including… similarities that are probative of copying between the works, **and expert testimony**.") *See also*, *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 85 (S.D.N.Y. 2015) ("Evidence admissible on the issue of 'probative similarity' includes expert testimony[.]") (citations omitted); *Altai*, 982 F.2d

---

[1] Plaintiff does not suggest that a court can never evaluate claims of *scenes a faire* without expert testimony—there are certainly archetype characters and stock scenes that ordinary observers understand to be unprotectable. But even in those cases "*scenes a faire* 'at some point cross the line… into [protectable] expression' and are 'protected by copyright' when 'plots become more intricately detailed and characters become more idiosyncratic." *Latele Television, C.A. v. Telemundo Comm. Group*, LLC, 215 WL 427817, *18 (S.D. Fla. 2015) (quoting *Suntrust Bank v. Houghton Mifflin Co*., 268 F.3d 1257, 1266 (11th Cir. 2001)). See also, *Hogan v. DC Comics*, 48 F. Supp. 3d 298, 311 (S.D.N.Y. 1999) (citing *Walker*, 784 F.2d at 50 (*scenes a faire* copyrightable to the extent they are "given unique… expression")).[2] Authorship attribution is sometimes called "stylometry "or "stylometics." It is a well-established (sub)field with applications not only in forensic linguistics, but also in journalism, history, sociology, and many other areas. Juola Report, ¶10.

at 713 ("expert testimony may be used to assist the fact finder in ascertaining whether the defendant had copied any part of the plaintiff's work."); *Laureyssens*, 964 F.2d at 140 (noting that in considering actual copying "dissection and expert testimony ... are proper ....").

Professor Reiss's testimony plainly goes to whether the similarities between the works are probative of copying—i.e., access. And because the issue of access is "inextricably intertwined with evidence of illicit copying", such expert testimony may also be used to assist in the determination of substantial similarity. *See e.g., Walker v. Time Life Films, Inc*., 784 F.2d 44 (2d Cir. 1986) (affirming the district courts consideration of expert testimony within the copying analysis, even where there is overlap with the substantial similarity analysis).

Given the complex nature of the infringement, voluminous works, and intertwined issues of *scenes a faire*, the jury's substantial similarity analysis is "likely to be somewhat impenetrable by lay observers." (*Id*.) Unlike most copyright cases where the initial visual comparison takes from a few minutes to a few hours, the jury (or the Court on this motion) will need to compare works that will take weeks just to read. Although the YA genre may not be overly technical or complicated, the bounds of *scenes a faire* within it requires analyzing what characters, scenes, and other elements flow from the genre itself instead of the authors creativity.

Ultimately "the two works are to be compared in their entirety ... [and] in making such comparison resort may properly be made to expert analysis...." 3 Nimmer § 13.03[E][2], at 13–62.16. Expert testimony is frequently admitted where it streamlines the evidence and helps jurors avoid confusion especially when dealing with voluminous evidence. *See e.g., Scott v. Chipotle Mexican Grill, Inc*., 315 F.R.D. 33, 45 (S.D.N.Y. 2016)("Expert testimony is, however, admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamlines the[e] presentation of

the data to the jury, saving the jury time and avoiding unnecessary confusion.'" quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp*., 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015).

And Professor Reis's testimony is admissible to rebut Defendants' claims of independent creation as it helps establish that "the two works are so strikingly similar […] preclude[ing] the possibility of independent creation[.]" *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) (considering expert testimony in determining whether the two works were so strikingly similar to preclude the finding of independent creation), citing *Lipton v. Nature Co*., 71 F.3d 464, 471 (2d Cir. 1995) (quotation and citation omitted); *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 fn 3 (2d Cir. 1988)("That issue as to whether the two works are strikingly similar [ … ], so as to preclude any reasonable possibility of independent creation, is an issue which is to be determined [ ] on the basis of all of the evidence, including the expert testimony.").

Defendants cannot credibly argue that Professor Reiss's testimony will not be helpful.

### C.  Professor Reiss's testimony is based on sufficient facts and data

Professor Reiss' testimony is grounded in a review of the works at issue and her experience and knowledge as a literature professor—certainly an appropriate data set. Defendants aver that Reiss improperly relies on versions of BMR created after the relationship between Kim and Freeman terminated in 2014, but as set forth more fully in Freeman's Summary Judgment Reply brief (ECF 335) there is at least a factual question as to whether Defendants had access to those manuscripts. And, in any event, Professor Reiss has explained that removing later versions makes no real difference to her findings. *See* ECF 334.

