UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al.,<br><br>Defendants. | Case No. 1:22-cv-02435-LLS-SN<br><br>**DECLARATION OF MARK D. PASSIN IN OPPOSITION TO PLAINTIFF'S SUPPLEMENTAL MOTION REGARDING EVIDENTIARY ISSUES** |

## **DECLARATION OF MARK D. PASSIN**

I, Mark D. Passin, do hereby declare as follows:

1. I am over eighteen (18) years of age, am counsel of record in this case for Plaintiff, Lynne Freeman, and am competent to give the testimony set forth below. Said testimony is given from my personal knowledge except where otherwise indicated. If called as a witness, I could and would competently testify thereto.

2. True and correct copies of the cited pages from the Transcript of a Telephonic Conference before the Honorable Sarah Netburn on December 12, 2022, are attached hereto as **Exhibit 1**.

3. Defendants' Objections based on the December 12, 2022 Ruling were asserted in response to the statements of material fact set forth below, which were included in Defendants' Consolidated Local Rule 56.1 Statement of Material Facts (ECF 299), and Plaintiff's responses to them were included in Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts (ECF 332):

1

### Defs' Material Fact No. 31

Other books in the YA Paranormal Romance genre—including books published before *BMR* was written—have utilized at least the following character, storyline, and setting components:

    **Protagonist:** is supernatural; initially thinks she is a normal human; has supernatural family; death of parents; lives with surrogate parents; is a teenager; moves/is new in town; doesn't feel attractive or special; experiences anxiety, depression, or panic attacks; loves books/is a good student; is the "chosen one" (special power or prophecy); must choose between Light/Dark or bring balance; has prophetic dreams/visions; powers are hidden/bound for safety; "kicks butt"; saves love interest's life; has "hot guy" friend, sometimes gay; is kidnapped; is attacked by supernatural creatures.

    **Romantic lead:** has model-like looks; is "bad boy with a good heart"; is powerful supernatural creature; heroine meets him right away; has instant connection with heroine; heroine and he have initial aversion/annoyance but end up falling in love; heroine and he are soul mates or "bonded"; heroine and he are conflicted by attraction; breaks heroine's heart to save her; heroine and he profess love; heroine and he share epic kiss; rescues heroine or vice versa; has dark secrets; dangerous for heroine to be with him.

  **Setting:** remote setting; supernatural school; public school with supernatural students; Gothic architecture/castle setting; cold/dark setting for vampires or other paranormals.

  **Other paranormal romance:** supernatural creatures (vampires, werewolves, witches, etc.); love triangle; rival houses/supernatural war; choosing light or dark, good and evil, or restoring "balance"; secret organization of supernatural creatures; secret sanctuary location; mythology/fairy tale roots; magical guide or mentor; entering other realms; objects of power and magic; vengeance for death of loved one; magical creatures forbidden to mix; vortexes, portals, or similar magical travel devices; time freezing, dream sequences, or similar time-displacement devices; elusive magical artifacts. (Easton Rep. at 5-8, 16-49; Freeman Dep. 55:2-69:1, 71:20-76:15; Pelletier Decl. ¶¶ 4, 8; see also Defendants' Request for Judicial Notice ("Defs.' Notice Req.") at 1-2 (advising that Court may take judicial notice of all published prior third-party works).

### Defs' Material Fact No. 32

Other vampire books, including books published by Entangled, have been set in Alaska. (Pelletier Dep. 65:10-25; Wolff Dep. 36:8-37:2 ("I do know that one of my favorite vampire novels ever was in Alaska. It's – and I always thought that was a very cool setting for vampires. Q. And which novel was that? A. Dancing in the dark by Sherrilyn Kenyon."); Pelletier Decl. ¶ 8; Defs.' Notice Req. at 1-2.).

### Defs' Material Fact No. 33

Other books, including books published by Entangled, have featured a heroine who moved to Alaska from southern California. (Pelletier Dep. 65:7-25 (discussing Wild in Captivity by Samantha Beck (Entangled, 2021)); Pelletier Decl. ¶ 8; Defs' Notice Req.).

### Defs' Material Fact No. 34

Other books have featured a search for elusive magical artifacts, including Harry Potter and the Half-blood Prince (2005) (horcruxes), Harry Potter and the Deathly Hallows (2007) (horcruxes and deathly hallows), City of Bones (2007) (search for "mortal instruments"); Shadow and Bone (2013) (search for "amplifiers"); and Children of Blood and Bone (2018) (search for sacred objects to perform a ritual). (Easton Rep. at 8, 19, 49; Defs.' Notice Req. at 1-2.) The search for artifacts goes back to Greek myth (the Golden Fleece) and Arthurian legend (the Holy Grail), and has been used in popular series like Lord of the Rings and Raiders of the Lost Ark. (Id.)

