UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    8/1/2024
```

LYNNE FREEMAN,

                                        Plaintiff,                    22-CV-02435 (LLS)(SN)

                -against-                                        **REPORT &**
                                                                 **RECOMMENDATION**
TRACY DEEBS-ELKENANEY, et al.,

                                        Defendants.

------------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LOUIS L. STANTON:**

   Between 2010 to 2014, Lynne Freeman, a lawyer and unpublished author, tried to publish

a young adult paranormal romance novel. Freeman secured an agent, Emily Sylvan Kim of

Prospect Agency, and Kim sent Freeman's manuscripts and queries to dozens of publishing

houses, including Entangled Publishing. Over the next 40 months, Freeman and Kim

collaborated to publish Freeman's novel. Ultimately, no publisher was interested, and the

relation ended in March 2014. In April 2020, Kim's other client, author Tracy Deebs-Elkenaney

(known professionally as Tracy Wolff), published *Crave*, the first installment in what would be a

*New York Times* bestseller and a multi-book series. *Crave* is also a young adult paranormal

romance novel.

   Freeman contends that *Crave* is too similar to her unpublished manuscript to be anything

other than a knock-off. She accuses the Defendants of direct, vicarious, and contributory

copyright infringement. She also sues Kim and Prospect for breach of fiduciary duty, breach of

contract, fraud, and fraudulent concealment. Freeman moves for summary judgment on her

direct copyright infringement claim, and the Defendants cross-move for summary judgment on that claim. The Defendants also move for summary judgment on Freeman's state law claims. I recommend DENYING both parties summary judgment on the direct copyright infringement claim and GRANTING the Defendants summary judgment on Freeman's state law claims.

## BACKGROUND

### I.    Factual Background

Freeman and Kim started working together in December 2010, when they executed a contract for Kim and Prospect to serve as Freeman's literary agent. ECF No. 278, Doniger Ex. 39. Freeman's book, *Blue Moon Rising* ("*BMR*"), is about Anna, a 16-year-old girl living in Anchorage, Alaska. Anna falls in love with a boy, Ash. She learns that Ash is a werewolf-like creature, that she is half-witch, half-werewolf, and that forces of good and evil have waged supernatural war since the beginning of time. Upon turning 17, Anna will hold the key to maintaining the balance of good and evil.

For more than three years, Freeman and Kim worked together to publish *BMR.* During that period, Freeman sent Kim at least 10-15 different versions of *BMR*, as well as many sets of notes. Kim provided Freeman with edits and sent *BMR* to various publishers. During rounds of revisions, Freeman changed her novel's title to *Masqued*. Kim sent that iteration to Stacy Abrams, Entangled's Executive Editorial Director, in 2013. ECF No. 290, Pl. Stmt. of Undisputed Facts ("PSUF"), ¶ 24. Ultimately, Kim and Freeman were unable to secure a publishing deal. In March 2014, Kim and Freeman terminated their contract and amicably parted ways. ECF No. 299, Def. Stmt. of Undisputed Facts ("DSUF"), ¶ 11. *BMR* remains unpublished.

Kim has represented Wolff since 2007. PSUF, ¶ 30. In 2019, Elizabeth Pelletier, Entangled's Chief Executive Officer, decided that Entangled should publish a young adult novel

with a "fish out of water trope" or an "ordinary girl in a super rarified world" plot. PSUF, ¶¶ 5, 46. Pelletier instructed Abrams and other Entangled editors "to find an author to write a book in the paranormal genre for Entangled's teen line." DSUF, ¶ 83. Abrams reached out to Wolff directly to see if she could quickly write that book for Entangled. PSUF, ¶ 46. Wolff expressed interest and sent five plot ideas to Abrams, including a plot about a warlock or vampire boarding school. DSUF, ¶ 86. In May 2019, Entangled and Wolff officially decided to work together on that project, which would become *Crave*. Id. at 91.

The protagonist in *Crave* is Grace, a 17-year-old girl who moves from San Diego to remote Alaska following the death of her parents. Grace attends a magical Hogwarts-like boarding school and falls in love with Jaxon, a vampire. Grace learns that she is half-witch, half-gargoyle and participates in supernatural battles. She ends up in a love triangle with Jaxon and his believed-dead brother, Hudson. After hitting major commercial success, *Crave* became a four-book series, with *Crush*, *Covet,* and *Court* following the first book. All four books have been published by Entangled and distributed by Macmillan. PSUF, ¶¶ 10, 11. Universal Studios is planning a movie based on *Crave*.

