**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

LYNNE FREEMAN,

         **Plaintiff,**

    -against-

TRACY DEEBS-ELKENANEY, et al.,

         **Defendants.**

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/1/2024 _____

**22-CV-02435 (LLS) (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

   In this copyright infringement action, both parties move to exclude expert testimony

pursuant to Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Additionally, both parties ask the

Court to strike various summary judgment exhibits and to keep various summary judgment

exhibits under seal. The Court addresses these evidentiary issues in this opinion and order and

makes recommendations on the parties' motions for summary judgment by separate report and

recommendation, also filed today. The relevant factual background to the case can be found in

that report and recommendation.

## DISCUSSION

### I.  Expert Evidence

   The Defendants ask the Court to exclude six affirmative expert reports offered by

Plaintiff Lynne Freeman. Those experts opine on: (1) the substantial, probative, and striking

similarity between Freeman's works and the *Crave* series; (2) the fiduciary and contractual

obligations that Kim and Prospect owed Freeman; and (3) Kim's and Wolff's motives to copy Freeman's work. Freeman seeks to exclude two rebuttal experts offered by the Defendants.

### A.    Legal Standard

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. Under Federal Rule of Evidence 702, expert testimony is admissible where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"To determine whether a proposed expert's testimony passes muster under Rule 702, this Court must inquire into: (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based on reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005)).

"Because the purpose of summary judgment is to weed out cases in which there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law, it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," including the admissibility of expert evidence. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) (cleaned up). Indeed, as the "gatekeeper for expert

testimony," the court "performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." Id.

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). In conducting its analysis, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." Id. at 266. Contentions that the expert's "assumptions are unfounded 'go to the weight, not the admissibility, of the testimony.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1188 (2d Cir. 1992)). Nevertheless, "conclusions and methodology are not entirely distinct from one another," and "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Accordingly, a district court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." Id. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

The court must also conclude that the proposed testimony will assist the trier of fact. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "This 'helpfulness'

3

standard . . . requires as a precondition to admissibility that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation." Krys v. Aaron, No. 14-cv-2098 (JBS), 2015 WL 3660332, at *3 (D.N.J. June 12, 2015) (citing Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)) (internal quotation marks omitted). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." United States v. Mejia, 545 F.3d 179, 194 (2d Cir. 2008).

Exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

### B.    Substantial Similarity Experts

To establish copyright infringement, a plaintiff must show that: (1) they own a valid copyright; (2) the defendant "actually copied" from the plaintiff's copyrighted work; and (3) the defendant's work is "substantially similar" to the plaintiff's copyrighted work, such that the defendant's copying amounts to "unlawful appropriation." Castle Rock Entm't, Inc. v. Carol

4

Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998). Freeman seeks to introduce expert testimony from Dr. Carole E. Chaski, Dr. Patrick Juola, and Professor Kathryn Reiss to support Freeman's assertion that her works and the *Crave* series share substantial similarities. The Defendants argue that, regardless of an expert's qualifications or the reliability of their methodology, the Court should categorically exclude any expert testimony offered to establish substantial similarity.

An "ordinary lay observer" standard governs substantial similarity, and the determination of substantial similarity is therefore "solely for the trier of fact." Computer Assoc. Int'l v. Altai, 982 F.2d 693, 713 (2d Cir. 1992). For that reason, the "well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar." Id. An exception exists only for "highly complicated and technical subject matter," because such matters can be "somewhat impenetrable by lay observers." Id. Lay observers can easily understand the young adult paranormal romance novels at issue in this case. The factfinder – whether the Court or an appropriately selected jury – can grasp books written for middle and high schoolers. Accordingly, permitting expert testimony on substantial similarity would violate the "ordinary lay observer test" and would usurp, rather than assist, the trier of fact.

Freeman asks the Court to make an exception, arguing that the Court should permit expert testimony on substantial similarity to aid the factfinder's hefty task of reading thousands of pages. Freeman does not cite a single instance of a court using volume, rather than complexity, to justify allowing expert testimony on substantial similarity. Instead, Freeman argues more generally that expert testimony "is frequently admitted where it streamlines the evidence and help jurors avoid confusion especially when dealing with voluminous evidence."

ECF No. 346, Plaintiff's Motion *in Limine* Opposition ("Pl. Exp. Opp.") at 3. For many types of claims, expert testimony can streamline evidence without usurping the factfinder and veering from the legal standard. For copyright claims, however, permitting expert testimony only to "streamline" otherwise understandable evidence would disturb the ordinary lay observer test. The Court therefore excludes all expert testimony on substantial similarity.

### C.    Probative and Striking Similarity Experts

Freeman also offers the expert reports of Juola, Chaski, and Reiss to establish probative and striking similarity. ECF No. 283, Plaintiff's Copyright Brief, ("Pl. Copy. Br.") at 15-16.[1] Probative and striking similarity relate to the second element of a copyright infringement claim: actual copying. A plaintiff can establish actual copying by demonstrating: (1) that the defendant had access to the plaintiff's work; and (2) that the similarities between the works are probative of copying. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). But where a plaintiff cannot establish access, actual copying can still be shown if "the works in question are 'so strikingly similar as to preclude the possibility of independent creation.'" Id.

