UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------:
LYNNE FREEMAN,
an individual, : Docket No.: 22-cv-02435

Plaintiff, :

v. :

Tracy Deebs-Elkenaney,
et al., : New York, New York

: June 5, 2025

Defendants. :
-----------------------------:

PROCEEDINGS BEFORE
THE HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: REEDER MCCREARY
BY: MARK D. PASSIN, ESQ.
11766 Wilshire Boulevard
Suite 1470
Los Angeles, California 90025

DONIGER / BURROUGHS
BY: STEPHEN M. DONIGER, ESQ.
603 Rose Avenue
Venice, California 90291

For Defendant: (Deeb-Elkenaney) KOWERT, HOOD, MUNYON, RANKIN & GOETZEL, P.C
BY: DWAYNE K. GOETZEL, ESQ.
1120 S. Capital of TX Highway
Building 2, Suite 300
Austin, Texas 78746

APPEARANCES:

For Defendant: (Kim, et al.)

KLARIS LAW, PLLC
BY: LACY H. KOONCE, III, ESQ.
161 Water Street, Suite 904
New York, New York 10038

TROYGOULD
BY: AMY LEE NASHON, ESQ.
1801 Century Park East, Suite 1600
Los Angeles, California 90067

Transcription Service: Marissa Lewandowski
Phone: (631) 813-9335
E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE COURT: Good morning, everybody. This is Judge Netburn. Thank you for accommodating my late schedule. This case is Freeman v. Deebs-Elkenaney, et al. The docket number is 22-Civil-2435.

Who do we have on the phone on behalf of the plaintiff?

MR. PASSIN: Good morning, Your Honor. Mark Passin of Reeder McCreary on behalf of plaintiff Lynne Freeman.

MR. DONIGER: Steve Doniger. Doniger/Burroughs is here as well.

THE COURT: Thank you. And between the two of you, who's going to take the lead?

MR. DONIGER: So this is Steve Doniger, Your Honor. I'll be arguing regarding the copyrightability hearing. And then Mr. Passin, Mark, will be addressing the request for the discovery hearing.

THE COURT: Okay. And who do we have on the lines for Ms. Deebs-Elkenaney?

MR. GOETZEL: Good morning, Your Honor. This is Dwayne Goetzel on behalf of Tracy Deebs.

THE COURT: Thank you. And on behalf of Kim Prospect Agency, et al?

MR. KOONCE: Good morning, Your Honor. Lacy Koonce with Klaris Law.

THE COURT: Anybody else on the line?

MS. NISHAN: This is Amy Nishan, Your Honor, appearing on behalf of the defendants and, in particular, Entangled Publishing and Holtzbrinck Publishers.

THE COURT: Thank you. Anybody else on the line want to state their appearance?

Great. All right, so I --

MR. PASSIN: Your Honor, may I please point out that plaintiff Lynne Freeman and her husband, Trent Baer, are dialing in. I know they didn't have the dial-in number. I just sent it to them.

THE COURT: Understood. Thank you. This is obviously --

MR. KOONCE: And along the same -- sorry, Your Honor.

THE COURT: Go ahead.

MR. KOONCE: Ms. Kim is also on the line, I believe.

THE COURT: Thank you. All right. If I can just add --

MS. NISHAN: I believe Wendy McMillan is as well. I apologize.

THE COURT: Okay, anybody else want to state their appearance?

Great. Okay. So in preparation for today's conference, I have a letter from plaintiff dated May 8th, requesting trial deadlines and discovery deadlines. There's a response letter on May 14th, which is where the issue of the copyrightability hearing was first raised. I have the May 16th opposition to that from the plaintiff. Then I have plaintiff's letter of May 21st with respect to the discovery issues. I have a short letter on sealing from May 21st from the plaintiffs. And then I have a response letter from the defendants on discovery issues dated May 28th. I hope that that is the full set of the documents folks want me to review for today's conference. Am I missing anything?

MR. PASSIN: Your Honor, this is Mark Passin.

I just want to point out that, I guess, there was a slight confusion on our end and documents that were filed under seal, redacted copies were filed. So we refiled yesterday late some of the exhibits in unredacted form.

