Q1CVFREC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LYNNE FREEMAN, an individual,

                Plaintiff,

        v.                                22 Civ. 2435 (CM)

TRACY DEEBS-ELKENANEY P/K/A/
TRACY WOLFF, an individual,
*et al*,

                Defendants.               Conference

------------------------------x

                                          New York, N.Y.
                                          January 12, 2026
                                          1:40 p.m.

Before:

                    HON. COLLEEN MCMAHON,

                                          District Judge

                        APPEARANCES

REEDER McCREARY
     Attorneys for Plaintiff
BY:  MARK D. PASSIN
     -and-
DONIGER/BURROUGHS
BY:  STEPHEN M. DONIGER
     DAVID M. S. JENKINS

TROY GOULD
     Attorneys for Defendants
BY:  AMY L. NASHON
     JOHN C. ULIN
     -and-
KOWERT HOOD MUNYON RANKIN & GOETZEL PC
BY:  DWAYNE K. GOETZEL
     -and-
KLARIS LAW PLLC
BY:  LACY H. KOONCE III

Q1CVFREC

(Case called)

THE LAW CLERK:  Counsel, your appearances, please.

MR. PASSIN:  Mark Passin of Reeder McCreary, on behalf of plaintiff, Lynne Freeman.  Good morning, your Honor.

THE COURT:  Hello.  It's afternoon, but it's morning in California.  I know it's still morning in California.

MR. DONIGER:  Good afternoon.  Stephen Doniger, on behalf of plaintiff as well.

And our New Yorker.

MR. JENKINS:  Good afternoon, your Honor.

David Jenkins from Doniger/Burroughs, for plaintiff, Lynne Freeman.

THE COURT:  Okay.  Great.

I'm sure you guys are tired.  Have a seat.

Okay.  Who's at the back table?

MS. NASHON:  Good afternoon, your Honor.

Amy Nashon with Troy Gould, on behalf of all defendants.

MR. ULIN:  Good afternoon, your Honor.

John Ulin, *pro hoc* pending.  Also from Troy Gould, for all defendants.

MR. KOONCE:  Good afternoon, your Honor.

Lance Koonce with Klaris Law, for Prospect Agency and Emily Kim.

MR. GOETZEL:  Dwayne Goetzel, your Honor, on behalf of

Q1CVFREC

Tracy Wolff.

THE COURT:  Okay.  Have a seat, everybody.

Partly I wanted to do this so I could meet you.  I've just gone back and forth on a number of things, but I've now got a court reporter here, so I made up my mind on something.

I have spent more time working on this case since I took it over than you can possibly imagine.  I have read all four *Crave* books.  I am still making my way through Ms. Freeman's six or seven different draft versions of her book.  So I spent my Christmas vacation reacquainting myself with hundreds of copyright cases.

So I will say possibly because I'm getting to you at the eleventh-hour, so I haven't had an opportunity to be familiar with things over the course of the several years that you guys have been litigating, but I certainly in the last two and a half months have spent an awful lot of time with this case.  And I've gone back and forth, and back and forth, and back and forth on a couple of things I raised with you earlier.

I have finally decided — especially in light of your most recent round of letters — don't send me letters — that we're going to have another round of summary judgment motions on my terms.  If I had been the judge on this case from the get-go, A, I would never have had a magistrate judge issuing an R&R on a summary judgment motion.  I don't do that.  It's a waste of time.  I have been told by my wonderful amazing

Q1CVFREC

magistrate judges that they are not fond of it because they feel like they are being law clerks. And it's not what I do. It's not what I do.

And if I had been deciding the summary judgment motion, I would have addressed every issue. I think I told you that earlier. Every potentially dispositive issue would have been decided. And they weren't. Even though you briefed them all, they weren't.

So what I have concluded is that either side is free to move for summary judgment on a very expedited schedule. You are not going to like the schedule, folks, but on a very expedited schedule, you have briefed this issue before, on the issue of substantial similarity. And the defendants can make a motion for summary judgment or preclusion. I think summary judgment seems to be the preferred way to handle this on the issue of what remains of a damages case and a motion to strike a jury.

But you've got to make a motion, people. Do not send me these letters full of case cites. I don't accept letter motions. It's in my rules. I don't believe in letter motions. I want fully briefed motions. And that happens to be a critically important issue, and I want it fully briefed. And I want citations to every interrogatory that you ask that asks for the disclosure of damages, and every question that you ask at the deposition that asks for the disclosure of damages. I

Q1CVFREC

want everything, okay, and I want it in great detail.

