**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LYNNE FREEMAN,

        Plaintiff,

    v.

TRACY DEEBS-ELKENANEY, et al.

        Defendants.

Case No. 1:22-cv-02435-CM-SN

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON SUBSTANTIAL SIMILARITY**

## I.    INTRODUCTION.

Defendants appreciate the Court's invitation to seek summary judgment on the central, dispositive issue of whether their *Crave* novels are substantially similar to Plaintiff's manuscripts for *Blue Moon Rising (BMR)/Masqued*. Because Plaintiff cannot show that the *Crave* novels are substantially similar to protected elements of her manuscripts, her copyright claims fail as a matter of law.

The *Crave* novels are not substantially similar to Freeman's manuscripts under any version of any legal test that has ever been applied in any copyright infringement case, in this Circuit or any other. This is true whether one compares just one of Freeman's manuscripts to any one of the *Crave* novels, or improperly compares (as discussed below) disparate elements from Freeman's many unpublished manuscripts against cherry-picked

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 6

    A.   The Court Should Apply the Analytical Approach of *Hogan v. DC Comics* to Defendants' Summary Judgment Motion ............................................. 6

    B.   Summary of the Parties' Works .............................................................. 8

        1.   The *Crave Series* ......................................................................... 8

            a) *Crave* ........................................................................... 11

            b) *Crush* ........................................................................... 14

            c) *Covet* ........................................................................... 16

            d) *Court* ........................................................................... 18

        2.   Plaintiff's Manuscripts for *Blue Moon Rising / Masqued* ........................ 21

            a)_*BMR 2010* ................................................................... 25

            b) *BMR 2011* ................................................................... 26

            c) *Masqued 2012* ............................................................. 28

            d) *Masqued 2013* ............................................................. 29

            e) *Masqued 2014* ............................................................. 30

            f) *Masqued 2016* .............................................................. 31

    C.   The Court Must Filter Out Tropes, Scenes a Faire, and Unprotectible Ideas From Its Substantial Similarity Analysis ............................... 33

    D.   Plaintiff Cannot Construct a Copyright Infringement Claim Based on Amalgamated Bits and Pieces of Different Works ................... 39

    E.   *Crave* and *BMR/Masqued* Are Not Substantially Similar ..................... 46

        1.   The Works Do Not Have Substantially Similar Plots ............................... 47

        2.   The Works Do Not Have Substantially Similar Characters ...................... 54

        3.   The Works Do Not Have Substantially Similar Settings .......................... 62

        4.   The Works Do Not Have Substantially Similar Themes .......................... 64

        5.   Pace Does Not Support Substantial Similarity .......................... 65

        6.    The Works Differ in How They Use Tropes in the Genre........................65

        7.    The Works Differ In Their Total Concept and Feel ...................................67

    F.    There Is No Substantial Similarity Between *Crave* and *BMR/Masqued,*
          Regardless of the Analytical Test That is Applied. .................................71

III.    CONCLUSION...........................................................................................73

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Federal Cases**

*Allen v. Scholastic, Inc.*

    739 F. Supp. 2d 642 (S.D.N.Y. 2011)................................................... 39, 47, 49, 54, 68

*Amanze v. Adeyemi*

    2019 WL 2866071 (S.D.N.Y. Jul. 3, 2019) ................................................. 47

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*

    150 F.3d 132 (2d Cir. 1998)........................................................................ 40

*Dean v. Cameron*

    53 F. Supp. 3d 641 (S.D.N.Y. Sept. 17, 2014) ........................................... 41

*DiTocco v. Riordan*

    815 F. Supp. 2d. 655 (S.D.N.Y. 2011)........................................................ 54

*Dreamtitle Publ'g, LLC v. Penguin Random House LLC*

    2023 WL 4350734 (S.D.N.Y. Jul. 5, 2023) ................................................ 64

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*

    499 U.S. 340 (1991)................................................................................... 72

*Hogan v. DC Comics*,
    48 F. Supp. 2d 298 (S.D.N.Y. 1999)........................................................ 6-8, 54

*Kroencke v. Gen. Motors Corp.*
    270 F. Supp. 2d 441 (S.D.N.Y. July 10, 2003)........................................... 40

*Lewinson v. Henry Holt and Co., LLC.*,
    659 F. Supp. 2d 547 (S.D.N.Y. 2009)........................................................ 32

*Litchfield v. Spielberg*

    736 F.2d 1352 (9th Cir. 1984) ................................................................... 49

*Mallery v. NBC Universal,*

    2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ............................................................... 54

*Nelson v. Grisham*
    942 F. Supp. 649 (D.D.C. Sept. 26, 1996)...................................................................40

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*

    602 F.3d 57 (2d Cir. 2010) .......................................................................................... 68

*Reyher v. Children's Television Workshop*

    533 F.2d 87 (2d Cir. 1976)........................................................................................... 68

*Sheldon Abend Revocable Tr. v. Spielberg*

    748 F. Supp. 2d 200 (S.D.N.Y. 2010)......................................................................... 73

*Walker v. Time Life Films, Inc.,*
    784 F.2d 44 (2d Cir. 1986)......................................................................................32, 39

*Werlin v. Reader's Dig. Ass'n, Inc.*

    528 F. Supp. 451 (S.D.N.Y. 1981)............................................................................. 71

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996)..................................................................................32, 39, 49

**Other Authorities**

Local Rules of the United States District Courts for the Southern and Eastern
    Districts of New York, Local Civil Rule 6.3 ............................................................2

elements from the Defendants' published novels. This is also true whether one compares the text, the structure, the total concept and feel, or the "selection, order and arrangement" of the separate works.

The only actual "similarities" between the works – and these are legally insufficient to support a finding of copyright infringement – are that they are both written in the same genre, young adult ("YA") paranormal romance, and they are both set in Alaska. This shared genre means that a limited number of tropes common to that genre are employed by both authors, but the expression of those common tropes is entirely different in their respective works. The choice of setting also leads inevitably to certain high-level generalities – *e.g.*, books set in Alaska will naturally involve scenes that take place in the snow – but again, the expression of those ideas is wildly different in the respective works, and two hundred years of case law makes crystal clear that ideas and concepts cannot form the basis of a copyright claim.

Throughout this case, Plaintiff has been deliberately vague about her exact theory of infringement. As a threshold matter, she has not suggested that the *Crave* novels include verbatim copying of her manuscripts – never identifying a single verbatim overlapping chapter, paragraph, or even sentence, because there are none. While at various times Plaintiff has argued that the works are substantially similar under a "fragmented literal similarity" analysis, at most she has pointed to a few scattered short phrases of no more than a few words each out of the more than ten thousand pages of manuscripts and novels at issue. In the absence of any verbatim copying, Plaintiff has turned to a grab-bag of tests

for non-literal similarity, without ever settling on one, much less applying such a test with any consistency to the works.[1]

Plaintiff has argued that she can show "comprehensive non-literal similarity," but has never been able to point to any replication of the fundamental structure or essence of her manuscripts.  Plaintiff has argued that the "total concept and feel" of the works is the same, but again without specifics and at a level of generality that would render all works within the YA paranormal romance genre unlawfully similar.  Recently, Plaintiff seems to have shifted to an argument that her works contain a unique "selection, order and arrangement" of unprotectible tropes, but she cannot point to a replication of that selection, order and arrangement in the *Crave* novels, much less the slavish duplication required to prove infringement of such a "thin" copyright interest.

As Your Honor has noted, the touchstone for proving infringement is simply whether the works are substantially similar; all of the various tests used in this and other Circuits are merely tools used to assess this basic question, when confronted with different types of works. Here, the works at issue are literary, narrative fiction, and require no special analysis for the Court to determine that they are not substantially similar. The Court need only compare the actual works themselves. The only two further guideposts that Defendants submit must be part of the analysis are that the Court must not (1) consider

---

[1] For a robust review of the various tests for non-literal similarity, *see* Pamela Samuelson, *A Fresh Look at Tests for Nonliteral Copyright Infringement*, Northwestern University School of Law, Vol. 107, No. 4 (2013) (available at https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1045&context=nulr).

unprotectable elements of Plaintiff's work when determining substantial similarity,[2] or (2) allow Plaintiff to aggregate disparate – and often contradictory – versions of her manuscripts into some imagined larger "work" (which never existed except in the minds of Freeman and her counsel for purposes of this lawsuit) and use that amalgamation of elements of different works as the basis for comparison.

Plaintiff recently sought permission from the Court to expand her briefing from sixty to one hundred pages. Defendants suspect that this is so Plaintiff can take the hundreds of pages of "comparisons" previously submitted in chart form, which were rejected by the Court as mere argument and not evidence of infringement, and recycle them in some fashion in her opening brief. If Plaintiff finally, against all odds, presents a coherent theory of infringement backed up with clear examples of alleged similarity, Defendants welcome the opportunity to rebut her arguments. However, if what Plaintiff indeed presents is another laundry list of "examples" pulled from across scattered locations in her various works and the four *Crave* novels, made up entirely of unprotectable tropes and ideas dressed up to look similar by the careful use of ellipses, the amalgamation of words and phrases, and mischaracterized paraphrasing, Defendants submit that this instead will demonstrate the fundamental void at the heart of Plaintiff's case, which is illustrated by the following high-level comparisons, which will be discussed in greater detail herein.

---

[2] As Your Honor has noted, Courts in this Circuit apply a "more discerning observer" test to works like these that contain both protectable and unprotectable elements (which, in literary fiction, would typically be all works), but in the main this sobriquet simply requires the Court to disregard unprotectable elements when comparing the works.

- Plaintiff claims the books' plots are similar because they share "overall storylines." But general storylines are unprotected ideas and only an author's specific expression of them is copyrightable. Plaintiff claims Defendants infringed her central story of "a teenaged heroine who turns out to be paranormal and must fight a supernatural war," but this generic idea of a young hero with extraordinary powers is both common in fiction (*e.g.*, *Fallen* by Lauren Kate, *Hush, Hush* by Becca Fitzpatrick, the *Evermore* series by Alyson Noel, the *Daughter of Smoke and Bone* series by Laini Taylor, the *Wings* series by Aprilynne Pike, and *Paranormalcy* by Kierstin White) and is expressed very differently in the *Crave* novels.

- Plaintiff claims the books' protagonists Anna/Mia/Ella (*BMR/Masqued*) and Grace (*Crave*) are similar, but, *inter alia*: (1) Grace is short with curly hair, while Anna/Mia/Ella is tall with long dark layered hair; (2) Grace is a gargoyle who can fly and heal, while Anna/Mia/Ella is a witch who practices Tarot and has premonitions; (3) Grace doesn't know she's paranormal, while Anna/Mia/Ella knows she's a witch from the outset; (4) Grace's parents both died tragically, while Anna/Mia/Ella lives with her mother and her father turns out to be living, as well; and (5) Grace attends a remote paranormal boarding school in the mountains, while Anna/Mia/Ella goes to a normal public school in a city.

- Plaintiff claims that Grace's first boyfriend, Jaxon, is similar to Anna/Mia/Ella's boyfriend Ash, ignoring that Hudson, not Jaxon, is Grace's main love interest in the *Crave* series. In any event, Jaxon is a pale vampire with a jagged facial scar and the power of telekinesis, while Ash is a rosy-cheeked, sun-kissed werewolf with "supermodel" looks.

- Plaintiff claims the books' villains are similar, but *Crave*'s main villain, Cyrus, is a megalomaniac vampire king who leads large paranormal armies to take over the world, while *BMR's* main villain Ronan/Aeden is a Druid priest who privately stalks Anna/Mia/Ella as a raven.

- Plaintiff claims the books' settings are similar, but *Crave* is set in a remote boarding school for paranormal students in a gothic castle in a remote location in the Alaska mountains, whereas the school in *BMR/Masqued* is a real public high school in Anchorage, the largest city in Alaska. Outside the school setting, the characters in *Crave* visit myriad, fully-realized paranormal settings around the world across its four books, while *BMR/Masqued* mostly takes place at ordinary locations in and around Anchorage.

- The books wildly differ in total concept and feel. *Crave* is written in a fun, casual, modern, and quirky tone with an emphasis on humor, diversity, found

family, and teamwork, while *BMR/Masqued* is more serious, with a darker, more brooding tone, and it does not emphasize diversity, teamwork, or *Crave*'s many other distinct themes.

Ultimately, none of Plaintiff's claimed similarities, considered individually or in combination, supports a finding of substantial similarity across novel-length books in genre fiction.

## II.    <u>ARGUMENT</u>

### A.    **The Court Should Apply the Analytical Approach of *Hogan v. DC Comics* to Defendants' Summary Judgment Motion.**

Judge Scheindlin's opinion in *Hogan v. DC* Comics, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) provides a sound model for analyzing summary judgment motions challenging a plaintiff's ability to prove substantial similarity in a literary fiction copyright case. In *Hogan*, Judge Scheindlin granted defendant's motion for summary judgment after comparing the plaintiffs' work, *Matchsticks,* a dark, Gothic comic book with the defendant's graphic novel *Dhampire: Stillborn* and ultimately concluding that no reasonable jury could find substantial similarity.

The *Hogan* plaintiff alleged that *Matchsticks* and *Dhampire* shared the following elements: (1) both works contain a half-human, half-vampire main character named Nicholas Gaunt, who is a young white male with "pale skin, a medium build, dark and tired eyes, dark hair that is scraggly, short and unkempt"; (2) both characters seek to uncover the truth about their origins and both learn about their origins through flashbacks or memories; (3) both characters are faced with the choice of pursuing good or evil; (4) both characters are indoctrinated into the forces of evil by killing; (5) both characters have a "sinister

genealogy"; (6) both characters have a developing romance; (7) both works use similar imagery, such as religious symbolism, Biblical allusions and the use of doors to see into the past; and (8) both works have a "macabre" feel, including scary characters and dark, haunted scenes.

Judge Scheindlin began her analysis with detailed summaries of the two works, which she had carefully reviewed. She then compared the works, and found that even though they shared a similar underlying idea, in that they both involved a half-vampire character who is on a quest that leads him to discover his origins, and despite the fact that the main character had the exact same name in both works, the similarities consisted of unprotectable ideas and themes that did not represent any original elements of plaintiffs' work.

Judge Scheindlin observed:

> A half-vampire, half-human character would necessarily have a "sinister genealogy." The quest of a half-vampire who is searching for his origins would predictably involve a struggle and ultimate choice between good and evil, as the very essence of the character and the story is that such character has a "dual nature," and the use of flashback or memory is the most logical way to portray events from that character's past. The fact that the characters become indoctrinated into the forces of evil by killing is a similarly unprotectable theme that is not uncommon to horror or science fiction literature.

48 F. Supp. 2d at 310-11.

The Judge then turned her focus to the manner in which the parties actually used these ideas, tropes, and *scènes à faire* in their works, reviewing the "total concept and feel," and the settings, characters, sequences of events, plots, and other elements of the works in the manner that the Second Circuit has adopted for analyzing substantial similarity in

literary fiction cases, finding that plaintiff could not prove substantial similarity between the defendant's work and any protected elements of his own work.

Following the analytical structure applied in *Hogan*, Defendants will show that no actionable substantial similarities exist between Plaintiff's *BMR/Masqued* on the one hand and *Crave* on the other. We begin with a detailed summary of *BMR/Masqued* and *Crave*. We then explain the use of tropes, *scènes à faire*, and ideas in YA paranormal romance fiction and how they are used in *BMR/Masqued* and *Crave*, so that the Court can filter these unprotected elements out of its substantial similarity analysis. Even without such filtering, the works are starkly different and use unprotectible ideas, *scènes à faire*, tropes, and genre conventions very differently. Moreover, once the latter are filtered out, there is zero substantial similarity between such core aspects of the works as total concept and feel, plots, characters, or settings. As a result, Plaintiff's copyright claim fails as a matter of law and should not survive this motion for summary judgment.

