**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>-against-<br><br>TRACY DEEBS-ELKENANEY, et al.<br><br>Defendants. | Case No. 1:22-cv-02435 (CM)(SN)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON SUBSTANTIAL SIMILARITY**<br><br>**[DECLARATION OF STEPHEN DONIGER FILED CONCURRENTLY]** |

# TABLE OF CONTENTS


I. Introduction……………………………………………………………………………..1

II. Defendants ignore the substantial similarities between *BMR* and the *Crave* Books, instead focusing on illusory and/or irrelevant differences………………………………...3

A. Differences between the works cannot excuse substantial similarity……………..3

B. Defendants materially misrepresent the differences between the works…………4

III. Protectable expression includes the selection and arrangement of unprotectable elements, which cannot be filtered out of the Court's review…………………………...28

IV. Review of Freeman's manuscripts in the aggregate is appropriate because they reflect the same underlying story, not independent, unrelated works……………………30

A. Aggregate Review of Related Works is the Established Practice of Courts in this Circuit and is Appropriate Here………………………………………..32

B. The Nature of the Infringement Requires Aggregate Comparison………………34

C. Freeman's drafts are largely consistent as to the points of substantial similarity……………………………………………………………………36

V. There is at least a triable issue of Substantial Similarity………………………………...42

A. When reviewed in the aggregate, the works are substantially similar…………...42

i. *BMR* and *Crave* share substantially similar characters…………………..43

ii. The works share substantially similar plot and storylines………………45

iii. *BMR* and *Crave* share substantially similar scenes and settings………..46

iv. Both works feature substantially similar themes, pacing, and overall feel………………………………………………………………47

B. Even when reviewed individually, *Crave* infringes on the *BMR* drafts…………50

C. If *Crave*, the first book in the Series, Infringes *BMR*, *Crush*, *Covet*, and *Court* also Infringe *BMR*……………………………………………………………….....51

VI. Conclusion……………………………………………………………………….52

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........ 51

*Attia v. Soc'y of New York Hosp.*,
201 F.3d 50 (2d Cir. 1999) ........ 1, 3

*Branch v. Ogilvy & Mather, Inc.*,
765 F. Supp. 819 (S.D.N.Y. 1990) ........ 50

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*,
150 F.3d 132 (2d Cir. 1998) ........ 32, 33

*Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*,
409 F.2d 1315 (2d Cir. 1969) ........ 4, 7

*Dean v. Cameron*,
53 F. Supp. 3d 641 (S.D.N.Y. 2014) ........ 33

*Detective Comics v. Bruns Publications*,
111 F.2d 432 (2d Cir. 1940) ........ 45

*DiTocco v. Riordan*,
815 F. Supp. 2d 655 (S.D.N.Y. 2011) ........ 31, 32

*Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*,
73 F.4th 1048 (9th Cir. 2023) ........ 52

*Kaye v. Cartoon Network Inc.*,
297 F. Supp. 3d 362 (S.D.N.Y. 2017) ........ 31, 32, 35, 44

*Klauber Bros., Inc. v. M.J.C.L.K., LLC*,
2024 WL 4467618 (S.D.N.Y. Oct. 10, 2024) ............................................................................ 45

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*,
71 F.3d 996 (2d Cir. 1995) ............................................................................................. 4, 28, 45

*Kroencke v. General Motors Corp.*,
270 F. Supp. 2d 441 (S.D.N.Y. 2003) ....................................................................................... 34

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
922 F.3d 946 (9th Cir. 2019) ....................................................................................................... 4

*Nelson v. Grisham*,
942 F. Supp. 649 (D.D.C. 1996).................................................................................................. 34

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
558 F.2d 1090 (2d Cir. 1977) ....................................................................................................... 3

*Pannonia Farms, Inc. v. USA Cable*,
No. 03 Civ. 7841, 2004 WL 1276842 (S.D.N.Y. June 8, 2004) ............................................. 51

*Penguin Random House LLC v. Colting*,
270 F. Supp. 3d 736 (S.D.N.Y. 2017) ....................................................................................... 45

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) .......................................................................................................... 35

*Sheldon Abend Revocable Tr. v. Spielberg*,
748 F.Supp.2d 200 (S.D.N.Y. 2010) ......................................................................................... 44

*Sheldon v. Metro-Goldwyn Pictures Corporation*,
81 F.2d 49 (2d Cir. 1936) ............................................................................................................ 50

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
338 F.3d 127 (2d Cir. 2003) ........................................ 1, 3, 35, 50

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993) ........................................ 31, 32

*Williams v. Crichton*,
84 F.3d 581 (2d Cir.1996) ........................................ 28

**Statutes**

17 U.S.C. § 106(2) ........................................ 51

## I. Introduction

As the Court has found multiple times, there are significant similarities between *BMR* and the *Crave* Books probative of copying and "the plaintiff has the better of the argument on probative similarity." And, as set forth more fully in Freeman's concurrently filed summary judgment motion, those similarities go far beyond unprotectable ideas, tropes, and other coincidental overlaps. Rather, they demonstrate point-by-point copying of *BMR*'s expressive elements including, *inter alia*, its characters, narrative architecture, plot points, pace, language, themes, and overall feel. For example, between *Crave* (book 1) and *BMR* alone Freeman has identified 62 discrete similarities in plot points and story beats—many of which have numerous sub-similarities—that flow in the same order between the two works.

Entirely ignoring the uncanny similarities between the works, Defendants now argue that no reasonable jury could find substantial similarity by presenting this Court with incomplete and misleading summaries of the works to highlight putative differences between them. But it is "entirely immaterial that, in many respects, Plaintiff's and Defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown." *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 57-58 (2d Cir. 1999); see *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 132 (2d Cir. 2003), quoting *Sheldon*, 81 F.2d at 56 ("It has long been settled that 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate[.]'"). Perhaps more troubling, Defendants' significantly mischaracterize the works in their putative list of dissimilarities.

Defendants also misrepresent Freeman's *BMR* manuscripts as containing fundamentally different story beats, plots, and details such that it would be unfair for her to "pick and choose" parts from each. In fact, each version shares a consistent story spine of plot points and story beats

which map to the parallel points of the *Crave* series. The differences between Freeman's manuscripts amount to little more than what would be expected in the rewrite and editing process—as Defendants themselves admit. Indeed, after submitting *BMR* to Penguin/Razorbill and receiving a rejection, Defendant Emily Kim wrote:

> The author and I were brainstorming about this book. We do realize it's a tough sell in today's market, but we're wondering if you and your team might find it more marketable if the vampires weren't vampires and the werewolves weren't werewolves. Both of these creatures were based on various elements of Celtic and Egyptian mythology, and with some easy changes, could easily be more elemental in form and less typical of what we think of when we think paranormal these days.

*See* Declaration of Stephen Doniger, Exhibit 1. This email all but admits that the types of changes that Defendants hold out as significant in this case (e.g., "Jaxon is a vampire, Ash is a werewolf) are really "easy changes" that do not fundamentally change the work.

Because the BMR manuscripts share a consistent spine of story points, characters, etc. and are part of a single body of work and story development, comparison of the *BMR* and the *Crave* works in the aggregate is appropriate. And because Defendants' additional storylines and plot points are derivative add-ons to Freeman's work that carry forward the storylines she contemplated and documented in her manuscripts and notes (like the love triangle and Ronan being the heroine's true love match), they offer Defendants no quarter. Ultimately, whether considering each manuscript individually or the full body of *BMR* together, the similarities shared by the Crave books not only compel denial of this motion, but the granting of Freeman's motion for summary judgment as to substantial similarity.[1]

---

[1] Freeman hereby incorporates by reference her Motion for Summary Judgment on Substantial Similarity (ECF Nos. 525 and 526), including but not limited to, all other Court filings incorporated by reference and her objections set forth in footnote 1 therein.

## II. Defendants ignore the substantial similarities between *BMR* and the *Crave* Books, instead focusing on illusory and/or irrelevant differences.

Defendants' motion presents pages of self-serving and inaccurate summaries of *BMR* and the *Crave* books along with an exhaustive list of claimed differences between them. But beyond their inaccuracy, it is "entirely immaterial that, in many respects, Plaintiff's and Defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown." *Attia*, 201 F.3d at 57–58; see also *Tufenkian Imp./Exp. Ventures, Inc.*, 338 F.3d at 132, quoting *Sheldon*, 81 F.2d at 56 ("It has long been settled that 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate[.]'").

### A. Differences between the works cannot excuse Defendants' copying.

Defendants appear to either misunderstand or intentionally ignore the correct legal standard for substantial similarity review. "Only a slavish copy would have no differences" and "(n)o one disputes that the copyright extends beyond [an exact reproduction.]" *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir. 1977). Thus, the inquiry on substantial similarity is concerned with "similarities rather than the differences." *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir. 1977).

Setting aside that many of the "differences" claimed by Defendants rest on misrepresentations of the works, as discussed *infra*, any such differences do nothing to support Defendants' motion so long as there are otherwise sufficient similarities for a reasonable juror to find the copying of protectable expression—which here there are. To be sure, the Second Circuit rejects similar "lengthy recitation[s] of differences" because "[t]hese differences in detail, while requiring considerable ink to describe, do little to lessen a viewer's overwhelming impression"

that the works bear substantial similarities. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1004–05 (2d Cir. 1995).

On the other hand, both the Second and Ninth Circuit have explained that differences between works may in fact evidence willful infringement. *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969) (the differences "tend[] to emphasize the extent to which the defendant has deliberately copied from the plaintiff."). *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 953–54 (9th Cir. 2019) ("a jury could find these to be knowing modifications, which could be evidence of willful copying.") citing *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1316 (2d Cir. 1969). The differences in this case do just that—evidencing superficial changes to hide the piracy.

In short, an infringer cannot escape liability by pointing to either what they did not copy or what they added since "a would-be appropriator who wishes to test the limits of copyright law gains nothing from 'adding on'" to what they copied. *Tufenkian Imp./Exp. Ventures, Inc, Supra,* 338 F.3dat 132–33. So long as the similarities between *BMR* and *Crave* could plausibly lead a reasonable observer to conclude that the works are substantially similar, Defendants' twenty-pages effort to highlight alleged differences between the works are for naught and this motion must be denied.

**B. Defendants materially misrepresent the differences between the works.**

Even if this Court were to consider the differences between the works, iDefendants' motion rests on grossly inaccurate summaries of the works, beginning with their identification of the shared tropes between the works and continuing with a multitude of misrepresentations and omissions of key facts, and is therefore properly rejected.

For example, Defendants' chart from their Motion for Summary Judgement p. 36, purports to show "YA paranormal tropes that are used in *BMR/Masqued* and *Crave*… most of which do not [overlap]." But when the same chart is populated with the actual narrative details (added below in red) it becomes clear how illusory these purported differences are:

| Trope | Used in *Crave* | Used in *BMR* |
|---|---|---|
| Protagonist is an orphan[2] | Yes<br><br>She has lost her father and mother in an accident. Lives with the last two relatives she believes are left and they are supernatural witches: uncle and cousin. | ~~No~~ (Anna/Mia/ Ella lives with her mother and aunt; father is found to be alive)<br>Yes (father believed dead at outset of story)<br>She has lost her father and grandparents in an accident. Lives with the last two relatives she believes are left and they are supernatural witches: mom and aunt. |
| Protagonist moves to remote location[3]<br><br>A principal supernatural residence associated | Yes (boarding school in rural Alaska near Denali) | No ~~(Anna/Mia/Ella's mother moves to Anchorage and they go to actual restaurants, bars, grocery stores, and Barnes & Noble)~~<br>Yes |

[2] **(Heroine loses parent(s), comes to Alaska to live with the only two family members she believes has left)**: *BMR* 2011 p. 13; 2011 p. 73; 2013 p. 15 "The three of us make up my family. We're all that's left." *Crave*: p. 7. p. 28, 316 "Not to mention the only family I have left."; **(They are supernatural witches)** *BMR* 2013 p. 220 "My mom and my aunt are both witches, but not exactly the Wiccan variety as I had been led to believe. *BMR* 2011 p. 576, 578; "I was born and remain Kindred—witch…I am your mother." *Crave* p. 316 "A warlock, yeah. Just like my dad. And I'm a witch. It's a family thing." (**Accident was in a vehicle that crashed and fell a long distance)**: *BMR* 2010 p. 100-101 "My dad and my grandparents took one car and I agreed to let my mom ride with me—she'd come back to get dressed so we could all go together to see her show…When they got in, they crashed forty stories to the basement and the car exploded." *Crave* p. 45 "I wish that my dad hadn't lost control of the car two hours later and driven himself and my mother off a cliff, plunging hundreds of feet into the ocean." p. 45 **(Vampire prince / vampire prince's mate killed heroine's family members)**: *BMR* 2010 p. 443 "B-but he died in the elevator crash with my grandparents." I insisted stubbornly. He shook his head. "Not so. That was no accident, Anna Sweet.*"* *Crave* p. 483 "I spent weeks planning your parents' accident…"

[3] **(Remote location in Alaska of the castle)**: *BMR* 2011 p.411 "Anchorage is surrounded by water—Cook Inlet on one side and snow covered mountains all around...but it's a bit remote. The homes are built along the side of a small mountain overlooking the town and the Inlet," *Crave* p. 8 "I can't help but think of the mountains and rivers that surround this town in all directions." *Crave* p. 119 "We're on the side of a mountain."

| | | |
|---|---|---|
| with the male lead is a castle/ chateau in a remote mountain setting | Heroine relocates to Alaska. The principal supernatural residence in the story, the castle, is located in a remote mountain area at the end of a long driveway<br><br>(First edition shows the heroine arriving in Anchorage before going to castle.) | Heroine relocates to Alaska. A principal supernatural residence in the story–the male lead's chateau–is located in a remote mountain area at the end of a long driveway |
| Use of Alaska[4] | Yes (Remote, rural Alaska is a symbol of Grace's isolation/setting is a character)<br>Alaska functions as a symbolic landscape reflecting the heroine's feelings of isolation, grief, and guilt following the accident in which her final words with her family members were in an argument<br><br>"Frozen hellhole" | Yes ~~(Anchorage is part of Anna/Mia/Ella's ordinary life)~~<br><br>Alaska functions as a symbolic landscape reflecting the heroine's feelings of isolation, grief, and guilt following the accident in which her final words with her family members were in an argument<br><br>"Frozen wasteland" |

