**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>TRACY DEEBS-ELKENANEY, et al.<br><br>Defendants. | Case No. 1:22-cv-02435 CM-SN<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 5

A. Plaintiff is Deliberately Attempting to Deceive the Court ........ 5

1. Plaintiff Recycles her Similarity "Index" ........ 5

2. Plaintiff Stitches Together Imaginary "Scenes" From Across Her Various Manuscripts ........ 10

B. Plaintiff Does Not Present Any Coherent Theory of Infringement ........ 16

1. Plaintiff Misttates the Tests for Comprehensive Non-Literal Similarity and Fragmented Literal Similarity, and Ultimately Adopts Neither ........ 18

a. Comprehensive Non-Literal Similarity ........ 18

b. Fragmented Literal Similarity ........ 19

2. Plaintiff Does Not Seriously Argue Selection and Arrangement ........ 20

3. The Court must Factor Out Unprotectible Content ........ 21

C. Crave is not a Derivative Work of BMR / Masqued ........ 23

D. Plaintiff's Versions Should Not be Aggregated ........ 24

1. Case Law is Clear that Aggregation is Not Appropriate ........ 25

2. Plaintiff's Own Brief Demonstrates Why Aggregation is Untenable ........ 27

E. The Proper Approach to Substantial Similarity as Shown by Williams v. Crichton ........ 30

F. Plaintiff Fails to Demonstrate Substantial Similarity in Plot ........ 33

1. Plaintiff's Pre-Litigation Descriptions of the Plot of BMR/Masqued Differs Vastly From Her Current Description (and from Crave) ........ 35

2 Many of the "Plot" Similarities Plaintiff Claims Do Not Relate to Plot ........ 38

3. Plaintiff Micharacterizes and Misrepresents Many of the Allegedly Similar Plot Points ........ 39

4. Plaintiff's Plot Similarities Are Frequently Based on Unprotectible Ideas, Tropes and Scenes a Faire ........ 40

5. Many of Plaintiff's Purported Plot Similarities are Random, De Minimis Elements in BMR/Masqued and/or Crave ........................ 41

G. Plaintiff Fails to Prove Actionable Similarity With the Characters .................. 42

H. Plaintiff Fails to Prove Actionable Similarity In Theme .................................. 46

I. Plaintiff Fails to Prove Actionable Similarity In Pace and Sequence ................ 48

J. The Settings Are Not Substantially Similar ...................................................... 50

K. Plaintiff Fails to Prove Fragmented Literal Similarity ...................................... 53

L. The Total Concept and Overall Feel is Dissimilar ............................................ 54

III. CONCLUSION ........................................................................................................ 56

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Allen v. Scholastic, Inc.*
739 F. Supp. 2d 642 (S.D.N.Y. 2011) ........................................................ 18

*Amanze v. Adeyemi*
2019 WL 2866071 (S.D.N.Y. Jul. 3, 2019) ........................................................ 21

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*
683 F. 2d 610 (2d Cir. 1982)........................................................ 31

*Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*
150 F.3d 132 (2d Cir. 1998) ........................................................ 19, 24

*Dean v. Cameron*
53 F. Supp. 3d 641 (S.D.N.Y. Sept. 17, 2014) ........................................................ 25

*DiTocco v. Riordan*
815 F. Supp. 2d. 655 (S.D.N.Y. 2011) ........................................................ 26

*Dreamtitle Publ'g, LLC v. Penguin Random House LLC*
2023 WL 4350734 (S.D.N.Y. Jul. 5, 2023) ........................................................

*Eckes v. Card Prices Update,*
736 F.2d 859 (2d Cir. 1984) ........................................................ 20

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*
499 U.S. 340 (1991) ........................................................ 20

*Guity v. Santos*
2020 Wl 4340417 (S.D.N.Y. Jul. 28, 2020)........................................................ 20

*Hogan v. DC Comics,*
48 F. Supp. 2d 298 (S.D.N.Y. 1999)........................................................ 23

*Hord v. Jackson*
281 F. Supp. 3d 417 (S.D.N.Y. 2017)........................................................ 33

*Kaye v. Cartoon Network*
297 F. Supp. 3d 362 (S.D.N.Y. 2017)........................................................ 26

*Key Pubs., Inc. v. Chinatown Today Pubs. Ents., Inc.*

945 F.2d 509 (2d Cir. 1991)........................................................................ 20

*Kroencke v. Gen. Motors Corp.*
270 F. Supp. 2d 441 (S.D.N.Y. July 10, 2003) ....................................................................25

*Lego A/S v. Zuru Inc.*,
2025 WL 915027 (2d Cir. Mar 26, 2025) ..................................................................17, 22

*Lewinson v. Henry Holt and Co., LLC.*,
659 F. Supp. 2d 547 (S.D.N.Y. 2009) ..............................................................................22

*Litchfield v. Spielberg*
736 F.2d 1352 (9th Cir. 1984) ..................................................................31, 33

*Mallery v. NBC Universal*,
2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ..........................................................54

*Nelson v. Grisham*
942 F. Supp. 649 (D.D.C. Sept. 26, 1996) ..............................................................25

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*
602 F.3d 57 (2d Cir. 2010)
........................................................................................ 17, 19

*Reyher v. Children's Television Workshop*
533 F.2d 87 (2d Cir. 1976) ..............................................................................68

*Sheldon Abend Revocable Tr. v. Spielberg*
748 F. Supp. 2d 200 (S.D.N.Y. 2010) ........................................................73

*Skidmore v. Led Zeppelin,*
952 F.3d 1075 (9th Cir. 2020) ......................................................................... 21

*Structured Asset Sales, LLC v. Sheeran,*
120 F.4th 1066 (2d Cir. 2024) .........................................................................20

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*
996 F.2d 1366 (2d Cir. 1993) ................................................................19, 24, 25

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
338 F.3d 127 (2d Cir. 2003) ........................................................................ 21

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)........................................................................... 22

*Warner Bros. Ent. Inc. v. RDR Books*

575 F.Supp.2d 513 (SDNY 2008) ........................................................................................ 24

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)..........................................................................................passim

## I. INTRODUCTION

While acknowledging the substantial time commitment involved, Defendants have nevertheless implored this Court to do what the Second Circuit compels in copyright infringement cases: directly compare the works at issue for substantial similarity. Defendants have sought this comparison because they already *know* what the results will be, because they *know* exactly how the *Crave* series was written and that any purported similarities with Plaintiff's *Blue Moon Rising* (BMR)/*Masqued* can only be the result of independent creation and common subject matter and literary genre. After four years of costly litigation and public calumny, Defendants are eager to have this Court take a clear-eyed look at the works and finally end this charade of a lawsuit.

And what a charade it is. At its core, this is a tale of two young adult fantasy novels of modest length, both set in Alaska. One is an unfinished manuscript of 400 to 600 pages, written over the course of more than half a decade, which has undergone massive revisions without ever reaching a "final" form, so that it remains unpublished to this day. The other is 575 pages and was written in 2019 and published in 2020 and has spawned a best-selling series of five additional novels. Much of Plaintiff's efforts over the last four years have been to bury the two works beneath an avalanche of alternate versions, private notes, misleading indices and "expert" testimony. What Plaintiff cannot achieve under the law, she attempts to achieve through volume, repetition and mischaracterization, attempting to browbeat the Court into not believing its own eyes.

At some point after she first saw *Crave* in a bookstore and reacted to its Alaskan setting, Ms. Freeman and her attorneys must have realized she had no case on the merits and set out to obfuscate the truth. Otherwise, Plaintiff would have been as eager to have this Court compare the two works as Defendants have always been. Plaintiff instead has tried to avoid that comparison by any means necessary, including by withholding her manuscripts for months after filing her lawsuit (and then, only when ordered by the court) and instead creating false similarity "indices" as long

or longer than the books themselves. As Defendants predicted in their summary judgment motion (Dkt. 527, p. 4), Plaintiff recycles her indices in whole cloth in her summary judgment motion, hanging them on the limbs of a purported "total concept and feel" test but, in reality, not applying any coherent, much less accepted, legal analysis to support her infringement claim.

Of all her transgressions in furtherance of her single-minded goal, Plaintiff's willingness to present falsehoods to this Court about what is found in the respective texts is perhaps the most shocking. That she continues to misrepresent what is in the works, even while knowing that Your Honor has actually read the books, is as difficult to comprehend as it is egregious.

In her motion, Plaintiff begins by providing broad summaries of the works that distort them so much as to make them unrecognizable. With respect to her own works, these summaries often contrast entirely with the summaries she prepared at the time she wrote them, when she was not busy trying to manufacture similarities with Defendants' books for litigation purposes. Next, she misrepresents the factual details in her comparisons, claiming that certain elements exist in the respective works when they do not, and omitting certain elements that *do* exist and which clearly distinguish her manuscripts from Defendants' novels. To facilitate this deception, Plaintiff frequently fabricates supposed "scenes" from each of her versions that are actually random sentences and ideas collected and cobbled together from various places across her works. In addition to manufacturing such outright falsehoods, Plaintiff posits numerous "examples" that fail to show actionable similarity - even if they existed in the way that Plaintiff alleges - because they consist of nothing more than ideas, memes, tropes, scenes a faire, or story elements that flow naturally from her decision to set the book in Alaska and in the Young Adult paranormal romance genre.

Below, Defendants provide just a few examples of Plaintiff's misdirection, but suffice it to say that her bad faith in misrepresenting the respective works is found throughout the vast majority of her motion. To get a flavor for Plaintiff's strategy, one need only take the first few lines of her very first summary of similarities on the first page of her brief: "Both tell essentially the same story in the first-person voice of an approximately seventeen-year-old girl from San Diego who arrives in Anchorage, Alaska after an accident kills her family members. Her last words with her family were in a fight and she feels guilty. The accident was in a type of car that crashed and fell a long distance." <u>But the actual works tell very different stories</u>.

When Plaintiff's book opens, Anna has already been living in Anchorage, Alaska for many years and is being driven to her normal high school by her very much alive mother. Her father's supposed death (he later turns out to be alive) is a backstory from nine years earlier and we learn, hundreds of pages later, that he was believed to have died in an elevator accident.

On the other hand, *Crave* opens with Grace taking a bush plane to the remote town of Healy, Alaska. Both of her parents died only a month earlier in a car crash, following heated words with Grace, and Grace has left San Diego to live with her only known surviving relatives, an uncle and cousin living in rural Alaska. When she lands, Grace takes a snowmobile with her cousin to a magical (she later learns), castle-like boarding school in the mountainous wilderness near Denali.

Other than both heroines having brooding teenage thoughts (albeit very different ones) and both books being set in Alaska (albeit many hundreds of miles apart), even a cursory review of the books' opening chapters reveals that the authors' respective creative expressions could not be more different. The plots, characters, and all other significant elements of the respective works only diverge further as the stories move forward.

Plaintiff's approach to the law follows a similar, deliberately obfuscatory strategy. As Defendants predicted in their opening brief (ECF No. 527 at p. 72-73), and despite this Court's request that Plaintiff finally identify a cognizable theory of the case, Plaintiff instead cobbles together various copyright principles and substantial similarity tests to concoct a Frankenstein version of copyright law. She cites multiple tests of infringement and settles on none, ultimately choosing what she likes best from each and applying a *sui generis* approach that exists nowhere in case law, and is entirely erroneous.

In essence, as described in more detail below, Plaintiff argues that the "selection, coordination and arrangement" principle that courts in this Circuit apply to compilations of fact or other unprotectible material, means that she can combine unrelated and disparate concepts, tropes, snippets of dialogue and descriptions from across her various manuscripts and notes into an otherwise non-existent creative work and use it as the basis for comparison with Defendants' novels. This is nonsense. And even if Plaintiff could show that any of her works constitutes an original compilation of unprotectible elements, she cannot show that such thinly protected copyrighted material has been copied verbatim (or at all) in the *Crave* books, which on their face consist of an entirely different selection, order and arrangement of elements.

Rather than wade through the morass of Plaintiff's hodgepodge of half-baked copyright theories, the Court need look no further than the seminal case of *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996), which applied a straightforward approach to similar facts, and provides a guide for this Court's substantial similarity analysis. In *Williams*, given that both works contained both protectible and unprotectible elements, the court performed a detailed analysis of the two works, comparing elements such as concept and feel, theme, setting, sequence, pace, plot, and characters. As the Second Circuit noted in that case, "Plaintiff, although having sifted the works to produce a

list of similarities, often not essential to the stories, has at the same time ignored major characters and events in *Jurassic Park* that do not comport with his theory of the case. Consequently, even assuming the accuracy of the various similarities in details as represented by Plaintiff, a finding of substantial similarity cannot be supported." The same holds true here.

Plaintiff has very deliberately created a Herculean task for Defendants to refute her litany of supposed similarities, no doubt hoping that the very act of doing so will somehow demonstrate that "where there is smoke, there is fire." But there is another "smoke" aphorism that better applies here: smoke and mirrors. There is no fire, because the works themselves considered in their entirety are just not similar under any test. While Defendants are, therefore, cognizant of the dilemma here in trying to address the dozens of supposed similarities that Plaintiff claims (and equally aware that the entire effort is a diversion from the central inquiry in the substantial similarity analysis), we attempt to do so at both a high level and in some detail, to finally and fully put a stake in the heart of this case.

## II. ARGUMENT

### A. Plaintiff is Deliberately Attempting to Deceive the Court.

#### 1. Plaintiff Recycles her Similarity "Index"

Included as part of Plaintiff's prior motion for summary judgment was a declaration from Lynne Freeman that stated: "Since one paragraph cannot capture all the similarities between my work and the Crave series, **I have created a Summary and Supporting Index** with some of the most telling similarities in the stores. **That index is attached hereto as Exhibit 32**." (Dkt. 276-34, ¶ 14) (emphasis added).

Despite repeated admonitions from this Court and while knowing that the Court has now personally read all of the works at issue in this case, Plaintiff nevertheless continues to rely on her

Exhibit 32 (hereinafter, "Plaintiff's Index"), incorporating it nearly verbatim into her motion's introduction, footnotes, and "support," to create a false sense of similarity between the works. But as the Court has reiterated, Plaintiff's indices are not evidence.

For example, *compare*

> **Plaintiff's motion, p. 1**: Both tell essentially the same story in the first-person voice of an approximately seventeen-year-old girl from San Diego who arrives in Anchorage, Alaska after an accident kills her family members…The accident was in a type of car that crashed and fell a long distance….She now lives with the only two family members she believes she has left who are both supernatural witches which she doesn't know because she has been kept ignorant of the magical world.

