**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN,<br><br>        Plaintiff,<br><br>  v.<br><br>TRACY DEEBS-ELKENANEY, et al.<br><br>      Defendants. | Case No. 1:22-cv-02435 CM-SN<br><br>**DEFENDANTS' MOTION AND MEMORANDUM OF LAW SEEKING AN AWARD OF PREVAILING PARTY ATTORNEY'S FEES AND COSTS PURSUANT TO FRCP 54 AND 17 USCA 505** |

1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTORY STATEMENT ..................................................................2

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................................4

III.  LEGAL ARGUMENT ..............................................................................6

      A)    The Copyright Act Provides for Prevailing Party Fees to Successful Defendants6

      B)    Plaintiff's Lawsuit Was Frivolous.........................................................7

      C)    Plaintiff's Claims Were Motivated by Bad Faith Which Was Perpetuated by Her Lawyers Throughout the Litigation ....................................................14

      D)    Plaintiff's Legal and Factual Claims Were Objectively Unreasonable...............19

      E)    An Award to Defendants Would Further the Aims of the Copyright Act ...........22

IV.   DEFENDANTS' FEE REQUEST .................................................................23

V.    CONCLUSION.......................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adsani v. Miller*,
No. 94 Civ. 9131, 1996 WL 531858 (S.D.N.Y. 1996) ............................................................19

*Crescent Publ'g Group, Inc. v. Playboy Enterprises, Inc.*,
246 F.3d 142 (2d Cir. 2001) ................................................................................................24

*Fogerty v. Fantasy*,
510 U.S. 517 (1994) .................................................................................................6, 7, 23

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016) ........................................................................................6, 7, 19, 22

*Porto v. Guirgis*,
659 F. Supp.2d 597 (S.D.N.Y. 2009) ..............................................................................19, 20

*Screenlife Establishment v. Tower Video, Inc.*,
868 F. Supp. 47 (S.D.N.Y. 1994) ..................................................................................7, 22, 23

*We Shall Overcome Foundation v. The Richmond Organization, Inc.*,
330 F. Supp. 3d 960 (S.D. N.Y. 2018) ......................................................................................7

*Williams v. Crichton*,
891 F. Supp. 120 (1994) .......................................................................................19, 20, 22, 24

**Federal Statutes**

The Copyright Act, 17 U.S.C. § 505 ......................................................................2, 4, 6, 7, 22, 23

Federal Rule of Civil Procedure 54(d) ......................................................................................2, 25

Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff ("Wolff"), Entangled Publishing LLC ("Entangled"), Emily Sylvan Kim ("Kim"), Prospect Agency, LLC ("Prospect"), Holtzbrinck Publishers, LLC d/b/a Macmillan ("Macmillan"), and Universal City Studios LLC ("Universal") respectfully move for an order declaring them the prevailing party in this case and awarding them attorney's fees and costs pursuant to the Copyright Act, 17 U.S.C. § 505 and Federal Rule of Civil Procedure 54(d). This motion is supported by the Declarations of Tracy Wolff, Emily Kim, Elizabeth Pelletier, Wendy Szymanski, and Amy Nashon submitted herewith.

## I.    INTRODUCTORY STATEMENT

Defendants ask that this Court exercise its discretion to declare them the prevailing parties in this case and to award them their attorney's fees and costs. Over the course of four long years, Defendants fought, at great expense and personal cost, to defend against purely speculative claims of access, completely meritless claims of substantial similarity, junk science dressed up as expert opinions, indices dressed up as evidence, and scorched earth litigation tactics designed to ensure Defendants lost at least by attrition. In addition, Defendants were forced to watch their reputations dragged through the proverbial mud, their integrity questioned online and in the media, their fan base decimated, and their sales plummet – exactly as Plaintiff intended. But Defendants refused to give up, not only for themselves, but for all authors who rely on the principles of copyright law to allow them access to the common well of cultural references, genre conventions, stereotypes, scenes a faire, and ordinary words and phrases from which to create something new. Because Defendants safeguarded the purposes of the Copyright Act while also defending against Plaintiff's objectively unreasonable and frivolous claims and bad faith litigation conduct, an award of fees in the full amount of their litigation costs is more than warranted in this case.

Plaintiff Lynne Freeman ("Freeman") has been a licensed attorney for twenty-seven years, is an avid reader (she estimated she has read more than seventy novels in the young adult, fantasy, and paranormal romance genres), and an aspiring author with a degree in psychology. (Nashon Dcl., Ex. A "Freeman TR" at pp. 17, 20, 23-24). Her two lead attorneys have a combined seven decades of experience. More than anyone else, Freeman and her counsel should have known better than to file a lawsuit based on nothing more than conspiracy theories and alleging intentional copyright infringement by Defendants even though any reasonable reader would easily conclude (as did this Court) that her work and *Crave* are "vastly different." [Dkt. 548, pp. 37, 50, 64, 67, 72, 76, 79, 82] But not only did she bring a lawsuit alleging that Defendants intentionally mined every detail of her unpublished manuscripts and her personal life to write the *Crave* series (and various other books by Wolff that were written before Kim and Freeman had ever met), but she ignored all of the evidence that came out in discovery proving that her claims were false, and instead simply changed positions and adopted ever more outlandish arguments in an effort to keep her lawsuit alive. Thus, not only were Defendants forced to defend their integrity and reputations against spurious claims made in a highly publicized lawsuit, but they were forced to spend a tremendous amount of money to tackle each new argument that Freeman managed to come up with over the course of four long years.

