**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| LYNNE FREEMAN,<br><br>       Plaintiff,<br><br>   v.<br><br>TRACY DEEBS-ELKENANEY, et al.<br><br>       Defendants. | Case No. 2:22-cv-02435 CM-SN<br><br>Honorable Colleen McMahon<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR AN ORDER REQUIRING PLAINTIFF TO POST A BOND PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 7 AND LOCAL RULE 54.2** |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION……………………………………………………………………. 1

II.   FREEMAN'S DIVORCE FILING IS HIGHLY SUSPECT……………………………..2

III.  FREEMAN'S STATUTORY INTERPRETATION IS FLAWED……………………......5

      A) The Court Can Order a Bond Under LR 54.2 While the Appeal is Pending…………5

      B) A Bond Can Be Issued for Fees Already Incurred and For Fees Yet To Be Incurred..6

IV.   FREEMAN'S APPEAL IS FRIVILOUS AND SHE KNOWS IT……………………….7

V.    THE COURT NEED NOT RULE ON THE FEES MOTION TO ORDER A BOND…..8

VI.   THERE IS A STRONG LIKELIHOOD THAT FREEMAN WILL NOT PAY………....9

VII.  THE AMOUNT OF BOND SOUGHT BY DEFENDANTS IS REASONABLE………10

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Celli v. NYC*,
  24-CV-9743, 2025 WL 1810365 (S.D.N.Y. May 27, 2025) .......................................................7

*Gary Friedrich Enter., LLC v. Marvel Enter., Inc.*,
  08-CIV-01533, 2010 WL 3452375 (S.D.N.Y. 2010) ...............................................................6

*Julien J. Studley, Inc. v. Lefrak*,
  412 N.Y.S.D. 2d 901 (1979 .......................................................................................................4

*Kensington Intern. Ltd. v. Republic of Congo*,
  03 CIV 4578, 2005 WL 646086 (S.D.N.Y., Mar. 21, 2005) .....................................................6

*Klpisch Group, Inc. v. Big Box Store Ltd.*,
  12-CV-6283, 2016 WL 11944285 (S.D.N.Y. September 30, 2016) ........................................10

*Selletti v. Carey*,
  173 F.3d 104 (2d Cir. 1999)........................................................................................................5

*Selletti v. Carey*,
  173 F.R.D. 96 (S.D.N.Y. 1997) .................................................................................................5

*Tatung Co., Ltd. v. Shu Tze Hsu*,
  217 F.Suppp.3d 1138, 1187 (C.D.Cal. 2016) and Cal. Civil ...................................................4

*Woodhouse v. Meta Platforms Inc.*,
  704 F.Supp.3d 502 (S.D.N.Y. 2023)..........................................................................................7

**Alaska Cases**

*Merdes & Merdes, P.C. v. Leisnoi, Inc.*,
  410 P.3d 398 (Alaska 2017)........................................................................................................4

*Richter v. Richter*,
  330 P.3d 934 (Alaska 2014)........................................................................................................3

**Alaska Statutes**

Alaska Statute 34.40.110 ...............................................................................................................4

**California Statutes**

Cal. Civil Code § 3439.01...............................................................................................................4

iii

Cal. Family Code § 910 ................................................................................................3

**New York Statutes**

N.Y. Debtor and Creditor Law §§ 270-281 ................................................................4

Rule of Appellate Procedure 7 ................................................................................2, 7, 8

**Local Rules**

Local Rule 54.1................................................................................................................5

Local Rule 54.2........................................................................................................ 2, 5- 8

## I.     INTRODUCTION

Defendants brought their motion for an order requiring Lynne Freeman ("Freeman") to post a bond out of concern that she would attempt to shield her assets from any future fee and cost award, especially given the substantial amount of fees and costs incurred by Defendants over the four years of prior litigation and the amounts anticipated to be incurred on appeal ("the Motion"). In their Opposition, Freeman scoffs at this concern.

