**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN,<br><br>        Plaintiff,<br><br>    v.<br><br>TRACY DEEBS-ELKENANEY, et al.<br><br>        Defendants. | Case No. 1:22-cv-02435 CM-SN<br><br>**DECLARATION OF AMY NASHON SUBMITTED WITH DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR AN ORDER REQUIRING PLAINTIFF TO POST A BOND** |

## DECLARATION OF AMY NASHON

Amy Nashon declares as follows:

1.      I am a shareholder at the law firm of TroyGould, PC, attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC in the above-captioned matter.  I make this declaration in support of the Reply Brief submitted jointly by all Defendants (including Emily Kim and Prospect Agency, LLC) with respect to the Motion for an Order Requiring Plaintiff to Post a Bond [Dkt. 557].

2.      On June 9, 2026, Defendants learned that Plaintiff Lynne Freeman ("Freeman") and her husband Trent Baer ("Baer") had been granted a divorce.  I immediately requested and received a copy of the divorce filings from the Anchorage Superior Court.  True and correct copies of those files are attached as follows: the Divorce Petition is attached hereto as "Exhibit A," the Settlement Agreement is attached hereto as "Exhibit B," and the Divorce Decree is attached hereto as "Exhibit C."

3.      Trent Baer was deposed on or about March 21, 2023.  True and correct excerpts of his deposition transcript are attached hereto as "Exhibit D."

4.      On June 14 and 15, 2026, I performed an internet and Westlaw public records investigation into the real property and business assets identified in the Settlement Agreement.

5.      As part of my Westlaw investigation, I was able to determine that Freeman's Santa Barbara property was purchased in October 2019 for $1,350,000. According to Homes.Com, (which collects data from public records) the mortgage is now approximately $867,000 and the property is now worth up to $2,075,000.  According to Zillow, the property's estimated value is $1,778,372.  Freeman and Baer listed its estimated value as $1,400,000.  A true and correct copy of the Zillow and Homes.com print-outs as of June 16, 2026 are attached hereto as "Exhibit E."

1

6.      As part of my Westlaw investigation, I was able to determine that Freeman's Alaska property, consisting of a large lot in downtown Anchorage with a home and a converted office) was bought separately as two lots in 2012 and 2015 (although she claims that it is a single, undivided lot) and it is valued by Zillow at a combined amount of $1,390,000.  A true and correct copy of the Zillow print-out for that home is included in "Exhibit E."

7.      As part of my investigation, I was able to observe photograph images of a BMW X5 (not an X3) parked in the driveway at Freeman and Baer's Anchorage home, and found that Baer has discussed the X5 in online forums.  According to BMW, a BMW X5 is generally around $15,000 to $17,000 more expensive than an X3, and a newer model would obviously be significant more expensive than that.

8.      On June 14, 2026, I reviewed the website www.cvgwealth.com that advertises Baer's investment company, CVG Wealth Management.  Relevant print-outs from that website as of June 16, 2026 are attached hereto as "Exhibit F."

9.      On June 14, 2026, I reviewed the website and social media posts of Jennifer Holland, the attorney who represented Freeman in her divorce.  Ms. Holland has offices at 737 M Street, a converted office building on Freeman and Baer's Anchorage property. She advertises herself only as a bankruptcy attorney on her website www.alaskabankruptcy.com.

10.     On January 1, 2025, attorney Jennifer Holland posted to Instagram Threads under the username @notbtjen: "My friend filed a lawsuit after her manuscripts and ideas were stolen and her beautiful writing … was churned out into formulaic pulp.  Not only was this theft of deeply personal ideas, but an absolute insult to all authors with genuine talent, and their readers."  On May 1, 2025, referring to Defendants, she posted: "What they did is so disgusting….I hope they get what they deserve" and separately, "The defendants have already lost at summary judgment.  This is my friend Lynne's lawsuit. So embarrassing for the author, publisher, and especially the agent.  Of course, I'm here

for all the drama" and posted a link to Freeman's website, www.Lynnefreemanwriter.com.

11.    Lynne Freeman was deposed on or about March 24, 2023.  True and correct excerpts of her deposition transcript are attached hereto as "Exhibit G."

I affirm this 16th day of June 2026 under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Amy Nashon

3

## CERTIFICATE OF SERVICE

I, Amy Nashon, hereby certify that a true and correct complete copy of the

Declaration of Amy Nashon has been served on all counsel of record via the Court's

CM/ECF service.

/s/ Amy Nashon

Amy Nashon

# Exhibit A

FILED IN THE ALASKA TRIAL COURTS ON 4/3/2026

Law Offices of Jennifer L. Holland
737 M Street
Anchorage, AK 99501
(907) 279-3333
(907) 258-4428 (facsimile)
jennifer@alaskabankruptcy.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| LYNNE FREEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| TRENT DEREK BAER, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | Case No. 3AN-26-05990CI |

**COMPLAINT FOR DIVORCE**

COMES NOW Lynne Freeman, through her attorney, THE LAW OFFICES OF JENNIFER L. HOLLAND, and alleges as follows:

**I**

Plaintiff current lives in the state of California. Defendant is a resident of the state of Alaska.

**II**

Plaintiff and Defendant were married on June 19, 1999, in Anchorage, Alaska, and ever since have been husband and wife.

**III**

There has developed, since the date of the marriage, an incompatibility of temperament,

and it appears impossible for the parties to live together as husband and wife.

## IV

There are no minor children of the marriage. There is one adult child of the marriage. No other children were adopted during the marriage, and Plaintiff is not presently pregnant.

## V

The parties have acquired certain property and obligations during the course of the marriage which will require adjudication by this court.

## VI

The parties' property and obligations should be divided as set forth in the proposed Property Settlement Agreement.

WHEREFORE, Plaintiff prays for judgment as follows:

1. a decree of divorce on the grounds of incompatibility of temperament,

2. an equitable disposition of the marital estate as set forth in the proposed Property Settlement Agreement, and

3. any other relief just and proper under the circumstances.

DATED at Anchorage, Alaska this 3rd day of April, 2026.

LAW OFFICES OF JENNIFER L. HOLLAND
Attorney for Plaintiff

By: _____
Jennifer L. Holland
ABA #9311079

COMPLAINT FOR DIVORCE
Page #2

# Exhibit B

FILED IN THE ALASKA TRIAL COURTS ON 4/3/2026

Law Offices of Jennifer L. Holland
737 M Street
Anchorage, AK 99501
(907) 279-3333
(907) 258-4428 (facsimile)
jennifer@alaskabankruptcy.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| LYNNE FREEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| TRENT DEREK BAER, ) | |
| ) | |
| Defendant. ) | |
| _____) | Case No. 3AN-26-_05990_____ CI |

**PROPERTY SETTLEMENT AGREEMENT**

This Property Settlement Agreement ("Agreement") is made between Plaintiff, Lynne Freeman ("Lynne") and Defendant Trent Derek Baer ("Trent"):

1. Plaintiff currently lives in the state of California. Defendant is a resident of the state of Alaska

2. The parties were married on June 19, 1999, at Anchorage, Alaska, and ever since have been husband and wife.

3. There are no minor children born of the marriage. There is one adult child born of the marriage. No children were adopted during the marriage, and Lynne is not presently pregnant.

