**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LYNNE FREEMAN,<br><br>Plaintiff,<br><br>v.<br><br>TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al.,<br><br>Defendants. | Case No. 2:22-cv-02435 (CM)(SN)<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S JUNE 17, 2026 ORDER RE DEFENDANTS' MOTION FOR A BOND** |

i

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT................................................................................1

II.    THE DIVORCE DID NOT MEANINGFULLY CHANGE THE COLECTABILITY

OF ANY JUDGMENT…………………………………………………………………3

    A.  Ms. Freeman's former spouse was never liable for her separate debts…………...4

    B.  The parties' jointly.  Held real property remains equally available to creditors…..4

    C.  The limited liability companies were insulated from a personal judgment

    creditor before and after the divorce…………………………………………………6

    D.  There was no fraudulent conveyance, and a bond motion Is not the vehicle to

    adjudicate one………………………………………………………………………..6

III.    DEFENDANTS' CHARACTERIZATION OF THE DIVORCE IS INACCURATE……9

    A.  Defendants' claims regarding the Santa Barbara property valuation are

    irresponsible and wrong………………………………………………………...9

    B.  Defendants' claims regarding a "newer model" "BMW X5" are irresponsible

    and wrong…………………………………………………………………………….9

    C.  Defendants' claims regarding the Anchorage property and concealed income

    property is irresponsible and wrong…………………………………………...10

D. Defendants' claims regarding the "$867,000" mortgage figure for the Santa Barbara condo is irresponsible and wrong……………………………………….11

E. Defendants' suggestion that Freeman has sought bankruptcy advice or otherwise sought to hide assets is without foundation and wrong………………11

F. Defendants improperly rely on superseded deposition testimony and omit Mr. Baer's timely corrections………………………………………………………...12

G. Defendants' attacks on a non-party are improper and should be stricken……….12

H. Defendants' misrepresent the law regarding inter-spousal loans and support…...13

I. The Court should strike the offending matter, afford the Nashon declaration no weight, and reconsider its Order calling for briefing of the previously stayed fee-motion……………………………………………………………...14

IV. THE NEW INFORMATION DOES NOT WARRANT A BOND, AND CONFIRMS THE BOND SOUGHT IS OVERBROAD……………………………………………15

A. A Rule 7 bond secures the prospective costs of appeal—not the district-court-fees Defendants claim already have incurred…………………………...15

B. Local Rule 54.2 does not authorize a bond as a condition of the appeal………...16

C. The risk of nonpayment rationale remains unsupported………………………16

V. CONCLUSION……………………………………………………………………...17

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Adsani v. Miller*,

   139 F.3d 67 (2d Cir. 1998) ................................................................................................ 15, 16

*CFTC v. Walsh*,

   618 F.3d 218 (2d Cir. 2010) ................................................................................................... 8

FDIC v. Malin,

   802 F.2d 12 (2d Cir. 1986) ..................................................................................................... 8

*In re Am. President Lines, Inc.*,

   779 F.2d 714 (D.C. Cir. 1985) .............................................................................................. 16

*Richter v. Richter*,

   330 P.3d 934 (Alaska 2014) .................................................................................................. 13

*Selletti v. Carey*,

   173 F.R.D. 96 (S.D.N.Y. 1997) ............................................................................................ 16

*Selletti v. Carey*,

   173 F.3d 104 (2d Cir. 1999) ................................................................................................. 16

*Wanberg v. Wanberg*,

   664 P.2d 568 (Alaska 1983) .................................................................................................. 14


**Statutes**

17 U.S.C. § 505 ............................................................................................................................ 15

AS § 25.15.050 ............................................................................................................................... 4

Cal. Civ. Code § 3439 ..................................................................................................................... 8

Cal. Fam. Code § 2320(a) ........................................................................................ 1

Cal Civ. P. § 704.820 ............................................................................................. 5

DCL § 278 .............................................................................................................. 8

## Rules

Fed. R. App. P. 7 ................................................................................................. 2, 3

Fed. R. App. P. 8 .................................................................................................. 16

Fed. R. Civ. P. 30(e) ............................................................................................ 12

Fed. R. Civ. P. 62 ................................................................................................. 16

## Other Authorities

L.R. 54.2 .............................................................................................................. 16

## I.    PRELIMINARY STATEMENT

By Order dated June 17, 2026 (Dkt. 567), the Court directed Plaintiff Lynne Freeman to respond to "the new information contained in the Defendants' reply papers"—namely, the recent divorce and the accompanying property settlement agreement, which Defendants mischaracterize as a scheme to shield assets from a future fee award. It is not, and the new information does not support a bond for three independent reasons.

