**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LYNNE FREEMAN,

Plaintiff,

v.

TRACY DEEBS-ELKENANEY P/K/A TRACY WOLFF, et al.,

Defendants.

Case No. 2:22-cv-02435 (CM)(SN)

**DECLARATION OF LYNNE FREEMAN IN SUPPORT OF PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S JUNE 17, 2026 ORDER RE DEFENDANTS' MOTION FOR A BOND**

I, Lynne Freeman, hereby declare as follows:

1. I am the Plaintiff in this action. I submit this declaration in support of my Supplemental Brief in response to the Court's June 17, 2026 Order and my Letter-Motion to Seal. The facts stated herein are based on my personal knowledge, and if called as a witness, I could and would testify competently to them.

2. I was married to Trent Baer for nearly twenty-seven years before our divorce. The decision to divorce was difficult and deeply private, and made in December 2025, several months before the Court's summary judgment ruling in this action. The property settlement agreement ("PSA") was the product of several months of negotiation. Trent and I testified in open court that the agreement was fair and equitable, and the Anchorage Superior Court approved it and granted the divorce May 4, 2026.

3. Throughout our marriage, Trent and I were and remain residents of the State of Alaska. We file Alaska tax returns, hold Alaska driver's licenses, and are registered to vote in Alaska.

Neither of us has been a resident of California, although I have been in California for medical treatment that has been unavailable to me in Alaska.

4. I have serious health issues that presently prevent me from working. Because of my health and our long marriage, spousal support was necessary to meet my living expenses, and it was the principal reason for the terms of our settlement. I am willing to provide details about my health issues if the court so desires but respectfully request that I do so *in camera* or by filing under seal as these details are highly personal.

5. When I opposed the Defendants' motion for a bond, I did not raise my assets or my ability to post a bond as issues, and I did not believe my divorce to bear on the arguments I made and had no desire to share my personal life more than necessary in this litigation. I now understand that the Court views my divorce as relevant to the pending motion and wishes me to address it and I respect that.

6. I did not divorce to hide assets or to defeat any award the Defendants might one day obtain. And I do not believe that my marital settlement agreement would have any meaningful effect on the collectability of a judgement against me. The decision to get divorced and the settlement with my ex-husband was reached and filed *before* Defendants' filed a motion for fees later in April, and before they filed a motion for a bond May 23, 2026. My divorce hearing was May 4, 2026, and the Superior Court Judge reviewed every paragraph during that hearing and found the terms fair and equitable.

7. There is no concealed BMW X5. My ex-husband and I owned a 2017 BMW X5. That vehicle was placed into winter storage in Alaska in the fall of 2024, which is the last time either of us saw it before it was stolen from storage. State Farm declared the date of loss

November 1, 2024. A police report was filed after we discovered the vehicle was missing from storage, and the thief was apprehended April 8, 2025 while in possession of the vehicle, which State Farm deemed a total loss. A true and correct copy of the State Farm Insurance Letter and the police report/memo for Case No AK25032324 is attached as **Exhibit 1**; and the case number for the Class C felony for which the thief is serving time is 3PA-25-00658CR.

8. Because the vehicle was placed in winter storage in the fall of 2024 and stolen thereafter, any photograph depicting a BMW X5 in the driveway of the Anchorage property necessarily was taken before that time. Accordingly, Ms. Nashon's statement in her Declaration (¶ 7): "As part of my investigation, I was able to observe photograph images of a BMW X5 (not an X3) parked in the driveway at Freeman and Baer's Anchorage home" does not support the subsequent assertion in Defendants' Reply p. 4 that: "Baer was awarded a BMW X3 conveniently also valued at $11,000, despite evidence that he drives a newer, more expensive model BMW X5."

9. The marital property was valued as of the time of the divorce. The $11,000 value assigned to the BMW X3 in the PSA was determined by reviewing comparable vehicles of similar model year and mileage and then deducting the estimated cost of necessary repairs. A true and correct copy of the comparable vehicle valuations and a repair invoice (I no longer have the original repair estimate) is attached as **Exhibit 2**. The vehicle also has unrepaired body damage.

10. Similarly, The $11,000 value assigned to the 2016 Range Rover Sport in the PSA was determined by reviewing comparable vehicles of similar model year and mileage and then

deducting the estimated cost of necessary repairs. A true and correct copy of the Range Rover Sport estimates and an estimate for repair used to establish its value is attached as **Exhibit 3**. This vehicle too has unrepaired body damage.

11. We both therefore agreed to assign each vehicle a value of $11,000 in the PSA because that figure closely approximated each vehicle's fair market value after accounting for the cost of the necessary repairs.

12. Ms. Nashon's Declaration (¶ 1) states: "As part of my Westlaw investigation, I was able to determine that Freeman's Alaska property, consisting of a large lot in downtown Anchorage with a home and a converted office was bought separately as two lots in 2012 and 2015 (although she claims it is a single, undivided lot)." Nashon is wrong, and it is telling that she does not provide an exhibit showing that there are two separate lots and two separate properties. The Alaska property is one undivided lot purchased in 2015.

13. Ms. Nashon's contrary claims regarding the Alaska property are based on her Exhibit E, which is an incomplete Zillow report. I pulled up the full Zillow report which shows that Nashon omits 1) the original listing page showing the purchase date in 2015; 2) the listing description which clearly states: "This perfect property features 2 hms & and allows you to live 50 ft from your office! Live in a classy, 1607SF home, built in 2007 & faces Coastal Place. The Office/Home was built in 1935, faces M St., is 1604SF…" and 3) the parcel map showing it is one parcel with two dwellings that share a back yard. A true and correct copy of these omitted pages is attached as **Exhibit 4**.

