UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LYNNE FREEMAN,

Plaintiff,

-against-

TRACY DEEBS-ELKENANEY, et al.

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/28/206

No. 22-cv-2435 (CM) (SN)

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS; GRANTING DEFENDANTS' MOTION FOR AN ORDER REQUIRING PLAINTIFF TO POST A BOND PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 7; AND DENYING DEFENDANTS' MOTION TO BOND COSTS PURSUANT TO LOCAL CIVIL RULE 54.2**

McMahon, J.:

Before the Court are two motions filed by Defendants Tracy Deebs-Elkenaney, p/k/a Tracy Wolff. Emily Silvan Kim, Prospect Agency, LLC, Entangled Publishing, LLC, Holtzbrinck Publishers, LLC, d/b/a Macmillan, and Universal City Studios LLC (together, "Defendants").

*First*, Defendants move for an order declaring them the prevailing party and awarding them an amount to be determined in attorneys' fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d). Defendants estimate that they will seek around $3.4 million in fees and costs but seek leave to put in documentation and a specific request if the Court grants the motion for any fee award. Thus, Defendants are asking the Court to announce that it will award fees and costs but not to enter an award in any specific amount today.

*Second*, Defendants seek an order requiring Plaintiff Lynne Freeman ("Freeman" or "Plaintiff") to post a bond in the amount of $3,407,435.19 pursuant to Local Rule 54.2. This bond would secure Freeman's payment of a judgment for attorneys' fees and costs, and presumes

that the Court will award Defendants what they estimate they will ask for – though they have not yet asked the Court to award that amount or provided the Court with any documentation that would justify that amount.

*Third*, Defendants ask the Court for a bond in the amount of $150,000 pursuant to Federal Rule of Appellate Procedure 7 to cover their anticipated attorneys' fees and costs that will be incurred in connection with Plaintiff's pending appeal. *See* Dkt. No. 556.

For the reasons set forth below, Defendants' motion for an award of attorneys' fees and costs is GRANTED and Defendants have ten business days to put in their documentation and request for a specific amount. Defendants' motion for an order requiring Plaintiff to post a bond in the amount of $3.4 million pursuant to Local Civil Rule 54.2 is DENIED. However, Defendants' motion for a bond in the amount of $150,000 to bond fees and costs that will be incurred on appeal is GRANTED.

## BACKGROUND

The Court assumes familiarity with the facts as set out – in extensive detail – in this Court's March 16, 2026 decision and order granting Defendants' motion for summary judgment on Plaintiff's copyright claim and denying Plaintiff's cross-motion for summary judgment. *See* Dkt. No. 548. As set forth in that decision, no reasonable trier of fact could conclude that Plaintiff's and Defendants' works are substantially similar in light of the well-developed law in this Circuit on substantial similarity between literary works. [1] *See id.* at 82.

---

[1] Freeman's assertion that "this Court is [aware that] Defendants almost certainly copied *BMR* to create the *Crave* series" does not represent an accurate statement of this Court's state of mind on the subject of copying. Dkt. No. 575 at 7. As I explained in the summary judgment decision, the Court merely assumed, without deciding, that Plaintiff could succeed on the issue of actual copying. I did this so that I could reach the ultimate and decisive issue of substantial similarity, which my predecessor judges had avoided addressing. *See* Dkt. No. 548 at 5-6, 20 -21. To be quite precise, I noted that there was no evidence in the record that Tracy Wolff, the credited author of the *Crave* series, ever saw Plaintiff's drafts or notes, or that Emily Kim, who acted as a literary agent for both Freeman and Wolff, ever sent more than a single manuscript to *Crave*'s publisher. *See id.* at 5-6. Given what I have read (*i.e.*, everything in the record written by both Freeman and Wolff) and what I have held (not just no substantial similarity but no similarity beyond standard tropes of the genre at all), it can hardly be contended that I am of the view that

2

On April 14, 2026, Defendants moved for an order declaring them the prevailing party and awarding them attorneys' fees and costs pursuant to the Copyright Act, 17 U.S.C. § 505, and Federal Rule of Civil Procedure 54(d). *See* Dkt. No. 551.

On April 15, 2026, Freeman filed a notice of appeal from this Court's summary judgment decision dismissing her copyright claim. *See* Dkt. No. 553. In light of that appeal, I ordered that Defendants' motion for attorneys' fees and costs be held in abeyance pending the outcome of the appeal. *See* Dkt. No. 554.

On April 23, 2026, Defendants moved for an order requiring Freeman to post a bond of $3,407,435.19 pursuant to Local Civil Rule 54.2 to cover the attorneys' fees and costs that Defendants incurred in litigating the action before this Court. *See* Dkt. No. 556. Defendants also moved for an order requiring Freeman to post a bond in the amount of $150,000 pursuant to Federal Rule of Appellate Procedure 7 to cover the attorneys' fees and costs they anticipate incurring on appeal. *Id.*

On June 16, 2026, Defendants filed their reply brief in support of their bond motion. *See* Dkt. No. 566. That reply brief advised the Court about highly relevant information that had not been previously disclosed concerning Plaintiff's recent divorce and the corresponding property settlement agreement. *See* Dkt. No. 566. In light of the Plaintiff's changed circumstances, I elected to lift the stay imposed on April 17, 2026 and decide the attorneys' fees motion that had been held in abeyance. *See* Dkt. No. 567.

