# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LYNNE FREEMAN,

Plaintiff,

v.

TRACY DEEBS-ELKENANEY, et al.

Defendants.

Case No. 2:22-cv-02435 CM-SN

**DECLARATION OF AMY NASHON IN SUPPORT OF DEFENDANTS' FURTHER SUPPLEMENTAL BRIEF IN SUPPORT OF AN AWARD OF ATTORNEYS' FEES FOLLOWING SECOND SESSION OF FREEMAN DEPOSITION**

**DECLARATION OF AMY NASHON**

Amy Nashon declares as follows:

1. I am a shareholder at the law firm of TroyGould, PC, attorneys for Defendants Tracy Deebs-Elkenaney p/k/a Tracy Wolff, Entangled Publishing, LLC ("Entangled"), Holtzbrinck Publishers, LLC d/b/a Macmillan, and Universal City Studios LLC in the above-captioned matter.

2. I took Ms. Freeman's deposition on September 23, 2026 and requested and received from the court reporter a rough transcript of the deposition for the purposes of preparing Defendants' further supplemental brief in support of an award of attorney's fees. I have reviewed the rough transcript that I received and believe that it accurately reflects the testimony given by Ms. Freeman at her deposition. A true and accurate copy of that deposition transcript is attached hereto as "Exhibit A."

3. I have reviewed the Social Security Administration's official listing of impairments which qualify for a finding of disability. Hastimoto's, fibromyalgia, chronic fatigue syndrome, long COVID, osteoporosis, POTS, GI motility disorder, and macular pucker are not listed as impairments that qualify a person for Social Security benefits.

4. I have reviewed the website for Dr. Kristi Harter, Ms. Freeman's "general practitioner doctor" and she is a nutritionist with a doctorate in naturopathy, but not a licensed medical doctor.

5. I searched for a "Dr. Denton" in Santa Barbara or Montecito, and came up with no results.

I affirm this 24th day of September, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Amy Nashon

_______________________
Amy Nashon

# EXHIBIT A

0001

**ROUGH DRAFT - NOT CERTIFIED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYNNE FREEMAN, )
) CASE NO. 2:22-cv-02435-CM-SN
Plaintiff, )
v. ) VOLUME II
)
TRACY DEEBS-ELKENANEY, et al. )
)
Defendants. )

*****CONFIDENTIAL*****

ROUGH DRAFT TRANSCRIPT OF
LYNNE FREEMAN,
SEPTEMBER 23, 2026

THE FOLLOWING TRANSCRIPT OF PROCEEDINGS, OR ANY PORTION THEREOF, IN THE ABOVE-ENTITLED MATTER, TAKEN ON SEPTEMBER 23, 2026, IS BEING DELIVERED UNEDITED AND UNCERTIFIED BY THE OFFICIAL COURT REPORTER.

THE PURCHASER AGREES NOT TO DISCLOSE THIS UNCERTIFIED AND UNEDITED TRANSCRIPT IN ANY FORM (WRITTEN OR ELECTRONIC) TO ANYONE WHO HAS NO CONNECTION TO THIS CASE. THIS IS AN UNOFFICIAL TRANSCRIPT, WHICH SHOULD NOT BE RELIED UPON FOR PURPOSES OF VERBATIM CITATION OF TESTIMONY.

THE TRANSCRIPT HAS NOT BEEN CHECKED OR PROOFED. IT IS A DRAFT TRANSCRIPT, NOT A CERTIFIED TRANSCRIPT. AS SUCH, IT MAY CONTAIN COMPUTER-GENERATED MISTRANSLATIONS OF STENOTYPE CODE OR ELECTRONIC TRANSMISSION ERRORS, RESULTING IN INACCURATE OR NONSENSICAL WORD COMBINATIONS, OR UNTRANSLATED STENOTYPE SYMBOLS WHICH CANNOT BE DECIPHERED BY NON-STENOTYPISTS. CORRECTIONS WILL BE MADE IN THE PREPARATION OF THE CERTIFIED TRANSCRIPT, RESULTING IN DIFFERENCES IN CONTENT, PAGE AND LINE NUMBERS, PUNCTUATION AND FORMATTING.

THIS REALTIME UNCERTIFIED TRANSCRIPT CONTAINS NO APPEARANCE PAGE, CERTIFICATION PAGE, INDEX, OR CERTIFICATION.

STENO
concierge@steno.com
(888) 707-8366

0002

(Disclosure given pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting.)

(VIDEO ON)

THE VIDEOGRAPHER: Good morning. We are on the record at 9:07 a.m. Pacific Time, September 23, 2026, to begin the deposition of Lynne Freeman, Volume II, in the matter of Lynne Freeman versus Tracy Deebs-Elkenaney, et al. The venue for this case is United States District Court,

Southern District of New York. The case number is 2:22-cv-02435-CM-SN. This deposition is taking place via Zoom. The legal videographer is Kwasi Yeboah, here on behalf of Steno, whom's business address is 315 West Ninth Street, Suite 807, Los Angeles, California 90015.
Would counsel please identify yourself and state whom you represent.
MR. PASSIN: Good morning. Mark Passin of Reeder, LLP, on behalf of the plaintiff and witness, Lynne Freeman.
MS. NASHON: Amy Nashon on behalf of Defendants.
MR. KOONCE: Lance Koonce with Klaris Law on behalf of Emily Sylvan Kim and Prospect Agency, LLC.
MR. GOETZEL: Dwayne Goetzel on behalf of defendant Tracy Deebs-Elkenaney, professionally known as Tracy Wolff.
THE VIDEOGRAPHER: Thank you, counsel. Will the court reporter please identify yourself and swear in the

0003

witness.
THE REPORTER: Good morning. My name is Misti Gilbert, Georgia Certification No. 2705, and I am the court reporter contracted by Steno for this proceeding. I will now read the following stipulations into the record:
The attorneys appearing in this deposition acknowledge that I am not physically present in the deposition room; that I will be reporting on this deposition remotely; and that I will administer the oath to the witness remotely. The parties and their counsel further agree that while I am a licensed court reporter, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.
If any party does have an objection to this manner of reporting or anything stated above, please state so now.
Hearing none, we can proceed. I will now swear in the witness.
Ms. Freeman, would you raise your right hand to be sworn in, please, ma'am. Do you solemnly swear or affirm the testimony you give today will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE REPORTER: Thank you.
MR. PASSIN: Before we start, I have two little housekeeping matters. One is, Amy and Lance, the last

0004

transcript and all of them saying this case have been designated confidential, so I'd like to stipulate that this transcript shall be confidential, as well. Is that acceptable?
MS. NASHON: So stipulated.
MR. PASSIN: Lance?

