# EXHIBIT B

LYNNE FREEMAN v. TRACY DEEBS-ELKENANEY, et al.

---

UNEDITED ROUGH DRAFT TRANSCRIPT

OF

LYNNE FREEMAN

---

September 14, 2026

THIS IS A REALTIME ROUGH DRAFT TRANSCRIPT. IT IS NOT CERTIFIED BY THE CERTIFIED COURT REPORTER. PURSUANT TO CCP SECTION 2025.540 (b), IT MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS. THE ROUGH DRAFT TRANSCRIPT MAY NOT BE CITED OR USED IN ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT THE CERTIFIED TRANSCRIPT OF THE DEPOSITION PROCEEDINGS. THIS ROUGH DRAFT CONSTITUTES AN ORDER OF THE FULL TRANSCRIPT.

01:35:14

01:35:14

THE VIDEO TECHNICIAN: We are on the record. Today is September 14th, 2026. The time is 1:35 p.m. Pacific.

My name is Thomas Meadows. I am a notary public contracted by Steno. I am not financially interested in this action, nor am I a relative or employee of any of the attorneys or any of the parties.

This deposition is taken at 7 West Figueroa Street, Suite 300, Santa Barbara, California 93101. The name of the case is Lynne Freeman v. Tracy Deebs-Elkenaney, et al., filed in the United States District Court for the Southern District of New York, case number 2:22-cv-02435-CM-SN. This is the video-recorded deposition of Lynne Freeman. The attorney taking this deposition is Amy Nashon.

Will counsel please identify yourselves and state whom you represent starting with the noticing attorney.

MS. NASHON: Amy Nashon of Troy Gould representing all defendants.

MR. KOONCE: Lance Koonce with Klaris Law representing Emily Sylvan Kim and Prospect Agency, LLC.

MR. DONIGER: Stephen Doniger of Doniger Burroughs, counsel for Plaintiff.

THE VIDEO TECHNICIAN: Thank you. We are ready to proceed.

The court reporter today is Chandler Alvino with Steno.

Would the reporter please swear in the witness.

THE COURT REPORTER: Good afternoon. Chandler Alvino, CSR number 14462.

LYNNE FREEMAN,

having first declared under penalty of perjury to tell the truth, was examined and testified as follows:

EXAMINATION

BY MS. NASHON:

Q. All right. Good afternoon. I am going to go over just a couple of things more personal to my style because I know that you have sat through a deposition before, and you know generally the rules. I'm just going to reiterate a few things. I happen to be a sometimes soft-spoken person, so I'm going to try to speak up, but if I speak too softly or too quickly and you can't hear me, please feel free to remind me as many times as necessary to speak up so

01:37:48 I can make sure that you have heard the questions.
01:37:50 And if you answer the question, I'll assume you
01:37:54 heard it and understand it. Does that make sense?

01:37:57 A. Yes.

01:37:58 Q. Okay. And if you need to, of course, take
01:38:01 a break at any time, just let me know. We can take
01:38:05 as many breaks as you need. I just ask that you
01:38:06 answer any pending question before we go on a break.

01:38:09 Does that make sense?

01:38:10 A. Yes.

01:38:11 Q. Okay. Can you tell me what you did to
01:38:13 prepare for your deposition today?

01:38:16 A. I spoke with my attorneys Friday briefly.

01:38:22 Q. Okay. Anything else?

01:38:23 A. No.

01:38:25 And I would like to take a moment, if this
01:38:28 is appropriate, to read into the record the
01:38:30 conditions under which I am testifying today. I
01:38:34 [redacted]
01:38:38
01:38:43
01:38:47
01:38:52
01:38:56
01:39:02

[redacted]

MR. DONIGER: Actually, you know what, let me just pause for a minute.

THE WITNESS: Sure.

MR. DONIGER: As we know from Ms. Freeman -- some of the previous testimony that's come out, we have -- things that have been personal and medical in nature have been kept confidential under the protective order. I just -- it probably makes sense since the entirety of this is about her financial condition and she's talking about her medical condition to just put this under a confidentiality designation. Is that agreeable?

MS. NASHON: Yes. And I should have led

01:40:14 with that, but I assumed that that would be what you
01:40:17 would be asking to do, and I'm fine. I think this
01:40:20 entire deposition is probably -- I agree, would be
01:40:23 subject to confidentiality.

01:40:25 MR. KOONCE: I agree.

01:40:26 MR. DONIGER: Thank you.

01:40:27 MS. NASHON: So that's fine.

01:40:28 THE WITNESS: Okay. So I am [redacted]

01:40:29
01:40:33
01:40:35
01:40:39
01:40:41
01:40:46
01:40:49
01:40:55
01:40:58
01:41:02
01:41:06
01:41:11
01:41:13
01:41:16
01:41:18
01:41:25
01:41:27

[redacted]

My attorney's requested that I be permitted to appear remotely because of these conditions. They're very hard to manage out in public. I don't go into rooms like this. [redacted]

Q. Well, you've answered a lot of my questions already, so that's helpful.

A. Okay. Okay.

Q. I am going to ask really quickly. I tried to take notes, and I don't -- I want to make sure I caught everything, and some of them --

A. Sure.

01:42:34 Q. -- have long names. So I'm going to -- I won't ask you to repeat everything, but --
01:42:41 A. That's fine.
01:42:42 Q. -- if I can ask, you said -- before you got to long COVID, there were a couple that I missed.
01:42:48 A. [redacted]
01:42:51 Q. Yeah. Yeah.
01:42:52 A. And what that is, the short abbreviation for it --
01:42:52 Q. Uh-huh.
01:42:54 A. [redacted]
01:42:56 Q. Uh-huh.
01:42:57 A. [redacted]
01:43:02 Q. And I'll just -- I don't mean to interrupt you, but I would -- before I forget, I don't intend to have you read anything today, so --
01:43:10 A. [redacted]
01:43:16 Okay. Great.
01:43:16 Q. We're on the same page on that one.

01:43:19 A. Okay. Go ahead, please.
01:43:20 Q. No, that was -- I just wanted to reassure
01:43:24 you I didn't plan to present any documents for you
01:43:28 to read or look at even.
01:43:30 A. Okay. Okay.
01:43:32 Q. So we're good.
01:43:33 So[redacted] I got that one.
01:43:35 A. Do you want me to keep going?
01:43:38 Q. Yeah. Not all of them, but just I --
01:43:38 A. All right. So --
01:43:40 Q. There was something before [redacted] I
01:43:43 think two or three that I kind of missed.
01:43:45 A. I think it was probably [redacted]. So it's
01:43:47 [redacted]
01:43:52 Q. [redacted]--
01:43:55 A. [redacted] yeah.
01:43:57 Q. [redacted].
01:43:58 A. Yeah. [redacted]
01:43:58 Q. Oh, gosh. Okay.
01:44:01 A. It's got a very long...
01:44:02 But if you want to look this up, it's
01:44:06 [redacted]
01:44:06 Q. [redacted] Got it. Okay.
01:44:08 A. [redacted]
01:44:09 Q. Uh-huh.

01:44:11 A. [redacted]
01:44:11 Q. Uh-huh.
01:44:12 A. [redacted]
01:44:21 Q. Got that one.
01:44:23 [redacted]
01:44:23 A. Oh, okay. So I have [redacted] and I'm being --
01:44:34 Q. Oh, [redacted] right?
01:44:35 A. Yup.
01:44:36 Q. Uh-huh.
01:44:37 A. [redacted]
01:44:45 Q. Okay. So you have a family history of [redacted]
01:44:50 A. Yes. And I'm having a lot of [redacted] right now because of the -- [redacted]
01:44:59 Q. Got it. And do you -- have you been [redacted] Or is that -- [redacted] --
01:45:05 A. [redacted], yeah.
01:45:10 Q. Okay. And you mentioned how those, you

01:45:15 know, may affect your testimony today, and I
01:45:17 appreciate that. Are you on any medication that
01:45:21 would also affect your testimony today?
01:45:27 A. No.
01:45:36 Q. Okay. Have you reviewed any documents in
01:45:40 order to prepare for your deposition today?
01:45:42 A. No.
01:45:51 Q. Have you reviewed any of your digital
01:45:57 records pertaining to your finances in preparation
01:46:01 for your deposition?
01:46:02 A. No.
01:46:07 Q. Have you spoken with anyone other than
01:46:09 your attorney in preparation for your deposition
01:46:12 today?
01:46:13 A. No.
01:46:16 Q. And for the record, you have somebody else
01:46:18 in the room with you. Can you identify who that
01:46:21 person is?
01:46:21 A. This is my mom, who's here to hold my
01:46:26 hand. We're a little bit far.
01:46:28 Q. Do you need to -- I was going to say do
01:46:28 you need to --
01:46:28 A. Is it okay if she moves over here?
01:46:29 Q. -- have her sit on that side? I don't --
01:46:31 (Overlapping speakers.)

A. You can stay where you're at, Steve. I don't mind. If she can just move her seat over it would be okay. Is that -- Mom, do you need help?

MS. JAN FREEMAN: Well, I'm your driver.

THE WITNESS: I know. Do you want some help to move your seat, Mom?

MS. JAN FREEMAN: Yeah, I'm just going to move my...

Q. (BY MS. NASHON) And just for the record, what is your mom's name?

A. This is Jan Freeman.

Okay. Do you want to sit here, Mom? Let's put you over here.

(Overlapping speakers.)

THE WITNESS: Oh, okay. All right.

THE VIDEO TECHNICIAN: One moment.

THE WITNESS: I'm moving back over. I gotcha. Just be here.

Q. (BY MS. NASHON) Okay. And do any of the conditions that you mentioned affect your memory?

A. At times, yes.

Q. Okay. Do you feel like your memory is impaired today for any reason?

A. I may have trouble with some things. I may not. I'm in a flare right now, so I don't know.

Q. How long have you been in a flare?
A. [redacted]
Q. And is it your contention that you are [redacted]
A. No.
Q. Okay. Is it your contention that you are [redacted]
A. Yes, I hope so.
Q. [redacted]
A. About nine years. Maybe a little longer, ten years. Nine, ten years.
Q. Okay. Is there something that triggered that [redacted]
A. Yes.
Q. What was that?
MR. DONIGER: I'm going to just object as potentially calling -- exceeding the scope of the deposition. This -- the limited scope of this deposition is the ability to pay. Her condition her prognosis, not causes and other related things.
MS. NASHON: Based largely on her ability or inability to work, and so having an understanding of how long and to what extent why she's unable to

work I think is relevant to the scope of today's testimony.

MR. DONIGER: Well, I think she's here to answer why she's unable to work.

MS. NASHON: Are you instructing her not to answer?

MR. DONIGER: Can I have the question read back?

(Requested portion was read back.)

MR. DONIGER: You know, I'm also going to interpose an objection that it calls for a medical causation analysis that may be beyond her knowledge as a layperson, although I'm sure she has opinions. I'm not trying to be difficult, but without a better showing of how this relates to her actual ability to pay a judgment, I'm going to instruct not to answer. And I'm open to an offer of proof on it.

MS. NASHON: No, I'll ask a few other questions, and this will make more sense.

Q. (BY MS. NASHON) So you said that you're [redacted] and have been for nine to ten years, but you're hoping that that may change. What makes you think that that is going to change?

A. At times, I can be better than at others, and I'll have brief periods where I'm doing well,

01:50:13 and then at other times I'm in a flare, and I'm not
01:50:16 doing well. So I'm hoping that given time,
01:50:21 treatment, that these things will improve.
01:50:24 Q. Okay. So these -- the cause of your --
01:50:33 what -- the cause of your [redacted] I understand
01:50:38 your attorney doesn't want you to discuss, but is it
01:50:42 something that is reversible or curable so that you
01:50:48 would no longer be [redacted]
01:50:49 MR. DONIGER: Same objection. Calls for
01:50:51 medical opinion.
01:50:55 Ms. Freeman, if you have an opinion on
01:50:56 that, you're free to give it, but it's certainly not
01:51:00 a substitute for a medical opinion.
01:51:00 THE WITNESS: Yeah, and these are
01:51:02 questions for my doctors is why I can't answer that.
01:51:06 Q. (BY MS. NASHON) So you can't answer what
01:51:08 it would take to remove your [redacted]?
01:51:10 A. No. It's my understanding that these
01:51:15 conditions that I have are these conditions that I
01:51:18 have.
01:51:18 Q. And these are the conditions that you
01:51:21 mentioned at the beginning of your deposition?
01:51:23 A. Yes.
01:51:23 Q. There are no others?
01:51:24 A. I'm sure that there are, but I don't -- I

have -- okay. Yes. I have developed [redacted]

Q. Anything else?

A. I -- I think that's everything, I think.

Q. So your severe [redacted] When did you -- when were you diagnosed with the [redacted]

A. It's been three years since I got [redacted] and the actual diagnosis that that's what the disorder is has been a long time in coming.

Q. Okay. And when were you diagnosed with [redacted]

A. That's been two years now.

Q. And you said you have [redacted]. How long have you had [redacted] for?

A. I've had [redacted] for about -- let me think a moment.

I can't remember the year that I first got diagnosed with that.

Q. Sometime after 2020 presumably?

01:53:30 A. Yes.
01:53:31 Q. Okay. And you're still being treated for that?
01:53:43 A. Yes.
01:53:56 Q. And the [redacted], when were you diagnosed with that?
01:54:02 A. I can't recall the year.
01:54:06 Q. Okay. Was it in the last five years?
01:54:09 A. Yes.
01:54:18 Q. Okay. So of the -- and the -- I'm sorry. [redacted], when did you get diagnosed with that?
01:54:29 A. I -- it's been -- she can't -- she can't talk to me.
01:54:40 Q. Yeah. Sorry.
01:54:40 MS. JAN FREEMAN: I'm so sorry.
01:54:42 THE WITNESS: It's been almost 30 years.
01:54:45 Q. (BY MS. NASHON) Okay. So do you believe that it is one of these conditions or a combination of conditions that results in your [redacted]
01:54:57 A. I believe it's a combination of these conditions.
01:55:08 Q. Okay. But the only condition you've had for -- you said you've had this [redacted]

01:55:16 for nine to ten years. The only condition I think
01:55:20 you had for that long would be the [redacted]
01:55:25 [redacted], and the [redacted]; am I right on
01:55:30 that?

01:55:30 A. No. The [redacted]
01:55:35 [redacted] --

01:55:37 Q. Okay.

01:55:37 A. -- with me as well.

01:55:38 Q. Okay. I --

01:55:40 A. And the [redacted].

01:55:42 Q. And the [redacted] Right. I missed
01:55:44 those. I'm sorry. I can't read my own notes.

01:55:47 So when did you get diagnosed with the
01:55:50 [redacted]

01:55:54 A. I'm going to -- I believe that was in -- I
01:56:01 can't recall exactly, but let's ballpark it at
01:56:04 around 2013, '14.

01:56:08 Q. Okay. And the [redacted]

01:56:12 A. Same time.

01:56:21 Q. So nine to ten years ago, it was the
01:56:24 [redacted] right?

01:56:36 A. No. [redacted]

01:56:38 Q. Right. I mean that those were existing

01:56:40 nine to ten years ago --
01:56:42 A. Yes, correct.
01:56:42 Q. -- when you had this. Okay. Got it.
01:56:46 And the [redacted], I think I
01:56:55 recall from prior testimony you've had that for a
01:56:58 long time?
01:56:58 A. Yes.
01:56:59 Q. Many -- what? 20, 30 years? More?
01:57:06 A. Not as long as that.
01:57:08 Q. No. Okay.
01:57:09 How long would you say?
01:57:11 A. I can't recall.
01:57:24 Q. And were you -- have you ever applied for
01:57:28 disability benefits?
01:57:29 A. Recently I did.
01:57:31 Q. Okay. With what -- with the state? With
01:57:36 the federal government?
01:57:37 A. Federal government.
01:57:39 Q. Okay. Did you retain an attorney to
01:57:44 assist you with that?
01:57:44 A. No.
01:57:45 Q. Okay. And did you apply for -- what kind
01:57:52 of disability benefits did you apply for?
01:57:54 A. I filled out the form online that you fill
01:57:57 out, and my application is pending. They sent back

things for me to complete, but I haven't been able to see in the last ten days to do those.

Q. Okay. And that's for Social Security benefits?

A. Yes.

Q. Based on disability?

A. Yes.

Q. And did you have a treating physician who filled out paperwork that you submitted for that application?

A. Thus far, they haven't required it, but when they do, my physicians are aware.

Q. All right. And you previously identified to the Court [redacted]. Do you have other treating physicians who you regularly see for these conditions?

A. Yes.

Q. Who are they?

MR. DONIGER: I'm going to have to ask for an offer of proof on this. Is -- this is as to her ability to pay? Are you asking about the cost for medical bills? Or, like, what's the relevance of who her treating doctors are?

MS. NASHON: There's a variety of relevance, but a lot of it is based on the claim

that she is disabled and can't work and can't earn income.

MR. DONIGER: Okay. And she's answering questions about her...

MS. NASHON: Well, so far she's disclosed one doctor who's a concierge longevity doctor. So if there are additional doctors with -- who are a little better credentialed, I think it would help her case to provide those names.

MR. DONIGER: I think this is getting far afield of her ability to pay. I understand that -- I mean, it sounds like what you're trying to do is do discovery into additional witnesses that you may want to depose to test her ability to work.

MS. NASHON: I'm not going to be able to depose anyone, I assume, before September 25th and have no intention of deposing all of her medical doctors. I'm trying to have an understanding, a full and complete understanding, of why she can't work and why she is indigent and can't pay an attorney fee award.

MR. DONIGER: Well, if you want to ask her why she's indigent, that's a question of what she has not what her potential future speculative earnings may be at some point.

MS. NASHON: She has definitely put at issue that she cannot satisfy a fee award because she is disabled and can't work.

MR. DONIGER: And she's answering questions about that. Who her doctors are and all of her, like, private medical history beyond that, I think that's going beyond the scope of this deposition.

MS. NASHON: So for the record, I just want to make clear, you're instructing her not to answer who her treating physicians are for these conditions that we talked about just now; correct?

MR. DONIGER: I mean, we can certainly discuss whether or not she's willing to provide that information. I think it's beyond the scope of what's being -- what's called for in this deposition.