### D.  Reiss's testimony is the product of reliable principles and methods

Under *Daubert*, the district court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." A*morgianos v. Nat'l R.R.*

*Passenger Corp*., 303 F.3d 256, 265–66 (2d Cir. 2002)(citations omitted). In doing so, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Professor Reiss's testimony is based on her years of academic training and understanding of the necessary elements of telling stories in particular genres. Her methodology is the application of basic principles of writing and genre conventions to the works at issue—which is precisely what she did (and presumably Easton did as well) to complete her report. Reiss Rep. pp. 3-4.

Defendants' only "challenge" is that her methodology lacks any peer-review or publication. But a peer-reviewed methodology is not a requirement of admissibility. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 593 (1993)("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability[.]"); *Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2d Cir. 2002)(stating that requiring expert testimony to be backed by peer reviewed or published studies would be "at odds with the liberal admissibility standards of the federal rules and express teachings of *Daubert*."). Rather, lack of publication or peer-review goes to the weight of the testimony, not the admissibility.

### E.  Professor Reiss' testimony is reliably applied to the facts.

Defendants primary gripe with Professor Reiss' findings is that her "comparison is merely her own subjective assessment of ways the parties' works seem similar to her." "But of course, by its very nature, an opinion expresses the personal views of its holder." *Better Holdco, Inc. v. Beeline Loans, Inc*., 666 F. Supp. 3d 328, 374 (S.D.N.Y. 2023)(holding that an expert opinion based on experience in digital marketing was reliable even if based on personal views).

Defendants further complain that Professor Reiss "cherry picks" through the similarities and only includes those that she believes significant in her report. They are correct. The point of her testimony is to identify the similarities *not* attributable to trope or genre convention, so it would make no sense to address either differences or similarities attributable to tropes.

Defendants finally claim that Professor Reiss's report misrepresents the works and reaches unreasonable conclusions, but they fail to state how. To the extent they argue that her "conclusions… are inconsistent with other evidence in the record, contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *15 (S.D.N.Y. Mar. 28, 2022)(internal quotations and citations omitted); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (refusing to strike expert testimony allegedly based upon unfounded assumptions; challenge to expert testimony "go[es] to the weight, not the admissibility, of the testimony"); *Aventis Env't Science v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) ("Defendants are free to challenge the basis and source for [the proposed expert]'s numbers, but a challenge to the facts or data relied upon by [the proposed expert] does not go to the admissibility of his testimony, but only to the weight of his testimony."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants are free to vigorously cross-examine Professor Reiss at trial. But there is no basis to exclude her testimony and this motion should be denied.

## II.  Dr. Juola has fairly applied a reliable methodology.

Dr. Patrick Joula ("Dr. Juola") is an expert in computations, quantitative, and forensic linguistics. *See* ECF No. 278-37 (Expert Report, May 12, 2023), p. 1 ("Juola Report"). He is a

Professor of Computer Science at Duquesne University, where he holds the Joseph A. Laurits C.S. Endowed Chair in Teaching and Technology. *Id.* at ¶2. He is also the Director of the evaluating Variations in Language Laboratory at Duquesne University. *Id.* Dr. Juola has published numerous articles and book chapters on the computational inference of document authorship via the statistical analysis of linguistic features, as well as many peer reviewed articles regarding document authorship. *Id.*, ¶3; Doniger Decl., ¶2, Ex. 1 (Juola's CV). He is also the author of one of the leading works on the subject of authorship analysis and stylometry[2]. *Id.,* ¶4 Dr. Juola has also lectured worldwide on the analysis of authorship and related subjects and has qualified as a testifying expert in forensic linguistics in many cases. *Id* at ¶4-7.

A. **Dr. Juola's Testimony is Helpful to the Trier of Fact**

Among the issues in this case are whether Kim improperly shared BMR with Wolff and whether Wolff used BMR in creating the *Crave* series. Dr. Juloa's testimony goes directly to those issues. Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that there are similarities between the two works that are "probative of copying." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999); *Gal v. Viacom Intern., Inc*., 518 F. Supp. 2d 526, 538 (S.D.N.Y. 2007). Dr. Juola provides such evidence.