### Defs' Material Fact No. 35

Other books, TV shows, movies, and video games have named characters and/or weapons the "Bloodletter." (Pelletier Dep. 109:11-18 (Q. And how did you come up with that name? A. I play a lot of video games and it was a weapon in a video game.'); Easton Rebuttal Rep. at 5 ("Many other books have used it, including J.R. Ward's best-selling vampire series Black Dagger Brotherhood, specifically in book 5, Lover Unbound (published 2007), The Bloodletter's Daughter: A Novel of Old Bohemia by Linda Lafferty (2012), Bloodletter (Star Trek: Deep Space Nine) by K.W. Jeter (2000), and Bloodletter by Warren Newton Beath (1994)."); Defs.' Notice Req. at 1-2.)

### Defs' Material Fact No. 37

Wolff has used San Diego in multiple books, such as the Ethan Frost series and the Shaken Dirty series, both bestsellers. (Wolff Decl. ¶ 18(a); see generally Cole Ex. X (Tempest 6/30/10 draft/ARC); see also Defs.' Notice Req. at 1-2.)

### Defs' Material Fact No. 30 Re Trent Baer

Baer admitted that all alleged similarities in Plaintiff's Tempest List identifying 56 purportedly similar phrases appearing in Tempest and BMR, as well as various alleged plot and character similarities, "have to just be coincidences." (Baer Dep. 184:7-220; (*See also* Pl.'s Tempest List (ECF No. 103-2) at 11-26.)

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed March 11, 2024, at Westlake Village, CA.

*Mark Passin*
_____
Mark D. Passin

**EXHIBIT 1**

```
        MCCKFREC


 1      UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x

 3      LYNNE FREEMAN,

 4                      Plaintiff,

 5                 v.                          22 CV 2435 (LLS)(SN)
                                               Telephone Conference
 6      TRACY DEEBS-ELKENANCY, et al.,

 7                      Defendants.

 8      ------------------------------x
                                               New York, N.Y.
 9                                             December 12, 2022
                                               3:00 p.m.
10
        Before:
11
                           HON. SARAH NETBURN,
12
                                         Magistrate Judge
13
                               APPEARANCES
14
        CSREEDER PC
15           Attorneys for Plaintiff
        BY:  MARK D. PASSIN
16           -and-

17      REITLER KAILAS & ROSENBLATT LLC
        BY:  PAUL LiCALSI
18
        COWEN DEBAETS ABRAHAMS & SHEPPARD LLP
19           Attorneys for Defendants Tracy Deebs-Elkenaney, Entangled
        Publishing LLC, Holtzbrinck Publishers LLC, and Universal City
20      Studios LLC
        BY:  BENJAMIN HALPERIN
21           CeCe COLE

22      KLARIS LAW PLLC
             Attorneys for Defendants Prospect Agency LLC and Emily
23      Sylvan Kim
        BY:  LANCE KOONCE
24           ZACH PRESS

25
```

1    need to do because it sounds like both sides have differing

2    views on how this case is going to be litigated, but, more

3    importantly, proved at trial. So, maybe the briefing will help

4    narrow the issues.

5        We were talking about the manuscripts, and then

6    Mr. Passin indicated that, in connection with that, there are

7    other books that you'd like to discuss?

8        MR. PASSIN: Yes, your Honor.

9        THE COURT: Why don't you raise that, Mr. Passin?

10       MR. PASSIN: Look, we also believe that the Defendant

11   Wolff started copying my client's manuscript and using material

12   in earlier books, so we believe we'd like to have some

13   discovery on the earlier books.

14       But besides that, and more importantly, we have claims

15   against the agent and the agency for fraud, deceit, breach of

16   fiduciary duty, fraudulent concealment, and breach of contract

17   for basically taking my client's manuscripts and showing it to

18   Wolff and possibly others so they could copy it. So, that's

19   not limited to the claimed series.