The parties hold different views about who wrote *Crave*. According to the Defendants, Wolff wrote the series, Pelletier provided substantive edits, Abrams provided copy edits, and Kim provided moral support. DSUF, ¶¶ 92-99. Additionally, Kim suggested some chapter titles and contributed to the *Crave* series "bible," an internal guide detailing *Crave*'s many subplots and characters. Id. at ¶¶ 113, 117. Freeman suggests a different truth. Freeman asserts that Pelletier, Abrams, and Kim all helped write the *Crave* series. PSUF, ¶ 49.

Freeman offers six separate *BMR* manuscripts for the Court's substantial similarity analysis: *BMR 2010* (ECF No. 276, Freeman Ex. 18); *BMR 2011* (Freeman Ex. 14); *BMR 2012*

(Freeman Ex. 19); *BMR 2013* (Freeman Ex. 17); *BMR 2014* (Freeman Ex. 16); and *BMR 2016*

(Freeman Ex. 15). Freeman also claims that the Defendants infringed several sets of her notes

(Freeman Exs. 3-11).

## II.    Procedural Background

Freeman filed this action on March 25, 2022. Two months later, she amended her

complaint. After completing fact and expert discovery, Freeman filed her motion for summary

judgment on her direct copyright infringement claim. The Defendants cross-moved and moved

for summary judgment on Freeman's state law claims. Contemporaneous with this summary

judgment motion, the Defendants seek to exclude the testimony of six affirmative experts offered

by Freeman, and Freeman seeks to exclude the testimony of two rebuttal experts offered by the

Defendants. Both parties also ask the Court to strike various summary judgment exhibits and to

keep various summary judgment exhibits under seal. The Court decides these evidentiary issues

today by separate opinion and order.

## DISCUSSION

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial

burden of establishing that no genuine issue of material fact exists. Id. at 256-57; see Celotex

Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party

who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can

point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-23).

To defeat summary judgment, the non-moving party must produce more than a "scintilla of evidence" and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Anderson, 477 U.S. at 252; Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."). The non-moving party "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).

In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). When both sides have moved for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011).

## II.    Copyright Infringement

"The determination of the extent of similarity that will constitute a substantial, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." 4–13 Nimmer on Copyright § 13.03 (2009).

Thus, the question of substantial similarity typically presents an extremely close question of fact, Arnstein v. Porter, 154 F.2d 464, 468-69 (2d Cir. 1946), and questions of non-infringement have traditionally been reserved for the trier of fact. See Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 239 (2d Cir. 1983) (the issue of substantial similarity "is frequently a fact issue for jury resolution"); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation.").

To establish direct copyright infringement, a plaintiff must show that: (1) they own a valid copyright; (2) the defendant "actually copied" from the plaintiff's copyrighted work; and (3) the defendant's work is "substantially similar" to the plaintiff's copyrighted work, such that the defendant's copying amounts to "unlawful appropriation." Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998).

The parties do not dispute, for the purposes of this motion, that Freeman owns a valid copyright in her *BMR* manuscripts and notes. PSUF, ¶ 2. At issue, then, is whether the Defendants actually copied from Freeman, and if so, whether *BMR* and the *Crave* series share substantial similarities.

### A.    Actual Copying

Direct evidence of actual copying is rare. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). For that reason, a plaintiff may establish actual copying circumstantially. Id. There are two ways for a plaintiff to circumstantially establish actual copying. In the first, the plaintiff must establish both that the "the person who composed the defendant's work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." Id. In the second, if the plaintiff cannot establish that the author of the allegedly infringing work had access to the plaintiff's work, the plaintiff can nevertheless

establish actual copying if the works are "so strikingly similar as to preclude the possibility of independent creation." Id. (citing Lipton v. Nature Co., 71 F.3d 464, 471 (2d Cir. 1995)). Like in most copyright cases, there is no direct evidence of copying. Accordingly, the Court must consider whether Freeman can establish actual copying through either a combination of access and probative similarity, or through striking similarity.

### i. Access

Freeman presents two theories for access. First, Freeman argues that Kim and Abrams – who both undisputedly had access to some *BMR* versions[1] – helped write *Crave*, thus establishing that those "who composed the defendant's work" had direct access. Jorgensen, 351 F.3d at 51. Second, Freeman presents a theory of intermediary access that, while Kim and Abrams did not help write *Crave*, they shared Freeman's materials with Wolff.

### a. Direct Access

The parties dispute who authored *Crave*. The Defendants argue that Kim and Abrams did not write Wolff's books; Freeman argues the opposite. Because the parties do not dispute that Kim and Abrams had access to some *BMR* versions, if Freeman could establish that Kim and Abrams helped author *Crave*, she could establish direct access. This factual dispute over *Crave*'s authorship is therefore highly relevant to the issue of actual copying.