Unlike with substantial similarity, a factfinder may consider expert testimony when deciding probative and striking similarity. The Second Circuit Court of Appeals has long held that:

> If there is evidence of access and similarities exist, then the trier of the facts must determine whether the similarities are sufficient to prove copying. On this issue,

---

[1] Confusingly, Freeman states that "Dr. Chaski does not . . . seek to establish striking similarity." Pl. Exp. Opp. at 14. But in the section of Freeman's summary judgment brief titled "Striking Probative Similarity Also Establishes Access," Freeman quotes Chaski's conclusion that "it is virtually impossible that the two works could have been independently created in light of my findings." Pl. Copy. Br. at 15. Given that citation, the Court interprets Freeman as seeking to rely on Chaski to establish probative and striking similarity and considers the admissibility of Chaski's testimony accordingly.

analysis ('dissection') is relevant, and the testimony of experts may be received to aid the trier of the facts. If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result.

If copying is established, then only does there arise the second issue, that of illicit copying (unlawful appropriation). On that issue (as noted more in detail below) the test is the response of the ordinary lay hearer; accordingly, on that issue, 'dissection' and expert testimony are irrelevant.

Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)[2]; see also Repp v. Webber, 132 F.3d 882, 890 (2d Cir. 1997) (holding that the trial court erred by ignoring expert testimony relevant to striking similarity); McDonald v. Multimedia Entm't, Inc., No. 90-cv-6356 (KC), 1991 WL 311921, at *5 (S.D.N.Y. July 19, 1991) ("Evidence admissible on the issue of 'probative similarity' includes expert testimony 'dissecting' the two works and discussing the works' relationships to other earlier works, for the purpose of illuminating whether similarities between the two works are more likely due to copying or independent creation.").

The Defendants argue that the Court should exclude expert testimony on probative and striking similarity because the subject matter is not technical, enabling a factfinder to decide the issue without the aid of expert testimony. But courts in the Southern District have permitted expert testimony on probative and striking similarity in non-technical infringement cases. See, e.g., Bunick v. UPN, No. 06-cv-2833 (RMB)(HBP), 2008 WL 1968305 (S.D.N.Y. Apr. 30, 2008) (considering expert testimony when deciding whether two television scripts shared

_____

[2] The Court of Appeals has since stated that the "days of Arnstein v. Porter are behind us." Maxtone-Graham v. Burtchaell, 803 F.2d 1253, n.5 (2d Cir. 1986) (cleaned up). But that comment referred only to Arnstein's discussion of the summary judgment standard, not expert testimony. Since Maxtone-Graham, the Court of Appeals has reaffirmed Arnstein's relevant holding on expert testimony. See Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992).

striking similarities); Muller v. Twentieth Century Fox Film Corp., 794 F. Supp. 2d (S.D.N.Y. 2011) (acknowledging that expert testimony could be relevant to the striking similarity of screenplays, but excluding the expert testimony because of failure to meet the Daubert factors). The Court therefore declines to find a categorical bar to expert testimony on probative and striking similarity in literary infringement cases.

### i.    Dr. Patrick Juola

Dr. Patrick Juola is a forensic linguist who teaches computer science at Duquesne University. ECF No. 278, Ex. 37, Juola Rep., ¶ 2. Juola has "published numerous journal articles and book chapters on the computational inference of document authorship via the statistical analysis of linguistic features." Id. at ¶ 3. In his expert report, Juola concludes that he would "consider the odds in favor of [*BMR 2011* and the *Crave* series] having a common origin as more than 1000:1." Id. at ¶ 41. Juola reaches this conclusion by: (1) Google searching seven-word sequences shared by *BMR 2011* and the *Crave* series to determine the rarity of those seven-word sequences; (2) using the Google Books Ngram Database ("GBN") to search for commonalities shared by *BMR 2011* and *Crave*, as identified by Freeman's husband; (3) searching the cluster "katm" – related to "Katmai," mentioned in one set of Freeman notes, and "Katmere Academy" in *Crave* – in the "million-word Brown corpus"; and (4) noting that four of the commonalities are not shared by ten "baseline" young adult novels in the same genre as *BMR* and *Crave*.

Freeman fails to establish the reliability of Juola's methodology of using GBN to search short phrases shared by *BMR 2011* and *Crave*. Based on an article cited by Juola and authored by GBN's architects, the platform was designed to "enable us to investigate cultural trends quantitatively." Jean-Baptiste Michel, et al., Quantitative Analysis of Culture Using Millions of

Digitized Books., 331 Science 176 (2010). That article makes no mention of using GBN to identify plagiarism, as Juola uses it here. Neither Freeman nor Juola cites a single article, study, test, or case using GBN to identify plagiarism. The only reference to using GBN in this context comes from a law review article published by Juola himself, where he writes only that GBN "can be consulted to confirm not just whether a usage is rare, but exactly how common or rare it is in natural language." Janet Ainsworth & Patrick Juola, Who Wrote This?: Modern Forensic Authorship Analysis as a Model for Valid Forensic Science, 96 Wash. U. L. Rev. 1161, 1183 (2019). To support that statement, Juola cites Quantitative Analysis of Culture Using Millions of Digitized Books. But as explained above, that article only explains that GBN can be used to identify cultural trends.[3]

In his report, Juola argues that this methodology meets Daubert's requirements because "this technique has been extensively tested" and because "there is an extensive history of peer review and publication dating back to the 1960s." Juola Rep., ¶ 40. That claim cannot possibly apply to Juola's GBN methodology because Google only introduced GBN in 2010. Juola seems to mean that the field of stylometry – or the field of authorship attribution – is established and well-studied; Juola adds that "Google Scholar lists more than 8,000 publications including the word 'stylometry' in its catalog." Id. at ¶ 41. The Court does not question the legitimacy of stylometry generally, but the Daubert factors require the reliability of the *specific* methodology

---

[3] Notably, a feature of GBN lends itself more readily to the identification of cultural trends than plagiarism: GBN only produces hits for phrases that appear "at least 40 times in the corpus." Jean-Baptiste Michel, et al., Quantitative Analysis of Culture Using Millions of Digitized Books., 331 Science 176 (2010).

used by the expert, not the reliability of an entire field of study. For example, physics is a well-studied field, but not every methodology that uses some physics principles will automatically qualify as reliable.