THE COURT: Yes, I saw that.

MR. PASSIN: I apologize for that.

THE COURT: Thank you.

All right. So let's start with trial. We have been in touch with Judge Stanton's chambers. It is their intention to have this case tried this year. We don't have a date for that schedule. We reached out again this morning. We expect Judge Stanton to issue an order in the coming days, hopefully, but if not days, then weeks, setting a date for trial. That will be sometime in 2025. So that is, I think, an important reference point as we move forward on some of these other issues. Again, I don't have dates on that, but that is his expectation.

All right. Let's turn next to the issue of the copyrightability hearing, which I think, given that trial is going to be approaching in the coming months, may address some of the concerns that the defendant raised.

Who from the defendants is going to take on this issue?

MS. NISHAN: I will. This is Amy Nishan.

THE COURT: Thank you, Ms. Nishan.

All right. So, you know, I read the *SAS* case, which I think is factually distinguishable,

given that the questions in that case deal with whether or not the type of matter, I guess I'll use that word, is even subject to the copyright law. You know, that dealt with programming and other things far from the literary context that this case deals with. The issue -- the copyrightability hearing, which was held when the judge, in reviewing the summary judgment motions, thought that there were questions about whether or not certain items were even subject to the copyright laws.

In this case, number one, I know there are legal or factual questions about whether or not certain ideas, characters, or tropes are or are not subject to copyright law, but the Court has addressed a lot of that and determined that (indiscernible) to a trial. This doesn't strike me as a case where there's an open question about whether or not something like coding can be subject to copyright law.

Can you explain to me why you think what was done in the *SAS* case is appropriate in this case, both given the subject matter and given the posture of the case?

MS. NISHAN: Absolutely, Your Honor.

So, as a threshold matter, the *SAS* case

involves programming. But that case also makes clear that they are -- those cases are evaluated in the same way as literary works are evaluated. I think so --

THE COURT: Ms. Nishan --

MS. NISHAN: Yes?

THE COURT: Ms. Nishan, sorry to interrupt you.

Can I just ask that everybody else mute their lines? There's some feedback we're getting as a result. And if you don't know -- yes, you can hit star six to mute -- well, no, that's -- is it star six?

MS. NISHAN: I think star six is to unmute yourself actually.

MR. PASSIN: No. Star six muted my phone, I believe, Your Honor, and I just unmuted.

THE COURT: Okay. I think it does both.

Okay. All right. Sorry, Ms. Nishan, go ahead.

MS. NISHAN: Not a problem. So in *SAS*, the Court actually did apply the literary standard in evaluating coding and programming and noted -- you know, that's reflected in discussion that the scope of protection is not constant across all

literary works, et cetera, nor across the elements in a single work, and that copyrightability is a threshold issue for the Court that should not be injected into a jury trial, which the jury trial should be focused on an infringement analysis and not the copyrightability analysis. I think also that in the *SAS* case that they mentioned, this procedure that they -- you know, is admittedly rather new, but it is consistent with the Rules of Civil Procedure and the concept that the Court has discretion to conduct pretrial conferences and case management processes to narrow the issues for trial.

In this case, I think it is uniquely analogous to the *SAS* case because of the scope of material that has been put at issue. This is not a matter like in the *Lewinson v. Henry Holt* case, where you're comparing to children's books. This is a case, as, you know, very well know, involving many, many versions of manuscripts and notes versus, you know, several very lengthy novels, published novels. And the idea that the jury will be tasked with reviewing all of that material and determining not only infringement, but copyrightability as a threshold issue, I think is not only problematic, but inherently very cumbersome. And I think that

this Court has at least seemed to acknowledge previously that there were these threshold issues that would need to be addressed before trial. Whether that's addressed under the guise of a co-copyrightability hearing or simply pretrial briefing to be able to limit the issues and properly prepare the case for trial. I think the underlying analysis and process that was engaged in by the Federal Circuit in that case is instructive here.

THE COURT: So -- thank you, Ms. Nishan.