Now, you know my -- I'm just going to put this on the record because I've got a court reporter here.  You know my initial thoughts because I've sent them to you on the substantial similarity matter.  Judge Netburn didn't reach it at all.  And Judge Stanton, when overturning her recommendation that there was at least probative similarity and then directing that all issues go to trial, did no analysis of why there was no -- why there was a genuine issue of fact on substantial similarity, even though you all briefed it.  And the defendants objected to Judge Netburn's R&R on the ground that she failed to reach it, okay.

So if I told you I don't think it's law of the case, but even if it were, we're still prejudgment, and I'm a district judge, and I can change my mind, and I can change Judge Stanton's mind.  So I can rule substantively on this.

I want to make one thing clear:  I am not interested in reopening summary judgment on actual copying, right.  For purposes of the motion, I'm going to assume that probative similarity and access, independent creation need to go to a jury.

I actually think the plaintiff has the better of the argument on probative similarity right now.  But Judge Stanton said that he thought it was a jury issue, maybe it's at least a jury issue.  I will tell the defendants I would not be granting

Q1CVFREC

them summary judgment on probative similarity, okay.  I'm that far along in my analysis.  And there's no question that access would have to go to a jury.

I'm going to assume that those issues aren't in the case right now.  And we're going to deal with one issue that would be dispositive, and that's substantial similarity.  And that, after reading 150 cases over the course of my Christmas holiday, seems to be what the courts in this district and in this circuit tend to do; they jump right to the ultimate issue, which is substantial similarity.  They do run motions to dismiss, for crying out loud, which, frankly, I think is a little weird.  But they do it, and that's the issue that they address.

So I don't want to deal with the actual copying issues; I just want to focus on the one issue.  And I'm going to give you a lot of pages, but I don't want you to waste time telling me what the standard for summary judgment is.  I know.  Writing the long statement of facts, facts are best discussed in the context of your argument.  Outlining the law on substantial similarity.  Guess what?  I am now -- my head is stuffed with that, okay.  Stuffed with it.

All right.  So I've kind of made that clear.

I do want to talk about your expert reports.  I told you I was thinking about whether or not to revisit Judge Netburn's *Daubert* ruling.  Basically, I think she got it right.

I've read all these reports.  Now, of course, I read all the reports because I'm a judge and I have to read everything.

Expert testimony is perfectly appropriate in a case like this to explain to the trier of fact, what's a trope?  What's a scène à faire?  What kinds of tropes and scènes à faire are common in this type of literature?  Give me examples of how common they are by identifying works in which these tropes or scènes à faire have appeared before.  That's perfectly acceptable expert testimony.  That's the first Easton report.  That's what's in there.

But is it Reiss or Reiss?

MR. PASSIN:  Reiss.

THE COURT:  Reiss — thank you — report that's not what that is.  Let me read what she said:

I have been retained in this case to evaluate the similarities between six of the *Blue Moon Rising/Masqued* manuscripts offered by Lynne Freeman and the first four books of the *Crave* series.

No.  Not proper expert testimony.  Sorry.

Deciding whether there are similarities is the job of the trier of fact, okay?

And on a substantial similarity motion, they are not deciding whether there are individual discrete similarities; they are deciding whether there is substantial similarity in the works as a whole.  So considering this, this, this, this,

Q1CVFREC

this, this elements.

So I think that Judge Netburn was correct in striking her report and in striking the Easton rebuttal report, which just does the same thing from the other side.

Now, on the damages thing, you all didn't complete your damages discovery until the end of November, as I understand it. So there was no opportunity previously for the defendant to raise the issue that the defendant has raised in his letter; and to do so appropriately, which is to say in a motion for preclusion or a motion for summary judgment. So I'm okay with allowing you to do it now.

I need some clarification. It's my understanding that the plaintiff is not seeking statutory damages in this case, that the plaintiff wants the big bucks. Right? This case is about clawing back the profits that Tracy Wolff and the publisher have made on these books. It's not about ten cents for each copyright infringement, right?

MR. PASSIN: That's correct, your Honor.

But I should point out that in Ms. Freeman's second supplement to her disclosures, she --

THE COURT: That's what you're going to -- that's what you're going to brief. Okay? We're talking about actual damages and lost profits. One way or another, whether this goes to a jury or it doesn't go to a jury, whether I grant summary judgment to you guys, I'm the person who is going to

decide what the amount of the lost profits is, because that's an equitable remedy in this circuit anyway.