### B.     Summary of the Parties' Works

#### 1.     The *Crave* Series

As a brief overview, the *Crave* series consists of YA novels in the supernatural romance genre of which *Twilight* is the seminal modern incarnation, but which includes L.J. Smith's *The Vampire Diaries* from 1991 (a YA title), Anne Rice's *Interview with a Vampire* series (1976), as well as many earlier novels and films featuring Dracula, witches, werewolves, dragons and other supernatural beings. The *Crave* novels blend in elements made popular by the *Harry Potter* books and films, giving them an American twist, by setting the novels in a remote, magical boarding school in Alaska. However, the arc of the

narrative of the first four novels moves from this classic "fish out of water" premise (human protagonist in a supernatural school) into strategic, political and violent confrontations between supernatural species fighting for dominance on a global level.

The *Crave* series currently consists of six published novels—*Crave* (2020); *Crush* (2020); *Covet* (2021); *Court* (2022); *Charm* (2022); and *Cherish* (2023) (Dkt. 24, ¶¶ 33-34). Only the first four are at issue in this case (*Id.*, ¶¶ 1, 8, 39, 44).

*Crave* is often described as "Harry Potter meets Twilight," in that it melds the magical, boarding school elements of Harry Potter with the vampire romance made popular by the Twilight series. Moreover, it is not based on any known mythology; rather, the series creates its own, drawing from literary canon rather than already established religious or mythological systems. The plot of each *Crave* book is detailed and distinct, with a different beginning, middle and end for each book. While the series as a cohesive whole has a similar tone, each book has different plot beats, different character arcs, different climaxes and resolutions, and each book represents a different story archetype such as journey and return, quest, tragedy and more (as discussed further below). Collectively, the novels tell a sprawling tale in which teenaged protagonist Grace Foster is introduced to a paranormal world of witches, vampires, gargoyles, dragon shifters, wolf shifters, giants, manticores, and living gods, while herself becoming a major player in a centuries' old strategic chess game between the forces of Order and Chaos. Through all of this, Grace falls in and out of love, finds a strong sense of community and chosen family, repeatedly overcomes dangerous paranormal obstacles, and develops a mature understanding of relationships,

love, leadership, the complexities of the world, and how to cope with life's inevitable challenges.

The *Crave* books are written in a modern tone with an emphasis on humor, diversity/inclusion, and teen culture, reflecting the period in which they were written (2019-2021), particularly in terms of the political and social events of the time, as well as the COVID-19 pandemic, among other historic events that are explored in theme and allegory on the page.

The first four books primarily take place at and around Katmere Academy, a gothic castle and magical boarding school hidden within the remote mountains of northern Alaska. Numerous additional locations are introduced over the course of the series, such as the Dragon Court in Manhattan, the Witch Court in Turin, Italy, the Vampire Court in London, the Gargoyle Court in Ireland, Giant City in the Redwood Forest, and an unbreakable prison in New Orleans. The first four books take place over eight months, including a four-month time gap between books one and two.

*Crave* explores numerous themes, many of which are common in YA romance and teen literature, including: coming of age; love and family; self-discovery and self-reliance; feminism; pushing past stereotypes and preconceptions; trust, loyalty, betrayal, and forgiveness; grappling with mortality, grief and forces beyond one's control; bravery, sacrifice, and leadership; the nature, responsibility, and abuse of power; chaos versus order and checks and balances; the nature of evil; and the power of humor, friendship, compassion, mercy, and (per the heroine's name) grace.

A brief summary of each *Crave* book follows[3]:

a)      *Crave*

*Crave* can best be described as a journey-and-return story (a plot where the protagonist leaves their ordinary world for a strange, often magical place, overcomes dangers, and is transformed by newly acquired wisdom or experience). *Crave* begins when short, curvy, curly-haired Grace moves from San Diego to rural Alaska mere weeks after both her parents die suddenly in a car crash (*Crave* pp. 1-11). She travels by bush plane to a remote town near Denali and is met by her cousin, who takes her by snowmobile up to her new boarding school, Katmere Academy, which is hidden in the mountains far from civilization. Her Uncle Finn is Katmere's headmaster and her younger cousin Macy is a junior and Grace's roommate (*e.g., id*. pp. 6, 18-19). Unbeknownst to Grace, Katmere is a bona fide magical school (like Hogwarts in Harry Potter), where the student body is divided into four factions—vampires, witches, wolf shifters, and dragon shifters—who variously align with and/or distrust one another (*e.g., id*. pp. 313-321, 398-504). Paranormal power is woven into the fabric of the school; the students take classes about supernatural topics and regularly discuss and display their powers openly (except in front of Grace at first) (*e.g., id*. pp. 96, 317-323, 342-369).

---

[3] Defendants acknowledge Your Honor's instruction at the most recent in-person conference that the Parties need not include lengthy fact sections in their briefing. Here, Defendants reiterate their summaries of the *Crave* titles and two of Plaintiff's manuscripts from the prior summary judgment briefing for the Court's convenience, and because the content of those works is directly relevant to the substantial similarity argument. The summaries of Plaintiff's other manuscripts are new to this briefing.

At first, Grace is mired in grief at the loss of her parents and struggles to accept her starkly different new life (*e.g., id.* pp. 1-11, 28-29, 50-51, 248-249). Throughout the book, Grace believes she is a normal girl with no paranormal powers (*e.g., id.* pp. 322-338). Grace's initial love interest is the mysterious and surly Jaxon Vega, eventually revealed to be a nearly 200-year-old vampire with telekinetic powers and the prince of the royal vampire family (*e.g., id.* pp. 391-392, 439-441, 559-562). He hangs out with a diverse group of five other vampires (the "Order"), the coolest clique in school (*e.g., id.* pp. 135, 348). Unbeknownst to Grace, she and Jaxon magically bond as "mates" upon their first meeting over a chess board featuring paranormal figurines (*Id.* pp. 21-31, 86-87, 538-547). Jaxon acts distant at first (mostly for Grace's safety), but as the story goes on, he saves Grace from other paranormal students who try to hurt and kill her, and the two fall in love (*Id.* pp. 56-60, 330-334, 553-555).

The other main characters in *Crave* are: (1) Macy, a kind, fun, and whimsical witch with rainbow-colored hair who emotionally supports Grace as she transitions to life at Katmere and joins the paranormal world; (2) Lia, a female vampire of East Asian descent who appears to be quiet, nerdy, and friendly, but is secretly plotting to use Grace as a human sacrifice in a magical spell to resurrect her old boyfriend, Jaxon's older brother Hudson; (3) Flint, a tall and muscular half-Egyptian, half-Irish dragon shifter who is friendly and flirty with Grace even as he plans to kill her to prevent her from being used in Lia's plot; (4) Heather, a feisty, gay, Black girl who is Grace's best friend from home and regularly texts with Grace, providing a contrast between Grace's old and new lives, and (5) Mekhi, a Black vampire who is a member of the Order, and befriends Grace even as his best friend,

12

Jaxon, tries to push her away. Major series character Hudson only appears briefly at the very end of *Crave* but is often discussed and Lia's plan to "resurrect" him drives the book's central conflict.

Over the course of the book, Grace continually experiences oddities and dangers as she slowly learns the "truth" about Katmere and its paranormal denizens (*e.g., id*. pp. 344-345). On her first night, two wolf shifter students try to intimidate her by throwing her out into the cold, but Jaxon intervenes and saves her (*Id.* pp. 52-60). Later, Grace leaves an intimidating, school-sponsored welcome party and meets Lia, who secretly poisons her (*Id*. pp. 97-107). Flint later knocks Grace out of a tree during a snowball fight in an attempt to kill her, to prevent her from unwittingly furthering Lia's plot (*Id.* pp. 152-152; *see also id*. pp. 403-417, 553-555 (later revealing Flint's motivation)). Over the course of the book, Grace and Jaxon's relationship escalates, and the two first kiss in a climactic scene where Jaxon is so overcome by passion that he loses control of his powers and causes an earthquake (*Id*. pp. 260-272). Later Jaxon rescues Grace from a falling crystal chandelier in the school cafeteria (*Id*. pp. 347) and nearly kills a fellow student, wolf shifter Cole (*Id.* pp. 381-383), for repeated attacks on her. As their relationship develops, Jaxon bites Grace's neck in a sensual, YA-appropriate placeholder for sex. At the end of *Crave*, Jaxon manages to interrupt Lia's human sacrifice spell and rescue Grace from an altar filled with candles and jars of blood in the school's ossuary. Grace, in turn, rescues him when she slits her own wrist to feed him when he is dying from the fight with Lia (Lia is killed) (*Id*. pp. 469-497). A week later, after things seem back to normal, Hudson appears in a puff of

smoke in the school hallway, swinging a sword toward Jaxon (*Id*. pp. 522-537). Grace steps in to take the blow, and then immediately and mysteriously turns to stone (*Id*).

### b)     Crush

Crush can best be described as a quest book – one where a protagonist undertakes a journey to find a specific person, place, or object(s) in order to achieve a goal and is tested harshly along the way. The story begins four months after *Crave* ends and spans approximately two weeks. Hudson is now a major character, and a central plot point of *Crush* involves him being trapped inside Grace's head where only she can hear and see him, creating romantic tension and leading to an emotional climax where Jaxon and Grace's mating bond is broken. Another running plot point is "Ludares"—a sports game much more bloody, dangerous, and high-stakes than Quidditch (Harry Potter).

Grace, Jaxon, Hudson, Macy, and Flint remain major characters[4], as do members of Jaxon's " Order," including Mekhi. Other notable characters include: (1) Cyrus—Jaxon and Hudson's father, the Vampire King and ultimate villain of *Crush*, *Covet*, and *Court*; (2) Cole, the wolf shifter alpha, who was briefly introduced in *Crave* and now plays a bigger role as a minor villain; (3) Cassia, nicknamed the "Bloodletter," Jaxon's thousand-year-old mentor and the most feared vampire in the world, who looks like a harmless little old lady and is magically imprisoned in an ice cave; (4) the Unkillable Beast, a huge, fearsome, rock-covered creature who has been alone and restrained with unbreakable shackles in a

---

[4] Flint notably admits to Grace that he is gay and in love with Jaxon (*Crush* p. 388).

cave for a millennium; and (5) Xavier, a charming and fun wolf shifter who is new to Katmere and with whom Macy falls in love.

*Crush* begins with Grace finding out that she has been frozen in stone for four months and that she is a "gargoyle"—a type of paranormal creature long believed to be extinct (*Id.* pp. 12-24, 31). Grace has newfound paranormal gargoyle powers such as flight (*e.g.*, *id.* pp. 102-103) and the ability to heal others (*id.* pp. 513-518) and in one scene, Flint shifts into a dragon and takes Grace for a ride on his back as her first flying lesson (*id.* pp. 273-285). But she soon realizes something is wrong, waking up bloody to find that she has unconsciously been stealing high-value magical objects from around the school (*Id.* pp. 82-121). She eventually learns that Hudson is trapped inside her head and is manipulating her actions (*Id.* pp. 121-129). She also learns that she has different colored "strings" inside of her mind, which correspond to different metaphysical connections and powers, including ones representing her gargoyle self and ones representing her bond with Jaxon.

The Bloodletter reveals that a special spell is needed to free Hudson, requiring one elusive magical item from each of Katmere's paranormal factions (*Id.* pp. 167-171). Grace and her friends proceed to search for the objects, variously competing in Ludares to win a vampire bloodstone and completing a near-fatal mission to recover a dragon bone from an underground dragon boneyard (*See id.* pp. 402-409, 449-466). They travel to the Unkillable Beast's volcanic island near the North Pole to retrieve the final magical object (the gargoyle's heartstone), where Xavier is killed and others are badly injured during the ensuing violent struggle (*Id.* pp. 523-550). The Unkillable Beast turns out to be a gargoyle

with whom Grace can communicate telepathically; he offers Grace his actual heart, but she refuses to take it (*Id*).

Returning to Katmere, Grace and Jaxon must prevail in an unfairly lopsided Ludares match to establish Grace's rightful gargoyle seat on the "Circle," the royal paranormal governing body (*See id*. pp. 486-494 (explaining backstory)). Right before the match starts, Cole suddenly approaches and severs the Grace-Jaxon mating bond, leaving them both devastated (*Id*. pp. 563-567). Grace is nearly defeated in the Ludares match, but Hudson manages to feed her his power, allowing her to regroup and prevail (*Id*. pp. 624-632). But as she goes to claim her seat on the Circle, Cyrus bites her, injecting her with deadly venom (*Id*. pp. 633-642). Hudson carries Grace into the mountains and buries her alive to use the earth to heal her (*Id*. pp. 649-656). Grace finally puts her full trust in Hudson—a major climax and turning point (*Id).* Hudson saves Grace and the book ends with him telling Jaxon, who is holding the now-healed Grace, to "take your … hands off my mate." (*Id*. pp. 657-663).

### c)     *Covet*

*Covet* also follows the quest story archetype, though it also embraces elements of a tragedy, as Grace and her friends search for the key to free the Unkillable Beast, a journey which ends with several of them severely injured or dead. The story begins shortly after *Crush* ends and spans about eight weeks, during which Grace turns eighteen and graduates from high school. Throughout the novel, Grace must balance her deep and competing feelings for Hudson and Jaxon, who continually damage each other in uncontrollable ways.

Major new settings include the Aethereum (a fearsome prison in New Orleans), Giant City in the California Redwood Forest, and the Dragon Court in New York City.

Returning major characters include Grace, Jaxon, Hudson, Macy, Flint, Cyrus, Cassia a/k/a the Bloodletter (revealed to be the God of Chaos), and the Unkillable Beast. Notable new characters include: (1) Nuri and Aidan, Flint's parents and the Dragon Queen and King; (2) several giants, including Vander, the "Blacksmith"; (3) Luca, a vampire and member of the Order, and Flint's new boyfriend; (4) Adria, nicknamed the "Crone" (revealed in *Court* to be the Bloodletter's sister and the God of Order); (5) Remy, a teenaged time wizard who speaks with a New Orleans drawl and his female manticore prison cellmate Calder; and (6) Aethereum prison warden Charon.

*Covet* opens at Katmere with Grace devastated by how her decisions have led to her close friend Xavier's death (*Covet* pp. 1-4). As Grace prepares to graduate, she learns that Jaxon is deeply hurting and that she may need to break her mating bond with Hudson to save him (*Id*. pp. 65-69). The Bloodletter instructs Grace and friends to retrieve a magical object from the Unkillable Beast to defeat Cyrus, and also to find the Blacksmith (Vander) to obtain the key to the Unkillable Beast's unbreakable shackles.[5] (*Id*. pp. 116-122). Meanwhile, Cyrus has put a warrant out for Grace and Hudson's arrest, which could result in them being imprisoned in the Aethereum (*Id*. pp. 134-137). Grace and her friends fly (mostly via dragon, though Grace also uses her gargoyle wings) to Giant City to search for Vander, but learn that he has long been imprisoned in the Aethereum (*Id*. pp. 208-256).

---

[5] It is later revealed the Bloodletter is manipulating them as part of a larger scheme.

Flint later invites the group to attend a festival at the Dragon Court in New York City (*Id*. pp. 287-300). Grace and friends attend the lavish ball, followed by a huge festival in Times Square, after which Grace and Hudson dance on the roof of the Dragon Court and then make love all night (*Id*. pp. 330-377).