[4]**(Use of Alaska):** *BMR* 2013 p. 84: "I know all of this comes as a surprise, but you have to understand, everything we've done has been to keep you safe…..We just left. And moved to Alaska." *BMR* 2013 p. 467: " I thought if I could keep you from it, I would protect you and save myself. Instead, by keeping you ignorant..." *Crave* p. 277-278 "I brought you to Alaska because I wanted you to feel safe, wanted to help you find a new home. Instead, you've been miserable since you got here." p. 278 "I guess I thought ignorance would keep you safe." **(Use of Alaska as punitive location to process grief):** *BMR* 2011 p. 11 "We'd lived in California before the accident; a time and place of sunshine and laughter. Now we live here, a land of seemingly perpetual darkness and winter." *Crave* p. 5 *"*It's so cold out…How can anyone live like this? It's unreal, especially considering it was seventy degrees where I woke up this morning." *BMR* 2011 p. 12 *"*It was to this frozen wasteland of ice and snow that my mother condemned us when she ran away after my dad and grandparents were killed. *Crave* p. 3 "It's not the first description that popped into my head--no that was the old cliche that hell has actually frozen over--but it's the most polite one. *BMR 2011* p. 124 "We lived in San Diego. Talk about extremes!' I rolled my eyes;" *Crave* p. 278 "I mean, Alaska is about as different from San Diego as it can get…" **(Guilt over family members deaths because of argument):** *BMR 2010* p. 100-101 "I pitched a fit...I've always felt really guilty about what happened. If I hadn't insisted on having my way, they'd still be alive." *Crave* p. 45 "I wish that the last words my parents and I spoke weren't hurled at each other in a fight that seems so stupid now.

| | | |
|---|---|---|
| Inbound Disruption (main character as ordinary girl enters an extraordinary world)[5] | Yes (Grace enters a supernatural academy as an ordinary girl) The heroine initially believes she lives within the ordinary world while unaware of the true supernatural nature of her environment, and her encounters with supernatural actors, particularly the male lead, initiate her transition into the extraordinary world | ~~No (Anna/ Mia/ Ella knows she is a witch)~~ Yes The heroine initially believes she lives within the ordinary world while unaware of the true supernatural nature of her environment, and her encounters with supernatural actors, particularly the male lead, initiate her transition into the extraordinary world |
| Outbound Displacement (extraordinary being enters and changes main character's ordinary world) | ~~No~~ Yes Supernatural actors, particularly the male lead, enter the heroine's ordinary awareness and trigger the narrative conflict | Yes (~~Anna/Mia/Ella is a girl with special powers living in an ordinary environment and attending a regular public high school in Anchorage when a boy with special powers enrolls in her school and changes things)~~ Supernatural actors, particularly the male lead, enter the heroine's ordinary awareness and trigger the narrative conflict |
| Supernatural academy setting[6] Setting in school with supernatural actors | Yes The heroine attends a high school where teachers and students are supernatural, and their identities are initially unknown to her | ~~No~~ Yes The heroine attends a high school (not labeled an "academy") where certain teachers and multiple students are supernatural, and their identities are initially unknown to her |
| Regular public high school setting [7] | No Heroine initially believes it is an ordinary school, though supernatural students and teachers are secretly present | Yes Text does not say it's public or private Heroine initially believes it is an ordinary school, though supernatural students and teachers are secretly present |
| Main character leads an army/political movement[8] | Yes Heroine is revealed to be the Gargoyle queen, a leader and the army is hers | No Not yet but Heroine is revealed to be a queen, a leader, and heir to political leadership through royal lineage and extraordinary power, with large-scale conflict foreshadowed but not yet occurring |

[5] **(Heroine believes she is human. She discovers her friends and family are supernatural beings and two teachers)** *BMR* 2011p. 409 "Am I still—human?"; BMR 2011p. 500: "'They're

| | | |
|---|---|---|
| Rival houses, factions[9] | Yes<br><br>Rival houses and factions engaged in conflict | ~~No~~ Yes<br><br>Two ancient royal houses and rival factions engaged in conflict |
| Has a group called Order[10] | Yes—The Order (five vampire friends of Jaxon's).<br><br>Romantic lead is a member | Yes—The Order aka Order of the Sphinx (secret police looking for the Chosen One to keep her from choosing bad) Romantic lead is a member "The Order" present in drafts 2010-2011. Later drafts edited to Order of the Sphinx. |
| Main character thinks she is an ordinary human and later discovers her powers[11] | Yes<br>Heroine thinks she is a human girl and later discovers her powers | ~~No.~~ Yes<br>Heroine thinks she is a human girl and later discovers her powers |

vampires?' Vampires, trolls and demons, oh my." BMR 2011 p. 224: "How do you ask someone if they're a teenage werewolf?" *BMR* 2013 p. 409 "I stare at my friends in disbelief. 'You're not *human*? None of you?' 2013 p. 40 ; "I'm a ban sidhe, Anna. Rachel and I are cousins by blood. Sirens and ban sidhe are cousins, too." 2013 p. 405 "The boy's a Faery."; 2013 p. 423: "I thought you knew we were succubi…" He claimed he wasn't a werewolf but could shift into a wolf." p. 236

6 *Id*. In both works, the heroine attends a school environment in which supernatural students and faculty are present, whose identities are initially concealed from her.

7 *Id* at footnote 6

8 In both works, the heroine is identified as a future sovereign leader whose authority over forces develops as the conflict unfolds. **(She's a queen)** "But when he told us about you being special and all that...He said you're a queen." *BMR* 2012 p. 486; **(She is from two of the strongest royal houses)** *BMR* 2014 p. 175 "They're born with more power than either of their parents. And this particular Nyx is said to be from two of the oldest and strongest royal houses." **(She's a leader)** *BMR* 2013 p. 425 "That ring is on your hand for a reason. And as much as I hate to admit it, that makes you the leader."

9 **(Rival factions & Rival/ Royal Houses)** *BMR* 2013 p.75: "Apparently, my father discovered valuable information that a rival faction had been after." *BMR* 2014 p 175 "And this particular Nyx is said to be from two of the oldest and strongest royal houses." **(large scale conflict)** *BMR* 2011 p. 239 "Someone who is tied to both houses, light and dark. That girl is the key to tipping the balance of the war, one way or the other." *BMR* 2011 p. 574 "We are at war, child, a war that has been waged since the beginning of time itself. In all of life there is light and dark. Good and evil. But there must be balance. It is your time.. Time to achieve your potential and come fully into your powers, Annalise."

10**(The Order: romantic lead is a member)** *BMR* 2012 p.219 "After Athair's warning about the Order and Ash's involvement with them." *BMR* 2014 p.387 "You serve the Order."; *Crave* p. 522 "... Jaxon and the rest of the Order…"

**11(Heroine thinks she is human and later discovers her powers)** *BMR* 2011 p. 276 *heroine thinks she and her aunt and mom are human:* "I held my breath as I watched them watching him,

| | | |
|---|---|---|
| Main character has special powers[12] | Yes (Grace is a gargoyle; she is a healer, can fly, manipulate elements and freeze time)<br><br>Twin goddess descendant<br>Magical tattoos | Yes (Anna/Mia/Ella is a witch/Kindred; she has visions; electricity comes from her fingers; she reads Tarot)<br>A healer and manipulates elements<br>Twin goddess descendant<br>Magical tattoos |
| Visions or prophecy[13] | No<br>Text describes the heroine experiencing sensations of premonition and deja vu | Yes<br>Text describes premonitions, deja vu, and visions |

four pairs of eyes, two human and two feline." *Heroine after wolf shifter bite: BMR* 2011 p. 409 "Am I still—human?" *see also BMR* 2012 p. 335; *BMR* 2013 p. 226 *Heroine wonders*: "Is it because I'm human?" and p. 233, BMR 2013 p. 240 *Heroine to romantic lead: "*Your parents don't want you dating a human and my mom doesn't want me dating, period." *BMR* 2014 p. 186 "Is it because I'm human?" and p. 192, 204: "'Maybe you're not supposed to mix with humans." I hate that I might be right. That maybe I'm bad for him." *BMR* 2013 p. 212 "That's when the Nyx will come into her power."

[12] **(Heroine has special powers, healer)** *BMR* 2016 p. 59 "They don't have the golden seal of Isis like the two live whales I healed." *BMR* 2014 "Aunt Brynne says all true witches have at least one of the thirteen Powers. Some are spell casters, some healers, some predict the future, or even command the weather. **(Elements)**; *BMR* 2011 p. 387 "I recognize the presence of Air and Spirit, though I've never felt them before. Somehow in this place, I know what to do—calling the elements—and it's as though I've always known but never had the desire until this moment." **(Twin goddess descendant)** *BMR* 2016 p. 104-105 "True daughters of Isis are always born as fraternal twins, like Isis and her twin sister, Nephthys. Like your mother and Roselyn." She pauses and lowers her voice. "Like you and Emmaline." *Court* p. 168; and 159 "In the beginning, two gods gave birth to twins, two daughters. One was the God of Chaos and the other the God of Order...Cassia and Adria'...I am…The God of Chaos,' she answers. '...you're my grand-daughter.' p. 159; **(Magical Tattoos that itch and burn)** *BMR* 2011 p. 469-470: "my neck and my back burning and itching...imprinted along my spine from the nape of my neck to the tip of my tailbone were tattoos" *Covet* p. 654 "scratching at my palm because it's suddenly burning and itching. I turn it over, and tattooed right in the center of my hand"

[13] **(Premonitions and Deja Vu)** *BMR* 2013 p. 9 "This particular waking vision tastes and feels strongly of premonition." *BMR* 2011 p. 570 "I moved forward as though I was in a trance, fascinated and compelled to touch my fingers to hers, all of this feeling oddly familiar. Deja vu. I'd done this before." *Court* p. 627 "It feels like a premonition, like a promise, but I ignore the skitter of nerves down my spine." *Crave* p. 499 " Her words feel an awful lot like deja vu-then again, a lot of this morning feels like deja vu."

| | | |
|---|---|---|
| Speaks telepathically with others[14] | Yes<br>Speaks telepathically with romantic lead #2 and her grandfather "Alistair." She can speak telepathically with those of her kind | ~~No~~ Yes<br>Speaks telepathically with romantic lead #1 and #2 and father "Athair." She can speak telepathically with those of her kind |
| Restores balance[15] | Yes<br>Heroine's purpose as a supernatural being is to bring balance. She is a special being born to this task; a protector of humans and non-humans creatures she holds power from two opposing forces which she must balance within her | ~~No~~ Yes<br>Heroine's purpose as a supernatural being is to bring balance. She is a special being born to this task; a protector of humans and non-humans creatures she holds power from two opposing forces which she must balance within her |
| Type of power[16] | Gargoyle<br>Healer/Fly/Manipulate elements/Freeze Time | Witch/Kindred-(has visions, electricity comes from her fingers, reads tarot) Healer, |

[14]**(Speaks telepathically with romantic lead and those of her kind)**. *BMR* 2011 p. 460; *BMR* 2012 p.521; 2011 p. 595; 2013; p. 450; 2014 p. 363; *The World Notes*

[15](**Heroine's purpose is to restore and maintain the balance)** *BMR World Notes* "Ronan wants to help her learn to use her powers to restore the balance." *BMR* 2012 p. 218, 2013 p. 220 "And your greatest gift in maintaining the balance. It is your destiny." *Crush* p. 242 "Gargoyles were created to keep the balance among the factions." **(Heroine is unique, special / of utmost importance to keep the balance)** *BMR* 2011 p. 268; 2012 p. 216 "You are something different, unique. Your birth heralds a new age. A new beginning for us all. Surely you sense that you are special?" *Covet p. 112* "And I knew instantly that you would be of the utmost importance to us later...because of who you really are." **(Protector)** *BMR* 2012 p. 197 "We're protectors of humankind from Others—non-humans." p. 385 "The Kindred are protectors of the land and all of its creatures, including humans. They protect against demons but also against humans who disturb the natural balance." *Crush* p. 220 "Gargoyles kept the balance among all the paranormals...and every other not-just-human creature on the planet—and also humans." p. 219 "...and that's why gargoyles have always been protectors.";**(Born)** *BMR* 2012 p. 216-217: "…You were born to achieve this task." *Covet*: "It was into this chaos, this disorder, these extremes of love and hate, that you–that all gargoyles–were born." p. 396. **(Balance two opposing forces within her)** *BMR* 2014 p. 357 "*You will be of Shadows. You will be of Light. That is your destiny*." 2013 p. 220 "...the ability to balance both Shadows and Light within yourself and emerge transformed will be your greatest challenge. And your greatest gift in maintaining the balance…You will need to balance both." *Covet p. 398* "...you hold both within you. A desire to create order, a desire to create chaos....It's this ability that allows you to straddle both worlds…" p. 398

[16] (**Type of Powers):** *BMR*: *Id* at footnote 11 (twin goddess, grandmother, sisters, balance) *BMR* 2016 p. 104-105 *Grandmother to heroine:* "True daughters of Isis are always born as fraternal twins, like Isis and her twin sister, Nephthys. Like your mother and Roselyn." She pauses and lowers her voice. "Like you and Emmaline." 2013 p. 90 "I understand that the balance is harmony, an accord of light and dark. You can't have one without the other because they're two

| | | |
|---|---|---|
| | Descendant of twin goddess through maternal grandmother | Healer, manipulate elements<br>Descendant of twin goddess through maternal grandmother |
| Love triangle[17] | Yes | ~~No~~ Yes but it is just beginning |
| Treacherous ~~best friend~~ friend who pretends friendship (separate from blood-related female antagonist who is the illegitimate daughter of the ultimate villain)[18] | ~~No~~ Yes<br>Lia the vampire who pretends friendship, drugs heroine's drink and abducts her at the climax of the story<br><br>Female antagonist related to heroine by blood who is the daughter of the vampire king. Heroine offers her a | Yes<br>Taylor the succubus who pretends friendship, drugs the heroine's drink and is responsible for her abduction at the climax of the story<br>Female antagonist related to heroine by blood who is the daughter of the vampire prince and helps heroine. |

sides of the same coin; each opposite is essential to maintain the balance and rhythm of life on earth." *Covet* p. 392 "The children were sisters, twins in fact, born of two deities, Zamar and Aciel, who loved each other so much that they wanted to have a child. But the universe requires balance, and so they had two daughters, each a different side of the same coin." *BMR* 2016 p. 104, "But you are not just kindred. You are something more," she says. "Ours is a sacred lineage. An unbroken chain of priestesses, mother to daughter back to the first queen of Egypt, to the Great Mother Isis herself" p. 107 "'Remember. You are flesh of my flesh, bone of my bone, blood of my blood, granddaughter.' *Grandmother?"; Court*, *Grandmother to heroine:* "In the beginning, two gods gave birth to twins, two daughters. One was the God of Chaos and the other the God of Order...Cassia and Adria…" p. 168; '...I am…The God of Chaos,' she answers. '...you're my grand-daughter.' p. 159.