*with*

> **Plaintiff's Index** (under "Overall Summary," p. 8): BMR and the Crave series are Young Adult Paranormal Romance and Fantasy stories about a teen girl, approximately seventeen years old, who comes to live in Alaska from San Diego after an accident kills her family members…It was an accident in which the car they were in fell a long distance and they crashed to their deaths (elevator car / automobile car)…She now lives in Alaska with the only two family members she believes she has left in the world, and they are both supernatural witches, though she doesn't know this at first.

Even if treated as "argument," Plaintiff's Index – and its regurgitation in her motion – is completely unreliable because it merely provides a litany of manipulated statements designed to make it seem like there are similarities between these stories, when in fact there are none.

Below, Defendants provide a chart showing some of these falsified comparisons in order to demonstrate, in summary form, the *extent* of Plaintiff's efforts to mislead the Court based on her Index. For each, we first set forth Plaintiff's misleading description in bold, followed by a description of what actually appears in the works, along with the pages in the works from which the misleading description has been assembled.

| |
|---|
| **"The narrative in both works begins with the displacement of the teenage protagonist (Anna in BMR, Grace in Crave) from a specific sunny, familiar environment (San Diego, California) to a remote, harsh environment (Alaska) following a tragic accident that killed** |

| | | | |
|---|---|---|---|
| **one or both parents."** Similarity #1 (citing BMR 2010, p. 9, BMR 2011, p. 11 and Crave, p. 5) / Plaintiff's Index, Supporting Summary Index No. 9. | | | |
| The books begin with Tarot-induced visions, then the protagonist riding in the car with her mother, on her way to the public high school in Anchorage that she has attended for going on three years. The protagonist's **<u>mother is alive in every version</u>** and the protagonist's "displacement" from California (San Diego is mentioned only in BMR 2011) to Anchorage happened after her father and grandparents died **<u>nine years earlier</u>** when she was seven. | BMR 2010, p. 5, 8; BMR 2011, p. 6; Masqued, 2013, p. 11 | Grace is about to board a tiny plane headed to Alaska and from there into the unknown, just a month after **<u>both her parents were tragically killed</u>**. She flies into the small town of Healy, Alaska on the bush plane, has a rough landing, meets her cousin Macy, and the two of them climb onto a snowmobile to travel to their remote, Gothic-style boarding school. It is November, the ground is snow covered, and it is eight degrees.[1] | Crave, ch. 0 and 1 |
| **"The protagonist's parents were killed in a specific type of vehicular accident that involved both a crash and a fall from a significant height or distance."** Similarity #2 / Plaintiff's Index No. 7. | | | |
| Father and grandparents died in an supposedly died in an **<u>elevator accident</u>** years earlier ("What I do remember is that we were in New York staying at a hotel with my grandparents for my mom's art show […] When it was time to go to the opening, two elevator doors opened at the same time […] My dad and my grandparents took one car and I agreed to let my mom ride with me—she'd come back to get dressed so we could all go together to see her show. Anyway, when Mom and I reached the lobby, they weren't there. We waited but never saw them again.")<br><br>In other versions, the protagonist's father supposedly died in a **<u>plane crash</u>** (Masqued 2014, p. 71) or was mysteriously **<u>murdered</u>** (Masqued 2016, p. 77). In both BMR and Masqued, it is later revealed that the father is actually alive. | BMR 2010, p. 100 | Both parents died in a **<u>car crash</u>** a month earlier ("I wish that my dad hadn't lost control of the car two hours later and driven himself and my mother off a cliff, plunging hundreds of feet into the ocean.") | Crave, p. 45 |

[1] An initial reference to arrival in Anchorage was a copyediting error, which was caught and corrected for subsequent printings.

| | | | |
|---|---|---|---|
| **"The heroine arrives from San Diego to Alaska to live with what she believes are the only two relatives she has left in the world (mother, aunt / uncle, cousin) and they are both supernatural witches, unbeknownst to her, and they conceal their true nature, the existence of the supernatural world and her own place in it as a unique supernatural creature from her."** Similarity #3 / Plaintiff's Index No. 9. | | | |
| The protagonist in BMR doesn't "arrive" in Alaska, she has already been living there for *nine years* when the story begins ("…I'd been Annalise de Winter until I was seven. And all of a sudden, literally days after the accident, we moved here…") Moreover, Anna is well aware that her mother and aunt are witches, as is she. | BMR 2011, p. 124 | The story begins with Grace boarding a bush plane on her way to the remote wilderness of Alaska, where she's never been before. She is going to live with her uncle and cousin whom she has not seen since she was a little girl, and she is convinced that they (and everyone around her) are ordinary humans. | *Crave*, p. 1 |
| **Reference to a fight scene involving 80's rocker-style bad guys, after which the romantic lead departs and the heroine is left "wondering."** Similarity # 11 / Plaintiff's Index No. 245-264. | | | |
| In BMR, the protagonist notices "two men standing near a van watching us…[one] reminded me of Billy Idol."<br><br>In Masqued, the protagonist is trying to leave the bathroom of a Stop-N-Go when a raven blocks her path and calls "Beware." After "blue lightening" [*sic*] arcs from her fingertips, a "thin, wiry man with spikey, white-blond hair claps his hands, slowly applauding me. Sporting a black leather jacket with a dog collar and an earring, he's out of place. He looks like a retro throw back to the eighties. In fact, he looks a lot like Billy Idol."<br><br>Protagonist is left "wondering," not after a fight scene, but elsewhere in the manuscript, after getting dropped off at home by the male lead, who leaves on his motorcycle. | BMR 2011, pp. 63, 518-519; Masqued, pp. 57-58; Masqued 2014, chapaters 7-8 | Grace is wandering the halls of her school after hours, wanting to stick her head out of the front entrance to see if the northern lights are visible (Crave, p. 52). The doors fly open, and "in walk two guys wearing nothing but old-school concert T-shirts, jeans, and lace-up boots. No jackets, no sweaters, no hoodies, even. Just ripped jeans, Motley Crue, and Timberlands. It's the most ridiculous thing I've ever seen, and for a second, I can't help wondering if this castle—like Hogwarts—comes equipped with its very own ghosts. Ones who died at an eighties rock concert." | *Crave*, p. 52 |
| **"Heroine's father/grandfather tells her his name is Athair/Alistair."** Dkt. 526, p. 88 / Index No. 210. | | | |
| The protagonist's father's name is Dante, but he tells her to call him | BMR 1010, pp. | Grace's many-times removed great-grandfather is named Alistair. | Crave, p. 34 |

<table>
<tr><td>“Athair Mo Chroid” which is Gaelic for “father of my heart.”</td><td>208, 223; BMR 2013, pp. 82, 435</td><td></td><td></td></tr>
<tr><td colspan="4">“During the first school day scene, the male friend character greets the heroine and jokes with her. In his supernatural form he has wings.” The heroine’s male best friend is “revealed to be a supernatural creature with wings that the heroine finds beautiful in his supernatural form.” Similarity # 10 / Plaintiff’s Index, p. 11.</td></tr>
<tr><td>Throughout all the versions of BMR and Masqued, Brendan is described exactly <u>twice</u> in his supernatural form, and wings are not mentioned in either of them.[2]</td><td></td><td>Grace is new to the boarding school and does not yet have a male friend. She eventually makes friends with a group of paranormal creatures, including male friends Flint (a dragon), Mekhi (a vampire), Luca (a vampire), and Remy (warlock)</td><td></td></tr>
<tr><td colspan="4">“Heroine kidnapped by vampire prince / mate.” Similarity # 48 / Plaintiff’s Index, Nos. 367 and 370.</td></tr>
<tr><td>The protagonist is captured by the guy who reminds her of Billy Idol, from the so-called “80s Rocker” scene. He is not the “vampire prince.”</td><td>BMR 2010, pp. 417-420</td><td>Grace is kidnapped by Lia, who is not the vampire prince or the prince’s mate (“I already told you—<u>she wasn’t my mate</u>”)</td><td>Crush, p. 423</td></tr>
<tr><td colspan="4">“The hero puts arm around the heroine like a blanket.” Similarity # 45 / Plaintiff’s Index No. 325</td></tr>
<tr><td><u>Blanket is a metaphor</u> for sense of peace while Anna is dancing with Ash: “[he] took me by the hand and led me to the middle of the dance floor. I tried to look like I belonged there with him, cool and confident, but I was just so nervous I felt stiff and awkward. His hand was warm and dry, not cold and clammy like mine. He put an arm around my waist and looped my hand around the back of his neck […] Oh no. I was in trouble. I’d never danced this way—at least not with a boy—and I was definitely too nervous to even remotely try and follow his lead. Why couldn’t he</td><td>BMR 2011, pp. 161-162</td><td><u>Blanket is an actual blanket</u>: “Much as I love that dress, you need a hoodie,” he answers, pulling out a heavy fur-lined one from The North Face… in black, of course, He slides my arms into the sleeves, zips it up Pulls the hood over my head over my head. Then <u>he grabs the red blanket off the end of his bed</u> and says, “Come on.” He reaches a hand out to me and I take it–how could I not? Right now, there isn’t anywhere I wouldn’t follow this boy. And that’s before he pulls back the curtains that cover his window, and I get my first look at what’s waiting for us…<br><br>“You’ve only mentioned them like three different times,” he answers, sliding the window open and climbing</td><td>Crave, pp. 437-438</td></tr>
</table>

[2] Indeed, he is referred to by one character as a “faery” who has no wings.

| | | | |
|---|---|---|---|
| just do the hug sort of dance that everyone else was doing? […] I glanced around and caught Taylor and Amanda standing on the sidelines watching. Rage contorted Taylor's pretty face. Disbelief registered on Amanda's. Straightening my spine, I cowboyed up. They would never see me as weak again. I looked into Ash's eyes as the music washed over us. Just when I thought I couldn't possibly do this with everyone staring, it happened. **A sense of peace settled over me like a warm blanket** and I moved in time with the music and with Ash. | | onto the parapets before holding his hand out to me. I follow him outside, my eyes glued to the sky spread in front of us. It's lit up like one giant rainbow, the background an incredible intense purple while swirls of periwinkle and green and red dance across it. "The northern lights," I breathe, so caught up in the incomparable beauty of them that I barely feel the cold…or Jaxon draping his super-warm blanket around me. "So do they live up to your expectations?" he asks, **wrapping his arms around me from behind so that I'm snuggled up in the blanket and his arms**. | |

The above are not the only examples of the reckless use of Freeman's own self-serving Plaintiff's Index; they are just the tip of the iceberg, and Plaintiff's use of her Index as the basis for her motion continues throughout the entire brief. It would take hundreds of pages to break them all down and analyze them to show the myriad ways in which they are intended to mislead the Court. Below, by means of illustration, Defendants address just one of the most egregious ways in which Plaintiff attempts to deceive.

### 2. Plaintiff Stitches Together Imaginary "Scenes" from Across Her Various Manuscripts

In her brief, Plaintiff points to a number of scenes and elements from the *Crave* series and claims that they duplicate scenes depicted in her own work. However, the scenes that Plaintiff claims support her argument do not exist in the way that Plaintiff presents them in her motion. In many instances, she cobbles together scenes from different places within her manuscript into a single scene that does not appear in the way she describes, or she chooses only element from one

version of a scene from one of her manuscripts, even if that scene is different or missing in her other manuscripts. The following are only a few highlights of Plaintiff's scene-stitching efforts:

- **Similarity 11 - "80s Rocker" fight scene**": Plaintiff's description of a fight scene in *BMR/Masqued* draws on different and contradictory fight scenes *in six different manuscripts*. The 2010, 2011 and 2012 versions of the scene take place in a Mexican restaurant and involve hypnotism and a kidnapping, not a fight. Ash is not present. In *Masqued* 2013, Anna comes to the attention of two men at a convenience store when electricity shoots from her fingertips. Ash is not present at first and the two men get scared off before he returns. In *Masqued* 2014, two men at a convenience store attack Anna (now called Mia) and Ash (now called Roman) comes to her defense and rescues here. It is the *only* version in which he saves her. Finally, in *Masqued* 2016, the scene is similar to 2014, but Ash does not save Anna (now called Ella).

- **Similarity 31 - "Heroine's aunt/mother/uncle want her to leave Alaska" and Similarity 33 - "Heroine tells her family she does not want to leave Alaska"**: This story element appears only in *BMR* 2014 and is not part of any other manuscript, and shows Plaintiff attempting to pick and choose elements from different drafts in an effort to prove plot similarity, when most drafts do not even contain the element that she contends is similar. In any event, this is a common theme (Edward convincing Bella to leave Forks in *Twilight*, Dumbledore hiding Harry in *Harry Potter*, or Percy Jackson's mother hiding him from Olympus in *The Lightning Thief*).

- **Similarity 47 - Heroine is disoriented, lightheaded.** In addition to replicating Similarity 15 ("The Spiked Drink Incident"), in Similarity 47, Plaintiff claims that "the heroine finds herself challenged to move steadily as a result of Taylor / Lia's drink that made her ill." But her alleged proof pulls from two sources in her works that are completely unrelated. In *Crave*, Grace is drinking tea that turns out to have been poisoned by someone pretending to be her friend. To support her allegation of a similar scene in her work, Plaintiff points to her 2011 version where Anna feels "dizzy" after a demon attack, and to her 2013 version where Ash tells Anna's parents that Taylor gave Anna spiked punch at a party. To be clear, Plaintiff takes separate scenes from two different manuscripts, one involving *an attack from a demon* and another involving *recalling* drinking alcoholic punch - two different scenes in two different versions - and condenses them together as one reason for the heroine's inability to "move steadily as a result of Taylor/Lia's drink that made her ill."

Plaintiff's scene stitching and version shopping efforts are precisely the sorts of problems courts have sought to prevent when they refuse to base substantial similarity analysis on an amalgamation of elements from a copyright owner's different works (*see* Section D below). Infringement exists, if at all, if the defendant's actual work is substantially similar to plaintiff's actual work. Here, Plaintiff resorts to simply astounding contortions to bring bits and pieces from

multiple versions of her manuscript – sometimes across hundreds of different, non-sequential pages – to try to make it appear that scenes are the same, when they are not.