Ultimately, this Court dismissed Freeman's lawsuit after undertaking the herculean task of reading *all* the material at issue and determining that the two works were not substantially similar, and the Court's comprehensive order may, in and of itself, serve as a basis for finding that the lawsuit was frivolous. *See* Dkt. 548 (finding Freeman's claims "border[ed] on the frivolous" (p. 47), that Plaintiff took "liberties" with descriptions of her own works (p. 52, fn. 15), that Plaintiff's briefs showed the "weakness of her argument" (p. 53), that Plaintiff's characterizations were

3

"misleading at best" (p. 65, fn. 19), and that her entire list of supposed similarities were "either tropes / scenes a faire, similarities based on the shared use of ordinary words and common phrases, or trivial details that have no bearing on the total concept and overall feel of the works" (p. 65).

Further, as discussed in greater detail below, Plaintiff's claims were objectively unreasonable and frivolous, her litigation conduct was permeated with bad faith, and she drove up the cost of litigation at every opportunity. This case supports a ruling in Defendants' favor in order to deter similar future conduct and to further the goals of the Copyright Act by protecting against infringement claims based entirely upon unprotectable content.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This saga could and should have ended before it ever began. In or around February 2022, Plaintiff's counsel, Mark Passin, sent demand letters to Defendants accusing them of copyright infringement and demanding that they cease marketing, publishing and distributing the *Crave* series, but he refused to provide them with a copy of Freeman's manuscripts unless they would agree to return the materials, not take any notes or make any copies, and agree not to "use the materials for any purpose whatsoever in any future litigation even if the material would otherwise be inadmissible." *See* Szymanski Decl. ¶¶3-6. When Defendants (of course) refused to agree, Freeman filed her lawsuit and then very intentionally withheld the manuscripts for six months afterwards.

That is because Plaintiff's counsel knew – or would have known, had they ever actually read all of the books themselves – that the works were not similar enough to withstand a motion to dismiss, and wanted the Court to rely only on the self-serving and blatantly misleading list of "similarities" generated by Freeman, incorporated in her Complaint, and later published on her website. In fact, Plaintiff argued strenuously throughout this litigation that the Court and the jury

4

need not ever read all of the works, as required by law, but could instead rely solely on Freeman's indices alone, as well as her (ultimately excluded as completely unnecessary, unreliable, and/or biased) experts. *See e.g.,* Dkt. 103 (arguing experts should be allowed "on both the issues of probative and substantial similarity because it is too complicated for a lay observer in this case to determine if the works are substantially similar" and that comparing the works would be "an extremely complicated, if not impossible, task for the jury," including because "the works do not lend themselves to a side by side comparison"); Dkt. 362, pp. 6, 8-18 (excluding all experts on substantial similarity, as well as Juola (bias embedded in methodology), Chaski (same) and Reiss (unnecessary and unreliable).

Deprived of the opportunity to timely dismiss on a 12(b)(6) motion, Defendants were forced into years of costly discovery involving more than a dozen depositions; forensic examinations of Defendants' computers; the production of thousands and thousands of pages of private emails and text messages, in addition to drafts, versions and notes showing that Defendants wrote and edited *Crave* without referencing Freeman or anyone else; Daubert motions to exclude Plaintiff's *seven* different expert witnesses; and, various "side quests" to deal with Freeman's ever-changing conspiracy theories, including that Wolff had "practiced" stealing from Plaintiff's work in books Wolff had written before anyone had ever heard of Freeman. A first round of summary judgment briefing by both sides resulted only in the dismissal of various state law claims filed against Kim and Prospect. A second round of summary judgment briefing by both sides thankfully resulted in the dismissal of her remaining claims, but only after hundreds of pages of briefing, and this Court having to read over 6,000 pages of the parties' respective works – all over Plaintiff's repeated objections and continued efforts to prevent a side-by-side comparison of the works themselves.

5

In fact, even after this Court repeated, on multiple occasions and in no uncertain terms that Freeman's indices would not be relied upon as evidence, as they are "inherently subjective and unreliable, particularly where, as here, the list emphasizes random similarities scattered throughout the works" [dkt. 548, p. 27], her lawyers continued to almost exclusively rely on them in an attempt to prove substantial similarity.  But as the Court stated in its Order, the supposed "similarities" in her indices and briefs "turn out not to be similar at all when one goes back to the text" or are "nothing more than specific bits and pieces found here and there in works of extended length." [Dkt. 548, p. 66.] To put an even finer point on it, the Court stated that "even if the Court were to accept that Freeman's hundreds of claimed similarities are both protectable and substantially similar to things that occur in *Crave* – something it is impossible to do, since so many of the similarities are tropes/*scènes à faire* – no reasonable trier of fact, having read the works in their entirety, could conclude that the plots of BMR/Masqued and the four *Crave* novels are substantially similar." [ *Id.,* p. 67.]

## III.    LEGAL ARGUMENT

### A)  The Copyright Act Provides for Prevailing Party Fees to Successful Defendants.

The Copyright Act provides that a court may award a prevailing party their reasonable attorney's fees and costs in an action brought under the statute.  §17 USCA 505.  The Supreme Court has confirmed that this statute allows for fees and costs to be awarded to a prevailing defendant at the court's discretion, noting that the successful defense of a copyright infringement action may further the policies of the Copyright Act as much as the successful prosecution of an infringement claim.  *Fogerty v. Fantasy*, 510 U.S. 517 (1994); *see also, Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016) (holding defendants should be encouraged to litigate meritorious copyright defenses to the same extent that plaintiffs are encouraged to litigate meritorious claims

of infringement); *Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47 (S.D.N.Y. 1994) (defendant entitled to fee award after it prevailed completely against copyright owner's claim for actual damages). An award of fees under §17 USCA 505 is appropriately granted where, like here, a defendant has prevailed on summary judgment. *See, e.g., We Shall Overcome Foundation v. The Richmond Organization, Inc.*, 330 F. Supp. 3d 960 (S.D. N.Y. 2018) (fees awarded after summary judgment on the merits in favor of filmmakers who prevailed against alleged copyright owners of an iconic anthem of the American civil rights movement).