But, Defendants were absolutely right to be concerned. Unbeknownst to Defendants at the time they filed the Motion, Freeman had already begun transferring her assets to avoid future collection efforts by Defendants. In fact, just a few weeks before Defendants moved for prevailing party fees, Freeman had already prepared a "Settlement Agreement" with her husband, transferring almost all of her assets to him. She filed it, along with her petition for divorce, in Anchorage Superior Court just three days after this Court entered judgment in favor of Defendants. The Settlement Agreement conveniently awards virtually all of the parties' assets[1] to Freeman's husband, while simultaneously requiring that he provide for her care and living expenses for the next five years. It also grants him the right to recover over $1 million in "loans" extended to her for litigation expenses.

Of course, Freeman made no mention of these substantial changes in her financial circumstances in her Opposition to the Motion, presumably because she did not anticipate anyone would find out what she had done until further down the road, and in the (likely) event she loses her appeal and is subjected to collection efforts.

---

[1] At least, the assets the parties' bothered to identify in the Settlement Agreement, which notably does not list any bank accounts or rental property, downplays the value of certain assets, and lacks credibility with respect to others – all as set forth in further detail herein below.

Not only does this Court have the authority under Local Rule  54.2 ("LR 54.2") and Rule of Appellate Procedure 7 ("Rule 7") to require Freeman to post a bond for all of the reasons set forth in the Motion and herein below, but the Court may further act under its inherent judicial power to prevent abuse, oppression and injustice and to protect the integrity of the Court and the judicial process.

## II.    FREEMAN'S DIVORCE FILING IS HIGHLY SUSPECT.

On March 16, 2026, the Court granted Defendants' summary judgment motion and on March 31, 2026, the Court entered judgment in favor of Defendants.  [Dkt. 549.]  By April 3, 2026, Freeman and her husband of almost thirty years, Trent Baer ("Baer"), had signed a Settlement Agreement and filed for divorce, which the Anchorage Superior Court entered one month later. (*See* Declaration of Amy Nashon, filed herewith, at Exhs. A-C.)  Not only does the timing in and of itself render the filing highly suspicious, but so do the following facts associated therewith:

- At his deposition on March 21, 2023, Baer testified that he and Freeman had a happy marriage, that he bought her gifts, took her to fancy dinners, took her on expensive vacations, and that they never fought.  He testified: "[W]e depend on each other.  We're a partnership one hundred percent."  The two split their time 50/50 between Alaska and California and had homes and offices in each.  (Nashon Decl., Exh. D.)

- Baer was heavily involved throughout this litigation, helped find attorneys and expert witnesses, was deposed as a witness, personally attended the Defendants' depositions taken throughout the U.S. and remotely attended the Zoom depositions, argued for the right to personally review unredacted versions of documents produced in the case (even those protected by the confidentiality order), and started reading paranormal romance books to the tune of 150 books in two years to "get a better understanding of what's in the particular genre."  (*Id.*)

- Freeman was represented in the uncontested divorce by Jennifer Holland, a bankruptcy attorney who has spoken out publicly against Defendants and in support of Freeman's lawsuit and who works out of Baer's offices at 737 M Street.  (Nashon Decl. ¶¶ 9-10.)  Trent Baer was unrepresented but agreed to pay Holland's attorney's fees and costs.  (*Id.*, Exh. B.)

- Freeman and Baer valued their Santa Barbara home at more than $300,000 less than Zillow's estimated value, more than $675,000 less than Home.com's estimated value, and only

2

$50,000 more than the price they purchased it for in 2019.[2]  (*Id.*, ¶ 5 and Exh. E.)  At the same time, they listed their mortgage at $1,015,000 – but that was the initial amount of the mortgage in 2019, and it is now estimated at $867,000.  This means, even using the lower Zillow estimate of the home's value, the marital equity is over $800,000 (maybe more than a million) and not the $385,000 represented in the Settlement Agreement.  (*Id.*)

- Baer agreed that Freeman can live in the Santa Barbara condominium for five years, cost-free, and he will pay the mortgage, HOA fees, insurance, taxes, repairs, maintenance, cost of new furniture, and all other associated expenses.  After five years, they will refinance or sell the property and split the proceeds 50/50.  (*Id.*, Exh. B.)