4. The parties have accumulated certain assets and incurred certain debts during the marriage that require distribution by the court.

5. The parties desire to enter into a property settlement that fairly allocates the economic

effects of the divorce and settles all rights and claims to the property and debts of the marriage as well as the parties' separate property.

NOW THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the parties agree as follows:

## PART I PROPERTY AND DEBT DISTRIBUTION

### Real Property

6. Santa Barbara Condominium

a. The parties own a two bedroom, two bathroom condominium located at 3722 State Street #309, Santa Barbara, California (the "Condominium").

b. The parties agree the Condominium has an estimated fair market value of $1,400,000. The value is based on a March 2026 sale in the complex for a similar two bedroom, two bathroom unit with higher-end finishes and in superior condition to the parties' unit. The outstanding mortgage balance is $1,015,000, and the marital equity is $385,000. The title and the mortgage are in joint names.

c. The property is awarded 50/50 to the parties. Lynne retains the right to reside in the condominium and exclusively occupy the condominium until May 1, 2031. Lynne shall have until May 1, 2031, to refinance the Condominium and buy out Trent's interest at fair market value at the time of sale or to sell the Condominium and divide the proceeds. The property is currently on an adjustable rate mortgage which resets to a higher interest rate February 20, 2027. The property may need to be refinanced at that time. Lynne and Trent agree to work together if

PROPERTY SETTLEMENT AGREEMENT
Page #2

that becomes necessary to achieve a lower interest rate.  Both parties shall remain on the title until such time as the property is sold or refinanced.  If the property is refinanced and Lynne buys out Trent's interest, Lynne and Trent will cooperate with the necessary paperwork to transfer title to Lynne at that time.

d. Trent shall pay the mortgage, HOA dues, insurance, repairs, property taxes, and maintenance until sale or refinance in Lynne's name, until May 1, 2031.

e. If the property is not refinanced or sold by May 1, 2031, the property shall be listed for sale with a real estate agent agreed upon by both parties.  Trent and Lynne will cooperate with the recommendations of the listing agent and agree to decrease the listing price as recommended until the property is sold.

f. Upon sale or refinance, the net proceeds shall be divided equally between the parties, except that Trent shall first be reimbursed for one half of the mortgage, HOA dues, insurance, repairs, property taxes, and maintenance actually paid from the date of the decree until the property is sold or refinanced.

7. Anchorage LLC property and Baer Asset Management Group, LLC

a. The parties are joint shareholders of an LLC, Baer Asset Management Group ("BAMG,") whose sole asset is real property located at 737 M Street and 736 Coastal Place ("Anchorage Property.") The real estate is on one parcel and cannot be divided.  The value of the real property is $1,030,000.  There is a mortgage and a second mortgage in the name of the LLC

PROPERTY SETTLEMENT AGREEMENT
Page #3

securing the two parcels in the combined amount of $705,000. The marital equity in this property is $325,000.

b. Trent is awarded BAMG, including the Anchorage Property held in BAMG.

c. Upon transfer of her shares, Lynne shall have no further ownership, control, liability, or obligation associated with the BAMG or Anchorage Property.

d. Trent shall prepare and file transfer documents within one week of this Agreement; Lynne shall cooperate to execute those documents in a prompt manner.

e. Trent shall indemnify, defend, and hold Lynne harmless from all claims, liabilities, debts, obligations, damages, or expenses related to the BAMG or Anchorage Property.

## **Remaining Assets and Debts of the Marriage**

8. Baer Investment Group, LLC

Trent is currently the sole shareholder of Baer Investments Group, LLC ("BIG"). The LLC's only asset is a bank account. It is a services-based company operating in Alaska and California and has no blue sky value. Trent shall retain 100% interest in BIG, in exchange of which Lynne will be receiving benefit through future temporary maintenance as otherwise set forth in this Agreement.

9. 49% interest in CVG Wealth Management, LLC

PROPERTY SETTLEMENT AGREEMENT
Page #4

Trent has a 49% share in an LLC created for the sole purpose of establishing group benefits and office share expenses for BIG.  Trent shall receive this LLC.  Lynne has never had an interest in this LLC.

10. <u>Vehicles</u>

a.   The 2016 Range Rover Sport is awarded to Lynne, with a value of approximately $11,000.  Trent agrees to pay maintenance and for the necessary body work for its current damage.

b.   The 2018 BMW X3 is awarded to Trent, with a value of approximately $11,000.

11. <u>Retirement accounts and stock account</u>

a.  Lynne retains her IRA worth approximately $178,000.

b.  Trent retains his 401(k) worth approximately $35,000.

c.  Trent retains his stock account worth approximately $45,000.

12. <u>Personal property</u>

a.  Each party retains the personal property in their possession.

b.  Trent receives the Anchorage storage unit contents, consisting of furniture, office materials, tools, art, and outdoor gear and equipment valued at approximately $10,000.

13. <u>Copyright Litigation, Freeman v. Deebs, et. al</u>

<u>PROPERTY SETTLEMENT AGREEMENT</u>
Page #5

a. Lynne is pursuing a copyright infringement claim in federal court in the Southern District of New York. Trent is not a party to the lawsuit. If she receives any recovery, she shall keep the net proceeds less the amount she owes Trent for the loan he gave her to finance the litigation.

b. Trent loaned monies to Lynne to fund her copyright litigation. To date, he has loaned her a total of $720,000. $250,000 represents his half of the proceeds from the sale of the parties' marital home in Anchorage in December 2022. BIG loaned Lynne an additional $470,000. Trent will continue to pay the cost of the e-discovery storage, which is approximately $1,450 per month, until the litigation is finally resolved. This payment will be added to the total of the loan.

c. If Lynne does not receive a recovery in this litigation, Trent retains his full legal rights to recover this debt from Lynne.

d. Lynne is solely responsible for any losses resulting from this litigation, including attorney's fees, if she is unsuccessful. She shall indemnify and hold Trent harmless thereon.

14. The parties' dog, Buddy

Buddy shall reside with Lynne. Trent will have liberal visitation rights when he is in Santa Barbara for business, to include having Buddy for overnight stays. Trent will cover the cost of a monthly groomer, Buddy's food, and all veterinary care for Buddy.