First, and dispositively, the divorce was not intended to hide assets or to defeat any award the Defendants might one day obtain and did not in any meaningful way change the collectability of a potential judgment. Even accepting every valuation and characterization in Defendants' reply as true (in fact they are irresponsible and inaccurate valuations and characterizations designed to inflame the Court and falsely paint Plaintiff as a bad actor), the divorce does not have any meaningful impact on the collectability of any potential judgment.

Critical to understanding this first point—and Defendants' misrepresentation of the effects of the divorce—is that Ms. Freeman and her former husband have always been and continue to be residents of the state of Alaska.[1] Under Cal. Fam. Code Section 2320(a)[2] Ms. Freeman was never subject to California divorce law and could not have filed for divorce in California since neither she nor Mr. Baer have ever been residents of California. And under Alaska law, Mr. Baer was never liable for Ms. Freeman's separate debts; the parties' jointly held real property in Santa Barbara remains exposed to creditors both before and after the divorce; and the limited liability companies addressed in the settlement were insulated from a personal judgment creditor both

---

[1] Declaration of Lynne Freeman ("Freeman Decl.") ¶3; Declaration of Jen Holland ("Holland Decl.") ¶8.
[2] Cal. Fam. Code Section 2320(a) states in relevant part: "Except as provided in subdivision (b), a judgment of dissolution of marriage may not be entered unless one of the parties to the marriage has been a resident of this state for six months and of the county in which the proceeding is filed for three months next preceding the filing of the petition."

before and after the divorce. To the extent that Freeman gave up anything to her ex-husband, she did so for a legitimate reason—to obtain alimony that she needed to pay her living expenses while she is undergoing medical treatment in California.[3] This support arrangement simply does not constitute a fraudulent conveyance, an attempt to hide assets, or any other malfeasance and supplies no basis for a draconian security bond.

Second, Defendants' factual narrative is materially inaccurate—seemingly by design. As the accompanying Declaration of Jennifer L. Holland—the Alaska family law attorney who represented Ms. Freeman in the divorce—establishes, Defendants rely on online "estimates" that Alaska courts do not use to value marital property; misread the controlling Alaska authority on the characterization of marital debt; and recast routine, court-approved features of an equitable divorce as badges of fraud. Defendants also make demonstrably false claims about things like a BMW X5 and the amount of outstanding property mortgages. Contrary to Defendants' inflammatory allegations, everything stated in the divorce is factually accurate; the divorce was the product of negotiation that was underway several months before any adverse adjudication in this action; and it was approved by the Alaska Superior Court as fair and equitable after the parties testified in open court. In fact, the signed property settlement agreement was filed in the Alaska Superior Court April 3, 2026—before Defendants filed their motion for attorney's fees and which the court held in abeyance. The Alaska Superior Court held a hearing and granted the divorce May 4, 2026, well before Defendants filed a motion for a bond.

Third, the new information still does not satisfy the governing standards for a bond and, if anything, confirms that the multi-million-dollar bond Defendants seek is grossly overbroad. A bond under Federal Rule of Appellate Procedure 7 secures the prospective costs of the appeal—

---

[3] As Freeman's divorce attorney explains, Freeman "has health issues that prevent her from working. Her ex-husband was the only one with income. Alimony was the best result for my client." Holland Decl. ¶21.

not the millions in district-court fees Defendants say they have already incurred. And nothing in the new information cures the defects identified in Plaintiff's opposition: Defendants still have submitted no contemporaneous billing records from which a reasonable amount could be fixed, and the occurrence of the divorce does not alter the fact that Defendants have failed to meet their burden for requiring a bond.