14. The Alaska property was purchased in March of 2015 by and always held by Baer Asset Management Group, LLC, which was formed in 2015, years before this lawsuit was filed.

15. There is no hidden income property not disclosed in our PSA. One of the two dwellings on the Alaska property parcel was historically used as an income property, but it is now Trent's primary residence in Alaska and the home in which our son has lived for the past three years and continues to live while attending college. There is no "other" undisclosed property as Defendants speculate.

16. The $1,030,000 value assigned to the Alaska property in the PSA was based on comparable properties that had sold or were listed for sale in the area together with a prior bank loan appraisal. The lending banker confirmed that "a value for property located at 736 Coastal Place & 737 M Street, Anchorage, AK 99501 ranging between $1,030,000 and $1,100,00 is in line with what the bank used to support a loan at 75% LTV or less against the subject property." A true and correct copy of this email is attached as **Exhibit 5**. Comparable properties sold at that time and an MLS report are attached as **Exhibit 6**. Thus, with the variation in prices, the value we agreed on for the property at $1,030,000 was reasonable.

17. The value assigned to the Santa Barbara condominium in the PSA was also based on objective market evidence. Specifically, we relied on the March 2026 sale at $1.499 million of a comparable unit in the same condominium complex that had the same square footage but superior end finishes. A true and correct copy is attached as **Exhibit 7**. We agreed to assign our unit a value of $1.4 million in the PSA because our unit requires substantial work to make it market-ready, including repairs to the hardwood flooring, the kitchen and two bathrooms.

18. The mortgage balance on the Santa Barbara property was listed correctly in the PSA, notwithstanding the contrary assertion in Ms. Nashon's Declaration based on incomplete

hearsay documents that lack any proper foundation. Nashon's declaration (¶ 5) states: "According to Homes.Com, (which collects data from public records) the mortgage is now approximately $867,000 and the property is now worth up to $2,075,000." But the Homes.Com "evidence" attached as Exhibit E only provides one page of 9. The actual outstanding mortgage balance on the Santa Barbara condominium is $1,015,500 as of April 1, 2026, as reflected in my mortgage statement and PSA. A true and correct copy of the mortgage statement is attached as **Exhibit 8**. The mortgage is an interest-only seven-year adjustable-rate mortgage. If the property is not sold or refinanced by February 2027, the monthly payment doubles.

19. In the interest of full disclosure, after the divorce I recorded a California homestead declaration with respect to my one-half interest in the Santa Barbara condominium. It is my understanding that California law protects a certain amount of a judgment debtor's equity in a principal dwelling, regardless of residency, and that a property owner is afforded a certain amount of protection automatically even without recording. Subsequently, I have learned that by recording, the exempt proceeds are also protected for six months after the sale date to allow the homeowner time to purchase a new home. (*id*. §§ 704.910–704.960).

20. While married, we sold our family home in Alaska to fund this litigation. It was a very emotional decision, and as part of that decision my former husband agreed to allow me to use the approximately $250,000, representing his share of the proceeds of that sale, as a loan to cover my legal expenses. Before the divorce, I also borrowed approximately $470,000 from my former husband via his business over a four-year period. These were

real obligations that I incurred long before the divorce. The divorce did not create them; it merely recognized and allocated a debt that already existed.

21. More importantly, my debt to my former husband does not affect Defendants' ability to collect on any judgment they might obtain. Under the terms of the PSA, Trent is obligated to continue paying the $1,450 e-discovery expense, with those monthly payments added to the outstanding balance I owe him. If Defendants obtain a judgment, they would be able to secure priority over my obligation to Trent so that they are not prejudiced by that debt.

22. Relatedly, as part of the PSA, I agreed to indemnify my former husband if this litigation ultimately causes him to incur financial loss. That is a promise I made to him and only comes into play if he actually suffers a loss. It provides him with no present payment, lien, security interest, or priority over any other creditor. I did not grant him any lien, security interest, or other basis to be repaid ahead of any other creditor.

23. My ex-husband timely served corrections to his March 21, 2023 deposition testimony in accordance with the applicable rules. A true and correct copy of those corrections (the errata sheet) is attached as **Exhibit 9**.

24. Exhibits A–C to the Nashon Declaration (Dkt. 566-1), which Defendants filed publicly, contain my private medical and personal financial information, as well as Trent Baer's confidential financial and business information, even though he is not a party to this action. I strongly take issue with the public dissemination of this information on the Court's nationwide electronic docket as an unwarranted invasion of my privacy rights that could also cause real (and unjustified) professional harm to Trent. The PSA was filed in Alaska Superior Court. Unlike filings in this Court, those documents are not available for public

download through an online docket and may not be read online. To obtain the contents, someone must submit a formal written records request, in person or by email, using a court form with their name, address and phone number and pay a per document fee. I spoke with the Clerk of Court Monday, June 29, and confirmed these facts.

25. My former husband is a non-party to this copyright case, yet Defendants have filed an 8x10 photograph of him and used the PSA to claim: "Baer has only $35,000 in a 401(k) and stocks worth $45,000. He is either spectacularly bad at financial planning—his job for three decades—or is lying to the court." These statements publicly disclose Trent Baer's personal financial information even though he is not a party to this action. Public disclosure of his retirement and investment account balances serves no legitimate purpose in resolving the issues before the Court and could harm his professional reputation, his relationship with clients, his company, and his business. The documents in the PSA are accurate, and if the Court wishes to see verification, I am fully willing to provide copies of 401(k) and stock investment account for *in camera* review. However, I believe it would be more appropriate for the Court to strike from the public record the portions of Defendants' Reply disclosing these personal details and place the PSA under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 29, 2026, at Santa Barbara, California.

Lynne Freeman