---

Defendants copied anything from Freeman. Neither this Court nor either of my predecessor judges ever ruled that "Defendants almost certainly copied BMR to create the *Crave* series," and I am certainly not "aware" that this much disputed contention of Plaintiff's is a fact. Had there been any genuine issue of fact about substantial similarity we would have tried the issue of copying. There was, of course, no such genuine issue.

## DISCUSSION

### 1. Defendants' Motion for Attorneys' Fees and Costs Pursuant to 17 U.S.C. § 505 is Granted

Section 505 of the Copyright Act authorizes the Court "in its discretion" to allow recovery of full costs and award reasonable attorneys' fees to the prevailing party in any infringement action brought under the statute. 17 U.S.C. § 505. In determining whether to exercise its discretion to award fees under the Copyright Act, courts consider "several nonexclusive factors," including "frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016).

For the reasons set forth below, the Court concludes that the totality of the circumstances, including the factors articulated above, warrant an award of attorneys' fees and costs to Defendants.

### A. Frivolousness/Objective Reasonableness

In evaluating a motion for attorneys' fees, "objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted." *Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 122 (2nd Cir. 2001). The mere fact that a defendant prevailed in litigation, however, "does not necessarily mean that the plaintiff's position was frivolous or objectively unreasonable." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 2004 WL 728878, at *2 (S.D.N.Y. Apr. 6, 2004) (citation omitted). Courts in the Second Circuit have "generally concluded that only those claims that are clearly without merit or otherwise patently devoid of legal or factual basis ought to be deemed objectively unreasonable." *Id.* at *3.

4

While a finding that a defendant is entitled to summary judgment on a copyright claim does not automatically entitle that party to an award of attorneys' fees, this Court's March 16, 2026 opinion sets out, in great detail, why Plaintiff's copyright infringement claim was objectively unreasonable. As I explained in that decision, virtually all of the similarities on which Plaintiff based her claim of substantial similarity concerned unprotectable elements rather than protectable expression. *See* Dkt. No. 548.

Many of Plaintiff's alleged similarities, for instance, were unprotectable tropes/*scènes à faire* common to virtually all young adult romantasy fiction novels. Freeman's own expert agreed that many of the similarities Freeman identified are, at an abstract level, unprotectable tropes/*scènes à faire*. *See* Dkt. No. 548 at 29–31. And when looking at how Plaintiff and Wolff expressed those tropes/*scènes à faire*, their works are substantially different – not substantially similar. *See id.* at 82.

Other alleged similarities were based on the use of ordinary words and common phrases – including "well, well, well," "pang of disappointment," and "things that go bump in the night" – which are, of course, not entitled to copyright protection. *See Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992). As I previously explained, Freeman's contention that the shared use of ordinary words and common phrases demonstrates substantial similarity trivializes copyright law. Dkt. No. 548 at 41.

Still other similarities on which Plaintiff based her substantial similarity argument were nothing more than unexpressed ideas. In her motion for summary judgment, for example, Freeman argued that a point of similarity between the works is a love triangle involving the heroine. *See* Dkt. No. 543-1 at 85. Putting aside the fact that Freeman's own expert testified that a love triangle is an unprotectable trope/*scène à faire* in romantasy fiction, *see* Dkt. No. 548 at

5

29, the idea of a "love triangle" did not appear in any of Freeman's six drafts of her novel. It appeared only in idea form in sketchy notes where she wrote down ideas about additional books (never written) in what she hoped would be a series. *See* Dkt. No. 397-1 at 3 ("Love triangle for book 2. Ash wants to protect her. Ronan wants to help her learn to use her powers to restore the balance"). It is, of course, a fundamental principle of copyright law that "a copyright does not protect an idea, but only the expression of an idea," *Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993). A love triangle is an unprotectable idea, so Freeman's assertion that the works are substantially similar because the *Crave* series includes a love triangle and she anticipated writing about the same thing is devoid of legal support.

To the extent Freeman identified any similarities relating to *protectable* elements of her work, this Court has ruled that those similarities are trivial, insubstantial, and vastly outweighed by the massive differences between the works. *See* Dkt. No. 548 at 67, 75. As explained *ad nauseum* in this Court's summary judgment decision, "the total concept and feel of BMR/Masqued and *Crave* are vastly different in substance, style, structure, length, tone, and mood [and] engender very different visceral responses." Dkt. No. 548 at 79. In fact, the unique creative expression of the works is so dissimilar that I found the case was "easily disposed of" after a side-by-side comparison of the works. Dkt. No. 548 at 82.