MR. KOONCE: Agreed.
MR. PASSIN: Okay. And then the other thing is -- I can ask Kwasi. Who is ESK?
THE VIDEOGRAPHER: That's Emily -- Emily Kemp.
MR. PASSIN: Oh, okay. Thank you.
THEREUPON,
LYNNE FREEMAN
was called as a witness and, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MS. NASHON:
Q. All right. Ms. Freeman, can you please tell me, did you do anything to prepare for your deposition today?
A. I spoke with my attorneys briefly yesterday.
Q. Did you review any documents?
A. No. I -- I would like to say for the record, if this is appropriate, that the last time I read in my [redacted]. I would like to go ahead and incorporate by reference what I said the last time. I am -- I still have

0005

those conditions. [redacted]
Q. Understood.
A. [redacted]
Q. We'll get into that.
First of all, Ms. Freeman, do you have anyone there at the house with you?
A. My mom is here with me.
Q. Okay. And is she in the room with you?
A. She is.
Q. Okay. Well, since we're taking this deposition by Zoom, I'm going to instruct you not to speak with her while we are on the record and not to text or email with anyone while we are on the record. Do you understand and agree to that instruction?
A. Yes.
Q. And, Ms. Freeman, have you reviewed the court's orders issued by Judge McMahon on September 17th and September 21 of this month?
A. I -- yes, I've discussed those with my attorneys.

0006

Q. Okay. So you understand that the judge has ordered that you must answer all questions today unless she rules that the question implicates the attorney-client privilege?
A. Yes.

Q. Okay.
MR. PASSIN: Objection. I don't necessarily agree with that interpretation, but that's fine.
BY MS. NASHON:
Q. And as you sit here today, Ms. Freeman, do you continue to have the same [redacted] you identified on September 14th?
A. Yes.
Q. Okay. Have any of those conditions changed?
A. No. [redacted].
Q. [redacted]
A. No.
Q. Do you have any new [redacted] since your last deposition?
A. No.
Q. [redacted]
A. Yes. [redacted]
Q. Okay. When did she say that you [redacted]
A. Today's Wednesday. Monday, Tuesday. She was discussing it with me last Friday, last week.
Q. Why did she say you [redacted]
Q. As you sit here today, are you suffering from any

cognitive (inaudible).
A. [redacted].
Q. Are you suffering from any memory loss?
[redacted]
Q. Have you taken any medications in the past 12 hours that would affect your cognition or your memory?
A. No.
Q. So as you said, you've incorporated sort of by reference, and we talked about last time, [redacted] and I want to understand a little bit more about that. So you -- [redacted] Is that correct?
A. Yes.
Q. Okay. And you said that you had been [redacted] Do you recall when that was?
A. I don't recall.
Q. Do you recall [redacted]
Q. Okay. [redacted]

[redacted]9

[redacted] You mentioned about 30 years ago. Is that right?
A. I don't recall when that was.
Q. Okay. Do you recall [redacted]
Q. Do you recall any of them?
A. [redacted] I can't think of any others right now.
Q. Do you recall [redacted] first name?
A. I don't.
Q. And you said that you were [redacted] Is that right?
A. Yes, and I -- yes.
Q. Okay. And do you know who [redacted]

0010

Q. [redacted]

Q. Okay. [redacted]

A. Yes.

Q. [redacted] Is that right?

A. Yes.

Q. Okay. [redacted] Is that correct?

0011

A. Yes.

Q. Okay. [redacted]

Q. And is that a [redacted] that you can only get in California?

A. No. [redacted] That is available only in California.

Q. [redacted]

[redacted]

0012

A. Yes.

Q. [redacted]

A. So three years ago. A little over three years ago, [redacted]

A. Yes. Okay.

Q. And is that [redacted] that you can only get in California?

A. Yes.

Q. [redacted]

Q. Okay, [redacted]

A. [redacted]

Q. Can you spell that, please?

A. [redacted]

Q. Okay.

A. [redacted] Is that right?

A. [redacted]

A. Yes.

Q. [redacted]

[redacted]

0014

Q. And you said. I think you said you had been [redacted] there.
A. I have been, yes.
Q. [redacted]
Q. Is it your understanding that eventually you'll need to go to [redacted]
A. Yes.
Q. And is who will be paying for your [redacted]
A. Trent will be covering that.
Q. Have you gotten any estimate of that cost?
A. Not as yet. I'll know more after [redacted]
A. Yes.
Q. And would Trent be paying for that cost as well?
A. Yes.
Q. For [redacted] and for your [redacted] there?
A. Yes.

0015

Q. Do you have an estimate of that cost?
A. Not as yet, no.
Q. Do you have an estimate of the time that you would need to be there?
A. Not as yet, no.
Q. At your deposition on September 14, you said that you didn't believe you were [redacted], but [redacted]. Has that position changed since then?
A. No.
Q. And you testified that you had been [redacted] Can you please tell me [redacted]
A. [redacted] I'm told that it's many things. It's not any one thing.
Q. Did someone [redacted] or how did you reach that conclusion?
A. It wasn't a conclusion that I reached. It is the way that my life has played out. [redacted]

[redacted]

Q. Okay. [redacted] Am I understanding that right?

A [redacted]

A. Right now it's too soon for me to be able to tell you what those will be. [redacted] So I'm at a point that it's a little bit soon for me to know.

Q. [redacted]

A. Can you repeat that question for me again, please?

Q. So you'll recall perhaps at your last deposition, you mentioned that you [redacted]

A. Yeah. So that -- [redacted]

Q. Okay. And were there any [redacted] that were not available in Alaska?

A. [redacted]

[redacted]
A. No.
Q. [redacted]
0018
A. Yes.
Q. When you applied for [redacted], what is the [redacted] that you listed?
A. I listed [redacted].
Q. And did you apply for [redacted]
A. I don't recall.
Q. And last we spoke, you had not provided any [redacted] in support of your application. Is that right?
A. Not as yet, no.
Q. And you had not retained a [redacted]. Is that still the case?
A. That's correct.
Q. And presumably, have you. [redacted]
A. No.
Q. Have you reviewed what is called the [redacted] That is the [redacted]
A. I've reviewed - no, I don't know if I've reviewed that or not. I reviewed something online that has a list of [redacted], but I don't know if it's the [redacted]
Q. [redacted]
0019
A. Yes.
Q. Okay. Which ones?
A. [redacted]. There may be others. I don't recall.
Q. Is there a reason you waited 10 years [redacted]
A. Yes.
Q. What is that?
A. [redacted]. Is that. Am I recalling that correctly?
A. Yes, we've discussed it.
Q. Okay. [redacted]