MS. NASHON: I just want to have a clean record --

MR. DONIGER: I understand.

MS. NASHON: -- of questions that you have instructed her not to answer in case we need to take that up with the judge. So if you're instructing her not to answer, just let me know.

MR. DONIGER: So it will be up to you to

02:01:09 decide whether to follow my instruction, but I see
02:01:12 this as beyond the scope of what this deposition
02:01:13 covers.

02:01:13 THE WITNESS: I'm going to follow my
02:01:15 attorney's instruction.

02:01:16 MS. NASHON: Okay.

02:01:17 THE WITNESS: I would like to correct one
02:01:19 premise that I disagree with that you stated --

02:01:22 MS. NASHON: Uh-huh.

02:01:23 THE WITNESS: -- which is that [redacted]
02:01:26 --

02:01:26 MS. NASHON: Uh-huh.

02:01:28 THE WITNESS: -- and sitting here, I can't
02:01:30 tell you what his curriculum vitae was that you
02:01:34 filed that identifies him as a doctor of internal
02:01:37 medicine and where he completed his residency and
02:01:42 what he is certified in, and I see him as an
02:01:43 internist.

02:01:44 Q. (BY MS. NASHON) Okay. And do you -- does
02:01:45 he provide concierge services to you?

02:01:49 A. I'm not part of his longevity practice.

02:01:51 Q. Okay. That wasn't my question though.

02:01:53 A. Okay. Then I don't understand the
02:01:54 question. Sorry.

02:01:54 Q. Do you pay him a monthly retainer to be a

02:01:57 concierge doctor?
02:01:59 A. Yes, I do.
02:02:00 Q. Okay. And how much is that?
02:02:01 A. I don't know.
02:02:02 Q. Who pays that: you or Trent?
02:02:03 A. Trent pays that. It's...
02:02:22 Q. Does Trent pay all of your medical
02:02:26 expenses?
02:02:26 A. Under the terms of the PSA, he does.
02:02:37 Q. Can you estimate how many -- how much that
02:02:40 is every month?
02:02:42 A. Can you please give me a more specific
02:02:45 question? Are you asking for how much all of the
02:02:49 support is or how much the medical is?
02:02:51 Q. How much he pays in medical expenses on
02:02:54 average every month.
02:02:55 MR. DONIGER: Hold on a second. I'm going
02:02:57 to object and instruct not to answer. Her ability
02:02:59 to pay is not affected by someone else paying her
02:03:03 medical bills or how much they -- how much someone
02:03:06 else pays in her medical bills. Again, open to an
02:03:08 offer of proof, but I'm not seeing how this is
02:03:11 relevant to her ability to pay.
02:03:11 MS. NASHON: Okay. So you're asking me to
02:03:14 make an offer of proof regarding the divorce

settlement and the transfer of her assets to her ex-husband in exchange for him paying all of these expenses, and you're saying I can't inquire into that?

MR. DONIGER: I'm saying there is an agreement that somebody else is paying her medical expenses.

MS. NASHON: Uh-huh.

MR. DONIGER: How much somebody else pays a month on her medical expenses has nothing to do with her ability to pay judgment.

MS. NASHON: I completely disagree. Absolutely disagree.

So this is another one where you're going to instruct her not to answer?

MR. DONIGER: I mean, tell me what the relevance -- tell me how this is relevant to her ability to pay a judgment.

MS. NASHON: Her income and expenses is relevant to whether she can pay a judgment. If someone else is paying her expenses for her for a limited period of time, that is absolutely relevant to whether she can afford to pay a judgment, especially one that may be paid over time.

MR. DONIGER: So what you're assuming is

02:04:06 that at the end of the period of time they're
02:04:08 paying, those expenses are going to continue, and
02:04:11 then that's going to be an expense she's going to
02:04:12 have to pay.

02:04:12 MS. NASHON: That's a certainly plausible
02:04:15 scenario.

02:04:15 MR. DONIGER: Okay. But it's a plausible
02:04:17 scenario, but five years from now what are her
02:04:20 medical expenses going to be? That's your -- is
02:04:20 that your question?

02:04:20 MS. NASHON: No. My question right now is
02:04:23 she has given up value. She has given up assets
02:04:27 that could otherwise be considered as part of her
02:04:29 ability to pay in exchange for something of value.

02:04:29 MR. DONIGER: Uh-huh.

02:04:33 MS. NASHON: I would like to know what all
02:04:35 that value entails, and that includes the payment of
02:04:38 her medical expenses.

02:04:39 MR. DONIGER: Okay. I don't see how
02:04:40 that's relevant to her ability to pay judgment. I'm
02:04:41 going to instruct her not to answer.

02:04:51 MS. NASHON: Well, considering that it is
02:04:54 five o'clock on the east coast and we can't get the
02:04:58 judge involved, I hope that you don't have plans for
02:05:03 tomorrow.

02:05:18 Q. (BY MS. NASHON) Ms. Freeman, is it your
02:05:21 testimony that you are currently unable to work?
02:05:23 A. Yes.
02:05:24 Q. And how long has that been the case?
02:05:32 A. It's been a long time.
02:05:34 Q. More than five years?
02:05:35 A. Yes.
02:05:36 Q. More than ten years?
02:05:39 A. No.
02:05:44 Q. Nine years? Eight years?
02:05:46 [redacted]
02:05:48
02:05:52
02:05:56
02:05:57 Q. Okay. And are you unable to practice law?
02:06:11 Are you unable to perform any other kind of work
02:06:14 that you have historically done, such as writing and
02:06:19 consulting?
02:06:19 A. Yes, presently I am.
02:06:22 Q. And that's been the case for more than
02:06:25 five years?
02:06:35 A. I'm not sure how to answer that question.
02:06:46 Could you perhaps rephrase that?
02:06:49 Q. So I understand from your prior deposition
02:06:52 that in addition to practicing law as an attorney,

02:06:55 you sometimes performed consulting work, and you certainly were writing your manuscripts. Have you been unable to do those tasks for more than five years?

02:07:16 A. I'm able to or was able to consult on a limited basis, but I did not do so for money because my medical conditions get in the way of me being able to have a regular schedule of any kind for employment.

02:07:46 Q. So when is the last time that you were able to consult on a limited basis?

02:07:53 [redacted]

02:08:14 Q. And when did you -- but you said that most of the consulting work you did you didn't get paid for; correct?

02:08:21 A. That's true.

02:08:21 Q. Okay. So --

02:08:22 A. Consulting a client directly.

02:08:24 Q. Uh-huh. So that wouldn't be reflected on your Social Security statements.

02:08:27 A. It is. It's income that I reported.

02:08:29 Q. You reported income you didn't get paid?

02:08:32 A. Okay.
02:08:33 Q. I'm just trying to understand.
02:08:36 A. Well, I'm trying to do my best to explain
02:08:39 to you --
02:08:41 Q. Uh-huh.
02:08:41 A. -- that with the [redacted]
02:08:44 that I have, I don't have any kind of
02:08:46 regular schedule for working. You asked me the
02:08:49 question, I believe, about when was the last time.
02:08:51 I tried to do some work in 2021, and I was able to
02:08:55 [redacted]
02:09:00
02:09:00 Q. Okay. And did you do any consulting work
02:09:03 after 2021 that you did for free?
02:09:09 A. Yes.
02:09:11 Q. Okay. And who did you do that consulting
02:09:15 work for?
02:09:16 A. I am not comfortable naming any person's
02:09:20 names, but friends going through divorce, I could
02:09:25 offer a little bit of help sporadically who were
02:09:31 represented by counsel.
02:09:36 Q. And when was that?
02:09:38 A. I don't recall the last time.
02:09:49 Q. Was it within the last three years?
02:09:54 A. I -- I don't think so, no.

I have to change that answer to I just don't recall the last time.

Q. So other than counseling friends going through divorce, have you done any other consulting work after 2021 for free?

A. I don't recall.

Q. And what about writing? Have you been writing with the purpose of eventually earning income from that writing?

A. No.

Q. Not for the last five years?

A. No.

Q. In the property agreement that you filed in your divorce, there was a reference to a transplant and a need for a second transplant. Have you undergone an organ transplant or been told you need one?

A. I -- I'm trying to understand how that question relates to my ability to pay a fee award.

Q. Are you refusing to answer the question?

A. I'm not refusing to answer the question. I'm just trying to understand how that question relates to my ability to pay a fee award, whether I've had a transplant or am planning one, it's -- the wording is in the PSA, and I'm just trying to

understand how that relates to my ability to pay a fee award.

Q. So in your PSA in paragraph 21, there was a reference to Trent paying your monthly physical therapy, your dietician while going through a second transplant procedure, and the out-of-pocket cost of the second transplant, and any other medically necessary treatments not covered by insurance. So transplants, depending on what kind, can be extraordinarily expensive, and I'm trying to understand if that has diminished -- if you've gone through one, if it's diminished your income, if you're going through another one, if Trent is paying for it. I believe all of those are relevant to your financial condition.

MR. DONIGER: Well, I think respectfully those are two very different things. Whether they're expensive and whether getting one would diminish her income. But one of them -- the second one, I think you're absolutely entitled to ask her that. So maybe that's the question -- I don't want to give a question to you -- for you, but maybe it's the question is has a transplant, has it been any impact on your income as a result of -- I -- ask a question about that, and we're fine with that.

MS. NASHON: Well, I'm trying to understand if she's even had one, period, which is sort of a foundational question than jumping into asking how much it costs. So, you know, that was my foundational question, [redacted].

MR. DONIGER: Okay. What I'd say is the cost and the deduction -- the affect on her income are two very -- two different things. One of -- the latter I think is fair game. The former I think is outside the scope of...

Q. (BY MS. NASHON) Okay. So you'd like me to ask how much did your hypothetical transplant cost I guess is what I'm asking?

MR. DONIGER: No. No. No. It's not.

Q. (BY MS. NASHON) Has your hypothetical transplant affected your assets and income? I mean, this is the game we're playing now because --

MR. DONIGER: No, no.

Q. (BY MS. NASHON) -- I can't ask you if you've had a transplant.

A. How about do you have the PSA on your computer?

Q. I do.

A. Why don't you read -- read the piece that you're --

Q. I did.

A. Okay.

Q. So I'll read it.

A. Thank you.

Q. Paragraph 21:

"Trent shall pay Lynne's monthly physical therapy at 750 to $1,500 a month, her dietician while she is going through a second transplant procedure at $195 per hour, the out-of-pocket cost of the second transplant estimated to be approximately $7,500, and any other medically necessary treatments not covered by insurance."

A. So what is your question, please?

Q. So my question is did the cost of the first transplant procedure affect your assets or income?

A. My assets or income, no.

Q. Uh-huh.

A. No.

Q. Did they affect your ex-husband's assets or income?

MR. DONIGER: I'm going to object as being outside the scope of this deposition. Instruct her not to answer.

02:14:41 Q. (BY MS. NASHON) Are you going to follow your attorney's instruction?
02:14:45 A. I'll follow my attorney's instruction.
02:14:48 Q. Okay. And if you have a second transplant planned, is that something that has already occurred or is imminently likely to occur?
02:15:01 A. It is imminently likely to occur.
02:15:04 Q. Okay. Within the next year?
02:15:12 A. Yes.
02:15:15 Q. Okay. Will that affect your ability to work?
02:15:21 MR. DONIGER: Calls for speculation. Lacks foundation.
02:15:24 If you know.
02:15:25 THE WITNESS: I don't know.
02:15:26 Q. (BY MS. NASHON) And that is something that the cost of the transplant is estimated to be approximately $7,500; is that accurate?
02:15:54 A. Yes.
02:16:08 Q. And Trent pays your medical insurance indefinitely; is that right?
02:16:17 A. I --
02:16:18 Q. As part of your agreement?
02:16:19 A. I don't recall without looking at the PSA how long that is that he pays the medical insurance.

It's whatever is stated in the PSA.

Q. Okay. Well, paragraph 19 says:

"Trent shall maintain a health insurance policy for Lynne and pay Lynne's uncovered medical expenses. This shall continue beyond the regular period of spousal support unless and until Lynne is able to obtain her own health insurance at the same or lesser cost."

Does that refresh your recollection?

A. Yes.

Q. Okay. Have you made any efforts to obtain your own health insurance?

A. No.

Q. Do you anticipate being able to obtain your own health insurance at any time in the next five years?

A. I don't know.

Q. What kind of health insurance policy do you have?

A. Are you asking who the carrier is?

Q. Is it a PPO or an HMO?

A. It's a PPO.

Q. Okay. Do you know how much Trent pays in monthly premiums for that policy?

02:17:23 A. For my policy? Me alone?
02:17:27 Q. Uh-huh.
02:17:28 A. It's [redacted]
02:17:36 Q. Do you know what the deductible is, the
02:17:40 annual deductible?
02:17:41 A. I know that it's a low deductible, but I
02:17:45 do not know the amount.
02:17:59 Q. Have any of your treating physicians told
02:18:02 you that [redacted]
02:18:05 A. [redacted]
02:18:06 Q. Have they given you a prognosis for when
02:18:11 [redacted]
02:18:13 A. [redacted]
02:18:16 Q. You previously stated in a declaration
02:18:20 that you're in California to receive treatment that
02:18:26 you cannot receive in Alaska. What treatment is
02:18:29 that?
02:18:31 A. [redacted]
02:18:36
02:18:46
02:19:04 Q. Is that the only reason that you're living
02:19:07 in California, not Alaska?
02:19:08 A. Yes.
02:19:11 Q. Do you have plans to return to Alaska?
02:19:15 A. I hope to return to Alaska when I am

[redacted]

Q. And these -- [redacted] available in Alaska?

A. [redacted]

Q. When's the last time you were in Alaska?

A. I don't recall.

Q. Has it been more than five years?

A. I don't recall.

Q. Has it been more than three years?

MR. DONIGER: I'm going to object to this as outside of the scope. Not a reasonable question about her ability to pay. Instruct her not to answer.

MS. NASHON: You're instructing her not to answer the last time she was in Alaska?

MR. DONIGER: Yeah. You laugh, but Rule 30 specifically authorizes an instruction not to answer for questions that go beyond the scope of the core deposition topic.

Q. (BY MS. NASHON) Uh-huh. Are you physically able to travel?

02:20:37 A. No.
02:20:38 Q. How long have you been unable to travel?
02:20:41 A. The last three years.
02:20:49 Q. Is that by plane and car?
02:20:55 A. Both would pose a significant hardship on
02:21:00 me right now, yes.
02:21:08 Q. Where is your primary residence?
02:21:10 A. My primary residence is here in Santa
02:21:13 Barbara.
02:21:19 Q. How long has your -- that been your
02:21:22 primary residence?
02:21:24 A. For at least the last three years.
02:21:47 Q. Have you gone to Alaska since you got
02:21:51 divorced?
02:21:51 A. No.
02:22:12 Q. How did you plan to attend trial in New
02:22:15 York when it was scheduled for this past March?
02:22:18 A. I --
02:22:19 MR. DONIGER: Hold on a second. I'm going
02:22:23 to -- it's beyond the scope of the deposition. I'll
02:22:26 instruct you not to answer.
02:22:28 Q. (BY MS. NASHON) Are you going to follow
02:22:30 your attorney's --
02:22:31 A. I'm going to follow my attorney's
02:22:34 instruction.

02:22:35 Q. Okay. Who was going to pay for you to get to New York for trial when it was scheduled in March?

02:22:43 MR. DONIGER: Vague and ambiguous as phrased. Exceeds the scope of the deposition. I'm going to instruct her not to answer.

02:22:51 Q. (BY MS. NASHON) Are you going to follow the instruction?

02:22:53 A. I'm going to follow my attorney's instruction.

02:22:56 Q. Where did you plan to stay when you were in New York for a at least month -- three week long trial?

02:23:03 MR. DONIGER: Beyond the scope of the deposition. I'm going to instruct her not to answer.

02:23:06 MS. NASHON: It certainly goes to her finances. I'm not sure on what basis you're instructing her not to answer.

02:23:13 MR. DONIGER: Where were you going to stay?

02:23:16 MS. NASHON: Yeah, at the Waldorf Historia or with a friend? It goes to her finances.

02:23:21 MR. DONIGER: It also calls for speculation. It assumes she even had plans.

MS. NASHON: Well, you wouldn't let her answer yes or no whether she did, so.
MR. DONIGER: Because where would you have spent money you didn't spend has nothing to do with her ability to pay judgment at this point.
MS. NASHON: Okay. We'll take it up with the judge --
MR. DONIGER: Sure.
MS. NASHON: -- and continue this deposition.
Q. (BY MS. NASHON) How long did you practice law as a family law lawyer?
A. I'm not sure exactly how many years.
Q. You previously testified over 20. Is that still accurate?
A. That's accurate.
Q. Okay. And you were married and divorced before you met Trent Baer; is that correct?
A. I'm going to ask what relevance that has to my ability to pay a fee award today.
Q. We'll get there. I promise. If you answer that question, the next question will probably connect that dot for you.
THE WITNESS: Counsel, are you instructing me to answer that question about my prior marriage

02:24:31 before Trent?
02:24:31 MR. DONIGER: It's a yes-or-no question;
02:24:33 right?
02:24:34 THE WITNESS: Okay.
02:24:35 Can you please repeat it?
02:24:36 Q. (BY MS. NASHON) Sure. You were married
02:24:38 and divorced before you met Trent; correct?
02:24:41 A. Yes.
02:24:41 Q. Okay. Did you have any prenuptial
02:24:44 agreement with Trent Baer?
02:24:45 A. No.
02:24:46 Q. Did you and Trent have any agreements
02:24:49 addressing separate or community property or the
02:24:52 characterization of separating community property?
02:24:57 A. No.
02:24:57 Q. Okay. Did you have any agreements
02:25:00 addressing loans between the two of you?
02:25:03 A. Yes.
02:25:04 Q. Okay. What were those?
02:25:06 A. Those are the terms that are reflected in
02:25:08 the PSA about the litigation funds that I borrowed
02:25:12 from Trent in order to pursue this litigation.
02:25:15 Q. Any other agreements on loans?
02:25:18 A. No.
02:25:30 Well, okay. There is one other. I

borrowed $50,000 from my Aunt Sally for litigation, but it is not anything that's part of the divorce or anything that Trent is involved with.