In this case, Dr. Juola (1) inspected the text of the Crave *Series* and BMR to determine if there were any word-for-word overlaps of seven words or more (Juola Report, ¶17); (2) inspected the text for shorter word-for-word overlaps that were rare due to the small number of times they appear in the hundreds of billions of pages available by a Google search (Juola Report, ¶18 – 20; Doniger Decl., ¶3, Ex. 2 (Juola Deposition, 107:22 – 108:19)), (3) analyzed if certain phrases that

---

[2] Authorship attribution is sometimes called "stylometry "or "stylometics." It is a well-established (sub)field with applications not only in forensic linguistics, but also in journalism, history, sociology, and many other areas. Juola Report, ¶10.

appeared in both works also appeared in the Google Book Ngram Datablase (Juola Report, ¶21 & fn.. 14), (4) analyzed how often the character cluster "katm," which is contained in Katmere (Crave) and "Katmai" (BMR), appeared in a million word database (Juola Report, ¶¶34-35); and (5) examined 10 different YA vampire novels to determine if "tree stump seats," Stonehenge lite," "air as I try to," and 'Katm' appeared in those 10 genre novels. (Juola Report, ¶36-37).

Based on his analysis, Dr. Joula concluded that:

> Quantitative and computational analysis indicates that there are similarities between the Crave novels and the 2011 manuscript for Blue Moon Rising, and that these similarities are unlikely to have arisen by chance. Based on the evidence described in this report, I consider it to be more likely than not that these works have a common origin. **In fact, based on the calculations above, I would consider the odds in favor of these works having a common origin as more than 1000:1**

Joula Report, ¶41 (emphasis added). This testimony will undeniably help the trier of fact evaluate the questions of copying and independent creation.  The foregoing is especially true because the trier of fact does not have the expertise to conduct the analysis him or herself and reading the books alone would not provide the trier of fact with the information provided by Dr. Joula in his report.

### B.   **Dr. Juola's report is based on sufficient facts and data.**

Dr. Juola's analysis is based on (1) the four books in the Crave series; (2) the 2011 version of BMR; (3) ten baseline YA Vampire novels; (4) the Google database; (5) the Google books database which contains 15 million books; and (6) a wide body of scholarly works. Defendants do not meaningfully challenge the sufficiency of these facts and data.

### C.   **Dr. Juola properly applied a reliable methodology to the facts**.

Numerous studies have confirmed the effectiveness of stylometric authorship attribution. Juola Report, ¶29. A recent law review article provides numerous examples of court cases resolved in part through stylometric evidence. *Id.* As Dr. Juola explains, (1) his technique has been

extensively tested; (2) there is an extensive history of peer review and publication dating back to the 1960's; (3) the error rate can be easily derived from the testing regime; (4) standards and protocols have been proposed for these problems although they do not have regulatory force, and (5) a substantial research community focused on stylometry exists. Joula Report, ¶40.

### 1. Dr. Juola's "seven-word sequence" findings are reliable and proper.

Dr. Juola found several seven-word sequences in common between the Crave book series and BMR, including "in the air as I try to," "that million-dollar smile of his," and "on my arms and the back of my neck." Juola Report, ¶19. Although Defendants argue these findings are of no consequence because they contain a "common stereotyped phrase" (*see* Def's Moving Papers, pp. 3 and 20-21), Dr. Juola explains that "seven words is not a hard cutoff: a rare phrase can be a shorter phrase such [as] 'trombone playing scuba instructor,' which . . . . is rare enough not to appear in Google as a phrase." Juola Report, ¶18. And all things being equal, "any overlap of any string is evidential, it just becomes stronger and stronger evidence the longer that it is." *Id.* at 73: 13-20. Indeed, Defendants' expert, Malcolm Coulthard, recognized in *Coulthard and Johnson* 2007 "**that even four words in a row might be indicative of copy-paste plagiarism**." (Emphasis added.)[3] A real world example is the Unabomber case, in which David Kaczynski recognized the three-word phrase "cool-headed logician" in his brother Ted's manifesto, which was sufficient for the FBI to get a warrant to search Kaczynski's cabin where they found the original manifesto.[4]