20       So, by them saying that we can't have discovery on any

21   other books by Wolff or by Entangled to show that they took

22   material from our client's manuscript is depriving us of

23   discovery certainly we'd be entitled to on those other claims I

24   just mentioned, and I think the copyright claim, because at

25   trial, I do intend to show that she started copying gradually,

1     got away with it, started copying a little more, got away with
2     it, and then went for the whole thing in her YA book.
3              THE COURT:  Do you have specific books that you
4     believe are the product of that infringement?
5              MR. PASSIN:  Yes, we do have some, yes.
6              THE COURT:  Which books are those?
7              MR. PASSIN:  Well, I'd have to get my client -- the
8     one I know for sure is *Tempest Rising*, is one.  I think our
9     expert needs to get the rest.
10             THE COURT:  Why didn't you bring *Tempest Rising* as
11    part of this copyright case?
12             MR. PASSIN:  Well, because we're not claiming it's
13    copyright infringement; we're just claiming that they took some
14    material from there.  So it was a gradual process, she started
15    taking some, and then in her later books, she took enough to be
16    copyright infringement.  Plus we are suing because it's a
17    violation of those other causes of action.  I didn't limit it
18    to the *Crave* series.  I said that the agent disclosed her
19    manuscript to Wolff and possibly others for the purposes of
20    copying them and committing copyright infringement.  But I
21    didn't limit it to the *Crave* series.
22             MR. KOONCE:  Your Honor, this is Lance Koonce.
23             I've had trouble following this argument, I will
24    confess.  I think I understand it better today than I have in
25    the letter-writing.

But as I understand what Mr. Passin is saying, it's that somehow Prospect Agency thought that -- believed that the manuscripts that Ms. Freeman had provided were so valuable, that they started broadcasting to multiple of their clients, including Ms. Wolff, that, oh, you should borrow some language from these manuscripts, and they weren't enough to add up to any kind of copyright infringement, but that that's a violation of Prospect's fiduciary duty or a breach of contract.

There is zero evidence whatsoever in the record for any of this, including with respect to the books that Ms. Wolff eventually wrote many, many years after Ms. Freeman had been an author with Prospect.  Zero evidence.  So the idea that now, as we're hopefully hitting the end of fact discovery, Mr. Passin is identifying new books by not just -- presumably it sounds like not just by Wolff, but books by other authors who were working with Prospect Agency to allege that Prospect was providing that kind of information to them.  He had no evidence, no documentary evidence, whatsoever that anything like that happened with the Wolff books.  So the idea that somehow he now needs discovery of books that aren't part of this case at this point in time and/or were with other authors altogether, and he's saying that, ultimately, if they used them -- I don't even want to sort of give any credence to this hypothetical argument, but just completely hypothetically, if you provided -- if they provided something to some other

1  author, which they didn't, he's not even alleging a legal claim
2  that that resulted in.
3        I guess he's saying that that would be somehow breach
4  of fiduciary duty, I don't know.  I'm baffled by this, but all
5  I know is it seems like an attempt to expand discovery further
6  in this case to other things that were not part of his
7  complaint to begin with.
8        MR. PASSIN:  Your Honor, it's Mark Passin.
9        We'll limit it to the Wolff books.
10       THE COURT:  Well, Mr. Passin, the thrust of your
11  letters to me have been that discovery is burdensome, that
12  you're a solo practitioner, that you can't take on all the work
13  here and are feeling snowballed by the defendants.  I don't
14  understand how you intend to take on this additional burden of
15  looking at all other books, where you haven't alleged any
16  specific facts about misconduct or breaches of any duties with
17  respect to any other books.  And discovery is not an
18  opportunity to go searching for a claim.  If you don't have a
19  basis when you file your complaint, I'm not going to allow you
20  to go rummaging through other books and all of the process that
21  goes into publishing a book in order to try to locate a claim
22  that you haven't pled yet.
23       MR. PASSIN:  Your Honor, but I did make the claim on
24  the breach of fiduciary duty and all those claims.  How about
25  if I show you some evidence?  I have evidence.

1   THE COURT:  All right.  On the record before me, I'm
2   going to deny any written discovery into the other books than
3   the *Crave* series at issue in this case.
4   Mr. Passin, if you want to ask Ms. Kim or somebody
5   else questions that relate to possible breaches of fiduciary
6   duty beyond the *Crave* series at her deposition, you can ask
7   those questions, and based on those answers, you may be able to
8   come back to me and ask for additional discovery, but on the
9   record before me now, I'm going to deny that request.
10  MR. PASSIN:  Okay, your Honor.  Thank you.
11  THE COURT:  Let's turn to the issue of the plaintiff's
12  document production.
13  I understand from the defendants that there is a
14  concern that the plaintiff herself has searched for responsive
15  documents and produced what she believes is responsive, rather
16  than either having some sort of search term protocol and/or
17  having counsel go through the documents.
18  So, Mr. Passin, why don't I begin with you, and you
19  can tell me how you've collected the documents that are
20  responsive to the defendants' demands.
21  MR. PASSIN:  With respect to the emails, we hired an
22  i-discovery company, and they uploaded her entire computer and
23  did the search.  The only thing they're complaining about is,
24  on her computer, she had manuscripts and notes, and those, she
25  gathered from me, we didn't do a search of her computer, but

I, Mark D. Passin, hereby certify that a true and correct complete copy of Declaration of Mark D. Passin in Opposition to Plaintiff's Supplemental Motion Regarding Evidentiary Issues has been served on all counsel of record via the Court's CM/ECF service.

/s/ *Mark D. Passin*

Mark D. Passin