Although Freeman argues that Abrams was "very involved in the writing of the *Crave* series," Freeman has no specific evidence showing that Abrams helped write Wolff's books. PSUF, ¶ 49. To support her claim, Freeman cites Wolff's deposition testimony. In response to a question about Abrams's contribution to the *Crave* series, Wolff responded "Stacy Abrams was

---

[1] The parties do not dispute that Kim had access to *BMR 2010*, *BMR 2011*, *BMR 2012*, and *BMR 2013*, as well as Freeman's notes. Additionally, the parties do not dispute that, in 2013, Kim forwarded Abrams a copy of *BMR*. PSUF, ¶ 24.

the copy editor." ECF No. 278, Doniger Ex. 4, Wolff Tr., 180:1-4. Nowhere does Wolff testify that Abrams wrote any *Crave* material, and Freeman does not offer any evidence rebutting the Defendants' claim that Abrams only copyedited the books. Because copyediting does not amount to authoring, and Freeman does not point to any facts rebutting the Defendants' claim that Abrams only copyedited *Crave*, the parties do not genuinely dispute whether Abrams helped write *Crave*; the evidence shows that she did not. Accordingly, Freeman cannot establish direct access of *BMR 2013* through Abrams.

Whether Kim helped write *Crave* is, however, genuinely in dispute. Wolff testified that, aside from writing some chapter titles, Kim did not write, edit, or otherwise make changes to any *Crave* manuscripts.[2] Wolff Tr., 47:3-48:7. But Freeman questions the credibility of Wolff's testimony, pointing to these text messages Kim sent Abrams: "I'm feeling overwhelmed because I'm also helping Tracy write"; "Tracy and I are team speed writing new scenes"; "I convinced Tracy to let me help her write the guide"; and "I've stopped copy editing because I helped write all this." Doniger Ex. 15, at 3, 5-7. These text messages seem to imply that Kim helped write *Crave.* To explain away the messages, the Defendants assert that Kim simply sat with Wolff while she wrote, kept her awake, and motivated her. It will be the task of the jury, not the Court, to decide whether the Defendants' explanation sufficiently accounts for Kim's text messages. The Court cannot resolve this pivotal factual dispute on summary judgment.

Even if Freeman could establish that Kim helped write *Crave*, there would remain a dispute over Kim's access to *BMR 2014* and *BMR 2016*. Kim claims that "the last full version of [Freeman's] manuscript that [she] received was in July 2013." ECF No. 306, Kim Declaration ("Kim Decl."), ¶ 45. The Defendants point out that *BMR 2014*'s metadata shows a creation date

---

[2] Freeman does not allege that *Crave*'s chapter titles infringe Freeman's works.

of July 20, 2014, and *BMR 2016*'s metadata shows a creation date of October 10, 2016.[3] ECF

No. 300, Cole Declaration ("Cole Decl."), ¶¶ 18, 19. Based on Kim's sworn statements, she

could not have received *BMR 2014* and *BMR 2016*. Freeman, however, claims that she "sent

Kim drafts of *BMR* between July 2013 and approximately June, 2015," including *BMR 2014* and

*BMR 2016*. ECF No. 329, Supplemental Freeman Declaration ("Supp. Freeman Decl."), ¶ 6. The

parties present contradictory testimony, which should be resolved through a jury's credibility

determination.

   The Defendants argue that only *BMR 2011* and *BMR 2013* are at issue in the litigation. If

the Defendants were correct, the factual disputes over *BMR 2014* and *BMR 2016* would be

irrelevant. In the Defendants' view, the Court's January 11, 2023 Order for Freeman to select

"two manuscripts to serve as the primary works that establish her copyright claim" limited

Freeman's copyright claims to only the two versions of *BMR* (she later selected *BMR 2011* and

*BMR 2013*). ECF Nos. 105, 111. But Judge Stanton has clarified that the selection of two

manuscripts was meant only to "allow the parties a preliminary view of the works' similarities"

and was a "practical way to start." Judge Stanton added that the "selection of the two test

examples is not a ruling on the remainder of plaintiff's evidence." ECF Nos. 141, 181.

Accordingly, Freeman can still assert copyright infringement as to *BMR 2010, BMR 2012, BMR

2014,* and *BMR 2016*, and her notes, making access to *BMR 2014* and *BMR 2016* relevant.

Because the Court declines to address substantial similarities in this report and recommendation,

---

[3] The Defendants also claim that the metadata for a third *BMR* version (filed as Freeman Ex. 21) post-
dates Kim's professional relationship with Freeman. Cole Decl., ¶ 20. That *BMR* manuscript is not one of
the six that Freeman offers for substantial similarity analysis. Accordingly, whether Freeman sent Kim
that particular *BMR* manuscript is immaterial.