Freeman therefore fails to demonstrate any of the factors that would establish the reliability of Juola's GBN methodology. She provides no evidence that Juola's GBN methodology can be, or has been, tested; she does not demonstrate that the methodology has been "subjected to peer review or publication"; Juola does not comment on the "known or potential rate of error" of his GBN methodology; and Freeman does not establish that anyone has ever applied this methodology outside of this case, let alone that the methodology has gained "general acceptance" in the fields of forensic linguistics or stylometry. Daubert, 509 U.S. at 593-94. Freeman therefore fails to establish the reliability of using GBN to identify plagiarism, as is her burden. Because Freeman fails to establish the reliability of Juola's methodology, and his "conclusions were not supported by other studies," the Court excludes the GBN-related portion of Juola's report. Coning v. Bayer Pharma AG, 982 F.3d 113, 124 (2d Cir. 2020); see also Mowry v. Viacom Int'l, Inc., No. 03-cv-3090 (AJP), 2005 WL 1793773, at *46 (S.D.N.Y. July 29, 2005) (excluding expert testimony because the plaintiff cited no cases of any other expert applying the methodology, and the methodology did not otherwise meet the Daubert factors).

Next, Juola searched the cluster "katm" in the Brown corpus to establish its rarity. In Freeman's materials, the "katm" cluster appears in just one set of notes. See ECF No. 276, Freeman Ex. 3. In the Crave series, the students attend a magical boarding school named "Katmere Academy." Juola writes that the Free Dictionary "identifies only five words with this cluster," and that the cluster "does not appear anywhere in the million-word Brown corpus."

10

Juola Rep., ¶ 34. Based on this, Juola concludes that "the probability of this cluster appearing in both *BMR* and *Crave* is .213 (21.3%), which is unlikely-but-not-incredible." Id. at ¶ 35. But Juola ignores a crucial fact: both stories are set in Alaska, a state hosting a real national park named Katmai.[4] Juola therefore should be asking about the probability of two works *set in Alaska* both containing the "katm" cluster, rather than two works generally. Because Juola does not account for this important context when calculating probabilities, his conclusion undoubtedly misrepresents the probability of the parties' works sharing the "katm" cluster.

Finally, Juola "confirmed" the reliability of his first three methodologies by taking four phrases "shared" by the at-issue works – "tree stump seats," "Stonehenge lite," "air as I try to," and "katm" – and observing that none of the four phrases appears in ten "baseline" novels in the same genre as *BMR* and *Crave*.[5] Id. at ¶¶ 15, 36-37. Juola reasons that, because these four phrases appear in both Freeman's work and Wolff's work, but do not appear in the ten "baseline" novels, he can reject the hypothesis that the phrases reflect genre conventions.[6]

Problematically, Freeman's counsel selected the ten "baseline" novels for Juola. ECF No. 322, Ex. A, Juola Tr. 259:5-260:6. This undermines the notion that the novels constitute a representative baseline for the genre. Freeman's counsel has every incentive to select ten novels in the genre that are relatively dissimilar to *BMR* and *Crave*. Further, Freeman's counsel can

---

[4]  The Court takes judicial notice of this fact. "Official government maps have long been held proper subjects of judicial notice." Gov. of Canal Zone v. Burjan, 596 F.2d 690, 693 (5th Cir. 1979). The Defendants link to a National Park Service government webpage that includes an official map of Katmai National Park in Alaska.

[5] The Court notes that "Stonehenge lite" does not actually appear in any of Freeman's works.

[6] As explained above, this method of "confirmation" fails to account for words that appear in both works because of shared setting, rather than genre conventions.

consult with Freeman to ask which works influenced her most when writing *BMR* in order to exclude those novels from the "baseline" selection. Counsel's selection of the novels therefore embeds bias into Juola's "confirmation" method. Accordingly, the Court excludes this portion of Juola's report as unreliable. U.S. Info. Sys. v. IBEW Local Union No. 3, 313 F. Supp. 2d 213, 217, 233 (S.D.N.Y. 2004) (excluding expert testimony because the plaintiffs "failed to demonstrate that the data set upon which [the expert's] analysis was based was unbiased" and noting that "the reliability of any analysis depends upon an unbiased selection of sample data").

The Court, therefore, excludes Juola's report in its entirety.