You know, I'm reading the questions that you presented in the May 28th letter that you filed, which I think, by my light, reflect that pretrial motion practice, or, you know, at least conferences with Judge Stanton about how he wants this case to be tried are absolutely warranted in this case. But the types of questions that you present as justifying what feels to me like basically a summary judgment hearing, you know, don't make sense. I mean, for example, your very first question is, which of Freeman's notes and manuscripts will be presented at trial? I think that is a very real question. I think it's one for Judge Stanton to determine as far as what the jury will be tasked with. But I don't think that's really a question

about whether or not the literary elements at issue here are subject to the copyright law. And again, as the Court ruled in the summary judgment context, a lot of these questions are fact intensive. And so the types of questions that you present to me, those six questions, I think are legitimate questions and make this a sort of complicated case to manage. But I am not sure they justify having what I think would amount to a sort of separate trial before there is the trial before the jury.

MS. NISHAN: I understand your position on that. I do think that, however, that to the extent that these six questions, for example, are determined to be fact issues that are not appropriate for a decision by the Court, I think that that is, in many respects, contrary to Second Circuit law, that some of these issues are threshold ones that the Court should decide before presenting the case to the jury. But in the event that they are reserved for trial, I think it makes absolute sense in that instance to consider a bifurcated trial because I think that these are threshold issues that would be -- not only, if they are resolved, it would certainly limit the burden that is placed on the jury and having to spend,

presumably, weeks sequestered reviewing all of the material. But also would prevent inflation of the issues that are for the jury.

THE COURT: There seems --

MS. NISHAN: I know that early on there was a -- I apologize.

THE COURT: That's okay. Go ahead.

MS. NISHAN: I know that early on there was, I believe, some consideration of bifurcating the issue and there was some concern about the burden on the plaintiff to do that. I do think it's something that should potentially be reexamined if we're not going to be able to resolve these through pretrial briefing or conferences or some other mechanism.

THE COURT: And what would you propose as far as bifurcation?

MS. NISHAN: As far as bifurcation, I think it would make sense to do copyrightability and access prior to a substantial similarity analysis.

THE COURT: I don't disagree on access. I guess I don't -- I don't quite see why having a copyrightability analysis for the jury and then asking them later to go back potentially and do a substantial similarity test would be more efficient.

MS. NISHAN: Well, I think the two things are distinct. The substantial similarity test automatically requires that there has been the filtering that needs to take place prior to considering the protected elements versus the allegedly infringing work. So it's necessarily a stepped process, which, I think, lends itself to bifurcation.

THE COURT: All right. Mr. Doniger, would you like to be heard?

MR. DONIGER: I would, Your Honor. Thank you.

So I'm happy to address any specific questions. But, you know, big picture, defendant's May 14th letter that requested a copyrightability hearing, there's no daylight between what they're arguing and requesting now and what they argued and sought on summary judgment and reconsideration. This really does seem to us like an improper request for reconsideration that's not supported by any authority. There's no such thing as a copyrightability hearing. I mean, to the extent there is, it's summary judgment, which happened in this case. And, you know, was -- there's a motion for a request for reconsideration that was

effectively denied. And, you know, Judge Stanton issued a final ruling after all these arguments were considered, saying that, and I quote, you know, "All questions related to direct copyright infringement, including access, probative similarity, striking similarity, actual copying, independent creation, and unlawful appropriation are best left for trial."

Now, if there's a, you know, a way to bifurcate this case that makes sense, I mean, that's -- I'm happy to discuss that with defense. We can -- I mean, but this is not -- that's a different question that's not really teed up for this hearing. And, you know, certainly we're happy to figure out what makes sense.

But with respect to this copyrightability hearing, you know, I'm not seeing any new arguments. And to the extent there are, summary judgment was the time to raise it if they thought that there were things that were not entitled to copyright protection. Otherwise, they're effectively getting two summary judgment hearings.