So the thing that would go to the jury is actual damages. And so the issue that I see that I have to decide is in response to legitimate discovery requests, did the plaintiff disclose the existence of any actual damages, all right? And that's what we're going to decide. And you're going to brief that. And if she did so disclose, then she's not going to be precluded from proving actual damages. And if she didn't so disclose, then, to the extent that she made a claim for actual damages in her complaint, then the defendants are entitled to summary judgment dismissing it, because you have to disclose your damages in response to discovery requests.

Okay. So I really need to move very quickly because I want to keep the trial date. Because if there is one thing that you folks do not need, it is to have this hanging over your head for another year. You just don't.

So anyone who wants to move for summary judgment on the issue of substantial similarity — and I gather that's both of you — has until the close of business on January 26th to do that. And you can have a 60-page brief. But I've told you, don't bother with long statement of facts, don't be redundant, don't waste time telling me what the standards are, don't waste your pages. Focus on the argument — why I'm entitled -- why my client is entitled to summary judgment on the issue of

substantial similarity.  Okay.

Now, if the defendant chooses to move for summary judgment or preclusion on what damages are provable, you have to make that motion by January 30th.

Briefs in opposition to substantial similarity motions are due on February 9.  Briefs and reply briefs are due on February 17th.

Opposition to a motion for summary judgment on damages is due on February 13th, and the reply brief is due on February 20th.

You will have a decision one way or another by the middle of March, because I really want to keep that trial date.

Okay.  Not that the *Crave* -- I mean, I wanted to see the *Crave* Bible, but not that the *Crave* Bible is really evidence in this case.  When you're dealing with substantial similarity, you're dealing with the works themselves, okay.

But I'm just curious.  There's a redaction in my copy of the *Crave* Bible on pages 13 and 14.  Does any of you know why?  I just got black.  You don't know why.  See if you can find out why.

And we have one page -- can you show the plaintiff's counsel this page.  We have one page that looks very much to me like it's something that Ms. Freeman prepared for you guys as a litigation document.  You can see I've been in the weeds.  It was clearly prepared after 2016.  And it looks to me like she's

Q1CVFREC

telling you things.

MR. PASSIN:  Your Honor, we have to check with our client.

THE COURT:  Okay.  I mean, I'm thinking that's not a document we should be considering?  Okay.

MR. PASSIN:  Thank you for bringing it to our attention.

THE COURT:  Look, my pleasure.  Maybe it's the advantage of having brand-new eyes.

Okay.  So I guess I've kind of preempted a lot of things.  But let me find out what else is percolating with you guys.

And by the way, I would like you to meet someone.  In the event that you would be interested in having a serious settlement discussion — and I mean a serious settlement discussion — the gentleman over here is Jim O'Neill.  He's sighing hi.  Jim is my senior law clerk; he's my permanent law clerk.  And he settles my cases.  I don't settle cases.  I'm a lousy settlement negotiator and, besides, on this case, I'm in the weeds.  So he is my guy.  And he has settled some big case. He has delivered some nine-figure settlements.  So he is a serious settlement negotiator.

And if you guys are interested, he's around any time between now and the beginning of the trial, assuming that we go to trial.  Okay?  He's around.  I wanted to introduce him to

Q1CVFREC

you, you to him.

MR. PASSIN:  Nice to meet you.

THE COURT:  He is just very good at it and he's very experienced.  So I've made that introduction.

Okay.  So from the plaintiffs -- and, by the way, I do apologize, because I really made a final decision on this over the weekend, if I'm wasting your time today.  I've spent a lot of time thinking about this.  A lot.

Okay.  Sir.

MR. PASSIN:  Your Honor, may I briefly address the Professor Reiss issue?

THE COURT:  Sure.

MR. PASSIN:  So Professor Reiss, it's kind of a long story, but if you look at docket 427 and 428, all right, that was plaintiff's objections to Judge Stanton, the magistrate's January 30, '25 order denying plaintiff's request to designate Professor Reiss as a rebuttal to -- rebuttal report to Emily Easton.

THE COURT:  Hang on.

Did she actually submit a rebuttal report?

MR. PASSIN:  No.  I want to explain why.

THE COURT:  Okay. Fine.

MR. PASSIN:  All right.

What happened was on May 10th, 2023, plaintiff designated Professor Reiss as an affirmative expert witness on

Q1CVFREC

three topics, your Honor:  One, which we know is out of the question, to valuate the similarities between the works.

THE COURT:  Right.

MR. PASSIN:  Two, which we also know is out of the question, to address whether those similarities reflect genre-specific conventions and tropes.  And we know you've said before that's out of the question.