The group later visits a tropical island to meet the Crone, who reveals that Jaxon no longer has a soul following the severance of his and Grace's mating bond (*Id*. pp. 386-390, 414-417). After the group returns to Katmere and graduates, vampire guards storm the school and arrest Hudson, Grace, and Flint (*Id*. pp. 428-432). The three are sent to the Aethereum, where they meet Vander, Remy and Calder, and are forced by Charon to battle giants in order to escape (*Id*. pp. 433-574). Grace's group then travels to the Unkillable Beast's volcanic island to free him (*Id*. pp. 618-619). But Cyrus and his allies are lying in wait and an epic battle ensues, in which Luca dies and others are badly injured, including Jaxon, who is saved by Nuri giving him her dragon heart (*Id*. pp. 620-642). Cyrus is ultimately defeated but flees (*Id*. pp. 620-648). Grace frees the Unkillable Beast, who then shifts into a man (*Id*. pp. 649-654). The book concludes with an epilogue from Hudson's point of view, where he resolves to finally reveal to Grace what the green string inside her really is (*Id*. pp. 655-680).

### d)     *Court*

*Court* follows the "overcoming the monster" plot (the main character sets out to destroy a great evil or menacing force/figure and is forever changed by the battle). The story begins immediately after *Covet*. Major *Court* plot threads include discovering the truth about Grace's lineage; the increased role of Grace's multicolored internal strings; new

18

tension between Grace and Hudson; awkward sexual tension between Flint and Jaxon; Grace's struggle to earn the approval of the Gargoyle Army and its dismissive General Chastain; and learning to freeze time, despite the God of Time's petulant objections.

The main, still living *Crave* characters return (the Unkillable Beast now a man named Alistair). Notable additional characters include: (1) General Chastain, who dislikes Grace, and his more friendly second-in-command, Artelya; (2) Jikan, the God of Time, a largely comic relief character who is Japanese, dresses outrageously, and speaks in malapropisms; (3) Izzy Vega, Jaxon and Hudson's previously unknown half-sister, who is half-Latinx, dresses in black leather, and wields multiple knives; (4) Macy's mother Rowena, who Macy believed was dead and discovers has actually been Cyrus's prisoner; and (4) Hudson/Jaxon's mother Dehlila, the Vampire Queen, turned vicious from centuries of Cyrus's abuse. Major new settings include: (1) the Gargoyle Court, located in the Cliffs of Moher, Ireland; (2) the ornate, Venetian-styled Witch Court in Turin, Italy; (3) an elaborate lighthouse Airbnb where the group hangs out and recuperates; and (4) the Vampire Court in London, including its crypts and dungeons (*Id*). Katmere Academy is destroyed early in the book, but its grounds host an epic battle at the end of the book (*Id*)

*Court* begins with Grace's group returning to Katmere, grieving Luca, and discovering that all the students have been kidnapped (*Id*. pp. 5-9). Alistair magically transports Grace to the Gargoyle Court, where she meets the Gargoyle Army, a group of thousand-year-old soldiers who have been frozen in time to prevent their death from a poison Cyrus had long ago given them (*Id*. pp. 30-44). Cyrus's army then arrives at Katmere, and Grace's group narrowly escapes through a portal after the nearly defeated

Hudson and Jaxon combine powers and turn the beloved Katmere to dust in a last-ditch effort to escape (*Id*. pp. 59-75).

After the group is turned away from the Witch Court (who fear Cyrus) and realize they cannot access the frozen-in-time Gargoyle Court, Hudson treats them to an epic stay at the rented lighthouse where hijinks ensue, including Jaxon walking in on Hudson and Grace in flagrante delicto (*Id*. pp. 80-89, 118-123; 226-230). The group visits the Bloodletter, who reveals that she is Grace's many-times great-grandmother, making Grace a demigod of chaos (*Id*. pp. 153-182). She instructs that Grace must free the Gargoyle Army to defeat Cyrus, but this requires an antidote to Cyrus's poison, which in turn requires winning the deadly, aptly named "Impossible Trials" (*Id*. pp. 183-205). The group then travels to an outdoor mall in St. Augustine, Florida to obtain the antidote, the "tears of Elios", guarded by a sexy witch named Tess who works in a taffy shop (*Id*. pp. 206-217).

The group next travels to the Vampire Court in London, where Izzy arrives in a flurry of knives and throws them in the dungeons, where they find the kidnapped Katmere students and learn that Rowena is alive and is being held as Cyrus's prisoner (*Id*. pp. 249-257). Cyrus offers to spare them after Grace reluctantly agrees to obtain the magical "God Stone" from the Gargoyle Court (*Id*. pp. 273-283). After Grace retrieves this from Chastain (*id*. pp. 284-288, 394-401), Cyrus reneges and imprisons Grace and her friends, but they escape with the aid of Grace's time-freezing power (*id*. pp. 413-455). The group later competes in the Impossible Trials, which prove fatal for several characters and culminates with a battle against a horrifying and ever-growing beast (*Id*. pp. 471-569). Grace shows

mercy to the beast, who cries, revealing that its tears are the antidote they have been searching for (*Id*. pp. 569-580).

Back at Katmere (now a pile of rubble), Cyrus and his huge army captures Grace's group, traps them in a "power-sucking machine" activated by the God Stone, and successfully becomes a false god (*Id*. pp. 587-646). When all appears lost, Izzy switches sides and Grace harnesses her powers as the demigod of chaos, so that she is finally able to command the Gargoyle Army (*Id*. pp. 645-661). Cyrus and his army are vanquished in an epic battle (*Id*. pp. 662-665). Grace magically traps Cyrus in the Bloodletter's ice cave with Delilah, who can eternally feed off of him to make up for years of persecution (*Id*. pp. 666-670). The now-freed Bloodletter congratulates Grace for a chess game well played, and Grace's group returns to the lighthouse for much deserved rest and recovery (*Id*). In a final cliffhanger, Grace tells Hudson she finally "remembers everything" (referring to her months trapped in stone during *Crave*) (*Id*. pp. 671-677).

### 2.    Plaintiff's Manuscripts for *Blue Moon Rising*/*Masqued*

It is difficult to summarize Plaintiff's multitude of manuscripts in any unified way because Plaintiff's treatment of plot and characters differs so markedly between the various versions. (*See* Dkt. 298, at pp. 15-17). Many authors go through revision after revision before settling on a final version they seek to share with the world, but what *is* problematic is that Plaintiff has refused to identify a final "work" here, instead suing on every one of her manuscripts and notes written across half a decade, claiming that Defendants somehow cherry-picked from each to infringe. The reason for this approach is transparent: on the face of any individual manuscript, none of the *Crave* novels infringe any of the Plaintiff's

manuscripts, whereas Plaintiff can try to sow confusion by pulling disparate pieces from thousands of additional pages and finding some circumstance of similarity based on her employing both sides of a binary choice in different versions of her works (*e.g.,* in one version her parents are dead and in one they are alive).

Per an early ruling by this Court, Plaintiff initially selected *BMR* 2011 and *Masqued 2013* to serve as the basis for a substantial similarity comparison. The below synopsis of Plaintiff's works refers to those two versions, as well as the other *BMR/Masqued* manuscripts that Plaintiff submitted to this Court on November 5, 2025.

Generally speaking, although the different versions vary significantly, *BMR/Masqued* follows the coming-of-age story structure, and centers around Annelise ("Anna") (alternately known as Mia or Ella in other manuscripts), a sixteen-year-old high school junior who lives in Anchorage, Alaska in a private home with her mother Marcheline and Aunt Brienne (alternately known as Aunt Rose) (*BMR 2011* pp. 8-13; *Masqued 2013* pp. 11-15; *Masqued 2016* p. 4). The mythology of *BMR/Masqued* draws eclectically from different established mythologies depending on the manuscript (Celtic, Egyptian, Greek, and Arthurian). Anna/Mia/Ella descends from a family of witches/Kindred and has the power to read Tarot cards; her Tarot readings and myriad prophetic dreams/visions are a recurring plot point (*e.g.*, *BMR 2011* pp. 2-6, 461; *Masqued 2013* pp. 2-10, 90). Anna/Mia/Ella has a strained relationship with the controlling and secretive Marcheline, who discourages her witchcraft (*e.g.*, *BMR 2011* pp. 8-14) (the relationship is less strained in *Masqued 2013* and more strained in *Masqued 2014* and *2016*). Depending on the version of *BMR/Masqued*, Anne had moved to Anchorage at age

seven from either "San Diego" (*BMR 2011*) or "California" (*2010, 2012, 2013, 2014, 2016*) with Marcheline and Brienne/Rose, following the death of her father and grandparents, or in another version, the additional death of a twin sister, Emma (*Masqued 2016* p. 12). Beyond Tarot and witchery, Anna/Mia/Ella is a typical frustrated teenager who attends a normal, non-magical public high school where she confronts typical teen issues like social status, crushes, and jealous frenemies (*e.g.*, *BMR 2011* pp. 28, 30, 84; *Masqued 2013* pp. 20, 96, 138; *Masqued* 2014 p. 16).

Unlike the *Crave* books which approach paranormal teen romance from a modern perspective far from the genre's heyday in the late aughts and early teens, *BMR/Masqued* sits squarely within those literary moments, drawing heavy inspiration from authors such as Sophie Jordan, Alyson Noel, PC Cast (who notably had a character who was Nyx, as in Freemans's work) and adult authors popular at the time, such as Sherilyn Kenyon (who notably also had a bar named Sanctuary and a scene in her *Dark Hunters* series where two wolves were tied to a tree). Freeman, who is an Alaska resident, approaches the setting of Anchorage with reality (identifying actual places and landmarks), familiarity and fondness, and the desire to superimpose magic upon a her hometown.

*BMR/Masqued*'s main characters are Anna/Mia/Ella, Marcheline, Brienne, and Ash MacKay—the latter a mysterious new student with "supermodel" looks who becomes Anna's love interest and turns out to be a powerful and protective werewolf, but who in some versions is tasked with killing her. Other notable characters include: (1) Taylor, the jealous and vindictive alpha of Anna/Ella/Mia's friend trio, described as blonde, blue-eyed, and conventionally attractive; (2) Brendan, a half-Black, half-Swedish stereotypical "gay

23

best friend" in some versions; (3) Lily, who is Ash/Roman's conventionally attractive sister, also a shifter; (4) Drs. Baen and Caitlin MacKay, Ash/Roman and Lily's parents, who ostensibly came to Anchorage to teach Ancient Global Studies but are really shapeshifters fighting a supernatural war; (5) an evil (*BMR 2011*) or perhaps less evil (*Masqued 2013*) Druid priest named Ronan O'Faiolain (*BMR 2011*) or Aeden Faiolain (*Masqued* 2014 p. 366), who stalks Anna/Mia/Ella in raven form for much of the story; (6) Julian, a vampire (*2011*), incubus (*2013*), or a demon (*2014*) (who doesn't exist in the 2016 version), who abducts Anna/Mia/Ella because he believes she is his reincarnated dead lover, Elise; (7) Elise, revealed to be the High Priestess of Avalon and Anna/Mia/Ella's real mother; and (8) Dante, Anna/Mia/Ella's father, who Anna/Mia/Ella believed had died in an elevator accident (*2011*) or plane crash (*2013*), or because he gave too much information to the Order (*Masqued 2014* p. 71), but is actually alive in wolf form in another dimension (Avalon or the Gloaming).

*BMR/Masqued* primarily takes place at Anna/Mia/Ella's and Ash's homes; the public high school, including its parking lot, cafeteria, classrooms, and hallways; other local spots like a Barnes & Noble, La Mex restaurant, and Beluga Point; the Sanctuary (a neutral supernatural territory accessed through an actual notorious bar (Chilkoot Charlie's) in Anchorage); and, in *Masqued 2013*, an enchanted forest called "the Gloaming;" or, in later manuscripts, "Avalon" (*Masqued 2014* p. 346; *Masqued 2016* p.94). In most versions, *BMR/Masqued* unfolds across approximately four months, beginning with Anna/Mia/Ella's third week of school and ending around her birthday in December. The initial version of *BMR* expressed common YA romance themes including overcoming personal insecurities

and internal conflict, family dynamics and secrets, love and attraction, and social challenges such as the desire to fit in. For example, Anna/Mia/Ella's relationship with her mother is a major theme, as is her waning childhood friendships with Amanda/Samantha (*BMR 2010* p. 14, *Masqued 2014* p. 16). Later versions, however, lean more into epic fantasy and away from YA paranormal romance altogether. Some of these differences are discussed below.

### a)     BMR 2010

The story opens with sixteen-year-old Anna experiencing a terrifying vision: she is alone on a frozen bluff under a full blue moon, hunted by a glowing-eyed creature. She runs, is driven toward a cliff, and is forced to turn and face the predator. She awakens to discover the vision was triggered by a Tarot reading, specifically the Tower card, which signifies catastrophic change and a truth she is refusing to see (*BMR 2010* p. 5).

Anna is a quiet, intelligent high-school student who has long had prophetic dreams and an intuitive connection to Tarot, astrology, and magic (*BMR 2010* p. 7). Her mother discourages this interest, but her aunt secretly supports it. Anna's strained relationship with her mother is a major theme of the book. As Anna's visions intensify, she begins to realize they are not symbolic fantasies but literal premonitions.

At school, Anna befriends the MacKay family, particularly Ash, whose parents teach archaeology and seem to know far more than they admit about ancient civilizations and myth (*BMR 2010* p. 28). Anna learns that ancient bloodlines still exist, with descendants of gods and priestesses, and that she herself is part of this hidden world and is the key to

25

tipping the balance.  (*BMR 2010* p 186). The MacKays reveal that the supernatural is real and that Anna's abilities and lineage mark her as one whose role will be crucial.

In the novel's climax, a vampire villain named Julian wants Anna to "become his bride" (*BMR 2010* p. 435) as payment for a debt for another woman he has lost.  However, Anna escapes through a mirror portal to another realm (*BMR 2010* p. 462) and learns that her normal life is ending and that her "calling" will place her at the center of a conflict older than civilization itself.  Immediately, she must choose to free one of two trapped wolves (*BMR 2010* p. 472) and once she does, she ends up living out the scene of her vision from the beginning of the novel (*BMR 2010* p. 490) where she realizes she has freed a demon and Ash declares his love. It turns out her father is the other wolf, the one she did not set free.

### b)    *BMR 2011*

*BMR 2011* introduces Anna while she is having a vision during a Tarot reading (*BMR 2011* p. 2-7). Anna is having increasing visions and knows that her mother and aunt are keeping secrets from her (*e.g.*, *BMR 2011* pp. 65-73). As the school year starts, mysterious new students Ash and Lily arrive, looking "rock-star-chic" on a motorcycle (*BMR 2011* pp. 15-20). Anna initially doesn't think Ash is her type, but they proceed to fall for each other, to Taylor's jealous chagrin (*e.g.*, *BMR 2011* pp. 24-29, 161-166). As the story unfolds, Anna repeatedly performs Tarot readings (including about Ash) and has numerous foreboding dreams/visons; she is continually stalked by a raven; she develops a strange tingling and growing rash on her neck; she probes her mother and aunt for information about her family; and, she butts heads with Taylor (in one scene seeming to

manifest a zit on Taylor's face, and later fighting with her at a party) (*e.g.*, *BMR 2011* 85-93, 107-108, 139-140, 152-155, 209-214, 350-355). Meanwhile, teen girls are being mysteriously abducted (*Id.* pp. 59-60).

Ash takes Anna to a bluff to watch the northern lights and his eyes frighteningly glow as they have their first kiss, reminding Anna of a vision (*BMR 2011* pp. 167-173). Later, at a Barnes & Noble, Ash reveals that he is a werewolf and that a paranormal war is afoot, featuring demons who are searching for "the one" who is "tied to both houses, light and the dark" and the "key to tipping the balance of the war" (*BMR 2011* pp. 221-250). Anna later returns to school and rescues Ash's mother from an attacking "buidseachd" demon (an Irish wizard who gives a demon his soul in exchange for powerful magic and immortality), but is stabbed in the belly and badly bleeding, prompting Ash to bite her to save her (confirming a previous vision about being bitten) (*BMR 2011* pp. 391-415).