[17] **(Love Triangle)** *BMR World Notes* "He has been a guide to her and has spoken to her trying to help her in his wolf form from the Otherworld. She doesn't remember him or his voice. When he shifts to human form, and they meet she is intrigued and attracted to him at first--. He gives her a summoning stone to contact him, kisses her and bites her lip, taking her blood so he can always find her. Love triangle for book 2. Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance."

[18] **(Female antagonist, illegitimate daughter of the vampire prince / vampire king)** *BMR* 2014 p.338-339 "Well now, would you look at us? Sisters and everything. I sensed something about you but I didn't see that one coming." .."Have you known this whole time?" I ask. "About him being your father?" *BMR* 2014 p. 341 "*My* mother was a dark Fae." 2014 p. 347 "If Julian is my father—the very thought brings on a choking grief—how did that happen? And what does it mean if Taylor's my sister?" *Court* p 435 "Cyrus wasn't having an affair with a witch. He was having an affair with the Crone. And the Crone's daughter would be a demigod like me." A demigod like Izzy. "Izzy is her daughter," I tell them. "And, apparently, my cousin." p. 435 **(heroine offers her a choice to come with her and leave her evil father. She chooses her father)** *BMR* 2014 p. 340 *Heroine:* "Maybe Taylor isn't all bad….Maybe she would be different if someone gave her a chance. "Taylor, come with me," I say on impulse. "You don't have to stay here." *Taylor:* She smiles her slow cat's smile. "Oh but I do! You see dear little Mia, I'm wicked." / *Court* p. 349-350 *Heroine:* "You don't have to stay on the other side, you know." Even as I say the words, I wonder if I'm making a mistake. But there's something in her

| | | |
|---|---|---|
| | choice to come with her. She refuses and chooses her father | Heroine offers her a choice to come with her. She refuses and chooses her father |

And the misrepresentations Defendants put forward in their Motion are not limited to those in the above chart. Rather, their summaries of the works are riddled with inaccuracies. for example, their summary of *Crave*, their own book:

**Point 1**: In both works, the story begins with the heroine on her way to school having moved from San Diego to Alaska after an accident kills her family members. Defendants omit the trajectory from San Diego to Anchorage.[19] (Grace has just moved, Anna moved several years ago. Grace is short and curvy. Anna is tall and slim). There is a snowmobile ride on this first day in *Crave* and a motorcycle ride in *BMR* a first time experience for both heroines. She is taken to school by a female relative; her cousin in *Crave,* her mother in *BMR*. Defendants omit that this female relative is one of only two relatives the heroine believes she has left in the world and both are supernatural witches, which she does not yet know.[20] Also omitted are salient points in the opening sequences: the heroine is suffering from loss and thinking about her family, they died in an accident, it was in a vehicle that crashed and fell a long distance; she feels guilty because her last words with them were in a fight; she compares the weather of Alaska with home in California, and she suffers panic and anxiety from the trauma.[21] In both works, the heroine refers

eyes-something lurking under all the ice and mockery-that makes me think there's more there." *Izzy*: "All this sweetness might work for you, but if I've learned anything from Cyrus, it's that nothing's free. And frankly, I'd rather stick with the payment plan I've already got set up."

[19] *BMR* 2011 p 15; *Crave* p. 98 (first editions) "Anchorage"; *BMR* 2011 p. 124; *Crave* p. 3 "San Diego"

[20] "The three of us make up my family. We're all that's left." (mother and aunt) *BMR* 2011 p. 13 ; "Not to mention the only family I have left." (cousin and uncle) *Crave* p. 7; *BMR* 2011 p. 576; 578, *Crave* p. 316 (relatives are witches); *BMR* 2013 p. 220 (mom and aunt witches) castle

[21](Suffering from loss, thinking of family); *BMR* 2011 p. 12, 76; *Crave* p. 45 (died in an accident) *BMR* 2011 p. 128*, Crave* p. 45 (guilty, fight before accident); *BMR* 2010 p.100, *Crave*

to Alaska with similar harsh language, calling it a "frozen wasteland" (*BMR*) "frozen hellhole" (*Crave*), with *Crave's* drafts using "frozen wasteland" as well.[22] She even compares Alaska with the moon.[23]

**1(a) School, Beings, Katmere / Katmai, Creatures, Castle:** The heroine attends a boarding school called "Katmere" for supernatural beings in *Crave* with vampires, witches, wolf shifters and dragon shifters. (In *BMR,* the heroine attends a day school). "Katmai" is a separate magical place for supernatural creatures she and her friends will go once she knows about the supernatural world. *BMR* likewise features vampires, werewolves and witches and references dragon shifters.[24] Defendants omit that both works feature a castle in Alaska, which is not possible given the region's climate, and is associated with the supernatural community featured in the story. In *Crave*, the school itself is in the castle. In *BMR*, the romantic lead and his clan, two of whom teach at the school, live in the stone castle. In both works, this castle is on a remote hillside with a long driveway, and is described the same way: "Entirely made of stone it was an architectural masterpiece" / "architecture I've only heard described in my art classes before."[25] Although Defendants characterize the setting as "remote" and "in the mountains far from civilization," *BMR* similarly describes a secluded snow-covered mountain location for this castle:

---

p. 45 (vehicle crashed and fell a long distance); *BMR* 2011 p. 11, *Crave* p. 3, 5 (weather in CA v AK)' ; "Anna carries a strong sense of loss over the death of her father and grandparents in an accident. She has panic attacks – anxiety from the trauma." *BMR The Cast Notes*, *2008*; *The World Notes, 2010*; *BMR* 2011 contains scenes with anxiety, panic attacks, trauma, *Crave* p. 15 (panic attacks, anxiety).

[22] *BMR* 2011 p. 12, *Crave* p. 3, 90 (Alaska frozen wasteland, hell frozen over, frozen hellhole); WOLFF _0838235 (early *Crave* drafts "frozen wasteland" same scene)

[23] *BMR* 2011 p. 274; *Crave* p. 34.

[24] *The World Notes* 2010 (Katmai); (all of her friends and two teachers supernatural); *BMR* 2011 p. 236, 500, 576; *BMR* 2012 p. 409 and *The World Notes* (wolf shifters, vampires, witches, dragon shifters)

[25] *The Plot*, 2008, last page ("castle"), ("Old-World European chateau" French for castle). *BMR 2013* p. 322, *Crave* p. 13 (European architecture, gothic castle, stone); *BMR 2011* pp. 411-412, *Crave* p. 13 (remote hillside mountain); *BMR 2011* p. 412, *Crave* p. 13-14; (long driveway).

"snow covered mountains all around. The hillside area is still considered to be in town but it's a bit remote. The homes are built along the side of a small mountain…"[26]

**1(b) Magic "woven into" the physical setting and interspecies mistrust:** In *Crave*, Defendants claim that the school is described as having magic "woven into" the fabric of the building itself to ensure protection and regulate supernatural conduct, maintaining order among different species who are not naturally aligned. In *BMR*, Sanctuary is described as a place for non-humans where conflict is prohibited and there are "spells woven into the walls and floors to ensure it."[27]

**Point 2**: In both *Crave* and *BMR*, the heroine grieves the loss of her family throughout the narrative; not merely "at first" as Defendants claim. Her thoughts repeatedly return to the accident, her family's deaths and its aftermath.[28] Defendants' claim that Grace "believes she is a normal girl with no paranormal powers" does not distinguish the works or eliminate similarity. In both stories, the heroine is introduced as human and remains unaware of her true nature.[29] In each narrative, her supernatural identity is concealed for most of the story and only later revealed. In both works, her family has intentionally kept her "ignorant." This shared concealed-identity arc performs the same narrative function in both works. This similarity is reinforced by parallel scenes in which the heroine's female nemesis directly challenges the heroine's understanding of who and what she is during the kidnapping sequence at the climax of the story–Lia in *Crave* and Taylor in *BMR*–each telling her she does not realize what she is."[30]

---

[26] *BMR* 2011 p. 411
[27] *BMR* 2011 p. 481
[28] *BMR* 2011 p. 9-13. 31, 32, 62, 68, 71-76, 116-120, 213, 237, 261, 289, 318, 348, 356, 357, 402, 417, 418, 423, 448,517, 525, 526, 547, 552-564; *Crave* p. 7, 15, 22, 28, 31, 46, 47, 49, 50, 82, 99, 116, 150, 209, 251, 252, 331, 340, 346, 351, 378, 384, 413, 427, 467.
[29] *BMR* 2011 p. 409; *Crave* p. 322 (human)
[30] *BMR* 2011 p. 567, *Crave* p. 483 (not what she thinks she is)

**2(a) Heroine's love interest: the romantic lead**: Defendants' description omits numerous parallel elements that define the romantic lead's role in both works. In each story, the heroine first encounters the romantic lead at the end of Chapter Two. There is a Shakespeare quote between them marking their interaction as one of mutual intellectual recognition establishing from their first interactions that day that the romantic bond is grounded not only in attraction, but in shared intelligence and literary awareness.[31] She recognizes the loss in his eyes mirroring her own and later learns his older brother– nineteen (*BMR*) / looks about nineteen (*Crave* series)--was murdered and he feels responsible.[32] He is royal in both works: a knight and member of the Order in *BMR* and a prince associated with a group of male friends called the Order in *Crave*.[33] He smiles by turning one corner of his mouth up with a twist of his lips.[34] The heroine describes him with nearly identical language in both books, calling him a "bad-boy," "dark/fallen angel, a "rockstar," "wicked," "wild," "sexy" "beautiful," "gorgeous," "smoking hot," and "dangerous."[35] The girls at school swoon over /ogle him,[36] and he initially frustrates

[31] *BMR* 2011 p. 40, *Crave* p. 24-25 *(Julias Caesar* in *BMR* and *Hamlet in Crave)*
[32] *BMR 2011* p. 125, *2012* p. 110 (older brother murdered), *Crave* p. 130 (older brother murdered). *BMR 2011* p. 127, *Covet* (book 3) p. 448 (older brother was nineteen in *BMR* and looks nineteen in *Crave* series); *BMR* 2011 p. 125, *Crave* p. 29, 130 (recognizes loss as like her own pain over loss of family) *BMR* 2011 p. 125 (he believes his older brother's death was his fault), *Crave* p. 391.
[33] *BMR* 2011 p. 443, 444, (knight) *BMR* 2011 p. 319 (His Royal Hotness), *Crave* p. 392 (royalty); *BMR* 2011 p. 443; *Crave* p. 135, 557 (the Order).
[34] *BMR* 2011 p. 24, *Crave* p. 22, *BMR* 2011 p. 314, *Crave* p. 259; *BMR* 2011 p. 109, *Crave* p. 385.
[35] *BMR* 2011 p. 222 (dark angel) 2010 p. 32, *Midnight Overview Notes 2009* (bad boy), *Crave* p. 30 (fallen angel, bad boy); *BMR* 2011 p. 20, 82, *Crave* p. 137 (rockstar); *BMR* 2011 p. 16, *Crave* p. 22 (wicked); *BMR* 2011 p. 186, 2014 p. 19, *Crave* p. 22 (wild); *BMR* 2011 p. 20, *Crave* p. 86 (sexy); *BMR* 2011 p. 17, 222, *Crave* p. 21, 203 (beautiful); *BMR* 2011 p. 16, 82 108, 483 *Crave* p. 137, 432 (gorgeous); *BMR* 2011 p. 303, *Crave* p. 137 (smoking hot); *BMR* 2011 p. 16, 53, 127, 251, 286, 311, *Crave* p. 22, 28, 127, 224 (dangerous)
[36] *BMR* 2013 p. 24, *Crave* p .220

the heroine by blowing hot and cold, acting as if he's not interested in her to the point that the heroine dislikes that she has feelings for him.[37]

In both works, he tries to keep his distance for the same reason: he believes the heroine is human and fears proximity with him will endanger her. The last thing he says to her on their first meet day is a warning for her safety. In the story, he tells her to stay away, even cautioning her about "things that go bump in the night." He ultimately can't stay away and admits it's because he's "selfish."[38] The heroine is drawn to him and his danger in spite of herself: "Something inside of me responded to the dangerous edge in him and liked it."(*BMR*) "...everything inside me is responding to everything inside him. Even the danger. *Especially* the danger…(*Crave*)"[39]

Defendants omit that both works situate the romance and the story at large within the same supernatural conflict. A war between the races of beings threatens the world, both supernatural and human (earth as battlefield / turf war).[40] The romantic lead feels a responsibility to stop the war to keep the balance.[41] He is concerned for the heroine's safety because of their