For example, in Plaintiff's motion, footnotes 207 through 241 purportedly support "Similarity 49: The Start of the Kidnapping Scene," "Similarity 50: The Heroine fights back, ""Similarity 51: Romantic Lead to the Rescue (and to be rescued)," and "Similarity 52: Villain Murdered the Parents," which Plaintiff compares to the plot in Chapters 57 - 62 (pp. 454-497) of *Crave*. However, these references pull elements from her manuscripts from 2010, 2011, 2012, 2013, 2014 and 2016. Even with respect to just BMR 2011, the citations do not follow a sequential order in that manuscript at all, but jump around to other pages of the manuscript, as shown below:

- **FN 206** — 2011 p. 545
- **FN 206** — 2011 p. 549 4 pages forward from p. 545
- **FN 211** — 2011 p. 543 6 pages back from p. 549
- **FN 216** — 2011 p. 472 71 pages back from p. 543
- **FN 217** — 2011 p. 472 same
- **FN 217** — 2011 p. 430 42 pages back from p. 472
- **FN 220** — 2011 p. 552 122 pages forward from p. 430
- **FN 221** — 2011 p. 551 1 page back from p. 552
- **FN 222** — 2011 p. 551 1 page back from p. 552
- **FN 229** — 2011 p. 552 same
- **FN 230** — 2011 p. 532 20 pages back from p. 552
- **FN 231** — 2011 p. 559 27 pages forward from p. 532
- **FN 233** — 2011 p. 599 40 pages forward from p. 559
- **FN 234** — 2011 p. 559 40 pages back from p. 599
- **FN 236** — 2011 p. 560 1 page forward from p. 559
- **FN 237** — 2011 p. 552 8 pages back from p. 560
- **FN 241** — 2011 p. 540 12 pages back from p. 552

Plaintiff's last reference from the 2011 "climax scene" (footnote 241) occurs 5 pages **<u>before</u>** the first reference (footnote 206), but in-between jumps back and forth between pages 430 to 599, a gap of 169 pages, despite Plaintiff's claim that this sequence is substantially similar to Crave's final climax scene. Perhaps the easiest way to illustrate this type of scene-jumping is with a chart that plots out the claimed sources from "Similarity 50 (The Heroine Fights Back)" and

"Similarity 51 (Romantic Lead to the Rescue (and to be Rescued))." In the chart below, the central orange arrow shows the sequential progression of plot points or elements in *Crave*, as set forth in Plaintiff's papers. The pink line shows the versions of Plaintiff's manuscript, and the range of pages within those manuscripts that Plaintiff uses to cobble together an imagined scene or sequence that she says is similar to Crave:




As the foregoing illustrates, the cited *Crave* pages are in 29 sequential pages, while the cites from various *BMR/Masqued* versions leap around over 500 pages in the course of multiple drafts created over seven years. This is not substantial similarity; it is manipulation.

Perhaps one of the best examples of the depths to which Plaintiff is willing to stoop to present a deceptive "similarity" can be found in her "Similarity No. 55: Questioning whether love is enough." Here, Plaintiff states that the "heroine / romantic lead say sometimes things don't work out," and she provides the following sources in footnote 247 (*BMR* [*sic*] 2014, p. 388, "Following your heart doesn't always lead to a happy ending"; *Crave* p. 508, "But sometimes love isn't enough").

Putting aside the fact that each scene is written completely differently in scope and tone (positively in *BMR*, negatively in *Crave*), or that "star-crossed lovers" is a common trope, the interesting thing about this supposed similarity is that Plaintiff actually plagiarized the relevant language from the TV show "Roswell":

> The tough thing about following your heart is what people forget to mention, that sometimes your heart takes you to places you shouldn't be, places that are as scary as they are exciting and as dangerous as they are alluring, and sometimes your heart takes you to places that can never lead to a happy ending. And that's not even the difficult part. The difficult part is when you follow your heart, you leave normal, you go into the unknown. And once you do, you can never go back.[3]

**<u>This passage shows up verbatim in *BMR 2013* at page 468.</u>**

Plaintiff then proceeds to paraphrase the *Roswell* quote, and works it into *BMR 2014* at page 388:

> Following your heart doesn't always lead to a happy ending. I know this. And sometimes when you follow your heart, you go places from which you can never return. But if you don't follow your heart when everything inside you is begging you to take that risk—no matter the consequences—you'll live a life full of regret.

As the above example shows, Plaintiff has the gall to accuse Defendants of copying what she herself lifted directly from "Roswell." As the Court is aware, not only is there not one single instance of this type of plagiarism in any book in the *Crave* series, but when the actual scenes are compared, everything about them is different.

This isn't the only example where, upon closer examination, there is a great deal of similarity between Plaintiff's claimed "Similarities" list and other literary works, including the pioneering YA paranormal romance novel *Twilight*, as a few simple examples illustrate:

> **Similarity 1: The Inciting Incident – Displacement to Alaska.** In *Twilight*: the 17-year-old heroine leaves sunny Phoenix for Forks, Washington, the dwelling place of a group of vampires, who have recently relocated from Alaska.

---

[3] *Roswell*, Season 1, Episode 4 (Oct 27, 1999) (line spoken by character Liz Roswell) (*see* https://www.imdb.com/title/tt0690275/quotes/).

**Similarity 5: The "Meet Cute" – Intense and Dangerous.** "The heroine then meets the male romantic lead (Ash in *BMR*, Jaxon in *Crave*) for the first time at the end of chapter two in both works, and is immediately struck by his unearthly, intense, and explicitly "dangerous" presence. *Twilight*: Bella first encounters the Romantic Lead in a regular high school at the end of Chapter 1. Not just handsome, he is "devastatingly, inhumanly beautiful" (Chapter 1, p.19)

**Similarity 6: The Warning – "Stay Away." "**During their encounters on the first meet day, the romantic lead reaches out and touches the heroine's hair. He then warns her that it's not safe, that she needs to be careful." *Twilight*: "It would be more . . . *prudent* for you not to be my friend," he explained. "But I'm tired of trying to stay away from you, Bella." (Chapter 4)

**Similarity 9: Heroine compares Alaska with the moon**. *Twilight*: Forks is "too green- an alien planet." (Page 8)

**Similarity 19: In-class discussion of shyness and introductions. "**The heroine is shy and the teacher talks about standing up and introducing herself in class." *Twilight*: "My trigonometry teacher, Mr. Varner, who I would have hated anyway just because of the subject he taught, was the only one who made me stand in front of the class and introduce myself. I stammered, blushed, and tripped over my own boots on the way to my seat." (Chapter 1)

**Similarity 29: Romantic lead saved heroine with his healing bite/venom.** *Twilight*: Heroine might die after being attacked and bitten by a vampire. Romantic Lead heals Bella by sucking out the venom from the previous bite. (Chapter 23)

**Similarity 48: The heroine is kidnapped by the vampire prince/vampire prince's mate** *Twilight*: Bella is kidnapped by a dangerous vampire called the Tracker. (Chapter 22)

**Similarity 60: The Romantic Lead Casting / Fading.** Romantic lead moves so quickly it's called fading / it's called casting. *Twilight*: Edward gets across parking lot in the blink of an eye to save Bella. "His hands moved so fast they blurred." (Chapter 3)

Although this type of analysis could go on for hundreds of pages, suffice it to say that the footnotes in Plaintiff's motion are all taken from Plaintiff's own self-serving Index, which is not only unreliable, but false, misleading, conflated, condensed, and sometimes outright fraudulent, but also often relies on tropes found in earlier YA paranormal romance or material that Plaintiff herself apparently plagiarized. This is exactly why the "works themselves" have to be read and

compared in their entireties, rather than dissected into disparate words, brief phrases, and other alleged similarities that fall apart on examination.

**B. Plaintiff Does Not Present Any Coherent Theory of Infringement.**

In a recent Memo to Counsel, Your Honor admonished, "I need to understand… what the argument is going to be on the issue of 'substantial similarity.'" (Dkt. 512, at 4.) The Court elaborated:

> I was surprised to read in the recent submission that the plaintiff appeared to be relying on a "selection and arrangement" theory of liability… I am not familiar with "selection and arrangement" as applied to original works of literature, as opposed to compendia of information like telephone books and catalogs. But I am prepared to try to understand why that theory would or could apply to novels…. If, on the other hand, the plaintiff is contending that there are specific aspects of her work that are both protectable and infringed (such that there could be a finding of substantial similarity on that basis, rather than on, or in addition to, a "selection and arrangement" basis), then <u>I need to know exactly what her argument is</u>. Is it that the "total concept and feel" of the Crave novels - which, as we know, are far more extensive and detailed than *BMR/Masqued* - apes the "total concept and feel" of the much shorter and less detailed Freeman works? Is it that the plot of the Crave novels was copied from plaintiff's plot? Is it that there are protectable (*i.e.*, non-tropic or scene-a-faire) themes or plot elements that Crave copies from Freeman's work- and if so, exactly what are those non-tropic or scene-a-faire elements? Is it some combination of the above?

*Id.* at 3-4 (emphasis added).

Plaintiff's motion for summary judgment answers <u>none</u> of the questions posed by the Court and presents no coherent argument on the issue of substantial similarity. Instead, Plaintiff misstates and conflates a grab bag of potential theories of copyright liability and ultimately adopts none of them. The Court is thus left to guess at Plaintiff's theory of substantial similarity, which she apparently has not yet decided upon. In light of this abject failure to advance a particular theory, the Court should apply the test in *Williams v. Crichton*, as discussed below.

Instead, Plaintiff's theory of liability presents a deliberately moving target, as Plaintiff picks and chooses from different approaches when it suits her, regardless of their cumulative analytical coherence. She name-drops a litany of tests, including the "discerning ordinary observer

test," which she calls the "lens" for proper review; the "comprehensive non-literal similarity" test, which she calls the proper "framework" for review; the "fragmented literal similarity" test, which she also says is a proper "framework" for review; the "selection and arrangement" test, which she says is not a theory of liability at all but a fundamental principle of copyright law; the "total concept and feel" analysis, which she wrongly says precludes filtering out unprotectible elements; the definition of "derivative works;" and, the concept of independent character protection. The one test she entirely eschews is the filtering described in *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) and *Lego A/S v. Zuru Inc.*, 2025 WL 915027, at *3 (2d Cir. Mar. 26, 2025), presumably because she believes this process can only hurt her, if the Court does not consider unprotectible aspects of both works in its substantial similarity analysis.

But just as she cannot cherry-pick tropes and mismatched lines from across all of her works and call them a "unique narrative," she cannot cherry-pick from copyright tests that the courts in this Circuit have developed over decades to address particular situations and specific types of works to apply them here. To put it as simply as possible:

- The basic test for substantial similarity is the ordinary observer test.

- When a work contains both protectible and unprotectible elements, it requires a more careful analysis, sometimes called the "more discerning" ordinary observer test. ***That circumstance is present in this case.***

- For works of literature, courts examine first whether there is verbatim copying or whether there is close paraphrasing in the respective works. ***That is not the case here.***

- In cases where there is some verbatim copying, but not throughout the infringing work, courts look at whether there is sufficient "fragmented" literal copying throughout the work to nevertheless constitute infringement. ***That is not the case here.***

- In cases where there is no verbatim copying, courts look to whether the fundamental essence or structure of the work has been duplicated. ***That is not the case here.***

- In cases involving factual compilations, courts ask whether there has been duplication of a unique selection, coordination and arrangement of those facts, in which case the compilation may receive "thin" copyright protection. ***That is not the case here.***

- Where a plaintiff claims that a particular character or characters are worthy of *independent* copyright protection, courts will look to whether the character is sufficiently delineated to warrant such protection, even beyond the confines of a particular work. ***That is not the case here.***

- For all works, the courts include a "total concept and feel" analysis as part of the "more discerning ordinary observer" test, to ensure that the works are compared in their entirety. ***The Court should apply this holistic analysis here, but must compare only expression against expression (not unprotectable tropes and scenes a faire, etc.).***

Once all of Plaintiff's extraneous rhetoric about non-applicable tests is stripped away, this case is relatively simple. The Court should apply the more discerning ordinary observer test, and in that context, look at the works' respective total concept and feel and decide substantial similarity on that basis.

### 1. Plaintiff Misstates the Tests for Comprehensive Non-Literal Similarity and Fragmented Literal Similarity, and Ultimately Applies Neither.

Plaintiff presents two potential "frameworks" for substantial similarity – comprehensive non-literal similarity and fragmented literal similarity – which she contends apply "outside of copy-and-paste plagiarism cases" to facts like those presented here, "where there is not word-for-word… similarity." (Dkt. 526, p. 7, quoting *Arica Inst. v. Palmer*, 970 F.2d 1067, 1073 (2d Cir. 1992).) However, neither doctrine applies to this case.

#### a. Comprehensive Non-Literal Similarity.

Plaintiff describes the test for comprehensive non-literal similarity as an inquiry into similarities between elements of Plaintiff's and Defendants' works, such as "plot, theme, dialogue, mood, setting, pace, and sequence." (Dkt. 526, p. 7.) While the comparison Plaintiff describes is *close* to what the Second Circuit has identified as the proper test for analyzing substantial similarity in literary fiction copyright cases (*see Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 665 (S.D.N.Y.

2011) ("court examines the similarities between… literary works in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and setting of the works"); *accord Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996); *see Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (analysis is principally guided by "the total concept and overall feel of the works")), it is not an accurate statement of the test for comprehensive non-literal similarity. The "comprehensive nonliteral similarity" test examines whether "the fundamental essence or structure of one work is duplicated in another." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03 [A] [1], at 13–29, § 13.03[A][2], at 13–45 (1997)).

Applying this standard, the Second Circuit has rejected comprehensive nonliteral similarity arguments when a plaintiff has presented only "isolated quotations" from its work and the defendant's work, *see Castle Rock* at 141, as Freeman attempts to do here, and it has affirmed a finding of substantial similarity under this standard only where defendant's book provided a detailed recounting of eight episodes of a television program, including every element of intricate plot twists and character development in the same sequence as the original teleplays. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1372-73 (2d Cir. 1993). Those are plainly not the facts before this Court, and Plaintiff makes no serious effort to argue that they are.

**b. Fragmented Literal Similarity.**

Plaintiff also misstates the test for fragmented literal similarity ("FLS"), which requires "direct copying or close paraphrasing" of a qualitatively important or crucial element of the Plaintiff's work. *See Castle Rock*, 150 F.3d at 140 (rejecting FLS because undue focus on isolated quotations from plaintiff's and defendant's works could improperly distract the court from the

proper consideration of whether substantial similarity exists between the two works considered as a whole); *see also, Guity v. Santos*, 2020 WL 4340417, at *1 (S.D.N.Y., Jul. 28, 2020) (rejecting FLS where the common elements in the two works were "trivial" and "insubstantial"). As discussed below, by conceding the absence of direct copying (*see* Dkt. 526, p. 7) Plaintiff essentially concedes that FLS has no application in this case and she must therefore attempt to prove substantial similarity under a different theory. That is likely why she gives the argument such short shrift in her motion – just two pages at the end of her 100-page "brief" – which serves only to demonstrate that there are no such close similarities between the works.