The Supreme Court provides the district courts with guidance in exercising their discretion by listing various non-exclusive factors for them to consider. *Fogerty,* 510 US at 534, fn. 19. These include (i) frivolousness of the copyright claim, (ii) motivation of bad faith in the litigation, (iii) objective unreasonableness of the factual or legal arguments regarding the copyright claim, and (iv) the need to compensate the prevailing party and deter future misconduct by the losing party or those similarly situated. *Id.*

As will be established below, the application of each of the *Fogerty* factors in this case warrants an award of attorney's fees and costs to Defendants as the prevailing parties.

### B) Plaintiff's Lawsuit Was Frivolous

While the Court was able to dispose of this case by resolving only the issue of substantial similarity, had the remaining merits of Plaintiff's claims gone to trial and been judged – not in the light most favorable to her as required at the summary judgment stage – but through the objective lens of common sense, Defendants are confident that the factfinder would have concluded that her factual allegations were as absurd as her claims of substantial similarity.

The very first paragraph of Freeman's Complaint reveals the frivolous nature of her lawsuit. She alleged that her literary agent, Emily Kim, manipulated her for years into constantly

revising and creating new material for her manuscript so that Kim could simultaneously feed it to Tracy Wolff to create the *Crave* series. [Dkt. 1, ¶ 1]. Setting aside the question of why – if Freeman's material was so compelling –she could never find anyone to publish it, what Freeman failed to mention is that she had ended her relationship with Kim <u>five years</u> before Wolff ever began writing *Crave.* [Dkt. 307 ¶43, Dkt. 150, ¶2.]. The accusation that Kim was feeding material to Wolff as Freeman wrote because of the two women's long-standing friendship [dkt. 103-2, p. 2], also makes no rational sense because Kim submitted Freeman's work to over twenty different publishers, but nobody wanted it – a fact of which Freeman was well-aware and a process with which she was involved in at every stage. If Kim was secretly feeding the material to Wolff (over five years before Wolff started writing *Crave*), she wouldn't have been simultaneously trying to sell it to publishers far and wide.

Of course, the allegation further flies in the face of common sense because Wolff was a prolific author who had successfully published over sixty books by that time, and she clearly did not need to plagiarize someone else's material (again, that had been rejected over twenty times and that Freeman herself knew was not workable)[1] in order to come up with a story. She certainly didn't need to engage in the convoluted plagiarism effort that Freeman conjured, which would require an impossible amount of deconstruction and repurposing of bits and pieces from Freeman's manuscripts across six different novels, as discussed further below.

---

[1] In fact, Freeman admitted that even she couldn't make a workable story out of any of her pre-2016 manuscripts, at least. *See* Dkt. 307, p. 25, referencing LF266676 (referring to her 2016 version: "This last one is honestly a completely new book. Not the original in any way. And that's been part of my frustration with writing it. I've wanted to keep to the original and it just couldn't happen. Not with the characters and not with the story."). And she never provided any credible evidence – as this Court recognized – that she ever sent the 2016 manuscript to Kim, nor was that manuscript ever published. [Dkt. 548, p. 20, fn. 9].

If that accusation was far-fetched, Freeman's creative license didn't stop there. Freeman next claimed that she had met Wolff at a literary conference in Anaheim, California, and that Freeman and Wolff rode together in Kim's rental car from the hotel to the conference center, and during the ride, Kim asked Freeman questions about her manuscript and about living in Alaska. [Dkt. 1, ¶ 28.] But Kim lives in New Jersey and doesn't really drive, and she never rented a car in California (or in her life). (Nashon Decl., Exhibit B, "Kim TR" at pp. 151:6-8, 243:15-23). Moreover, Kim and Wolff have the receipts to show that they were already staying at the same hotel where the conference was held. (Nashon Decl., Exhibit C, "Wolff TR" at pp. 83:15-25). The car ride occurred only in Freeman's imagination. Still, to disprove this allegation, Defendants were forced to "prove a negative" – which became a consistent theme over the next four years of litigation (and a needlessly expensive endeavor).

The obvious frivolity of Freeman's claims required constant lies and ever-shifting positions on her part, which in turn required Defendants to play years of "whack-a-mole" to disprove each of her allegations. For example, Freeman tried to manufacture a narrative whereby Wolff was obsessed with her (and not the other way around) and had spent years mining not only Freeman's unpublished manuscripts and notes but even Freeman's own personal life for inspiration. To support this outlandish narrative, she testified at her deposition that Wolff named her main character "Grace," because that was the name of Freeman's niece (Freeman TR pp. 341: 23-25); that she made Grace a gargoyle because Freeman supposedly had a gargoyle collection at home (*id.*, pp. 341:18-22); that she named Grace's love interest Jaxon because that was the name of Freeman's first dog (*id.*, pp. 342:3-3); that she named the pilot who flies Grace to Healy in the first chapter of *Crave* "Philip" because that is the name of Freeman's only uncle (*id.*, pp. 342:14-25); that she included the pilot in the story because Freeman's grandfather was a bush pilot (*id.,* pp.