- Baer was awarded the parties' real property in Alaska and full ownership of Baer Asset Management Group, which he and Freeman used to hold the real property.[3]  Freeman and Baer listed the value of that real property (which consists of a home and a converted office on one large lot in downtown Anchorage) as $1,030,000, but Zillow lists the value of the two properties as $1,390,000, meaning even if the mortgage Freeman and Baer show is correct, the equity would be over $685,000. (*Id.*, ¶ 6 and Exh. E.)

- Baer was awarded full ownership of Baer Investment Group ("BIG") and its bank account.  The amount of funds in the bank account is not stated - but it apparently had enough liquid assets to "loan" Freeman $470,000 for legal fees.  There is no documentation or information regarding this alleged loan. (*Id.,* Exh. B.)

- Contrary to applicable family law, the Settlement Agreement gives Baer the right to recover the $1.1 million that Baer and BIG supposedly "loaned" to Freeman (out of marital assets) to pay for the litigation, but he is entitled to indemnity in the event that Freeman becomes liable for any fees and costs.[4]  (*Id.*)

- Baer was awarded CVG Wealth Management, which the Settlement Agreement describes as a vehicle for "establishing group benefits and share expenses for BIG," but which in reality, is an "independent wealth management firm" with "over 98 years of combined industry experience and approximately $400 Million in assets under management… licensed in nineteen

---

[2]  Defendants are not filing the Zillow estimate under seal because, irrespective of the supposed "safety concern" raised by Freeman's attorney at Docket 562, Freeman has already put in the public record that she lives at the Santa Barbara address. (Nashon Decl., Exh. B.)  It should also be noted that the social media and publicity surrounding this case was all initiated and fueled by Freeman and her friends and family, so the concerns she raises are particularly unpersuasive.

[3]  Baer testified at his deposition that he also owns rental property but no rental property was identified in the Settlement Agreement.  (*Id.*, Exhs. B and D.)

[4]  Under both Alaska and California law, the court does not recognize the use of marital income to pay marital debt as a reimbursable loan. *See e.g., Richter v. Richter,* 330 P.3d 934, 938-939 (Alaska 2014) (money borrowed during the marriage to pay off one spouse's student loan was marital debt); Cal. Family Code § 910 (community is liable for community debts even if incurred by one spouse exclusively for his/her personal benefit).

states" with "a physical presence in three" and affiliated with LPL Financial. (*Id*., Exh. F.) Baer is the managing director and allegedly owns 49% of the company. (*Id.*, Exhs. B and F.)

- Freeman and Baer claim in the divorce filing that, despite "managing private client portfolios for more than 27 years" and creating "customized portfolios that utilize innovative, independent research," Baer has only $35,000 in a 401(k) and stocks worth $45,000. He is either spectacularly bad at financial planning – his job for three decades – or is lying to the court.[5] (*Id.*)

- Freeman was awarded a Range Rover the parties valued at just $11,000, and Baer must pay the automobile insurance, registration, taxes, and repair costs. Baer was awarded a BMW X3 conveniently also valued at $11,000, despite evidence that he drives a newer, more expensive model BMW X5. (*Id.*, ¶ 7 and Exh. B.)

- Freeman was awarded the family dog, and Baer must pay the monthly grooming, food and vet costs. (*Id.*, Exh. B.)

- Freeman is allowed to use two credit cards in Baer's name for her monthly living expenses, and he will pay for her health insurance, uncovered medical expenses, utilities, groceries, and other living expenses. (*Id.*)

- Perhaps most conspicuously, there is no mention of the divorce or the Settlement Agreement in Freeman's Opposition filed last week. [Dkt. 563.]

It is clear, given the totality of the circumstances, that the divorce was filed only as a backstop in case Freeman loses her appeal, and for no other legitimate purpose. For these reasons, a bond for Defendants' fees and costs is entirely warranted. Without one, Defendants will need to bring an ancillary action to set aside the fraudulent conveyances (which it may do even without a money judgment under New York, Alaska and California law).[6] To avoid a multiplicity of actions in various jurisdictions and the substantial legal fees and expense associated therewith, the Court should simply issue the bond requested in Defendants' Motion.

---

[5] Speaking of which, the parties identify no other bank accounts (aside from Freeman's IRA supposedly worth $178,000) and no liabilities whatsoever. (*Id.*, Exh. B.)