15.  <u>Other Debts and Obligations</u>

Except as set forth in this Agreement, each party is solely responsible for any debt in his or her own name and shall indemnify and hold the other harmless thereon.  Neither party shall incur any further debt for which the other bears responsibility, except as set forth within this Agreement.  The parties shall cooperate to file any outstanding tax returns.  Trent shall be responsible for any resulting tax liability and shall receive any resulting tax refund.

## **PART II SPOUSAL SUPPORT**

Given the parties' long-term marriage,  Lynne's long-standing illness resulting in an inability to work, and the understanding that property division alone will not meet Lynne's financial needs, Trent agrees to support her as set forth below while she recovers her health.

16. Trent's spousal support obligations shall continue through May 1, 2031, except for health insurance as set forth below.  Although these obligations are considered spousal support, they shall not be subject to modification due to change in circumstances.

17. As set forth in PART I above, Trent shall pay Lynne's mortgage on the Santa Barbara Condominium, HOA dues, etc. until the time of sale or refinance as set forth above. In addition to receiving a credit for one half of these payments upon sale or refinance as set forth above, these payments shall be considered in the nature of spousal support.  Payments will be made directly to the obligations and not to Lynne directly.

18. Trent will allow Lynne to keep two joint credit cards, which he will pay monthly, for her reasonable living expenses of groceries, gasoline, and uncovered medical expenses, as

PROPERTY SETTLEMENT AGREEMENT
Page #7

well as expenses for the parties' dog, "Buddy." Lynne may use the joint credit cards up to a limit of no more than $3,000 per month.  Anything above that amount will be her sole responsibility.

19. Trent shall maintain a health insurance policy for Lynne and pay Lynne's uncovered medical expenses.  This shall continue beyond the regular period of spousal support unless and until Lynne is able to obtain her own health insurance at the same or lesser cost.

20.  Trent shall pay Lynne's auto insurance policy and pay for registration and taxes on personal property,

21. Trent shall pay Lynne's monthly physical therapy at $750-$1,500 a month, her dietician while she is going through a second transplant procedure at $195 per hour, the out-of-pocket cost of the second transplant estimated to be approximately $7,500, and any other medically necessary treatments not covered by insurance.

22. Trent agrees to purchase a new ergonomic sofa for Lynne that supports her spine, a Ruggable for the floor, and new balcony furnishings at the Condominium to consist of a couch and chair. He will pay for these items no later than two weeks from the date of this Agreement.

23. Trent will keep Lynne as the primary beneficiary on his life insurance policy until May 1, 2031, to secure her support.

PROPERTY SETTLEMENT AGREEMENT
Page #8

## PART III COSTS AND ATTORNEY FEES

24. Trent shall be responsible for Lynne's costs and attorney's fees related to the divorce.

25. Trent is not represented but has consulted with an independent attorney of his choosing, and he shall be solely responsible for his own costs and attorney's fees.

## PART IV GENERAL AGREEMENTS

26. Both parties have had the benefit of independent counsel throughout this case, and each participated freely and knowingly in each stage of the negotiation process which resulted in this settlement. Lynne's attorney has provided no legal advice to Trent. Neither attorney has provided tax advice. Each party has been advised to consult with his or her own financial advisor regarding tax implications and consequences;

27. Neither party is under the influence of drugs and/or alcohol affecting their judgment, powers of perception, or mental abilities;

28. Each party agrees that the marital estate division, division of costs and attorney's fees, and the spousal support agreements are fair and equitable.

29. Construction of this agreement should not be construed more strictly against the drafter.

30. Both parties have made full disclosure of all significant property and debts.

PROPERTY SETTLEMENT AGREEMENT
Page #9

DATED 4-3-26


_____
Lynne Freeman
Plaintiff


DATED 4|3|26


_____
Trent Derek Baer
Defendant


PROPERTY SETTLEMENT AGREEMENT
Page #10

# Exhibit C

Law Offices of Jennifer L. Holland
737 M Street
Anchorage, AK 99501
(907) 279-3333
(907) 258-4428 (facsimile)
jennifer@alaskabankruptcy.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

LYNNE FREEMAN,                   )
                                     )
       Plaintiff,           )
                                     )
vs.                              )
                                   )
TRENT DEREK BAER,      )
                                   )
       Defendant.     )
_____)    Case No. 3AN-26-05990_____ CI

## DECREE OF DIVORCE   **#2**

The court entered its Findings of Fact and Conclusions of Law in the above-referenced case.  Based upon the foregoing, it is:

ORDERED, ADJUDGED AND DECREED:

1.  The parties are granted an absolute Decree of Divorce, forever dissolving the bonds of matrimony now and heretofore existing between them;

2.  The marital estate is divided as set forth in detail in the Property Settlement Agreement, which together with the Findings of Fact and Conclusions of Law, is incorporated and merged into this decree; and

DATED at Anchorage, Alaska this <u>4th</u> day of <u>May</u>, 2026.

_____
Superior Court Judge

Yvonne Lamoureux
_____
Type or Print Name

Approved as to form and content
this _3rd_ day of April, 2026.

_____
Trent Derek Baer, Defendant

Law Offices of Jennifer L. Holland
737 M Street
Anchorage, AK 99501
(907) 279-3333
(907) 258-4428 (facsimile)
jennifer@alaskabankruptcy.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| LYNNE FREEMAN,<br><br>          Plaintiff,<br><br>vs.<br><br>TRENT DEREK BAER,<br><br>          Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 3AN-26-05990_____ CI

**FINDINGS OF FACT & CONCLUSIONS OF LAW**     **#1**

The parties have entered into a Property Settlement Agreement resolving all issues between them. An uncontested hearing was held on ___May 4_____, 2026, before the Honorable ___Yvonne Lamoureux_____. Plaintiff was present by telephone with her attorney, Jennifer L. Holland. Defendant, was present         by telephone, representing himself. At that time, the parties placed their settlement on the record. Having reviewed the evidence, having reviewed the Property Settlement Agreement, and having heard the testimony of the parties, the court makes and enters the following:

**FINDINGS OF FACT**

1. The Plaintiff ("Lynne") is currently living in the state of California and Defendant ("Trent") is a resident of the State of Alaska.

2. The parties were married on June 19, 1999, in Anchorage, Alaska, and since that time

have been and are now husband and wife.

3.  An incompatibility of temperament has developed between the parties, in that their likes and dislikes are widely divergent, resulting in irreconcilable differences making the continuation of a viable marriage not possible.

4.  The parties have no minor children born of the marriage.  There is one adult child born of the marriage.  No children were adopted during the marriage, and the wife is not presently pregnant.