Plaintiff acknowledges that the timing of her divorce—especially when accompanied by the calculated misrepresentations and innuendo of Defendants' reply brief—created the optics that led this the Court observe that it "appears to have been in the works" when Plaintiff opposed the bond motion but "was not disclosed." (Order at 1.) On the timing, the decision to obtain the divorce was made in December of last year—several months before the adverse summary judgment ruling in this case and while Plaintiff fully expected that at least a question of fact existed as to substantial similarity. And it was not part of her opposition to the bond motion because neither Rule 7 nor Local Rule 54.2 require the disclosure of the responding parties' financial condition, and she did not place her assets or her ability to pay at issue, instead arguing, *inter alia*, that Defendants had failed to carry their burden under the governing standards—which they still have not done. Plaintiff's financial circumstances were therefore not a litigated question as she framed her opposition, and the divorce—a matter of public record in the Anchorage Superior Court—was neither concealed nor material to the arguments she advanced. In any event, the complete picture is now before the Court, and it confirms that no bond is warranted.

## II.    THE DIVORCE DID NOT MEANINGFULLY CHANGE THE COLLECTABILITY OF ANY JUDGMENT.

A main thrust of Defendants' reply brief is that Plaintiff's divorce is somehow a ruse intended to move assets beyond their reach and thereby increases the risk that a future fee award

would go unpaid. That premise is wrong factually and legally. In fact, Plaintiff's divorce is an unfortunate result of several deeply personal factors and began well before any adverse judgment in this case. Freeman Decl. ¶¶2 & 6. And even taking Defendants' own grossly inaccurate valuations as given, the divorce did not meaningfully diminish what a judgment creditor of Ms. Freeman could collect and thus offers no support to Defendants' motion.

### A.    Ms. Freeman's former spouse was never liable for her separate debts.

Alaska is an equitable-distribution state. Under Alaska Statutes, Title 25, "neither spouse is liable for the debts or liabilities of the other incurred before marriage, and, except as otherwise provided, neither is liable for the separate debts of the other, nor is the rent or income of the property of one spouse liable for the separate debts of the other." AS 25.15.050; Holland Decl. ¶11. A fee award against Ms. Freeman in this action would be her separate liability. Her former husband was not answerable for it during the marriage, and he is not answerable for it now. The divorce therefore took nothing from Defendants: they never had recourse to his separate property or income in the first place.

### B.    The parties' jointly held real property remains equally available to creditors.

Defendants Reply brief focuses on the parties' California and Alaska real property. With respect to the Santa Barbara condominium, prior to the divorce the property was owned jointly by the parties. See Decl. of Nashon, Exh. "B" Property Settlement Agreement ("PSA"), ¶6. Under principles of equitable distribution, jointly titled property is reachable by a creditor only to the extent of the debtor spouse's interest. That exposure is unchanged by the divorce—Ms. Freeman's former husband remained on the title, retained his interest, and a judgment creditor's ability to

reach Ms. Freeman's interest in jointly held real property is no different after the divorce than before. (Holland Decl. ¶¶ 12-15)[4] Nothing was placed beyond reach.

And the Anchorage property[5] has always been the sole asset of Baer Asset Management Group LLC ("BAMG") which was never subject to a potential judgment against Freeman prior to the divorce under, *inter alia*, AS 10.50.380(c) which provides in relevant part:

> "This section provides the exclusive remedy that a judgment creditor of a member or a member's assignee may use to satisfy a judgment out of the judgment debtor's interest in the limited liability company. Other remedies, including foreclosure on the member's limited liability company interest and a court order for directions, accounts, and inquiries that the debtor member might have made, are not available to the judgment creditor attempting to satisfy a judgment out of the judgment debtor's interest in the limited liability company and may not be ordered by a court."

The exclusive remedy is a charging order against the debtor-member's *distributions*—which, of course, provides no claim where there are no distributions. See AS 10.50.375. As discussed below, the Alaska property is the property from which Mr. Baer runs his business and has a residential unit that was an income property but is now Mr. Baer's primary residence. Because there is no reasonable expectation of distributions from this property,[6] it made sense to transfer ownership of and responsibility for it to Mr. Baer[7] in exchange for valuable alimony. That transfer did not materially change the availability of that asset to any creditor and was certainly not part of any "scheme" to hide assets.

---

[4]*See* California CCP § 704.820.

[5] Defendants' Reply brief falsely insinuates that Freeman's ex-husband admitted at deposition to also owning rental property that was not identified in the settlement agreement. As discussed below, the Anchorage property has a residential unit that was previously an income property but is now Mr. Baer's primary residence.