Having read the allegedly infringed and infringing works in their entirety, and in light of the well-developed law in this Circuit on substantial similarity between literary works, it is abundantly clear that Freeman's claim of substantial similarity had no basis in fact or law and was objectively unreasonable from the outset. As was the case in *Mallery v. NBC Universal, Inc.*, 331 F. App'x 821, 823 (2d Cir. 2009), the dissimilarities between Freeman's six drafts and Wolff's four completed and published novels were "profound" and "obvious." *See also Chivalry*

*Film Prods. v. NBC Universal, Inc.*, 2007 WL 4190793, at \*3 (S.D.N.Y. Nov. 27, 2007) (awarding attorneys' fees where "the works at issue could not be more different in total concept and feel and plaintiff's arguments to the contrary were wholly specious, masking the striking differences between the works") (internal quotations omitted); *Beverage Mktg. USA, Inc. v. S. Beach Beverage Corp.*, WL 31844911, at \*2 (S.D.N.Y. Dec. 19, 2002) (plaintiff's copyright claim was objectively unreasonable where the claim "would have been dismissed on motion early in the case on the  same ground on which it was dismissed three years after the action was commenced" – namely, "a simply comparison of the alleged infringed and infringing products" – "without any necessity for elaborate briefing"). I cite particularly to the last case because, had I been the judge assigned to this matter from the beginning, the court would have read both sides' writings within six months' of the filing of suit, and the matter would have been disposed of on the same ground – lack of substantial similarity – years before I was actually able to rule on that ground.

That Freeman's arguments fall comfortably within the "specious" label used by the court in *Chivalry Film Productions* is obvious from the briefs her counsel filed in opposition to Defendants' motion for summary judgment. At a January 12, 2026 conference in this case, the Court advised the parties that the appropriate standard for analyzing substantial similarity should be the "total concept and feel" test as viewed from the perspective of the "more discerning ordinary observer," *see* Dkt. No. 521 at 25.  But while Freeman's acknowledged that "total concept and feel" is the governing standard for substantial similarity in this Circuit, *see* Dkt. No. 543-1 at 13, her briefs in opposition to the motion for summary judgment barely address or apply that standard. *See* Dkt. No. 537 at 43-44; Dkt. No. 543-1 at 114. Rather than discussing the total concept and overall feel of the works as a whole, Freeman focused almost entirely on discrete

bits of scattered similarities, untethered to the total concept and feel of the works. It is well settled in this Circuit that random similarities scattered throughout the works cannot support a finding of substantial similarity, because, "Such a scattershot approach . . . fails to address the underlying issue: whether a lay observer would consider the works *as a whole* substantially similar to one another." *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) (emphasis added). Freeman's reliance on the similarity of highly selective, scattered details – rather than on the total concept and overall feel of the works as a whole – was itself objectively unreasonable. *See Williams v. Crichton*, 891 F. Supp. 120, 122 (S.D.N.Y. 1994) (plaintiff's claim of substantial similarity was objectively unreasonable where claim was based on the comparison of "highly selective, scattered details").

Freeman argues that her reliance on lists of scattered similarities cannot be objectively unreasonable because I informed the parties at a January 12, 2026 conference that they could "submit any evidence [they] want." Dkt. No. 521, Tr. 26:19-20. Now that is a specious argument. I told the parties to introduce whatever evidence they wanted. But I also told them that I would be measuring that evidence against the "total concept and feel" standard applicable in this Circuit. *See* Tr. 26:19-24. Plaintiff appears oblivious to the fact that I advised her lawyers that lists of discrete similarities would be "*absolutely inadmissible* on the issue of substantial similarity." Tr. 24:17-20 (emphasis added). *See also* Tr. 19:14-20 ("And again, I want to emphasize that substantial similarity means substantial similarity. It's not discrete lists of this, she's wearing green in this scene and she's wearing green in that scene. His first name begins with an A, and his first name begins with an A. That doesn't get you substantial similarity").

Freeman's remaining arguments warrant only brief discussion.

8

*First*, Freeman argues that her claim of substantial similarity cannot possibly be unreasonable because, "after extensive litigation and fulsome review of the evidence, two separate judges concluded that the substantial similarity question posed close factual and legal issues that required a jury trial." Dkt. No. 575 at 13. The Court has made its position on this issue abundantly clear. The Court invited motions for summary judgment limited to the issue of substantial similarity because neither Magistrate Judge Netburn nor Judge Stanton ever addressed the question of substantial similarity on the merits. Judge Netburn declined to reach the issue; Judge Stanton simply said, with no analysis, that every issue in the case (including those Judge Netburn had not addressed, such as substantial similarity) would go to trial. *See* Dkt. No. 503; Dkt. No. 548 at 8. And, unlike Judges Netburn and Stanton, who were limiting their consideration to just two of Freeman's manuscripts, this Court read all six of Freeman's manuscripts and her nine sets of notes – some of which set out ideas for books that had (and have) yet to be written – before issuing any ruling at all. *See* Dkt. No. 548 at 34.

*Second*, Freeman argues that her copyright claim was not objectively unreasonable because her claim of access was "essentially established at summary judgment as to many of her core manuscripts" and because Judge Netburn "found that Freeman established probative similarity." Dkt. No. 575 at 7, 19. This argument rests on a distorted view of the record. Contrary to Freeman's assertion, access was not "essentially established" at summary judgment. Rather, Judge Netburn denied the parties' cross-motions for summary judgment because she concluded that there was a genuine issue of fact concerning access that needed to be resolved by a jury. Dkt. No. 361 at 15. And while Judge Netburn found that the parties' works shared probative similarities, Judge Stanton vacated that finding when her Report and Recommendation was

9

appealed to him; he reasoned that Judge Netburn, while logical and persuasive, had engaged in the sort of fact finding that only a jury could perform. *See* Dkt. No. 398.