[redacted]. And there may be others, but I don't recall right now.
Q. [redacted]
A. We didn't discuss that.
Q. Okay. What did you discuss?
A. [redacted] And this was not right now. This was, you know, in the
0020
past.
Q. When did you have those conversations?
A. Over the past couple of years?
Q. Five years? Ten?
A. No, the last 00 the last three years.
Q. Okay.
A. With those [redacted]
Q. Did you make plans to travel to New York when the trifurcated trial was scheduled for March 26, 2026?
A. No.
Q. Is there a reason why?
A. I was waiting to see when a date would be set. Before I made plans.
Q. When is the last time that you went to Alaska?
A. I don't recall when I was last in Alaska.
Q. Have you gone in the past five years?
A. I don't recall the last date of when I was in Alaska.
Q. So you don't recall whether you have been to Alaska in the last five years?
A. I don't believe that I have been within the last five years, but I cannot pin what the date was.
Q. Did you go to Alaska during COVID in 2020?
A. I was living in Alaska during COVID in 2020.
Q. When did you move to California?
0021
A. I did not move to California. Came to California to visit family and for my son. But I can't recall the date of when that was.
Q. Your son was living in California at the time?
A. No.
Q. You said that you came to visit him. What was he doing?
A. No. There, there. [redacted] And I understand I have to answer every question, but my son is a young man in his last year of college. And I will answer this question, but I'm answering it under compulsion because I do not feel that his [redacted], which I -- [redacted] should

be disclosed.
Q. [redacted] but I am trying to pin down when you left Alaska, California.
A. I can't recall the date, [redacted]
Q. Okay. And -- okay. So you lived in Alaska when Covid hit in 2020, and at some point you came to visit California?
A. Yes.
0022
Q. Okay. Was that 2021? 2022?
A. I believe that it was in 2021, but I cannot recall the exact date of when it was.
Q. Okay. That's fine. Not asking for exact dates.
And so since 2021, since you came to visit California, you don't recall whether you've been back to Alaska since then?
A. I have not.
Q. OKay. And you previously testified that you plan to move back to Alaska. Do you recall that?
A. Yes.
Q. And do you plan to buy a home there?
A. I don't know how I would buy a home there.
Q. Okay. Do you have a plan for where you'll live when you move back?
A. No, It's - it's too soon for that.
Q [redacted]
Q. Grandparents?
A. They've passed away.
Q. Any other family members?
A. No.
Q. The last time we spoke, you mentioned that when Trent is in Santa Barbara, he stays at your condominium
0023
complex. Do you recall [redacted] last name?
A. I don't recall.
Q. What unit number are you in?
THE VIDEOGRAPHER: I'm sorry, I don't mean to interrupt. We just had someone join the chat. Just wanted to make sure they belong here. A Stephanie -- yeah.
MR. DONIGER: Stephen Doniger.
THE VIDEOGRAPHER: Who are you with? Oh, you're - -
MR. DONIGER: Co-counsel for the deponent.
THE VIDEOGRAPHER: Okay, sounds good. Thanks for identifying yourself. Sorry about that.

BY MS. NASHON:
Q. Okay. What unit is [redacted] in?
A. I don't. I don't recall her unit number.
Q. You recall what floor she's on?
A. She's on a second floor.
Q. And how often does Trent perform work at your condo complex or your condo unit?
MR. PASSIN: Objection vague and ambiguous.
A. I couldn't say because the schedule varies as to when he's going to work on it and when he can get help for some of the things that he needs help with.
Q. About how far along would you say he is in the process? Can you give me a percentage of completion?

0024

A. Yes.
Q. And how long has he been working on getting to the halfway point?
A. I'm not. I'm not sure how long he's been doing it. Off and on over the last couple months.
Q. And does Trent have a designated office space in Santa Barbara?
A. Yes.
Q. Is that separate from your condominium complex?
A. Yes.
Q. Do you know how much Trent pays for your medical expenses on average every month, not including your health insurance?
A. No. It varies.
Q. He pays those expenses directly?
A. Yes.
Q. Do you submit the bills to him or did the provider submit the bills to him?
A. He pays what is uncovered by insurance. The bills are received by me, and I provide them to him. Some bills go to Trent directly.
Q. We talked about your last deposition a little bit about loans that were made to you as part of this litigation. So there was a loan from Trent personally to you. Is that right?

0025

A. Yes.
Q. Is there any documentation of that loan?
A. No.
Q. Is the loan forgivable?
A. [redacted] The PSA has the terms of that.
Q. Is there interest that accrues on that loan?
A. [redacted]
Q. Are you meant to make payments over time?

A. [redacted]
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]
Q. And there was also a loan from Trent's business to you. Is. Is that correct?
A. Yes.
Q. [redacted]
A. [redacted].
Q. Okay. Who was it from?
A. From Trent's business of Trent himself. And that would be -- Trent is big. So I'm -- it's in the psa and I would need to look at the document to see what it says about how. How that was -- but it was made over time. It wasn't
0026
a lump sum.
Q. That's when you say BIG, for the record, that's Baer Investment Group.
A. Yeah.
Q. And you said those loans were made over time?
A. Yes.
Q. Okay. What period of time?
A. [redacted]
Q. When was the last loan from BIG
A. It's a continuing to accrue loan. So it would be what -- the e discovery is ongoing. That is accruing. [redacted]
Q. Is there any documentation of these agreements that you reached with him regarding repayment of this money?
A. Other than the psa, no.
Q. And is it your understanding that any of this loan -- I'll just -- even though it was made over time, I'm just going to refer to it as the loan you understand. Is there -- is it your understanding that any part of the loan is forgivable?
0027
A. [redacted], but the terms of that are in the psa, which I cannot recall unless I am looking at the document. Would you like to go over it and show me the document so that we can talk about it to the extent that I can read it?
Q. And that loan is not accruing interest, is it?
A. [redacted]
Q. And I assume that loan has the same terms as far as

payment that the personal loan has.
A. I don't know if I understand the question. I'm sorry.
Q. I was trying to shortcut. But you had mentioned before that with his personal loan, [redacted] Is that right?
A. [redacted]
Q. [redacted] Is that the same with this loan from BIG
A. [redacted].
Q. And have you repaid any part of the monies loaned to you by BIG?
A. [redacted]
Q. Did you and Trent ever discuss the possibility of recovering attorneys fees and costs in this litigation?
A. No.
Q. Did you ever discuss the possibility of having to pay attorneys fees and costs as a result of this litigation?

0028

A. Yes.
Q. Did those discussions happen before these loans were made?
A. No. Or I'm sorry. Yes.
Q. So to be clear, is it your understanding that Trent understood there was a potential liability to pay defendants attorneys fees and costs as part of this case?
A. No.
Q. Okay. So you don't believe that he was aware that there was a potential you would have to pay defendants fees and costs
A. No.
Q. Do you know when Trent became aware of the potential liability for payment of defendants fees and costs?
A. No.
Q. When is the last time that Trent assisted you with this litigation?
A. It's been a long time. I can't recall the exact date.
Q. Was it more than a year ago?
A. I'm pausing to think. I can't recall when it was. Trent began to distance himself from the litigation because he started having heart issues.

0029

Q. When Was that?
A. In 2025. I can't recall the exact dates of it.
Q. Does Trent still assist you with gathering evidence in this case?
A. What do you mean by gathering evidence? We're at the fee award stage.

Q. Rephrase. Does Trent still assist you with gathering documents that are used as exhibits in this case?
A. I. I don't know what documents you would mean.
Q. Has Trent assisted you with gathering any documents that have been used as exhibits to one of your declarations filed in the last year?
A. Trent got estimates for me when I wasn't - I'm not physically able to go and do that. So those were used as exhibits in the case and he did do that.
Q. Are you referring to the vehicle estimates?
A. Estimates for the vehicles, his estimate -- his contact with the bank, the -- the things that relate to that, yes, he did that.
Q. Has he done anything else to gather documents that are used as exhibits in this case in the past year?
MR. PASSIN: Excuse me, can you repeat the question? I couldn't hear.
Q. I'm basically just asking if there are any other documents that she hasn't mentioned.