Q. Have you repaid that loan?

A. No.

Q. Has she asked for repayment?

A. No.

Q. Do you have anything documenting that loan?

A. Yes.

Q. How is it document --

A. And I will volunteer, just to make this easier, that it is a forgivable loan. That's why it's not part of the divorce agreement or anything else, so.

Q. How is the loan documented?

A. A signed document from me that if I recovered funds someday to pay her back that I would pay her back and that if I don't ever have funds to pay her back that I don't need to pay her back.

Q. When did you sign that document?

A. I don't recall exactly when, but probably a year ago.

Q. Any other loans that you took to finance the litigation?

A. No.

Q. Have you filed tax returns for each of the past five years?

A. No.

Q. What years have you filed tax returns for?

A. All of the tax returns are filed for the last five years except for I believe 2020 -- I'm not completely sure if 2024 is filed. I know that 2025 is not.

Q. Okay. Have you reviewed those tax returns recently?

A. Not recently, no.

Q. Did you file married or single?

A. Those are all married.

Q. Did you review your 2023 tax return before filing it?

A. I did.

Q. Do you recall what your possible adjusted gross income was?

A. I do not.

Q. And you filed for taxes as an Alaska resident; is that correct?

A. Yes.

Q. How do you intend to file your taxes for 2025, single or married?

A. I believe I would be married because I was still married in 2025.

Q. In 2023, did you have to pay taxes or did you get a refund?

A. I don't recall that.

Q. Do you plan to file as an Alaska resident for 2025?

A. Yes.

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. Do you have any dependents that you'll claim on your taxes?

A. [redacted]

Q. [redacted]

02:30:34 A. [redacted]
02:30:37 [redacted]
02:30:40 Q. Up until 2023, 2024?
02:30:43 A. I don't know the answer.
02:30:44 Q. Okay. [redacted]
02:30:47 A. [redacted]
02:30:52 Q. [redacted]
02:30:54 [redacted] [redacted]
02:31:00 [redacted] [redacted]
02:31:02 [redacted] [redacted]
02:31:03 [redacted] [redacted]
02:31:04 A. [redacted]
02:31:05 Q. Full or part-time?
02:31:07 MR. DONIGER: I'm going to object to this
02:31:09 being outside the scope of the deposition. Instruct
02:31:12 her not to answer.
02:31:13 Q. (BY MS. NASHON) [redacted]
02:31:14 A. [redacted]
02:31:21 MS. NASHON: And you're instructing her
02:31:22 not to answer whether he goes to school full or
02:31:28 part-time?
02:31:28 MR. DONIGER: His school status has
02:31:31 nothing to do with her ability to pay, especially if
02:31:36 she's not paying his tuition.
02:31:41 Q. (BY MS. NASHON) [redacted]

02:31:43 A. [redacted]
02:31:45 Q. Does he have his own business?
02:31:50 MR. DONIGER: I -- absent an offer of
02:31:56 proof as to how this has anything to do with her
02:31:59 ability to pay a judgment, I'm going to instruct her
02:32:00 not to answer.
02:32:01 Q. [redacted]
02:32:03
02:32:05 A. [redacted]
02:32:10
02:32:13 Q. [redacted]
02:32:18 MR. DONIGER: You're instructed not to
02:32:20 answer.
02:32:27 MS. NASHON: You keeping a list?
02:32:36 Q. (BY MS. NASHON) [redacted]
02:32:39
02:32:40 A. [redacted]
02:32:44 Q. And that's at the [redacted]
02:32:53
02:32:54 A. [redacted]
02:33:02 Q. When's the last time you saw him?
02:33:06 A. It's been a very long time since I've last
02:33:09 seen my son. It's been about a year and -- it's
02:33:20 been over a year.
02:33:26 Q. Did you pay for him to come see you in

Santa Barbara?

A. Not -- not me personally, no.

Q. Do you want to take a break?

A. I just need a minute.

MS. NASHON: Can we go off the record and take a five-minute?

THE VIDEO TECHNICIAN: Okay. The time is 2:34 p.m. We are off the record.

(Recess from 2:34 p.m. to 2:45 p.m.)

THE VIDEO TECHNICIAN: The time is 2:45 p.m. We are back on the record.

Q. (BY MS. NASHON) All right. Thank you.

Okay. So last we were talking about you were -- to confirm, you did not -- [redacted]

[redacted] [redacted]

Q. -- right?

Okay. Does he pay for his own travel or does [redacted] pay for his travel?

MR. DONIGER: Objection. Incomplete hypothetical. Calls for speculation. Lacks foundation.

MS. NASHON: You can answer.

THE WITNESS: I don't know.

02:46:21 Q. (BY MS. NASHON) We talked earlier about your tax returns.
02:46:27 So starting in 2019, do you have a ballpark estimate of what your household adjusted gross income was?
02:46:41 A. No.
02:46:42 Q. Is it more than [redacted]?
02:46:45 A. I don't know.
02:46:46 Q. More than [redacted]
02:46:47 A. [redacted]
02:46:48 Q. Okay. More than [redacted]
02:46:53 A. [redacted]
02:46:58 Q. [redacted]
02:47:01 A. [redacted]
02:47:02 Q. -- if it was between, let's say, [redacted]
02:47:06 A. [redacted]
02:47:08 Q. Okay. [redacted]
02:47:14 A. [redacted]
02:47:26 Q. Okay. Do you know if it was between [redacted]
02:47:31 A. [redacted]
02:47:32 Q. [redacted]
02:47:34 A. [redacted]
02:47:36 Q. Same ballpark?

02:47:37 A. [redacted]
02:47:41 Q. 2022?
02:47:42 A. [redacted]
02:47:44 Q. 2023?
02:47:45 A. [redacted]
02:47:47 Q. 2024?
02:47:48 A. [redacted]
02:47:54 Q. Who prepares your taxes?
02:47:56 A. My tax preparer.
02:47:58 Q. Always the same one?
02:48:00 A. Yes.
02:48:01 Q. Who is that?
02:48:02 A. Her name is [redacted]
02:48:11 Q. Sounds familiar. Anchorage is a small
02:48:17 town.
02:48:18 And is [redacted] --
02:48:22 A. [redacted]
02:48:24 Q. -- [redacted]
02:48:26 A. [redacted]
02:48:39 Q. [redacted]
02:48:45 A. [redacted]
02:48:46 Q. Okay. And that's with [redacted]
02:48:56 A. [redacted]

02:49:04 Q. How often does he come to Santa Barbara?

02:49:07 A. I don't know his schedule.

02:49:09 Q. Does he come once a quarter, once a month, 02:49:13 once a year?

02:49:14 A. I don't know.

02:49:15 Q. Does he visit Buddy when he's here?

02:49:20 A. Yes.

02:49:21 Q. Okay. How often does he visit Buddy?

02:49:24 A. Every day that he's in Santa Barbara.

02:49:28 Q. Okay. And how many days was he in Santa 02:49:32 Barbara this year?

02:49:33 A. I don't know.

02:49:33 MR. DONIGER: Objection. Calls for 02:49:34 speculation.

02:49:35 THE WITNESS: I don't know.

02:49:40 Q. (BY MS. NASHON) How do you know that he 02:49:41 visits Buddy when he's in Santa Barbara?

02:49:43 A. I see him when he gets Buddy.

02:49:45 Q. Okay. But you don't know how often that 02:49:49 is?

02:49:49 A. No. You asked for the year. I don't 02:49:51 know.

02:49:55 Q. I asked for an estimate of how often, 02:49:57 whether it's once a month, once every quarter, once 02:50:01 a year, and you're not able to answer that; is that

right?

A. I believe you'd have to go back and read the question again as to what you asked.

Q. Okay. You understand what I'm trying to ask is how often does Trent come to Santa Barbara, and I'm throwing out broad concepts so you can give me an estimate?

A. There isn't a schedule that I'm aware of about his travel.

Q. Uh-huh. I'm not asking about a schedule.

A. Okay. Then I don't understand the question.

Q. Okay. It's pretty simple.

It is September. Do you know how many times Trent has traveled to California this year?

A. I do not know.

Q. How many times has he seen Buddy this year?

A. I do not know.

Q. Is it more than 5 times?

A. Yes.

Q. Is it more than 10 times?

A. Yes.

Q. Is it more than 20 times?

A. Yes.

02:50:52 Q. Is it more than 50 times?
02:50:55 A. This year, in 2026, yes.
02:50:59 Q. Uh-huh. Is it more than 100 times?
02:51:01 A. I don't know.
02:51:03 Q. When he's in town, is he in town for weeks at a time, or just a few days at a time, or does it vary?
02:51:13 A. It varies.
02:51:14 Q. Okay. Is it usually weeks or is it usually months?
02:51:27 MR. DONIGER: I'm sorry. Without an offer of proof of how this relates to the deponent's ability to pay the judgment, this is well beyond the scope of the permissible topics of this deposition. I'm going to instruct her not to answer. But I'm open to an offer of proof.
02:51:40 MS. NASHON: Well, as you know, we have expressed in our pleadings it is no secret that we have some questions about the validity of the divorce proceedings and given its timing and the agreements made in the property settlement, and so I would like to ask questions about the provisions of the property settlement agreement and the arrangements and how it actually works so I can understand and assess credibility of that --

02:52:12 MR. DONIGER: Okay. You're asking how many times he visits the dog. You're not asking about --

02:52:15 MS. NASHON: I'm asking how many -- that's in the settlement agreement.

02:52:17 MR. DONIGER: Okay.

02:52:18 MS. NASHON: It is.

02:52:18 MR. DONIGER: It's not a financial term.

02:52:20 MS. NASHON: It -- there are financial terms about the dog in the settlement agreement.

02:52:26 MR. DONIGER: That's not what you're asking about though.

02:52:30 Carry on. I'm certainly going to let you ask whatever questions are relevant to her ability to pay a judgment. So go ahead.

02:52:40 Q. (BY MS. NASHON) Okay. Where does Trent stay when he's in town?

02:52:44 A. Trent --

02:52:44 MR. DONIGER: Calls for speculation. Lacks foundation.

02:52:46 If you know.

02:52:48 Q. (BY MS. NASHON) Sorry?

02:52:49 A. Trent stays in a condo complex where I live as well.

02:53:04 Q. So he stays with you?

02:53:05 A. No.
02:53:06 Q. Okay. Who owns the condo where he stays?
02:53:18 A. Her name is Vickie. I can't recall her
02:53:25 last name.
02:53:28 Q. Is she a friend of his?
02:53:30 A. Yes.
02:53:48 Q. Does Trent still assist you with the
02:53:52 litigation?
02:53:52 A. No.
02:53:53 Q. When was the last time he assisted you
02:53:55 with the litigation?
02:53:57 MR. DONIGER: Objection. Beyond the scope
02:53:58 of the deposition topics. Instruct her not to
02:54:01 answer.
02:54:04 Q. (BY MS. NASHON) Does Trent still assist
02:54:07 you with gathering evidence and responding to
02:54:12 arguments in the case?
02:54:13 MR. DONIGER: Objection. Beyond the scope
02:54:14 of the deposition. Instruct her not to answer.
02:54:16 Q. (BY MS. NASHON) Are you taking that
02:54:17 instruction?
02:54:17 A. I'll accept the instruction from my
02:54:19 attorney.
02:54:20 Q. Does Trent still review filings in the
02:54:24 case?

MR. DONIGER: Calls for speculation. Lacks foundation. Beyond the scope. Instruct her not to answer.

Q. (BY MS. NASHON) And you're following that instruction --

A. Yes.

Q. -- I assume? Okay.

Are you the beneficiary of any trust?

A. No.

Q. Have you inherited any money?

A. No.

Q. Are you the recipient of a pension?

A. No.

Q. Do you receive any royalties?

A. No.

Q. Any residuals?

A. No.

Q. Any annuities?

A. No.

Q. Are you currently employed or self-employed?

A. I am not employed right now.

Q. Okay. When is the last time you earned income?

A. I believe -- I would need to look at my

02:55:11 Social Security statement to tell you that, but I believe it's 2021.

02:55:22 Q. And what was the source of that income?

02:55:24 A. Client.

02:55:25 Q. That was for legal services?

02:55:28 A. Yes.

02:55:30 Q. When is the last time that you signed a legal filing on behalf of a client?

02:55:45 A. I don't recall the last time.

02:55:48 Q. More than five years?

02:55:51 A. Yes. 20 -- I may have in 2021, but I just don't recall.

02:56:00 Q. Are you the attorney of record on any active case?

02:56:05 A. No.

02:56:06 Q. When is the last time you were attorney of record on an active case?

02:56:12 A. I don't recall.

02:56:21 Q. Was it 2021, before then?

02:56:24 A. It's possible for the 2021. I just don't recall what that service was. It is a family law legal service, but I just don't recall whether I signed any pleadings or was an attorney of record. I don't know.

02:56:43 Q. Could you have been attorney of record for

anyone after 2021?

A. No.

Q. When is the last time you provided legal services in trade?

A. I don't recall.

Q. Was it before 2021?

A. I -- I don't recall.

Q. Was it in 2022?

A. I don't recall.

Q. Do you provide any consulting that is not legal in nature?

A. No.

Q. Did you ever?

A. No.

Q. Okay. And you still maintain your Alaska law license; correct?

A. Yes.

Q. What is required to maintain your Alaska law license?

A. I am required to take a certain amount of ethics classes and CLEs each year.

Q. And you maintain active status or inactive status?

A. I maintain active status.

Q. Who pays your dues?

A. Trent has paid those dues in the past.
Q. And does he pay for the cost of your CLEs and ethics classes as well?
A. In the past, yes.
Q. Is there an agreement that he continue to pay those costs?
A. We do not have an agreement, no.
Q. Do you intend to remain on active status with the bar?
A. Yes.
Q. How do you intend to pay the cost of the CLEs and bar dues?
A. I don't know.
Q. Do you have malpractice insurance?
A. No.
Q. Have you ever had malpractice insurance?
A. Yes.
Q. When's the last time you had malpractice insurance?
A. I don't recall.
Q. Has it been in the last five years?
A. I don't know.
Q. Do you recall who it was with?
A. No.
Q. Do you receive public assistance of any

kind?

A. No.

Q. Have you applied for public assistance of any kind?

A. No.

Q. Do you intend to apply for public assistance of any kind?

A. I don't know.

Q. Do you have a trust?

A. No.

Q. Do you have an ownership in any partnership, LLC, corporation, or similar entity?

A. No.

Q. Do you have a safe-deposit box?

A. No.

Q. Do you directly or indirectly own any stocks, bonds, or mutual funds?

A. No.

Q. Have you transferred any assets to any person worth more than $500 in the past two years?

A. Can you define assets?

Q. Item of value.

A. Cash?

Q. Sure.

A. My birth father.

03:00:25 Q. Okay. Tell me more about that.
03:00:30 A. I was helping the family out by paying a
03:00:38 few hundred dollars here and there for his care.
03:00:47 Q. How long did you do that?
03:00:50 A. About a year.
03:00:52 Q. When was that?
03:00:53 A. This was in 2025.
03:01:05 Q. And how much total did you pay for his
03:01:08 care in 2025?
03:01:09 A. I'm not sure of exactly how much, but
03:01:16 these were 200-dollar, 100-dollar, 400-dollar
03:01:20 payments here and there, so I don't know the total.
03:01:23 Q. And when you say "here and there," was it
03:01:26 monthly?
03:01:26 A. Monthly.
03:01:34 Q. And you've discontinued those payments at
03:01:38 some point?
03:01:38 A. Yes.
03:01:38 Q. Why did you discontinue those?
03:01:41 MR. DONIGER: I'm going to object as --
03:01:42 unless it's a question about her -- you can ask if
03:01:47 she will be paying in the future, but why is a
03:01:50 personal question that goes beyond her ability to
03:01:53 pay. I'm going to instruct her not to answer.
03:01:56 Q. (BY MS. NASHON) Have you discontinued

03:01:58 those payments?
03:01:58 A. Yes.
03:01:59 Q. When did you discontinue those payments?
03:02:04 A. I don't remember exactly when. There -- I
03:02:11 believe in 2025. There may have been one 100-dollar
03:02:15 payment at the beginning of 2026, but I don't recall
03:02:20 for sure.
03:02:25 Q. Do you intend to make additional payments
03:02:29 at any point?
03:02:30 A. No.
03:02:37 Q. Do you expect to be repaid for any of the
03:02:40 payments that you've made?
03:02:41 A. No.
03:02:53 Q. Are there any other transfers of assets to
03:02:56 any person worth more than $500 in the past two
03:03:02 years?
03:03:02 A. No.
03:03:04 Q. Do you own any vehicles?
03:03:06 A. Yes.
03:03:07 Q. What are they?
03:03:08 A. As listed in the PSA, I have a 2016 Range
03:03:19 Rover Sport.
03:03:19 Q. And in the PSA, you mention that it was
03:03:23 damaged. In what way is it damaged?
03:03:25 A. It has body damage, and then it has a

number of -- I don't know what you -- repairs that are needed.

Q. Have you gotten a quote to address those, the damage and repairs?

A. Some of those were supplied with the motion practice that's been in this case, estimates of the repairs that were needed.

Q. Okay. Do you recall what those were?

A. No.

Q. Have you gotten those repairs?

A. Some in order to make it work.

Q. And it's -- is there a reason you haven't gotten all of the repairs done?

A. Money.

Q. Isn't Trent responsible for that cost?

A. Yes.

Q. Is he unable to afford those repairs?

A. He has made the repairs he believes are necessary for the vehicle to run.

Q. Do you consider him to be in violation of your settlement agreement?

A. No.

Q. Any other vehicles that you own?

A. No.

Q. Any recreational vehicles? Boats?

A. No.
Q. Jet skis? Machines?
A. No.
Q. Do you own any real property?
A. I own a one-half interest of the condo in Santa Barbara.
Q. Any others?
A. No.
(Sirens wailing.)
MS. NASHON: We'll give that a second to complete its rounds. Okay.
MR. DONIGER: Just when it sounds like it's done.
MS. NASHON: Sounds like we're on the streets of New York.
THE VIDEO TECHNICIAN: Sounds like it's gone.
MS. NASHON: Okay.
Q. (BY MS. NASHON) Do you receive rents from any source?
A. No.
Q. Do you have any other sources of income that we have not yet covered?
A. No.
Q. All right. Tell me about your financial

accounts. You have a checking account?
A. No.
Q. No checking account.
Have you ever had a checking account?
A. Yes.
Q. When did you cease having a checking account?
A. I haven't used a checking account in a long time.
Q. More than five years?
A. I don't know.
Q. Do you have a savings account?
A. No.
Q. Have you ever had a savings account?
A. I don't recall when the last time.
Q. Do you have a credit card?
A. Under the terms of the PSA, I'm to have two credit cards.
Q. Do you have any cards in addition to that?
A. If I do, I'm not aware of them and I'm not using them.
Q. Are you listed as a named account holder on any checking or savings account?
A. Yes.
Q. And can you identify those, please?