Of course, counting stereotypic phrases as one word makes "that million-dollar smile of his" a four-word sequence, "in the air as I try to" effectively a five-word sequence, and "on my

---

[3] Deposition of Chaski, 89:25 – 90:10 ("Chaski Depo"), true and correct copies of which are attached as Exhibit 3 to the Doniger Decl., ¶4.
[4] Chaski Depo., 89:11-24. *See also* https://www.huffpost.com/entry/david-kaczynski-unabomber-manifesto_n_7278454, of which the Court should take judicial notice. *See* Fed. R. of Evid. §902 (printed material purporting to be a newspaper or periodical are self-authenticating).

arms and the back of my neck" a five or six word sequence.  Joula Dep., 105:3 – 116:2.  But even Coulthard's published criterion (as opposed to his paid testimony in this case) establishes that these lexical bundles can evidence common authorship and/or copying. Defendants' challenges go to the weight of Dr. Juola's findings as opposed to their admissibility.

2.   <strong>Dr. Juola's reliance on Google Books N-Grams was proper.</strong>

Dr. Joula also identifies four commonalities of smaller word clusters that appear in BMR and *Crave* but nowhere else in the Google Books Ngrams ("GBN") viewers: tree stump seats/tree-stump seats, small Stonehenge/Stonehenge lite, "air as I try to," and that "million-dollar smile of his."  Juola Report, ¶¶19 & 33. He then undertook a quantitative assessment of probability of the four commonalities and reached a well-grounded opinion. *Id.*

With respect to "air as I try," Dr. Juola concludes that "999 times out of a thousand we would see no overlap of this type if there were no shared authorial influences. Since we have observed that there IS overlap (and overlap is the rare case), it follows that it is very much more likely than not that they were not independently written."  Juola Report, ¶¶22-30. He further states that the identical calculation applies to the phrase "million-dollar smile of his," and that the phrase would only be expected to independently occur 6% of the time. *Id.* at ¶31. For inexact matches such as "tree stump seats"/"tree-stump seats" or "small Stonehenge"/"Stonehenge lite," the calculations are more complex, but "it is intuitively obvious that overlaps of rare concepts like these are notable and unlikely to occur independently in two sources." *Id.* at ¶¶32-33.

Defendants make the absurd argument that this analysis is unreliable and fatally flawed because Plaintiff's husband, Trent Baer, chose the phrases. Def's Moving Papers, p.22. That argument is both misleading and irrelevant. It is misleading because Baer did not really "choose" the phrases—he provided Juola a list of twenty-five commonalities, from which Juola chose six

related specifically to the 2011 version, then "independently reanalyzed them to determine, first, if we could confirm their presence in BMR and in at least one of the Crave books; and secondly, whether or not they appeared in the Google Books Ngram Database" ("GBN").  Juola Report, ¶21. Juola then narrowed that list down to the four in his report. *Id.* at ¶22. And Defendants' argument is irrelevant because the statistical probability of the phrases being in both works is not affected by who found them.

Defendants also argue that the GBN viewer is an inherently limited and unreliable database for investigating whether a phrase is rare (Def's Moving Papers, p. 22) but the Google Books website contains the text of 15 million books and the Ngram viewer allows searches for any sequence of five or fewer words to see how often it appears by year. Doniger Decl., ¶3, Ex. 2 (Juola depo., 150:1 – 151:3); Juola Report, ¶25.  Assuming a modest 10,000 words per book, this becomes 150 billion words in the Google Book database. *Id.* Thus, Dr. Juola believes that GBN database is the most representative and reliable sample available of all English language books published in history. Juola Depo., 168:12- 25. It is extremely likely that any common word or phrase would be found somewhere in this huge sample of English, and that a phrase that does not appear in the database is necessarily an uncommon phrase. Juola Report, ¶25.

Defendants also complain that the GBN database does not include n-grams longer than five words in a row (Def's Moving Papers, p. 22) but only one of the terms searched by Juola arguably contained more than five words in a row. Juola Report, ¶22. And Defendants grasp at straws in protesting that "tree stump seats" is not identical to "tree stump seats" and "small Stonehenge" is not identical to "Stonehenge lite." Moving Papers, p. 24. Joula searched each of the phrases separately. Juola Report, ¶33.

3. **Dr. Juola's "Katm" opinions are proper and admissible**.