the question of *how* a jury will consider *BMR 2011* and *BMR 2013* vis a vis the other four versions should be decided through pretrial briefing, not at summary judgment.[4]

### b.    Intermediary Access

Freeman argues that, even if she cannot establish that Kim helped write *Crave*, she can still establish access via an intermediary theory. "A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third-party intermediary who has a close relationship with the infringer." <u>Jorgenson</u>, 351 F.3d at 51 (quoting <u>Towler v. Sayles</u>, 76 F.3d 579, 583 (4th Cir. 1996)). If Kim did not help write *Crave*, she would be a third-party intermediary with a close relationship to Wolff and with access to at least four versions of *BMR*. Additionally, Abrams is a third-party intermediary with access to *BMR 2013*. Even with these close relationships, however, Freeman would need to establish that Wolff "had a 'reasonable possibility' – not simply a 'bare possibility'" – of viewing Freeman's work. <u>Jorgenson</u>, 351 F.3d at 51. That reasonable possibility "cannot be based on 'mere speculation or conjecture,'" but rather must be based on "significant, affirmative and probative evidence." <u>Id</u>.

Complicating Freeman's theory of intermediary access is testimony from Wolff and Kim denying that anyone ever showed Freeman's work to Wolff. In Kim's declaration, she asserts that:

> Other than sending the submission copy of *Masqued* to Stacy Abrams at Entangled, neither I nor anyone else at Prospect Agency ever provided any of Freeman's manuscripts or other written material to Entangled Publishing. Nor did I or anyone else at Prospect Agency ever provide any of Freeman's manuscripts or other written material to Tracy Wolff. I also did not convey (nor did anyone else at Prospect) any content authored by Freeman to any third party (including Entangled or Wolff) verbally or through other means, other than the submissions we made to publishers during my time working as Freeman's agent. I also never even spoke to Wolff, Pelletier, Abrams or anyone else about Freeman or her manuscripts aside from my submission to them, until the start of this dispute.

---

[4] Relatedly, the parties dispute whether, at the substantial similarity analysis, Freeman's works should be aggregated or viewed individually. That, too, should be decided through pretrial briefing.

Kim Decl., ¶ 46. Wolff likewise swears:

> I have never read any of Plaintiff's manuscripts. No one has ever shown me any of
> Plaintiff's manuscripts. I have never heard any passages from Plaintiff's manuscripts.
> The only knowledge I have of Plaintiff's manuscripts is what I read in the complaint
> that she filed in this case. I did not copy Plaintiff's manuscripts, or incorporate any of
> Plaintiff's material into my books, regardless of whether we're talking about the *Crave*
> Series, *Tempest Rising*, *Deserving of Luke*, or any of my other novels.

ECF No. 150, Wolff Decl., ¶ 27.

In the absence of specific contradictory evidence, the Court cannot simply disregard the
testimony offered by the Defendants. See, e.g., Tomasini v. Walt Disney Co., 84 F. Supp. 2d
516, 520 (S.D.N.Y. 2000) (finding no access because the defendants "stated under oath that they
personally never received, reviewed, or heard of" plaintiff's copyrighted material, and the
plaintiff presented no evidence to rebut that testimony); Cox v. Abrams, No. 93-cv-6899 (RJW),
1997 WL 251532, at *4 (S.D.N.Y. May 14, 1997) (finding no access because accepting the
plaintiff's theory of access would require the Court to assume that the purported intermediaries
"lied when they swore under oath that they did not provide the manuscript or communicate its
substance to any of the defendants"); Siskind v. Newton-John, No. 84-cv-2634 (TPG), 1987 WL
11701, at *5 (S.D.N.Y. May 22, 1987) (finding no access because the defendants "swor[e] in
depositions and affidavits that they did not receive, hear or know of plaintiff's song"); see also
Towler v. Sayles, 76 F.3d 579, 583 (4th Cir. 1996) (finding no access because the defendant
testified that he had never received the copyrighted work, the plaintiff presented no evidence
showing that the purported intermediary ever sent the defendant plaintiff's work, and plaintiff
"presented no evidence upon which a jury could base an inference that [the defendant] was not
truthful"). Kim's and Wolff's sworn testimony therefore reduces the possibility of Freeman's
intermediary access theory from reasonable to bare because it would require the Court to

speculate – without evidence – that Wolff and Kim both lied under oath. In light of this undisputed evidence, no reasonable jury could find access under a theory that Kim or Abrams shared Freeman's work with Wolff.

### ii.    Similarity

If the at-issue works shared no probative similarities, access would become immaterial, Freeman would fail to establish actual copying, and her direct infringement claim would fail. If the at-issue works shared striking similarities, Freeman would no longer need to establish access, and the Court could proceed to the substantial similarity analysis. In either situation, the factual dispute over access would cease to be material. Accordingly, the Court must consider probative and striking similarity.