### ii.    Dr. Carole E. Chaski

Dr. Carole E. Chaski is a forensic linguist with decades of experience. ECF No. 315, Ex. 5, Chaski Rep., ¶¶ 21-23. Like Juola, Chaski used forensic linguistics to quantify the similarities shared by *BMR* and *Crave*. Specifically, Chaski focused on whether the similarities indicate "conceptual plagiarism" (essentially, advanced paraphrasing).[7] Id. at ¶ 5. To do this, Chaski selected 35 "keywords" "based on the similarities of plot, character, and setting outlined in the complaint." Id. at ¶ 23(e). Chaski then "calculated the way that the 35 keywords operate" in the *Crave* series, Freeman's six *BMR* manuscripts, and the same ten baseline novels used by Juola. Id. at ¶ 10. Specifically, Chaski calculated the "lexical overlap rates" for the 35 keywords. A high lexical overlap rate indicates that the authors "put the keyword with similar companion words." Id. at ¶ 11. Chaski concluded that, for 31 of the 35 keywords, Freeman and Wolff had

---

[7] Chaski also opines on "copy-paste plagiarism" (word-for-word copying) and "mosaic plagiarism" (paraphrasing), but Freeman no longer seeks to rely on those portions of Chaski's report. Pl. Exp. Opp. at n.5.

the highest lexical overlap rate – or used the keywords more similarly – than for any of the ten baselines authors. Id. at ¶ 120. Based on this, Chaski concluded that "it is virtually impossible that the two works could have been independently created." Id. at ¶ 135. Chaski's report suffers from three major problems: (1) she did not differentiate between different versions of *BMR*; (2) as with Juola's report, Freeman's counsel selected the ten baseline novels; and (3) Chaski selected the 35 keywords based on Freeman's complaint.

To prove "actual copying," Freeman must establish probative or striking similarity *for each distinct BMR* manuscript and set of notes. If Freeman fails to establish probative or striking similarity for a specific Freeman work, then that work cannot be considered at the substantial similarity stage. Chaski's analysis groups together all six *BMR* manuscripts and treats them as one large work. She then concludes that, as a whole, the *BMR* manuscripts are strikingly similar to the *Crave* series.

To illustrate the problem: Chaski reports that the word "Diego," as used in *BMR* in the aggregate, shares a higher "lexical overlap rate" with the *Crave* series than with any of the ten baseline authors. Chaski uses this finding to support her conclusion that *BMR* and *Crave* share meaningful similarities. But the word "Diego" does not appear once in *BMR 2013*, meaning that Chaski's Diego-related finding would not be relevant to whether the Defendants had access to that iteration of *BMR*. Her report misleadingly implies otherwise. Chaski's decision to aggregate Freeman's works therefore eliminates her report's utility for determining access to each specific *BMR* manuscript. For that reason, her report would not assist the trier of fact with the task of

evaluating striking or probative similarity and is excluded on that basis alone. Nimely, 414 F.3d at 396-97.

Freeman seeks to cure this issue by submitting a supplemental affidavit from Chaski. ECF No. 336, Chaski Supplemental Declaration ("Chaski Supp. Decl."). In her supplemental affidavit, Chaski explains that excluding from her analysis the two most recent *BMR* versions – *BMR 2014* and *BMR 2016* – would not change her conclusions about the works' similarities. Id. at ¶ 4. This, however, does not actually cure the issue. Freeman has to establish access for each *BMR* material, not *BMR 2014*, *BMR 2016*, and everything else in the aggregate. Accordingly, even if Chaski removes *BMR 2014* and *BMR 2016*, her report still unreasonably groups together the first four *BMR* versions.[8]

Separately, Chaski uses the same ten "baseline" novels used by Juola and selected by Freeman's counsel. ECF No. 322, Ex. B, Chaski Tr., 39:11-16. Chaski's entire conceptual plagiarism relies on comparing the lexical overlap rates between Freeman's manuscripts and Wolff's series to those ten novels. As is explained above, counsel's selection of the baseline

---

[8] Even if Chaski's supplemental affidavit could cure the issues in her expert report, the supplemental affidavit would be inadmissible as untimely. An expert may supplement a report only when "the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate." Anthem, Inc. v. Express Scripts, Inc., 660 F. Supp. 3d 169, 184-85 (S.D.N.Y. 2023). "To construe supplementation to apply whenever a party wants to bolster its expert opinions would wreak havoc on docket control and amount to unlimited expert opinion preparation." Lewis v. FMC Corp., 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) (cleaned up). Freeman does not argue that Chaski learned any new information that required her to supplement her report. Instead, Freeman offers Chaski's supplemental affidavit to cure issues and add information that should have been included in her initial report.

novels embeds bias into Chaski's analysis and could easily skew Chaski's findings in favor of Freeman. Accordingly, Chaski's report is also excludable on this basis.

Finally, Chaski erred by selecting her 35 keywords based on Freeman's complaint, a document in which Freeman identified specific instances in which she and Wolff used the 35 keywords similarly. One would expect, then, for Freeman and Wolff to use those 35 words more similarly than other authors. The decision to select 35 keywords based on Freeman's complaint therefore seems designed to find that *Crave* and *BMR* share more similarities than other books. As with the issue of the "baseline" novels, this methodological decision improperly embeds bias into the data set and justifies exclusion.

The Court, therefore, excludes Dr. Chaski's report in its entirety.

### iii.    Kathryn Reiss

Kathryn Reiss is an "award-winning author of twenty novels for children and young adults" who teaches English and creative writing at Mills College. ECF No. 278, Ex. 36, Reiss Rep., ¶ 1. In contrast to Juola and Chaski, Reiss took a qualitative approach to analyzing striking and probative similarity. She simply read the works, "took copious notes whenever [she] came across examples of similarities that went beyond genre convention or trope," and "drew on [her] knowledge and experience as a writer and professor to eliminate similarities which were the result of genre conventions and tropes." Id. at ¶¶ 7-8.