And ultimately, this question of -- I think Your Honor's analysis is quite astute. Unlike with coding issues, no one disputes that books are copyrightable subject matter. And my colleague's

filtering argument, you know, is problematic in itself because it also ignores, you know, selection and arrangement, which can be a valid basis for infringement and can include elements that are not independently entitled to copyright protection. If you could -- it's time to get this case set for trial under the order that Judge Stanton issued on summary judgment. And this is all just, you know, a third or fourth attempted bite at the apple that should be rejected.

THE COURT: Thank you, Mr. Doniger.

I appreciate that this is not on the agenda for today's conference, but do you have thoughts about management of this case? Because I do think the questions raised in the May 28th letter by the defendants are well brought. As I've indicated, I don't think the answer is to have a copyrightability hearing for many of the reasons Mr. Doniger has just stated. But I do think there's a real question about how this case gets tried to a jury. And I'm curious if you have thoughts about what it looks like.

MR. DONIGER: You know, I haven't put the thought into that that I would like to before giving a sort of a well-conceived answer, Your Honor.

Yeah, I don't have an answer to that right now.

THE COURT: Okay. I think that that is something that the party should really be thinking about now. Judge Stanton -- it is possible this case will be tried in the next few months, not in December. Again, I don't know what his schedule is, but that was the sense I got in interpreting law clerks speaking to one another about schedules.

MR. DONIGER: Your Honor?

THE COURT: Yes.

MR. DONIGER: So in our May -- as you noted at the beginning, we wrote a May letter to Judge Stanton that in which we noted that your July 26th, 2023 order stayed compliant with Rule 4A of Judge Stanton's individual rules until after summary judgment. We had asked that that stay be lifted and for the Court to set a date certain for the ultimate findings that sacked under Rule 41(a)(1).

I raise that because I think that perhaps the parties going back and forth on the ultimate findings of fact in that process, it may clarify if there's a logical place for bifurcation or something else. So I would sort of revisit -- you know, I think this might be a good opportunity to revisit

that May 8th letter and whether or not, you know, we should begin the process of complying with Rule 4A, you know, as a way to sort of get to this place that I think you're asking us about.

THE COURT: Sorry, you've now said that Rule 41(a) and Rule 4A. I'm confused.

MR. DONIGER: No. No, sorry. I said Rule 4(A)(1) and Rule 4A. 4(A)(1) is the requirement that the Plaintiff provide ultimate findings of fact to the defendant. And then we start to sort of -- we go from there --

THE COURT: Are you referring to Judge Daniel's rule?

MR. DONIGER: I'm sorry?

THE COURT: Are you referring to Judge Daniel's -- Judge Stanton's rule?

MR. DONIGER: Yes.

THE COURT: All right.

Okay. Ms. Nishan, anything further from you?

MS. NISHAN: I really just have a practical question whether there will be any consideration for counsel's trial schedule in setting the trial date. I do have a large jury trial --

THE COURT: Ms. Nishan, you're --

(Technical difficulties.)

MS. NISHAN: I apologize. I have a large jury trial starting August 11th, two trials in October, and another very large jury trial starting December 5th. So I'm not sure if the Judge would be willing to take those trials into account in scheduling this one, or if that's something that will need to be addressed after the date is set. But for efficiency sake, I wanted to --

THE COURT: I think that should be addressed once he's set a date. And it should be addressed to him.

Okay. I'm going to deny the defendant's motion for a copyrightability hearing. I don't think it's warranted. I share the plaintiff's view that it feels like just another summary judgment motion. And so -- and I don't think that the *SAS* case is one that is sort of a sound precedent for sort of opening up this mini-trial before there is a trial.

I do believe that there are very serious questions about how this case is going to be tried. I think there's going to have to be some sort of, you know, either, you know, staging. I think a question about whether or not, you know, about

access maybe is a threshold question that the jury maybe should answer before moving on to the actual material. Because if there hasn't been access, if the jury determines, for instance, that Ms. Kim is not an author, this case gets narrowed quickly without even having to get into the manuscripts. Also, questions about what is possible to have been shared, including, for example, the 2014 manuscript.