But the third and important one is to provide a general discussion of tropes and genre conventions.  And then what happened is -- by the way, Professor Reiss is extremely qualified.  She is --

THE COURT:  No, no.  I have no quarrel with the qualifications of either of these individuals, all right.  This is not a situation that's going off on qualifications.

MR. PASSIN:  So I'll skip that.

THE COURT:  I just read three reports.

MR. PASSIN:  And where I'm going, just so you know and have it telecast, if you bear with me, is we're only asking for five and a half pages of her report, all right.  And those five and a half pages deal solely with general tropes and genre conventions.

THE COURT:  General tropes and conventions is okay.  So did I miss something here?

MR. PASSIN:  Yes.  If you look at -- if you pull up --

THE COURT:  Here is her report.

Q1CVFREC

MR. PASSIN:  Well, I actually have it highlighted.  If you look at 427, 428 --

THE COURT:  Yeah, but I don't have that.

MR. PASSIN:  Well, it's only five and a half pages.

THE COURT:  Can you give me an idea where to look in here?

MR. PASSIN:  Yes.  I do have the report with me, yes, your Honor.  But I really wish you'd let me tell the story.

THE COURT:  You can tell the story.  Please feel free to tell the story.

MR. PASSIN:  If you look at her report, pages 2 through 8, all she talks about is specific -- is genre conventions in general and tropes in general, as opposed to Emily Easton.  Emily Easton goes into the specific genre and tropes in two of Ms. Freeman's manuscripts which you have already said we cannot do.  But that's what Ms. Easton did in her report, all right.

THE COURT:  The way I read her report -- I'll go back and read it again.  But the way I read her report, she said these things are tropes.  You'll find this one in *Harry Potter*, and you'll find this one in *Twilight*, and you'll find this one -- and that's perfectly fine expert testimony.

MR. PASSIN:  But she also went into the two books, two versions of her books, and pointed out the tropes.  But we could leave those out.

Q1CVFREC

But, more important, I want to show you why we didn't designate her as a rebuttal.

So on May 10th, defendants designated Emily Easton as an affirmative expert.

THE COURT:  On those three topics.

MR. PASSIN:  They were a little different topics, but we won't go into that, okay.

Then on February 7th, defendants filed *Daubert* motions to all of our experts, including Professor Reiss.  And forget the other ones.  We argued in response to Professor Reiss that, All right, if you want to exclude it, it's fine.  But, at the very least, you should leave it in to the extent she discussed tropes and genre conventions.

Now, although the magistrate didn't address the grounds on which she excluded Ms. Reiss's report, including that section, she specifically said that she found Reiss had specialized knowledge relating to identifying which similarities stem from tropes and genre conventions.

Then, on December 11, '24, plaintiff filed before the Court a request for a premotion conference on a contemplated motion for leave to allow Professor Reiss to be a rebuttal expert just on that one issue.

THE COURT:  Which, I have to say, I would have allowed.

MR. PASSIN:  You would have what?  Let me explain what

Q1CVFREC

happened.

THE COURT:  I have to say I would have allowed.

MR. PASSIN:  You would have allowed?  Oh, thank you.

THE COURT:  I would have allowed that.

I was surprised that there wasn't a Reiss rebuttal report.

MR. PASSIN:  Right.  But I want to give you the background just so you understand.

Again, we were merely seeking -- if you look at docket 428, you'll see Exhibit 1, those pages, including her CV.

THE COURT:  No, no, I've read those pages.  There's nothing wrong until we get to page 8.  Okay.  Fine.

MR. PASSIN:  Where Magistrate Netburn had problems with the original report, she had no problems with that.  But more importantly, and this is important, your Honor, we really were misled.  Plaintiffs didn't designate Reiss as a rebuttal because in a June 2nd --

THE COURT:  I don't believe in -- you don't have to worry about that.

MR. PASSIN:  Okay.

THE COURT:  I couldn't care less.

MR. PASSIN:  Okay.

THE COURT:  If you have an expert, the expert can file a rebuttal report.  That's like standard operating procedure in this district.  You don't designate your expert, redesignate as

Q1CVFREC

a rebuttal expert.  I can't even remember the last case when every expert didn't file a rebuttal report after the other guy's expert report came in, which is why I was surprised that I didn't have a Reiss rebuttal expert report.

MR. PASSIN:  Do you want to hear the reason why?

THE COURT:  The reason why.  The reason why is that they told you you couldn't do it.