Anna and Ash later visit the Sanctuary, where she notices an apparent vampire eyeing her (*BMR 2011* pp. 487-497). Anna leaves but is abducted by thugs in the parking lot and brought to a Tudor mansion, where the vampire (Julian) tells Anna about Elise (also previously seen in a vision) (*BMR 2011* pp. 512-537). Julian explains that Elise is Anna's real mother, and that he believes Anna in fact *is* Elise, and he wants to take Anna as his lover (*BMR 2011* pp. 538-550). Ash bursts in and fights Julian, and then Taylor joins in the fray, under the control of a demon via a cursed ring on her finger (*BMR 2011* pp. 557-569).

Elise appears to Anna in a mirror and beckons her to portal through the mirror to an alternate dimension (Avalon, sometimes called Annwyn) where she confirms she is Anna's mother, and explains that a wolf from Anna's visions is Anna's father, such that

Anna/Mia/Ella is in no way an orphan (*BMR 2011* pp. 569-581). Anna then follows a raven (Ronan) to come upon two trapped wolves who look familiar (one her father as seen in a vision) (*BMR* 2011 pp. 581-583). Anna frees the wolf she thinks is her father, who snatches her and pushes her out through the mirror as she goes to rescue the second wolf (*BMR* 2011 pp. 583-586). The story returns to Anna's initial Tarot vision from the beginning of the book (*BMR* 2011 pp. 586-589). A large black wolf appears and shifts into a man, Ronan. Ash appears as a bear and lunges at Ronan, who shifts into a raven and flies away. (*BMR* 2011 pp. 590-603).

### c)      *Masqued 2012*

This version stresses mythology, which becomes more structured and ancient, departing from prior versions.  The heroine discovers her family descends from priestesses whose lineage stretches back to Egypt, Atlantis, and Avalon (*Masqued 2012* p. 79), creating a more "epic fantasy" theme. Her aunt is a powerful healer; her mother has concealed the truth to protect her. The heroine's Tarot visions are revealed as a form of inherited oracle magic (*Masqued 2012* p. 513). There is more overt witchcraft such as The Three-Fold Law" (*Masqued 2012* p.94) and Anna learns that she has dark powers within her.

Anna becomes romantically involved with Ash MacKay, a werewolf, (*Masqued 2012* p. 198) whose family guards portals, artifacts, and warded lands. Through him, she visits the Gloaming (*Masqued 2012* p. 200) and learns he is a :Berserker" able to shift into both a bear and a wolf, and that when bad things happen in the human world they are often caused by demons (*Masqued 2012* p. 205). Artifacts—especially serpentine rings and Egyptian symbols—appear in her visions before manifesting in reality, proving that

prophecy and destiny are intertwined. Demonic entities begin actively stalking her, drawn by her bloodline and the awakening of her powers. Her relationship with her friends Amanda and Taylor continues to evolve from past versions.  In this version, Taylor has a serpent ring that ends up being significant in revealing Taylor's true nature (*Masqued 2012* p. 135).

At the novel's climax, Anna makes a deal with Julian to be his bride to save her friends (*Masqued 2012* p. 473) but the deal is interrupted by her allies and a fight ensues before Anna enters Avalon through the mirror portal and again faces the test of the two wolves (*Masqued 2012* p. 518).

The central question becomes not whether the heroine is supernatural, but what role she is meant to play: oracle, gatekeeper, healer, or something more dangerous. The story frames her as a living bridge between worlds whose very existence may determine whether ancient realms remain sealed or collapse into the modern world.

### d)      *Masqued 2013*

*Masqued 2013* contains significant revisions over the prior versions. Tarot cards are featured more prominently and are used to organize chapters, each of which starts with a picture of a different card. *Masqued 2013* starts with a prologue and ends with a new chapter in which a distraught Anna flees in a car, has an accident, and is rescued by Ronan (*Masqued 2013* pp. 4-10, 461-467).

Further, several characters are portrayed differently, including: (1) Marcheline, who is less harsh and meanspirited; (2) Taylor, who has changed significantly and is now portrayed as a pure interloper rather than initial friend; (3) Ronan (sometimes now called

29

Case 1:22-cv-02435-CM-SN    Document 527    Filed 01/26/26    Page 34 of 80


"Ronan the Bloodletter"), now portrayed as possibly less evil; and (4) Julian, now a French incubus rather than a British vampire. It is also revealed that Julian may be Anna's real father (*Masqued 2013* pp. 411-421). Towards the end of *Masqued 2013*, Anna very suddenly learns that her school friends are all secretly supernatural—for example, Brendan is a faery and Taylor and Amanda are succubi (*Masqued 2013* pp. 405-407, 423). The Gloaming, an enchanted forest called the "Shadow Realm" at night, is also a new major setting (*Id.* 204-205, 377). *Masqued 2013* also refers to the sought-after "chosen one" (revealed to be Anna) as a "Nyx" (*e.g.*, *id*. 211, 379).[6]

### e)    *Masqued 2014*

This version focuses on initiation and transformation. The heroine, Mia, trains to physically cross into the Otherworld (*Masqued* 2014 p. 73) under the guidance of the hero, now named Ronan, an agent of an ancient magical Order. She learns of Avalon as a real but fading realm and Atlantis as a lost civilization whose priestesses once governed the balance of magic. She undergoes ritual testing, vision quests, and controlled crossings between planes. Mia learns that she has a "marque" that will fully develop when she turns 17 (*Masqued* 2014 p.159) and that her gift is "maintaining the balance." Her powers evolve from spontaneous prophecy to disciplined sight, shielding, and energy manipulation, again leaning into the epic fantasy genre.

---

[6] The idea of a "Nyx" had already been used in the 2007 book *Marked* by P. C. Kristin Cast (see Easton Report at 99. 18-19, 34-35).

The plot centers on preparation: ancient wards are failing, portals are weakening, and the war glimpsed in earlier drafts is inevitable. The heroine's role is now defined as a potential linchpin—one who can either stabilize the boundaries between realms or become the catalyst for their collapse.

Mia learns that Julian is her father (*Masqued* 2014 p. 333) even though she still thinks of her mother's husband Dante as her real father. Nevertheless, when she reaches Avalon, as in past versions, Mia frees the demon, now known as Aeden, and must face the fact that she is the girl Roman must destroy (*Masqued* 2014 p.368)

### f)      *Masqued 2016*

*Masqued 2016* is an incomplete manuscript of approximately 30,000 words. Each chapter opens with Tarot framing. The story also leans heavily on a mixture of Celtic/Avalon and Egyptian mythology. The reader learns that the heroine Ella had a twin, but her twin supposedly died alongside her father and grandparents many years before this story takes place (*Masqued 2016* p. 22)

As in past versions, the book opens with Ella using her Tarot cards, but when she is doing so, an amulet her mother usually keeps in a shoebox breaks, and she unwittingly frees "Set," an Egyptian god (*Masqued 2016* p. 9) Her mother, not named Marcheline in this version, explains that, "When you used the amulet last night, your Powers were accelerated and amplified" (*Masqued 2016* p.11). Ella later learns that her mother also freed Set but later trapped him in the amulet. Because of these events, Ella experiences an accelerated "kindred puberty" (*Masqued 2016* p. 12) that amplifies her powers. Her Aunt

31

Rose explains that she is part of a sacred lineage that is comprised of an unbroken chain of priestesses going back to the Great Mother Isis herself (*Masqued 2016* p. 104).

Roman, the romantic lead, is part of the Order, a supernatural police force, and her aunt and mother warn if the Order learns that Ella has the Mark of Set, they will try to kill her. Roman takes Ella home after school, and one the way, Ella encounters some dying sea life and tries to save the animals (*Masqued* 2016 p. 52). They then encounter "Hulk and Punk Rock," two goons from the Order who can see that Ella is wielding her powers and so try to fight her (*Masqued 2016* p. 59). Later, after Roman takes her home, and her friend Brendan (not known to be gay in this version), gets bitten by a snake (*Masqued* 2016 p.85). The Order comes knocking at the door and to escape, Aunt Rose pulls Ella and Brendan, still recovering from the snake bite, into a magical mirror, and they arrive at Avalon. Anna meets with a "High Priestess" who explains that she is the "Keeper of the Amulet," and that her "blood is the key. It is who you are" (*Masqued 2016*, p.107). The manuscript ends there. There is no climactic villain scene with Julian or anyone else.

Ella's childhood friend Samantha/Amanda continues to play a significant role, though Taylor is Samantha's new friend. It is hinted that Julian is her father (*Masqued 2016* p.31), but this plot thread never comes to fruition.

---

As noted above, and as the foregoing summaries make clear, the initial versions of *BMR* and *Masqued* start off in the YA paranormal romance genre, but progress to more of an epic fantasy, which is a completely different genre, with different tropes that are necessary to fulfill reader expectations. As the summaries indicate, each of Plaintiff's

manuscripts involves distinct characters, plots, structures, and mythologies, among other "internal" differences in her supposedly unified "work."

### C. The Court Must Filter Out Tropes, *Scènes à Faire*, and Unprotectible Ideas from its Substantial Similarity Analysis.

As Your Honor has observed, the Second Circuit's test for substantial similarity in copyright cases involving works that contain both protectible and unprotectible elements is the "more discerning ordinary observer test," in which the Court considers only whether the defendant's works are substantially similar to the protectible elements of the plaintiff's works, standing alone. *See Williams v. Crichton*, 84 F.3d 581, 587-88 (2d Cir. 1996); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986). As an initial step in that analysis, the Court must filter out unprotectible elements of plaintiff's works, so that the substantial similarity comparison focuses only on protected content. *See Lewinson v. Henry Holt and Co., LLC*, 659 F. Supp. 2d 547, 565 (S.D.N.Y. 2009). This was also the first step of Judge Scheindlin's analysis in *Hogan*.

In this case, the Court must filter out ideas, words, short phrases, and common tropes and *scènes à faire* that Plaintiff used in her manuscripts and that are not protectible and cannot support a claim of copyright infringement. To be clear, this filtering process, as it relates to tropes and *scènes à faire*, involves omitting the tropes and common scenes *as concepts* from the comparison – that is, works cannot be deemed similar based on the use of the idea of, for example, a fight between the protagonist and an antagonist. But by identifying these unprotectible concepts and removing them from the analysis, this process also necessarily identifies the ways in which the authors' respective expression of those

tropes and *scènes à faire* are the same or different.  Here, as discussed below, the expression could not be more different.

The works at issue all fall within the popular literary genre of YA paranormal romance, (although Plaintiff's later manuscripts veer more into epic fantasy). As an initial matter, a "genre" in fiction traditionally describes very large categories of works, such as science fiction, fantasy, and mystery. YA paranormal romance might thus be called a sub-genre, but just like the broader genres, it is exemplified by works that feature certain recognizable themes, character types, and storylines. Niche sub-genres like this often rely heavily on a well-developed universe of tropes that typify the genre; in a sense, the tropes *define* the genre. It is an author's originality in telling a unique, compelling story that still fits within the genre conventions – including the author's unique spin on certain tropes – that distinguishes that author's work from others.

YA paranormal romance is romance-forward fiction geared toward a young adult audience, in which the central romantic arc is intertwined with supernatural elements, such as vampires, witches, shapeshifters, or angels, and magical and often remote and/or gothic settings.  A common variant of the genre is the "supernatural academy," in which the teen protagonist is placed into a rule-bound institutional environment that contains and/or trains supernatural beings.  A well-known example of this variant is J.K. Rowling's *Harry Potter* series, which first appeared in 1997.  Other examples are discussed below.  Common tropes include not only magical academies, but enemies-to-lovers stories, fated soulmate characters, dystopian or autocratic societies, fights against unstoppable evil, quest

34

fantasies, chosen ones, evil lords, and love triangles – all of which can be found in the *Crave* series.[7]

Defendants' expert, Emily Easton, provided an enormous amount of background about the common tropes and ideas that are so commonly used in YA paranormal romance that authors must rely on them because readers of the genre expect to see them. Ms. Easton also identified examples of numerous other novels that used these same tropes long before *BMR/Masqued* or *Crave*. Some of these tropes include setting stories in remote (often far north) locations, including Alaska; supernatural schools and their supernatural teachers, students and other inhabitants; gothic architecture and castle settings; the protagonist's parents being dead; a lead character moving or being new in town; the protagonist believing they are ordinary, when they actually possess paranormal powers; the protagonist suffering anxiety, depression or panic attacks; the protagonist being a good student and loving books; the protagonist being the "chosen one;" an attack on the protagonist by a supernatural creature; a very attractive romantic lead; a romantic lead who is a supernatural being; a romantic lead with dark secrets; the romantic lead saving the protagonist's life (or vice-versa); a love triangle; it being dangerous or forbidden for the protagonist and romantic lead to be together; rival houses or factions; restoring balance in the novel's universe (often between good and evil); other realms or dimensions; kidnapping; avenging the death of a

---

[7] The website https://www.book-editing.com/10-ya-paranormal-romance-tropes-2019/ lists several such tropes that were well known in the genre in 2019 when the first *Crave* book was being written.

loved one; secret organizations; secret sanctuaries; use of mythology; need for a mentor or guide; having prophetic dreams or visions; and, powerful or magical objects.

None of these themes, ideas, or tropes are protectable by copyright.  It is *how* each party uses them, and *how* each party expresses them in their own unique way, that may make the work protectible. For example, as the following chart shows, there are a number of YA paranormal tropes that are used in *BMR*/*Masqued* and *Crave*, a few of which overlap, but most of which do not. It is how these tropes are used, and how they are written (with what voice, tone, humor, detail, etc.) that makes a difference between the works.

| Trope | Used in *Crave* | Used in *BMR* |
|---|---|---|
| Protagonist is an orphan | Yes | *No* (Anna/Mia/Ella lives with her mother and aunt; father is found to be alive) |
| Protagonist moves to remote location | Yes (boarding school in rural Alaska near Denali) | *No* (Anna/Mia/Ella's mother moves to Anchorage and they go to actual restaurants, bars, grocery stores, and Barnes & Noble) |
| Use of Alaska | Yes (Remote, rural Alaska is a symbol of Grace's isolation/setting is a character) | Yes (Anchorage is part of Anna/Mia/Ella's ordinary life) |
| Inbound Disruption (main character as ordinary girl enters an extraordinary world) | Yes (Grace enters a supernatural academy as an ordinary girl) | *No* (Anna/Mia/Ella knows she is a witch) |
| Outbound Displacement (extraordinary being enters and changes main | *No* | Yes (Anna/Mia/Ella is a girl with special powers living in an ordinary environment and attending a regular public high school in Anchorage when a boy with special powers enrolls in her school and changes things) |

| character's ordinary world) | | |
|---|---|---|
| Supernatural academy setting | Yes | *No* |
| Regular public high school setting | *No* | Yes |
| Main character leads an army/political movement | Yes | *No* |
| Rival houses, factions | Yes | *No* |
| Has a group called Order | Yes—The Order (five vampire friends of Jaxon's) | Yes—Order of the Sphinx (secret police looking for the Chosen One to keep her from choosing bad) |
| Main character thinks she is an ordinary human and later discovers her powers | Yes | *No* (Anna/Mia/Ella knows she is a witch) |
| Main character has special powers | Yes (Grace is a gargoyle; she is a healer, can fly, manipulate elements and freeze time) | Yes (Anna/Mia/Ella is a witch/Kindred; she has visions; electricity comes from her fingers; she reads Tarot) |
| Visions or prophecy | *No* | Yes |
| Speaks telepathically with others | Yes | *No* |
| Restores balance | Yes | *No* |
| Type of power | Gargoyle (Healer/Fly/Manipulate elements/Freeze Time) | Witch/Kindred (has visions, electricity comes from her fingers, reads tarot) |
| Love triangle | Yes | *No* |

| Treacherous best friend | *No* | Yes |
|---|---|---|

As noted above, there are many tropes that are found in the YA paranormal romance genre, and a small fraction of them overlap between *Crave* and *BMR/Masqued*, but Plaintiff has no monopoly on them. To the extent that Plaintiff seeks to prove substantial similarity because her manuscripts and the *Crave* novels both include teenaged heroines who have paranormal abilities and fight supernatural wars; have romantic male lead characters with paranormal powers; involve a struggle against a supernatural villain; and begin in high schools set in Alaska, those are all either unprotectible ideas or genre tropes that the Court must filter out of the substantial similarity analysis. The relevant comparison is limited to the specific manner in which Freeman and Wolff use particular ideas and tropes in their respective works, and that comparison reveals vastly different works which use common genre tropes very differently and often rely on entirely different genre tropes altogether.