---

[37] *BMR* 2011 p. 116, *Crave* p. 90, *BMR* 2010 p. 91, *Crave* p. 90; *BMR* 2013 p. 35, *Crave* p. 27.
[38] *BMR* 2011 p. 297, 321-322 and *BMR* 2014 p. 99, *Crave* p. 398-399 (tries to stay away); *BMR* 2011 p. 62, *Crave* p. 31 ( warning it's not safe); *BMR* 2011 p. 411 and 2014 p. 261, *Crave* p. 291 (believes her association with him puts her in danger); *BMR* 2011 p. 299 "staying away from me would be better for you."/*Crave* p. 291 "You need to stay away from me." (stay away); *BMR* 2010 p. 233; *BMR* 2010 p. 185, *Crave* p. 198 ("things that go bump in the night") *BMR* 2011 p. 299 "Staying away from me would be better for you. But I'm selfish, Anna." / *Crave* p. 562 "I should have left Grace the hell alone. But I'm selfish and I'm weak and I couldn't not see her." (selfish)
[39] *BMR* 2011 p. 127, *Crave* p. 127
[40] *BMR* 2011 p. 230 Romantic lead to heroine: "...you believe in the supernatural," he began. I nodded…. "Well, there are good guys and bad guys in the supe world." …He leaned forward, his features suddenly animated, his voice intense. "There's a war going on, Anna. It's happening all around us every day …"Beings of myth and legend are fighting each other every day with Earth as the battlefield. *Crave* p. 344.; Uncle Finn to Heroine: …. my uncle kind of grimaces. "...It's not exactly easy to hide the fact that vampires and dragons are real when we're in the middle of a giant turf war." "Turf war?"... we're talking about different supernatural species…"
[41] *BMR* 2011 p. 239 "They're searching for someone…who is tied to both houses, light and dark. That girl is the key to tipping the balance of the war, one way or the other (2011 p. 241).. If they find her first, the world as we know it will never be the same ....it's my duty, the duty of my

association and expressly acknowledges the dangers of a relationship with her, telling her: "You know this isn't going to be easy for us," (*BMR*) "This is going to be a lot of things, Grace. Easy isn't one of them." (*Crave*).[42] He believes they are "mates." [43]

This shared responsibility–to protect the heroine while preventing the supernatural war– defines the same narrative function in both works. As Defendants themselves acknowledge in their summary of *Crave,* he saves the heroine from other supernatural creatures attempting to harm or kill her. Defendants omit that the relationship culminates in the first "I love you" exchange occurring after the kidnapping scene and that the romantic lead's type of supernatural being is caused by a gene.[44]

**Point 3: The other main characters in *Crave***. Defendants' identification of the remaining "main characters" in *Crave* is inaccurate and materially misleading. Main cast members are those who actively participate in and drive the plot. "Heather" is not a principal figure at all; she never physically appears at the school and is mentioned through occasional text messages and Grace's memories of her life in San Diego. Mekhi likewise is not a central

---

people to look after and protect yours. It's what has to be done…there is no second chance here, Anna.". *Crave* p. 399: "We're balanced on a razor-thin tightrope, and every day, every minute, is a balancing act. One wrong step in either direction, and the world burns. Not just ours, but yours as well, Grace. I can't let that happen."

[42] *BMR 2010* p.200 / *Crave* p.167.

[43] *BMR* 2010 p. 450, 451 and 2011 p. 556-557, *Crave* p. 487 (shudders, Ash / Jaxon); *BMR* 2014 p. 508, *Crave* p. 388; *BMR* 2014 p. 388, *Crave* p. 508 ("I'm in love with you" / "I'm so in love with you"); *BMR* 2011 p. 423-424; 495'What does bonded mean?' 'We can have only one life partner. If that person dies we don't get remarried.' He paused for a moment. 'Many choose not to live after their mate dies—unless there are children.'... '…finding that one person right under your very own nose,' he said as he tapped me on the end of my nose. And the way he said it, I could tell he meant that I was that one person for him.'; *Crave* p. 546 This girl, this fragile human girl…is my mate." ("bonded" "mates").

[44] 80's Rocker Table at p .39 below. *BMR* 2014 p. 57; *Crave* p 56-60 (80's rocker sequence where he saves her ); *BMR* 2011 p. 556, *Crave* p. 487 (door / wall shudders and he's there to rescue kidnapping scene); *BMR* 2011 p. 600, *Crave* p. 508 (love you exchange); *BMR* 2011 p. 421-22, *Crave* p. 349 (gene).

character; he is one of the several Order members and functions peripherally in book one with no plot-driving role. Instead of focusing on narrative function, Defendants rely on isolated descriptors (e.g. race, appearance or other cosmetic traits). The proper inquiry is character function and story role. When analyzed by narrative function rather than superficial descriptors, the core cast consists of the heroine and romantic lead, and the small group of characters who consistently drive the plot, and those functions map directly onto parallel roles in both works: Lia / Taylor, Flint / Brendan, Macy / Jenny, Amanda, and Uncle Finn / Aunt Brie.

**3(a) Lia / Taylor**. Defendants' brief mischaracterizes Lia as "quiet and nerdy." The *Crave* text shows the opposite. Lia–like Taylor in *BMR,* is portrayed as a "popular girl" whom the heroine describes as "one of the most beautiful" she has ever seen. She is also a supernatural predator (succubus in *BMR*, vampire in *Crave*).[45] More importantly, both characters perform the same narrative function. Each is a concealed agonist who befriends the heroine and gives her a special drugged drink which later makes the heroine throw-up; an act that foreshadows her later betrayal. At the climax of the story, she is responsible for the heroine's kidnapping; calling her "pathetic" and telling the heroine that she is not what she believes herself to be, planting doubt in the heroine's mind about her own nature and identity in the supernatural world.[46] These parallel actions, not surface traits, define character roles.

**3(b) Flint /Brendan**

Defendants' summary of *Crave* describes this character as "half-Egyptian and half-Irish." *Crave* does not describe this character as "Egyptian," nor does it describe him as "Irish"

---

[45] *BMR* 2014 p. 17, *Crave* p. 94 (one of most beautiful); *BMR* 2010 p. 125, *Crave* p. 105 (most popular girl); *BMR* 2013 p. 423, *Crave* p. 313 (sucks life sustenance).

[46] *BMR* 2013 pp. 276-278, *Crave* pp. 100-105 (spikes drink scene in part); *BMR* 2013 p. 293, *Crave* p. 451 (She spiked heroine's drink); BMR 2010 p. 458, *Crave* p. 455 (aids in /responsible for kidnapping); *BMR* 2012 p. 489, *Crave* p. 483 (you're pathetic, heroine not what heroine thinks she is).

(those words don't appear in the book at all). Flint (*Crave*) / Brendan (*BMR*) /) is introduced on the first day of the story and is multiracial–part Black–with warm brown skin.[47] He is both brainy and athletic and plays on a school sports team.[48] He holds a leadership position at the school[49] and is charismatic and attractive, including in a way that creates tension with the romantic lead; the heroine notices staring contests between them and interprets the dynamic as jealousy.[50] He is later revealed to be a winged supernatural creature; the heroine describes him as "beautiful" in his supernatural form and he is "gorgeous" in his human form.[51] The parallels extend beyond appearance. He is known for humor, he calls the heroine nicknames (*BMR*) a nickname (*Crave*) and "waggles his brows" at her.[52] Flint / Brendan is introduced on story day one in both works and serves the same narrative function: he befriends the heroine, eases her amid the unfolding tensions, and acts as an early ally and source of comfort. He is gay, and only the heroine knows in both works, with the disclosure occurring later in the *Crave* series.[53] Later plot developments in *Crave* do not alter this shared role of friend, source of humor and camaraderie, and stabilizing presence before the broader, supernatural conflict escalates.

**3(c) The heroine's uncle / aunt who is a witch**

---

[47] *BMR* 2011 p. 100; *Crave* p. 35, *Crush* p.382, (part Black, multiracial,); *BMR* 2011 p.100; *Crave* p.35. (warm brown skin)
[48] *BMR* 2013 p. 100, *Crave* p. 43 (brainy); *BMR* 2011 p. 99,100; *Crush* p.245, 394. (school sport)
[49] *BMR* 2011 p. 100, *Crave* p. 245 (athletic, team sport); *BMR* 2011 p. 99, Crush p. 394 (leadership).
[50] *BMR* 2011 p. 164, *Crave* pp. 156, 157, 243.
[51] *BMR* 2013 p.283, 405, *Crave p*.314; *BMR* 2013 p.275, *Crush* p.274-275; *BMR* 2012 p.280, 2011 p.100, *Crave* p.43, *Crush* p.275.; *BMR* 2013 p. 283, *Crush* 274; *BMR* 2012 p. 280; *Crave* p. 43 and *Crush* p. 275
[52] *BMR* 2011 p.141, *Crave* p.142; *BMR* 2011 p.100, 142, 164, 180, 515, *Crush* p.40,41,184, 248, 266, 284. *BMR* 2011 p.165, *BMR* 2012 p.124; 2013 p.129; 2011 p.141, *Crush* p.231, 318; *BMR* 2011 p. 166, *Crush* p. 262; *BMR* 2011 p. 104, p, 141, p. 166, p 180, p. 515, *Crush* p. 40, p 41, p. 184, p. 248, p. 266, p. 284 (nickname); *BMR* 2013 p. 97, *Crave* p. 361 *Crush* p. 439 (waggles his brows at heroine)
[53] *BMR* 2011 p. 100, *Crush* p. 388 (gay and only heroine knows)

*Crave*'s Uncle Finn and *BMR*'s Aunt Brie are parallel characters who serve the same structural and emotional function in the story. This figure is one of only two relatives the heroine believes she has left. Each is a supernatural witch[54] who provides the heroine with guidance and information about the supernatural world. The character follows the family's instructions to keep the heroine ignorant of that world–a fact that upsets the heroine.[55] They discuss the loss of her family, the character is protective of her and concerned for her safety, and at one point wants her to leave Alaska to keep her safe out of concern that she will be killed.[56] They also discuss the romantic lead and his allure which the heroine finds embarrassing.[57] This character kisses her on top of her head as a sign of affection.[58]

**3(d) Macy / Amanda, Jenny - Best friend and dance team / cheerleader**

Defendants' description of Macy focuses on surface traits rather than function. The relevant inquiry is how the best friend's role operates in each work. In *BMR*, the role is sequential: Amanda–the heroine's childhood best friend and a cheerleader, a sport the heroine dislikes–abandons her early.[59] She is then "taken in" by a second, distinct friend unit of two cousins, Jenny and Rachel, who become the heroine's new best friends.[60] In *Crave*, these same narrative functions are consolidated rather than newly created. Macy serves as both the childhood-friend and the welcoming figure; she is the heroine's cousin and is likewise on a dance team, a sport the heroine dislikes, mirroring Amanda's cheerleading in *BMR*. The structure

[54] *BMR* 2013 p. 220, *Crave* p. 316, 339
[55] *BMR* 2013 p. 343; 344-345, *Crave* p. 343
[56] *BMR* 2013 p. 76, *Crave* p. 116 (family death); 2014 p. 279, *Crave* p. 345-346 (leave Alaska)
[57] *BMR* 2011 p. 83, *Crave* p. 487
[58] *BMR* 2013 p.128, 76; *Crave* p.116, 423
[59] *BMR* 2013 p. 29…she's part of Amanda's latest phase—the cheerleader phase. One I hope won't last for very long.; I've never been a big dance team enthusiast. But Macy obviously loves it... *Crave* p. 247-48;
[60] *BMR* 2013 p. 259 (new best friends), *Crave* p. 78

remains the same: 1) a marked childhood friend tied to a school sport the heroine dislikes, and 2) a close, new best-friend bond that incorporates the heroine into a new social unit while the supernatural nature of that world (and of the friends themselves) remains hidden from her until the same catalyst event (the first kiss with the romantic lead). This redistribution does not alter the shared narrative function.

**Point 4**: Defendants contend that the heroine encounters oddities and dangers while she slowly learns the "truth" about the supernatural world and the beings around her. This is true in both works.[61] That generalized description applies to countless works and misses the point. The attack by the two supernatural wolf-shifter students in *Crave* is not about the existence of an attack but the specific protectable expression of Plaintiff's "Eighties Rocker" scene which is in every iteration of *BMR*. The attackers in *Crave* remind the heroine of "eighties" concert goers, just as in *BMR* the two supernatural vampire attackers remind her of "eighties rockers."

As shown below (p.39) Defendants reproduce the same sequence of events and choreography: The heroine alone at night; two human-seeming guys not dressed for the winter weather; dialogue of "Well, well, well. Looks like…" and the beat-for-beat fight sequence. The romantic lead saves her but she does not realize it at first. During the drafting process, literary agent Emily Sylvan Kim, acting as Plaintiff's agent, specifically directed Plaintiff to relocate this scene from later in the manuscript to the approximately fifty-page mark to serve as the story's first major action sequence. This shared placement reflects Defendants' intimate knowledge of Plaintiff's developmental edits.

**4(a) The drugging by Lia / Taylor**

---

[61] *BMR* 2011 p. 356, *Crave* p. 344-345.; *see also BMR* 2013 p. 282-283

Defendants reduce this scene to the abstract statement that "Grace leaves a school party and meets Lia who secretly poisons her." This omits the protectable expressive details that define the scene with parallel characters. The works share the same staged sequence of events: this parallel character hands the heroine a drink in a cup; tells her she'll like it / hopes she'll like it; heroine takes a sip, describes the taste as fruity / floral; heroine tells this character she has to go; Lia / Taylor tells her to stay and finish the drink; she rolls her eyes. It is only later, after the heroine leaves, that she "throws up," and she "rides" "wave of nausea." And it is only later revealed that the drink was drugged by Taylor / Lia. These elements appear together in Plaintiff's drafts and recur in *Crave.*[62] This is not the unprotectable idea of "poisoning." It is a specific arrangement of dialogue, timing, and cause-and-effect choreography.