**2. Plaintiff Does Not Seriously Argue Selection and Arrangement.**

Plaintiff also gives little space to her half-formed argument that the *Crave* novels are substantially similar to her "selection and arrangement" of unprotectible elements (such as ideas, genre tropes, scenes a faire, words and short phrases) in *BMR/Masqued* – and with good reason. "Selection and arrangement" protection does not apply to original works of literature and Plaintiff cites no case suggesting otherwise. As this Court has observed, protection for "selection and arrangement" is typically reserved for factual compilations like telephone books or catalogs that organize unprotectible information in an original way. *See*, *e.g.*, *Key Pubs., Inc. v. Chinatown Today Pubs. Ents., Inc.*, 945 F.2d 509, 512-513 (2d Cir. 1991) (telephone directory); *Eckes v. Card Prices Update*, 736 F.2d 859, 862-63 (2d Cir. 1984) (baseball card price guide); *accord, Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991) (telephone directory)

Fantasy novels are about as far from the paradigm of factual compilations as one can get. Moreover, prior efforts to apply selection and arrangement to creative works have generally been confined to music copyright cases, and even there they have failed. *See Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1079-81 (2d Cir. 2024); *accord, Skidmore v. Led Zeppelin*, 952

F.3d 1051, 1075-76 (9th Cir. 2020) ("many works of art can be recast as compilations of individually unprotected constituent parts ... deem[ing] substantially similar two vastly dissimilar… novels… for sharing some of the same… words").

In order to prove copyright infringement, Plaintiff has to establish substantial similarity between *Crave* and protected elements of *BMR/Masqued*, (including her own original application of genre tropes), in the context of the story told in her manuscript. Selection and arrangement cannot serve as a substitute for proving substantial similarity between the Plaintiff's and Defendants' works when each is considered as a whole.

Finally, the Second Circuit has cautioned that protection for selection and arrangement is "thin" because the scope of the copyright "is limited to the particular selection or arrangement," and a "subsequent [author] remains free to use [the public domain elements] to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 136 (2d Cir. 2003) (quoting *Feist*, 499 U.S. at 349-51). Substantial similarity therefore requires "a near exact copy" of the plaintiff's selection and arrangement, which Plaintiff concedes by omission that she cannot prove here, given her use of differing character descriptions, names, backstories, motivations, plot elements, settings, and other details that do not even remotely track of *Crave*.

**3. The Court Must Factor Out Unprotectible Content.**

Remarkably, Plaintiff argues that the Court should assess substantial similarity without filtering out unprotectible content. (Dkt. 526, pp. 4-5.) The argument is entirely wrong and should be rejected for the obvious reason that it gives Plaintiff the opportunity to prevail based upon alleged copying of unprotected content.

The more discerning ordinary observer test is meant to empower the Court to determine whether alleged similarities relate only to the defendant's use of unprotectible elements like ideas, tropes, and scenes a faire, which cannot support infringement. Applying the test, the Court considers whether the defendant's works are substantially similar to the protectible elements of the plaintiff's works. <u>That is the only type of similarity that is actionable</u>. *See Williams,* 84 F.3d at 587-88; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986). As a first step in the analysis, the Court must filter out unprotectible elements of plaintiff's works, so that the substantial similarity comparison focuses only on protected content. *See Lewinson v. Henry Holt and Co.*, LLC, 659 F. Supp. 2d 547, 565 (S.D.N.Y. 2009).

The Second Circuit's most recent opinion on the application of this test is instructive. In *Lego,* 2025 WL 915027 at *3, the Court held:

> Yet where a work contains both protectable and unprotectable elements, we apply the "more discerning observer" test. . . . This test, which is "intended to emphasize that substantial similarity must exist between the defendant's allegedly infringing design and the *protectible* elements in the plaintiff's design," . . . requires "substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed [work]" . . . . Thus, the court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the protectible elements, standing alone, are substantially similar. . . ."

(citations omitted)

The Second Circuit goes on to explain that the analysis of "total concept and feel" is just *part* of the more discerning observer test, and still limits the comparison to protectable elements:

> The more discerning observer test factors out unprotectible elements, but still requires a total-concept-and-feel analysis in comparing the protectible elements of the parties' works. . . . . We must, therefore, 'be more discerning, and ignore those aspects of a work that are unprotectable' as we apply the test, lest we conflate mere copying with wrongful copying. . . . After all, the term 'substantial similarity' is 'properly reserved for similarity that exists between the protected elements of a work and another work.'

*Id.*

Plaintiff simply ignores the Second Circuit's most recent governing decisions and insists that the Court can factor *in*, not factor *out*, unprotectible elements.

Plaintiff distorts the case law to argue that filtering is not appropriate, when it is actually critical. Plaintiff quotes *Williams* (as it is cited in other cases) for the proposition that a comparison of Defendants' works to only the protected elements of her works would result in a "scattershot approach" that "fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." 84 F.3d at 590. But the language Plaintiff quotes from *Williams* does not question the need for filtering. Rather, *Williams* confirms that filtering remains necessary to assure that a defendant is not liable if the plaintiff cannot prove that defendant's allegedly infringing work is substantially similar to protected elements of her works, and that the similarity does not simply flow from defendant's use of unprotected ideas, tropes or scenes a faire that also appear in the plaintiff's work. *See also Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310-11 (S.D.N.Y. 1999) (comparing total concept and feel of two works and concluding no substantial similarity where similarities resulted from common use of unprotectible elements).

### C. *Crave* is not a Derivative Work of *BMR/Masqued*.

Plaintiff next argues that the *Crave* series infringes *BMR/Masqued* because Defendants' novels are derivative works that they adapted and transformed from her manuscripts. But Plaintiff cannot subvert the derivative works doctrine in this way to avoid her obligation to prove substantial similarity.

The Copyright Act defines a "derivative work" as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. "A work is not

derivative, however, simply because it is 'based upon' the preexisting works." *Warner Bros. Ent., Inc. v. RDR Books*, 575 F. Supp. 2d 513, 538-39 (S.D.N.Y. 2008). The statutory language seeks to protect works that are "recast, transformed, or adapted" into another medium, mode, language, or revised version, while still representing the "original work of authorship." *See Castle Rock,* 150 F.3d at 143 n. 9 ("derivative works that are subject to the author's copyright transform an original work into a new mode of presentation"). "Without incorporation of a substantial amount of protectible material from a copyrighted work, a subsequent work cannot be considered a derivative work." *See* 4 Patry on Copyright § 12:12 (*citing Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 720 F.2d 231, 242 (2d Cir. 1983)).

Defendant's authorship of an original novel cannot be characterized as a transformation or adaptation of *BMR/Masqued*. Nor is it conduct that the statute lists as potentially constituting the creation of a derivative work (*e.g.*, translation, adaptation, abridgement, condensation, etc.). 17 U.S.C. § 101; *see Twin Peaks*, 996 F.2d at 1373 (finding a guidebook to a television series because it contained so much detail about the series that the Court found it was an abridgement). In any event, in order to prove copyright infringement, Plaintiff will have to show that Defendants' novels are substantially similar to her manuscripts. Her argument that the sequels in the *Crave* series infringe *BMR/Masqued* because they are derivative works of the first novel begs the critical question of whether she can show that *Crave* is substantially similar to any one of her works. She has not—and cannot—and the derivative works doctrine will therefore not help her prove her case.

**D. Plaintiffs' Versions Should Not be Aggregated.**

Essentially conceding that the *Crave* novels do not infringe any one of her copyrights in the twenty-two *BMR/Masqued* manuscripts, notes, or other documents she identifies as the basis for her infringement claims, Plaintiff persists in arguing that the Court can nevertheless find

substantial similarity by combining elements from different drafts into an amalgamated "work" that never existed, and using that new, imaginary work as the basis for comparison. Courts in this circuit have consistently rejected similar efforts to base copyright claims on an amalgamation of elements of different works - and this case underscores why such an attempt is improper.

**1. Case Law is Clear that Aggregation is Not Appropriate.**

As this Court has held, when analyzing substantial similarity, "a court must not 'aggregate' a plaintiff's work, but must consider each allegedly infringed work independently." *Dean v. Cameron*, 53 F. Supp. 3d 641, 647 (S.D.N.Y. Sept. 17, 2014). As Judge Rakoff observed, nothing in the Copyright Act or Second Circuit case law "supports the view that a plaintiff's entire oeuvre, or even an aggregated portion of it, may be used as the point of comparison" for substantial similarity. *Kroencke v. Gen. Motors Corp.*, 270 F.Supp.2d 441, 444 (S.D.N.Y. July 10, 2003), *aff'd*, 99 Fed. Appx. 339 (2d Cir. 2004). In *Kroencke*, the Court rejected Plaintiff's effort to "seek[] aggregation [of elements of different works]… as a means of proving qualitative similarity," which is exactly what Plaintiff seeks to do here. *Id.* at 443-44; *see also, Nelson v. Grisham*, 942 F. Supp. 649, 651 (D.D.C. Sept. 26, 1996), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997) (applying Second Circuit law, using only final published version of plaintiff's book for comparison although "Plaintiff allege[d] that Grisham copied from earlier drafts, as opposed to the final published version").

The authorities Plaintiff cites in her Motion at page nine provide no support for using an amalgamation of elements of different works as the basis for a substantial similarity comparison on a copyright infringement claim. In *Twin Peaks,* 996 F.2d 1366, the Second Circuit affirmed a finding that a guide to a television series infringed separate copyrights in the first eight episodes. The Court noted the guide's elaborate recounting of plot twists and character development in each of the eight episodes and nowhere gave any indication that it based its finding of substantial

similarity on a combination of elements from different episodes. *Id.* at 1370-73 ("Chapter 3 of the Book is essentially a detailed recounting of the first eight episodes of the series").

Both *DiTocco v. Riordan*, 815 F. Supp. 2d 655 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012) and *Kaye v. Cartoon Network, Inc.*, 297 F. Supp. 3d 362 (S.D.N.Y. 2017) involved claims that the Defendant had infringed the copyrights in the final published versions of several different works in a series of books (*DiTocco*) or comics (*Kaye*). Neither case involved a claim of infringement of multiple drafts of the same book – like the one Plaintiff presents here. Moreover, even as they rejected both plaintiffs' claims of substantial similarity based, in part, on an assessment of elements that were common to their copyrighted works, the courts in those cases gave no indication that they based their comparisons on a combination of elements from different books or comics into an amalgamated "work" that does not actually exist, as Plaintiff suggests this Court should do. On the contrary, the Courts based their analysis on a comparison to the actual final copyrighted versions of the plaintiffs' books and comics.

The distinction between what happened in *DiTocco* and *Kaye* and what Plaintiff seeks here is critical. Those Courts compared allegedly infringing works with the final published versions of books or comics in a series. There was no risk of manipulation or a moving target. The Courts could be certain about what the protected elements of each book or comic were because they were fixed in final versions. And even then, the Courts did not combine disparate elements of the books or comics into an amalgamated "work." They relied only on the actual published works.

Here, by contrast, Plaintiff asks the Court to base its substantial similarity review on "all the *Crave* manuscripts in the aggregate." (Dkt. 526, p. 8.) No case supports that approach. And the situation is made worse because, unlike cases that addressed infringement of the copyrights in the final published versions of multiple scripts, books, or comics, this case involves multiple drafts

of the same unpublished story - and the opportunities for mischief abound. Plot elements are present in one draft, but not another. Or they develop one way in an earlier draft, and a different way in a later draft. Characters are present in some drafts, but not others. Or they have different characteristics in different drafts. If Plaintiff is allowed to pick and choose elements from different drafts to combine into an imaginary amalgamated draft, for purposes of a substantial similarity analysis, she will literally be able to manipulate the contents of that so-called "work" in an attempt to fabricate infringement, when Defendants' novels are not substantially similar to any one particular draft. Substantial similarity analysis requires a clear basis for comparison. Not the moving target that Plaintiff proposes.

**2. Plaintiff's Own Brief Demonstrates Why Aggregation is Untenable.**

Plaintiff's manuscripts do not present a unified story with details that are the same across versions. Defendants have characterized this case as a "moving target" because Plaintiff attempts to pick and choose an element from one version and a different element from another, then cobble them together in a non-existent whole in order to compare that new version to *Crave*. The reason why this method is not supported by Second Circuit decisions can be easily illustrated by some of the differences within Plaintiff's own manuscripts:

- ***How does Plaintiff's work begin?*** With a vision in her mom's car (2010, p. 2); same thing in 2011 (p. 2); while performing a tarot reading, not in a car (2012, p. 3); with an appendix of tarot cards, not in a car (2013, p. 2); with a dictionary definition of tarot, not in a car (2014, p. 2); with a dictionary definition of tarot, not in a car (2016, p. 2).

- ***What is the protagonist's name?*** Anna or Annaliese (2010, p. 6; 2011, p. 8; 2012, p. 14; 2013, p. 18); Mia (2014, p. 7); Ella (2016, p. 7) (You are my namesake, Mariana. BMR 2014 p.346); Ella (2016, p. 7); "Well done, Gabriella Mayfair" (BMR 2016 p. 98) *(note: Lives of the Mayfair Witches is a trilogy by Anne Rice, beginning in 1990)*.

- ***What is Anna's identity?*** A "thrice born daughter" of mixed heritage from light and shadow (2010, p. 188); mixed heritage demon with a mark on her neck (2011, p. 190); a Nyx and "Kindred" (2012, p. 94); similar in 2013; a Nyx and the chosen one of the Dark Moon Goddess (2014, p. 348); "Keeper of the Amulet" (2016, p. 107).

- ***What does the protagonist look like?*** Hair dark and glossy, skin a sun-starved olive, hair and the distinctive gray color of her eyes are from her father (2010, p. 51); similar in 2011, reference to being 5'9" (2010, p. 12; 2011, p. 67); dark hair, sun-starved olive skin, dark smoky eyes, and rich, blood red lips (2012, p. 118); her dad's eyes were gray "like mine" (2013, p. 231), but the character Julian later refers to her by saying, "They're blue. Like mine" (2013, p. 417) (*showing inconsistency within the same version*); my hair is brown and my eyes are more gray than green (2014, p. 9), but also a reference to "They are silver. Like mine before initiation" (2014, p. 334); hair is now brown (2016, p. 10).

- ***Does protagonist have a twin sister?*** No, in 2010-2014; yes in 2016 (**"**She stitched a patch over the hole in my heart after Emma's death. My twin. My mirror. My other self" (2016, p. 22).

- ***How does protagonist think her father died?*** In an elevator accident (2010, p. 100); same in 2011, p. 127; same in 2012; in a plane crash, where her aunt and mom pretended the protagonist had died as well ("My father died in a small plane crash nine years ago, allegedly due to a fuel tank explosion. My aunt said it wasn't difficult to claim that I'd been with him when he'd piloted his Cessna from Santa Barbara that day," 2014, p. 71; murdered but not clear how ("Your dad and Emmaline's deaths weren't an accident. They were murdered," 2016, p. 77) (*protagonist's dad is not actually dead*).