9

343:10-12).  Obviously, Wolff had no reason to know or care about those details of Freeman's life when she was writing *Crave* (and didn't even know who Freeman was at that time).  And the proposition that Kim would have remembered these obscure details about Freeman's personal life five years later and then fed them to Wolff is even more outlandish.  But again, both women were put in the absurd position of having to disprove these allegations and more – <u>even though details of someone's personal life are by no means protected by copyright</u>.[2]

Perhaps the most egregious example occurred in January 2023, when Freeman represented to the Court that one of the ways she intended to prove her case was to show that Wolff had used her material (accessed through Kim) in various novels she had written prior to *Crave,* including *Deserving of Luke, Hidden Embers, Tempest Rising,* and *Tempest Unleashed,* "to test if she could get caught using the unauthorized material" before she appropriated it more fully in *Crave.* [Dkt. 103, p. 4.]  Freeman demanded that discovery extend to those books as well.  [*Id.*]  Defendants presented her with metadata, timestamps, and emails showing that those works had been written and submitted to Wolff's publisher before Kim ever had access to Freeman's work.  [Dkt. 150, ¶¶ 28-30.]  Freeman then claimed that the metadata had been intentionally altered, forcing Defendants to hire a forensic expert to confirm that it had not been.  [Dkt. 132].  Still, Freeman issued subpoenas to Wolff's then-publisher and even deposed Wolff's best friend, because she was so confident that Defendants had somehow manipulated the metadata.  [*Id.*]. Faced with irrefutable evidence to the contrary, Plaintiff still refused to concede that this imagined scenario never happened, but she never raised the issue again (although she was indignant when Defendants pointed it out in their summary judgment briefing.) [Dkt. 540].

---

[2] Of course, that did not stop Freeman from still using these (at best) minor coincidences as irrefutable "proof" of wrongdoing during her interview with the *New Yorker*.

Plaintiff's shifting and increasingly speculative theories of access further underscore the frivolity of her lawsuit.  First, she claimed that Kim handed over her work to Wolff as Freeman was writing it, so Kim and Wolff both had to undergo forensic inspections of their phones and computers, turn over their email passwords[3], and provide years' worth of communications to show that never occurred.  [Dkt. 59: "[W]e strongly contend that Kim sent Freeman's Copyrighted Material to Wolff, and will present testimony at trial, that the Crave Series <u>could not possibly have been created any other way.</u>  Thus, there must be e-mails exchanged between Wolff and Kim with copies of Freeman's Copyrighted Material attached…" (emphasis added)]. *See also,* Wolff Decl. at ¶4.

Of course, none of the documents Freeman demanded showed that Kim had ever shared any part of Freeman's work with Wolff.

Freeman therefore also claimed that Entangled had access to her manuscripts and had given the contents to Wolff for purposes of writing *Crave*, so Entangled's content editor (Pelletier) and copyeditor (Adams) likewise had to turn over their computers, as well as years of private emails and text messages to prove that they had never heard of Freeman, much less read her work.  *See* Pelletier Declaration, ¶7).  While one version of a manuscript had been submitted to Abrams many years before and was added to a pile of manuscripts for her to eventually read[4], the submission was withdrawn (at Freeman's request) without her ever getting to it. (Nashon Decl., Exh. D, "Abrams TR" at pp. 89:5-94:13).

---

[3] Including for their personal email accounts, because Freeman alleged "[t]hey would most likely not use their business accounts to avoid detection."  [Dkt. 59, p. 4.]. Freeman even demanded access to Kim's husband's personal email account.  [*Id.*]

[4] She receives anywhere between five to ten manuscript submissions every day and it takes her three to four months to get to a submission. (Abrams TR, pp. 56, 91:20-25).

11

Unable to prove that Wolff had ever directly received or read her work, despite her confidence that the *Crave* series could not "possibly have been created any other way," Freeman still changed her story and claimed that Kim and Abrams must have co-written the *Crave* series with Wolff.  [Dkt. 290.]  Her sole support for her claim about Abrams (which blithely ignored the fact that there was no evidence Abrams had ever read Freeman's work) was that she was the book's copyeditor.  This Court had to point out to her that copyediting is not writing, and there was no evidence showing that Abrams helped to write *Crave* in any way. [Dkt. 361, pp. 7-8]

With respect to Kim, Freeman relied on incomplete snippets of text messages, completely taken out of context, indicating that the last hundred pages of the fourth book in the series had been a "group project" to meet the publishing deadline (and ignoring Kim's immediate text back to Wolff: "That is very kind but the brilliant writing is the result of all your hard work on this book and the many that came before.")  [Dkt. 307, ¶72].  In doing so, Freeman completely ignored the evidence showing that Kim's involvement was undisputedly limited to fixing typos, correcting punctuation, and passing along (without changing) comments and re-writes from the editor, and that only happened with respect to the concluding chapters of the fourth book (where, as this Court pointed out, "any suggestion of substantial similarity evaporates entirely." [Dkt. 307, ¶¶65-66, Dkt. 303, ¶12, 22, Dkt. 548, p. 59].

Perhaps more notably, Freeman's theory about how Wolff carefully and artfully wove disparate words, phrases, and details from Freeman's notes and manuscripts into and across six novels ignores how books are written, particularly when there is a publishing deadline to meet, as was the case in each of Wolff's novels. [Dkt. 303, ¶6.]  This Court knows all too well how lengthy each of the books are in the *Crave* series.  Each were written in approximately two or three months (except for one which took around five months), and Defendants produced the time stamps to

prove it. (Wolf TR, pp. 65:21-68:11). The idea that Wolff or Kim had the time to sit down with all of Freeman's varied manuscripts and notes and pull out disparate plot ideas, themes, characters, settings, words and phrases, and then find a way to carefully incorporate them across six novels without ever stringing more than a handful of words together (the longest string of words in common between all of the *Crave* books and all of Freeman's works is the phrase "It's all I can do not to…"), all while cranking these books out in two months apiece, is as frivolous a proposition as one can imagine.