[6] *See Julien J. Studley, Inc. v. Lefrak,* 412 N.Y.S.D. 2d 901 (1979) and N.Y. Debtor and Creditor Law §§ 270-281; *Merdes & Merdes, P.C. v. Leisnoi, Inc.,* 410 P.3d 398, 409 (Alaska 2017) and Alaska Statute 34.40.110; *Tatung Co., Ltd. v. Shu Tze Hsu,* 217 F.Suppp.3d 1138, 1187 (C.D.Cal. 2016) and Cal. Civil Code § 3439.01.

## III.   FREEMAN'S STATUTORY INTERPRETATION IS FLAWED.

A) <u>The Court Can Order a Bond Under LR 54.2 While the Appeal is Pending</u>.

Freeman takes the incredible position that an order requiring a bond under LR 54.2 is somehow prohibited by LR 54.1, and she makes a false equivalence between a bond for costs under the former and the taxation of costs under the latter.   That statutory interpretation makes no practical or legal sense.   Why would the New York legislature allow a court to order a bond for fees and costs, if the court could only do so after final judgment or disposition of an appeal?   There would be no point to such a bond.   There is no such limitation on the Court's power to require a bond, and a bond order is by no means equivalent to the taxation of costs during an appeal.

Freeman's statutory interpretation is contradicted by the manner in which LR 54.2 is applied by the federal courts.   For example, in 1999, the Second Circuit in *Selletti v. Carey,* 173 F.3d 104, 110-11 (2d Cir. 1999) found "the district court did not abuse its discretion by requiring plaintiff to file a security for costs and attorney's fees, which may be awarded to the prevailing party in a copyright action" because "[s]such orders are specifically authorized, under the appropriate circumstances, by Local Civil Rule 54.2" and because, among other reasons, "defendants' ultimate ability to recover costs that might be awarded by the court was in doubt." In that case, Mariah Carey had sought an order requiring the plaintiff alleging copyright infringement to post a bond as security for what Carey viewed as a likely award of costs and fees when she prevailed. *See Selletti v. Carey,* 173 F.R.D. 96, 100 (S.D.N.Y. 1997).   Relying on LR 54.2, the court found that the posting of security was entirely appropriate and issued an order requiring the same, <u>well before any judgment was entered or appeal commenced</u>, and without the filing of any notice of taxation of costs under LR 54.1. *See id.* at 100-103.

5

A bond in this case is even more appropriate where Defendants have already prevailed, the majority of fees and costs have already been incurred, Defendants are being subjected to a frivolous appeal where they will incur still further fees and costs, and Freeman knows that her appeal is frivolous because she is already taking tangible steps to shield her assets.

B)  A Bond Can Be Issued for Fees Already Incurred and For Fees Yet To Be Incurred.

First, Freeman argues the Court cannot require a bond for fees and costs that have not yet been awarded, and then she argues that a bond is only appropriate for "prospective" costs and fees going forward.  Of course, neither condition can be read into the statute, which allows the court to order a bond "so conditioned as it may designate."  LR 54.2.  In fact, Freeman's own cited case, *Gary Friedrich Enter., LLC v. Marvel Enter., Inc.,* 08-CIV-01533, 2010 WL 3452375, at *2, (S.D.N.Y. 2010), confirms that the "primary purpose of the rule is to ensure that the prevailing party will be able to collect the costs and fees owed to it in situations where the other party is unlikely or unwilling to pay," including "attorneys' fees when a prevailing party is potentially entitled to those fees by statute," but "there are no set guidelines for applying Rule 54.2." (emphasis added).  In fact, the Court has such broad discretion that it can order an LR 54.2 bond even on its own initiative.

Freeman is wrong that LR 54.2 cannot be used to order a bond "for work already done," and she is wrong in her characterization of the rule as a "district-court security-for-costs device…tied to prospective, recoverable, ascertainable costs" only. [Dkt. 563, p.11.]  Neither of the cases she cited support that proposition, and the relevant case law is, in fact, solidly against her. *See, e.g., Kensington Intern. Ltd. v. Republic of Congo*, 03 CIV 4578, 2005 WL 646086, at *2 (S.D.N.Y., Mar. 21, 2005) (requiring Congo to post a bond of $450,000 for fees and costs both

6

"that Kensington <u>has incurred and likely will incur</u> in obtaining judgment in this action)" (emphasis added).  Defendants merely seek the same in this case.