5.  Property and debts were acquired during the course of the marriage.  The parties have divided that property and debt, including separate property, as set forth in the Property Settlement Agreement.  Both parties testified, *inter alia*, that each entered into the agreement freely and voluntarily, that each had adequate time to consider the terms of the agreement and to consult with counsel, and that their agreement is fair and equitable.

6.  The Property Settlement Agreement is fair and equitable to the parties, and should be entered as an order of court.

## CONCLUSIONS OF LAW

1.  This court has personal and subject matter jurisdiction of all issues in this matter;

2.  An incompatibility of temperament exists such that the marriage can no longer continue.

3.  The property division, division of costs and attorney's fees, and spousal support outlined in the Property Settlement Agreement are fair and equitable to both parties and are approved by this court.

FINDINGS OF FACT &
CONCLUSIONS OF LAW
Page #2

4. The Property Settlement Agreement, and these Findings of Fact and Conclusions of Law, are incorporated by reference and merged into the Decree.

DATED at Anchorage, Alaska this 4th day of _____ May _____, 2026.

_____
Superior Court Judge

Yvonne Lamoureux
_____
Type or Print Name

Approved as to form and content this 3rd day of April, 2026.

_____
Trent Derek Baer, Defendant

FINDINGS OF FACT &
CONCLUSIONS OF LAW
Page #3

# Alaska Trial Courts

# Certificate of Distribution

**Case Number: 3AN-26-05990CI**

**Case Title: FREEMAN, LYNNE VS. BAER, TRENT DEREK YL**

---

**The Alaska Trial Courts certify that the Order Granting [Proposed] Findings of Fact and Conclusions of Law Freeman, Lynne Case Motion #1 [Proposed] Findings of Fact and Conclusions of Law was distributed to:**

| Recipient | Servicing Method | Distribution Date |
|---|---|---|
| Trent Baer | Email | 5/4/2026 |
| Jennifer Holland | Email | 5/4/2026 |
| Trent Baer | Mail | 5/4/2026 |
| Jennifer Holland | Mail | 5/4/2026 |

# Alaska Trial Courts

# Certificate of Distribution

**Case Number: 3AN-26-05990CI**

**Case Title: FREEMAN, LYNNE VS. BAER, TRENT DEREK YL**

---

**The Alaska Trial Courts certify that the Order Granting [Proposed] Decree of Divorce Freeman, Lynne Case Motion #2 [Proposed] Decree of Divorce was distributed to:**

| Recipient | Servicing Method | Distribution Date |
|---|---|---|
| Trent Baer | Email | 5/4/2026 |
| Jennifer Holland | Email | 5/4/2026 |
| Trent Baer | Mail | 5/4/2026 |
| Jennifer Holland | Mail | 5/4/2026 |

# Exhibit D

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


LYNNE FREEMAN, an individual,      )
                                   )
              Plaintiff,           )
                                   )
         vs.                       ) Case No.
                                   ) 1:22-cv-02435-AT
TRACY DEEBS-ELKENANEY P/K/A         )
TRACY WOLFF, an individual,        )
EMILY SYLVAN KIM, an               )
individual, PROSPECT AGENCY,       )
LLC, a New Jersey limited          )
liability company, ENTANGLED       )
PUBLISHING, LLC, a Delaware        )
limited liability company,         )
HOLTZBRINCK PUBLISHERS, LLC        )
D/B/A MACMILLAN, a New York        )
limited liability company, and )
UNIVERSAL CITY STUDIOS, LLC, a )
Delaware limited liability         )
company,                           )
                                   )
              Defendants.          )
_____  )


CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF

TRENT BAER

TUESDAY, MARCH 21, 2023


Reported in Stenotype by:
Cody R. Knacke, RPR, CSR No. 13691
Job No.:  886197

12

Santa Barbara, California 93105.

Q.    The properties that you have described, do you own them just yourself or jointly with your wife?

A.    I own them jointly with my wife.

Q.    How long have you lived at your current residence in Alaska?

A.    The previous residence -- we just moved into this other residence because we sold the residence in November.

Q.    How long did you live at the one before, the one you just sold?

A.    That one, we lived in for -- I think it was 2018 that we bought it, so four years.

Q.    Are you originally from Alaska?

A.    I am originally from Alaska.

Q.    So if I'm understanding correctly, you and your wife split your time between California and Alaska; is that correct?

A.    Correct.

Q.    Is it a 50/50 split would you say?  Or how would you describe that split to me?

A.    Yes.  It's about a 50/50 split.  We spend a good portion of the summers and sometimes part of the winter in Alaska.  And when it gets below --

13

40 below 0, we go to Santa Barbara.

Q.    Sounds about right.

How many times a year would you say you go back and forth between California and Alaska?

A.    Due to COVID it was a lot -- it's been less frequent, but prior to COVID, it was -- I was going back and forth every three weeks.

Q.    How often does your wife go back and forth?

A.    She was going back and forth every -- I would say she would spend more of the summer there and most of the spring or fall; so it was -- she was not traveling on business as often as I was, but she was going back and forth probably every couple of months, I would guess.

Q.    When you travel back and forth between California and Alaska, how do you travel?

A.    I was generally catching the red eye out of LA on a five-hour flight direct to Anchorage.

Q.    So these are commercial flights, not private flights?

A.    They are on Alaska Airlines, yeah.

Q.    And is it the same for your wife?

A.    Generally, yes.  She would not take red eyes, though.

Q.    Are you currently employed, Mr. Baer?

16

Q.   How many clients do you have?

A.   Approximately 140 clients.  Maybe 150.

Q.   How much money does your group have under management?

A.   Depending on the day, we have 120 million.

Q.   Do you work any other jobs besides investment management?

A.   No.

Q.   Do you have any other sources of income, besides investment management?

A.   No.  I do have a rental property.  That's about it.

Q.   Is it fair to say that the industry you work in is finance?

A.   Yes, it's finance.

Q.   Is finance the only industry you've ever worked in?

A.   No.

Q.   What other industries, besides finance, have you worked in?

A.   I started my career in Japan.  I worked in -- actually, prior to that, I have worked summer jobs in Alaska on oil fields, commercial fishing. I've had a variety of jobs.  I worked the ramp at the airport and realized I wanted to complete my

22

Anchorage, Alaska.

Q.   What was the date of the wedding?

A.   It was June 21, 1999.

Q.   Depositions often aren't a memory test, but that's a big one; right?

A.   I hope I get that one right.

Q.   Do you have any children, you and Lynne?

A.   I do.  I have a son named Christian Baer.

Q.   How old is Christian?

A.   He is 20 years old now.

Q.   Does he go to college?

A.   He does.

Q.   Where does he go?

A.   Currently, he's enrolled at Pepperdine University, Malibu.

Q.   Any other children besides Christian?

A.   No.

Q.   Would you say you have a happy marriage with Lynne?

A.   Yes.

Q.   Do you ever buy gifts for her?

A.   Yes.

Q.   Do you ever take her to fancy dinners?

A.   I would say so, yes.

Q.   Do you ever take her on expensive

23

vacations?