[6] This is the one area where Freeman ascertains that there is a technical (but non-meaningful) difference in the collectability of assets before and after the divorce. It is a distinction of little to no-significance because from a practical standpoint it is extremely unlikely that a distribution would issue. Nonetheless, even if it were a meaningful difference, which it is not, it logical for Freeman to give up her interest in a property that her ex-husband worked out of while in Alaska and her son currently lives in, in exchange for valuable alimony.
[7] The record should be clear that this was an LLC created in 2015 long before this lawsuit was filed.

**C.      The limited liability companies were insulated from a personal judgment creditor before and after the divorce.**

Defendants devote much of their reply to baseless innuendo concerning two other limited liability companies. As to each, a judgment creditor of Ms. Freeman would gain nothing now, and lost nothing in the divorce. See Holland Declaration ¶14-17.

First, Defendants' reference to "$400 Million in assets under management" by CVG Wealth Management is a gross and irresponsible attempt to mislead the Court. Defendants certainly understand that the assets under management are client assets, not assets of the LLC or of the marital estate, and a judgment creditor would obtain nothing from the entity either before or after the divorce. Holland Decl., ¶16.

And second, Ms. Freeman was never a member of Baer Investment Group, LLC. Thus, under the Alaska statutes cited above, a judgment creditor of Ms. Freeman had no remedy against it before or after the divorce. Holland Decl., ¶17.

**D.      There was no fraudulent conveyance, and a bond motion is not the vehicle to adjudicate one.**

Because the divorce did not remove any asset from a judgment creditor's reach (see *supra* Part II.A–C, and Part III *infra*), it could not have hindered, delayed, or defrauded Defendants. As such, the premise of any fraudulent-conveyance theory—a transfer intended to place assets beyond a creditor's reach—is absent.  Indeed, the only thing Defendants could conceivably point to that Freeman gave up in terms of chargeable assets—i.e., her right to distributions from the BAMG— is more than offset by the support payments and other consideration Freeman received since that support essentially acts as additional income, leaving other assets and income of Ms. Freeman available to pay creditors.

Perhaps knowing this, Defendants try to spin the litigation-funding debt and the indemnity provisions of the divorce agreement as evidence of malfeasance. They are not. The debt is a real obligation that predates the divorce, reflecting, *inter alia*, litigation funds secured from Mr. Baer's separate business that were always documented as a loan.[8] The divorce did not create that debt, nor did it transfer any of Ms. Freeman's property to Mr. Baer on account of it. The debt simply remains unpaid.[9] Freeman Decl. ¶20 (explaining the financing of this litigation in part through bona fide loans from BIG and Mr. Baer's loaning of his approximately $250,000 share of the sale of their home in 2022). And that unpaid debt is not a secured debt, there has been no effort to create a judgment on it, and there is simply no effort to have it take priority over any other creditor. Freeman Decl. ¶21.

Similarly, the indemnity agreement does not move any assets from Freeman to Baer or make collection against Freeman any more difficult. Rather, it runs from Ms. Freeman to Mr. Baer and is limited to a potential future situation where he sustains a loss. The indemnification provision gives Baer no present claim against her support or her interest in the residence, and creates no judgment or other vehicle that could prevent collection against Freemen. Indeed, by the time a judgment creditor against Freemen took any action against Baer that could implicate the indemnification agreement, that creditor would already be a judgment creditor with priority over Baer. Because nothing in the PSA makes Mr. Baer as a priority creditor or establishes any lien or security interest, it simply does not shield any assets of Ms. Freeman and does nothing to support the purported need for a bond. Freeman Decl. ¶22.

---

[8] See Freeman Declaration, ¶¶20-21 (explaining the financing of this litigation in part through bona fide loans from BIG and Mr. Baer's loaning of his approximately $250,000 share of the sale of their home in 2022).

[9] The PSA also states that the costs of monthly E-discovery storage will be added to the loan until the litigation is finally resolved. (PSA p. 6, 13b.) Therefore, there is no final amount to reduce to judgment. *If Defendants receive a judgment, that will occur prior to a final judgment that Mr. Baer or his LLC could receive and apply for by motion.*

Defendants also attack the allocation of marital assets to Mr. Baer in exchange for the support that is well-established as fair, if not typical, consideration. For example, in *FDIC v. Malin*, the Second Circuit reversed the setting aside of a husband-to-wife conveyance made under a separation agreement, holding that New York Debtor and Creditor Law § 278 bars a creditor's suit against "a purchaser for fair consideration without knowledge of the fraud," and that "it is well settled in New York that a husband's obligation to support his wife is an antecedent debt sufficient to satisfy the definition of fair consideration." 802 F.2d 12, 18–20 (2d Cir. 1986); see *CFTC v. Walsh*, 618 F.3d 218, 228–32 (2d Cir. 2010) (relinquishment of marital rights in a matrimonial settlement may constitute fair consideration).[10] Here, the marital property was likewise allocated against the relinquishment of competing claims and Mr. Baer's assumption of substantial support obligations; and a "judgment creditor occupies a less favored position than a subsequent bona fide purchaser." *Malin*, 802 F.2d at 20.