In any event, the strength of Freeman's claims of probative similarity and access was, in the end, irrelevant, because "the lack of [substantial] similarity between the works, by itself, doomed plaintiff's efforts from the outset." *Adsani v. Miller*, 1996 WL 531858, at *16 (S.D.N.Y. Sept. 19, 1996). *See also Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F. Supp. 154, 157 (S.D.N.Y. 1980), *aff'd*, 657 F.2d 262 (2d Cir. 1981) ("Copying cannot be found on proof of access alone when the resulting works are not substantially similar.").

*Third*, Freeman contends that her copyright claim was objectively reasonable because her "very experienced copyright" counsel and "a third-party literary professor and published author" saw "strong claim[s] of substantial similarity." Dkt. No. 575 at 8. Well, no. The *subjective* belief of Plaintiff's counsel in the strength of her copyright claim (a belief no doubt influenced by counsel's highly probable financial interest in the outcome of the case) has no bearing on whether her claim was *objectively* reasonable. What Freeman's lawyers may have personally believed is beside the point. *See Siegel v. Pro-Ex Sec.*, 2002 WL 1203851, at *2 (S.D.N.Y. June 3, 2002) (an attorney's subjective belief in the validity of an argument is irrelevant to an objective reasonableness inquiry).

Likewise, the fact that Freeman's paid expert believed there to be substantial similarities between BMR/Masqued and *Crave* is of no moment, even if that expert is, as Plaintiff argues, a "highly qualified literature professor" and "award-winning author of twenty novels." As this Court has explained more times than should be necessary, expert testimony was irrelevant to the ultimate question of substantial similarity between the works. *See* Dkt. No. 548 at 32; *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51-52 (2d Cir. 1986).

10

In sum, Freeman's claims of substantial similarity were objectively unreasonable. Any assertion to the contrary is itself an objectively unreasonable argument.

### B. Bad Faith

Although a finding of bad faith is not required for an award of attorneys' fees under the Copyright Act, *see Porto v. Guirgis*, 659 F. Supp. 2d 597, 617 (S.D.N.Y. 2009), the record here is replete with bad faith litigation conduct.[2]

*First*, Freeman and her counsel withheld from Defendants, for months, the allegedly infringed manuscripts – manuscripts that should have been produced on day one, when the complaint was served and filed, but were not, *see* Dkt. No. 1; manuscripts that should have been reviewed by counsel consistent with their Rule 11 obligations (and so should have been ready to provide to Defendants immediately upon request); and above all manuscripts that could not more plainly fall within Fed. R. Civ. P. 26(a)(1)(A)(ii) – which means that they were required to be produced at the outset of litigation, without any discovery request or order of the court. Plaintiff's counsel's failure to turn over any and every manuscript on which she intended to rely to prove her case was plainly improper. *See Gayle v. Hearst Commc'ns, Inc.*, 2021 WL 293237, at *2 (S.D.N.Y. Jan. 28, 2021); *Gayle v. Larko*, 2019 WL 4450551, at *3 (S.D.N.Y. Sept. 17, 2019).

That the manuscripts were not produced for an improper litigation purpose is apparent from communications between counsel. On the day Freeman's complaint was filed, her counsel

---

[2] Although Freeman contends that attorneys' fees may only be awarded where there is "clear evidence" that a party's conduct was "taken for reasons of harassment or delay or for other improper purpose," Dkt. No. 575 at 18, she cites no case applying this standard to an award of attorneys' fees pursuant to 17 U.S.C § 505. The cases Plaintiff cites instead concern the standard for imposing sanctions under the court's inherent authority or the award of attorneys' fees under 28 U.S.C. § 1927, neither of which is a basis on which Defendants seek an award of fees. *See, e.g., Eisemann v. Greene*, 204 F.3d 393, 395-96 (2d Cir. 2000); *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 362-63 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007).

11

emailed Wendy Szymanski, Macmillan's Associate General Counsel, asking Macmillan to accept service of Freeman's recently filed complaint. *See* Declaration of Wendy Szymanski ("Szymanski Decl.") at ¶ 5, Dkt. No. 551-4. Szymanski responded that she would accept service and asked for a copy of the manuscripts at issue, pointing out that Macmillan had no way of evaluating the copyright infringement claim without having possession of the works in question. *Id.* Freeman's counsel informed Szymanski in a telephone call that the lawsuit was based on sixty-four unpublished manuscripts and sets of notes, and would require a "key" to understand what parts of Freeman's works were allegedly infringed by *Crave*. *Id.* at ¶ 6. Plaintiff declined to produce these manuscripts and notes on the ground that counsel did not want the manuscripts to be available for use by Defendants in support of a motion to dismiss. *Id.* Of course, Defendants had an absolute right to make a motion to dismiss if they wished to do so. Indeed, as this Court noted in the summary judgment opinion, a motion to dismiss is the usual way in which the issue of substantial similarity is addressed in this Circuit, since the complaint necessarily relies on the allegedly infringed and the allegedly infringing works, which can be read and compared for similarity at the outset of a lawsuit, possibly obviating years of discovery and precious court time. By declining to produce the manuscripts for the manifestly improper purpose of denying Defendants the right to make a motion to dismiss, Plaintiff and her counsel engaged in conduct that, to this Court, qualifies as extreme bad faith.