0030

A. I don't recall. I would have to see what document it was.
Q. Has Trent assisted you with responding to arguments raised in the case in the past year?
A. Not that I recall.
Q. And is it your understanding that Trent still reviews filings in this case?
A. If he does, I'm not aware of it.
Q. We talked a little bit last time about litigation costs. I'm going to ask you a few more questions about that. You had a number of experts. Did you pay those experts directly?
A. Yes.
Q. Do you recall how much you paid your experts in this case?
A. I do not.
Q. Did any of your experts work on contingency or any other non monetary basis?
A. No.
Q. Do you recall if you paid your Experts more than [redacted]
A. I don't recall.
Q. Did Trent pay your experts or did you pay your experts?
A. Trent paid the expert.

0031

Q. Do you recall whether you or Trent paid the filing fees in this case?
A. I don't recall that.
Q. What about transcript?

A. I don't recall.
Q. E-discovery vendors?
A. Yes.
Q. Did Trent pay those vendors?
A. Yes.
Q. Do you know how much he paid?
A. I know that while the eDiscovery is in storage phase, which it is, I believe right now it's [redacted] amonth. And I know that it's more when the case is active, but I don't know that cost.
Q. Did you pay for your attorney's travel during the - -
A. Yes.
Q. Do you know how much you paid for that?
A. I don't.
Q. Did Trent pay those costs?
A. Yes.
Q. Presumably, did Trent pay for his own travel to attend depositions and things in this case?
A. Yes.
Q. Do you know the amount that he paid for that?

0032

A. No.
Q. You mentioned that your son is in his last year of college at -- that's a [redacted] correct?
A. Yes.
Q. Is he a full or part time student there?
A. [redacted]
Q. And before that he attended uc davis. Is that right?
A. No.
Q. He never attended uc davis?
A. No.
Q. Okay. [redacted] e?
A. Yes.
Q. Did he attend full or part time?
A. [redacted]
Q. For how many semesters?
A. He was there. [redacted]
Q. Who paid his tuition?
A. His dad.
Q. Has he attended any other colleges or universities?
A. I didn't mention [redacted].
Q. Where's that?
A. [redacted].
Q. How long was he there?

0033

A. I don't recall whether -- I don't recall.
Q. Was he a full or part time student?

A. [redacted].
Q. And did Trent pay his tuition there as well?
A. Yes.
Q. Does your son have his own car?
A. Yes.
Q. What kind of car?
A. It's a [redacted].
Q. Do you know if he purchased that himself or if Trent paid for it for him?
A. Trent paid for it. It's a [redacted] that Trent had himself and gave it to [redacted] when he was in high school.
Q. Do you know whether Trent pays any other of your son's living expenses?
A. Yes.
Q. Okay. All of them?
A. Yes, most of them.
Q. And did your son [redacted]?
A. He's [redacted], yes.
Q. Do you know whether Trent gave him any money to [redacted]
A. He did not.
Q. Did you give him any money to start that company?
0034
A. I did not.
Q. Do you pay any of your son's living expenses?
MR. PASSIN: Excuse me, can you repeat that? I couldn't hear it.
Q. Do you pay any of your son's living expenses?
A. No, I do not.
Q. And at your last deposition, we talked about income that you had paid Social Security taxes on. Have you earned any income in the past five years for which you did not pay social social Security taxes?
A. No, I -- I am -- if I have, I'm not aware of what that would be.
Q. Okay.
A. Can you explain that to me?
Q. Have you received any payments under the table for any work that you did, whether consulting or otherwise?
A. No.
Q. Okay. Did you receive anything in value besides cash?
A. No.
Q. Last five years.
A. somebody I was -- a friend I was helping with a divorce [redacted].
Q. Okay. You mentioned providing consulting work to friends that were going through divorces who were otherwise
0035

represented by counsel?
A. Yes.
Q. Did you consider that work to be the provision of legal services, or were you giving moral support and advice as a friend?
A. I considered it to be both.
Q. Okay. Do you consider the conversations that you had with those friends to be protected by the attorney plan privilege?
A. Yes.
Q. And [redacted], did those people offer anything to you in exchange for your services?
A. No.
Q. You didn't recall at your last deposition whether you'd done any other consulting work aside from assisting friends since 2021? Is that still the case?
A. I remembered one more consulting or assistance that I did in 2024 with Michelle Bittner.
Q. Can you tell me about that?
A. Yes. [redacted] And I assisted Michelle, directed Michelle how to help the young lady file a domestic violence restraining order. And Michelle and I worked together to find an attorney to

0036

represent her who could -- who would be willing to do the custody and the domestic violence hearing pro bono.
Q. And you did not receive any compensation for that work.
A. No.
Q. And I know that when you practice law, you were a family law attorney. Can you tell me what kinds of cases you handled? Custody, divorces, family estate? What kind of family law did you practice?
A. Primarily custody, some adoption and divorce.
Q. Miss Freeman, have you ever reviewed your tax return since we last spoke?
A. No.
Q. Have you reviewed your bank account balances since we last spoke?
A. No.
Q. Do you recall when's the last time you provided legal services and trade?
MR. PASSIN: Excuse me. Can you repeat the question?
Q. When is the last time she provided legal services in trade?
A. I don't recall.
Q. You recall when is the last time you had

malpractice insurance?
0037
A. I do not.
Q. You had previously testified back in 2023 that you'd sponsored a colleague's pro hoc vice admission?
A. Yes. Attorney was [redacted], and I don't know that it was pro hac vice.
Q. Okay.
A. [redacted] is an Alaskan.
Q. Okay. Do you recall what the transaction entailed?
A. Ken was suffering from a medical condition and needed to have a member of the bar sponsor him to help a group of people pro bono. It was my understanding. And [redacted] was my former bar class teacher and asked me if I would be that sponsor.
Q. Have you sponsored anyone's pro hac vice admission to the Alaska Bar?
A. No.
Q. Have you ever been admitted on a pro hac vice basis in California?
A. No.
Q. And you've mentioned at your last deposition about making payments to your [redacted] that had recently stopped. Can you tell me why you stopped making those payments?
A. Yes. He was in Mexico and my aunt was able to bring him back to America to get treatment. This year in
0038
2020.
Q. Does anyone live with you?
A. No.
Q. You mentioned under the terms of the PSA that you're to have two credit cards. Do you actually have two credit cards that use
A. There are two credit cards for me. [redacted].
Q. [redacted]
Q. And you testified before about an account that Trent puts money in that has a [redacted], or it had a [redacted], I should say. Do you know how much money is in there now?
A. No.
Q. Did you talk to Trent about your last deposition?
A. No.
Q. Have you talked to him about this deposition?
A. No.
Q. Is it your understanding that Trent is paying --