A. [redacted]

Q. How much does he deposit every month?

A. I don't know.

Q. How is it that you don't know?

A. I am not -- I don't have access to look at the account online.

Q. So you're on the account, but you don't have access to it?

A. No.

Q. Have you requested access to it?

A. No.

Q. Is there a reason you don't have access to it?

A. The expenses are paid directly for me, so there isn't a need for me to have access to it.

Q. Why is your name on it?

A. It's been an account that was opened, I don't know, more than 20 years ago, and it's been kept for the purpose of paying -- [redacted]

Q. Was it used for something else before you

03:08:52 got divorced?
03:08:55 A. It was a joint account that we held.
03:09:00 Q. But you've never had access to it?
03:09:03 A. It's been many years since I've had access
03:09:08 to it because I'm not earning money.
03:09:27 Q. So when you were working, you were allowed
03:09:31 to have access to it?
03:09:32 A. The premise of the question -- I cannot
03:09:41 agree with the premise of the way that's worded.
03:09:44 Q. Okay. Well, you were -- you have not had
03:09:49 access since you stopped earning money. Was your
03:09:52 access revoked?
03:09:54 A. No.
03:09:55 Q. Did you relinquish your access?
03:10:03 A. Yes. I didn't have need of looking at it.
03:10:08 I've been sick.
03:10:09 Q. So you just -- you had access, but you
03:10:12 just stopped looking at it?
03:10:13 A. Yes.
03:10:23 Q. And that started in --
03:10:23 A. I don't know.
03:10:26 Q. -- nine, ten years ago?
03:10:28 A. No, I don't know.
03:10:31 Q. And you have no idea how much is in there?
03:10:34 A. Well, at the time that I wrote my last

03:10:37 declaration, there was a negative 200 and something
03:10:41 dollars in there.
03:10:45 Q. How did you find that out?
03:10:47 A. Because Trent told me, and -- that that's
03:10:54 what the amount, balance was, and he showed me on
03:10:58 the screen that that's what the balance was.
03:11:05 Q. When was that?
03:11:07 A. I don't recall, but it would be for the
03:11:11 declaration that was filed in August.
03:11:18 Q. Is that when he was in Santa Barbara?
03:11:20 A. Yes.
03:11:35 Q. And what was the purpose of him showing
03:11:38 you that negative 200 thousand -- 200-dollar
03:11:41 balance?
03:11:41 A. For me to know what was in the account at
03:11:44 that time so that I could tell the Court about it.
03:11:49 The account, I'm going to go ahead and volunteer it,
03:11:52 is used to pay my expenses. That is why it's
03:11:56 maintained.
03:11:56 Q. Did it concern you that it had a negative
03:11:59 balance?
03:11:59 A. Sure.
03:12:00 Q. Did you ask Trent to replenish that?
03:12:04 A. No.
03:12:07 Q. Did you understand that it would be

replenished?

A. Yes.

Q. Why -- what was that understanding based on?

A. Based on the agreement of the PSA, which is that Trent is to pay my expenses as laid out in the PSA, and he uses that joint account in order to do that for recordkeeping.

Q. So you -- did he tell you that he planned to put money into that account?

A. Yes.

Q. Is that account linked to a card that you use?

A. No.

Q. So he pays all of your expenses directly; is that right?

A. Yes.

Q. Do you understand the -- is it normal for there to be a negative balance in that account?

A. I don't know.

Q. Did you ask him, "How did this happen? How is it negative?"

A. No.

Q. Have you had any bills that are unpaid or late or debts that you owe because there's a

negative balance in that account?

A. Not that I'm aware of.

Q. Do you have any other accounts that you haven't mentioned?

A. There's one other account that I mentioned it in the PSA. It was a petty cash account that I kept where I paid my birth father out of, and where occasionally funds would be paid for our son. And I put in my declaration that information about that account.

Q. Okay. Forgive me for not -- I'm going to ask questions about it because I don't recall that particular account.

So how was that account funded?

A. The money would come from Trent's funds.

Q. Was it a joint account with Trent?

A. [redacted]

Q. Did you have a card or checks tied to that account?

A. [redacted]

Q. So no cards or checks?

03:15:31 A. I could have cards, but I didn't, and I don't have checks on that account.

03:15:40 Q. How often would [redacted] put money into that account?

03:15:44 A. As needed for my birth father or for our son. And I could put money into that account by writing a check too.

03:16:03 Q. Okay. And what check -- where was this check --

03:16:08 A. From our [redacted] --

03:16:10 Q. -- tied to?

03:16:11 A. -- during the marriage.

03:16:12 Q. Was that different from the account that we talked about?

03:16:16 A. I don't -- I don't think so. I think it's the same one that I'm talking about, but I'm not sure.

03:16:24 Q. Do you still have this account?

03:16:26 A. I no longer have the authority to write. I still have that account, the one I'm talking to you about. It's sitting there with $24 in it as per the declaration I filed.

03:16:40 Q. Where is that account at? What financial institution?

03:16:44 THE WITNESS: Am I -- Counsel, am I

03:16:46 required to name that?

03:16:51 MR. DONIGER: I mean, I think that's
03:16:54 probably okay, the financial institution. Yeah.

03:16:57 THE WITNESS: Okay. It's at [redacted]

03:17:01 Q. (BY MS. NASHON) When's the last time
03:17:03 Trent put money in that account?

03:17:11 A. I don't recall.

03:17:17 Q. This year?

03:17:18 A. I wrote a check on that account -- or for
03:17:22 that account when our son was traveling in Brazil
03:17:28 this summer, and he didn't have any money, couldn't
03:17:33 get into the hotel. I couldn't reach Trent, and I
03:17:37 wrote -- I found an old checkbook and wrote a check
03:17:40 for [redacted] and Zelled the amount to Christian that
03:17:44 night so that he would be safe, and Trent asked me
03:17:50 not to use the checkbook and -- again.

03:18:03 Q. Okay. When is the last time Trent put
03:18:06 money in that account?

03:18:09 A. I think that's the last time Trent's money
03:18:12 went into that account.

03:18:14 Q. Okay. When did he volunteer -- when's the
03:18:17 last time he voluntarily put money into that account
03:18:21 I guess?

03:18:21 A. I -- I -- I think it would have been a
03:18:26 long time ago.

Q. Okay. And that -- the account that he uses to pay your expenses directly, what financial institution is that account at?

THE WITNESS: Counsel, am I required to tell that?

MR. DONIGER: Yeah, I think the institution is fine.

THE WITNESS: That's [redacted]

Q. (BY MS. NASHON) Okay. So other than the account at [redacted] and the account at [redacted] are there any other accounts?

A. [redacted]

Q. Any others?

A. Not that I know of.

Q. And do you continue to have money invested through [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. So you have one account that you know of

with [redacted], and [redacted]

A. [redacted]

Q. And that's the account that you used to post a bond in this case?

A. Yes.

Q. And then you have -- additionally, you have a Roth IRA, but you don't know where it is?

A. Yes. I named it in the declaration, and I can't remember today whether it's with [redacted] or not. I don't know.

Q. And do you intend to keep your accounts with [redacted]?

A. [redacted]

Q. Are you comfortable with having your accounts managed by your ex-husband?

[redacted]

Q. Have you had a discussion with [redacted] about the tax liability considering you'll be filing married?

A. No.

Q. You don't have any agreement with him regarding those tax consequences or who's going to

pay that?

A. [redacted]

Q. Is that an agreement that you reached with him?

A. He has no responsibility for paying that. That's my understanding, so I plan to pay that.

Q. And that will come -- that will be part of your joint tax return though; correct?

A. [redacted] s[redacted]

Q. Who owns the other 51 percent of [redacted]?

A. [redacted]

Q. He owns 100 percent?

A. [redacted]?

Q. Uh-huh.

A. I don't know.

Q. You don't know who his partner is?

A. No. I can't recall his name.

Q. When was CVG formed?

MR. DONIGER: So this question seems to be beyond the scope of the permissible topic of the deposition of the deponent's ability pay judgment. I'm going to instruct her not to answer.

MS. NASHON: There has been no

adjudication of the validity of these transfers, of the validity of the division of assets, and the characterization of CVG as separate property for purposes of Ms. Freeman's ability to pay a judgment in this case, so I believe that those questions regarding CVG that was an asset of the marital estate presumably for many, many years is relevant to this deposition.

MR. DONIGER: Well, Alaska's not a community property state.

MS. NASHON: It doesn't matter. There's still marital assets.

MR. DONIGER: And there's an agreement dividing that up, and if you want to claim fraudulent conveyance or whatever you want to claim, I mean, you're free to pursue that, but that's a separate claim from her current -- what she currently --

MS. NASHON: It may be a separate claim, but it's certainly one that the judge seemed to indicate she was -- saw the validity of and had concerns about the validity of the divorce and the property settlement agreement.

MR. DONIGER: So, look --

MS. NASHON: And the declaration of

Ms. Freeman's longtime best friend I don't think goes to establish the actual law and how this will be treated if it is subject to further litigation, whether in this case or a fraudulent transfer case.

MR. DONIGER: Look, all that may well be, and you may have whatever claims you may have. The thing is Ms. Freeman filed a declaration in opposition to your motion for attorney's fees.

MS. NASHON: Uh-huh.

MR. DONIGER: You asked the Court to conduct discovery, to take a deposition on that declaration and what she talked about. This is well outside the scope of it.

MS. NASHON: That's not -- that is completely inaccurate.

MR. DONIGER: Let's take a look.

MS. NASHON: Your client is essentially a judgment debtor at this point, and she is claiming the inability to pay and has put her financials and all of her financial condition very plainly at issue for purposes of this litigation.

MR. DONIGER: So you're -- you're talking about in this -- in your reply brief, you're talking about Ms. Freeman, what she -- the declaration she put forward, and you say:

"To the extent the Court considers giving her the benefit of the doubt on this issue, it should first allow limited discovery into her finances so the truth is available for future decision."

MS. NASHON: Uh-huh.

MR. DONIGER: Her finances is not open season on any claim of other conveyances that you want to, you know, undo or whether -- you have whatever claims you have, but --

MS. NASHON: Transfers and finances that have changed throughout this litigation within days of a decision in our favor absolutely is relevant --

MR. DONIGER: Within days?

MS. NASHON: -- and it was very --

MR. DONIGER: Well, that's -- that's the big -- that's the big lie.

MS. NASHON: -- I mean, that's convenient.

MR. DONIGER: I mean, the divorce was all well before there was any judgment in your favor. It wasn't finalized until after, but it had begun before, but you know that.

And, again, the Court said Defendant may depose Plaintiff on her ability to pay. Her ability to pay is her ability to pay. It's -- her current

ability to pay is based on the assets that she has. If you want to undertake some other case, some other thing after a judgment, you're welcome to do that, but that's basically trying to change the assets that she has as opposed to the assets --

MS. NASHON: She went ahead and changed the assets that she had in order to avoid a 3-million-dollar judgment in this case --

MR. DONIGER: Well, false. But --

MS. NASHON: -- and she changed them on the eve of getting a judgment against her and the judgment to pay fees against her, and so I am absolutely entitled --

MR. DONIGER: No such thing happened.

MS. NASHON: -- to explore that transfer of assets and the validity of that transfer of assets.

MR. DONIGER: So you and I are going to have a fundamental disagreement on that. This --

MS. NASHON: So you are instructing her not to answer when CVG was formed? That's clear, yes?

MR. DONIGER: I'm instructing her not to answer questions about CVG as a company that she has no interest in.

MS. NASHON: Has she ever had an interest in CVG?

MR. DONIGER: Her current ability to pay has nothing to do with -- I mean, I don't know the answer, but --

MS. NASHON: Yeah, [redacted]? Is [redacted] and that's not relevant to her financial ability to pay?

MR. DONIGER: You can go gangbusters on a fraudulent conveyance action. It's going to get you nowhere because it's not. But that's not what the Court allowed this limited deposition on.

MS. NASHON: Well, we'll find out tomorrow when we talk to the Court in the morning what this limited deposition is going to be about.

So you -- to be clear, you're instructing her not to answer when [redacted]

MR. DONIGER: Do you even know the answer?

THE WITNESS: I don't know the answer.

MR. DONIGER: Okay. Then fine.

Q. (BY MS. NASHON) Was it formed during the marriage?

A. Yes.

03:27:59 Q. Okay. And you don't know who owns the other half of it?
03:28:04 A. I don't know his name, no.
03:28:06 Q. Did you give [redacted]
03:28:19 A. [redacted]
03:28:20 Q. Did you use any of [redacted]
03:28:25 A. [redacted]
03:28:25 Q. [redacted]
03:28:32 A. [redacted]
03:28:36 Q. What monies were used to acquire the [redacted]
03:28:40 MR. DONIGER: Objection. Calls for speculation. Lacks foundation. And I'm going to object it's beyond the scope of the limited deposition topic and instruct you not to answer.
03:28:52 THE WITNESS: Okay.
03:28:57 Q. (BY MS. NASHON) [redacted]
03:29:05 A. [redacted]
03:29:07 Q. [redacted]

A. [redacted]

Q. Who would know?

A. [redacted] would know, but I don't think we have anything. So other than what's in the PSA.

Q. Do you have any separate property that was not adjudicated as part of the property settlement agreement?

A. No.

Q. Does [redacted] have any separate property that was not adjudicated as part of the property settlement agreement?

A. No.

Q. So it's your position that [redacted] has -- I'm sorry -- [redacted]

A. [redacted]

Q. And that's it? No other separate property?

A. Nope.

Q. Any other real estate?

A. No.

Q. What's the mortgage payment on your primary residence?

A. I'll give you a ballpark.

Q. Uh-huh.

03:30:46 A. It's 4,000 and a few hundred dollars with, as I explained in my declaration, it's on an adjustable rate arm, and that payment almost doubles in February of 2027.
03:31:05 Q. When did you first take out the mortgage?
03:31:07 A. I don't recall when we purchased the property.
03:31:14 Q. Was it around 2019?
03:31:18 A. I'm not sure.
03:31:22 Q. Has it adjusted previous to February 2027?
03:31:28 A. No.
03:31:38 Q. And is it scheduled to adjust annually after February of 2027?
03:31:43 A. I don't know.
03:31:46 Q. How do you know it's going to double in February of 2027?
03:31:50 A. Because as part of the divorce, we had to go through the paperwork, the mortgage statements, and what was the -- what were the financial consequences with our respective counsel.
03:32:03 Q. Did Trent have counsel?
03:32:05 A. Yes.
03:32:05 Q. Who was his counsel?
03:32:07 A. I don't know.
03:32:13 Q. Was it Jennifer Holland?

A. No.

Q. [redacted] together to achieve a lower interest rate.

What have you done to work together to achieve a lower interest rate?

A. Well, I haven't been able to do anything, but [redacted] is making repairs on the unit to qual- -- try to qualify for a refinance.

Q. Is he doing those repairs himself?

A. Yes, and then with help from various handymen.

Q. What kind of repairs is that?

A. Weather stripping on all of the doors, grout in kitchen and bathrooms, paint of the residence. The front door is damaged and needs repair or replacement, I don't know which. The hardwood floor has some gouges. There is a dishwasher leak. Shower doors are broken.

I know there's more, but I can't recall all of it here. There's a list of things.

I think the fireplace is broken. In the garage, there's a water faucet, and that's broken.

I can think about the things that I use that are broken, but I know there's more than that.

I just can't think of what they are, all of them, today.

Q. And is the plan to refinance in both of your names or just your name?

A. I think in the PSA, it would be in both of our names. I can't afford to buy him out.

Q. Do you have any mortgage or rental obligations on any other real property?

A. No.

Q. When did you take out the second mortgage on the [redacted]?

A. That was done under Trent's LLC, and I don't have any information about that, about when he did that. I don't recall.

[redacted]

03:36:44 A. [redacted]
03:36:44 MR. DONIGER: Objection.
03:36:45 THE WITNESS: Well, no, he doesn't.
03:36:51 Q. (BY MS. NASHON) Where do you stay when
03:36:53 you travel to Alaska?
03:36:56 A. I'm trying to remember. I've stayed with
03:37:02 my friend [redacted] before.
03:37:11 Q. That's it?
03:37:11 A. And back when we had the Anchorage
03:37:15 property together, I'd stay there too.
03:37:18 Q. That was the property sold in 2022?
03:37:21 A. Oh, are you talking about our -- our --
03:37:24 the house that we lived in as a family?
03:37:27 Q. Well, I wasn't sure what you were talking
03:37:29 about.
03:37:29 A. Oh, okay.
03:37:30 Q. I wasn't sure which one you were referring
03:37:31 to.
03:37:31 A. Okay. So you asked where I stay when I go
03:37:35 to Anchorage.
03:37:35 Q. Uh-huh.
03:37:36 A. Often I've stayed with [redacted] --
03:37:36 Q. Uh-huh.
03:37:38 A. -- and her family. I've also stayed at
03:37:42 the [redacted].

03:37:43 Q. Have you stayed at the [redacted] property since your divorce?
03:37:50 A. No.
03:37:59 Q. When's the last time you stayed with [redacted]?
03:38:02 A. I don't recall.
03:38:11 Q. Are you the borrower or guarantor of any student loans?
03:38:17 A. No.
03:38:17 Q. Are you the borrower or guarantor of any auto loans?
03:38:23 A. I believe I am on the Range Rover Sport.
03:38:31 Q. You have a loan on that?
03:38:32 A. Oh, it's paid off. Sorry. No.
03:38:35 Q. Do you have a -- are you the borrower or guarantor on any other auto loan?
03:38:42 A. No.
03:38:42 Q. Are you the cosigner on any financial obligations on behalf of anyone else?
03:38:49 A. No.
03:38:49 Q. Do you have any accrued property taxes?
03:38:55 A. No.
03:38:55 Q. Do you have any back taxes owed?
03:38:59 A. No.
03:38:59 Q. Do you have any payment plan with the

03:39:02 IRS --

03:39:02 A. No.