Dr. Juola examined the character cluster "Katm" which appears in "Katmere" (Crave) and Katmai (Freeman copyrighted *The World.doc* note) and concluded that the probability of that word cluster appearing in both BMR and Crave is 21.3%. Joula Report, ¶4, ¶35. Defendants object that Katmai was only used by Freeman in her notes entitled *The World.doc*, but those notes were provided to Kim and registered with the USCO (Freeman Declaration, ¶5 (ECF 276) and Ex. 3 (ECF 277) thereto) and are protected by copyright law to the same extent as if the word cluster appeared in BMR. Defendants also criticize Juola's methodology because he uses the "Brown corpus" as his database. Def's Moving Papers, p. 25. Defendants ignore that the "Brown corpus" database contains a million words. Juola Report, ¶35. Again, these arguments go to the weight and not the admissibility of the testimony.

4.     **Dr. Juola's genre conventions findings are proper and admissible**.

Dr.  Juola's opinions include that the similarities underlying his analysis are not the result of genre conventions. Juola Report, ¶37. He made that conclusion by examining 10 different YA paranormal romance novels by 10 different authors and confirming that neither "tree stump seats," "Stonehenge lite," "air as I try to," nor the 'katm' letter cluster appear in any of them. *Id.* at 36. Defendants criticize Juola's methodology on the grounds that the ten baseline novels used are miniscule, a non-representative sample and were hand-selected by Plaintiff's counsel, but they offer no evidentiary or other support for this ipse dixit statement and make no attempt to analyze any other books in the genre to show that these phrases appear anywhere else.

As set forth on the preceding pages, each challenge to Dr. Juola's testimony fails.

III.     **Dr. Chaski Conceptual Plagiarism Analysis is Relevant and Reliable.**

Dr. Chaski is a well-respected expert in forensic linguistics who has taught forensic science and linguistics at, *inter alia*, the University of Delaware (Georgetown campus), George

Washington University, University of Michigan, and University of Chicago. See ECG 278-35 ("Chaski Report"), ¶ 28. She has published ten peer-reviewed articles on forensic linguistic methods in academic and professional journals, contributed seven book chapters on forensic linguistics and two law review articles concerning forensic linguistic techniques.

She is a Fellow (and currently the Chair of the Engineering and Applied Sciences Section) of the American Academy of Forensic Sciences, a lifetime member of Linguistic Society of America, a member of the Association for Computing Machinery, a member of Institute of Electrical and Electronics Engineers, an associate member of the American Bar Association (criminal justice and science and technology sections), a founding member of the International Language and Law Association, and a founding member of TALE: The Association for Linguistic Evidence, the only association in forensic linguistics with eligibility standards for membership. Id. at ¶29.

### A. Dr. Chaski's testimony is helpful to the trier of fact.

Professor Chaski provides background on the different forms of plagiarism but explains early in her report that because "the authors in this case are well-educated and sophisticated, I focused my attention on the most sophisticated plagiaristic strategy, conceptual plagiarism."[5] Id. at ¶5. Her analysis focused on two independent tests which showed not only that keywords from Freeman's work are shared with the *Crave* series, but they are used in conceptually similar ways as shown by the companion words that surround them—as happens when works are recast, adapted, and paraphrased. The results of these tests revealed:

> "that the amount of similarity between the Freeman manuscripts and the Crave series, in relation to the [10 young adult] baseline novels,

---

[5] Defendants' briefing regarding Chaski's discussion of "copy-paste" and "mosaic" plagiarism is curious since they acknowledge that Plaintiff has made clear that Chaski is not being offered to opine on those modes of plagiarism, i.e., she is not going to testify about "the over 700 examples of 6-words-in-a-row-exact matches" or that Wolff copied chapter titles from Freeman.

> cannot be explained as chance: instead, the statistical analysis shows that the similarity between the Freeman Manuscripts and the Crave series is so far from the baseline that it can only be explained by deliberate re-use of material in the Freeman Manuscripts."