### a.    Probative Similarity

"'Probative similarity' is a less demanding test than 'substantial similarity,' requiring only that there are similarities between the two works that would not be expected to arise if the works had been created independently." Odegard, Inc. v. Costikyan Classic Carpets, 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997). When evaluating probative similarity, the Court should consider "the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994); see also Boone v. Jackson, 206 F. App'x 30, 32 (2d Cir. 2006) (summary order) (finding that "the district court erred by dissecting the works into protectable and non-protectable elements" when evaluating probative similarity).

*BMR 2010, 2011, 2012, 2013,* and *2014* each share probative similarities with the *Crave* series, and no reasonable juror could find otherwise. The similarities – some more probative than others – add up to raising an inference that *Crave*'s authors copied these Freeman works. In both sets of works: the heroine lives in Alaska after moving from California in the wake of losing

12

close family members, including their fathers, in a tragic accident; the heroine believes she is human but later learns that she is a supernatural half-witch key to maintaining the balance between good and evil; an evil vampire kidnaps the heroine and bites her; an evil vampire has trapped the heroine's paternal family member in a non-human form; a mean girl spikes the heroine's drink; and more. Absent copying, one would not expect two works to share these kinds of similarities. Freeman has therefore established probative similarity as to these specific Freeman manuscripts. Ex. 3

*BMR 2016*, however, shares few similarities with Wolff's series. Between *BMR 2014* and *BMR 2016*, Freeman made significant changes to her manuscript, including cutting about 300 pages and most of the ideas she alleges Wolff stole. In Freeman's final edit, the story no longer includes: vampires; werewolves; the mean girl spiking the heroine's drink; the heroine hearing a voice in her head; the heroine's dead father being trapped in a non-human form; the heroine learning that she's magical (she knows from the outset); or supernatural war. Additionally, the heroine's family members were murdered, not killed in an accident. The only remaining similarities hold little probative value. For example, both books: feature a female main character who moved to Alaska from California; involve magic; reference ancient imagery and tarot cards; quote Shakespeare; mention gold double doors and lemon verbena tea; and discuss good and evil. These similarities are all either so commonplace or so minor that they do not rise to the level of indicating copying. Because Freeman has failed to establish probative similarity for *BMR 2016*, Freeman cannot establish actual copying for that manuscript, and I recommend excluding it from the substantial similarity analysis.

Finally, the Court considers the probative similarity of Freeman's notes. Some of those sets of notes – including Exhibits 3, 5 through 9, and 11 – reference the probative similarities

described above for *BMR 2010, 2011, 2012, 2013*, and *2014*. Accordingly, Freeman has established probative similarities as to those sets of notes. Other sets of notes, however, share few or no similarities with Wolff's books. Exhibit 4 is dialogue of the heroine's mom and aunt discussing their desire for the heroine to have a normal life; Freeman points to no analogue dialogue in Wolff's books. Exhibit 10 is a half-page description of the heroine's ability to feel evil around her, which is not a similarity highlighted by Freeman. Accordingly, Freeman has failed to establish probative similarity for Exhibits 4 and 10, and I accordingly recommend excluding those from a substantial similarity analysis.

### b. Striking Similarity

The bar for striking similarity is much higher than the bar for probative similarity. "At base, 'striking similarity' simply means that, in human experience, it is virtually impossible that the two works could have been independently created." L.A. T-Shirt & Print, Inc. v. Rue 21, Inc., No. 16-cv-5400 (RA), 2017 WL 3575699, at *12 (S.D.N.Y. Aug. 17, 2017) (citing Nimmer on Copyright § 13.02(B)). To establish striking similarity, the works "must be so identical as to preclude any reasonable possibility of independent creation." Dimmie v. Carey, 88 F. Supp. 2d 142, 150 (S.D.N.Y. 2000). Unlike with probative similarity, "mere multiple similarities are insufficient" to establish striking similarity, "and the relevance of a similarity is diminished if the similarity consists of 'stock elements' within a genre or otherwise non-protectable elements." Webb v. Stallone, 910 F. Supp. 2d 681, 687 (S.D.N.Y. 2012).

To establish striking similarity, Freeman primarily relies on the conclusions of experts that the Court has excluded as unreliable under the Daubert factors. That leaves the Court to decide striking similarity based on the works themselves. The works are far from identical, with their differences outweighing their similarities. Some major differences between the works

include: in *BMR*, Anna has lived in Alaska since elementary school, while *Crave* starts with Grace's move to Alaska; Anna feels at home in Alaska, while Grace feels like an outsider; Anna attends a public high school with mostly human classmates, while Grace attends a Hogwarts-like magical boarding school with supernatural classmates; the romantic lead of *BMR* is a kind and sweet teenage werewolf, while the romantic lead of *BMR* is a brooding and angry centuries-old vampire; a major plot point in *Crave* is a love triangle with the romantic lead and his brother, while in *BMR*, there is no love triangle and the romantic lead's brother is dead; in *BMR*, Anna lives at home with her living mother, while in *Crave*, Grace lives at her boarding school and her mother is dead; and more. Additionally, *BMR* has a more serious and traditional tone, while *Crave* inserts more humor and is written more colloquially, making significant use of text-speak. Given these myriad differences, no reasonable juror could find Freeman's and Wolff's works "so identical as to preclude any reasonable possibility of independent creation." Dimmie, 88 F. Supp. 2d at 150. Accordingly, I find that no reasonable jury could conclude that the at-issue works share striking similarities.