The Defendants argue that Reiss ignored relevant differences between the parties' works. Freeman claims that this is a non-issue, arguing that the purpose of "Reiss's testimony is to identify the similarities *not* attributable to trope or genre convention, so it would make no sense to address either differences or similarities attributable to tropes." Pl. Exp. Opp. at 6. Freeman,

however, mischaracterizes Reiss's testimony. Reiss does not simply list similarities; rather, she concludes that "the similarities are so striking as to preclude the possibility of independent creation." Reiss Rep., ¶ 228. One cannot rationally reach this conclusion without comparing a works' differences and similarities. See, e.g., Klauber Bros. v. M.J.C.L.K., LLC, No. 21-cv-4523, 2022 WL 5108902, at *17 (S.D.N.Y. Oct. 4, 2022) (finding no striking similarity because "the works reflect several significant differences with respect to elements, arrangement, and overall layout"). Exclusion of expert testimony "is warranted where the expert fails to address evidence that is highly relevant to his or her conclusion." Acetaminophen, 2023 WL 8711617, at *53. Because Reiss does not identify or discuss the differences between the works, which are highly relevant to her conclusion on striking similarity, the Court excludes her report.

Insofar as Freeman plans to use Reiss's testimony to establish probative – rather than striking – similarity, Reiss offers no particular expertise. Expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Reiss's "specialized knowledge" relates to identifying which similarities stem from tropes or genre conventions, and which stem from original elements. But when evaluating probative similarity, the factfinder should consider "the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994). Unlike with substantial similarity, then, the factfinder may use trope-based similarities in deciding whether two works are probatively similar. Absent the need for an explanation of trope-based similarities, Reiss's report simply compares the works' similarities as a jury would. "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of

16

understanding on his or her own." <u>United States v. Mejia</u>, 545 F.3d 179, 194 (2d Cir. 2008).

Because, absent her trope-based expertise, Reiss's report simply makes "observation[s] that

jurors could make as easily," she "usurp[s] the jury's role" on probative similarity. <u>Chapman v.

Universal Motown Records Grp.</u>, No. 08-cv-3255 (LAP), 2010 WL 517480, at *3 (S.D.N.Y.

Feb. 4, 2010). Accordingly, Reiss's delineations about whether similarities relate to trope

provide no assistance to the trier of fact at the probative similarity stage.

 Finally, even if Reiss's testimony were not excludable for the above reasons, it would

still be unreliable. To the extent that Reiss employs any methodology, it consists of separating

out trope or genre-based similarities from other similarities. But throughout Reiss's report, she

enumerates many similarities that are plainly genre conventions and tropes but fails to identify

them as such. For example, Reiss identifies as a notable similarity that in both works, the

romantic lead and the heroine "heal one another through their love, and he believes they have a

special bond, that they are mates, and that she is the only one for him." Reiss Rep., ¶ 35(c).

Similarly, Reiss notes that the *BMR* and *Crave* heroines both find the romantic leads to be

"mysterious, dangerous, and alluring." <u>Id</u>. at ¶ 42. Any reasonable person would recognize these

similarities as paradigmatic young adult romance genre conventions, but Reiss fails to identify

them accordingly, significantly reducing the reliability of her report.

 Like with Chaski, Freeman seeks to save Reiss's testimony by introducing a

supplemental affidavit explaining that excluding *BMR 2014* and *BMR 2016* from her analysis

would not alter her conclusions about similarity. Because the Court excludes Reiss's testimony

for reasons unrelated to aggregation, her supplemental affidavit does not cure the identified issues.[9]

The Court, therefore, excludes Reiss's report in its entirety.

### iv.    Rebuttal Experts

The Defendants offer expert testimony from Dr. Malcolm Coulthard to rebut the testimony of Juola and Chaski, as well as testimony from Emily Easton to rebut Reiss's testimony. Because the Court excludes the reports of Juola, Chaski, and Reiss, the rebuttal reports of Coulthard and Easton are unnecessary and therefore also excluded.

### D.    State Law Experts

Freeman seeks to introduce expert testimony from Christine Witthohn to establish motive for her breach of contract and breach of fiduciary duty claims.[10] She also seeks to introduce expert testimony from Marlene Stringer and Eric Ruben to establish that literary agents owe their clients fiduciary duties. The Defendants offer testimony from Rose Hilliard to rebut Witthohn's and Stringer's reports. In my separate report and recommendation, I recommend granting the Defendants' motion for summary judgment on Freeman's breach of contract and breach of

---

[9] Like Chaski's report, Reiss's report discusses *BMR* in the aggregate. But the problem does not reach the severity of Chaski's because she cited each specific *BMR* version throughout her report, allowing a factfinder to piece together which *BMR* versions share which similarities with *Crave*. Because the Court excludes Professor Resiss's testimony on several other bases, the Court does not need to decide whether Reiss's level of aggregation requires exclusion.