But all of this will be a question for Judge Stanton and how he wants the case to be tried. So I urge you to be thinking seriously now about what you think makes the most sense. I know throughout this litigation, the Plaintiff has had a sort of full court press on every possible issue. I leave it to you all to decide whether that's manageable for the jury to comprehend and to get through. But I think these are questions that are to be resolved through either motions in limine or other pretrial conferences, but not through a so-called copyrightability hearing. So that application is denied.

I will convey to Judge Stanton that the sooner he can get a schedule on the docket, the faster you all can determine whether or not you can comply with that schedule. And obviously, that'll

be between you and Judge Stanton.

Let's turn now to the discovery issues. Mr. Passin, where do things stand now with respect to the damages discovery?

MR. PASSIN: Your Honor, I think we set forth in the letter, the issue still remains the interrogatories. Also, Ms. Nishan said she was going to produce some additional documents, which I don't have yet, but I'm happy to first address the interrogatories, if that is what Your Honor would like me to do.

THE COURT: Whatever order you want to take. I mean, I have the Defendant's response letter on the 28th. They indicated that they've produced 564 pages of discovery. They have, you know, indicated that you have all of the data that you're entitled to. They interpret the other request as requesting that they, you know, summarize or put things into, you know, other ways of understanding the material, whether that's charts or summaries or something else, and object to the obligation that they need to take on that burden to analyze the raw data. So I'm happy to hear your response to their comments in the 28th letter or if you want to take it one by one, I'm happy to do that

as well.

MR. PASSIN: No -- well, let me first discuss the interrogatories. You know, Your Honor, this dates back to the previous or original motion to compel. And in that motion to compel, the only issue was the timing of the supplemental document production and supplemental interrogatory responses. Each of the defendants expressly stated in their responses to the interrogatory seeking the updated information that they were not going to supply supplemental interrogatory responses at that time. But they said, and this is a quote, "Should damages become relevant later in this litigation, defendants will provide plaintiff with an updated estimate of its revenues."

And then the Court, in summarizing what they said, said that "Defendants acknowledged and have communicated to plaintiffs that they have an ongoing obligation to update their discovery responses to reflect new information. Defendants is not to an update, but to continue incremental updating." And then you said, "Defendants are quotes ready to produce updated financial documents and interrogatory responses at an appropriate time." And you suggested 45 days after the summary judgment

decision.

You know, Defendants' argument they're not required to update the interrogatories lacks merit. The Court denied Plaintiff's previous motion because, again, not because they didn't think they had to produce supplemental interrogatory responses, but the timing. The Court specifically said, defendants' objection is not to an update, but again, the continual updating. And they said that defendants are ready to produce updated financial documents and interrogatory responses. Now, as far as whether the document production is sufficient or even supplemental interrogatory responses referring to the document that have been produced, defendants originally responded to the interrogatories by only referring to documents. And Your Honor even said that might be sufficient. And the defendants each came to me and said, we are going to update the interrogatory responses with a breakdown of the expenses and revenues. And they did that. And they're useless to us unless they update them. And their updated interrogatory responses must be in kind and make them accurately and fairly usable at trial. And also, the defendants admit in their opposition that the documents produced were created

by defendants in response to their obligation to provide updated discovery. They didn't produce documents solely that were prepared in the ordinary course of business.

Let me give you two examples. Tracy Wolff produced a two-page document entitled business expenses, and it contains a list of expenses without any backup whatsoever, which was obviously prepared solely in response to their obligation to update interrogatory -- I mean, discovery. It wasn't a document prepared in the ordinary course of business.

Similarly, Entangled prepared a profit-and-loss statement containing line items for net sales, gross profits, pre-tax profits and net profits as of January 31, 2025 that again was obviously prepared solely for updating their document production.

Plaintiffs are entitled to the financial information in a verified form, especially because she'll not have an opportunity to depose the defendants regarding the documents produced or even have them authenticated. I mean, for them to just put together documents that are unverified that set forth their damages is not compliant with the

24

March 15th order or their obligation to produce supplemental interrogatories. We're entitled to verified responses that we can use at trial, not documents that were prepared solely reflecting their expenses that are -- and revenues that are unverified.

THE COURT: So --

MR. PASSIN: And then with respect to the documents.