MR. PASSIN:  No.  On June 2nd, at a hearing, defendants' counsel at the time said to your Honor, Your Honor, let's have a summary judgment.  Let's use Reiss and let's -- Professor Reiss, let's use Emily Easton.  And we reserve our right to exclude Reiss solely on the issue of substantial similarity.

THE COURT:  But that's the only issue as to which she has anything to say.

MR. PASSIN:  No.  If you look at the pages I designated, she talks about that tropes are like a house, and that when you have a house, there's a certain foundation.  And the initial foundation may be the same when it's the same genre, but as you get down to specifics, it becomes different. I'm not --

THE COURT:  *Romeo and Juliet* is in my standard jury instructions on copyright, okay.

MR. PASSIN:  She explains *Romeo and Juliet* has been infringed many times, okay.

Q1CVFREC

THE COURT:  It hasn't been infringed at all.

MR. PASSIN:  So, anyway, we would be grossly prejudiced, your Honor, if they are allowed to have an expert on tropes in general and we're not, all right.  And like I said, we were told by the other side that they are not going to exclude her on those general issues, so we didn't add her.  And specifically --

THE COURT:  It's not a question of adding her, okay.  You didn't file even a proposed report on using her to discuss the general issue of tropes, as opposed to what the overwhelming amount of her report is, which is, here's a similarity between Freeman and Wolff.  Here's a similarity between Freeman and Wolff.  Here's a similarity between Freeman and Wolff.  And that's the ultimate issue.  Actually, the ultimate issue isn't discrete, but it's total concept and feel.

But, I mean, I don't want to prejudice you.  I really don't.

MR. PASSIN:  Your Honor --

THE COURT:  Wait, wait, wait.  I don't.  That's part of the problem with taking over a case after somebody else handled the case.  Because I would have had you in, I would have said, Is there going to be a rebuttal report from this woman?  You would have said, Oh, yeah, sure, what.  Because I would have told you early on that what she submitted wasn't appropriate, but there were things she could have talked about.

So feel free to send me what your idea is of Reiss report on the issue of tropes and scènes à faire.

The thing about that issue that I would certainly allow testimony to a jury, so would allow it on summary judgment, is you can illustrate that by saying teenagers with super normal powers, *Harry Potter*, *Twilight*, this book.  I don't read a lot of these books.  I mean, in the last two months I've read more in this genre than I have ever read in my life.  I have not read all the *Harry Potter* books, but I will have read all of the *Crave* books by the time I'm done.  That's what's helpful, because that explains this is a trope, it gets used a lot, and here are examples of where it's been used.  That to me is perfectly legitimate testimony.

Now, I don't know how you say this is not a trope, this has never been used.  And again, I want to emphasize that substantial similarity means substantial similarity.  It's not discrete lists of this, she's wearing green in this scene and she's wearing green in that scene.  His first name begins with an A, and his first name begins with an A.  That doesn't get you substantial similarity.

I mean, look, you could have two characters named Hulk who are superheroes in the Second Circuit, and that's not substantial similarity of characters.  And that's from the circuit.  So I can't quarrel -- I might quarrel with that, if I had the freedom to quarrel with that, but I can't quarrel with

Q1CVFREC

that.

So why don't you send me what your rebuttal report would have looked like.

MR. PASSIN:  When would you like that, your Honor?

THE COURT:  ASAP.

MR. PASSIN:  Yes, your Honor.

MS. NASHON:  Your Honor, if I may ask, I just want to clarify that this is truly intended to be a rebuttal report to Easton's report on this topic, and not --

THE COURT:  Yeah.  That's what he just told me he was more or less denied the opportunity to file.  And I'm saying, Well, you know, in the McMahon world, you wouldn't have been denied an opportunity to file that.  I looked through the file. I was trying to find it.  That's how commonplace it is.

MS. NASHON:  I understand.

I just am trying to make sure that it is --

THE COURT:  We'll see if they are going to be off the bounds.

MS. NASHON:  Sure.

THE COURT:  Okay.  I mean, both of these women are obviously incredibly qualified to talk about these issues, okay.

Okay.  What else?

MR. KOONCE:  Your Honor, on that last point, just to clarify, I know you said they should submit it ASAP, but it

Q1CVFREC

will be with enough time for us to incorporate responses into summary judgment.

THE COURT:  Trust me, you're going to have -- I mean, by the time you get to responsive papers, yes.

MR. KOONCE:  Fair enough.

THE COURT:  They are not going to submit it at the beginning of April.  Who knows?  You may have won by then, or they may have won by then, or nobody may have won by then and we'd be going to trial.