Further, the fact that many tropes are found in *BMR/Masqued* but not in *Crave* defeats any selection, order and arrangement argument and indicates a lack of substantial similarity. Once the unprotectible ideas and genre tropes that are found in both are filtered out, Plaintiff's copyright claims must automatically fail. A meaningful comparison of Plaintiff's manuscripts and Wolff's novels, including the manner in which they use tropes to develop vastly different works with differing plots, settings, characters and total concepts and feels, leads to only one natural conclusion - that the two bodies of works are not substantially similar.

Plaintiff has assembled enormous "indexes" consisting of scattered words and phrases like "yogurt" or "et tu, Brute," or irrelevant supposed correlations like "eye of the tiger" verses a "tiger's eye jewel," that she (sometimes falsely) claims are common in both *BMR/Masqued* and *Crave* in order to create the illusion of similarity. But this is nothing more than smoke and mirrors. It is an effort to obscure her inappropriate attempt to base a claim of substantial similarity on the use of unprotected ideas, words and phrases in common parlance, and common genre tropes and stereotypes. The effort runs afoul of Second Circuit law, which does not sanction consideration of scattered, excerpted words and phrases or self-serving lists of "similarities" in performing its substantial similarity analysis. *See Williams*, 84 F.3d at 590; *Walker*, 784 F.2d at 51; *Montgomery v. Holland*, 408 F. Supp. 3d 353, 377 (S.D.N.Y. 2019), aff'd 833 F. App'x 361 (2d Cir. 2020); *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 663 (S.D.N.Y. 2011). To the contrary, the Second Circuit has emphasized that the analysis must be based on a comparison of the works themselves (*Williams*, 84 F.3d at 583) after filtering out the unprotected elements.

### D. Plaintiff Cannot Construct a Copyright Infringement Claim Based on Amalgamated Bits and Pieces of Different Works.

Plaintiff registered twenty-two separate manuscripts and notes as individual works of authorship. If Plaintiff believed that the first book in the *Crave* series infringed on *Masqued* 2013 (as alleged in her Complaint was the catalyst for her lawsuit), it would have been a relatively simple matter for the Court to compare those works one-to-one for substantial similarity.

That, however, is not what Plaintiff has done in this case. She tacitly concedes that none of the *Crave* novels infringes any of her manuscripts individually. Instead, she previously argued that elements spread across her manuscripts are copied across all four of the *Crave* novels, and that "The Freeman Copyrighted Material is properly compared in the aggregate to the *Crave* Series." [Dkt. 284, 19-20]. In support of this position, Plaintiff has cited *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 138 (2d Cir. 1998), where the defendant copied elements from multiple *Seinfeld* episodes in creating a trivia game. In that case, the Court held, in the context of determining whether copying was *de minimis*, that it would treat *Seinfeld* as "a discrete, continuous television series" and as a single work for purposes of the "quantitative" analysis only. To squeeze that round peg of a case into this square hole, Plaintiff previously argued that "Freeman's Copyrighted Material—drafts, notes, outlines, subplots, character descriptions, etc., all relating to the same original manuscript—represent a far more cohesive and intertwined body of work than the 84 individually copyrighted television programs at issue in *Castle Rock*," and "is properly considered a single work in the aggregate" because it "tells a single story." [Dkt. 284, 20-21].

This is erroneous for several reasons. First, as noted, the *Castle Rock* Court only allowed the aggregation of individual works when examining the quantum of alleged copying, not for the purposes of a qualitative substantial similarity analysis. *See Kroencke v. Gen. Motors Corp.*, 270 F.Supp.2d 441, 443-44 (S.D.N.Y. July 10, 2003), *aff'd*, 99 Fed. Appx. 339 (2d Cir. 2004) (distinguishing *Castle Rock* on this basis and noting that "Plaintiff here seeks aggregation for an altogether different purpose, *viz,* as a means of proving

40

qualitative similarity"); *see also Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. Sept. 17, 2014) (courts "must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently"); *Nelson v. Grisham*, 942 F. Supp. 649, 651 (D.D.C. Sept. 26, 1996), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (applying Second Circuit law, using only final published version of plaintiff's book for comparison although "Plaintiff allege[d] that Grisham copied from earlier drafts, as opposed to the final published version").

Second, Plaintiff's various manuscripts in no way represent a "cohesive and intertwined body of work." While they may represent steps in a multi-year process of writing a novel that was never finished, the problem is that they are *not* cohesive and, in fact, differ wildly from one another. There are countless changes in characters, plot, relationships, and magic across Plaintiff's various drafts. For instance, in 2010, the protagonist is fascinated by the supernatural ("Tarot cards, astrology… spells and magic…") and the full moon is emphasized ("full moon," "The days I'm not allowed to drive…") (*BMR 2010* p.7, 10). By 2012, the heroine is a natural born witch, with explicit laws ("What you send out… comes back times three… The Three-Fold Law…") (*Masqued 2012* p. 94). In 2014, Anna is renamed Mia, Ash becomes Roman, and the mythology intensifies into a structured initiation system ("Your marque is forming… when you reach your seventeenth birthday… your special gift… maintaining the balance") (*Masqued 2014* p.159). Anna/Mia's identity pivots to being a Nyx, pledged to a Dark Moon Goddess, and she has freed Aedan the Bloodletter (*Masqued 2014* p. 368). By 2016, the incomplete version shows the magic system becoming "Kindred puberty" plus Egyptian/Isis lineage ("descendants of Mother Isis… left hand path…") (*Masqued 2016* p.8, 11, 16).

These are not just different descriptions of the same power, they are different magic systems, cosmologies, mythic genealogies, and themes. This is why comparisons of all of Plaintiff's manuscripts against the single, overarching *Crave* story is inappropriate. Plaintiff's manuscripts are "moving targets," varying in fundamental aspects that makes it impossible (and unfair) to compare one element in a 2010 version to *Crave*, and another element in a 2012 version to Crush, while using yet another aspect from 2014 to compare with Covet or *Crave* or Court.  In *BMR/Masqued*, there are fight scenes in some versions but not in others. There are dead relatives in some (Anna/Mia's twin sister, Emma, and Ash's dead brother) that don't exist in others (she doesn't always have a twin and Ash doesn't always have a brother). In *BMR* 2010, the protagonist is best friends with Taylor (p. 11). In *Masqued* 2012, she is surprised Taylor is addressing her at all, "when we've never exchanged more than three words" (p. 19). These are not minor details. These are pivotal differences, which is why letting Plaintiff use multiple versions of a changing story gives her an improper ability to pick and choose in order to construct infringement, versus comparing a work fixed in a tangible medium of expression to the *Crave* novels.

And pick and choose Plaintiff does. For example, in her First Amended Complaint on page 16, subsection s, she states: "Vampire prince wants to use heroine to resurrect his dead mate; he believes she will be the reincarnation of his dead mate once he converts her to a vampire because they look alike and are related by blood."

First of all, there is no scene in the *Crave* series in which a vampire prince (Jaxon or Hudson or anyone else) sees Grace as a reincarnated version of their dead mate. Though the villain of the first *Crave* book (who is not a vampire prince) plans to use Grace to break

Jaxon's control so that his unleashed power can be harnessed to bring her (not actually dead) boyfriend back to Katmere Academy, Grace looks nothing like Hudson and is not related to him by blood.

Second of all, major details differ between the many versions of *BMR/Masqued*. For example, in the 2010 version, Julian is a vampire ("the Master was the very same vampire I'd seen in Sanctuary. The one who had taunted me in the bar. My abduction was no mere coincidence," *BMR 2010* p. 425), but he does not believe Anna/Mia/Ella is his reincarnated mate. In the 2013 version, Julian is an incubus ("the Incubus at Sanctuary tonight—is my— father," *Masqued 2013* p. 458) who knows Anna/Mia/Ella is his daughter ("They're blue. Like mine. I can't believe I didn't see it until now. My daughter. My—child," *Masqued 2013* p. 417). In the 2016 version, there is no longer any comparable scene between a character like Julian and Anna/Mia/Ella.

Similarly, in subsection "oo" of the First Amended Complaint, also on page 19, Plaintiff states that the "Heroine is attacked by two vampires who aren't dressed for the winter weather. They remind her of eighties rockers. She starts to fight back in the same way in both books. The romantic lead saves her." What actually happens in *Crave* is that Grace is alone in the entryway of Katmere Academy when she is attacked by two students who are wolf shifters. They are dressed in jeans and Motley Crue t-shirts and try to throw her out in the snow in her pajamas. Jaxon intervenes by using telekinesis to send her attackers flying across the room.

In contrast, in *BMR 2010*, Anna/Mia/Ella is with her friends at a Mexican restaurant. When they head to their car in the parking lot, they see two grown men standing by a van,

one of whom reminds her of Billy Idol. All of Anna/Mia/Ella's friends suddenly look "Like lost sheep, Brendan, Mason, Jenny and Rachel moved in single file and hopped into the van beside me. Their eyes slightly vacant, they had lost looks on their faces. Apparently, they weren't immune to Billy and Willy's charms" (*BMR 2010* p. 419). Also, Ash is nowhere in this scene, so it is not possible for him to save her.

In *Masqued 2013*, Anna/Mia/Ella is at a Stop-N-Go with Ash, a wolf shifter, when she is attacked by two adult male vampires, one of whom Freeman refers to as the Hulk and one of whom Freeman refers to as Billy, because he looks like Billy Idol. They attack her when she lets electricity come out of her fingertips because "our employer has been looking for a girl like you for a long, long time (*Masqued 2013* p. 52). Furthermore, Ash doesn't save Anna/Mia/Ella. Instead, she fights back herself and her attackers jump in their van and drive away before Ash–who is getting sandwiches–returns.

In *Masqued 2014*, Anna/Mia/Ella is also at the Stop-N-Go, only now she is with Roman. The scenario is largely the same as the 2013 version, except this time, her attackers are incubi and Roman–perhaps in his bear form–does step in to save her ("I hear the engine cough and know I'm a goner. I'm being taken, just like the missing girls. A roaring growl splits the air around us—a grizzly bear?—and we're both hauled backward out of the van. I roll out of the Hulk's grasp. Roman is on top of him in a flash, using the Hulk's face as a punching bag, his fists are flying so fast," *Masqued 2014* p.50) It is unclear if Roman is in bear or human form here, but this version is very different than the previous versions.

There is no comparable scene in the 2016 version.

The foregoing examples show that Plaintiff is trying to construct an infringement case against Defendants by using her various versions that are inconsistent with each other at best, and contradictory to each other at worst. Put somewhat differently, Plaintiff's attempts to amalgamate her manuscripts and notes presents a problem similar to the satirical "Schrodinger's Cat" physics thought experiment, in which a cat sealed in a box with an open container of poison can be thought of as both dead and alive until the box is opened. Here, Plaintiff's various manuscripts present different facts and scenarios, such as whether a character is dead or even exists at all. If Plaintiff were allowed to construct a copyright claim from bits and pieces of her various manuscripts and notes, she would effectively be able to "cover all bases" – if one fact pattern is not similar to a challenged element of *Crave*, she can simply claim that another permutation of the story in a different draft works better.

Plaintiff's effort to aggregate elements from different works to cobble together a copyright claim based on a combined "work" that does not actually exist, however, is prohibited under Second Circuit precedent. *See Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. 2014) ("a court must not 'aggregate a plaintiff's work, but must consider each allegedly infringed work independently"); *see also Williams*, 860 F. Supp. at 170; *accord Kroencke*, 270 F.Supp.2d at 443-44; *Robinson v. Viacom Int'l, Inc.*, 1995 WL 417076, at *8 (S.D.N.Y. 1995). And that prohibition is soundly rooted in copyright law.

An infringement claim based on amalgamated elements of different works would defy the Second Circuit's directive that substantial similarity analysis should focus on a comparison of "the works themselves." *Williams*, 84 F.3d at 583. Plaintiff's claim is not

based on consideration of any one of her works taken as a whole. It is instead based on her self-serving indexes of similarities, which draw elements from different works. Your Honor has already determined that Plaintiff's extensive patchwork "summaries" of her manuscripts, as compared with similarly manufactured summaries from the *Crave* series, cannot be presented as evidence, and Plaintiff should not be permitted to present cobbled-together bits and pieces from across her writings in any other form. That is an appropriate limitation, because Plaintiff's indexes are not the works themselves and purport to usurp the jury's function of determining substantial similarity based on their own review of the parties' actual works.

While Plaintiff's claims should fail because she does not even attempt to show that *Crave* is substantially similar to any one *BMR/Masqued* manuscript, which is what the law of this Circuit requires, even if that issue is put aside, Defendants demonstrate for purposes of this motion that Plaintiff still cannot show substantial similarity.

     **E.**    ***Crave* and *BMR / Masqued* Are Not Substantially Similar.**

When deciding substantial similarity on summary judgment, the Second Circuit has instructed courts to "examine [ ] the similarities between the two literary works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting of the works." *Allen*, 739 F. Supp. 2d at 665. In *Hogan*, *supra*, Judge Scheindlin filtered out the unprotectable material and reviewed the "total concept and feel," as well as the settings, characters, sequences of events, plots, and other elements of the works. A similar comparison of *Crave* and *BMR/Masqued* reveals that Plaintiff cannot hope to prove substantial similarity.

### 1.    The Works Do Not Have Substantially Similar Plots.

*Crave* and *BMR/Masqued* have very different plots, as the summaries of the works indicate. While both generally involve a teen girl who has supernatural powers and who falls for a boy with supernatural powers, this is not sufficient to show substantial similarity (also, Jaxon in *Crave* is a "bad boy," but Ash in *BMR* is not). *See, e.g.*, *Allen*, 739 F. Supp. 2d at 661-63 (no substantial similarity even though "both works 'tell the story of a wizard competition'" since the plots "share no similarities beyond this level of abstraction" and "many, if not all, of the allegedly infringing features constitute *scènes à faire*"); *Amanze v. Adeyemi*, 2019 WL 2866071, at *7 (S.D.N.Y. Jul. 3, 2019) ("alleged similarities, such as characters falling in love, betrayal, … imprisonment, fleeing antagonists, magical powers, escape scenes, and spectral visions, are likewise unprotectable ideas expressed in strikingly dissimilar ways, and constitute nothing more than paradigmatic *scènes à faire* of fairytales and fantasies, among other genres") "), *aff'd*, 824 F. App'x 86 (2d Cir. 2020).