**4(b) First kiss with romantic lead: catalyst for heroine's discovery of supernatural**

Defendants state that the first kiss between Grace and Jaxon triggers the romantic lead's powers. That characterization omits the specific expressive sequence that defines the scene. In each work, this "first kiss" is the catalyst for the heroine's discovery of the supernatural world and the sequence is specific in both works: They go outside at night to watch a light display (northern light /meteor shower). Although the setting is winter and cold, the romantic lead makes her feel heat. The heroine thinks of it as "a light show." The heroine feels shy. She wants to kiss

---

[62] (Hands heroine cup, sips, encouraged to drink more, you'll like it, fruity /floral): "She hands me another plastic cup. I sniff the contents while Taylor rolls her eyes. 'It's just punch*,* Anna. Get a grip. Besides, it's super yummy. You'll like it.'...I take a small sip and decide it's okay. 'Thanks.'... just the right amount of fruity." *BMR* 2013 p. 276-277; 'It's my own special blend,' she says, holding her cup up to her mouth and blowing softly. 'I hope you like it.' … 'I'm sure it's awesome.' …I take a sip of the tea, which has a really powerful floral taste that I'm not sure I care for. But it's hot, and that's enough to have me taking another sip." *Crave* p. 100-101; (heroine wants to go) *BMR* 2013 p. 277, *Crave* p. 103; (Don't go, have more) *BMR* 2013 p. 277, *Crave* p. 104; (rolls eyes) *BMR* 2013 p. 277, *Crave* p. 104; (heroine throws up) BMR 2013 p. 289, *Crave* p. 108; (rides waves nausea) *BMR* 2013 p. 288, *crave* p. 109; (heroine learns Taylor / Lia drugged her drink) *BMR* 2013 p. 293, *Crave* p. 451. Note: this scene appears across all *BMR* drafts except 2016 which is only 100 pages

him but part of her is afraid. The air is electric. He looks at her with a yearning / craving. She can't look away. He / she cups her / his face. The kiss is soft. He pulls her closer. She feels delirious / her head gets lighter. When they kiss, he loses self-control of his powers, his eyes gleam / earthquake, and she is frightened. She wants to run / he tells her to run, she thinks he's a monster / a monstrous version of himself. She thinks about running away / she tries to run away. She can't go to sleep that night. The next day the heroine demands to know the truth. She notices marks on her neck after the kiss. She wonders if the romantic lead is an alien. She confronts the romantic lead about what he is and learns the truth: he's a werewolf / vampire.[63] These shared

---

[63] "'Don't worry, I'll keep you warm,' he offers. The way he says it I feel a flutter of heat curl through me." *BMR* 2013 p. 155, 2011, p. 169; "try to pretend that despite the chill, his hand on my arm doesn't flood every cell of my body with heat." *Crave* p. 261; "that flash across the sky in Alaska in the deep winter…Just a perfect black background to showcase our own personal lightshow" *BMR* 2013 p. 154, 2011 p. 168, "just watching the most brilliant show I've ever seen light up the sky." *Crave* p. 263 ; "I feel shy and uncertain of myself." *BMR* 2011 p. 172, 2013 p. 157, I glance at him, suddenly shy, though I don't know why." *Crave* p. 263; "I want him to kiss me but at the same time I'm afraid he might." *BMR* 2013 p. 155, *"*A part of me that wonders what it would feel like to kiss him and a part of me that thinks I should run for the hills" *Crave* p. 267; "The air is suddenly charged between us, crackling with electricity." 2013 p. 117, "The air between us loaded, heavy, electric**.** " *Crave* p. 267 ; "What I see in his face is a mix of wistful yearning and hope." *BMR* 2013 p. 157, "There's a desire in his eyes, a craving that has nothing to do with wanting me and everything to do with needing me. *Crave* p. 269 ; "He looks down into my eyes and I can't look away. I'm caught." *BMR* 2013 p. 157, "I don't back away. I can't. I'm dazzled, mesmerized, enthralled." *Crave* p. 269; "He cups my cheek with his hand" *BMR* 2013 p. 158, "I cup his face in my hands" *Crave* p. 269; "He leaned in and turned my chin up, pressing his lips ever so gently, ever so softly over my own in a whisper of a first kiss." *BMR* 2011 p. 172, .2013 p. 158; "Then he leans down and presses his lips to mine. It's not a passionate kiss, not a hard kiss, definitely not a wild kiss. It's just the brush of one mouth against another, as soft as a snowflake, as delicate as the permafrost." *Crave* p. 270; "His hands are in my hair and my arms are twined around his neck pulling him closer." 2013 p. 158, "his hands are on my upper arms...pulling me against him...try to slide my arms around his neck" *Crave* p. 271; "I'm delirious with the heat and urgency of our kiss." *BMR* 2013 p. 158, "My head gets lighter, my knees get weaker." *Crave* p. 271; "His coppery eyes were gleaming, phosphorescent like an animal's eyes in the dark." *BMR* 2013 p. 159, 2011 p. 173, "'Earthquake!' I manage to squeak out, wrenching my mouth from his." *Crave* p. 271; "Gleaming amber eyes rimmed in black.... Inhuman eyes…My heart was racing double-time so fast and so hard I was dizzy...It was all I could do not to stomp on his toes and make a run for it...I needed to get out of here. Now." *BMR* 2011 p. 173-176; *see also* 2013 p. 159...wishing this all could have been different. Ash. My first kiss. The fact that he's some kind of monster." 2013 p. 162, 2011 p. 173, 176, 177, 193, and

beats, including the same distinctive descriptors, reflect similarity in both expression and sequence, not merely the unprotectable idea of a kiss.

**4(c) The kidnapping of the heroine and climax of the story**

Defendants reduce the climax and *Crave's* ending to a few sentences describing the romantic lead's rescue of the heroine from Lia, the heroine rescuing him in turn, Hudson's appearance as a puff of smoke with a sword, and the heroine turning to stone when she attempts to ward the blow. This characterization improperly abstracts the scene and ignores the detailed sequence of events and specific expressive elements copied from Plaintiff's work.

In both works, the climax and major plot come together when the heroine is kidnapped by the vampire prince (Julian in *BMR*) / vampire prince's mate (Lia in *Crave)*, who intend to use her to bring back a dead mate. In *BMR*, the vampire prince believes the heroine will be a reincarnation of his dead mate if she survives his bite, and in *Crave*, the vampire prince's mate believes she can use the heroine to resurrect her dead mate with a spell, which she is not likely to survive. In each work, the supposedly dead mate will later (in *Crave* series and in *BMR*) be revealed to have been residing in another dimension. The heroine is used as both a sacrificial conduit and an instrument of vengeance against the person who is believed responsible for the

2013 p. 272; 'You. Need. To. Go!'... He advances on me then, fingers flexing and eyes burning like black coals in a face livid with rage. I turn and run as fast as my weak knees will carry me...before this monstrous version of Jaxon overtakes me. *Crave* p. 272; I wanted answers about Ash and I wanted them now." *BMR* 2011 p. 292, "Jaxon, on the other hand…If he lies to me, you'd better believe I'm going to stake him through his fangy black heart…I march through the school like a woman on a mission." *Crave* p. 303; "There were markings on the back of my neck!" *BMR* 2011 p. 190, "staring at the cut on my neck. Or, more precisely, at the two perfectly round, perfectly spaced puncture marks." *Crave* p. 300; "Exhausted, I was too wired to go to sleep but needed to go through the motions anyway" *BMR* 2011 p. 189, "Needless to say, there's no going to sleep after that." *Crave* p. 301; "Ash was likely to be either a vampire or a werewolf. Or just a freak, alien or monster of unknown origin." *BMR* 2011 p. 193, "Are you an alien?" *Crave* p. 260; " I-I think you might be under a curse of some kind. Like a werewolf." *BMR* 2011 p. 228, "Then tell me the truth. Is. Jaxon. Vega. A. Vampire?" *Crave* p. 313.

mate's death (Anna's father in *BMR* and Jaxon in *Crave*). These parallel plot beats are not generalized tropes. They occur in the same narrative order as the climax in both works, serve the same dramatic functions, and employ the same distinctive roles and motivations.

The following sequence occurs in the kidnapping: she's abducted, she's in the dark, her arms are in "cuffs," she thinks the vampire is "crazy," she's told the vampire has been waiting a long time for this, and that they are responsible for the deaths of heroine's family which resulted in her coming to Alaska. This vampire tells the heroine how painful it is to lose a mate, and while she feels sorry for this vampire for a moment, she's furious about the murder of her family.[64]

This vampire villain tells the heroine she will be used to bring back the dead mate; in *BMR* through a bite resulting in reincarnation, and in *Crave* through a spell resulting in resurrection. The heroine wonders about Frankenstein: "Apparently, the next time I saw Ash, if I ever saw him again, I could very well be a monster of Julian's creation. Frankenstein's bride." (*BMR*) / "I read *Frankenstein* last year—I can only imagine what abomination she'll bring back from the dead if her little plan actually works." (*Crave*).[65]

The heroine notices that the voice she usually hears in her head warning her and telling her what to do is gone. When she comes up against the vampire's strength, she goes completely still / plays possum. There is a sickening crunch of bone/of a wrist. The heroine is "choked" and

[64] *BMR* 2011 p. 527, 528; *Crave* p. 455 (heroine abducted); *BMR* 2011 p. 523, *Crave* p. 456-457 (she's in darkness); *BMR* 2010 p. 422, *Crave* p. 455 (cuffs); "Great. A crazy vampire." *BMR* 2011 p. 530, "And oh yeah, I'm being stalked by a crazy-ass vampire" *Crave* p. 465; BMR 2011 p. 539, *Crave* p. 483 (waited long time) *BMR* 2011 p. 547, *Crave* p. 483 (responsible for family's deaths). "'Why me?...Why?' I whispered. 'Because you're special.'" *BMR* 2011 p. 538-539, "What makes me so special? *Crave* p. 484; *BMR* 2011 p. 540, and Julian mate p. 2010 p. 467, *Crave* p. 485-486 ); suffering loss of mate); *BMR* 2011 p. 540, *Crave* p. 484 (she feels sorry); *BMR* 2011 p. 547, *Crave* p. 484 (fury and their murder);

[65] *BMR* 2012p. 474, *Crave* p. 485 (Frankenstein in the kidnapping scene bringing back dead mate)

"can't breathe," the person who chokes her is thrown up against a wall by a vampire prince. A loud shuddering sound is heard when the romantic lead destroys the door / the wall and door to get in and save the heroine. There is a primal war cry/ primal kind of war cry in this scene. The heroine leaps on a demon's back / the vampire prince's mate leaps on the romantic lead's back with a knife. There is a horrible sucking sound / sickening squishing sound when the knife connects with flesh.[66]

The heroine saves the romantic lead's life and he has saved hers. He feels like the heroine's abduction is his fault because of her association with him; she tells him it's not his fault. The romantic lead tells the heroine he loves her, and he tells her she loves him for the first time after this fight has occurred. There is an argument between them about whether or not they should be together. Their discussion ends with an epic kiss.[67]

At the end of the story, *BMR* and *Crave* (book 1), the heroine has accidentally brought Ronan in *BMR* / Hudson in *Crave*, back from another dimension, where he is now tied to her

[66] *BMR* 2011 p. 543, *Crave* p. 463 (voice missing); *BMR* 2011 p. 555, *Crave* p. 479 (still/possum); (sickening crunch) *BMR* 2011 p. 552, p. 467-469 (she's choked and can't breathe); *BMR* 2011 p. 552, *Crave* p. 470 (thrown against wall); *BMR* 2011 p. 556, *Crave* p. 487 (loud shuddering); *BMR* 2011 p. 559, *Crave* p. 490-91 (primal war cry); *BMR* 2011 p. 559, *Crave* p. 490-91 (back with knife / dagger); *BMR* 2011 p. 559, *Crave* p. 492 (knife / dagger makes sucking/squishing sound)

[67]In *BMR* 2010-2013 drafts, the heroine saves his life when she stabs the demon in this scene as noted in footnote 80. In the 2014 draft, she saves his life by offering her own in exchange, *BMR* 2014 p. 357, *Crave* p. 496 (heroine saves his life); *BMR* 2010 p. 488, *Crave* p. 490 (his fault this happened, she disagrees); they argue about staying together: "Following your heart doesn't always lead to a happy ending." *BMR* 2014 p. 388; "But sometimes love isn't enough." *Crave* p. 508; I'm saying we'll figure it out together." *BMR* 2014 p. 388, "You're not the only one in the relationship...And that means you don't get to make all the decisions for us." *Crave* p. 509; 'I know what I'm doing,' he says with a rueful smile. 'And what I'm doing is following my heart. The question is, do you trust me enough to follow yours?' 2014 p. 388, It's exactly that simple. Either you want to be with me or you don't...Be with me. *Love* me. Let me love you." *Crave* p. 510; *BMR* 2014 p. 388, *i* p. 510 (kiss); *BMR* 2011 p. 600, *Crave* p. 508 (they tell each other I love you first time).

which terrifies her. She doesn't realize this until book 2, *Crush*, in the *Crave* series.[68] The story comes to a final conclusion when the Bloodletter character turns into a raven / turns into a winged creature and flies away.[69]

The bonus chapters at the end of *Crave* also feature a composite scene lifted from *BMR* as well in which the romantic lead (with the heroine in *BMR* and with the Bloodletter in *Crave*) are inside a room in Alaska during the winter and take a step into the summer: "We took a small step forward and it was as though we had crossed over into another world entirely. The room didn't look like it was really a room at all; it seemed as though we were standing outside among a grove of trees in high summer—oak, birch and yew—beneath a glimmering canopy of stars. The air was warm and fresh." In a related sequence, they step behind a tree in the Alaska winter: "Sunlight? I look around, staring at the impossible. We're in a clearing in the heart of a forest—and it's summer. The leaves of the trees are brushed with the golden glow of dazzling sunlight ...The air is heavy with the wild perfume of honeysuckle and jasmine.[70]

*Crave* reproduces both expressive components of this sequence. As the characters pass through the threshold of the room: "The moment we pass through, the icy floor and walls of what I vaguely remember as my training room transform into a summer meadow, complete with wildflowers and the sun beating down on us."[71] In each work, an Alaskan winter space gives

---

[68] This happens toward the end of *BMR* 2010-2014 and in the beginning of book two, *Crush* of *Crave* series.
[69] *BMR* 2010, 2011, 2012, 2013, 2014 and *Crave* some to an end with the Bloodletter character turning into a raven / winged creature and flying away. Bloodletter as the name for the character begins with the 2012 draft. In the latter drafts, character names and specific supernatural mechanics vary but the corresponding characters occupy the same narrative roles and serve the same dramatic functions. Also, references to later drafts are offered to demonstrate continuity of the expressive core, including characters, relationships, and narrative trajectory. They are not offered to expand the scope of the comparison, but to show the same expressive elements persist.
[70] *BMR* 2011 p. 492. *BMR* 2013 p. 204.
[71] *Crave* p. 566.

way, through a physical step to an impossible summer landscape marked by warmth, light, vegetation, and scent.