- ***Where does the "80s rocker" fight scene occur?*** Fight scene in parking lot of "La Mex" restaurant flows into kidnapping scene near the end of the book (2010, p. 412); same in 2011; same in 2012; early in the book at the Stop 'n Go while Roman gets sandwiches (2014, p. 46); at the beach after kneeling in the silt next to dead whales (2016, p. 53, 56).

- ***Who attacks the protagonist in the "80s rocker" fight scene?*** Two adult men, dressed in jeans and shirts, no coats, no gloves, one reminded her of Billy Idol and she describes the other as "Willy" (2010, p. 417); same in 2011 (p. 519); same in 2012 (p. 437); same in 2013, now described as Billy Idol and The Incredible Hulk (p. 393); similar in 2014, now Punk Rock and The Incredible Hulk, with the former now in a "black leather jacket with a dog collar and an earring, he's out of place. He looks like a punk rocker throwback in a bad eighties movie" (p. 48); heavily revised from 2014 version, but some similarities remain (2016, p. 56) (*note: on p. 44 of Defendants' motion for summary judgment, Defendants stated "[t]here is no comparable scene in the 2016 version," which was intended to mean that this scene is very different from 2010-2013)*.

- ***What type of entity is her love interest?*** "Wolf shifter" and "Sentinel" (2010, p. 182); additionally a "berserker" in 2011 (p. 422); additionally a "Watcher" (2012, p. 336-337); additionally a "Shadow Hunter" (2013, p. 324); still a wolf shifter, sentinel, and berserker, but Shadow Hunter changed to "Darkhunter" (2014, p. 171); unknown, but apparently a member of "The Order" (2016, p. 85).

- ***Does love interest have a dead sibling?*** In one version, yes: "My brother, Dylan, was killed. He was nineteen…He was in the wrong place at the wrong time" (2011, p. 127); in other versions, no: by 2013, the dead brother has disappeared and is no longer a plot element (*despite what is set forth in the plaintiff's motion*).

- ***Is there really a love triangle?*** Ronan calls Anna his cousin (2010, p. 481); same in 2011; cousins "of a sort" (2012, p. 520); similar to 2012, with extra scene where he says "Of course there will be a next time. This is just the beginning (2013, p. 466); Aeden (no longer "Ronan") is no longer her cousin, claims that she chose him for a reason (2014, p. 364); Ronan/Aeden does not appear to be a plot thread (2016).

- ***What is the character Julian?*** Not fully developed, but possibly a vampire who wants to marry Anna and was in love with Anna's aunt, or possibly Anna is his child (2010, pgs. 425, 440, 467); a Sanguine and/or vampire (2011, p. 541); again undeveloped, but possibly an incubus who apparently still wants to marry Anna although she may be his child (2012, pgs. 445, 505); Anna/Mia's father (2013, p. 401; 2014, p. 334); possible love interest for Taylor (2014, p. 26); not present in 2016.

- ***Is Taylor a best friend, mean girl, or none of the above?*** Childhood best friend since second grade (2010, p. 11); same in 2011; not a friend at all, and surprised Taylor is addressing her "when we've never exchanged more than three words" (2012, p. 19); same in 2013; Amanda changes to "Samantha," who is sitting with Taylor (2014, p. 16); same in 2016;

- ***What are minor characters' eye colors?*** Grandmother/High Priestess "shimmering blue eyes"(2011, p. 387) and same in 2010, 2012, 2013, 2014; "jewel-green" (2016, p. 98); Imprisoned father/grandfather (putting aside that this character shifts from biological father to adopted father throughout the drafts) has "glittering silver" eyes (2010, p. 205), "gray-eyed" (2010, p. 470); "golden gaze is level with my own" (2014, p. 179, *father in wolf form*), "dark gray of winter" (2014, p. 354, *father in wolf form*). Similarly, Aeden (formerly Ronan) has gray eyes as a wolf, but in human form has eyes that are "gray, dark blue and green" (2014, p. 362) (*covering all bases*).

As the foregoing examples illustrate (and there are many more), the details of Plaintiff's manuscripts are all over the board, presenting different fact scenarios, names, backgrounds, events, characteristics, motivations, and even the existence of the character himself or herself.

If Plaintiff were allowed to construct a copyright claim from bits and pieces of her various manuscripts and notes, she would effectively be able to select what works best for her. If one fact pattern is not similar to a challenged element of *Crave*, she can simply claim that another permutation of the story in a different draft works better. This is exactly what Plaintiff is trying to

do, from claiming that eye color is a similarity (despite the changes in her own versions), to claiming that attack scenes are the same (despite evolving and changing places, functions, and settings within the various manuscript versions), to claiming that the villain is a vampire, despite being different entities who may be the protagonist's father or uncle, and who may or may not want to marry her, in other manuscripts.

It is precisely because of the differences in fundamental aspects of Plaintiff's own manuscripts from version to version that Second Circuit courts reject aggregation of elements as a means to prove qualitative similarity, which is what Plaintiff seeks to do here.

### E. The Proper Approach to Substantial Similarity as Shown by *Williams v Crichton.*

In *Williams v. Crichton*, 860 F. Supp. 158, Judge McKenna with this Court reviewed a complaint alleging copyright infringement against the author, Michael Crichton, the publisher, and the movie studio, along with just about everyone else associated with "Jurassic Park," claiming that the novel and movie infringed upon plaintiff's series of four books about "Dinosaur World," a place where visitors can "tour and observe dinosaurs and other pre-historic animals in a presumably safe, man-made, controlled environment." *Id.* at 160.

The Court summarized each of plaintiff's works, as well as Jurassic Park, noting that while the works centered on "a type of dinosaur zoo," both the movie and novel "contain substantially more sophisticated plot and character development than Plaintiff's works. For instance, in *Jurassic Park,* the creation of the park involves issues of genetic engineering and financial intrigue that nowhere appear in Plaintiff's works." *Id.* at 164. The Court then examined total concept and feel, theme, setting, time sequence, pace, characters, and sequence of events.

With respect to setting, the Court stated as follows:

> Similarity in the basic setting of a work of fiction is not by itself actionable, *Burroughs v. Metro-Goldwyn-Mayer, Inc.,* 683 F.2d 610, 626 (2d Cir.1982); although it may be a factor

> in a determination of substantial similarity, setting alone can not constitute infringement. *See also Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D.N.Y.1978) (setting and theme, "the skeleton of a creative work rather than the flesh, are not protected by the copyright laws").
>
> Nonetheless, Plaintiff points to several similarities in the setting of the respective works. Indeed, the settings of the works are such that a reasonable jury could find them substantially similar. These similarities, however, all flow from the concededly uncopyrightable concept of a dinosaur zoo. Pl. Br. at 7. As such, the corresponding scenic elements are *scenes a faire* that "follow naturally from the work's theme rather than the author's creativity." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 715 (2d Cir.1992) (quoting 3 M. & D. Nimmer, Nimmer on Copyright § 13.03[F][3], at 13-65), and are likewise unprotectible.

The Court found that "Plaintiff's comparison of these highly selective, scattered details, however, is not enough to warrant a finding of substantial similarity between the works" (citing *Walker,* 784 F.2d at 50; *Burroughs,* 683 F.2d at 624 ("the few purported similarities either are so general as to be meaningless, or are not similarities at all"); *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S. Ct. 1753, 84 L. Ed. 2d 817 (1985) (such lists of similarities are "inherently subjective and unreliable," particularly where "the list emphasizes random similarities scattered throughout the works")). *Id.* at 170.

In a passage that is even more relevant to the present case, the *Williams* court stated as follows:

> Nonetheless, in his attempt to assert substantial similarity, Plaintiff represents only the respective dinosaurs' size and how they use their tails in locomotion. Pl.Br. at 36-37. *See, e.g., Bevan,* 329 F. Supp. at 605 (rejecting "[q]uantitatively impressive" list of "apparent similarities" that "break down under the closer, detailed examination which the copyright law requires" because a comparison focusing "on the dramatic mood, the details and interplay of the characters, and the dynamic of events indicates such substantial dissimilarity" as to bar verdict for plaintiff).
>
> Moreover, because Plaintiff effectively mixes and matches from six works, the opportunities for identifying similar details is greatly enhanced. Even considering the works together, the Court believes that such a comparison should focus on identifying important congruences only; to weight similar nonessential details discovered in such an exercise would seem as a general matter to allow a plaintiff to cast too wide a net.

*Id.*

The foregoing principles are directly applicable to the present case. Plaintiff, in her desperation to get this matter before a jury, who she hopes to confuse with her hundreds of pages of indices, has repurposed her indices into hundreds of footnotes and citations that attempt to show substantial similarity, but in fact are gross mischaracterizations; outright misrepresentations; tropes; scenes a faire; events that flow naturally from the theme; and, mixed and matched descriptions from different works that give Plaintiff the opportunity to enhance the supposed similarities.

Despite the Court's inquiry as to what specific theory of infringement Plaintiff alleges, Plaintiff still refuses to answer that question, instead giving a grab bag of possibilities, when the case does not fit within any of them. Instead, it appears Plaintiff's operating theory is simply volume: present as many misleading apparent similarities as possible in hopes that the Court will throw its collective hands up. Because Your Honor has read the works, however, Plaintiff's attempt to mislead and misconstrue should fall on deaf ears. Nonetheless, Defendants must point out where Plaintiff has disingenuously made certain points, where Plaintiff attempts to outright mislead the Court, and where Plaintiff tries to conflate what is not substantially similar by talking about things that, from the 30,000 foot level, might "seem" to be similar, but which do not compare the actual expression of the works at all.

For each category of alleged similarity, Defendants provide some examples of the items that are gross mischaracterizations, disingenuous statements, and outright misrepresentations by Plaintiff.

### F. Plaintiff Fails to Demonstrate Substantial Similarity in Plot.

Plaintiff's convoluted effort to stitch together similarities between the vastly different plots of *BMR/Masqued* and *Crave* from scattered scenes, story fragments, phrases, and even individual words cherry-picked from her manuscripts and Defendants' novels has been repeatedly rebuffed by this Court. (*See* Dkt. 362 (Opinion & Order (Aug. 1, 2024) (Magistrate Judge Netburn striking Plaintiff's indexes of similarities from earlier summary judgment briefing because "such lists are 'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'' *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984))."); Dkt. No. 398 (Nov. 21, 2024) (Judge Stanton indicating that the Magistrate Judge's recommendation that Plaintiff's similarity indexes be excluded *in toto* would "probably be adopted at trial"); Dkt. No. 486 (Nov. 4, 2025) (Your Honor questioning whether Plaintiff's "summaries of underlying evidence" are admissible for any purpose at trial).) Yet it is Plaintiff's only stratagem, and she shamelessly trots it out again in this motion. It has not improved with age.

In sixty-five pages that, as noted, closely track the similarity indexes that she previously (and unsuccessfully) attempted to submit, Plaintiff attempts to distract the Court from a comparison of each manuscript and novel as a whole with lists of purported similarities that frequently blend elements from different drafts of *BMR/Masqued*, often claiming similarities between elements of one draft that do not appear in other drafts. Faced with comparable efforts by plaintiffs in other cases to argue substantial similarity based on strategically constructed lists of selected similarities, courts have routinely dismissed claims or granted summary judgment for defendants. *See*, *e.g.*, *Hord v. Jackson*, 281 F. Supp. 3d 417, 425 n.6 (S.D.N.Y. 2017) ("District Courts are directed to ignore lists provided by Plaintiffs of purported similarities between two

works"); *Nobile v. Watts*, 289 F. Supp. 3d 527, 533 (S.D.N.Y. 2017) (courts "must… resist a 'scattershot approach' of comparing lists of 'random similarities scattered throughout the works'"); *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642, 663 (S.D.N.Y. 2011) ("random similarities scattered throughout the works… cannot by themselves support a finding of substantial similarity"); *Hogan*, 48 F. Supp. 2d at 310-14; *accord Amanze v. Adayemi*, 824 Fed. App'x 86, 87 (2d Cir. 2020) (summary order) ("after careful review of each of [plaintiff's] examples, we find that they fail to show protectable similarities and instead demonstrate abstract *scenes a faire* or dissimilarities between the novels"); *Piuggi v. Good for You Productions LLC*, 739 F. Supp. 3d 143, 166 (S.D.N.Y. 2024). As the Second Circuit has held, "[s]uch a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590; *see Walker,* 784 F.2d at 50; *Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610, 624 (2d Cir. 1982).

Plaintiff's effort to construct an infringement claim based on extensive lists of purported plot similarities fails for most of the reasons that caused these courts (and others) to dismiss or grant summary judgment against the copyright claims before them. Specifically:

- Plaintiff's purported similarities frequently rest on mischaracterizations or bald misrepresentations of her manuscripts and/or Defendants' novels;

- Many of the purported "plot" similarities do not relate to plot at all, but focus instead on settings and characters that may have common elements, but differ substantially in the way they are developed in *BMR/Masqued* and *Crave*;

- Plaintiff often points to similarities between *Crave* and aspects of her manuscripts that constitute unprotectible ideas, genre tropes or scenes a faire that cannot support copyright liability;

- Many of the items on Plaintiff's list of similarities are events that flow naturally from the theme of a teen paranormal romance story and thus constitute unprotectible ideas.

- Even scenes that may appear similar in their abstract description prove to be quite dissimilar when examined in any detail; and

- Plaintiff improperly mixes and matches descriptions from different works that give her the opportunity to enhance supposed similarities and to base her arguments on a comparison of *Crave* with a plot she has constructed from elements of multiple manuscripts that is not actually contained in any one of her works.

For all of these reasons, Plaintiff likewise fails to establish substantial similarity between the plots of *BMR/Masqued* and *Crave* and her claims here must come to an end.

**1. Plaintiff's Pre-Litigation Descriptions of the Plot of *BMR/Masqued* Differs Vastly from Her Current Description (and from *Crave*).**

The plots in the respective works are not substantially similar. But the Court need not take Defendants' word for it. Plaintiff has provided this Court with her own chapter analyses and descriptions of her work, which she prepared contemporaneously with writing her various manuscripts, before she brought this unfortunate litigation. Plaintiff's chapter analyses and descriptions show how Plaintiff herself viewed her own manuscripts when she was not trying to engineer the content to resemble the content of the best-selling *Crave* series.

It is striking that nowhere in her original summary judgment papers does Plaintiff provide a chapter-by-chapter summary of her work(s) against a chapter-by-chapter summary of any book in the *Crave* series. The reason is clear: Comparing the respective plots in any straightforward or expected way demonstrates that the respective works are in fact wildly dissimilar. So instead, Plaintiff presents what she calls a "detailed breakdown of the similarities in story and plot points" (Dkt. 427, p. 31), which is actually a series of unordered elements, not limited to actual *plot*, that do not mirror the actual sequence of events in the respective works. Nevertheless, Defendants address these supposed plot similarities in the next section.