In fact, this whole idea that Wolff – a wildly successful and prolific author – had to go to such lengths as mining Freeman's life and unpublished drafts in order to come up with the *Crave* series defies basic common sense. Nor does it make any rational sense that Wolff's agent – who reads approximately one hundred and twenty-five books and manuscripts a year, represents around sixty clients at any given time, and has helped her clients publish more than two hundred romance novels and more than ten multi-book series *in the paranormal genre alone* – would have even remembered the details of Freeman's manuscripts so many years later, much less felt the need to integrate them across six novels written by one of her most creative and talented authors. [Dkt. 307]. The idea breaks down completely when applied to Liz Pelletier at Entangled, who undisputedly never read or saw Freeman's work, and who publishes around fifty books a year - including several of the most successful books in recent history, was named 2024 Person of the Year by Publishers Weekly, and whose company was listed as one of the Time Magazine's 100 Most Influential Companies of 2025. Yet Freeman has fought for years – both in this Court and in the court of public opinion – to accuse these brilliant, hard-working women of building their success entirely off of her unfinished manuscripts and notes that she could never get published herself. To say her claims are frivolous gives them too much credit.

13

### C) Plaintiff's Claims Were Motivated by Bad Faith Which Was Perpetuated by Her Lawyers Throughout the Litigation.

As set forth above, Plaintiff's bad faith began even before filing her lawsuit, by not only demanding that the publisher and distributor cease and desist without ever giving them a copy of the supposedly infringed work, but refusing to do so unless they promised never to use it in the lawsuit. *See* Szymanski Decl., ¶6. Plaintiff and her attorneys doubled down by continuing to withhold her manuscripts for six months even after she filed suit. She then engaged in a crippling discovery campaign (the scope of which was virtually unlimited, since she could never come up with a cognizant theory for how Defendants supposedly copied her work) which included (i) forensic examinations of the parties' computers; (ii) a list of search terms that included words and phrases such as "ditto," "looks like," "oh my" "element," "change" and "copy" [dkt. 65-2]; (iii) fifteen depositions all over the country; (iv) the designation by Plaintiff of seven different expert witnesses (all of whom were unreliable, unnecessary, and properly disqualified[5]); and, (v) a constantly moving target of legal theories and claims for Defendants to address and shoot down.[6]

Specific examples of Freeman and her counsel's bad faith litigation conduct, which increased the cost and the duration of the litigation, include, but are by no means limited to:

- Accusing Judge Netburn of bias and demanding that she recuse herself after she told Plaintiff that her damages demand of $10 million was not realistic. [Dkt. 238, p. 2.]

---

[5] Prior to that order (dkt. 362), however, Defendants were required to spend a great deal of time and effort, over many months, to analyze the expert reports, retain rebuttal experts to prepare rebuttal reports, and depose Plaintiff's experts, all of which resulted in an enormous (and unnecessary) expenditure of time, money and effort.

[6] In fact, Freeman admitted that she essentially stopped working and allowed this lawsuit to "take over her life," and indeed she seems to have made it her mission to find any way she could to harass Defendants and destroy the reputations they had built. (Freeman TR, p. 22:11-21)

14

- Fighting to maintain her manuscripts under seal, arguing that they were "irrelevant to the judicial function and process." [Dkt. 240, p. 2.]

- Moving (successfully) for reconsideration of Judge Stanton's order that expert discovery be stayed and the issue of substantial similarity tried first, on the basis that it would cost her too much money and cause her too much anxiety, thereby increasing the litigation cost exponentially and dragging the case out for nearly three more years. [Dkt. 225, p. 7.]

- Filing separate lawsuits against each retailer who sold the *Crave* series, including Amazon, Walmart, and Barnes & Noble, solely to damage Defendants' reputation and sales and try to pressure them into settling.

- Filing a separate lawsuit regarding the fifth and sixth books in the *Crave* series after Your Honor explicitly stated that you would not consider them in your substantial similarity analysis.

- Falsely accusing Wolff – without any evidence whatsoever - of working with "plagiarism software" and of employing "text spinning" to write *Crave*. [Dkt. 225, p. 15.]

- Demanding that Kim produce sensitive financial documents, including mortgage statements, bank statements, credit and loan application history, and documentation showing her real property and liabilities, without presenting viable arguments for punitive damages, necessitating a motion for protective order. [Dkt. 128.]

- Claiming that Abrams at Entangled had read her 2013 manuscript and liked it but asked for a revised version, which was sent in 2014 (Freeman TR, pp. 328:16-329:8), when Abrams did not read *any* of Freeman's manuscripts and she certainly never

asked for a revised version. (Abrams TR, pp. 89:5-94:13).

• Claiming that Kim discouraged her from copyrighting her work, but also that she did not know what copyright was nor did she ever consider that she should copyright her work until talking to her lawyers about this case. (Freeman TR, pp. 48:3-49:11).

• Accusing Wolff of copying her work in books other than the *Crave* series (*i.e., Tempest Rising,* which were written before anyone had even met Freeman), based on the shared use of common words and phrases including "full of life," "woo-hoo," "fun and games," "knight in shining armor," and "Shakespeare." [Dkt. 103-2.]