Not only does the Court have the authority to grant Defendants security under both LR 54.2 and Rule 7, but the Courts may also exercise their "inherent power and [] constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions… [including] against the threat of onerous, multiplicitous, and baseless litigation" such as that engaged in here.  *See Celli v. NYC,* 24-CV-9743, 2025 WL 1810365, at *16, (S.D.N.Y. May 27, 2025); *Woodhouse v. Meta Platforms Inc.,* 704 F.Supp.3d 502, 517 (S.D.N.Y. 2023).

## IV.    FREEMAN'S APPEAL IS FRIVOLOUS AND SHE KNOWS IT.

In order to argue that her underlying claims are not frivolous so she should not be required to post a bond, Freeman continues to rely on early rulings that were based solely on her misleading charts of supposed similarities, apparently forgetting that Your Honor subsequently did what no one else had done in four years and actually *read* everything.[7]  She conspicuously ignores Your Honor's conclusion that the case was "<u>easily disposed</u> of once one reads the allegedly infringed and infringing works against each other…" and that the works are, in fact, "<u>substantially different</u>." [Dkt. 548, p. 82 (emphasis added).]

In her Opposition, Freeman even concedes that the works at issue are substantially different – and yet, she continues with her frivolous appeal of that finding.  She argues "there is no justification to find this case 'frivolous' merely because Defendants may have changed their work enough for this Court to find insufficient substantial similarity of protectable expression."  [Dkt.

---

[7]  She also relies on a preliminary observation about probative similarity made by Your Honor at the very first hearing following your assignment to this case, and prior to your having read Freeman's manuscripts – an observation which was clearly not intended to be a referendum on the merits of her case as a whole.

563]. In other words, she admits there is no substantial similarity between the works, while refusing to understand that necessarily means there was no copyright infringement. No matter what creative theories she attempts to come up with to avoid that conclusion, the absence of substantial similarity is fatal to her case, and no court is likely to change the law for her just because she refuses to let go of her delusion that she was the sole source and wellspring of Defendants' inspiration.

Based on the frivolousness of her underlying suit and her appeal, there is a very strong likelihood Defendants will prevail on their motion for prevailing party fees, and that they will also be awarded their costs on appeal. Freeman knows this to be true, and that is why she has already begun shielding her assets from Defendants' reach.

## V.     THE COURT NEED NOT RULE ON THE FEES MOTION TO ORDER A BOND.

Freeman claims the instant Motion is an "end run" on Defendants' motion for prevailing party fees, which the Court stayed pending the appeal, and that the Court would need to decide that motion, or at least review Defendants' billing statements, to determine "the necessity of a bond" and "Freeman's ability to secure one."[8] Of course, those excuses fail to make any logical sense. Whether a bond should issue is determined by the factors set forth in the cases applying LR 54.2 and Rule 7, as discussed at length in the Motion and above, and Freeman's ability to secure a bond has nothing to do with Defendants' billing statements, but with her own financial condition.[9]

---

[8] In yet another reckless display of frivolity, Freeman attacks the credibility of Defendants' fee request based entirely on a statement by a reporter a year-and-a-half ago that the litigation has cost defendants "more than a million" – for the proposition that it is conclusive evidence of gross overbilling by defense counsel. [Dkt. 563 p.12 and fn. 9.] The suggestion would be offensive were it not so patently ridiculous.

[9] To the extent the Court finds Plaintiff's argument persuasive that a determination of the fees motion now is necessary, Defendants would certainly not object to the Court deciding the issue at this time.

## VI.    THERE IS A STRONG LIKELIHOOD THAT FREEMAN WILL NOT PAY.

Freeman ironically argues that "Defendants' motion rests almost exclusively on forked-tongue arguments that Freeman is both financially well off, a risk of nonpayment, an officer of the court with strong earning potential, and one who cannot be trusted to comply with an order to pay costs or fees should they be awarded." [Dkt. 563, p. 16.] She is absolutely correct.