A.   Yes.

Q.   Do you and Lynne ever get in any fights in all your years of marriage?

A.   No.

Q.   Never fight?

A.   I think there's a difference between squabbles and fights.

Q.   Do you get in any squabbles in all your years of marriage?

A.   I think every couple has some squabbles.

Q.   What are the sort of things you might squabble about?

A.   Who's going to take the dogs out.  I mean, just little stuff.  Timing.  We are both two very busy professionals and splitting household chores that we cover each other all the time.  And we depend on each other.  We're a partnership 100 percent.

Q.   When you say your wife is a busy professional, what career are you referring to?

A.   As an attorney.

Q.   Is she a practicing attorney?

A.   Yes.

Q.   What kind of law does she practice?

24

A.   Divorce law, family law.

Q.   Does that practice include litigation?

A.   Yes.

Q.   Does it include copyright litigation?

A.   No.  No.

Q.   Where is her practice located?

A.   In Anchorage, Alaska.

Q.   Do you know how many clients she has approximately?

A.   Currently?

Q.   Currently.

A.   I think she's put everything on hold, currently.

Q.   When did she start putting everything on hold?

A.   When this -- when we were alerted of this issue.

Q.   When you refer to this issue, do you mean the lawsuit that we're currently having a deposition for?

A.   (No audible response.)

Q.   Has your wife ever lied to you about anything in all your years of marriage?

A.   No.

Q.   Has she ever been wrong about anything in

30

thorough notes and assisted in that sense.  But as far as marketing or soliciting, no, I did not.

Q.   Are any of your investment clients in the publishing industry?

A.   No.

Q.   By the way, and I meant to ask this before, your clients, are they in any particular industry, or do they span a wide variety of industries?

A.   Wide variety.

Q.   Do you think Masqued is good enough to be published?

A.   Yes.

Q.   Do you read a lot of young adult paranormal books?

A.   I do now.

(Unidentified laughter.)

MR. HALPERIN:  I just heard some laughing, and I just want to make sure everybody is muted, besides us, Steve, myself, and the witness.  If you laughed and you aren't Steve or the witness, can you please go on mute?

MR. DONIGER:  Yeah.  And it wasn't me.

MR. HALPERIN:  Thank you.

It was a funny answer, though.

///

34

Q.    What genres do you like to read besides young adult paranormal?

A.    Most of my reading involves nonfiction finance and sometimes mathematical stuff.

Q.    How many books would you say you read per year for pleasure?

A.    I would easily say -- of one genre versus another or just one -- just books in general?

Q.    Why don't we start with fiction.

How many fiction books do you read a year for pleasure?

A.    For pleasure, I would say, generally speaking, four or five.  The last two years, I've read substantially more.

Q.    What do you mean by substantially?

A.    I have been through probably 150 books in the last two years.

Q.    And by "been through," you mean read?

A.    Yeah, I've been actively reading.

Q.    Why have you read so much more substantially over the last several years?

A.    Getting a better understanding of what's in a particular genre.

Q.    So you just testified that you -- over the last couple years, you have read substantially more

35

than you did before that.

Can you tell me what the books are that have been part of this greater body that you've read over the last couple years?

A.    They're generally all paranormal romance books.

Q.    Why don't you please list for me as many of them as you can right now.

A.    I believe I just -- I did -- I listed several just a little while ago.

Q.    So you listed several, including several Twilight books, and I asked you about Harry Potter. I think you --

A.    Jennifer Armintrout is another set of books.  There are Sherrilyn Kenyon books, JR Ward books.  I'm trying to think of all the other authors there.  I mean, I just -- I have a whole list. These have been on my iPad as well, so...

Q.    Okay.

A.    If I pulled up the library on my iPad, I could share all those with you.

Q.    Do you have your iPad with you?

A.    I don't.  I believe it's in the car.

Q.    And this isn't a memory test.  I'm just trying to get as many as you can remember right now.

A.    Yes, yes.

Q.    Can I just ask, and I'm not asking you to disclose any privileged conversations you might have had with counsel, but what did you do during the break?

A.    Nothing.  I had a setting on my phone that was -- it was, like, an alarm from the snooze alarm earlier this morning, so I wanted to make sure I -- it stopped going off.  I just shut my phone off entirely, so...

Q.    Oh, okay.  I thought you said your phone was off before.

A.    I did, but it was -- I have another backup phone that was in my -- my bag that's here.  I have two phones.  I have one for California and one for Alaska.

Q.    Why do you have a separate phone for Alaska and a separate one for California?

A.    I have clients in California; clients in Alaska.  I have an office in California and an office in Alaska.

Q.    You said before that you have read about 150 books in the last two years.

Do you recall that?

A.    I -- approximately.  I'd have to look at

90

Q.   Did you attend her deposition?

A.   Yes.

Q.   Physically in person?

A.   Yes.

Q.   Was she asked, at her deposition, whether she plagiarized from your wife's manuscript, Masqued?

A.   I don't recall.

Q.   Was she asked if she had ever read or saw Masqued before?

A.   Maybe, possibly.

Q.   Do you recall what she said?

A.   No.

Q.   Do you know who Elizabeth Pelletier is?

A.   Yes.

MR. HALPERIN:  For the court reporter, I'm just going to spell the last name, P-E-L-L-E-T-I-E-R.

BY MR. HALPERIN:

Q.   Who is Elizabeth Pelletier?

A.   I believe she's the CEO of Entangled Publishing.

Q.   Have you ever met her?

A.   I have not.

Q.   Did you attend her deposition?

91

A.    I did meet her at the deposition, yes.

Q.    And you attended it in person?

A.    Yes.

Q.    Do you know what, if any, role Elizabeth Pelletier had in creating and writing the Crave series?

A.    My understanding is she was the editor.

Q.    Was she a specific type of editor?

A.    I believe she is a content editor.

Q.    And do you understand that content editor is something different than a copy editor?

A.    I understand that now.

Q.    You learned it at Elizabeth Pelletier's deposition?

A.    Correct.

Q.    Was she asked whether she had ever seen or read Masqued before?

A.    I don't recall.

Q.    You don't recall whether she was asked?

A.    No.

Q.    Who is Stacy Abrams?

A.    Another Entangled editor.

Q.    Have you ever met Ms. Abrams?

A.    No.

Q.    Do you know what her role, if any, was with

respect to the writing and creating of Crave?

A.    I believe she was the copyright editor --

or not copyright -- copy editor.