There is, simply put, no basis to find that Freeman's unfortunate divorce included any improper attempt at asset hiding (or any other impropriety). Nevertheless, if Defendants believe some feature of the settlement is voidable, their remedy is a plenary fraudulent-transfer action under the applicable uniform act—which they concede they may bring (Reply at 4 & n.6)—in which they would bear the burden of proving the statutory elements. See *Malin*, 802 F.2d at 18–20 (claim adjudicated after a bench trial). But that determination cannot be made on this record and in this posture in a bond reply against an Alaska judgment approved as fair and equitable.

---

[10]*Malin* and *Walsh* construed the former Uniform Fraudulent Conveyance Act (DCL §§ 270–281). For transfers made on or after April 4, 2020, New York's Uniform Voidable Transactions Act governs; it likewise protects a good-faith transferee who gives reasonably equivalent value. California (Cal. Civ. Code § 3439 et seq.) and Alaska (AS 34.40.110) apply materially similar frameworks, and under each the creditor bears the burden of proof.

8

### III.    DEFENDANTS' CHARACTERIZATION OF THE DIVORCE IS INACCURATE.

Even setting collectability aside, the specific "badges" of fraud Defendants argue do not withstand scrutiny. Defendants, primarily through the sworn Declaration of Amy Nashon, accuse Freeman of misrepresenting her assets to the Anchorage Superior Court based on nothing more than demonstrably inaccurate hearsay and innuendo lacking in foundation that Defendants compound with improper, scandalous attacks on a non-party. To wit:

**A. Defendants' claims regarding the Santa Barbara property valuation are irresponsible and wrong.**

As one example, Defendants suggest that Freeman fraudulently undervalued real property based on nothing more than notoriously unreliable Zillow and Home.com "estimates." But Alaska courts do not value marital property by reference to such estimates, and it would have been an extremely uncommon practice for Plaintiff to employ such valuation. Holland Decl. ¶9. Rather, marital property is valued as of the date of the divorce, ordinarily through a formal appraisal or, where the parties agree, a broker's opinion or a recent comparable sale adjusted for square footage and condition—the very method used here for a condominium with substantially similar units. *Id.* This method was also used for the Anchorage real property. *Id.*, Freeman Decl. ¶17. Defendants' complaint that Freeman used an actual recent comparable sale instead of a specious Zillow estimate is irresponsible.

**B. Defendants' claims regarding a "newer model" "BMW X5" are irresponsible and wrong.**

Paragraph 7 of the Nashon Declaration advances three false assertions about a purported BMW X5, each offered to suggest that the 2018 BMW X3 identified in the settlement agreement (PSA ¶ 10(b)) conceals a more valuable vehicle. First, Ms. Nashon swears that she "was able to

9

observe photograph images of a BMW X5 (not an X3) parked in the driveway at Freeman and Baer's Anchorage home." Nashon Decl. ¶ 7. She produces no such photograph. The declaration attaches no image and provides no date, source, or other indicium of authenticity by which the assertion could be tested. A bare, unauthenticated representation by counsel, who may not serve as an unsworn witness on a contested fact, is entitled to no weight.

More importantly, Defendants characterization of the vehicle as a "newer, more expensive model BMW X5" (Reply at 4) and the corresponding assertion that "a newer model would obviously be significant[ly] more expensive" (Nashon Decl. ¶ 7) *is demonstrably false*. Freeman had a 2017 model X5 (older than the 2018 X3) that was stolen in 2025 and declared a total loss. Freeman Decl. ¶¶ 7-8. Ms. Nashon's generic comparison of new X5 and X3 prices "[a]ccording to BMW," id., says nothing about a nine-year-old vehicle and supplies no basis to infer a concealed value. While it is entirely unclear what "online forums" Ms. Nashon's declaration refers to, it is entirely clear that the allegation regarding a concealed "newer BMW" is irresponsible, foundationless mudslinging.