The follow-up email from Plaintiff's counsel was no better. Counsel said he would provide Defendants with copies of the works on the condition that Macmillan agreed to use them solely for reaching a settlement with Plaintiff and not for any other purpose. *Id.* That was an absurd and unprofessional request. Again, Defendants had an absolute right to make a motion to dismiss based on the manuscripts themselves. Had they done so, it would have saved a

12

considerable amount of time and money, because a side by side comparison of the works revealed no substantial similarity. Plaintiff can and should – indeed, must – pay for such bad faith litigation conduct.

Despite counsel's earlier assertion that Freeman's copyright claim was based on sixty-four unpublished manuscripts, Plaintiff had produced only six manuscripts by August 2, 2022 – more than four months after she filed her complaint. *See* Dkt. No. 66 at 1-2. After Magistrate Judge Netburn ordered Freeman to "identify with specificity which manuscripts were infringed" by October 14, 2022, Dkt. No. 67, Freeman produced 30 documents registered with the Copyright Office, consisting of various versions of her novel, chapter outlines, plot points, character descriptions, and excerpts. *See* Dkt. No. 78 at 4. Plaintiff asserted that her claim relied on all of the material covered by the copyright registrations. Nonetheless, she said that she would limit the universe of works at issue "for purposes of doing a comparison of the works." Dkt. No. 90 at 3. The only problem was the Freeman did not include in her "generous" offer a list of what she would actually rely on for purposes of comparison – in direct violation of Judge Netburn's order that she identify what was infringed with specificity.

Two months later Plaintiff was still playing coy with Defendants and the Magistrate Judge. After her counsel suggested at a December 12, 2022 conference that she "might" be willing to limit the material to six or seven versions of the manuscripts (along with certain notes and chapter outlines) for comparison purposes, Dkt. No. 99, Tr. 15:20-17:16, Judge Netburn ordered Freeman to submit a letter brief addressing how she intends to prove her case and identifying the specific works on which her claim is based. *See* Dkt. No. 99, Tr. 49:16-20. Judge Netburn's order sounds remarkably similar to the language of Fed. R. Civ. P. 26(a)(1)(A)(ii), which requires a litigant to identify and produce to her opponent – without the need for any

13

discovery request or court order – "a copy – or a description by category and location – of all documents…that the disclosing party has int its possession, custody or control and may use to support its claims……" Fed. R. Civ. P. 26(a)(1)(A)(ii). But rather than comply with Judge Netburn's order and Rule 26 by identifying the manuscripts that she intended to use to support her claim of copyright infringement, Freeman filed a letter stating that she would rely on over 5,500 pages of unidentified copyrighted material, while "reserve[ing] [her] right . . . to add additional infringed manuscripts or other materials" that were not presently in her possession, but that she anticipated Defendants would produce to her during discovery. *See* Dkt. No. 103 at 2 n.1.

It was not until Judge Netburn held that Freeman "cannot rely on an amalgam of bits and pieces of her work in progress" and yet again ordered her to identify manuscripts to serve as the primary works that establish her copyright claim – specifically, two manuscripts – that Freeman finally identified two manuscripts that she would ask the court to compare against the *Crave* series novels.  Plaintiff took an appeal from Judge Netburn's order, but Judge Stanton overruled her objections, agreeing with the learned Magistrate Judge that the identification of two primary versions of Freeman's manuscript was necessary for a fact finder to effectively compare the allegedly infringed and infringing works. Dkt. No. 141. This did not occur until February 27, 2023 – almost a year after the lawsuit was filed.

Plaintiff's months-long delay in producing the allegedly infringed works and identifying the specific works underlying her copyright claim undoubtedly prejudiced Defendants' ability to evaluate and defend against her claim. Her lawyer's articulated reason for so doing – to prevent Defendants from moving to dismiss and so possibly short-circuiting her lawsuit – makes it easy for this Court to find that the behavior of Plaintiff and her counsel constituted bad faith litigation

14

tactics.[3] *See Elements/Hill Schwartz, Inc. v. Gloriosa Co.*, 2002 WL 31133391, at *3 (S.D.N.Y. Sept. 26, 2002) (awarding attorneys' fees where plaintiff's failure to identify the copyrighted works which were allegedly infringed suggested "bad faith conduct that did not adequately put defendants on notice of plaintiff's claims"); *Davis v. United States Small Bus. Admin.*, 2021 WL 4893357, at *3 (C.D. Cal. Sept. 23, 2021), *aff'd sub nom. Traylor v. U.S. Small Bus. Ass'n*, 2023 WL 7297329 (9th Cir. Nov. 6, 2023) (granting attorneys' fees to defendants in part because plaintiff's "complete failure to produce the basis of her copyright claim (i.e., the allegedly original work)—can only be described as acting in bad faith"). Frankly, I cannot recall, after almost 28 years on the federal bench, an instance in which bad faith was so easily established.