well, let me go back and lay foundation. You mentioned at your last deposition that Trent was pay paying your expenses to the tune of about [redacted]. Do
0039
you recall that?
A. Yes.
Q. And he's paying his own expenses and Christian's expenses and tuition as well, correct?
A. Yes.
Q. Is it your understanding that he's paying that out of his salary alone or from some other source as well?
A. [redacted]
Q. While you were married, did your -- did Trent liquidate his retirement or investment accounts?
A. [redacted]
Q. Are you aware of whether he made investments that were not in the form of retirement or investment accounts, such as real estate, crypto?
A. [redacted].
Q. Business investments?
A. [redacted].
Q. Okay. [redacted]
0040
Q. And how do you know that to be the case?
A. Because when Trent and his partner decided to form their agreement, [redacted]
Q. Who's Trent's partner?
A. I don't know his name.
Q. Do you know when CVG was formed?
A. I don't recall.
Q. Do you know what trent's percentage of CVG is?
A. I don't recall.
Q. But you do recall the terms of their agreement?
A. Yes.
Q. And this partner, does he also share office space in Alaska?
A. No.
Q. Does Trent conduct any of his investment or financial services outside of CVG?
MR. PASSIN: Objection vague and ambiguous

A. I don't -- I don't know that I understand the question.
Q. So what is Trent's job?
A. Trent's job is that he helps people with retirement, so -- and invests their money for retirements.
0041
He's a financial advisor.
Q. And how does he market his services?
A. I don't know.
Q. Does he market them under CVG or under some other business entity or just under his own name?
A. I don't know.
Q. Do you know how he did during the marriage?
MR. PASSIN: Excuse me, can you repeat that please?
Q. You know how he marketed his services during the marriage?
A. No.
Q. Okay.
A. I know he has a website.
Q. You don't know -- did he have a company website?
A. Yeah, he has a website.
Q. Okay. What was the company that had the website?
A. I don't know. He's changed platforms several times while we've been married.
Q. I'm not asking who hosted the website. I'm saying that Trent provided services through some kind of business entity, correct?
A. Yes.
Q. Okay. What was that business entity?
A. I don't know. I don't recall.
0042
Q. All right. Trying to do this on two different computers is a challenge. Why don't we take a quick five minute break anyway, it's been a while and I will pull up my exhibits in the meantime so that.
MR. PASSIN: I'm sorry, Amy, I know sometimes you speak softly. I didn't hear what you said.
MS. NASHON: I was saying why don't we go ahead and take a 5 minute, 5 or 10 minute break. We've been on for a while and I need to pull up my exhibits on my other computer and that way you don't have to sit here and stare at me while I do that.
A. Okay, so is that five minutes?
THE VIDEOGRAPHER: Sounds good. Well, if there's no objections, I could go ahead and read us off the record.
We are now off the record. The time is 10:22 a.m. Pacific Time.
THE VIDEOGRAPHER: We are now on the record. The time is 10:38 a.m. Pacific Time.

BY MS. NASHON:
Q. All right, Ms. Freeman, I'm going to share my screen with you in just a second. Do you see this website?
A. Yes
Q. sure. So this is CVG Wealth Management website is cvdwealth.com meet the team. I'm going to scroll down. And that's Trent Baer, managing director listed there, correct?
0043
A. Yes.
Q. Okay. And that's your ex husband, Trent Baer, correct?
A. Yes.
Q. Okay. Does this -- excuse me. Does this refresh your recollection as to whether Mr. Baer marketed himself through the entity CVG?
A. I don't know how to answer that question. Yes, this is a website in which Trent is there.
Q. Okay. And CVG Wealth Management is presumably what it says, a wealth management firm?
A. Yes.
Q. Okay. And is it your understanding that Mr. Baer is the managing director of that company?
A. Yes.
Q. [redacted]
A. [redacted]
Q. And that's based on your understanding of Trent's relationship with his partner at the company?
A. Yes.
Q. And is that partner Richard Paiks, the fellow managing director?
A. If that's what the name says on there, I can't read it, but yes that sounds right.
0044
Q. Have you ever seen any financial statement statements for CVG?
A. [redacted]
Q. What -- well, let me go back. Did you exchange financial disclosures as part of your divorce?
A. We worked together on the financial disclosures for our divorce.
Q. Okay. And what financial disclosures were made as part of your divorce?

A. Bank accounts, tax returns, retirement accounts.
Q. And you exchanged those with each other?
A. Yes.
Q. Okay. Did you review the bank accounts for big?
A. Yes.
Q. Do you recall how much was in those bank accounts when you reviewed them?
A. I don't.
Q. Did you review bank accounts for cvg?

0045

A. [redacted]
Q. Did Baer Asset Management Group have a bank account?
A. [redacted]
Q. Have you formally transferred your shares from bamg?
A. Yes.
Q. Have you signed any documents transferring or disclaiming your interest in big?
A. I don't recall.
Q. Did you ever execute a spousal consent with respect to cvg?
A. No, I don't recall having done so.
Q. Do you recall reviewing any tax returns for BIG during your divorce?
A. I recall reviewing tax returns, but I can't tell you the details of what I reviewed.
Q. You recall whether you review tax returns specifically for BIG or were they just your --
A. I can't -- I can't recall.
Q. In your property settlement agreement, it states that the only asset BIG was a bank account. But you don't recall how much was in that bank account?

0046

A. I don't recall.
Q. Was it over [redacted]?
A. No.
Q. Was it over [redacted]?
A. No.
Q. Was it Over [redacted]
A. I don't recall.
Q. I'm going to skip around a little bit here. The name of the person that Trent stays with in Santa Barbara. Is that [redacted]
A. Yes.
Q. She's in unit [redacted]?
A. I don't know the unit number.
Q. Do you know if he pays to live there?

A. No.
Q. [redacted]
Q. So that was in the last 10 days?
A. Sometime within the last two weeks.
Q. Is Mr. Baer in California now?
A. Yes.
Q. Does Mr. Baer have a vehicle in Santa Barbara?
A. Yes.

0047

Q. Where does he keep that vehicle?
A. Sometimes it's in [redacted] garage and sometimes there's a parking space.
Q. What kind of vehicle is it?
A. It's the BMW x3.
Q. What year
A. That is -- in the psa, I think it said 20.
Q. Does he also have a white Escalade?
A. No.
Q. What vehicle does he use when he's in Alaska?
A. I don't know.
Q. Did he disclose another vehicle to you as part of the divorce?
A. There were no other vehicles at that time.
Q. He didn't have a vehicle in Alaska at that time?
A. Not to my knowledge, no.
Q. Not an easy town to get around in without a vehicle.
MR. PASSIN: Objection. Calls for speculation.
Q. Does Mr. Baer pay for his food or other expenses during his visits to Santa Barbara?
A. Yes.
Q. Has any of your [redacted]

0048

Q. [redacted]

Q. [redacted]
Q. And you disclosed it in this litigation?
MR. PASSIN: Objection vague and ambiguous
Q. Yyou disclosed it to the court in this litigation, correct?
A. I disclosed it when I was going to be forced to travel to New York for a deposition and opposing counsel would not agree that I could participate remotely, is what I recall.
Q. And you didn't report any [redacted] to this court prior to judgment in this

0049

case, correct?
A. Correct.
Q. Have you traveled anywhere more than 100 miles from your home for any purpose in the past three years?
A. No.
Q. Who created your website, your personal website?
A. I don't recall. The website's gone.
Q. Who took it down?
A. I don't know.
Q. Did you instruct someone to take it down?
A. I did not.
Q. It just magically went away?
A. It appears to.
Q. Do you receive a copy of your September 14 deposition transcript?
A. Yes.
Q. Did you give it to anybody?
A. No.
Q. Do you know who paid for the -- for your website domain?
A. I did.
Q. Okay. Do you know who provided the content for your website?
A. I did.
Q. So you testified previously that your total

0050

litigation costs in this case exceed $700,000. Is that right?
A. Where did I testify to that?
Q. I believe at your past deposition.
A. Okay.
Q. Do you disagree with that?
A. No, I just -- I'm wondering what you're -- where you where you're reading it from.
Q. Do you believe that your total litigation costs do not exceed 700,000?