03:39:05 Q. -- for the payment of taxes?

03:39:14 So other than the loan from [redacted] for the
03:39:18 litigation that we'll get into and you mentioned
03:39:22 money loaned to you from your [redacted], do you owe
03:39:26 money to any other person or entity for any reason?

03:39:30 A. No.

03:39:36 Q. And have you discussed with [redacted] how you
03:39:41 intend to repay the debt for the litigation?

03:39:44 A. No.

03:39:49 Q. Do you own any insurance policies?

03:39:55 A. No.

03:39:56 Q. Are you the beneficiary of any insurance
03:39:59 policies?

03:39:59 A. Under the PSA, I'm the beneficiary of a
03:40:02 life insurance policy to guarantee the spousal
03:40:07 support right now.

03:40:08 Q. Was that an insurance policy obtained just
03:40:11 for purposes of the divorce?

03:40:14 A. I don't know.

03:40:15 Q. Do you know if there's a cash value to
03:40:19 that insurance policy?

03:40:20 A. I don't know.

03:40:24 Q. Do you have any annuity contracts?

A. No.

Q. Do you have a plan for supporting yourself when your spousal support expires in five years?

A. I hope to be returned back to practicing law.

Q. And this PSA is not subject to modification according to its terms; is that correct?

A. Correct.

Q. Okay. So what happens if you are not able to recover your health?

A. I don't know.

Q. Under the PSA, you have a spending limit of 3,000 per month on two credit cards. Is that 3,000 per credit card or 3,000 total?

A. Total.

Q. Have you ever surpassed that limit?

A. I don't know. I think I did one month.

Q. And when you surpassed the limit, you're meant to pay for any excess out of your own funds; correct?

A. I don't have any funds to pay for the excess out of, but yes.

Sorry.

Q. And did Trent cover that excess amount?

03:42:22 A. Yes, and he let me know.
03:42:32 Q. Does the $3,000 include the monthly cost of your doctor?
03:42:38 A. No.
03:42:50 Q. How much were your attorney's fees for the divorce?
03:42:59 MR. DONIGER: I'm going to object to this as going beyond the scope of the examination and instruct her not to answer.
03:43:07 Q. (BY MS. NASHON) Did Trent pay your attorney's fees for the divorce?
03:43:13 A. Yes, Trent is paying for the attorney's fees under the divorce.
03:43:34 Q. Do you continue to have attorneys who represent you on an hourly basis in this case?
03:43:40 A. No.
03:43:41 Q. When's the last time you were represented by attorneys that you paid by the hour?
03:43:46 A. Years ago.
03:43:50 Q. How many?
03:43:52 A. It was at the beginning of the case. I can't recall.
03:44:25 Q. How much have you paid your attorneys in this case so far?
03:44:29 MR. DONIGER: Which case?

MS. NASHON: This litigation.

MR. DONIGER: It's beyond the scope, and I'm going to instruct you not to answer based on that and privilege.

MS. NASHON: If she has paid a million dollars, I think that certainly goes to her financial ability to pay attorneys' fees.

MR. DONIGER: If she has nothing in her bank account and she has no income right now, that's her ability to pay regardless of what she paid in the past.

MS. NASHON: That is not going to -- you know that's not going to stand. Like, you're just guaranteeing that we have to come back here and do this again.

Q. (BY MS. NASHON) How much have you paid your experts in this case?

A. I don't know.

Q. Did you pay Kathryn Reiss to write her declaration in June?

A. No.

Q. Do you owe Kathryn Reiss for preparing her declaration in June?

A. No.

Q. Did you pay Jennifer Holland to prepare

her declaration?
A. No. I don't know. No.
Q. Is the Law Office of Lynne Freeman a professional entity of any kind?
A. I don't know what that means.
Q. A PC, an LLC, an Inc.?
A. It used to be an LLC.
Q. Okay. When did it cease being an LLC?
A. I don't know.
Q. Five years ago? Ten years ago?
A. I'm not sure.
Q. When's the last time it filed taxes?
A. I don't know that either.
Q. Is it still an entity -- a functioning entity of some kind?
A. No.
Q. Does it have an IOLTA?
A. I believe the IOLTA is closed.
Q. Does it have any other accounts?
A. No.
Q. When did -- was the IOLTA closed?
A. That's been years.
Q. Five, ten, twenty?
A. Not sure.
Q. Do you have -- does it have physical

03:47:09 offices?
03:47:10 A. Not anymore.
03:47:10 Q. When's the last time it had a physical
03:47:15 office?
03:47:15 A. Probably 2021.
03:47:17 Q. Do you still utilize a signature block
03:47:44 that refers to the Law Office of Lynne Freeman in
03:47:48 your emails?
03:47:48 A. Not now.
03:47:49 Q. When did you stop?
03:47:51 A. Sometime in the last couple months.
03:48:13 Q. Are you a member of any legal
03:48:15 organizations?
03:48:16 A. Other than the Alaska Bar Association, no.
03:48:20 Q. Have you ever taught any courses?
03:48:25 A. Informally a long time ago, I taught
03:48:31 voluntarily high school volun- -- I don't even know
03:48:39 what it was called. It was part of a program where
03:48:42 they had attorneys volunteer and teach at high
03:48:45 school. You're not paid. It's just a program.
03:48:48 Q. Do you recall when that was?
03:48:51 A. Would have been when I was a baby lawyer,
03:48:54 so sometime in the '90s, late '90s.
03:48:58 Q. Any other courses?
03:49:00 A. No.

Q. Have you written any articles, treatises, or textbooks?

A. No.

Q. When you practiced law, did you bill by the hour or were you contingency or flat fee?

A. I billed by the hour.

Q. What was your hourly rate?

A. It varied depending on the year.

Q. What was the range?

A. From 250 to -- I'm not sure. Maybe $400 toward the end.

Q. In one of your previous declarations, you said -- I'm going to quote it:

"I am the plaintiff in this action. I am also an attorney and have been acting as such in my own case performing legal research, drafting motions, and so on."

Was that true when you said it?

A. It was true when I said it.

Q. Did it become untrue at some point?

A. Yes.

Q. When was that?

A. I'm not sure. As I got sicker with what's going on with me, I could not do as much and had not been able to.

03:50:18 Q. And you don't recall when that was?
03:50:19 A. No.
03:50:20 Q. Last year? The year before?
03:50:22 A. I don't know.
03:50:30 Q. Did you assist with the first round of summary judgment briefing in this case?
03:50:38 MR. DONIGER: Vague and ambiguous as to "assist." Calls for attorney-client communications. I'm going to instruct her not to answer.
03:50:45 Q. (BY MS. NASHON) Did you write any portion of any draft of the summary judgment briefing, the first round of summary judgment briefing in this case?
03:50:57 THE WITNESS: Counsel?
03:51:00 MR. DONIGER: Well, I mean, you have her declaration that she did the indices. Is that -- are you excluding those or are you including those?
03:51:14 MS. NASHON: I'm asking broadly.
03:51:16 MR. DONIGER: So...
03:51:18 MS. NASHON: She said drafting motions. I'm trying to understand what motions she drafted and how much of them and when. It's relevant to her ability to work.
03:51:32 MR. DONIGER: It's not. It's relevant to her ability to work at a point in time in the past.

MS. NASHON: Yeah, and I'm certainly asking questions as to how recently that stopped.

MR. DONIGER: And you also -- you know what, I think we need to take a break because this implicates attorney-client communications, and we need to have a conversation about it before she can answer.

THE VIDEO TECHNICIAN: Do you agree to go off?

MS. NASHON: That's fine.

THE VIDEO TECHNICIAN: The time is 3:51 p.m. We are off the record.

(Recess from 3:52 p.m. to 4:03 p.m.)

THE VIDEO TECHNICIAN: The time is 4:03 p.m. We are back on the record.

MS. NASHON: Can you read back the last question, please, Madam Court Reporter?

THE COURT REPORTER: Yes. One moment.

(Requested portion was read back.)

THE WITNESS: The answer is no.

Q. (BY MS. NASHON) What motions have you written in this case?

A. None.

Q. So when you said that you were drafting motions, what were you referring to?

04:04:02 A. Reviewing motions, assisting with the pieces of the comparisons, page numbers, similarities, working on the motions in that capacity.

04:04:21 Q. Okay. What legal research did you perform?

04:04:27 A. I would, of my own initiative, look up cases sometimes to try to understand the cases that were cited in the briefs or in the court orders.

04:04:41 Q. And you did not perform legal research in order to assist your counsel in this case?

04:04:48 A. I tried. Yes, I tried of my own volition to try to do that, but it was not helpful.

04:05:12 Q. Did you draft any portion of any of the briefing on the second round of summary judgment?

04:05:20 A. No.

04:05:21 Q. Are you doing anything to assist with the appeal?

04:05:24 A. No.

04:05:56 Q. So when you said you had been acting as an attorney in your own case, what did you mean?

04:06:02 A. I meant reviewing motions, trying to understand the cases, about what they said, and offering suggestions sometimes as I could, looking at the similarities, making sure I agreed with what

04:06:26 was being written about them.

04:06:35 Q. So you never provided a first draft of a
04:06:38 motion?

04:06:39 A. No. Never.

04:06:40 Q. You never drafted portions of motions?

04:06:44 A. No.

04:06:53 Q. You previously declared that between 2021
04:07:02 and 2022, you communicated about the case with
04:07:09 Ms. Michelle Bittner, who was, quote:

04:07:11 "A civil litigation attorney, and we
04:07:14 regularly work for and with one another.
04:07:17 I basically represent her from time to
04:07:19 time and vice versa for the purpose of
04:07:23 rendering legal advice to each other."

04:07:25 Do you recall making that statement?

04:07:27 A. I don't recall it.

04:07:30 Q. Okay. Was it true when you said it?

04:07:33 A. Yes.

04:07:33 Q. Okay. And when was the last time that you
04:07:37 performed work for Ms. Bittner?

04:07:44 A. The premise of how that's being worded
04:07:48 isn't correct, as in "work for."

04:07:51 Q. Okay. What does "work for" mean?

04:07:53 A. And the answer -- as one colleague to
04:07:55 another providing information or advice, Ms. Bittner

04:08:01 was taking family law cases pro bono and would call
04:08:07 me and ask for advice about how to do something or
04:08:12 what kind of motion she might file, and I would give
04:08:16 her advice about that. And I don't recall, in
04:08:20 answer to your question, when the last time that
04:08:22 was. It's been a long time.

04:08:23 Q. And what kind of work did she do for you?

04:08:26 A. Michelle would give me advice about
04:08:29 whether -- what she thought of a court order or what
04:08:34 she thought about I should do next in response to a
04:08:44 court order.

04:08:47 Q. So Ms. Bittner, when you said she's a
04:08:50 civil litigation attorney, she was also a family law
04:08:55 lawyer?

04:08:55 A. She was practicing doing some family law
04:08:57 pro bono, yes.

04:08:59 Q. And that was between '21 and '22?

04:09:02 A. If that's -- yeah, I think so.

04:09:04 Q. And you said you represent her from time
04:09:06 to time?

04:09:06 A. I've never represented Michelle. If I
04:09:09 used those words, I do not know in what that means.

04:09:14 Q. So the words were:

04:09:16 "I basically represent her from time
04:09:18 to time and vice versa for the purpose of

04:09:21 rendering legal advice to each other."

04:09:23 A. For the purpose of giving legal advice, yes. Not represent in the capacity of she's a client and I'm a client and I'm going to go to court for her.

04:09:33 Q. So she has never represented you?

04:09:36 A. No.

04:09:36 Q. And you have never represented her?

04:09:38 A. Not in a capacity as a lawyer with a client, no.

04:09:50 Q. Okay. And have you ever represented clients jointly with her?

04:09:58 A. Not in an entry of appearance. I can think of one instance where we were co-counseling a client.

04:10:14 Q. Okay. When was that?

04:10:18 A. It was when my son was in high school, so I can't recall the year of this, but it was a student at her high -- at the high school where her son attended.

04:10:29 Q. Okay.

04:10:39 A. There was no money involved.

04:10:41 Q. And Ms. Bittner's never been your attorney in this case?

04:10:44 A. She's offered me -- no. Not a formal

entry of appearance, no.

Q. Has Ms. Holland represented you in any case other than your divorce?

A. No. Well, yes. Do you mean, like, a formal entry of appearance lawsuit?

Q. Have you ever considered her your attorney in any case other than your divorce?

A. My --

MR. DONIGER: Hold on a second. I'm going to have to ask unless -- again, unless there is some reason why this bears on her ability to pay a judgment, this is well beyond the scope of this deposition, and I'm going to instruct her not to answer.

MS. NASHON: Because she has described in previous declarations how she performs work for these people and they perform work for her and work as legal consultants and then trade, and so I'm asking her about that because at the time that she is now saying she was unable to work, she has a previous declaration talking about the work that she's doing with these people.

MR. DONIGER: Why don't you ask her about the work that she's doing, not who she considers to be her attorney? You're asking the opposite

question. Did somebody else do work for you, not did you do work for somebody else.

MS. NASHON: I'm exploring the relationship that, in her own declaration, she said went both ways.

MR. DONIGER: Okay. I under- -- I understand that. The leave that the Court has given you to inquire into her ability to pay a judgment is not an open invitation to explore her attorney-client relationships.

MS. NASHON: I'm not exploring her attorney-client relationships, but when she put her work at issue and said for the last three years, four years, she's been talking about the work she's doing, and now she's telling us that she didn't work since 2021, I'm entitled to explore that and under- -- get to the truth of that, and that's what I'm doing.

MR. DONIGER: Okay. Go for it.

MS. NASHON: Okay. Can you read back the last question, please?

(Requested portion was read back.)

MR. DONIGER: Same objection. Same instruction.

Q. (BY MS. NASHON) Have you ever provided

legal services to Ms. Holland?
A. No.
Q. You've never traded legal services with her?
A. I've offered legal advice. That's what I mean by "and trade," legal advice from a colleague to another.
Q. Is Ms. Mary McCully an attorney?
A. No.
Q. What kind of consulting work does Dr. Prinz do for you?
A. She no longer -- I don't know her anymore.
Q. Okay. What kind of consulting work did she do for you?
A. Can you read me where that's coming from, please?
Q. "Dr. Prinz performs consulting work for me, and I perform consulting work for her in exchange."
A. Okay. So Dr. Prinz is an internist, and she would look over my labs for me, and then I would look over -- she had a custody dispute with her ex, and I would look over -- she had an attorney representing her, and I would look over the custody settlement agreement that her attorney drafted for

her. And that's it.

Q. When did you overlook her custody agreement?

A. It's been a very long time. I don't recall. Her kids have graduated from college.

Q. And what about Wendi Bates? What kind of consulting work does she do for you?

A. Can you read to me the sentence of what I said?

Q. "Ms. Bates performs consulting work for me, and I consult with her in exchange."

A. Okay. So what was your question to me about --

Q. What kind of consulting work does she perform for you?

A. She no longer does, and she did photography for me.

Q. What kind of -- like, for business?

A. Family photography.

Q. And what kind of consulting did you do for her?

A. A very long time ago, I reviewed her dissolution paperwork with her ex-husband.

Q. When was that?

A. Let me try to do the math for a moment

here to give you a ballpark estimate. It would be when I was in practice in Alaska for money. So I don't recall the exact date. It's going to be --

Q. So it would be more than nine or ten years ago --

A. Yes.

Q. -- based on earlier framing?

A. Yeah.

Q. And Ms. Jennifer Ramsey, what kind of consulting work did you do for her?

A. When she was going through her divorce represented by counsel, she would ask me for my legal opinion about various matters in her divorce.

Q. When was that?

A. I don't recall. She's been divorced a while too.

Q. More than five years?

A. More than five years.

Q. More than ten years?

A. I don't know.

Q. And what kind of consulting work did she do for you?

A. I no longer recall.

Q. Do you remember the last time she performed consulting work for you?

04:18:38 A. No.

04:19:17 Q. So at your deposition in this case when asked if you were currently practicing law, you said:

04:19:23 "I'm not practicing law in traditional sense. I'm doing consultant work for people who can't afford attorneys, and I do that for free."

04:19:34 Was that a true statement when you said it?

04:19:36 A. Yes.

04:19:37 Q. Okay. And that was in 2023; correct?

04:19:40 A. Yes.

04:19:41 Q. What consulting work were you doing in 2023?

04:19:46 A. I was assisting Michelle by answering questions with her -- for her about the divorces that she was helping people with or the custody cases she was helping me with, and I would give her advice on what kind of motion to file.

04:20:08 I also believe that I had a friend going through a divorce represented by counsel who would also ask me for my opinion about various matters in her divorce.

04:20:35 Q. So you testified:

"I'm paying Michelle Bittner in trade. I do family law consult work for her, and I'll do cases for her -- for her clients where they need to go to an entity or something that she cannot appear at, I do that for her, and we trade with one another."

A. Uh-huh.

Q. Is Michelle -- Michelle Bittner is an attorney in Alaska?

A. Anchorage. Uh-huh.

Q. So you would go to appearances that she could not attend?

A. Yes.

Q. Okay. And that was in 2023?

A. No. It was prior to that.

Q. When was that?

A. That's the thing that I was talking about that happened when our kids were in high school.

Q. What year was that?

A. I don't recall the year. It -- it was before COVID.

Excuse me a second.

It was not a court appearance.

Q. It was not a court appearance?

A. No.

Q. Okay. What kind of appearance was it?

A. School district.

Q. So before the school board?

A. No. I can't recall the entity at the school district, but it was -- but Michelle's -- there was a conflict because her husband's firm represented that entity.

Q. So had you made a formal appearance in that case?

A. No. It wasn't a court case. It was, you know, assisting a student with a matter to do with the school district.

Q. And is that the only case that you assess -- assisted her with?

A. Other than providing legal advice when she'll ask questions about family law at the time, yes, to the best of my recollection right now.

Q. And you said that:

"We trade with one another, and we do this in trade."

What did you mean by that?

A. At that time, I might have advice that I would want to get from Michelle either about this case that I'm doing, that I'm in right now, or other

matters that I might want to ask her legal advice about.