Defendants acknowledge that Professor Chaski has provided expert testimony or consultancy in over 100 cases but argue that her testimony would be "more confusing than helpful," quoting a 20-year-old *Moury v. Viacom* copyright case in which her testimony was excluded. But in that case, she utilized a technique known as phylogenetic reconstruction—which was little known at that time but has become standard practice since—to establish striking similarity between the works at issue. Id. at ¶25. In this case, Dr. Chaski does not utilize phylogenic reconstruction or seek to establish striking similarity.[6] The *Mowry* Court also noted that "Dr. Chaski did not test to see if any of the allegedly common schemata she found are *scenes a faire*… or common across a multitude of scripts, *i.e.,* the prior art referred to by defendants." *Mowry v. Viacom Int'l, Inc*. 2005 WL 1793773, p.13. But in this case Dr. Chaski utilized 10 baseline novels. Thus, the court's findings in *Mowry* are inapposite and offer no assistance in this case.

Defendants next attempt to draw a bright line between theft of copyrightable works and uncopyrightable ideas to argue that "Chaski's conceptual plagiarism analysis is irrelevant and unhelpful because it attempts to establish theft of Freeman's uncopyrightable ideas." ECF 321, p.26. But Dr. Chaski need not show theft of copyrightable expression to establish probative similarity and address Defendants' independent creation claims. And as set forth in Freeman's opposition to the Prospect Defendants' summary judgment bid, breach of fiduciary duties claims may also be grounded in the improper sharing of her ideas not protectable under copyright law.

---

[6] Dr. Chaski states in Paragraph 17 of her report that "the LF and TW documents are strikingly similar to such a degree that chance cannot explain the level of similarity, but re-use of material can explain the similarity." But as Defendants note, Dr. Chaski stated in her deposition that she did not believe she was opining as to substantial similarity, and she was clearly using "strikingly similar" in a non-legal way to indicate that the similarity between the lexical clusters is striking.

The fact finders in this case will be asked to determine, *inter alia*, whether Wolff had access to and used Freeman's BMR work to create the *Crave* series. Dr. Chaski's opinions are directly relevant and helpful towards answering that question.

### B.  **Dr. Chaski's opinions are based on sufficient facts and data**.

Dr. Chaski's findings are based on (1) the six versions of BMR on which Freeman's comparison rests, (2) the first four books of the *Crave* series, and (3) ten young adult paranormal romance novels. Chaski Report pp 15-16. Knowing this is a sufficient data, Defendants dispute having had access to all 6 of those manuscripts (and/or that Freeman is limited to only two versions) and complain "it is impossible to confine her analysis to the specific versions of BMR that are relevant and at issue." But as set forth more fully in Freeman's Summary Judgment Reply brief (ECF 335) there is at least a factual question as to whether Defendants had access to all six manuscripts, and this Court had Freeman designate two manuscripts only as "fair place to start" the comparison. Defendants are free to examine Dr. Chaski on whether her analysis would be materially impacted by excluding later versions of BMR, although she has already made clear it would not. *See* ECF 336. But their challenge go to the weight of her testimony, not its admissibility.

### C.  **Dr. Chaski properly applied a well-established methodology.**

The methodology utilized by Dr. Chaski for her two independent tests is set forth in paragraphs 8-16, 40-51 and 99-113 of her report. That methodology was not created for this case, has been used in many other matters, is supported by abundant peer-reviewed literature,[7] and there are literally millions of references to the use of lexical clusters in plagiarism detection, including overlap rate and cosine similarity that Chaski used in her report.[8]

---

[7] The scientific literature which Chaski references in fn.22 of her report follows the best practices for scientific methods developed and tested outside of litigation and used outside of litigation. These three references each use lexical clusters –clusters of words that occur with and near each other–as the linguistic basis for determining plagiarism.

[8] For example, a February 27, 2024 Google Search for "plagiarism detection using lexical clusters" returned approximately 5,300,000 results. A search for "plagiarism detection using document vectors of

Unable to meaningfully dispute this, Defendants argue that Dr. Chaski's methodology "reflects an extreme departure from 'examining the works themselves'" (Motion, p.29) and lob baseless challenges to her application of that methodology. But Dr. Chaski's analysis *is* of the works themselves and the focus of her analysis is not substantial similarity (for which an analysis of the *unmodified* works themselves is key). Their remaining challenges are equally specious.

For example, ignoring that her methodology *requires* that words be reduced to their dictionary form (lemma) and that only content words (as opposed to function words) be compared to evaluate the similarity of the lexical clusters among the subject and baseline works, Defendants complain that Dr. Chaski reduced the Works to misleading and distorted keyword clusters. This argument borders on frivolous.