Because the parties' works share probative, but not striking, similarities, the factual disputes over access remain material and should be resolved by a jury.

### iii.    Independent Creation

The Defendants assert an "independent creation" affirmative defense, arguing that the evidence of independent creation precludes a finding of actual copying. At this juncture, however, the Court should not consider whether the Defendants have established the affirmative defense:

> To negate copying, a defendant can allege independent creation. No matter how credible such a claim is, and even absent any contrary evidence, a court should not grant defendant summary judgment on that basis. For, in the absence of the ability to construct a time machine capable of peeking back into defendant's atelier, the law has

devised proof of access plus probative similarity as surrogates to prove copying as a factual matter. To the extent that defendant denies that copying and maintains independent creation, a factual issue arises, which it is for trial to resolve.

Nimmer on Copyright § 12.10(B); see also Repp v. Webber, 132 F.3d 882, 891 (2d Cir. 1997) ("Whether the evidence of independent creation here is sufficient to rebut the *prima facie* case established in this action is a question for the factfinder, whatever the contours of the burden of establishing the defense."). Because the Defendants' independent creation argument cannot resolve the summary judgment motions, I decline to comment on the strength of their affirmative defense.

### B.   Unlawful Appropriation

If Freeman could establish actual copying, the next step would be for the Court to determine whether the copying amounted to unlawful appropriation. Copying becomes unlawful when "substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010). Substantial similarity "typically presents an extremely close question of fact." Id. For that reason, determination of substantial similarity has traditionally been reserved for the jury. Id.; see also Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) ("[S]ummary judgment has traditionally been frowned upon in copyright litigation."). Courts decide substantial similarity on summary judgment only if "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 240 (2d Cir. 1983) (cleaned up). Where, as here, the similarities fall somewhere between probative and striking, substantial similarity presents a particularly close question of fact and should be decided by a jury.

Aside from the close question of fact on substantial similarity, the issue should be decided by a jury because access is in dispute. "It is *only after* actual copying is established that one claiming infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work." Castle Rock, 150 F.3d at 137 (emphasis added). When courts find actual copying in dispute at summary judgment, they decline to discuss substantial similarity. See, e.g., Clonus Assocs. v. Dreamworks, LLC, 457 F. Supp. 2d 432, 443 (S.D.N.Y. 2006) (finding actual copying in dispute and therefore declining to discuss unlawful appropriation, noting that such questions are "fraught with fact-based disputes"); Michael Grecco Prods. v. Valuewalk LLC, 345 F. Supp. 3d 482, 501 (S.D.N.Y. 2018) (finding actual copying in dispute for one defendant and explaining that the Court "need not address" substantial similarity for that defendant). The factual dispute over access to *BMR 2014* particularly prevents the Court from prematurely discussing substantial similarity; the resolution of that dispute will determine which of Freeman's works the jury will consider in its substantial similarity analysis and could therefore alter the substantial similarity finding.[5] Accordingly, because access is in dispute, the Court should not determine whether the at-issue works are substantially similar.

---

[5] Freeman's five remaining manuscripts all tell essentially the same story. Freeman's own brief describes her manuscripts as "iterations and edits of *one overarching story*." Pl. Copy. Br. at 1 (emphasis added). Similarly, Freeman's counsel has represented on the record that the various manuscript are "a single story that has some revisions here and there." ECF No. 222, June 2, 2023 Tr. at 30:18-22. Accordingly, the inclusion or exclusion of *BMR 2014* should not impact a jury's finding regarding whether the at-issue works share "common themes, concepts, characters, and plots that formed part of their very meaning, context, and expression." Warner Bros., Inc. v. ABC, 530 F. Supp. 1187, 1193 (S.D.N.Y. 1982). But the inclusion or exclusion of *BMR 2014* could affect the jury's decision on fragmented literal similarity, which asks whether Wolff's work contains identical or closely paraphrased portions from Freeman's work. Castle Rock, 150 F.3d at 140.

Due to the genuine factual disputes that are material to access, I recommend that the Court deny the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim and allow that claim to proceed to trial.