[10] The Court's understanding is that Freeman does not seek to use Witthohn's report to establish that the Defendants had a motive to commit copyright infringement. But in the event that the Court misunderstands Freeman's position, the Court clarifies that she cannot use evidence of motive to prove copyright infringement liability. Louissier v. Universal Music Group, Inc., No. 02-cv-2447 (KMW), 2005 WL 5644420, at *5, n.1 (S.D.N.Y. Aug. 30, 2005) (excluding evidence relevant to intent because "a defendant's motive, intent or knowledge are not elements of proof of defendant's liability in a copyright action").

fiduciary duty claims for reasons unrelated to motive or the scope of a literary agent's fiduciary duties. Accordingly, if Judge Stanton adopts my recommendations as to those claims, the motions *in limine* as to Witthohn, Ruben, Stringer, and Hilliard will be moot. If Judge Stanton declines to adopt my recommendation and denies the Defendants' motion for summary judgment on the breach of contract and breach of fiduciary duty claims, I will revisit the parties' motions *in limine* to decide the admissibility of affirmative and rebuttal experts on state law issues.

### E.    Metadata Experts

The parties dispute whether Freeman ever sent Kim three *BMR* drafts. The Defendants argue that Freeman did not, and they cite a declaration from defense counsel CeCe Cole in support. Based on Cole's review of metadata, the creation dates of those three *BMR* versions post-date the Kim-Freeman professional relationship. ECF No. 300, Cole Decl., ¶¶ 16-20. Cole explains that, superficially, the metadata shows that all three drafts "were created in or after June 2021, likely in connection with document production in this case." Id. at ¶ 16. She then explains that she found the "native" versions of the documents "provided as deposit copies in connection with her copyright registrations." Id. at ¶ 17. Based on the metadata in the "native" versions, all three *BMR* versions were created after Kim and Freeman stopped working together. To rebut Cole's declaration, Freeman offers an affidavit from Ron Kaplan, an information technology consultant. Kaplan explains that Microsoft Word's "save as" function changes the "creation" date reflected in the metadata. ECF No. 333, Kaplan Decl., ¶ 6.

The Defendants ask the Court to exclude Kaplan's affidavit as undisclosed expert testimony. Freeman responds that if the Court excludes Kaplan's affidavit for that reason, it should exclude Cole's report for the same reason. But Kaplan's report constitutes expert

testimony, while Cole's does not. Under Federal Rule of Civil Procedure 701, lay witnesses may only testify to matters that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." In her affidavit, Cole describes her perception of the metadata in the relevant documents, based on her own review. Although Cole did rely on some specialized knowledge to review the metadata, a "witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony expert as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." United States v. Rigas, 490 F.3d 208, 224 (2d Cir. 2007) (cleaned up). Because Cole's declaration relied only minimally on specialized knowledge, the Court categorizes her testimony as lay testimony.

On the other hand, Kaplan's testimony relies only on the specialized knowledge he has gained as an information technology consultant. He does not testify about any matters based on his own perception; he never claims to have viewed the metadata in the at-issue documents. Accordingly, the Court categorizes his affidavit as expert testimony. In violation of Rule 26(a), Freeman did not disclose Kaplan's affidavit by the deadline set by the Court.[11] Under Rule 37, exclusion can be the proper sanction for a Rule 26(a) violation. To determine whether exclusion is appropriate, the Court must consider: "(1) the party's explanation for the failure to comply

---

[11] Freeman does not argue that the Defendants failed to timely disclose Cole's metadata-related testimony. Accordingly, Freeman has no excuse for failing to disclose Kaplan's affidavit during expert discovery.

with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) (cleaned up). Those factors support excluding Kaplan's affidavit. Freeman fails to provide any explanation for failing to timely disclose Kaplan's testimony. The "save as" testimony does not significantly move the needle on the question of whether Freeman provided Kim the reports, because Freeman could have sent Kim the manuscripts after they stopped working together. Further, in the absence of a continuance, Freeman's late disclosure deprives the Defendants of the ability to depose Kaplan. Accordingly, the Court excludes Kaplan's affidavit but does not exclude Cole's.

Freeman also argues that "Kaplan's declaration relates to a ministerial fact that is not subject to reasonable dispute." The Court does not classify the innerworkings of Microsoft Word metadata as "ministerial" and accordingly rejects this argument.

## II.    Motions to Strike

### A.    Similarity Indexes

The parties dispute whether Freeman can rely on 14 "similarity indexes." Combined, the indexes comprise hundreds of pages of lists of the purported similarities between Freeman's works and the *Crave* series. The Defendants ask the Court to strike these indexes and all Rule 56.1 paragraphs citing to them.

The Defendants argue that Freeman's lists constitute undisclosed lay or expert testimony, but the Court disagrees. The lists are more appropriately classified as argument, rather than evidence. The lists simply draw from, recategorize, and reorganize portions of *actual* evidence:

the at-issue works. Freeman, too, seems to understand the lists as argument rather than evidence, because she did not disclose the lists during fact or expert discovery. Accordingly, in the Court's view, the lists egregiously violate the briefing limits set by the Court. It is within the Court's "inherent discretion to strike excessive pages," but the Court also holds "reciprocal discretion to waive page limits." Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC, No. 13-cv-1275 (DRH) (ARL), 2017 WL 1194499, at *10 (E.D.N.Y. Mar. 30, 2017); see also Perez v. United States Immigration & Customs Enforcement, No. 19-cv-3154 (PGG) (JLC), 2020 WL 5362356, at *9 (S.D.N.Y. Sept. 8, 2020) (declining to strike summary judgment memorandum of law that exceeded the page limits set by the Court). In Perez, the Court decided to deny the defendants' motion to strike because it found that the plaintiff had not filed the seven excess pages in bad faith. In other words, the plaintiff in that case "did not act with the intention of gaining an unfair advantage through his violations or otherwise benefit from the excess pages in his memoranda." Perez, No. 19-cv-3154 (PGG) (JLC), 2020 WL 4557387, at *4 (S.D.N.Y. Aug. 6, 2020), R. & R. adopted, 2020 WL 5362356, at *12 (S.D.N.Y. Sept. 8, 2020).