THE COURT: Hold on. Before we move to the documents -- before we move to the documents, I'm looking at the interrogatory responses. They all seem to be verified. So I'm not sure what you mean by unverified responses. And, to the extent --

MR. PASSIN: You're looking -- I apologize. Go ahead, Your Honor.

THE COURT: To the extent you're saying that their sort of computer printout, for lack of a more sophisticated way of saying it, of the money that they received is inadequate and instead you should receive sort of receipts from every bookstore across the country that bought the book, you know, suggests, you know, a pretty significant burden, unless you can demonstrate to me that their sort of computer-generated reports on how much money this

book made in 2022 is somehow inaccurate. And you've got these verified interrogatory responses with the top line number, and you have a report produced by their, I assume, sort of accounting system. I don't know why you need to see the underlying, you know, receipts from the bookstores that are ordering 20 copies of a book.

MR. PASSIN: Your Honor, I probably wasn't clear. I apologize.

First of all, the interrogatory responses we have are the original interrogatory responses, and they only go through a specific date. We ask for updated information. So those interrogatory responses that are verified, we ask that they be updated, okay?

Secondly, I'm not really complaining about the computer-generated documents. I think you misunderstand me on that. In addition to the computer-generated documents, they sat down and prepared spreadsheets. In other words, they got the document request and the interrogatories saying, update your discovery, and they sat down and prepared a spreadsheet, which, if they're going to do that, that needs to be done in an interrogatory response and be signed and verified.

So two things I pointed out as examples. Wolff just made up and produced a two-page document that said, here are my expenses and listed them out. That's not a computer-generated document that they had in the ordinary course of business. They wrote that out solely for purposes of producing it in response to discovery. If they do that, that needs to be in an interrogatory response that's verified.

Secondly, Entangled didn't just punch a button and print out stuff. They sat down and prepared a spreadsheet and said, these are my expenses, these are my revenue, these are my expenses, this is my net profits. If they're going to do that, that has to be in a verified discovery response. You can't just -- basically, they gave me documents that they prepared solely in response to the discovery, and it's unverified. It's useless for me to use a trial. And also, how do I know it's accurate if it's not verified? They decided that instead of producing the underlying documents, they'll give me summaries. Well, if they're giving me summaries, they have to do an interrogatory response and verify it.

THE COURT: All right. Who from the defendants can speak on this issue?

MS. NISHAN: I would like to be heard on this issue. First of all, potentially to address this issue in the most efficient way, we would be happy to stipulate to the authenticity of the documents produced for purposes of trial as well as their admissibility. So I think that takes care of that issue. In addition --

THE COURT: I don't know that interrogatory responses are admissible at trial, even if you stipulate. I mean, I think the question is, can you provide updated verification?

MS. NISHAN: Sorry, I meant the documents themselves, Your Honor. The documents that were produced --

THE COURT: I want to focus on the interrogatory.

MS. NISHAN: So what I under- -- what I think I understand opposing counsel to be saying is that he wants us to take the data that we produced in document format and copy and paste it into an interrogatory that's signed. I don't think that that is required under any of the discovery rules nor under the order denying plaintiff's motion to compel. We were ordered to update the documents that we provided, and that's what we did. We

provided updated reports. I'm kind of flabbergasted that this is a controversial issue somehow. I really don't understand what the real problem is, even after hearing the argument on this. But, you know, our position is that the motions to compel were denied. We were ordered to provide updated reports. We provided updated reports, hundreds of pages of updated reports. Of course, they were filtered by book and time in order to be responsive and, you know, directly pertain to this litigation. So I'm not sure why this argument that they weren't prepared in the ordinary course of business, I'm not sure how we would even get around that. But I think at the end of the day, all of the information they want has been provided, and we would stipulate those documents their admissibility and authenticity.

THE COURT: So I'm looking at a series of interrogatory responses that were produced by the defendants in November and December of 2022. And each of them has a verification page where person with knowledge states under penalty of perjury that the information is true and correct. I hear Mr. Passin saying that that is what is missing here and that the update to the data that was provided simply needs to be verified such that it would be a

sort of statement provided under oath for purposes of admissibility at trial. Is there any objection to, you know, having the updated responses to the interrogatories verified in the same way that you did in 2022?