Okay.  So what other important issues are there from the front table or have I short-circuited them all?

MR. DONIGER:  So, your Honor, we came here today to discuss -- ready to discuss the four matters that the Court had outlined.

THE COURT:  I, of course, forget what they were.  That was many pages of reading ago.

MR. DONIGER:  Well, again, we're here to answer the Court's questions.  But the Court had -- essentially, I think we've addressed some of them.  The first was plaintiff's theory of why defendants' work infringes.  The second is how Judge Netburn --

THE COURT:  Yeah, the *Daubert* stuff --

MR. DONIGER:  -- which I think we've addressed.

THE COURT:  We've addressed that.

MR. DONIGER:  The third is any evidentiary rulings

Q1CVFREC

that would need to be made in advance of trial.  And the fourth is settlements, and I think you've addressed that.

THE COURT:  Let's go back to number one.

I'm happy to have you explain it to me.  I'm equally happy to wait -- I suspect you're both moving for summary judgment.  You already did both move for summary judgment. Maybe you're not.  I know they are going to.

MR. DONIGER:  Sure. We did initially.  And I think the grounds were fairly set forth in those motions.

THE COURT:  In that case, I'll dive into those papers, okay.  I'll actually read those papers.

And one thing, if you want to just say, Judge, read the old briefs, or, Judge, read the old brief and here's ten extra pages, because we want to address some extra things this time around, great.  That's fine.

I truly don't want to cost your clients a lot of money.  I don't want you to have to reinvent the wheel.  I accept that I'm making your life more difficult than you thought it was going to be, and I apologize for that.

So if there's an easy way for you to brief this, do it.  Hand me the old brief, hand me the old brief plus ten extra pages.  Do that.

MR. PASSIN:  We don't have to do undisputed facts anew, right?

THE COURT:  Yeah.  We're at substantial similarity.

Q1CVFREC

Book, manuscript --

MR. DONIGER:  So just brief --

THE COURT:  -- book, manuscript.

MR. DONIGER:  So there is one question on that that I'd like to raise, which has to do with the evidence that we'd be submitting.  One of the very first things that your Honor had done was asked us how we would present a large amount of material to a jury.  We talked about Rule 1006 summaries of evidence.

THE COURT:  Can I tell you something?

MR. DONIGER:  Of course.

THE COURT:  That's a jury issue, if we get there. I've read the books.  So there won't be any summaries.  I've read the books.  Don't need any summaries.  I've read the books.

I don't know that I could lock a jury in a room for long enough for them to read the books.  I spent four weeks reading those *Crave* books.  And whoever is representing the publisher, oh, my God, the print gets smaller with each edition and the margins get more nonexistent.  So they are all 650 pages long, except the last one is 1,000 pages long, with tiny print and no margins.  I read them in about four, four and a half weeks.  I didn't do much else.

MR. DONIGER:  Understood.

THE COURT:  So how we do this at a trial, if we get

Q1CVFREC

there, perplexes me.  And I have spent a lot of time thinking about that.  And the Second Circuit is very clear that you have to look at the works themselves.  I mean, I can understand how a jury could look at the works and draw one conclusion.  I'm not sure it could look at the works and draw the other conclusion.  Okay.  But we don't need to do that now because I've read the books.

MR. DONIGER:  Understood.

THE COURT:  But I have to tell you, this is just early thinking.  I came back from Christmas and talked to Jordyn.  You all have met Jordyn now, this is Jordyn Manly.  She's the lucky law clerk on this case.  And this, by the way, is Arnold Zahn, who is my other term law clerk.  He's working on different cases, but he's intimately familiar with this.

So I came back and I said, I'm more convinced than ever that trifurcating this trial, if we get to a trial, is the right thing to do.  Because I actually think that the plaintiff's list of similarities is admissible on the issue of probative similarity, and it's absolutely inadmissible on the issue of substantial similarity.

And so if I were the defendants and I were trying the case, I'd keep it out by conceding probative similarity.  But I'm not the defendants.  So that's what I was thinking then.  I might be thinking something different next week.  Believe me, I have thought different things at different times about issues

Q1CVFREC

in this case over the last two months.  But the one thing we do not need to decide now is what you're going to be allowed to show the jury because, hand to God, I've read the books.

MR. DONIGER:  I understand.  And that's not what I -- I certainly understand the distinction between what goes to the jury and what goes to the Court.

The reason why I raised the issue is, as you may be aware, in our last summary judgment go-around, we had submitted certain indexes from our client.  And the Court had indicated, Well, I find that to be additional argument that exceeds the scope of the page limitation.