In Plaintiff's original motion for summary judgment, she described the alleged similarities of plot between her work and *Crave*, the first novel in the *Crave* series, as follows:

> Both *Crave* and *BMR* are young adult paranormal fantasy romances that tell essentially the same story about an approximately 17-year-old girl from San Diego who moves to Alaska after an accident kills her family members. [SSUF 97]. The story begins with the heroine on her way to school in Alaska thinking about the frozen land, the weather in California, and her loss. [SSUF 146]. She meets the romantic lead at the end of chapter two at the beginning of school. [SSUF 147]. Through their relationship she begins to learn about

the supernatural world when he accidentally loses self-control of his powers during their first kiss. [SSUF 147, 158]. . . . [8]

The climax of *BMR* and *Crave* (Book 1) occurs when the heroine is kidnapped by a vampire who wants to use her to bring back their dead mate as an act of vengeance against the person they believe is responsible, and they need the heroine in order to do so. [SSUF 155-156]. This vampire tells her they murdered her family members by causing the accident which killed them. [*Id*.] She feels sorry for this vampire at first but is then infuriated at them for the murder. [*Id*.] The romantic lead comes to rescue her but she ends up saving his life. [*Id*.]

The ultimate villain, the vampire prince/king, wants to bring supernaturals out of hiding and into the world. [SSUF 117]. . . . He has a special bite he is known for which he wants to give the heroine and ultimately does. [*Id*.]. At the end of the first book, "the Bloodletter" turns into a raven in Freeman's work and a "winged creature" in Wolff's and flies away. [SSUF 149].

[Dkt. 284, 8-9].

Tellingly, Plaintiff's summary speaks in vague generalities and concepts, and focuses only on the beginnings of the respective works and their climaxes – Plaintiff makes no effort to demonstrate that the vast bulk of the plots in the respective works don't even overlap at the highest level of generality (or "abstraction," to use Judge Hand's term). In the absence of literal similarity or paraphrasing in an alleged infringing work,

---

[8] We omit from Plaintiff's summary the following passages which do not address the plots of the works but rather the characters therein (discussed separately below): "Not only are the romantic leads similar, but their parents are leaders of their kind and would want the heroine for their own purposes and/or to destroy her if they knew what she was. [SSUF 147]. The heroine in both works is a unique being made of magic who is a protector of supernaturals, humans, and other creatures, and her kind has not been seen in a very long time. [SSUF 110]. She is a queen and the descendant of a twin goddess. [SSUF 111]. Her purpose is to restore "the balance." [*Id*.] Others are seeking to destroy her so that she can't be used in the war. [*Id*.] These wars disrupt the human world and have caused storms. [SSUF 149]." Dkt. 284, p. 8] "He is good-looking, tall with short dark hair, intense blue eyes, and the heroine describes him as being like a "cobra." [SSUF 119]. [Dkt. 284, p. 9].

demonstrating similarity in plot or structure requires a plaintiff to show that the plot "beats" are similar throughout – not that there may be one or two plot points that can be carefully manipulated to look similar. *See Williams*, 84 F.3d at 590 ("The plot, or sequence of events, of the works likewise is not substantially similar. Although Williams points to several specific instances of similarity, we agree with the district court that such lists are 'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'"); *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984) (declining to find similarity in plot based on the plaintiff's list of random similarities found throughout the works); *accord Allen,* 739 F. Supp. 2d at 661-63 (finding no substantial similarity even though both works told the story of a "wizard competition" because the plots "share no similarities beyond this level of abstraction" and many, if not all, of the allegedly infringing features constitute scenes a faire"); *Amanze*, 2019 WL 2866071, at *7 (finding no substantial similarity where alleged plot similarities consisted of "unprotectible ideas expressed in strikingly dissimilar ways").

Further, Plaintiff's description of even these few alleged plot similarities falls apart under even casual scrutiny. First, the alleged similarity of female protagonists who are "approximately" seventeen years old is not a plot point but rather a character detail; but in any event while Grace in *Crave* is indeed seventeen, in Plaintiff's manuscripts her protagonist is sixteen, which is not "approximately seventeen," especially in the context of young adult novels in which the protagonists ages fall within a narrow range to begin with. While this may sound trivial, it is precisely this kind of manipulation of the details of the respective works that make Plaintiff's comparisons suspect, and ultimately invalid.

49

Separately, while the respective characters both move to Alaska, in *Crave* the move is from San Diego to the remote Katmere Academy, and in some versions of Plaintiff's manuscripts the main character moves from "California" (with no reference to the city) and in every version Anna/Mia/Ella moves to Anchorage. In *Crave*, Grace moves after her family dies in a car accident; in Plaintiff's manuscripts Anna/Mia/Ella moves to Anchorage after her father dies in an elevator accident or, depending on the manuscript, a plane crash.[9] These small examples also demonstrate that even where Plaintiff alleges a similarity of an idea, there are distinct differences in the way the authors portray those ideas.

Although at the very highest level of generality it is true that the respective works contain scenes where the protagonist is "on her way to school in Alaska thinking about the frozen land, the weather in California, and her loss," this oversimplified description hides a difference in expression that could not be more stark. In *Crave*, the first page of the novel begins with Grace worried about getting on a small plane and leaving behind the world she knows and flying to Alaska:

> *Crave* (p. 1): I stand at the outer tarmac door staring at the plane I am about to get on and try my hardest not to freak out. It's easier said than done. Not just because I'm about to leave behind everything I know, though up until two minutes ago, that was my main concern. Now, though, as I stare at this plane that I'm not even sure deserves the dignity of being called a plane, a whole new level of panic is setting in.

---

[9] These details also are not truly plot points – they are backstory character elements that do not play a major role in the way the narrative itself moves forward within the respective works.

By contrast, the first page of *BMR* 2011 begins with the main character in a dream sequence being chased by an unknown threat. But even skipping forward to the second chapter in *BMR* 2011, where the main character – already firmly established in Anchorage and attending school there – is on her way one morning to that school, here is how that chapter begins:

> *BMR* 2011 (p. 8): It was the third week of my junior year of high school. I'd been having a lot of disturbing dreams and visions ever since school started. In fact, all of my so-called "abilities" had been acting up—to the point that I was a little scared of what was happening to me. I leaned my head back against the leather headrest of my mom's car and took a deep breath, closing my eyes while she drove. I blew my breath out slowly, allowing the tension in my body to release.

Notably, even though both characters are anxious in these scenes, the reasons are entirely different – Grace is afraid of getting on a small plane heading into the unknown, while Plaintiff's character is anxious about her powers.

Moreover, countless plot points in the *Crave* series are absent in *BMR*/*Masqued*, and *vice versa.* Significant narratives in *Crave* such as Grace's trip to Katmere and Lia's evil resurrection scheme appear nowhere in Plaintiff's works.  Also absent are Hudson being trapped in Grace's head and the search for relics to free him, the Ludares matches, and the emotional Grace/Hudson/Jaxon love triangle and mating bond severance in *Crush* that continues into *Covet*. Plaintiff's works also do not include the trip to Giant City, the Aethereum prison sequences, and the violent struggle to free the Unkillable Beast in *Covet*, as well as the stay at the lighthouse, various time freezing sequences, and the Impossible Trials, and the full blown paranormal war on a battlefield with the Gargoyle Army in *Court.*

51

In *Crave*, a substantial plot arc involves Grace coming into her own as a long-lost Gargoyle Queen, healer, leader, and demigod of chaos -- a storyline not found in *BMR/Masqued*.

By contrast, *BMR/Masqued*'s plot points revolve around Anna/Mia/Ella's pervasive Tarot readings and prophetic visions; constant friction with her (living) mother; struggles with stereotypical high school mean girl Taylor; stalking by a raven revealed to be Ronan/Aiden; encounter with her wolf father and, in some versions, true mother Elise who is living in another dimension; release of Ronan from the dimension; and the abrupt final confrontation, at least in some versions, where Ronan transforms into a raven to escape Ash's bear jaws. These plot points are not replicated in *Crave*.

One of the major arcs of *Crave* is a rules-driven "Impossible Trials" system whose prize (Tears of Eleos) becomes a world-scale curative (*Court*, Ch. 55-56, pp. 222-229; *Court*, Ch. 148-150, pp. 577-594). In the *Crave* series, portals behave like infrastructure with physics (anchoring, drift), supporting heists and timed extractions (*Crush*, Ch. 84-85; *Court*, Ch. 102, Scene 1, pp. 414-420). None of that is present in *BMR/Masqued*.

The lack of substantial similarity becomes even more obvious as the works progress. The *Crave* novels culminate in a literal battlefield judgment using formal Crown procedure (encircling army; sentencing by touch; term-limited stripping of power) (*Court*, Ch. 26, Scene 1, pp. 105-109; *Court*, Ch. 172-173, Scene 1, pp. 666-671).

On the other hand, the plot of *BMR/Masqued* opens with an omen (the "Tower" tarot card or vision) and uses "divine" interpretations to drive the plot, such as the use of tarot cards, ravens, and prophetic dreams ("this particular waking vision tastes and feels strongly of premonition," *BMR* 2011, p. 7, "the raven had said, 'trust no one'", p. 215).

52

Escalation in *BMR/Masqued* runs through a "neutral ground" (Sanctuary) that turns out not to be a safe space after all, leading to abduction and a throne-room reveal where an incubus 'sips' teens' strength (*Masqued 2013*, p. 400 "The Master is the very same incubus I saw at Sanctuary"). The protagonist is revealed to be Nyx (*Masqued 2013*, p. 403 "You're part demon, a little Nyxie").

Another plot distinction is a living serpent ring that becomes a plot engine by bonding to the heroine in *BMR/Masqued*, and no such plot device is found in *Crave* (*Masqued 2013*, p. 138 "her nasty serpent ring catching the light" and "her ring bites into my skin"). One version of the climax involves Melusine's Mirror into Avalon, where priestesses frame Initiation and impose vow rules (*Masqued 2013*, p. 426: "The mirror's silvery surface shivers and ripples, like a gentle breeze playing upon water. Standing before Melusine's mirror, I'm spellbound"; similar scene in *BMR 2011*, p. 570). *Crave* contains no similar scene.

In addition to these key plot constructs, many other key scenes in each work are entirely missing from the other, such as:

| Narrative function | *Crave* series | *Masqued / BMR* |
|---|---|---|
| Governance/judgment | Battlefield becomes a courtroom via Crown procedure; sentencing by touch (Court, Ch. 172-173, pp. 666-671.) | Avalon priestess circle deals Tarot and imposes vow rules; guidance rather than sentencing. (*Masqued*, Ch. 43, pp. 430-435.) |
| Public trial/quest | Taffy shop -> "Impossible Trials" death arena to win Tears of Eleos antidote (Court, Ch. 55-56; Ch. 148-150.) | Mirror gate -> Avalon Initiation threshold; "two wolves" test of choice/loyalty (*Masqued*, Ch. 42-44, pp. 422-443.) |
| Neutral ground | Court hospitality and negotiation under court | Sanctuary behind VIP door; neutrality is exploited and |

| | rules; neutrality as institutional custom (Court, recurring court sequences.) | immediately followed by abduction (*Masqued*, Ch. 37-39, pp. 374-397.) |
|---|---|---|

### 2. The Works Do Not Have Substantially Similar Characters.

"The bar for substantial similarity in a character is set **quite high**." *DiTocco v. Riordan*, 815 F. Supp. 2d. 655, 667 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012). Even when characters have shared many more specific characteristics than those alleged here—such as both being half-vampires named Nicholas Gaunt, *Hogan*, 48 F. Supp. 2d at 311; minority artists who can paint the future, *Mallery v. NBC Universal*, 2007 WL 4258196, at *7 (S.D.N.Y. Dec. 3, 2007), *aff'd*, 331 F. App'x 821 (2d Cir. 2009); or, "famous male wizards" who are "chosen to compete in year-long wizard competitions," *Allen*, 79 F. Supp. 2d at 659—courts have found no substantial similarity because these traits are general prototypes too indistinct to merit protection.

***Heroines.*** Grace and Anna/Mia/Ella have almost nothing in common besides being female teenagers with supernatural abilities. Grace is short and curvy, with curly, auburn hair and freckles. She is snarky, feisty, quirky, funny, sarcastic, selfless, and sometimes stubborn. Grace's arc is leadership and judgment. She moves toward an "office of power" and ultimately takes control of the Gargoyle Army and sentences the antagonist via Crown procedure. She believes in justice and mercy and always gets up one more time than she's been knocked down. Her archetype is a spunky kid, whose magic is visible strings, flying, healing, manipulating elements and freezing time (*see, e.g.*, *Court*, Ch. 172-173, pp. 663-

671). Her love of Pop Tarts and Dr. Pepper is well-documented throughout the series, as is her appreciation for One Direction and Harry Styles.

In *BMR/Masqued*, Anna/Mia/Ella is usually described as tall and slender, with dark, long, layered hair. She often speaks in exclamations, lacks self-confidence, and is much less nuanced than Grace in *Crave*. In *BMR/Masqued*, Anna (and variations) has an arc of initiation and choice. She moves toward a seventeenth-birthday rite, framed by priestess lineage and Light/Shadows selection (*Masqued*, Ch. 43-44, pp. 430-443). Anna/Mia/Ella's archetype is waif (a vulnerable or abandoned young person like Dorothy in the *Wizard of Oz*) and her power is through divination and a body-mark (*Masqued*, Ch. 19, pp. 171-175). Her love for her cat and Tarot appears throughout the different versions.

Grace has no remaining immediate family and rooms with her cousin at a remote magical boarding school, whereas Anna/Mia/Ella lives with her (alive) mother and aunt in a private home in Alaska's largest city.

Anna/Mia/Ella routinely practices Tarot and has many prophetic visions, while Grace does not practice Tarot or have any prophetic visions.

Grace struggles to adapt to her sudden new life in Alaska, whereas Anna/Mia/Ella has been living in Alaska since age seven and is well acclimated.

Both heroines are supernatural—they typically are in YA paranormal fiction—but this generic idea is expressed very differently. Grace thinks she is a normal human girl, but turns out to be a gargoyle (a rare paranormal species believed to be extinct) with specific gargoyle powers like the abilities to fly and heal people (*Crush*, p. 23 "Gargoyle. As in a huge stone creature with wings and snarling fangs and … horns? Surreptitiously, I run a

hand over my head, just to see if I've somehow grown horns and don't know about it.").) Anna/Mia/Ella knows she is a witch or other supernatural being (depending on the version) from the beginning of *BMR/Masqued*, based on her prophetic visons (*BMR 2010*, p. 6 "I've been having a lot of disturbing dreams and visions ever since school started. In fact, all of my so-called 'abilities' are acting up.")

In *Crave*, Grace's parents suddenly died in a car crash right before the story begins. In *BMR*/*Masqued*, Anna/Mia/Ella lives with her mother, Marcheline. Although she believes her father Dante died long ago (not suddenly right before the story begins), it turns out he has really been living in another dimension. Most importantly, the effect of having "dead" parents is expressed far differently. Grace deeply misses and grieves her parents, which is an important component of her character and story (*Crave* pp. 50-51.) *BMR/Masqued* mentions Dante's supposed death sparingly – on a single page in the 2011 manuscript – without exploring how it affects Anna/Mia/Ella (*BMR 2011* p. 62.) Her strained relationship with her living parent Marcheline (*BMR 2011* pp. 1-11, 28-29, 50-51, 248-249) is central to *BMR/Masqued* and a theme that is entirely absent from *Crave*.