Based on the above, it should be clear that Defendants have grossly misrepresented the works in an effort to present them as different when those putative differences in fact point to significant underlying similarities. This motion should be denied.

### III. Protectable expression includes the selection and arrangement of unprotectable elements, which cannot be filtered out of the Court's review

Knowing that there are substantial similarities between the works, Defendants begin their argument by advocating for this Court to apply the wrong legal standard to its substantial similarity analysis. Indeed, the very first sentence of Defendants' argument begins with an analysis of *Hogan v. DC Comics*, 48 S.Supp.2d 298 (S.D.N.Y 1999), a case in which Judge Scheindlin applied the correct legal standard and concluded that a comic book about a half-vampire was not substantially similar to a painted novel about the same, but then Defendants ignore that proper standard in favor of one that is simply incorrect (as they argue that the Court should give no consideration to unprotectable ideas and tropes in the works).

Citing both *Williams v. Crichton* (84 F.3d 581 (2d Cir.1996)) and *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* (71 F.3d 996 (2d Cir.1995)), Judge Scheindlin recognized that where a work contains elements that are both protectable and non-protectable "a court must 'attempt to extract the unprotectable elements from [its] consideration and ask whether the protectable elements, standing alone, are substantially similar.'" *Id.* At 300. But she also recognized that:

1. "Even when two works are dissimilar in many respects, substantial similarity between them may still be found where their similarities are important in the overall context, whether qualitatively or quantitatively"; and

2. "even a compilation of unprotectable elements may enjoy copyright protection when those elements are arranged in an original manner."

*Id*. (additional citations omitted). In *Hogan*, the Court thus made clear that while unprotectable elements standing alone were not properly considered as a part of substantial similarity analysis, the selection and arrangement of those elements certainly was.

Put differently, there are two discrete ways to evaluate and establish substantial similarity: *either* by demonstrating substantial similarity of the selection and arrangement of individually unprotectable elements (e.g., plot points, characters & interactions, story beat points, etc. stripped of the detail that would make them individually protectable) *or* by demonstrating sufficient substantial similarity of constituent protectable expression of a work regardless of how those expressive elements are selected and arranged in the works or whether those expressive elements can be characterized as details relating to a trope at the abstract level.

The correct standard set forth in *Hogan*—the very case Defendants start their argument relying on—is at odds with the standard advocated by the defense in this case. Defendants aver that unprotectable ideas and tropes must be entirely "filter[ed] out of the substantial similarity analysis. The relevant comparison is limited to the specific manner in which Freeman and Wolff use particular ideas and tropes..." E.g., ECF 528-1 at 38. Defendants then go on to argue that "[o]nce unprotectable ideas and general tropes that are found in both are filtered out, Plaintiff's copyright claims automatically fail." This approach is squarely at odds with Second Circuit law.

It is, of course, true that substantial similarity analysis must only concern itself with the similarity of the protectable elements of a work and cannot rest on the similarity of unprotectable elements standing alone. But because the protectable elements of a work include the selection and arrangement of unprotectable elements, those unprotectable elements cannot be simply

filtered out and discarded in their entirety as Defendants claim. Instead, the Court must consider them and give them weight to the extent it finds an original combination and use of those elements in each work.

And in that regard, Defendants' motion and the report of their expert each prove too much. For example, Emily Easton's report provides a list of the similarities between the works that she ascribes to being "tropes" and for each provides a handful of other books in which those purported tropes occur. But she does not identify *any* books that have all the tropes shared between *BMR* and the *Crave* books, let alone that also share stories with parallel casts of characters that engage in similar scenes across parallel plot points and story beats, etc. as do the works at issue (as discussed below). Defendants identify no prior YA work that assembles the same *selection, sequencing, and functional deployment* of those elements across its narrative.

Defendants' catalogue of eleven unrelated YA titles proves only that works in a genre will shares tropes at a high level of abstraction—which no one disputes. But, as discussed below, *Crave* and *BMR* converge in protected expression through parallel story progression, shared character function, and similarly deployed plot beats. These are similarities that Defendants' trope analysis never addresses. And they are similarities that all but compel a finding of infringement under the more discerning observer test.

**IV. Review of Freeman's manuscripts in the aggregate is appropriate because they reflect the same underlying story, not independent, unrelated works.**

Although a finding of substantial similarity in this case is appropriate even if the Court only compares the *Crave* books to each individual *BMR* manuscript (as discussed in Section V, *infra*), courts in this Circuit routinely review multiple copyrighted works in the aggregate when assessing substantial similarity and the Court should do so here. Indeed, doing so is "in line with

the common practice of courts of the Second Circuit, which generally review works of multiple volumes or iterations in the aggregate." *See DiTocco v. Riordan*, 815 F. Supp. 2d 655, 658 (S.D.N.Y. 2011), aff'd, 496 F. App'x 126 (2d Cir. 2012) (reviewing plaintiff's two books and defendant's five-book series in the aggregate); *Kaye v. Cartoon Network Inc*., 297 F. Supp. 3d 362, 364–65 (S.D.N.Y. 2017) (comparing plaintiff's nine-part comic book series with defendant's multi-season TV show as aggregated wholes); *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1370–71 (2d Cir. 1993) (comparing defendant's work against entirety of *Twin Peaks* television show).

Defendants argue that it would be unfair to do so, falsely arguing that "each of Plaintiff's manuscripts involves distinct characters, plots, structures, and mythologies, among other 'internal' differences." ECF 528-1 at 33. These claims fundamentally mischaracterize Freeman's manuscripts as a grab bag of independent or unrelated works when in truth they are successive iterations of a single coherent creative project, sharing the same core protagonist, the same Alaskan setting, the same supernatural war and discovery arc, and the same supporting cast and overall story beats across every version.

The Copyright Act does not require that a work be "finished" or "final" to receive protection; drafts, outlines, and partial manuscripts are all independently copyrightable upon fixation and may properly be considered in the aggregate when they are fairly considered part of a single body of work-as is the case here. Defendants' suggestion that they can misappropriate the best iterations from each of Freeman's manuscripts without the Court considering the same would frustrate the very protections our copyright laws are designed to afford. Indeed, aggregation prevents defendants from evading a finding of substantial similarity through

strategic copying of small portions from multiple related works rather than substantial copying from individual works.

### A. Aggregate review of related works is the established practice of Courts in this Circuit and is appropriate here.

Defendants' central objection—that Freeman improperly "aggregates" elements from different manuscripts—runs headlong into the established practice of Second Circuit courts which routinely compare bodies of related copyrighted works against alleged infringing works in the aggregate.

Aggregation in a case like this is not a novel theory; it is standard procedure. In *DiTocco v. Riordan*, the court reviewed the plaintiff's two books and the defendant's five-book series in the aggregate to assess substantial similarity. 815 F. Supp. 2d at 658. In *Kaye v. Cartoon Network*, the court compared the plaintiff's nine-part comic book series against the defendant's multi-season television show as aggregated wholes. 297 F. Supp. 3d at 364–65. In *Twin Peaks*, the Second Circuit compared the defendant's book against the entirety of the Twin Peaks television series. 996 F.2d at 1370–71. And in *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, the Second Circuit treated 84 separate Seinfeld episodes as a unified body for the purpose of infringement analysis, expressly noting that precedent in the Second Circuit supports such an "aggregate analysis." 150 F.3d 132 (2d Cir. 1998).

If it is appropriate to aggregate 84 separate television episodes (*Castle Rock*), a nine-part comic series (*Kaye*), or a multi-season TV series (*Twin Peaks*) for purposes of infringement analysis, it is *a fortiori* appropriate to aggregate successive manuscript drafts of a single creative project. Freeman's *BMR* manuscripts are more cohesive than any of these aggregated bodies of work— they are not different stories or different episodes, but evolving iterations of the same

novel, sharing the same protagonist, the same setting, the same core narrative arc, and the same supporting cast.

Defendants' attempt to limit *Castle Rock*'s holding to its "quantitative" prong is unsupportable. The Second Circuit's reasoning was far broader, reflecting an acknowledgement that a comparison of the entirety of an interconnected body of creative work is necessary where the infringement allegation at issue is that the offending work took protectable expression from across that body. Indeed, the court continued to review the works in the aggregate when expressly analyzing substantial similarity qualitatively and under the "ordinary observer" test, reviewing for "total concept and feel," and even comprehensive non-literal similarity. See *Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 138–41 (2d Cir. 1998). And, again, Freeman's manuscripts—successive drafts of a single creative project—are far more cohesive than 84 separate television episodes, each with its own plots, guest characters, and storylines.

Defendants' reliance on *Dean v. Cameron*, 53 F. Supp. 3d 641 (S.D.N.Y. 2014), is equally misplaced. In *Dean*, the court held that the plaintiff could not "aggregate" for comparison purposes fourteen separate, unrelated paintings that he alleged were infringed by the film Avatar, finding that the different works "bear little or no relation to one another[.]" *Id.* at 647. Freeman's *BMR* manuscripts are the opposite: evolving drafts of the same story, with the same core protagonist, romantic leads, supernatural discovery arc, narrative sequencing, supporting cast, setting, mood, plot and story beats. The relation between each could not be clearer where they are simply iterative drafts of the same story. Variations in secondary character names, mythological frameworks, and plot mechanics across manuscript versions reflect the natural revision process of a novelist developing her work—not distinct and unrelated intellectual properties. *Dean* is thus inapplicable here.

*Kroencke v. General Motors Corp*., 270 F. Supp. 2d 441 (S.D.N.Y. 2003), and *Nelson v. Grisham*, 942 F. Supp. 649 (D.D.C. 1996), are similarly inapposite. As with *Dean*, *Kroencke* involved distinct works, in this case entirely separate illustrations, bearing no meaningful relationship to one another. And *Nelson* only debated the review of multiple pre-publication drafts on the issue of access, which the Court here is assuming will be adjudicated in Freeman's favor for purposes of these cross-motions on substantial similarity, and then went on to review substantial similarity without distinguishing between the published and unpublished drafts, implicitly adopting an aggregate lens for reviewing substantial similarity. See *Nelson v. Grisham*, 942 F. Supp. 649, 651–52 (D.D.C. 1996), aff'd, 132 F.3d 1481 (D.C. Cir. 1997). Even if it had not, *Nelson* concerned two works that had both ultimately been published, and has no application where, as here, Plaintiff's manuscripts were all unpublished and Defendants are alleged to have selectively drawn from across the body of those unpublished drafts.

**B. The nature of the infringement requires aggregate comparison.**

Part of Freeman's theory of infringement is that Defendants selectively drew protectable expression from across Freeman's body of *BMR* manuscripts—not that they copied any single manuscript wholesale.[72] This is precisely the type of claim for which aggregate comparison is both necessary and appropriate.

The *Crave* Books replicate a constellation of specific expressive elements drawn from across the *BMR* manuscripts: a seventeen-year-old heroine from San Diego transplanted to Alaska after an accident which kills family members; she suffers panic and anxiety as a result of the trauma, as well as guilt because her last words with them were in an argument; a romantic

[72] That said, most of the similarities upon which Freeman's claims are based are of story beats, character traits, and other elements that run through all of Freeman's manuscripts, as discussed *infra*.

lead who is a supernatural being grieving the death of an older brother who was nineteen and was murdered; an imprisoned father/grandfather named Athair/Alistair with "smoky-gray"/"smoke gray" eyes who speaks Gaelic and appears as a voice in the heroine's head; a second romantic lead who is a royal vampire with "stormy blue" eyes and a not quite British / British accent in an alternate dimension whom she accidentally brings back with her; a multiracial, part-Black, winged, gay best friend; a maternal green-eyed grandmother (the heroine is the descendant of a twin goddess through her), a vampire villain who abducts the heroine to use her as an instrument to bring back their dead mate (only that mate isn't really dead but alive in another dimension) and this vampire was responsible for the accident which killed her family, as well as other characters, and dozens of specific plot parallels, scenes, settings, and instances of fragmented literal similarity.

Under the "more discerning" ordinary observer test the court must "compare holistically the works' 'total concept and overall feel.'" *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d at 367., citing *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010). This holistic, "total concept and feel" analysis is fundamentally incompatible with Defendants' gambit to artificially restrict comparison to a single manuscript version and a single *Crave* novel. As the Second Circuit has explained, "the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another." *Gaito*, 602 F.3d at 66, quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003). The principle of protectable "selection and arrangement"—that individually unprotectable elements gain

protection through their original combination—applies with full force to an author's creative development of a novel across multiple drafts.

To hold otherwise would be to create a framework for a knowing infringer to access a progressive series of drafts of an author's work (as we have been instructed by this Court to assume happened in this case), recast and adapt what she believes to be the best iterations of each scene and element to retell substantially the same story, and then potentially evade liability by arguing that not enough was taken from any one draft (as Defendants do in this case). Such a result would all but invite the harvesting and copying of original creative expression by anyone with access to unpublished works in progress—in direct contravention of the purposes of the Copyright Act.

### C. Freeman's drafts are largely consistent as to the points of substantial similarity.

Defendants' "Schrödinger's Cat" Argument, that Freeman's manuscripts have "covered all bases" with regard to the alleged points of similarity such that it is unfair and improper to allow her to compare the *Crave* books to *BMR* in the aggregate, is factually untenable. The similarities between *BMR* and the *Crave* series reflect consistent core story points, themes, and subplots *that exist across every draft of BMR put forward for comparison*. While Freeman may have revised and refined her prose over time, changed some characters' creature-types and names, etc. change, the same foundational narrative elements and skeletal structure recur and serve the same dramatic purposes across each draft.

Every draft of *BMR* tells the story of an "almost seventeen" year old heroine[73] from San Diego[74] who relocates to Alaska following a catastrophic accident killing her family members in a vehicle crash. The heroine in the opening sequences compares the sunny pre-accident life in California with the now cold, frozen wasteland of Alaska, where she feels exiled following their deaths. She suffers from a deep sense of familial loss compounded by a realization that her parents were deeply in love, and she suffers from panic attacks as a physical manifestation of the grief and guilt she bears as their last words were in an argument.