It is worth noting, however, that Plaintiff knew how to summarize her plot in the traditional manner when she wanted to do so. Exhibit 9 to Dkt. 397, which Plaintiff sent to the Court on November 5, 2025, is Freeman's chapter-by-chapter summary of *Masqued 2013*. This unbiased, pre-litigation summary is presented at a modest level of detail, and a review of the summaries of each chapter demonstrates just how different they are from her purported plot summaries in support of this motion, as well as how different her manuscripts are from the *Crave* novels.

In the table below, we reproduce in the first column Plaintiff's description of the prologue and first three chapters of *Masqued 2013* verbatim from her summary document. In the second column are summaries of *Crave*'s first four chapters.[4]

| Masqued 2013 | Crave |
|---|---|
| **Prologue**<br>The reader is introduced to Anna who is in the 3rd week of her junior year of high school as Anna casts a circle and performs a Tarot reading. She has a waking vision in which she's hunted in the woods, discovers a strange serpent ring on her fingers and is faced with a choice: jump into the abyss or fight the man at the edge of the cliff. She can't see his face, only that he has glow in the dark amber eyes rimmed in black. He says, "You! It's always been-you." She steps back and falls into the abyss. Anna comes out of her trance and analyzes the spread which is about hidden truths that a person refuses to see. | **Ch 0**<br>Grace stands at the edge of the airport tarmac in Fairbanks, Alaska staring at the "puddle jumper" plane that will take her to a town at the edge of Denali. She thinks about the fact that she is leaving behind everything she knows, and she thinks about the size of the plane. The pilot who was sent by her uncle to pick her up asks if she is ready for an adventure. She is not, and she thinks about how things can change in 30 days, and that things can always get worse. |
| **Ch 1**<br>The reader meets Anna's mother and gets a taste of their conflicted relationship as Marchalene drives Anna to school. Anna can't drive on full moon days, her mother is controlling and overly protective and doesn't like Anna dabbling in the Craft-something that she herself used to do. M feels that she should have seen her husband's death coming in time to stop it. M is clear that she wishes Anna would pursue normal activities for a girl her age. The chapter closes with Anna | **Ch 1**<br>Grace is on the puddle jumper plane, and the pilot points out Healy, Alaska down below, which is smaller than her neighborhood in San Diego. The pilot takes the plane down for a quick, rough landing that frightens Grace. She jumps out of the plane into the 8-degree air, and goes to collect her bags from the baggage hold, thinking about how the bags are all that she has of her old life. The pilot helps her to the parking lot, where she encounters her cousin Macy. They hug and make small talk with the pilot, then Macy leads Grace to a |

[4] The summaries in the second column have been created by Defendants, but Defendants welcome the Court's scrutiny of the accuracy of these summaries.

| | |
|---|---|
| recognizing that her mother loves her but understanding that her mother sees her as a puzzle. The setting of the story is in Alaska in the fall. Winter is a heartbeat away with the leaves falling to the ground and the darkness setting in. | snowmobile, to Grace's horror. They discuss the cold and Alaska. Macy's says that she is sorry Grace had to come to Alaska. The climb on the snowmobile and head towards the boarding school Grace will be attending. Grace is terrified. |
| **Ch 2**<br>Anna comes to the front doors of the high school and sees a beautiful boy and girl on a motorcycle. She's captivated and runs into a door gawking at them. Boy opens the door for her and she sees his eyes-amber rimmed in black-and wonders if they are the same eyes from her vision last night. She notices the way he smells and wonders if she's being paranoid. Still, she questions whether her internal psychic radar might be giving her an important warning about him. In class, they end up seated next to one another and he takes an interest in her. Humor with her sneezing off her glasses. Fingers touching and sparks between them. We meet Taylor and Amanda - learn that Amanda is Anna's best friend who has recently become a "cheerbot," much to Anna's dismay. Brief description of both T and A who don't seem to be very likeable to other girls but are appealing to boys. We learn that Anna is smart and bookish and that Ash is smart too. Aces his quiz. Anna is trying to resist the strange attraction she feels for him. | **Ch 2**<br>Grace completes her long freezing ride on the snowmobile and is astounded to arrive at Katmere Academy, a gothic castle, complete with gargoyles and all. Macy helps her bring in her bags and informs her they are going to be roommates, and though Grace longs for privacy, she agrees. Grace is reeling from altitude sickness so Macy leaves her to go find her father. While she is waiting she starts fiddling with some chess pieces on a paranormal looking chessboard and when she picks up the vampire queen piece, a hot guy tells her "Careful with that one, she's got a nasty bite." He smirks at her and Grace feels like a romance heroine in a book, which embarrasses her. And right then, she decides that He (Jaxon) will never be the hero in her story. |
| **Ch 3**<br>Taylor gives Anna grief about flirting with the new boy because she, Taylor, has already put first dibs on him. Anna tries to maintain the peace for Amanda's sake but shows some spine with Taylor by not putting up with her strong arm tactics.<br>Anna notices Taylor's new ring-the very same snake ring that Anna is wearing in the vision she had last night. Humor in dialogue with girls. Amanda breaks up with Anna. The new boy introduces himself, having overheard the conversation. Ash. They have AGS together (ancient global studies). | **Ch 3**<br>This chapter is entirely dialogue between Jaxon and Grace, along with some physical connection. He tries to convince her to leave Katmere and they face off, trading barbs and finally Grace tries to push him out of the way. He moves, running his hands through his hair and revealing his scar. They have a moment where they both feel each other's pain and finally he tells her that if she's going to stay, she needs to watch her back. |

An extension of the above chart would demonstrate that the plots of the works diverge even further as the respective works proceed.

**2. Many of the "Plot" Similarities Plaintiff Claims Do Not Relate to Plot.**

In order to increase the number of "plot" similarities she alleges and fabricate an illusion that *Crave* closely copies the plot of *BMR/Masqued*, Plaintiff frequently resorts to erroneously categorizing themes, characters and their traits, settings, and even outfits as plot points. While the approach enables Plaintiff to expand the list of similarities in her brief, these miscategorized story elements reveal nothing about plot similarity and Plaintiff's effort to double-count these elements underscores her own uncertainty about the weakness of her argument that the plots of *BMR/Masqued* and *Crave* are substantially similar. By way of example:

> **Similarity 1: The Inciting Incident – Displacement to Alaska:** While *Crave* begins with Grace moving to Alaska, Anna/Mia/Ella's move is not part of any version of *BMR/Masqued.* In every manuscript, she had moved there over nine years earlier and the move is therefore back-story and not plot.
>
> **Similarity 7: The "Bubbly Guide" – Female New Best Friend:** The protagonist's high-energy female confidante is both an unprotectible idea and a common trope or scène à faire in YA romance novels. It is also a character description and not a plot point, and the characters are expressed differently.
>
> **Similarity 9: "Compares Alaska with the moon":** Anna (in *BMR*) and Grace (in *Crave*) invoke the moon in reflections on Alaska in very different ways. Anna uses the moon as a metaphor for her visual surroundings in an expression of wonder. Grace uses the moon to express her feelings of alienation or emotional distance in her new surroundings. Regardless, the moon comparisons that Plaintiff cites are isolated reflections on the protagonist's feelings and not plot points.
>
> **Similarity 14. "The Heroine's Gemstone necklace and gemstones":** The stray references in *BMR* to Anna's necklace, which her Aunt tells her has magical properties, and in *Crave* to Grace's feelings when she sees other girls wearing spectacular jewelry is at most an unprotectible idea – high school girls wearing jewelry – expressed very differently. It is also an isolated description of a trivial detail in the respective works that is not a plot point and does not advance discussion of plot similarity.
>
> **Similarity 44. "Romantic lead smells of citrus and waterfalls (BMR) / oranges and freshwater (Crave)":** Anna describes Ash's aroma in various ways in different versions of *BMR/Masqued*, including as green grass, a woodsy or spicy smell, and citrus and waterfalls. In *Crave*, Grace describes Jaxson as smelling like oranges and dark or deep water. In addition to the obvious differences in the descriptions themselves, it bears emphasis that they are character traits or descriptions and not plot points.

If Plaintiff had more actual plot similarities to cite, she would cite them. It is doubtless not lost on this Court that her repeated efforts to pad the plot similarity list with alleged similarities between non-plot elements actually undermine her argument that the plots are substantially similar.

### 3. Plaintiff Mischaracterizes and Misrepresents Many of the Allegedly Similar Plot Points.

As discussed above, many of Plaintiff's alleged plot similarities misrepresent the actual content of the works at issue to such an extent that they can only be understood as deliberate efforts to deceive the Court on the dispositive issue of whether the works at issue are substantially similar. Regardless of whether they rise to the level of intentional deception, it is clear that many of the allegedly similar plot points that Plaintiff identifies in her motion simply misrepresent what is said in *BMR/Masqued*, in *Crave*, or in both. For example:

> **Similarity 1: The Inciting Incident – Displacement to Alaska:** As noted above, *BMR/Masqued* begins either with a Tarot scene or vision and/or the protagonist snapping her eyes open in her mother's car, over nine years after Anna/Mia/Ella moves to Alaska. By contrast, *Crave* begins with Grace's move to Alaska. The openings of the books are not similar and it misrepresents them to suggest otherwise.
>
> **Similarity 6: "The Warning – Stay Away":** Plaintiff argues that *BMR/Masqued* and *Crave* both involve a warning from the romantic lead to the female protagonist, upon their first meeting, that she should stay away from him because "it's not safe." In the passage Plaintiff cites from *BMR* 2010, Ash wants to be sure Anna does not get in trouble because he gave her a ride on his motorcycle. In the cited passage in *Crave*, after saving her from two werewolves, Jaxon warns Grace that Katmere Academy is not safe like her old school and that she should stay in her room after midnight. The concern in *Crave* (bodily harm or worse) is different and far more serious than the one in *BMR* (parental disapproval).
>
> **Similarity 18: "Romantic lead invites heroine to sit next to him in class":** In the *BMR scene* Plaintiff identifies*,* Anna walks into class and Ash is seated at what she calls "our table." There is no verbal invitation. In the supposedly similar seen in *Crave*, Grace is seated in the cafeteria with Macy and Jaxon approaches from behind and asks if the seat next to her is taken. Here, the so-called "romantic lead" does not invite the heroine to sit next to him and the scene does not take place in class. The scenes are thus very different.
>
> **Similarity 34. "Looking for answers in books":** Plaintiff asserts that both Anna (in *BMR/Masqued*) and Grace (in *Crave*) search for answers about the supernatural world in books. While Grace indeed goes to the library to research the supernatural, that does not

happen in *BMR*. In the passage Plaintiff cites, Anna merely remembers images she saw in books at some point in the past. The allegedly common story element is not present in Plaintiff's works.

#### 4. Plaintiff's Plot Similarities Are Frequently Based on Unprotectible Ideas, Tropes and Scenes a Faire.

To the extent that Plaintiff identifies any actual similarities between the plots of her manuscripts and Defendants' novels, they are typically at such a high level of abstraction that they reflect very different implementations of unprotectible ideas or common tropes or scène à faire of the YA paranormal fantasy genre. Of course, none of those things are protected by copyright and the differences in the way they are implemented in *BMR/Masqued* and *Crave* is fatal to any claim of actionable substantial similarity. The following examples illustrate the point:

> **Similarity 3: "Moving to Alaska to live with her two remaining relatives":** Plaintiff does not own the idea of a teenager or moving to Alaska. Moreover, the idea is implemented very differently in *BMR/Masqued* and *Crave*. Every version of *BMR/Masqued* either opens with Anna either having a vision while in her mother's car or in her bedroom in Anchorage (Alaska's largest city), where she has lived with her mother and aunt for over nine years or being driven to school in a luxury car by her mom. By contrast, *Crave* opens with Grace moving from San Diego to a boarding school in a remote, rural area in the mountains near Denali. The boarding school is run by her uncle and her cousin is a fellow student. Supernatural boarding schools, in particular, are a common trope of YA paranormal fiction, seen in such books as the *Harry Potter* (1997), *Vampire Academy* (2007), and *Hex Hall* (2010). Similarly, a young protagonist who moves from a warm climate to a cold northern (and often remote) environment is another common literary trope, reflected in such books as *Into the Wild* (1996) and *Twilight* (2005).
>
> **Similarity 13. "The Mean Girl Rival & Cliques:** "Mean girls" who torment the female lead are a common trope and scène à faire of YA fiction, including YA romantic fiction. They appear in such well-known YA books as *Gossip Girl* (2002) and *Pretty Little Liars* (2006). "Mean girls" are a significant theme in *BMR/Masqued* because Anna/Mia/Ella's interactions with her former best friends, to whom she refers as "cheerbots," are a central part of all versions of the story. *Crave* does not involve a "mean girl" clique or make much, if any, use of the trope. So mean girls are both an unprotectible genre trope and one that actually distinguishes *BMR/Masqued* from *Crave*.
>
> **Similarity 28. "Heroine learns she is a half witch by blood":** The revelation of hidden powers or a previously unknown magical or paranormal lineage is likewise an unprotectible idea and a common trope of YA paranormal fiction that is implemented very differently in *BMR/Masqued* and *Crave*. In most of Plaintiff's manuscripts, Anna is aware

she has magical powers when the story begins. By contrast, at the beginning of *Crave*, Grace believes she is an ordinary teenager and only later learns she is a gargoyle and later a Queen and that her dad was a witch and gave it up to marry her mom but notably Macy says: "I'm not saying you are a witch. I'm just saying that if your dad hadn't fallen in love with your mom and lost his magic, you probably would be" (Crave p, 328). Other YA books that utilize the trope of young protagonists who discover previously hidden magical powers and heritage include *Harry Potter* (1997) and *The Lightning Thief* (2006).

**Similarity 34: "Looking for answers in books":** The trope or scène à faire of a beautiful heroine who turns to books to make sense of a magical world to which she has recently been introduced is hardly original to *BMR/Masqued.* It appeared famously in *Beauty and the Beast* and more recently in the character of Hermione Granger in the *Harry Potter* series or Bella in *Twilight*. To the extent Plaintiff's manuscripts and Defendants' novels actually incorporate this trope, they do so very differently. In *BMR*, after Ash tells Anna about the supernatural world, her imagination is filled with images she had seen in books of ancient gods and mythological creatures. By contrast, in *Crave*, Grace seeks out additional information, going to the library to find books on paranormal creatures.