• Claiming that Kim asked her once what the "coolest" type of motorcycle was, and when Freeman told her a Ducati, Kim asked for permission to give that to one of her authors (despite no such "permission" being needed even if the conversation happened), and then Wolff used it in *Tempest Rising* by having her main character ride a Ducati (despite that the book was written and submitted before the alleged conversation with Kim). [Dkt. 132.]

• Demanding that Defendants produce their hard drives for forensic examination, all of their production in "native" format, provide access to their email accounts, and allow for multiple subpoenas to third-parties for all versions of *Tempest Rising*, because she refused to believe the evidence that the book was indeed written before Kim and Freeman began working together. [Dkt. 132, p. 5.]

• Arguing substantial similarity in this case based upon the exact same supposed similarities found in popular works throughout the genre, including *Twilight.* [Dkt. 533, p. 21.]

• Accusing Wolff of copying from a portion of her manuscript which she herself had

16

actually plagiarized verbatim from *Roswell*.  [Dkt. 533, p. 20.]

- Claiming that Kim did not know what gargoyles were, but because Freeman has a gargoyle collection and explained them to her, Wolff made her main character a gargoyle. (Freeman TR, p. 178:5-7).

- Mischaracterizing and taking liberties with her own work in order to claim similarities that did not exist and "forcing" similarities to the point of frivolity [dkt. 548, pp. 47, 52, fn. 15], *e.g.* by

  o Claiming both works refer to "civil twilight" when *Crave* actually uses the term "civil twilight" and BMR does not use the term, but describes the sun sitting low on the horizon and the sky being its "usual shade of unrelenting gray." (Freeman TR, pp. 168:10-169:29)

  o Claiming both works feature a castle, when the word "castle" does not appear in any of her manuscripts. [Dkt. 548, p. 47.]

  o Claiming both heroines suffer from panic attacks when the word "panic attack" does not appear in any of her manuscripts. [Dkt. 548, p. 51.]

  o Claiming both heroines have grandmothers with green eyes, when none of her manuscripts feature a grandmother with green eyes (and in three of the five drafts, no grandmother at all).  [Dkt. 548, p. 52, fn. 15.]

- Admitting that she made no effort to eliminate cliches and common phrases from her list of supposed similarities – but continuing to rely on them throughout the case to prove copying.  (Freeman TR, p. 111:17-21).

- Admitting that she included examples of supposedly similar phrases made similar only because she took words from across multiple pages and cobbled them together

17

with ellipses – but continuing to rely on them throughout the case, as well. (Freeman TR, pp. 116:14-117:3).

- Admitting that the appearance of similar short phrases in both works was not an indication that her work was copied in *Crave*, but she still included them in her indices at the behest of her lawyers. (Freeman TR, pp. 304:14-305:5).

- Providing interviews to the media with misleading, inaccurate and incomplete information about the lawsuit, her claims, and the facts (resulting in, for example, the *New Yorker* article read by Your Honor before taking this case).

- Allowing (if not encouraging) her friends and family to post harassing, defamatory, and offensive statements about Wolff online. *See* Wolff Decl., ¶10.

But perhaps what is most offensive about all of this is that Freeman knew – even before filing her lawsuit – that copyright law does not extend to "something sort of frivolous," "something vague," or "something small," but only to "something significant and perhaps unique" (Freeman TR, p. 88:14-21) and yet she still asserted claims of copyright infringement based upon, *inter alia,* arguments that both books mention Hawaii and use the phrase "Well, well, well." [Dkt. 548, p. 65]. She testified (Freeman TR, pp. 63-67) that she knew that common tropes in the YA paranormal romantasy genre include "a hero and heroine who have some sort of obstacle to their romance," "for people to find that they have superpowers that they didn't know about, or if they did know about them, that there's something that they don't know or that's magical about the world, that they may have a special destiny, like Harry Potter, for example. Even Star Wars." She knew it is common to have a "coming-of-age story where someone starts out very awkward and becomes more confident at the end of the story." She knew that it is a trope "where someone moved from a place that is familiar to a place that's unfamiliar," to have a "dead parent that may

18

be secretly supernatural," to have a love triangle, and a boyfriend who is "dark and mysterious," and a hero or heroine who "will risk their lives for the other." And yet, despite that she *knew* these were tropes, Freeman still relied on them as the basis for her copyright claim, and she continued to rely upon them in order to argue substantial similarity at the summary judgment stage. [Dkt. 531, pp. 43, 49].

Even after losing on summary judgment, Plaintiff's willingness to mislead not only this Court but the general public to pursue her vendetta against Defendants continues to this day.  On her website, www.lynnefreemanwriter.com, Plaintiff has posted her complaint, her self-serving and misleading indices of alleged similarities, cherry-picked language from prior court orders (but of course, not the Court's order granting summary judgment for Defendants), and copies of all of her expert reports (without ever clarifying that the experts were disqualified by the Court and the reports thrown out).  By keeping up such obviously misleading, incomplete and inaccurate (if not libelous) material, it is clear that Plaintiff's motivation always has been, and continues to be, to cause as much harm to Defendants as possible.