Freeman is (or at least, was) financially well off, with multiple properties in California and Alaska.  In fact, she and her husband were apparently able to finance this litigation with over $1.1 million worth of cash on hand.  (Nashon Decl., Exh. B.)  Indeed, Freeman testified she had six different attorneys over the course of the lawsuit, two on contingency, two that billed by the hour, and two that accepted her legal services "in trade."  (*Id.*, Exh. G.)  She was a busy family law attorney for over twenty-five years, but she voluntarily stopped working to focus on this lawsuit.  (*Id.*)  Her husband specializes in giving "strategic advice and comprehensive planning" to "build wealth, protect your family, [and] preserve your assets."  (*Id.*, Exh. F.)  And indeed, within days of losing the underlying case, the two of them entered into a "Settlement Agreement" that clearly was designed to do exactly that.  (*Id.*, Exh. B.)

There is every indication that Freeman does not intend to pay the likely fee award that will be entered against her in this case.  While she was willing to bankrupt an innocent author with three kids to support in the event she prevailed, she has already taken steps to ensure that the same author, and the other Defendants whose lives and careers she also sought to ruin, have no recourse against her after successfully defending against her spurious claims.  A bond is the precise mechanism designed to protect against such injustices.

9

## VII.    THE AMOUNT OF BOND SOUGHT BY DEFENDANTS IS REASONABLE.

Contrary to Freeman's assertion, there is no requirement that Freeman deposit the full amount of the bond to obtain one (and her attorney's double hearsay declaration on this point should be stricken).  She need only offer collateral for the bond, and setting aside the recent actions taken to shield her assets, she has more than sufficient collateral to obtain a bond for the amount sought.  While the amount requested is significant, this case has and continues to be far from "normal."[10]  The extreme frivolity of the claims, which Freeman persisted in litigating despite all evidence showing that they were false, and the bad faith with which she litigated said claims, all as set forth in great detail in Defendants' motion at Docket 551, already provide sufficient grounds for the Court to award a bond in the amount requested.  Now that Freeman has doubled down by using the legal system as a means for conspiring to shield her assets from any award issued against her, the Court has even more reason to act to prevent her from victimizing Defendants even more than she already has.

Dated: June 16, 2026                                       Respectfully submitted,

                                                           */s/ Amy L. Nashon*

                                                           Amy L. Nashon
                                                           California State Bar No. 316353
                                                           **TROYGOULD P.C.**
                                                           1801 Century Park East, Suite 1600
                                                           Los Angeles, CA 90067
                                                           Phone: (310) 553-4441
                                                           Fax: (310) 201-4746
                                                           anashon@troygould.com

---

[10] Moreover, a bond of several million dollars is not unheard of in appropriate cases.  *See, e.g., Klpisch Group, Inc. v. Big Box Store Ltd.,* 12-CV-6283, 2016 WL 11944285, at *2 (S.D.N.Y. September 30, 2016) (finding a bond of up to $5 million appropriate in a trademark infringement action).

Jennifer Pariser
**OPPENHEIM + ZEBRAK, LLP**
461 5th Avenue, 19th Floor
New York, NY 10017
Phone: (212) 951-1874
Fax: (866) 766-1678
JPariser@oandzlaw.com

*Attorneys for Defendants Tracy Deebs-Elkenaney*
*p/k/a Tracy Wolff, Entangled Publishing, LLC,*
*Holtzbrinck Publishers, LLC d/b/a Macmillan, and*
*Universal City Studios LLC*

Lacy H. Koonce, III
**KLARIS LAW PLLC**
161 Water Street, Ste. 904
New York, NY 10038
Phone: (917) 612-5861
lance.koonce@klarislaw.com
*Attorneys for Defendants Emily Sylvan Kim and*
*Prospect Agency, LLC*

Dwayne K. Goetzel
Texas State Bar No. 08059500
**KOWERT, HOOD, MUNYON, RANKIN &**
**GOETZEL, P.C.**
1120 S. Capital of Texas Hwy., Bld. 2, Ste 300
Austin, Texas 78746
Phone: (512) 853-8800
Fax: (512) 853-8801
dgoetzel@intprop.com
*Attorneys for Defendants Tracy Deebs-Elkenaney*
*p/k/a Tracy Wolff*

11