Q.    She was asked about that at her deposition;

correct?

A.    Correct.

Q.    You attended her deposition on Zoom;

correct?

A.    Right.

Q.    She testified that she did not write any of

the content of Crave.  She just edited the grammar;

correct?

A.    That's correct.

Q.    And who's Emily Sylvan Kim?

A.    A literary agent.

Q.    Whose literary agent?

A.    I'm sorry.  Could you repeat that?

Q.    Whose literary agent?

A.    I believe for Tracy Wolff, and for my wife

Lynne Freeman.

Q.    Sorry.  To interrupt you.

      Have you ever met Ms. Kim?

A.    Yes.

Q.    Was that the time when you dropped your

wife off at the conference in Anaheim?

A.    Yes.

Q.    What did you do to help her find a lawyer?

A.    I just called and left messages and see who would -- I just left her number to call back and see who would call back.

Q.    Did you send any e-mails out to lawyers on behalf of your wife?

A.    I don't believe so.  I don't recall.

Q.    Did you send any e-mails out to try to find a lawyer -- like to anybody to help try to find a lawyer?

A.    Yes, I did.  We're friends with attorneys, friends with, you know, people that may have attorney -- other attorney, you know, business owners and whatnot that are in different industries that may have access to patent attorneys or copyright attorneys, and we were just looking for referrals.

Q.    I'm going to do my first attempt to add an exhibit to this deposition.  The way I'm going to do this is I'm going to drop it into the chat in Zoom for you.  These kind of work multiple ways in Zoom.  As you may have seen, sometimes people share their screens.  Sometimes people drop it into the chat.  I tend to think it's better if you can download it and

113

situation?  We are looking for referrals and currently interviewing litigators."

Did I read that correct?

A.    Correct.

Q.    So this is an example of you reaching out to someone to help try to find an attorney; right?

A.    Looking for referrals, correct.

Q.    And at this time, you were already interviewing litigators, meaning attorneys; right?

A.    I believe so, yes.

Q.    You write:  "Any help would be appreciated. Please keep this e-mail strictly confidential."

Did I read that correctly?

A.    Correct.

Q.    You wrote this e-mail to, kind of, a catch-all mailbox at Writers-World.com; right?

A.    Correct.

Q.    And you asked them to keep it confidential.

A.    Correct.

Q.    Did they ever respond to you?

A.    I don't think so.

Q.    You can put that one away.  Sometimes we say you can put it away, but this is on a computer; so you can close the window.

So why don't you describe to me what your

114

role has been helping out with this lawsuit.

A.   I have assisted --

MR. DONIGER:  Hold on.

I'm going to object to the extent you're asking for things that he's done that may be at the direction of counsel and may constitute work product and are privileged.

I would -- I'll let him answer to the extent he can without divulging those things, but I would request that you ask a more specific question.

MR. HALPERIN:  I'm happy to ask more specific questions, and I totally get it.

BY MR. HALPERIN:

Q.   So, for example, have you attended depositions?

A.   Yes.

Q.   How many depositions have you attended?

A.   I guess we've had Abrams -- whatever's been done thus far.

Q.   Have you attended every deposition thus far?

A.   I believe so, except I have not attended the Macmillan or the Entangled depositions.

Q.   Did you read the transcripts for those depositions?

A.   I have not.

Q.   Why have you attended these depositions?

Is it out of personal interest or is it to be of help?

A.   I think it's help -- I've been an agent of my wife in a sense that, you know, she's been unable to attend, so I've been -- I think it's important to get things firsthand.  So that's why.

Q.   Are you using your financial knowledge, in any way, to help?

A.   No.

Q.   Have you reviewed documents that were produced by defendants in this litigation?

A.   I have assisted the attorneys in their review.

Q.   Have you reviewed text messages that were produced in this litigation?

A.   Yes.

Q.   Is it fair to say you're very familiar with the facts of this litigation?

A.   Yes.

Q.   And you're so familiar that Mr. Passin actually asked the Court's permission to have you review unredacted versions of the text; correct?

A.   Correct.

116

Q.   Did you help investigate the facts for this lawsuit at all?

And I'm just asking did you or did you not, not the contents of any investigation.

MR. DONIGER:  Vague and ambiguous as to "investigate the facts."

MR. HALPERIN:  I thought I worded it to get around an objection there, Steve, but I appreciate it.

MR. DONIGER:  Well, I mean, he said he had read some of the books.  I don't know what you mean by "investigate the facts."  He's already testified as to some things he's done.

MR. HALPERIN:  Sure, totally.

BY MR. HALPERIN:

Q.   Have you conducted any investigation of any of the defendants for this case?

A.   Can you be more specific?

Q.   Did you research Tracy Wolff online at all?

A.   I looked at her books.  I looked at her blog.  Yes, I tried to get familiar with what her -- what information she had available on -- on herself out there.  I mean, she does blogs, she does social media, and I wanted to know what she was commenting on.

118

at them.

A.    Okay.

Q.    Have you communicated with any consultants on behalf of your wife?

A.    Consultants -- no --

MR. DONIGER:  I'm sorry.  That's a yes or no question.

Go ahead.

THE WITNESS:  On behalf of my wife?  Any communication has been with my wife.

BY MR. HALPERIN:

Q.    So you have not had any communications with consultants without your wife on them?

A.    She's been a party of all -- you know, all the -- I can't -- I can't say all -- I don't know for sure.  She's been a party of all communications with any consultants.  The consultants are expert -- that's really her forte.

Q.    Because the truth is that you have reached out to litigation consultants without your wife on those communications; right?

A.    What do you mean as a litigation consultant?

Q.    I am kind of using a word that plaintiff's attorneys have used already; so I, sort of, don't

know, to be honest.  But my understanding is someone who is helping your side with the litigation who is not a party.

A.    Correct.  I -- she may have other -- she may have communications with other consultants that I'm not -- you know, I was a party to.

Q.    Have you had those conversations without your wife on the e-mails or phone calls?

A.    I don't think so.  I don't recall.

MR. HALPERIN:  I'm going to mark another exhibit.  We'll call this Exhibit 126.

(Exhibit 126 was marked for identification by the Certified Shorthand Reporter, and a copy is attached hereto.)

BY MR. HALPERIN:

Q.    Adding it to the chat now and sending it your way so you should have it.

Can you download it, please.

A.    Yes.

Q.    Have you had a moment to take a look at it?

A.    I'm trying to look at this here.  Hold on.

Q.    It's kind of small, I realize.

A.    Yeah, it's really small.

Q.    Does what you're looking at say:

"Individual Entry Privilege Log" at the top middle?