Relatedly. Defendants' suggestion that Freeman and her ex-husband falsely valued their vehicles is, again, irresponsible and wrong. Freeman Decl. ¶¶ 9-11.

## C. Defendants' claims regarding the Anchorage property and concealed income property is irresponsible and wrong.

Ms. Nashon swears that "public records" show the Anchorage property "was bought separately as two lots in 2012 and 2015," and on that basis charges that Plaintiff's description of the property as a single, undivided lot is a misrepresentation. Nashon Decl. ¶ 6. That attestation— tellingly without reference to anything with proper foundation—is another misrepresentation to this Court. In fact, the property is a single, undivided parcel containing two dwellings, acquired in

10

2015 by Baer Asset Management Group, LLC—which has owned it ever since. Freeman Decl. ¶¶ 12-15.

Troublingly, the property listing reflected in Defendants' own Exhibit E omits the full description whereas the full Zillow description identifies two dwellings on the same lot as part of the original sales listing in 2015, omits the parcel map showing one parcel and two dwellings and the purchase in 2015. Freeman Decl. ¶13. The second dwelling is the residential unit Mr. Baer described at his deposition as income property; it is now his Alaska residence and the home of the parties' college age son, and it is part of that same parcel, not a concealed "rental." Freeman Decl. ¶13. Plaintiff's settlement agreement is accurate; Ms. Nashon's "two lots" assertion is an irresponsible misrepresentation.

**D. Defendants' claims regarding the "$867,000" mortgage figure for the Santa Barbara condo is irresponsible and wrong.**

Ms. Nashon swears in her declaration that the mortgage on the Santa Barbara condominium "is now approximately $867,000," citing Exhibit E. Nashon Decl. ¶ 5. The exhibit she cites does not contain that figure. Online platforms such as Zillow and Homes.com report estimated values, not a homeowner's actual loan balance and cannot establish a mortgage. The actual outstanding balance is reflected in Plaintiff's mortgage statement which is accurately stated in her property settlement agreement. Freeman Decl. ¶18, Exhibit 8. Defendants' estimate derived equity calculations "over $800,000 (maybe more than a million)," Reply is not only irresponsible and wrong, it is unsupported by the very exhibit they cite.

**E. Defendants' suggestion that Freeman has sought bankruptcy advice or otherwise sought to hide assets is without foundation and wrong.**

In what appears to be a calculated attempt to create a false impression for this Court, Defendants cast Freeman's divorce attorney, Jennifer Holland, as a bankruptcy attorney. While Ms. Holland may also be an accomplished bankruptcy practitioner, family law was her primary focus from 1993 through 2008, she has 30 years of domestic relations experience, she represented Ms. Freeman in connection with her previous dissolution of marriage, and she has never provided any bankruptcy advice to Ms. Freeman. Holland Dec. ¶¶4-6. The suggestion that Freeman went to Ms. Holland as a bankruptcy attorney to handled these proceedings is baseless—particularly given (as discussed above) that the decision to divorce was made months before any adverse judgment in this case.

Defendants insinuate impropriety from the fact that Ms. Holland maintains a tenancy at the building owned by one of the LLCs. Ms. Holland is a tenant who pays rent, holds no ownership interest, and obtained written conflict waivers from both parties providing that she would withdraw if the matter became contested. Holland Decl. ¶¶2-3. That Plaintiff undertook the most efficient path to an amicable divorce with someone she knows and trusts is simply not a badge of fraud.

**F. Defendants improperly rely on superseded deposition testimony and omit Mr. Baer's timely corrections.**

Defendants present excerpts of Mr. Baer's March 21, 2023 deposition (Exhibit D) as definitive testimony while omitting that he timely served corrections to that testimony under Federal Rule of Civil Procedure 30(e). Freeman Decl. ¶23, Exhibit 9. Presenting the uncorrected answers, without disclosing the corrections, does not place an accurate record before the Court; the corrected testimony should be considered and Exhibit D weighed accordingly.