*Second*, many of Freeman's alleged similarities relied on misleading characterizations and descriptions of her works – characterizations and descriptions that were wholly untethered to the works themselves. I offer but two of the many examples to illustrate the point.

Freeman argued, that the works share a substantially similar setting because both BMR/Masqued and *Crave* are set in a castle. But there is no "castle" in any of Freeman's manuscripts; there is only an "Old-World European chateau." As this Court has previously explained, the notion that the Gothic castle in which *Crave* is set is substantially similar to the "Old-World European chateau" featured in *BMR/Masqued* – a claim apparently rooted in Plaintiff's observation that "chateau" is the French word for "castle" (as well as "large or grand country manor house," *see* https://www.frenchdictionary.com/translate/chateau) – borders on the frivolous. *See* Dkt. No. 548 at 47.

Similarly, Freeman argued that both heroines have maternal grandmothers with green eyes. But in none of the five drafts that follow the template, *see* Dkt. No. 548 at 37, does

---

[3] I should note that Freeman is herself a lawyer, which makes this behavior all the worse.

Freeman's heroine have a maternal grandmother with green eyes. In fact, in three of those five drafts, the heroine does not have a maternal grandmother at all. In all versions of the novel that conform to the template, the mysterious woman in the mirror – who is variously the heroine's biological mother or her grandmother – has blue eyes, not green eyes. Only in *Masqued 2016* – the half-finished novel that does not conform to the template and that the Court analyzed separately – does the heroine have a maternal grandmother who has green eyes. As for the *Crave* novels: the character with green eyes is a vampire and a goddess – not a witch or a priestess – and she is not the heroine's maternal grandmother, but her ancestor going back many generations.

Freeman's misleading (and in some instances, plainly inaccurate) descriptions of her own works in order to create an illusion of similarity gives rise to a strong inference of bad faith.

## C.  Compensation and Deterrence

In determining whether an award of attorneys' fees is appropriate, courts "must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Kirtsaeng*, 579 U.S. 197 at 209. The primary objective of the Copyright Act is to "encourage the production of original literary, artistic, and musical expression for the good of the public." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994). This objective is promoted by not only discouraging infringement, but by the successful defense of copyright infringement actions. *See id.* at 527. As the United States Supreme Court has explained:

> Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.
>
> *Id.*

16

Here, an award of attorneys' fees and costs to Defendants would "advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n.19. Not only would an award compensate Defendants for being "forced to pursue this lengthy litigation in the face of an obviously losing position" on Freeman's part, *id.*, but would serve "to deter this plaintiff, and other similarity situated plaintiffs, from bringing unreasonable claims based on a cost/benefit analysis that tells such plaintiffs that they can score big if they win and that there will be no adverse consequences if they lose." *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 359 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007). *See also Kirtsaeng*, 579 U.S. 197 at 209 (courts may award attorneys' fees even where the losing party's position was reasonable to deter "overaggressive assertions of copyright claims"). Under these circumstances, a decision not to award attorneys' fees to Defendants "would invite others to bring similarly unreasonable actions without fear of any consequences." *Earth Flag Ltd. v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 668 (S.D.N.Y. 2001). *See also Chivalry Film Prods. v. NBC Universal, Inc.*, 2007 WL 419079, at *3 (S.D.N.Y. Nov. 27, 2007) ("the denial of fees and costs to a prevailing defendant in an objectively unreasonable copyright case may spur additional frivolous lawsuits, of exactly the sort that an award of fees and costs is designed to chill").

Freeman's assertion that the "novelty of this case" augurs against an award of attorneys' fees to Defendants is unavailing. She "submits that this case does not fit neatly" into existing authority "given the strong evidence of copyright ownership, clear probative similarity, a shared agent as an intermediary, and a dearth of authority addressing how much a work can be harvested and how much it must be altered to evade liability for the unauthorized copying." Dkt. No. 575 at 9.

I am constrained to disagree. This is a garden variety literary copyright case. Freeman has never argued to the contrary until now, and today her argument is utterly unpersuasive. Anyone who was familiar with the law of substantial similarity in the Second Circuit, and who took the time to read Plaintiff's manuscripts (when they were finally produced and identified) against the four novels written by Defendant Wolff that were at issue in this lawsuit, would have no difficulty deciding that the works were not substantially similar. There was no need to "reach" in order to come up with a result; there were no novel issues of law or unusual facts to address. Plaintiff admitted as much in her pre-summary judgment briefs. *See, e.g.*, Dkt. No. 103 at 3-4; Dkt. No. 537 at 7 (the "factfinder will not be limited to considering one single theory of liability but rather may consider any theory supported by Second Circuit law that fits the facts—and in this case there are many"); Dkt. No. 537 at 13 (arguing that regardless of which test is applied, an ordinary or more discerning reader would recognize substantial similarity between BMR/Masqued and *Crave*); Dkt. No. 284 at 24 ("Freeman *easily satisfies*" both the fragmented literal similarity and comprehensive nonliteral similarity tests under this Circuit's law) (emphasis added).