A. I believe they do.
Q. Do you know what amount you have spent on this litigation to date?
A. No, I don't know the exact amount.
Q. Do you have an estimate?
A. Do you mind if I take a second here?
Q. Sure.
A. Going to estimate what I wrote in the psa. The loan from the house, proceeds, and Trent. So that amount, plus there's ongoing E discovery bills. There's been the bond that I had to cash out of my retirement. There was a payment for the appeal, maybe binders or printing costs. So I can't -- I can't tell you exactly how much, but we're in the ballpark.
Q. Sorry, I thought you were --

0051

A. No, I can't -- I can't sit here and write the math. I have double vision and I can't do it. I can talk to you about it, but I can't do it.
Q. Okay. So you don't have a ballpark estimate?
A. No, not off the top of my head, I don't.
Q. So you said the loan from the house, that was [redacted]
A. Yes.
Q. That was 250,000?
A. Yes.
Q. Okay. And then the loans from Trent, that was --
A. What's in the psa.
Q. So 400 -- another 470,000, right?
A. [redacted]
MR. PASSIN: I'm sorry, what is that -- [redacted] from what, Amy?
MS. NASHON: [redacted]
MR. PASSIN: Okay
Q. [redacted]. Does that sound right? As a ballpark, the ongoing expenses.
A. I'll defer to your math that that's correct.
Q. Dangerous. Okay. And do you have an estimate of

0052

what percentage of that is for attorneys fees versus costs?
A. I do not.
Q. And you said that your attorneys have been working on contingencies since the beginning of this case, since, and I say beginning using your word, since early on in the case. Is that right?
A. Correct.
MR. PASSIN: Amy, how'd you get the [redacted] Can you

break that down for me?
Q. [redacted] from the [redacted] which is [redacted] and 250 from Trent's house. I didn't use an actual calculator, so I could be wrong here, but that's --
MR. PASSIN: Are you listening to this one?
THE WITNESS: I'm listening to this. Yes.
MR. PASSIN: Go ahead.
Q. -- plus the [redacted] loan from big [redacted]
MR. PASSIN: I'm sorry, I didn't -- after the 50,000 what?
Q. If I'm right on this. Like I said, my math isn't always -- so I was actually off. [redacted] What I get for trying to do it by hand.
Q. Does that sound right, Ms. Freeman?
A. If that's what the math adds up to, yeah. Those amounts are right.

0053

Q. Ms. Freeman, when you provided the content for your website, who did you provide it to?
A. I can't recall.
Q. Is it a person or a company?
A. Person.
Q. Was it a friend or family member?
A. Someone overseas. I can't recall her name.
Q. Have you seen this declaration of Mark Passin submitted recently in this case? Let me know if you want me to scroll down.
A. I can't read it at all.
Q. Okay.
A. And I don't know whether I have --
Q. It was executed on September 18, 2026.
A. Okay, I have not read this.
Q. Okay.
A. I can't.
Q. Sure. I'm not - I'm just scrolling up for my own benefit here. So there is a reference here to Mr. Passin taking this case after talking to two other highly experienced attorneys that he who you would have previously approached to handle the case.
A. Uh-huh.
Q. Do you know what attorneys those were?
MR. PASSIN: Hold on one second. Let me think

0054

about that. Can you give me a minute? I've got to think about that. Ms. Freeman, you can answer that without getting into conversations with them. You can just identify their names.
A. Okay. One of them is Barry Slotnick of Loeb and Loeb.

Q. Okay. Who's the other one?
A. I believe -- I don't know who Mark is referring to --
MR. PASSIN: By the way objection on the ground is speculation.
A. I can't speculate as to who the second one is. The first one, though I can confidently tell you, is Barry Slotnick.
Q. I don't know that it's speculation considering that --
A. I -- I can't -- I can't tell -- can't recall who the second one is. I'd be guessing at who Mark spoke with.
Q. Okay.
A. But I know that one of them is Barry Slotnick.
Q. Did you pay Mr. Slotnick for his time?
A. No.
Q. Did you provide -- did you provide Mr. Slotnick with the Crave novels and your manuscripts?
A. I provided Mr. Slotnick with some materials, but I can't recall now which materials.

0055

Q. But he didn't charge you for reviewing those materials?
A. No.
Q. Do you know how much time he spent reviewing the materials?
A. No.
Q. I'm going to pull up the declaration of Stephen Doniger that was also filed on September 18, 2026. Are you familiar with this declaration?
A. No. I haven't been able to read documents because of my eyes. Is there some part you want to read to me?
Q. I'm going to scroll there. I just want to make sure everybody else who can read has the opportunity to, so.
So at paragraph 7, Mr. Doniger said, but Freeman followed her character by character analysis with over 30 pages of analysis. And it goes on.
Can you tell me, did you provide this character by character analysis referenced by Mr. Doniger in this case?
MR. PASSIN: Hold on one second. I have to look at this.
A. I can't read what this says. Can you read to me, please?
MS. NASHON: Do you have a problem with that, Mr. Passin?