Q. What other matters in 2023 would you want to ask her legal advice about?

A. I'm trying to remember. I don't -- I don't recall right now.

Q. So when you were asked at your deposition in 2023 about your work, you said:

"This present case takes up my time right now. It has taken over my life. This case has a lot going on in it. I'm not a copyright lawyer. I'm busy doing what I can, helping out with my lawyers as I can in the case. It's also very upsetting, so I don't really have the focus right now to be out practicing in my own field."

Why didn't you say at that time that you had been disabled for two years and that's why you weren't working?

A. I wasn't asked about my medical condition, and I did not want to volunteer that I was ill in the middle of a copyright litigation.

Q. But you disclosed your panic disorder and other conditions to the Court, but you didn't want

to disclose that you were temporarily disabled and couldn't work?

A. Correct.

MR. DONIGER: Objection. Argumentative.

THE WITNESS: It's fine.

Q. (BY MS. NASHON) And when Trent was deposed, he described you both as, quote:

"We are both two very busy professionals and splitting household chores that we cover each other all the time."

And when asked about being a busy professional, he said that you're a practicing attorney and that you practice divorce law, family law, and litigation. Do you recall that?

A. I don't recall what he said, but I believe what you're reading to me.

Q. Okay. Do you know why he would describe you as a practicing attorney in 2023?

MR. DONIGER: Lacks foundation. Calls for speculation. Essentially calls for spousal-privileged communications. I'm going to instruct her not to answer.

Q. (BY MS. NASHON) Are you going to take that instruction?

04:26:06 A. I'll take that instruction.
04:26:08 Q. And he said that your practice was located
04:26:11 in Anchorage, Alaska. Was that true?
04:26:14 A. Yes.
04:26:15 Q. In 2023, did you have a --
04:26:17 A. I didn't, no.
04:26:18 Q. -- practice located in Anchorage, Alaska?
04:26:21 A. I did not have a -- no.
04:26:23 Q. And was it true that in 2023 that you were
04:26:27 a practicing attorney?
04:26:29 MR. DONIGER: Asked and answered.
04:26:30 MS. NASHON: It wasn't answered.
04:26:37 THE WITNESS: I consider myself a
04:26:38 practicing attorney. I don't have income, and I'm
04:26:42 not able to work right now. I hope to be able to
04:26:45 return to work. I've kept my bar license active.
04:26:49 Q. (BY MS. NASHON) Okay. In what ways do
04:26:52 you continue to practice law?
04:26:53 A. I am not actively practicing law.
04:27:03 Q. Do you have any documentation of the loans
04:27:06 from Trent or his business to you with respect to
04:27:11 the litigation?
04:27:12 A. No.
04:27:18 Q. Were those always characterized as loans?
04:27:21 A. Yes.

Q. Do you have any written communications regarding the loans, texts, emails, anything contemporaneous?

A. No.

Q. And the loans that were from your husband's business, did they have to be approved by his partner?

A. No.

MR. DONIGER: Calls for speculation. Lacks foundation. Beyond the scope of this deposition.

I'm going to instruct you not to answer.

Q. (BY MS. NASHON) Are you going to take that instruction?

A. I'll take the instruction.

Q. What are the repayment terms of the loan?

A. That I am to pay him when I can pay him.

Q. Is there interest that's accruing on the loan?

A. No.

Q. And is -- and the loan is to be repaid to Trent or to his business?

A. It's to be repaid to Trent, and Trent pays it however he pays it.

Q. And isn't it true that you've indemnified

04:28:40 Trent from any damages arising from this litigation?
04:28:44 A. Yes.
04:28:44 Q. Okay. So if you have no assets, that
04:28:47 indemnification agreement is basically worthless;
04:28:51 correct?
04:28:51 MR. DONIGER: Argumentative.
04:28:56 You don't need to answer that question.
04:28:58 Q. (BY MS. NASHON) Why would -- why did
04:28:59 Trent agree to that?
04:29:00 MR. DONIGER: Calls for speculation.
04:29:02 Lacks foundation. Ask Trent.
04:29:06 MS. NASHON: If you know.
04:29:07 THE WITNESS: I don't know.
04:29:07 MR. DONIGER: And -- okay.
04:29:09 THE WITNESS: I can't answer these
04:29:10 questions. I can't answer.
04:29:10 Q. (BY MS. NASHON) Do you have any ability
04:29:12 to satisfy the indemnification agreement?
04:29:15 A. I don't know.
04:29:44 Q. Have you reported your disability to the
04:29:48 Alaska bar?
04:29:49 A. No.
04:29:55 Well, it depends on what you mean by
04:29:59 "reported" actually.
04:30:00 Q. What do you interpret it to mean?

A. I have had past discussions with the Alaska Bar Association about my health and whether I would keep my status as active or inactive.

Q. Okay. When did you have those conversations?

A. At various times over the years.

Q. And why have you elected to keep your status as active?

A. Because I hope to return to practice.

Q. Did you give an interview to the Anchorage Daily News?

A. Yes.

Q. Did you tell them that you're an Anchorage family law attorney who spends her winters in Santa Barbara?

A. I don't recall saying that.

Q. Do you consider that a true statement?

MR. DONIGER: Today?

THE WITNESS: Today? Yeah. Yeah, I don't know.

Q. (BY MS. NASHON) Was it true when you said it?

A. I don't know that I said those words.

MR. DONIGER: Hold on. Hold on. Lacks -- assumes facts not in evidence.

04:31:16 Q. (BY MS. NASHON) What did you tell the
04:31:19 Anchorage Daily News about yourself?
04:31:21 A. I don't know. I mean, you'd have to -- is
04:31:24 there a quote in there from me about my -- about
04:31:27 being a family law attorney and what I did? Because
04:31:30 I don't think that I did.
04:31:31 Q. The Anchorage Daily News article reported
04:31:33 you as, quote, "an Anchorage family law attorney who
04:31:35 spends her winters in Santa Barbara."
04:31:37 A. Those are the words of the reporter;
04:31:40 right? Those are not my words.
04:31:42 Q. Okay. So how did she find out those
04:31:45 facts?
04:31:45 A. I don't recall.
04:31:46 Q. Okay. So what did you tell the Anchorage
04:31:50 Daily News reporter about your background?
04:31:51 A. I don't recall. She -- I don't recall.
04:31:56 Q. When is the last time you updated your
04:31:59 website?
04:32:00 A. I don't recall.
04:32:04 Q. Have you ever updated it since you first
04:32:06 posted it?
04:32:07 A. There's been one update. I'm told that it
04:32:11 says the case is on appeal.
04:32:13 Q. When was that?

A. I don't know.

Q. Who created the website?

MR. DONIGER: Objection. This goes well beyond the scope of the deposition topic of the deponent's ability to pay. I'm going to instruct her not to answer.

Q. (BY MS. NASHON) Your website, I'll -- you may recall, describes you as a practicing attorney in the State of Alaska. So who created that website and wrote that?

A. I've been instructed not to answer, and I'm not going to answer that question.

MS. NASHON: You're instructing her not to answer that question?

MR. DONIGER: Who created the website?

MS. NASHON: That says "I'm a practicing attorney in the State of Alaska"?

MR. DONIGER: You've asked her all the questions about her being a practicing attorney in the State of Alaska, and now you're just looking for, what, just gratuitous impeachment stuff? Come on. Stop it. Get to the facts of the ability to pay.

MS. NASHON: I am entitled to ask her all the questions I want to ask her about how she is

04:33:16 constantly contradicting herself since at least 2023
04:33:19 up until today by describing herself --
04:33:21 MR. DONIGER: No, you're --
04:33:21 (Overlapping speakers.)
04:33:21 MR. DONIGER: You can ask all the
04:33:22 questions you want about her ability to pay.
04:33:22 MS. NASHON: No, because she --
04:33:22 MR. DONIGER: That's the scope of this
04:33:24 deposition.
04:33:24 MS. NASHON: Yes, and her ability to pay
04:33:26 is largely based on whether or not she can practice
04:33:27 law.
04:33:28 MR. DONIGER: Okay. So ask her all the
04:33:30 questions you want about her ability to practice
04:33:33 law.
04:33:34 MS. NASHON: Are you instructing her not
04:33:35 to answer who --
04:33:35 MR. DONIGER: As to who created her
04:33:37 website, yes. Move on.
04:33:40 MS. NASHON: Right.
04:33:43 Q. (BY MS. NASHON) Do you represent and hold
04:33:46 yourself out publicly as a practicing attorney?
04:33:50 A. At this moment in time, no.
04:33:52 Q. On your LinkedIn, do you represent
04:33:54 yourself as an attorney at the Law Offices of Lynne

04:33:58 Freeman?
04:33:58 A. Yes.
04:34:02 Q. And on your Instagram, do you represent yourself as "attorney, writer, lover of Alaska, nature, and all of Earth's creatures"?
04:34:12 A. Yes.
04:34:13 Q. And on your website, do you represent yourself as a practicing attorney in the State of Alaska?
04:34:18 A. Yes.
04:34:18 Q. And that website features a romantic photo of you and your husband on the beach; correct?
04:34:27 A. Yes.
04:34:29 Q. Okay. And you've kept that up post-divorce; correct?
04:34:34 A. Yes.
04:34:35 Q. Okay. Same thing with the photos on your Instagram and Facebook; you've kept all those photos up of you and your husband in a romantic embrace?
04:34:52 A. I'm not aware of the pictures you're talking about, but I haven't updated any of my social media due to my illness.
04:35:01 Q. Are you active on social media at all?
04:35:03 A. I am not.
04:35:04 Q. When is the last time you were active on

04:35:06 social media?

04:35:07 A. I give a like on Facebook to my friends

04:35:10 that make posts for birthdays and anniversaries and

04:35:14 things like that.

04:35:15 Q. Okay. When's the last time you were, like

04:35:18 I said, active on social media?

04:35:19 A. I gave a like on a Facebook post by a

04:35:24 friend of a sunset or something maybe yesterday.

04:35:42 Q. If you get a judgment against you for

04:35:44 attorneys' fees in this case, how do you intend to

04:35:48 pay it?

04:35:48 A. I don't know.

04:36:17 Q. Did you previously own a home in Santa

04:36:21 Barbara --

04:36:21 A. Yes.

04:36:22 Q. -- at 1225 Manitou Lane?

04:36:26 A. Yes.

04:36:27 Q. Okay. And you sold that property in 2019;

04:36:32 is that right?

04:36:32 A. I don't recall the year.

04:36:33 Q. Okay. How much did you make on the sale

04:36:37 of that property?

04:36:43 A. I don't recall the exact amount. I would

04:36:46 have to ballpark that for you.

04:36:48 Q. Okay. What's the ballpark?

04:36:59 A. I'm estimating, because I don't know for
04:37:03 sure, [redacted]
04:37:06 Q. Okay. And where did those funds go?
04:37:09 A. The funds went to a down payment of the
04:37:15 condo that I live in now and the house that we had
04:37:18 in Anchorage.
04:37:20 Q. Okay. And that was the house that you
04:37:23 bought in 2019?
04:37:25 A. Yes.
04:37:25 Q. Okay. And then you sold in 2022?
04:37:30 A. Yes.
04:37:31 Q. Okay. How long did you live in the house
04:37:48 in Santa Barbara?
04:37:54 A. I can't recall exactly because the house
04:38:03 had been damaged by a storm, and we were renting for
04:38:07 a number of years while there was a dispute with the
04:38:13 insurance company over the repairs.
04:38:15 Q. And you were living in California at that
04:38:18 time?
04:38:18 A. California and Alaska.
04:38:23 Q. And your son went to school in California?
04:38:27 A. He went to school in California some and
04:38:30 then in Alaska.
04:38:35 Q. How long did he go to school in
04:38:38 California?

MR. DONIGER: I'm sorry. I'm going to interpose an objection. And, again, happy to -- if you can tie this to her current ability to pay, that's fine. But this seems like it's well outside the scope of the deposition topics.

MS. NASHON: Whether or not she really is a Alaska resident versus a California resident is relevant to a lot of things in this case.

MR. DONIGER: Not including her ability to pay.

MS. NASHON: I completely disagree.

MR. DONIGER: How is it relevant to her current ability to pay?

MS. NASHON: Because it affects her -- not only her credibility, but her tax liability. It affects the validity of her California homestead exemption that she filed. It's relevant.

MR. DONIGER: Where her son -- how many years back are we talking about when her son --

MS. NASHON: I'm trying to find out.

MR. DONIGER: Can I get the last couple questions read back, please, and answers just to make sure I'm not missing something? I certainly don't want to be obstructive if this is proper.

(Requested portion was read back.)

04:39:59 MR. DONIGER: And I'm assuming this is 2019? This is --

04:40:02 MS. NASHON: I'm not sure. I'm trying to figure that out.

04:40:07 MR. DONIGER: All right. Yeah, I'm going to let you ask. Rather than go back further to figure out when we're talking about, I'll just let you ask your question.

04:40:14 THE WITNESS: Actually, can we go off record for a moment? Because I think I have something that would -- I would like to talk to you about to clarify this up.

04:40:21 MR. DONIGER: I mean, if it's going to get her what she needs and --

04:40:23 THE WITNESS: Well, I'm starting to feel faint, so I don't know how much longer we can go, but --

04:40:27 MS. NASHON: That's fine. Sure.

04:40:29 THE VIDEO TECHNICIAN: Do you want to go off?

04:40:30 MR. DONIGER: Yes, let's go off the record.

04:40:34 THE VIDEO TECHNICIAN: The time is 4:40 p.m. We are off the record.

04:40:38 (Recess from 4:40 p.m. to 5:00 p.m.)

05:00:08 THE VIDEO TECHNICIAN: The time is
05:00:10 5:00 p.m. We are back on the record.
05:00:12 Q. (BY MS. NASHON) Ms. Freeman, we spoke
05:00:15 about the Wells Fargo and the Northrim account
05:00:20 earlier. Prior to your divorce, were there other
05:00:23 joint accounts that you have since been removed
05:00:26 from?
05:00:26 A. There was a Northrim account that I think
05:00:32 was a joint account that was closed for the -- for
05:00:38 the divorce.
05:00:40 Q. What do you mean it was closed for the
05:00:43 divorce?
05:00:43 A. I mean to say that as part of the divorce,
05:00:46 that account was closed out.
05:00:48 Q. What happened with the money that was in
05:00:51 it?
05:00:51 A. Everything went to pay the attorneys'
05:00:54 costs and the remaining expert cost bills,
05:00:56 everything to do legally. A tax bill was paid out
05:01:00 of it. I think property taxes, all expenses, and
05:01:05 credit cards.
05:01:08 Q. How much was in it before it was closed?
05:01:12 A. I don't recall. We put our savings of
05:01:17 what we had into it to pay out all of the bills.
05:01:20 Q. Was it over [redacted]

A. I don't recall what the amount was.
Q. Okay. You said property taxes. Was that on the Alaska house?
A. I think the Santa Barbara condominium, but I'm not sure.
Q. And income taxes as well?
A. I don't know.
Q. Credit card bills, you said?
A. Credit cards, attorneys' costs.
Q. Attorneys for this case or --
A. Yes.
Q. -- for the --
And experts in this case?
A. Yes.
Q. How much did you pay the attorneys and experts in this case from that account?
A. I would have to guess about that.
Q. What's your best estimate?
A. Approximately [redacted]
Q. Anything else you paid from that account?
A. Just everything to do with the case and the outstanding bills to do with the marriage.
Q. Outstanding bills having to do with the marriage. Can you explain that to me?
A. Credit cards, tax bills, expert bills,

attorneys' costs. I can't think of anything else.

Q. Okay. Any other accounts?

A. Other than the dead, abandoned federal credit union account, I can't think of anything else, no.

Q. And you were a shareholder in [redacted]

A. [redacted]

Q. Okay. [redacted]

A. No.

Q. So was it formed solely to acquire the M Street property?

A. Yes. To my knowledge.

Q. Did CVG or anyone else pay rent to Baer Asset Management Group?

MR. DONIGER: Calls for speculation. Lacks foundation.

THE WITNESS: No.

Q. (BY MS. NASHON) Okay.

A. Not that I'm aware of.

Q. So -- well, did you rent out the space at [redacted]

05:04:45 A. A long time ago, it was rented out.
05:04:47 Q. Okay. When was that?
05:04:50 A. I don't recall.
05:04:51 Q. More than ten years?
05:04:53 A. No.
05:04:53 Q. More than five years?
05:04:54 A. I don't know.
05:04:59 Q. And what about [redacted] Isn't it
05:05:03 true that those are the offices for CMG [sic]?
05:05:08 A. I don't know if it's CM --
05:05:09 Q. Or CVG. Sorry.
05:05:11 A. It's where Trent works.
05:05:13 Q. Uh-huh. But he doesn't pay rent for that
05:05:21 space?
05:05:21 A. I don't -- I don't know.
05:05:25 Q. And Ms. Jennifer Holland, for at least at
05:05:29 some point in time, worked out of that space as
05:05:32 well; correct?
05:05:32 A. Yes.
05:05:33 Q. Did she pay rent?
05:05:36 A. Yes.
05:05:37 Q. Okay. And that rent went to BAMG?
05:05:40 A. I don't know.
05:05:41 Q. How much did she pay in rent?
05:05:46 A. I don't know the amount. It was a nominal

amount.

Q. Have you had any other tenants?

A. No.

Q. Do any other employees work out of that space?

A. Trent has a -- a receptionist.

Q. Anyone else that works for him out of that space?

A. No.

Q. When is the last time Jennifer Holland paid rent?

A. I don't know.

Q. When's the last time she rented that space?

A. I believe she's still renting that space.

Q. Do you believe that she still pays rent then?

A. I believe she probably does.

Q. But you don't know how much?

A. It's a nominal amount is all I know.

Q. Does BAMG have a bank account?

A. I don't know.

Q. Does it file taxes?

A. I don't know.

Q. You are a equal shareholder with [redacted] in

that LLC?
A. I don't know.
Q. Did you sign anything relinquishing your ownership interest in the LLC?
A. I don't recall.
Q. And did you have any ownership interest in Baer Investment Group LLC?
A. No.
Q. Did you ever?
A. No.
Q. So I have a -- okay.
Did you have a marital interest in that entity?
A. No.
Q. So in your divorce settlement agreement, it says:

"Trent shall retain 100 percent interest in BIG in exchange of which Lynne will be receiving benefit through future temporary maintenance as otherwise set forth in this agreement."