They also complain that Dr. Chaski's 35 keywords were subjectively chosen, but Chaski explained that she "selected 35 keywords based on the similarities of plot, character and setting outlined in the complaint," thus ensuring that they relate to the particulars of BMR. Chaski Report ¶¶9-10. Defendants claim that she "could have used software to objectively scan the parties' works and identify commonly used words," (ECF 321, p.30) but such an approach would be more likely to produce a list of function words, words tied to genre conventions, or words that are inappropriate for comparison for any number of other reasons. In any event, that different words could have been found and used does not make those used in this case inappropriate or suspect.

It is certainly true that "[a]n expert who simply regurgitates what a party has told him provides no assistance to the trier of fact through the application of specialized knowledge." A*rista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424, 428-29 (S.D.N.Y. 2009). But that is not what has happened here. Rather, Dr. Chaski took information that is verifiably in the underlying works and performed a competent probabilistic analysis using that information. What is determinative is whether that information is accurate (it is), not whether Professor Chaski incurred unnecessary billing to find those examples herself.

---

lexical clusters" returned approximately 3,970,000 results. A search for "binomial probability" returned 256,000,000 results. Freeman invites the Court to do the same searches.

Similarly, Defendants infer that the 10 baseline novels used by Dr. Chaski are non-representative of the genre, but don't say why. Notably, they could have performed their own analysis using other baseline novels but did not do so.

Defendants then complain that certain keywords did not appear in certain baseline novels (see p.32) but that only proves Dr. Chaski's point—that certain words only appear in Crave and BMR *and that they occur in the same context* is part of the statistical evidence of a lack of independent creation. Thus, for example, while the Claire novel includes "Diego," it is in reference to Diego Rivera and *not* San Diego.

Finally, Defendants argue that Dr. Chaski's "binomial probability" and "vector measurement" statistical tests should be disregarded based on nothing more than their assertions that the "underlying data" is unreliable. But, as set forth above, that underlying data is an appropriate sampling of select content words important to the BMR story, and a scientifically sound analysis of how those words operate in BMR, *Crave*, and the baseline novels. Dr. Chaski's methodology and opinions are proper and admissible.

## IV. Witthohn's Testimony is Relevant and Reliable

In her declaration in support of Defendants' summary judgment motion, Pelletier states:

> "There is no reason why we would want to plagiarize BMR. Tracy is an exceptionally talented author who has published nearly 70 books, several of which were New York Times or USA Today bestsellers before she wrote Crave… It makes no sense that someone as talented as Tracy would need to copy from another author…"

Decl. of Liz Pelletier (ECF 303) ¶3. Similarly, Kim claims that "Wolff's career was on the rise throughout the 2010s and right up to the present day" to suggest that she would not have had any need to share Freeman's work with Wolff. Decl. of Emily Kim (ECF 306) ¶ 63.

Knowing Defendants would make this argument and that there is substantial objective evidence that it is untrue, Freeman retained Witthohn to explain that, *inter alia*, Publishers' Marketplace and NPD BookScan data objectively tells a very different story.[9]

---

[9] Witthohn also explains the state of the book publishing industry during the relevant time period.

Importantly, while Witthohn does not opine about Defendants motive—she only offers an opinion regarding Kim and Wolff's decline of financial success prior to the release of *Crave*—motive may be quite relevant to Freeman's breach of fiduciary duty and breach of contract claims. *See e.g., Terrydale Liquidating Tr. v. Barness*, 611 F. Supp. 1006, 1018 (S.D.N.Y. 1984)(holding that where there is an identifiable and sizable self-interest, the burden on the fiduciary shifts, requiring the fiduciary to demonstrate fairness and reasonableness of their actions). *See also, Bonnie Briar Country Club, Inc. v. Bonnie Briar Syndicate, Inc.*, 260 A.D.2d 336, 687 N.Y.S.2d 662 (1999)(breach of fiduciary duty requires a determination of defendants motives).

Again, Witthohn does not explicitly reach a conclusion regarding Kim and Wolff's motive for their conduct. *See In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 117 (S.D.N.Y. 2020) citing *Pretter v. Metro-North Commuter R. Co.*, 2002 WL 31163876, at *1 (S.D.N.Y. Sept. 30, 2002) ("[E]xpert testimony is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). It merely assists in painting a picture regarding Kim and Wolff's financial decline based on objective information that the jury is unlikely to otherwise understand.