## III.    State Law Claims

### A.    Breach of Contract

Freeman alleges that Kim and Prospect breached their contract with her by sharing "Freeman's work and ideas with Wolff and the other defendants." ECF No. 326, Plaintiff's State Law Opposition ("Pl. State Opp."), at 16. Kim stopped representing Freeman in March of 2014. That month, "Freeman terminated her agency agreement with Kim and Prospect Agency." DSUF, ¶ 151. Freeman argues that Kim and Prospect breached that agency agreement over five years later, when Entangled contracted with Wolff to write *Crave*. But "a contract cannot be breached after it has been terminated." Wall St. Sys. Swed. AB v. Hertz Global Holdings, Inc., No. 14-cv-7819 (KBF), 2015 WL 158887, at *8 (S.D.N.Y. Jan. 13, 2015); see also Twitchell v. Pittsford, 106 A.D.2d 903, 904 (3rd Dep't 1984) ("When a contract is terminated . . . the rights and obligations thereunder cease."). Because Freeman improperly asserts a post-termination breach, I recommend granting the Defendants summary judgment on her breach of contract claim.

### B.    Breach of Fiduciary Duty

Freeman claims that Kim and Prospect breached their fiduciary duty when they shared her work with Wolff without her permission and for personal gain. "The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." Rut v. Young Adult Inst., Inc., 74 A.D.3d 776, 777 (2nd Dep't 2010).

The Defendants argue that the Court should grant them summary judgment on this claim because Kim and Prospect owed Freeman no fiduciary duty. In the alternative, the Defendants argue that even if Kim and Prospect did breach their fiduciary duty to Freeman, she has not established any resulting damages that are unique from her copyright claim.

Freeman has established the existence of a fiduciary relationship. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Mandelblatt v. Devon Stores, 132 A.D.2d 162, 168 (1st Dep't 1987). Courts routinely find that literary agents fit squarely within this definition. See, e.g., Friedman v. Kuczkir, 272 F. Supp. 3d 613, 618 (S.D.N.Y. 2017) ("A literary agent has a fiduciary duty to the agent's client and is required to act in the best interests of the client."); Hay v. Gernert Co., No. 22-cv-698 (LGS), 2023 WL 402511, at *10 (S.D.N.Y. Jan 25, 2023) (finding that the complaint alleged sufficient facts to show that a literary agent owed their client "a fiduciary duty over and above, or independent of, any contractual obligations that existed"); see also, Jacqueline D. Lipton, Are Literary Agents (Really) Fiduciaries?, 86 Tenn. L. Rev. 825, 827 (2018) ("It seems to be accepted as common practice that a literary agent owes a fiduciary duty to their clients."). A fiduciary's duties of loyalty and confidentiality can persist "even after the relationship ends." Avco Corp. v. Turner, No. 22-cv-3448, 2024 WL 185678, at *1 (3d Cir. Jan. 17, 2024).

The Defendants argue that this Court has "clearly held that a literary agent holds no [fiduciary] duties to his or her client." Def. State Br. at 13 (citing Clifford v. Janklow, No. 22-cv-1259 (MKV), 2023 WL 2711353, at *6-7 (S.D.N.Y. Mar. 30, 2023)). The Defendants' claim misrepresents and broadens Clifford's holding. In that case, the Court found that the plaintiff had not adequately pleaded that her literary agent owed her a fiduciary duty. There, the plaintiff had

failed to plead facts showing that her relationship with her agent amounted to more than a "purely commercial transaction." <u>Clifford</u>, 2023 WL 2711353, at *16. "When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." <u>Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield</u>, 276 F.3d 123, 130 (2d Cir. 2002). Accordingly, <u>Clifford</u>'s holding means only that a court cannot *automatically* assume that a literary agent is a client's fiduciary. <u>See</u> <u>Oddo Asset Mgt. v Barclays Bank PLC</u>, 19 N.Y.3d 584, 593 (2012) (explaining that a "a fiduciary relationship is 'necessarily fact-specific'"). Instead, the client must establish that they had more than an "arms length" relationship with their agent and that the agent and client "created their own relationship of higher trust." <u>Id</u>.

Kim and Freeman did create their own "relationship of higher trust." Over the course of their professional relationship, Freeman sent Kim at least 10-15 *BMR* manuscript drafts. PSUF, ¶ 17. Kim "worked with Freeman to bring the *BMR* manuscript into a form suitable for pitching to book editors." DSUF, ¶ 142. Kim gave Freeman advice about which publishing deals seemed most promising. PSUF, ¶ 24. After several editors rejected *BMR*, "Kim continued to offer suggestions and have readers review the book." DSUF, ¶ 148. Kim spent years giving Freeman advice and guidance on publishing-related matters. The two worked together closely, and Freeman placed significant trust in Kim. This relationship is a far cry from the kind of arms-length, commercial transaction that would not give rise to a fiduciary duty. Accordingly, Freeman has established that Kim and Prospect owed her a fiduciary duty.