In the Court's view, Freeman filed the similarity indexes to gain an unfair advantage over the Defendants. Permitting them would grant Freeman hundreds of additional pages of argument. The Defendants could have filed hundreds of pages of lists describing the differences between the at-issue works, but they did not because they followed the Court's orders. Additionally, Freeman's indexes contain numerous frivolous similarities, further evincing bad faith. For example, Freeman points out that in both works: the authors use the phrases "the whooshing sound," "will be moot," and "crooked grin"; the heroine breathes and her heart pounds; the romantic lead is "hot" and is the heroine's boyfriend; and the villain disgusts the heroine. ECF

No. 276, Ex. 49, *Court* Language Index, at 14, 21; Ex. 46, *Crave* Language Index, at 20; Ex. 38, Heroine Index, at 15, 20; Ex. 40, Romantic Lead Index, at 3, 9; Ex. 43, Villain Index at 11. These similarities, along with many others identified by Freeman, are shared by hundreds of other novels and hold little probative value. Because Freeman filed the similarity indexes in bad faith, the Court strikes them.

Striking the indexes should not meaningfully prejudice Freeman because even when courts do consider plaintiff-compiled lists of similarities, such lists are afforded minimal weight. Courts reason that such lists are "inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'" Williams v. Crichton, 84 F.3d 581, 590 (2d Cir. 1996) (citing Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984)). In Freeman's lists, she editorializes, arbitrarily highlights "similarities" in various colors, and uses ellipses to omit massive amounts of relevant text, distorting "similar" passages. Accordingly, even if the Court had decided to consider Freeman's indexes, it would have afforded them little weight.

In Freeman's statement of undisputed facts, she repeatedly cites her inadmissible similarity indexes. Under Local Rule 56.1, a party must only cite to "evidence which would be admissible." Local Rule 56.1(c). The Court therefore strikes all paragraphs in Freeman's Rule 56.1 statement that rely solely on her inadmissible similarity indexes. This, too, should not significantly prejudice Freeman because the Court has decided probative, striking, and

substantial similarity based on the works themselves, not the parties' contrary descriptions of the works.

### B.    Freeman's Additional Material Facts

When Freeman countered the Defendants' statement of undisputed facts, she also tacked on about 64 pages of "additional material facts." ECF No. 332. Under Local Rule 56.1(b), a party may add to their counterstatement only "additional material facts as to which it is contended that there exists a genuine issue to be tried." Freeman's additional facts relate to the similarity between the parties' works, a topic raised in her affirmative motion for summary judgment and discussed in her initial statement of undisputed facts. In Freeman's opposition to the Defendants' summary judgment motion, Freeman cites her additional facts to argue that the Court should grant her summary judgment; she does not argue that similarity is in dispute and should be decided by a jury. It is clear, then, that Freeman does not contend that the additional facts are in dispute, rendering the additional facts improper under Rule 56.1. Freeman should have, and could have, included the additional facts in her initial statement of undisputed facts. The Court therefore strikes Freeman's additional facts.

### D.    *Tempest Rising* Evidence

Freeman asks the Court to strike paragraphs 26 to 30 of Defendant's statement of undisputed facts. Those paragraphs all relate to *Tempest Rising*, a prior work of Wolff's. In the parties' summary judgment briefing, *Tempest Rising* is relevant only to the Defendants' claims of independent creation. As explained in my report and recommendation, the Court should not, at this juncture, decide whether the Defendants have established the affirmative defense of independent creation. Accordingly, I do not rely on paragraphs 26 to 30 of the Defendants'

statement of undisputed facts in the report and recommendation, and I accordingly do not need to decide whether to strike those paragraphs.

## III.    Sealing

The parties previously requested that the Court seal various summary judgment exhibits. The Court granted the parties' requests on an interim basis but noted that it may reconsider their applications when deciding the summary judgment motions. ECF No. 286. The documents currently under seal fall into two categories: (1) documents deemed confidential by the Defendants and filed under seal pursuant to a stipulated protective order; and (2) Freeman's manuscripts and notes. The parties' disputes over sealing primarily relate to the second category.

"The common law right of public access to judicial documents is firmly rooted in our nation's history." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006). This strong presumption of access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). Documents are considered "judicial documents" if they are "relevant to the performance of the judicial function and useful in the judicial process." Brown v. Maxwell, 929 F.3d 41, 49 (2d Cir. 2019) (citation omitted). The presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion, such as a motion for summary judgment. Id. at 50.

Freeman's manuscripts and notes are highly relevant to the Court's decision on the parties' cross-motions for summary judgment. In fact, aside from Wolff's *Crave* series, Freeman's *BMR* materials are the documents *most* central to the issues before the Court. The Court relies on the *BMR* materials to make recommendations about both probative and striking

similarity. The Court therefore considers Freeman's materials judicial documents with the highest presumption of public access.