MS. NISHAN: We don't have a problem providing a verification that the documents we've produced are true and correct. To the extent that -- like I said in our brief, they are also requesting that we reformat everything that we've already produced, the 564 pages, into a nice chart, that burden I think is inappropriate to shift onto the defendants. To the extent, as I said, that they're seeking a verification signed by the clients that these documents are true and correct, that's fine. That's essentially what we were agreeing to in the form of admission to authenticity and admissibility.

THE COURT: Okay. So, again, I don't want to focus on documents. I appreciate your stipulation. I don't want to focus on documents right now. I'm looking at a series of interrogatory responses that were provided in 2022 that have listings of revenue for each book during particular date ranges, and it has a summary number, and it

ends in 2022. And I think the issue that has now been presented to the Court over a period of months is that the plaintiff would like this to be updated to reflect, you know, revenues up to, I don't know, January 1, 2025. And it's my understanding is that their objection is that what has been provided is a series of documents, but that these columns that are in your interrogatory responses just have not been updated to get through to the relevant period, which I'm going to say is the end of 2024, and that they want those to be verified so that they're admissible at trial. So they're not asking for new sort of pretty charts, or however you put it, in your letter. I think they just want you to update what you already provided through the relevant period of time.

MS. NISHAN: I understand that, Your Honor, that, again, the motion they had on that issue, as I said, had been denied. To the extent that they are now being required nevertheless to provide updated interrogatory responses as well as the documents themselves, my understanding is that you are, from what you just said -- and I'm just seeking to clarify -- is that it would not be sufficient to reference the documents that were produced in the

interrogatory response despite that is generally a recognized manner of going about it when there's a request to create new charts and summaries. But, in fact, we will be asked to create these updated charts and summaries as part of our updated responses. Is that -- am I understanding that correctly?

THE COURT: Let's begin with I don't recall denying on the merits, these discovery requests, the motion to compel. My recollection is, was that it was premature until we had the right time with respect to documents. There was an agreement, as I recall, by the defendants to produce certain documents. I directed the parties to meet and confer on that. So I don't have a recollection right now that I denied on the merits any motion to compel.

Again, I think I share your puzzlement that we're having this conversation, but maybe not for the same reason. I think there's a chart that you guys determined in 2022 was what you wanted to submit as part of your interrogatory responses. I don't recall in 2022 ordering that you respond in this fashion. You answered, and by "you" I mean it appears to be all of the defendants, answered the

interrogatories by having a three-column chart -- I'm looking at it right now -- with the book, the date range, and a dollar amount. And the request from the plaintiff has just been to bring it up to date. I think that's the simple request. And so I think what's being asked and what I understood the parties were agreeing to was that you would just add four more columns, or I guess four more rows, to your spreadsheet that you voluntarily produced, that just moves us forward in time. And so to the extent that that is what plaintiff is seeking, which is what I understand, I think that's reasonable, and I'll direct you to update what you already provided in 2022 up through the end of 2024.

All right. Mr. Passin, anything else, Mr. Passin?

MR. PASSIN: The only thing is, Your Honor, with respect to documents, Mr. Nishan and Mr. Doniger and I had several meet and confers. I told Ms. Nishan I really can't tell if everything's totally been produced until we have it all and I can have my expert look at it. But I specifically pointed out that Macmillan didn't produce any documents, then Ms. Nishan kindly produced some documents from Macmillan. There were some documents

that were produced the first time around back in 2022 that were not produced by Macmillan. She gave me the impression that she was going to produce those and promised that back in April and I still haven't gotten those. So I'm not sure if Ms. Nishan is going to produce those or if I need to raise that.

THE COURT: Why don't I -- Ms. Nishan, why don't you work with Mr. Passin, and I'll just ask you to file a status letter at the end of next week.

MS. NISHAN: Will do.

THE COURT: Okay. So, Mr. Passin, I just ask that you file a status letter next week on the 13th of June, letting me know the status of that meet and confer. And if there's still a dispute, just set forth your basis.