THE COURT:  Okay.

MR. DONIGER:  I want to make sure we don't run afoul of that.

THE COURT:  If you find that you're exceeding the page limitation, let me know, okay.  Five days before your brief comes in, let me know.

I will tell you this:  I'm going to look at the works, and I'm going to apply the test, the Second Circuit's test, total concept and feel test.  This is a work that has -- face it, this is a work that has both protectable and nonprotectable stuff in it, okay.  So that means the discerning reader test is what applies.

And, frankly, I can't tell much difference between the discerning reader and the ordinary reader, but let's assume

Q1CVFREC

that I'm a discerning reader, and that's the test that I'm going to apply. And I'm going to apply it to the actual texts themselves. And you can make any argument that you want.

MR. DONIGER: Okay. I appreciate that.

THE COURT: As I said, I love Judge Netburn. She is so smart. She's smarter than I am. I think she's terrific.

She chose, for whatever reason, not to handle this the way I would have handled it. I never have failed to reach a potentially dispositive issue, okay.

MR. DONIGER: It's less clear to us that that happened, but I understand the Court has a different --

THE COURT: It's very clear. She said she wasn't reaching it. She said because you have to go to trial on actual copying, I'm not going to even begin to talk about substantial similarity. And, frankly, Judge Stanton didn't either.

MR. DONIGER: All right. So I just want to make sure that in terms of the evidence that we submit to the Court --

THE COURT: You can submit any evidence you want. It's a great advantage.

I might tell you in the context of deciding, perhaps in your favor, that there are things that I'm not -- that I didn't consider in reaching that conclusion and I will not allow to be introduced to a jury, okay. But submit away.

MR. DONIGER: All right. Thank you.

Q1CVFREC

THE COURT:  Back table.  Issues.  Concerns.

MS. NASHON:  I would like to address Item No. 3 that we just didn't talk about, which is evidentiary rulings that need to be made in advance of trial.  And if your Honor would like to set a motion *in limine* briefing schedule on that, as well, since we're setting dates.

THE COURT:  Well, I'm happy to set the schedule, but it won't start until I've decided whether there's going to be a trial or not.  I think you should assume that there's going to be a trial.  I don't think you should assume that you're going to win, okay.

MS. NASHON:  Never would be so presumptuous, your Honor.

THE COURT:  Never would have crossed your mind, I'm sure.

But I will want motions *in limine* certainly by the end of March.  I never, by the way, take reply papers on motions *in limine*.  I have rules on motions *in limine*.  They are five pages long; each individual evidentiary ruling gets a motion; and you get a five-page response within one week, and that's it.  There's no reply.  And you get a very cursory -- I don't know quite why I have so many colleagues who write these extensive decisions on motions *in limine*.  You'll get a very cursory evidentiary ruling.  But that will be happening at the end of March/beginning of April.

Q1CVFREC

MS. NASHON:  Your Honor, would that be the appropriate time to address the number of plaintiff's exhibits?  I noted that your Honor --

THE COURT:  Yeah, we'll have a whole separate conference early in April.  I do have a criminal trial on, but Jim, who handles all my criminal docket, is predicting that that will end up with pleas.  It doesn't, it doesn't.

But the plan would be like the second week of April to have a conference, and to address literally every exhibit and its admissibility to make -- because I make those rulings in advance of trial.  I told you, if it's a bench trial, everything can come in.  I don't worry about it.  I don't make any rulings.  And I consider what's relevant and I don't.

But if we're having a jury trial, we will have a conference, and we will go exhibit-by-exhibit.  And if there are objections to the exhibit, we'll resolve those objections right then and there.  And that's to save their time.  I'm a big fan of saving jury time.

And then I can tell them that you're wonderful, cooperative lawyers who have met with me in advance of the trial, and we've resolved all of these issues so they don't have to worry about them.  And that means there's not a lot of sidebars, because I don't like sidebars.

MS. NASHON:  On a more substantive matter, just thinking about the briefing and the expedited schedule and the

Q1CVFREC

summary judgment, I understand that your Honor indicated that plaintiffs could elaborate on their theory as part of their briefing, but it seemed like they were prepared to elaborate on it to some extent today.

THE COURT:  They just told me they elaborated on it in their last brief.

MS. NASHON:  Well, I would argue, your Honor, that we have had a very hard time throughout this case trying to understand exactly what the theory is, whether the selection --

THE COURT:  I understand that because I've had some difficulty myself.