While Grace is originally from San Diego and Anna/Mia/Ella is either originally from "San Diego" (*BMR 2011*) or the more general "California" (*Masqued 2013*), this idea is expressed differently as well. Grace deeply misses her hometown, constantly reminisces about it, and still texts with her best friend back home. At the end of Court, she actually moves the Gargoyle Court to San Diego. *BMR* mentions that Anna once lived in San Diego/California on a single page, without even touching on what this means for Anna (*BMR 2011* p. 124; *Masqued 2013* p. 14.) Defendant Tracy Wolff, who wrote *Crave*, is

originally from San Diego, and the heroine of one of her early books (that pre-dates any version of *BMR*), *Tempest Rising,* is also from San Diego.

Finally, the relationship between protagonist and boyfriend is very different in each of the works. Hudson's relationship with Grace in *Crave* includes explicit consummation and erotic, consent-checked vampire bites (*Covet*, Ch. 85, pp. 361-363; Covet, Ch. 88, pp. 372-373). In *Masqued*, the only bite is medicinal/healing (much like the kind Edward Cullen gives Bella in *Twilight* to save her life when she is dying), and the High Priestess states that priestesses may not form lasting alliances with men, which puts an entirely different spin on the relationship (*Masqued*, Ch. 31, pp. 311-317; *Masqued* 2013, Ch. 43, pp. 431-435).

***Boyfriends.*** Ash from *BMR/Masqued* is not substantially similar to either of the two romantic leads in *Crave* (Jaxon and/or Hudson). The fact that Plaintiff often compares Ash and Jaxon while ignoring that Hudson becomes Grace's love interest beginning with *Crush* both underscores the weakness of any suggestion that the romantic leads are substantially similar and reveals a deep misunderstanding of the parties' works. Plaintiff's Ash-Jaxon comparison should be rejected on this basis alone, but it fails for numerous other reasons as well.

The boyfriend in *BMR/Masqued*, Ash (or Roman in other versions) is a different paranormal creature with vastly different powers than the love interests in *Crave*. In *Crave*, Jaxon is a vampire with classic vampire attributes (such as drinking blood and having no reflection) and also has the power of telekinesis. Ash is a werewolf (as well as a Viking berserker and Sentinel) with classic werewolf shape-shifting powers. Ash claims to be

attracted to Anna but their physical interactions are limited and he often feels more paternal or like a mentor than a lover (again, very similar to the Edward-Bella dynamic in *Twilight*).

While both Ash and Jaxon are tall and handsome (a standard YA paranormal romance trope), they differ noticeably in appearance. Ash has "rosy cheeks, red lips, and sun-kissed skin" and radiates "vibrant, good health" (*BMR* 2011 p. 16). He is "bewitchingly good-looking" and "heart-stoppingly gorgeous," like a "super model" (*BMR* 2011 pp. 15-16). Jaxon is pale—he could not have "sun-kissed skin" because he is a vampire—and has "a jagged scar from the center of his left eyebrow to the left corner of his mouth" (*Crave* p. 30). He has "a jaw so sharp it could cut stone" and "the kind of face nineteenth-century poets loved to write about—too intense to be beautiful and too striking to be anything else" (*Crave* pp. 21, 30). Jaxon's archetype is bad boy while Ash's archetype is warrior. These two archetypes come with diametrically opposed personality traits and character arcs.

Finally, Jaxon's evolving relationship with Grace (and other characters, such as Hudson and Flint) is much more nuanced and developed than Ash's more straightforward role as an initially mysterious but overall kind and protective boyfriend.

In *Crave*, Hudson, who emerges as Grace's true love interest, is a vampire prince whose signature powers are disintegration at a soul-cost and the ability to make anyone do what he wants (*Court*, Ch. 160-161, pp. 630-633). He is tall with dark hair and bright blue eyes. He dresses in Armani black, which he insists is a distinct color (*Crush* p.156 "He's right there, one wide shoulder resting against the icy wall near a lamp, long legs crossed at the ankle, obnoxious smirk on his ridiculously pretty face. He's got the signature Vega high cheekbones and strong jawline …Hudson's (eyes) are an endless blue sky. Thick eyebrows,

the same shade of rich dark brown as his short hair, slant downward …Jaxon is a blunt weapon next to his brother, who seems to be cataloging my every weakness, every nuance and emotion, with surgical precision. This guy would know exactly how to hurt you the most—and you'd never see it coming"). Hudson is sophisticated, elegant, intelligent, sarcastic, charming, a little vain, and plays into the negative image most people have of him. His archetype is lost soul.

Another major difference between the works is the way the characters interact with each other. Jaxon has a sinister but protective vibe toward Grace that she refuses to give in to through most of the story (*Crave* p. 303).  Hudson and Grace's dynamic is different. He views her as his equal, someone he doesn't need to protect (*Crush* p.156).

Ash and Anna/Mia/Ella's relationship is based more on caregiving and he is a fatherly kind of protector (*Masqued 2014* p. 29).

***Villains.*** To the extent *BMR* has an overall villain, it might have been Plaintiff's intention to give this role to Ronan/Aeden, who stalks Anna in raven form throughout the book and appears briefly at the end before being chased away by Ash. However, this is not in any manuscript and his villain archetype is not developed enough to identify.

The more minor character Julian at one point abducts Anna, but is not squarely a villain either, as he believes Anna/Mia/Ella is his deceased lover and/or child and wants to marry her. Julian is framed as an incubus "Master" or vampire who feeds on humans (teens in particular) and uses abduction and throne-room domination (*Masqued*, Ch. 37-41, pp. 374-415.). In some versions, he is Anna/Mia/Ella's father.  He is beautiful and ethereal and driven by obsession. His archetype is the Devil, who will take the daughter if he can't have

the mother.  He thinks he is owed something because he was once in love with Elise/Marcheline, depending on the version.

Julian, from *BMR*, is also not like Lia, who is the initial villain in the first *Crave* book.  Julian wants to marry Anna, while Lia wants to kill and sacrifice Grace. Lia's archetype is the Maniac.

Neither Julian nor Ronan/Aeden are anything like *Crave*'s arch villain Cyrus—an unambiguously evil megalomaniac Vampire King who repeatedly leads powerful armies to attempt to variously harm, kill, and capture Grace and her friends as part of his plot for world domination. Cyrus is an ideological villain and his archetype is a mix between the Idol and the Tyrant, driven by power and change. He wields political and legal power, using contractual loopholes as his weapons of choice, along with poison against the gargoyles who are the only paranormals with a chance to stop his plan. He is king of the Vampire Court and married to Delilah. He is also the father of Hudson and Jaxon, who he tortured for centuries to help hone their powers. He is tall, with long silver hair and dark eyes. His power is the incurable bite (Court, Ch. 163-165, pp. 640-648; Court, Ch. 173, pp. 670-671). Cyrus is ultimately defeated and sentenced through procedural justice.

**Side characters.** The works' various friends and side characters have nothing in common beyond genre tropes and generalities. Macy, Grace's friendly, girly cousin and best friend, has no parallel in *BMR/Masqued.* She acts as a strategist and portal maker for the team, driving plot outcomes (Court, Ch. 76, pp. 313-318; Court, Ch. 121, pp. 488-491). She is tall and dresses in colorful clothes and regularly dyes her hair different colors. Her archetype is the Nurturer.

*BMR's* stereotypical high school mean girl antagonist Taylor is one-dimensional and nothing like Grace's adversary Lia in *Crave*, who is nerdy, quiet, and isolated rather than a popular "queen bee." In addition, Taylor is not the villain of *BMR/Masqued*, while Lia is the villain of the first book, *Crave*.

Friends such as Flint (in *Crave*) and Brendan (in *BMR/Masqued*) have nothing in common besides being gay and mixed race, which again are mere generalities and unprotected ideas. Among many other differences in expression, Flint is a powerful dragon shifter that Wolff created as an homage to her son, who is the same ethnicity as Flint and loves dragons. Flint has a complex initial relationship with Grace and later an awkward but heartfelt romance with Jaxon, who ends up becoming his mate. Brendan, on the other hand, is (usually) a stereotypical "gay best friend" without substantial nuance and never has a romantic relationship with Ash/Roman. Flint's archetype is a daring swashbuckler, whereas Brendan is a sassy diva.

*Crave* includes active deities and court sovereigns (e.g., Jikan, God of Time; Nuri Montgomery, Dragon Queen) that have no counterparts in *BMR/Masqued* (*see Court*, Ch. 52, pp. 209-213; *Crush*, Ch. 112, pp. 595-602.).   *BMR/Masqued*, on the other hand, includes Avalon priestess lineage figures and Anchorage-based Unseen clan elders (e.g., Elise, High Priestess of Avalon; Baen MacKay) that are not found in *Crave* (see *Masqued 2013*, Ch. 42-43, pp. 422-436; *Masqued 2013*, Ch. 32-33, pp. 318-335).

In *Crave*, the friendship group expands with a "found family" theme that starts with Grace's friendship with Macy and Flint and slowly grows to encompass others, while in *BMR/Masqued*, the friendships fit within a theme of "repaired high-school bonds" and

ritual adoption. In *Crave*, the friend group becomes a multi-species coalition where friends' abilities (portals, flying, court knowledge) are plot-critical (*Court*, Ch. 108, pp. 436-440).

In *BMR/Masqued*, on the other hand, the friendship starts with a mean-girl fracture, then pivots into solidarity after a supernatural "sorting" scene and a clan blood vow that ritually adopts the heroine (see *Masqued* 2013, Ch. 39-41, pp. 394-415; *Masqued* 2013, Ch. 33, pp. 336-339).

In *Crave*, friends are rescued in various ways, such as magical bargains struck in prison cells and paranormal courts to save captives ("Lock-and-Key" contract), while rescue moments in *BMR/Masqued* occur in intimate, coercive spaces like the incubus throne room (*Court*, Ch. 108, pp. 436-440; *Masqued* 2013, Ch. 40-41, pp. 398-415).

### 3.    The Works Do Not Have Substantially Similar Settings.

The settings of *BMR/Masqued* and *Crave* are dissimilar. *BMR/Masqued* features a normal, non-magical public high school that actually exists in the real world, whereas Katmere in *Crave* is an elaborate magical boarding school filled with overt paranormal activity. *BMR/Masqued* is set in Anchorage, Alaska's largest city, whereas *Crave* is set in the remote Alaska mountains near Denali, so far from civilization that Grace initially has to access Katmere via a snowmobile trek across the wilderness (*Crave*, p. 9). And the sub-settings within the schools are radically different. For example, *BMR/Masqued* has no parallel to Jaxon's tower suite or Hudson's underground lair, or the Ludares field where major events in *Crush* occur, or even to Grace and Macy's shared dorm room.

Many other settings introduced throughout the *Crave* books have no counterparts in *BMR/Masqued*. Katmere Academy is a gothic castle set in the most remote part of the Alaska mountain range. It is accessible only by snowmobile (or dragon flight), with secret passageways, turrets, and underground ossuary tunnels that lead to satellite classrooms and a massive dragon boneyard. Its Great Hall is staged as a Gothic auditorium with thrones - a physical manifestation of supernatural governance and hierarchy (*Crush*, Ch. 70, Scene 1, pp. 375-379; Crush, Ch. 72, Scene 1, pp. 384-391). Katmere's arena (Ludares coliseum) functions as public lawmaking theater, a spectacle that doubles as constitutional politics (*Crush*, Ch. 66-67, Scenes 1-2, pp. 345-352). *Crave*'s map expands into multiple elaborate courts and magical destinations (e.g., Witch Court Great Hall in Turin; Vampire Court complex in London; time-dilated Gargoyle Court in County Cork, or the Aethereum prison in New Orleans) (*Court*, Ch. 23-24, pp. 93-100; Court, Ch. 61-63, pp. 250-259; Court, Ch. 9-13, pp. 41-59). A Florida taffy shop becomes the gateway to the "Impossible Trials," a hidden arena that structures the plot and is the site of a magical series of high stakes challenges. (*Court*, Ch. 55-56, pp. 222-229).

None of that is in *BMR/Masqued*, which instead features a real Anchorage public high school (West High) with ordinary classroom and hallway scenes (front steps, trigonometry classroom). (*Masqued 2013*, Ch. 2, Scenes 1-2, pp. 18-27). Key Anchorage locations are everyday teen spaces used for disclosure/regrouping (Barnes & Noble cafe; La Mex restaurant; a house party; a diner), grounding the book in contemporary realism before it escalates into the supernatural (*Masqued 2013*, Ch. 22, Scene 1, pp. 197-203; Ch. 27, pp. 257-261; Ch. 18, Scene 1, pp. 160-166). The occult underworld is accessed via

embedded threshold spaces: the Sanctuary behind a VIP door at real-life bar Chilkoot Charlie's, and the Gloaming stone-ring portal behind evergreen trees (*Masqued 2013*, Ch. 37-38, pp. 374-383; Ch. 22-23, pp. 203-206).  A climactic mythic portal is Melusine's Mirror, pulling the heroine into Avalon (or the Gloaming, in some versions) (*Masqued 2013*, Ch. 42-43, pp. 422-436).

Furthermore, Alaska's setting functions very differently in the two works. In *Crave*, Alaska is used as a character, something that has a profound effect on Grace. It is unfamiliar, often menacing, intimidating, and deeply isolating. In *BMR/Masqued*, however, Alaska is home, a place where the heroine feels comfortable and its locations (such as Chilkoot Charlie's and La Mex) help create a comforting, love letter type feel to the setting.

### 4.    The Works Do Not Have Substantially Similar Themes.

*Crave* and *BMR/Masqued* also do not have materially similar themes. Both could be construed as expressing common YA paranormal romance themes such as coming of age; falling in love; family and friendship; trust and betrayal; and, good versus evil. But Plaintiff does not own these themes and they are expressed differently in the parties' respective works (for example, Anna/Mia/Ella's family issues primarily concern friction with her living mother versus Grace's grief for her dead parents, and Grace's complex evolving love for Jaxon and Hudson is nothing like the more straightforward Anna-Ash courtship). *See, e.g.*, *Dreamtitle Publ'g, LLC v. Penguin Random House LLC*, 2023 WL 4350734, at *15 (S.D.N.Y. Jul. 5, 2023) (dismissing where allegedly similar general "theme is not protectible by copyright law").

Meanwhile, *Crave* explores many unique themes that are not present in *BMR/Masqued*, including feminism; diversity/inclusion and overcoming stereotypes (the *Crave* cast is thoroughly diverse as discussed *infra*); grief and mortality; the nature, responsibility, and abuse of power; and the power of humor, friendship, compassion, and grace. To the extent *BMR/Masqued* covers any of these themes (*e.g.*, with the passing mention of Anna/Mia/Ella's father's death, which isn't actually a death), they are not expressed similarly or explored to the same degree.

### 5.    Pace Does Not Support Substantial Similarity.

*BMR/Masqued* unfolds across roughly four months, while most of *Crave* occurs in a single week and the four *Crave* books collectively unfold across eight months. *Court* heavily features a time freezing subplot, which is absent from *BMR/Masqued*. And *BMR/Masqued* is repeatedly interrupted with Anna's many Tarot readings and dreams/visions, none of which occurs in *Crave*. Even if the overall time frames were construed as similar, Plaintiff cannot monopolize the concept of a four-to-eight-month plot period.

### 6.    The Works Differ in How They Use Tropes in the Genre.

Both *BMR/Masqued* and *Crave* utilize many of the tropes found in the YA paranormal genre, which they ***must*** use to fit within that genre. Some of the high-level ideas found in the 2005 novel *Twilight* by Stephanie Meyer, for instance, also appear in *Crave*, such as a teen girl relocates to a smaller location and falls for a mysterious classmate who is revealed to be a vampire. Similarly, the television series *The Vampire Diaries*, from 2009, deals with a human heroine, a secret supernatural underworld, and a romantic

triangle between supernatural brothers, all set against a small-town backdrop. *Vampire Academy* by Richelle Mead from 2007 involves a boarding-school setting where vampire politics, training, and interpersonal drama are tightly interwoven. The school environment functions as a closed system with its own rules and dangers. Defendant's expert report from Emily Easton discusses many of these genre tropes, ideas, and *scènes à faire*.