The heroine now lives with who she believes are the only two family members she has left in the world and they are both supernatural witches. In reality, she has two other family members she will meet later in the story: one male and one female from her maternal side. She discovers she is a rare and unique being in the supernatural world meant to restore and maintain the balance. Her supernatural lineage and her unique place in the supernatural world have both been kept hidden from her as of the outset of the story. She also has a dramatic scene of drawing tarot cards where she draws the Tower card as her first draw, which is a bad omen.

Each draft also features a brooding, royal supernatural romantic lead with secrets of his own who wants to protect her. He feels a strong sense of responsibility and duty in the war between supernatural beings.[75] He is intended to be in a love triangle with the second love interest introduced as evil, depraved, and responsible for the deaths of many. This presumed evil second love interest is not actually evil and the heroine is attracted to him. She accidentally

---

[73] 2010 p. 12 ("almost seventeen"), p. 338 ("We were both seventeen now."); 2011 p. 20 ("almost seventeen"); 2012 p. 14 ("nearly seventeen"); 2013 p. 16 ("nearly seventeen"); 2014 p. 189 ("almost seventeen); 2016 p. 45. All drafts place the heroine from "sunny" California to Alaska following the accident.

[74] San Diego or southern California with Plaintiff being asked to change from San Diego by the literary agent involved in this case.

[75] 2016 is only the first 108 pages; war hasn't been mentioned yet.

brings him back with her from the other dimension which horrifies her.[76] Each also includes a disembodied voice in her head who is later revealed to be her father, trapped in his supernatural bestial form, who has been imprisoned at the hands of the ultimate royal, supernatural villain.[77]

Each draft also gives the heroine a first taste of the supernatural world with an attack scene with a group of out-of-place supernatural men who remind her of 80's rockers who threaten her and a fight scene ensues. She visits her father via a magical portal to try and free him in his bestial form where he is trapped in chains at the hands of the vampire prince.[78] This royal supervillain wants to kidnap the heroine and use her as an instrument to bring back his dead mate, and the heroine describes him as "cobra" like. And the heroine's female nemesis at school drugs the heroine's drink at a party as part of the plot, and is connected with the heroine's kidnapping at the climax and is involved in that scene.[79]

The heroine in each draft meets a previously unknown maternal relative who lives in a place that is very hard to find who gives her cryptic advice. This maternal relative knows the heroine's true identity and role in their world. The heroine discovers she has a special magical lineage connected with her maternal relative.

There is also a quest to collect a series of magical artifacts to stop a supernatural cataclysm connected to Ronan (*Crave*'s Hudson).[80] A character named the Bloodletter turns into a raven and flies away.[81] And there are scenes of the heroine stepping through a door or behind a

[76] 2016 is only the first 108 pages, this hasn't happened yet.
[77] 2016 is only the first 108 pages revised of the 2014 manuscript, therefore, the voice in the head is not yet heard.
[78] 2016 is only the first 108 pages, therefore this hasn't happened yet.
[79] 2016 is only the first 108 pages, therefore this hasn't happened yet.
[80] 5 objects in 2010-2014; 1 object in 2016 draft
[81] This character flies away in drafts 2010-2014; he is called Bloodletter beginning in 2012. 2016 is only the first 108 pages, this hasn't happened yet.

tree in the Alaskan winter into summer, with warmth, flowers and sunshine. All drafts culminate in a rescue and confession climax involving the romantic lead.

This is not an exhaustive recitation of all the narrative and dramatic elements shared across the *BMR* corpus and notes, but merely a concise summary of the key relevant ones which *all* appear in the *Crave* series.[82] From the earliest *BMR* drafts and notes, through the later *Masqued* iterations, Freeman was developing one story, told through revisions.

The "Eighties Rocker Fight" sequence illustrates this perfectly as it appears in *every* draft of *BMR*. Although in earlier drafts it occurs near the climax as part of the kidnapping sequence while it later appears in approximately the first fifty pages, where it serves as the story's first major action and foreshadows the heroine's danger, across all works it is not a random attack by bad guys—it is an attack by bad guys who know a truth about the heroine that feeds into the larger plot of the story when the heroine herself does not. And it serves the same narrative function in *BMR* and *Crave*.

The chart below shows the scene's language and choreography across the *BMR* drafts, as reflected in the dated manuscripts, and the adaptation of the scene in *Crave* which mirrors the revised early placement and combines specific expressive details from the *BMR* drafts:

| ***BMR*: Eighties Rocker Fight Scene** | ***Crave:* Eighties Rocker Fight Scene** |
|---|---|
| Despite the biting wind, the *two men were dressed in jeans and shirts, no coats, no gloves*.<br>*BMR* 2010 p. 417, 2011 p. 518-519, 2012 p. 437, 2013 p. 393; 2014 p. 312<br>(2016 two men p. 56 but no winter weather) | And in walk *two guys wearing nothing but old-school concert T-shirts, jeans* and lace-up boots. *No jackets, no sweaters, no hoodies even*.<br>p. 53 |

[82] They are relevant because they mirror the story of the *Crave* books, as discussed in Section V, *infra*. In contrast, there are many differences between Freeman's drafts that are irrelevant because they do not relate to the alleged misappropriation of her work by Defendants.

| | |
|---|---|
| Sporting *a black leather jacket and a dog collar and an earring,* he's out of place. He looks like a retro throw back to the *eighties*. In fact, he looks a lot like *Billy Idol*.<br>2013 p. 58, 2014 p. 48; *see also* 2016 p. 56 ("Billy Idol" but no "eighties" reference yet, 2010 p. 417, 2011 p. 43; 2012 p. 437) | Ones who died at an *eighties rock concer*t…dark hair tied back in a *ponytail and a black nose ring* right through his septum. p. 53 |
| *Well, well, well. Looks like* I've hit the jackpot.<br>2013 p. 58 (only version with "*Well, well, well. Looks like*")<br>("Well, well, well." 2010 p. 419; 2011 p. 522; 2012 p. 440; 2014 p. 314; 2016 p. 55) | *Well, well, well. Looks like* we made it back just in time. p. 53 |
| He looks like a punk rocker throwback in a bad eighties *movie.*<br>2014 p. 48, 2016 p. 56<br>(In *movies*, things don't always go well for the heroine when she fights back. 2010 p. 419, 2011 p. 439, 2012 p. 439, 2013 p. 395) | ...this feels like a scene out of every teen *movie*…<br>p. 55 |
| *Punk Rock reaches out and grabs me…*<br>2014 p. 49; *see also* 2016 p. 56-57 | But *Marc reaches out and grabs me…*<br>p. 56 |
| *The Hulk grabs me and twists my wrists behind my back, pinning me to him, my back to his front.*<br>2014 p. 49; 2016 p. 57<br>(2013 the Hulk twists my wrists behind my back, pinning me to him back to front) | *He yanks me hard against him–my back to his front–and wraps his arms around me* as I start to struggle in earnest. p. 56 |
| *I struggle against him, lashing out blindly with my feet…I buck backwards for all I'm worth, head butting him. Crack! I've hit his nose*. 2014 p. 50; 2016 p. 57 | ..*I start to struggle* in earnest....I shout, *bucking and kicking against him as hard as I can…I slam my head back with as much force as I can, aiming to break his nose*. p. 57 |
| *Fury pulses through me*.<br>2013 p. 60, 2014 p. 50 | Which *infuriates me* as much as it terrifies me.<br>p. 56 |
| I flinched at the pain but continued to struggle, *kicking out at his shins and stomping on his toes. I screamed* too…<br>2010 p. 419; 2011 p. 521, 2012 p. 439; 2013 p. 295; 2014 p. 314 (I raise my knees and slam my feet down, heels first onto the Hulk's toes. 2016 p. 57) | ...bringing my heel back *to kick him in the knees*… I think about *stomping on his feet,* but my Converse aren't going to do much damage… Let me go or *I'll scream*!<br>p. 56 |

| | |
|---|---|
| And that's when my head is yanked backward so hard *I bite my tongue. The coppery tang of blood fills my mouth.*<br>2014 p. 50 | He yelps and jerks, and his forearm *slams against my mouth*. It hurts, has the *metallic taste of blood pooling in my mouth.*<br>p. 56-57 |
| I clench my jaw…*fists up, ready to take the Hulk on.*<br>2014 p. 50, 2013 p. 60 | I turn… *fists up in an attempt to ward off Quinn* if he tries to stop me…<br>p. 57 |
| Just a *self-defense class,* I mutter, looking away. 2013 p. 62, 2014 p. 52 | Every ounce of *self-defense training* I've ever had says I should run.<br>p. 59 |
| *The secret's safe with me*, but I think you should tell her anyway.<br>2013 p. 68, 2014 p. 57 | ..hold his gaze, telling him with a look that *I'll keep his secret.*<br>p. 59 |
| *Are you hurt? He looks me over*, cupping my face in his hands. *I shake my head*. Miraculously, I'm not. *And I probably should be.* "What happened?" he asks, wrapping his arms around me and guiding me to a curb to sit down. All I can do is shake my head. "I don't know. They were trying to get me to go with them in their van, whether I wanted to or not. I just—I can't believe it." Ash blows out a long breath. "*Are you sure you're not hurt* anywhere?" *I'm fine*… 2013 p. 61 | For long seconds, he doesn't say anything, *just looks me over* from head to toe, his dark eyes cataloging every inch of me…. "*Are you okay*?" he asks quietly, his fingers finally releasing their hold on my wrist. "*I'm fine,*" I answer, *even though I'm not sure it's true*. What kind of place is this where people try to shove you outside to die as a prank? "*You don't look fine.*<br>p. 60 |
| *Thanks for—well, for everything*."<br>2013 p. 68, 2014 p. 57, 2016 p. 63<br>("Um, *thanks for* the ride." 2010 p. 47;<br>("...*thanks for helping* out about the ride.")<br>2011 p. 62, 2012 p. 59 | *Thank you," I blurt out. "For helping me,* I mean. p. 61 |
| His brows draw together in a frown. "Sorry about today." *"You saved me." He just shakes his head, and I can tell he thinks it's his fault.* 2014 p. 57 ….*You don't know how many times I've wondered if those guys at the Stop-N-Go would've attacked if you hadn't been with me.* 2013 p. 118 , 2014 p. 99<br>…*they were completely unaffected by the cold. They should have been shivering, stamping their feet, and rubbing their hands together.*<br>2010 p. 417, 2011 p. 519, 2012 p. 437 | *"Thank you…for helping me…" "Is that what you think I did?" "Isn't it?" He shakes his head,* gives a little laugh that has my heart stuttering in my chest. *"You have no idea…I just made you a pawn in a game you can't begin to understand."* p. 61<br>…*they were high or something because there's no other explanation as to why they would have been outside in only jeans and t-shirts. I mean how did they avoid getting hypothermia?*<br>p. 68 |

The above illustrates not only the continuity of the *BMR* drafts but *Crave's* copying of the corpus of the drafts rather than any specific one. Thus, far from being unfair or improper to consider Freeman's drafts in the aggregate, it would be unfair and improper not to.

**V. There is at least a triable issue of substantial similarity**

Whether the Court ultimately compares the *Crave* series to Freeman's *BMR* manuscripts in the aggregate or one-by-one, there is at least a jury question of substantial similarity. This is because while the specific expression of some of the relevant *BMR* story beats may differ from draft to draft, substantial similarity may be shown by *either* demonstrating copying of the selection and arrangement of individually unprotectable story beat ideas/elements *or* copying of sufficient protectable expression of individual elements (regardless of the selection and arrangement of those elements or whether they reflect tropes at higher level of abstraction). And here, both the common thread of shared story elements across each work and the shared specific expressive elements garnered from each draft provide ample basis to find substantial similarity.

**A. When reviewed in the aggregate, the works are substantially similar**

Reviewed in the aggregate as they should be, *BMR* and *Crave* are substantially similar. Defendants copied from across the corpus drafts of *BMR* that Freeman submitted to Defendant Kim to first create *Crave* (book 1) and then to create a subsequent series reflecting Freeman's narratives elements, characters, themes, and subplots. This is evident both in the overall story spine of Freeman's drafts, as ventilated above, and in the copying of individual elements and scenes from throughout that work.

Freeman's pending Motion for Summary Judgment explains in detail the extensive and substantial similarities found between *BMR* and each of the *Crave* novels—i.e., a mirror cast of

characters who interact in substantially similar ways across a substantially similar storyline with substantially similar plot points, scenes, settings, theme, pace, and overall feel. To wit:

**i. *BMR* and *Crave* share substantially similar characters**

Both the core and supporting casts of the works are substantially similar, as detailed in Freeman's motion. See ECF 526 pgs. 9-30. This includes the main protagonist, who in both works is an "almost seventeen" year-old girl from San Diego whose family members died in a tragic vehicle crash that has left her with both tremendous grief and guilt (because the last words they exchanged prior to the accident were in an argument) that manifest in panic attacks. She will later learn that she is a unique magical being not seen in ten generations / thousand years who is meant to restore balance to the supernatural world. She loves to read and quote literature and enjoys French philosophers, among many other similarities.

There is also the first male lead, a brooding supernatural royal suffering from the loss of his nineteen-year old brother (who was murdered and he feels responsible). He has an aura of predatory danger around him and the heroine finds herself drawn to him in spite of herself, particularly to the danger. The first kiss between them is the catalyst for her discovery of the supernatural world when he loses control of his powers during the kiss.

The second love interest is intended for a love triangle seeded in *BMR* / is in a love triangle in books 2 and 3 of the *Crave* series. His is the second voice the heroine hears in her head, and she accidentally brings him back from the other dimension to Alaska. He is thought to be evil, depraved, and responsible for the deaths of many but in reality is good and did what was necessary for the greater good.

Both works also feature a main antagonist vampire prince/king with a special bite he is known for who is described by the heroine as being "like a cobra." He wants to give the heroine

his bite and does so, which she survives. He wants war and believes supernaturals should take over the world. He is the person who imprisoned the heroine's father/grandfather in chains on an island.

That father/grandfather with smoky gray / smoke gray eyes is also substantially similar between both works, named Athair/Alistair and imprisoned his supernatural, bestial form. He speaks Gaelic and communicates with the heroine telepathically, first as a mysterious voice in her head and she wonders if it's her supernatural half.