**Similarity 62. "The Bloodletter's flight":** Vampires in paranormal fiction are commonly able to change form into winged creatures, often bats, and often escape harm by doing so. The vampire shape-shift and escape scene is thus a common genre trope that Plaintiff therefore cannot claim to own. It appears most famously in Bram Stoker's *Dracula* (1897). Though this moment shifts between versions, the *BMR/Masqued* vampire escape scene involves Roman/Aeden, who has just been released from Avalon and that the Plaintiff claims is a love interest (but who also appears to be Anna's cousin), shapeshifting into a raven and flying away when Ash attacks. In *Crave*, the vampire is Grace's grandmother, who shifts into a bat and flies away after an informational conversation in which she dispenses advice to Jaxon who is concerned about Grace because she has turned to stone. The books thus employ this unprotectible genre trope very differently.

**5. Many of Plaintiff's Purported Plot Similarities are Random, De Minimis Elements in BMR/Masqued and/or Crave.**

On numerous occasions, Plaintiff points to what she perceives as a similarity in an unimportant detail or element of a scene that does not advance the plot of either her manuscript or Defendants' novels. These random references to de minimis story elements cannot support a finding of substantial plot similarity. A few examples follow:

- A single comparison of Alaska to the moon, as a mystical place (in *BMR*) or a remote and emotionally distant place (in *Crave*) **(Similarity 9)**

- A single reference to a necklace that Anna wears in *BMR* 2011 and to jewelry worn by Grace's classmates in *Crave.* **(Similarity 14)**

- Anna/Mia/Ella unknowingly drinking spiked punch at a party in *BMR/Masqued* and Grace being served poisoned tea in *Crave.* **(Similarity 15)**

- The supernatural world reminding Anna/Mia/Ella (in *BMR/Masqued)* of pictures she had seen in books at some unspecified time and Grace (in *Crave*) going to the library to read about supernatural creatures **(Similarity 34)**

- Anna telling Ash she does not think of him as a werewolf and Grace telling Jaxon that he tried so hard to make everyone believe he is a monster that he has begun to believe it himself. **(Similarity 40)**

  A single instance of Anna wearing a Little Red Riding Hood costume for Halloween and Grace choosing between a red and yellow dress for her date with Jaxon. **(Similarity 43)**

In sum, Plaintiff's lengthy list of purported similarities is precisely the sort of "scattershot approach" that the Second Circuit has warned "cannot support a finding of substantial similarity" because it fails to address "whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590. Moreover, even considered on its own merits, the list does not demonstrate actionable substantial similarity for at least the reasons outlined above.

**G. Plaintiff Fails to Prove Actionable Similarity with the Characters.**

Plaintiff appears to argue, for the first time in her motion, that the characters in her various manuscripts are themselves separately "protectable" under copyright law. (Dkt. 526, p. 9) ("The Crave Books Copy Protectable Characters From BMR"). Plaintiff relies primarily on *Warner Bros.*, 720 F.2d at 241–42, but that case involved the character Superman, which the Court noted had already been found in prior cases to be a protectable character. *Id.* at 235 (*citing Detective Comics, Inc. v. Bruns Pub., Inc.*, 111 F.2d 432, 433 (2d Cir. 1940)). Other cases in this Circuit involving independent protection for characters typically involve characters with a visual element, where the character is recognizable across multiple works (*see*, *e.g.*, *Wozniak v. Warner Bros. Ent.*

*Inc.*, 726 F. Supp. 3d 213, 232 (S.D.N.Y. 2024) (Batman)), although courts have found literary characters described only with words protectable on occasion (*see Salinger v. Colting*, 607 F.3d 68, 73 (2d Cir. 2010) (Holden Caulfield in *The Catcher in the Rye*). Here, though, Plaintiff simply does not attempt to make the necessary showing that any of her characters are "sufficiently delineated" to be *independently* protectable. *See Wozniak*, 726 F. Supp. 3d at 232.

Rather, notwithstanding her broad language, Plaintiff's argument as to character protection really appears to just boil down to arguing character similarity as one element of the "total concept and feel" analysis (which, as noted, Plaintiffs mislabels "comprehensive non-literal similarity"). Either way, however, Plaintiff's claims as to characters fail because she cannot show distinguishable, consistent character traits in her own works (and indeed most, if not all, of hers are no more than stock characters to begin with), and in any event Plaintiff cannot show that the characters in the *Crave* series are similar in expression to her own characters.

First, Plaintiff's attempt to aggregate her manuscripts into a single, monolithic and nonexistent novel runs into serious problems in the context of characters. A fictional character is made up of its distinguishing attributes and traits. *See Walker*, 784 F. 2d at 50. Here, those characteristics and traits shift and morph over Plaintiff's various drafts, such as what type of entity Anna/Mia/Ella is and what are her powers, whether Taylor is a best friend or new acquaintance, whether Brendan is supernatural or not and how he appears, and what type of entities Julian and the Ash/Roman character are. The Court cannot make a meaningful comparison of characters in the respective works if Plaintiff cannot point to a consistent set of traits her characters embody across her own versions. At most, Plaintiff's characters selected from a single version of her manuscripts should be used for any comparison.

But it hardly matters. On the face of her motion papers, Plaintiff's own descriptions of her characters reveal that she is primarily claiming protection over ideas and broad character strokes, or that she is confusing character with plot or other literary elements. Taking the latter first, as an example, she describes her heroine (whose very name shifts between manuscripts) by stating that "[t]he inciting incident in both narratives with the heroine on her way to school and thinking about her life in California and comparing it to the cold of Alaska, and the loss of her family, is identical in function and geography." (Dkt. 526, p. 11.) This does not describe character traits, it (mis)describes a backstory plot point as an "inciting incident," and purports to summarize a scene or scenes in the books. Plaintiff goes so far as to say that "[t]he heroines are defined by the sharp transition from San Diego sun to Alaskan ice, triggered by death and a burden of guilt," and that this establishes the "foundational DNA of the protagonist." *Id.* Putting aside that Plaintiff's summary of these aspects of the works is entirely misleading,[5] even if it was accurate, the fact that fictional traumas or a move to Alaska could lead to generalized overlaps between characters is precisely what copyright law does *not* protect: similarities that flow ineluctably from mere ideas.

Just as with Plaintiff's description of plot similarities, her description of the characters in the respective works is wildly inaccurate, as they are deliberately manipulated to create the impression of similarity where none exists. Because the mischaracterizations are so extensive, we start with one example to demonstrate Plaintiff's misleading examples:

> BMR's Aunt Brie and Crave's Uncle Finn, are parallel characters who serve the same structural and emotional function in the story. This character is one of only two relatives the heroine believes she has left in the world. Each is a supernatural witch and it is this character who gives the heroine advice and information about the supernatural world. This character has acted as the heroine's family wished and kept the heroine ignorant about that world, which the heroine is upset about. They discuss the loss of her family, the character

[5] Notably, the death in Plaintiff's work is of Anna's father, nine years earlier (when Anna was seven), and in *Crave* it is the death of both her parents a month earlier; Anna barely expresses any grief in *BMR* about her father, and the "guilt" portrayed is her mother's guilt, whereas in *Crave* Grace's grief and guilt are raw and fresh.

> is protective of her and concerned for her safety, and at one point wants her to leave Alaska to keep her safe out of concern that she will be killed. They also discuss the romantic lead and his allure which the heroine finds embarrassing. This character talks to the heroine about her father's amulet with stones that the heroine now has / rune stones that were her father's and tells her not to ever take it off / to keep it on at all times (implying magical protection), and explains the meaning of the stone. This character kisses her on top of her head as a sign of affection.

Dkt. 526, p. 28.

Putting aside that one character is female and the other is male, characters who (purportedly) serve "parallel" "functions" are not *ipso facto* similar, under copyright law. Again, it is the creative expression of those characters that matters. In *Crave*, Grace's uncle is the headmaster of the magic boarding school. He a gregarious, overly affectionate man who greets her with a bear hug, speaks loudly, and looks and smells like her father. In *BMR*, Anna's aunt Brienne – whom Anna lives with – is first described as "a veterinarian [who] dresses low maintenance, jeans and long-sleeved cotton tees. But there's a sense about her of warm, quiet wisdom and banked power that people and animals alike can't help but respond to." While both Finn and Brienne do serve to deliver exposition about their families, and want to keep the protagonist safe (although Finn is Grace's guardian and Brienne is <u>not</u> the guardian for Anna, who lives with her mother), their interactions with the protagonist, and the scenes in which they appear, differ in every respect from each other.

Plaintiff's attempt to generalize the characters in order to create similarities is unavailing. Indeed, the only <u>detail</u> Plaintiff offers is that, at different points in the respective works, the uncle/aunt kisses the protagonist on the head. But Plaintiff cannot hang an infringement claim on a common, fleeting gesture – and for the record, Finn kisses Grace "absentmindedly" while entering her dorm room, he also kisses his daughter Macy on the head in the same scene, and he tweaks Grace's cheek and squeezes her shoulder (and Macy's) in that scene as well, demonstrating

his oversized affection [*Crave*, pp. 207-08], whereas in *BMR,* Brienne just kisses Anna's head when she is getting up to leave after a tete-a-tete. [*BMR 2013*, p. 128]]

### H. Plaintiff Fails to Prove Actionable Similarity in Theme.

Plaintiff claims that *BMR/Masqued* is feminist because it tracks "female characters who are strong and have agency throughout the works." (Dkt. 526, p. 95.) Plaintiff also claims that in *BMR*, "education is important," and alleges that the work is marked by diversity, humor, inclusion, friendship, compassion, and grace. Each of these is simply an idea that shows up in nearly all YA romance novels (for instance, a great deal of the focus in *Harry Potter* is on education, training, and advanced learning). Diversity, friendship and inclusion show up in *Twilight*. These are not protectible ideas. It is the expression of ideas such as compassion or grace that might be protectible, but even though compassion and grace are not themes in *BMR/Masqued*, to the extent Plaintiff tries to shoehorn them into her comparison, the fact is that they are expressed very differently.

The most telling indication of the theme of Plaintiff's manuscripts, however, again can be found in her own words:

> Her destiny has been foretold. He has sworn to destroy her. Their love is forbidden. Annalise St. Claire has been marked by the hand of destiny. And strange things are happening to her. Ravens stalk her, visions haunt her and she can fight like a trained assassin—even though she's never had any instruction. With her rare ability to wield talents of both Shadows and Light, Anna is special even among the Kindred—powerful, elemental witches descended from the Priestesses of Avalon and Atlantis. In the frozen wilds of Alaska—the one place in the world the Unseen cannot recognize one another—Anna is determined to take control of her powers. Her world is turned upside down when she meets the gorgeous and lethal Ash McKay, whose family is hunting her. Anna can't resist his allure even though she knows she's risking her life and the secret of her family's existence. As she tries to find her way in a world she never knew existed, she encounters hidden dangers and choices she never thought she'd have to make—between the boy she loves and her destiny, between love and duty, Shadows and Light . . . Their love is forbidden. When Anna finds out who and what she really is, will she accept her destiny? Loving Anna goes against everything Ash has been taught to believe. Can he destroy her—or is their love strong enough to cross an ancient divide?

Exh. 6 (LF 089445) (included with Dkt. 397 and sent by Plaintiff to this Court on 11/5/25).

As the foregoing indicates, the protagonist of *BMR/Masqued* is marked by destiny; stalked by ravens; beset with visions; descended from Avalon and Atlantis; hunted by her love interest's family; and, trying to balance love with duty. In sum, the theme of *BMR* is how to use destiny and power when confronted by love and duty.

Now, compare the foregoing with the inside cover flap description of *Crave*:

> My whole world changed when I stepped inside the academy. Nothing is right about this place or the other students in it. Here I am, a mere mortal among gods...or monsters. I still can't decide which of these warring factions I belong to, if I belong at all. I only know the one thing that unites them is their hatred of me. Then there's Jaxon Vega. A vampire with deadly secrets who hasn't felt anything for a hundred years. But there's something about him that calls to me, something broken in him that somehow fits with what's broken in me.
>
> Which could spell death for us all. Because Jaxon walled himself off for a reason. And now someone wants to wake a sleeping monster, and I'm wondering if I was brought here intentionally - as the bait.

Unlike the Plaintiff's own description of *BMR, Crave* does not speak of destiny, ravens, vision, descent from ancient royalty, being hunted by the love interest's family, or balancing love and duty. The theme of *Crave* is how someone who thinks she is a mere mortal leaves her ordinary world for a strange and magical place (surrounded by monsters), whether she can overcome dangers and can fix her broken self and others, and if she was brought there as bait, how she will be transformed.

The same thing is true for the other books in the *Crave* series. The inside cover flap provides a brief summary of what the book is about, setting a theme for the work as a whole, as shown by the excerpts below:

> *Crush*: Everything feels off—especially me. I've returned to Katmere Academy, but I'm haunted by fragments of days I have no recollection of living and struggling to understand who, or what, I really am […] And not only am I fighting for my life, but now everyone

> else's is at stake—unless we can defeat an unspeakable evil. All I know is that saving the people I love is going to requires sacrifice. Maybe more than I'm able to give.

*Crush* involves Grace's quest, her journey to find something, achieve a goal, and survive the tests along the way, all while getting the series' hero out of her head, where he is trapped.

> *Covet:* I may have reached my breaking point. As if trying to graduate from a school for supernaturals isn't stressful enough, my relationship status has gone from complicated to a straight-up dumpster fire […] As if things couldn't get worse, now there's an arrest warrant for Hudson's and my supposed crimes—which apparently means a lifetime prison sentence with a deadly unbreakable curse.

*Covet* continues with the quest story archetype, but involves tragic elements, as several of the characters die in the course of the narrative.

> *Court*: No one survived the last battle unscathed. Flint is angry at the world, Jaxon is turning into something I don't recognize, and Hudson has put up a wall I'm not sure I'll ever break through. Now war is coming, and we're not ready. We're going to need an army to have any hope of winning.

The theme of *Court*, as the foregoing intimates, is the protagonist trying to overcome a great evil or menace, and how she and her friends are changed by the battle.

Clearly, the overall theme of the *Crave* series does not overlap with that of *BMR/Masqued*. Since Exhibit 6 was created by Plaintiff herself before she filed her lawsuit and had an incentive to try and make it seem as though *BMR/Masqued* is substantially similar to *Crave*, that description of her work is a far more trustworthy analysis of the theme of her manuscripts, which is simply nowhere near the same as the *Crave* series.

## I. Plaintiff Fails to Prove Actionable Similarity in Pace and Sequence.

Plaintiff claims that the structure and pace of both works are similar, and in support discusses what is basically the classic three-act structure that comes from ancient Greece: beginning, midpoint, climax. Plaintiff states that moving from a slow buildup to a faster pace and climax makes the works similar, ignoring the fact that such a feature is common to literally every

novel in every genre and has been around for thousands of years. She also ignores that the fact that *Crave's* pace and sequencing actually unfolds much more quickly and ends with a cliffhanger, followed by – in a quite unique fashion – a bonus chapter from another character's perspective.