**D)  Plaintiff's Legal and Factual Claims Were Objectively Unreasonable.**

If a plaintiff's claims were objectively unreasonable, the Court will give that fact "substantial weight" in deciding to award a copyright defendant its attorney's fees and costs. *Kirtsaeng*, 579 U.S. at 199-200.  In literary copyright cases like this one, the Courts have found the plaintiff's claims objectively unreasonable where the claims of substantial similarity were based on (i) the "comparison of highly selective, scattered details," (ii) lists of similarities that were misleading, exaggerated and inaccurate, or (iii) where the supposed similarities consisted entirely of unprotectible elements. *See, e.g. Williams v. Crichton,* 891 F. Supp. 120, 121-22 (1994); *Adsani v. Miller,* No. 94 Civ. 9131, 1996 WL 531858, *2, 14-16 (S.D.N.Y. 1996); *Porto v. Guirgis*,

659 F. Supp.2d 597, 617-18 (S.D.N.Y. 2009).  In this case, the Court found that Plaintiff's case was based on all three.  *See* Dkt. 548, pp. 27, 41 (quoting *Williams,* finding plaintiff's lists "emphasize random similarities scattered throughout the works" and take a "scattershot approach" that "cannot support a finding of substantial similarity"); pp. 47, 51, 52, 63, 65 (finding Freeman's list of similarities to be misleading, recognizing that she was taking liberties with her own work in order to force comparisons that did not exist, and relying on "examples [that] are frequently not tethered to the contents of the actual drafts" or "supported by the works themselves"); p. 65 ("But virtually all of the similarities Freeman identifies in these lists are either tropes / scenes a faire, similarities based on the shared use of ordinary words and common phrases, or trivial details that have no bearing on the total concept and overall feel of the works.")

Not only were Plaintiff's factual allegations objectively unreasonable, but she presented objectively unreasonable legal arguments to this Court in an effort to justify them.  Understanding that an actual comparison of her manuscripts with *Crave* would never pass the ordinary observer test, she argued that the Court should disregard the "well-developed law in this Circuit on substantial similarity within literary works," and instead apply "alternative theories" of copyright law.  But as the Court noted in its ruling, "Despite recognizing that the 'more discerning ordinary observer' test is the appropriate test for substantial similarity under Second Circuit precedent, Freeman contends that the Court should judge whether Wolff's novels are substantially similar to her using the "comprehensive nonliteral similarity" and "fragmented literal similarity" tests.  Freeman is incorrect on both counts." [Dkt. 548, p. 38, emphasis added].

The Court found that the first test was "an academic's suggestion in this Circuit, where courts do not normally apply it," and even were it applied as Freeman suggested, it would still require the comparison of factors the Court already considers under the established ordinary observer test. [*Id.*]

20

As far as the second test, the Court found it "is rarely apposite when considering literary works," Freeman's cases applying it were so different from those here as to render them unpersuasive, and the test would require "precisely the type of scattered approach that cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." [*Id.*, pp. 39-41.] Moreover, Freeman's application of the test relied on ordinary words and common phrases in such a way that "trivialize[d] copyright law." [*Id.*, p. 41.]

Similarly, Freeman knew that a book-to-manuscript comparison, whereby "each copyrighted work [is] assessed independently in considering whether the total concept and overall feel is substantially similar" [*id.,* p. 37], would underscore how substantially *different* the works are, so she argued that the Court should aggregate all of her drafts and notes into one single work. This legal argument was as objectively unreasonable as her other legal theories, as recognized by this Court: "Freeman does not cite, and the Court is not aware of, any case supporting the notion that a court can aggregate multiple unfinished drafts of the same underlying work for purposes of determining substantial similarity. The paucity of case law supporting Freeman's proposed approach is unsurprising, because such an approach would overlook the fundamental question of whether a lay observer would consider the works *as a whole* substantially similar to one another. The Court has serious doubts about whether Freeman's theory is legally sound." [*Id.*, emphasis in original.]

Finally, recognizing that none of the individual elements of her work she claimed were copied were actually protected by copyright, Freeman argued to the Court that *Crave* had misappropriated her "unique selection and arrangement of characters, settings and plot elements." The Court found that the "selection and arrangement" theory also "does not assist Freeman here, because the selection and arrangement of individually unprotectable elements in BMR/Masqued is

21

not sufficiently original to warrant copyright protection.  In fact, her selection and arrangement is dictated by genre conventions and is consistent with what a reader would expect in any young adult paranormal romance story…"  [*Id.*, p. 77.]

In sum, the Court's Order dismissing Plaintiff's claim clearly establishes that both Plaintiff's factual and legal arguments, whether taken individually or together, were <u>all</u> objectively unreasonable and, therefore, it is appropriate to award Defendants their prevailing party fees and costs.  In fact, objective unreasonableness alone, even in the absence of frivolousness or bad faith, is a sufficient basis to award fees.  *See Williams,* 891 F. Supp. at 121 (holding that where there is a finding of objective unreasonableness, "bad faith or frivolousness is not a prerequisite to an award"); *Screenlife,* 868 F. Supp. at 52 (same); *Earth Flag,* 154 F. Supp. 2d at 668 (failing to award attorney fees where the claim was objectively unreasonable "would invite others to bring similarly unreasonable actions without fear of any consequences").

## E)  An Award to Defendants Would Further the Aims of the Copyright Act.

Courts have found that the public policy aspects of advancing the aims of the Copyright Act may be considered in setting fee awards.  The goal of copyright law includes "encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng,* 579 U.S. at 204.  Therefore, fee awards should encourage the types of lawsuits that promote those purposes. *Id.*  Where there is a possibility of recovering one's prevailing party fees, it "encourages parties with strong legal positions to stand on their rights and deters those with weak ones from proceeding with litigation." *Id.* at 205.  As here, it gives a defendant against a "patently meritless copyright claim…every incentive to keep fighting, no matter that attorney's fees in a protracted suit might be as or more costly than a settlement." *Id.*

In this case, it was "important that the boundaries of copyright law be demarcated as clearly

22

as possible," in order to further the goals of the Copyright Act and deter others from trying to use similarly weak allegations of infringement to ride on the coattails of bestselling authors. *Fogerty v. Fantasy, Inc.,* 510 U.S. at 527. Plaintiff's claims had cast a dark shadow over the realm of genre fiction over the last four years, as any author writing in a genre faced uncertainty as to whether the use of common tropes, themes, characters and ideas might trigger an infringement suit. Had Plaintiff succeeded in expanding the law in such a way, the creative well from which writers have always drawn their inspiration would have become inaccessible to all. Defendants protected this important right on behalf of authors everyone, at great cost and personal expense to themselves, and they should be compensated for their efforts.