# Exhibit E

736 Coastal Pl, Anchorage, AK 99501 | Zillow

<   **Back to search**          ♡ Save    ⬆ Share    ∘∘∘ More

**Off market**

**Street View**

## Zestimate®

# $968,100
### 736 Coastal Pl, Anchorage, AK 99501

| **2** beds | **3** baths | **1,607** sqft |
|---|---|---|

Est. refi payment: **$5,085/mo**   ⓢ **Refinance your loan**

| 📊 SingleFamily | 🔨 Built in 2007 | 📐 7,048 Square Feet Lot |
|---|---|---|
| 🏠 $968,100 Zestimate® | 📈 $602/sqft | 🤲 $2,804 Estimated rent |

# Home value

Zestimate®

 




NOT LISTED FOR SALE

      ⋮

### 736 Coastal Place

Anchorage, AK 99501
South Addition
Neighborhood
Estimated Value:
**$845,000 – $1,404,639**

**$845,000 – $1,404,639**

736 Coastal Place

Anchorage, AK 99501

See Similar Homes for Sale

**2** Beds **2.5** Baths **1,607** Sq Ft **$700/Sq Ft** Est. Value

## Sale Details

Date Sold: March 11, 2015
Current estimated payment $7,242 / mo

## Highlights

 Deck     Den     2 Car Attached Garage

 Inlet View Elementary School Rated A-     Fireplace     Attached Carport

## About This

As of May

 **Zillow**®

Back to search    ♡ Save    ⬆ Share    ⋯ More



**Off market**









⊞ See all 6 photos

 Zestimate®

# $422,700

737 M St, Anchorage, AK 99501

**2** beds    **1** baths    **1,768** sqft

Est. refi payment: **$2,220/mo**    ⓢ **Refinance your loan**

🏢 SingleFamily          🔨 Built in 1935          📐 7,046 Square Feet Lot

Ⓩ $422,700 Zestimate®   📊 $239/sqft            🤲 $2,067 Estimated rent

# Home value

Zestimate®

737 M St, Anchorage, AK 99501 | Homes.com

 



NOT LISTED FOR SALE

        ⋮

**737 M St**
Anchorage, AK 99501
South Addition
Neighborhood

737 M St

Anchorage, AK 99501

**See Similar Homes for Sale**

**--** Bed **--** Bath **1,604** Sq Ft **6,970** Sq Ft Lot Lot

## About This Home

This home is located at 737 M St, Anchorage, AK 99501. 737 M St is a home located in Anchorage Municipality with nearby schools including Inlet View Elementary School, Central Middle School of Science, and West High School.

**Create a Home Valuation Report for This Property**

〈  **Back to search**           Zillow®          ♡ Save    ⬆ Share    ∘∘∘ More

**Off market**

## Zestimate®

# $1,710,300
### 3722 State St Unit 309, Santa Barbara, CA 93105

**2** beds    **2** baths    **1,459** sqft

Est. refi payment: **$10,674/mo**  ⑤ **Refinance your loan**

Condo                Built in 2019            -- sqft lot

$1,710,300 Zestimate®    $1,172/sqft           $5,369 Estimated rent

# Home value

Zestimate®

  Homes.com

Buy   Sell   Rent   Agents   Explore   News      Sign In      Advertise



NOT LISTED FOR SALE

      ⋮

**3722 State St Unit 309**
Santa Barbara, CA 93105
San Roque
Neighborhood
Estimated Value:
**$1,575,000 – $2,075,000**

**$1,575,000 – $2,075,000**

3722 State St

Santa Barbara, CA 93105

See Similar Homes for Sale

**2** Beds **2** Baths **1,451** Sq Ft **$1,208/Sq Ft** Est. Value

## About This Home



# Exhibit F



## CVG Wealth Management

Applying the principles of portfolio management with wisdom and prudence.

## Your Wealth. Your Vision. Our Expertise.

At our independent wealth management firm, we serve clients across the United States with a singular mission: to deliver customized, transparent, and cost-effective investment solutions that align with your life, your goals, and your family's future.

With over 98 years of combined industry experience and approximately $400 Million in assets under management, our team strives to bring deep insight and sound judgment to every financial decision. We are currently licensed in nineteen states and maintain a physical presence in three, allowing us to serve a diverse and growing client base nationwide.

Unlike the growing trend in the industry—where "Over 80% of fee-based advisors are now utilizing model portfolios to outsource investment decisions." (Wall Street Journal, Mike Pitcher, June 12, 2025)—we take a different approach. We build custom portfolios tailored to your unique needs, values, and long-term objectives. This commitment to personalization is at the heart of everything we do.

We pride ourselves on:

- Putting client interests first



We are independent—but we are not alone. We've chosen to affiliate with LPL Financial, the nation's #1 independent broker-dealer by total revenue (Financial Planning Magazine, 1996–2024), and the #4 custodian of assets, with over $1.8 trillion in brokerage and advisory assets and a network of 29,000+ advisors (https://www.efim.lpl.com/lpl-by-the-numbers).

This partnership gives us:

- Greater autonomy
- Access to robust and dynamic resources
- Objective research and market insights

…all of which empower us to put your interests first—always.

SCHEDULE AN APPOINTMENT



## Your Process

We create strategies that are tailored to your goals.

LEARN MORE



## Our History



Trent Baer



📞 (866) 677-1551

✉ tbaer@cvg-wealth.com

Trent Baer has been managing private client portfolios for more than 27 years. He has built long-term relationships with his clients by providing tailored and personalized financial advice. He holds a degree in Economics and Finance, with a minor in Accounting, from Gonzaga University.

Trent creates customized portfolios that utilize innovative, independent research. He prides himself on offering strategic advice and comprehensive financial planning to address the specific goals of clients at all stages of life. In his free time, he enjoys spending time with his family, trail running, playing ice hockey, skiing, playing chess, and reading.

## CONTACT US

### Quick Links

Retirement

Investment

Estate

Insurance

Tax

Money

Lifestyle

Latest Articles

All Videos

All Calculators

LPL Financial Form CRS

Check the background of your financial professional on FINRA's BrokerCheck.

The content is developed from sources believed to be providing accurate information. The information in this material is not intended as tax or legal advice. Please consult legal or tax professionals for specific information regarding your individual situation. Some of this material was developed and produced by FMG Suite to provide information on a topic that may be of interest. FMG Suite is not affiliated with the named representative, broker - dealer, state - or SEC - registered investment advisory firm. The opinions expressed and material provided are for general information, and should not be considered a solicitation for the purchase or sale of any security.



The Financial Consultants at CVG Wealth Management are registered representatives with, and Securities and Advisory Services are offered through LPL Financial, a Registered Investment Advisor. Member FINRA & SIPC.