**G. Defendants' attacks on a non-party are improper and should be stricken.**

12

Mr. Baer is not a party to this action; he is Plaintiff's former spouse and a non-party witness. Defendants nonetheless devote substantial portions of their reply to him. They unnecessarily malign him by, *inter alia*, accusing him of being "either spectacularly bad at financial planning … or … lying to the court," Reply at 4. They publish his photograph and personal financial information by attaching a printout of his business website (Nashon Decl., Exh. F) and they parse his finances at length regardless of whether those finances have any bearing on the bond motion at issue.

These gratuitous attacks on a nonparty are unnecessary to the bond question. Accusing a non-party of dishonesty to the Court, and publishing his image and finances on a public, nationwide docket, is scandalous and serves only to harass and inflame. The Court has inherent authority to strike scandalous and impertinent matter from the record, and Plaintiff respectfully requests that it do so.

**H.  Defendants' misrepresent the law regarding inter-spousal loans and support.**

Knowing they have no real basis to argue any fraud or asset concealment by Freeman, Defendants misrepresent the holding of *Richter v. Richter*, 330 P.3d 934 (Alaska 2014), to challenge the propriety of the loan agreement between Freeman and Baer—arguing that it is "contrary to applicable family law" to allocate the litigation-related debt between spouses. But *Richter*, which was not even an inter-spouse loan case, holds no such thing.

In *Richter,* the Supreme Court of Alaska recognized that a debt incurred by one spouse during the marriage (again, not an interspousal loan as it was a loan from the mother-in-law to pay off the wife's student loan debts) could be either a marital debt or a separate debt of one spouse in divorce proceedings and determining which "is a question of intent and acceptance." *Id*. at 939. In that case the Court found that "[t]he evidence on this issue at trial was conflicting" and upheld the

trial court's finding that the debt was marital where there was no agreement between the spouses and, *inter alia*, the couple started to repay the loan out of their joint marital account. *Id. See also*, Holland Decl. ¶19.

Defendants' misrepresentation of the holding of *Richter* is at odds with Alaska law, under which identifying and characterizing the cause of action and the associated debt as separate or marital is the first step of Alaska's three-step distribution analysis. See *Wanberg v. Wanberg*, 664 P.2d 568, 574 (Alaska 1983). And in this case, the parties' treatment of those items was a legitimate exercise of that framework. Holland Decl. ¶¶20-21.

Defendants' repeated suggestions of impropriety in the various provisions under which Ms. Freeman's former husband bears certain living expenses are equally irresponsible. Those provisions reflect Alaska's alimony statute, AS 25.24.160(a)(2), under which support is "just and necessary" where marital property is insufficient to meet a spouse's needs. See also Holland Decl. ¶¶22-23. This was a long-term marriage; Ms. Freeman has health issues that currently prevent her from working; and her former husband was the sole income earner. *Id.* Court-approved spousal support in those circumstances is unremarkable, and certainly not a badge of fraud.

I. **The Court should strike the offending matter, afford the Nashon declaration no weight, and reconsider its Order calling for briefing of the previously stayed fee motion.**

As (hopefully) addressed above, Defendants' claims of fraudulent representations, asset-hiding, and other malfeasance are truly lacking in merit. While Plaintiff would have preferred to keep discussion of a highly personal divorce out of the public record in this case, she understands—especially given the Defendants' mischaracterizations—that the Court desires reasonable assurances that her divorce was not a litigation-driven contrivance. And it was not:

14

the agreement was the product of several months of negotiation starting well before any adverse judgment, and the parties testified in open court that they believed it fair and equitable—a finding the Alaska court found warranted.

With that said, Plaintiff respectfully requests that Defendants not escape scrutiny for their irresponsible representations, and that the Court (i) strike paragraphs 5, 6, and 7 of the Nashon Declaration and the corresponding passages of the reply identified above; (ii) afford the declaration no weight in deciding the bond motion; and (iii) reconsider its June 17, 2026 Order lifting the abeyance of the fee motion, which rested on the false impression these papers created (Order at 1).

## V. THE NEW INFORMATION DOES NOT WARRANT A BOND, AND CONFIRMS THE BOND SOUGHT IS OVERBROAD.

### A. A Rule 7 bond secures the prospective costs of appeal—not the district-court fees Defendants claim already to have incurred.