As for Freeman's contention that this case involved complicated issue of law or fact, *i.e.,* that it was "a case in which the facts were 'close' or the issues 'novel' so as to make an award of attorney's fees inappropriate," *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 311 (S.D.N.Y. 2009), this Court disposed of those contentions in the course of ruling against her on the merits. All it took to dispose of this case was a side-by-side comparison of the allegedly infringed and infringing works. This was not a close case. It was not an arguably close case. Once someone read the works, it was an open and shut case.

18

The Court declines Freeman's invitation to "consider the relative finances of the parties" in determining whether to grant an award of attorneys' fees. Dkt. No. 575 at 27. In this Circuit, the "decision to award attorney's fees is based on whether imposition of the fees will further the goals of the Copyright Act, not on whether the losing party can afford to pay the fees." *Chivalry Film Prods*, 2007 WL 4190793, at *4. While the relative financial strength of the parties may be properly considered in determining the amount of an award, it is not a basis on which the Court should decline to impose an award of attorneys' fees and costs. *See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 2004 WL 728878, at *5 (S.D.N.Y. Apr. 6, 2004) (collecting cases).

Moreover, if ability to pay were properly considered in determining whether to impose an award of attorneys' fees, Plaintiff has not alleged – let alone offered supporting documentation to demonstrate – that she would be unable to pay an award of fees or that such an award would cause her financial hardship. She argues only that, "Regardless of Freeman's earning potential," Defendant Entangled appears to be worth approximately $400 million and was recently acquired by Peter Chernin's private equity firm. Dkt. No. 575 at 27. In other words, she argues that Defendants are richer than she is. But she cites to no authority suggesting that a prevailing party's ability to pay its own attorneys' fees and costs is a valid basis for denying a fee award to a party that is otherwise entitled to one. And for good reason: the Copyright Act's fee-shifting provision is intended to "enrich the general public through access to creative works" by demarcating the boundaries of copyright law "as clearly as possible," not to redistribute litigation costs based on a prevailing party's financial means. *Fogerty*, 510 U.S. at 527.

### D. Reasonableness and Amount of Award

Based on the foregoing, the Court has no difficulty concluding that it will award Defendants some amount in fees and costs for litigation in the district court. However, the fact that Defendants are entitled to a fee award does not resolve the amount of fees to which they are entitled. They suggest that they have incurred $3.4 million in litigation costs, but they have not yet provided the Court with time records, summaries of work performed, or any other evidence that would support an award in that – or any specific – amount. They seek leave to request an amount and to support that request in the event that the Court is inclined to make an award.

Since I am inclined to make an award, Defendants have fourteen days from the date of this Order to submit an itemization of fees they contend are appropriate, along with the required documentation necessary for the Court to determine the proper amount of any award. In making their request, Defendants should be careful to delineate how many lawyers, and at what specific per lawyer billing rates, worked on any specific task. All Defendants were aligned in interest throughout this lawsuit and the case was disposed of on grounds equally applicable to all; it is not the practice of this Court to award fees for the work of ten lawyers when only two were needed. If Defendants are not able to cull out duplication of effort, the Court will not spend a great deal of time doing it for them; I will simply slash their request. Forewarned is forearmed.

### 2. Defendants' Motion for Bond to Cover Attorneys' Fees and Costs Incurred in the District Court is Denied

Defendants next seek an order requiring Freeman to post a bond in the amount of $3,407,435.19 pursuant to Local Rule 54.2 to cover Defendants' attorneys' fees and costs incurred in litigating this action before this Court. That motion is DENIED.

Local Civil Rule 54.2 provides, in relevant part, that "The court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in

such an amount and so conditioned as it may designate." S.D.N.Y. Local Civ. R. 54.2. "The primary purpose of the rule is to ensure that the prevailing party will be able to collect the costs and fees owed to it in situations where the other party is unlikely or unwilling to pay." *Kensington Int'l Ltd. v. Republic of Congo*, 2005 WL 646086 at *1 (S.D.N.Y. Mar. 21, 2005).

Defendants argue that a bond is necessary because the Court's decision to hold its attorneys' fees motion in abeyance pending Freeman's appeal to the Second Circuit creates a risk that Freeman's assets will be exhausted before an attorneys' fees award can be granted. *See* Dkt. No. 556 at 17. But as I have not yet awarded Defendants $3,407,435.19 in attorneys' fees and costs, or anything like that amount, it would not be appropriate to impose on Freeman the requirement that she post bond in that amount.

### 3. Defendants' Motion for Bond to Cover Appeal Costs is Granted

Finally, Defendants ask that Plaintiff be required to post bond in the amount of $150,000 pursuant to Federal Rule of Appellate Procedure 7 to cover their anticipated attorneys' fees and costs on appeal. *See* Dkt. No. 556. That request is GRANTED.

Rule 7 of the Federal Rules of Appellate Procedure states that, "In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7. "Costs" has been defined to include "anticipated appellate attorney's fees if the statute governing the underlying cause of action defines 'costs' to include fees." *RBFC One, LLC v. Zeeks, Inc.*, 2005 WL 2140994, at *2 (S.D.N.Y. Sept. 2, 2005) (quoting 20 Moore's Federal Practice ¶ 307.10[2] (2005)).