0056

MR. PASSIN: So you're just asking her if she -- if she provided the character by character analysis to. Mr. Doniger.
MS. NASHON: If she performed this character by

character analysis herself.
MR. PASSIN: Well -- well, that's a different. That's a different question. I thought you said, did she provide it to him? Hold on. Let me look at it. So what is the question to Ms. Freeman?
MS. NASHON: Ms. Freeman was asking if I could read this paragraph to her, was my understanding.
A. So that I can understand the question you're asking, yes. Any kind of print like this, it makes me nauseated. So I'm -- I'm not going to look at the screen.
MR. PASSIN: I'm sorry, Amy. Is there a pending question, or what are we waiting --
MS. NASHON: Oh, I was waiting for -- I thought you were reading it. So, Mr. Passin, I'll -- you know, I'll provide this context. I'm not trying to -- certainly not trying to invade any attorney client privilege, but Ms. Freeman has previously testified in a declaration that she was acting as an attorney in this case on her own behalf, and so I'm trying to understand what tasks -- what legal tasks she has done in this case on her behalf. So one of my questions is whether she performed this character by
0057
character analysis.
MR. PASSIN: First of all, I object to your characterization of her role in the case.
MS. NASHON: I'm happy to pull up her declaration. We can look at it together.
MR. PASSIN: No, it doesn't matter. I'm just objecting to it. So let me read it. Give me -- give me a minute, please.
(BRIEF PAUSE)
MR. PASSIN: Yeah, ii -- this -- like I thought. What's the problem is, is what this paragraph says. Okay? When it says the court file, it says, and Freeman filed a character -- it doesn't mean Freeman personally. Okay? It means what -- what was in those papers that the attorneys did. So I'm not sure what you want to ask her in light of that.
MS. NASHON: Well, I thank you for the testimony -- testimony about Mr. Doniger's declaration, but I'm trying to make that -- establish that through the witness.
MR. PASSIN: So, again, what's the pending question?
MS. NASHON: She did not -- so did she perform this character by character analysis referenced by Mr. Doniger? It's yes or no.
MR. PASSIN: You can ask that question, yes or no.
0058
A. I don't know.
BY MS. NASHON:

Q. So, Ms. Freeman, I don't - I'm not going to ask you to review this, but I have pulled it up. Like I said, for the purposes of everyone else. This is Docket 183. It's your declaration filed on March 30, 2023. And a paragraph 2, it says, I'm the plaintiff in this action. I am also an attorney and have been acting as such in my own case, performing legal research, drafting motions and so on.
Can you please tell me what kind of legal research -- what legal topics you researched in this case?
A. No. When you asked me this question --
MR. PASSIN: Again, I'm going to also object, since you point that out, on the grounds of privilege. I'll let her have some leeway here. Go ahead. The grounds of attorney client privilege.
A. No, I can't -- I can't say what topic. You asked me this question during the last deposition, and what I believe I said and what I recall is that I would, of my own volition, look up cases, cases that I saw in orders, cases in the briefs, trying to understand the law and how it worked.
Q. And when you looked up these cases, did you research any cases regarding the ability to recover or liability for payment of attorney's fees?
0059
MR. PASSIN: Same objection.
A. No.
Q. Did you review the Copyright Act?
MR. PASSIN: Same objection.
A. I reviewed parts of that act.
Q. Did you review the parts of the act having to do with the remedies available to you as a plaintiff?
MR. PASSIN: Same objection.
A. No.
Q. When you filed this lawsuit, did you have any understanding of possible implications if you lost?
MR. PASSIN: Amy, can you -- can you read that question back?
Q. When you filed this lawsuit, did you have an understanding of any possible financial implications if you lost?
MR. PASSIN: Let me just instruct the witness that to the -- object on the grounds of attorney-client privilege and the extent it requires to reveal any communications between me and her, I instruct her not to answer.
MS. NASHON: Wait, you weren't her attorney when she filed the lawsuit, were you?
MR. PASSIN: Yes, I was.
MS. NASHON: Okay.
MR. PASSIN: So I -- I mean, we may have to go to
0060

the judge now, I suppose.
MS. NASHON: So you're instructing her not to answer the question --
MR. PASSIN: Well, to the extent -- the extent it requires any communications between her and me.
Q. Absent any communications with Mr. Passin, based on your own research and your own experience as a lawyer, did you have any understanding of the possible financial implications communication if you lost this case?
A. No.
MR. PASSIN: So you're withdrawing the question that -- that involves my communication?
A. I'm not --
MS. NASHON: Asked a question that involves your communication, but I clarified my question.
MR. PASSIN: All right. Fine, fine. Thank you. Thank you.
MS. NASHON: -- to evade the attorney client privilege.
A. Right. You're asking me not about discussions I had with Mr. Passin. You're asking me of my own volition, of my own research. Did I understand that? What was the rest of your question, please?
Q. Possible financial implications if you lost the case.

0061

A. No.
Q. And did you understand, absent of any communication with your lawyers, but based on your own research, your own review of the statutes, your own status as an attorney, whether you had the ability to recover prevailing party fees in this case?
A. No.
Q. Have you considered self publishing your book in order to earn income?
A. I've considered it, yes. I don't believe I can.
Q. Why is that?
A. Because I'm in a -- been in a copyright litigation.
Q. So you believe that this litigation prohibits you from self publishing your book?
A. Yes.
Q. Is that based on your own research?
A. Just based on what I think.
Q. Do you have intentions of self publishing after this lawsuit is over?
A. I haven't thought -- put much thought into that, so I don't know.
Q. True that you previously claimed that this -- that your book was worth $10 million when these proceedings began?

MR. PASSIN: Can you read that question back,
0062
please?
Q. Is it true that you previously claimed that this -- that your works were worth $10 million at the beginning of these proceedings?
MR. PASSIN: Objection vague and ambiguous.
A. I -- I don't know.
MS. NASHON: All right. I think I'm getting close to finish. I'm just going to review my notes and let's go off record for maybe 10 minutes and maybe wrapping up. Okay.
MR. PASSIN: Thank you.
MS. NASHON: Thank you.
THE VIDEOGRAPHER: Sounds good. I'll go ahead and read this off. We are now off the record. The time is 11:22 a.m. Pacific Time.
(BRIEF BREAK)
THE VIDEOGRAPHER: We are now on the record. The time is 11:37 a.m. Pacific Time.
BY MS. NASHON:
Q. Ms. Freeman, can you tell me how much your attorney's fees were for the divorce?
A. The bill is around around [redacted] I'm not sure exact amount, but it's around that amount.
Q. And I'm just going to clarify this because the testimony was a little bit jumbled during your last
0063
deposition due to objections and sort of dialogue between counsel. Did you write any portion of any draft of the first round of summary judgment briefing in this case?
A. No.
Q. And as your counsel pointed out your deposition, you did do the indices that were attached to the summary judgment motion, correct?
A. Yes.
Q. And did you create something like those indices, some comparison of the works, before you formally retained an attorney in this case?
A. Yes.
Q. And did you provide those comparisons to all the potential attorneys that you talked to in seeking counsel for this case?
A. Sometimes. They were just beginning at that point, so sometimes.
Q. What do you mean by they were just beginning?
A. Can I -- am I able to answer these questions without privilege? Attorneys that I spoke with gave me direction --
Speaker B: So hold on. Object on the grounds of

attorney client privilege. Can you read word the question, Amy, so it doesn't include advice she got from attorneys she was consulting?

0064

MS. NASHON: I just asked what she meant by they were just beginning. I didn't understand what she meant by that.

A. In the beginning I had just lists of similarities that I provided is the recollection.

Q. And you provided those to Mr. Slotnick?

A. I don't recall what materials in total that I gave,Mr. Slotnick.

Q. Okay. Did you prepare additional materials in addition to these lists of similarities as part of your sort of initial preparation for the litigation?

MR. PASSIN: Objection vague and ambiguous.

A. Can you restate question, please?

Q. Sure. So you mentioned that you prepared these lists of similarities prior to formally retaining attorneys in this case. Well, let me ask you, were those lists of similarities between just crave and one version of your manuscript or multiple works?