Can you explain this sentence to me?
A. That was written by my lawyer about the spousal support that I'm to receive. And, no, I -- I don't know any more than that.

Q. So you don't know why you're receiving spousal support in lieu of an interest in BIG?

A. I don't know that I understand the question. From what I understand about the PAC and the businesses, [redacted]

Q. So you're a family law lawyer. Jennifer Holland, one of your close friends, is a family law lawyer. Did you work on this document together?

A. I reviewed it. I discussed it with her.

Q. Okay. So it's your position that you had no interest, marital interest whatsoever, community property interest, marital interest, actual interest, documented interest, in BIG?

A. I have to be honest with you. I don't understand, sitting here today as I am, what BIG is.

Q. [redacted] --

A. No, I get it.

Q. -- LLC.

Is [redacted] -- it says that, in your PSA, [redacted] has a 49 percent share in an LLC created for the sole purposes -- I'm sorry, for the sole purpose of establishing group benefits and office share expenses for [redacted].

A. Right.

Q. Okay. So what group benefits and office share expenses does BIG have?

A. Okay. I don't know how to answer that except to say we're talking about health insurance policy. That's the benefits, is the health insurance policy.

Q. Okay.

A. So that the employees and me -- or his, you know, assistant, me, Trent, our child, have health insurance.

Q. And BIG has office share expenses?

A. I don't know what the office share expenses would be except perhaps utilities, maintenance.

Q. So BIG shares office space with CVG?

A. I don't -- I don't know.

Q. Okay. Did Trent make any financial disclosures to you as part of your divorce?

A. Yes, but I don't under- -- I don't

05:12:13 understand the questions that you're asking me about
05:12:15 how all of this -- I don't understand.
05:12:17 Q. Your PSA --
05:12:19 A. Yeah, I get it.
05:12:21 Q. -- says:
05:12:22 "Trent shall retain 100 percent
05:12:24 interest in BIG in exchange of which Lynne
05:12:28 will be receiving benefit through future
05:12:31 temporary maintenance as otherwise set
05:12:34 forth in this agreement."
05:12:36 A. Right.
05:12:36 Q. That sentence implies that you had an
05:12:40 interest in BIG, which you exchanged for future
05:12:43 temporary maintenance. So I'm trying to understand
05:12:46 that.
05:12:46 A. I -- I don't know if that's what that
05:12:49 sentence means --
05:12:49 Q. Okay.
05:12:50 A. -- but BIG is Trent working.
05:12:52 Q. Uh-huh.
05:12:53 A. [redacted]
05:13:05 Q. Okay. The PSA says that the -- an asset
05:13:09 of BIG is a bank account. Do you know how much

05:13:13 money was in the bank account?
05:13:14 A. At the time of the divorce, I did; but
05:13:17 sitting here today, I can't tell you that. I don't
05:13:20 know.
05:13:30 Q. Have you ever seen a profit and loss
05:13:34 statement or balance sheet for BIG?
05:13:36 A. In the past, I have, yes.
05:13:39 Q. When's the last time?
05:13:40 A. I don't recall.
05:13:41 Q. Did you review one as part of the divorce?
05:13:44 A. Yes.
05:13:46 Q. Okay. Do you recall what the assets and
05:13:52 liabilities were?
05:13:53 A. I do not.
05:14:01 Q. Do you recall what the gross annual
05:14:04 profits were?
05:14:05 A. No, I do not.
05:14:22 Q. Do you have any estimate for the value of
05:14:26 the temporary maintenance that you're receiving as
05:14:30 part of your divorce?
05:14:31 A. Yes. I know that it varies month to
05:14:36 month, but it is usually [redacted].
05:15:28 Q. Do you believe that amount is equivalent
05:15:32 to the amount of assets that you relinquished in
05:15:37 your divorce?

05:15:37 A. It's more than, according to my legal advice that I received.
05:15:47 Q. How much more?
05:15:48 A. A lot.
05:15:53 Q. Do you have a percentage?
05:15:57 A. Many multiple times more.
05:16:26 Q. When is the last time you took a vacation?
05:16:28 A. It's been nine or ten years.
05:16:36 MR. DONIGER: Amy, she just told you that there's, like, [redacted] I know one of the questions I instructed her not to answer earlier was about how much [redacted] pays for her medical bills. I think she's implicitly gotten into that. So if you want --
05:16:54 THE WITNESS: I actually have included --
05:16:54 MR. DONIGER: If you want to ask her that, go ahead.
05:16:56 THE WITNESS: -- that in there in addition to the condo and all of that.
05:16:59 Q. (BY MS. NASHON) So the [redacted] a month includes the medical bills that he is paying?
05:17:07 A. Yes.
05:17:10 THE VIDEO TECHNICIAN: One moment. The --
05:17:10 THE WITNESS: Sorry. I didn't realize.
05:17:13 MR. DONIGER: No, no, no, no, no. It's

05:17:14 fine. It's fine. You eliminate one potential
05:17:15 dispute with the Court.
05:17:20 THE WITNESS: Okay. Got it. Yeah.
05:17:20 MR. DONIGER: Give Amy the information she
05:17:24 wants.
05:17:29 THE VIDEO TECHNICIAN: Never mind.
05:17:30 Q. (BY MS. NASHON) Does that also include
05:17:32 the eDiscovery storage?
05:18:00 A. Yes.
05:18:00 MS. NASHON: Okay. I think I'm ready to
05:18:02 turn it over to Lance at this point.
05:18:07 MR. KOONCE: Okay. So we are at 5:20.
05:18:07 What do you -- do you want to keep going for now and
05:18:12 see how we do? Or --
05:18:12 MR. DONIGER: I mean, with any luck, you
05:18:16 have 45 minutes. We can be done by 6:00ish maybe.
05:18:17 So --
05:18:17 THE WITNESS: Is there any way we can do
05:18:20 before 6:00, guys? I'm trying not to faint, but
05:18:22 let's do it.
05:18:23 MR. DONIGER: Let's see what we can do.
05:18:24 Let's be aspirational.
05:18:28 THE VIDEO TECHNICIAN: Real quick, are you
05:18:31 going to be swapping seats?
05:18:31 MS. NASHON: Oh, yeah.

05:18:31 MR. KOONCE: I probably should; right? For the microphone.

05:18:32 MS. NASHON: Yeah. Yeah, yeah, yeah.

05:18:32 THE VIDEO TECHNICIAN: And then we are still on the record. Would you like to stay on?

05:18:35 MR. KOONCE: We can just -- I don't think it matters.

05:18:37 MR. DONIGER: We'll let it run through.

05:18:39 THE VIDEO TECHNICIAN: So double-checking, we're staying on?

05:18:43 MR. KOONCE: You can keep going.

05:18:43 MS. NASHON: Yeah.

05:18:45 MR. KOONCE: Yeah, we're just going to sort of...

05:18:48 MS. NASHON: Oh, sorry.

05:18:59 MR. KOONCE: Sorry.

05:18:59 THE VIDEO TECHNICIAN: And then your microphone is right there.

05:19:03 MR. KOONCE: Thank you. And you said the white dot points out?

05:19:07 THE VIDEO TECHNICIAN: Correct.

05:19:08 MR. KOONCE: Okay. Does that work?

05:19:10 THE VIDEO TECHNICIAN: Yes.

05:19:10 MR. KOONCE: Okay.

05:19:10 EXAMINATION

05:19:23 BY MR. KOONCE:
05:19:23 Q. Ms. Freeman, you just testified earlier that you -- that you did not know the value of the bank account that was held by [redacted] is that right?
05:19:37 A. No. I did know at the time of the divorce. But today cognitively where I'm at, I don't recall.
05:19:43 Q. Okay. Do you have any ballpark idea of what the value of the funds that were in the BIG bank account at the time of your divorce?
05:19:53 A. I feel like it was a small amount of money, but I can't tell you what that small amount is.
05:19:59 Q. Okay. With respect to the North -- was it the Northrim account that you mentioned earlier?
05:20:05 A. Uh-huh.
05:20:06 Q. You said that account was closed in connection with the divorce. That was a -- say, a checking account; is that right?
05:20:13 A. I -- I think so.
05:20:17 Q. Okay. You testified that -- that you put -- [redacted]

05:20:29 A. [redacted]
05:20:30 Q. Where was the -- where was the funds that -- where were the funds that were in savings held before you moved those funds into that account?
05:20:39 A. I don't recall which account held those. It doesn't exist anymore because it's gone.
05:20:52 Q. Okay. So that account was closed in connection with the divorce and the Northrim account was closed in connection with the divorce?
05:21:00 A. I don't know. I don't know if that account is closed. I just know there was no more money in it. We spent it to pay the bills.
05:21:11 Q. Okay. And how much money was in the account that was your savings account that you moved into the Northrim account if you recall?
05:21:18 A. I don't recall how much it was, but I think it was around [redacted] that was left.
05:21:23 Q. Okay. And you testified earlier about an insurance payment on your prior home in Santa Barbara. Was that -- what year did you get that payment?
05:21:39 A. So the payment was used for construction to fix the house.
05:21:42 Q. Okay.
05:21:42 A. And I didn't -- we didn't receive the

money directly as payment. It went into the construction company to fix it. And that was during the, I don't know, 2017, 2018, somewhere in there of construction that was going on with that house.

Q. Okay. And did you buy that home in Santa Barbara on [redacted] in 2010?

A. I don't recall the year, but that sounds about right.

Q. Okay. Did you maintain a home in Anchorage at the same time?

A. Yes.

Q. Okay. And was that a rental home in Anchorage or did you own the home?

A. That was the [redacted] property, whenever that was purchased.

Q. Understood.

A. I can't remember.

Q. And do you recall the amount that you and Mr. Baer paid for the home in Santa Barbara in -- on [redacted]?

MR. DONIGER: I'm sorry. Hold on a second.

What year is this?

THE WITNESS: 2000 --

MR. KOONCE: '10.

05:22:41 THE WITNESS: '10.
05:22:41 MR. DONIGER: We're going back 16 years on a line of inquiry about her current ability to pay a judgment? No. I'm going to instruct you not to answer.
05:22:47 MR. KOONCE: Well, I need to understand, Mr. Doniger, where --
05:22:51 MR. DONIGER: It's a hard G. Doniger.
05:22:56 MR. KOONCE: Doniger. Excuse me.
05:22:59 What I need to understand is what funds Ms. Freeman and Mr. Baer held coming out of sales of homes, coming out of income, so that I know what amount of funds they had when the divorce went into place, and therefore whether there's money somewhere else that could be used to fund a fee award. So I think all of that is relevant because I need to have an understanding. I was just about to ask about the sale of the -- the purchase and the sale of the home in Santa Barbara. And if there were proceeds from that sale, those funds went somewhere, and I can ask about that, I believe. Do you disagree?
05:23:39 MR. DONIGER: So I -- you know what, I do, but I don't want to argue with you on the record. So go ahead. What was the last question? Let me get the last question read back.

05:24:00 (Requested portion was read back.)
05:24:01 MR. DONIGER: Yeah, so what they paid for
05:24:04 has nothing to do with when they sold it, how much
05:24:04 money they pulled out of it. Like, it's just
05:24:09 nothing to do with it. I'm going to instruct her
05:24:10 not to answer.
05:24:11 Q. (BY MR. KOONCE) Okay. Do you recall what
05:24:13 you sold the house on Manitou Lane for, the amount?
05:24:18 A. I believe I answered Ms. Nashon that
05:24:23 question hours ago --
05:24:24 MR. DONIGER: True.
05:24:25 THE WITNESS: -- and I said that we had --
05:24:27 I didn't know the exact amount of what the cashout
05:24:31 was. I believe it was in the neighborhood, I
05:24:33 believe I said, of 8- or $900,000.
05:24:37 Q. (BY MR. KOONCE) Okay. Well, I'm going
05:24:39 to -- I have some public records on this --
05:24:40 A. Okay.
05:24:41 Q. -- that show the house, that you paid
05:24:45 1.799 million for the house.
05:24:47 A. Okay.
05:24:47 Q. You had a mortgage of about 1.345 million.
05:24:49 A. Okay.
05:24:49 Q. So which means you would have put down
05:24:51 450,000 at that point in time. You sold the home

05:24:54 for a little over 3 million, and it looks to me like
05:25:00 the -- that you would have cleared more than a
05:25:01 million dollars, maybe up to $2 million on that
05:25:06 sale, but maybe there were other mortgages in
05:25:09 between?

05:25:09 A. I don't know. There would have been
05:25:12 Realtor closing costs. There would have been other
05:25:14 things too. What I can tell you voluntarily is that
05:25:15 every bit -- no?

05:25:16 MR. DONIGER: No. Go ahead.

05:25:17 THE WITNESS: The money went into the
05:25:19 purchase of the condo in Santa Barbara and the house
05:25:22 in Alaska.

05:25:22 Q. (BY MR. KOONCE) How much did you put down
05:25:25 on the purchase of the condo in Santa Barbara?

05:25:26 A. I don't know.

05:25:27 Q. Like, the public records show that you put
05:25:29 down about $335,000.

05:25:32 A. Okay.

05:25:32 Q. Does that sound right?

05:25:32 A. Sure.

05:25:33 Q. Okay. How much did you put down on the
05:25:36 home on Evangeline Lane in Anchorage?

05:25:37 A. I don't recall.

05:25:38 Q. Okay. The public records show about

05:25:42 $200,000. Does that sound right?
05:25:44 A. Sure.
05:25:44 Q. Okay. So you've now put down about a half a million dollars out of the, you said, 8- or 900 --
05:25:51 A. Sure.
05:25:52 Q. -- looks like it could have been more of the prior sale.
05:25:54 You then sold the house on Evangeline Lane in Anchorage and cleared a half a million or 600,000 on that sale; is that right?
05:26:01 A. The public records will tell you exactly how much it was I guess.
05:26:04 Q. Okay. So you had cleared close to a million dollars on the sale of the home in Santa Barbara. You then used half or a little more toward -- to buy the other two homes, and then you sold one of those homes after holding it for three years for about a half a million dollars.
05:26:26 So I'm just trying to understand was there a point after the sale of that home in Anchorage where you and Mr. Baer had liquid assets of up to a million dollars from those sales?
05:26:41 A. What we had in liquidity, and there's -- can we go off record for just a second? Because I need to ask a question.

05:26:52 THE VIDEO TECHNICIAN: Do you --
05:26:53 MR. DONIGER: If it's a privilege issue --
05:26:53 MR. KOONCE: Is it a privilege issue? Or
05:26:56 is it --
05:26:56 THE WITNESS: No. I'm just going to
05:26:58 volunteer it. I just don't care. I'm just going to
05:27:00 be honest. I just don't care.
05:27:02 Okay. All of the house proceeds from
05:27:06 Evangeline went into this litigation to pay experts
05:27:10 all of it and costs and other things and the E
05:27:13 storage and all of that.
05:27:15 Any money that was left over from any
05:27:19 sales from Santa Barbara, we were building a house
05:27:24 in Anchorage initially, and we lost money on that.
05:27:27 The foundation was ruined, and we couldn't get a
05:27:31 full refund with the builder.
05:27:33 Q. (BY MR. KOONCE) And how much did you lose
05:27:36 on that house?
05:27:36 A. I don't know.
05:27:37 Q. Okay. So any proceeds that were leftover
05:27:41 from that sale you used to pay legal expenses; is
05:27:45 that right?
05:27:45 A. The sale on the Evangeline Lane house,
05:27:50 yes --
05:27:50 Q. Okay.

A. -- went into this litigation.

Q. And how much have you paid in expenses in this litigation today?

A. I can't tell you sitting here right now what that is. It's in declarations as to what the amounts are, but I don't know right now sitting here.

Q. In June of 2023, you signed a declaration in which you, I believe, said that you had spent -- sorry, it's July of 2023, that you had spent $580,000 in connection with this case at that point in time. Does that sound right?

A. Sure.

Q. Okay. And what did you spend $580,000 on one year and a few months into this case?

A. That is going to go to some of what I've been instructed not to answer.

Q. Well, I think the instruction not to answer was because your counsel believed that --

A. No, it doesn't have to do with your questioning. Sorry to interrupt. But it does have to do with what I was instructed previously under -- with Ms. Nashon.

Q. No, no. I understand that.

A. Okay.

05:28:56 Q. But I think that the -- that you've now
05:28:58 put into -- into issue the use of the funds from the
05:29:02 Evangeline home --
05:29:03 A. Okay.
05:29:04 Q. -- and that you've used it for litigation.
05:29:07 I'm trying to understand whether or not the
05:29:08 statements that you've made in the divorce filings
05:29:13 and in your declarations are true or not. I think
05:29:16 I'm entitled to probe that.
05:29:18 So I am trying to understand what has
05:29:21 happened with the funds from the Evangeline home,
05:29:24 and you've said this is where you spent it. I'm
05:29:26 just trying to verify with you what you spent that
05:29:29 on and -- you know, in the litigation.
05:29:31 MR. DONIGER: I'm going to instruct her
05:29:32 not to answer.
05:29:33 MR. KOONCE: On what grounds?
05:29:34 MR. DONIGER: On the grounds that this
05:29:36 goes well beyond her ability to pay a judgment. She
05:29:40 had money. She spent it. She doesn't have it.
05:29:42 She's told you every bank account. She's told you
05:29:46 everything about this. Her ability to pay a
05:29:47 judgment is her ability to pay a judgment regardless
05:29:50 of what she or didn't spend money on in the past or
05:29:53 how that distribution of proceeds was allocated.

MR. KOONCE: Where the funds -- where -- if she had funds and her husband had funds, and those funds have been sheltered, it absolutely goes to the --

MR. DONIGER: I understand.

MR. KOONCE: -- whether they're -- and you're making a -- you're stating that the things that have been said in the divorce proceeding and in the declarations are true. I am entitled to probe whether they're true in order to determine whether she has an ability to pay a fee award.

MR. DONIGER: Up to -- up to a limit, and that limit ends at the attorney-client relationship.

MR. KOONCE: Well, I'm not asking about the attorney-client relationship. I'm asking how much she paid in --

MR. DONIGER: There's literally --

MR. KOONCE: -- litigation costs. That's not the attorney -- I mean, that's not about legal advice. That's about how much -- people ask that in depositions all the time, and businesses answer that all the time.