Defendants have no answer to the above cases and offer no authority holding that a plaintiff may not use expert testimony to establish that the fiduciaries conduct was done in bad faith. And a defendant's intent may be relevant in a breach of contract claim in determining whether the defendant's "bad faith" or "alleged misconduct prevented or hindered compliance" with a contractual condition precedent. *Bersin Properties, LLC v. Nomura Credit & Cap., Inc.,* 178 A.D.3d 449, 449–50, 111 N.Y.S.3d 178 (2019).

Defendants' only other complaint is that Witthohn would not violate her terms of service with Publishers' Marketplace and NPD BookScan by making and distributing copies of the materials that she solely reviewed online in compliance with her license. But Witthohn told Defendants exactly what information she reviewed from those sites and nothing prohibited them from securing their own subscription (assuming none of the Defendants already subscribe) to access the very same information. And to the extent those sites do not show all deals, Defendants

are free to cross examine Witthohn or provide contrary evidence—but that goes to weight, not admissibility, and provides no basis to exclude Ms. Witthohn.

**V.     Ruben and Stringer Offer Helpful and Proper Testimony Defining the Fiduciary Duties of a Literary Agent.**

The jury will be instructed on the elements of a claim for breach of fiduciary duties but must know what the fiduciary duties of literary agents are before they can determine whether there has been a breach of those duties. Freeman has retained Reuben and Stringer to explain just that— i.e., what fiduciary duties agents owe their clients—*not* to reach a conclusion as to whether a breach in fact occured in this case. "An expert witness must add something to the jury's understanding," *Kane*, 2010 WL 11549577, at *1, 2010 U.S. Dist. LEXIS 164819, at *3, which Ruben and Stringer undoubtedly do.

Defendants essentially admit that Ruben and Stringer do not usurp the role of the jury, acknowledging that "Ruben identifies no facts suggesting an actual fiduciary relationship, let alone a breach of one," and Stringer "just assumes Kim had a fiduciary duty, without supporting that assumption in any way." Defendants are correct—because, again, Ruben and Stringer will not be presented to argue there was a breach—they are simply offering their industry experience to help the jury understand the duties that literary agents have to their clients.[10] And in Stringer's case, this includes understanding the role of an agent, different types of agency and writing agreements, such as shopping spec manuscripts vs. soliciting work-for-hire projects, and concerns specific to agents and publishers being involved in the creation and development of a book series.

---

[10] While Stringer states in ¶6 of her report that part of her opinion addresses "whether Kim / Prospect fulfilled or breached their contractual and fiduciary obligations to Lynne Freeman," her actual report and opinions make clear that she is not opining as to what Kim / Prospect did or did not do, but rather whether certain actions would be consistent with an agent's fiduciary duties if they occurred. It will, of course, be for the jury to say whether they occurred.

And contrary to Defendants' suggestions, experts _can_ make factual conclusions that embrace an ultimate issue to be decided by the fact-finder so long as they do not offer testimony stating ultimate legal conclusions based upon those facts. *See Bilzerian,* 926 F.2d at 1294; *United States v. Scop,* 846 F.2d 135, 140, *modified,* 856 F.2d 5 (2d Cir.1988). This motion therefore must be denied as to their testimony.

## VI.    Conclusion

Defendants' challenges nearly all go to weight, not admissibility, and those that do not fall flat. Freeman's experts are all well qualified and offer testimony that is helpful to the jury, based on sound methodologies and/or experience, and are well grounded. Therefore, this motion should be denied.

Respectfully submitted,

Dated: February 28, 2024          By:    _/s/ Stephen M. Doniger_
Los Angeles, CA                           Stephen M. Doniger
                                          (admitted *pro hac vice*)
                                          DONIGER / BURROUGHS
                                          247 Water Street, First Floor
                                          New York, New York 10038
                                          (310) 590-1820
                                          stephen@donigerlawfirm.com

                                          **Reeder McCreary, LLP**
                                          11766 Wilshire Boulevard,Suite 1470
                                          Los Angeles, California 90025
                                          (310) 861-2475

                                          mark@reedermccreary.com