Freeman argues that Kim and Prospect breached their fiduciary duty by "exploiting her work with a third-party competitor to her detriment." Pl. State Opp. at 14. She argues that Kim exploited her work either to help Wolff write the *Crave* series or by using the work herself to

help write the series. Id. at 7-9. If true, this would amount to a breach of a fiduciary's duties of loyalty and confidentiality. Kim has denied these allegations under oath. But, as explained above, there are factual disputes regarding whether Kim helped write *Crave*. Additionally, although Kim denies sharing or using Freeman's material to write *Crave*, a reasonable juror could rely on the similarities between the works to infer otherwise. Accordingly, whether Kim and Prospect breached their fiduciary duty would need to be determined by a jury.

But even if a jury found that Kim and Prospect breached their fiduciary duty by sharing Freeman's manuscripts or using them to write *Crave*, Freeman has not established that she suffered any injury as a result. "[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability." LNC Invs. v. First Fid. Bank, N.A., 173 F.3d 454, 465 (2d Cir. 1999). Speculative damages are "insufficient to maintain a cause of action alleging breach of a fiduciary duty." Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli, 215 A.D.3d, 701 (2nd Dep't 2023). Additionally, "[n]ominal damages cannot satisfy the 'damage' element of a breach of fiduciary duty claim." Yukos Capital S.A.R.L. v. Feldman, 977 F.3d 216, 243 (2d Cir. 2020).

The Defendants contend that Freeman has failed to establish the "damages" element because she offers no evidence of damages separate from her copyright infringement claim. Def. State Br. at 7. If accurate, that would warrant dismissal of her breach of fiduciary duty claim because "claims are duplicative of one another if they arise from the same facts and do not allege distinct damages." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175 (2d Cir. 2008); see, e.g., Townsquare Media, Inc. v. Regency Furniture, Inc., No. 21-cv-4695 (KMK), 2022 WL 4538954, at *22 (S.D.N.Y. Sept. 28, 2022) (dismissing a claim because it stemmed

from "identical facts" and sought "identical damages" as another claim); <u>Biosafe-One, Inc. v.</u>

<u>Hawks</u>, 639 F. Supp. 2d 358, 368 (S.D.N.Y. 2009) (dismissing conversion claim as duplicative

of copyright and trademark infringement claims). In an attempt to cure this issue, Freeman

clarifies that she claims the Defendants "breached their fiduciary duties by exploiting her work

with a third-party competitor to her detriment regardless of whether that also constitutes

copyright infringement." Pl. State Opp. at 14. She further clarifies that "her state law claims are

*not* dependent" on her copyright claims. <u>Id</u>. at 1 (emphasis in original). But although Freeman

correctly explains that a jury could find that Kim and Prospect breached their fiduciary duty by

improperly using her material, even absent a substantial similarity or copyright infringement

finding, Freeman never identifies any specific injury she suffered as a result.

When discussing damages for her breach of contract claim, Freeman explains that Kim

and Prospect "likely destroyed any market for Freeman's work." <u>Id</u>. Even assuming that

Freeman seeks the same damages on her breach of fiduciary duty claim, she has not offered any

evidence to support such damages. For example, Freeman has not provided evidence that anyone

in the publishing industry believes *BMR* and *Crave* are unusually similar, that she has attempted

to publish *BMR* since *Crave* was published, or that she intends to publish *BMR* in the future.

Without such evidence, no reasonable juror could find damages. Additionally, "likely" future

publishing difficulty, without more, is too speculative to constitute recoverable damages.

Accordingly, although Kim and Prospect owed Freeman a fiduciary duty, and may have

breached that duty, Freeman has failed to identify or establish specific, non-speculative, non-

copyright damages resulting from that breach. I therefore recommend that the Court grant the

Defendants summary judgment on Freeman's breach of fiduciary duty claim.

### C.    Fraud and Fraudulent Concealment

Freeman also sued Kim and Prospect for fraud and fraudulent concealment. In Freeman's state law opposition brief, she writes that she "maintains that the Prospect Defendants also defrauded her but to streamline the issues before the court and focus on the primary claims she agrees that her fraud claim may be dismissed." Pl. State. Opp. at 1, n.2. Accordingly, I recommend that the Court dismiss Freeman's fraud claims with prejudice.

### CONCLUSION

I recommend that the Court DENY the parties' cross-motions for summary judgment on Freeman's direct copyright infringement claim. I further recommend that the Court GRANT the Defendants' motion for summary judgment on Freeman's state law claims.

SARAH NETBURN
United States Magistrate Judge

DATED:    August 1, 2024
          New York, New York

*         *         *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Louis L. Stanton if required by his Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Stanton. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).