After finding that documents are judicial documents to which the common law presumption of access attaches, courts must "balance competing considerations against" that presumption. Lugosch, 435 F.3d at 120 (citation omitted). The sealing of judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Id. at 124. The interests in favor of non-disclosure can include "the privacy interests of those resisting disclosure." Walker v. City of New York, No. 15-cv-500, 2017 WL 2799159, at *6 (E.D.N.Y. June 27, 2017); In re United States for Material Witness Warrant, No. 19-cv-447, 2020 WL 3959208, at *3 (S.D.N.Y. July 13, 2020) (citations omitted). The moving party must make a "particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." Ashmore v. CGI Grp. Inc., 138 F. Supp. 3d 329, 351 (S.D.N.Y. 2015), aff'd, 923 F.3d 260 (2d Cir. 2019).

The Court recognizes that Freeman holds a privacy interest in her manuscripts and notes. Nevertheless, the right of public access far outweighs Freeman's privacy interest. When initially briefing the issue, Freeman identified two specific injuries that could flow from unsealing her manuscripts: an increased risk of other authors infringing her work and "diminished creative control" over the publication of her work. The Copyright Act, however, protects unsealed work with equal force as sealed work. Unsealing would not "undermine the entire goal of copyright law," as Freeman argues, because she can still sue for copyright infringement after the Court unseals her manuscripts. And any "diminished creative control" over future publication of

26

Freeman's work flows naturally from her choice to file a public lawsuit litigating the substance of her work.

The parties now report that the case is garnering attention on social media, and Freeman puts forth new concerns about unsealing. She argues that social media posts siding with the Defendants "have already caused her substantial harm and prejudiced the jury pool against her," and that unsealing her manuscripts would only worsen both problems.[12] ECF No. 360 at 3. But Freeman does not specify the harm the social media posts have caused her, and the Court does not agree that the social media posts would hinder jury selection; courts in this district have successfully selected impartial juries in many higher-profile cases with more controversy.

In the Court's view, the case's newfound social media attention only strengthens the need for public access. To ensure the public's "confidence in the administration of justice," the public should have Freeman's manuscripts, which are materials central to today's decisions. Lugosch, 435 F.3d at 119 (citing United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)). The public generally, and Wolff's fans particularly, have a right to look at Freeman's books to consider, for themselves, the validity of her publicly filed accusations. This is especially true in light of the reputational harm faced by Kim and Prospect. Accordingly, the Court orders the unsealing of Freeman's manuscripts and notes.

Freeman argues in the alternative that if the Court unseals her manuscripts, it should also unseal Wolff's unpublished early drafts and "the voluminous text messages" produced by the

---

[12] Freeman's letter also alleges that the Defendants started this social media controversy and speculates about the Defendants' specific tactics and related expenses. None of these arguments are relevant to the Court's analysis under Lugosch.

Defendants. ECF No. 360 at 4. This kind of tit-for-tat unsealing is not consistent with <u>Lugosch</u>; instead, what matters is whether materials qualify as judicial documents, and whether any interests overcome the presumption of public access. Freeman does not cite to which specific exhibits she wants unsealed, and she does not explain why these materials qualify as judicial documents under <u>Lugosch</u>. The Court does not rely on any early Wolff drafts in either of the decisions it issues today, and accordingly, such drafts do not qualify as judicial documents.

Several text messages, however, do qualify as judicial documents. Doniger Exhibit 15 contains text messages central to the Court's conclusion that access is in dispute, and the Court cites those text messages in its report and recommendation. Additionally, Doniger Exhibits 5, 6, 11, 18, and 20 contain text messages related to the *Crave* writing process, and particularly, Kim's role. Because the question of Kim's involvement in *Crave*'s authorship is discussed in my report and recommendation, and those texts messages are relevant to that question, those sets of text messages also qualify as judicial documents. Additionally, the Court relies on Doniger Exhibit 4, Wolff's deposition transcript, to conclude that access is in dispute, rendering that transcript a judicial document. In large part, the text messages and Wolff's deposition transcript discuss non-confidential matters relevant Freeman's claims, and accordingly, the Court identifies no interests outweighing the presumption of public access. To the extent that these materials mention personal and irrelevant information, like Wolff's finances, the parties should redact that confidential information consistent with their protective order.

The Court ORDERS the parties to file unredacted versions of Freeman's manuscripts and notes, the relevant text messages, and Wolff's deposition transcript by August 9, 2024.

**CONCLUSION**

The Court STRIKES the affirmative expert testimony of Dr. Patrick Juola, Dr. Carole E. Chaski, Professor Kathryn Reiss, and the rebuttal testimony of Dr. Malcolm Coulthard, Emily Easton, and Ron Kaplan. The Court reserves decision with respect to the parties' requests to exclude the testimony of Christine Witthohn, Eric Ruben, Marlene Stringer, and Rose Hilliard, pending the Court's decision on whether to adopt my recommendations regarding Freeman's state law claims. Additionally, the Court GRANTS the Defendants' motion to strike Freeman's similarity indexes and additional statement of facts, DENIES Freeman's motion to seal her manuscripts, notes, text messages, and Wolff's deposition transcript, and otherwise GRANTS the parties' motions to seal. By August 9, 2024, the parties shall file unredacted versions of Freeman's manuscripts and notes, Wolff's deposition transcript, and the relevant text messages (currently under seal at: ECF No. 277, Freeman Exhibits 3-11 and 14-19; ECF No. 301, Cole Exhibits E, F, and CC; and ECF No. 279, Doniger Exhibits 4-6, 11, 15, 18, and 20).

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 297, 309, 314, and 321.

**SO ORDERED.**

_____

SARAH NETBURN
United States Magistrate Judge

DATED:    August 1, 2024
           New York, New York