MR. PASSIN: That's fine. Thank you, Your Honor.

THE COURT: Okay. Anything else that the parties want me to address?

MR. DONIGER: Your Honor, this is Steve Doniger again.

I think I might have been unclear before, and I want to just raise this briefly just to make sure that I'm not missing something. I referred

earlier to the individual practices of Judge Stanton, the document that's on his website. And under 4(A)(1) of that, he requires that after the completion of discovery, promptly after the completion, plaintiff is to serve on defendants a set of proposed findings of ultimate fact -- and I'm just reading from his document -- without evidentiary detail, which would be sufficient to sustain a judgment for plaintiff if these facts were ultimately found to be true. He says 20 findings should be sufficient in most cases. (2) Following that receipt, defendant shall inform plaintiff which proposed findings are contested, et cetera.

So, obviously, we're well past the completion of discovery. And this is what I was referring to earlier and what we were referring to in our letter to Judge Stanton, that he referred to you, where back in July of 2023, you stayed compliance with that until after summary judgment. So at some point, we need to get back into that conversation, which, again, I think would inform where there might be a reasonable -- if there's a reasonable way to bifurcate, to bifurcate.

Can we expect that stay to be lifted, and can we get a schedule for us to begin compliance

with that 4(A)(1) and (2). I think that's what I was asking for and I think maybe I wasn't clear.

THE COURT: So I'm unfamiliar with Judge Stanton's individual practices.

MR. DONIGER: Okay.

THE COURT: So I will coordinate with him, and we will give some direction to the parties in the coming days.

MR. DONIGER: Okay. I appreciate that, because in his response to our letter, he did specifically refer it to you, so thank you.

THE COURT: Okay. All right. Anything further?

MR. DONIGER: No, not from plaintiff.

THE COURT: Anything further from the Defendants?

MS. NISHAN: I don't believe so.

THE COURT: Okay. I'll just leave you with two last parting remarks. The first is that I know there's been some complaints in various letters about the parties litigating this issue in the press. As I said to you before, number one, everybody has a First Amendment right to engage in speech, and so I'm not going to prohibit that, obviously. Number two, the lawyers on this case are

all excellent lawyers, and you know best how to advise your clients on what's appropriate. You know, this case will be tried in a court, and the jury will hear the facts, but this case does not need to be tried in newspaper outlets or the Internet or anything like that. And I very strongly encourage the lawyers to advise their clients that trying to litigate this case in the press is really not appropriate.

The last comment I'll make is about settlements, which I've made to you all for several years now. I know the parties have very strong views about the correctness of their positions, which impedes the possibility of settling the case. I will just tell you now that if anyone is interested in having a settlement conference, I would probably be scheduling it right now for August or September. I'm sure I've said this to you before, but I'll say it again. If you come to me in September and ask for a September settlement conference, it won't be available, and I don't know when Judge Stanton will set his trial date, and I don't know whether he will be flexible on moving it. But if you think there is any chance of this case settling before trial, I would encourage you all to

get on my calendar for sometime in September. You can always cancel the conference if you decide it just doesn't make sense, but you can't always get on my calendar.

So I will just once again encourage you to speak with your clients about the possibility of settlements and, if there is an openness, to reach out to my courtroom deputy. But I'm giving you all permission to speak both with your clients and then to speak with your adversary on the case about the possibility of holding a settlement conference, or at least scheduling a settlement conference, one that can be adjourned if it won't be productive, but cannot be scheduled quickly. All right.

MR. DONIGER: Understood. Thank you, Your Honor.

THE COURT: All right. So Mr. Passin from you on June 13th on the discovery issue, and otherwise, you'll hear from the Court on deadlines.

MR. PASSIN: Thank you so much, Your Honor.

THE COURT: Thank you, everybody. We're adjourned.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Freeman v. Deebs-Elkenaney, et al, Docket #1:22-cv-02435-CM-SN, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature *Marissa Lewandowski* ___________________________

Marissa Lewandowski

Date: October 3, 2025