Could I make a suggestion?  Could I suggest that you make your motion, and you make your best argument, and you wait to see what's in their papers, and that you then respond to that.  That would be my suggestion, is that you remake, I guess, that motion.  And then if they have failed to articulate a discernible theory in their motion papers, I guess I would -- you could certainly point that out.  I mean, I just -- I have not read yet your proposed jury instructions.

Another thing I did over Christmas when I was reading all these cases, I was like writing jury instructions, because I told you, I will start there and work backwards.

But I understand there are proposed jury instructions in the file now, and I will look at them.  And it would seem to me that you would be able to discern what the plaintiff's

theory of the case was from reading those jury instructions.

MS. NASHON:  I guess, your Honor --

THE COURT:  If you can't, maybe there's a problem with the instructions.

MS. NASHON:  Perhaps.

I think what we continue to struggle with really is this idea of what is actually copyrightable, what she contends is copyrightable in her books.  And, you know, as your Honor pointed out in your request for submissions back in December --

THE COURT:  There was a weird suggestion that -- and I'm overstating this, okay.  I want the people at the front table not to have a heart attack.  So I'm overstating this.

You could have read something that came in before Christmas as a suggestion that there was nothing in her work that was independently copyrightable, but, rather, it was the way that this stuff was arranged and articulated, you know.

And my response was I thought that was for calendars and phone books.

Now, I have read cases over Christmas — remember, that's when I read the cases, was over Christmas — that suggest that there is a viable theory of copyright infringement even in a literary work that is a collection of tropes, but it's expressed in a particular way.

Now, I understand that the plaintiff's theory is not plagiarism, is not word-for-word.  That's not the theory.

Well, well, well, by the way, it's never plagiarism. It's been somewhat more complicated. I expect it to be fleshed out. I expect it will be fleshed out. Because I see that you all -- people were going like this at the back table.

I see that you all read the letter that came in before Christmas. And you felt the same way I felt on initial reading, which was, Our theory of the case isn't that there are -- our theory of the case is, yeah, maybe this is a collection of trope and scènes à faire, but it is an original expression; it's its own way of arranging it.

I can understand how you could have interpreted the letter that way, because it's certainly the first way I interpreted the letter. And by the way, I think that's one of the problems with writing letters, because you write them very quickly. And maybe you don't -- you're not completely accurate in what you want to say. That's why I like briefs.

Okay. My theory of substantial similarity is the Second Circuit's theory of substantial similarity, which is the -- I'm going to be laser-focused on that one issue. If you start briefing other stuff, it's just going to go right out of my head. I'm not going to consider it. One issue that nobody ever reached: substantial similarity. No discussion anywhere.

Okay. Anything else?

MR. PASSIN: Your Honor, may I ask one thing? My co-counsel may step on my feet, but is there any way we can get

a little longer?

THE COURT:  No, because I want to keep your trial date.  And my schedule is such that we have to get the trial done in May.  So I really want to keep the trial date.  To me, it's -- well, first of all, I think it's very important for you all, one way or another, whether it be on summary judgment or after a trial, to have a verdict, to have an answer to this issue.  And then to go to the Court of Appeals, if that's what you want to do.

And the second thing — and this is selfish on my part, I'll grant you — is that any post-trial motions have to be decided in the summer because she's leaving in September.  And I can't get a new law clerk acquainted with the case to the same degree -- I can't get a new law clerk who will have read the books.  This case in particular is not a case I can pass off.  And, unfortunately, I can't keep her beyond her sell-by date.

Okay.  Anything else?  All right.  Go to work.

Oh, wait.  Jordyn has a question.

Oh, Jordyn has asked that I remind you, do not send us emails with merits arguments in them.  Do not write letters with merits arguments in them.

MR. PASSIN:  I'm sorry.  Excuse me, your Honor.

THE COURT:  No merits arguments in emails.  No merits arguments in letters.  Merits arguments come in briefs,

Q1CVFREC

accompanied by notices of motion.

Okay.  Go to work.  Go to work.

It's lovely to meet you.

MR. PASSIN:  Thank you, your Honor.

THE COURT:  Nice to meet you.

And I have several more of Ms. Freeman's manuscripts to read, and that's what I'm about to start now.

MR. PASSIN:  Happy reading, your Honor.

THE COURT:  Look, we'll be the only people in the whole world who will have read --

MR. PASSIN:  Can I highlight something?

THE COURT:  No.  But we'll be the only people in the world who will have read all of this stuff:  Us and you guys.

Okay.

*    *    *