*BMR/Masqued*, with its location in Anchorage and use of a typical high school, utilizes many of the same ideas found in *The Mortal Instruments: City of Bones* by Cassandra Clare from 2007, which was a YA urban fantasy/romance involving a hidden supernatural society in which the protagonist discovers a concealed world of demon hunters and supernatural politics layered under ordinary city life. *Fallen* by Lauren Kate from 2009 was a YA paranormal romance built around fate, mystery, and a dangerous supernatural love interest. Similarly, *Hush, Hush*, a 2009 book by Becca Fitzpatrick, involved a YA paranormal romance with a brooding love interest and concealed supernatural identity, illustrating the trope of "mysterious boy + escalating danger + romance."  Finally, *Shiver* by Maggie Stiefvater, from 2009, is a werewolf romance that revolves around shapeshifter mythologies and fate-tinged romance, in which the protagonist is interested in a wolf with yellow eyes.

Many of these tropes, such as plots that involve moving from a warm place to a cold remote one, dangerous or forbidden romance, dead parents, battles between good and evil, etc are so ubiquitous that they cannot support substantial similarity as a matter of law. For example, Luke Skywalker in *Star Wars* is an orphan who must leave his familiar home for an entirely new world, where he engages in a battle between light and dark with the help

of a trusted mentor. Harry Potter is an orphan who leaves his familiar home for an entirely new magical world, where he engages in a battle between light and dark with the help of a trusted mentor. Does *Harry Potter* infringe on *Star Wars*? Of course not. The execution of those tropes and general ideas is completely different between the respective works. The same is true in the present case. As the chart provided herein above illustrates, many of the tropes do not overlap between the respective works, but even where they do, such as the heroine having supernatural powers, the tropes are used in completely different ways, with differences in tone, voice, humor, plot, context, purpose, etc.

The general tropes used in each work predate both *Crave* and *BMR/Masqued*. Plaintiff is not the first, for example, to have a teenaged girl fall for a mysterious boy who is a shapeshifter or wolf and who has yellow eyes. Plaintiff isn't the first to write about a romance filled with fate, mystery, and ancient legacies. Plaintiff is not the first to have a concealed world lurking under ordinary city life.

All of these genre tropes, memes, ideas, and *scènes à faire* have been widely used before and after Plaintiff's manuscripts or Defendants' novels. Neither Plaintiff nor Defendants have any exclusive right to them, and the use of them by Defendants (or anyone else) cannot, by definition, infringe Plaintiff's rights (or anyone else's).

### 7.    The Works Differ in Their Total Concept and Feel.

The total concept and feel of *BMR* and the *Crave* series are not substantially similar. In evaluating total concept and feel, courts variously consider: (1) scope, length, and structure; (2) tone, mood, and style, including the use of humor; and (3) the "overall feel" of the works, including whether they "engender very different visceral responses." *See,*

*e.g.*, *Allen*, 79 F. Supp. 2d at 657; *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976); *DiTocco*, 815 F. Supp. 2d. at 672.  The Second Circuit has emphasized total concept and feel as the most important consideration when analyzing substantial similarity, *see, e.g.*, *Peter F. Gaito Architecture, LLC v. Simone Dev. Copr.*, 602 F.3d 57, 66 (2d Cir. 2010) (analysis is "'principally guided' by the 'total concept and overall feel' of the works").

*Crave* is written in a fun, engaging, and casual tone; although it conveys heartbreak, death, and other serious subjects, its mood and tone remain light-hearted, optimistic, and funny (for example, Grace and Jaxon's recurring "bad joke" competition). *Crave* repeatedly breaks tension through humor devices (e.g., punny, wink-at-the-reader chapter titles; meme-like tonal beats) that function as a pacing engine rather than isolated jokes (see, e.g., *Court*, Ch. 135-136, Scene 1, pp. 533-538). Pop-culture and snack references serve as an emotional register for the cast, reinforcing a modern, bantering voice even in high-stakes sequences (*Crave*, Ch. 9, Scene 3, pp. 90-94). Many high-stakes scenes are cushioned by "found family" banter that is itself a recurring motif (*Crush*, Ch. 77, Scenes 1-2, pp. 428-435).

*Crave* has light, flowing dialog. It sounds modern. There is a balance between dialog and description. *Crave* hints at what happened to Grace's parents, but doesn't just come right out and say it (wondering "what my parents might have seen coming").  It shows, doesn't tell ("toes trembling" in *Crave*, p. 4).  You feel the emotion instead of just reading someone verbally express an emotion.  It has funny chapter headings.  The description of scenery and place makes everything come alive (*e.g., Crave's* castle description on p.

13). It is self-aware (questioning how she became the heroine in some YA romance at *Crave,* p. 23).

In *Crave*, magic is perceived and manipulated by Grace as visible strings (silver life, platinum/gold shift, blue store/return, green chaos) that can be rerouted (*Court*, Ch. 171, Scene 1, pp. 663-665). Blacksmith-forged magic-proof metal functions as a hard counter in combat and imprisonment, shaping the villain's plan and the heroes' tactics (*Court*, Ch. 164-167, pp. 643-654).

The tone and feel of magic and power is quite different in *BMR/Masqued*. The Plaintiff's works alternate between dialog and exposition. It has a serious tone, with heavy, adult-feeling dialogue that doesn't sound like it comes from a teenaged narrator ("making a little moue of her rosebud mouth (*BMR*, p. 21).

Substantively, in *BMR*/*Masqued*, power is mediated through Tarot, visions, and a living marque of hieroglyphs/script that can be concealed (*Masqued 2014*, Ch. 19, pp. 171-177; Ch. 35, pp. 356-360). Authority is priestess-based and prophetic: a High Priestess frames Initiation and imposes romance limits tied to office. (*Masqued*, Ch. 43, pp. 431-435). Key relics are ancestral and mythic (*e.g.*, Wepwawet "Original" amulet) (*Masqued*, Ch. 32-33, pp. 321-335). Geasa, thresholds and warding rules structure encounters by the characters (e.g., warded door consent; sacred portal ring boundaries). (*Masqued*, Ch. 20, pp. 178-185; Ch. 22-23, pp. 203-206). As a result, the overall feel of *BMR/Masqued* is more mystical, mythical and fantasy-based compared to *Crave*.

In addition, *BMR/Masqued*, likely due to the selection of mysticism and fantasy elements, is much less quirky in tone and mood, with more workmanlike writing and little

if any humor. Tarot functions as solemn chorus rather than comedic punctuation, such as the opening with The Tower as an omen and later framing sacrifice through High Priestess/Death/Lovers (*Masqued*, Prologue, pp. 5-10; *Masqued 2013*, Ch. 43, Scene 2, pp. 431-435). Ravens serve as literal augury ("Beware!"; "Priestess. Chosen."), producing an atmosphere of prophecy rather than teen banter (*Masqued 2013*, Ch. 5, Scene 1, pp. 48-53; Ch. 13, Scene 1, pp. 111-115; Ch. 18, Scene 2, pp. 166-168). Threshold etiquette is written as dread/consent anxiety (such as the warded door, or Ash saying he could compel but will not) (*Masqued 2013*, Ch. 20, Scene 1, pp. 178-185). As another example, a priestess rule that forbids "lasting alliance" with men introduces renunciation stakes that are absent from *Crave*'s romantic tone (*Masqued 2013*, Ch. 43, Scene 2, pp. 431-435).

Tragedy is another element that is present in the *Crave* series but not seen in *BMR/Masqued*. Many beloved characters die throughout *Crave*'s pages and Grace must learn to be a leader in the face of unimaginable loss. The *Crave* books ask the reader to feel great empathy and to let in the full extent of the terribleness that life can bring. In contrast, *BMR/Masqued* does not ask the reader to face tragedy. No one dies within the pages of any version of the manuscripts and the story remains centered on Anna/Mia/Ella specifically and her unique personal journey. In that way, the *BMR* manuscripts are more self-centered and about personal fulfillment. But in any case, they differ starkly in what emotions they bring forth from readers.

These are not cosmetic differences. Tone choices and humor drive which scenes exist, how they are written, and what emotional promise the book makes to a reader. The *Crave* series leaves readers with the sense of the importance of found family, diversity and

humor, and a belief that the world can embrace us all if we have mercy, empathy and curiosity. The magic juts against the real world in almost pop art ways.  Grace has her cell phone while riding a dragon, she eats Pop Tarts on dangerous quests, and she carries Band-Aids in her backpack.

In contrast, *BMR/Masqued*, while initially beginning as YA paranormal romance, veers into epic mystic fantasy with unseen worlds, ancient mythologies, and hidden legacies.

The worldbuilding and length of *Crave* is also dissimilar to that of *BMR/Masqued*. *Crave* is far more detailed, creating completely new worlds that spread across over 2500 pages, while *BMR/Masqued* presents a familiar world (big city, regular high school), with the supernatural lurking in the shadows.

## F.    There is No Substantial Similarity Between *Crave* and *BMR/Masqued*, Regardless of the Analytical Test That is Applied.

Previously, Plaintiff has mentioned a number of tests for substantial similarity she believes should be used here, including "fragmented literal similarity," "comprehensive non-literal similarity," and "selection, coordination and arrangement." In the context of young adult fiction, none of these tests offer a useful or appropriate approach to assessing substantial similarity not already incorporated into the standard ordinary discerning observer and total concept and feel tests discussed above.

The first two tests were proposed by Professor Nimmer, and first recognized in *Werlin v. Reader's Dig. Ass'n, Inc.*, 528 F. Supp. 451 (S.D.N.Y. 1981). In *Werlin*, this Court explained that "substantial similarity may be found in cases where, although there is no

literal or word-for-word similarity between the two works, the fundamental essence or structure of a substantial part of one work is duplicated in another. Also, substantial similarity is properly found in certain cases where, although the fundamental essence or structure of a work has not been duplicated, there are a substantial number of instances of literal similarity between the two works." *Id.* at 462. Separately, the seminal case approving copyright protection for the "selection, coordination and arrangement" of compilations of unprotectible facts is *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991), which explains that even where such a compilation is protected, "the copyright in a factual compilation is thin," and a "a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." *Id.* at 349.

It remains unclear whether Plaintiff has now settled on a particular theory of infringement in this case. What is clear is that Plaintiff cannot cherry-pick from the various tests or combine them in ways that then fail to fairly assess issue of substantial similarity. That is, Plaintiff cannot point to "fragmented" *non*-literal passages where the only overlap is a concept or trope, because the entire point of the test is to look for verbatim passages that do not constitute the whole work but are found throughout the work; no such verbatim passages exist here. Nor can Plaintiff point to *non*-comprehensive non-literal similarities, because the entire point of the second test is to look at the works comprehensively, and a comprehensive look at the respective works here demonstrates they are dissimilar in every aspect. And finally, Plaintiff cannot use a purported unique compilation of unprotectible elements in her works to claim infringement of even a "thin" compilation copyright, unless

she can show that Defendants copied the particular selection, coordination and arrangement of elements slavishly, which is not remotely the case here.

Given the uncertainty around Plaintiff's actual theory of the case, Defendants expect to address these issues at more length in opposition to any motion filed by Plaintiff, or on reply in support of the instant motion.

## III.  <u>CONCLUSION</u>

Courts have declined to find substantial similarity in situations where there has been far greater overlap in relevant aspects than are present with respect to *Crave* and *BMR/Masqued*. *Allen*, 739 F. Supp. 2d at 664 & n.161 (collecting examples); s*ee also Hogan*, 48 F. Supp. 2d at 311-12 (no substantial similarity even though the works' main characters "share the same name: Nicholas Gaunt" and "both Gaunts are half-vampire and half-human"); *DiTocco*, 815 F. Supp. 2d at 670 (same even though, *inter alia*, "plaintiffs' books and the Percy Jackson Books both tell the story of modern-day young heroes who must prevent destruction of the world by forces from Greek mythology"); *Mallery*, 2007 WL 4258196, at *6 (same where works both involved "(1) painting a future in which tragic and destructive events take place, such as the destruction of landmark buildings in New York City; (2) having a prediction confirmed by a newspaper report; and (3) making an attempt to prevent a tragic death in the light of the future."); *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (same where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave of boredom, ... discovers that one of his neighbors is a murderer, ... is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated").

Plaintiff does not claim that a particular version of *BMR/Masqued* is infringed by a specific *Crave* book. Instead, she points to bits and pieces from different manuscripts, attempting to create a "Frankenstein" version of her various drafts that does not actually exist.  Even when those cherry-picked portions are compared, however, there is still no substantial similarity between Plaintiff's manuscripts and *Crave*.  *Crave* has a different plot, setting, and characters than *BMR/Masqued*. It is marked by wit, humor, and self-aware references. *BMR/Masqued*, by contrast, has no humor, snark, banter or wit. The story of *BMR/Masqued* is more serious, weighed down with myth and ancient legacies. It contains far more opinion and author intrusion than *Crave*. *BMR/Masqued* tells, not shows, and sounds like an adult trying to sound like a teen.

*Crave*, on the other hand, has light, flowing, modern dialog that sounds like teen-speak. It is easy to read, with a balance between dialog and description, unlike *BMR/Masqued*, which alternates between dialog and exposition.

Grace is an orphan. Anna/Mia/Ella is not. Grace thinks she's a normal teen girl who turns out to be a gargoyle. Anna knows from the start that she is a witch. Grace is short and curvy.  Anna is tall and thin. Grace is confident. Anna is not. Grace has a love triangle with vampires. Anna is attracted to a shape shifter. Grace's relationship is consummated.  Anna's is not. These are just some of the high-level comparisons of the lead heroine of each work. The differences between *Crave* and *BMR/Masqued* that are outlined in this brief are more than sufficient to dispose of Plaintiff's substantial similarity arguments and, as a result, this case, but they are just the tip of the iceberg.  In truth, there are so many other differences

between the characters, tone, plot, setting, theme, and total concept and feel of the parties'
works, that it might take two or three hundred pages to detail them all.

One thing is clear, however: when all of the relevant factors are compared, as Judge
Scheindlin did in the *Hogan* case, the inescapable conclusion is that the respective works
are not substantially similar.

Dated: January 26, 2025

Respectfully submitted,

*/s/ Amy L. Nashon*

Amy L. Nashon
California State Bar No. 316353
John C. Ulin (*pro hac vice* pending)
California State Bar No. 165524
**TROYGOULD P.C.**
1801 Century Park East, Suite 1600
Los Angeles, CA 90067
Phone: (310) 553-4441
Fax: (310) 201-4746
anashon@troygould.com
JUlin@troygould.com

Jennifer Pariser
**OPPENHEIM + ZEBRAK, LLP**
461 5th Avenue, 19th Floor
New York, NY 10017
Phone: (212) 951-1874
Fax: (866) 766-1678
JPariser@oandzlaw.com

*Attorneys for Defendants Tracy Deebs-
Elkenaney p/k/a Tracy Wolff,
Entangled Publishing, LLC,
Holtzbrinck Publishers, LLC d/b/a
Macmillan, and Universal City Studios
LLC*

Lacy H. Koonce, III
**KLARIS LAW PLLC**
161 Water Street, Ste. 904
New York, NY 10038
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Silvan*
*Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
**KOWERT, HOOD, MUNYON,**
**RANKIN & GOETZEL, P.C.**
1120 S. Capital of Texas Hwy.
Building 2, Ste. 300
Austin, Texas 78746
Phone: (512) 853-8800
Fax: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendants Tracy Deebs-*
*Elkenaney p/k/a Tracy Wolff*