This list goes on, to include the heroine's multi-racial gay best male friend with wings known for his humor and waggling his brows at the heroine and calling her a nickname / nicknames. There is an aunt/uncle who cares for the heroine while following parental wishes to hide her supernatural identity from her. There are specially brewed teas given to the heroine by her aunt and mother who wish to keep her powers bound and the supernatural world secret from her to protect her; the heroine is the descendant of a twin goddess through her maternal green-eyed grandmother who is unknown to the heroine. All of this only scratches the surface of the exhaustive similarities detailed in Freeman's motion and demonstrates that the *Crave* books copied the original and protectable characters of *BMR*. There is, at a minimum, a triable question as to whether the characters between the works are substantially similar.

Defendants opine on minute, cosmetic discrepancies between the characters to claim they are not substantially similar, but the relevant question is whether "the 'totality of [the characters'] attributes and traits as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [the plaintiff's work].'" *Kaye v. Cartoon Network Inc.*, 297 F. Supp. 3d 362, 368 (S.D.N.Y. 2017), quoting *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F.Supp.2d 200, 208 (S.D.N.Y. 2010). And this is so regardless of whether both characters

draw from common archetypes. See *Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 746 (S.D.N.Y. 2017), citing *Detective Comics v. Bruns Publications*, 111 F.2d 432, 433 (2d Cir. 1940). Thus, differences in the precise ethnic background of a character or their slightly altered familial tie to the protagonist do not excuse the substantial copying of an original character—or in this case cast of characters.

**ii. The works share substantially similar plot and storylines**

The original cast of *BMR* and their copied counterparts in the *Crave* Books also appear in substantially similar narratives told with substantially similar sequencing, pacing, and story beats. To be sure, the very same core storyline described as the consistent narrative of *BMR*'s multiple manuscripts in Section C above is equally apt to describe the core storyline of *Crave*, and the later novels all draw their plots and elements from subplots and portions of *BMR*, as discussed in Freeman's cross-motion of summary judgment.

Defendants' motion argues, in essence, that differences in the protectable expression of individual story beat elements somehow negate the overwhelming similarity in the many dozens of substantially similar sequential plot and story beat elements. They do not. Although Defendants implore the Court to proceed otherwise, it is basic that "[t]he point of the "substantial similarity" inquiry is not to "'set out to detect the disparities'" between the works. *Klauber Bros., Inc. v. M.J.C.L.K., LLC*, No. 21 CIV. 4523 (PGG), 2024 WL 4467618, at *12 (S.D.N.Y. Oct. 10, 2024). As under the established discerning ordinary observer test, such differences make no impact where they "do little to lessen a viewer's overwhelming impression" that the defendant's work is an appropriation of the plaintiff's work. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1004–05 (2d Cir. 1995). As explained above, no amount of enumerated minor differences,

real or imagined, can negate the plain impression that the *Crave* Books appropriate their material from *BMR*.

**iii. *BMR* and *Crave* share substantially similar scenes and settings**

Both *BMR* and the *Crave* Books feature numerous substantially similar scenes and story beats set to the same pace, despite Defendants' efforts to reductively categorize the works as nothing more than a stock story where the heroine merely encounters oddities and dangers while she slowly learns the "truth" about the supernatural world and the beings around her. That generalized description applies to countless works and misses the point. The "80's Rocker" attack scene discussed in detail above is only one example of the copied scenes and story beats Defendants' copied.

Taken together, these shared elements reflect far more than generalized ideas or tropes; they replicate a single, continuous expressive sequence. The kidnapping, confrontation, rescue, and aftermath unfold in the same narrative order, employ the same character roles and motivations, and include the same distinctive, expressive details. Viewed as a whole, the similarities concern protected expression and selection and arrangement, not abstract ideas.

The sharing of individual scenes such as the "80's Rocker" fight scene of both works, the copied secretly drugged drink from the heroine's female nemesis, the kidnapping and bringing back the dead mate scene, the subsequent rescue by the romantic lead, and more only emphasize that both on a macro and micro level, *Crave* copies the original and protectable plot of *BMR*. And both stories are set in the same unusual locale of snowy Alaska, depicted not as a vibrant winter destination but a grim and frozen wasteland of exile and hidden magical underbellies. Both even feature substantially similar gothic medieval castles anachronistically placed in Alaska and provide neutral ground for their supernaturals at "Katmere" (*Crave*) and

"Katmai" and "Sanctuary" (*BMR*). These substantially similar scenes and settings, combined with the myriad other similarities in characters, plot, and more, all culminate in at least a triable question as to substantial similarity.

**iv. Both works feature substantially similar themes, pacing, and overall feel**

All the above examples show that, regardless of cosmetic differences, a reasonable jury could find that *BMR* and the *Crave* Books present a substantially similar overall concept and feel. Beyond the characters, plots, settings, and scenes, both works explore the same themes of feminism and strong female agency, even illustrated through the heroine choosing a second love interest who, rather than protect her like an ordinary fantasy partner, encourages her to be herself and become powerful: "Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance." / Jaxon wanted to protect me, wanted to take care of me, but Hudson wants to help me learn how to take care of myself."[83]

Both similarly stress diversity, inclusion, and the rejection of stereotypes both in the real-world sense of characters of myriad backgrounds, sexualities, and ethnicities while also showing reverence for the native peoples of Alaska, and with a mirrored sense of diversity and inclusion in the supernatural world populated by numerous supernatural races and histories.

Furthermore, both stories follow substantially similar pacing and structure, starting as a slow burn hiding the reveal of the supernatural and the danger before quickening into a high-octane action with thriller-esque elements. Both balance this with romance following identical arcs of Attraction -> Rejection (Warning) -> Forced Proximity -> Intimacy -> Betrayal ->

[83] The World Notes, 2010, Covet p. 194

Reunion, broken up with bouts of supernatural violence to remind readers that beyond the love story, there are potentially cataclysmic stakes at play.

And unlike virtually any other young adult paranormal romance stories on the market, *BMR* and *Crave* present a unique feel of an "Alaskan Gothic," a young and thrilling supernatural romance set against a dark and oppressive backdrop and atmosphere.

Defendants' assertion that *Crave* reflects a distinctly "modern" tone grounded in the social and political context of 2019–2021 is unsupported by citation to the text and is disputed. Notably, Defendants identify no passages or quotes demonstrating that the narrative meaningfully engages with the COVID-19 pandemic or other contemporaneous events. On the other hand, contemporaneous reviews have curiously (or not) described *Crave* as stylistically evocative of young-adult paranormal fiction from the late 2000s—<u>i.e., from the same period as *BMR*</u>—rather than as reflecting a uniquely current cultural moment.[84] And Defendants argue that *Crave* uses *Harry Potter* elements in its story, "giving them an American twist," curiously ignoring that *BMR* also uses multiple *Harry Potter* elements.[85]

Defendants next falsely assert that later versions of *BMR* lean into "epic fantasy" and away from paranormal romance—a characterization that is plainly untrue and contradicts Emily

---

[84] *Crave* Book Reviews: *https://readingbystarlightblog.wordpress.com/2020/06/13/review-crave-by-tracy-wolff/* "Yeah, YA has come a LONG way since the 2000s." *https://laurieisreading.com/2025/11/01/book-review-crave-by-tracy-wolff/* "Tracy Wolff's *Crave* is exactly what you are looking for. It has all the late 2000s vibes, but this probably wouldn't become such a huge classic as aforementioned popular series."

[85] *BMR* 2013 p. 405 "'A most unusual bouquet,' he says, closing his eyes. 'Hmm. 'You might belong in Gryffindor, where dwell the brave at heart, their daring, nerve and chivalry set Gryffindors apart.' I do believe I got it right. You've read the books, haven't you, cherie?'"... "'What?" I sputter. 'Are you quoting Harry Potter? Really?!'"..." *see also* 2010 p. 429, 430; 2012 p. 451; 2014 p. 323.

Kim's 2013 pitches to Liz Pelletier and Stacy Abrams at Entangled Publishing.[86] Epic fantasy refers to narratives set primarily in secondary or invented worlds structured around kingdom-or civilization-level political systems. In contrast, all versions of *BMR*, just like *Crave,* are set in contemporary Alaska–the real modern world–with limited portal travel. The presence of supernatural conflict or the possibility of a large-scale war does not convert a contemporary world narrative into epic fantasy; rather it reflects a contemporary structure grounded in the real-world setting, which is true in both works. Whether *Crave* embodies a modern sensibility or an earlier stylistic approach is a factual question that turns on the text itself and cannot be resolved on summary judgment through unsupported characterization and genre labeling.

Defendants argue that their books span several locations; however both books mention the same locations in the text: Greece, Egypt, Sumeria, Alexandria, Syria/ Asssyria, England, Ireland, Scotland, France, Northern Italy, San Diego, Anchorage, Hawaii, North Pole, New York City.

***

*BMR* and the *Crave* Books, taken as a whole, tell essentially the same story, populated by nearly identical characters in settings and scenarios common to both, and do so expressing the same themes and feelings to young adult readers. Given the above examples and the wealth of similarities described in Freeman's cross motion for summary judgment, this Court should find, as Judges Netburn and Stanton did, that a reasonable jury could perceive substantial similarity between these works. Defendants' motion for summary judgment should be denied.

---

[86] Emily Kim pitch of BMR/ Masqued to Entangled publishing as "YA paranormal romance " in 2013."I'm excited to be writing to you about Lynne Freeman's MASQUED. If you are looking for something unique in **young adult paranormal romance**" KIM00157457-61.

### B. Even when reviewed individually, *Crave* infringes on the *BMR* drafts

Even if the Court were to compare each *BMR* manuscript individually against each *Crave* novel, there is at least a triable question as to substantial similarity because the core protectable elements copied in the *Crave* Books are present in *every* version of *BMR*: the original protagonist with her specific biographical and psychological profile; the unique selection and arrangement of characters, settings, and plot elements; and the specific detailed expression of genre tropes that goes far beyond unprotectable scènes à faire. And, there are then additional points of similarity with each draft.

As the Second Circuit has emphasized, "'it is entirely immaterial that, in many respects, plaintiff's and defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.'" *Attia*, 201 F.3d at 57–58. And as the Second Circuit long ago established, "'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'" *Tufenkian Imp./Exp. Ventures, Inc.*, 338 F.3d 127, 132, quoting *Sheldon*, 81 F.2d 49at 56. Defendants have never demonstrated that any individual *BMR* manuscript lacks substantial similarity to any individual *Crave* novel. Their objection to aggregation is therefore a red herring that has no bearing on the merits of Plaintiff's infringement claims.

Indeed, The *Crave* Books copy myriad plots points, elements, characters, settings, and even specific scenes from each of the *BMR* manuscripts individually. *BMR* 2011 provides an illustrative example. A point-by-point comparison using the *BMR* 2011 draft demonstrates that *Crave* tracks that same narrative and protectable elements, while incorporating revisions drawn from Freeman's other drafts. This amounts to infringement of not only *BMR* 2011, but also the other drafts so long as the elements taken from each are original and protectable. Nor is this incompatible with arguing that Defendants copy the overall concept and feel of *BMR*. See

*Branch v. Ogilvy & Mather, Inc.*, 765 F. Supp. 819, 822–23 (S.D.N.Y. 1990) (confirming that even where the plaintiff argued copying of her book's overall concept and feel, she could also argue that defendants copied individual elements of her book, and citing precedent.)

And beyond these shared similarities, each version has additional similarities to the Crave books that reflect the copying of substantial artistic expression, as set forth more fully in Plaintiff's summary judgment motion.

**C. If *Crave,* the first book in the Series, Infringes *BMR*, *Crush, Covet* and *Court* also Infringe *BMR***

The Copyright Act reserves exclusively to the copyright owner the right to "prepare derivative works." 17 U.S.C. § 106(2). It is well established that sequels and subsequent installments in a series are derivative works of the first. See *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 541 (2023) (including "sequels" among "derivative works"); *Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1276842, at *7 (S.D.N.Y. June 8, 2004) ("Subsequent works in a series (or sequels) are in a sense derivative works while the characters which appear throughout the series are a part of the underlying work upon which the later works are based."). Thus, if *Crave,* the first book in the series infringes *BMR*, *Crush, Covet* and *Court* must logically also infringe *BMR* because they are each derivative works of the book *Crave* that incorporate elements such as characters, settings and plots contained in *Crave.*

It is indisputable that *Crush, Covet and Court* each incorporate the very same elements that *Crave* misappropriated from *BMR*, including characters, settings and the entirety of the story contained in *Crave.* Each new book in the Series merely follows the main characters through a series of events that pick up where the last book ended and incorporates the entirety of the prior

book's story by reference. Thus, if *Crave* is substantially similar to *BMR*, each subsequent book in the series that contains those shared elements is also substantially similar to *BMR*. *Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*, 73 F.4th 1048, 1059–60 (9th Cir. 2023)("if elements in an original work were copied by an infringing work, and the defendant copies those elements as set forth in the infringing work, the defendant's copy infringes the original work").

Accordingly, if there is a material issue of fact as to whether the book *Crave* is substantially similar to *BMR*, the Court must also find that there is a material issue of fact as to whether the other three books in the *Crave Series* are also substantially similar to *BMR*.

## VI. Conclusion

Judge Netburn and Judge Stanton rightly concluded that the similarities in this case are somewhere between probative and striking. Indeed, they are so substantial that judgment should ultimately be entered in favor of Freeman. Defendants cannot avoid that conclusion by advancing alleged differences between the works, especially where those differences are illusory, and imploring the Court to improperly filter out elements and refuse to consider selection and arrangement. Since that is, in truth, all they offer this Court, they cannot carry their burden on this motion and it must be denied.

Dated: February 9, 2026
New York, New York

Respectfully submitted,

By: /s/ *Stephen M. Doniger*

Stephen Doniger, Esq.
**DONIGER / BURROUGHS PC**
603 Rose Avenue
Venice, California 90291
(31) 590-1820
stephen@donigerlawfirm.com

**Reeder McCreary, LLP**
Mark D. Passin
11766 Wilshire Boulevard,
Suite 1470

Los Angeles, CA 90025
310-861-2475
*Attorneys for Plaintiff Freeman*