Every iteration of *BMR/Masqued* comprises around 400 to 560 pages, and the storyline takes place over approximately four months. While the first *Crave* book is about 550 pages long, and *Court, Covet*, and *Crush* are each over 680 pages, most of *Crave* occurs in a single week, and combined, all four books unfold over eight months. The sheer length of the *Crave* series mandates a completely different pace. There is vastly more detail, explanation, and world-building in the *Crave* series, as indicated by the length alone, and this level of detail requires a different pace.

For instance, by page nine of *Crave*, Grace has flown in on a puddle jumper to the hinterlands of Alaska and finds herself on a terrifying snowmobile ride, in freezing cold, speeding through dusk toward Katmere Academy, where she has never been before, which she reaches by page twelve. On page thirteen, Katmere is described as a huge castle with vaulted arches, flying buttresses, ornate windows, and gargoyles protruding from the top of the castle walls (foreshadowing a plot turn). Grace enters the school and is immediately thrust into anxiety-producing, mysterious encounters.

In contrast, by page five of *BMR*, after having a vision of being alone in the snow and in danger, Anna opens her eyes and finds herself sitting in her mother's car holding a Tarot card. By page six, Anna states that it is the third week of her junior year of high school (obviously, she had been there before), and she refers to dreams and visions she's been having. The next five pages of *BMR* are exposition and dialog between Anna and her mother. On page fourteen, Anna bumps into a glass door to the school, and walks down the hallway to her locker.

The pace of *Crave* in the early pages constitutes "showing." The world is being built and described, emotions are described, and fears expressed. The pace in *BMR* is marked by "telling," such as Anna explaining her relationship with her mother and her aunt, and describing the type of "eccentric and unusual" people that Alaska tends to attract.

With respect to sequence, the court in *Williams*, supra, examined the works with respect to time and event sequence. That is, it questioned whether similar events occurred in a similar way and order. As discussed above in Section II(F)(1), Plaintiff's own chapter-by-chapter analysis of her manuscript entirely debunks the idea that the sequence is the same as in *Crave*, nor in any of the other books in the *Crave* series.

**J. The Settings are Not Substantially Similar.**

Plaintiff's efforts to concoct similarities in the settings of *BMR/Masqued* and the *Crave* series suffer the same defects as her other arguments about substantial similarity – they are based on distortions and misrepresentations of the actual works and attempt to base similarity arguments on abstract and unprotectible ideas that, on closer inspection, are represented very differently. The novels are set in Alaska and both have multiple scenes in a school. The similarities end there. Plaintiff's manuscripts are set in Anchorage - Alaska's largest city – and often in real locations like an actual, non-magical public high school or a Barnes & Noble bookstore. *Crave* is set in a remote mountain range in rural Alaska – so far from civilization that it can only be reached via snowmobile – at a fictional magical school in a Gothic castle filled with overt paranormal activity. Plaintiff's suggestion that these settings are substantially similar is literally akin to arguing that infringement should be found when one book is set in Manhattan's financial district and another is set in upstate New York's Adirondack Park.

Much of *BMR/Masqued* takes place in ordinary Anchorage homes where the main characters live. *Crave*, by contrast, involves stylized Gothic settings like Jaxon's tower suite, Hudson's underground lair, the Ludares field, and Grace and Macy's dorm room, which have no parallels in *BMR*. The *Crave* novels also introduce many other fully developed magical settings far from Alaska that are not found in *BMR* – the Dragon Court in New York, the Vampire Court in London, the Witch Court in Turin, and the Gargoyle Court in Ireland, as well as important destinations like Giant City in the California redwoods, the Aethereum prison in New Orleans, and a magical taffy shop in a Florida mall where the Impossible Trials are held. Other recurring settings in *Crave* that do not appear in *BMR* include the Bloodletter's ice cave, the Unkillable Beast's volcanic island, and the Crone's tropical island.

Setting a paranormal romance in Alaska is hardly an original idea.[6] Nor can Plaintiff claim ownership over setting a YA romance in a school, because schools are expected components of literature involving teen characters – like *Twilight*, *Harry Potter*, or even J.D. Salinger's classic *The Catcher in the Rye*. Those ideas are represented very differently in *BMR/Masqued* and *Crave*. Moreover, any expressions of disaffection for Alaska by the protagonists – which is not a central theme of either book and for which Plaintiff fails to cite any excerpt from *BMR/Masqued* – is both a genre trope for a YA book centering on a high school girl, and a misdescription of an alleged theme in the books, and not their settings.

Faced with these stark differences in the main settings of the books, Plaintiff attempts to shift focus to alleged similarities between minor settings – with no greater success. She tries to liken the Gothic-style Katmere Academy, which is the central location of the *Crave* novels, to a

[6] Alaska is the setting for Nikki Jefford's *Aurora Sky: Vampire Hunter* series (2012), Sherilynn Kenyon's *Dance With the Devil* (2003), and Molly Harper's *Naked Werewolf* series (2011).

large stone home that is likened to an old-world European chateau in *BMR* 2013. Her textual citations reveal that the "chateau" is simply an unprotected idea that is not realized in most manuscripts of *BMR*. Moreover, Plaintiff's "chateau" is a private residence that is used sparingly in the plot, very unlike Katmere Academy, which is the characters' beloved refuge, and a fully realized boarding school with many intricate rooms and features where most of *Crave* takes place.

Plaintiff's suggestion that Katmere Academy is somehow replicated in *BMR/Masqued* because she identified Alaska's "Katmai" national park (which obviously is not a high school) as a location where supernatural beings could find refuge in one set of her notes should be rejected out of hand. Here again, Plaintiff's unprotectible idea never even made it into a manuscript for her book. And Katmai is a real place – not one that Plaintiff invented – and the name (even if it were similar to Katmere) is used very differently in *Crave* (for a boarding school where paranormal creatures are divided into factions that often do battle, which is hardly a refuge for anyone). Moreover, Defendant Wolff has testified that she created the name "Katmere" independently as an homage to *The Lion King* and *Harry Potter* (Timon, the meerkat in *Lion King* and Hogwarts in *Harry Potter*).

Finally, Plaintiff's reference to Grace (in *Crave*) saying that everything appeared so surreal that she felt trapped in a horror movie or a Salvador Dali painting as she approached Katmere for the first time as somehow indicating that the settings of the books are similar because Anna said she felt like she was in Dante's *Inferno* in one of the six *BMR/Masqued* manuscripts is a complete non sequitur. Anna makes her remark in *BMR*, as she and her friends walk into Chilkoot Charlie's (a real Anchorage bar), where she notices men's underwear and women's bras and panties hung everywhere. When a red light flashes, indicating someone has flushed a toilet, Anna makes her comment about Dante's *Inferno*. Plaintiff is truly grasping at straws to suggest that a single, stray

reference to the painter Dali on page 13 of *Crave* is evidence of substantial similarity because *BMR* 2011 contains a single, stray reference to the author Dante at page 491, in a completely different context. Moreover, the protagonists' isolated comments about their feelings have no bearing on whether the settings of *BMR/Masqued* and *Crave* are similar. They are vastly different and Plaintiff's obfuscation and misdirection cannot change that.

**K. Plaintiff Fails to Prove Fragmented Literal Similarity.**

Finally, Plaintiff makes a half-hearted effort to demonstrate fragmented literal similarity, including via a chart of eleven examples that compels the opposite conclusion. In this Circuit, courts apply the FLS test when a plaintiff claims that "defendant copie[d] a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure." *Kassel v. Moynihan*, No. 1:23-CV-06958 (JLR), 2024 WL 2832813 (S.D.N.Y. June 3, 2024) (*citing TufAmerica, Inc. v. Diamond,* 968 F.Supp. 2d 588, 597 (S.D.N.Y. 2013)). In such cases, "the question of substantial similarity is determined by an analysis of whether the copying goes to trivial or substantial elements of the original work' as 'measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole.'"

As a threshold matter, Defendants are aware of no cases that have ever applied the "fragmented literal similarity" test where the allegedly similar passages were scattered across multiple works of the defendant. In Plaintiff's chart, she shows a single "fragment" in *Crave*; seven in *Covet*; and three in *Court*. Only a few are verbatim, the short phrases "silence descends between us," "skitters down my spine," "Let's make a deal" and "Why would I be immune" – all of which are common usages, and constitute trivial similarities at best. The rest of Plaintiff's examples, apparently of what Plaintiff believes are "close paraphrases," are all trivial as well, and

in many instances are not paraphrases at all. While Plaintiff's examples are certainly "fragmented," for the most part they are not literal, and certainly not qualitatively or quantitatively so. As the Court is aware, copyright law does not protect words and short phrases, and the examples Plaintiff lists are not only *de minimis* when put in the context of approximately 2,500 pages that comprise the first four books of the *Crave* series, they do not serve as the crux of either *BMR/Masqued* or *Crave*, thereby indicating they are trivial to the overall analysis.

**L. The Total Concept and Overall Feel is Dissimilar.**

As this Court recently stated: "The Second Circuit has cautioned. . . that courts should not merely 'dissect' the works at issue 'into their separate components, and compare only those elements which are in themselves copyrightable' but that the 'courts' principal task is to compare the works' 'total concept and overall feel . . . as instructed by . . . good eyes and common sense.' *In re OpenAI, Inc. Copyright Infringement Litig.*, 2025 WL 3003339 (S.D.N.Y. Oct. 27, 2025) (*citing Peter F. Gaito, 602 F.3d at 64*; Williams, 84 F.3d 581, 588.)

Here, Plaintiff instead asks the Court to ignore what it sees with its own eyes and jettison common sense. In the scant two paragraphs Plaintiff devotes to total concept and feel, she first states in conclusory fashion that the works share an "'Alaskan Gothic' blend of modern YA voice with dark, oppressive, frozen atmosphere." This is spurious. If "Alaskan Gothic" has any meaning, it means the idea of supernatural elements in an Alaskan setting. A "dark, oppressive, frozen atmosphere" merely describes Alaska in the winter (which, as noted previously, is not even the season during which Plaintiff's novel opens). Similarly, a modern young adult voice describes virtually any recent work in the Young Adult genre. Plaintiff goes on to say that "each

protagonist's internal monologue is characterized by modern sarcasm, self-deprecation, and snark that contrasts with the heaviness of her past loss and future challenges." Again, this could be describing virtually any modern novel. None of these vague descriptions demonstrates a cognizable similarity in "total concept and overall feel" between the works.

As Defendants have noted in prior papers, when evaluating total concept and feel for literary works, courts typically consider: (1) scope, length, and structure; (2) tone, mood, and style, including the use of humor; and (3) the "overall feel" of the works, including whether they "engender very different visceral responses." *See, e.g.*, *Allen*, 79 F. Supp. 2d at 657; *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91-92 (2d Cir. 1976); *DiTocco*, 815 F. Supp. 2d. at 672; *Montgomery*, 408 F. Supp. 3d at 376.

*Crave* is written in a fun, engaging, and casual tone, maintaining a light-hearted, optimistic, and funny aesthetic even when dealing in serious subjects such as heartbreak and death. By contrast, *BMR* is serious and less quirky in tone and mood, with little if any humor. The extensive worldbuilding in the *Crave* series – stretching over multiple books but already fulsome in just the first novel – dwarfs the more limited world of *BMR,* which has a less cohesive and developed vision, with more disparate plot threads and randomly-introduced elements. Whatever larger vision Plaintiff aspired to, she did not realize it on the page the way that Tracy Wolff realizes her very different, extravagant vision.

Thus, while the "total concept and overall feel" analysis is the juncture at which Plaintiff – if she had a viable case for substantial similarity – would bring all of her arguments home, instead they just fall apart. This is because the disparate, unrelated and manipulated elements she attempts to assemble are figments, and do not actually contribute to a shared concept and feel. Instead, she tries to shift focus by bizarrely arguing that the total concept and feel of the works is similar

because both contain scattered pop culture references. Not only does this not even superficially show "total concept and overall feel," more importantly, modern fiction of all types routinely makes pop culture references. Moreover, the references she claims overlap are all obvious targets: fairy tales, *Star Wars*, *The Wizard of Oz*. And again, by pulling such references from across her many manuscripts and across four Crave novels she tries to create the impression of similarity where none exists.

In any event, the directive for courts reviewing the total concept and feel of works really boils down to not missing the forest for the trees. Courts must compare the key elements of the works such as plot and characters, but then must take a look at the works holistically as well. Here, however, there are no trees, and there is no forest. The works are vastly different no matter what lens is applied, as shown by, among other things, Plaintiff's own description of her works in her chapter analyses and overall summary of the work created prior to litigation.

## III. CONCLUSION.

As detailed above, Plaintiff's motion relies entirely on the indices created by Plaintiff herself. Plaintiff's indices are not evidence. Further, they are not only incorrect and unreliable, but they are misleading and wrong.

Even if the footnotes that are based on Plaintiff's indices constituted "evidence" (and they do not), as a comparison of the works reveals, Plaintiff has done nothing more than take a 30,000 foot view of her manuscripts as compared to the *Crave* series in order to create an enormous list of supposed similarities that break down when the actual words on the page are compared.

For instance, Plaintiff blurs real differences with use of slashes to conflate to unequal elements, such as "jeans/party attire," "healing bite/venom," or "aunt/uncle/mother." There are very real differences between an aunt and a mother, and how they are written is paramount. This

is not similarity. Likewise, the use of ellipses to splice disparate fragments of speech that are often many pages apart, or found in different scenes or different manuscripts entirely, is not substantial similarity. It is a Frankenstein monster cobbled together that does not exist in any single version of Plaintiff's unfinished manuscripts and notes.

In addition, misleading statements and manipulation of words and sentences to such a degree that requires an extraordinary amount of time to untangle and decipher is not substantial similarity. A drink spiked with alcohol is not poison. A school dance is not the same as climbing onto the parapets of a Gothic boarding school. Saying that an elevator is the same thing as an automobile is absurd. Saying that a villain is another character's "mate" by omitting the part where the very same character says that she is not his mate is a misrepresentation. And calling something a plot point (such as "boy kisses girl" or "girl is immediately attracted to boy") is not a similarity. It is a trope of just about every romance ever written.

These are not accidental distortions by the Plaintiff. Plaintiff is claiming substantial similarity by virtue of deliberate mischaracterizations, purposeful misstatement, intentional deletions, and known inaccuracies. Plaintiff has willfully done all of this to try to overwhelm with sheer volume, regardless of the absurdity of claiming that both works refer to "yogurt" or "well, well, well," as Plaintiff does in her complaint. All of this was intentionally done to misdirect the Court and the Defendants and to cause both to have to spend an inordinate amount of time to untangle the mess Plaintiff has purposefully created.

When the works are compared, and the Plaintiff's indices are ignored, Defendants respectfully submit that no substantial similarity exists at all.