In the same vein, Plaintiff and her attorneys – who actively worked to erode a core tenet of copyright law, should be deterred from such conduct in the future and, in doing so, the Court should also send a clear message to other prospective plaintiffs and lawyers that lawsuits based on nothing more than trivial scattered details, ordinary words and phrases, and tropes / scenes a faire (even when amalgamated into misleadingly "comprehensive" indices) will not be tolerated in this district.

## IV.    DEFENDANTS' FEE REQUEST

It is well-established that, in determining the amount of reasonable attorney's fees to award to a prevailing party, courts should consider the amount of legal work performed by the prevailing party's attorneys, the skill of the attorneys, and the results achieved. *See, e.g., Earth Flag*, 154 F. Supp. 2d at 668-69; *Screenlife*, 868 F. Supp. at 53.

In this case, as set forth in detail above, the amount of work performed by Defendants' respective counsel over four years in responding to Plaintiff's groundless claims of infringement, including by (but not limited to) filing responsive pleadings, conducting extensive fact discovery,

23

defending and taking more than a dozen depositions, engaging in extensive expert discovery, preparing Daubert motions, drafting two rounds of summary judgment motions and opposing two of plaintiff's summary judgment motions, attending numerous hearings (including many in person, as preferred by this Court), and preparing for an imminent trial - was <u>incredibly substantial</u>.  The team of defense attorneys working collaboratively and efficiently together in this case has been made up of experienced copyright and intellectual property specialists and seasoned trial lawyers whose skill is evidenced by the results they achieved - a complete defense victory on behalf of their clients.

A prevailing party's actual billing arrangement with its counsel is a significant, although not necessarily controlling, factor in determining what magnitude of fee award is "reasonable." *Crescent Publ'g Group, Inc. v. Playboy Enterprises, Inc.*, 246 F.3d 142, 151 (2d Cir. 2001).  In this case, each of Defendants' law firms billed hourly at rates that were very reasonable given their skill and experience, and in most cases, billed at a discount that was lower than prevailing industry rates.

The estimated fees and costs[7] incurred by each party are as follows:

| | |
|---|---|
| Tracy Wolff | $281,018.92 |
| Emily Kim and Prospect Agency | $437,934.93[8] |
| Entangled (on behalf of itself and all defendants) | $2,688,481.34 |

Federal Rule of Civil Procedure 54(d)(2) "provides for an initial determination of a parties' entitlement to recover costs and attorneys' fees, with a subsequent determination of the size of the award." *Williams,* 891 F. Supp. at 122.  Therefore, Defendants have fully complied with Rule 54

---

[7] These fees are an estimate for purposes of this motion and may be subject to (minimal) change.

[8] This amount does not include fees and costs Kim expended to defend the state law claims.

24

by timely filing an estimate of the amount sought and seeking a ruling that they are the prevailing party. *See id.* Should the Court grant this motion, Defendants will provide their detailed submissions demonstrating that the amount of attorneys' fees and costs sought was reasonable and necessarily incurred and is supported by reliable evidence.

## V.  CONCLUSION

Defendants are overwhelmingly grateful for the immense amount of work this Court has done to thoroughly review all of the works at issue and to craft such a detailed and comprehensive ruling finding that the works are only similar "in the ways that all young adult romantasy fiction novels are similar to each other," but "looking at their unique creative expression, they are substantially different – not substantially similar." [Dkt. 548, p. 82.] Indeed, no one should know more than this Court what a tremendous amount of work was put in to assist the Court in reaching that inevitable conclusion. Defendants appreciate this opportunity to now detail to the Court all of the work that was required to defend this case prior to her involvement, and all of the reasons why they should be compensated for that work. Defense counsel now looks forward to the opportunity to provide their submissions in support of their requested fees and costs, that will reimburse the Defendants for at least this portion of the harm that they have suffered as a result of this meritless lawsuit.

Dated: April 14, 2026

Respectfully submitted,
*/s/ Amy L. Nashon*

Amy L. Nashon
California State Bar No. 316353
**TROYGOULD P.C.**
1801 Century Park East, Suite 1600
Los Angeles, CA 90067
Phone: (310) 553-4441
Fax: (310) 201-4746
anashon@troygould.com

Jennifer Pariser
**OPPENHEIM + ZEBRAK, LLP**
461 5th Avenue, 19th Floor
New York, NY 10017
Phone: (212) 951-1874
Fax: (866) 766-1678
JPariser@oandzlaw.com

*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC*

Lacy H. Koonce, III

**KLARIS LAW PLLC**
161 Water Street, Ste. 904
New York, NY 10038
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Silvan Kim and Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
**KOWERT,    HOOD,    MUNYON, RANKIN & GOETZEL, P.C.**
1120 S. Capital of Texas Hwy.
Building 2, Ste. 300
Austin, Texas 78746
Phone: (512) 853-8800
Fax: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff*

26