Richard J. Pakes TX Insurance Lic#1998156 Trent Baer CA Insurance Lic#0C7055 Kathy Mathis CA Insurance Lic#0K42314 Jamie Meisinger CA Insurance Lic#OK60197

State of Domicile is TX and principal place of business in TX.  Office locations in TX, AK, and CA

The LPL Financial Registered Representatives associated with this site may discuss and/or transact business with residents of the states in which they are properly registered or licensed.  No offers may be made or accepted from any resident of any other state.

# Exhibit G

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 1:22-cv-02435-LLS-SN

LYNNE FREEMAN, an individual,

        Plaintiff,

    -vs-

TRACY DEEBS-ELKENANEY P/K/A
TRACY WOLFF, an individual,
EMILY SYLVAN KIM, an
individual, PROSPECT AGENCY,
LLC, a New Jersey limited
liability company, ENTANGLED
PUBLISHING, LLC, a Delaware
limited liability company,
HOLTZBRINCK PUBLISHERS, LLC
D/B/A MACMILLAN,  a New York
limited liability company, and
UNIVERSAL CITY STUDIOS, LLC, a
Delaware limited liability
company,

        Defendants.
    _____/

DEPOSITION OF
Lynne Freeman
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Friday, March 24, 2023
9:04 a.m. - 6:19 p.m.
Pacific Time

Remote Location
Via Zoom Videoconference
All Parties Remote

STENOGRAPHICALLY REPORTED BY:
ERICA FIELD, RPR
JOB NO. 886198

22

family law lawyer, did clients ever have

disputes that would involve property that was

subject to copyright?

A.    No.

Q.    So no clients or musicians or

writers or filmmakers or --

A.    Not in Alaska.

Q.    Did any clients ask that you

prepare copyright registrations for them?

A.    No.

Q.    You said you have been too busy to

do much consulting.  Are you engaged in any

other business right now?

A.    No.  This present case takes up my

time right now.

Q.    And how so?

A.    Well, it's taken over my life.

This case has a lot going on in it.  I'm not

a copyright lawyer.  I'm busy doing what I

can helping out with my lawyers, as I can, in

the case.

It's also very upsetting, so I

don't really have the focus right now to be

out practicing in my own field.

Q.    Let's go into your writing

203

Incomplete hypothetical.  Calls for

speculation.  Lacks foundation.

Argumentative.

A.    Can you restate the question,

please?

BY MS. COLE:

Q.    I will withdraw the question.

We can put this document away.

Who is your counsel in this case?

MR. DONIGER:  Objection.  Vague

and ambiguous.

Counsel of record?

BY MS. COLE:

Q.    Who is your counsel of record in

this case?

A.    I have Mark Passin as counsel of

record.  I have Stephen Doniger as counsel of

record, and I show Paul LiCalsi as local

counsel in New York.

Q.    Do you have other counsel that's

not listed on the record?

A.    I do, yes.

Q.    And who is that?

THE WITNESS:  Am I able to name

those?

204

MR. DONIGER:  Yes.

A.    So there is Mark Lee.  There is Michelle Bittner.  There was Jennifer Holland.

I'm trying to think if that's everybody that's involved right now, yes.

BY MS. COLE:

Q.    And who is Mark Lee?

A.    Mark Lee is a copyright infringement attorney, and he is also a USC law professor.

Q.    Is Mr. Lee affiliated with a law firm?

A.    He is.  That would be Rimon Law.

THE VIDEOGRAPHER:  Counsel, excuse me.  This is the videographer.  Can we go off the record for a moment?

MR. DONIGER:  Sure.

MS. COLE:  Sure.

THE VIDEOGRAPHER:  Okay.  Thank you.

Ms. Field, is it possible to pause the recording on your end?

(A brief recess was held from 5:36 p.m. to 5:40 p.m.)

205

THE VIDEOGRAPHER:  We are back on the record at 2:40 p.m.

BY MS. COLE:

Q.    So before we went off the record, you testified that Mr. Mark Lee is counsel to you and that he's affiliated with Rimon Law.

Do you remember that?

A.    Yes.  When you say, counsel to you, are you defining any particular way?  Yes, he's an attorney who --

Q.    Do you have an engagement letter with Mr. Lee?

A.    Yes, I do.

Q.    And is it in connection with this action?

A.    Yes, it is.

Q.    And do you pay Mr. Lee hourly, or are you paying him on contingency?

A.    This was an issue that came up during my husband's deposition the other day.

THE WITNESS:  May I ask, did your -- did you lawyers have a chance to resolve how this is being handled?

MR. DONIGER:  We did, and you can let them know the answer to that

206

question.

THE WITNESS:  Okay.

A.    Yes, Mark Lee is being paid hourly.

BY MS. COLE:

Q.    And you also mentioned Michelle Bittner, that she's a lawyer for you; is that true?

A.    That is true.

Q.    And do you have an engagement letter with Ms. Bittner?

A.    I do not.

Q.    And are you paying Ms. Bittner?

A.    I'm paying her in trade.

Q.    And what do you mean by paying her in trade?

A.    I mean that Ms. Bittner and I have been attorneys in trade with one another for a very long time.

Q.    And what are you trading?

A.    I do family law consult work for her, and I will do cases for her -- for her clients where they need to go to an entity or something that she can not appear at, I do that for her, and we trade with one another.

Lynne Freeman
March 24, 2023

207

Q.    What do you mean by you will do cases for her clients?

A.    There was a case that she had with -- it would be adverse to the school district, and her husband is also an attorney who represents the school district, so then I would need to take that client and represent that client for Michelle, so we do this in trade.

Q.    And you said Jennifer Holland was your lawyer but is no longer counsel to you?

A.    Correct.

Q.    And when did she stop being counsel to you?

A.    I don't recall exactly.

Q.    And was she counsel to you in connection with this action?

A.    For some matters, yes, she was.

Q.    And did you have an engagement letter with Ms. Holland?

A.    No.

Q.    And did you pay Ms. Holland for services in connection with this action?

A.    No.  I've done trade with her in the past as well.

208

Q.    You mentioned that Mark Passin is your attorney of record here as well?

A.    Correct.

Q.    How do you pay Mark Passin?

THE WITNESS:  I assume I'm able to answer these questions, Stephen?

MR. DONIGER:  You can say the nature of the --

THE WITNESS:  Okay.

A.    So Mark is on contingency.

BY MS. COLE:

Q.    And what about Paul LiCalsi's firm?  How is he being paid?

A.    Paul LiCalsi's firm is being paid hourly.

Q.    And you recently retained Doniger Burroughs as counsel of record; isn't that true?

A.    Correct.

Q.    How is Doniger Burroughs being compensated here?

A.    They're contingency counsel.

MS. COLE:  I have no further questions on my end.

If we want to take a break, or