As addressed in Plaintiff's opposition brief, a bond under Rule 7 is a "cost bond" that is "prospective relating to the potential expenses of litigating an appeal"; it is distinct from a supersedeas bond, which is "retrospective covering sums related to the merits of the underlying judgment (and stay of its execution)." *Adsani v. Miller*, 139 F.3d 67, n.2 (2d Cir. 1998) (quotation omitted) (a cost bond is "intended to cover costs in the appellate court only"). Although attorney's fees recoverable "as part of the costs" under 17 U.S.C. § 505 may be included in a Rule 7 bond, that reaches only fees incurred on the appeal. See *id*. Indeed, in *Adsani* the Rule 7 bond was security unrelated to the award of fees at trial.

15

The more-than-$3-million bond Defendants seek is comprised overwhelmingly of district-court fees they say they have already incurred. Those are retrospective sums tied to the underlying judgment, not the prospective costs of the appeal, and they are not the proper subject of a Rule 7 bond. Securing a district-court fee award (if one is ever entered) pending appeal is the office of a supersedeas bond under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8—a bond the appellant may elect to post to stay enforcement, not a toll the Court imposes as the price of appealing. At most, then, any Rule 7 bond must be limited to the reasonable, prospective costs and fees of the appeal itself—a small fraction of the sum Defendants demand.

**B.  Local Rule 54.2 does not authorize a bond as a condition of the appeal.**

Defendants also invoke Local Rule 54.2. But LR 54.2 is a district-court security-for-costs device, and its enforcement mechanisms—staying the action, striking pleadings, or dismissing the case—operate only on a pending district-court proceeding. They cannot be used to condition an appeal, which lies within the jurisdiction of the Court of Appeals. The authorities Defendants cite confirm the point: in *Selletti v. Carey*, the LR 54.2 security was ordered while the action was pending in the district court, and the consequence of noncompliance was dismissal of the action—not any condition on an appeal. See 173 F.3d 104, 110–11 (2d Cir. 1999); *Selletti v. Carey*, 173 F.R.D. 96 (S.D.N.Y. 1997). *Kensington* is to the same effect. A court may not "put a price on an appeal," and "any attempt by a court at preventing an appeal is unwarranted and cannot be tolerated." *Adsani*, 139 F.3d at 79 (quotations omitted); see *In re Am. President Lines, Inc.*, 779 F.2d 714, 718–19 (D.C. Cir. 1985) (district court exceeded its authority in imposing a Rule 7 cost bond without sufficient justification).

### C. The risk-of-nonpayment rationale remains unsupported.

Both Rule 7 and LR 54.2 turn on a genuine risk that the appellee will be unable to recover. See *Adsani*, 139 F.3d at 78-79 (affirming bond where appellant had "no assets in the United States" and "failed to adduce credible evidence of an inability to pay"). Here, Defendants admit that Freeman is an attorney with significant earning potential, and the only "new" basis Defendants offer for a payment risk is the divorce—which, as shown above, did not materially change what a judgment creditor may collect. The payment-risk rationale thus fails on the very evidence Defendants submitted.

Finally, the new information does nothing to cure the defect identified in Plaintiff's opposition: Defendants have submitted no contemporaneous billing records from which the Court could fix a reasonable amount for any bond based on anything more than Defendants "take our word for it." But as set forth above, Defendants have asked this Court to take their word for many irresponsible, unreasonable, and even demonstrably false assertions. And the inability to fairly assess a reasonable value for a bond cannot be cured for the first time on a reply, where Plaintiff would have no opportunity to respond. Because Defendants have not fairly quantified nor supported the bond amount they seek, their request for a bond should be denied.

## V.    CONCLUSION

For the foregoing reasons, and those set forth in Plaintiff's opposition, the Court should deny Defendants' motion for a bond. In the alternative, any bond should be limited to the reasonable, prospective costs and fees of the appeal.  The Court should place back in abeyance until after the decision on the appeal Defendants' motion for fees.  The court reinstated the motion as a sanction against the Plaintiff prior to hearing her side of the facts.  As demonstrated above, such a sanction was unwarranted.

17

Dated: June 29, 2026
New York, New York

Respectfully submitted,

By:   /s/ *Stephen M. Doniger*
      Stephen Doniger, Esq.
      **DONIGER / BURROUGHS PC**
      603 Rose Avenue
      Venice, California 90291
      (31) 590-1820
      stephen@donigerlawfirm.com

      **Reeder LLP**
      Mark D. Passin
      11766 Wilshire Boulevard,
      Suite 1470
      Los Angeles, CA 90025
      310-861-2475

      *Attorneys for Plaintiff Freeman*

18