In determining whether a bond is warranted, courts generally consider the following non-exhaustive factors: 1) the appellant's financial ability to post a bond; 2) the risk that the appellant would not pay appellee's costs if the appeal fails; 3) the merits of the appeal; and 4) whether the appellant has shown any bad faith or vexatious conduct. *Watson v. E.S. Sutton, Inc.*, 2006 WL

21

4484160, at *2 (S.D.N.Y. Dec. 6, 2006). "Notwithstanding this guiding framework, the decision whether to impose an appeal bond is left to the sound discretion of the district court." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 2012 WL 260231, at *1 (S.D.N.Y. Jan. 12, 2012).

I find that a bond in the amount of $150,000 as sought by Defendants is reasonable under the circumstances and would not constitute an "impermissible barrier to appeal." *Adsani*, 193 F.3d at 76. *See In re Morgan Stanley Data Sec. Litig.*, 2022 WL 6577031, at *1 (S.D.N.Y. Sept. 28, 2022) ("The Court has the discretion to determine the appropriate amount of the bond."). All four factors counsel in favor of bonding the appeal.

The first factor is Freeman's financial ability to post the bond. She "ha[s] not presented any evidence demonstrating that [she] lack[s] the financial ability to post a bond" in the amount requested. *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 293 (S.D.N.Y. 2010). Indeed, Freeman argues that she had no obligation to disclose information about her financial condition precisely because she did not elect to place her ability to pay bond at issue (an untrue statement, as will be seen below). Dkt. No. 568 at 8. In light of this statement, her "ability to do so is presumed." *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d at 293.

The second factor is the risk that Freeman would not pay costs or fees if her appeals were unsuccessful. I view the risk as quite high. Freeman's refusal to comply with her Rule 26 obligations and with Judge Netburn's repeated orders to identify the basis for her lawsuit is enough for me to conclude that – notwithstanding Freeman's status as an attorney herself – she would do her utmost to avoid or evade compliance with any court order that she did not like.

Turning to the third factor, I have no doubt about how the appeal is going to come out. This is because I have read both Freeman's and Wolff's work – all of it – multiple times. Having read the works puts me in the best possible position to evaluate the possibility that Freeman

22

might succeed on appeal. It is my considered judgment that her appeal is entirely without merit. That too counsels in favor of requiring her to post bond. *Adsani*, 139 F.3d at 79. l.

Finally, while a demonstration of bad faith or vexatious conduct is not required for the imposition of an appeal bond, *see Stillman v. InService Am. Inc.*, 838 F. Supp. 2d 138, 140 (S.D.N.Y. 2011), Freeman and her lawyers have engaged in "vexatious" and bad faith conduct throughout this litigation, as described *supra*, pages 11–16.

Moreover, she has engaged in bad faith conduct in connection with this very motion. Although Freeman presently argues that she did not place her financial situation at issue, Dkt. No. 568 at 8, that is a lie. Freeman put her financial condition at issue by arguing in her opposition brief that imposing a bond would represent an impermissible barrier to her ability to appeal and that "any bond amount will impose a real burden since it requires paying more than 100% of the bond amount up front, thus tying up assets that may otherwise be needed for, *inter alia*, litigation costs, business and other regular expenses, and the unanticipated emergencies that can arise in life." Dkt. No. 563 at 21. Despite crying poverty, Freeman failed to disclose to the Court that she was engaged in a divorce proceeding and that she had agreed to transfer certain assets to her former spouse pursuant to a court-ordered property settlement agreement – facts that the Court would find relevant to any assessment of her ability, not just to post bond, but to pay any ultimate judgment if it were not bonded. Freeman insists that she did not disclose the divorce and settlement agreement because "neither Rule 7 nor Local Rule 54.2 require the disclosure of the responding parties' financial condition." Dkt. No. 568 at 8. But this is disingenuous in light of the argument that she did make.

All of this suffices to convince me that Freeman should be required to post bond if she wants to perfect her appeal. *See Tri-Star Pictures, Inc. v. Unger*, 32 F. Supp. 2d 144, 148

23

(S.D.N.Y.), *aff'd*, 198 F.3d 235 (2d Cir. 1999) ("It is also proper to require the posting of a bond pursuant to Rule 7 when a party has engaged in a course of vexatious conduct throughout a litigation") (internal quotations omitted).

As all four factors counsel in favor of requiring an appeal bond, Plaintiff is directed to post a bond in the amount of $150,000.

## CONCLUSION

For the reasons set forth above, Defendants' motion for an award of attorneys' fees and costs pursuant to 17 U.S.C. § 505 is GRANTED. Within fourteen days of this Order, Defendants must submit an itemization of fees they contend are appropriate, along with the required documentation necessary for the Court to determine the proper award amount.

Defendants' motion for an order requiring Plaintiff to post a bond of $3,407,435.19 pursuant to Local Civil Rule 54.2 is DENIED.

Defendants' motion for an appeal bond pursuant to Federal Rule of Appellate Procedure is GRANTED. Plaintiff is directed to post a bond in the amount of $150,000.

The Clerk of Court is respectfully directed to remove the motions at Docket Numbers 555, 556, 557, and 559 from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written decision.

Dated: July 28, 2026

U.S.D.J

BY ECF TO ALL COUNSEL

24