MR. PASSIN: Objection vague and ambiguous.

A. I don't -- I don't recall right now what those initial ones were.

Q. Were there any other materials besides these lists of similarities that you created early on before formally retaining counsel?

A. Not that I recall, no.

0065

Q. At your last supposition, we talk about how Trent, when he was deposed, described you as a busy professional and practicing attorney. Do you know why he described you that way in 2023?

MR. PASSIN: Objection calls for speculation.

A. No, I don't know what he meant.

Q. And on your website, it describes you as a practicing attorney in the state of Alaska. Who wrote that?

A. I did.

Q. Why'd you write that?

A. Because I consider myself and have considered myself a practicing attorney licensed in the state of Alaska.

Q. Did you -- when did you write that?

A. I don't recall the year.

Q. Do you recall when that website was created?

A. I don't.

Q. Do you recall whether it was published online in 2024?

A. I don't recall.

Q. Whose idea was the website? What was the purpose of the website?
A. I was receiving phone calls and social media people contacting me and I didn't feel comfortable talking about anything to do with a website or -- not website -- with the

0066

case with anyone and I just wanted a place where there were court documents that people could see and after the Courtney Milan blast about me and social media, what I perceived as a campaign against me, I wanted a place where there were court documents and not opinions so that the people coming to talk to me, contacting me, could just look at those.
Q. And at some point you instructed that that be taken down?
A. No.
Q. You did not?
A. Nope.
Q. And you don't know what happened to it?
A. No, I don't.
Q. Have you investigated that?
MR. PASSIN: I'm sorry, I didn't hear that.
Q. Have you investigated that?
A. I wouldn't know how to investigate that.
Q. Have you talked to this woman overseas about it?
A. I can't recall who that is.
Q. Did you ever update the website after it was first published?
A. It was updated to say that the case was on appeal.
Q. When was that?
A. I don't know.
Q. Who updated it?

0067

A. I think I -- I don't know.
Q. Did you instruct someone to update it?
A. I asked that it be updated but I did not receive a response about it.
Q. Who did you ask?
A. The woman who did it.
Q. But you don't know how to get in contact with her now?
A. I don't recall her name.
MS. NASHON: All right. I have no further questions, Ms. Freeman.
MR. PASSIN: Okay. So I suggest we take a -- I assume -- does Lance have questions?
MS. NASHON: I don't believe so. I was just going to ask if -- if Lance did or if Mr. Goetzel did.
MR. KOONCE: I do not have any questions.
MR. GOETZEL: Nothing further from me.
MR. PASSIN: So we're done?

MS. NASHON: I believe so.
MR. PASSIN: Great. Well, thank you very much.
THE VIDEOGRAPHER: Okay. Sounds good. If there's no other questions for the witness, I'll go ahead and just take some orders. For our taking attorney, you will receive our standard video editing for today and also the standard transcript. Would you like to make any additional video

0068

orders such as text to video sync?
MS. NASHON: No, that's okay. Thank you.
THE VIDEOGRAPHER: Sounds good. Would any other attorney like to make an order of a transcript or video product for today?
MR. PASSIN: What do we get -- what do we receive automatically?
THE VIDEOGRAPHER: Well, you have to order it, sir.
THE VIDEOGRAPHER: We don't get an original free? Oh, the video. Oh, we don't need the video. I'm sorry.
THE VIDEOGRAPHER: Okay. So you would like the transcript?
THE VIDEOGRAPHER: Well, we get the original, correct?
MR. KOONCE: Not free.
THE VIDEOGRAPHER: I would have to let the court reporter answer that. I'm -- I'm not fully equipped. Maybe we could do that once we get off the record.
Let me just ask the other attorney, would you like to order any video or transcript for today?
MR. KOONCE: We'll take -- I'll take a rough.
MS. NASHON: Same.
THE VIDEOGRAPHER: Okay.
MR. PASSIN: Steve -- Stephen Doniger, are you

0069

there?
MR. DONIGER: I am.
MR. PASSIN: Do we need anything?
MR. DONIGER: We should -- we should just get a copy.
MR. PASSIN: Just get a copy. Should we -- do we need a rough?
MR. DONIGER: I don't think so, not at present.
MR. PASSIN: All right. If we need something, who do we contact if we need something?
THE VIDEOGRAPHER: Yes, you'll contact Stenos. I'll go ahead and put the email in the chat.
MR. PASSIN: Thank you.
THE VIDEOGRAPHER: No problem.
THE REPORTER: And before we go off the record, I do have to clarify about the orders. Ms. Nashon, because

she's taking attorney, would be ordering the original and the first copy. So, Mr. Passin and Mr. Doniger, are you ordering just a copy?
MR. DONIGER: Yeah.
MR. PASSIN: Yes --
THE REPORTER: Okay.
MR. PASSIN: -- just a -- just a copy.
THE REPORTER: And, Mr. Koonce, I heard you ask for a rough. Are you asking for an expedited rough

0070

transcript or just regular turnaround for the completed transcript? It's normally two weeks, 10 business days.
MR. KOONCE: I mean, I think -- my, what are you -- what are you getting? Because I -- I mean, are we ordering an expedited rough like last time?
MS. NASHON: Yeah, yeah. If I can just get a rough, and then I can share it with Mr. Koonce and Mr. Goetzel. That's fine.
MR. KOONCE: And we'll take a -- we will take a copy of the transcript.
THE REPORTER: Okay. So I have a copy for Mr. Passi and Mr. Doniger and for Mr. Koonce. Anyone else ordering a copy of the transcript?
MR. PASSIN: Mr. Doniger, do you need a separate copy or are we just getting one?
MR. DONIGER: I don't think I need a separate copy.
MR. PASSIN: Right. So just one.
THE REPORTER: For Mr. Passin. Okay.
And rough draft turnaround, what day would you like the rough draft, or just when?
MS. NASHON: I mean, if -- if you have it by Friday, that'd be great. If -- Monday could work as well.
THE REPORTER: Okay.
MR. KOONCE: I think we want it before -- I think

0071

we want it by Friday. We have a -- we have a -- we have to submit another --
MS. NASHON: That's true. By the -- I'm sorry. Yeah, by Friday.
THE REPORTER: Okay.
MR. KOONCE: I mean, better -- better tomorrow, even --
MS. NASHON: Thursday, yeah, close of business would be even better.
THE REPORTER: Okay.
MS. NASHON: How about that?
THE REPORTER: Can have it to you tomorrow by close of business.
MS. NASHON: Okay.

THE REPORTER: All right. Thank you.
MS. NASHON: Thank you.
MR. PASSIN: Thank you.
THE VIDEOGRAPHER: Sounds good. I'll go ahead and read the official read off, and then we'll get off the record. This concludes the deposition of Lynne Freeman, Volume II, for Lynne Freeman versus Tracy Deebs-Elkenaney, et al. We are now off the record. The time is 11:51 a.m. Pacific Time.
(The deposition was concluded at 11:51 a.m. Pacific Time.)
***END OF ROUGH DRAFT - UNCERTIFIED***