MR. DONIGER: If you want to ask her about the experts, other costs, like, that's fine. But her -- well --

MR. KOONCE: I'm not asking about the relationship. I'm asking how much she has paid out of pocket for attorneys' fees to date.

MR. DONIGER: And I think she answered that.

MR. KOONCE: She has not answered that.

MR. DONIGER: It's literally in the declaration -- or, okay. For attorney's fees to date.

MR. KOONCE: Right.

MR. DONIGER: Attorneys' fees specifically?

MR. KOONCE: Specifically. I'm trying to get a breakdown of the 580,000 that was spent.

So are you going to instruct her not to answer?

MR. DONIGER: Are you able to separate out attorneys' fees from other costs of litigation?

THE WITNESS: Not accurately.

MR. DONIGER: Well --

THE WITNESS: I can tell you that that amount includes that. That's all I can tell you.

MR. DONIGER: Okay. Okay. I mean, that's what she can tell you.

THE WITNESS: That's all I can tell you.

Q. (BY MR. KOONCE) And do you have a sense of how much you have spent on eDiscovery costs?
A. They are [redacted] a month right now because it's in storage. When it's active and we're going in litigation, it's more than that.
Q. How long has it been inactive?
A. I'm not sure. I'm not sure.
Q. Okay. What about how much have you paid expert witnesses?
A. A lot. I can't break it down for you.
Q. Okay. Are there other litigation costs beyond expert witnesses, eDiscovery, and your attorneys' fees?
A. Attorneys' costs --
Q. Okay.
A. -- and cost of binders and other fees related to the federal court proceedings.
Q. Okay. And do you have records of all these expenses?
A. Yes.
Q. Okay. Since July 2023, do you -- do you know, without looking at a declaration, how much you've spent since that time?
A. I don't.
Q. Okay. I believe -- and I'm trying to --

I'm actually trying to put some questions together here to make this faster, but I -- as opposed to trying to pull things out you'd have to look at, but my understanding is that with -- during the next few years that you then had loans from your ex-husband, and that amount totaled something like $720,000. Does that sound right?

A. Yes.

Q. Okay. And have you spent more than $720,000 on litigation expenses now as you sit here today?

A. Well, each month the eDiscovery adds up.

Q. Okay. Anything beyond that in --

A. The bond I had to pay for my retirement.

Q. Okay.

A. And I don't know what else there will be.

Q. Okay. But do you think that -- would you estimate that as of today you've spent more than $800,000 on your legal expenses?

A. I don't know.

Q. Previously you testified today, and I think it's also in a declaration, that you have -- that you had a loan of approximately $470,000 from your ex-husband through his business; is that right?

A. Yes.

Q. Okay. Which business was that?

A. I only know it as his business, through Trent.

Q. Okay. Well, there -- I think Ms. Nashon has asked you about the Baer Investment Group, BAMG, which is the asset management group, and CVG.

A. No, I think there's a misunderstanding on your part about what these things are.

Q. Okay.

A. Okay? BAMG is just real estate holding LLC. And Trent -- BIG has been defined in the PSA, as I understand it, as really just a bank account and benefits for employees.

Q. Okay. And what is -- and CVG is what?

A. CVG is this partnership that he has with another guy that is, like -- it's, like -- I'm not the best person to explain it. I certainly am having trouble, as I let you know, with words. But it's, like, CVG is the entity that they use for renting their office in Santa Barbara.

Q. Okay.

A. It's -- it's not anything with money. It doesn't have money in it.

Q. Okay. So when Mr. -- when Mr. Baer's business loaned you $470,000, where would those

funds have come from?

A. That would be -- I'm speculating, but the best guess is that that would come from BIG. That's Trent.

Q. Okay. And that -- so there would have been -- that's probably from that BIG bank account then; correct?

A. Yeah. That would be from his, you know, monthly stuff for eDiscovery, for this, for this, for this, for that.

Q. Okay.

A. Yeah.

Q. And then you testified -- I think you were asked earlier what -- about your -- your adjusted gross income each year, and I think Ms. Nashon asked you about a few different years.

Ballpark, what -- how much does Trent earn each year?

A. I don't know exactly.

Q. Understood.

A. And am I to throw out what I think it is?

MR. DONIGER: Hold on. Hold on.

I'm going to object. This is beyond the scope of her ability to pay of her deposition, his income. And instruct her not to answer.

MR. KOONCE: Well, she entered into a divorce in which she gave up certain things in order for spousal support in a certain amount. I'd like to understand what she was giving up, and I think we're entitled to know that because that allows us to understand whether this transaction, this divorce transaction, was one that is meant to shelter assets or not, and I think that his -- what he makes each year is clearly relevant to the decision to structure a divorce in that way. I mean, I don't know how you would have a divorce and not at least have an understanding of what your spouse is making each year if you're then going to agree to a particular type of structure.

MR. DONIGER: Okay. But I feel like we've already answered this stuff though, but --

MR. KOONCE: She refused to answer or you instructed her not to answer.

MR. DONIGER: Well, no, that's not really true. That's not really true. She said she didn't know how much he made, but that she saw the records and -- I mean, I don't want to testify for her. But she saw the records. She saw the profit-and-loss statements in connection with the divorce, she testified to that, and what she got in terms of

monthly payments were way more than -- I mean, she testified to that.

MR. KOONCE: I heard that. I'm not asking the same question.

MR. DONIGER: Oh, I'm sorry. Go ahead.

Q. (BY MR. KOONCE) I'm asking what the -- what the -- I mean, you know, in any given year in the past ten years, do you know what your former spouse made in income?

A. I don't want to get the answer wrong and tell you the wrong thing. I am cognitively impaired today, and at this period of time, I can give you a ballpark guess, and I don't want to be slammed if I'm wrong, and I don't want to be saying it's too much. Do you want me to give a ballpark guess? Does -- I know what I've seen.

MR. DONIGER: No one wants you to guess --

THE WITNESS: Right.

MR. DONIGER: -- if you really don't know. But if you have an estimate or some sense --

THE WITNESS: I have an idea. I can tell you. You know, you guys are down a rabbit hole.

What I have seen that I recall is around 200,000, 250,000.

MR. KOONCE: Okay.

05:39:03 THE WITNESS: And I can't do better than that today.
05:39:08 Q. (BY MR. KOONCE) Okay. You've testified that he is paying 15,000 a month --
05:39:15 A. Yes.
05:39:16 Q. -- in support. That, by my calculation, is $180,000 a year.
05:39:21 A. Yeah.
05:39:22 Q. So how do you on a salary or income of 200 or so thousand a year after tax cover that amount?
05:39:31 A. He doesn't have much money leftover for anything.
05:39:35 Q. I don't think he'd have enough money to cover this from what you're saying.
05:39:40 A. Yeah, so I haven't -- I don't know, like I said, exactly what it is right at this minute. I did at the time we divorced.
05:39:44 Q. Uh-huh.
05:39:47 A. From what I recall, I remember an AGI around that amount. That's the best I can give you right now.
05:39:54 Q. Okay. I'm now just trying to move through this quickly.
05:40:36 At your deposition in -- I'm sorry. Strike that.

In your declaration in July of 2023, you also said, quote:

"During his deposition, my husband stated that there was a time when I was flying back and forth between California and Alaska. It is true that I did that several years ago, just as it is also true that I went five years without flying, and I have not been on a plane these past two and a half years."

So I'm just wanting to understand. That means that as of July 2023, you would not have been on a plane since January of 2021; correct?

A. That would be correct.

Q. Okay. I have -- and I can pull them up, but I know you're having vision issues. We've seen Facebook posts of you with your son and your -- and Mr. Baer in -- in Alaska in March of 2022. So I can pull those up and show unless those are dated March of 2022 --

A. It would be that those would not be current photos. I was not in Alaska in March of 2022.

Q. Would you have been --

A. I would have reposted old photos.

05:41:49 Q. Okay.
05:41:51 A. Yeah.
05:41:52 Q. There are pictures of you with your -- 05:41:56 with Nathan Baer, your husband's brother and his 05:42:01 family, including his daughter --
05:42:02 A. On a hike.
05:42:03 Q. -- on a hike.
05:42:04 A. Yeah.
05:42:05 Q. Was that also in Alaska?
05:42:06 A. Yeah.
05:42:06 Q. And when was that? Do you --
05:42:07 A. When our child was in high school.
05:42:07 Q. Okay. So --
05:42:09 A. So it was before 2021.
05:42:11 Q. Okay. And same, there are photos of you 05:42:14 on a boat also dated March of 2022 in Alaska. Those 05:42:17 are just all older pictures?
05:42:20 A. They are.
05:42:21 Q. Okay. Thank you.
05:42:33 Earlier -- strike that.
05:42:34 In your fee declaration from June of this 05:42:38 year, June 29th, you state that -- that there -- 05:42:45 that your -- your husband's BMW X5 was a total loss 05:42:53 and there were $26,000 in insurance proceeds. Where 05:42:57 did those funds go, to your recollection?

05:43:00 A. Paying bills.
05:43:01 Q. Paying bills? Okay.
05:43:03 But at that point in time before that car
05:43:07 was a loss, you and Mr. Baer both owned a BMW X3 and
05:43:14 a BMW X5 that you had in Alaska; is that right?
05:43:17 A. The BMW X5 was in Alaska, yes, that's
05:43:23 right. And it was stolen.
05:43:24 Q. Right. Okay.
05:43:35 Do you happen to know the monthly payment
05:43:37 on your mortgage on the State Street condo?
05:43:40 A. Yes. I already testified to that with
05:43:43 Ms. Nashon.
05:43:44 Q. Okay.
05:43:44 A. I believe the amount I said was 4,000 and
05:43:48 something hundred and that it will not quite double,
05:43:55 almost double, in February of 2027.
05:43:57 Q. All right. And -- and that mortgage
05:44:01 that -- so that's a -- is that an interest-only arm?
05:44:05 Is that --
05:44:05 A. Yes, it is.
05:44:05 Q. Okay. And you had a mortgage before that
05:44:07 one on this house in about the same amount, and then
05:44:10 you took out a new one in 2022 at a lower interest
05:44:15 rate with this arm; is that your recollection?
05:44:18 A. I don't -- I don't recall.

05:44:20 Q. Okay. At Mr. Baer's deposition, he -- he was asked:
05:44:34 
05:44:35 "Do you know how many clients you had approximately?"
05:44:38 
05:44:38 And he asked -- he said:
05:44:40 "Currently?"
05:44:41 The question was:
05:44:42 "Yes, currently."
05:44:43 And he said:
05:44:44 "I think she's put everything on hold currently."
05:44:47 
05:44:47 He was asked:
05:44:48 "When did she start putting everything on hold?"
05:44:50 
05:44:51 And he answered:
05:44:52 "When this -- when we were alerted of this issue," meaning this lawsuit.
05:44:54 
05:44:57 Is it accurate that you started putting everything on hold when this lawsuit arose?
05:45:00 
05:45:07 A. No. I had been sick before -- you know, for a number of years. But in 2021, in all fairness, I did have a client and made, as I said, $935 that went onto the Social Security earnings of income.
05:45:10 
05:45:15 
05:45:19 
05:45:24 
05:45:24 Q. Okay.

05:45:24 A. So I think the hope was that I would be
05:45:28 well and be able to practice.
05:45:31 Q. Okay. And so his statement that that's
05:45:35 when you started putting everything on hold relates
05:45:40 to a health issue, not to the lawsuit?
05:45:43 A. Yes.
05:45:43 Q. Okay. In your -- in the bond opposition
05:46:00 brief that your attorneys filed on your behalf this
05:46:04 year, there's a statement that reads:
05:46:06 "Any bond amount will impose a real
05:46:11 burden since it requires paying more than
05:46:13 100 percent of the bond upfront, thus
05:46:15 tying up assets that may otherwise be
05:46:16 needed for interalia litigation costs,
05:46:21 business and other regular expenses, and
05:46:23 the unanticipated emergencies that can
05:46:26 arise in life."
05:46:28 You don't dispute that your counsel filed
05:46:30 that statement on your behalf; correct?
05:46:34 A. I don't dispute that that's in the brief.
05:46:36 Q. Okay. What business expenses were being
05:46:39 referred to there?
05:46:40 A. That statement was not written about me in
05:46:43 particular. That was a general statement that was
05:46:46 written in the brief.

05:46:47 Q. So if it wasn't about your personal finances, why does it list unanticipated emergency and regular expenses, which sound like personal categories of expense?
05:47:00 MR. DONIGER: Objection. Calls for attorney-client communications to the extent that her understanding of why I made an argument that I made in a brief is in that brief. I'm going to instruct her not to answer.
05:47:14 MR. KOONCE: Okay.
05:47:15 Q. (BY MR. KOONCE) And are you taking --
05:47:15 MR. DONIGER: And I'm happy to talk to you about my thought process in making that argument.
05:47:18 MR. KOONCE: Well, you made the argument on her behalf, and she has -- has testified that she understands it was made on her behalf.
05:47:26 Q. (BY MR. KOONCE) But you're taking your client -- your counsel's instruction not to answer?
05:47:31 A. I believe I already answered your question actually.
05:47:54 Q. When you filed your complaint in this case, did you ask to recover some of your legal fees in -- with respect to any of the claims?
05:48:05 A. I don't know.
05:48:06 Q. Okay. Did you have an understanding as to

05:48:11 whether your legal fees were -- could be compensated
05:48:16 as to some of your claims?
05:48:18 A. I don't recall.
05:48:19 Q. Okay. Did you understand at the time you
05:48:21 filed your complaint that if the defendants
05:48:25 prevailed, they could ask for their fees from you?
05:48:28 MR. DONIGER: Well, I am also just going
05:48:30 to -- let me interpose an objection. This
05:48:31 potentially calls for attorney-client
05:48:32 communications, and to the extent your understanding
05:48:35 is solely given by conversations with counsel, I'm
05:48:39 going to instruct you not to answer. If you have an
05:48:41 independent understanding, go ahead.
05:48:43 THE WITNESS: Okay. I can't answer that.
05:48:46 MR. KOONCE: If I could have five minutes
05:48:47 just to make sure I don't have anything further, I
05:48:49 think we're almost done.
05:48:49 MR. DONIGER: Yeah. Great -- great job.
05:48:50 MR. KOONCE: Okay. So just give me five
05:48:52 to take a look, and then we'll --
05:48:52 THE VIDEO TECHNICIAN: Double-checking,
05:48:53 would you like to go off the record?
05:48:55 MR. KOONCE: Yes, please.
05:48:57 THE VIDEO TECHNICIAN: The time is
05:49:00 5:49 p.m. We are off the record.

05:49:01 (Recess from 5:49 p.m. to 5:56 p.m.)

05:56:33 THE VIDEO TECHNICIAN: The time is
05:56:37 5:56 p.m. We are back on the record.

05:56:39 MR. KOONCE: I have no further questions.

05:56:39 MR. DONIGER: I don't know if Ms. Nashon
05:56:40 has any follow-up?

05:56:40 MS. NASHON: I don't have any follow-up
05:56:42 questions. I'm just leaving the deposition open for
05:56:46 a second session to be coordinated with counsel and
05:56:52 the parties, and we're happy to do that via Zoom.

05:56:58 MR. DONIGER: Okay.

05:56:59 THE WITNESS: Thank you.

05:57:00 MR. KOONCE: That's fine.

05:57:01 THE VIDEO TECHNICIAN: Before we go off,
05:57:01 can we get transcript orders and video orders?

05:57:03 MS. NASHON: I --

05:57:05 MR. DONIGER: Yeah. Well, actually,
05:57:05 before we go off, I have a very -- a relatively
05:57:07 short list of things that I instructed not to answer
05:57:10 that you seem to have an issue with. Do you want to
05:57:14 confer on any of those right now and see if there's
05:57:17 anything to work out?

05:57:19 MS. NASHON: I don't have an equivalent
05:57:21 list. I would need to look at the transcript.

05:57:24 MR. DONIGER: Okay.

05:57:24 MS. NASHON: It's hard for me to imagine that my list would be as short as you're representing your list to be.

05:57:31 MR. DONIGER: I'd be surprised if your list is much longer, but that's fine.

05:57:34 MS. NASHON: Okay. If there are things that you think would be productive to meet and confer on now and narrow the scope of the requested relief to the judge, we can do that.

05:57:45 THE WITNESS: May I -- may I ask if I could be excused to go while you do that?

05:57:49 (Overlapping speakers.)

05:57:49 MR. DONIGER: Yeah, let's go off the record then and we can talk about how to present whatever we --

05:57:52 THE VIDEO TECHNICIAN: Real quick --

05:57:54 MS. NASHON: And a rush.

05:57:56 THE VIDEO TECHNICIAN: Got it.

05:57:56 Would you like your video synchronized?

05:58:00 MS. NASHON: And a rough.

05:58:00 No.

05:58:00 THE VIDEO TECHNICIAN: No for you.

05:58:01 And then for you, Counsel, would you like to order a video?

05:58:06 MR. DONIGER: No. Sorry, no.

THE COURT REPORTER: Do you need to order the transcript, Counsel?

MR. DONIGER: Yeah. Let me get a rough of the transcript as well.

THE COURT REPORTER: Okay.

MR. DONIGER: And then I guess the regular transcript when it comes.

THE VIDEO TECHNICIAN: And then, Mr. Doniger, would you like to order a video or --

MR. DONIGER: I'm Mr. Doniger.

THE VIDEO TECHNICIAN: Oh, my apologies.

(Overlapping speakers.)

MR. KOONCE: With a hard G, not a soft G. Sorry.

MR. DONIGER: Don't let him put --

MR. KOONCE: Yeah, I would like a synced video and --

THE VIDEO TECHNICIAN: Synced video?

MR. KOONCE: No, I'm kidding.

A rough, yes, and then regular delivery on the final. But I don't need the video.

THE VIDEO TECHNICIAN: Copy that. Concluding now.

This ends Volume I of the video deposition of Lynne Freeman in the matter of Lynne Freeman v.

05:58:48 Tracy Deebs-Elkenaney, et al. The time is 5:58 p.m.
05:58:51 We are off the record.
05:58:55 (Deposition suspended at 5:58 p.m.)